UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

JAMIL ABDUL MUHAMMAD,

               Plaintiff,

v.                                                                          3:24-CV-0037
                                                                            (DNH/ML)
MICHAEL L. BREEN, Town Justice;
SCHOHARIE TOWN COURT; R.
GILMAN, New York State Police
Trooper; NEW YORK STATE POLICE
DEP'T; and MRS. KENNEDY, Court
Clerk,

               Defendants.

---

APPEARANCES:                                                OF COUNSEL:

JAMIL ABDUL MUHAMMAD
  Plaintiff, *Pro Se*
119 Clinton Street, Apartment 5
Binghamton, New York 13905

MIROSLAV LOVRIC, United States Magistrate Judge

## ORDER and REPORT-RECOMMENDATION

       The Clerk has sent this *pro se* Complaint (Dkt. No. 1) together with an amended

application to proceed *in forma pauperis* ("IFP") (Dkt. No. 7) filed by Jamil Abdul Muhammad

("Plaintiff") to the Court for review.  For the reasons discussed below, I (1) grant Plaintiff's

amended IFP application (Dkt. No. 7), and (2) recommend that Plaintiff's Complaint (Dkt. No.

1) be dismissed (1) in part with leave to amend, and (2) in part without leave to amend.

I.       **BACKGROUND**

Liberally construed,[1] Plaintiff's Complaint asserts that his rights were violated by Defendants Michael L. Breen, Schoharie Town Court, R. Gilman, New York State Police Department ("Defendant NYSP"), and Mrs. Kennedy (collectively "Defendants"), who were involved in a traffic infraction charge that was issued to Plaintiff.  (*See generally* Dkt. No. 1.)

The Complaint alleges that on February 17, 2021, Plaintiff was driving on the highway when he was pulled over by Defendant Gilman, who accused Plaintiff of speeding.  (Dkt. No. 1 at 6.)  Plaintiff alleges that Defendant Gilman made a comment during the traffic stop that "when you hunt[,] you hunt the biggest catch."  (*Id*.)

The Complaint alleges that Plaintiff appeared before Defendant Breen and informed him that he wanted a trial on the traffic ticket.  (Dkt. No. 1 at 6.)  The Complaint alleges that on December 27, 2023, Plaintiff attended the traffic ticket trial and Defendant Gilman acted as both a witness and the prosecutor.  (*Id*.)

The Complaint alleges that during the trial, Plaintiff questioned Defendant Gilman about his hunting comment during the traffic stop and Defendant Gilman refused to answer the question.  (Dkt. No. 1 at 7.)  The Complaint alleges that Defendant Gilman denied being racist and failed to produce body camera footage to Plaintiff.  (*Id*.)  The Complaint alleges that Plaintiff moved to dismiss the case for failure to produce *Rosario* material and Defendant Breen denied Plaintiff's motion.  (*Id*.)  Plaintiff alleges that Defendant Gilman admitted, while on the witness stand, that other vehicles were "traveling in the front[,] along side, [and] in the back of [Plaintiff's] vehicle."  (*Id*.)  The Complaint alleges that Plaintiff argued the defense of

---

[1]       The court must interpret *pro se* complaints to raise the strongest arguments they suggest. *Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)).

justification but that Defendant Breen denied Plaintiff's second motion seeking dismissal of the charges.  (*Id*.)

The Complaint alleges that Plaintiff informed Defendant Breen that African Americans are pulled over more often than white drivers and again accused Defendant Gilman of using "racist tactics" against Plaintiff.  (Dkt. No. 1 at 7.)

The Complaint alleges that at the conclusion of the trial, Defendant Gilman stated he remembered what he said to Plaintiff during the traffic stop and again repeated that "as a skilled deer hunter[,] I hunt the biggest catch."  (Dkt. No. 1 at 8.)

The Complaint alleges that Defendant Breen found Plaintiff guilty of the offense—which resulted in four points attaching to Plaintiff's driver's license—and imposed a fine of $193.00. (Dkt. No.1 at 8.)  The Complaint alleges that Plaintiff requested a receipt of the penalty and was provided a document by Defendants Breen and Kennedy that stated "The court has accepted your guilty plea for the charges listed above."  (*Id*.)  The Complaint alleges that Defendant Breen "fraudulently ordered [Defendant Kennedy] to forge an illegal disposition of a court filing . . . [as] having plead[ed] guilty."  (*Id*.)

Based on these factual allegations, the Complaint appears to assert the following four causes of action: (1) a claim that Defendants violated Plaintiff's right to equal protection of the law in violation of the Fourteenth Amendment and 42 U.S.C. § 1983; (2) a claim that Defendants violated Plaintiff's right to due process pursuant to the Fourth Amendment and 42 U.S.C. § 1983; (3) a claim that Plaintiff was discriminated against in violation of the Americans with Disabilities Act ("ADA"); and (4) a claim that Defendants violated N.Y. Penal Law § 195.00. (*See generally* Dkt. No. 1.)  In addition, the Complaint mentions the Fifth, Seventh, Eighth, and Ninth Amendments, Plaintiff's "right to travel," Plaintiff's right to life, liberty, and the pursuit of

happiness, and Title VI of the Civil Rights Act of 1964 as having been violated by Defendants. (*Id*.)

As relief, Plaintiff seeks $100,000,000.00 in damages, a direction that "Internal Affairs" conduct a "full investigation" of Defendants, disbarment of Defendant Breen, and that the fine and surcharge of $193.00 and four points on Plaintiff's driver's license be waived.  (Dkt. No. 1 at 8-9.)

On January 19, 2024, Plaintiff filed a "Supplement" to the Complaint, which appears to be the first page of the form complaint for a civil case and contains no additional information or allegations.[2]  (Dkt. No. 4.)

On February 6, 2024, Plaintiff filed another "Supplement" to the Complaint, which appears to be a page from one of the District's form complaints.[3]  (Dkt. No. 5.)  This Supplement identifies, among other things, 18 U.S.C. § 241 and the "No-FEAR Act" as bases for relief.[4] (*Id*.)

On March 15, 2024, Plaintiff filed another "Supplement" to the Complaint.[5]  (Dkt. No. 8.)  This "Supplement" is difficult to decipher and largely contains jargon.  (*Id*.)

Plaintiff also filed an amended application to proceed IFP.  (Dkt. No. 7.)

---

[2]     Pursuant to Fed. R. Civ. P 15(d) "[o]n motion and reasonable notice, the court may . . . permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented."  Plaintiff failed to file a motion to supplement.  In addition, the "Supplement" filed by Plaintiff does not relate to events that occurred after the Complaint was filed on January 9, 2024.

[3]     *See*, *supra*, note 2.

[4]     Notification and Federal Employee Antidiscrimination and Retaliation Act "(No Fear Act"), 5 U.S.C. § 2301 *et seq.*

[5]     *See*, *supra*, note 2.

## II.     PLAINTIFF'S AMENDED APPLICATION TO PROCEED *IN FORMA PAUPERIS*

When a civil action is commenced in a federal district court, the statutory filing fee, currently set at $405, must ordinarily be paid.  28 U.S.C. § 1914(a).  A court is authorized, however, to permit a litigant to proceed IFP status if a party "is unable to pay" the standard fee for commencing an action.  28 U.S.C. § 1915(a)(1).[6]  After reviewing Plaintiff's amended IFP application (Dkt. No. 7), the Court finds that Plaintiff meets this standard.  Therefore, Plaintiff's amended application to proceed IFP is granted.[7]  (*Id.*)

## III.    LEGAL STANDARD FOR INITIAL REVIEW OF COMPLAINT

"Notwithstanding any filing fee, or any portion thereof, that may have been paid, the court shall dismiss the case at any time if the court determines that . . . the action . . . (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief."  28 U.S.C. § 1915(e)(2).

In determining whether an action is frivolous, the court must consider whether the complaint lacks an arguable basis in law or in fact.  *Neitzke v. Williams*, 490 U.S. 319, 325 (1989).  Dismissal of frivolous actions is appropriate to prevent abuses of court process as well as to discourage the waste of judicial resources.  *Neitzke*, 490 U.S. at 327; *Harkins v. Eldridge*, 505 F.2d 802, 804 (8th Cir. 1974); *see Fitzgerald v. First East Seventh Street Tenants Corp.*, 221

---

[6]     The language of that section is ambiguous because it suggests an intent to limit availability of IFP status to prison inmates.  *See* 28 U.S.C. § 1915(a)(1) (authorizing the commencement of an action without prepayment of fees "by a person who submits an affidavit that includes a statement of all assets such prisoner possesses").  The courts have construed that section, however, as making IFP status available to any litigant who can meet the governing financial criteria.  *Hayes v. United States*, 71 Fed. Cl. 366, 367 (Fed. Cl. 2006); *Fridman v. City of N.Y.*, 195 F. Supp. 2d 534, 536 n.1 (S.D.N.Y. 2002).

[7]     Plaintiff is reminded that, although his IFP application has been granted, he is still required to pay fees that he may incur in this action, including copying and/or witness fees.

F.3d 362, 364 (2d Cir. 2000) (a district court "may dismiss a frivolous complaint *sua sponte* even when the plaintiff has paid the required filing fee[.]"); *see also Pflaum v. Town of Stuyvesant, Columbia Cnty., N.Y.*, 11-CV-0335, 2016 WL 865296, at *1, n.2 (N.D.N.Y. Mar. 2, 2016) (Suddaby, C.J.) (finding that the Court had the power to address and dismiss additional theories of the plaintiff's retaliation claim *sua sponte* because those theories were so lacking in arguable merit as to be frivolous).

In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia*, "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (emphasis added) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 [2007]). "Determining whether a complaint states a plausible claim for relief . . . requires the . . . court to draw on its judicial experience and common sense. . . . [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not shown–that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (internal citation and punctuation omitted).

"In reviewing a complaint . . . the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994) (citation omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

Courts are "obligated to construe a pro se complaint liberally." *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009); *see also Nance v. Kelly*, 912 F.2d 605, 606 (2d Cir. 1990) (per curiam) (reading the plaintiff's *pro se* complaint "broadly, as we must" and holding that the complaint sufficiently raised a cognizable claim). "[E]xtreme caution should be exercised in ordering sua sponte dismissal of a pro se complaint before the adverse party has been served and [the] parties . . . have had an opportunity to respond." *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983).

## IV.   ANALYSIS

In addressing the sufficiency of a plaintiff's complaint, the court must construe his pleadings liberally. *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008). Having reviewed Plaintiff's Complaint with this principle in mind, I recommend that the Complaint be dismissed in its entirety.

### A.   Claims Seeking Criminal Charges

Plaintiff's claims pursuant to 18 U.S.C. § 241 and N.Y. Penal Law § 195.00 cannot proceed.

There is no private right of action to enforce state or federal criminal statutes. *See generally Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973) ("[A] private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another."); *see also Walker v. CIBC Ltd.*, 20-CV-1337, 2021 WL 3518439, at *5 (N.D.N.Y. Apr. 13, 2021) (Hummel, M.J.) ("It appears plaintiff is either seeking the criminal prosecution of an individual or individuals or a law enforcement investigation, which is beyond this Court's jurisdiction."), *report-recommendation adopted by* 2021 WL 3204860 (N.D.N.Y. July 29, 2021) (McAvoy, J.); *McFadden v. Ortiz*, 12-CV-1244, 2013 WL 1789593, at *3 (N.D.N.Y. Apr. 26, 2013)

(D'Agostino, J.) (holding that "there is no private right of action to enforce either state or federal criminal statutes.").

As a result, I recommend dismissal of Plaintiff's claims that are premised on alleged violations of federal or state criminal laws. *See Polinski v. Oneida Cnty. Sheriff*, 23-CV-0316, 2023 WL 2988753, *4 (N.D.N.Y. Apr. 18, 2023) (Lovric, M.J.) (citing *inter alia*, *Hall v. Sampson*, 21-CV-4839, 2022 WL 2068248, at *2 n.2 (E.D. Pa. June 8, 2022) (holding that the plaintiff cannot bring criminal charges against the defendants through a private lawsuit and that claims pursuant to 18 U.S.C. § 241 do not give rise to a civil cause of action); *Walthour v. Herron*, 10-01495, 2010 WL 1877704, at *2 (E.D. Pa. May 6, 2010) (recognizing no private right of action under 18 U.S.C. § 241)) (recommending dismissal of the plaintiff's claims pursuant to the New York State Penal Law and 18 U.S.C. § 241), *report and recommendation adopted by*, 2023 WL 3344060 (N.D.N.Y. May 10, 2023) (Hurd, J.), *appeal dismissed by* 2023 WL 8357375 (2d Cir. Oct. 12, 2023).

### B.     Claims Pursuant to the ADA

The ADA "forbids discrimination against persons with disabilities in three major areas of public life: employment, which is covered by Title I of the statute; public services, programs, and activities, which are the subject of Title II; and public accommodations, which are covered by Title III." *Tennessee v. Lane,* 541 U.S. 509, 516-17 (2004).  In addition, "Title V of the ADA, sometimes referred to as the 'retaliation provision,'" prohibits retaliation against individuals "engaged in activity protected by the ADA." *Griffiths v. Saint Josephs Hosp.*, 22-CV-0199, 2022 WL 1271533, at *3 n.5 (N.D.N.Y. Apr. 5, 2022) (Dancks, M.J.) (citing *Chiesa v. New York State Dep't of Labor*, 638 F. Supp. 2d 316, 323 (N.D.N.Y. 2009) (Hurd, J.)), *report and recommendation adopted*, 2022 WL 1265761 (N.D.N.Y. Apr. 28, 2022) (Hurd, J.).

"[T]here is no individual liability under the ADA." *Gomez v. N.Y.C. Police Dep't*, 191 F. Supp. 3d 293, 302–03 (S.D.N.Y. 2016).  As a result, I recommend that Plaintiff's ADA claim against Defendants Breen, Gilman, and Kennedy, be dismissed with prejudice.

With respect to Plaintiff's ADA claim against Defendants Schoharie Town Court and NYSP, I recommend that it be dismissed for failure to state a claim upon which relief may be granted.[8]

> To establish a prima facie violation under Title II of the ADA . . . , a plaintiff must show: "that 1) he is a qualified individual with a disability; 2) [defendants are] entit[ies] subject to the acts; and 3) he was denied the opportunity to participate in or benefit from [defendants'] services, programs, or activities or [defendants] otherwise discriminated against him by reason of his disability."

*Rivera v. Quiros*, 23-CV-0227, 2024 WL 363193, at *6 (D. Conn. Jan. 31, 2024) (quoting *Wright v. New York State Dep't of Corr.*, 831 F.3d 64, 72 (2d Cir. 2016)).  There are "three available theories" of discrimination that can be used to establish the third prong of an ADA claim: "(1) intentional discrimination (disparate treatment); (2) disparate impact; and (3) failure to make a reasonable accommodation." *Fulton v. Goord*, 591 F.3d 37, 43 (2d Cir. 2009).

---

[8]    Based on the facts alleged, Plaintiff could not proceed with a claim under Title I of the ADA, which addresses employment discrimination, because he has not alleged that he was employed by Defendants.  42 U.S.C. § 12117; *see Mary Jo C. v. New York State and Local Retirement Sys.*, 707 F.3d 144, 169 (2d Cir. 2013) ("Title I of the ADA expressly deals with th[e] subject of employment discrimination . . . .") (citation and internal quotation marks omitted). Title III of the ADA is "not applicable to public entities" and thus, is inapplicable here where Defendants NYSP and Schoharie Town Court are public entities.  *Morales v. New York*, 22 F. Supp. 3d 256, 266-67 (S.D.N.Y. 2014) (citing cases).  Moreover, Title IV of the ADA does not appear to be applicable to Plaintiff's claims because Title IV prohibits disability discrimination in telecommunications.  *See Genco v. Sargent & Collins LLP*, No. 18-CV-0107, 2018 WL 3827742, at *3, n.5 (W.D.N.Y. June 4, 2018).  Lastly, Title V of the ADA, sometimes referred to as the "retaliation provision," also does not appear applicable because Plaintiff does not allege that he engaged in activity protected by the ADA, that Defendants were aware of that activity, or any causal connection between the allegedly adverse actions that Defendants took against him and the protected activity.  *See Chiesa v. New York State Dep't of Labor*, 638 F. Supp. 2d 316, 323 (N.D.N.Y. 2009) (Hurd, J.).

Assuming, without deciding, that Plaintiff adequately alleged that he is a qualified individual with a disability and Defendants Schoharie Town Court and NYSP are entities subject to the acts, Plaintiff has failed to sufficiently plead that Defendants "denied [him] the opportunity to participate in or benefit from public services, programs, or activities, or has otherwise discriminated against him, by reason of his disability rather than a legitimate nondiscriminatory reason." *Tsuma v. Costello*, 22-CV-0067, 2022 WL 1036819, at *8 (D. Conn. Apr. 6, 2022). More specifically, Plaintiff has not alleged facts plausibly suggesting that Defendants Schoharie Town Court and NYSP discriminated against him on the basis of his disability. *See Franks v. Eckert*, 18-CV-0589, 2020 WL 4194137, at *4 (W.D.N.Y. July 21, 2020) ("Although [the p]laintiff has alleged he was denied some of his requested reasonable accommodations, there are no facts in the Amended Complaint to suggest that [the d]efendants refused to allow [the p]laintiff to participate in any program or activity because of his disability"); *see also Rosado v. Herard*, 12-CV-8943, 2014 WL 1303513, at *6 (S.D.N.Y. Mar. 25, 2014) (dismissing ADA claims where the plaintiff failed to "plead[ ] facts demonstrating that he was denied access to therapeutic group sessions because of a disability"). Instead, the Complaint asserts that Plaintiff informed Defendant Breen he is a recipient of "Medical S.S.I. Disability" and Defendant Breen granted Plaintiff over one month to pay the imposed fine. (Dkt. No. 1 at 8.) The Complaint fails to allege that he was mistreated because of his physical disabilities. *See Moran v. Deamelia*, 17-CV-0422, 2017 WL 2805160, at *3 (N.D.N.Y. Apr. 20, 2017) (Hummel, M.J.) ("Although [the] defendants may have been aware of [the] plaintiff's alleged disabilities because his underlying discrimination complaint against his former employer filed with the NYSDHR appears to have been based, in part, on his disabilities, he offers not even a scintilla of proof that the alleged misconduct was 'motivated' by his major depressive disorder and ADHD."), *report and*

*recommendation adopted*, 17-CV-0422, 2017 WL 2804941 (N.D.N.Y. June 28, 2017) (McAvoy, J.).  Indeed, there are no facts to suggest that Defendants were even aware of what Plaintiff's disability was.  *See, e.g., Costabile v. New York Dist. Council of Carpenters*, 17-CV-8488, 2018 WL 4300527, at *5 (S.D.N.Y. Sept. 10, 2018) (dismissing the plaintiff's discrimination claim under the ADA because he failed to allege that the defendants were aware of his disability, and, thus, "fail[ed] to plead even a barebones claim of disability discrimination").  Moreover, Plaintiff does not identify what public services, programs, or activities he was denied the opportunity to participate in or benefit from.  *See Cordero v. Semple*, 696 F. App'x 44, 45 (2d Cir. 2017) (summary order) (affirming the dismissal of an ADA claim because the plaintiff "did not allege that his conditions prevented him from participating in any programs or activities").  It is, therefore, recommended that Plaintiff's ADA claim against Defendants Schoharie Town Court and NYSP be dismissed for failure to state a claim upon which relief may be granted.

### C.     Claims Pursuant to 42 U.S.C. § 1983

For the reasons set forth below, I recommend that Plaintiff's claims pursuant to 42 U.S.C. § 1983 be dismissed.

#### 1.     Claims Against Defendant Breen

Judges are absolutely immune from suit for claims seeking damages for any actions taken within the scope of their judicial responsibilities.  *See Mireles v. Waco*, 502 U.S. 9, 11-12 (1991).  Generally, "acts arising out of, or related to, individual cases before [a] judge are considered judicial in nature."  *Bliven v. Hunt*, 579 F.3d 204, 210 (2d Cir. 2009).  "[E]ven allegations of bad faith or malice cannot overcome judicial immunity."  *Bliven*, 579 F.3d at 209.  Judicial immunity does not apply when a judge takes action outside his or her judicial capacity, or when a judge takes action that, although judicial in nature, is taken "in the complete absence of all

jurisdiction."  *Mireles* 502 U.S. at 11-12; *see also Bliven,* 579 F.3d at 209-10 (describing actions that are judicial in nature).  However, "the scope of [a] judge's jurisdiction must be construed broadly where the issue is the immunity of the judge."  *Stump v. Sparkman*, 435 U.S. 349, 356 (1978).

Plaintiff asserts claims that appear to arise from the efforts of Defendant Breen in his capacity as a judge in Schoharie Town Court.  (Dkt. No. 1 at 2.)  Defendant Breen is therefore immune from suit under the doctrine of judicial immunity.  As a result, I recommend that Plaintiff's claims against Defendant Breen in his individual capacity be dismissed based on the doctrine of judicial immunity.

Moreover, I recommend that Plaintiff's claims against Defendant Breen in his official capacity be dismissed pursuant to the Eleventh Amendment.  *See Sundwall v. Leuba*, 28 F. App'x 11, 12 (2d Cir. 2001) (citing *K & A Radiologic Tech. Servs., Inc. v. Comm'r of the Dep't of Health*, 189 F.3d 273, 278 (2d Cir. 1999)) (holding that "state officers, if sued in their official capacities, are immunized from suit by private citizens under the Eleventh Amendment."); *King v. New York State*, 23-CV-3421, 2023 WL 5625440, at *4 (E.D.N.Y. Aug. 31, 2023) (citing *Thomas v. Martin-Gibbons*, 857 F. App'x 36, 37 (2d Cir. 2021) (affirming dismissal of *pro se* Section 1983 claims against the State of New York and a state court judge in his official capacity based on Eleventh Amendment immunity)) ("Eleventh Amendment immunity extends to state officials acting in their official capacities, including state court judges."); *Aron v. Becker*, 48 F. Supp. 3d 347, 366-67 (N.D.N.Y. 2014) (McAvoy, J.) (dismissing the plaintiff's claims against a state court judge in his official capacity based on the doctrine of Eleventh Amendment immunity).

### 2.      Claims Against Defendant Schoharie Town Court

New York State is immune from suits pursuant to 42 U.S.C. § 1983 seeking either legal

or equitable relief, under the Eleventh Amendment.  *Papasan v. Allain,* 478 U.S. 265, 276

(1986); *Pennhurst State School & Hosp. v. Halderman,* 465 U.S. 89, 98-100 (1984); *see*

*Ognibene v. Niagara Cnty. Sheriff's Dep't*, 03-CV-0678, 2003 WL 24243989, at *3 (W.D.N.Y.

Dec. 1, 2003) ("To the extent the plaintiff names various state courts as defendants and seeks

either legal or equitable relief against them under § 1983, they are immune from such suit under

the Eleventh Amendment.").  As an agency or arm of the State of New York, Defendant

Schoharie Town Court is immune from suit under the Eleventh Amendment.  *See Kentucky v.*

*Graham,* 473 U.S. 159, 166 (1985); *Bonilla v. Connerton*, 15-CV-1276, 2016 WL 2765287, at

*4 (N.D.N.Y. Apr. 14, 2016) (Peebles, M.J.) (recommending dismissal of the claims to the

extent that they seek monetary damages against the "Binghamton City Court" as barred by the

Eleventh Amendment), *report and recommendation adopted by*, 2016 WL 2760373 (N.D.N.Y.

May 12, 2016) (Kahn, J.); *see also Mercado v. Town of Goshen*, 20-CV-5399, 2020 WL

5210949, at *3 (S.D.N.Y. Aug. 28, 2020) ("Plaintiff sues the 'Orange County Court,' which is

part of the New York State Unified Court System. The Court therefore dismisses Plaintiff's §

1983 claims against this Defendant under the doctrine of Eleventh Amendment immunity and

because these claims are frivolous."); *Curto v. Palisades Collection, LLC*, 07-CV-529S, 2008

WL 11357852, at *4 (W.D.N.Y. Mar. 10, 2008) (dismissing the plaintiff's claims against the

"New York State Unified Court System, 8th Judicial District Buffalo City Court" as barred by

the Eleventh Amendment); *Saint-Fleur v. City of New York,* 99-CV-10433, 2000 WL 280328, *2

(S.D.N.Y., Mar. 14, 2000) (collecting cases) ("State courts, as arms of the State, are entitled to

Eleventh Amendment immunity from suit in federal court."); *Fields v. Walthers,* 94-CV-1659,

1997 WL 204308 at *2 (N.D.N.Y. April 5, 1997) (Pooler, J.) ("For Eleventh Amendment purposes, governmental entities of the state that are considered 'arms of the state' receive Eleventh Amendment immunity.").

### 3. Claims Against Defendant Gilman

To the extent that the Complaint is construed against Defendant Gilman in his official capacity, I recommend that it be dismissed based on the doctrine of immunity set forth in the Eleventh Amendment. A claim against Defendant Gilman in his official capacity is essential a claim against Defendant NYSP. *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."); *Reynolds v. Giuliani*, 506 F.3d 183, 191 (2d Cir. 2007)("An official capacity suit against a public servant is treated as one against the governmental entity itself."). For the reasons set forth below in Part IV.D.4., I find that Defendant Gilman, in his official capacity, is immune from a suit for damages pursuant to 42 U.S.C. § 1983, and thus, recommend dismissal.

To the extent that the Complaint is construed against Defendant Gilman in his individual capacity, I recommend that it be dismissed.

### a. Equal Protection

Plaintiff alleges that Defendant Gilman violated his Fourteenth Amendment right to equal protection. A successful equal protection claim requires a plaintiff to "allege facts showing that the plaintiff was treated differently from similarly situated individuals and that the reason for the different treatment was based on 'impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.'" *Morgan v. Semple*, 16-CV-0225, 2020 WL 2198117, at *19 (D. Conn. 2020) (quoting

*Diesel v. Town of Lewisboro*, 232 F.3d 92, 103 (2d Cir. 2000)); *accord Mitchell v. Martin*, 23-CV-0902, 2023 WL 8114344, at *7 (D. Conn. Nov. 22, 2023).

There are two avenues for pursing an equal protection claim: (1) a selective enforcement claim, and (2) a class of one claim.

In order to sustain a selective treatment claim a plaintiff must show that: (1) compared with others similarly situated, they were selectively treated; and (2) "such treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Crowley v. Courville*, 76 F.3d 47, 52–53 (2d Cir. 1996).

Absent a suspect classification, a plaintiff may proceed under a "class of one" theory by "alleg[ing] that [he] has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Fortress Bible Church v. Feiner*, 694 F.3d 208, 222 (2d Cir. 2012) (quoting *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)).

The Complaint fails to allege facts plausibly suggesting that Plaintiff was treated differently based on his race (or any other suspect classification).  (*See generally* Dkt. No. 1.) Instead, the Complaint implies[9] that there is a history of racism against Black people dating back to slavery and because Plaintiff was pulled over and issued a speeding ticket, it must have been because he is Black.  (Dkt. No. 1 at 6.)  These allegations are insufficient to plausibly suggest an equal protection claim.  Although Plaintiff alleges that there were other vehicles traveling around him when he was pulled over, the Complaint fails to allege that those vehicles were traveling at

---

[9]     The Complaint does not clearly make this connection but construing all reasonable inferences in Plaintiff's favor, it could be inferred.

the same rate of speed as he was and—perhaps more significantly—it fails to allege facts

plausibly suggesting the race of the individuals operating those vehicles.  (*See generally* Dkt. No.

1.)  Moreover, Plaintiff fails to present any comparators who are "*prima facie* identical" to him

and who were treated differently.  *Conquistador v. Corcella*, 22-CV-0992, 2023 WL 3006806, at

*2 (D. Conn. Apr. 19, 2023) (quoting *Hu v. City of New York*, 927 F.3d 81, 92 (2d Cir. 2019)

As a result, I recommend that Plaintiff's equal protection claim be dismissed for failure to

state a claim upon which relief may be granted.

**b.    Due Process**

The Due Process Clause protects procedural and substantive rights.[10]  *Page v. Cuomo*,

478 F. Supp. 3d 355, 370 (N.D.N.Y. 2020) (Hurd, J.).  Procedural due process requires that "a

deprivation of life, liberty, or property be preceded by notice and opportunity for hearing

appropriate to the nature of the case."  *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542

(1985).

"To assert a violation of procedural due process rights, a plaintiff must first identify a

property right, second show that the state has deprived him of that right, and third show that the

deprivation was effected without due process."  *Ferreira v. Town of E. Hampton*, 56 F. Supp. 3d

211, 225 (E.D.N.Y. 2014) (citation omitted).  "Notice and an opportunity to be heard are the

hallmarks of due process."  *Ferreira*, 56 F. Supp. 3d at 225.

---

[10]    To the extent Plaintiff's Complaint might be understood to raise a substantive due process claim, I recommend that it also be dismissed.  Substantive due process protects against government action that is "arbitrary, conscience shocking, or oppressive in a constitutional sense," but not against official conduct that is merely "incorrect or ill-advised."  *Page v. Cuomo*, 478 F. Supp. 3d 355, 371 (N.D.N.Y. 2020) (Hurd, J.) (citation omitted).  In other words, "substantive due process rights are violated only by conduct 'so outrageously arbitrary as to constitute a gross abuse of governmental authority.'"  *Puckett v. City of Glen Cove*, 631 F. Supp. 2d 226, 237 (E.D.N.Y. 2009) (quoting *Natale v. Town of Ridgefield*, 170 F.3d 258, 263 (2d Cir. 1999)).  There is no such outrageous conduct alleged here.

The crux of Plaintiff's due process claim against Defendant Gilman appears to be Plaintiff's belief that Defendant Gilman—as a police officer—was unqualified to also serve as the prosecutor during the traffic infraction trial.  However, in New York State "the prosecution of petty crimes or offenses may be delegated to subordinates or other public or administrative officers and even to private attorneys." *People v. Soddano*, 86 N.Y.2d 727, 728 (N.Y. 1995) (citing *People v. DeLeyden*, 10 N.Y.2d 293, 294 (N.Y. 1961) (prosecution by deputy sheriff who made the speeding charge); *People v. Czajka*, 11 N.Y.2d 253, 254 (N.Y. 1962) (prosecution of traffic offense by deputy town attorney)).

Plaintiff was permitted to raise his concerns regarding the delegation of prosecutorial authority to Defendant Gilman during his traffic infraction prosecution.  *Matter of Jeffryes v. Vance*, 58 Misc. 3d 185, 189 (N.Y. Sup. Ct. New York Cnty. 2017) (citing *Cayuga Indian Nation of N.Y. v. Gould*, 14 N.Y.3d 614, 633-34 (N.Y. 2010); *Matter of Morgenthau v. Erlbaum*, 59 N.Y.2d 143, 147 (N.Y. 1983); *Matter of Steingut v. Gold*, 42 N.Y.2d 311, 315 (N.Y. 1977); *Hurrell-Harring v. State of New York*, 15 N.Y.3d 8, 16 (N.Y. 2010)).  Moreover, since Plaintiff was convicted of the traffic infraction, he was permitted to appeal that adverse determination. *Matter of Jeffryes*, 58 Misc. 3d at 189 (citing *Cayuga Indian Nation of N.Y.*, 14 N.Y.3d at 634; *Matter of Dondi v. Jones*, 40 N.Y.2d 8, 13-14 (N.Y. 1976)).  Further, if, after conviction, the New York Appellate Term reversed the conviction, Plaintiff could bring an Article 78 proceeding to determine Defendant Gilman's liability and seek damages.  *Id*. at 189-90 (citing N.Y. C.P.L.R. 7806; *Morgenthau*, 59 N.Y.2d at 147-48; *Dondi*, 40 N.Y.2d at 14; *Matter of Gross v. Perales*, 72 N.Y.2d 231, 236 (N.Y. 1988); *Hughes Vill. Rest., Inc. v. Vill. Of Castleton-on-Hudson*, 46 A.D.3d 1044, 1047 (N.Y. App. Div. 3d Dep't 2007); *Metropolitan Taxicab Bd. of*

*Trade v. New York City Taxi & Limousine Comm'n*, 115 A.D.3d 521, 522 (N.Y. App. Div. 1st Dep't 2014)).

"It is well established that the availability of Article 78 proceedings . . . provide meaningful post-deprivation remedies sufficient to defeat a due process claim." *Mathurin v. Broome Cnty.*, 20-CV-0515, 2020 WL 4194415, at *5 (N.D.N.Y. June 25, 2020) (Lovric, M.J.), *report and recommendation adopted by*, 2020 WL 4192522 (N.D.N.Y. July 21, 2020) (Sharpe, J.).

As a result, I recommend that Plaintiff's due process claim against Defendant Gilman based on his role during Plaintiff's traffic infraction trial be dismissed for failure to state a claim upon which relief may be granted.

### 4.     Claims Against Defendant NYSP

The Eleventh Amendment to the United States Constitution bars federal courts from exercising subject matter jurisdiction over claims against a state or one of its agencies absent their consent to such a suit or an express statutory waiver of immunity. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 90-100 (1984). Congress did not abrogate the Eleventh Amendment immunity granted to the states when it enacted 42 U.S.C. § 1983 because it is well-settled that states are not "persons" under section 1983. *See Quern v. Jordan*, 440 U.S. 332, 240-41 (1979); *see also Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) (citation omitted).

The Eleventh Amendment's immunity extends to the New York State Police as an agency of the State of New York. *See, e.g., Riley v. Cuomo*, 17-CV-1631, 2018 WL 1832929, *4 (E.D.N.Y. Apr. 16, 2018) (holding that the New York State Police, as a division in the executive department of the State, is immune from claims under § 1983); *Finkelman v. New York State Police*, 06-CV-8705, 2007 WL 4145456, *3 (S.D.N.Y. Nov. 15, 2007) (holding that the Eleventh

Amendment barred the plaintiff's suit seeking monetary damages under § 1983 against New York State Police).

As a result, I recommend that Plaintiff's claims pursuant to 42 U.S.C. § 1983 against Defendant NYSP seeking monetary damages be dismissed.

### 5.   Claims Against Defendant Kennedy

Absolute immunity extends to nonjudicial officers who perform acts that "are integrally related to an ongoing judicial proceeding." *Mitchell v. Fishbein*, 377 F.3d 157, 172-73 (2d Cir. 2004). Plaintiff's Complaint identifies Defendant Kennedy as "Court Clerk" of Defendant Schoharie Town Court. (Dkt. No. 1 at 2, 8.) Quasi-judicial immunity protects court clerks from suit "for performance of tasks which are judicial in nature and an integral part of the judicial process." *Garcia v. Hebert*, 08-CV-0095, 2013 WL 1294412, at *12 (D. Conn. Mar. 28, 2013) (quoting *Rodriguez v. Weprin*, 116 F.3d 62, 66 (2d Cir. 1997)), *aff'd*, 594 F. App'x 26 (2d Cir. 2015) (summary order), *cert. denied*, No. 14-9720 (Oct. 5, 2015).

As a result, I recommend that Plaintiff's claims against Defendant Kennedy in her individual capacity be dismissed, because she is immune from suit. *See Leftridge v. Judicial Branch*, 22-CV-0411, 2023 WL 4304792, at *9 (D. Conn. June 30, 2023) (dismissing the plaintiff's claims against the state court clerks of court based on the doctrine of quasi-judicial immunity where "their alleged actions arose out of or related to [plaintiff]'s child support and child custody proceedings."); *Braithwaite v. Tropea*, 23-CV-1431, 2023 WL 4207907, at *4 (E.D.N.Y. June 27, 2023) (citing *Jackson v. Pfau*, 523 F. App'x 736, 737-38 (2d Cir. 2013) (affirming dismissal pursuant to Section 1915(e)(2)(B) of pro se plaintiff's Section 1983 claims against the Chief Clerks of several state courts based on the doctrine of judicial immunity)) (dismissing as frivolous the plaintiff's claims against the clerk of the court because he was

19

entitled to absolute immunity); *Mendez v. Johnson*, 22-CV-6811, 2022 WL 3587600, at *2

(S.D.N.Y. Aug. 22, 2022) (citing *inter alia, Chmura v. Norton, Hammersley, Lopez & Skokos*

*Inverso PA*, 17-CV-2164, 2018 WL 2138631, at *2 (D. Conn. May 9, 2018) (extending judicial

immunity to a clerk of court); *Manko v. Ruchelsman*, 12-CV-4100, 2012 WL 4034038, at *2

(E.D.N.Y. Sept. 10, 2012) (same)) (noting that courts have routinely granted judicial immunity

to "government officials, including clerks of court and other court employees, for their acts that

assist a judge in the performance of his or her judicial duties.").

Moreover, I recommend that Plaintiff's claims against Defendant Kennedy in her official

capacity as Court Clerk of the Schoharie Town Court be dismissed because the Schoharie Town

Court is an arm of the New York state court system and New York State is immune from suit

pursuant to the Eleventh Amendment.  *Braithwaite*, 2023 WL 4207907, at *4 (collecting cases)

(holding that the plaintiff's claims against the Chief Clerk of the Suffolk County Court in his

official capacity are barred by the Eleventh Amendment).

### D.    Additional Legal Grounds Listed

The Complaint also mentions the Fifth Amendment, Seventh Amendment, Eighth

Amendment, Ninth Amendment, Title VI of the Civil Rights Act, the "right to travel," the "right

to life, liberty, and the pursuit of happiness," and the No Fear Act as bases for relief.  Based on

my review, the Complaint fails to allege facts plausibly suggesting any claims pursuant to these

legal bases.

"The Fifth Amendment protects against compulsory self-incrimination by forbidding the

introduction of coerced statements into evidence at trial."  *Harris v. Doe*, 24-CV-0151, 2024 WL

1344697, at *3 (D. Conn. Mar. 29, 2024).  The Complaint fails to allege facts plausibly

suggesting that Plaintiff made any self-incriminating statements or that such statements were introduced as evidence during his trial.

The Seventh Amendment preserves "the right to trial by jury" for certain cases brought in federal court.  U.S. Const. amend. VII.  Since the *federal* judiciary determines the extent to which a litigant in *federal* court may try his or her case before a jury, *see e.g., Messa v. Goord*, 652 F.3d 305 (2d Cir. 2011), persons acting under the color of *state* law (*i.e.*, those persons who may be named as defendants in a § 1983 action) generally lack the capacity to violate the Seventh Amendment.  *See Kampfer v. Argotsinger*, 18-CV-0007, 2020 WL 906274 at *10 (N.D.N.Y. Feb. 25, 2020) (The Seventh Amendment does not "provide a [. . .] cause of action cognizable under § 1983." (citation and quotation omitted)).  As a result, I recommend that "'Plaintiff's citation to the Seventh Amendment [be construed] as support for h[is] request for a civil jury trial,' rather than as an independent basis for relief."  *Kampfer*, 2020 WL 906274, at *10 (citing *White v. City of New York*, 13-CV-7156, 2014 WL 4357466, at *8 n.13 (S.D.N.Y. Sept. 3, 2014)).

"[T]he Eighth Amendment applies only to convicted prisoners."  *Simpson v. Town of Warwick Police Dep't.*, 159 F. Supp. 3d 419, 443 (S.D.N.Y. 2016) (citing *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983)).  The Complaint fails to allege facts plausibly suggesting that Plaintiff was incarcerated after conviction of the traffic infraction.

"The Ninth Amendment cannot serve as the basis for a § 1983 claim."  *Rodriguez v. Burnett*, 22-CV-10056, 2024 WL 1466880, at *7 (S.D.N.Y. Apr. 4, 2024) (citing *Lloyd v. Lee*, 570 F. Supp. 2d 556, 566 (S.D.N.Y. 2008)).

"Title VI does not provide for individual liability."  *Sherman v. Yonkers Pub. Schs.*, 21-CV-7317, 2023 WL 137775, at *7 (S.D.N.Y. Jan. 9, 2023) (citing *Bayon v. State Univ. of N.Y. at*

*Buffalo*, 98-CV-0578, 2001 WL 135817, at *2 (W.D.N.Y. Feb. 15, 2001)).  Hence, I recommend

that Plaintiff's Title VI claim against Defendants Breen, Gilman, and Kennedy, be dismissed

with prejudice.  Moreover, to the extent that the Complaint is construed as asserting a claim

pursuant to Title VI against Defendants Schoharie Town Court and NYSP, I recommend that it

be dismissed.  Plaintiff's conclusory allegation—that "[a]s an African American we as a people

were hunted as slaves and hung , shot raped , and murdered for over 400 years , with sham courts

acquitting racist white men , police,judges , sheriffs, and numerous highly ranked officials

complicit and in collusion were at that time lawfull , legal killings of African American people"

(Dkt. No. 1 at 6 [errors in original])—is insufficient to plausibly suggest that Plaintiff was

discriminated against on the basis of race.  *See Grillo v. N.Y.C. Transit Auth.*, 291 F.3d 231, 235

(2d Cir. 2002) ("Even if [plaintiff's] highly dubious claim that he was unfairly singled out for

punishment by the instructors is credited, [plaintiff] has done little more than cite to his alleged

mistreatment and ask the court to conclude that it must have been related to his race.");

*Varughese v. Mount Sinai Med. Ctr.*, 12-CV-8812, 2015 WL 1499618, at *42 (S.D.N.Y. Mar.

27, 2015) ("fallacy" for the plaintiff to conclude: "I belong to a protected class; something bad

happened to me at work; therefore, it must have occurred because I belong to a protected class");

*Rissman v. Chertoff*, 08-CV-7352, 2008 WL 5191394, at *4 (S.D.N.Y. Dec. 12, 2008) ("In

essence, plaintiff alleges that because he was yelled at [by his supervisors], this must have been

because [of his protected status]. Such conclusory and speculative statements are insufficient.").

  "As the Supreme Court has explained, the 'right to travel' is something of a constellation

of rights:

> The 'right to travel' discussed in our cases embraces at least three different
> components. It protects the right of a citizen of one State to enter and to
> leave another State, the right to be treated as a welcome visitor rather than
> an unfriendly alien when temporarily present in the second State, and, for

those travelers who elect to become permanent residents, the right to be treated like other citizens of that State."

*Weisshaus v. Cuomo*, 512 F. Supp. 3d 379, 391 (E.D.N.Y. Jan. 11, 2021) (quoting *Saenz v. Roe*, 526 U.S. 489, 500 (1999)).  The Complaint fails to allege facts plausibly suggesting a claim pursuant to any of these components of the "right to travel."  (*See generally* Dkt. No. 1.) Moreover, "[t]o the extent Plaintiff means to argue that traffic enforcement violates his right to travel, that claim [should be] dismissed as frivolous."  *Johnson El v. Bird*, 19-CV-5102, 2020 WL 5124920, at *5 n.8 (S.D.N.Y. Aug. 31, 2020) (citing *Annan v. State of N.Y. Dep't of Motor Vehicles*, 15-CV-1058, 2016 WL 8189269, at *5 (E.D.N.Y. Mar. 2, 2016), *aff'd*, 662 F. App'x 85 (2d Cir. 2016) (summary order)).

Claims that Defendants deprived Plaintiff of his "right to life, liberty, and the pursuit of happiness" are not cognizable under 42 U.S.C. § 1983.  *Bones v. Cnty. of Monroe*, 23-CV-6201, 2023 WL 8809732, at *4 n.3 (W.D.N.Y. Dec. 20, 2023) (citing *Nguyen v. Ridgewood Sav. Bank*, 66 F. Supp. 3d 299, 307 (E.D.N.Y. 2014) (rejecting Section 1983 claim premised on the "vague invocation of the right to life, liberty and the pursuit of happiness")) (rejecting the plaintiff's claim that her "right to liberty" was violated because it "is not a cognizable claim, and the Court accordingly does not address it.").

Finally, to the extent that the Complaint and Supplements are construed as asserting a claim pursuant to the No Fear Act, I recommend that it be dismissed.  The No Fear Act is a law to protect federal employees from workplace discrimination and is not applicable to Plaintiff's case where he does not allege to be a federal employee.  Moreover, "[o]f the few courts that have considered claims made under the No Fear Act, none have found that the Act provides a private cause of action[.]"  *Zietek v. Pinnacle Nursing and Rehab Ctr.*, 21-CV-5488, 2024 WL 243436, at *5 (S.D.N.Y. Jan. 23, 2024) (citing *Baney v. Mukasey*, 06-CV-2064-L, 2008 WL 706917, at

*6 (N.D. Tex. Mar. 14, 2008); *see also Lee v. Saul,* 19-CV-6553, 2022 WL 1051216, at *12

(S.D.N.Y. Feb. 10, 2022); *Glaude v. United States,* 2007-5125, 2007 WL 2682957, at *2 (Fed.

Cir. Sept. 7, 2007); *Pedicini v. U.S.,* 480 F. Supp. 2d 438, 459 (D. Mass. 2007); *Mills v. Barreto,*

03-CV-0735, 2004 WL 3335448, at *3 (E.D. Va. Mar. 8, 2004)).

## V.    OPPORTUNITY TO AMEND

Generally, a court should not dismiss claims contained in a complaint filed by a *pro se*

litigant without granting leave to amend at least once "when a liberal reading of the complaint

gives any indication that a valid claim might be stated."  *Branum v. Clark*, 927 F.2d 698, 704-05

(2d Cir. 1991); *see also* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when

justice so requires.").  An opportunity to amend is not required, however, where "the problem

with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it."

*Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000); *see also Cortec Indus. Inc. v. Sum Holding

L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("Of course, where a plaintiff is unable to allege any fact

sufficient to support its claim, a complaint should be dismissed with prejudice.").  Stated

differently, "[w]here it appears that granting leave to amend is unlikely to be productive, . . . it is

not an abuse of discretion to deny leave to amend."  *Ruffolo v. Oppenheimer & Co.*, 987 F.2d

129, 131 (2d Cir. 1993); *accord, Brown v. Peters*, 95-CV-1641, 1997 WL 599355, at *1

(N.D.N.Y. Sept. 22, 1997) (Pooler, J.).[11]

---

[11]     *See also Carris v. First Student, Inc.*, 132 F. Supp. 3d 321, 340-41 n.1 (N.D.N.Y. 2015)
(Suddaby, C.J.) (explaining that the standard set forth in *Gomez v. USAA Fed. Sav. Bank*, 171
F.3d 794, 796 (2d Cir. 1999)—that the Court should grant leave to amend "unless the court can
rule out any possibility, however unlikely it might be, that an amended complaint would be
successful in stating a claim"—is likely not an accurate recitation of the governing law after *Bell
Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)), *rev'd on other grounds*, 682 F. App'x 30.

Here, better pleading could not cure the deficiencies described above with respect to the following claims: (1) claims pursuant to N.Y. Penal Law § 195.00 and 18 U.S.C. § 241; (2) ADA claim against Defendants Breen, Gilman, and Kennedy; and (3) claims pursuant to 42 U.S.C. § 1983 against (a) Defendant Breen, (b) Defendant Schoharie Town Court, (c) Defendant Gilman in his official capacity, (d) Defendant NYSP, and (e) Defendant Kennedy.  As a result, I recommend that those claims be dismissed without leave to replead.

Out of an abundance of caution and in deference to Plaintiff's *pro se* status, the undersigned recommends that Plaintiff be granted leave to amend the following claims to cure the defects as stated above: (1) ADA claim against Defendants NYSP and Schoharie Town Court; and (2) Section 1983 claims against Defendant Gilman in his individual capacity.

If Plaintiff chooses to avail himself of an opportunity to amend, such amended pleading must set forth a short and plain statement of the facts on which he relies to support any legal claims asserted. Fed. R. Civ. P. 8(a).  In addition, the amended complaint must include allegations reflecting how the individual(s) named as Defendant(s) are involved in the allegedly unlawful activity.  Finally, Plaintiff is informed that any amended complaint will replace the existing Complaint, and must be a wholly integrated and complete pleading that does not rely upon or incorporate by reference any pleading or document previously filed with the Court.  *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) ("It is well established that an amended complaint ordinarily supersedes the original, and renders it of no legal effect." (internal quotation marks omitted)).

**ACCORDINGLY**, it is

**ORDERED** that Plaintiff's amended IFP application (Dkt. No. 7) is **GRANTED**; and it is further respectfully

**RECOMMENDED** that the Court **DISMISS WITH LEAVE TO AMEND** the

Complaint (Dkt. No. 1) to the extent that it asserts the following claims: (1) an ADA claim

against Defendants NYSP and Schoharie Town Court; and (2) Section 1983 claims against

Defendant Gilman in his individual capacity, for failure to state a claim upon which relief may

be granted pursuant to 28 U.S.C. § 1915(e); and it is further respectfully

**RECOMMENDED** that the Court **DISMISS WITHOUT LEAVE TO AMEND** the

Complaint (Dkt. No. 1) to the extent that it asserts the following claims: (1) claims pursuant to

N.Y. Penal Law § 195.00 and 18 U.S.C. § 241; (2) ADA claim against Defendants Breen,

Gilman, and Kennedy; and (3) claims pursuant to 42 U.S.C. § 1983 against (a) Defendant Breen,

(b) Defendant Schoharie Town Court, (c) Defendant Gilman in his official capacity, (d)

Defendant NYSP, and (e) Defendant Kennedy, because it seeks relief from individuals who are

immune from such relief, and is otherwise frivolous pursuant to 28 U.S.C. § 1915(e); and it is

further

**ORDERED** that the Clerk of the Court shall file a copy of this Order and Report-

Recommendation on Plaintiff, along with copies of the unpublished decisions cited herein in

accordance with the Second Circuit's decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009)

(per curiam).

**NOTICE:** Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[12]  Such objections shall be filed with the Clerk of the Court.  **<u>FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW</u>**.  28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)).

Dated: June 11, 2024
        Binghamton, New York

Miroslav Lovric
U.S. Magistrate Judge

---

[12]     If you are proceeding *pro se* and served with this report, recommendation, and order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date that the report, recommendation, and order was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. P. 6(a)(1)(C).

2016 WL 865296

Only the Westlaw citation is currently available.

United States District Court, N.D. New York.

William PFLAUM, Individually and as a Citizen,
Resident and Taxpayer of Town of Stuyvesant, Plaintiff,

v.

TOWN OF STUYVESANT, COLUMBIA CTY.,
N.Y.; and Valerie Bertram, Individually and as
Supervisor of Town of Stuyvesant, Defendants.

1:11-CV-0335 (GTS/DJS)
|
Signed 03/02/2016

**Attorneys and Law Firms**

WILLIAM PFLAUM, Plaintiff, Pro Se [1], 3 Rybka Road, Box 40, Stuyvesant Falls, NY 12174.

BRYAN D. RICHMOND, ESQ., THOMAS J. MORTATI, ESQ., BURKE, SCOLAMIERO, MORTATI & HURD, LLP, Attorneys for Defendants, 9 Washington Square, Suite 201, P.O. Box 15085, Albany, NY 12212-5085.

## **DECISION and ORDER**

GLENN T. SUDDABY, Chief United States District Judge

**\*1** Currently before the Court, in this civil rights action filed by William Pflaum ("Plaintiff") against the Town of Stuyvesant ("Town") and Valerie Bertram, Town Supervisor ("Bertram") (collectively, "Defendants"), is Defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56. (Dkt. No. 59.) For the reasons set forth below, Defendants' motion is granted.

## **I. RELEVANT BACKGROUND**

### **A. Plaintiff's Complaint**

As a result of the Court's prior decisions (Dkt. Nos. 17, 26), Plaintiff's sole remaining claim in this action is his First Amendment retaliation claim. More specifically, as articulated in his Complaint (which was drafted by Plaintiff, *pro se*, and therefore must be construed with special solicitude), that claim alleges three separate ways he was retaliated against for publicly criticizing Town officials. [2]

First, Plaintiff alleges that, in retaliation for filing charges of ethical violations against Defendant Bertram, she (a) "collaborated with and supported" the Town's Fire Chief to deny and/or threaten to deny fire protection to Plaintiff, (b) "supported and encouraged" various Town employees to "illegal[ly] revo[ke] ... Plaintiff's permit to operate his business," and (c) "supported and encouraged" the Town Assessor's "campaign to intimidate Plaintiff by linking [his] political speech [with his] real estate assessment." (Dkt. No. 1, ¶¶ 20-23, 116 [Pl.'s Compl.].)

Second, Plaintiff alleges that, in retaliation for writing columns on his Internet blog regarding corruption among the Town's public officials, the Town filed false criminal charges against him. (*Id.*, ¶ 116.)

Third, and finally, Plaintiff alleges that, in retaliation for criticizing Bertram, the Town Assessor, and the Town, the Town Assessor used his authority to raise taxes in order to intimidate Plaintiff into silence. (*Id.*, ¶¶ 23, 39, 47, 116.)

### **B. Defendants' Motion for Summary Judgment**

**\*2** In their motion for summary judgment, Defendants request the dismissal of Plaintiff's Complaint in its entirety. (Dkt. No. 59.) In support of their motion, Defendants make the following four arguments. First, Defendants argue that there was no adverse action against Plaintiff in that there was no actual chilling of Plaintiff's First Amendment speech or any other damages. (Dkt. No. 61, at 3-8 [Defs.' Mem. of Law].)

Second, Defendants argue that, in any event, any such adverse action was not motivated or substantially caused by Plaintiff's First Amendment speech. (*Id.* at 5-6.)

Third, in the alternative, Defendants argue that Bertram was not personally involved in any deprivation of fire protection services to Plaintiff. (*Id.* at 5, 8-10.)

Fourth, and finally, Defendants argue that Bertram is entitled to qualified immunity. (*Id.*)

### **C. Plaintiff's Opposition Memorandum of Law**

Generally construed, Plaintiff makes five arguments in opposition to Defendants' motion. First, Plaintiff argues that he engaged in protected speech by creating an Internet blog on which he publicly criticized Town officials and exposed

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 29 of 449

Pflaum v. Town of Stuyvesant, Columbia Cty., N.Y., Not Reported in Fed. Supp. (2016)

their illegal activities. (Dkt. No. 65, at 3 [Pl.'s Opp'n Mem. of Law].)

Second, Plaintiff argues that Town officials took adverse action against him by issuing noise violations against him with respect to loud dog barking on his property, retaining special prosecutors to pursue civil suits and criminal charges against him, encouraging harassment and extra-judicial threats against him, and treating him differently from other residents. (*Id.* at 4-5.) As a result, Plaintiff argues that he suffered a chilling effect on his blogging as well as monetary damages due to the expense required to oppose the Town's retaliatory activities. (*Id.* at 6-8.)

Third, Plaintiff argues that the timing of these adverse actions, i.e., that they began after he created his blog, establishes the causal connection between his protected speech and the adverse actions. (*Id.* at 5.)

Fourth, Plaintiff argues that Bertram is not entitled to qualified immunity because it was not objectively reasonable to believe that her actions did not violate Plaintiff's First Amendment rights. (*Id.* at 5-6.) According to Plaintiff, these actions consisted of (1) threatening to fire the Town's Dog Control Officer if he did not serve Plaintiff with a criminal charge related to dog barking, and (2) retaining special prosecutors to pursue this charge against Plaintiff without first obtaining the Town's approval. (*Id.* at 9.)

Fifth, Plaintiff argues that municipal liability extends to the Town because of the actions of Bertram, the Town's supervisor, and her position as a policymaker. (*Id.* at 8-9.)

Finally, the Court notes that Plaintiff spends considerable time in his opposition papers arguing the merits of issues not raised by Defendants in their motion. For example, Plaintiff discusses the Town's denial of his FOIL requests, the Town's failure to respond appropriately to alleged vandalism of his property, and the sufficiency of the evidence that led to the issuance of noise violations related to dog barking. (*See generally id.*, at 3-4, 6-9; Dkt. No. 67, ¶¶ 4, 14, 25, 27, 36, 56-107 [Pl.'s Decl.].)

### D. Defendants' Reply Memorandum of Law

In reply to Plaintiff's opposition memorandum of law, Defendants make two arguments. First, Defendants argue that, because Plaintiff has not complied with Local Rule 7.1(a)(3) in his response to their statement of material facts, their

statement of material facts should be deemed admitted. (Dkt. No. 74, at 2-6 [Defs.' Reply Mem. of Law].)

**\*3** Second, Defendants argue that the record is devoid of any admissible evidence that Bertram was personally involved in an alleged deprivation of fire protection services with regard to Plaintiff's residence. (*Id.* at 6-7.) Furthermore, Defendants argue that Plaintiff cannot demonstrate that any adverse action was taken because he was never actually deprived of fire protection services and his subjective belief that the fire department may not respond to a fire at his residence is insufficient to create a genuine dispute of fact. (*Id.* at 7-8.)

### E. Statement of Material Facts

#### 1. Plaintiff's Failure to Comply with N.D.N.Y. Local Rule 7.1

Before reciting the material facts of this case, the Court must address Plaintiff's response to Defendant's Rule 7.1 Statement of Material Facts. Local Rule 7.1(a)(3) of the Local Rules of Practice for this Court requires a party moving for summary judgment to submit a statement of material facts supported by specific citations to the record where those facts are established. N.D.N.Y. L.R. 7.1(a)(3). The non-moving party's subsequent response must mirror the moving party's statement of material facts by (1) admitting and/or denying each of the moving party's factual assertions in matching numbered paragraphs and (2) supporting any denials with specific citations to the record where the factual issues arise. *Id.* Importantly, "[t]he Court shall deem admitted any properly supported facts set forth in the [moving party's] Statement of Material Facts that the [non-moving] party does not specifically controvert." *Id.*

This Court's "Local Rule requirements are not empty formalities." *Bombard v. Gen. Motors Corp.,* 238 F. Supp. 2d 464, 467 (N.D.N.Y. 2002) (Munson, J.) (stating that "[t]he courts of the Northern District have adhered to a strict application of Local Rule 7.1[a][3]'s requirement on summary judgment motions"); *accord, Cross v. Potter,* 09-CV-1293, 2013 WL 1149525, at \*3 (N.D.N.Y. Mar. 19, 2013) (McAvoy, J.). Indeed, the underlying purpose of this rule "is to assist the court in framing the issues and determining whether there exist any triable issues of fact that would preclude the entry of summary judgment." *Youngblood v. Glasser,* 10-CV-1430, 2012 WL 4051846, at \*4 (N.D.N.Y. Aug. 22, 2012) (Peebles, M.J.); *see also N.Y. Teamsters Conference Pension*

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 30 of 449

Pflaum v. Town of Stuyvesant, Columbia Cty., N.Y., Not Reported in Fed. Supp. (2016)

*& Ret. Fund v. Express Servs., Inc.*, 426 F.3d 640, 649 (2d Cir. 2005) (noting that "Rules governing summary judgment practice are essential tools for district courts, permitting them to efficiently decide summary judgment motions by relieving them of the onerous task of 'hunt[ing] through voluminous records without guidance from the parties'") (quoting *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 [2d Cir. 2001]).

In the present case, Plaintiff has failed to respond appropriately to Defendants' Rule 7.1 Statement of Material Facts. Specifically, Plaintiff has failed to admit and/or deny each of Defendants' factual assertions in matching numbered paragraphs. Indeed, Defendants' Rule 7.1 Statement contains 71 paragraphs of factual assertions, while Plaintiff's 7.1 Response contains only 11 paragraphs. (*Compare* Dkt. No. 62 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 66 [Pl.'s Rule 7.1 Response].) Moreover, many of Plaintiff's responses are conclusory in nature and/or contain legal arguments. The Court notes that, when he responded to Defendants' motion, Plaintiff was represented by counsel. Accordingly, the Court will accept the factual assertions in Defendants' 7.1 Statement as true to the extent that the evidence in the record supports these facts. *See Davis v. Cumberland Farms, Inc.*, 10-CV-0480, 2013 WL 375477, at *4 (N.D.N.Y. Jan. 29, 2013) (Scullin, J.) (accepting the defendant's statement of material facts as true where plaintiff neither admitted nor denied defendants' factual assertions); *Aktas v. JMC Dev. Co., Inc.*, 877 F. Supp. 2d 1, 5 n.3 (N.D.N.Y. 2012) (D'Agostino, J.) (accepting the third-party defendants' statement of material facts as true because the defendant/third-party plaintiff failed to respond to it in accordance with Local Rule 7.1[a][3] ).

## 2. Undisputed Material Facts

**\*4** For purposes of this motion, the undisputed material facts are as follows. Gerald Ennis has served as the Zoning Enforcement Officer for the Town of Stuyvesant continuously since 2003. (Dkt. No. 62, ¶ 43 [Defs.' Rule 7.1 Statement].) In this capacity, Mr. Ennis issued Plaintiff a Class 2 Home Occupation Permit in August, 2009. (*Id.*, ¶ 44.) Under this permit, "[n]o unusual appearances, noise, vibration, smoke, dust, odors, heat, glare or electrical disturbances that exceed those normally produced by a resident shall be permitted." (*Id.*, ¶ 45.) Following the issuance of this permit, Mr. Ennis received numerous noise complaints from Plaintiff's neighbors in regard to increasingly loud barking from dogs on Plaintiff's property. (*Id.*, ¶¶ 46-47.) Following an investigation into these complaints, Mr. Ennis concluded that

Plaintiff's "home dog kennel which housed up to 50 dogs at a time was producing noise levels that exceeded those normally produced by a resident and, accordingly, [Plaintiff] was in violation of his Permit." (*Id.*, ¶ 48.)

On December 7, 2009, Mr. Ennis issued Plaintiff a notice of violation, which informed Plaintiff that the Town had received several complaints about the noise coming from his property and directed Plaintiff to remedy the violation by December 23, 2009. (*Id.*, ¶ 49.) Subsequently, Plaintiff contacted Mr. Ennis and requested that his phone number be given to those who had complained with instructions that they contact Plaintiff directly when there are noise issues so he can rectify any problems. (*Id.*, ¶ 50.) However, after a few months had passed, Plaintiff stopped answering his neighbors' phone calls; and, as a result, his neighbors made new complaints to Mr. Ennis. (*Id.*, ¶ 51.) After receiving these complaints and personally observing the loud noise emanating from Plaintiff's property, Mr. Ennis issued a second notice of violation to Plaintiff on April 26, 2010. (*Id.*, ¶¶ 52-53.) In response, Plaintiff advised Mr. Ennis that he would erect a sound barrier to remedy the issue. (*Id.*, ¶ 54.)

According to Mr. Ennis, he waited "some time" for Plaintiff to erect, or apply for a permit to construct, a sound barrier but neither action was taken. (*Id.*, ¶¶ 55-56.) After continuing to receive noise complaints, Mr. Ennis issued a third notice of violation to Plaintiff on August 9, 2010. (*Id.*, ¶ 56.) On the same day, Mr. Ennis met with Bertram and the Town Attorney to discuss the noise issue on Plaintiff's property. (*Id.*, ¶ 57.) The Town Attorney advised Bertram that Mr. Ennis had the authority to revoke Plaintiff's home occupation permit if he determined that Plaintiff was in violation of the permit's conditions. (*Id.*, ¶ 37.) As a result, Bertram advised Mr. Ennis that he may revoke Plaintiff's permit if he determined that the permit's conditions had been violated. (*Id.*, ¶ 38.) Later that same day (August 9, 2010), Mr. Ennis made the decision to revoke Plaintiff's permit and notified Plaintiff of that fact. (*Id.*, ¶¶ 39, 59.) Neither Plaintiff's statements concerning various issues in the Town nor his postings on various Internet sites had any bearing on the decision to revoke Plaintiff's permit. (*Id.*, ¶¶ 40, 61.)

Plaintiff testified at his deposition that the basis for his claim that he was deprived of fire protection services is that, "in 2011, or perhaps late 2010," a local fire department chief, Steve Montie, posted an online statement that Plaintiff should move out of town. (*Id.*, ¶ 14.) Plaintiff testified that the post was made in response to one of his earlier posts on a local

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 31 of 449

Pflaum v. Town of Stuyvesant, Columbia Cty., N.Y., Not Reported in Fed. Supp. (2016)

town Internet forum; in Plaintiff's post, he had complained of alleged ethical violations committed by Bertram. (*Id.*, ¶¶ 15-16.) The alleged post by Mr. Montie states in its entirety as follows:

> William,
>
> How much more of this are you going to do ? ? ? ? You are wasting more tax payer dollars than its worth. Man up correct your problems and move on, or better yet move out.
>
> S

(*Id.*, ¶ 19.) The author of this post is not identified by name but only by the email address stuyvesantchief@fairpoint.net; and, as indicated above, the post is signed only as "S." (*Id.*, ¶ 18.)

 **\*5** Plaintiff testified that the statements in the alleged post amounted to a threatened denial of fire department services because "the fire chief told me I should move out of town, which makes me wonder if there was a fire at my house would he come." (*Id.*, ¶ 20.) However, Plaintiff testified that no one has ever told him that the fire department would not respond if there was a fire at his house. (*Id.*, ¶ 22.) In addition, Plaintiff testified that there are two distinct fire departments in the Town, Stuyvesant Company 1 and Stuyvesant Company 2, which divide their responses to emergency calls in the Town geographically. (*Id.*, ¶ 23.) Steve Montie is the Chief of Stuyvesant Company 1 and a different chief controls Company 2. (*Id.*, ¶ 25.) Plaintiff's property is located in the geographic area covered by Company 2. (*Id.*, ¶ 24.) According to Bertram, she did not "in any way direct any fire department to deprive or threaten to deprive [Plaintiff] of fire services." (*Id.*, ¶ 33.)

Finally, Plaintiff testified that there was "never" a time that he did not publicize or speak out against some issues based upon any actions by the Town and the alleged efforts to silence him did not work. (*Id.*, ¶ 26.) In fact, following the alleged actions by the Town, Plaintiff did more blogging and increased his "political activities against the Town." (*Id.*, ¶ 27.) With respect to his business, Plaintiff testified that, despite losing his business permit in August, 2010, he continued to operate his business uninterrupted without a permit as he had before it was issued in 2009. (*Id.*, ¶ 29.) Accordingly, there was no interruption to Plaintiff's business as a result of his home business permit being revoked. (*Id.*, ¶¶ 28, 30.)

## II. STANDARD GOVERNING A MOTION FOR SUMMARY JUDGMENT

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). As a result, "[c]onclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) (citation omitted); *see also* Fed. R. Civ. P. 56(e)(2). As the Supreme Court has famously explained, "[the non-moving party] must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the movign party. *Anderson*, 477 U.S. at 255. In addition, "[the moving party] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the ... [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986); *see also* Fed. R. Civ. P. 56(c), (e). However, when the moving party has met this initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with specific facts showing a genuine dispute of material fact for trial. Fed. R. Civ. P. 56(c), (e). Where the non-movant fails to deny the factual assertions contained in the movant's Rule 7.1 Statement of Material Facts in matching numbered paragraphs supported by a citation to admissible record evidence (as required by Local Rule 7.1[a][3] of the Court's Local Rules of Practice), the court may not rely solely on the movant's Rule 7.1 Statement; rather, the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of N.Y.*, 322 F.3d 139, 143, n.5 (2d Cir. 2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 32 of 449

Pflaum v. Town of Stuyvesant, Columbia Cty., N.Y., Not Reported in Fed. Supp. (2016)

## III. ANALYSIS

### A. Whether Plaintiff Suffered an Adverse Action

**\*6** After carefully considering the matter, the Court answers this question in the negative for the reasons set forth in Defendants' memorandum of law and reply memorandum of law. (Dkt. No. 61, at 3-8 [Defs.' Mem. of Law]; Dkt. No. 74, at 6-8 [Defs.' Reply Mem. of Law].) To those reasons, the Court adds the following two points.

As this Court noted in its prior decisions, in order to state a claim for retaliation under the First Amendment, "a plaintiff must prove (1) his conduct was protected by the First Amendment, (2) the defendants' actions were motivated or substantially caused by the exercise of that right, and (3) defendants' actions effectively 'chilled' the exercise of plaintiff's First Amendment right." *Pflaum*, 937 F. Supp. 2d at 303 (citing *Dillon v. Morano*, 497 F.3d 247, 251 [2d Cir. 2007]). "In cases 'involving criticism of public officials by private citizens,' the Second Circuit has generally 'impose[d] an actual chill requirement for First Amendment retaliation claims[,]' i.e., a requirement that the plaintiff allege and ultimately prove an 'actual chill' of his First Amendment rights." *Hafez v. City of Schenectady*, 894 F. Supp. 2d 207, 221 (N.D.N.Y. 2012) (D'Agostino, J.) (quoting *Gill v. Pidlypchak*, 389 F.3d 379, 381 [2d Cir. 2004]). "To establish this element, it is not enough for the plaintiff simply to show that he changed his behavior in some way; he must show that the defendant intended to, and did, prevent or deter him from exercising his rights under the First Amendment." *Hafez*, 894 F. Supp. 2d at 221. "However, 'where the retaliation is alleged to have caused an injury separate from any chilling effect, such as a job loss or demotion, an allegation as to a chilling effect is not necessary to state a claim.'" *Id.* (quoting *Puckett v. City of Glen Cove*, 631 F. Supp. 2d 226, 239 [E.D.N.Y. 2009]); *see also Brink v. Muscente*, 11-CV-4306, 2013 WL 5366371, at \*7 (S.D.N.Y. Sept. 25, 2013) (noting that, in private citizen cases, "various forms of concrete harm have been substituted for the 'actual chilling' requirement").

First, it is clear from Plaintiff's deposition testimony that there was no actual chilling of his protected speech as a result of Defendants' actions. As discussed above, Plaintiff admitted that he increased his political activities and continued to publicize his opinions against the Town in the face of its alleged efforts to silence him. "Where a party can show no change in his behavior, he has quite plainly shown no chilling of his First Amendment right to free speech." *Curley v. Vill. of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001); *see also Singer v.*

*Fulton Cty. Sheriff*, 63 F.3d 110, 120 (2d Cir. 1995) (finding no chilling effect where, after an arrest, the plaintiff continued to publish his newspaper through which he criticized the village government); *Spear v. Town of W. Hartford*, 954 F.2d 63, 67 (2d Cir. 1992) (finding no chilling effect where, after the filing of a lawsuit, the plaintiff continued to write criticizing editorials in the same manner as before the lawsuit).

Second, to the extent that Plaintiff argues that he perceived the online post regarding the loss of fire protection as a real threat, he is still required to show that his perception was objectively reasonable, i.e., "that the defendant[s'] actions had some actual, non-speculative chilling effect." *Colombo v. O'Connell*, 310 F.3d 115, 117 (2d Cir. 2002); *see also Laird v. Tatum*, 408 U.S. 1, 13-14 (1972) (holding that "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm"). Plaintiff's subjective belief that the online post constituted a real threat, without more, is insufficient to demonstrate an actual chilling effect on his First Amendment rights. Indeed, as discussed above in Point I.E.2. of this Decision and Order, Plaintiff admitted that no one had told him that the fire department would not respond if there was a fire at his house. Moreover, a different fire chief than the one who allegedly authored the online post is responsible for responding to fire calls in the location of Plaintiff's residence.

### B. Whether There Was a Causal Connection Between Plaintiff's Speech and Any Adverse Action

**\*7** After carefully considering the matter, the Court answers this question in the negative for the reasons set forth below.

To establish the second element of his First Amendment retaliation claim, "plaintiff must provide specific proof of defendants' improper motivation with either circumstantial or direct evidence." *Media All., Inc. v. Mirch*, 09-CV-0659, 2011 WL 3328532, at \*5 (N.D.N.Y. Aug. 2, 2011) (D'Agostino, J.) (citing *Curley*, 285 F.3d at 73). "Circumstantial evidence includes close temporal proximity between plaintiff's speech and the alleged retaliatory act." *Mirch*, 2011 WL 3328532, at \*5.

"Regardless of the presence of retaliatory motive, however, a defendant may be entitled to summary judgment if he can show dual motivation, i.e., that even without the improper motivation the alleged retaliatory action would have occurred." *Scott v. Coughlin*, 344 F.3d 282, 287-88 (2d Cir. 2003) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 [1977]). "Plaintiff has the initial burden

of showing that an improper motive played a substantial part in defendant's action. The burden then shifts to defendant to show it would have taken exactly the same action absent the improper motive." *Scott*, 344 F.3d at 288.

### 1. Revocation of Plaintiff's Business Permit

In denying Defendants' underlying motion to dismiss Plaintiff's First Amendment claim, this Court held that Plaintiff had sufficiently alleged a concrete harm through the loss of his business permit, and consequently, the loss of business income, as a result of Defendants' alleged retaliatory actions. *Pflaum*, 937 F. Supp. 2d at 308. Having carefully reviewed the record, the Court finds that Plaintiff has failed to create a genuine dispute of material fact regarding Defendants' alleged improper motive. Specifically, with respect to the revocation of his business permit, the undisputed facts establish that the Town received complaints regarding the noise emanating from Plaintiff's property. Plaintiff was given two [3] noise violations over the course of approximately one year and ample opportunity to rectify the problem. (Dkt. No. 67, Attach. 5.) Because the noise problem and complaints continued, Mr. Ennis revoked Plaintiff's permit. [4] Even if Plaintiff were able to establish that an improper motive played a part in this decision, it is clear to the Court that, under these circumstances, the revocation would have still occurred. Indeed, Plaintiff challenged the decision to revoke his permit in appeals made to the Town's Zoning Board of Appeals and in two actions filed in New York State Supreme Court. (Dkt. No. 67, Attachs. 1 & 2.) Although Plaintiff was successful in his state court actions, those decisions were based, in part, upon the Town's failure to follow proper procedure, rather than the merits of the Town's decision. (*Id.*)

### 2. Criminal Charges

**\*8** Plaintiff has also failed to demonstrate an improper motive with respect to his claim that he received false criminal charges in retaliation for comments on his website about corruption among public officials. Plaintiff relies on the temporal proximity of these charges with a meeting he had with Bertram and his filing of an Article 78 petition in New York State Supreme Court. More specifically, Plaintiff argues that he began an Internet blog on or about January 1, 2011,

and in that blog reported on what he perceived to be the illegal activities of Town officials. (Dkt. No. 67, ¶ 15 [Pl.'s Decl.].)

For example, on January 1, 2011, Plaintiff wrote about the alleged inflation of billable time by the Town Attorney that was spent on work paid for by the Town. (*Id.* at 65:8-11.) Around the same time, Plaintiff met with Bertram to discuss his discovery of specific instances of corruption by public officials, including the alleged inflation of billable work by the Town Attorney. (Dkt. No. 59, Attach. 7, at 62:13-15; 64:9-15 [Pl.'s Dep. Tr.].) On January 15, 2011, a few days after this meeting occurred, Plaintiff was issued a criminal summons for the offense of "habitual loud barking," in violation of N.Y. Local Law § 1. (*Id.* at 61:19-22; Dkt. No. 68, Attach. 7 [Criminal Summons]; Dkt. No. 67, ¶ 15 [Pl.'s Decl.].) Plaintiff testified at his deposition that the Town Attorney went to great lengths to research the Local Law that he was charged under and assisted one of Plaintiff's neighbors in drafting an affidavit upon which the criminal summons was based. (Dkt. No. 59, Attach. 7, at 65:17-21 [Pl.'s Dep. Tr.]; Dkt. No. 67, ¶ 107 [Pl.'s Decl.].) Plaintiff argues that he is the first Town resident to be charged under this section of the Local Law. (Dkt. No. 67, ¶¶ 100, 106 [Pl.'s Decl.].) Finally, Plaintiff argues that Bertram retained outside counsel to pursue this charge against him, which was later dismissed. (Dkt. No. 67, ¶¶ 5, 19, 21 [Pl.'s Decl.]; Dkt. No. 59, Attach. 7, at 57:16-18 [Pl.'s Dep. Tr.].)

Thereafter, in October 2011, Plaintiff filed an Article 78 petition in New York State Supreme Court challenging the Town's denial of Plaintiff's FOIL requests. (Dkt. No. 59, Attach. 7, at 67:7-12 [Pl.'s Dep. Tr.].) Plaintiff sought disclosure of the information in the FOIL requests to substantiate his belief that Town officials were engaging in illegal activities. (Dkt. No. 67, ¶¶ 43-44 [Pl.'s Decl.].) One week after commencing that action, Plaintiff received a second criminal summons for the same offense related to loud dog barking. (Dkt. No. 68, Attach. 7 [Appearance Ticket]; Dkt. No. 59, Attach. 7, at 56:16-19; 67:7-12 [Pl.'s Dep. Tr.].) Plaintiff testified that he had "almost no dogs" on his property in October 2011. (Dkt. No. 59, Attach. 7, at 67:8-10 [Pl.'s Dep. Tr.].) According to Plaintiff, that charge was neither dismissed nor withdrawn, but "vanished." (*Id.*, at 57:19-58:9.)

While Plaintiff's allegations may plausibly suggest that an improper motive played a role in the charges brought against him, Defendants have submitted admissible record evidence that establishes otherwise. (Dkt. No. 59, Attach. 17.) Specifically, the criminal information in question is signed

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 34 of 449

Pflaum v. Town of Stuyvesant, Columbia Cty., N.Y., Not Reported in Fed. Supp. (2016)

by one of Plaintiff's neighbors, Frederick Platt, and states, in part, that "my complaint is that the dogs at Glencadia Dog Camp exhibit ongoing habitual barking/howling at any given time of day or night. This has been an issue since the Fall of 2009." (*Id.*) Furthermore, an affidavit filed by Wes Powell, the Town's Dog Control Officer, states that he received repeated complaints from Mr. Platt throughout 2010, culminating in the noise complaint that served as the basis for the criminal charge. (Dkt. No. 59, Attach. 16, ¶¶ 3-5 [Powell Aff.].) Mr. Powell states that the complaint was written by Mr. Platt in his presence and that no Town official directed Mr. Powell to serve Plaintiff with the criminal summons. (*Id.*, ¶¶ 7-10.)

 **\*9** Conversely, Plaintiff has not submitted any admissible record evidence supporting his claim that the Town Attorney (who is not a party) played any role in the charge being filed against him or that he is the only resident to have ever been charged under this section of the Local Law. Similarly, Plaintiff's contention that the Town pressured Mr. Platt to file a complaint against him (Dkt. No. 67, ¶ 7[Pl.'s Decl.] ) is unsubstantiated. While the timing of the charge may appear suspicious, the Town cannot control when its residents decide to file a complaint and, in light of the record evidence demonstrating that there was a preexisting noise problem on Plaintiff's property, the complaint is unsurprising. Moreover, the fact that Plaintiff *believes* the Town shored up its criminal charge against him is of little, if any, materiality. Finally, because the second charge seemingly "vanished," no documentation or evidence (other than the appearance ticket itself) has been submitted with respect to that charge. In any event, because the charge was never prosecuted, Plaintiff has failed to support his claim that he suffered any harm. Accordingly, the Court finds that Plaintiff has failed to meet his burden in demonstrating an improper motive with respect to this charge.

### 3. Town Assessor Gleason

Plaintiff claims that Town Assessor Howard Gleason (also not a party) threatened to raise his property taxes for engaging in political activities when Mr. Gleason hand delivered a letter to Plaintiff before a public meeting. (Dkt. No. 69, Attach. 18, at 3 [Letter from Pl. to Gleason]; Dkt. No. 67, ¶ 29 [Pl.'s Decl.].) The only evidence submitted with respect to this claim is not the original letter from Mr. Gleason to Plaintiff but letter correspondence from Plaintiff to Mr. Gleason. (Dkt. No. 69, Attach. 18, at 3 [Letter from Pl. to Gleason].) Plaintiff's letter to Mr. Gleason, dated October 5, 2010, states that Plaintiff

interpreted Mr. Gleason's attempt to speak with him about tax filings before a town hall meeting as threatening in nature due to the "timing and manner of the interaction." (*Id.*) This is because Plaintiff "had announced [his] intention to call for a referendum frequently and in many forums prior to appearing for the meeting." (*Id.*) Furthermore, Plaintiff requested that, in order to "avoid the impression that you coordinate your tax-related activities with other people in government in order to intimidate free speech, please do not present important information to me in such an information [sic] and unverifiable way." (*Id.*)

However, Mr. Gleason's response to Plaintiff's letter suggests that their interaction was not meant as a threat to raise Plaintiff's taxes or "was in any way politically motivated." (Dkt. No. 69, Attach. 18, at 4 [Letter from Pl. to Gleason].) More specifically, Mr. Gleason explains that he needed to re-assess Plaintiff's property in light of the fact that Plaintiff was now running a kennel (business) on his property and decided to hand deliver his letter knowing that Plaintiff would be present for the town hall meeting. (*Id.*) Moreover, Mr. Gleason reassured Plaintiff that politics do not dictate how he performs his job and promised that all future communication will be transmitted through mail rather than in-person. (*Id.*)

Plaintiff has failed to submit any additional evidence with respect to his tax assessment, that his taxes were improperly raised or that Mr. Gleason acted with a retaliatory animus. [5] Similarly, no evidence has been submitted to substantiate Plaintiff's claim that Bertram encouraged Mr. Gleason to use his authority as Town Assessor to intimidate Plaintiff. In sum, Plaintiff has wholly failed to satisfy his burden demonstrating that he suffered harm as a result of any action taken by Mr. Gleason and that Mr. Gleason acted with an improper motive.

 **\*10** For all of these reasons, the Court finds that Plaintiff has failed to create a genuine dispute of material fact with respect to his First Amendment claim. Because the Court has reached this conclusion, it need not, and does not, consider the merits of Defendant Bertram's alternative qualified immunity argument.

**ACCORDINGLY**, it is

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 59) is **GRANTED**. The Clerk of the Court is directed to enter judgment in favor of the Defendants and close this case.

Pflaum v. Town of Stuyvesant, Columbia Cty., N.Y., Not Reported in Fed. Supp. (2016)

Case 3:24-cv-00037-DNH-ML    Document 9    Filed 06/11/24    Page 35 of 449

**All Citations**

Not Reported in Fed. Supp., 2016 WL 865296

## Footnotes

1    Although Plaintiff is currently proceeding *pro se*, the Court notes that he had counsel when preparing his response to Defendant's motion for summary judgment. Accordingly, no need exists to construe Plaintiff's response with the special solicitude ordinarily afforded to *pro se* litigants.

2    The Court notes that, while it did not previously (i.e., in its prior decisions) liberally construe Plaintiff's retaliation claim as arising under three separate theories, it does so now. The Court further notes that it has the power to address these two additional theories for each of two alternative reasons: (1) because Defendants moved for dismissal of Plaintiff's retaliation claim in its entirety, Plaintiff has had sufficient notice and an opportunity to be heard with respect to the two theories in question; and (2) in any event, even if Plaintiff cannot be said to have had such notice and an opportunity to be heard, he filed his Complaint *pro se* and the Court finds the two theories to be so lacking in arguable merit as to be frivolous, *see Fitzgerald v. First E. Seventh St. Tenants Corp.*, 221 F.3d 362, 363 (2d Cir. 2000) (recognizing that district court has power to *sua sponte* dismiss *pro se* complaint based on frivolousness notwithstanding fact that plaintiff has paid statutory filing fee).

3    As discussed above, Plaintiff was actually given three noise violations. However, because his permit was revoked on the same day that he received the third violation, the Court will disregard the third violation for purposes of this analysis.

4    The Court notes that Plaintiff spends considerable time in his opposition papers disputing the sufficiency of the evidence and procedures that were followed that led to the issuance of noise violations. (*See generally* Dkt. No. 67, ¶¶ 56-95 [Pl.'s Decl.].) However, this Court is not the proper forum for that dispute. Furthermore, to the extent that the New York Supreme Court observed that there appeared "to have been a disproportionate amount of time and money spent on [the noise violation] notice," and that the records did not "reveal a real issue with dog-barking," those observations are not binding upon this Court. (Dkt. No. 67, Attach. 2, at 6.) Setting aside the fact that the observations constitute dicta, Defendants have submitted admissible record evidence demonstrating that Mr. Ennis acted upon complaints made to him by residents of the Town, which Plaintiff has failed to properly dispute.

5    For example, with regard to this lack of additional evidence regarding retaliatory animus, Plaintiff has failed to adduce admissible record evidence establishing that, even assuming Mr. Gleason knew of Plaintiff's intent to engage in protected speech, the so-called "manner of the interaction" by Mr. Gleason (i.e., the hand delivery of the letter) was in fact unusual for Mr. Gleason given the date of the letter and the date of the public meeting. Moreover, Plaintiff has failed to adduce admissible record evidence that the so-called "timing ... of the interaction" is significant, given his rather constant exercise of his First Amendment rights during the time in question.

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 36 of 449

Walker v. CIBC Limited, Not Reported in Fed. Supp. (2021)

2021 WL 3518439
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Myrna Althia Alicia WALKER, Plaintiff,

v.

CIBC LIMITED, Defendant.

1:20-CV-1337 (TJM/CFH)
|
Signed 04/13/2021

**Attorneys and Law Firms**

Myrna Althia Alicia Walker, 841 Western Avenue, Apartment 2A, Albany, New York 12203, Plaintiff pro se.

### REPORT-RECOMMENDATION & ORDER

CHRISTIAN F. HUMMEL, UNITED STATES MAGISTRATE JUDGE

### I. In Forma Pauperis

**\*1** Plaintiff pro se Myrna Althia Alicia Walker purported to commence this action on October 28, 2020, by submitting a complaint and application to proceed in forma pauperis ("IFP") in lieu of paying the Court's filing fee. See Dkt. No. 1 ("Compl."); Dkt. No. 2. On March 15, 2021, plaintiff submitted a supplement to her complaint. Dkt. No. 4. On April 6, 2021, plaintiff submitted an additional filing entitled "Emergency Petition for the Death Penalty Against Adethia Keshia Fitten and Others on the Principle Found in the Law of Necessity." Dkt. No. 5. On April 7, 2021, plaintiff submitted additional 86 pages to supplement to her complaint. Dkt. Nos. 6, 7. On April 8, 2021, plaintiff submitted additional exhibits and a letter requesting to file those exhibits under seal. Dkt. No. 8.

The Court has reviewed plaintiff's IFP application and determines that she financially qualifies to proceed IFP for purposes of filing only. [1]

### II. Legal Standards

Section 1915(e) of Title 28 of the United States Code directs that, when a plaintiff seeks to proceed IFP, "the court shall dismiss the case at any time if the court determines that ... the action or appeal (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B). It is a court's responsibility to determine that a plaintiff may properly maintain his complaint before permitting her to proceed with her action. As plaintiff is representing himself, the court must afford plaintiff special solicitude; thus, it is to consider her claims "liberally" and "interpret them 'to raise the strongest arguments that they suggest.' " Cold Stone Creamery, Inc. v. Gorman, 361 F. App'x 282, 286 (2d Cir. 2010) (summary order) (quoting Brownell v. Krom, 446 F.3d 305, 310 (2d Cir. 2006)).

Pleading guidelines are set forth in the Federal Rules of Civil Procedure. Specifically, Rule 8 provides that a pleading which sets forth a claim for relief shall contain, inter alia, "a short and plain statement of the claim showing that the pleader is entitled to relief." See FED. R. CIV. P. 8(a)(2). "The purpose ... is to give fair notice of the claim being asserted so as to permit the adverse party the opportunity to file a responsive answer, prepare an adequate defense and determine whether the doctrine of res judicata is applicable." Flores v. Graphtex, 189 F.R.D. 54, 54 (N.D.N.Y. 1999) (internal quotation marks and citations omitted). Rule 8 also requires the pleading to include:

> (1) a short and plain statement of the grounds for the court's jurisdiction ...;
>
> (2) a short and plain statement of the claim showing that the pleader is entitled to relief; and
>
> (3) a demand for the relief sought ....

FED. R. CIV. P. 8(a). Although "[n]o technical form is required," the Federal Rules make clear that each allegation contained in the pleading "must be simple, concise, and direct." Id. at 8(d).

**\*2** Further, Rule 10 of the Federal Rules provides in pertinent part that:

> [a] party must state its claims or defenses in numbered paragraphs, each limited as far as practicable to a single set of circumstances. A later

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 37 of 449

Walker v. CIBC Limited, Not Reported in Fed. Supp. (2021)

pleading may refer by number to a paragraph in an earlier pleading. If doing so would promote clarity, each claim founded on a separate transaction or occurrence – and each defense other than a denial – must be stated in a separate count or defense.

FED. R. CIV. P. 10(b). This serves the purpose of "provid[ing] an easy mode of identification for referring to a particular paragraph in a prior pleading[.]" Flores, 189 F.R.D. at 54 (internal quotation marks and citations omitted). A complaint that fails to comply with the pleading requirements "presents far too a heavy burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of their claims." Gonzales v. Wing, 167 F.R.D. 352, 355 (N.D.N.Y. 1996). As the Second Circuit has held, "[w]hen a complaint does not comply with the requirement that it be short and plain, the court has the power, on its own initiative ... to dismiss the complaint." Salahuddin v. Cuomo, 861 F.2d 40, 42 (2d Cir. 1988) (citations omitted). However, "[d]ismissal ... is usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised." Id. (citations omitted). In such cases of dismissal, particularly when reviewing a pro se complaint, the court generally affords the plaintiff leave to amend the complaint. Simmons v. Abruzzo, 49 F.3d 83, 86-87 (2d Cir. 1995). A court should not dismiss a complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citation omitted).

### III. Initial Review

#### A. Plaintiff's Complaint

Plaintiff purports to bring this action pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000, et seq. On her form Title VII complaint, she indicates that defendant discriminated against her due to her race and color, religion, sex, and "my date of birth – Easter."

Compl. at 2. Plaintiff further indicates, through checking the boxes on the form complaint, that defendant terminated her employment, failed to promote, engaged in unequal terms and conditions of employment, retaliated against her, and "forced prostitution; [i]dentity theft, which is used to do Bank frauds & Poisonings." Id.

Plaintiff's complaint, inclusive of exhibits, is 158 pages long. Dkt. No. 1. Included with the exhibits to the complaint is an Equal Employment Opportunity Commission ("EEOC") dismissal notice [2] noting that plaintiff's EEOC charge was not timely filed and the EEOC was closing its file. Dkt. No. 1-1. The remainder of the exhibits appended to the complaint appear to be an 80-page letter relating to apparent visa fraud that plaintiff sent to The US Department of Justice; the United States Department of Homeland Security, Immigration and Customs Enforcement; and the Federal Bureau of Investigation; as well as an incident report dated May 29, 2019, regarding an apparent rape of plaintiff. Dkt. No. 1-2 at 81-82.

**\*3** The supplement plaintiff filed on March 15, 2021, is 112 pages long. Dkt. No. 4. The supplement appears to be filings from a complaint plaintiff had before Supreme Court, Rensselaer County against Unity House of Troy and Joseph Posa. Id. The "emergency motion," filed on April 4, 2021, is 22 pages long, with 70 additional pages of exhibits. Dkt. No. 5. These exhibits are (1) various transfer orders and orders of protection plaintiff either sought or obtained against various individuals in family court proceedings in different counties (dkt. no. 5-1); (2) a residential lease agreement from July 2018, for a property in Troy, New York, with landlord Joseph Posa (dkt. no. 5-2); (3) records from a proceeding before the Rensselaer County Supreme Court in a case captioned Myrna Althia Alicia Walker vs. "Change of Name" Heidi Elizabeth Zuach (dkt. no. 5-3); and (4) a lease agreement dated May 2, 2017, between Capital Group Management LLC and plaintiff for a property in Troy, New York (dkt. no. 5-4). The submission filed on April 7, 2021, is 59 pages long and includes various orders of protection, a USPS tracking number report, a Unity House Domestic Violence Services Transitional Housing Program Handbook, a form from the Rensselaer County Department of Social Services, earnings statements, a New York State incident report from 2018, an eviction notice, a letter from the Unity House Transitional Housing program, a "notice" letter, and a "birth registration" form. Dkt. No. 6-6. The exhibits filed on April 7, 2021, appear to be letters plaintiff sent to the New York State Department of Labor, United States

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 38 of 449

Walker v. CIBC Limited, Not Reported in Fed. Supp. (2021)

Department of Homeland Security, Immigration and Customs Enforcement, and the EEOC, apparently related to "pandemic unemployment compensation benefits." See dkt. no. 7.

Plaintiff's complaint discusses Allison Carolyn Rattray, the Corporate Secretary and Legal Counsel of defendant CIBC First Caribbean International Bank (Jamaica) Limited. Dkt. No. 1 at 3. Plaintiff contends that Ms. Rattray kills unidentified people "with her married name" and drinks plaintiff's blood. Id. Apparently, plaintiff contends that Ms. Rattray is or was her "employer" who "uses the drinking blood of the employee to kill the employing the employment agreement and the incomes paid by direct deposit as the consideration for the blood that is drank before the killings and the doomings if [sic] innocent persons." Id. at 4. Plaintiff also appears to suggest that Ms. Rattray and her husband, "Barrington Andrew Rattray, Senior Judge, The Commercial Division, The Supreme Court of Jamaica," force plaintiff to use "illegal psychotropic medicines," cocaine, and alcohol. Id. at 5. Plaintiff refers to an employment agreement she signed with Ms. Rattray in 1995 and appears to suggest that since that date, Ms. Rattray "has been stalking the Plaintiff inside her bedroom, bathroom mirror, on her cell phone from 1995 even until today October 20, 2020 even the bathroom stables has visual and audio devices inside of them." Id. at 6. The Complaint then appears to proceed to explain why Ms. Rattray and her various family members are carrying out unspecified killings. See generally Dkt. No. 1. Plaintiff further suggests that through her employment with defendant, both defendant and the Commercial Division of the Supreme Court of Jamaica

> has been using me as a sex doll; as sex services; as sex product also incorporating The University of the West Indies Hospital to do surgeries; using illegal force of The Jamaican police; using the illegal Force of the Jamaican Army; using the illegal force of the Jamaican parliament to have men from any where have sex with The Plaintiff because The Plaintiff was born on the day the crucifixion was celebrated, that is Easter and Good Friday.

Id. at 13. Plaintiff asks the Court for

> an Injunction to stop, restrain and prevent Allison Carolyn Rattray (maiden name Smith), Corporate Secretary and Legal Counsel, CIBC FirstCaribbean Jamaica; her husband, Barrington Andrew Rattray, Senior Judge, The Commercial Division, The Supreme Court of Jamaica, King Street, Kingston, Jamaica, West Indies Deryke Smith, her brother; Lacelles Smith retired lecturer The University of the West Indies, Jamaica, West Indies; and the Rhoda FORR children and others from practicing their religion in a way that results in the death or harm or injury of The Rights of The Plaintiff and or the mother of The Plaintiff and or the siblings of The Plaintiff; and or any member of The Public, which includes anyone in the global community.

Id. at 14.

As for plaintiff's causes of action, plaintiff lists:

> forced religion imposed on The Plaintiff whom is the employee by The Employer, CIBC Limited. The Forced Religion imposed on Myrna Althia Alicia Walker [ ] to kill innocent Persons. The daily murders of innocent Persons is used to supply the demands of the global organ Donor list. The staff is Allison Carolyn Rattray.

**\*4** Dkt. No. 1 at 69. As for a second cause of action is

> employment discrimination – I chose a career path to be an Attorney-At-Law. Allison Carolyn Rattray (maiden name Smith) my (former) then manager at

**Walker v. CIBC Limited, Not Reported in Fed. Supp. (2021)**

Case 3:24-cv-00037-DNH-ML    Document 9    Filed 06/11/24    Page 39 of 449

CIBC had be fired; told me that (1) I am not worthy to be an Attorney-at-Law because of my Race (2) I was not worthy to be in the same Profession as her. She has been defaming my character ever since.

Id. at 70. Third cause of action is listed as employment discrimination - compensation: denied increases in my salary verbally communicated to be by Ms. Cherlyn Blackman my Senior Manager of 3% in 2004; Denied Promotion communicated to be my Human Resources Regional Director, Jerime Cjnttihs-Bell; denied fringe benefits that accompanied my five (5) CIBC Achievers awards – my salary was split and part paid to my aunt. Id. In the prayer for relief, plaintiff requests:

(1) an Injunction(s) for Criminal Indictment(s) of Allison Carolyn (Smith) Rattray, Corporate Secretary and Legal Counsel CIBC for her forced Prostitution of The Plaintiff and Others; (2)An Injunction to prevent and stop all Prostitution or abuse of The Plaintiff; (3) Restitution(s) by CIBC for lost Incomes and fringe benefits[; and] (4) Job Reference letter from CIBC and an apology and my land Title Deed.

Id. at 71.

**B. Analysis**

First, plaintiff's complaint fails to meet the pleading requirements of Rules 8 and 10. Her complaint does not present a short and plain statement of the claim showing that she is entitled to relief. FED. R. CIV. P. 8. Further, she does not present her claims in numbered paragraphs, limited to one "circumstance" per paragraph. FED. R. CIV. P. 10. Instead, her complaint is a lengthy, disjointed, difficult to follow narrative. Her complaint clearly "presents far too a heavy burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to

assess the sufficiency of their claims." Gonzales, 167 F.R.D. at 355.

Second, plaintiff's claims, insofar as she seeks to bring them under Title VII are (1) barred by the statute of limitations, and (2) fail to state a claim for employment discrimination in violation of Title VII. [3] To the extent plaintiff suggests that she was discriminated against in violation of Title VII insofar as she was told that she was inadequate due to her race or denied promised promotions because of her race, dkt. no. 1 at 70, even if plaintiff could provide additional factual support and clarification for the alleged discrimination, plaintiff provides that the alleged discrimination occurred as early as 1995 until 2004, and would be beyond the statute of limitations of Title VII. Indeed, plaintiff's entire employment with defendant occurred outside of the statute of limitations as she suggests that her employment began in January 1995 and that she was terminated in March 2009. Dkt. No. 1 at 52-53. Thus, the complained-of actions occurred more than 300 days prior to when plaintiff appears to have filed a complaint with the EEOC. See Gunning v. New York State Just. Ctr. for Prot. of People with Special Needs, No. 1:19-CV-1446 (GLS/CFH), 2020 WL 5203673, at *3 (N.D.N.Y. Sept. 1, 2020) ("Title VII's statute of limitations bars claims based upon events that occurred more than 300 days prior to filing a charge of discrimination with a state or local employment agency, and, therefore, "[a] plaintiff may bring a claim under Title VII only for acts of discrimination that occurred within the statutory period set by 42 U.S.C. § 2000e–5(e)(1).") (quoting Patterson v. Cnty. of Oneida, 375 F.3d 206, 220 (2d Cir. 2004)). The undersigned notes that plaintiff does not indicate when she filed a complaint with the EEOC. However, she submits the EEOC's dismissal letter, dated September 10, 2020, which states that plaintiff did not timely file a complaint with the EEOC. Dkt. No. 1-1. As plaintiff likely filed her EEOC complaint in 2020, [4] appears to have been last employed by defendant in 2009, and complains of alleged employment discrimination occurring as early as 1995, her filing of an EEOC complaint in 2020 is clearly more than 300 days after the alleged discrimination occurred. Thus, any cognizable Title VII claims arising out of her employment with defendant are barred by the statute of limitations.

**\*5** However, even if the statute of limitations was not an issue, plaintiff's claims still must fail because plaintiff's claims fail to state any cognizable legal claim under the United States Constitution, federal statute, or state law, and ultimately fails establish this Court's jurisdiction under federal question or diversity jurisdiction. [5] Plaintiff makes several disjointed,

Walker v. CIBC Limited, Not Reported in Fed. Supp. (2021)

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 40 of 449

confusing claims about being sold as a prostitute against her will by defendant's employees and other nonparties, defendant's employees and others murdering innocent people, defendant's employees drinking plaintiff's blood, and being stalked and prostituted by various officials from Jamaica and employees of defendant's company. See generally dkt. nos. 1, 4, 6, 7. Plaintiff makes several allegations against her former supervisor, Ms. Rattray, and says the various physical wrongdoings Ms. Rattray committed against plaintiff were all due to "The employment agreement between The Plaintiff and CIBC FirstCarribean Jamaica." Dkt. No. 1 at 60-61. Although plaintiff's submissions seem to suggest that she was employed by defendant at some point in time, and that a supervisor told her she could not be a lawyer due to her race and denied promised salary increases for unclear reasons, nothing about the factual allegations pleadings suggest that she presents a valid employment discrimination claim under Title VII or any other statute.

The Court is at a loss as to how the allegations in the complaint relate to a valid employment discrimination claim or any valid legal claim. Plaintiff presents a difficult to comprehend series of allegations against various individuals – many of whose connections to her apparent former employer is difficult, if not impossible, to comprehend – who she alleges forced her into prostitution, performed plastic surgeries on her against her will, installed "spying devices" into plaintiff's body, forced her to undergo various injections, and involved plaintiff in murder scheme that is somehow related to her Easter birthday. See Dkt. No. 1 at 56-60. Plaintiff also sets forth unexplained allegations that appear to involve Ms. Rattray and others, such as "an abuse of a veteran of the United States Army by the said Allison Carolyn Rattray" (dkt. no. 1 at 54). Plaintiff submits dozens of pages of exhibits and supplements that appear to relate to cases filed in other courts, orders of protection obtained in other courts, unemployment insurance issues, police reports, and documents sent to various federal agencies. See dkt. nos. 4, 5, 6, 7. The relevance of this deluge of documents is entirely unclear.

Further, to the extent plaintiff requests injunctions (dkt. no. 1 at 71) to prevent defendant's employees from prostituting or harming plaintiff or seeks some kind of prosecution of defendant's employees for criminal conduct, this Court does not have authority to direct persons to cease engaging in illegal activity through a civil suit as it is not a law enforcement agency. It appears plaintiff is either seeking the criminal prosecution of an individual or individuals or a law enforcement investigation, which is beyond this Court's

jurisdiction. See generally Linda R.S. v. Richard D., 410 U.S. 614, 619 (1973) ("[A] private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another."); McFadden v. Ortiz, 5:12-CV-1244(MAD/ATB), 2013 WL 1789593 (N.D.N.Y. Apr. 26, 2013) (noting that there is no private right of action to enforce either state or federal criminal statutes).

Next, plaintiff files an "emergency motion" for the Death Penalty, [6] which appears to ask the United States Supreme Court to enforce the death penalty against various individuals who plaintiff contends engaged in "drug assisted surgeries on The Plaintiff herein to induce The Coronavirus ahead of the proposed mass vaccination of the US public, which is set for May 1, 2021[,]" implanting maggots into plaintiff's bones, releasing poisons into plaintiff's body, "install[ing] television" and "Netflix Television" into plaintiff's eye and spinal cord, "alter[ing]" plaintiff's "joints to make [her] walk in [sic] all four" to be "displayed as a naked dog on a lease [sic]," and other similar allegations. See Dkt. No. 5. As discussed above, this Court does not have the authority or jurisdiction to sua sponte impose the death penalty in a civil case nor can it seek the criminal prosecution of individuals or at the request of a plaintiff or decide the ultimate punishment if convicted after a criminal trial.

**\*6** Generally, in cases involving pro se plaintiffs, a court should not dismiss a complaint without granting leave to amend "at least once" "when a liberal reading of the complaint gives any indication that a valid claim might be stated." Branum v. Clark, 927 F.2d 698, 704-05 (2d Cir. 1991). However, an opportunity to amend is not required where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." Cuoco v. Moritsugu, 222 F.3d 99, 112 (2d Cir. 2000); see also Cortec Indus. Inc. v. Sum Holding L.P., 949 F.2d 42, 48 (2d Cir. 1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice."). The Court, however, also has an overarching obligation to determine that a claim is not legally frivolous before permitting a pro se plaintiff's complaint to proceed. See, e.g., Fitzgerald v. First East Seventh St. Tenants Corp., 221 F.3d 362, 363 (2d Cir. 2000) (holding that a district court may sua sponte dismiss a frivolous complaint, notwithstanding the fact that the plaintiff paid the statutory filing fee). "Legal frivolity ... occurs where 'the claim is based on an indisputably meritless legal theory [such as] when either the claim lacks an arguable basis in law, or a dispositive defense clearly exists on the face of

Walker v. CIBC Limited, Not Reported in Fed. Supp. (2021)

Case 3:24-cv-00037-DNH-ML    Document 9    Filed 06/11/24    Page 41 of 449

the complaint.' " Aguilar v. United States, 99-MC-0304, 99-MC-0408, 1999 WL 1067841, at *2 (D. Conn. Nov. 8, 1999) (quoting Livingston v. Adirondack Beverage Co., 141 F.3d 434, 437 (2d Cir. 1998)); see also Neitzke v. Williams, 490 U.S. 319, 325 (1989) ("[D]ismissal is proper only if the legal theory ... or factual contentions lack an arguable basis."); Pino v. Ryan, 49 F.3d 51, 53 (2d Cir. 1995) ("[T]he decision that a complaint is based on an indisputably meritless legal theory for purposes of dismissal under section 1915(d), may be based upon a defense that appears on the face of the complaint."). Thus, although the Court must show special solicitude to pro se litigants, see Nance v. Kelly, 912 F.2d 605, 606 (2d Cir. 1990) (per curiam), and is to exercise "extreme caution ... in ordering sua sponte dismissal of a pro se complaint before the adverse party has been served and both parties (but particularly the plaintiff) have had an opportunity to respond, ..." Anderson v. Coughlin, 700 F.2d 37, 41 (2d Cir. 1983) (internal citations omitted), the Court also has a responsibility to determine that a claim is not frivolous before permitting a plaintiff to proceed with an action in forma pauperis.

Even if, arguendo, the statute of limitations was not a jurisdictional bar and plaintiff had been able to establish this Court's jurisdiction, the undersigned would still recommend dismissal with prejudice on its initial review as plaintiff's complaint is "factually frivolous." See Bennett v. Mnuchin, 6:20-CV-243 (BKS/TWD), 2020 WL 1674068 (citing Denton v. Hernandez, 504 U.S. 25, 32-33 (1992)) (holding that a court may dismiss a factually frivolous claim when the allegations are "clearly baseless," including claims that "describ[e] fantastic or delusional scenarios."); Brown v. New York State Educ. Dept., 8:18-CV-169 (TJM/CFH), 2018 WL 1865547, at *2 (N.D.N.Y. Mar. 19, 2018) (dismissing pro se plaintiff's complaint with prejudice where "it is clear that no federal claim can be stated on these facts[.]"). Accordingly, the undersigned recommends dismissal with

prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B)(i) as any leave to amend would be clearly futile.

### IV. Conclusion

**WHEREFORE**, for the reasons set forth herein, it is hereby

**ORDERED**, that plaintiff's in forma pauperis application (dkt. no. 2) be granted for purposes of filing only; and it is

**RECOMMENDED**, that plaintiff's complaint (dkt. no. 1) be **DISMISSED WITH PREJUDICE**; and it is further

**RECOMMENDED**, that plaintiff's "Emergency Motion for the Death Penalty" (dkt. no. 5) be **DISMISSED**; and it is further

**RECOMMENDED**, that plaintiff's letter motion to file exhibits under seal (dkt. no. 8) be **DISMISSED AS MOOT**.

**IT IS SO ORDERED**.

Pursuant to 28 U.S.C. § 636(b)(1), plaintiff has FOURTEEN (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Sec'y of Health and Human Servs., 892 F.2d 15 (2d Cir. 1989)); see also 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72 & 6(a). [7]

**All Citations**

Not Reported in Fed. Supp., 2021 WL 3518439

### Footnotes

1    Plaintiff is still financially responsible for any other fees or costs she may incur.

2    It appears that the EEOC dismissal notice is dated September 10, 2020. Dkt. No. 1-1.

3    A plaintiff establishes "a prima facie case of discrimination by showing that (1) he is a member of a protected class; (2) he is competent to perform the job or is performing his duties satisfactorily; (3) he suffered an adverse employment decision or action; and (4) the decision or action occurred under circumstances giving

Walker v. CIBC Limited, Not Reported in Fed. Supp. (2021)

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 42 of 449

rise to an inference of discrimination based on his membership in the protected class." Dawson v. Bumble & Bumble, 398 F.3d 211, 216 (2d Cir 2005) overruled on other grounds Zarda v. Altitude Express, Inc., 883 F.3d 100 (2d Cir. 2018).

4    As the EEOC dismissal notice is dated September 10, 2020, the Court makes the reasonable inference that plaintiff filed her EEOC complaint some time in 2020.

5    Even if this Court were to assess this case as seeking to proceed under diversity jurisdiction pursuant to 28 U.S.C. § 1332(a), the plaintiff has also failed to set forth a cognizable state law claim. Scherer v. Equitable Life Assur. Soc'y of the United States, 347 F.3d 394, 397 (2d Cir. 2003) (quoting 28 U.S.C. § 1332(a)) (noting that diversity jurisdiction "confers original jurisdiction on the federal district courts with respect to 'all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between ... citizens of different States.' ").

6    This "emergency motion" notes that it is presented to the United States Supreme Court, but contains a caption including this Court. It is unclear if this is a document plaintiff intends to submit before this Court, or before the United States Supreme Court. See dkt. no. 5.

7    If you are proceeding pro se and are served with this Report-Recommendation & Order by mail, three (3) additional days will be added to the fourteen (14) day period, meaning that you have seventeen (17) days from the date the Report-Recommendation & Order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Id. § 6(a)(1)(c).

---

**End of Document**                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 3204860
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Myrna Althia Alicia WALKER, Plaintiff,

v.

CIBC LIMITED, Defendant.

1:20-CV-1337 (TJM/CFH)
|
Signed 07/29/2021

**Attorneys and Law Firms**

Myrna Althia Alicia Walker, Albany, NY, Pro Se.

**DECISION and ORDER**

THOMAS J. McAVOY, Senior United States District Judge

### I. INTRODUCTION

**\*1** This case was before the Hon. Christian F. Hummel, United States Magistrate Judge, for an initial review of plaintiff's complaint and other filings pursuant to 28 U.S.C. § 1915(e)(2)(B). Judge Hummel recommends that plaintiff's complaint (dkt. no. 1) be dismissed with prejudice; that plaintiff's "Emergency Motion for the Death Penalty" (dkt. no. 5) be dismissed; and that plaintiff's letter motion to file exhibits under seal (dkt. no. 8) be dismissed as moot. *See* April 13, 2021 Report-Recommendation & Order, dkt. no. 10. Plaintiff did not file objections directed to Judge Hummel's recommendations, and the time to do so has expired. Plaintiff did, however, file an amended complaint. For the reasons that follow, the Court adopts Judge Hummel's recommendations, and independently reviews plaintiff's amended complaint and finds it fails to assert viable causes of action.

### II. DISCUSSION

#### a. Complaint

As Judge Hummel explains, plaintiff *pro se* Myrna Althia Alicia Walker purported to commence this action on October 28, 2020, by submitting a complaint and application to proceed in forma pauperis ("IFP") in lieu of paying the Court's filing fee. *See* Dkt. No. 1 ("Compl."); Dkt. No. 2. On March 15, 2021, plaintiff submitted a supplement to her complaint. Dkt. No. 4. On April 6, 2021, plaintiff submitted an additional filing entitled "Emergency Petition for the Death Penalty

Against Adethia Keisha Fitten and Others on the Principle Found in the Law of Necessity." Dkt. No. 5. On April 7, 2021, plaintiff submitted an additional 86 pages to supplement to her complaint. Dkt. Nos. 6, 7. On April 8, 2021, plaintiff submitted additional exhibits and a letter requesting to file those exhibits under seal. Dkt. No. 8.

Plaintiff purports to bring this action pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000, *et seq.* On her form Title VII complaint, she indicates that defendant discriminated against her due to her race and color, religion, sex, and "my date of birth – Easter." Compl. at 2. Plaintiff further indicates, through checking the boxes on the form complaint, that defendant terminated her employment, failed to promote, engaged in unequal terms and conditions of employment, retaliated against her, and "forced prostitution; [i]dentity theft, which is used to do Bank frauds & Poisonings." *Id.* Plaintiff's complaint, inclusive of exhibits, is 158 pages long. Dkt. No. 1. The exhibits include an 80-page letter relating to apparent visa fraud that plaintiff sent to the US Department of Justice, the United States Department of Homeland Security, Immigration and Customs Enforcement, and the Federal Bureau of Investigation, as well as an incident report dated May 29, 2019, regarding an apparent rape of plaintiff.

The supplement plaintiff filed on March 15, 2021 is 112 pages long. Dkt. No. 4. The supplement appears to be filings from a complaint plaintiff had before the Supreme Court, Rensselaer County against Unity House of Troy and Joseph Posa. *Id.* The "emergency motion," filed on April 4, 2021, is 22 pages long, with 70 additional pages of exhibits. Dkt. No. 5. These exhibits are (1) various transfer orders and orders of protection plaintiff either sought or obtained against various individuals in family court proceedings in different counties (dkt. no. 5-1); (2) a residential lease agreement from July 2018, for a property in Troy, New York, with landlord Joseph Posa (dkt. no. 5-2); (3) records from a proceeding before the Rensselaer County Supreme Court in a case captioned Myrna Althia Alicia Walker vs. "Change of Name" Heidi Elizabeth Zuach (dkt. no. 5-3); and (4) a lease agreement dated May 2, 2017, between Capital Group Management LLC and plaintiff for a property in Troy, New York (dkt. no. 5-4). The submission filed on April 7, 2021, is 59 pages long and includes various orders of protection, a USPS tracking number report, a Unity House Domestic Violence Services Transitional Housing Program Handbook, a form from the Rensselaer County Department of Social Services, earnings statements, a New York State

incident report from 2018, an eviction notice, a letter from the Unity House Transitional Housing program, a "notice" letter, and a "birth registration" form. Dkt. No. 6-6. The exhibits filed on April 7, 2021 appear to be letters plaintiff sent to the New York State Department of Labor, United States Department of Homeland Security, Immigration and Customs Enforcement, and the EEOC, apparently related to "pandemic unemployment compensation benefits." *See* dkt. no. 7.

**\*2** Plaintiff's complaint discusses Allison Carolyn Rattray, allegedly the Corporate Secretary and Legal Counsel of defendant CIBC First Caribbean International Bank (Jamaica) Limited. Dkt. No. 1 at 3. Plaintiff contends that Ms. Rattray kills unidentified people "with her married name" and drinks plaintiff's blood. *Id.* Apparently, plaintiff contends that Ms. Rattray is or was her "employer" who "uses the drinking blood of the employee to kill employing the employment agreement and the incomes paid by direct deposit as the consideration for the blood that is drank before the killings and the doomings if [sic] innocent persons." *Id.* at 4. Plaintiff also appears to suggest that Ms. Rattray and her husband, "Barrington Andrew Rattray, Senior Judge, The Commercial Division, The Supreme Court of Jamaica," forced plaintiff to use "illegal psychotropic medicines," cocaine, and alcohol. *Id.* at 5. Plaintiff refers to an employment agreement she signed with Ms. Rattray in 1995 and appears to suggest that since that date, Ms. Rattray "has been stalking the Plaintiff inside her bedroom, bathroom mirror, on her cell phone from 1995 even until today October 20, 2020 even the bathroom staples [sic] has visual and audio devices inside of them." *Id.* at 6. The Complaint then appears to proceed to explain why Ms. Rattray and her various family members are carrying out unspecified killings. *See generally* Dkt. No. 1. Plaintiff further suggests that through her employment with defendant, both defendant and the Commercial Division of the Supreme Court of Jamaica

> has been using me as a sex doll; as sex services; as sex product also incorporating The University of the West Indies Hospital to do surgeries; using illegal force of The Jamaican police; using the illegal Force of the Jamaican Army; using the illegal force of the Jamaican parliament to have men from any where have sex with The Plaintiff because The Plaintiff was

> born on the day the crucifixion was celebrated, that is Easter and Good Friday.

*Id.* at 13. Plaintiff asks the Court for

> an Injunction to stop, restrain and prevent Allison Carolyn Rattray (maiden name Smith), Corporate Secretary and Legal Counsel, CIBC First Carribean Jamaica; her husband, Barrington Andrew Rattray, Senior Judge, The Commercial Division, The Supreme Court of Jamaica, King Street, Kingston, Jamaica, West Indies Deryke Smith, her brother; Lacelles Smith retired lecturer The University of the West Indies, Jamaica, West Indies; and the Rhoda Ford children and others from practicing their religion in a way that results in the death or harm or injury of The Rights of The Plaintiff and or the mother of The Plaintiff and or the siblings of The Plaintiff; and or any member of The Public, which includes anyone in the global community.

*Id.* at 14.

As for plaintiff's first cause of action, plaintiff lists:

> forced religion imposed on The Plaintiff whom is the employee by The Employer, CIBC Limited. The Forced Religion imposed on Myrna Althia Alicia Walker [ ] to kill innocent Persons. The daily murders of innocent Persons is used to supply the demands of the global organ Donor list. The staff is Allison Carolyn Rattray.

Dkt. No. 1 at 69. As for a second cause of action is

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 45 of 449

Walker v. CIBC Limited, Not Reported in Fed. Supp. (2021)

employment discrimination – I chose a career path to be an Attorney-At-Law. Allison Carolyn Rattray (maiden name Smith) my (former) then manager at CIBC had me fired; told me that (1) I am not worthy to be an Attorney-at-Law because of my Race (2) I was not worthy to be in the same Profession as her. She has been defaming my character ever since.

*Id.* at 70. The third cause of action is listed as

employment discrimination - compensation: denied increases in my salary verbally communicated to me by Ms. Cherlyn Blackman my Senior Manager of 3% in 2004; Denied Promotion communicated to me by Human Resources Regional Director, Jerime Cjnttihs-Bell; denied fringe benefits that accompanied my five (5) CIBC Achievers awards – my salary was split and part paid to my aunt.

*Id.* In the prayer for relief, plaintiff requests:

(1) an Injunction(s) for Criminal Indictment(s) of Allison Carolyn (Smith) Rattray, Corporate Secretary and Legal Counsel CIBC for her forced Prostitution of The Plaintiff and Others; (2) An Injunction to prevent and stop all Prostitution or abuse of The Plaintiff; (3) Restitution(s) by CIBC for lost Incomes and fringe benefits[; and] (4) Job Reference letter from CIBC and an apology and my land Title Deed.

*Id.* at 71.

Judge Hummel found (a) that plaintiff's complaint fails to meet the pleading requirements of Fed. R. Civ. P. 8 and 10, *see* Dkt. 10 at 8-9; (b) plaintiff's claims under Title VII (1) are barred by the statute of limitations, and (2) fail to state a claim for employment discrimination in violation of Title VII, *see id.* at 9-10; and (c) apart from the Title VII claims, "plaintiff's claims fail to state any cognizable legal claim under the United States Constitution, federal statute, or state law, and ultimately fails [to] establish this Court's jurisdiction under federal question or diversity jurisdiction." *Id.* at 10. Judge Hummel indicated that he was

**\*3** at a loss as to how the allegations in the complaint relate to a valid employment discrimination claim or any valid legal claim. Plaintiff presents a difficult to comprehend series of allegations against various individuals – many of whose connections to her apparent former employer is difficult, if not impossible, to comprehend – who she alleges forced her into prostitution, performed plastic surgeries on her against her will, installed "spying devices" into plaintiff's body, forced her to undergo various injections, and involved plaintiff in a murder scheme that is somehow related to her Easter birthday. *See* Dkt. No. 1 at 56-60. Plaintiff also sets forth unexplained allegations that appear to involve Ms. Rattray and others, such as "an abuse of a veteran of the United States Army by the said Allison Carolyn Rattray" (dkt. no. 1 at 54). Plaintiff submits dozens of pages of exhibits and supplements that appear to relate to cases filed in other courts, orders of protection obtained in other courts, unemployment insurance issues, police reports, and documents sent to various federal agencies. See dkt. nos. 4, 5, 6, 7. The relevance of this deluge of documents is entirely unclear.

*Id.* at 11.

Judge Hummel also concluded that to the extent plaintiff requests injunctions (dkt. no. 1 at 71) to prevent defendant's employees from prostituting or harming plaintiff or seeks some kind of prosecution of defendant's employees for criminal conduct, this Court does not have authority to direct persons to cease engaging in illegal activity through a civil suit as it is not a law enforcement agency. *Id.* at 11-12.

As to plaintiff's "emergency motion" for the Death Penalty, Judge Hummel found that it appears to ask the United States Supreme Court to enforce the death penalty against various individuals who plaintiff contends engaged in "drug assisted surgeries on The Plaintiff herein to induce The Coronavirus

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 46 of 449

Walker v. CIBC Limited, Not Reported in Fed. Supp. (2021)

ahead of the proposed mass vaccination of the US public, which is set for May 1, 2021[,]" implanting maggots into plaintiff's bones, releasing poisons into plaintiff's body, "install[ing] television" and "Netflix Television" into plaintiff's eye and spinal cord, "alter[ing]" plaintiff's "joints to make [her] walk in [sic] all four" to be "displayed as a naked dog on a lease [sic]," and other similar allegations. *See* Dkt. No. 5. Judge Hummel concluded that "this Court does not have the authority or jurisdiction to *sua sponte* impose the death penalty in a civil case nor can it seek the criminal prosecution of individuals or at the request of a plaintiff or decide the ultimate punishment if convicted after a criminal trial." Dkt. 10 at 12.

Judge Hummel concluded that although the Court must show special solicitude to *pro se* litigants, and is to exercise "extreme caution ... in ordering sua sponte dismissal of a *pro se* complaint before the adverse party has been served and both parties (but particularly the plaintiff) have had an opportunity to respond, ..." *id.* at 14 (quoting *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983) (internal citations omitted)), the Court also has a responsibility to determine that a claim is not frivolous before permitting a plaintiff to proceed with an action *in forma pauperis. Id.* Judge Hummel concluded:

> Even if, *arguendo*, the statute of limitations was not a jurisdictional bar and plaintiff had been able to establish this Court's jurisdiction, the undersigned would still recommend dismissal with prejudice on its initial review as plaintiff's complaint is "factually frivolous." *See Bennett v. Mnuchin*, 6:20-CV-243 (BKS/TWD), 2020 WL 1674068 (citing *Denton v. Hernandez*, 504 U.S. 25, 32-33 (1992)) (holding that a court may dismiss a factually frivolous claim when the allegations are "clearly baseless," including claims that "describe[e] fantastic or delusional scenarios."); *Brown v. New York State Educ. Dept.*, 8:18-CV-169 (TJM/CFH), 2018 WL 1865547, at *2 (N.D.N.Y. Mar. 19, 2018) (dismissing *pro se* plaintiff's complaint with prejudice where "it is clear that no federal claim can be stated on these facts[.]"). Accordingly, the undersigned recommends dismissal with prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B)(i) as any leave to amend would be clearly futile.

**\*4** *Id.* at 14. As indicated above, Judge Hummel also recommends that plaintiff's "Emergency Motion for the Death Penalty" (dkt. no. 5) be dismissed, and that plaintiff's letter motion to file exhibits under seal (dkt. no. 8) be dismissed as moot. *Id.* at 15.

After examining the record, this Court has determined that the recommendations in the Report-Recommendation and Order are not subject to attack for plain error or manifest injustice. Further, even if plaintiff's amended complaint is treated as an objection, the Court has completed a *de novo* review and has determined to adopt Magistrate Judge Hummel's recommendations for the reasons stated in his report.

**b. Amended Complaint**

As indicated, plaintiff filed an amended complaint after Judge Hummel recommended that the complaint be dismissed with prejudice. After a review of the amended complaint, the Court finds that it too must be dismissed with prejudice.

Plaintiff's amended complaint is a form Title VII complaint. *See* dkt. no. 11. She indicates that the defendant is "CIBC Limited/Michael Capatide CEO CIBC." *Id.* at ¶ 3(b). [1] Plaintiff checks the boxes indicating that the defendant discriminated against her on account of her "race or color," "religion," "sex (or sexual harassment)," "national origin," and "other" indicating on the line that follows: "my right to marry; my right to life; my right to work and provide for my daily living expenses." *Id.* at ¶ 6. Where plaintiff is asked to indicate what the complained-of conduct involves, she checked the boxes for "failure to employ," "termination of employment," "failure to promote," "unequal terms and conditions of employment," "retaliation," and "other acts as specified below" after which she writes: "I am being sex trafficked by CIBC First Caribbean staff in lieu of my salary." *Id.* at ¶ 7. In the section of the amended complaint asking for the facts underlying her claims, plaintiff asserts she is being sex trafficked because she was born on Easter and that the sex trafficking is in lieu of her salary paid to her by CIBC First Caribbean Jamaica." *Id.* ¶ 8. She also asserts that "the force" of the Jamaican Police, the Jamaican Judiciary, the Jamaican Hospital, and the University of the West Indies are conspiring with her "Walker relatives used to commit crimes with my identity using identity theft of Myrna Suzette Walker employed by Jamaican government Judge Barrington Andrew Rattray & Allison Carolyn Rattray." *Id.* In addition, she asserts that "Adethia Keisha Fitten is physically cutting me to create presumed consent for the crimes organized by Judge Barrington Andrew Rattray." *Id.*

The First Cause of Action alleges "forced organized criminality using the salary that was paid to the plaintiff by CIBC First Caribbean Jamaica January 1, 1995 to March 28, 2009." It also asserts that Myrna Suzette Walker "is a

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 47 of 449

Walker v. CIBC Limited, Not Reported in Fed. Supp. (2021)

thief," and that "Allison Carolyn Rattray ... hired Myrna
Suzette Walker and her five (5) children and Adethia Keisha
Fitten to steal and to say that the stealing was done by
the plaintiff." Plaintiff also appears to indicate that "to do
the stealing," Myrna Suzette Walker "and others" repeatedly
physically injure plaintiff. As discussed by Judge Hummel,
these allegations do not provide plaintiff with a timely Title
VII cause of action, *see, e.g.,* Am. Compl. attach. 4, dkt. no.
11-4 at 1, [2] nor do they provide a basis for the relief plaintiff
seeks. *See* Dkt. 11, at 5. [3]

**\*5** The Second Cause of Action asserts violations of the
"Human Rights Act of 1998." The Human Rights Act of
1998 appears to be a law or act of Parliament in the
United Kingdom. *See Brady v. Wks. Med. Ctr.*, No. 19-
CV-00655-SM, 2019 WL 6529870, at *2 (D.N.H. Nov.
12, 2019)("A law in effect in the United Kingdom bears
that title.")(citing Human Rights Act 1998, ch. 42, http://
www.legislation.gov.uk/ukpga/1998/42/contents), *report and
recommendation approved*, No. 19-CV-655-SM, 2019 WL
6529459 (D.N.H. Dec. 4, 2019); *Simpson v. Dauphin Cty.
Hous. Auth.*, No. 1:16-CV-01747, 2017 WL 2375702, at *2,
n. 4 (M.D. Pa. Apr. 26, 2017) ("Simpson also references
a 'Human Rights Act of 1998,' which as best we can tell
refers to an Act of Parliament of the United Kingdom, not
applicable in this jurisdiction."), *report and recommendation
adopted*, No. 1:16-CV-1747, 2017 WL 2362510 (M.D. Pa.
May 31, 2017). The Human Rights Act of 1998 does not
provide plaintiff with a viable cause of actions against the
defendant for any events occurring in the Northern District of
New York over which this Court would have jurisdiction. *See
Brady*, 2019 WL 6529870, at *2.

The Third Cause of Action is confusing but appears to be a
claim seeking unpaid wages. *See* dkt. no. 11 at 4 (stating at
the start of Third Cause of Action: "The right to my paycheck.").
Plaintiff asserts that her aunt Myrna Suzette Walker "assisted
by CIBC First Caribbean staff Allison Carolyn Rattray has
been falsely selling me as a whore in lieu of my current
income(s) from JC Penney, Aerotek, Walmart, Fidelis Care
and more." However, Myrna Suzette Walker, Allison Carolyn
Rattray, JC Penney, Aerotek, Walmart, or Fidelis Care are
not defendants in this action. Further, plaintiff does not
assert when it was that she worked at JC Penney, Aerotek,
Walmart, or Fidelis Care, or when or where it was that Myrna
Suzette Walker and Allison Carolyn Rattray purportedly took
actions preventing plaintiff from receiving her wages from
these employers. The claim in this regard fails to assert a

viable cause of action under Title VII. In addition, in nearly
incomprehensible fashion plaintiff ends the Third Cause of
Action by asserting: "The rapes of me by co-workers is [sic]
recorded and published. Walmart staff a [sic] man named
Donnell she [sic] gave permission to live in my apartment as
well as Fidelis Care Health Insurance staff- Rashid Rardon."
These allegations fail to provide a sufficient basis for the
Court to discern any viable cause of action under Title VII
or any other law or statute over which the Court would have
jurisdiction.

Accordingly, for the reasons set forth above plaintiff's
amended complaint will be dismissed. Because the
allegations in the amended complaint are factually frivolous,
and because plaintiff filed an amended complaint that did
not cure the pleading defects pointed out by Judge Hummel,
dismissal will be with prejudice pursuant to 28 U.S.C. §
1915(e)(2)(B)(i) as any leave to amend would be futile.

### III. CONCLUSION

For the reasons discussed above, the Court **ACCEPTS AND
ADOPTS** Judge Hummel's recommendations in the April 13,
2021 Report-Recommendation & Order, dkt. no. 10. Thus, it
is hereby

**ORDERED** that plaintiff's complaint (dkt. No. 1) is
**DISMISSED with prejudice**; and it is further

**ORDERED** that plaintiff's "Emergency Motion for the Death
Penalty" (dkt. no. 5) is **DENIED and DISMISSED**; and it
is further

**ORDERED** that plaintiff's letter motion to file exhibits under
seal (dkt. no. 8) is **DENIED and DISMISSED as moot**.

Based on the Court's review of the amended complaint, it is
hereby

**ORDERED** that plaintiff's amended complaint (dkt. No. 11)
is **DISMISSED with prejudice**.

The Clerk of the Court may mark this file as closed.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2021 WL 3204860

**Footnotes**

1    At paragraph 3(a) asking to identify the defendant, plaintiff writes: "Not Applicable"

2    Dkt. no. 11-4 is a letter from Maureen Kielt, Director of the EEOC Buffalo Local Office to plaintiff in the matter
     of *Walker v. CIBC* confirming that plaintiff indicated that her "last date of harmed occurred on March 24,
     2009, when [she] was terminated," thus making her EEOC administrative claim against CIBC untimely. Dkt.
     No. 11-4 at 1.

3    In the Prayer for Relief, plaintiff requests the Court to grant the following relief:

     1. The plaintiff <u>do</u> <u>not</u> [sic] want to be a party to the religious killing business of Myrna Suzette Walker;
     her five children; and CIBC First Caribbean Jamaica staff, Allison Carolyn Rattray and her husband Judge
     Barrington Andrew Rattray, Supreme Court of Jamaica;

     2. The plaintiff do not [sic] want cocaine nor any thing to ingest from anyone, by force or otherwise.

     3. The plaintiff wants full restitution socially, physically, professionally.

     Dkt. 11, at 5 (emphasis in original).

---

**End of Document**                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 1789593
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Alexander McFADDEN, Plaintiff,

v.

Jose D. ORTIZ, Executive Officer Chase JP
Morgan Chase & Co., and James Simon, Manager
Chase JP Morgan Chase & Co., Defendants.

No. 5:12–CV–1244 (MAD/ATB).
|
April 26, 2013.

**Attorneys and Law Firms**

Alexander McFadden, Pine City, NY, pro se.

Jose D. Ortiz, Executive Officer for Chase JP Morgan Chase & Co., Houston, TX.

James Simon, Manager for Chase JP Morgan Chase & Co., New York, NY.

**MEMORANDUM–DECISION AND ORDER**

MAE A. D'AGOSTING, District Judge.

**I. INTRODUCTION**

*\*1* Plaintiff *pro se* Alexander McFadden ("McFadden"), an inmate at the Southport Correctional Facility ("SCF"), filed this action pursuant to 42 U.S.C. § 1983. In his complaint, Plaintiff appears to allege that Defendants, two executives of Chase JP Morgan Chase & Co. ("Chase"), violated his constitutional rights through conduct that, in some way, involved a bank account. *See* Dkt. No. 1 at ¶ 4.

On August 7, 2012, Magistrate Judge Andrew T. Baxter issued an Order and ReportRecommendation, recommending that the Court dismiss Plaintiff's complaint in its entirety with prejudice, pursuant to 28 U.S.C. § 1915(e)(2)(B)(i)-(ii). *See* Dkt. No. 5. Currently before the Court are Plaintiff's objections to Magistrate Judge Baxter's August 7, 2012 Order and ReportRecommendation.

**II. BACKGROUND**

In his Order and Report–Recommendation dated August 7, 2012, Magistrate Judge Baxter recommended that Plaintiff's motion to proceed *in forma pauperis* ("IFP") should be denied by the Court and, upon review of the complaint, that this action be dismissed in its entirety with prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B)(i)-(ii). *See* Dkt. No. 5 at 9. Further, Magistrate Judge Baxter recommended that if the Court approves his report, the Court should certify that any appeal from this matter will not be taken in good faith pursuant to 28 U.S.C. § 1915(a)(3). *See id.*

Regarding Plaintiff's complaint, Magistrate Judge Baxter's Order and ReportRecommendation recommends that because there is no indication that either Defendant acted under "color of state law," and because there are no allegations that either or both Defendants "conspired" with any state actors to bring this action under section 1983, Plaintiff's complaint should be dismissed. *See* Dkt. No. 5 at 5.

Regarding Plaintiff's claim that Defendants violated New York Penal Law by offering false documents for filing, tampering with public records, and falsifying business records, Magistrate Judge Baxter recommended that because there is no private right of action to enforce either state or federal criminal statutes, Plaintiff is barred from bringing a claim to enforce these provisions of the New York State Criminal Law. *See* Dkt. No. 5 at 6.

Accordingly, Magistrate Judge Baxter recommended this Court hold that, due to Plaintiff's failure to state a claim under 42 U.S.C. § 1983 upon which relief can be granted, combined with the courts inability to determine what venue might be appropriate, Plaintiff's motion for IFP should be denied, and Plaintiff's complaint should be dismissed in its entirety with prejudice pursuant 28 U.S.C. § 1915(e)(2)(B)(i)-(ii). *See* Dkt. No. 5 at 9.

In his "objections" to Magistrate Judge Baxter's Order and Report–Recommendation, Plaintiff simply provides the Court with language from various cases discussing various types of objections and the Court's authority to review unpreserved errors. *See* Dkt. Nos. 14, 15.

**III. DISCUSSION**

## A. Review of a magistrate judge's decision

**\*2**  If a party files specific objections to a magistrate judge's report-recommendation, the district court performs a *"de novo* determination of those portions of the report of specified proposed findings or recommendations to which objections is made." 28 U.S.C. § 636(b)(1) (2006). However, if a party files "[g]eneral or conclusory objections or objections which merely recite the same arguments [that were presented] to the magistrate judge," the court simply reviews those recommendations for clear error. *O'Diah v. Mawhir,* No. 9:08–CV–322, 2011 WL 933846, \*1 (N.D.N.Y. Mar. 16, 2011) (citations and footnote omitted). At the conclusion of the appropriate review, "the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).

## B. *In Forma Pauperis* application

In order for a plaintiff to proceed without payment of any fees, he must first meet the financial criteria for IFP status. *See* 28 U.S.C. § 1915(a)(1). The plaintiff must submit an affidavit, including a statement of all assets, establishing his inability to pay the filing fee of $350.00. *See id.* Here, Plaintiff submitted a standard IFP application form, but answered only some of the relevant questions. Furthermore, while Plaintiff is incarcerated and has filed a motion to proceed IFP, his application states that, in the past twelve months, he has had income from "[b]usiness, profession or other self employment," and has "millions of dollars" in "cash, checking or savings accounts." *See* Dkt. No. 2 at ¶¶ 3, 4. Plaintiff, however, does not answer the question that asks him to "describe the source of money and state the amount received and what you expect you will continue to receive ." *See id.* at ¶ 3. Plaintiff answers "yes" to the questions asking whether he owns "real estate, stocks, bonds, securities, other financial instruments, automobile or any other assets." *See id.* at ¶ 5. Once again, however, Plaintiff does not complete the question by describing the property and stating its value. *See id.* Lastly, the form indicates that Plaintiff only has $9.60 in his prison account, and that during the last six months prior to this application, the average balance in his prison account was $4.03. *See* Dkt. No. 2 at 2.

If Plaintiff's claims are true and he does in fact have millions of dollars and real estate or other valuable property, then he cannot meet the financial requirements for proceeding IFP. Generally, when plaintiff has failed to properly complete the IFP request, the court will deny IFP without prejudice and allow plaintiff to resubmit the form with proper information.

However, in this case, based upon the inadequacy of Plaintiff's responses, combined with his failure to state a plausible cause of action and the fact that amendment would be futile as discussed below, even if Plaintiff met the financial requirements for IFP, the Court would still find dismissal of this action to be proper.

## C. Sufficiency of the complaint

### 1. Legal Standard

**\*3**  In addition to determining whether Plaintiff meets the financial criteria to proceed IFP, the court must also consider the sufficiency of the allegations set forth in the complaint in light of 28 U.S.C. § 1915, which provides that the court shall dismiss the case at any time if it determines that the action is (i) frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief. *See* 28 U.S.C. § 1915(e)(2)(B) (i)-(iii).

### 2. Application

#### a. Color of state law

Plaintiff brings this complaint pursuant to 42 U.S.C. § 1983. *See* Dkt. No. 1. To state a claim under section 1983, a plaintiff must allege two elements: (1) the defendant acted under color of state law; and (2) as a result of the defendant's actions, the plaintiff suffered a deprivation of her rights or privileges as secured by the Constitution of the United States. *See Annis v. County of Westchester,* 136 F.3d 239, 245 (2d Cir.1998). Under extremely limited circumstances not alleged here, private actors, such as Defendant, may be held liable under section 1983. *See White v. Monarch Pharmaceuticals,* Inc., No. 08–CV–0430, 2009 WL 3068217, \*1 (2d Cir. Sept. 28, 2009); *see also Rendell—Baker v. Kohn,* 457 U.S. 830, 838–42 (1982). The law does not reach private conduct, no matter how "discriminatory or wrongful." *Annis,* 136 F.3d at 245 (quoting *Blum v. Yaretsky,* 457 U.S. 991, 1002 (1982)).

In the present matter, Plaintiff names two executives of Chase as Defendants. Along with being very difficult to determine what these Defendants allegedly did to Plaintiff, there is no indication that either Defendant acted under color of state law. Moreover, the complaint does not allege or suggest that Defendants conspired with a state actor to violate his constitutional rights. Further, Plaintiff does not allege any conduct attributable to either Defendant sufficient to establish

their personal involvement in any alleged constitutional deprivation. *See Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quotation and other citations omitted).

Based on the foregoing, the Court finds that Magistrate Judge Baxter correctly recommended that the Court should dismiss the complaint.

#### b. Criminal statutes

Plaintiff states in the "Causes of Action" section of his complaint that Defendants violated the New York Penal Law regarding falsifying business records, tampering with public records, and offering false documents for filing. *See* Dkt. No. 1 (citing N.Y. PENAL LAW §§ 175.10, 175.25, and 175.35). Even if this is true, however, there is no private right of action to enforce either state or federal criminal statutes. *See Abrahams v. Incorporated Village of Hempstead,* No. 08–CV–2584, 2009 WL 1560164, *8 (E.D.N.Y. June 2, 2009) (holding that dismissal of civil suit for perjury was proper because there is no private right of action for perjury under New York Law). Therefore, even assuming, *arguendo,* that Defendants violated some criminal statutes, Plaintiff may not bring a claim based on those statutes to enforce New York Criminal Law.

**\*4** As such, Magistrate Judge Baxter correctly recommended the Court find that Plaintiff has failed to allege a plausible cause of action.

#### c. Venue

Venue in federal-question cases is generally determined by 28 U.S .C. § 1391(b) which provides that

> [a] civil action wherein jurisdiction is not founded solely on diversity of citizenship may, except as otherwise provided by law, be brought only in (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, ... or (3) a judicial district in which any defendant may be found, if

there is no district in which the action may otherwise be brought.

28 U.S.C. § 1391(b). In this case, one of the Defendants is listed with a Houston, Texas address, while the other Defendant is listed as having a New York City address. *See* Dkt. No. 1 at ¶¶ 3(a) and (3)(b). Thus, neither of the Defendants reside, or are located, in the Northern District of New York. Plaintiff is incarcerated at Southport Correctional Facility, located in the Western District of New York. Therefore, since both Plaintiff and one of the Defendants are New York residents, this case could clearly not be brought as a diversity action. Moreover, under Plaintiff's section 1983 claim, venue is not proper in the Northern District of New York. All Defendants do not reside in the same state, neither Defendant is located in this district, and the complaint does not allege any conduct that occurred in the Northern District of New York.

Under 28 U.S.C. § 1406, a district court faced with a case brought "laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." 28 U.S.C. § 1406(a). The Second Circuit has suggested that "a district court should not dismiss for improper venue on its own motion except in extraordinary circumstances." *Concession Consultants, Inc. v. Mirisch,* 355 F.2d 369 (2d Cir.1966).

In the present matter, the Court finds and agrees with Judge Baxter's Order and ReportRecommendation that this case presents precisely the extraordinary circumstances making it proper for the Court to dismiss for improper venue *sua sponte.*

#### d. Leave to amend

When a *pro se* complaint fails to state a cause of action, the court generally "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (internal quotation and citations omitted). Of course, an opportunity to amend is not required where "[t]he problem with [the plaintiff's] cause of action is substantive" such that "better pleading will not cure it ." *Id.* (citation omitted); *see also Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129, 131 (2d Cir.1993).

**\*5** Here, the Court agrees with Magistrate Judge Baxter that any attempt by Plaintiff to amend his complaint would be futile. As discussed, although Plaintiff alleges "due process violations," section 1983 does not permit such actions to be brought against private individuals absent some involvement by the state. Moreover, Plaintiff does not have the right to enforce New York State criminal statutes.

Based on the foregoing, the Court finds that Magistrate Judge Baxter correctly recommended that the Court should dismiss Plaintiff's complaint with prejudice.

### IV. CONCLUSION

After carefully considering Magistrate Judge Baxter's Order and Report–Recommendation, the applicable law, and for the reasons stated herein, the Court hereby

**ORDERS** that Magistrate Judge Baxter's August 7, 2012 Order and Report–Recommendation is **ADOPTED** in its entirety for the reasons stated therein; and the Court further **ORDERS** that Plaintiff's application to proceed *in forma pauperis* is **DENIED;** and the Court further

**ORDERS** that Plaintiff's complaint is **DISMISSED with prejudice** pursuant to 28 U.S.C. § 1915(e)(2)(B)(i)-(ii); and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendants' favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve Plaintiff with a copy of this Memorandum–Decision and Order in accordance with Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 1789593

---

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

 © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:24-cv-00037-DNH-ML  Document 9  Filed 06/11/24  Page 53 of 449

Polinski v. Oneida County Sheriff, Not Reported in Fed. Supp. (2023)

2023 WL 2988753
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Peter Joseph POLINSKI, Plaintiff,

v.

ONEIDA COUNTY SHERIFF, in his official
and individual capacities; Comptroller of City
of Utica, William Moorehouse; KeyBank of the
City of Utica; and City of Utica, Defendants.

6:23-CV-0316 (DNH/ML)
|
Signed April 17, 2023
|
Filed April 18, 2023

**Attorneys and Law Firms**

PETER JOSEPH POLINSKI, Plaintiff, Pro Se, 5735
Cavanaugh Road, Suite 614, Marcy, New York 13403.

ZACHARY OREN, ESQ., Assistant Corp. Counsel,
CORPORATION COUNSEL – CITY OF UTICA, Counsel
for Defendants Comptroller of the City of Utica and City of
Utica, 1 Kennedy Plaza, 2nd Floor, Utica, New York 13502.

### ORDER and REPORT-RECOMMENDATION

MIROSLAV LOVRIC, United States Magistrate Judge

**\*1** The Clerk has sent a *pro se* amended complaint in
the above captioned action together with an application to
proceed *in forma pauperis* filed by Peter Joseph Polinski
("Plaintiff") to the Court for review. (Dkt. Nos. 2, 4.)
For the reasons discussed below, I grant Plaintiff's *in
forma pauperis* application and recommend that Plaintiff's
Amended Complaint be dismissed in its entirety. (Dkt. Nos.
2, 4.)

## I. BACKGROUND
On March 9, 2023, Plaintiff commenced this action by filing a
*pro se* Complaint against defendants Oneida County Sheriff,
Comptroller of City of Utica, KeyBank of the City of Utica,
and City of Utica (collectively "Defendants"). (Dkt. No. 1.)
On March 17, 2023, Plaintiff filed an amended complaint as of
right, which supersedes his original complaint. (*See* Dkt. No.

4 [Am. Compl.]); *Int'l Controls Corp v. Vesco*, 556 F.2d 665,
668 (2d Cir. 1977) ("It is well established that an amended
complaint ordinarily supersedes the original, and renders it of
no legal effect."). Thus, presently before the undersigned for
review pursuant to 28 U.S.C. § 1915, is Plaintiff's Amended
Complaint. (Dkt. No. 4.)

The Amended Complaint is thirty-one pages with an attached
exhibit that is ninety-five pages in length. (*See generally*
Dkt. No. 4.) The Amended Complaint and its attachment are
predominantly a series of incoherent text, devoid of factual
assertions. (*Id.*)

Although not clear from the Amended Complaint,
Plaintiff appears to allege that on October 31, 2022, he
provided checks to "THE CITY OF UTICA FINANCE
DEPARTMENT OFFICE OF THE COMPTROLLER" but
that those payments were "fraudulently transferred by
[Defendants] the Comptroller of Utica and Key Bank." (Dkt.
No. 4 at 8.)

The Amended Complaint alleges that on March 1, 2023, two
Oneida County Sheriffs went to Plaintiff's parents' home,
where Plaintiff does not live. (*Id.*) Plaintiff alleges that, on
March 1, 2023, he explained to an Oneida County Sheriff that
"the instruments were legal tender and that the instruments
needed to go to the Treasury Window" and "the authority
behind the negotiable instrument law." (Dkt. No. 4 at 9.)

Plaintiff alleges that on March 7, 2023, his father (Peter
Anthony Polinski) received a phone call (from an unspecified
individual) "menacing and harassing him with threats of
violence, to kidnap his son with an unlawful arrest." (Dkt. No.
4 at 8-9.)

Plaintiff's Amended Complaint lists numerous statutes,
contains biblical references, and refers to, *inter alia*, the
Magna Carta, the 1620 Mayflower Compact, and the 1689
English bill of rights. (*See generally* Dkt. No. 4; Dkt. No. 4
at 7.) Notwithstanding, the Amended Complaint references
the following thirteen "counts" that appear to be Plaintiff's
claims: (1) a claim that Defendants violated Plaintiff's
constitutional rights under color of law pursuant to 42 U.S.C.
§ 1983; (2) a claim that Defendants conspired to interfere
with Plaintiff's civil rights pursuant to 42 U.S.C. § 1985; (3) a
claim of conspiracy against Defendants pursuant to 18 U.S.C.
§ 241; (4) a claim of deprivation of rights under color of
law against Defendants pursuant to 18 U.S.C. § 242; (5) a
claim that Defendants interfered with commerce pursuant to

Polinski v. Oneida County Sheriff, Not Reported in Fed. Supp. (2023)

Case 3:24-cv-00037-DNH-ML    Document 9    Filed 06/11/24    Page 54 of 449

18 U.S.C. § 1951; (6) a claim that Defendants conspired to commit an offense or defraud the United States pursuant to 18 U.S.C. § 371; (7) a claim that Defendants refused to pay as evidence of embezzlement pursuant to 18 U.S.C. § 3487; (8) a claim that Defendants committed the misdemeanor of menacing in the third degree in violation of N.Y. Penal Law § 120.15; (9) a claim that Defendants violated Plaintiff's rights pursuant to 18 U.S.C. 1961; (10) a claim that Defendants violated Plaintiff's rights pursuant to 18 U.S.C. § 875; (11) a claim that Defendants violated Plaintiff's rights pursuant to 18 U.S.C. § 471; (12) a claim that Defendants violated Plaintiff's rights pursuant to 18 U.S.C. § 641; and (13) a claim that Defendants violated Plaintiff's rights pursuant to 18 U.S.C. § 115. (Dkt. No. 4 at 25-27.)

**\*2** As relief, Plaintiff seeks damages in the amount of $39,000,000.00 from each Defendant for a total of $195,000,000.00 in compensatory damages, treble punitive damages, a "permanent injunction and restraining order ... requiring Defendants to adopt appropriate policies related to the hiring and supervision of its police officers ... who are ... depriving [Plaintiff] of his Constitutional Rights"; and such other relief as may be just and proper. (Dkt. No. 4 at 29-30.)

Plaintiff also filed a motion for leave to proceed *in forma pauperis.* (Dkt. No. 2.)

## II. PLAINTIFF'S APPLICATION TO PROCEED *IN FORMA PAUPERIS*

"When a civil action is commenced in a federal district court, the statutory filing fee, currently set at $402, must ordinarily be paid. 28 U.S.C. § 1914(a). A court is authorized, however, to permit a litigant to proceed *in forma pauperis* status if a party "is unable to pay" the standard fee for commencing an action. 28 U.S.C. § 1915(a)(1). [1] After reviewing Plaintiff's *in forma pauperis* application (Dkt. No. 2), the Court finds that Plaintiff meets this standard. Therefore, Plaintiff's application to proceed *in forma pauperis* is granted. [2]

## III. LEGAL STANDARD FOR REVIEW OF THE COMPLAINT

Although the court has a duty to show liberality toward *pro se* litigants, and must use extreme caution in ordering *sua sponte* dismissal of a *pro se* complaint before the adverse party or parties have been served and have had an opportunity to respond, the court still has a responsibility to determine that a claim is not frivolous before permitting a plaintiff to proceed,

notwithstanding payment of the filing fee. *Fitzgerald v. First East Seventh Street Tenants Corp.*, 221 F.3d 362, 364 (2d Cir. 2000) (a district court "may dismiss a frivolous complaint *sua sponte* even when the plaintiff has paid the required filing fee[.]"); *see also Pflaum v. Town of Stuyvesant, Columbia Cnty., N.Y.*, 11-CV-0335, 2016 WL 865296, at \*1, n.2 (N.D.N.Y. Mar. 2, 2016) (Suddaby, C.J.) (finding that the Court had the power to address and dismiss additional theories of the plaintiff's retaliation claim *sua sponte* because those theories were so lacking in arguable merit as to be frivolous). In determining whether an action is frivolous, the court must consider whether the complaint lacks an arguable basis in law or in fact. *Neitzke v. Williams*, 490 U.S. 319, 325 (1989). Dismissal of frivolous actions is appropriate to prevent abuses of court process as well as to discourage the waste of judicial resources. *Neitzke*, 490 U.S. at 327; *Harkins v. Eldridge*, 505 F.2d 802, 804 (8th Cir. 1974).

## IV. ANALYSIS

In addressing the sufficiency of a plaintiff's complaint, the court must construe his pleadings liberally. *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008). Having reviewed Plaintiff's Amended Complaint with this principle in mind, I recommend that all causes of action be dismissed.

**\*3** Plaintiff's Amended Complaint is nearly impossible to decipher. (*See generally* Dkt. No. 4.) The Amended Complaint is replete with pseudo-legal jargon of the kind typically used by litigants who affiliate themselves with the sovereign citizen movement. (*Id.*) The sovereign citizen movement is "a loosely affiliated group who believe that the state and federal governments lack constitutional legitimacy and therefore have no authority to regulate their behavior; the FBI has labeled the sovereign citizens a domestic terrorist group." *United States v. Ulloa*, 511 F. App'x 105, 107 (2d Cir. 2013).

I recommend dismissal of Plaintiff's Amended Complaint because it is frivolous. By way of example, the Amended Complaint states the following:

> By the grace of God almighty, and through the supremacy clause of the Constitution (Article VI Clause 2 & 3) and the below-listed treaties of supreme law, it is I alone, who shall determine my status, standing, honor

Case 3:24-cv-00037-DNH-ML Document 9 Filed 06/11/24 Page 55 of 449

Polinski v. Oneida County Sheriff, Not Reported in Fed. Supp. (2023)

and jurisdiction. I hereby invoke and stand upon all my natural rights, given by my God, which are written in the documents listed below. These, and all others, are universally known as supreme law of the land:

(Dkt. No. 4 at 7.)

"People who identify as sovereign citizens use maneuvers like [a] notary presentment to avoid paying debts or to collect debts that are not actually owed." *Balash-Ioannidou v. Contour Mortg. Corp.*, 22-CV-4506, 2022 WL 3358082, at *2 (E.D.N.Y. Aug. 15, 2022) (citing *Kesick v. Ulloa*, 10-CV-1248, 2012 WL 2873364, at *3 (N.D.N.Y. July 12, 2012) (McAvoy, J.) (the plaintiff filed fraudulent papers entitled "notary presentment" with the Town of Ulster Justice Court falsely claiming that a Justice of the Ulster Town Court owed him the sum of $176,000,000.00); *McKay v. U.S. Bank*, 14-CV-0872, 2015 WL 5657110, at *2 (M.D. Ala. Sept. 24, 2015) (denying plaintiffs' request for declaratory judgment that the defendant was not the real mortgage holder and to quiet title based upon their mailing of a "notarial presentment" and a "notarial notice of Dishonor" to the defendant bank)); *see Muhammad v. Smith*, 13-CV-0760, 2014 WL 3670609, at *2 (N.D.N.Y. July 23, 2014) (D'Agostino, J.) ("Theories presented by redemptionist and sovereign citizen adherents have not only been rejected by the courts, but also recognized as frivolous and a waste of court resources.") (collecting cases).

As a result, I recommend that Plaintiff's Amended Complaint be dismissed as frivolous.

In the alternative, I recommend that Plaintiff's Amended Complaint be dismissed in its entirety (a) in part for failure to state a claim upon which relief may be granted, and (b) in part for lack of standing.

### A. Plaintiff's Claims Asserting Various New York State and Federal Criminal Provisions

To the extent that Plaintiff attempts to assert claims pursuant to New York State Penal Law § 120.15, and 18 U.S.C. §§ 115 (Influencing, Impeding, or Retaliating Against a Federal Officer), 241 (Conspiracy against Rights), 242 (Deprivation of Rights under Color of Law), 371 (Conspiracy to Commit Offense or to Defraud the United States), 471 (Obligations or Securities of United States), 641 (Public Money, Property or Records), 875 (Interstate Communications), and 1951 (Interference with Commerce by Threats or Violence), I recommend that those claims be dismissed because Plaintiff lacks standing to pursue them.

There is no private right of action to enforce state or federal criminal statutes. *See generally Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973) ("[A] private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another."); *see also Walker v. CIBC Ltd.*, 20-CV-1337, 2021 WL 3518439, at *5 (N.D.N.Y. Apr. 13, 2021) (Hummel, M.J.) ("It appears plaintiff is either seeking the criminal prosecution of an individual or individuals or a law enforcement investigation, which is beyond this Court's jurisdiction."), *report-recommendation adopted by* 2021 WL 3204860 (N.D.N.Y. July 29, 2021) (McAvoy, J.); *McFadden v. Ortiz*, 12-CV-1244, 2013 WL 1789593, at *3 (N.D.N.Y. Apr. 26, 2013) (D'Agostino, J.) (holding that "there is no private right of action to enforce either state or federal criminal statutes.").

*4 As a result, I recommend dismissal of all of Plaintiff's claims that are premised on alleged violations of federal or state criminal laws. *See Walsh v. Krantz*, 386 F. App'x 334, 336 (3d Cir. 2010) (affirming district court dismissal that found there was no "private right of enforcement" for violations of 18 U.S.C. § 875); *Lawton v. Wells Fargo Bank, N.A.*, 22-3294, 2023 WL 2539000, at *4 (E.D. Pa. Mar. 16, 2023) (citing *Luckett v. Bure*, 290 F.3d 493, 497 (2d Cir. 2002) (no cause of action for forgery); *McCann v. Falato*, 14-4869, 2015 WL 6445859, at *3 (D.N.J. Oct. 23, 2015) (no cause of action under 18 U.S.C. § 371)) (dismissing the plaintiff's claims pursuant to 18 U.S.C. §§ 371, 471 because those "are criminal statutes that do not contain private rights of action."); *Allen v. FMR LLC*, 23-CV-0031, 2023 WL 142903, at *2 (D. Ariz. Jan. 10, 2023) (dismissing the plaintiff's claims pursuant to 18 U.S.C. §§ 471, 641 because "these are criminal statutes and do not create any private right of action."); *Isaacs v. Steven Allen Isaacs*, 21-CV-1912, 2022 WL 18492546, at *4 n.7 (M.D. Fla. Oct. 27, 2022) (citing *Pompura v. Paxton*, 16-CV-1099, 2016 WL 11586260, at *3 (W.D. Tex. Sept. 30, 2016) (finding that 18 U.S.C. § 641 does not provide for a private right of action and collecting cases)) (dismissing the plaintiff's claims for lack of subject matter jurisdiction and noting that "several of the federal statutes Plaintiff references do not provide private causes of action."); *Hall v. Sampson*, 21-CV-4839, 2022 WL 2068248, at *2 n.2 (E.D. Pa. June 8, 2022) (collecting cases) (holding that the

Polinski v. Oneida County Sheriff, Not Reported in Fed. Supp. (2023)

Case 3:24-cv-00037-DNH-ML    Document 9    Filed 06/11/24    Page 56 of 449

plaintiff cannot bring criminal charges against the defendants through a private lawsuit and that claims pursuant to, *inter alia*, 18 U.S.C. §§ 241, 371 do not give rise to a civil cause of action); *Barnaby v. Michigan State Gov't*, 22-CV-1146, 2022 WL 9005214, at *4 (W.D. Mich. Dec. 14, 2022) (dismissing the plaintiff's claim pursuant to 18 U.S.C. § 471 because it is a criminal statute that does "not provide a private right of action."); *Ojeda v. Mendez*, 20-CV-3910, 2021 WL 66265, at *3 (E.D.N.Y. Jan. 7, 2021) (quoting *Connecticut Action Now, Inc. v. Roberts Plating Co.*, 457 F.2d 81, 86-87 (2d Cir. 1972)) (holding that 18 U.S.C. § 1951 is a federal criminal statute, which may be "prosecuted by the Federal Government, not ... by private complaints," but noting that it is a predicate act for purposes of a RICO violation and thus, the allegations may be relevant to the surviving RICO claim); *Lewis v. Soc. Sec. Admin.*, 20-CV-9277, 2020 WL 6647424, at *3 (S.D.N.Y. Nov. 10, 2020) (dismissing as frivolous the plaintiff's claim pursuant to, *inter alia*, 18 U.S.C. § 1951 because it seeks to prosecute the defendant for violations of the Hobbs Act); *Patterson v. Patterson*, 16-CV-0844, 2019 WL 1284346, at *7 (W.D.N.Y. Mar. 20, 2019) (quoting *Christian v. Town of Riga*, 649 F. Supp. 2d 84, 91 (W.D.N.Y. 2009)) ("Courts within this Circuit have accordingly held consistently that criminal charges under New York law 'cannot be prosecuted by a private person.' "); *Brett v. Rodriguez*, 15-CV-2366, 2016 WL 3704917, at *3-4 (M.D. Pa. Mar. 21, 2016) (finding that 18 U.S.C. § 115, as a criminal statute, does not create a private right of action); *Walthour v. Herron*, 10-01495, 2010 WL 1877704, at *2 (E.D. Pa. May 6, 2010) (recognizing no private right of action under, *inter alia*, 18 U.S.C. §§ 241, 371).

As a result, I recommend that, in the alternative, Plaintiff's claims pursuant to New York State Penal Law § 120.15, and 18 U.S.C. §§ 115, 241, 242, 371, 471, 641, 875, and 1951, be dismissed because Plaintiff lacks standing to pursue them.

### B. Claim Pursuant to 42 U.S.C. § 1983

"To state a valid claim under § 1983, the plaintiff must allege that the challenged conduct (1) was attributable to a person acting under color of state law, and (2) deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States." *Whalen v. Cnty. of Fulton*, 126 F.3d 400, 405 (2d Cir. 1997) (citing *Eagleston v. Guido*, 41 F.3d 865, 875-76 (2d Cir. 1994)). Thus, § 1983 does not create any independent substantive right, but rather "provides a civil claim for damages" to "redress ... the deprivation of [federal] rights established elsewhere." *Thomas v. Roach*, 165 F.3d 137, 142 (2d Cir. 1999).

### 1. Defendant Key Bank

Generally, private parties are not state actors, and are not liable under § 1983. *Sykes v. Bank of Am.*, 723 F.3d 399, 406 (2d Cir. 2013) (quoting *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001)); *see also Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 323 (2d Cir. 2002) ("[T]he United States Constitution regulates only the Government, not private parties....") (internal quotation marks and citations omitted). "Because the United States Constitution regulates only the Government, not private parties, a litigant claiming that his constitutional rights have been violated must first establish that the challenged conduct constitutes 'state action.' " *United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*, 941 F.2d 1292, 1295-96 (2d Cir. 1991) (citing *Blum v. Yaretsky*, 457 U.S. 991, 1002 (1982)). A private defendant may be held liable only as "a willing participant in joint activity with the State or its agents." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970) (quoting *United States v. Price*, 383 U.S. 787, 794 (1966)). Claims under § 1983 can be brought against private entities by "showing that a person acting under color of state law ... collaborated with a private person ... to deprive the plaintiff of a constitutional right." *Fries v. Barns*, 618 F.2d 988, 990 (2d Cir. 1980) (citing *Adickes*, 398 U.S. at 144).

**\*5** With respect to Defendant Key Bank of the City of Utica, the Amended Complaint fails to allege facts plausibly suggesting that it is a state actor or that it collaborated with a state entity to deprive Plaintiff of a constitutional right.

As a result, I recommend that Plaintiff's claim pursuant to 42 U.S.C. § 1983 against Defendant Key Bank be dismissed for failure to state a claim upon which relief may be granted.

### 2. Defendants Oneida County Sheriff, Comptroller of the City of Utica, and City of Utica

Although Defendants Oneida County Sheriff, Comptroller of the City of Utica, and City of Utica are state actors for purposes of liability pursuant to 42 U.S.C. § 1983, the extremely terse allegations in the Complaint fail to allege that they violated Plaintiff's rights under any statute or constitutional provision.

**Polinski v. Oneida County Sheriff, Not Reported in Fed. Supp. (2023)**

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 57 of 449

#### a. Defendant Oneida County Sheriff

A claim against the Oneida County Sheriff in his official capacity, is essentially a suit against the Oneida County Sheriff's Department.[3] *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."); *Reynolds v. Giuliani*, 506 F.3d 183, 191 (2d Cir. 2007)("An official capacity suit against a public servant is treated as one against the governmental entity itself.").

A municipality may only be named as a defendant in certain circumstances. In *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), the Supreme Court outlined the limited circumstances under which a municipality may be liable under Section 1983. A municipality may not be held liable solely because it employs a tortfeasor. *Los Angeles Cnty., Cal. v. Humphries*, 562 U.S. 29, 36 (2010). Only when the municipality, through the execution of its policies, actually deprives an individual of his constitutional rights, is it liable for the injury. *Monell*, 436 U.S. at 694.

To establish municipal liability, the policy must actually cause the violation of constitutional rights; it must be the moving force behind the violation. *Id.*; *Dominguez v. Beame*, 603 F.2d 337, 341 (2d Cir. 1979). Official policy includes the decisions of a government's lawmakers, the acts of policymaking officials, and practices that are so widespread as to "practically have the force of law." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). Municipal liability may also be shown by establishing that a policymaking official ordered or ratified the employees' actions either expressly or tacitly.

**\*6** Finally, municipal liability can, under limited circumstances, be based upon a failure to properly train the municipality's employees. *Connick*, 563 U.S. at 51. However, municipal liability is most tenuous when a claim turns on the failure to train. *Id.* (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 822-23 (1985) (plurality opinion) ("[A] 'policy' of 'inadequate training' " is "far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in Monell")). To satisfy the statute, a municipality's failure to train its employees must amount to " 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.' " *Id.* (citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989)).

Here, the Amended Complaint fails to allege facts plausibly suggesting a basis for municipal liability. Plaintiff appears to complain of a single incident, during which the officers did not act properly. There is no indication that Plaintiff can assert a policy or custom which would support municipal liability based on these facts. In addition, none of Plaintiff's allegations reflect a failure to train or "deliberate indifference" to the rights of persons who would come into contact with the deputies of the Oneida County Sheriff's Department who allegedly interacted with Plaintiff and his father on March 1, 2023.

To the extent that Plaintiff asserted a claim pursuant to 42 U.S.C. § 1983 against the Oneida County Sheriff in his individual capacity, I recommend that it be dismissed for failure to state a claim upon which relief may be granted.

In *Tangreti v. Bachmann*, 983 F.3d 609 (2d Cir. 2020), the Second Circuit addressed how the Supreme Court's decision in *Iqbal* affected the standards in *Colon* for establishing supervisory liability. Consistent with other circuits, the Second Circuit concluded that "there is no special rule for supervisory liability," and held that a "plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, had violated the Constitution.' " *Tangreti*, 983 F.3d at 618.[4] The Second Circuit explained that, " 'the factors necessary to establish a [§ 1983] violation will vary with the constitutional provision at issue' because the elements of different constitutional violations vary. The violation must be established against the supervisory official directly." *Id.* (quoting *Iqbal*, 556 U.S. at 676). "District courts discussing *Tangreti* agree that the decision invalidated the *Colon* test and mandates that a plaintiff must establish a violation against the supervisory official directly." *Fabrizio v. Smith*, 20-CV-0011, 2021 WL 2211206, at \*10 (N.D.N.Y. Mar. 10, 2021) (Lovric, M.J.) (collecting cases), *report and recommendation adopted*, 2021 WL 2211023 (N.D.N.Y. June 1, 2021) (Suddaby, C.J.).

**\*7** Here, Plaintiff fails to allege facts plausibly suggesting any action taken by Defendant Oneida County Sheriff individually. (*See generally* Dkt. No. 4.) The Amended Complaint alleges that "two Oneida County sheriffs" went to his parents' house on March 1, 2023, where he does not live. (Dkt. No. 4 at 8-9.) However, there is only one Oneida County Sheriff, *see* N.Y. County Law § 650; *see generally DiJoseph v. Erie Cnty.*, 18-CV-919S, 2020 WL 4194136, at \*8 (W.D.N.Y. July 21, 2020) ("A sheriff is an

elected county officer."), thus, it appears that Plaintiff was referring to two deputies of the Oneida County Sheriff's Department. Further, in any event, the Amended Complaint does not allege that Plaintiff interacted with the employees of the Sheriff's Department who allegedly went to his parents' property. Moreover, Plaintiff fails to allege facts plausibly suggesting that these individuals violated his rights in any way. In addition, Plaintiff's allegation that he "explained to an Oneida County Sheriff that the instruments were legal tender" and "the authority behind the negotiable instrument" does not allege that his rights were violated by Defendants or any employee of the Oneida County Sheriff's Department. (Dkt. No. 4 at 9.)

As a result, I recommend that Plaintiff's claim pursuant to 42 U.S.C. § 1983 against Defendant Oneida County Sheriff in his individual and official capacities be dismissed for failure to state a claim upon which relief may be granted.

### b. Defendant Comptroller of the City of Utica

To the extent that Plaintiff asserts a claim against Defendant Comptroller of the City of Utica in his official capacity, it is essentially a claim against the City of Utica because the Comptroller is an arm of the City of Utica and is not amenable to suit. *See Aikman v. Cnty. of Westchester*, 491 F. Supp. 2d 374, 380 (S.D.N.Y. 2007) (quoting *Hafer v. Melo*, 502 U.S. 21, 25 (1991) ("Suits against [municipal] officials sued in their official capacity ... should be treated as suits against the [municipality]."); *see also Zuk v. Gonzalez*, 07-CV-0732, 2007 WL 2163186, at *2 (N.D.N.Y. July 26, 2007) ("[T]o the extent that Plaintiff has named the individual Defendants in their official capacities, he has in essence named Onondaga County ... as a Defendant.")).

Courts within the Second Circuit regularly dismiss with prejudice official-capacity claims against a public official when the claims are duplicative of the claims against the governmental entity for which the official works. *See Kanderskaya v. City of N.Y.*, 11 F. Supp. 3d 431, 435 (S.D.N.Y. 2014) (dismissing with prejudice claims against a police officer sued in an official capacity "because they are duplicative of [the plaintiff's] other claims against [the municipality]") *aff'd*, 590 F. App'x 112 (2d Cir. 2015); *Quinn v. Gould*, 19-CV-0820, 2020 WL 1234553, at *4 (D. Conn. Mar. 13, 2020) ("[D]istrict courts within the Second Circuit consistently dismiss claims asserted against officials in their

official capacities as duplicative where the plaintiff has named the municipal entity as a defendant.") (citations omitted).

As a result, I recommend that Plaintiff's claim pursuant to 42 U.S.C. § 1983 against Defendant Comptroller of the City of Utica in his official capacity be dismissed as duplicative of his claim against Defendant City of Utica.

With respect to Plaintiff's claim pursuant to 42 U.S.C. § 1983 against Defendant Comptroller of the City of Utica in his individual capacity, I recommend that it be dismissed for failure to state a claim upon which relief may be granted.

As set forth above in Part IV.B.2.a. of this Order and Report-Recommendation, pursuant to the Second Circuit's holding in *Tangreti*, "plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, had violated the Constitution.' " *Tangreti*, 983 F.3d at 618. The Amended Complaint alleges that Plaintiff "tendered payment to THE CITY OF UTICA FINANCE DEPARTMENT OFFICE OF THE COMPTROLLER" but that his payments were "fraudulently transferred ... under 18 U.S. Code § 648." (Dkt. No. 4 at 8.) This conclusory allegation fails to allege facts plausibly suggesting that Defendant Comptroller of the City of Utica took any action that violated Plaintiff's rights.

 **\*8**  As a result, I recommend that Plaintiff's claim pursuant to 42 U.S.C. § 1983 against Comptroller of the City of Utica be dismissed for failure to state a claim upon which relief may be granted.

### c. Defendant City of Utica

As set forth above in Part IV.B.2.a. of this Order and Report-Recommendation, a municipality may be held liable pursuant to 42 U.S.C. § 1983 only when the municipality, through the execution of its policies, actually deprives an individual of his constitutional rights, is it liable for the injury. *Monell*, 436 U.S. at 694.

The Amended Complaint fails to allege facts plausibly suggesting that the City of Utica's policies deprived Plaintiff of his constitutional rights. As a result, I recommend that Plaintiff's claim pursuant to 42 U.S.C. § 1983 against Defendant City of Utica be dismissed for failure to state a claim upon which relief may be granted.

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 59 of 449

Polinski v. Oneida County Sheriff, Not Reported in Fed. Supp. (2023)

### C. Claim Pursuant to 42 U.S.C. § 1985

Although the Amended Complaint fails to specify which of § 1985's three subdivisions Plaintiff intends to invoke, only § 1985(3) is relevant here. [5]

"[T]o make out a violation of § 1985(3) ..., the plaintiff must allege and prove four elements: (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." *United Brotherhood of Carpenters & Joiners of Am., Loc. 610, AFL-CIO v. Scott*, 103 S. Ct. 3352, 3356 (1983). A "conspiracy" requires, for purposes of Section 1985, "a plurality of actors committed to a common goal." *Frooks v. Town of Cortlandt*, 997 F. Supp. 438, 456 (S.D.N.Y. 1998), *aff'd*, 182 F.3d 899 (2d Cir. 1999).

In addition, a claim pursuant to Section 1985 requires that a plaintiff allege "some racial or [ ] otherwise class-based animus behind the conspirators' action." *Palmieri v. Lynch*, 392 F.3d 73, 86 (2d Cir. 2004). The Amended Complaint fails to allege any racial or class-based animus behind the alleged conspirators' action. (*See generally* Dkt. No. 4.) "When a plaintiff fails to establish membership in a protected group, a civil rights conspiracy complaint under Section 1985 must be dismissed." *Morpugo v. Inc. Vill. of Sag Harbor*, 697 F. Supp. 2d 309, 339 (E.D.N.Y. 2010).

Here, Plaintiff does not allege any race or class-based animus behind Defendants' actions. Thus, Plaintiff does not sufficiently allege a conspiracy pursuant to 42 U.S.C. § 1985 between Defendants and/or others to deprive Plaintiff of any federally protected rights. As a result, I recommend that Plaintiff's claim pursuant to 42 U.S.C. § 1985 against Defendants be dismissed for failure to state a claim upon which relief may be granted.

### D. RICO (18 U.S.C. § 1691 et seq.) Claim [6]

**\*9** It is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). Section 1964 establishes a private right of action for individuals who are harmed by racketeering activity. 18 U.S.C. § 1964. This private right of action permits a plaintiff to bring a RICO claim for sustaining injuries "in his business or property by reason of a violation of section 1962." 18 U.S.C. § 1964(c). Generally, a plaintiff bringing a civil RICO claim under "Section 1962(c) must allege that (1) the defendant has violated the substantive RICO statute, and (2) the plaintiff was injured in his business or property 'by reason of a violation of section 1962.' " *Malvar Egerique v. Chowaiki*, 19-CV-3110, 2020 WL 1974228, at \*7 (S.D.N.Y. Apr. 24, 2020) (quoting *Moss v. Morgan Stanley, Inc.*, 719 F.2d 5, 17 (2d Cir. 1983) (citing 18 U.S.C. § 1962(c))), *vacated in part on other grounds by Weiss v. David Benrimon Fine Art LLC*, 20-CV-3842, 2021 WL 6128437 (2d Cir. Dec. 28, 2021) (summary order). More specifically, to assert a civil RICO claim under Section 1962(c), a plaintiff must allege the following elements: "(1) conduct, (2) of an enterprise, (3) through a pattern, (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985). Additionally, a plaintiff asserting a civil RICO claim must plead facts plausibly suggesting a resulting "domestic injury" to their business or property. *RJR Nabisco, Inc. v. European Community*, 136 S. Ct. 2090, 2111 (2016).

The Amended Complaint fails to allege facts plausibly suggesting the existence of an "enterprise" within the meaning of RICO. More specifically, Plaintiff fails to allege facts plausibly suggesting that Defendants constitute, control, or participate in any enterprise with a distinguishable existence or purpose. *See Mackin v. Auberger*, 59 F. Supp. 3d 528, 543 (W.D.N.Y. 2014) ("Plaintiff fails to allege that [the defendants] had a common or shared purpose or that they functioned as a continuing unit."). In addition, the Amended Complaint fails to allege any facts plausibly suggesting that Defendants functioned as a continuing unit. "Without such an enterprise, a RICO claim like [Plaintiff]'s must fail." *Liang v. City of New York*, 10-CV-3089, 2013 WL 5366394, at \*13 (E.D.N.Y. Sept. 24, 2013); *see also Peterson v. City of New York*, 11-CV-3141, 2012 WL 75029, at \*3-4 (S.D.N.Y. Jan. 9, 2012) (dismissing the plaintiff's RICO claim because "[t]he existence of a RICO enterprise is a necessary element for liability" and the plaintiff failed to allege facts plausibly suggesting the existence of a RICO enterprise).

Moreover, I find that the Amended Complaint fails to allege facts plausibly suggesting a pattern of racketeering activity. 18 U.S.C. § 1961(5) (To sufficiently allege a "pattern of racketeering activity," a plaintiff must allege at least two acts of "racketeering activity" that occur within ten years of

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 60 of 449

**Polinski v. Oneida County Sheriff, Not Reported in Fed. Supp. (2023)**

each other); *Westester Cnty. Indep. Party v. Astorino*, 137 F. Supp. 3d 586, 608 (S.D.N.Y. 2015) (emphasis in original) (quoting *Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 242 (2d Cir. 1999)) (To qualify as a "pattern" of racketeering activity, the predicate acts "must be from the crimes listed in [Section] 1961(1) and they must be 'related, *and* ... amount to or pose a threat of continued criminal activity.' "). Although the Amended Complaint lists statutes that constitute "racketeering activity" (*see, e.g.*, Dkt. No. 4 at 26 [referring to 18 U.S.C. § 1951]), it fails to allege facts plausibly suggesting that Defendants engaged in those predicate acts.[7]

**\*10** For each of these alternative reasons, I recommend that Plaintiff's RICO claim be dismissed.

### E. Claim Pursuant to 18 U.S.C. § 3487

To the extent that Plaintiff attempts to assert a claim against Defendants pursuant to 18 U.S.C. § 3487, I recommend that it be dismissed. 18 U.S.C. § 3487 states that, "[t]he refusal of any person ... charged with the safe-keeping ... of the public money ... belonging to the United States, ... to transfer or disburse any such money, promptly, upon the legal requirement of any authorized officer, shall be deemed ... prima facie evidence of ... embezzlement." Thus, 18 U.S.C. § 3487 does not provide a private cause of action and relates solely to evidence sufficient to establish embezzlement.

As a result, I recommend that Plaintiff's claim pursuant to 18 U.S.C. § 3487 be dismissed.

## V. OPPORTUNITY TO AMEND

Generally, a court should not dismiss claims contained in a complaint filed by a *pro se* litigant without granting leave to amend at least once "when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Branum v. Clark*, 927 F.2d 698, 704-05 (2d Cir. 1991); *see also* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when justice so requires."). An opportunity to amend is not required, however, where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000); *see also Cortec Indus. Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice."). Stated differently, "[w]here it appears that granting leave to amend is unlikely to be productive, ... it is not an abuse of

discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993); *accord, Brown v. Peters*, 95-CV-1641, 1997 WL 599355, at \*1 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.).[8]

Here, I find that leave to replead would be futile with respect to Plaintiff's claims pursuant to: (1) New York State and federal criminal provisions (including New York State Penal Law § 120.15, and 18 U.S.C. §§ 115, 241, 242, 371, 471, 641, 875, and 1951); (2) 18 U.S.C. § 3487; and (3) 42 U.S.C. § 1983 against Defendant Comptroller of the City of Utica in his official capacity, because the issues with those claims are substantive such that a better pleading will not cure them. *See Maretta-Brooks v. Comm'r of Soc. Sec.*, 22-CV-1261, 2023 WL 2655195, at \*6 (N.D.N.Y. Mar. 27, 2023) (Lovric, M.J.) (recommending dismissal without leave to replead the plaintiff's claims alleging violations of criminal statutes "because the problem with those claims is substantive such that a better pleading will not cure it"); *Maretta-Brooks v. Hanuszczak*, 18-CV-0426, 2018 WL 2021480, at \* (N.D.N.Y. Apr. 26, 2018) (Peebles, M.J.) (recommending dismissal without leave to amend the plaintiff's claims pursuant to 18 U.S.C. §§ 241, 242); *McFadden v. Ortiz*, 12-CV-1244, 2013 WL 1789593, at \*5 (N.D.N.Y. Apr. 26, 2013) (D'Agostino, J.) (dismissing without leave to amend the plaintiff's claims seeking to enforce New York State criminal statutes).

**\*11** Although I have serious doubts about whether Plaintiff can replead to assert an actionable claim pursuant to (1) 42 U.S.C. § 1983 against Defendants (a) Key Bank of the City of Utica, (b) City of Utica, (c) Oneida County Sheriff in his official and individual capacities, and (d) Comptroller of the City of Utica in his individual capacity; (2) 42 U.S.C. § 1985 against Defendants, and (3) 18 U.S.C. § 1961 against Defendants, given that this is the Court's first review of Plaintiff's pleading, out of an abundance of caution, I recommend that he be permitted to replead the Amended Complaint with respect to those claims.

If Plaintiff chooses to file a second amended complaint, he should note that the law in this circuit clearly provides that " 'complaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning.' " *Hunt v. Budd*, 895 F. Supp. 35, 38 (N.D.N.Y. 1995) (McAvoy, J.) (quoting *Barr v. Abrams*, 810 F.2d 358, 363 (2d Cir. 1987)); *accord Pourzancvakil v. Humphry*, 94-CV-1594, 1995 WL 316935, at \*7 (N.D.N.Y. May 22, 1995)

**Polinski v. Oneida County Sheriff, Not Reported in Fed. Supp. (2023)**

Case 3:24-cv-00037-DNH-ML    Document 9    Filed 06/11/24    Page 61 of 449

(Pooler, J.). Therefore, in any second amended complaint, Plaintiff must clearly set forth facts that give rise to the claims, including the dates, times, and places of the alleged underlying acts, and each individual who committed each alleged wrongful act. In addition, the revised pleading should allege facts demonstrating the specific involvement of any of the named defendants in the constitutional deprivations alleged in sufficient detail to establish that they were tangibly connected to those deprivations. *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). Finally, Plaintiff is informed that any such second amended complaint will replace the existing Amended Complaint, and must be a wholly integrated and complete pleading that does not rely upon or incorporate by reference any pleading or document previously filed with the Court. *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) ("It is well established that an amended complaint ordinarily supersedes the original and renders it of no legal effect.").

**ACCORDINGLY**, it is

**ORDERED** that Plaintiff's application to proceed *in forma pauperis* (Dkt. No. 2) is **GRANTED only for purposes of filing and any appeal unless the trial court certifies in writing that the appeal is not taken in good faith**; and it is further respectfully

**RECOMMENDED** that the Court **DISMISS** the Amended Complaint (Dkt. No. 4) as frivolous pursuant to 28 U.S.C. § 1915(e)(2)(B); and it is further respectfully

**RECOMMENDED in the alternative** that the Court **DISMISS WITH LEAVE TO REPLEAD** Plaintiff's Amended Complaint (Dkt. No. 4) to the extent that it asserts claims based on (1) 42 U.S.C. § 1983 against Defendants (a) Key Bank of the City of Utica, (b) City of Utica, (c) Oneida County Sheriff in his official and individual capacity, and (d) Comptroller of the City of Utica in his individual capacity; (2) 42 U.S.C. § 1985 against Defendants, and (3) 18 U.S.C. § 1961 against Defendants, because it fails to state a claim upon

which relief may be granted pursuant to 28 U.S.C. § 1915(e)(2)(B); and it is further respectfully

**RECOMMENDED in the alternative** that the Court **DISMISS WITHOUT PREJUDICE AND WITHOUT LEAVE TO REPLEAD** Plaintiff's Amended Complaint (Dkt. No. 4) to the extent that it asserts claims based on New York State and federal criminal provisions (including New York State Penal Law § 120.15, and 18 U.S.C. §§ 115, 241, 242, 371, 471, 641, 875, and 1951) because Plaintiff lacks standing to pursue claims pursuant to those statutes; and it is further respectfully

 **\*12 RECOMMENDED in the alternative** that the Court **DISMISS WITHOUT LEAVE TO REPLEAD** Plaintiff's Amended Complaint (Dkt. No. 4) to the extent that it asserts claims based on (1) 18 U.S.C. § 3487 against Defendants; and (2) 42 U.S.C. § 1983 against Defendant Comptroller of the City of Utica in his official capacity, for failure to state a claim upon which relief may be granted pursuant to 28 U.S.C. § 1915(e)(2)(B); and it is further

**ORDERED** that the Clerk of the Court shall file a copy of this order, report, and recommendation on the docket of this case and serve a copy upon the parties in accordance with the local rules. [9]

**NOTICE:** Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. [10] Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. 28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)).

**All Citations**

Not Reported in Fed. Supp., 2023 WL 2988753

---

**Footnotes**

1    The language of that section is ambiguous because it suggests an intent to limit availability of *in forma pauperis* status to prison inmates. *See* 28 U.S.C. § 1915(a)(1) (authorizing the commencement of an action without prepayment of fees "by a person who submits an affidavit that includes a statement of all assets such

**Polinski v. Oneida County Sheriff, Not Reported in Fed. Supp. (2023)**

Case 3:24-cv-00037-DNH-ML    Document 9    Filed 06/11/24    Page 62 of 449

prisoner possesses"). The courts have construed that section, however, as making *in forma pauperis* status available to any litigant who can meet the governing financial criteria. *Hayes v. United States*, 71 Fed. Cl. 366, 367 (Fed. Cl. 2006); *Fridman v. City of N.Y.*, 195 F. Supp. 2d 534, 536 n.1 (S.D.N.Y. 2002).

2    Plaintiff is reminded that, although his application to proceed *in forma pauperis* has been granted, he is still required to pay fees that he may incur in this action, including copying and/or witness fees.

3    It is unclear at this juncture whether Plaintiff's claims against Defendant Oneida County Sheriff in his official capacity, should be deemed as claims against the County of Oneida or the Oneida County Sheriff's Department. *Compare Carthew v. Cnty. of Suffolk*, 709 F. Supp. 2d 188, 195 (E.D.N.Y. 2010) ("It is well settled that an entity such as the Suffolk County Police Department is an 'administrative arm' of the same municipal entity as Suffolk County and thus lacks the capacity to be sued."), *and Krug v. Cty. of Rennselaer*, 559 F. Supp. 2d 223, 247 (N.D.N.Y. 2008) (McAvoy, J.) ("A city police department is not an independent, suable entity separate from the municipality in which the police department is organized."), *with DiJoseph v. Erie Cnty.*, 18-CV-0919S, 2020 WL 4194136, at *8 (W.D.N.Y. July 21, 2020) (noting that "[u]nder New York State Constitution article XIII, § 13(a) a county cannot be made liable for the acts of its sheriff" and finding that the County—absent a local law agreeing to assume liability for the Sheriff's actions—is not the proper defendant in a claim pursuant to 42 U.S.C. § 1983 against the Sheriff). However, this distinction is immaterial for purposes of this Order and Report-Recommendation.

4    Before *Tangreti*, various courts in the Second Circuit have postulated how, if at all, the *Iqbal* decision affected the five *Colon* factors which were traditionally used to determine personal involvement. *Pearce v. Estate of Longo*, 766 F. Supp. 2d 367, 376 (N.D.N.Y. 2011) (Hurd, J.) (recognizing that several district courts in the Second Circuit have debated *Iqbal*'s impact on the five *Colon* factors), *rev'd on other grounds sub nom.*, *Pearce v. Labella*, 473 F. App'x 16 (2d Cir. 2012) (summary order); *Kleehammer v. Monroe Cnty.*, 743 F. Supp. 2d 175, 185 (W.D.N.Y. 2010) (holding that "[o]nly the first part of the third *Colon* categories pass *Iqbal*'s muster...."); *D'Olimpio v. Crisafi*, 718 F. Supp. 2d 340, 347 (S.D.N.Y. 2010) (disagreeing that *Iqbal* eliminated *Colon*'s personal involvement standard).

5    Section 1985(1) provides a damages action against two or more persons who conspire to prevent, by force, intimidation or threat, any federal officer from performing his or her official duties. Section 1985(2) provides a cause of action against two or more persons who conspire to obstruct justice in the federal courts by force, intimidation, or threat. None of the facts alleged in the Amended Complaint relate in any way to these causes of action.

6    Under General Order #14 and N.D.N.Y. L.R. 9.2, a party who files a RICO claim must also file a Civil RICO statement within thirty days after the filing date of the Complaint. Despite thirty days having elapsed since the filing of his Amended Complaint (and his Complaint, which also appeared to assert a RICO claim [Dkt. No. 1 at 25-26]), Plaintiff has failed to file a Civil RICO statement. (*See generally* docket sheet.) As a result, I recommend that Plaintiff's RICO claim be dismissed. *See Poole v. Bendixen*, 20-CV-0697, 2021 WL 3737780, *12 (N.D.N.Y. Aug. 24, 2021) (Suddaby, C.J.); *Murphy v. Onondaga Cnty.*, 18-CV-1218, 2022 WL 819281, *6 (N.D.N.Y. Mar. 18, 2022) (Sharpe, J.).

7    For example, to demonstrate that Defendants engaged in extortion, Plaintiff must allege that Defendants "obstruct[ed], delay[ed], or affect[ed] commerce or the movement of any article or commodity in commerce, by ... extortion or attempt[ed] or conspire[d] so to do, or commit[ted] or threaten[ed] physical violence to any person or property in furtherance of a plan or purpose to do [so]." 18 U.S.C. § 1951; *see also McLaughlin v. Anderson*, 962 F.2d 187, 194 (2d Cir. 1992). Extortion is defined as the "obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2); *Entretelas Americanas S.A. v. Soler*, 19-CV-3658, 2020 WL 9815186, at *10 (S.D.N.Y. Feb. 3, 2020), *aff'd*, 840 F. App'x 601 (2d Cir. 2020), *as amended* (Jan. 7, 2021) (citation

**Polinski v. Oneida County Sheriff, Not Reported in Fed. Supp. (2023)**

Case 3:24-cv-00037-DNH-ML    Document 9    Filed 06/11/24    Page 63 of 449

omitted). "[F]atal" to an extortion claim is "[t]he absence of allegations of force, violence or fear." *Entretelas Americanas*, 2020 WL 9815186, at *10 (collecting cases).

8    *See also Carris v. First Student, Inc.*, 132 F. Supp. 3d 321, 340-41 n.1 (N.D.N.Y. 2015) (Suddaby, C.J.) (explaining that the standard set forth in *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 796 (2d Cir. 1999)— that the Court should grant leave to amend "unless the court can rule out any possibility, however unlikely it might be, that an amended complaint would be successful in stating a claim"—is likely not an accurate recitation of the governing law after *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)), *rev'd on other grounds*, 682 F. App'x 30.

9    The Clerk shall also provide Plaintiff with copies of all unreported decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

10    If you are proceeding *pro se* and served with this report, recommendation, and order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date that the report, recommendation, and order was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

---

**End of Document**                                         © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 2068248
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

Anthony J. HALL, Plaintiff,

v.

Frank SAMPSON, et al., Defendants.

CIVIL ACTION No. 21-CV-4839
|
Signed 06/08/2022

**Attorneys and Law Firms**

Anthony J. Hall, Philadelphia, PA, Pro Se.

**MEMORANDUM**

YOUNGE, District Judge

**\*1** Plaintiff Anthony J. Hall, a convicted prisoner incarcerated at the Federal Detention Center in Philadelphia, filed this civil action pursuant to 42 U.S.C. § 1983 and *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), based on allegations that he was illegally prosecuted, convicted and imprisoned on conspiracy and drug charges. (ECF No. 2.) ("Compl.") For the following reasons, the Court will dismiss the Complaint for failure to state a claim pursuant to 28 U.S.C. § 1915A(b)(1).

**I. FACTUAL ALLEGATIONS** [1]
Hall's claims arise from criminal proceedings presided over by the Honorable Wendy Beetlestone and the criminal investigation that resulted in those proceedings. *United States v. Gordon*, Crim. A. No. 15-0496-9 (E.D. Pa.). On August 17, 2016, Hall was charged with one count of conspiracy to distribute phencyclidine ("PCP") and one count of possession with intent to distribute PCP. The charges were included in the Second Superseding Indictment in the multi-defendant case. *Id.* (ECF No. 94.) Thereafter, a bench warrant issued for Hall's arrest; Hall was detained at SCI-Graterford at the time. *Id.* (ECF No 105.) On September 14, 2016, Hall appeared at a hearing before a Magistrate Judge at which he pled not guilty and stipulated to pretrial detention. *Id.* (ECF No. 159.) Following a 22-day jury trial before the Honorable Wendy Beetlestone, on December 19, 2018, the jury returned no verdict on the charges against Hall. *Id.* (ECF No. 780.)

On August 6, 2019, Hall was charged with 4 counts of possession with intent to distribute PCP and one count of conspiracy to distribute PCP. *Id.* (ECF No. 866 at 2-3, 60-63.) The charges were included in the Third Superseding Indictment in the same multi-defendant case. Following a six-day jury trial before the Honorable Wendy Beetlestone, on October 13, 2019, the jury returned a verdict of guilty against Hall on two counts of possession with intent to distribute PCP and one count of conspiracy to distribute PCP. (ECF No. 943.) Hall was found not guilty on the remaining two counts of possession with intent to distribute. (*Id.*) A sentencing hearing is currently scheduled for July 19, 2022. *Id.* (ECF No. 1135.)

Hall's Complaint names the following Defendants: (1) Drug Enforcement Agency ("DEA") Special Agent Frank Sampson; (2) DEA Task Force Officer Efrain Torres; (3) Assistant United States Attorney ("AUSA") Sozi Pedro Tulante; (4) AUSA Mary Teresa Soltis; (5) DEA Task Force Officer Kyle Boyd; (6) DEA Group Supervisor Raymond Franklin; (7) AUSA Anthony J. Wzorek; and (8) Judge Beetlestone. The Defendants are sued in their individual and official capacities. (Compl. at 4.) The gist of Hall's claims is that the investigation resulting in the charges against him was riddled with error, and that the decision to try him a second time following his acquittal on similar charges was the result of vindictive prosecution.

**\*2** Hall includes lengthy, detailed allegations regarding the investigation and prosecution of the charges against him. In short, Hall claims that the DEA, its agents, its task force officers, and the AUSAs assigned to his criminal case "conducted a constitutionally inadequate investigation ... planted evidence, falsified documents, committed perjury, to falsely arrest, indict and convict the Plaintiff." (*Id.* at 41.) He alleges that the "evidence against Plaintiff is exclusively recorded telephone conversation captured over the Title III wiretap, which the Government believes the Plaintiff was a participant. The Government has not to date produced no evidence, visual or physical, that the Plaintiff sold or purchase PCP. The Plaintiff is facing a mandatory ten (10) years to life imprisonment." (*Id.* at 33-34.)

Hall asserts the following claims pursuant to 42 U.S.C. § 1983 – violations of his Fourth, Fifth, Eighth and Fourteenth amendment rights, and violations of 42 U.S.C. § 1985 and various criminal statutes. [2] He raises the following claims under *Bivens* – illegal seizure, and due process and equal protection violations. (*Id.* at 3, 34.) He seeks an award of

Case 3:24-cv-00037-DNH-ML    Document 9    Filed 06/11/24    Page 65 of 449

Hall v. Sampson, Not Reported in Fed. Supp. (2022)

compensatory and punitive damages. (*Id.* at 41.) He also requests that his conviction be overturned, that a new Judge be appointed to his case, and that he be granted a new trial on the charges included in the Second Intervening Indictment only. (*Id.* at 36-37.)

## II. STANDARD OF REVIEW

Although Hall has paid the filing fee in full, the Court has the authority to screen his Complaint pursuant to 28 U.S.C. § 1915A. *See Shane v. Fauver*, 213 F.3d 113, 116 n.2 (3d Cir. 2000) (recognizing that the district courts have the authority to screen a prisoner complaint pursuant to § 1915A(b)(1) even if the prisoner is not proceeding *in forma pauperis*). Section 1915A requires that the Court "review, before docketing, if feasible or, in any event, as soon as practicable after docketing, a complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity." 28 U.S.C. § 1915A(a). In doing so, the Court must dismiss a complaint or any portion thereof that "is frivolous, malicious, or fails to state a claim upon which relief may be granted," *id.* § 1915A(b)(1), or that "seeks monetary relief from a defendant who is immune from such relief," *id.* § 1915A(b)(2).

**\*3** Whether a complaint fails to state a claim under § 1915A(b)(1) is governed by the same standard applicable to motions to dismiss under Federal Rule of Civil Procedure 12(b)(6). *See Neal v. Pa. Bd. of Prob. & Parole*, No. 96-7923, 1997 WL 338838, at \*1 (E.D. Pa. June 19, 1997); *see also Tourscher v. McCullough*, 184 F.3d 236, 240 (3d Cir. 1999). Accordingly, the Court must determine whether the complaint contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotations omitted). " 'At this early stage of the litigation,' '[the Court will] accept the facts alleged in [the *pro se*] complaint as true,' 'draw[ ] all reasonable inferences in [the plaintiff's] favor,' and 'ask only whether [that] complaint, liberally construed, ... contains facts sufficient to state a plausible [ ] claim.' " *Shorter v. United States*, 12 F.4th 366, 374 (3d Cir. 2021) (quoting *Perez v. Fenoglio*, 792 F.3d 768, 774, 782 (7th Cir. 2015)). Conclusory allegations do not suffice. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). As Hall is proceeding *pro se*, the Court construes his allegations liberally. *Vogt v. Wetzel*, 8 F. 4th 182, 185 (3d Cir. 2021) (citing *Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 244-45 (3d Cir. 2013)).

## III. DISCUSSION

Hall brings constitutional claims against federal actors pursuant to 42 U.S.C. § 1983 and *Bivens*. However, because § 1983 does not apply to federal actors, the Court will construe all of Hall's claims as having been raised pursuant to *Bivens*. *Bivens* provides a judicially recognized remedy for constitutional violations committed by federal actors in limited circumstances. [3] Since *Bivens* was decided in 1971, the Supreme Court "has repeatedly refused to extend *Bivens* actions beyond the specific clauses of the specific amendments [of the Constitution] for which a cause of action has already been implied, or even to other classes of defendants facing liability under those same clauses." *Vanderklok v. United States*, 868 F.3d 189, 200 (3d Cir. 2017). The Supreme Court has recognized an implied private action against federal officials in only four cases: (1) *Bivens* itself, which recognized an implied cause of action for violation of the Fourth Amendment's right against unreasonable searches and seizures; (2) *Davis v. Passman*, 442 U.S. 228 (1979), which recognized a claim for gender discrimination in the employment context under the Fifth Amendment's Due Process Clause; (3) *Carlson v. Green*, 446 U.S. 14 (1980), which recognized a claim against prison officials for inadequate medical care in the prison context under the Eighth Amendment; and (4) *Farmer v. Brennan*, 511 U.S. 825 (1994), which concerned a claim under the Eighth Amendment against prison officials for failure to protect a prisoner from violence by another prisoner. *Shorter*, 12 F.4th at 371-373 ("*Farmer* made clear[ ] ... that an Eighth Amendment *Bivens* remedy is available to a transgender prisoner who has been assaulted by a fellow inmate.").

**\*4** Because expanding *Bivens* is "a 'disfavored' judicial activity," *see Ziglar v. Abbasi*, 137 S. Ct. 1843, 1857 (2017), a "rigorous inquiry ... must be undertaken before implying a *Bivens* cause of action in a new context or against a new category of defendants." *Vanderklok*, 868 F.3d at 200. That inquiry involves determining whether the case presents a new context for a *Bivens* claim that has not been recognized by the Supreme Court and, if so, asking whether "special factors counsel hesitation in expanding *Bivens*." *Mack v. Yost*, 968 F.3d 311, 320 (3d Cir. 2020); *see also Abbasi*, 137 S. Ct. at 1857-58.

Here, Hall alleges that his conviction and incarceration are the result of a constitutionally deficient investigation and irregularities in his prosecution. Hall's claims concerning his arrest, detention and criminal prosecution are best construed as claims for malicious prosecution, as he was detained pursuant to a warrant. *See Johnson v. United States*, No.

20-3256, 2021 WL 1626522, at *2 (3d Cir. Apr. 27, 2021) (*per curiam*) ("[T]he Magistrate Judge correctly concluded that because Johnson was arrested pursuant to a warrant, his claims for false arrest and false imprisonment were, in essence, malicious prosecution claims."). Thus, based on the allegations therein, the Court construes Hall's Complaint as presenting claims for malicious prosecution, as well as claims that the Defendants conspired to secure his unlawful conviction by, among other things, fabricating evidence against him. [4] Whether or not these claims present viable *Bivens* claims is immaterial at present, because the claims may not proceed at this time.

The Supreme Court has held that "to recover damages [or other relief] for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus[.]" *Heck*, 512 U.S. at 486-87 (footnote and citation omitted); *see also Wilkinson v. Dotson*, 544 U.S. 74, 81-82 (2005) ("[A] state prisoner's § 1983 action is barred (absent prior invalidation) — no matter the relief sought (damages or equitable relief), no matter the target of the prisoner's suit (state conduct leading to conviction or internal prison proceedings) — if success in that action would necessarily demonstrate the invalidity of confinement or its duration." (emphasis omitted)); *Vanderklok*, 868 F.3d at 199 (the Supreme Court has only recognized a *Bivens* remedy in a handful of contexts and "has plainly counseled against creating new *Bivens* causes of action"). "Although *Heck* involved a § 1983 action by a state prisoner, the reasoning in *Heck* has been applied to bar *Bivens* claims." *Lora-Pena v. F.B.I.*, 529 F.3d 503, 506 n.2 (3d Cir. 2008).

**\*5** The favorable termination doctrine applies to malicious prosecution claims, as well as claims based on alleged fabrication of evidence. *Floyd v. Attorney Gen. of Pennsylvania*, 722 F. App'x 112, 114 (3d Cir. 2018) (*per curiam*) ("Because Floyd's malicious prosecution and fabrication of evidence claims do not accrue until the criminal proceedings have terminated in Floyd's favor, and Floyd has not demonstrated as much, they are barred by *Heck*.").

Additionally, *Heck* has been applied to preclude claims under § 1985. *Zhai v. Cedar Grove Municipality*, 183 F. App'x 253, 255 (3d Cir. 2006) (*per curiam*) (civil rights claims under §§ 1985 and 1986 were barred by *Heck*).

Here, success on Hall's claims would necessarily undermine the validity of his intact conviction because his Complaint challenges the constitutionality of his prosecution, conviction and related imprisonment. Accordingly, his claims for damages are barred by *Heck*. *See Garrett v. United States*, 771 F. App'x 139, 141 (3d Cir. 2019) (*per curiam*) ("Here, because Garrett's claims directly challenged the validity of his federal conviction and sentence—which have not been invalidated— his complaint sought the sort of relief that is plainly barred by *Heck*." (internal quotations omitted)); *Murphy v. Bloom*, 443 F. App'x 668, 669 (3d Cir. 2011) (*per curiam*) (holding that *Heck* barred *Bivens* claims where plaintiff "alleged that the defendants conspired to alter his trial transcript and to include a false declaration in his sentencing memorandum"); *Stuler v. United States*, 301 F. App'x 104, 106 (3d Cir. 2008) (*per curiam*) (*Heck* applied in *Bivens* action in which the bulk of plaintiff's complaint was "little more than a thinly veiled attempt to attack his criminal conviction ... under the guise of a civil action"). Accordingly, Hall's claims will be dismissed without prejudice to Hall filing a new case only in the event his conviction is first invalidated, whether on appeal or otherwise. [5]

## IV. CONCLUSION

**\*6** For the foregoing reasons, the Court will dismiss Hall's Complaint as legally baseless, pursuant to 28 U.S.C. § 1915A(b)(1). Although leave to amend would be futile, the Court will dismiss Hall's challenges to his conviction without prejudice to him filing a § 2255 motion in his criminal case, and will dismiss his remaining claims without prejudice to reassertion in a new civil action only in the event his conviction is reversed, vacated, or otherwise invalidated. *See Curry v. Yachera*, 835 F.3d 373, 379 (3d Cir. 2016). An appropriate Order follows, which shall be docketed separately.

## All Citations

Not Reported in Fed. Supp., 2022 WL 2068248

Case 3:24-cv-00037-DNH-ML Document 9 Filed 06/11/24 Page 67 of 449

Hall v. Sampson, Not Reported in Fed. Supp. (2022)

## Footnotes

1    The following facts are taken from the Complaint, exhibits to the Complaint, and public records, which the Court may consider in evaluating Hall's claims. *See Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006).

2    Hall asserts claims under 18 U.S.C. §§ 241 and 242. These sections establish criminal liability for certain deprivations of civil rights and conspiracy to deprive civil rights. *Molina v. City of Lancaster*, 159 F. Supp. 2d 813, 818 (E.D. Pa. 2001); *Figueroa v. Clark*, 810 F. Supp. 613, 615 (E.D. Pa. 1992); *see United States v. Philadelphia*, 644 F.2d 187 (3d Cir. 1980) (declining to create civil remedy under 18 U.S.C. §§ 241 and 242). However, a plaintiff cannot bring criminal charges against defendants through a private lawsuit, and these sections do not give rise to a civil cause of action. *U.S. ex rel. Savage v. Arnold*, 403 F. Supp. 172, 174 (E.D. Pa. 1975). Hall also cites 18 U.S.C. § 71, which relates to theft from interstate shipments. The Court assumes that he intended to cite 18 U.S.C. § 371, relating to conspiracy, which also does not provide for a private right of action. *See Walthour v. Herron*, No. 10-1495, 2010 WL 1877704 at *3 (E.D. Pa. May 6, 2010) (no private right of action exists under 18 U.S.C. §§ 241, 242, 245, 247, 371 or 1951); *Jones v. Lockett*, No. 08-16, 2009 WL 2232812 at *8 (W.D. Pa. July 23, 2009) ("It is clear that the criminal statutes invoked by Plaintiff, i.e., 18 U.S.C. §§ 241, 371 and 1341 do not provide for a private cause of action.") Hall also cites 18 U.S.C. § 1519 relating to destroying, altering or falsifying documents in a federal investigation, and 18 U.S.C. § 1623 relating to perjury, which also do not provide a private right of action. *Antonelli v. Kennedy Hosp.*, No. 17-13780, 2018 WL 443455, at *2 (D.N.J. Jan. 16, 2018) (no private right of action under 18 U.S.C. 1519).

3    Although *Bivens* provides a remedy against federal actors, "[a]n action against government officials in their official capacities constitutes an action against the United States; and *Bivens* claims against the United States are barred by sovereign immunity, absent an explicit waiver." *Lewal v. Ali*, 289 F. App'x 515, 516 (3d Cir. 2008) (*per curiam*); *see also F.D.I.C. v. Meyer*, 510 U.S. 471, 475 (1994) ("Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit."); *Ynfante v. United States*, Civ. A. No. 13-767, 2015 WL 631055, at *5 (M.D. Pa. Feb. 12, 2015) ("[A] *Bivens* claim can only be asserted against individual officials."). Accordingly, the constitutional claims against the Defendants in their official capacities are in essence claims against the United States that must be dismissed on sovereign immunity grounds. *See Brooks v. Bledsoe*, 682 F. App'x 164, 169 (3d Cir. 2017) (*per curiam*) ("To the extent that Brooks is suing the BOP employees in their official capacities, his claim fails as actions against prison officials in their official capacities are considered actions against the United States, and *Bivens* claims against the United States are barred by sovereign immunity, absent an explicit waiver."); *Bell v. Rossott*, 227 F. Supp. 2d 315, 320 (M.D. Pa. 2002) (dismissing claim against individual federal defendants sued in their official capacity because the claims are essentially made against the United States).

4    The Court notes that "[m]otions pursuant to 28 U.S.C. § 2255 are the presumptive means by which federal prisoners can challenge their convictions or sentences that are allegedly in violation of the Constitution," although § 2241 may be used when the remedy provided by § 2255 is "inadequate or ineffective." *Okereke v. United States*, 307 F.3d 117, 120 (3d Cir. 2002). In other words, a § 2255 motion is the proper way to challenge a federal conviction, rather than a *Bivens* action. *See Okoro v. Callaghan*, 324 F.3d 488, 490 (7th Cir. 2003) ("Okoro adhered steadfastly to his position that there were no drugs, that he was framed; in so arguing he was making a collateral attack on his conviction, and *Heck* holds that he may not do that in a civil suit, other than a suit under the habeas corpus statute or its federal-defendant equivalent, 28 U.S.C. § 2255."); *Beverly v. Reno*, 23 F.3d 158, 159 (7th Cir. 1994) (federal prisoner cannot circumvent § 2255 "by bringing an independent civil action"); *see generally Abbasi*, 137 S. Ct. at 1863 ("[W]hen alternative methods of relief are available, a *Bivens* remedy usually is not."). The Court will not construe Hall's Complaint as such a motion because the sentencing Judge is in a better position to determine the validity of any challenges to his conviction. Furthermore, this Court does not possess the authority to revoke or alter an order issued by a

Case 3:24-cv-00037-DNH-ML    Document 9    Filed 06/11/24    Page 68 of 449

**Hall v. Sampson, Not Reported in Fed. Supp. (2022)**

federal judge in another federal proceeding. *See Smith v. Meyers,* 843 F. Supp. 2d 499, 505 (D. Del. 2012) ("The structure of the federal courts does not allow one judge of a district court to rule directly on the legality of another district judge's judicial acts or to deny another district judge his or her lawful jurisdiction.").

5    There are other reasons why Hall's claims fail. Notably, judges are entitled to absolute immunity from liability based on acts or omissions taken in their judicial capacity, so long as they do not act in the complete absence of all jurisdiction. *See Stump v. Sparkman,* 435 U.S. 349, 355-56 (1978). Similarly, prosecutors are entitled to absolute immunity from liability for acts that are "intimately associated with the judicial phase of the criminal process" such as "initiating a prosecution and ... presenting the State's case." *Imbler v. Pachtman,* 424 U.S. 409, 430-31 (1976); *see also See Van de Kamp v. Goldstein,* 555 U.S. 335, 348-49 (2009). However, the Court need not address these or other defects in Hall's Complaint as alternative reasons for dismissal. Moreover, to the extent the Complaint could be construed as raising claims based on the DEA's investigation consideration of which would not be barred by *Heck,* it is apparent from the face of the Complaint that those claims are time-barred because Hall knew or should have known of those violations more than two years before he filed the Complaint in the instant action.

---

**End of Document**                              © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 1877704
Only the Westlaw citation is currently available.
United States District Court,
E.D. Pennsylvania.

Victor WALTHOUR, Sr., Plaintiff,

v.

Judge Jon HERRON, Defendant.

Civil Action No. 10–01495.
|
May 6, 2010.

**Attorneys and Law Firms**

Victor Walthour, Sr., Garnet Valley, PA, pro se.

Geri Romanello St. Joseph, Administrative Office Of Pennsylvania Courts, Philadelphia, PA, for Defendant.

***OPINION AND ORDER***

SLOMSKY, District Judge.

**\*1** This case was instituted by *pro se* Plaintiff, Victor Walthour, Sr., on April 5, 2010. The Complaint (Doc. No. 1) alleges that on March 24, 2010 Defendant, the Honorable John W. Herron (improperly captioned as "Judge Jon Herron"), signed a decree removing Plaintiff as the legal guardian of Plaintiff's wife, Mrs. Rosalyn Walthour. (Compl., 3.) The only further averments are that a person named Sheila Gibson was also involved and that court reporters witnessed this event. (*Id.*) The Complaint asserts federal question jurisdiction under 18 U.S.C. §§ 241, 242, 245, 247, 371 and 1951, and 42 U.S.C. §§ 1983, 1985, 1986, and 3631. (*Id.* at 2.) The relief sought by Plaintiff includes:

> Removal of decision making duties[.] Everything he has now and in the future [.] Everything his wife has now and in the future[.] Everything any offspring has now and in future[.] Everything his in-laws have now and in future [.] Everything his parents have now and in future[.]

(*Id.* at 3–4.)

Before the Court is a Motion to Dismiss (Doc. No. 3) and supporting Memorandum of Law (Doc. No. 4) filed by Judge Herron. Plaintiff filed a response in the form of a Motion (Doc. No. 6) requesting that Judge Herron's Motion to Dismiss be denied (hereinafter "Plaintiff's Response in Opposition"). Plaintiff's Response in Opposition states in full:

> Now this day 16 April 2010 I ask that the motion to dismiss be denied.

> 1) Knowledge is power, I have the knowledge that a Judge cannot open and alter a settlement brokered by another Judge who ordered it sealed!

(Pl.'s Response in Opposition, 1.)

Attached to Plaintiff's Response in Opposition is a copy of a March 24, 2010 Interim Order and Opinion from the Court of Common Pleas of Philadelphia, Orphan's Court Division, signed by Judge Herron (hereinafter "Exhibit A"). From this Opinion, it is apparent that Plaintiff's wife is incapacitated and is the beneficiary of a trust for her care and maintenance, which is worth approximately $9,649,643. (*Id.* at Exhibit A, 1.)

On February 16, 2010, Judge Herron held a hearing regarding the proposed spending plan under Mrs. Walthour's trust. (*Id.*) After this hearing, Judge Herron Ordered that Plaintiff be removed as co-guardian of his wife's estate because the proposed spending plan was wasteful of Mrs. Walthour's assets. (*Id.*) The proposed spending plan would have resulted in a projected annual income deficit of approximately $368,500. (*Id.*) The concluding paragraphs of Judge Herron's Opinion state that:

> Victor Walthour, co-guardian, fails to appreciate the significant financial issues and in consideration of his testimony during the proceedings, this Court deems him unqualified to serve as co-guardian and orders that he cease to serve in this capacity.

> A further hearing shall take place on April 13, 2010 at 10:00 a.m. in Courtroom 416 City Hall at which time the remaining guardian Ms. Hobkirk shall appear and present an alternative care plan for the Incapacitated Person [i.e., Rosalyn Walthour].

**\*2** (*Id.* at Exhibit A, 2.)

For reasons stated below, the Court will grant Defendant's Motion and dismiss the Complaint in its entirety.

# I. MOTION TO DISMISS STANDARD

The motion to dismiss standard has undergone recent transformation, culminating with the Supreme Court's Opinion in *Ashcroft v. Iqbal,* ——U.S. ——, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). After *Iqbal* it is clear that "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not suffice" in defeating a motion to dismiss. *Id.* at 1949; *see also Bell Atlantic Corp. V. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). Applying the principles of *Iqbal,* the Third Circuit in *Fowler v. UPMC Shadyside,* 578 F.3d 203 (3d Cir.2009), articulated a two part analysis that district courts in this Circuit must conduct in evaluating whether allegations in a complaint survive a motion to dismiss.

First, the factual and legal elements of a claim should be separated, meaning "a District Court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions." *Id.* at 210–11. Second, the Court must determine whether the facts alleged in the complaint demonstrate that the plaintiff has a "plausible claim for relief." *Id.* at 211. In other words, a complaint must do more than allege a plaintiff's entitlement to relief, it must "show" such an entitlement with its facts. *Id.* (citing *Phillips v. County of Allegheny* 515 F.3d 224, 234–35 (3d Cir.2008)). "Where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'shown'—'that the pleader is entitled to relief.' " *Iqbal,* 129 S Ct. at 1950. This "plausibility" determination under step two of the analysis is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

In this case, the allegations contained in Plaintiff's Complaint will be liberally construed, as pleadings filed by *pro se* plaintiffs are held to a less stringent standard than formal pleadings drafted by attorneys. *Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007); *see also* Fed.R.Civ.P. 8(e) ("[p]leadings must be construed so as to do justice"). Plaintiff has not indicated whether he is suing Judge Herron in his official or personal capacity. Therefore, in deciding this Motion to Dismiss and construing Plaintiff's Complaint liberally, the Court will infer that Plaintiff intended to sue Judge Herron in both his official and personal capacity.

# II. DISCUSSION

## A. Failure to State a Claim Upon Which Relief May be Granted

### 1. Claims Under Criminal Statutes: 18 U.S.C. §§ 241, 242, 245, 247, 371 and 1951

A private individual may sue under a federal statute only when Congress intended to create a private right of action. *See Gonzaga Univ. v. Doe,* 536 U.S. 273, 284–85, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002) ("where the text and structure of a statute provide no indication that Congress intends to create new individual rights, there is no basis for a private suit").

**\*3** In this case, Plaintiff asserts a violation of his rights under the following federal criminal statutes: 18 U.S.C. §§ 241, 242, 245, 247, 371 and 1951. (Compl., 2.) These statutes do not provide a private right of action under which Plaintiff may sue. *See Powers v. Karen,* 786 F.Supp. 46, 51 (E.D.N.Y.1991) ("because [18 U.S.C. §§ ] 241 and 242 do not provide for a private right of action, plaintiff's reliance on them is misplaced"), *aff'd,* 963 F.2d 1522 (2d Cir.1992); *People ex rel. Snead v. Kirkland,* 462 F.Supp. 914, 920 (E.D.Pa.1978) ("[18 U.S.C. § 245] permits federal prosecution for interference with a long list of federally protected activities; it confers neither substantive rights nor a private right of action for damages"); *Vega v. Daniels,* No. 07–1193, 2009 WL 80434, \*10 (E.D.Cal. Jan.13, 2009) (noting that 18 U.S.C. § 247 does not provide a "basis for Plaintiff to pursue claims of violation of his constitutional rights"); *Rockefeller v. U.S. Court of Appeals Office for Tenth Circuit Judges,* 248 F.Supp.2d 17, 23 (D.D.C.2003) (finding that there is no private right of action under 18 U.S.C. § 371); *Peterson v. Philadelphia Stock Exchange,* 717 F.Supp. 332, 336 (E.D.Pa.1989) ("The Hobbs Act [18 U.S.C. § 1951] contains no language which suggests it can provide civil relief.")

It is clear that none of the criminal statues cited by Plaintiff provide him with a private right of action. Generally, crimes are prosecuted by the government not by private citizens. Therefore, Plaintiff's claims under 18 U.S.C. §§ 241, 242, 245, 247, 371 and 1951 will be dismissed for failure to state a claim upon which relief may be granted.

### 2. Claims Under Civil Rights Statutes: 42 U.S.C. §§ 1983, 1985, 1986, and 3631

#### a. Claims Under 42 U.S.C. § 1983

The civil rights statute 42 U.S.C. § 1983 provides in pertinent part that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

Thus, in order to properly plead a Section 1983 claim, Plaintiff must allege (1) conduct by a person, (2) who acted under color of state law, (3) which caused a deprivation of a federally protected right. *West v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988).

Although a state official, such as Judge Herron, is literally a "person," a suit for money damages against a state official in his official capacity is, in reality, a claim against the state itself. *Will v. Mich. Dep't of State Police,* 491 U.S. 58, 64, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). A state is not a "person" within the meaning of Section 1983. *Id.* at 64. As the Supreme Court explained in *Will:*

> **\*4** Section 1983 provides a federal forum to remedy many deprivations of civil liberties, but it does not provide a federal forum for litigants who seek a remedy against a State for alleged deprivations of civil liberties.... Congress, in passing § 1983, had no intention to disturb

the States' Eleventh Amendment immunity ...

*Id.* at 66. In other words, a claim against Judge Herron in his official capacity is simply a claim against the state, and a state cannot be sued under Section 1983 for money damages. [1]

Moreover, to adequately plead a § 1983 claim, Plaintiff must allege a deprivation of a federally protected right. Plaintiff has failed to do so. The primary factual allegation contained in the Complaint is that Judge Herron signed a decree removing Plaintiff as the guardian of his wife. This factual averment does not demonstrate a violation of any federally protected right by Judge Herron. Therefore, Plaintiff's Section 1983 claim must be dismissed for failure to state a claim upon which relief may be granted.

### *b. Claims Under 42 U.S.C. § 1985*

Section 1985(3) allows an action to be brought by one harmed by a conspiracy formed "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws." 42 U.S.C. § 1985(3); *Farber v. City of Patterson,* 440 F.3d 131, 134 (3d Cir.2006). To state a claim under Section 1985(3), Plaintiff must allege:

> (1) a conspiracy; (2) for the purposes of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is injured in his person or property or deprived of any right or privilege of a citizen of the United States.

*Farber,* 440 F.3d at 134 (quoting *United Bhd. of Carpenters & Joiners v. Scott,* 463 U.S. 825, 828–29, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983)).

This civil rights provision was not "intended to provide a federal remedy for 'all tortious, conspiratorial interferences with the rights of others,' or to be a 'general federal tort law.' "

*Id.* at 135 (quoting *Griffin v. Breckenridge,* 403 U.S. 88, 101–02, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971)). Rather, Plaintiff must allege "some racial, *or perhaps otherwise class-based,* invidiously discriminatory animus behind the conspirators' action." *Id.* (quoting *Griffin,* 403 U.S. at 102) (emphasis in original). Thus, the conspiracy alleged must have been motivated by discriminatory animus against an identifiable class, and the discrimination must have been invidious. *Id.*

Plaintiff's Complaint is devoid of any allegations of any of the elements required to establish a Section 1985 claim. Therefore, Plaintiff's Section 1985 claim will be dismissed.

### c. Claims Under 42 U.S.C. § 1986

Section 1986 provides in relevant part:

> Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented ...

**\*5** 42 U.S.C.A. § 1986.

Thus, to state a claim under Section 1986, Plaintiff must have stated a valid claim under 42 U.S.C. § 1985. *Bieros v. Nicola,* 839 F.Supp. 332, 336 (E.D.Pa.1993). As noted above, Plaintiff has failed to do so. Accordingly, Plaintiff's Section 1986 claim will be dismissed.

### d. Claims Under 42 U.S.C. § 3631

Section 3631 is a violations and penalties provision under the Fair Housing Act. It provides that penalties may be imposed against:

> Whoever, whether or not acting under color of law, by force or threat of force willfully injures, intimidates or interferes with, or attempts to injure, intimidate or interfere with—

> (a) any person because of his race, color, religion, sex, handicap ..., familial status ..., or national origin and because he is or has been selling, purchasing, renting, financing, occupying, or contracting or negotiating for the sale, purchase, rental, financing or occupation of any dwelling ...

42 U.S.C. § 3631.

Plaintiff's allegation that Judge Herron signed a decree removing Plaintiff as Mrs. Walthour's guardian fails to demonstrate any willful interference with Plaintiff's rights under the Fair Housing Act. Even construing the *pro se* Complaint liberally, the Court is unable to discern any relationship between Plaintiff's Fair Housing Act claim and the allegations in the Complaint. Therefore, Plaintiff's Section 3631 claim will be dismissed.

### B. Judicial Immunity

Notwithstanding the fact that Plaintiff has failed to state any claims upon which relief may be granted, the Court also finds that Judge Herron is entitled to judicial immunity for all claims against him in his personal capacity. A judicial officer, in the performance of his duties as a judge, is absolutely immune from suit in his personal capacity and is not liable for his judicial acts. *Azbuko v. Royal,* 443 F.3d 302, 303 (3d Cir.2006) (*per curiam* ). A judge will not be deprived of his judicial immunity even if his actions were in error, or in excess of his authority, or were taken with malice. *Stump v. Sparkman,* 435 U.S. 349, 356–57, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978); *Azbuko,* 443 F.3d at 303. "[O]nly when he has acted in the 'clear absence of all jurisdiction' " will a judge be subject to liability. *Stump,* 435 U.S. at 356–57.

The allegations in Plaintiff's Complaint involve actions that were clearly taken in the performance of Defendant's duties as a judge. There are no facts to suggest that Judge Herron's conduct relates to actions taken in the clear absence of all jurisdiction. Accordingly, Judge Herron is entitled to judicial immunity for all claims against him in his personal capacity.

### III. CONCLUSION

For all of the aforementioned reasons, Plaintiff's Complaint will be dismissed in its entirety. An appropriate Order follows.

### *ORDER*

AND NOW, this 6th day of May, 2010, upon consideration Plaintiff's Complaint (Doc. No. 1), Defendant's Motion to Dismiss and supporting Memorandum of Law (Doc. Nos. 3 and 4), and Plaintiff's response thereto (Doc. No. 6),

it is ORDERED that Defendant's Motion to Dismiss is GRANTED, this case is DISMISSED, and all pending motions are DENIED AS MOOT.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 1877704

---

### Footnotes

1    After the 1996 amendments to Section 1983, it is clear that a judicial officer may be sued in his official capacity for injunctive relief (i.e., non-monetary damages), but only where a declaratory decree was violated or declaratory relief was unavailable. 42 U.S.C. § 1983; *Catanzaro v. Cottone,* 228 Fed. App'x 164, 167 (3d Cir.2007). This is a very narrow avenue for relief and Plaintiff has failed to adequately allege that a declaratory decree was violated or that declaratory relief was unavailable to him.

---

**End of Document**                                       © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Polinski v. Oneida County Sheriff, Not Reported in Fed. Supp. (2023)

Case 3:24-cv-00037-DNH-ML    Document 9    Filed 06/11/24    Page 74 of 449

2023 WL 3344060
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Peter Joseph POLINSKI, Plaintiff,
v.
ONEIDA COUNTY SHERIFF et al., Defendants.

6:23-CV-316
|
Signed May 10, 2023

**Attorneys and Law Firms**

PETER JOSEPH POLINSKI, Plaintiff, Pro Se, 5735
Cavanaugh Road, Suite 614, Marcy, NY 13401.

<u>**ORDER ON REPORT & RECOMMENDATION**</u>

DAVID N. HURD, United States District Judge

**\*1** On March 9, 2023, *pro se* plaintiff Peter Joseph
Polinski ("plaintiff") filed this civil rights action alleging
that defendants Keybank, the Comptroller of Utica, the
City of Utica, and the Oneida County Sheriff's Office
were liable for their involvement in certain fraudulently
transferred payments. Dkt. No. 1. Along with his complaint,
plaintiff sought leave to proceed *in forma pauperis* ("IFP
Application"). Dkt. No. 2. Thereafter, plaintiff filed an
amended complaint as of right. Dkt. No. 4. Plaintiff then
moved for injunctive relief, Dkt. No. 8, which was denied,
Dkt. No. 11. The amended complaint was referred to
the assigned Magistrate Judge for an initial review of it
sufficiency. *Id.*

On April 18, 2023, U.S. Magistrate Judge Miroslav Lovric
granted plaintiff's IFP Application for the purpose of filing
and advised by Report & Recommendation ("R&R") that
the amended complaint be dismissed as frivolous or, in the
alternative, dismissed with limited leave to replead certain
claims but not others. Dkt. No. 13.

As Judge Lovric explained, plaintiff's amended complaint
was "replete with pseudo-legal jargon of the kind typically
used by litigants who affiliate themselves with the sovereign
citizen movement." Dkt. No. 13. While Judge Lovric's R&R
was under review by this Court, plaintiff filed another motion
for injunctive relief, Dkt. No. 14, and exhibits to his pleading,
Dkt. No. 15.

Plaintiff has also filed objections. Dkt. No. 16. Upon *de novo*
review of the portions to which plaintiff has objected, the
R&R is accepted and will be adopted in all respects. *See*
28 U.S.C. § 636(b)(1)(C). In particular, the Court agrees
with Judge Lovric's bottom-line conclusion: the amended
complaint is frivolous. [1] The pleading references everything
from the King James Version of the Holy Bible and Magna
Carta to the Geneva Conventions and the International
Covenant of Civil and Political Rights. What the pleading
does not do, however, is plausibly allege any facts that
might tend to show that the checks plaintiff claims to
have sent to the City of Utica's Comptroller's Officer were
"fraudulently transferred" to Keybank. Instead, the rest of
plaintiff's pleading quotes extensively from various legal
texts, treatises, and other documents, without articulating
any kind of statement, let alone a short and plain one, that
might entitle him to relief under the law—certainly not the
$585,000,000.00 in relief he has requested in the *ad damnum*
clause of his operative pleading.

Therefore, it is

ORDERED that

1. The Report & Recommendation is ACCEPTED; and

2. Plaintiff's complaint is DISMISSED as frivolous.

IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2023 WL 3344060

**Footnotes**

1      Plaintiff's exhibits do not provide a basis to change this conclusion. Dkt. No. 15.

---

**End of Document**                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

**Polinski v. Oneida County Sheriff, Not Reported in Fed. Rptr. (2023)**

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 76 of 449

2023 WL 8357375
Only the Westlaw citation is currently available.
United States Court of Appeals, Second Circuit.

Peter Joseph POLINSKI, Plaintiff-Appellant,

v.

ONEIDA COUNTY SHERIFF, in his Official and
individual capacities, et al., Defendants-Appellees.

23-867
|
October 12, 2023

N.D.N.Y., 23-cv-316, Hurd, J., Lovric, M.J.

**Attorneys and Law Firms**

Peter Joseph Polinski, Marcy, NY, Pro Se.

Kenneth L. Bobrow General Attorney Esq., Felt Evans, LLP, Clinton, NY, Peter M. Rayhill Esq., Oneida County Attorney, Utica, NY, for Defendant-Appellee Oneida County Sheriff.

Zachary Oren Esq., City of Utica Law Department, Utica, NY, for Defendants-Appellees Comptroller of City of Utica, William Moorehouse, City of Utica.

Keybank of the City of Utica, Utica, NY, Pro Se.

Emily J. Mathieu, Thompson Hine LLP, New York, NY, for Defendant-Appellee Keybank of the City of Utica.

Present: Barrington D. Parker, Eunice C. Lee, Sarah A. L. Merriam, Circuit Judges.

**Opinion**

**\*1** Appellant, proceeding *pro se*, moves for leave to proceed *in forma pauperis* ("IFP"), injunctive and declaratory relief, removal, and other relief. He also petitions for writs of quo warranto, prohibition, and mandamus. Upon due consideration, it is hereby ORDERED that the IFP motion is DENIED as unnecessary because IFP status was previously granted by the district court and not revoked. *See* Fed. R. App. P. 24(a)(3). It is further ORDERED that the remaining motions are DENIED and the appeal is DISMISSED because it "lacks an arguable basis either in law or in fact." *Neitzke v. Williams*, 490 U.S. 319, 325 (1989); *see also* 28 U.S.C. § 1915(e)(2)(B).

It is further ORDERED that the petitions are DENIED because Appellant has not demonstrated that exceptional circumstances warrant the requested relief. *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 380–81 (2004); *Abrams v. McGohey*, 260 F.2d 892, 894 (2d Cir. 1958) (per curiam).

**All Citations**

Not Reported in Fed. Rptr., 2023 WL 8357375

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 1271533
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Joanna GRIFFITHS, Plaintiff,

v.

SAINT JOSEPHS HOSPITAL, et al., Defendants.

5:22-cv-00199 (DNH/TWD)
|
Signed 04/05/2022

**Attorneys and Law Firms**

JOANNA GRIFFITHS, Plaintiff, pro se, 7075 South Court
St., Canastota, NY 13032.

**REPORT-RECOMMENDATION AND ORDER**

THÉRÈSE WILEY DANCKS, United States Magistrate
Judge

**\*1** The Clerk has sent to the Court for review a *pro
se* complaint submitted by Joanna Griffiths ("Plaintiff"),
together with an application to proceed *in forma pauperis*
("IFP Application"). (Dkt. Nos. 1, 2.) For the reasons
discussed below, the Court grants Plaintiff's IFP Application
and recommends that the complaint be dismissed in its
entirety with leave to amend.

**I. PLAINTIFF'S IFP APPLICATION**
When a civil action is commenced in a federal district court,
the statutory filing fee, currently set at $402, must ordinarily
be paid. 28 U.S.C. § 1914(a). A court is authorized, however,
to permit a litigant to proceed *in forma pauperis* status if a
party "is unable to pay" the standard fee for commencing
an action. 28 U.S.C. § 1915(a)(1). After reviewing Plaintiff's
IFP Application (Dkt. No. 2), the Court finds she meets this
standard. Therefore, Plaintiff's IFP Application is granted. [1]

**II. SCREENING OF THE COMPLAINT**
Section 1915(e) directs that when a plaintiff proceeds *in forma
pauperis*, "the court shall dismiss the case at any time if the
court determines ... the action ... (i) is frivolous or malicious;
(ii) fails to state a claim on which relief may be granted; or

(iii) seeks monetary relief against a defendant who is immune
from such relief." 28 U.S.C. § 1915(e)(2)(B)(i)-(iii).

In determining whether an action is frivolous, the court must
look to see whether the complaint lacks an arguable basis
either in law or in fact. *Neitzke v. Williams*, 490 U.S. 319,
325 (1989). "An action is frivolous when either: (1) the
factual contentions are clearly baseless such as when the
claims are the product of delusion or fantasy; or (2) the
claim is based on an indisputably meritless legal theory."
*Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437
(2d Cir. 1998) (citation omitted). Although extreme caution
should be exercised in ordering *sua sponte* dismissal of a *pro
se* complaint before the adverse party has been served and
the parties have had an opportunity to respond, *Anderson v.
Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983), the court still has a
responsibility to determine that a claim is not frivolous before
permitting a plaintiff to proceed. *See, e.g., Thomas v. Scully*,
943 F.2d 259, 260 (2d Cir. 1991) (per curiam) (holding a
district court has the power to dismiss a complaint *sua sponte*
if the complaint is frivolous).

To survive dismissal for failure to state a claim, a complaint
must plead enough facts to state a claim that is "plausible
on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,
570 (2007). "A claim has facial plausibility when the
plaintiff pleads factual content that allows the court to
draw the reasonable inference that the defendant is liable
for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S.
662, 678 (2009). While Rule 8(a) of the Federal Rules
of Civil Procedure, which sets forth the general rules of
pleading, "does not require detailed factual allegations, ... it
demands more than an unadorned, the-defendant-harmed-me
accusation." *Id.*

**\*2** In determining whether a complaint states a claim upon
which relief may be granted, "the court must accept the
material facts alleged in the complaint as true and construe
all reasonable inferences in the plaintiff's favor." *Hernandez
v. Coughlin*, 18 F.3d 133, 136 (2d Cir.), *cert. denied,* 513
U.S. 836 (1994) (citation omitted). "[T]he tenet that a court
must accept as true all of the allegations contained in a
complaint is inapplicable to legal conclusions." *Iqbal*, 556
U.S. at 678. "Threadbare recitals of the elements of a cause
of action, supported by mere conclusory statements, do not
suffice." *Id.* Similarly, allegations that "are so vague as to
fail to give the defendants adequate notice of the claims
against them" are subject to dismissal. *Sheehy v. Brown*, 335
F. App'x 102, 104 (2d Cir. 2009). Where a plaintiff proceeds

**Griffiths v. Saint Josephs Hospital, Not Reported in Fed. Supp. (2022)**

Case 3:24-cv-00037-DNH-ML    Document 9    Filed 06/11/24    Page 78 of 449

*pro se*, the pleadings must be read liberally and construed to raise the strongest arguments they suggest. *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008) (citation omitted).

Generally, when the court dismisses a *pro se* complaint *sua sponte*, the court should afford the plaintiff the opportunity to amend at least once; however, leave to replead may be denied where any amendment would be futile. *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993). Futility is present when the problem with the plaintiff's causes of action is substantive such that better pleading will not cure it. *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (citation omitted).

### III. SUMMARY OF PLAINTIFF'S COMPLAINT

Utilizing a form complaint pursuant to the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 1201 *et seq*, Plaintiff brings this action against Defendants Saint Joseph's Hospital ("Hospital") and CEO Jeremy Zochs. (Dkt. No. 1.[2]) As a basis for the Court's jurisdiction, Plaintiff had indicated "Federal Jurisdiction" and specifies the ADA and "disparate treatment resulting in loss of dentures, causing personal injury." (Dkt. No. 1-1.) She lists the following disabilities in the complaint:

> severe mental disability, bi-polar, post traumatic stress, ADD, borderline personality disorder. My physical condition has greatly worsened due to the loss of my dentures, my face has sunken in and I have lost 31 pounds.

(Dkt. No. 1 at ¶ 4.) As to the conduct at issue in this action, she checked "failure to make alterations to accommodate disability" and "other acts." *Id.* at ¶ 5. Plaintiff states that on November 20, 2021, she was having a nervous breakdown and was brought to "CPAP"[3] and was given "additional meds". *Id.* She has "little memory" of that day, "but some memory." *Id.* According to Plaintiff, her dentures were lost, stolen, or misplaced while she was in the Hospital's care. *Id.* She has "since gone 3 months with no teeth causing [her] to lose 31 pounds, emotional distress." *Id.* Plaintiff wants a jury trial where she can "prove disparate treatment." *Id.* at ¶ 7. She has "suffered greatly both physically and mentally from their

discrimination." *Id.* Plaintiff seeks $100,000.00 in damages. *Id.*

**\*3** In an "Affidavit of Disparate Treatment" which is attached to the complaint, Plaintiff states that from what she can remember, she "was not treated well at all." (Dkt. No. 1, Exhibit A.[4]) She avers she had her dentures when she arrived at "CPAP" but did not have them when she returned home. *Id.* On "numerous occasions" she contacted the Hospital and received "more disparate treatment from the internal investigation done by ... Jennifer from Loss Prevention." *Id.* Plaintiff claims employees of the hospital "colluded their statements as to prevent the hospital's correct responsibility." *Id.* "Jennifer told [Plaintiff] that the hospital in no way lost [her] teeth in a disparaging manner, and in fact very rudely." *Id.* As a result, she has suffered physical and mental stress and loss of enjoyment. *Id.*

### IV. DISCUSSION

The complaint refers to the ADA generally, and does not identify the title of the ADA allegedly violated by Defendants. (*See generally* Dkt No. 1.) The ADA is divided in five separate titles. Reading the complaint liberally, the Court considers whether Plaintiff has stated a claim under Title III of the ADA."[5]

#### A. Title III of the ADA

Title III of the ADA prevents discrimination on the basis of a disability in places of public accommodation. 42 U.S.C. § 12182. "[P]ublic accommodations" are defined under 42 U.S.C. § 12181(7)(F), which includes a long list of qualifying private facilities, provided that their operations "affect commerce," such as an "insurance office, professional office of a health care provider, hospital, or other service establishment." To state a claim under Title III of the ADA, a plaintiff must allege (1) that she is a qualified individual with a disability;[6] (2) that defendants are a public accommodation as defined under Title III; and (3) that she was denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or was otherwise discriminated against by defendants on the basis of her disability. *Doe v. NYSARC Tr. Serv., Inc.*, No. 1:20-CV-801 (BKS/CFH), 2020 WL 5757478, at \*4 (N.D.N.Y. Sept. 28, 2020), *report-recommendation adopted*, 2020 WL 7040982 (N.D.N.Y. Dec. 1, 2020); *see Roberts v. Royal Atlantic Corp.*, 542 F.3d 363, 368 (2d Cir. 2008). Title III provides a private right of action for injunctive relief but no right of action for

**Griffiths v. Saint Josephs Hospital, Not Reported in Fed. Supp. (2022)**

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 79 of 449

monetary relief. 42 U.S.C. § 12188; *see Krist v. Kolombos Rest. Inc.*, 688 F.3d 89, 94 (2d Cir. 2012) (holding that Title III of the ADA "authorizes private actions only for injunctive relief, not monetary damages."); *Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 86 (2d Cir. 2004) ("Monetary relief ... is not available to private individuals under Title III of the ADA.").

**\*4** As an initial matter, because Plaintiff seeks only monetary relief, the complaint "fails to state a plausible claim for relief under Title III of the ADA." *Sandler v. Benden*, 15-CV-1193, 2016 WL 9944017, at \*16 (E.D.N.Y. Aug. 19, 2016), *aff'd*, 16-3218, 2017 WL 5256812 (2d Cir. Nov. 13, 2017); *see, e.g.*, *Doe v. NYSARC Tr. Serv., Inc.*, 2020 WL 7040982, at \*3 (*sua sponte* dismissing the plaintiff's claims for monetary damages pursuant to Title III of the ADA with prejudice and without leave to amend).

Additionally, even assuming the Hospital is a public accommodation, 42 U.S.C. § 12181(7), and that Plaintiff is a qualified individual with a disability under the ADA, 42 U.S.C. § 12131(2), the complaint is devoid of factual allegations concerning "policies, practices, [or] procedures" by Defendants that deprived Plaintiff of the ability to access goods, services, or privileges available to those without Plaintiff's disabilities. *See Benyi v. New York*, No. 3:20-CV-1463 (DNH/ML), 2021 WL 1406649, at \*14 (N.D.N.Y. Mar. 23, 2021), *report-recommendation adopted*, 2021 WL 1404555 (N.D.N.Y. Apr. 13, 2021) (citations omitted); *see, e.g.*, *Heendeniya v. St. Joseph's Hosp. Health Ctr. (SJHHC)*, No. 5:15-CV-1238 (GTS/TWD), 2017 WL 1013081, at \*9 n.14 (N.D.N.Y. Mar. 14, 2017) (dismissing Title III ADA claims against St. Joseph's Hospital Health Center for failure to state a claim where the plaintiff failed to alleged that he was denied the "full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations" and that Defendants discriminated against him "based on [his] disability"). Rather, as described above, Plaintiff was provided with medication at "CPAP" due to her "nervous breakdown" and seems to argue that employees of the Hospital were negligent and/or rude. Thus, the complaint does not state a Title III ADA claim against the Hospital.

As to CEO Jeremey Zochs, "the question of whether a person is a proper defendant under the ADA turns ... on ... whether the defendant owns, leases, or operates a place of public accommodation within the meaning of the ADA." *Doe v. NYSARC Tr. Serv., Inc.*, 2020 WL 5757478, at \*4 (quoting *Coddington v. Adelphi Univ.*, 45 F. Supp. 2d 211, 215

(E.D.N.Y. 1999) (emphasis removed)). In assessing whether an individual is a proper defendant under Title III of the ADA, "[c]ourts ... have focused on the issue of control and whether the named defendant 'operates' a place of public accommodation within the meaning of the ADA." *Id.* at \*4. "Under Title III, 'to operate' means 'to put or keep in operation,' 'to control or direct the functioning of,' or 'to conduct the affairs of; manage.' " *Id.* (quoting *Green v. DGG Properties Co., Inc.*, No. 3:11-CV-01989, 2013 WL 395484, at \*13 (D. Conn. Jan. 31, 2013) (quoting *Celeste v. East Meadow Union Free School Dist.*, 373 F. App'x 85, 91 (2d Cir. 2010)) (summary order) (additional internal quotation marks and citation omitted))). Further, "[t]he term 'operate' has been interpreted as being in a position of authority and having the power and discretion to perform potentially discriminatory acts." *Coddington*, 45 F. Supp. 2d at 215. Moreover, courts have explained that "[s]uch discriminatory acts may result in the imposition of liability under the ADA where they are the result of the exercise of the individual's own discretion, and not merely the implementation of institutional policies or the mandates of superiors." *Id.*

**\*5** However, courts have held that "naked assertions devoid of further factual enhancement" concerning an individual defendant's level of control over a public accommodation are insufficient for purposes of establishing individual liability under Title III of the ADA. *Doe v. NYSARC Tr. Serv., Inc.*, 2020 WL 5757478, at \*4 (quoting *Iqbal*, 556 U.S. at 678); *see Green*, 2013 WL 395484, at \*14. For example, in *Green*, where "[p]laintiff merely assert[ed] the names of the individual defendants and their respective titles," without more, the court held that, although the individual defendants could "be proper defendants in [the] action if they exercised the requisite control over [the public accommodation], the plaintiff "failed to allege any facts in his complaint that would allow the court to conclude that [the individual defendants] exercised such control over the functioning of affairs of [the public accommodation]."

Here, even affording the complaint the most liberal construction possible, Plaintiff has not pleaded *any* facts to state a claim against CEO Jeremy Zochs under Title III of the ADA. In this regard, CEO Jeremy Zochs is listed as a party and his name is not referenced in body of Plaintiff's complaint. Thus, Plaintiff has not stated a Title III ADA claim against CEO Jeremey Zochs.

Based on the foregoing, the Court recommends that Plaintiff claims brought pursuant to Title III of the ADA for monetary

**Griffiths v. Saint Josephs Hospital, Not Reported in Fed. Supp. (2022)**

Case 3:24-cv-00037-DNH-ML Document 9 Filed 06/11/24 Page 80 of 449

damages against Defendants be dismissed. *See Benyi,* 2021 WL 1406649, at *15.

### B. State Law Claims

Inasmuch as this Court is recommending that Plaintiff's federal claims—to the extent that she alleged any—be dismissed, the Court also recommends that the District Court decline to exercise supplemental jurisdiction over any state law claims. *See Kolari v. New York Presbyterian Hosp.,* 455 F.3d 118, 120 (2d Cir. 2006) ("[A] district court has discretion to decline to exercise supplemental jurisdiction over state law claims because all claims over which the federal court has jurisdiction have been dismissed."). Of course, Plaintiff may also pursue any state law claims in state court.

### C. Opportunity to Amend

This Court has serious doubts about whether Plaintiff can amend to assert actional ADA claims against Defendants. Nevertheless, in light of Plaintiff's *pro se* status and out of an abundance of caution, the Court recommends that Plaintiff be granted leave to file an amended complaint, except that Plaintiff's claims for monetary damages pursuant to Title III of the ADA be dismissed with prejudice and without leave to amend. [7]

**ACCORDINGLY,** it is hereby

**ORDERED** that Plaintiff's IFP Application (Dkt. No. 2) is **GRANTED**; and it is further

**RECOMMENDED** that Plaintiff's complaint (Dkt. No. 1) be **DISMISSED WITH LEAVE TO AMEND**; and it is further

**RECOMMENDED** that Plaintiff's claims for monetary damages pursuant to Title III of the ADA be **DISMISSED WITH PREJUDICE AND WITHOUT LEAVE TO AMEND**; and it is further

**\*6 RECOMMENDED** that the District Court decline to exercise supplemental jurisdiction over any state law claims; and it is further

**ORDERED** that the Clerk shall file a copy of this Order and Report-Recommendation on Plaintiff, along with copies of the unpublished decisions cited herein in accordance with *Lebron v. Sanders,* 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. [8] Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 72, 6(a).

**All Citations**

Not Reported in Fed. Supp., 2022 WL 1271533

## Footnotes

1     Plaintiff is reminded that, although her IFP Application has been granted, she will still be required to pay fees that she may incur in this action, including copying and/or witness fees.

2     The Court assumes Plaintiff is referring to St. Joseph's Health Hospital. The address that Plaintiff has listed for this Defendant is that of St. Joseph's Health Hospital. The Court takes judicial notice of the fact that St. Joseph's Health Hospital is a regional non-profit health care system based in Syracuse, New York, and is part of Trinity Health, the nation's second-largest Catholic Health System. *See* https://www.sjhsyr.org/about-us/ (last visited Apr. 4, 2022); *see also Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC,* 127 F. Supp. 3d 156, 167 (noting that, for the purposes of a motion to dismiss under Fed. R. Civ. P. 12(b)(6), "a court may take judicial notice of information publicly available on a party's website, as long as the website's authenticity is not in dispute and 'it is capable of accurate and ready determination.' ").

**Griffiths v. Saint Josephs Hospital, Not Reported in Fed. Supp. (2022)**

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 81 of 449

3   Plaintiff may be referring to the Comprehensive Psychiatric Emergency Program, also known as "CPEP". *See* https://www.sjhsyr.org/location/st-josephs-health-hospital-comprehensive-psychiatric-emergency-program-cpep (last visited Apr. 4, 2022).

4   *See Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991) (the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference).

5   Based on the facts alleged, Plaintiff could not proceed with a claim under Title I of the ADA, which addresses employment discrimination, because she has not alleged that she was employed by Defendants. 42 U.S.C. § 12117; *see Mary Jo C. v. New York State and Local Retirement Sys.*, 707 F.3d 144, 169 (2d Cir. 2013) ("Title I of the ADA expressly deals with th[e] subject of employment discrimination....") (citation and internal quotation marks omitted). Title II of the ADA covers disability discrimination in public services, programs, and activities, defined as "state or local governments and their instrumentalities." *Sherman v. Black*, 510 F. Supp. 2d 193, 197 (E.D.N.Y. 2007) (citing 42 U.S.C. § 12131(1)). However, "[a] private hospital performing services pursuant to a contract with a municipality[,] even if it does so according to the municipality's rules and under its direction, is not a creature of any governmental entity." *Green v. City of New York*, 465 F.3d 65, 79 (2d Cir. 2006). Moreover, Title IV of the ADA does not appear to be applicable to Plaintiff's claims because Title IV prohibits disability discrimination in telecommunications. *See Genco v. Sargent & Collins LLP*, No. 18-CV-0107, 2018 WL 3827742, at *3, n.5 (W.D.N.Y. June 4, 2018). Lastly, Title V of the ADA, sometimes referred to as the "retaliation provision," also does not appear applicable because Plaintiff does not allege that she engaged in activity protected by the ADA, that Defendants were aware of that activity, or any causal connection between the allegedly adverse actions that Defendant took against her and the protected activity. *See Chiesa v. New York State Dep't of Labor*, 638 F. Supp. 2d 316, 323 (N.D.N.Y. 2009) (Hurd, J.).

6   Under the ADA, the term "disability" means "a physical or mental impairment that substantially limits one or more major life activities of such individual." 42 U.S.C. § 12102. A physical or mental impairment can be "[a]ny mental or psychological disorder, such as an intellectual disability [or an] emotional or mental illness[.]" 29 C.F.R. § 1630.2(h)(2). "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending speaking, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102.

7   If the District Court adopts this Report-Recommendation, and if Plaintiff chooses to file an amended complaint, the pleading must comply with Rules 8 and 10 of the Federal Rules. The revised pleading will replace the original complaint, and must be a wholly integrated and complete pleading that does not rely upon or incorporate by reference any pleading or document previously filed with the Court. *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) ("It is well established that an amended complaint ordinarily supersedes the original and renders it of no legal effect."). The revised pleading should not attempt to resurrect any claims dismissed with prejudice in this action Additionally, although Plaintiff may submit objections to this Report-Recommendations, *see infra*, Plaintiff should wait for the District Court to rule on this Report-Recommendation before submitting an amended pleading.

8   If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. 6(a)(1)(C).

---

**End of Document**                                            © 2024 Thomson Reuters. No claim to original U.S. Government Works.

---

Griffiths v. Saint Josephs Hospital, Not Reported in Fed. Supp. (2022)

Case 3:24-cv-00037-DNH-ML Document 9 Filed 06/11/24 Page 82 of 449

2022 WL 1265761
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Joanna GRIFFITHS, Plaintiff,

v.

SAINT JOSEPHS HOSPITAL and
CEO Jeremy Zochs, Defendants.

5:22-CV-199
|
Signed 04/28/2022

**Attorneys and Law Firms**

JOANNA GRIFFITHS, Plaintiff, Pro Se, 7075 South Court
Street, Canastota, NY 13032.

MOLLY C. CASEY, ESQ., MAGUIRE CARDONA, P.C.,
Attorneys for Defendants, 22 Clinton Avenue, Albany, NY
12207.

## ORDER ON REPORT & RECOMMENDATION

DAVID N. HURD, United States District Judge

 **\*1** On March 3, 2022, *pro se* plaintiff Joanna Griffiths
("plaintiff") filed this action alleging that defendants violated
her rights under the Americans with Disabilities Act ("ADA")
in connection with alleged mistreatment that resulted in the
loss of her dentures. Dkt. No. 1. Along with her complaint,
plaintiff sought leave to proceed *in forma pauperis* ("IFP
Application"). Dkt. No. 2.

On April 5, 2022, U.S. Magistrate Judge Thérèse Wiley
Dancks granted plaintiff's IFP Application and advised
by Report & Recommendation ("R&R") that plaintiff's
complaint be dismissed with leave to amend except as to her
claims for money damages under Title III of the ADA. Dkt.

No. 7. As Judge Dancks explained, monetary relief is not
available to private plaintiffs who sue under this title of the
ADA. *Id.* However, in light of plaintiff's *pro se* status, Judge
Dancks recommended that plaintiffs be given an opportunity
to amend the rest of her pleading in accordance with Rules 8
and 10 of the Federal Rules of Civil Procedure. *Id.*

Plaintiff has not filed objections, and the time period in which
to do so has expired. *See* Dkt. No. 7. Upon review for clear
error, the R&R will be accepted and adopted in all respects.
*See* FED. R. CIV. P. 72(b).

Therefore, it is

ORDERED that

1. The Report & Recommendation is ACCEPTED;

2. Plaintiff's complaint is DISMISSED with leave to amend;

3. Plaintiff's claim for money damages under Title III of the
ADA is DISMISSED with prejudice and without leave to
amend;

4. Plaintiff shall have thirty days from the date of this
Order in which to amend her pleading in accordance with
the instructions set forth in Judge Dancks's Report &
Recommendation and this Order; and

5. If plaintiff does not file an amended complaint within this
thirty-day period, the Clerk of the Court shall enter a judgment
accordingly and close the file without further Order of this
Court.

IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2022 WL 1265761

2024 WL 363193
Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.

Noel RIVERA, Plaintiff,
v.
Angel QUIROS, et al., Defendants.

No. 3:23cv227 (OAW)
|
Signed January 31, 2024

**Attorneys and Law Firms**

Noel Rivera, Suffield, CT, Pro Se.

**INITIAL REVIEW ORDER**

OMAR A. WILLIAMS, UNITED STATES DISTRICT JUDGE

**\*1** The plaintiff is a *pro se* sentenced inmate who is in the custody of the Department of Correction ("DOC") at MacDougall-Walker Correctional Institution ("MacDougall"). [1] ECF No. 1. On May 16, 2023, Plaintiff filed the operative amended complaint [2] alleging violations of 42 U.S.C. § 1983 against eight DOC employees in connection with his treatment at MacDougall and Hartford Correctional Center ("HCC"): Warden Dougherty, APRN Akina Richards, Dr. Pilah, Regional Chief Operating Officer Jennifer Cruz, Dr. Kevin McCrystal, Disability Rights Coordinator Colleen Gallagher, Nurse Supervisor Tawana, and CSW Madeline. Plaintiff requests both damages and injunctive relief.

The Prison Litigation Reform Act requires that federal courts review complaints brought by prisoners against a governmental entity, officer, or employee. 28 U.S.C. § 1915A(a). Upon review, the court must dismiss a complaint, or any portion of a complaint, that is frivolous or malicious, that fails to state a claim upon which relief may be granted, or that seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. §§ 1915(e)(2)(B), 1915A(b). Accordingly, the court has reviewed all factual allegations in the amended complaint and has conducted an initial review of the allegations therein.

**I. ALLEGATIONS** [3]

The court will not exhaustively recount the allegations from the amended complaint but instead will summarize the alleged facts simply to provide context for this initial review.

Plaintiff has small bowel syndrome, a medical condition that began before his current incarceration. [4] He asserts that he needs certain medicines and nutrients, and specifically, that he requires Total Parenteral Nutrition ("TPN"), which is a liquid that can completely replace any other form of diet, and which typically is administered to individuals who cannot absorb nutrients from food. [5] TPN must be administered via specialized equipment through a peripherally-inserted central catheter ("PICC") line. [6]

**\*2** On April 7, 2022, Plaintiff entered HCC on pretrial detention, where the medical staff was aware of a medical device in his chest, [7] and where he was placed in the infirmary for evaluation and treatment. Infirmary staff members were provided with Plaintiff's diagnosis and treatment plan, but HCC did not have the correct equipment to provide him with TPN, and so Plaintiff was forced to do without it. [8] Plaintiff claims that Dr. McCrystal should have done more to provide for his medical needs while he was at HCC.

Plaintiff was sent to MacDougall on December 8, 2022, where the medical facility also was not equipped to administer TPN. He complains that Warden Dougherty, Dr. Pilah, and APRN Richards failed to make any effort to obtain the medicine or equipment despite his requests. More specifically, he asserts that Dr. Pilah failed to consult with a gastroenterologist and ordered the removal of Plaintiff's PICC line without Plaintiff's permission and prior to Plaintiff being sufficiently recovered from his illness. Plaintiff also asserts that APRN Richards denied him a bottom bunk pass, which he contends he requires because, as a result of his condition, he needs easy and frequent access to a toilet. Finally, he asserts that Warden Dougherty was deficient in making the medical staff tend to Plaintiff's medical needs.

Plaintiff was discharged from the MacDougall infirmary in January 2023, which he asserts was premature. He states that he is experiencing anxiety stemming from being in the general population, and that he has requested emergency mental health treatment on numerous occasions without receiving assistance. CSW Madeline apparently responded to one request, but it is not clear what her response was. [9]

In January 2023, Plaintiff wrote to RCOO Cruz (who oversees the medical unit) about his medical condition and alleged denial of treatment. He complains that she has permitted medical staff to act recklessly and dangerously, and that she has failed to provide the correct medical equipment or supplies for Plaintiff.

On February 12, 2023, Plaintiff requested a reasonable accommodation of a single cell due to his medical condition. He claims that placing him on double-cell status puts him in danger and is a violation of his rights under the Health Insurance Portability and Accountability Act ("HIPAA") because he will have to explain his medical conditions to his cellmate, who is not a medical staff member. Coordinator Gallagher denied his request.

On March 16, 2023, Plaintiff was called to the medical unit for his daily treatment and reported to the nurses that he had numbness in his right foot and leg and a painful, swollen wrist. He was not examined until the next day, at which point he was sent to the emergency room.[10] Plaintiff later wrote to Nurse Supervisor Tawana about the nurses' initial failure to provide Plaintiff medical treatment, but he never received a response.

In addition to damages, Plaintiff asks the court to order that he be provided with immediate medical care (as directed by his own gastroenterologist), a single cell,[11] a lower bunk pass, and a high protein diet. He also asks the court to issue an order preventing removal of his PICC line. In the alternative, he seeks to be released on medical parole due to the alleged lack of proper equipment to care for Plaintiff.

## II. DISCUSSION

**\*3** Section 1983 "provides a private right of action against any person who, acting under color of state law, causes another person to be subjected to the deprivation of rights under the Constitution or federal law." *Blyden v. Mancusi,* 186 F.3d 252, 264 (2d Cir. 1999). "The common elements to all § 1983 claims are: '(1) the conduct complained of must have been committed by a person acting under color of state law; and (2) the conduct complained of must have deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States.' " *Lee v. City of Troy,* 520 F. Supp. 3d 191, 205 (N.D.N.Y. 2021) (quoting *Pitchell v. Callan,* 13 F.3d 545, 547 (2d Cir. 1994)). To prevail on his deliberate indifference claims, Plaintiff must allege facts that show both an objective and a subjective element. More specifically, he must show (1) that he has a

condition that poses an unreasonable risk of serious damage to his health (the objective element); and (2) that a defendant acted with deliberate indifference to that serious condition (the subjective element). *Darnell v. Pineiro,* 849 F.3d 17, 32 (2d Cir. 2017).

Relevant to the objective element, "[t]he serious medical needs standard contemplates a condition of urgency such as one that may produce death, degeneration, or extreme pain." *Charles v. Orange Cnty.,* 925 F.3d 73, 86 (2d Cir. 2019). Here, Plaintiff alleges that he had a serious condition requiring daily treatment through a PICC line and frequent toilet use, and emergency mental health needs. For purposes of initial review, the court considers Plaintiff's allegations sufficient to satisfy the objective element.

With respect to the subjective element, Plaintiff's pleading burden depends upon his status as either a convicted prisoner or a pretrial detainee. *See Darnell v. Pineiro,* 849 F.3d 17, 29–35, 33 n.9 (2d Cir. 2017). Claims alleging deliberate indifference to health or safety are analyzed under the Due Process Clause of the Fourteenth Amendment when brought by pretrial detainees, *see id.* at 29, but are analyzed under the cruel and unusual punishment clause of the Eighth Amendment when brought by a sentenced prisoner, *see Charles,* 925 F.3d at 85. As Plaintiff's allegations span the period before and after his sentencing, his amended complaint raises claims under both the Fourteenth and the Eighth Amendment.

"[D]eliberate indifference, in the context of a Fourteenth Amendment due process claim, can be shown by something akin to recklessness, and does not require proof of a malicious or callous state of mind." *Charles,* 925 F.3d at 86. "[A] detainee asserting a Fourteenth Amendment claim for deliberate indifference to his medical needs can allege either that the defendants *knew* that failing to provide the complained of medical treatment would pose a substantial risk to his health or that the defendants *should have known* that failing to provide the omitted medical treatment would pose a substantial risk to the detainee's health." *Id.* at 87 (emphasis in original). Under the Eighth Amendment, a defendant must have been actually aware of a substantial risk that the plaintiff would suffer serious harm as a result of their conduct. *See Salahuddin v. Goord,* 467 F.3d 263, 280–81 (2d Cir. 2006). Under either the Eighth or the Fourteenth Amendment, a defendant's mere negligence is insufficient to support a deliberate indifference claim. *See Charles,* 925 F.3d at 86; *Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir. 2003).

Plaintiff's claims can be summarized as objecting to (1) the failure of medical personnel to ensure that he was housed in a single cell and that he slept on a bottom bunk; (2) the failure of medical personnel to properly treat Plaintiff; and (3) the failure of supervisors to ensure that their staff provided Plaintiff with his treatments. The court will address each claim seriatim.

#### A. Denial of Single Cell and Lower Bunk Pass

**\*4** The court construes Plaintiff's amended complaint as raising a deliberate indifference claim against APRN Richards and Coordinator Gallagher for failing to provide him with a single cell, and against APRN Richards for also failing to provide him with a bottom bunk pass.

To the extent Plaintiff's request for a single cell is based upon privacy concerns, the court finds no cognizable claim in these allegations. Plaintiff alleges that he requested a single cell as an accommodation so that he would not have to disclose his medical conditions to his cellmate in violation of his rights under HIPAA. But HIPAA does not create a private right of action and cannot support a claim under section 1983. *See Rogers v. Rensselaer Cnty. Sheriff's Dep't*, No. 1:14-CV-01162(MAD/TWD), 2015 WL 4404788, at \*7 (N.D.N.Y. July 17, 2015) ("It is well established that, because there is no private right of action under HIPAA, a violation of the Act cannot serve as the basis of a § 1983 claim.").

But to the extent these requests were based on Plaintiff's need to address the symptoms of his condition through frequent toilet usage, the court finds that Plaintiff has pleaded facts raising an inference that APRN Richards and Coordinator Gallagher knew of his need for frequent and easy access to a toilet, but acted with conscious disregard of this need, APRN Richards by denying him a lower bunk pass and a single cell, and Coordinator Gallagher by denying him a single cell. This inference is sufficient to satisfy the subjective element, at least at this point in the litigation. Accordingly, Plaintiff may proceed on his claims of Eighth Amendment violations against APRN Richards and Coordinator Gallagher in their individual capacities for damages.

#### B. Denial of Medical Treatment and Supervisory Liability

There are two ways in which Plaintiff believes he was denied adequate medical treatment. He clearly alleges that he sought emergency mental health services at MacDougall but did not receive aid. And, though less clearly, he also asserts that the medical facilities at HCC and MacDougall failed to procure the equipment necessary to provide him treatment (and consequently, he was denied treatment). [12] The court infers that these latter allegations all refer to the same thing: medical personnel's failure to provide Plaintiff with TPN through his PICC line. Plaintiff also objects to Dr. Pilah's failure to consult with a specialist and his recommendation to remove the PICC line entirely.

With respect to his mental health allegations, Plaintiff asserts that he requested treatment related to his fears about being in general population. He alleges that CSW Madeline responded to his inmate request, but he has not alleged any facts describing how she acted in conscious disregard to his serious mental health needs. Thus, no facts support the subjective element of the claim. Accordingly, the court must dismiss the Eighth Amendment claims against CSW Madeline as unsupported by the facts alleged.

Plaintiff's remaining claims regarding insufficient treatment appear to stem from his predicate dispute with prison medical staff. A letter from Coordinator Gallagher which Plaintiff attached to his complaint states that the prison healthcare providers are advising him to remove the PICC line because it was not in use. ECF No. 14 at CM/ECF p. 195. Plaintiff also attached a response to a grievance that he filed, that states Plaintiff had gained weight since his incarceration and that his bloodwork was within normal limits, so medical staff questioned whether he still required the TPN. *Id.* at CM/ECF p. 156.

**\*5** Thus, whether Plaintiff was deprived of necessary medications, whether the infirmaries should have procured the necessary machine to administer TPN, whether Dr. Pilah ought to have consulted with a specialist, and whether the PICC line ought to be removed, all appear to be questions of medical judgment, which cannot be the basis for a claim of deliberate indifference. *See Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998) ("[M]ere disagreement over the proper treatment does not create a constitutional claim" provided that "the treatment given is adequate[.]"); *see also Sires v. Berman*, 834 F.2d 9, 13 (1st Cir. 1987) ("We do not sit as a medical board of review. Where the dispute concerns not the absence of help but the choice of a certain course of treatment, or evidenced mere disagreement with considered medical judgment, we will not second guess the doctors."). It is well established that "a prisoner does not have the right to

choose his medical treatment as long as he receives adequate treatment." *Hill v. Curcione*, 657 F.3d 116, 123 (2d Cir. 2011).

A medical provider may act with deliberate indifference by consciously providing an inmate with "an easier and less efficacious" treatment plan, particularly if the provider has ulterior motives for doing so, such as an improper monetary incentive. *Chance*, 143 F.3d 698, 703–704 (2d Cir. 1998); *see also Braham v. Perelmuter*, 2017 WL 3222532, at *16–17 (D. Conn. July 28, 2017) (denying summary judgment due to a genuine dispute over whether certain dental treatment "derived from sound medical judgment."). Here, though, Plaintiff has not alleged facts to suggest that the medical decisions of the MacDougall and HCC medical staff were based on ulterior motives, nor has he alleged that any treatments he received were inferior or resulted in adverse health consequences. Indeed, it appears from the exhibits that (thankfully) he is in good health at this time. Accordingly, Plaintiff fails to show the subjective element for his claims of inadequate medical treatment, under either the Eighth or the Fourteenth Amendment standard, and the court must dismiss as not plausible the deliberate indifference claims against Dr. Pilah, Dr. McCrystal, and APRN Richards.

Finally, the court recognizes that a Section 1983 claim against a supervisor must allege that the supervisor personally engaged in violative conduct, *see Bennings v. Kearney*, 2 F. App'x 218, 220 (2d Cir. 2001) ("A viable § 1983 suit based on supervisory liability requires personal involvement by the defendant-supervisor."), and it is not clear that Plaintiff has done so here. But even if he had, any such claims would have to be dismissed because Plaintiff has not alleged any ultimate failure to provide adequate medical services (which is the predicate for his supervisory claims).

### C. Official Capacity Claims Under Section 1983

The court construes Plaintiff's amended complaint also to assert Eighth Amendment claims against Defendants in their official capacities.

Any constitutional claims for money damages against the defendants in their official capacities are barred by the Eleventh Amendment since each defendant is a state employee. *See e.g., Kentucky v. Graham*, 473 U.S. 159, 169 (1985). However, in *Ex parte Young*, 209 U.S. 123 (1908), the Supreme Court of the United States recognized a limited exception to the Eleventh Amendment's grant of sovereign immunity, permitting a plaintiff to sue (for prospective injunctive relief) a state official acting in an official capacity

who is sued for continuing violations of federal law. *Id.* at 155–56; *see also In re Deposit Ins. Agency*, 482 F.3d 612, 617 (2d Cir. 2007). Although Plaintiff plausibly alleged Eighth Amendment claims against certain defendants in their individual capacities arising from deliberate indifference to his need for access to a toilet, he no longer is housed at MacDougall, and it appears that he has a single cell at his current facility. ECF No. 14 at 195. Accordingly, he cannot allege any ongoing constitutional violation. Any official capacity claims therefore must be dismissed.

### D. Disability Discrimination

**\*6** The court also considers whether Plaintiff's allegations state any plausible claim for disability discrimination under either the Americans with Disabilities Act ("ADA") or the Rehabilitation Act ("RA"). The standards under Title II of the ADA and § 504 of the RA "are generally the same ...." *Wright v. New York State Dep't of Corr.*, 831 F.3d 64, 72 (2d Cir. 2016). [13] Each applies to state prisons and to state prisoners. *Id.*

It is clear, though, that "[n]either Title II of the ADA nor § 504 of the Rehabilitation Act provides for individual capacity suits against state officials." *Garcia v. S.U.N.Y. Health Scis. Ctr. Of Brooklyn*, 280 F.3d 98, 107 (2d Cir. 2001). Plaintiff therefore cannot bring any ADA or RA claims against any of the defendants in their individual capacities. And as to official capacity claims, it is unsettled in the Second Circuit whether a plaintiff may assert damages claims under the RA or under Title II of the ADA against a state actor in his or her official capacity for conduct that does not also violate the constitution. [14] However, for purposes of initial review, the court will consider whether Plaintiff has alleged a plausible disability discrimination claim against Coordinator Gallagher in her official capacity for denial of his request for an accommodation, assuming such a claim is cognizable.

To establish a prima facie violation under Title II of the ADA or the RA, a plaintiff must show: "that 1) he is a qualified individual with a disability; 2) [defendants are] entit[ies] subject to the acts; and 3) he was denied the opportunity to participate in or benefit from [defendants'] services, programs, or activities or [defendants] otherwise discriminated against him by reason of his disability." *Wright*, 831 F.3d at 72. There are "three available theories" of discrimination that can be used to establish the third prong of an ADA and RA claim: "(1) intentional discrimination (disparate treatment); (2) disparate impact; and (3) failure to

make a reasonable accommodation." *Fulton v. Goord*, 591 F.3d 37, 43 (2d Cir. 2009). Neither the ADA nor the RA "applies to claims regarding the adequacy or substance of services provided by correctional departments ...." *Reese v. Breton*, No. 3:18CV01465(VAB), 2020 WL 998732, at *5 (D. Conn. Mar. 2, 2020). Thus, "[c]ourts routinely dismiss ADA suits by disabled inmates that allege inadequate medical treatment, but do not allege that the inmate was treated differently because of his or her disability." *Elbert v. New York State Dep't of Corr. Servs.*, 751 F. Supp. 2d 590, 595 (S.D.N.Y. 2010).

**\*7**  The court accepts for purposes of initial review that Plaintiff is an individual with a qualifying disability, [15] and that he required an accommodation for his medical condition, specifically, frequent access to bathroom facilities, either through assignment to a single cell or a lower bunk. At this early stage, the court permits Plaintiff to proceed on his ADA and RA claims for damages and injunctive relief against Coordinator Gallagher in her official capacity for her failure to provide those accommodations.

### ORDERS

Consistent with the foregoing, the court enters the following orders:

(1) Plaintiff may proceed on (i) his Eighth Amendment claims of deliberate indifference to his need for a single cell and lower bunk against APRN Akina Richards in her individual and official capacity; (ii) his Eighth Amendment claims of deliberate indifference to his need for a single cell against Colleen Gallagher in her individual capacity; and (iii) his ADA/RA claims for damages and injunctive relief against Coordinator Gallagher in her official capacity. All other claims are DISMISSED. The Clerk of Court is instructed to terminate Warden Dougherty, Nurse Supervisor Tawana, and CSW Madeline as defendants in this action.

(2) The Clerk shall please verify the current work address for Akina Richards and Colleen Gallagher with the DOC Office of Legal Affairs, mail to them at their confirmed address within **twenty-one (21) days** of this order, a waiver of service of process request packet containing the amended complaint (ECF No. 14), and also shall please report on the status of the waiver request on the **thirty-fifth (35th) day** after mailing. If Defendants fail to return the waiver request, the Clerk shall make arrangements for in-person individual capacity service

by the U.S. Marshals Service on any such defendant, and that defendant shall be required to pay the costs of such service in accordance with Federal Rule of Civil Procedure 4(d).

(3) The Clerk shall send a courtesy copy of the amended complaint and this order to the DOC Office of Legal Affairs and the Office of the Attorney General.

(4) Defendants shall file their response to the amended complaint (either an answer or motion to dismiss) within **sixty (60) days** from the date the notice of lawsuit and waiver of service of summons forms are mailed to them. If Defendants choose to file an answer, Defendants shall admit or deny the allegations and respond to the cognizable claim recited above. Defendants also may include any and all additional defenses permitted by the Federal Rules.

(6) Discovery, according to Federal Rules of Civil Procedure 26-37, shall be completed within **six months (180 days)** from the date of this order. Discovery requests need not be filed with the court. Interim discovery deadlines established by the parties may be amended by their agreement without the need to seek court approval, so long as such extensions to not delay the deadline for completion of all discovery.

**\*8**  (7) The parties must comply with the District of Connecticut "Standing Order Re: Initial Discovery Disclosures," which will be sent to both parties by the court. The Order can also be found at http://ctd.uscourts.gov/administrative-standing-orders.

(8) All motions for summary judgment shall be filed within **seven months (210 days)** from the date of this order.

(9) According to Local Civil Rule 7(a), a nonmoving party must respond to a dispositive motion within **twenty-one (21) days** of the date the motion was filed. If no response is filed, or the response is not timely, the dispositive motion can be granted absent objection.

(10) If Plaintiff changes his address at any time during the litigation of this case, Local Court Rule 83.1(c)2 provides that he MUST notify the court. Failure to do so can result in the dismissal of the case. Plaintiff must give notice of a new address even if he is incarcerated. He should write "PLEASE NOTE MY NEW ADDRESS" on the notice. It is not enough to just put the new address on a letter without indicating that it is a new address. If Plaintiff has more than one pending case, he should indicate all of the case numbers in the notification

of change of address. He should also notify Defendants or defense counsel of his new address.

(11) Plaintiff shall utilize the Prisoner Electronic Filing Program ("The Program") when filing documents with the court. Plaintiff is advised that the Program may be used only to file documents with the court. Local court rules provide that discovery requests are not filed with the court. D. Conn. L. Civ. R. 5(f). Therefore, discovery requests must be served on Defendants' counsel by regular mail.

(12) In light of this order, Plaintiff's Motion to Compel, ECF No. 16, [16] and Motion for Order, ECF No. 17, [17] are denied as moot.

**IT IS SO ORDERED** at Hartford, Connecticut, this 31st day of January, 2024.

**All Citations**

Slip Copy, 2024 WL 363193

# Footnotes

1    The court may "take judicial notice of relevant matters of public record." *Giraldo v. Kessler*, 694 F.3d 161, 164 (2d Cir. 2012). The publicly available information on the DOC website shows that Plaintiff was sentenced on November 30, 2022, to a term of incarceration that has not yet expired. *See* "Connecticut State Department of Correction: Inmate Information," available at http://www.ctinmateinfo.state.ct.us/detailsupv.asp?id_inmt_num=327592 [https://perma.cc/ZRB3-G7TZ] (last visited Jan. 31, 2024).

2    Plaintiff filed a first amended complaint in March 2023, and then amended the complaint again thereafter in May 2023. Although he did not seek leave before filing the second amended complaint, the court accepts the May filing as the operative pleading.

3    All factual allegations are drawn from the amended complaint and exhibits thereto and are considered true for the purpose of this initial review.

4    Plaintiff's medical condition is not fully explained in the amended complaint itself, but additional detail can be found in the grievance forms attached thereto. The court relies upon those attachments for clarity.

5    *See* Mayo Clinic, "Home Parenteral Nutrition," available at https://www.mayoclinic.org/tests-procedures/total-parenteral-nutrition/about/pac-20385081 [https://perma.cc/7SKD-KMWM] (last visited Jan. 31, 2024).

6    Generally, a PICC line "is a long, thin tube that's inserted through a vein in [an individual's] arm and passed through to the larger veins near [the] heart." Mayo Clinic, "Peripherally inserted central (PICC) line," available at https://www.mayoclinic.org/tests-procedures/picc-line/about/pac-20468748 [**https://perma.cc/SQM3-M5WE**] (last visited Jan. 31, 2024). It provides a "doctor access to the large central veins near the heart ... [and is] used to give medications or liquid nutrition." *Id.*

7    It appears this device is the outlet for the PICC line.

8    Plaintiff actually asserts only that he was deprived of necessary treatment, but the court gathers that this is a reference to the TPN.

9    Another nurse also apparently stated that she could only put him on medical watch, or that he could refuse housing. As this nurse is not a party to this action, this detail is not relevant to this discussion.

10   Plaintiff also alleges that he was sent to the emergency room on April 5, 2023, but it is not clear why.

11    Certain exhibits suggest that Plaintiff already may have a single cell, *see, e.g.,* ECF No. 14 at CM/ECF p. 195, but that is unconfirmed. The court notes that it refers to the pagination supplied by the CM/ECF system because the amended complaint and exhibits are docketed as a single document.

12    He also alleges that nurses did not promptly address his wrist and leg pain, but this appears to be predicate conduct only for his supervisory claims, which are addressed *infra.*

13    The only difference between the ADA and the RA is that the RA applies to entities receiving federal financial assistance while Title II of the ADA applies to all public entities, a distinction not relevant here. *See Messier v. Southbury Training Sch.*, 562 F. Supp. 2d 294, 320 n.13 (D. Conn. 2008); *see also Henrietta D. v. Bloomberg,* 331 F.3d 261, 272 (2d Cir. 2003) (finding it proper to consider such claims together). Where "distinctions between the statutes are not implicated," courts will "treat claims under the two statutes identically.' " *Wright,* 831 F.3d at 72 (quoting *Henrietta D.,* 331 F.3d at 272).

14    In *Garcia v. S.U.N.Y. Health Scis. Ctr. Of Brooklyn,* 280 F.3d 98 (2d Cir. 2001), the United States Court of Appeals for the Second Circuit held that a private individual could bring an official capacity ADA claim for damages against a state official, but only when the conduct also violates the Equal Protection Clause of the Fourteenth Amendment. Thereafter, in *United States v. Georgia,* 546 U.S. 151 (2006), the Supreme Court of the United States entertained, but specifically left open, the question of whether a Title II claim may proceed against a state official for conduct that violates the ADA, but not the Constitution. *See Dean v. Univ. at Buffalo Sch. of Med. & Biomedical Scis.,* 804 F.3d 178, 195 (2d Cir. 2015) (discussing, but not answering, whether *Garcia* survived *Georgia*). There is now a divergence in how district courts approach this issue. *Id.*

15    A "qualified individual with a disability" is defined as a disabled individual "who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2). The ADA further defines "disability" as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment (as described in paragraph (3))." 42 U.S.C. § 12102(2)(A).

16    In this motion, Plaintiff asks for the defendants to be served and a deadline to respond to be imposed, which instructions are included in this order.

17    In this motion, Plaintiff asks the court to order the defendant medical staffers to withdraw as his healthcare providers because they are denying his medical needs. As discussed *supra*, the denial of treatment appears to be a legitimate medical judgment, which the court will not disturb.

---

End of Document                                                                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Tsuma v. Costello, Not Reported in Fed. Supp. (2022)

Case 3:24-cv-00037-DNH-ML    Document 9    Filed 06/11/24    Page 90 of 449

2022 WL 1036819
Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.

Emile I. TSUMA, Sr., Plaintiff,
v.
Matt COSTELLO, et al., Defendants.

3:22-cv-00067 (SVN)
|
Signed 04/06/2022

**Attorneys and Law Firms**

Emile I. Tsuma, Sr., Uncasville, CT, Pro Se.

## INITIAL REVIEW ORDER

SARALA V. NAGALA, UNITED STATES DISTRICT
JUDGE

**\*1** On January 13, 2022, Emile Tsuma, Sr. ("Plaintiff"),
an unsentenced inmate housed at Corrigan-Radgowski
Correctional Center ("Corrigan") of the Connecticut
Department of Correction ("DOC"),[1] brought this action
against his appointed counsel, Matt Costello, and District
Attorney David Smith, Prosecutor Ralph Bustamante,
and Prosecutor Sarah Steere (collectively the "Prosecutor
Defendants" and with Costello the "Defendants"). ECF No. 1.
Plaintiff asserts violations of his rights under the United States
Constitution, the Americans with Disabilities Act ("ADA"),
and the Rehabilitation Act ("RA"). *Id.* at 4-33. Plaintiff
has sued Defendants in their individual and official capacities and
requests damages and injunctive relief. *Id.* at 32-33. For the
reasons that follow, the Court hereby dismisses all claims
brought through this action.

## I. FACTUAL ALLEGATIONS

Plaintiff's complaint includes factual allegations concerning
his criminal prosecutions, his DOC disciplinary hearing,
his DOC disciplinary sanctions, his prior interactions with
Attorney Bustamante in 2015, his parental rights and efforts
to regain his children, and his mental health treatment at
Whiting Hospital. The Court has reviewed all of the facts and
includes only those facts relevant to Plaintiff's claims asserted
against the Defendants.

For purposes of this initial review, the Court considers all
of Plaintiff's allegations to be true.[2] On January 7, 2019,
Plaintiff was housed at Corrigan when he became involved
in an altercation with correctional staff. ECF No. 1 ¶¶ 1-4.
He was later taken to segregation and charged with assault
on a public safety officer. *Id.* at ¶ 5. He was given a court
date of January 21, 2019, for his arraignment. *Id.* at ¶ 8. At
his arraignment on the charge of assault on a public safety
officer, the judge and prosecutor agreed to proceed with the
prosecution despite a lack of evidence to support probable
cause and the existence of exculpatory video footage. *Id.* at
¶ 16.

Plaintiff was appointed Matt Costello as defense counsel. *Id.*
at ¶ 18. Although Plaintiff had lost his telephone privileges
as a result of the disciplinary sanctions, he was able to
write letters and request legal calls between January 1, 2019,
through September 2019. *Id.* at ¶ 19. Plaintiff sent letters
to both the prosecutor and Costello to explain that he had
exculpatory video evidence relevant to his criminal charges.
*Id.*; *see also id.* at ¶ 14. Costello allegedly indicated that his
investigators would speak to Plaintiff's counselor about the
exculpatory video evidence. *Id.* ¶ 19.

**\*2** Costello dragged the case on by filing for continuances
that were granted; he visited Plaintiff occasionally and told
Plaintiff that the case against him was weak, although District
Attorney Smith wanted to have Plaintiff serve three and a
half years for the assault. *Id.* at ¶ 20. Plaintiff explained
that District Attorney Smith was upset that Plaintiff had
previously had a case dismissed due to exculpatory evidence.
*Id.* at ¶ 21.

Plaintiff requested Costello to file a motion for discovery and
to suppress evidence so that the case against Plaintiff could
be dismissed due to alleged exculpatory video evidence. *Id.*
Costello claimed that there was no such video evidence and
that the state had provided him with all of the evidence. *Id.* at
¶ 22. Plaintiff informed Costello that the prison had "maybe"
not provided all of the evidence since the video would show
they are covering up the false charges against Plaintiff. *Id.*
Costello responded that the prison would not do that. *Id.*

Between January 7 and September 19, 2019, Plaintiff called
the court to follow up on the exculpatory evidence that was
mailed to the New London Superior Court. *Id.* at ¶ 23. During
one of these calls, Plaintiff spoke with Attorney Bustamante
about whether he had evidence that showed Plaintiff's
innocence. *Id.* Attorney Bustamante attempted to clarify who

he was speaking to, but Plaintiff refused to provide that information. *Id.* Instead, Plaintiff told Attorney Bustamante that he needed to abide by the law. *Id.* Attorney Bustamante then stated that if he was speaking to an inmate, any crime Plaintiff believed occurred needed to be reported to the prison counselor. *Id.* Eventually, Plaintiff revealed his identity and that he had mailed Attorney Bustamante exculpatory evidence. *Id.* Upon hearing this, Attorney Bustamante became angered and denied receiving such evidence. *Id.*

At some time thereafter, though it is unclear exactly when, Plaintiff filed grievances against District Attorney Smith, Attorney Bustamante, and Attorney Costello. *Id.* ¶ 25. As a result of filing these grievances, the prosecutors wanted Plaintiff to serve three and a half years for a crime he had not committed. *Id.* at ¶¶ 25, 26. Plaintiff rejected the plea offer to serve three and half years, and instead had Costello file a Speedy Trial Act motion. *Id.* at ¶ 26. Despite filing the speedy trial motion, Costello failed to file for a probable cause hearing and a motion to suppress, and had failed to discover the video evidence. *Id.* at ¶¶ 26, 29.

After the Speedy Trial Act motion was granted, Costello, Plaintiff, and Attorney Steere appeared in court to pick jurors. *Id.* at ¶ 30. Both sides presented their evidence and case to the jurors. *Id.* Attorney Steere called four witnesses, including Kevin Gaudet, who testified that Plaintiff assaulted him. *Id.* at ¶ 31. Gaudet was allegedly "out to get Plaintiff" and was harassing him for filing grievances against him and other officers. *Id.*

During Costello's examination of Gaudet, Gaudet admitted that he was assaulted but did not have to see medical staff, did not report any injuries, and in fact, had no injuries. *Id.* at ¶ 32. However, Costello made no effort to object when Gaudet "attempted" to insult Plaintiff's "babymother[.]" *Id.* at ¶ 33. Costello also told Plaintiff that he should relax and keep his anger under control after Plaintiff questioned why he had not objected to the witnesses' statements. *Id.*

**\*3** Costello called Plaintiff's witnesses, who testified that Plaintiff had never hit anyone but instead was himself being attacked. *Id.* at ¶ 34. Counselor Jones responded to Costello's questions about his advisor report by stating, "I don't recall." *Id.* at ¶ 35.

Plaintiff provided testimony about his "account" of the incident during questioning by Attorney Steere. *Id.* at ¶ 36. After both parties rested, Plaintiff was placed in a holding cell.

*Id.* at ¶ 38. After thirty minutes of deliberations, Plaintiff was found not guilty. *Id.* It had taken the state and Costello nine and a half months to bring his case to trial. *Id.*

Costello informed Plaintiff that Attorney Steere wanted to release him. *Id.* at ¶ 39. Plaintiff informed Costello that he would be filing a lawsuit; Plaintiff asked him why Attorney Steere had not dismissed the charges based on the evidence that Plaintiff had mailed to the prosecutor's Office. *Id.* at ¶ 40. Plaintiff was incarcerated for nine months even though all parties knew about the exculpatory evidence and failed to acknowledge it because it would expose the cover up of Gaudet's criminal intent. *Id.* at ¶ 41.

When Plaintiff returned home, he discovered that his father had died in February while Plaintiff was in the Restrictive Housing Unit ("RHU"). *Id.* at ¶ 42. Plaintiff also tried to have his children returned to him but received no assistance in doing so. *Id.* at ¶ 44. Plaintiff later got into counseling and was prescribed medicine. *Id.* at ¶ 45.

In February 2020, Plaintiff was arrested for being intoxicated in a store and charged with interfering with an officer, criminal trespass, and failure to comply with finger printing. [3] *Id.* at ¶ 46. Plaintiff was also arrested on February 14, 2020, for criminal mischief because he broke a ceiling tile while attempting suicide in a Dunkin Donuts bathroom by swallowing Adderall pills. [4] *Id.* at ¶ 47. Plaintiff was struggling with depression, anxiety, insomnia, and was upset about his time spent incarcerated and his parental rights. *Id.* at ¶ 48.

After about nine months, Plaintiff was called into court and appointed an attorney, Sean Kelly, who filed for a mental health evaluation of Plaintiff. *Id.* at ¶¶ 52-53. Attorney Kelly was later replaced by Costello. *Id.* at ¶ 53. Plaintiff returned to prison on May 17, 2021, and contacted Costello to inform him that his parents had both passed away, that he could not see his children due to COVID-19, and that he had tried to commit suicide. *Id.* at ¶¶ 55-56.

Between May 17 and June 14, 2021, Plaintiff saw a group of doctors who agreed that Plaintiff should be placed in Whitting Hospital due to his paranoid ideations. *Id.* at ¶ 57. In a meeting with Attorney Bustamante, Costello and a superior court judge, Plaintiff agreed that he would go to Whitting for a sixty-day evaluation and treatment. *Id.* at ¶ 59.

**\*4** While he was at Whitting, Plaintiff attempted to contact Costello for advice about taking medications that were offered at Whitting, but Costello swore at him and had "attitude." *Id.* at ¶ 63. Later, when Plaintiff tried to contact him after being assaulted by a patient at Whitting, Costello would not answer his telephone calls. *Id.* at ¶ 64. Plaintiff's brother was later able to reach Costello. *Id.*

Plaintiff was informed that he would not receive further services after being found competent because he was not taking any medication. *Id.* at ¶ 65. Plaintiff did not understand that he would be excluded from the care he needed and be returned to prison if he did not take the medication at Whitting. *Id.* at ¶ 66.

On August 18, 2021, Plaintiff was found competent and transferred to prison. *Id.* at ¶ 67. A unit manager informed Plaintiff that his attorney could use his good report at Whitting as an argument for a bond reduction and that his time at Whitting could count as time served. *Id.* at ¶ 67. After Plaintiff informed Costello about this information, he hung up the telephone, claiming to be in court. *Id.* at ¶ 68.

During his court appearance on August 18, 2021, Plaintiff was informed that he could file for a bond reduction before his next appearance on October 22, 2021. *Id.* at ¶ 69. Plaintiff was unable to reach Costello about his bond reduction before his court appearance on October 22, 2021. *Id.* at ¶ 70.

On October 20, Plaintiff filed grievances against Costello and Attorney Bustamante. *Id.* at ¶ 75. The grievance against Attorney Bustamante was returned as Plaintiff had not at that time identified Attorney Bustamante. *Id.* Plaintiff's grievance against Costello complained of, among other things, neglect, communication issues, conflict of interest, and diligence issues. *Id.* Costello responded to the grievance by admitting that he had "issues" with Plaintiff, but that Plaintiff also had mental illness. *Id.* Plaintiff later filed a response explaining how dealing with Costello had traumatic effects and that he would hurt himself if he had to deal with Costello again. *Id.* at ¶ 76.

On October 22, at Plaintiff's court appearance, Costello informed Plaintiff that Attorney Bustamante wanted him to serve a sentence of eight years suspended after three years with five years of probation. *Id.* at ¶ 71. Costello explained that Attorney Bustamante was "upping" the charge to burglary. *Id.* at ¶ 73. However, Costello would not permit Plaintiff to see any "paper work" about the charges, and he

admitted that he had not filed for a bond hearing because "they aren't going to do it." *Id.* at ¶ 73. Plaintiff then fired Costello. *Id.* at ¶ 74.

Plaintiff remains in prison due to Attorney Bustamante and Costello's "negligent behavior or misconduct." *Id.* at ¶ 77. He has been denied the right to a bond reduction and has been incarcerated with no resolution from May 17, 2021, to January 4, 202[2], without due process as a result of Attorney Bustamante's and Costello's personal interests. *Id.* at ¶ 77.

Defendant Costello has not argued any facts about Plaintiff's "very bad history of mental health issues" and drug and alcohol problem. *Id.* at ¶ 77. Costello's only concern was what the prosecutor and judge had to say. *Id.* at ¶ 78.

## II. LEGAL STANDARD

Pursuant to 28 U.S.C. § 1915A, the court must review prisoner civil complaints and dismiss any portion of the complaint that is frivolous or malicious, that fails to state a claim upon which relief may be granted, or that seeks monetary relief from a defendant who is immune from such relief. Although detailed allegations are not required, the complaint must include sufficient facts to afford the defendants fair notice of the claims and the grounds upon which they are based and to demonstrate a right to relief. *Bell Atlantic v. Twombly*, 550 U.S. 544, 555-56 (2007). Conclusory allegations are not sufficient. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic*, 550 U.S. at 570. Nevertheless, it is well-established that "*[p]ro se* complaints 'must be construed liberally and interpreted to raise the strongest arguments that they suggest.' " *Sykes v. Bank of America*, 723 F.3d 399, 403 (2d Cir. 2013) (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006)).

## III. DISCUSSION

**\*5** Plaintiff asserts four legal claims in his complaint.[5] In his first claim, Plaintiff alleges that the Prosecutor Defendants "directly participated in a[n] unconstitutional act of malicious prosecution, by denying Plaintiff equal protection of the law by ignoring the fact Plaintiff provided exculpatory evidence[,] [by] withholding all evidence and offering plaintiff prison time with no supporting facts[;]" and that he had to spend 9.5 months in prison and endure a trial that resulted in a dismissal. ECF No. 1 at 29 (¶ 1).

In his second claim, Plaintiff asserts that Costello "directly participated in a[n] unconstitutional act of negligence by failing to present evidence or obtain exculpatory evidence which forced Plaintiff to remain incarcerated for 9 1/2 months," and by "refusing to file proper motions in Plaintiff's interest." *Id.* at 30 (¶ 2). He claims that Costello thereby denied him his rights to equal protection of the law under the Fourteenth Amendment.

In his third claim, he alleges that Attorney Bustamante "directly participated in a[n] unconstitutional act of malicious prosecution, deliberate indifference, and abuse of process by threatening to give Plaintiff an excessive amount of time and trump[ed] charges despite having visual evidence of [the] incident from 02.07.20." *Id.* at 30 (¶ 3). He claims that Attorney Bustamante wanted to turn "the incident into a burglary to satisfy his malicious interest and force a sentence onto plaintiff for a crime that was never committed" in violation of Plaintiff's equal protection rights under the Fourteenth Amendment. *Id.*

Plaintiff's fourth claim asserts that Costello "directly participated in a[n] unconstitutional act of negligence" by denying Plaintiff an ability to communicate his needs, by refusing to file a motion for bond, and by failing "to create a defense in a reasonable time or even attempting to get Plaintiff into a program" for his drug and mental health issues. *Id.* at 30-31 (¶ 4). He claims that Costello thereby denied him his Eighth Amendment and Fourteenth Amendment rights.

Plaintiff seeks $33,000 in compensatory damages and $13,000 in punitive damages. ECF No. 1 at 31. Plaintiff also seeks a preliminary and permanent injunction against Attorney Bustamante to "cease his prosecutorial misconduct." *Id.* at 33. He also seeks a temporary restraining order against a Corrigan counselor who is not otherwise named in the body of the complaint, Counselor Derose, for denying him the "right to have his suit e-filed." ECF No. 1 at 32. Plaintiff claims Counselor Derose is denying him access to the courts.

## A. The Prosecutor Defendants

The Court construes Plaintiff's complaint as asserting malicious prosecution claims under § 1983 against the Prosecutor Defendants.

"Claims for false arrest or malicious prosecution, brought under § 1983 to vindicate the Fourth and Fourteenth Amendment right to be free from unreasonable seizures, are 'substantially the same' as claims for false arrest or malicious prosecution under state law." *Jocks v. Tavernier*, 316 F.3d 128, 134 (2d Cir. 2003) (citing *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996)). In order to prove a malicious prosecution claim under Connecticut law, Plaintiff would have to establish: "(1) the defendant initiated or procured the institution of criminal proceedings against the plaintiff; (2) the criminal proceedings have terminated in favor of the plaintiff; (3) the defendant acted without probable cause; and (4) the defendant acted with malice, primarily for a purpose other than that of bringing an offender to justice." *Spak v. Phillips*, 857 F.3d 458, 461 n.1 (2d Cir. 2017) (quoting *Brooks v. Sweeney*, 299 Conn. 196, 210-211 (2010)).

**\*6** Prosecutors receive absolute immunity from suit under § 1983 when they engage in "advocacy conduct that is 'intimately associated with the judicial phase of the criminal process.' " *Giraldo v. Kessler*, 694 F.3d 161, 165 (2d Cir. 2012) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976)); *Hill v. City of New York*, 45 F.3d 653, 661 (2d Cir. 1995) (noting that prosecutorial immunity from § 1983 liability is broadly defined, and covers "virtually all acts," associated with prosecutor's function as an advocate).[6] "The absolute immunity accorded to government prosecutors encompasses not only their conduct during trials but all of their activities that can fairly be characterized as closely associated with the conduct of litigation or potential litigation, including presentation of evidence to a grand jury to initiate a prosecution ..., activities in deciding not to do so ..., and conduct of plea bargaining negotiations." *Barrett v. United States*, 798 F.2d 565, 571-572 (2d Cir. 1986) (citations omitted).

"The doctrine of absolute immunity applies broadly to shield a prosecutor from liability for money damages (but not injunctive relief) in a § 1983 lawsuit, even when the result may be that a wronged plaintiff is left without an immediate remedy." *Anilao v. Spota*, No. 19-3949-CV, 2022 WL 697663, at \*4 (2d Cir. Mar. 9, 2022). As the Second Circuit explained recently, "[a] narrow limitation to the scope of absolute immunity in § 1983 actions ... exists where the defect is jurisdictional — that is, where the prosecutor acted well outside the scope of authority, rather than where the defect relates ... to the prosecutor's motivation or the reasonableness of his official action." *Id.* at \*5. Thus, a prosecutor's immunity "extends even to a prosecutor who 'conspir[es] to present

false evidence at a criminal trial[,]' and [t]he fact that such a conspiracy is certainly not something that is *properly* within the role of a prosecutor is immaterial, because the immunity attaches to his function, not to the manner in which he performed it." *Id.* at *4 (quoting *Dory v. Ryan*, 25 F.3d 81, 83 (2d Cir. 1994)) (emphasis in original).

Plaintiff's claims for damages against the Prosecutor Defendants arise out of their "conduct in furtherance of prosecutorial functions that are intimately associated with initiating or presenting the State's case" and are thereby barred by the doctrine of prosecutorial immunity. Specifically, all of Plaintiff's claims against the Prosecutor Defendants revolve around the fact that he was improperly charged under a crime he did not commit and that the prosecutor improperly withheld "all evidence and offering Plaintiff prison time with no supporting facts." *See* ECF No. 1 at 29, ¶ 1. Taking these allegations as true, the Prosecutor Defendants are absolutely immune from these actions, as each of these actions were taken in furtherance of prosecutorial functions. *See Staton v. Holzbach*, No. 3:20-CV-631 (SRU), 2020 WL 6119382, at *3 (D. Conn. Oct. 16, 2020) (prosecutor is absolutely immune for decision on whether to pursue or dismiss charges); *Hill*, 45 F. 3d at 662 (prosecutor was entitled to absolute immunity for claim that he withheld exculpatory evidence). Because there are no facts to suggest that any of the Prosecutor Defendants acted outside the scope of their roles in criminally prosecuting Plaintiff for the state, the claims against the Prosecutor Defendants for monetary damages are barred by absolute prosecutorial immunity and are dismissed with prejudice.

**\*7** Further, the only allegations related to Defendant District Attorney Smith are that he "was upset that Plaintiff had previously got a case dismissed due to exculpatory evidence and he was out to get me." ECF No. 1 ¶ 21. It thus appears that Plaintiff is accusing Defendant Smith of instructing Defendant Bustamante not to dismiss Plaintiff's case and to in fact seek a harsher sentence. A supervisory official, however, cannot be held liable under § 1983 on a theory of *respondeat superior. Tangreti v. Bachmann*, 983 F.3d 609, 616 (2d Cir. 2020). Therefore, Plaintiff fails to state a claim against Defendant Smith.

## B. Attorney Costello

Plaintiff asserts Fourteenth Amendment and Eighth Amendment claims against appointed defense counsel Costello. *See* ECF No. 1 ¶¶ 2, 4. Plaintiff's section 1983 claims

against Costello fail to state a claim because Costello is not a state actor for purposes of section 1983.

"Section 1983 provides a federal cause of action against any person who, acting under color of state law, deprives another of his federal rights." *Conn v. Gabbert,* 526 U.S. 286, 290 (1999) (citing 42 U.S.C. § 1983). A section 1983 plaintiff must show a violation of a federally protected constitutional or statutory right which was the result of state action, or action "under color of law." *See Pitchell v. Callan,* 13 F.3d 545, 547 (2d Cir. 1994).

A court-appointed attorney "performing a lawyer's traditional functions as counsel" to a party is not a state actor under section 1983. *Kaminski v. Semple*, 796 F. App'x 36, 39 (2d Cir. 2019) (summary order), *cert. denied*, 141 S. Ct. 434 (2020); *Rodriguez v. Weprin*, 116 F.3d 62, 65-66 (2d Cir. 1997); *Barfield v. Milling*, No. 3:14-CV-914 (VAB), 2015 WL 1737671, at *4 (D. Conn. Apr. 16, 2015) (citing cases). Likewise, an attorney who serves as a public defender does not act under color of state law when performing a lawyer's traditional functions as counsel to a defendant in a criminal proceeding or by virtue of their state law license. *Polk Cty. v. Dodson*, 454 U.S. 312, 318-19 (1981).

Accordingly, Attorney Costello is a private party. Although private parties are not generally liable under section 1983, the Court considers whether Plaintiff may bring his claims against Costello on the basis of any alleged conduct that may be considered state action. *See United States v. International Brotherhood of Teamsters*, 941 F.2d 1292, 1295 (2d Cir. 1991) ("Because the United States Constitution regulates only the Government, not private parties, a litigant claiming that his constitutional rights have been violated must first establish that the challenged conduct constitutes 'state action.' "). To show that the actions of a private party may be attributable to the state, thereby making the private party subject to liability under section 1983, the plaintiff must show "(1) the State compelled the conduct, (2) there is a sufficiently close nexus between the State and the private conduct, or (3) the private conduct consisted of activity that has traditionally been the exclusive prerogative of the State." *Hogan v. A.O. Fox Mem'l Hosp.*, 346 Fed. App'x 627, 629 (2d Cir. 2009) (summary order) (citing *Sybalski v. Indep. Grp. Home Living Program, Inc.*, 546 F.3d 255, 257 (2d Cir. 2008)). "The fundamental question under each test is whether the private entity's challenged actions are 'fairly attributable' to the state." *Fabrikant v. French*, 691 F.3d 193, 207 (2d Cir. 2012) (citation and quotation omitted).

Tsuma v. Costello, Not Reported in Fed. Supp. (2022)

Case 3:24-cv-00037-DNH-ML    Document 9    Filed 06/11/24    Page 95 of 449

Plaintiff has not alleged facts to show that Defendant Costello engaged in conduct that could be considered fairly attributable to the state. No allegation suggests that Costello was compelled by the State to take the actions of which Plaintiff complains; that there was a sufficiently close nexus between the State and Costello's conduct; or that the conduct consisted of activity that has traditionally been the exclusive prerogative of the State. *See Hogan,* 346 Fed. App'x at 629. [7]

**\*8** Accordingly, Plaintiff's section 1983 claims are dismissed pursuant to section 1915A as lacking "an arguable basis either in law or in fact." *Neitzke v. Williams,* 490 U.S. 319, 325 (1989).

### C. Disability Discrimination

Plaintiff's complaint refers to a violation of his rights under the ADA and the RA, but it fails to allege violation of the ADA or RA under his legal claims. See ECF No. 1 at 4 ¶ 1; *see id.* at 29-31.

Title II of the ADA "proscribes discrimination against the disabled in access to public services." *Powell v. Nat'l Bd. of Med. Exam'rs,* 364 F.3d 79, 84–85 (2d Cir.), *corrected,* 511 F.3d 238 (2d Cir. 2004). Title II applies to any state or local government or instrumentality of a state or local government. *Id.* § 12131(1). It provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

Section 504 of the RA states that "[n]o otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under" any covered program or activity. *Id.*

In order to prevail on a claim under either Title II of the ADA or § 504 of the RA, a plaintiff "must show that 1) he is a qualified individual with a disability; 2) [the defendant] is an entity subject to the acts; and 3) he was denied the opportunity to participate in or benefit from [the defendant's] services, programs, or activities [or that the defendant] otherwise discriminated against him by reason of his disability." *Wright v. N.Y. State Dep't of Corr.,* 831 F.3d 64, 72 (2d Cir. 2016). Under the second and third elements of this analysis, the court

must consider whether any defendant has denied Plaintiff the opportunity to participate in or benefit from public services, programs, or activities, or has otherwise discriminated against him," by reason of his disability rather than a legitimate nondiscriminatory reason. *See Torrez v. Semple,* 2018 WL 2303018, at \*8 (D. Conn. May 21, 2018) (discussing second and third elements).

A qualified individual can base a discrimination claim on any of "three available theories: (1) intentional discrimination (disparate treatment); (2) disparate impact; and (3) failure to make a reasonable accommodation." *Fulton v. Goord,* 591 F.3d 37, 43 (2d Cir. 2009).

It is unclear against whom Plaintiff asserts his claims of disability discrimination or what conduct plaintiff claims to constitute violations of the ADA and RA. The complaint is devoid of factual allegations plausibly suggesting that Plaintiff was unable to access public programs due to his disability, that his disability prevented him from accessing public programs, or that he was denied any accommodations so that he could access such programs. Moreover, Plaintiff has not alleged facts suggesting that he was treated differently because of his disability. *See Gibbs v. Doe 1-7,* No. 3:20-CV-1119 (JAM), 2020 WL 7129584, at \*9 (D. Conn. Dec. 4, 2020) (dismissing ADA and RA claims because plaintiff failed to allege that "DOC discriminated against him because of his disability."); *Atkins v. Cnty. of Orange,* 251 F. Supp. 2d 1225, 1232 (S.D.N.Y. 2003) ("With no allegation of disparate treatment, no claim for discrimination under the ADA ... lies."). Accordingly, Plaintiff's ADA and RA claims must be dismissed as not plausibly alleged.

### D. Requests for Injunctive Relief

**\*9** In addition to monetary relief, Plaintiff seeks injunctive relief against the Defendants and Corrigan Counselor Derose. ECF No. 1 at 32.

A district court has wide discretion in determining whether to grant preliminary injunctive relief, however it is an "extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *See Moore v. Consolidated Edison Co. of New York, Inc.,* 409 F.3d 506, 511 (2d Cir. 2005) (Sotomayor, J.). Specifically, in order to receive either a temporary restraining order or a preliminary injunction, a movant must establish "a threat of irreparable harm" and

Tsuma v. Costello, Not Reported in Fed. Supp. (2022)

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 96 of 449

either (1) "a probability of success on the merits" or (2) "sufficiently serious questions going to the merits to make them a fair ground for litigation, and a balance of hardships tipping decidedly in favor of the moving party." *Moore*, 409 F.3d at 510 (internal citations omitted).

For the reasons outlined above, Plaintiff has failed to show a probability of success on the merits, or sufficiently serious questions going to the merits, for any of his claims against Defendants. As such, any request for injunctive relief against Defendants is denied.

Additionally, the Court denies the request for injunctive relief against Counselor Derose, who is not a party to this action. Plaintiff has not named Derose as a defendant and did not state any allegations against Counselor Derose in the body of his complaint. Rather, in the prayer for relief, Plaintiff alleges that Counselor Derose has obstructed his right to "e-file" his suit, has refused to notarize legal documents, and is denying him access to legal phone calls. Derose's status as a non-party precludes the Court from granting the requested injunctive relief. Except in limited circumstances not relevant here, "a Court may not order injunctive relief as to non-parties to the

action." *Allen v. Brown*, No. 96-CV-1599, 1998 WL 214418, at *3 (N.D.N.Y. Apr. 28, 1998); *see Mitchell v. Cuomo*, No. 917CV0892, 2017 WL 8780773, at *6 (N.D.N.Y. Dec. 6, 2017) ("The Court has no power to enforce an injunction against individuals who are not parties to the lawsuit.... To the extent that Plaintiff seeks injunctive relief against ... any persons who are not parties ... the Court lacks subject matter jurisdiction to enjoin their actions."). Accordingly, Plaintiff's request for injunctive relief against Derose is denied.

## IV. CONCLUSION

For the foregoing reasons, the Court DISMISSES the complaint in its entirety due to Plaintiff's failure to state any plausible federal claims for relief. *See* 28 U.S.C. § 1915A.

**SO ORDERED** at Hartford, Connecticut, this 6th day of April, 2022.

## All Citations

Not Reported in Fed. Supp., 2022 WL 1036819

## Footnotes

1    The Court may "take judicial notice of relevant matters of public record." *Giraldo v. Kessler*, 694 F.3d 161, 164 (2d Cir. 2012). The DOC website reflects that Plaintiff is an unsentenced detainee housed at Corrigan.

2    *See Dehany v. Chagnon*, No. 3:17-cv-00308 (JAM), 2017 WL 2661624, at *3 (D. Conn. June 20, 2017) (for purposes of Section 1915A review, "[t]he Court must accept as true all factual matters alleged in a complaint").

3    Review of publicly-available information on the Connecticut Judicial Branch website shows that Plaintiff's criminal case for these charges is pending. *See* Case detail for K10K-CR20-0368088-S available at: https://www.jud2.ct.gov/crdockets/CaseDetail.aspx?source=Pending & Key=ae4f9f3b-56ed-4bb3-aad0-8bae5f256d9c.

4    Plaintiff's criminal case for these charges is still pending. *See* Case detail for docket K10K-CR20-0368197-S available at: https://www.jud2.ct.gov/crdockets/CaseDetail.aspx?source=Pending & Key=499a82cb-41a2-461c-8edd-ecd3527735c2.

5    In his claims, Plaintiff states that Defendants denied him equal protection of the law and violated his Fourteenth Amendment rights under "section 1 of the Fourteenth Amendment." Section one of the Fourteenth Amendment, which is the Citizenship Clause, states: "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." Reading Plaintiff's allegations together, the Court construes Plaintiff's allegations as asserting denial of his right to due process and equal protection under the Fourteenth Amendment.

**Tsuma v. Costello**, Not Reported in Fed. Supp. (2022)

Case 3:24-cv-00037-DNH-ML    Document 9    Filed 06/11/24    Page 97 of 449

6    Absolute immunity does not apply to a prosecutor's "administrative duties and those investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings[.]" *Warney v. Monroe County*, 587 F.3d 113, 121 (2d Cir. 2009) (quoting *Buckley v. Fitzsimmons,* 509 U.S. 259, 273 (1993)); *See Kalina v. Fletcher*, 522 U.S. 118, 125–27 (1997) (holding that prosecutor was not protected by absolute immunity because she was acting as an investigator when she signed a sworn affidavit attesting to the facts supporting an arrest warrant). Here, Plaintiff's claims arise from the Prosecutor Defendants' role as advocates in furthering their prosecutorial functions.

7    Nor can Plaintiff's allegations even generously be construed as alleging that Costello engaged in a conspiracy with state actors. *See Storck v. Suffolk Cnty. Dep't of Soc. Servs.*, 62 F. Supp. 2d 927, 940 (E.D.N.Y. 1999) (allegations of conspiracy can be neither vague nor conclusory, but must "allege with at least some degree of particularity overt acts which defendants engaged in which were reasonably related to the promotion of the alleged conspiracy."); *Ciambriello v. County of Nassau*, 292 F.3d 307, 325 (2d Cir. 2002). ("[C]onclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights" are insufficient.)

---

**End of Document**                                   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Franks v. Eckert, Not Reported in Fed. Supp. (2020)

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 98 of 449

2020 WL 4194137
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

Shaquan FRANKS, Plaintiff,

v.

Superintendant Stewart ECKERT; DSP Betty "Jo"
Gable; Doctor Jacqueline Levitt; IOB A. Acevedo;
and IOB Katherine Bergamasco, Defendants.

18-CV-589 EAW
|
Signed 07/21/2020

**Attorneys and Law Firms**

Shaquan Franks, Alden, NY, pro se.

**DECISION AND ORDER**

ELIZABETH A. WOLFORD, United States District Judge

**INTRODUCTION**

*1 Plaintiff Shaquan Franks ("Plaintiff"), who is no longer incarcerated, was formerly a state prisoner housed at the Wende Correctional Facility ("Wende"). While housed at Wende, Plaintiff filed an application to proceed *in forma pauperis* and a Complaint under Title II of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"), Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("RA"), and 42 U.S.C. § 1983. (Dkt. 1). The Court granted Plaintiff's application to proceed *in forma pauperis* and, after conducting an initial review of the Complaint, severed and transferred claims that belonged in other district courts, and terminated from this action the defendants who worked at prisons located in other districts. (Dkt. 11) (the "Initial Screening Order"). The Court granted Plaintiff leave to file an Amended Complaint regarding his Wende claims only. (*Id.*). Plaintiff's Amended Complaint (Dkt. 13) is now before the Court for initial review.

For the reasons that follow, Plaintiff's deliberate indifference claim against defendant Dr. Jacqueline Levitt ("Dr. Levitt") shall proceed to service. All of Plaintiff's remaining claims are dismissed pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915A.

**FACTUAL BACKGROUND**

The factual background of this action is described in detail in the Court's Initial Screening Order, familiarity with which is assumed for purposes of this Decision and Order. As required at this stage of the proceedings, the Court treats Plaintiff's allegations as true.

Plaintiff suffers from the eye disease keratoconus and on October 4, 2017, while incarcerated at Eastern Correctional Facility ("Eastern"), he had a corneal transplant. (Dkt. 11 at 5). Plaintiff was transferred from Eastern to Sullivan Correctional Facility in January 2018 and then to Wende in March 2018. (*Id.* at 5-6).

After his transfer to Wende, Plaintiff asked defendants IOB K. Bergamasco ("Bergamasco") and IOB A. Acevedo ("Acevedo") for "reasonable accommodations," but these defendants informed Plaintiff, in violation of policy, that he had to get reapproval before he could have his "reasonable accommodations." (Dkt. 13 at 4). Plaintiff told Bergamasco and Acevedo that he needed accommodations "to do everyday life things like 'reading-writing, et al.' " and that without accommodations he was in "a state of pain" due to light sensitivity. (*Id.*). He further informed them that the strain on his post-surgical eye could cause the corneal transplant to fail. (*Id.* at 5). Bergamasco and Acevedo nonetheless "overlooked [Plaintiff's issues] and he had to wait "almost 2 weeks" before receiving his accommodations. (*Id.*).

Even when Plaintiff received his accommodations, Bergamasco and Acevedo "refused to give [him] everything [he] was approved for," claiming that it was a security risk. (*Id.*). Plaintiff thereafter filed grievances and requests for information via the Freedom of Information Act, and discovered that neither Bergamasco nor Acevedo was qualified to be an "IOB" and that they were not "certified to deal with the blind or the legally blind." (*Id.*). Defendants DSP Betty "Jo" Gable ("Gable") and Superintendant Stewart Eckert ("Eckert") lied in their responses to Plaintiff's grievances, claiming that Bergamasco was a "low vision therapist." (*Id.* at 6). The failure to provide Plaintiff with all necessary accommodations resulted in "excruciating pain everyday" and his "transplant started failing," requiring outside hospitalization. (*Id.*).

*2 Further, when Plaintiff was transferred to Wende, Dr. Levitt discontinued all his pain medications and removed

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 99 of 449

Franks v. Eckert, Not Reported in Fed. Supp. (2020)

all his medical permits, despite knowing that he was light sensitive and suffered from ongoing chest and head pains. (*Id.* at 7). Plaintiff's condition deteriorated, but Dr. Levitt refused to reissue his pain medications or his medical permits. (*Id.*). Plaintiff began to suffer from headaches so severe that he would vomit and Dr. Levitt still refused him medical treatment. (*Id.* at 8). Plaintiff filed grievances and wrote to Eckert regarding his medical treatment, but nothing was done. (*Id.*). Dr. Levitt eventually ordered an x-ray of Plaintiff's chest and a CAT scan of his brain, but two months after the x-ray was taken, she told Plaintiff that it had been lost. (*Id.* at 8-9). Dr. Levitt further refused to issue Plaintiff a medical permit for a clock. (*Id.* at 9-10). Plaintiff filed additional grievances, and Dr. Levitt retaliated against him by falsely claiming he was not taking his prescribed eye drops and having him "placed in the hospital" in Wende "for almost a week without rec or [his] personal stuff." (*Id.* at 10).

Plaintiff wrote a number of letters to Gable, who was in charge of programs at Wende, including "assigning of ... reasonable accommodations." (*Id.* at 12). Gable never answered any of these letters. (*Id.* at 12-13). However, Plaintiff claims that as retaliation for his repeated complaints (including filing grievances), he was "kicked ... out of the cell-study program without reason." (*Id.*).

Plaintiff wrote to Gabel about the officers in the Special Housing Unit ("SHU") taking his "reasonable accommodation" during a "cell-frisk" and "never giving it back," but she did not respond. (*Id.* at 13.) Plaintiff subsequently spoke to Gabel while she was making rounds in the SHU. (*Id.* at 14). Gable confirmed that she had received his letters but told him she did not believe "her officers" would act in the way he alleged and further stated that she thought he had sold his reasonable accommodations to another inmate. (*Id.*). Plaintiff filed another grievance and also wrote a letter to Eckert, but nothing was done. (*Id.* at 14-15). Plaintiff wrote a letter to Gable complaining that his grievances were not being properly processed, but she never replied. (*Id.* at 15).

Plaintiff has suffered "retaliation/harassment" from officers and medical staff at Wende because of the grievances he has filed. (*Id.* at 17). Eckert was aware of this retaliation but refused to intervene "as a form of punishment." (*Id.*). In particular, and among other things, Plaintiff reported an incident in which he was left handcuffed "for almost 16 hours to [the] point [his] hand started turning blue," and Eckert refused to intervene. (*Id.* at 20-21). Instead, Eckert merely

"rubber stamp[ed]" the denial of Plaintiff's grievances. (*Id.* at 23).

Liberally construing these allegations, Plaintiff asserts the following claims arising out of his confinement at Wende: (1) Acevedo, Bergamasco, and Dr. Levitt failed to make "reasonable accommodations" necessitated by Plaintiff's post-eye surgery status in violation of the ADA and RA; (2) Dr. Levitt retaliated against him for his grievance writing in violation of the First Amendment; (3) Dr. Levitt denied him access to adequate medical care, in deliberate indifference to his serious medical needs, in violation of the Eighth Amendment; and (4) Eckert is complicit in all of the wrong-doing of the other defendants because he knew what was happening but failed to stop it.

## DISCUSSION

### I. Standard of Review

The Court is required to screen the Amended Complaint under 28 U.S.C. §§ 1915(e)(2)(B) and 1915A(a). Section 1915 "provide[s] an efficient means by which a court can screen for and dismiss legally insufficient claims." *Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007) (citing *Shakur v. Selsky*, 391 F.3d 106, 112 (2d Cir. 2004)). The Court shall dismiss a complaint in a civil action in which a prisoner seeks redress from a governmental entity, or an officer or employee of a governmental entity, if the Court determines that the action (1) fails to state a claim upon which relief may be granted or (2) seeks monetary relief against a defendant who is immune from such relief. *See* 28 U.S.C. § 1915A(b)(1)-(2). Generally, the Court will afford a *pro se* plaintiff an opportunity to amend or to be heard prior to dismissal "unless the court can rule out any possibility, however unlikely it might be, that an amended complaint would succeed in stating a claim." *Abbas*, 480 F.3d at 639 (internal quotation marks omitted).

**\*3**  In evaluating the Amended Complaint, the Court must accept all factual allegations as true and must draw all inferences in Plaintiff's favor. *See Larkin v. Savage*, 318 F.3d 138, 139 (2d Cir. 2003) (per curiam); *King v. Simpson*, 189 F.3d 284, 287 (2d Cir. 1999). "Specific facts are not necessary," and a plaintiff "need only 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.' " *Erickson v. Pardus*, 551 U.S. 89, 93, (2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotation marks and citation omitted)); *see also Boykin v. Keycorp*, 521 F.3d 202, 213 (2d Cir. 2008) ("even

Franks v. Eckert, Not Reported in Fed. Supp. (2020)

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 100 of 449

after *Twombly*, dismissal of a *pro se* claim as insufficiently pleaded is appropriate only in the most unsustainable of cases."). Although "a court is obliged to construe [*pro se*] pleadings liberally, particularly when they allege civil rights violations," *McEachin v. McGuinnis*, 357 F.3d 197, 200 (2d Cir. 2004), even pleadings submitted *pro se* must meet the notice requirements of Rule 8 of the Federal Rules of Civil Procedure. *Wynder v. McMahon*, 360 F.3d 73 (2d Cir. 2004).

As to Plaintiff' § 1983 claims, "[t]o state a valid claim under 42 U.S.C. § 1983, the plaintiff must allege that the challenged conduct (1) was attributable to a person acting under color of state law, and (2) deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States." *Whalen v. County of Fulton*, 126 F.3d 400, 405 (2d Cir. 1997) (citing *Eagleston v. Guido*, 41 F.3d 865, 875-76 (2d Cir. 1994)). "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993) (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985)).

To establish liability against an official under § 1983, a plaintiff must allege that individual's personal involvement in the alleged constitutional violation; it is not enough to assert that the defendant is a link in the chain of command. *See McKenna v. Wright*, 386 F.3d 432, 437 (2d Cir. 2004); *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995). Moreover, the theory of *respondeat superior* is not available in a § 1983 action. *See Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003). A supervisory official can be found to be personally involved in an alleged constitutional violation in one of several ways:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates

> by failing to act on information indicating that unconstitutional acts were occurring.

*Colon*, 58 F.3d at 873 (citing *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994)).

## II. ADA and RA Claims

Title II of the ADA "proscribes discrimination against the disabled in access to public services." *Harris v. Mills*, 572 F.3d 66, 73 (2d Cir. 2009) (citation omitted). The statute provides in relevant part that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." *Id.* (citing 42 U.S.C. § 12132). "To assure those requirements are met, 'reasonable accommodation' may have to be provided to the qualified individual." *Id.* at 73 (citation omitted). Similarly, the RA protects a "qualified individual with a disability" from being excluded from participation in, denied the benefit of, or subjected to discrimination "under any program or activity receiving Federal financial assistance," because of the individual's disability. 29 U.S.C. § 749(a). Although there are "subtle differences between the [A]cts," the purpose of both statutes is to prevent discrimination based upon disability and, as a result, courts generally apply the same legal standard for claims arising under Title II of the ADA and Title V of the RA. *See Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003).

**\*4** To establish a prima facie violation of either statute, a plaintiff must show "(1) that [ ]he is a qualified individual with a disability; (2) that the defendants are subject to one of the Acts; and (3) that [ ]he was denied the opportunity to participate in or benefit from defendants services, programs, or activities, or was otherwise discriminated against by defendants, by reason of [his] disability." *D.K. v. Teams*, 260 F. Supp. 3d 334, 368 (S.D.N.Y. 2017) (quoting *Powell v. Nat. Bd. of Med. Examiners*, 364 F.3d 79, 85 (2d Cir. 2004)). In addition to the outright denial of a reasonable accommodation, "[a] delay in providing a reasonable accommodation can violate the ADA, if that delay is caused by discriminatory animus and is sufficiently lengthy to constitute a constructive denial of a reasonable accommodation." *Wenc v. New London Bd. of Educ.*, No.

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 101 of 449

Franks v. Eckert, Not Reported in Fed. Supp. (2020)

3:14-CV-0840 (VAB), 2016 WL 4410061, at \*12 (D. Conn. Aug. 16, 2016), *aff'd*, 702 F. App'x 27 (2d Cir. 2017).

"Individuals in their personal capacities are not proper defendants on claims brought under the ADA or the Rehabilitation Act, although individuals can be sued in their official capacities under these statutes." *Keitt v. New York City*, 882 F. Supp. 2d 412, 456-57 (S.D.N.Y. 2011), *adopted*, 2011 WL 4526147 (S.D.N.Y. Sept. 29, 2011); *see also Garcia v. S.U.N.Y. Health Sciences Ctr.*, 280 F.3d 98, 107 (2d Cir. 2001) ("[N]either Title II of the ADA nor § 504 of the Rehabilitation Act provides for individual capacity suits against state officials").

Plaintiff makes no allegations to establish whether he is suing Acevedo, Bergamasco, and Dr. Levitt in their personal capacities, their official capacities, or both. Nevertheless, even assuming that Plaintiff intended to sue these defendants in their official capacities and that his post-surgery vision impairment qualified him as an individual with a disability, Plaintiff fails to state a viable ADA or RA claim. Although Plaintiff has alleged he was denied some of his requested reasonable accommodations, there are no facts in the Amended Complaint to suggest that defendants refused to allow Plaintiff to participate in any program or activity *because of* his disability. *See Roberts v. City of New York*, No. 14-CV-5198, 2016 WL 4146135, at \*9 (S.D.N.Y. Aug. 2, 2016) (dismissing ADA claim where "[t]he complaint fail[ed] to allege that the plaintiff was excluded from participation in any program or activity, or otherwise treated differently, because of the disability"); *Alsaifullah v. Furco*, No. 12-CV-2907, 2013 WL 3972514 at \*19 (S.D.N.Y. Aug. 2, 2013) (dismissing plaintiff's ADA claim and explaining that "the Court need not engage in an extensive analysis of the ADA requirements because the plaintiff makes absolutely no allegation that he was discriminated against, or that Defendants failed to provide him with a reasonable accommodation—i.e., railings on the walkway or an alternative to traveling through the walkway—because of his disability[.]"); *Rosado v. Herard*, No. 12-CV-8943, 2014 WL 1303513, at \*6 (S.D.N.Y. Mar. 25, 2014) (dismissing ADA and RA claims where plaintiff failed to "plead[ ] facts demonstrating that he was denied access to therapeutic group sessions because of a disability").

Further, with respect to the alleged delay in providing reasonable accommodations, Plaintiff has not set forth any facts to suggest that the delay was based on discriminatory animus or that the two-week delay was "sufficiently lengthy

to constitute constructive denial." *Wenc*, 2016 WL 4410061, at 12; *cf. Lewis v. Boehringer Ingelheim Pharm., Inc.*, 79 F. Supp. 3d 394, 411 (D. Conn. 2015) (eight or nine month delay could constitute a failure to accommodate); *O'Toole v. Ulster County*, No. 12–CV–1228, 2014 WL 4900776 at \*8 (N.D.N.Y. Sept. 30, 2014) (six month delay in providing ergonomic chair unreasonable); *Logan v. Matveevskii*, 57 F.Supp.3d 234, 271 (S.D.N.Y. 2014) ("[C]ourts have found plaintiffs' requests for reasonable accommodations to have been constructively denied after delays approximating four months." (collecting cases)).

 **\*5** Finally, Plaintiff's claim that he was not provided with all the accommodations he requested also fails to state a claim. "Although a public entity must make 'reasonable accommodations,' it does not have to provide a disabled individual with every accommodation he requests or the accommodation of his choice." *McElwee v. County of Orange*, 700 F.3d 635, 641 (2d Cir. 2012) (citations omitted). Here, the only specific accommodation Plaintiff claims he was not provided is a "clock or a watch" (*see* Dkt. 13 at 6), and he has failed to state what other accommodations he was provided or to explain why, as he claims, the failure to provide a clock somehow caused him to use his eye drops only three times per day rather than four times per day. Plaintiff has not plausibly alleged that he was denied reasonable accommodations.

For these reasons, Plaintiff's ADA and RA claims are subject to dismissal pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### III. Retaliation

Plaintiff alleges a claim for retaliation against Dr. Levitt who allegedly falsely, and in retaliation for his filing of grievances, said that he was "not taking the eye drops and had [him] placed in the hospital" at Wende for almost one week where he was without his personal items and was denied recreation. (Dkt. No. 13 at 10.)

It is well established that prison officials may not retaliate against inmates for exercising their constitutional rights. *See, e.g., Colon*, 58 F.3d at 872. To state a retaliation, claim under § 1983, "a plaintiff must show that: (1) his actions were protected by the Constitution or federal law; and (2) the defendant's conduct complained of was in response to that protected activity." *Friedl v. City of New York*, 210 F.3d 79, 85 (2d Cir. 2000) (internal quotation and citation

**Franks v. Eckert, Not Reported in Fed. Supp. (2020)**

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 102 of 449

omitted). As to the second prong, Plaintiff must allege that the protected conduct was "a substantial or motivating factor in the prison officials' decision to discipline [him]." *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996). Evidence that can lead to an inference of improper motive includes: (1) the temporal proximity of the filing of a grievance and the alleged retaliatory act; (2) the inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant regarding his motive for disciplining plaintiff. *See Colon*, 58 F.3d at 872-73.

Here, applying this standard, the Court finds that Plaintiff's retaliation claim against Dr. Levitt must be dismissed. Assuming that Dr. Levitt's action of transferring Plaintiff to the hospital constituted the kind of adverse action that could sustain a retaliation claim, Plaintiff has failed to allege any facts to establish the necessary causal connection. There are no facts in the Amended Complaint from which the Court could infer that Plaintiff submitted grievances against Dr. Levitt close in time to when she sent him to the hospital. *See Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001) (explaining that a plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action."). Further, there are no allegations to suggest that Dr. Levitt's behavior was motivated by anything other than the belief that Plaintiff was not properly using his eye drops—Plaintiff himself acknowledges that he struggled to take his eye drops as prescribed. (*See* Dkt. 13 at 9 (stating that Plaintiff was only taking three eye drops per day when he was meant to take four)). Plaintiff has not plausibly alleged that Dr. Levitt retaliated against him.

Further, to the extent Plaintiff may have been trying to assert a retaliation claim against Gable, it must fail also. There are no allegations in the Amended Complaint from which a reasonable factfinder could conclude that Gable took any manner of adverse action against Plaintiff. *See Davidson v. Chestnut*, 193 F.3d 144, 150 (2d Cir. 1999) (holding that, to be actionable, retaliation against a prisoner must be likely to "chill a person of ordinary firmness from continuing to engage" in activity protected by the First Amendment). In particular, while Plaintiff claims he was kicked out of the cell-study program, he does not allege that Gable was responsible for this action. Accordingly, Plaintiff's retaliation claim must be dismissed in its entirety.

**IV. Denial of Medical Care in Violation of the Eighth Amendment**

**\*6** Plaintiff alleges that Dr. Levitt discontinued his pain medication and removed his medical permit even though she knew that Plaintiff was very light sensitive and having ongoing chest and head pains. Plaintiff saw Dr. Levitt at sick call several times, but she refused to reissue his pain medicine or his medical permits. Plaintiff's head and chest pain got so bad that he became dizzy, got bad headaches, and started vomiting. He again went to sick call, but Dr. Levitt refused to treat him.

Claims that prison officials have intentionally disregarded an inmate's medical needs fall under the Eighth Amendment's prohibition against the imposition of cruel and unusual punishment afforded by the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 102, 104 (1976). "In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove 'deliberate indifference to [his] serious medical needs.' " *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (quoting *Estelle*, 429 U.S. 104). "First, the alleged deprivation must be, in objective terms, sufficiently serious." *Chance*, 143 F.3d at 702 (internal quotation marks and citations omitted). With respect to the objective element, the plaintiff must demonstrate a violation sufficiently serious by objective terms, "in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists." *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996). "Second, the defendant must act with a sufficiently culpable state of mind," *Chance*, 143 F.3d at 702 (internal quotation marks and citations omitted); that is, the plaintiff must demonstrate that the defendant "kn[ew] of and disregard[ed] an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837.

Here, reading the allegations of the Amended Complaint in the light most favorable to Plaintiff, the Court finds that his deliberate indifference claim against Dr. Levitt is sufficient to proceed to service.

**V. Supervisory Liability**

Finally, Plaintiff alleges that Eckert is liable for failing to prevent or correct the wrongdoing of the other defendants. As the Court has found that all claims other than Plaintiff's deliberate indifference claim must be dismissed, the Court limits its analysis to this claim. *See Alston v. Bendheim*, 672 F. Supp. 2d 378, 388 (S.D.N.Y. 2009) ("The failure to state a claim for an underlying constitutional violation forecloses supervisory liability.").

Franks v. Eckert, Not Reported in Fed. Supp. (2020)

Case 3:24-cv-00037-DNH-ML    Document 9    Filed 06/11/24    Page 103 of 449

Plaintiff's allegations with respect to the letters he wrote Eckert are vague and conclusory. For example, Plaintiff states that after he signed up for sick call and Dr. Levitt deliberately refused to treat him, he "sent a letter" to Eckert "and once again nothing was done to put a stop" to Dr. Levitt's wrongdoing. (Dkt. No. 13 at 8.) But nowhere does he suggest what he wrote to Eckert that might have put Eckert on notice that Dr. Levitt was violating his constitutional rights. *See Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (concluding that the defendant's receipt of a letter from a plaintiff generally complaining about the conditions of confinement was insufficient to put defendant "on actual or constructive notice of the violation"); *Lombardo v. Freebern*, No. 16-CV-7146 (KMK), 2018 WL 1627274, at *13 (S.D.N.Y. Mar. 30, 2018) (finding that a supervisor's "presumed knowledge, without more, is ... insufficient to establish personal involvement.") (quoting *Burgess v. Wright*, No. 08-CV-725, 2009 WL 2971538, at *6 (N.D.N.Y. Sept. 11, 2009)). [1]

**\*7** Further, Eckert's failure to respond to Plaintiff's letters, by itself, is insufficient to hold Eckert responsible for the constitutional violations of others, because "the fact that an official ignored a letter alleging unconstitutional conduct is not enough to establish personal involvement." *Winthrow v. Goord*, 374 F. Supp. 2d 326, 329 (W.D.N.Y. 2005) (quoting *Shell v. Brzezniak*, 365 F. Supp. 2d 362, 374 (W.D.N.Y. 2005)). *See also Johnson v. Rock*, No. 9:14-CV-815 DNH/ATB, 2014 WL 7410227, at *11 (N.D.N.Y. Dec. 31, 2014). "It is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations." *Brown v. Montone*, No. 17-CV-4618 (KMK), 2018 WL 2976023, at *4 (S.D.N.Y. June 13, 2018) (quoting *Allah v. Annucci*, No. 16-CV-1841, 2017 WL 3972517, at *7 (S.D.N.Y. Sept. 7, 2017) (alterations and internal quotation marks omitted)).

For these reasons, Plaintiff's supervisory liability claim against Eckert is dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

## VI. Leave to Amend

The Court recognizes that "[a] *pro se* complaint 'should not [be] dismiss[ed] without [the Court's] granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated.'" *Grullon v. City of New Haven*, 720 F.3d 133, 139-40 (2d Cir. 2013) (quoting *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010)). However, the Court has already given Plaintiff the opportunity to amend once and, despite his comprehensive effort, he has been unable to sufficiently state a claim against any defendant other than Dr. Levitt. The Court accordingly dismisses all of Plaintiff's claims except his deliberate indifference claim against Dr. Levitt without leave to amend.

## CONCLUSION

For the reasons set forth above, Plaintiff's deliberate indifference claim against Dr. Levitt will proceed to service. All of Plaintiff's remaining claims are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

## ORDER

IT HEREBY IS ORDERED, that Plaintiff's ADA, RA, retaliation, and supervisory liability claims are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) with prejudice and without leave to amend; and

FURTHER, that the Clerk of Court is directed to terminate Stewart Eckert, Betty Jo Gable, A. Acevedo, and Katherine Bergamasco as defendants in this matter; and

FURTHER, that the Clerk of the Court is directed to cause the United States Marshal to serve copies of the Summons, the Amended Complaint (Dkt. 13) and this Order upon Dr. Levitt, unpaid fees to be recoverable if this action terminates by monetary award in Plaintiff's favor; and

FURTHER, the Clerk of Court is directed to forward a copy of the Amended Complaint and this Order by email to Ted O'Brien, Assistant Attorney General in Charge, Rochester Regional Office <Ted.O'Brien@ag.ny.gov>; and

FURTHER, that, pursuant to 42 U.S.C. § 1997e(g), Dr. Levitt is directed to respond the Amended Complaint upon service.

SO ORDERED.

Attachment

Franks v. Eckert, Not Reported in Fed. Supp. (2020)

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 104 of 449

United States District Court

Western District of New York

"Amended Complaint"        18-cv-589

Shaquan Franks # 12A1270

v.

Wende Correctional Facility Defendants

Superintendent Stewart Eckert

DSP Betty "Jo" Gabel, Doctor Jacqueline Levitt,

I.O.B A. Acevedo, I.O.B Katherine Bergamasco

1983 Civil Action Complaint

Requesting a Bench trial by Federal Judge

MaxiAids                                Item#: 2071000

Mr Franks brings this action under title 2 of

the Americans with Disabilities Act, 42 U.S.C. Sect

Sect 12131 et seq (the ADA), sect 504 of the

Rehabilitation Act, 29 U.S.C Sect 794, as well as

under 42 U.S.C. Sect 1983 For violations of my

Rights under the 5,8, and 14 Amendment of the

United States Constitution.

I Mr Franks Has Suffered Retaliation by Crtain

Defendants in violation of the ADA, and the

Retaliation Act, of my Constitutional Rights.

I Mr Franks Seeks injunctive Relief Directing

the Defendants to Provide Reasonable accommodation

For my Disability and to seek monetary and Punitive

MaxiAids                                Item#: 2071000

Damage For Long term Life injury.

MaxiAids                                Item#: 2071000

Wende Correctional Facility Special Housing Unite

"March 12 2018" I was moved From "Sullivan Correctional

Facility" to "Wende Correctional Facility" why I Dont Know

But once I was Placed in the "SHU", I asked For my

Reasonable accommodations But the "I.O.B K. Bergamasco"

Along with "IOB A. Acevedo" told me I have to get

Reapproved to get my Reasonable accommodations when I

was already approved From a Other Facility when the

"D.I.B 2610 States all accommodations will Follow You" and I

told Both of them I Need my accommodations to do everyday

Life things Like "Reading, writing, Et al" and without the

accommodations I'm Left in a State of Pain

Because I'm very light Sensitive

MaxiAids                                Item#: 2071000

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 105 of 449

**Franks v. Eckert, Not Reported in Fed. Supp. (2020)**

AND the STRAIN OF the Post-SURGICAL EYE IS NOT GOOD

For the TRANSPLANT which WILL FAIL AND LEAVE ME BLIND

IF LEFT without MY EYE DROPS/ACCOMMODATIONS But they Both

OVER looked MY ISSUES AND I HAD to wait ALMOST A weeks

BEFORE GETTING MY ACCOMMODATIONS AND WHEN I DID GET MY

ACCOMMODATIONS they REFUSED to Give ME EVERYTHING I was APPROVED

For SAYING it's A SECURITY RISK to HAVE WHEN" D.I.R 2612

PAGE 14 of 14 STATES Other wise" So I wrote GRIEVANCES which

FAILED to HELP ME So I later F.O.I.L Requested to see IF

they HAD CERTIFICATION to be A "I.O.B." AND NONE OF

them was ~~Certification~~ CERTIFIED to DEAL with the BLIND or

the legally BLIND Let Alone Handle the REASONABLE ACCOMMODATIONS

But the "DEPT BETTY-JO GIMBLE Along with the

MaxiAids                                   Item#: 2071000

"SUPERINTENDENT STEWART ECKERT" LIED IN MY GRIEVANCES SAYING

the "I.O.B. K. BERGAMASCO" was A LOW VISION THERAPIST So

I F.O.I.L this to see IF it was TRUE AND NO CERTIFICATION

EXIST For that under HER NAME AND I also Requested A

Clock or a watch So I Can ~~Put~~ TAKE Post-SURGERY EYE DROPS

So the TRANSPLANT wont FAIL AND BECAUSE I ant GET this

MY TRANSPLANT STARTED FAILING ~~so~~ BECAUSE I was unable

to TAKE MY EYE DROPS ON ~~time~~ time As the EYE-SPECIALIST

ORDERED So that LEFT ME IN EXCRUCIATING PAIN EVERYDAY to

the Point I HAD to BE SENT to A outside Hospital MORE then

ONCE AND it STRESSED ME Out So BAD I was sent to "MHU/OMSO"

BECAUSE the Facility FAILED to accommodate ME while at

WENDE CORRECTIONAL Facility.

MaxiAids                                   Item#: 2071000

WENDE CORRECTIONAL Facility SPECIAL Housing UNITE ~~UNITES~~

"MARCH 12 2018" I was MOVED From "Sullivan CORRECTIONAL

Facility" to "WENDE CORRECTIONAL Facility" WHY I DON'T KNOW

But ONCE I Got to Jail "DR Jacqueline LEVITT" DISCONTINUE

MY PAIN MEDS AND REMOVED ALL MY MEDICAL PERMENTS. KNOWING

I'm VERY Light SENSITIVE AND I HAVE A ON GOING CHEST AND

HEAD PAINS WHICH LEAVE ME IN EXCRUCIATING PAIN WHEN

LEFT UNTREATED AND I PUT DOWN For SICK-CALL A number

OF times AND SHE REFUSE to REISSUE MY PAIN MEDS or

MY MEDICAL PERMENTS. So I wrote GRIVANCES About the

MEDICAL TREATMENT I was GETTING Here At WENDE At which

Point MY CHEST AND HEAD PAINS Got worst AND I

STARTED FEELING DIZZY ALL the time AND I was GETTING

MaxiAids                                   Item#: 2071000

REAL BAD HEADACHES AND it Got So BAD I STARTED

VOMITING ONCE AGAIN I SIGNED up For SICK-CALL

AND ONCE AGAIN "DR J. LEVITT" DELIBERATELY REFUSED ME

treatment So I wrote MORE GRIVANCES About the MEDICAL

treatment AS WELL AS SENDING A letter to the

"DEPT OF HEALTH MS. NEAL" At which Point NONTHING

was DONE I EVEN SENT A letter to the "SUPERINTENDENT

S. ECKERT" AND ONCE AGAIN NONTHING was DONE to PUT

A STOP to the WRONG DOING OF "DR J. LEVITT" So I wrote

the "DEPT OF HEALTH" up So AFTER A while "DR J. LEVITT"

PUT ME IN For A X-RAY AND A BRAIN CAT SCAN But

AFTER the X-RAY Almost 3months Gone BY with NO ANSWER

So ONCE AGAIN I SIGNED up to SICK-CALL to ASK About

MaxiAids                                   Item#: 2071000

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 106 of 449

**Franks v. Eckert, Not Reported in Fed. Supp. (2020)**

MY X-RAY AND AT which Point "Doctor J. Levitt" told me they

Lost the X-RAY of my Chest So I wrote a Grivance About this

And I told MHU Staff About this So they Can try to Help me

Now I have to take Post-Surgery eye Drops 4 times a Day

to keep my Cornea transplant From Failing Cause if it Fails I

may Be left Blind or worst I can Lose the eye Now without

MY REASONABLE ACCOMMODATION OF A talking watch OR A Clock

I was missing ONE DROP So I was ONLY Getting 3 times a Day

WHEN it Should Be 4 times a Day So I Sign up For Sick-Call

to talk to "Dr. J. Levitt" to see if ~~a~~ She issue me a medical

Perment Do the ~~fact~~ Fact I have A MEDICAL NEED For ONE ~~drop~~

AGAIN She Deliberately Refuse to issue me A medical

Perment For A Clock So I Can take my eye Drops ON

MaxiAids                                            Item#: 2071000

time AND Not Miss A Drop Do to the Fact I DONT

KNOW the time while in the SHU So AFTER months of

Going thought this with miss DROPS my Cornea transplant

Started Failing So the eye Started turning Red and

the Cornea was turning Gray which Put me in

Excruciating Pain to the Point I had to Be Rushed to

the Outside Hospital A number of times For Cornea

Failure AND "Doctor J. Levitt" Refuse to Give me meaning-

Full treatment So I wrote MORE Grivances AND As A

Retaliation to the Grivances "Doctor J. Levitt" Said I was

not taking the eye Drops AND Had me Placed in the

Hospital Here the Facility For Almost A week without

R.S.C. OR my PERSONAL STuFF AND ONCE AGAIN I wrote

MaxiAids                                            Item#: 2071009

this up But this is Just to Show How "Doctor J. Levitt"

Retaliated AGainst me ~~to~~ Do to my Grivances AND

How She Deliberately Refuse to Give me meaning-Full

MEDICAL treatment while at WENDE CORRECTIONAL Facility.

MaxiAids                                            Item#: 2071000

WENDE CORRECTIONAL Facility

"DEPT OF Program Betty "Jo" Gable" was in Charge of the

ASigning of the REASONABLE ACCOMMODATIONS As well As

Being in CHARGE of all Programs Here at "WENDE CORRECTIONAL

Facility" Now I wrote a number OF letters to Her which She

NEVER ~~Ever~~ ANSWERED About How I was Being Denied

School Based off my Disability So I wrote this up And at

which Point they let me Do Cell-Study But the Cell-Study

teacher NEVER ~~send~~ Sent the work in LARGE Print And once

AGAIN I wrote this up As well As Sending a letter to the

"DEPT OF Program Betty "Jo" Gable" which AGAIN She NEVER ANSWERED

AND As A Retaliation to my Grivance on this issue they Kicked

ME Out of the Cell-Study Program without Reason And once

MaxiAids                                            Item#: 2071000

Case 3:24-cv-00037-DNH-ML    Document 9    Filed 06/11/24    Page 107 of 449

Franks v. Eckert, Not Reported in Fed. Supp. (2020)

Again I wrote the "Dept of Program Betty "Jo" Gable" as well as a grivance and nonthing was ever done to right the wrong doing of the cell-study teacher or the school program here at "Wende Correctional Facility" Now I wrote the "Dept of Program Betty "Jo" Gable" about the officers in the shu taking my reasonable accommodation out of my cell during a cell-frisk and never giving it back once again she never answer my letter so I wrote a grivance about this and nonthing was done and again the officers in the shu take my reasonable accommodations out my cell during a cell-frisk and never giving it back this time I wrote a grivance and sent a letter to "Superintendent S. Eckert" as well as the "Dept of Program Betty "Jo" Gable" and nothing was ever done to put a stop to the wrong doing of the officers here in the shu at "Wende Correctional Facility" Now I got to see the "Dept of Program Betty "Jo" Gable" as she made rounds in the shu I asked her did she get my letters she said she did so I asked her when I'm going to get my "Reasonable Accommodations" back that officer take she said she dont believe her officers will do that as well as add she think I said my reasonable accommodations to someone so I wrote a grivance on her as well as sending a letter to the "Superintendent S. Eckert" and nonthing was ever done and I was left almost 2 weeks without my accommodation while in the shu here at "Wende Correctional Facility" Now I wrote "Dept of Program Betty "Jo" Gable"

MaxiAids                                    Item#: 2071000

about a issue I was having with the I.G.R.C. Supervisor Miss Filling my grivances as well as dismissing my grivances without reason as well as giving me her personal views on my grivances and not letting me use the audio/video as a withness to my grivances and one once again she never answered my letter so I wrote a grivance on the I.G.R.C. Supervisor as well as a number of other grivances on her and nonthing was ever done to help me with this issue well at "Wende Correctional Facility" Now I was having a issue with the "ORC S. Jackson" that work in the shu denying me transitional service so I can find Housing/Programs that help people with Disability and the "ORC S. Jackson" refused to help me and was telling other inmates my personal business and was very rude to me a number of times I wrote "Dept of Program Betty "Jo" Gable" as well as telling her in person when she made rounds in the shu and she never did nonthing to help with my issues so I wrote a number of grivances on the "ORC S. Jackson" as well as sending a letter to the "Superintendent S. Eckert" and nothing was ever done and I never got transitional service to help with my Rentry to the community while at "Wende Correctional Facility".

MaxiAids                                    Item#: 2071000

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 108 of 449

**Franks v. Eckert, Not Reported in Fed. Supp. (2020)**

WENDE Correctional Facility

"Superintendent Stewart Eckert" is the head officer here at Wende Correctional Facility as well as the last person to review your grivances before they are sent to C.O.R.C. for the last review/answer now I've been dealing with retaliation/herassment from the officers as well as medical staff here at "Wende Correctional Facility" because of grivances I wrote on them or they supervisor and the "Superintendent Stewart Eckert" knows this but refuse to intervene with these on going herassment of retaliation as a form of punishment while at "Wende Correctional Facility".

MaxiAids                                      Item# 2071000

Now I had officers bang on the back of my cell wall from the catwalk a number of nights after I wrote grivances on them as well as write fake ~~medical~~ disciplinary reports on me and when I write a grivance asking for the video/audio as a withness the I.G.R.C Supervisor always say I can't use the audio/video as a withness I had officer's/Lt's tell me medical don't exist for me when I was in excruciating pain from my post-surgery eye and at which point my cornea transplant was failing and the "Superintendent Stewart Eckert" had first hand information of this but refuse to intervene

MaxiAids                                      Item# 2071000

with these on going ~~Nor~~ herassment of retaliation as a form of punishment I was also placed on 1 on 1 watch while in the SHU and at which point I asked for medical but none of the officer's will call medical for me as well as stoping a number of dept's while they made rounds in the SHU and the 1 on 1 log book will show this and during this time on 1 on 1 watch they never came to give me my post-surgery eye drops and I was never giving no slippers or bed mats cause on 1 on 1 watch these are things you must have in your cell and I ~~was~~ was left without these things for a few days and the

MaxiAids                                      Item# 2071000

officer's ~~wasn't~~ did not feed me cause I ant turn my lights on even after I told him I'm very light sensitve and that's why I got a lamp so I wont turn on the over head light but being that I'm on 1 on 1 watch I don't got my lamp and he over looked my issue and did not feed me and while I was on 1 on 1 watch I was coming out to get eye drops but the hand cuffs was very tight and I told the officer this and he said I refuse to give the cuffs back and I was left hand cuffed for almost 16 hours to point my hand started turning blue and I ant have no feeling

MaxiAids                                      Item# 2071000

Franks v. Eckert, Not Reported in Fed. Supp. (2020)

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 109 of 449

IN MY LEFT HAND FOR almost 3 DAYS AND ONCE AGAIN "SUPERINTENDENT STEWART ECKERT" HAD FIRST HAND INFORMATION DO to the FACT HE HAS the LAST SAY on ALL GRIVANCES BEFORE they GO to C.O.R.C. But HE REFUSED to INTERVENE with these on GOING HERASSMENT OF Retaliation AS A FORM OF PUNISHMENT I HAD OFFICERS TELL ME to GO FUCK MYSELF AND HOW ME GETTING EYE DROPS IS A BIG FUCKING GAME then PUT the CUFFS SO tight it BROKE the SKIN AND ~~my wrist~~ my WRIST STARTED SWELLING UP AND this IS ALL ON VIDEO/AUDIO I ALSO WROTE FOR F.O.I.L REQUEST A NUMBER OF times AND the F.O.I.L STAFF DELIBERATELY SENT ME the WRONG ~~the~~ things A NUMBER OF times AND I WROTE the "SUPERINTENDENT STEWART ECKERT" About this AND NONTHING WAS DONE to RIGHT the WRONG DOING OF the F.O.I.L. STAFF I HAD the GIRVANCE SGT COME AND WAKE ME UP at "12:00 AM" to ANSWER A GRIVANCE I WROTE ON A "CO" with the CO I WROTE the GRIVANCE ON AND WHEN I TOLD HIM I HAD witHNESS to this HE SAID You SAID it HAPPENED FROM the CATWALK So HOW CAN You OR ANYBODY ELSE SEE WHO DID this ONCE AGAIN I WROTE this UP AND NONTHING WAS EVER DONE NOW I HAD A ON GOING ISSUE ABOUT MY REASONABLE ACCOMMODATIONS that I WAS

NOT BEING GIVING AND SHOWED WHY I NEED them AND HOW the SHU STAFF WAS TAKING REASONABLE ACCOMMODATION OUT OF MY CELL DURING A CELL FRISK AND NEVER GIVING it BACK AND HOW the "DEPT OF PROGRAM BETTY "20" GABLE" LIED A NUMBER OF times IN GRIVANCES ABOUT these ACCOMMODATIONS I WAS NOT GETTING AND ONCE AGAIN the "SUPERINTENDENT STEWART ~~~~ ECKERT" DID NONTHING But RUBBER STAMP ALL MY GRIVANCES WHEN HE HAS the POWER to INTERVENE But WONT PUT A STOP ~~~~ tO the WRONG DOING OF HIS OFFICERS So there FOR it's JUST AS HE'S DOING WRONG HIS-SELF AND NONE OF MY ISSUE ~~whhere~~ HAS BEEN FIX to this DAY AND the "SUPERINTENDENT STEWART ECKERT" CONTINUALLY REFUSE to INTERVENE with these ON GOING HERASSMENT OF RETALIATION AS FORM OF PUNISHMENT while at "WENDE CORRECTIONAL FACILITY".

_____

Sworn to before me this

24th day December 2018

_____
NOTARY PUBLIC STATE OF NEW YORK
ERIE COUNTY
01 _____
COMM EXP. _____

_____

MaxiAids                    Item#: 2071000

**Franks v. Eckert, Not Reported in Fed. Supp. (2020)**

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 110 of 449

WENDE RD., P.O. BOX 1187
AIDEN - NEW YORK - 14004 - 1187
taquAN FRANKS # 12A1370

CLERK, I
UNITED
BUFFAl

EGIAl
MAIl

**All Citations**

Not Reported in Fed. Supp., 2020 WL 4194137

## Footnotes

1    The same analysis applies to Plaintiff's claim that Eckert failed to respond to his complaints about retaliation by other, unnamed employees at Wende.

**End of Document** © 2024 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Distinguished by    Matagrano v. New York State Department of Corrections and Community Supervision,,    N.D.N.Y.,    December 14, 2020

2014 WL 1303513
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Tyrone ROSADO, Plaintiff,
v.
Daphnee HERARD, Defendant.

No. 12 Civ. 8943(PGG)(FM).
|
Signed March 25, 2014.

### MEMORANDUM OPINION & ORDER

PAUL G. GARDEPHE, District Judge.

**\*1**  *Pro se* Plaintiff Tyrone Rosado brings this action, pursuant to 42 U.S.C. § 1983, alleging that Defendant Daphnee Herard—a mental health clinician at Rikers Island—violated his constitutional, statutory, and common law rights by denying him and other Spanish-speaking detainees at the George R. Vierno Detention Center at Rikers Island access to "therapeutic group sessions," and by disclosing to other detainees that Rosado has H.I.V. (Cmplt.(Dkt. No. 2); Am. Cmplt. (Dkt. No. 25)) Defendant has moved to dismiss the Complaint. (Dkt. No. 30) In an August 28, 2013 order, this Court referred the motion to Magistrate Judge Frank Maas for a Report and Recommendation ("R & R"). (Dkt. No. 35) On November 25, 2013, Judge Maas issued a 25–page R & R recommending that the Court grant Defendant's motion in part and deny it in part. (Dkt. No. 42) For the reasons stated below, this Court will adopt the R & R in part and modify it in part.

### BACKGROUND [1]

Rosado is a pre-trial detainee in the custody of the New York City Department of Correction at Rikers Island. (Dkt. No. 52) On July 17, 2012, Rosado was assigned to the Rikers Island Mental Health Assessment Unit for Infracted Inmates (the "Mental Health Unit" or the "Unit") (Am.Cmplt.(Dkt.

No. 25) ¶ 6) Rosado suffers from bipolar disorder and anti-social personality disorder, as well as H.I.V. (Pltf.Affirm. (Dkt. No. 36) at 7) Defendant Herard—a licensed mental health clinician—is responsible for treating detainees, such as Rosado, who are confined in punitive segregation in the Unit. (Amended Cmplt. (Dkt. No. 25) ¶ 5)

While Rosado was in the Unit, he was denied access to "therapeutic group sessions." (*Id.* ¶ 7) According to Rosado, other inmates—"mainly Spanish speaking detainees" like himself—were also prohibited from participating in these sessions. (*Id.*) Rosado complained to Herard about being "denied access to his therapeutic group sessions," but received no response. (*Id.* ¶¶ 8–9) He then filed a complaint against Herard through the facility's Inmate Grievance and Request Program ("I.G.R .P."), challenging the denial of access to group sessions. (*Id.* ¶ 10)

Herard was informed of Rosado's grievance, which alleged that she was "discriminating against Spanish speaking mental health detainees by den[y]ing them their right to parti[ ]cipate in [the group] therapeutic treatment." (*Id.* ¶ 11) Herard visited Rosado in his cell and "inquired as to why he [had filed] a grievance." (*Id.* ¶ 12) Rosado responded by asking Herard why "only African American[ ] inmates [were] allow[ed] to attend ... group session[s] an [d] not Spanish speaking inmates." (*Id.*) Defendant then "became [agitated] and [belligerent]" and "stated out loud that [Rosado was] just mad because [he was] on the verge of dying because he[']s (H.I.V.-positive)." (*Id.* ¶ 13)

After this exchange, other detainees asked Herard about her encounter with Rosado. (*Id.* ¶ 14) Herard told these inmates that "Rosado was indeed H.I.V.-positive." (*Id.*) As a result, Rosado's medical condition "became known throughout the prison." (*Id.* ¶ 16) Rosado alleges that, because of Herard's disclosures, he suffered "psychological episodes of mental anguish" in the form of "depression, insomnia, scornful [harassment], headaches, inability to [concentrate], fatigue, [and] loss of appetite"; "became annoyed [continually]"; was "a target of gossip [and r]umor[,] as well as harassment by prisoners which might lead to inmate on inmate violence"; and suffered anxiety and panic attacks. (*Id.* ¶ 17)

**\*2**  Rosado's original complaint, dated November 27, 2012, was received by the *Pro Se* Office on December 7, 2012. (Cmplt.(Dkt. No. 2)) On July 19, 2013, Defendant filed a motion to dismiss. (Dkt.Nos.29, 30) On July 31, 2013, Rosado filed an Amended Complaint. (Am.Cmplt. (Dkt. No. 25))

Defendant has requested that her motion to dismiss be deemed to address the Amended Complaint. (Dkt. No. 29)

On August 28, 2013, this Court referred the motion to Magistrate Judge Maas for a Report and Recommendation ("R & R"). (Dkt. No. 35) On November 25, 2013, Judge Maas issued an R & R concerning the motion. (Dkt. No. 42)

Reading Rosado's pleadings liberally, Judge Maas concluded that Rosado had asserted claims under (1) the Privacy Act, 5 U.S.C. § 552A; (2) the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), 42 U.S.C. § 1320d et seq.; (3) the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq.; (4) the Rehabilitation Act, 29 U.S.C. § 794 et seq.; (5) the First Amendment; (6) the Fourteenth Amendment; and (7) New York state law. Rosado v. Herard, No. 12 Civ. 8943(PGG)(FM), 2013 WL 6170631, at *3 (S.D.N.Y. Nov. 25, 2013). Judge Maas determined that Rosado's First Amendment retaliation claim, his ADA and Rehabilitation Act claims—to the extent they seek non-monetary relief against Herard in her official capacity—and his state law claims should be permitted to proceed. Id. at *11. Judge Maas recommended that Rosado's remaining claims be dismissed. Id.

On December 4, 2013, Rosado filed objections to the R & R. (Dkt. No. 48) Rosado argues that Judge Maas erred in concluding that Rosado's Fourteenth Amendment deliberate indifference and equal protection claims should be dismissed. This Court construes Rosado's objections as including the argument that Judge Maas erred in not addressing his "state-created danger" theory of liability under the Fourteenth Amendment. In submissions dated December 9, 2013, and January 21, 2014, Defendant objects to the R & R, arguing that the Amended Complaint should be dismissed in its entirety. (Dkt.Nos.44, 50)

## DISCUSSION

### I. LEGAL STANDARD

#### A. Review of Magistrate Judge's Report and Recommendation

In evaluating a Magistrate Judge's R & R, a district court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b) (1). When a timely objection has been made to an R & R, "[the district judge] shall make a de

novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." Id. " '[T]o the extent ... that the [objecting] party makes only conclusory or general arguments, or simply reiterates the original arguments, the Court will review the [R & R] strictly for clear error.' " DiPilato v. 7–Eleven, Inc., 662 F.Supp.2d 333, 339 (S.D.N.Y.2009) (quoting IndyMac Bank, F.S.B. v. Nat'l Settlement Agency, Inc., No. 07–CV–6865 (LTS)(GWG), 2008 WL 4810043, at *1 (S.D.N.Y. Nov. 3, 2008)). Although "[t]he objections of parties appearing pro se are 'generally accorded leniency' and should be construed 'to raise the strongest arguments that they suggest,' ... even a pro se party's objections to a Report and Recommendation must be specific and clearly aimed at particular findings in the magistrate's proposal, such that no party be allowed a second bite at the apple by simply relitigating a prior argument." Id. at 340 (quoting Milano v. Astrue, No. 05 Civ. 6527(KMW) (DCF), 2008 WL 4410131, at *2 (S.D.N.Y. Sept. 26, 2008)).

*3 Here, Rosado's objections to the Magistrate Judge's findings concerning his deliberate indifference and equal protection claims lack specificity. Rather than addressing the Magistrate Judge's analysis, Rosado simply reiterates his arguments that "Defendant Daphnee Herard deliberately and recklessly retaliated against Plaintiff for daring to file a grievance against the Defendant" and acted "with deliberate indifference to his physical safety." (Pltf. Objections (Dkt No. 48) at 3) Moreover, Rosado has not objected to the Magistrate Judge's recommendation that other claims in the Amended Complaint should be dismissed. Accordingly, these portions of Judge Maas's R & R will be reviewed for clear error. See Gilmore v. Comm'r of Soc. Sec., No. 09 Civ. 6241(RMB) (FM), 2011 WL 611826, at *1 (S.D.N.Y. Feb. 18, 2011) (quoting Chimarev v. TD Waterhouse Investor Servs., Inc., 280 F.Supp.2d 208, 212 (S.D.N.Y.2003)) (" 'The district judge evaluating a magistrate judge's recommendation may adopt those portions of the recommendation, without further review, where no specific objection is made, as long as they are not clearly erroneous.' ").

In her objections, Herard contends that Judge Maas erred in concluding that (1) Rosado has stated a claim under the ADA and Rehabilitation Act; (2) Rosado has adequately pled a First Amendment retaliation claim; and (3) Rosado's state law claims should not be dismissed. (Def. Objections (Dkt. No. 44) at 4–12) Because Defendant has made specific arguments addressing Judge Maas's findings, the portions of the R & R relevant to these issues will be reviewed de novo.

### B. *Motion to Dismiss Standard*

Defendant has moved to dismiss the Amended Complaint for failure to state a claim under Fed.R.Civ.P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). "In considering a motion to dismiss ... the court is to accept as true all facts alleged in the complaint," *Kassner,* 496 F.3d at 237 (citing *Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals,* 282 F.3d 83, 87 (2d Cir.2002)), and must "draw all reasonable inferences in favor of the plaintiff." *Id.* (citing *Fernandez v. Chertoff,* 471 F.3d 45, 51 (2d Cir.2006)).

A complaint is inadequately pled "if it tenders 'naked assertion[s]' devoid of 'further factual enhancement,' " *Iqbal,* 556 U.S. at 678 (quoting *Twombly,* 550 U.S. at 557), and does not provide factual allegations sufficient "to give the defendant fair notice of what the claim is and the grounds upon which it rests." *Port Dock & Stone Corp. v. Oldcastle Ne., Inc.,* 507 F.3d 117, 121 (2d Cir.2007) (citing *Twombly,* 550 U.S. at 555).

Because Rosado is proceeding *pro se,* this Court is required to read his complaint liberally. *See Erickson v. Pardus,* 551 U.S. 89, 94 (2007) ("A document filed *pro se* is 'to be liberally construed.' ") (quoting *Estelle v. Gamble,* 429 U.S. 97, 106 (1976)). Accordingly, this Court will construe Rosado's pleadings " 'to raise the strongest arguments that they suggest.' " *Fulton v. Goord,* 591 F.3d 37, 43 (2d Cir.2009) (quoting *Green v. United States,* 260 F.3d 78, 83 (2d Cir.2001)). "Moreover, [factual] allegations made in a *pro se* plaintiff's memorandum of law, where they are consistent with those in the complaint, may also be considered on a motion to dismiss." *Braxton v. Nichols,* No. 08 Civ. 08568(PGG), 2010 WL 1010001, at *1 (S.D.N.Y. Mar. 18, 2010). However, "the court need not accept as true 'conclusions of law or unwarranted deductions of fact.' " *Whitfield v. O'Connell,* No. 09 Civ.1925(WHP), 2010 WL 1010060, at *4 (S.D.N.Y. Mar. 18, 2010) (quoting *First Nationwide Bank v. Gelt Funding Corp.,* 27 F.3d 763,771 (2d Cir.1994)).

## II. *PLAINTIFF'S PRIVACY ACT & HIPAA CLAIMS WILL BE DISMISSED*

**\*4** This Court finds no error in Judge Maas's recommendation that Rosado's Privacy Act and HIPAA claims be dismissed.

"[U]nder the Privacy Act, a plaintiff may file a suit against an agency, and not an individual ... [I]ndividual officers are not proper parties to a Privacy Act action." *Mandel v. U.S. Office of Pers. Mgmt.,* 244 F.Supp.2d 146, 153 (S.D.N.Y.2003); *see also Young v. Tryon,* No. 12–CV–6251– CJS–MWP, 2013 WL 2471543, at *5 (W.D.N.Y. June 7, 2013) ("[T]he Privacy Act does not provide for a cause of action against individuals."); *Williams v. McCausland,* 791 F.Supp. 992, 1000 (S.D.N.Y.1992) ("The Privacy Act authorizes suits only against 'agencies' and not individuals."). Accordingly, Rosado's Privacy Act claim against Herard must be dismissed.

"HIPAA does not provide for either an express or implied private right of action." *Warren Pearl Constr. Corp. v. Guardian Life Ins. Co. of Am.,* 639 F.Supp.2d 371, 377 (S.D.N.Y.2009); *see also Mascetti v. Zozulin,* No. 3:09–CV– 963 (PCD), 2010 WL 1644572, at *4 (D.Conn. Apr. 20, 2010) ("Enforcement of [HIPAA] and its regulations is limited to the Secretary of Health and Human Services; thus, there is no private right of action."); *Barnes v. Glennon,* No. 9:05–CV– 0153 (LEK)(RFT), 2006 WL 2811821, at *6 (N.D .N.Y. Sept. 28, 2006) ("[T]here is no private cause of action stemming from HIPAA.") Accordingly, Rosado has no claim against Herard under HIPAA.

The Court adopts Judge Maas's recommendation that Rosado's Privacy Act and HIPAA claims be dismissed.

## III. *PLAINTIFF'S ADA AND REHABILITATION ACT CLAIMS WILL BE DISMISSED*

Judge Maas concluded that Rosado has no claim against Herard in her individual capacity under either the ADA or the Rehabilitation Act, and that Rosado may not seek monetary damages against Herard in her official capacity under these statutes. [2] *Rosado,* 2013 WL 6170631, at *4. Accordingly, the R & R recommends that Rosado's claims under these statutes be dismissed, except to the extent that they seek injunctive relief against Herard in her official capacity. *See id.*

This Court concludes, however, that Rosado's ADA and Rehabilitation Act claims must be dismissed in their entirety. "In order to state a claim under the ADA, a prisoner must establish that: '(1) he or she is a "qualified individual with a disability"; (2) he or she is being excluded from participation in, or being denied the benefits of some service, program, or activity by reason of his or her disability;

and (3) the entity [that] provides the service, program, or activity is a public entity.' " *Allah v. Goord,* 405 F.Supp.2d 265, 274 (S.D.N.Y.2005) (quoting *Hallett v. New York State Dep't of Corr. Servs.,* 109 F.Supp.2d 190, 198 (S.D.N.Y.2000)). "The requirements for stating a claim under the ADA are virtually identical to those under § 504 of the Rehabilitation Act." *Clarkson v. Coughlin,* 898 F.Supp. 1019, 1037 (S.D.N.Y.1995).

**\*5** To state a claim for relief under section 504 of the Rehabilitation Act, an inmate must show that:

(1) he is a "qualified individual with a disability";

(2) he is "otherwise qualified" to participate in the offered activity or program or to enjoy the services or benefits offered;

(3) he is being excluded from participation or enjoyment solely by reason of his disability; and

(4) the entity denying the inmate participation or enjoyment receives federal financial assistance.

*Allah,* 405 F.Supp.2d at 274–75 (quoting 29 U.S.C. § 794).

The Second Circuit has noted that "the ADA and Rehabilitation Act are addressed to 'rules ... that hurt [people with disabilities] *by reason of their handicap.*' " *Henrietta D. v. Bloomberg,* 331 F.3d 261, 276 (2d Cir.2003) (emphasis and alteration in original). "In other words, there must be something different about the way the plaintiff is treated 'by reason of ... [his or her] disability.' " *Id.* (quoting 42 U.S.C. § 12132). Accordingly, "[c]ourts routinely dismiss ADA suits by disabled inmates that allege inadequate medical treatment, but do not allege that the inmate was treated differently because of his or her disability." *Elbert v. New York State Dep't of Corr. Servs.,* 751 F.Supp.2d 590, 595 (S.D.N.Y.2010) (collecting cases).

In concluding that Rosado has stated an ADA claim, the R & R points to Rosado's assertion that he asked Defendant " 'why he [was] being denied access' to 'therapeutic group session[s] that detainees are entitled to under the directive ( [reasonable] accommodation for people with mental/ [physical] disabilities.' " *Rosado,* 2013 WL 6170631, at \*4 (quoting Am. Cmplt. (Dkt. No. 25) ¶ 8). In the Amended Complaint and in his opposition papers, Rosado states that Herard

*discriminated against Spanish speaking mental health detainees* by refusing them the right to participate in their therapeutic group session[s]. The Plaintiff argues that he was discriminate[d] against because he has been stigmatize[d] by his race & disability. The log-book will show that ... Plaintiff ... & his two neig[h]bors ... name[d] Richard Logo & Christian Jimenez never came out for group session[s] but on the [other] hand nothing but African–Americans [attended therapeutic group sessions].

(Pltf.Br.(Dkt. No. 36) at 6) (emphasis added); *see also* Am. Cmplt. ¶ 11 (alleging that Herard was "discriminating against Spanish speaking mental health detainees by den[y]ing them the right to participate in their therapeutic treatment"))

While Rosado alleges that he was discriminated against when he was denied therapeutic group services, he asserts that the basis of this discrimination was his ethnicity, not a disability. His conclusory statement that he was "stigmatized" for his "disability" offers no factual basis to conclude that he was treated differently than prisoners without mental health conditions (or who were not H.I.V.-positive). *See Iqbal,* 556 U.S. at 678 ("naked assertion[s] devoid of further factual enhancement" are insufficient to state a claim) (internal quotations omitted). He does not allege, for example, that prisoners who did not suffer from mental health conditions, or who were not H.I.V.-positive, were allowed to participate in therapeutic group sessions, while he was not. *See Harnett v. Fielding Graduate Inst.,* 400 F.Supp.2d 570, 576 (S.D.N.Y.2005) (quoting *Felix v. N.Y.C. Transit Auth.,* 324 F.3d 102, 107 (2d Cir.2003)) ("[These] statutes ... 'mandate[ ] reasonable accommodation of people with disabilities in order to put them on an even playing field with the non-disabled.' ").

**\*6** The facts alleged by Rosado indicate that the therapeutic group sessions were intended for mental health detainees. Defendant, of course, is a mental health clinician who is "responsible for the welfare of ... mental health detainees." (Am.Cmplt.(Dkt. No. 25) ¶ 5) When Defendant confronted Rosado regarding the grievance he had filed against her, Rosado asked, "Why is it that only African American[ ] inmates are allow[ed] to attend [ ] group sessions and not Spanish speaking inmates? ... [A]ll mental health inmates should be permitted to participate in this program." (*See id.* ¶ 12) The fact that certain detainees with mental illness were allowed to participate in group therapy, while other detainees with mental illness were not, does not demonstrate that

Rosado was discriminated against "because of" his mental illness or some other medical condition.

Rosado has not pleaded facts demonstrating that he was denied access to therapeutic group sessions because of a disability. Instead, he has pleaded facts demonstrating that he was denied access to therapeutic group sessions because of his ethnicity. Because neither the ADA nor the Rehabilitation Act addresses discrimination based on ethnicity, Rosado's claims under these statutes must be dismissed.

## IV. *PLAINTIFF'S § 1983 CLAIMS WILL BE DISMISSED IN PART*

The R & R concludes that Rosado's pleadings can be read to raise Section 1983 claims based on: (1) the right to privacy; (2) due process; (3) deliberate indifference under the Fourteenth Amendment; (4) equal protection; and (5) First Amendment retaliation. The R & R recommends that all of these claims be dismissed except for Rosado's First Amendment retaliation claim. For the reasons set forth below, Judge Maas's recommendations will be adopted except as to Rosado's equal protection claim.

### A. *Right to Privacy*

To the extent that Rosado asserts that Defendant violated his right to privacy by revealing his H.I.V. status to other detainees, Judge Maas concluded that Rosado had waived any such claim by disclosing that his H.I.V. status in a public court filing in Florida in 2011. [3] *Rosado,* 2013 WL 6170631, at *5. This Court finds no error in this determination. "Certainly, there is no question that an individual cannot expect to have a constitutionally protected privacy interest [in his HIV status] in matters of public record." *Doe v. City of New York,* 15 F.3d 264, 268 (2d Cir.1994); *see McKinnon v. Fred,* No. 306 CV 147(JGM), 2007 U.S. Dist. LEXIS 59900, at *14 (D.Conn. Aug. 16, 2007) ("An inmate may waive his privacy right in his medical history through a variety of acts including ... commencement of a lawsuit.... Prior to this incident, plaintiff mentioned his HIV status in documents he submitted in two of his other lawsuits.... Thus, he has waived his privacy right and his HIV status is a matter of public record."). Accordingly, Rosado's right to privacy claim will be dismissed.

### B. *Due Process*

**\*7** This Court also finds no error in the R & R's conclusion that Rosado's "stigma plus" claim should be dismissed, because there is no allegation that Defendant made a false statement about Rosado in disclosing his H.I.V. status. *Rosado,* 2013 WL 6170631, at *6. "Loss of one's reputation can ... invoke the protections of the Due Process Clause if that loss is coupled with the deprivation of a more tangible interest.... This type of claim is commonly referred to as a 'stigma-plus' claim." *Patterson v. City of Utica,* 370 F.3d 322, 330 (2d Cir.2004). "[A] 'stigma plus claim' [ ] requires a plaintiff to allege ... the utterance of a statement about [him] that is injurious to [his] reputation, 'that is capable of being proved false, and that he ... claims is false....' " *Velez v. Levy,* 401 F.3d 75, 87 (2d Cir.2005) (quoting *Doe v. Dep't of Pub. Safety,* 271 F.3d 38, 47 (2d Cir.2001), *rev'd on other grounds, Conn. Dep't of Pub. Safety v. Doe,* 538 U.S. 1 (2003)). Rosado acknowledges that he is H.I.V.-positive, and therefore Defendant's statement was not false. (Am.Cmplt. (Dkt. No. 25) ¶¶ 13–16) Accordingly, Rosado's due process claim will be dismissed.

### C. *Deliberate Indifference to Medical Needs*

Judge Maas correctly concluded that Rosado has not plausibly alleged a deliberate indifference claim. *Rosado,* 2013 WL 6170631, at *7. For purposes of such a claim, "a prison official violates the Eighth Amendment [or Fourteenth Amendment] only when two requirements are met." *Farmer v. Brennan,* 511 U.S. 825, 834 (1994). "First, the deprivation alleged must be, objectively, 'sufficiently serious,' ... [such that] a prison official's act or omission ... result[s] in the denial of 'the minimal civilized measure of life's necessities.' " *Id.* (quoting *Wilson v. Seiter,* 501 U.S. 294, 298 (1991); *Rhodes v. Chapman,* 452 U.S. 337, 347 (1981)). "This contemplates a condition of urgency, one that may produce death, degeneration, or extreme pain." *Joyner v. Greiner,* 195 F.Supp.2d 500, 503 (S.D .N.Y.2002). "The second requirement ... [is that] a prison official ... have a 'sufficiently culpable state of mind.' ... In prison-conditions cases, that state of mind is one of 'deliberate indifference' to inmate health or safety." *Farmer,* 511 U.S. at 834 (quoting *Wilson,* 501 U.S. at 297).

Rosado acknowledges that he has been receiving regular treatment for his mental health conditions and H.I.V. infection while incarcerated. (Pltf.Affirm. (Dkt. No. 36) at 18–27 [4] ) He does not allege that he has suffered any specific harm from being denied access to therapeutic group sessions; instead, he speculates that the denial of this service "could [cause] him harm in the present or future." (*Id.* at 9) Such allegations do not demonstrate "a condition of urgency ... that may produce death, degeneration, or extreme pain." *See*

*Joyner,* 195 F.Supp.2d at 503; *see also Beckford v. Portuondo,* 151 F.Supp.2d 204, 218 (N.D.N.Y.2001) ("[E]ven accepting that Plaintiff's mental health care was far from optimum, he was provided significant psychotropic medication [and other treatment] while [incarcerated]. At most, Plaintiff disagrees with the treatment offered and alleges that he should have received ... additional group therapy treatment.... Nowhere does Plaintiff allege that the failure to provide him these additional treatments resulted in an urgent threat to his life or limb or was otherwise so grossly inadequate to rise to the level of deliberate indifference.").

**\*8** Because Rosado's factual allegations are not sufficient to plead a deliberate indifference claim, that claim will be dismissed.

### D. *Equal Protection*

Rosado's equal protection claim is based on Herard's alleged denial of group therapy sessions to him and other Spanish-speaking detainees, while providing these sessions to African American detainees. (Am.Cmplt.(Dkt. No. 25) ¶¶ 7–12) Judge Maas properly found that "Rosado's averments more than suffice to allege the differential treatment of a suspect class." *Rosado,* 2013 WL 6170631, at \*6. "Hispanics as an ethnic group do constitute a suspect class for the purpose of equal protection analysis."[5] *Soberal–Perez v. Heckler,* 717 F.2d 36, 41 (2d Cir.1983).

The R & R recommends that Rosado's equal protection claim be dismissed, however, because of a failure to plead facts demonstrating discriminatory intent. *Rosado,* 2013 WL 6170631, at \*6. Judge Maas concluded that "Rosado has alleged no facts from which the Court can infer such intent. At most, Rosado claims that he complained to Herard about the situation and received no response ." *Id.*

Rosado has alleged, however, that "only African American inmates [were] allow[ed] to attend [ ] group session[s] an[d] not Spanish speaking inmates." (Am.Cmplt.(Dkt. No. 25) ¶ 12) Given that there is no obvious medical or administrative reason for such a practice, discriminatory intent—at least at the pleading stage—can be inferred. *See, e.g., Barnes v. Ross,* 926 F.Supp.2d 499, 506–07 (S.D.N.Y.2013) ("Barnes alleges that minority inmates at Sullivan received mental-health care that differed from the care provided to white inmates. Specifically, he alleges that '[prison healthcare providers], would only send ... (white) inmates to Marcy Hospital, where they[ would] get the proper treatment. Africans & Hispanic[s]

(Black[s] & Latin[os] ) would sit in [the institution's on-site mental health unit] for long period[s], then [were] sent[ ] back to their cells, where they[ would] harm themselves or [try] to commit suicide.' ... Barnes' allegations state an equal protection claim."); *see also Phillips v. Girdich,* 408 F.3d 124, 129–30 (2d Cir.2005) ("[*Pro se* inmate's] allegations suffice to state an Equal Protection Violation ... [where plaintiff] alleges that he and other minorities were subject to disparate treatment because of their race."); *LaBounty v. Adler,* 933 F.2d 121, 123 (2d Cir.1991) ("LaBounty ... allege[d] that similarly-situated white inmates were given work assignments without having to complete any 90–day [training] program, while LaBounty, who is black, had the additional obstacles placed in his way. LaBounty further alleged that 'all persons assigned as institution electricians are non-Black and there are witnesses who can testify that it has been that way for the past ten (10) years that they know of.' Thus, his complaint not only alleges that he was treated differently because of his race, but also, drawing a fair inference, that black inmates in the past have been treated differently because of their race. We think these allegations by a *pro se* prisoner sufficiently set forth an equal protection claim."); *Peel v. Crew,* No. 96 Civ. 7154(RWS), 1996 WL 719378, at \*14 (S.D.N.Y. Dec. 13, 1996) ("To state a claim under the Equal Protection clause, and survive a motion to dismiss, plaintiff need only allege discriminatory intent generally and facts from which such intent may be inferred.").

**\*9** Accordingly, this Court will not adopt the Magistrate Judge's recommendation that Rosado's equal protection claim be dismissed. With respect to this claim, Defendant's motion will be denied.

### E. *First Amendment Retaliation Claim*

Herard objects to Judge Maas's conclusion that Rosado has properly pled a First Amendment retaliation claim, arguing that this finding is "wholly at odds" with Judge Maas's finding "that Plaintiff had no right to privacy in his HIV status because he had already disclosed it." (Def. Objections (Dkt. No. 44) at 9–10) Herard argues that because Rosado's H.I.V. status is a matter of public record, her disclosure of that information to other detainees cannot be considered an "adverse action." (*Id.* at 9–12)

"[T]o sustain a First Amendment retaliation claim, a prisoner must demonstrate the following: '(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the

adverse action.' " *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004) (quoting *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002)). "These allegations may not be conclusory; they must have some basis in specific facts that are not inherently implausible on their face." *Jones v. Harris,* 665 F.Supp.2d 384, 397 (S.D.N.Y.2009). Furthermore, "[c]ourts have been cautioned to approach First Amendment retaliation claims by prisoners with skepticism and particular care." *Id.* (citing *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003)).

Here, Rosado claims that he filed a grievance against Defendant alleging that she had denied him and other Spanish-speaking detainees access to therapeutic group sessions. (Am.Cmplt.(Dkt. No. 25) ¶¶ 10–11) "[R]etaliation against a prisoner for pursuing a grievance violates the right to petition government for the redress of grievances guaranteed by the First and Fourteenth Amendments and is actionable under § 1983." *Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996). Rosado has adequately alleged that he engaged in protected speech.

To satisfy the second prong, Rosado must allege facts demonstrating that Herard "took adverse action" against him. An "adverse action" is conduct "that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Dawes,* 239 F.3d at 493, *overruled on other grounds, Swierkiewicz,* 534 U.S. 506; *see also Davis,* 320 F.3d at 353 ("[R]etaliation against an inmate must be likely to 'chill a person of ordinary firmness from continuing to engage' in a protected activity.") (quoting *Thaddeus–X v. Blatter,* 175 F.3d 378, 397 (6th Cir.1999)). "In making this determination, the court's inquiry must be 'tailored to the different circumstances in which retaliation claims arise,' bearing in mind that '[p]risoners may be required to tolerate more ... than average citizens, before a [retaliatory] action taken against them is considered adverse." *Davis,* 320 F.3d at 354 (quoting *Dawes,* 239 F.3d at 493 (quoting *Thaddeus–X,* 175 F.3d at 398)) (alterations in original).

**\*10** Whether Defendant's disclosure of Rosado's H.I.V. status would deter a "similarly situated individual of ordinary firmness" from exercising his right to file a grievance cannot be resolved as a matter of law at this stage of the proceedings. The record does not, for example, disclose (1) the extent to which Rosado's illness was known to other detainees prior to Defendant's disclosures; (2) the extent to which Defendant's disclosures could have been expected to spread

through the Mental Health Unit and the larger institution, or (3) how detainees with H.I.V. are treated by other prisoners. Rosado has pled that "as a result of [Herard's disclosures] ... [his] medical condition ... became known throughout the prison ... [and] he became a target of gossip [and][r]umor as well as [harassment] by prisoners." (Am.Cmplt. (Dkt. No. 25) ¶¶ 16–17) It is a reasonable inference from the pleadings both that Rosado's H.I.V. status was not widely known to other detainees prior to Herard's disclosures, and that the disclosures led Rosado to suffer harm that might deter a similarly situated individual from filing a grievance. "Therefore, 'at this early state, the[se] allegation[s] ... must be construed as describing an adverse action,' and ... [Plaintiff] 'should have the opportunity to develop facts that would demonstrate that [Herard's actions] would deter a reasonable inmate from pursuing grievances.' " *Davis,* 320 F.3d at 354 (quoting *Morales v. Mackalm,* 278 F.3d 126, 131–32 (2d Cir.2002)).

With respect to causation, "[a] plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action." *Espinal v. Goord,* 558 F.3d 119, 129 (2d Cir.2009) (citing *Clark Cnty. Sch. Dist. v. Breeden,* 532 U.S. 268, 273–74 (2001); *Gorman–Bakos v. Cornell Coop. Extension,* 252 F.3d 545, 554 (2d Cir.2001)). Here, Rosado alleges that—after Herard learned that he had filed a grievance against her—Defendant "immediately" approached Rosado in his cell and loudly disclosed that Rosado was "on the verge of dying because he[']s H.I.V.-positive." (Am.Cmplt.(Dkt. No. 25) ¶¶ 12–13) Rosado further alleges that, over the next few days, Herard disclosed Rosado's H.I.V. status to several other detainees. (*Id.* ¶ 14) Assuming these allegations are true, Rosado has sufficiently alleged a causal relationship between his filing of a grievance against Herard and her adverse actions against him. Accordingly, Defendant's motion to dismiss will be denied as to Rosado's retaliation claim.[6]

### F. *"State–Created Danger" Claim*

In his objections to the R & R, Rosado refers to a "state-created danger" claim, alleging that Defendant "consciously, intentionally, and recklessly created a 'danger[ous] situation' " when she disclosed his H.I.V. status to other detainees. (Pltf. Objections (Dkt. No. 48) ¶ 11) Defendant objects to the assertion of this "entirely new theory of liability." (Def. Reply to Pltf. Objections (Dkt. No. 50) at 3)

**\*11** It is well-settled that a "complaint cannot be amended merely by raising new facts and theories in plaintiff['s] opposition papers, and hence such new allegations and claims should not be considered in resolving the motion." *Southwest Clothing LLC v. GFT (USA) Corp.,* No. 99 CV 10452(GBD), 2004 WL 2914303, at \*6 (S.D.N.Y. Dec. 15, 2004). However, "[a] document filed *pro se* is 'to be liberally construed.' " *Erickson,* 551 U.S. at 94 (quoting *Estelle,* 429 U.S. at 106). "Because [plaintiff] is proceeding *pro se,* the Court must read his pleadings 'liberally' and interpret them 'to raise the strongest arguments' that they may suggest." *Chavis v. Chappius,* 618 F.3d 162, 170 (2d Cir.2010).

In the Amended Complaint, Rosado alleges that he "became a target of gossip [and][r]umor as well as [harassment] by prisoners which might lead to inmate on inmate violence." (Am.Cmplt.(Dkt. No. 25) ¶ 17) He also alleges that "employee[s] that work in the correctional department" do not "ensure the safety of ... inmates." (*Id.* ¶ 23) Read liberally, the Amended Complaint may be construed as asserting a Fourteenth Amendment claim under the "state-created danger" doctrine. Accordingly, this Court will interpret Rosado's objections as asserting that Judge Maas erred in not considering this theory of liability.

In *Deshaney v. Winnebago County Department of Social Services,* 489 U.S. 189, 196 (1989), the Supreme Court held that the "Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." *Id.* Accordingly, "[a]s a general matter, ... a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *Id.* at 197.

An exception to this principle—known as the "state—created danger" exception—provides for state liability for acts of private violence where state actors "in some way ... assisted in creating or increasing the danger to the victim." *Dwares v. City of New York,* 985 F.2d 94, 98–99 (2d Cir.1993), *overruled on other grounds, Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit,* 507 U.S. 163 (1993). "[T]he Second Circuit has held that a claim is stated [under the state-created danger exception] where the defendant's facilitation of a private attack amounts to affirmative conduct necessary to state a due process violation." *Campbell v. Brentwood Union Free Sch. Dist.,* 904 F.Supp.2d 275, 280 (E.D.N.Y.2012) (citing *Pena v. DePrisco,* 432 F.3d 98, 109 (2d Cir.2005)).

Here, Rosado has not alleged that he suffered any act of violence. Instead, Rosado claims that Defendant's disclosures *"might* lead to inmate on inmate violence." (Am.Cmplt. (Dkt. No. 25) ¶ 17 (emphasis added)) Absent allegations that Rosado actually was the victim of a violent act, however, he has no claim under the "state-created danger" exception. *Cf. Lombardi v. Whitman,* 485 F.3d 73, 80 (2d Cir.2007) ("[I]n each of those cases [where the state created danger exception was applied], a third party's criminal behavior harmed the plaintiff after a government actor ... enhanced or created the opportunity for the criminal act.").

**\*12** Accordingly, to the extent that Rosado's due process claim is based on a theory of state-created danger, that claim will be dismissed.

### G. *Limitation of Damages under the Prison Litigation Reform Act*

Defendant argues that—to the extent that any of Rosado's claims survive her motion to dismiss—Rosado is barred from recovering compensatory damages under the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(e), because he has not alleged a physical injury. [7] (Def.Br.(Dkt. No. 32) at 15–16)

Under the PLRA, "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. § 1997e(e); *see also Thompson v. Carter,* 284 F.3d 411, 417 (2d Cir.2002) (noting that an inmate may not "recover damages for mental or emotional injury ... in the absence of a showing of actual physical injury"); *Jenkins v. Haubert,* 179 F.3d 19, 28–29 (2d Cir.1999) (explaining that under the PLRA, in "suits seeking damages for mental or emotional injuries," plaintiff must "make a prior showing of physical injury"); *Lee v. DelFavero,* No. 9:04 CV 382, 2005 WL 2387820, at \*6 (N.D.N.Y. Sept. 28, 2005) (granting defendant's motion to dismiss plaintiff's claim for compensatory damages for "mental anguish and emotional distress" for failure to plead physical injury); *Brewster v. Nassau Cnty.,* 349 F.Supp.2d 540, 553 (E.D.N.Y.2004) (granting defendant's motion to dismiss for plaintiffs failure to allege any physical harm).

" 'If, however, the plaintiff alleges the violation of a constitutional right, the action is not entirely barred and

the plaintiff may obtain injunctive or declaratory relief, and nominal or punitive, but not compensatory damages irrespective of any physical injury if [he] proves that violation.' " *Voorhees v. Goord,* No. 05 Civ. 1407(KMW) (HB), 2006 WL 1888638, at *9 (S.D.N.Y. Feb. 24, 2006) (quoting *Lipton v. Cnty. of Orange,* 315 F.Supp.2d 434, 457 (S.D.N.Y.2004) (citing *Thompson,* 284 F.3d at 418)).

In the Amended Complaint, Rosado alleges that—as a result of Defendant's conduct—he suffers "psychological episodes of mental anguish, such as depression, insomnia, scornful [harassment], headaches, inability to [concentrate], fatigue, [and] loss of appetite"; "became annoyed [continually]"; "suffers from [anxiety] & panic attacks"; and is "a target of gossip [and r]umor[,] as well as harassment by prisoners which might lead to inmate on inmate violence." (Am.Cmplt. (Dkt. No. 25) ¶ 17) Rosado has not alleged any physical injury. (*See id.*) In his prayer for relief, Rosado states that he seeks a declaration that his rights were violated; an injunction requiring Herard to, *inter alia,* permit all inmates to participate in therapeutic group sessions; $5,000 in compensatory damages; and $55 million in punitive damages. (*Id.* ¶¶ 28–31).

**\*13** To the extent that Rosado seeks compensatory damages for mental or emotional harm, that claim will be dismissed, given Rosado's failure to allege physical injury. As Judge Maas noted, however, compensatory damages for intangible deprivations of Rosado's liberty and personal rights—as "distinct from pain and suffering, mental anguish, and mental trauma"—are not barred by the PLRA. *Rosado,* 2013 WL 6170631, at *10. The Second Circuit has held that "[t]he damages recoverable for loss of liberty ... are separable from damages recoverable for such injuries as physical, harm, embarrassment, or emotional suffering." *Kerman v. City of N .Y.,* 374 F.3d 93, 125 (2d Cir.2004). Applying *Kerman,* courts in this Circuit have concluded that a physical injury is not required for a prisoner to recover compensatory damages for the loss of a constitutional liberty interest. *See Mendez v. Amato,* No. 9:12–CV–560 (TJM/CFH), 2013 WL 5236564, at *20 (N.D.N.Y. Sept. 17, 2013) (citing *Kerman,* 374 F.3d at 125–26) ("The Second Circuit has determined that intangibles can serve as a basis for recovery.... The claims surviving defendants' motion involve the loss of such intangibles as liberty through a lack of due process and equal protection. Such claims represent those which fall outside of the physical harm requirement of the PLRA."); *Malik v. City of New York,* No. 11 Civ. 6062(PAC)(FM), 2012 WL 3345317, at *16 (S.D.N.Y. Aug. 15, 2012), *report and recommendation*

*adopted,* No. 11 Civ. 6062(PAC)(FM), 2012 WL 4475156 (S.D.N.Y. Sept. 28, 2012) ("[T]he PLRA's physical injury requirement does not bar an award of compensatory damages for First Amendment violations."). Accordingly, Rosado's claim for compensatory damages flowing from the loss of his liberty interests under the First Amendment and the Equal Protection Clause will proceed.

As the R & R correctly recognizes, the PLRA does not place "limitations on injunctive or declaratory relief [or] nominal and punitive damages." *Rosado,* 2013 WL 6170631, at *10; *see Thompson,* 284 F.3d at 418. Rosado is therefore entitled to pursue these remedies with respect to his remaining claims. [8]

## V. *STATE CLAIMS*

As to Rosado's state law claims, Herard's only argument for dismissal is that this Court should decline to exercise its supplemental jurisdiction. (Def. Reply Br. (Dkt. No. 38) at 6) However, since certain of Rosado's federal claims will survive the motion to dismiss, and given that these claims arise out of the same events and conduct as his state law claims, the state law claims will not be dismissed. *See Kolari v. New York–Presbyterian Hosp.,* 455 F.3d 118, 121–22 (2d Cir.2006) (quoting 28 U.S.C. § 1367(a)) ("Federal district courts have supplemental jurisdiction over state-law claims 'that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.' ").

## VI. *DEFENDANT'S QUALIFIED IMMUNITY ARGUMENT*

**\*14** In responding to Rosado's objections to the R & R, Defendant raises the defense of qualified immunity for the first time. (Def. Reply to Pltf. Objections (Dkt. No. 50) at 9–11) Because this argument was never raised in the motion papers, it will not be considered now. *See Smith v. Hulihan,* No. 11 CV 2948(HB), 2012 WL 4928904, at *1 (S.D.N.Y. Oct. 17, 2012) ("[N]ew arguments ... cannot properly be raised for the first time in objections to the R & R, and indeed may not be deemed objections at all.").

## *CONCLUSION*

For the reasons stated above, Defendant's motion to dismiss is denied with respect to Plaintiff's equal protection and First Amendment retaliation claims, except to the extent that

compensatory damages for mental and emotional injury are sought in connection with these claims. The motion to dismiss is granted with respect to these claims to the extent that they seek compensatory damages for mental and emotional injury. The motion is also granted with respect to Plaintiff's remaining federal claims. The motion to dismiss is otherwise denied.

The Clerk of the Court is directed to terminate the motion (Dkt. No. 30) and to mail a copy of this Order to Tyrone Rosado, 241–11–05751, Anna M. Kross Center (A.M.K.C.) C–95, 18–18 Hazen Street, East Elmhurst, New York 11370.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 1303513

## Footnotes

1   The Court's factual statement is drawn from Plaintiff's Complaint and Amended Complaint. Plaintiff's factual allegations are presumed to be true for purposes of resolving a motion to dismiss. *See Kassner v. 2nd Ave. Delicatessen, Inc.,* 496 F.3d 229, 237 (2d Cir.2007).

2   Rosado has no claim against Herard in her individual capacity under these statutes. "[N]either Title II of the ADA nor § 504 of the Rehabilitation Act provides for individual capacity suits against state officials." *Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn,* 280 F.3d 98, 107 (2d Cir.2001); *Keitt v. New York City,* 882 F.Supp.2d 412, 426 (S.D.N.Y.2011) ("Individuals in their personal capacities are not proper defendants on claims brought under the ADA or the Rehabilitation Act.") (citing *Harris v. Mills,* 572 F.3d 66, 72–73 (2d Cir.2009)).

Less clear is whether claims for monetary damages are available against Herard in her official capacity. The Second Circuit has held that "a private suit for money damages under Title II of the ADA may only be maintained against a state if the plaintiff can establish that the Title II violation was motivated by either discriminatory animus or ill will due to disability." *Garcia,* 280 F.3d at 112. Some courts in this District have extended this holding to individuals sued in their official capacities. *See Degrafinreid v. Ricks,* 417 F.Supp.2d 403, 411 (S.D.N.Y.2006), *on reconsideration on other grounds,* 452 F.Supp.2d 328 (S.D.N.Y.2006) ( "Since the ADA permits official capacity suits, [plaintiff] can pierce Defendant's claim of state sovereign immunity and recover money damages under Title II, provided he satisfies the standard set forth in [*United States v. Georgia,* 546 U.S. 151 (2006).]"); *see also Johnson v. Goord,* No. 01 Civ. 9587 PKC, 2004 WL 2199500, at *19 (S.D.N.Y. Sept. 29, 2004) ("[P]laintiffs' claims against the individual defendants in their official capacities under section 504 of the Rehabilitation Act and Title II of the ADA fail because those laws do not provide for money damages against the state or state officials in their official capacities, absent a showing that any violation was motivated by discriminatory animus or ill will due to the disability.").

Other courts have concluded that monetary damages are available against individuals in their official capacities under the ADA, but not under the Rehabilitation Act. *See Gowins v. Greiner,* No. 01 Civ. 6933(GEL), 2002 WL 1770772, at *5 (S.D.N.Y. July 31, 2002) ("[Plaintiff] may not sue DOCS under ... the Rehabilitation Act at all, and may sue DOCS under the ADA only to the extent that the alleged violation resulted from discriminatory animus based on his disability.").

This Court need not resolve the official capacity issue here. Even reading Plaintiff's pleadings liberally, he has not asserted that he was denied access to therapeutic group sessions because of a disability.

3   "In considering a motion to dismiss for failure to state a claim under Fed.R.Civ.P. 12(b)(6), a district court ... may ... consider matters of which judicial notice may be taken under Fed.R.Evid. 201.... [C]ourts routinely take judicial notice of documents filed in other courts, ... not for the truth of the matters asserted in the other

litigation, but rather to establish the fact of such litigation and related filings." *Kramer v. Time Warner Inc.,* 937 F.2d 767, 773–74 (2d Cir.1991).

4    The pages numbers referenced in this opinion are the numbers assigned when the document was electronically filed.

5    Judge Maas correctly rejected Defendant's argument that Plaintiff alleges discrimination based on language rather than ethnicity. *See Rosado,* 2013 WL 6170631, at *6. Although Plaintiff refers to himself and certain other detainees as "Spanish speakers," he repeatedly contrasts this group with "African Americans." (*See, e.g.,* Am. Cmplt. (Dkt. No. 25) ¶ 12) Accordingly, the classification Plaintiff alleges is one based on ethnicity, and not language. This case is thus distinguishable from *Soberal–Perez v. Heckler,* 717 F.2d 36, 41 (2d Cir.1983)—cited by Defendant—because in that case "[a] classification [was] ... made ... on the basis of language, *i.e.,* English-speaking versus non-English-speaking individuals, and not on the basis of race, religion or national origin."

6    Defendant argues that this ruling is inconsistent with the dismissal of Plaintiff's privacy claim. This argument ignores the fact that Plaintiff's privacy and First Amendment retaliation claims involve different rights. The retaliation claim implicates Plaintiff's freedom to engage in constitutionally protected activity—here, First Amendment speech—while Plaintiff's privacy claim is based on his "individual interest in avoiding disclosure of personal matters." *Whalen v. Roe,* 429 U.S. 589, 599 (1977). While Plaintiff waived his privacy claim by filing court papers disclosing his H.I.V. status, it does not follow that he waived his right to be free of retaliation for engaging in First Amendment speech. The relevant question for purposes of Plaintiff's retaliation claim is whether disclosure of Plaintiff's H.I.V. status to other detainees—individuals who were housed in the same facility as Plaintiff and who did not know of his medical condition—"would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Dawes,* 239 F.3d at 493. It is reasonable to infer that a similarly situated detainee might be deterred from filing a grievance if threatened with disclosure of his H.I.V. status to other detainees. The fact that detainees in the Mental Health Unit could have learned about Plaintiff's H.I.V. status from documents filed in Plaintiff's Florida court action does not change the analysis.

7    Defendant did not raise this argument in her objections to the R & R. Accordingly, to the extent that this argument concerns Plaintiff's retaliation claim, this Court will review the Magistrate Judge's determination for clear error. As to Plaintiff's equal protection claim, Judge Maas determined that that claim should be dismissed and did not reach the issue of damages. Accordingly, as to Plaintiff's equal protection claim, this Court will consider Defendant's PLRA argument *de novo.*

8    Herard argues that Rosado's claims for injunctive and declaratory relief are moot because Rosado has been transferred from the Mental Health Unit at the George R. Vierno Detention Center, where the alleged events occurred. (Def. Objections (Dkt. No. 44) at 9) "In this circuit, an inmate's transfer from a prison facility generally moots claims for declaratory and injunctive relief against officials of that facility." *Salahuddin v. Goord,* 467 F.3d 263, 272 (2d Cir.2006).

The rationale for this rule is that—with the prisoner's transfer—"the problem sought to be remedied has ceased, and ... there is 'no reasonable expectation that the wrong will be repeated.' " *Prins v. Coughlin,* 76 F.3d 504, 506 (2d Cir.1996) (quoting *Preiser v. Newkirk,* 422 U.S. 395, 402 (1975)). However, both the George R. Vierno Detention Center and the Anna M. Kross Center—where Rosado is currently housed—are Rikers Island facilities. It is not clear from the record whether Rosado continues to be under Herard's care, or will be under Herard's care again in the future, given that he is detained in a Rikers Island facility. Accordingly, Plaintiff's claims for injunctive and declaratory relief will not be dismissed as moot at this time.

---

**End of Document**                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:24-cv-00037-DNH-ML    Document 9    Filed 06/11/24    Page 122 of 449

Moran v. Deamelia, Not Reported in Fed. Supp. (2017)

KeyCite Overruling Risk - Negative Treatment

Overruling Risk    Zarda v. Altitude Express, Inc.,    2nd Cir.,    February 26, 2018

2017 WL 2805160
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Thomas J. MORAN, Plaintiff,

v.

Victor P. DEAMELIA, Amanda
Colomb, Nicole Comstock, Defendants.

1:17-CV-422 (TJM/CFH)
|
Signed 04/20/2017

**Attorneys and Law Firms**

Thomas J. Moran, 600 16 th Street, Apt. 203, Watervliet, New
York 12189, Plaintiff Pro se.

**REPORT-RECOMMENDATION AND ORDER**

Christian F. Hummel, U.S. Magistrate Judge

 **\*1** Presently pending before the Court is plaintiff pro se
Thomas J. Moran's application to proceed in forma pauperis
("IFP") and motion for appointment of counsel. Dkt. Nos. 2,
3.

### I. In Forma Pauperis Application

After reviewing plaintiff's IFP Application, the Court finds
that he may properly proceed with this matter in forma
pauperis. [1] See Dkt. No. 2.

### II. Initial Review [2]

Section 1915(e) of Title 28 of the United States Code directs
that, when a plaintiff seeks to proceed IFP, "the court shall
dismiss the case at any time if the court determines that ...
the action or appeal (i) is frivolous or malicious; (ii) fails
to state a claim on which relief may be granted; or (iii)
seeks monetary relief against a defendant who is immune

from such relief." 28 U.S.C. § 1915(e)(2)(B). Thus, it is
a court's responsibility to determine that a plaintiff may
properly maintain his complaint before permitting him to
proceed with his action. In reviewing a pro se complaint, the
court must be mindful that the plaintiff's pleadings should be
held to "less stringent standards than formal pleadings drafted
by lawyers." Hughes v. Rowe, 449 U.S. 5, 9 (1980) (internal
quotation marks omitted); Erickson v. Pardus, 551 U.S. 89,
94 (2007).

To state a claim on which relief can be granted, a complaint
must contain, inter alia, "a short and plain statement of the
claim showing that the pleader is entitled to relief." FED. R.
CIV. P. 8(a)(2). A complaint must plead "enough facts to state
a claim to relief that is plausible on its face." Bell Atlantic
Corp. v. Twombly, 550 U.S. 544, 570, (2007). "A claim has
facial plausibility when the plaintiff pleads factual content
that allows the court to draw the reasonable inference that the
defendant is liable for the misconduct alleged." Ashcroft v.
Iqbal, 556 U.S. 662, 678 (2009). "Threadbare recitals of the
elements of a cause of action, supported by mere conclusory
statements, do not suffice." Id. Further,

> [d]etermining whether a complaint
> states a plausible claim for relief ...
> requires the ... court to draw on
> its judicial experience and common
> sense.... [W]here the well-pleaded
> facts do not permit the court to infer
> more than the mere possibility of
> misconduct, the complaint has alleged
> —but it has not 'show[n]'—that the
> pleader is entitled to relief.

Id. at 679 (internal citation omitted); FED. R. CIV. P. 8(a)(2).

Here, plaintiff alleges [3] that defendants, employees with the
New York State Division of Human Rights, [4] discriminated
against him on the basis of his sexual orientation and
disability. See generally Dkt. No. 1 ("Compl."). [5] Plaintiff
alleges that defendants' discriminatory conduct violated the
Americans with Disabilities Act ("ADA") and Title VII of the
Civil Rights Act of 1964 ("Title VII"). Id. at 6. Plaintiff filed
a complaint against his former employer, nonparty Jewish
Board of Family and Children's Services, for discrimination
on the basis of his race, sexual orientation, and disability with

Moran v. DeAmelia, Not Reported in Fed. Supp. (2017)

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 123 of 449

the New York State Division of Human Rights ("NYSDHR"). Id.; Dkt. No. 1-1 at 23-25. Plaintiff's claims in this complaint arise out of defendants' handling of plaintiff's employment discrimination complaint. Compl. at 6. Specifically, plaintiff contends that defendants discriminated against him on the basis of his disability and sexual orientation insofar as they (1) provided extensions of time and an adjournment to his former employer, but did not provide such extensions for plaintiff, and failed to explain why these extensions were awarded to his former employer; (2) were rude, dismissive, or otherwise refused to offer assistance or explain procedures; (3) refused to send plaintiff copies of the NYSDHR internal procedures; (4) permitted apparent non-attorneys to represent the former employer during the conference, and failed to include in conference notes the fact that "Mr. DeAmelia allowed two attorneys into this conference to practice law without law licenses"; and (5) produced a "fraudulent report" in the form of a "one-sided" "Determination and Order after Investigation" concluding that his former employer did not commit actionable discrimination. See Compl. at 6-13.

**\*2** Plaintiff demands "ALL monies due" to him as he

> alleges Mr. Victor De Amelia may have used or presently may be using Mr. Thomas J. Moran's name and identity which plaintiff alleges may have been taken by Mr. Victor P. DeAmelia presently and Plaintiff alleges may have been taken in the past without Mr. Thomas J. Moran's acknowledgment and/or consent.

Compl. at 13. Plaintiff further seeks monetary damages in the amount of $900 million from Mr. DeAmelia and $1 billion from the NYSDHR. Id. Plaintiff also seeks injunctive relief in the form of (1) "an investigation into all of Mr. Victor P. DeAmelia's dealings, job performance and relationship Defendant has now and had in the past as Regional Director of the New York State Division of Human Right using Mr. Thomas J. Moran's name and identity," (2) "[t]he resignation of Mr. Victor P. DeAmelia from the New York State Division of Human Rights," (3) the "bar[ring] of Mr. DeAmelia "from ever working again in the name of Human Rights or in a Human Resources capacity anywhere in the United States of America." Id. Plaintiff also demands costs. Id.

## A. ADA[6]

Plaintiff alleges that he is disabled due to major depressive disorder and attention deficit hyperactivity disorder. Compl. at 5. Plaintiff contends that defendants discriminated against him, as detailed above, because he is disabled. See generally id.

Title II of the ADA states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. A public entity includes "any department, agency ... or other instrumentality of a State or States or local government[.]" 42 U.S.C. § 12131(1)(B). A qualified individual with a disability is defined as

> an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

Id. § 12141(2). To demonstrate a prima facie case of discrimination on the basis of disability under Title II of the ADA, "a plaintiff must adequately allege that: (1) he is a 'qualified individual with a disability'; (2) he was excluded from participation in a public entity's services, programs, or activities; and (3) the exclusion was the result of his disability." Natarelli v. VESID Office, 420 Fed.Appx. 53 (2d Cir. 2011) (summary order) (citing Hargrave v. Vermont, 340 F.3d 27, 34-35 (2d Cir. 2003)).

The Court will assume, for purposes of this motion, that plaintiff is a qualified individual with a disability. 42 U.S.C. § 12141(2). Thus, the Court will assess whether plaintiff has demonstrated that he was "excluded from participation in a public entity's services, programs, or activities." Id. § 12132.

Moran v. Deamelia, Not Reported in Fed. Supp. (2017)

Case 3:24-cv-00037-DNH-ML    Document 9    Filed 06/11/24    Page 124 of 449

First, it is clear that NYSDHR is a "public entity"; however, plaintiff has not named the NYSDHR has a defendant. See generally Compl. Instead, the named defendants are individual employees of the NYSDHR. Id. Second, it is well settled that discrimination claims under Title II of the ADA can be asserted only against public entities, not individual employees of public entities in either their individual or official capacities. See, e.g., Hallett v. New York State Dep't of Corr. Services, 109 F. Supp. 2d 190, 199 (S.D.N.Y. 2000) (citing Cerrato v. Durham, 941 F. Supp. 388, 395 (2d Cir. 1996)); Bottge v. Suburban Propane, 77 F. Supp. 2d 310, 313 (N.D.N.Y. 1999). Thus, plaintiff has not met the requirements of the second prong of Title II insofar as he has named only individual defendants—against whom Title II of the ADA does not apply—and, thus, has not demonstrated discrimination by a public entity.[7]

**\*3** Further relating to the second prong of Title II, it is less than clear that plaintiff was denied the benefits of a public service or program or was discriminated by the employees of the NYSDHR. Read very liberally, plaintiff's complaint appears to suggest that, due to defendants' disability discrimination, he was denied the benefit of NYSDHR's employment discrimination complaint procedure because he was not given a fair and unbiased review of his complaint, was denied an explanation of the NYSDHR's process and procedures, and was denied adequate time in which to participate fully in the process. See generally Compl. Insofar as plaintiff's complaint suggests he was discriminated against because defendants denied him adequate time to file a response or gave him less time than his former employer, plaintiff has not even suggested that he timely requested an extension, provided good cause for the request, and that such request was denied. See generally Compl. Further, plaintiff has not alleged why the time extensions given to his former employer were invalid or done as a form of disability discrimination. Thus, the undersigned concludes that plaintiff's complaints that he was not given enough time to file a response or was unfairly given less time than his former employer does not, without more, demonstrate that he was denied participation in a public entity's service or program.

Even assuming plaintiff has demonstrated that he is a qualified individual with a disability, and demonstrated that he was denied participation in a public service or benefit by a public entity, even with a liberal reading of his complaint, plaintiff has not demonstrated that "defendants were motivated by irrational discriminatory animus or ill will

based on his alleged ... disability." Garcia v. S.U.N.Y. Health Sciences Ctr. of Brooklyn, 280 F.3d 98, 113 (2d Cir. 2001); Frank v. Sachem Sch. Dist., 84 F. Supp. 3d 172, 186 (E.D.N.Y. 2015) ("To prove intentional discrimination under the ADA, a plaintiff must allege facts showing that a policymaker acted with ill will or personal animosity toward him because of his disability or that the policymaker acted with deliberate indifference to his rights under the ADA.") (internal citation and quotation marks omitted). Although defendants may have been aware of plaintiff's alleged disabilities because his underlying discrimination complaint against his former employer filed with the NYSDHR appears to have been based, in part, on his disabilities, he offers not even a scintilla of proof that the alleged misconduct was *"motivated" by* his major depressive disorder and ADHD. As plaintiff provides the Court with no factual support for this allegation, it is the undersigned's opinion that plaintiff has failed to demonstrate that defendants' conduct was motivated by "motivated by irrational discriminatory animus or ill will" due to his disability. Garcia, 280 F.3d at 113.

Finally, it is noted that plaintiff seeks monetary damages against defendant DeAmelia and the NYSDHR, which he has not named as a party and against which he has not asserted specific claims. See Compl. at 13. Plaintiff does not indicate what portion of the requested damages he intends to be compensatory and which are punitive. See id. Although compensatory damages are recoverable under the ADA, punitive damages are not. Barnes v. Gorman, 536 U.S. 181, 189-90 (2002). Thus, it is recommended that, insofar as plaintiff's complaint seeks punitive damages under the ADA, such demand be dismissed with prejudice. Insofar as plaintiff seeks compensatory damages, it is recommended that such claims be dismissed without prejudice.

Insofar as plaintiff seeks injunctive relief, it is noted that, to demonstrate that he has standing to seek injunctive relief, plaintiff must demonstrate that there is a "real or immediate threat that he will be wronged again" by defendants. Naiman v. New York Univ., No. 95 Civ. 6469 (LMM), 1997 WL 249970, at \*4 (S.D.N.Y. May 13, 1997). This must be more than a hypothetical or possible likelihood. Id. Although plaintiff does not explain how there is a continued or immediate threat that he will continue to be harmed by defendants, giving plaintiff due solicitude, it is at least arguable, at this early stage, that plaintiff has demonstrated standing for injunctive relief as it is possible that plaintiff may seek to file future employment discrimination cases that would be handled by the NYSDHR. Thus, it is recommended

Moran v. Deamelia, Not Reported in Fed. Supp. (2017)

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 125 of 449

that plaintiff's claims for injunctive relief under the ADA be dismissed without prejudice.

**\*4** In sum, for all of the reasons stated above, the undersigned recommends that (1) plaintiff's ADA claims against defendants DeAmelia, Colcomb, and Comstock be dismissed with prejudice, but without prejudice to plaintiff's ability to allege ADA claims against a proper defendant should he seek to allege such claims in the future and with proper support; (2) plaintiff's claims for compensatory and injunctive relief under the ADA be dismissed without prejudice; and (3) plaintiff's claim for punitive damages under the ADA be dismissed with prejudice.

### B. Title VII

Plaintiff argues that he was discriminated against by defendants, in violation of Title VII, on the basis of his sexual orientation. <u>See</u> generally Compl. Plaintiff does not distinguish between alleged acts taken based on disability discrimination versus sexual-orientation discrimination, instead making general suggestions that the alleged rude treatment, denial of extensions or inequitable grant of extensions to the former employer, and biased final determination occurred due to discrimination as to both factors. <u>See</u> <u>id.</u>

Title VII applies to employment discrimination, and, thus, is not applicable to plaintiff's claims. 42 U.S.C. § 2000e, et seq. Even assuming plaintiff could demonstrate that sexual orientation discrimination is covered by Title VII,[8] it is abundantly clear from the complaint that plaintiff will be unable to demonstrate that employees of the NYSDHR, or NYSDHR itself, committed employment discrimination against plaintiff. Based on the allegations set forth in the complaint, plaintiff was never employed by defendants or the NYSDHR, nor has he sought employment and been discriminated against on the basis his membership in a protected class. Although plaintiff reached out to defendants for assistance with employment-related discrimination, his claims against defendants in this action do not arise out of employment discrimination. His allegations that defendants, employees of a state agency,[9] discriminated against him relating to their handling of his employment discrimination case, therefore, plainly fall outside of the confines of Title VII. Accordingly, it is recommended that plaintiff's claims

that defendants discriminated against him in violation of Title VII be dismissed with prejudice.[10]

### III. Conclusion

**WHEREFORE**, for the reasons stated herein, it is hereby

**ORDERED**, that plaintiff's application for in forma pauperis status be **GRANTED**, and it is

**RECOMMENDED**, that plaintiff's Title VII claims be **DISMISSED with prejudice**; and it is

**\*5 RECOMMENDED**, that plaintiff's ADA claims be **DISMISSED** against defendants Victor P. DeAmelia, Amanda Colomb, and Nicole Comstock, **with prejudice**; and it is

**RECOMMENDED**, that plaintiff's ADA claims otherwise be **DISMISSED without prejudice** insofar as plaintiff may potentially seek to bring such claims against a proper defendant in the future; and it is

**RECOMMENDED**, that insofar as plaintiff seeks punitive damages under the ADA, such claim be **DISMISSED with prejudice**; and it is

**RECOMMENDED**, that plaintiff's request for compensatory and injunctive relief under the ADA be **DISMISSED without prejudice**; and it is

**RECOMMENDED**, that the motion for appointment of counsel (Dkt. No. 3) be **DENIED without prejudice**, as the undersigned recommends dismissal of the complaint in its entirety;[11] and it is

**ORDERED**, that the Clerk of the Court serve this Report-Recommendation and Order on the plaintiff in accordance with Local Rules.

**IT IS SO ORDERED.**

Pursuant to 28 U.S.C. § 636(b)(1), parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court "within fourteen (14) days after being served with a copy of the ... recommendation." N.Y.N.D. L.R. 72.1(c) (citing 28 U.S.C. § 636(b)(1)(B)-(C)). **FAILURE TO OBJECT TO THIS REPORT WITHIN**

Moran v. Deamelia, Not Reported in Fed. Supp. (2017)

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 126 of 449

**FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Small v. Sec'y of HHS, 892 F.2d 15 (2d Cir. 1989); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72, 6(a), 6(e).

**All Citations**

Not Reported in Fed. Supp., 2017 WL 2805160

## Footnotes

1   Despite his IFP status in this action, plaintiff may still be responsible for any costs he may incur, such as copying fees or witness fees.

2   Any unpublished decisions cited within this Report-Recommendation and Order have been provided to plaintiff pro se.

3   Plaintiff submits his complaint on a form for a civil rights complaint pursuant to 42 U.S.C. § 1983, but does not set forth any allegations of violations of his constitutional rights under color of state law pursuant to section 1983. See Compl. Instead, plaintiff attempts to set forth allegations pursuant to the Americans with Disabilities Act and Title VII. However, it appears plaintiff merely used this form out of convenience, and not in an attempt to set forth section 1983 claims.

4   The New York State Division of Human Rights was not named as a party to this action.

5   This Court's citation to the pages in the complaint are to the pagination generated by the Court's electronic filing system at the top of each page, rather than to the pagination of the original document.

6   Copies of any unpublished decisions cited within this Report-Recommendation and Order have been provided to plaintiff by the Court.

7   Although plaintiff must meet all prongs in order to have demonstrated a prima facie claim under Title II, the undersigned will continue to assess whether plaintiff has met the third prong of Title II in order to assess whether plaintiff should be afforded an opportunity to amend.

8   The Second Circuit has declined to hold that Title VII's definition of prohibiting discrimination "because of ... sex" includes sexual orientation. Zarda v. Altitude Express, —— F.3d ——, 2017 WL 1378932, at *2-3 (2d Cir. Apr. 18, 2017) (declining to overturn Simonton v. Runyon, 232 F.3d 33, 36 (2d Cir. 2000) to hold that Title VII sex discrimination includes prohibitions on sexual orientation discrimination); Anonymous v. Omnicom Group, Inc., —— F.3d ——, 2017 WL 1130183 (2d Cir. Mar. 27, 2017).

9   It is also noted that, even if Title VII applied, no private action may be brought against individuals in either their personal or official capacity under Title VII.

10   Plaintiff has not attempted to set forth any state-law sexual orientation discrimination claims. See, e.g., N.Y. Exec. Law § 296(1)(a). Although it is possible that plaintiff may be able to allege such claims, as plaintiff has set forth no viable sexual orientation discrimination claims, opportunity to amend to provide a chance to assert potential state law claims is not recommended.

11   The undersigned also observes that plaintiff failed to demonstrate the efforts he took to find an attorney on his own or attach correspondence supporting such attempts, despite signing his motion for appointment of

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 127 of 449

Moran v. Deamelia, Not Reported in Fed. Supp. (2017)

counsel stating that he had completed such actions and declar[ing] under penalty of perjury that the foregoing is true and correct." Dkt. No. 3.

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 2804941
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Thomas J. MORAN, Plaintiff,

v.

Victor P. DEAMELIA, Amanda Colomb,
and Nicole Comstock, Defendants.

1:17-CV-422
|
Signed 06/28/2017

**Attorneys and Law Firms**

Thomas J. Moran, Watervliet, NY, pro se.

**DECISION & ORDER**

Thomas J. McAvoy, Senior U.S. District Judge

**\*1** This *pro se* civil action, brought pursuant to the Americans with Disabilities Act ("ADA") and Title VII of the Civil Rights Act of 1964 ("Title VII"), was referred to the Hon. Christian F. Hummel, United States Magistrate Judge, for a Report-Recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c).

The Report-Recommendation, dated April 20, 2017, provided the Complaint–filed *in forma pauperis*–with a preliminary screening. After engaging in that screening, Magistrate Judge Hummel recommended that Plaintiff's complaint be dismissed in its entirety. The Magistrate Judge recommended that some claims be dismissed with prejudice and some without prejudice. He also recommended that Plaintiff's motion for appointment of counsel be denied without prejudice.

Plaintiff has filed objections to the Report-Recommendation. When objections to a magistrate judge's Report-Recommendation are lodged, the Court makes a "*de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." See 28 U.S.C. § 636(b)(1). After such a review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions." Id.

Having reviewed the record *de novo* and having considered the issues raised in the Plaintiff's objections, the Court has determined to accept and adopt the recommendation of Magistrate Judge Hummel for the reasons stated in the Report-Recommendation.

Therefore, the Plaintiff's objections to the Report-Recommendation of Magistrate Judge Hummel, Dkt. # 6, are hereby **OVERRULED**. The Report-Recommendation, Dkt. # 5, is hereby **ADOPTED**; and

1. Plaintiff's Title VII claims are hereby **DISMISSED** with prejudice;

2. Plaintiff's ADA claims are hereby **DISMISSED** against Defendants Victor P. DeAmelia, Amanda Colomb, and Nicole Comstock, with prejudice;

3. Plaintiff's ADA claims are hereby **DISMISSED** without prejudice to Plaintiff bringing ADA claims against a proper defendant in the future;

4. Plaintiff's demand for punitive damages under the ADA is hereby **DISMISSED** with prejudice;

5. Plaintiff's demand for compensatory and injunctive relief under the ADA is hereby **DISMISSED** without prejudice; and

6. Plaintiff's motion for appointment of counsel, dkt. # 3, is hereby **DENIED** without prejudice.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2017 WL 2804941

---

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 129 of 449

Costabile v. New York District Council of Carpenters, Not Reported in Fed. Supp. (2018)

2018 A.D. Cases 325,134

2018 WL 4300527
United States District Court, S.D. New York.

Rocco COSTABILE, Plaintiff,
v.
NEW YORK DISTRICT COUNCIL OF
CARPENTERS, William Lacey, Defendants.

17 Civ. 8488
|
Signed 09/06/2018
|
Filed 09/10/2018

**Attorneys and Law Firms**

ROCCO COSTABILE, 739 Midland Avenue, Yonkers, NY
10704, Pro Se.

Attorneys for Defendants: LYDIA A. SIGELAKIS, Spivak
Lipton LLP, 1700 Broadway, Suite 2100, New York, NY
10019, (212) 765-2100.

OPINION

ROBERT W. SWEET, U.S.D.J.

**\*1** Defendants, New York City ("The City") and Vicinity
District Council of Carpenters (the "District Council" or
the "Union"), sued herein as "New York District Council
of Carpenters") and William Lacey ("Lacey") (collectively,
the "Defendants") have moved pursuant to Rules 12(b)(1),
(5), and (6) of the Federal Rules of Civil Procedure to
dismiss the Complaint of the *pro se* plaintiff Rocco Costabile
("Costabile" or the "Plaintiff") with prejudice for insufficient
service of process and failure to state a claim. Based upon the
following conclusions, the motions are granted.

**Prior Proceedings**

On January 29, 2018, Defendants were served with the
Complaint, but no summons. See Affidavit of Leslie Chappel,
February 16, 2018 ¶¶ 4-6. Plaintiff represented to the Court
that he served Defendants with the summons. See ECF No. 4.

The factual allegations in the Complaint are taken as true. See
Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d
868 (2009). The following facts, which are taken from the

*pro se* Complaint form and documents attached thereto, are
construed in the light most favorable to Plaintiff.

Plaintiff identifies himself as a "white-Italian Male" who has
a "qualifying disability." Compl. at 8. In July 2001, Plaintiff
resigned his position as a carpenter with the New York City
Housing Authority and took a job as a carpenter at the New
York City Health & Hospitals Corporations ("NYCHHC").
See Compl. at 3, 6, 8. The District Council was Plaintiff's
union, and Lacey is its Director for Civil Service Carpenters.
See Compl. at 6, 8. Plaintiff's employment with NYCHHC
was terminated on September 10, 2015. Compl. at 6, 8. After
his termination, "Lacey never once looked into [Plaintiff's]
situation to assist [Plaintiff]." Compl. at 6. Moreover, "several
times [Plaintiff] needed representation from [Defendants],"
but representation "never materialized." Compl. at 6.

Plaintiff was suspended from work by NYCHHC from May
1, 2007 to December 19, 2008. The Union filed a grievance
which resulted in a proposed $60,000 back pay settlement
payment to Plaintiff because Plaintiff should only have been
suspended for 30 days. See Compl. at 6. Plaintiff did not
sign the settlement agreement, however, and therefore did not
receive the payment. Id. Plaintiff was put back on payroll
in December 2008, but was assigned to a hospital that "was
not [his] pick." Compl. at 11. This assignment resulted in
Plaintiff having "to walk very far after parking [his] car [and]
this ... aggravated [his] disability." Id. The "District Council
did nothing to represent [Plaintiff]." Id.

Apparently, in the same incident that resulted in the
2007-2008 suspension, the Union "backed the wrong
member–Malick Byrne," who, at some unspecified time, was
asked to resign from NYCHHC. Compl. at 6.

Plaintiff "recently found out when [he] applied for his
pension, that [his] employment with NYCHHC was not a
civil service job. Had [he] ben aware that it was not a civil
service job [he] would have stayed with [his] former agency
at NYC Housing Authority." Id. Plaintiff "lost 5 years of work
and hundreds of thousands of dollars in salary, pension and
benefits for injuries sustained while employed at NYCHHC."
Id.

**\*2** "In October 2012, [Plaintiff] mailed 2 quarterly dues
checks to the union to keep [him] in good standing ... with the
union since [he] joined in 1974 by paying [his] dues." Compl.
at 11.

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 130 of 449

Costable v. New York District Council of Carpenters, Not Reported in Fed. Supp. (2018)

2018 A.D. Cases 325,134

The instant motion was unopposed and marked fully submitted on April 4, 2018. ECF No. 12.

**Applicable Standard**

On a Rule 12(b) (6) motion to dismiss, all factual allegations in the complaint are accepted as true, and all inferences are drawn in favor of the pleader. Mills v. Polar Molecular Corp., 12 F.3d 1170, 1174 (2d Cir. 1993). However, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (quotation marks omitted). A complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " Ashcroft v. Iqbal, 556 U.S. 662, 663, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting Twombly, 550 U.S. at 570, 127 S.Ct. 1955).

A claim is facially plausible when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 663, 129 S.Ct. 1937 (quoting Twombly, 550 U.S. at 556, 127 S.Ct. 1955). In other words, the factual allegations must "possess enough heft to show that the pleader is entitled to relief." Twombly, 550 U.S. at 557, 127 S.Ct. 1955 (internal quotation marks omitted).

Additionally, while "a plaintiff may plead facts alleged upon information and belief 'where the belief is based on factual information that makes the inference of culpability plausible,' such allegations must be 'accompanied by a statement of the facts upon which the belief is founded.' " Munoz-Nagel v. Guess, Inc., No. 12-1312, 2013 WL 1809772, *3 (S.D.N.Y. Apr. 30, 2013) (quoting Arista Records, LLC v. Doe 3, 604 F.3d 110, 120 (2d Cir. 2010) ) and Prince v. Madison Square Garden, 427 F.Supp.2d 372, 384 (S.D.N.Y. 2006); see also Williams v. Calderoni, No. 11-3020, 2012 WL 691832, *7 (S.D.N.Y. Mar. 1, 2012). The pleadings, however, "must contain something more than ... a statement of facts that merely creates a suspicion [of] a legally cognizable right of action." Twombly, 550 U.S. at 555, 127 S.Ct. 1955 (quoting 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1216 (3d ed. 2004) ).

**The Complaint against the District Council and Lacey is Dismissed for Lack of Jurisdiction**

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks

statutory or constitutional power to adjudicate it." Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000).

On his form complaint Plaintiff sued the Union and Lacey for "alleged violations of state and federal employment discrimination laws." In substance, however, his claims are that the [Defendants] did not properly represent him...." See generally Sales v. Clark, 2015 WL 7736548, at *1, 2015 U.S. Dist. LEXIS 160344, at *1 (S.D.N.Y. Nov. 30, 2015). As Plaintiff alleges, his claims arose in his capacity as an employee of the New York City Health and Hospitals Corporation. See Compl. at 3, 6, 8. As such, his employment was governed by the New York City Collective Bargaining Law ("NYCCBL"). See NYCCBL § 12-303(9) ("The term 'public employer' shall mean ... the New York City Health and Hospitals Corporation[.]"), § 12-303(h)("The term 'public employees' shall mean municipal employees and employees of other public employers"), and § 12-304 (statute applies to public employers and their public employees), New York City Administrative Code, Title 12, Chapter 3.

**\*3** Plaintiff's allegations against the Union and Lacey deal solely with the alleged inadequate representation of Plaintiff. See Compl. at 5, 6, 8, 11. Such breach of duty of fair representation ("DFR") claims constitute alleged improper practices under the NYCCBL. NYCCBL § 12-306(b)(3). Dismissal is proper because "federal courts lack jurisdiction over DFR claims brought by public employees because those claims do not arise under federal law." See Clark, 2015 WL 7736548, 2017 LEXIS 31739.

Moreover, improper practice claims, such as those alleging a union breached its duty of fair representation, must be filed with the Office of Collective Bargaining "within four months of the occurrence of the acts alleged to constitute the improper practice or of the date the [employee] knew or should have known of said occurrence." NYCCBL § 12-306(e). Since the most recent of Plaintiff's allegations are several years old, Plaintiff's claims are plainly time-barred by the relevant four-month statute of limitations.

**The Motion to Dismiss the Federal, State and City Anti-Discrimination Law Claims are Dismissed**

"Motions to dismiss based on a statute of limitations defense may be properly brought under Rule 12(b)(6)" of the Federal Rules of Civil Procedure. NCUA Bd. v. Morgan Stanley & Co., 2074 U.S. Dist. LEXIS 1809, at *11, 2014 WL 241739 (S.D.N.Y. Jan. 22, 2014) (citing McKenna v. Wright, 386 F.3d

Case 3:24-cv-00037-DNH-ML    Document 9    Filed 06/11/24    Page 131 of 449

Costabile v. New York District Council of Carpenters, Not Reported in Fed. Supp. (2018)

2018 A.D. Cases 325,134

432,436 (2d Cir. 2004) and Ghartey v. St. John's Queen's Hosp., 869 F.2d 160, 162 (2d Cir. 1989) ).

**Plaintiff's Title VII Claims are Dismissed as Time Barred**

By checking off the relevant complaint form boxes, Plaintiff alleges violations of Title VII of the Civil Rights Act of 1964 based on race and national origin. (Compl. at 3.) For a claim to be timely under Title VII, Plaintiff would have to have filed his charge with the U.S. Equal Employment Opportunity Commission ("EEOC") "within three hundred days after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1). See also Brandon v. O'Mara, 2011 WL 4478492, at *4, 2077 U.S. Dist. LEXIS 112314, at * 10 (S.D.N.Y. Sept. 30, 2011) (and cases cited therein) ("For a Title VII claim arising in New York to be timely, a plaintiff must file the charge with the Equal Employment Opportunity Commission ('EEOC') within 300 days of the allegedly unlawful employment practice.") (quotation marks omitted).

It is appropriate to dismiss suits in which the charge was filed more than 300 days after the alleged discrimination. See, e.g., Mira v. Kingston, 218 F.Supp.3d 229,234-5,237 (S.D.N.Y. 2016) aff'd Mira v. Kingston, 2017 U.S. App. LEXIS 21475, 2017 WL 4877290 (2d Cir. N.Y. Oct. 30, 2017) (finding "Title VII's statute of limitations provision bars employment discrimination claims based on events that occurred more than 300 days prior to filing a charge of discrimination" and dismissing with prejudice *pro se* plaintiff's Title VII claims as barred by the applicable statute of limitations).

As the EEOC Charge of Discrimination attached to the Complaint indicates, Plaintiff's EEOC charge was stamped received by the EEOC on January 11, 2017. Compl. at 8. Based on Plaintiff's allegation that he filed his EEOC charge on December 31, 2016, Compl. Section V at 6, the last alleged unlawful act by Defendants must have occurred no earlier than March 10, 2016-300 days prior to December 31, 2016.

However, Plaintiff cites no acts or omissions on the part of the Defendants that occurred on or after March 10, 2016. The most recent allegation against Defendants concerns Plaintiff's September, 2015 termination by NYCHHC (see Compl. at 8) when the Union allegedly failed to assist him. (See Compl. at 6, 8.) The allegation that on or about October 2012 Plaintiff mailed two quarterly dues checks, which were returned by the Union (see Compl. at 11), is likewise time-barred. The allegation involving a suspension that ended in December 2008 and the Union's alleged handling of the related grievance

on behalf of Plaintiff is also time-barred. See Compl. at 5, 11. The Complaint is dismissed with prejudice as untimely.

**Plaintiff's ADA Claims are Dismissed as Time-Barred**

**\*4** The ADA adopts Title VII's procedures by reference. See 42 U.S.C. § 12117(a), 42 U.S.C. $ 2000e-5(e). "Since under the ADA, the procedures for filing claims are governed by the procedures provided in Title VII, see 42 U.S.C. § 12117(a), the same 300-day rule applies to ADA claims as well." Brandon v. O'Mara, 2011 WL 4478492, at *4, 2011 U.S. Dist. LEXIS 112314, at *10 (S.D.N.Y. Sept. 30, 2011) (and cases cited therein) (dismissing as untimely *pro se* plaintiff's ADA claims arising out of events that occurred more than 300 days before filing of the EEOC charge). For the same reasons that Plaintiff's Title VII claims are time-barred, Plaintiff's ADA claims, to the extent he alleges any, are likewise time-barred and therefore are dismissed with prejudice.

**Plaintiff's New York State Human Rights Law and the New York City Human Rights Law are Dismissed as Time-Barred**

A civil action commenced under the New York City Human Rights Law "must be commenced within three years after the alleged unlawful discriminatory practice or act of discriminatory harassment ... occurred." Admin. Code of the City of New York, § 8-502(d). Likewise, civil actions alleging violations of the New York State Human Rights Law must be brought within three years of the alleged discriminatory act. See, e.g., Lightfoot v. Union Carbide Corp., 110 F.3d 898, 907 (2d Cir. 1991) ("A claim under the NYSHRL must ... be filed within three years of the alleged discriminatory act."); Smith v. Johnson, 636 Fed. Appx. 34, 36 (2d Cir. 2016) (finding complaint by *pro se* plaintiff time barred because many of the alleged discriminatory acts occurred outside the three-year limitations period for the NYSHRL and the NYCHRL).

The Complaint was filed on November 2, 2017, therefore the last alleged unlawful act by Defendants must have occurred no earlier than November 2, 2014. The only alleged act that could possibly fall within this three-year window is Defendants' alleged response to Plaintiff's September 10, 2015 termination. All other allegations are time-barred.

**Plaintiff's Title VII Claims Against Lacey Are Dismissed**

Under federal law, a plaintiff cannot assert a Title VII claim against an individual defendant. See, e.g., Wrighten v. Glowski, 232 F.3d 119, 120 (2d Cir. 2000) (affirming

Costable v. New York District Council of Carpenters, Not Reported in Fed. Supp. (2018)

2018 A.D. Cases 325,134

district court's dismissal of Title VII claims against individual defendants because "individuals are not subject to liability under Title VII"); see also Mira v. Kingston, 218 F.Supp.3d 229, 235 (S.D.N.Y. 2016) aff'd Mira v. Kingston, 2017 U.S. App. LEXIS 21415, 2017 WL 4877290 (2d Cir. N.Y. Oct. 30, 2017) (finding "to the extent Plaintiff has tried to assert a Title VII claim against any of the individual defendants ..., she fails to state a claim under federal law, and those claims are dismissed with prejudice"). Therefore, Plaintiff's Title VII claims against Defendant Lacey, an employee of the Union (see Compl. at 6, 8), fail as a matter of law.

There is no individual liability under the ADA. See, e.g., Spiegel v. Schulmann, 604 F.3d 72, 79 (2d Cir. 2010) ("the remedial provisions of Title VII, including § 2000e-5, do not provide for individual liability. Accordingly, it follows that, in the context of employment discrimination, the retaliation provisions of the ADA, which explicitly borrows the remedies set forth in § 2000e-5, cannot provide for individual liability."); see also Washington v. Borough of Manhattan Cmty. College, 2016 WL 7410717, at *1, 2016 U.S. Dist. LEXIS 176593, at *4 (S.D.N.Y. Dec. 21, 2016) (finding dismissal of ADA and Title VII claims against college president proper because individual defendants cannot be held liable under these statutes). Therefore, just as Plaintiff's Title VII claims against Lacey must be dismissed, so must his ADA claims against Lacey be dismissed with prejudice.

### Plaintiff's Claim of Discriminatory Motivation is Dismissed

**\*5** Plaintiff fails to plead that he was discriminated against because of his race or national origin in violation of Title VII.

"The sine qua non of a ... discriminatory action claim under Title VII is that the discrimination must be because of the employee's protected characteristic." Humphries v. City Univ. of N.Y., 2013 U.S. Dist. LEXIS 169086, *19, 2013 WL 6196561 (S.D.N.Y. Nov. 26, 2013) (citation and internal quotation marks omitted). "[A] claim for discrimination under Title VII is properly dismissed where the plaintiff fails to plead any facts that would create an inference that any adverse action taken by any defendant was based upon the protected characteristic." Id. at *19-*20 (citation and internal quotation marks omitted). See also O'Toole v. Cty. of Orange, 255 F.Supp.3d 433, 438 (S.D.N.Y. 2011) ("The law in this Circuit is clear that the 'sine qua non' of a Title VII discrimination claim is that the discrimination must be because of a protected characteristic].") (citation and internal quotation marks omitted).

Plaintiff has failed to adequately allege that Defendants discriminated against him because of his race or national origin. See Offor v. Mercy Med. Ctr., 676 Fed. Appx. 51, 53 (2d Cir. 2017) ("For a [Title VII race and national original claim to survive a motion to dismiss, [Plaintiff] must plausibly allege that [his] race or national origin was a motivating factor in the employment decision.") (Granting Defendants' motion to dismiss because "bare allegations that [Plaintiff's] mistreatment was due to race are not enough to survive dismissal").

Plaintiff's lone reference to his race and national origin appear in his EEOC Charge where he claims that he is "a White-Italian Male" (Compl. at 8.) Plaintiff alleges no facts whatsoever that suggest the "lack of representation" by the Union took place under circumstances giving rise to an inference of discrimination based on his race, national origin, or any other alleged protected category. Nor does Plaintiff allege that Defendants were aware of his protected categories. The Complaint does not therefore give rise to an inference that Defendants discriminated against Plaintiff.

### Plaintiff's Disability Claim in Violation of the ADA is Dismissed

A plaintiff alleging discrimination under the ADA must allege facts that his employer is subject to the ADA, that he was disabled within the meaning of the ADA, that he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation, and that he suffered adverse employment action because of his disability. See, e.g., Brandon v. O'Mara, 2011 U.S. Dist. LEXIS 112314, at *12-*13, 2011 WL 4478492 (S.D.N.Y. Sept. 30, 2011). A plaintiff must also adequately plead that the adverse action was taken because of a qualifying disability. See, e.g., Smith v. Hogan, 794 F.3d 249 253 (2d Cir. 2015) ("[A] plaintiff must adequately plead that he was terminated because of a qualifying disability").

Although Plaintiff makes the conclusory statement, "I have a qualifying disability, and my employer is aware of my disability" (Compl. at 8), nowhere does he allege that Defendants were aware of his disability or that Defendants' alleged failure to represent him was due to his disability. Therefore, because Plaintiff fails to plead even a barebones claim of disability discrimination, that claim is dismissed with prejudice.

2018 A.D. Cases 325,134

**Plaintiff's NYSHRL Discrimination Claims are Dismissed**

**\*6**  "Claims brought under the NYSHRL are analyzed identically and the outcome of an employment discrimination claim made pursuant to the NYSHRL is the same as it is under ...Title VII." Motta v. Global Contract Servs., 2016 WL 2642229, at \*2, 2016 U.S. Dist. LEXIS 59771, at \*7 (S.D.N.Y. May 4, 2016) (citation and internal quotation marks omitted); see also Henry v. NYC Health & Hosp. Corp., 18 F.Supp.3d 396,404 (S.D.N.Y. 2014) (stating that "substantive standards for liability under [Title VII and the NYSHRL] are coextensive" and granting motion to dismiss discrimination and retaliation claims under both statutes); Humphries v. City Univ. of N.Y., 2013 U.S. Dist. LEXIS 169086, at\*37, 2013 WL 6196561 (S.D.N.Y. Nov. 26, 2013) ("Claims brought under New York State's Human Rights Law are analytically identical to claims brought under Title VII.") (citing Rojas v. Roman Catholic Diocese of Rochester, 660 F.3d 98, 107 (2d Cir. 2011) ) (internal quotation marks omitted). Thus, because Plaintiff fails to state any discrimination claims under Title VII, his NYSHRL discrimination claims fail as well.

" 'New York State disability discrimination claims are governed by the same legal standards as federal ADA claims.' " Giambattista v. Am. Airlines, Inc., 584 Fed. Appx. 23, 26 (2d Cir. 2014) citing Rodal v. Anesthesia Grp. of Onondaga, P.C., 369 F.3d 113, 117 n.1 (2d Cir. 2004). Because the "[C]omplaint pleads no facts that would allow a court to draw a reasonable inference that [Plaintiff] was subjected to any mistreatment or adverse action because [ ]he was [disabled] ... [ ]he has not alleged any discrimination or harassment that would plausibly entitle [him] to relief." Id. Therefore, Plaintiff's NYSHRL disability discrimination claims fail.

**Plaintiff's NYCHRL Discrimination Claims Are Dismissed**

Discrimination claims under the NYCHRL are subject to a "more liberal judicial construction than those brought under federal or state law." Humphries v. City Univ. of N.Y., 2013 U.S. Dist. LEXIS 169086, at\*37, 2013 WL 6196561 (S.D.N.Y. Nov. 26, 2013). Notwithstanding this more liberal standard, to survive a motion to dismiss a plaintiff must plead facts that could give rise to an inference of discrimination based on a protected category. Id. Plaintiff fails to plead any such facts, and his claims under the NYCHRL are therefore dismissed.

**Plaintiff's Claims of Retaliation are Dismissed**

To survive a motion to dismiss a Title VII retaliation claim, Plaintiff must plead that (1) he participated in a protected activity, (2) Defendants knew of his participation, (3) he was subject to an adverse employment action, and (4) there was a causal connection between participation in the protected activity and the adverse employment action. See e.g., Moy v. Perez, 712 Fed.Appx. 38, 40 (2d Cir. 2017), Littlejohn v. City of New York, 795 F.3d 297 at \*315-16 (2d Cir. Nov. 5, 2014), Patane v. Clark, 508 F.3d 106, 115 (2d Cir. 2007).

"Protected activity" refers to either opposing a practice made unlawful by Title VII or making a charge, testifying, assisting, or participating in any manner in an EEOC investigation, proceeding, or hearing.  See Littlejohn, 795 F.3d at 316. Where, as here, a plaintiff merely complains of unfair treatment, there is no basis for finding unlawful retaliation. Lawtone-Bowles v. City of New York Dep't of Sanitation, 22 F.Supp.3d 341, 351 (S.D.N.Y. 2014).

Plaintiff fails to plead any element of a claim for retaliation. The only reference to retaliation is the check mark in the "Retaliation" box on page 5 of the form Complaint and on the EEOC charge form. Compl. at 5, 8. In his narrative, Plaintiff alleges no facts to suggest that he participated in protected activity of any kind or that Defendants were aware of any protected activity by Plaintiff.

**\*7**  Courts apply the same standard for NYSHRL retaliation claims as for Title VII retaliation claims. See Henry v. NYC Health & Hosp. Corp., 18 F.Supp.3d 396, 410 (S.D.N.Y. 2014). Plaintiff must plead (1) participation in a protected activity known to the defendant, (2) an employment action disadvantaging the plaintiff, and (3) a causal connection between the protected activity and the adverse employment action. Id. Plaintiff pleads no protected activity, let alone a protected activity known to the Defendants. Moreover, Plaintiff pleads no facts that suggest Defendants' alleged improper representation has a causal connection to any alleged protected activity. Plaintiff's retaliation claim under the NYSHRL fails for these reasons and for the same reasons his Title VII retaliation claim fails.

"Under the NYCHRL, a plaintiff need not show that any employment action was taken against h[im], but must instead show that, as result of h[is] engaging in a protected activity, some action was taken that would be reasonably likely to deter h[im] from engaging in the activity again." Gaughan v. Rubenstein, 261 F.Supp.3d 390, 406 (S.D.N.Y. 2017).

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 134 of 449

**Costabile v. New York District Council of Carpenters, Not Reported in Fed. Supp. (2018)**

2018 A.D. Cases 325,134

Plaintiff's failure to plead that he engaged in any protected activity dooms his NYCHRL retaliation claim even under the most liberal of readings.

## The Damages Sought by Plaintiff are Inappropriate

On his form Complaint, the specific relief Plaintiff indicates he wants is for the Court to: "direct the defendant[s] to re-employ [him]" and "direct the defendant[s] to reasonably accommodate [his] disability." Compl. at 7. However, these are remedies that can only be provided by Plaintiff's employer. Defendants are not, nor were they ever, Plaintiff's employer. Nor does Plaintiff allege any employee-employer relationship with either Defendant. The relief he requests is not tenable.

## Conclusion

Based on the conclusions set forth above, the Complaint is dismissed with prejudice.

It is so ordered.

## All Citations

Not Reported in Fed. Supp., 2018 WL 4300527, 2018 A.D. Cases 325,134

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

 © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 5625440
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Cecil Roy KING, Plaintiff,

v.

NEW YORK STATE, James Francis Mathews [sic],
William B. Rebolini, Howard Heckman, Defendants.

23-CV-3421(GRB)(ST)
|
Signed August 31, 2023

**Attorneys and Law Firms**

Cecil Roy King, Coram, NY, Pro Se.

Lori L. Pack, Office of the New York State Attorney General,
Hauppauge, NY, for Defendants New York State, James
Francis Mathews, William B. Rebolini.

**ORDER**

GARY R. BROWN, United States District Judge:

 **\*1** Before the Court is the fee paid *pro se* complaint of Cecil
Roy King ("Plaintiff") brought pursuant to 42 U.S.C. § 1983
against New York State ("NYS") and three NYS judges: Hon.
James Francis Matthews ("Judge Matthews"), Hon. William
B. Rebolini ("Judge Rebolini"), and Hon. Howard Heckman
("Judge Heckman" and collectively, "Defendants"). *See*
Docket Entry "DE" 1; Receipt No. 200001582. Upon initial
review of Plaintiff's complaint and Defendants' letter motion
requesting a pre-motion conference in anticipation of filing
amotion to dismiss the complaint (DE 5), the Court ordered
Plaintiff to show cause within thirty days why the claims set
forth in the complaint should not be dismissed for lack of
subject matter jurisdiction. (DE 7.) Plaintiff has responded
by filing a "Response to Order to Show Cause & Temporary
Restraining Order." [1] (DE 8.)

For the reasons that follow, the Court lacks subject matter
jurisdiction to adjudicate Plaintiff's claims. Accordingly, the
complaint is dismissed without prejudice pursuant to Federal
Rule of civil Procedure 12(h)(3). Given the dismissal of the
complaint, the request for a restraining order is denied.

**BACKGROUND**

**1. Summary of the Complaint**
Plaintiff's complaint is brought against NYS and three state
judges arising from an underlying state mortgage foreclosure
action and subsequent eviction proceedings. *See* DE 1. The
brief complaint is submitted on the Court's form for civil
rights actions brought pursuant to Section 1983 and has
an additional 169 pages of attachments. [2] *Id.* According to
the complaint, Defendants violated Plaintiff's civil rights by
depriving Plaintiff of property rights without due process of
law. *Id.* at ¶ II.B. In its entirety, Plaintiff's Statement of Claim
alleges:

> Mortgage was illegally assigned to
> PHH Mortgage. Original mortgage
> was Fleet Bank in 2003. Assigned
> to PHH on 12/16/10. Referee's deed
> executed 2/14/20. Referee's deed
> executed 2/14/20 and sold in a no
> due process foreclosure sale. James
> Mathew denied plaintiff's motion to
> have fair trial 11/2/22. Judge Heckman
> signed illegal foreclosure with equal
> protection of law. Promissory note was
> illegally assigned to PHH Mortgage
> on 12/16/10. Referee's deed was
> executed without due process denying
> the plaintiff equal protection of law
> and depriving plaintiff of life, liberty
> and property without due process
> or no recourse. Plaintiff's property
> was sold to Federal National Corp
> – not sure when they became the
> owner – defendant took Plaintiff to
> District Court on 9/28/22 as the owner/
> petitioner of the home. PHH Mortgage
> and Federal National Mortgage does
> not have standing. There is a title
> dispute as to who owns the property.

*Id.* at ¶ III. In the space on the form complaint that calls for
a description of any injuries sustained as a result, Plaintiff
wrote:

**\*2** The Plaintiff did not get a fair and impartial procedure/trial/hearing in Supreme Court or District Court. The defendants conspired and acted with deliberate indifference to the Constitution and federal laws when making decisions without investigating the facts. The defendants were provided notice that there is a title dispute. Plaintiff suffered wrongful eviction, slander, libel and intentional infliction of emotional distress.

Id. at ¶ IV. For relief

plaintiff requests 20 million dollar payment on this claim to be divided among the defendants. The plaintiff requests the state and district court judges licenses to practice law revoked. The judges assets to be liquidated to pay the judgement in full. The plaintiff demands complete control of the state's corporate charter and to have all records of illegal assignments, deed and all records to the plaintiff.

Id. ¶ V.

## 2. Plaintiff's Response to the Order to Show Cause

By Order to Show Cause dated June 16, 2023, the Court ordered Plaintiff to show cause why the claims in the complaint should not be dismissed without prejudice for lack of subject matter jurisdiction. DE 7. The Court explained that Eleventh Amendment immunity, absolute judicial immunity, and the *Rooker-Feldman* doctrine appeared to divest the Court of subject matter jurisdiction and set forth the legal and factual bases for that circumstance. *Id.* at 5-9. The Court invited Plaintiff to demonstrate why these doctrines do not bar adjudication of Plaintiff's claims in this Court and suggested that Plaintiff consult with the Hofstra Law *Pro Se* Clinic. *Id.* at 9.

Plaintiff's twenty-two page response does not address any of the issues raised by the Court and, instead, re-alleges the claims set forth in the complaint and argues the merits thereof. *See* DE 8, *in toto.* The only mention of "immunity" is at page 14 of Plaintiff's submission where in a single paragraph asserts that:

The judge has qualified immunity when he/she follows the constitution and the law. The Tucker Act exposes the government to liability for certain claims. Specifically, the Act extended the court's jurisdiction to include claims for liquidated or unliquidated damages arising from the Constitution (including takings claims under the Fifth Amendment), a federal statute or regulation, and claims in cases not arising in tort. The relevant text of the Act is codified in 28 U.S.C. §§ 1346(a) and 1491. The Tucker Act (March 3, 1887, Ch. 359, 24 Stat. 505, 28 U.S.C. § 1491) is a federal statute of the United States by which the United States government has waived its sovereign immunity with respect to lawsuits pertaining to 5th Amendment violations of due process.

*Id.* at 14.

## LEGAL STANDARDS

Regardless of whether a plaintiff has paid the Court's filing fee, a district court may *sua sponte*, that is, on its own, dismiss a frivolous *pro se* complaint. *Fitzgerald v. First E. Seventh St. Tenants Corp.*, 221 F.3d 362, 364 (2d Cir. 2000) (*per curiam*) ("[D]istrict courts may dismiss a frivolous complaint *sua sponte* even when the plaintiff has paid the required filing fee" because "as courts of first instance, district courts are especially likely to be exposed to frivolous actions, and thus have an even greater need for inherent authority to dismiss such actions quickly in order to preserve scarce judicial resources."); *Clark v. Schroeder*, 847 F. App'x 92, 93 (2d Cir. 2021) (summary order) ("District courts have the inherent power to dismiss a complaint as frivolous, even when, as here, the plaintiff has paid the filing fee."); *Hawkins-El III v. AIG Fed. Sav. Bank*, 334 F. App'x 394, 395 (2d Cir. 2009) (affirming the district court's *sua sponte* dismissal of fee paid frivolous complaint).

**\*3** A claim is "frivolous when either: (1) the factual contentions are clearly baseless, such as when allegations are the product of delusion or fantasy; or (2) the claim is based on an indisputably meritless legal theory." *Livingston v.*

*Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998). In addition, a complaint is frivolous where it seeks relief from defendants who are immune from suit. *Montero v. Travis*, 171 F.3d 757, 760 (2d Cir. 1999) ("A complaint will be dismissed as frivolous when it is clear that the defendants are immune from suit.") (internal quotation marks omitted).

*Pro se* complaints are to be examined with "special solicitude," *Tracy v. Freshwater*, 620 F.3d 90, 102 (2d Cir. 2010), and are to be "interpreted to raise the strongest arguments they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). However, "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," and district courts "cannot invent factual allegations" that the plaintiff has not pleaded. *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010). A complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations and citation omitted). "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level...." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotations, brackets, and citation omitted).

Notwithstanding the liberal pleading standard afforded *pro se* litigants, federal courts are courts of limited jurisdiction and may not preside over cases if subject matter jurisdiction is lacking. *Lyndonville Sav. Bank & Trust Co. v. Lussier*, 211 F.3d 697, 70-01 (2d Cir. 2000). Lack of subject matter jurisdiction cannot be waived and may be raised at any time or by the court *sua sponte. Id.; see also* FED. R. CIV. P. 12(h)(3)("Whenever it appears ... that the court lacks jurisdiction of the subject matter, the court shall dismiss the action."); *Lance v. Coffman*, 549 U.S. 437, 439 (2007) ("Federal courts must determine that they have jurisdiction before proceeding to the merits."). Although *pro se* complaints are held to less stringent standards than pleadings drafted by attorneys, *Erickson v. Pardus*, 551 U.S. 89 (2007), a *pro se* plaintiff is not exempt from "compliance with relevant rules of procedural and substantive law", *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983), and still must establish that the Court has subject matter jurisdiction over the action. *Ally v. Sukkar*, 128 F. App'x 194, 195 (2d Cir. 2005).

Even where subject matter is established, the Court may be divested of subject matter jurisdiction in certain circumstances, such as where the defendant is immune from suit. *See*, e.g., *Mireles v. Waco*, 502 U.S. 9, 11-12 (1991) (federal courts lack subject matter jurisdiction over claims against judges relating to the exercise of their judicial functions on immunity grounds); *Gollomp v. Spitzer*, 568 F.3d 355, 366 (2d Cir. 2009) ("[A]s a general rule, state governments may not be sued in federal court unless they have waived their Eleventh Amendment immunity, or unless Congress has abrogated the states' Eleventh Amendment immunity[.]").

## DISCUSSION

### I. Eleventh Amendment Immunity

**\*4** The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. Amend. XI. The Supreme Court has long held that the Eleventh Amendment bars suits against a state by one of its own citizens in federal court. *See*, e.g., *Bd. of Trs. of Univ. of Alabama v. Garrett*, 531 U.S. 356, 363 (2001). Eleventh Amendment immunity extends to state officials acting in their official capacities, including state court judges. *Thomas v. Martin-Gibbons*, No. 20-3124, 2021 WL 2065892 (2d Cir. May 24, 2021) (summary order) (affirming dismissal of *pro se* Section 1983 claims against the State of New York and a state court judge in his official capacity based on Eleventh Amendment immunity).

However, sovereign immunity "is not absolute," and the Supreme Court "ha[s] recognized ... two circumstances in which an individual may sue a State." *Coll. Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 670 (1999). First, "a State may waive its sovereign immunity by consenting to suit." *Id.* Second, "Congress may authorize such a suit in the exercise of its power to enforce the Fourteenth Amendment." *Id.; see also Kimel v. Florida Bd. Of Regents*, 528 U.S. 62, 80 (2000). Neither of these exceptions applies in this case. It is well-established that New York State has not waived its sovereign immunity from Section 1983 claims. *Mamot v. Bd. of Regents*, 367 F. App'x 191, 192 (2d Cir. 2010) (summary order). Moreover, Congress did not abrogate that immunity when it enacted Section 1983. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 66 (1989) ("Congress, in passing § 1983, had no intention to disturb the States' Eleventh Amendment immunity[.]"); *Clark v.*

*Schroeder*, 847 F. App'x 92, 93-94 (2d Cir. 2021) ("Absent the State's express waiver or a congressional abrogation of immunity, the Eleventh Amendment renders a state immune from federal lawsuits brought either by its own citizens or by citizens of another state.").

Thus, the Eleventh Amendment precludes Plaintiff's claims against NYS and the individuals Defendants sued in their official capacities. *See, e.g.*, *Parker v. New York*, No. 22-CV-3170(GRB)(AYS), 2022 WL 2441215, at *3 (E.D.N.Y. July 1, 2022) (finding New York state has not waived its Eleventh Amendment immunity and dismissing *pro se* plaintiff's Section 1983 claims against New York State). Plaintiff does not argue otherwise having been given an opportunity to do so. *See* DE 8. Accordingly, the Court lacks subject matter jurisdiction to adjudicate Plaintiff's Section 1983 claims brought against NYS and the individual Defendants in their official capacities. Thus, such claims are dismissed without prejudice pursuant to Federal Rule of Civil Procedure 12(h)(3). [3]

### II. Judicial Immunity

Judges have absolute immunity from suit for judicial acts performed in their judicial capacities. *Mireles*, 502 U.S. at 11 ("[J]udicial immunity is an immunity from suit, not just from the ultimate assessment of damages."). Indeed, "judicial acts -- even if they are alleged to have been done maliciously or corruptly -- are not subject to civil liability." *Davis v. Gillespie*, No. 22-CV-6207, 2023 WL 5002553, at *5 (E.D.N.Y. Aug. 4, 2023) (citing *Stump v. Sparkman*, 435 U.S. 349, 355-56 (1978) (finding state court judge absolutely immune from § 1983 suit where that judge had power to entertain and act upon motions in an underlying case)). "The Supreme Court has generally concluded that acts arising out of, or related to, individual cases before the judge are considered judicial in nature." *See* *Brady v. Ostrager*, 834 F. App'x 616, 618 (2d Cir. 2020) (quoting *Bliven v. Hunt*, 579 F.3d 204, 210 (2d Cir. 2009)). Absolute judicial immunity "is not overcome by allegations of bad faith or malice," and a judge cannot "be deprived of immunity because the action he took was in error ... or was in excess of his authority." *Mireles*, 502 U.S. at 11 (internal quotation marks omitted); *Bliven*, 579 F.3d at 209.

**\*5** Here, the challenged conduct of the individual Defendants occurred during the course of the underlying state court proceedings and any actions they took in those cases were judicial acts for which they are afforded absolute judicial immunity. Accordingly, Plaintiff's claims against the individual Defendants are dismissed without prejudice for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(h)(3). [4]

### III. State Law Claims

Under 28 U.S.C. § 1367(a), "the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." However, courts "may decline to exercise supplemental jurisdiction over a claim" if "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). The Supreme Court explained that "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine -- judicial economy, convenience, fairness, and comity -- will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988).

Here, given the absence of a plausible federal claim, the interests of judicial economy, convenience, fairness, and comity weigh in favor of not exercising supplemental jurisdiction at this time over any state law claims that may be reasonably construed from the complaint. Accordingly, the Court declines to exercise supplemental jurisdiction over any potential state-law claims contained in Plaintiff's complaint and dismisses any such claims without prejudice.

### IV. Leave to Amend

A *pro se* plaintiff should ordinarily be given the opportunity "to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Shomo v. City of New York*, 579 F.3d 176, 183 (2d Cir. 2009) (internal quotation marks and citation omitted). However, leave to amend is not required where it would be futile. *See* *Hill v. Curcione*, 657 F.3d 116, 123-24 (2d Cir. 2011); *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988). Given that Plaintiff's claims could not be cured with amendment, leave to amend would be futile and is, thus, denied.

### CONCLUSION

Based on the foregoing, Plaintiff's complaint is dismissed without prejudice for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(h)(3). Given the dismissal of the complaint, Plaintiff's request for injunctive relief is denied and Defendants' request for a pre-motion conference is denied as moot. The Clerk of the Court shall enter judgment accordingly and mark this case closed. The Clerk of the Court shall also mail a copy of this Order to the *pro se* Plaintiff at the address of record and note service on the docket.

The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this Order would not be taken in good faith and therefore *in forma pauperis* status is denied for the purpose of any appeal. *See Coppedge v. United States*, 369 U.S. 438, 444-45 (1962).

**\*6 SO ORDERED**.

**All Citations**

Slip Copy, 2023 WL 5625440

## Footnotes

1      Plaintiff also seeks an order "restrain[ing] the [D]efendants from any further state court action until the federal court dispute is adjudicated. Plaintiff also requests the court to vacate any state court judgments or orders in the interest of justice," (DE 8 at 21.)

2      The exhibits are largely excerpts from law treatises, copies of cases, and state and federal statutory laws, well as several reports prepared on Plaintiff's behalf concerning the mortgage at issue in the underlying state case. *See* DE 1-1.

3      Plaintiff's Section 1983 claims against NYS are frivolous for the additional reason that New York State is not a "person" within the meaning of Section 1983. *Will v. Mich. Dep't of State Police*, 491 U.S. 58 (1989) (State is not a "person" for the purpose of § 1983 claims); *Zuckerman v. Appellate Div., Second Dep't Supreme Court*, 421 F.2d 625, 626 (2d Cir. 1970) (Court not a "person" within the meaning of 42 U.S.C. § 1983).

4      Given that the Eleventh Amendment and judicial immunity divest this Court of subject matter jurisdiction, the Court need not address the application of the *Rooker-Feldman* doctrine and declines to do so.

---

**End of Document**                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2003 WL 24243989
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Salvatore OGNIBENE, Plaintiff,

v.

NIAGARA COUNTY SHERIFF'S DEPARTMENT,
Niagara County District Attorney's Office, Samuel
Novara, Esq., Town of Wheatfield Court, Niagara
County Court, Niagara County Supreme Court, New
York State Appellate Division, 4 TH Judicial Dept.,
and New York State Court of Appeals, Defendants.

No. 03–CV–0678E(SR).
|
Dec. 1, 2003.

**Attorneys and Law Firms**

Salvatore Ognibene, Niagara Falls, NY, pro se.

DECISION AND ORDER

ARCARA, J.

*INTRODUCTION*

**\*1** Plaintiff has filed this *pro se* action seeking relief under
42 U.S.C. § 1983 (Docket No. 1, 3) and has requested
permission to proceed *in forma pauperis* (Docket No.
2). Plaintiff claims that the defendants have violated his
constitutional rights in relation to an arrest that occurred on
July 10, 1997 for which plaintiff was given an Adjournment
in Contemplation of Dismissal ("ACD") [1] on November 17,
1997 in the Town of Wheatfield (New York) Town Court.
(Complaint, ¶ 5). Apparently, plaintiff later filed some type
of motion or appeal in the Town Court of Wheatfield seeking
to dismiss the ACD. (Docket No. 3, Table of Contents). [2]
This motion was denied and appeals ensued through the state
court system all the way to the New York Court of Appeals,
which denied plaintiff leave to appeal on or about September
17, 2003. (Complaint, ¶¶ 5–10; Table of Contents, ¶¶ 2–6).
For the reasons discussed below, plaintiff's request to proceed
as a poor person is granted and the complaint is dismissed
pursuant to 28 U.S.C. § 1915(e)(2)(B).

*DISCUSSION*

Because plaintiff has met the statutory requirements of 28
U.S.C. § 1915(a), plaintiff is granted permission to proceed *in
forma pauperis*. Section 1915(e)(2)(B) of 28 U.S.C. provides
that the Court shall dismiss a case in which *in forma pauperis*
status has been granted if, at any time, the Court determines
that the action (i) is frivolous or malicious; (ii) fails to state
a claim upon which relief may be granted; or (iii) seeks
monetary relief against a defendant who is immune from such
relief.

In evaluating the complaint, the Court must accept as true all
factual allegations and must draw all inferences in plaintiff's
favor. *See King v. Simpson,* 189 F.3d 284, 287 (2d Cir.1999).
Dismissal is not appropriate "unless it appears beyond doubt
that the plaintiff can prove no set of facts in support of his
claim which would entitle him to relief." *Conley v. Gibson,*
355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). "This
rule applies with particular force where the plaintiff alleges
civil rights violations or where the complaint is submitted *pro
se*." *Chance v. Armstrong,* 143 F.3d 698, 701 (2d Cir.1998).

Based on its evaluation of the complaint, the Court finds that
plaintiff's claims must be dismissed pursuant to 28 U.S.C. §
1915(e)(2)(B)(ii) because they fail to state a claim upon which
relief may be granted.

*Plaintiff's Allegations*

Plaintiff alleges that his constitutional rights were violated
and therefore brings this action pursuant to 42 U.S.C. § 1983.
In order to state a claim under § 1983, plaintiff must allege
(1) that the challenged conduct was attributable at least in part
to a person acting under color of state law, and (2) that such
conduct deprived plaintiff of a right, privilege, or immunity
secured by the Constitution or laws of the United States.
*Dwares v. City of New York,* 985 F.2d 94, 98 (2d Cir.1993).

Plaintiff names as defendants: (1) the Niagara County
Sheriff's Department ("Sheriff's Department"), the law
enforcement agency that responded to his daughter's "911"
telephone call, which occurred while plaintiff was admittedly
striking her in his home on July 10, 1997, and took plaintiff
into custody (Complaint, Statement of Claim, ¶¶ 1–3); (2)
the Niagara County District Attorney's Office ("DA's Office")

that, assumably, prosecuted plaintiff following this arrest; (*id.,* ¶¶ 4–5); (3) Samuel J. Novara, plaintiff's defense counsel in the proceedings in Town Court (*id.,* ¶ 6); (4) the Town of Wheatfield Town Court ("Wheatfield Town Court"), "Presiding" Town Justice Robert Cliffe, where plaintiff was prosecuted and obtained an ACD on November 17, 1997 (*id.,* ¶ 5); (5) the Niagara County Court ("County Court"), "Presiding" Judge, Hon. Peter Broderick, the court to which plaintiff appealed on or about April 14, 2000 (Complaint; Table of Contents, ¶ 3); (6) the New York Supreme Court, Niagara County ("State Supreme Court"), "Presiding" Justice, Hon. John Lane, the court to which plaintiff appealed on or about February 16, 2001 and which denied his request for relief on or about June 13, 2001 (Table of Contents, ¶ 3); (7) the New York State Supreme Court, Appellate Division, Fourth Department ("Appellate Division"), "Presiding" Justice Pine, and Justices Hayes, Hurlburt, Kehoe and Burns, the court to which plaintiff further appealed and which dismissed plaintiff's appeal on April 23, 2002 for failure to prosecute (Complaint, Statement of Claim, ¶ 8; Table of Contents, ¶ 6 A—B); and (8) the New York Court of Appeals ("Court of Appeals"), "Presiding" Justice, Hon. Judith Kaye, which denied plaintiff leave to appeal on or about September 17, 2003. (Complaint, ¶ 10; Table of Contents, ¶ 7).

**\*2**  The plaintiff's complaint, liberally construed, appears to allege a violation of plaintiff's civil rights based upon claims of false arrest and false imprisonment on July 10–11, 1997 arising out of his arrest (Complaint, Statement of Claim, ¶¶ 2–4), and the "faulty procedures" of the prosecutor and the courts. The complaint also alleges that the prosecutor and the courts named as defendants failed to insure that plaintiff obtained his *Miranda* warnings and his "right" to give a statement, and that they failed to insure that he obtained his various Sixth Amendment rights, such as the right to a speedy public trial, the right to an impartial jury, the right to notice of the charges against him, the right to confront witnesses, the right to compulsory process, and the right to counsel. (*Id.,* ¶¶ 4–10). The complaint also includes a claim of either a violation of § 1983 or legal malpractice or both against plaintiff's defense attorney. (*Id.,* ¶ 6).

*Claims against Sheriff's Department,
DA's Office and Wheatfield Town Court*

Plaintiff's claims against the Sheriff's Department, the DA's Office and the Wheatfield Town Court must be dismissed.

First, plaintiff's § 1983 claims against these three defendants accrued at the earliest on July 10, 1997 when he was arrested, and at the latest either on November 17, 1997, when the charges against him were resolved by means of an ACD (Complaint, Statement of Claim, ¶¶ 3–5; Table of Contents, ¶¶ 1–2), or on March 28, 2000, when a motion plaintiff made in the Town Court was denied. (Table of Contents, ¶ 2). The statute of limitations for an action filed under 42 U.S.C. § 1983 in a federal court sitting in New York is three years. *Owens v. Okure,* 488 U.S. 235, 251, 109 S.Ct. 573, 102 L.Ed.2d 594 (1989); *Jewell v. County of Nassau,* 917 F.2d 738, 740 (2d Cir.1990). Therefore, any and all claims against these defendants are time barred.

Second, the claims against the Sheriff's Department, the DA's Office, and the Wheatfield Town Court must also be dismissed because there is no allegation that any of the individual government officials, such as the Town Justice, deputies or assistant prosecutors, were acting pursuant to a policy or custom of the Town of Wheatfield or Niagara County. In the absence of such an allegation, the complaint fails to state a claim for relief and must be dismissed. *See Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Municipalities are not subject to § 1983 liability solely on the basis of a respondeat *superior* theory. *Collins v. City of Harker Heights,* 503 U.S. 115, 121, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992); *Monell,* 436 U.S. at 694.

Additionally, to the extent that the plaintiff may have intended to sue the Town Justice individually (Complaint, Defendant's Information), in addition to or instead of the Town Court, the Town Justice would be entitled to absolute judicial immunity. *See Stump v. Sparkman,* 435 U.S. 349, 356–57, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978) (internal quotations and citation omitted). The same would be true with respect to the District Attorney or any Assistant District Attorneys involved in the prosecution of plaintiff. Prosecutors are entitled to absolute immunity from suits brought under § 1983 "arising out of [their] prosecutorial duties that are 'intimately associated with the judicial phase of the criminal process." ' *Doe v. Phillips,* 81 F.3d 1204, 1209 (2d Cir.1996) (quoting *Imbler v. Pachtman,* 424 U.S. 409, 430, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976)), *cert. denied,* 520 U.S. 1115 (1997). Accordingly, the claims against the Sheriff's Department, the DA's Office, the Wheatfield Town Court and, to the extent he is a defendant herein, the Town Justice, Robert B. Cliffe, are dismissed.

*Claims against County Court, State Supreme Court, Appellate Division, and Court of Appeals*

**\*3** Plaintiff's complaint purports to allege that these courts somehow violated his numerous Sixth Amendment rights. In reality, however, what plaintiff is alleging is that these courts were in error when they denied or dismissed his various requests to overturn the ACD disposition of the charges arising from the July 10, 1997 incident. These claims too must be dismissed.

To the extent the plaintiff names various state courts as defendants and seeks either legal or equitable relief against them under § 1983, they are immune from such suit under the Eleventh Amendment. *Papasan v. Allain,* 478 U.S. 265, 276, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986); *Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 98–100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). As agencies or arms of the State of New York, the courts are immune from suit under the Eleventh Amendment. *See Kentucky v. Graham,* 473 U.S. 159, 166, 105 S.Ct. 3099, 87 L.Ed.2d 114; *see also Saint–Fleur v. City of New York,* 2000 WL 280328, \*2 (S.D.N.Y., Mar.14, 2000) (collecting cases); *Fields v. Walthers,* No. 94–CV–1659, 1997 WL 204308 at \*2 (N.D.N.Y. April 5, 1997) ("For Eleventh Amendment purposes, governmental entities of the state that are considered 'arms of the state' receive Eleventh Amendment immunity."). Accordingly, plaintiff's claims against the County Court, the State Supreme Court, the Appellate Division, and the Court of Appeals must be dismissed.

*Claims against Samuel Novara*

The complaint names Samuel Novara, plaintiff's defense counsel, as a defendant, and either alleges a § 1983 claim or a state common law legal malpractice claim, or both, against him. In any event, the claim or claims pled against this defendant must be dismissed. First, assuming that plaintiff intended to sue defense counsel under § 1983, such a claim must be dismissed because criminal defense counsel are not "state actors" for purposes of the "state action" requirement of § 1983. *Polk County v. Dodson,* 454 U.S. 312, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981). Second, assuming that plaintiff intended to sue his defense counsel for legal malpractice in relation to the handling and disposition of his criminal matter, this Court declines to exercise supplemental jurisdiction, 28 U.S.C. § 1367, over said claim because all the federal claims

have been dismissed at the initial stage of the litigation. *See Valencia ex rel. Franco v. Lee,* 316 F.3d 299, 305 (2d Cir.2003); 28 U.S.C. § 1367(c)(3); *see also Giordano v. City of New York,* 274 F.3d 740, 754 (2d Cir .2001) (noting that dismissal of pendent state law claims is appropriate where all federal claims have been dismissed and "it appears that the state issues substantially predominate") (internal quotation marks omitted). Accordingly, the complaint is dismissed without prejudice as against defendant Novara.

*CONCLUSION*

Plaintiff has met the statutory requirements of 28 U.S.C. § 1915(a). Accordingly, plaintiff's request to proceed *in forma pauperis* is granted and, for the reasons discussed above, the complaint is dismissed with prejudice, pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii), except with respect to the state common law legal malpractice claim against defendant Samuel Novara, which is dismissed without prejudice.

**\*4** The Court hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Order would not be taken in good faith, and leave to appeal to the Court of Appeals as a poor person is denied. *Coppedge v. United States,* 369 U.S. 438, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962). Further requests to proceed on appeal as a poor person should be directed, on motion, to the United States Court of Appeals for the Second Circuit, in accordance with Rule 24 of the Federal Rules of Appellate Procedure.

*ORDER*

IT HEREBY IS ORDERED, that plaintiff's request to proceed *in forma pauperis* is granted;

FURTHER, that the complaint is dismissed with prejudice, except with respect to the state common law legal malpractice claim against defendant Samuel Novara, which is dismissed without prejudice; and

FURTHER, that leave to appeal to the Court of Appeals as a poor person is denied.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2003 WL 24243989

## Footnotes

1    *See* N.Y.Crim. Proc. Law § 170.55. This disposition cannot be obtained without the consent of both parties and the court. *Id.*

2    Shortly after filing the complaint, plaintiff filed what he entitled a "Table of Contents" which outlines the dates of the various court filings and dispositions that are at issue in his complaint. This Court will treat this Table of Contents as a document attached to the complaint and incorporated by reference in the complaint. *Chance v. Armstrong,* 143 F.3d 698, 698 n. 1 (2d Cir.1998) ("the court may consider facts set forth in exhibits attached as part of the complaint as well as those in the formal complaint itself"); *see Cortec Industries, Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir.1991) ("the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference").

---

End of Document    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Bonilla v. Connerton, Not Reported in Fed. Supp. (2016)

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 144 of 449

2016 WL 2765287
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Daniel Ray BONILLA, Plaintiff,

v.

Rita CONNERTON, in her official capacity
as Family Court Judge, et al., Defendants.

Civil Action No. 3:15-CV-1276 (LEK/DEP)
|
Signed 04/14/2016

**Attorneys and Law Firms**

FOR PLAINTIFF: DANIEL RAY BONILLA, Pro se,
Broome County Correctional Facility, P.O. Box 2047,
Binghamton, NY 13902-2047.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, CHIEF U.S. MAGISTRATE JUDGE

 **\*1**  This is an action originally brought by *pro se* plaintiff
Daniel Ray Bonilla against the State of New York, pursuant
to 42 U.S.C. § 1983, complaining of civil rights violations.
Plaintiff's initial complaint, which did not contain significant
detail, appeared to relate to the terms of probation imposed
by Binghamton City Court Judge Daniel L. Seidon. Upon
initial review, plaintiff's complaint was dismissed based
upon the immunity afforded to the State under the Eleventh
Amendment, with leave to replead.

Plaintiff has now submitted a document that, in deference
to his *pro se* status, has been construed by the court as
an amended complaint. In it, he names seven defendants,
including two sitting judges, a district attorney, and a
private defense attorney, all of whom are sued in their
official capacities, as well as the Broome County Probation
Department, Binghamton City Court, and the Broome County
District Attorney's Office. Plaintiff's amended complaint has
been forwarded to me for initial review. Based upon my
consideration of plaintiff's amended complaint, I recommend
that it be dismissed.

I. *BACKGROUND*

Plaintiff commenced this action on October 27, 2015. Dkt.
No. 1. While the essence of plaintiff's original complaint was
difficult to discern, the focus of his claims appeared to be upon
actions taken by the Broome County Probation Department.
*See generally id.* Plaintiff alleged that he was directed to
appear at the probation office on November 3, 2015, as a
probationer, to complete "paperwork." *Id.* at 2. Plaintiff's
complaint further alleged the following with regard to actions
taken by the Broome County Probation Department:

> Through nefarious means I was duped
> into the probation office on 10/20/15.
> I can't remember exactly why I was
> there, I am disabled. I do *know*
> that on 10/20/15 I did *not* sign any
> probation contract with City Court
> Judge Daniel L. Seidon nor with
> Binghamton City Court on behalf
> of New York State, as the broome
> county Probation department does
> allege. I again am being subject to
> oppressive police power, this time
> through State Supervision by Broome
> County Probation department. I am
> an American with disabilities and
> demand my human rights. New York
> State is depriving me of my right to
> life, liberty, and to pursue happiness
> as a free man. This is in violation
> of my civil and constitutional rights
> guaranteed me by the 5th and 14th
> Amendments to the Constitution of
> these Great United States of America.

*Id.* at 3 (errors and emphasis in original). As relief, plaintiff's
initial complaint, which named the State of New York as the
only defendant, sought an injunction directing defendant "to
cease all unlawful activity" and an award of damages. *Id.* at 4.
Plaintiff's complaint was accompanied by a motion for leave
to proceed *in forma pauperis* ("IFP"). Dkt. No. 2.

On November 12, 2015, I issued a decision granting plaintiff's
IFP application but recommending that his complaint against
the State be dismissed, with leave to replead. Dkt. No. 4.
Senior District Judge Lawrence E. Kahn adopted that report
on February 9, 2016. Dkt. No. 9.

**\*2** In the interim between the issuance of my report and District Judge Kahn's decision, plaintiff filed a document that has been construed by the court as an amended complaint. Dkt. No. 8. In the amended complaint, plaintiff names, as defendants, (1) Rita Connerton in her official capacity as Family Court Judge; (2) John Jack Kotchak in his official capacity as defense attorney; (3) Broome County Probation Department; (4) Daniel L. Seidon in his official capacity as Binghamton City Court Judge; (5) Binghamton City Court; (6) Gerald Mollen in his official capacity as Broome County District Attorney; and (7) the Broome County District Attorney's Office. *Id.* at 2. The amended complaint materially reshapes his claims as compared to those purported to be asserted in the original complaint. Specifically, plaintiff alleges that defendant Connerton revoked plaintiff's parental and visitation rights regarding his son during a hearing that occurred on August 27, 2015. *Id.* at 3. He also accuses defendant Kotchak of failing to appeal a sentence that was imposed on him in defendant Binghamton City Court, but plaintiff's amended complaint fails to explain the circumstances surrounding that sentence. *Id.* Nevertheless, it appears that the sentence led to the filing of a petition on or about November 21, 2015, accusing plaintiff of violating the terms of his probation based upon the city court's sentence and the issuance of an arrest warrant by defendant Seidon. *Id.* Plaintiff alleges that, at the direction of defendant Mollen, he is currently held in custody of the Broome County Correctional Facility as result of the alleged probation violation. *Id.*

Plaintiff's complaint purports to assert three causes of action. The first two allege that plaintiff's due process rights under the Fifth and Fourteenth Amendments have been violated. Dkt. No. 8 at 4. The third cause of action recounts the fact of plaintiff's arrest for an alleged violation of probation and the fact that he is being prosecuted for that violation, but otherwise does not provide a basis for a cognizable claim. *Id.*

## II. *DISCUSSION*

### A. *Standard of Review*

Because plaintiff has previously been found to meet the financial criteria for commencing this case *in forma pauperis,* I must next consider the sufficiency of the claims set forth in his amended complaint in light of 28 U.S.C. §§ 1915(e), 1915A. Section 1915(e) directs that, when a plaintiff seeks to proceed IFP, "the court shall dismiss the case at any time if the court determines that ... the action ... (i) is frivolous or malicious; (ii) fails to state a claim on which relief may

be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2) (B). Similarly, 28 U.S.C. § 1915A(b) directs a court to review any "complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity," and to "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted; or ... seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915(b); *see also Abbas v. Dixon,* 480 F.3d 636, 639 (2d Cir.2007) ("We have found both sections [1915 and 1915A] applicable to prisoner proceedings *in forma pauperis*.").

In deciding whether a complaint states a colorable claim, a court must extend a certain measure of deference in favor of *pro se* litigants, *Nance v. Kelly,* 912 F.2d 605, 606 (2d Cir.1990) (per curiam), and extreme caution should be exercised in ordering *sua sponte* dismissal of a *pro se* complaint before the adverse party has been served and the parties have had an opportunity to address the sufficiency of plaintiff's allegations, *Anderson v. Coughlin,* 700 F.2d 37, 41 (2d Cir.1983). The court, however, also has an overarching obligation to determine that a claim is not legally frivolous before permitting a *pro se* plaintiff's complaint to proceed. *See, e.g., Fitzgerald v. First East Seventh St. Tenants Corp.,* 221 F.3d 362, 363 (2d Cir.2000) (holding that a district court may *sua sponte* dismiss a frivolous complaint, notwithstanding the fact that the plaintiff paid the statutory filing fee). "Legal frivolity ... occurs where 'the claim is based on an indisputably meritless legal theory [such as] when either the claim lacks an arguable basis in law, or a dispositive defense clearly exists on the face of the complaint.' " *Aguilar v. United States,* Nos. 99–MC–0304, 99–MC–0408, 1999 WL 1067841, at \*2 (D.Conn. Nov. 8, 1999) (quoting *Livingston v. Adirondack Beverage Co.,* 141 F.3d 434, 437 (2d Cir.1998)); *see also Neitzke v. Williams,* 490 U.S. 319, 325 (1989) ("[D]ismissal is proper only if the legal theory ... or factual contentions lack an arguable basis."); *Pino v. Ryan,* 49 F.3d 51, 53 (2d Cir.1995) ("[T]he decision that a complaint is based on an indisputably meritless legal theory, for the purposes of dismissal under section 1915(d), may be based upon a defense that appears on the face of the complaint.").

**\*3** When reviewing a complaint under section 1915(e), the court is guided by the Federal Rules of Civil Procedure. Specifically, Rule 8 provides that a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The purpose of Rule

Bonilla v. Connerton, Not Reported in Fed. Supp. (2016)

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 146 of 449

8 "is to give fair notice of the claim being asserted so as to permit the adverse party the opportunity to file a responsive answer, prepare an adequate defense and determine whether the doctrine of res judicata is applicable." *Powell v. Marine Midland Bank,* 162 F.R.D. 15, 16 (N.D.N.Y.1995) (McAvoy, J.) (quotation marks and italics omitted).

A court should not dismiss a complaint if the plaintiff has alleged "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). Although the court should construe the factual allegations of a complaint in a light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal,* 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly,* 550 U.S. at 555). Thus, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not 'show[n]'–'that the pleader is entitled to relief.' " *Id.* at 679 (quoting Fed.R.Civ.P. 8(a)(2)).

B. *Analysis*

1. *Claims Asserted Against Defendants Connerton and Seidon*

It appears from plaintiff's amended complaint that defendants Connerton and Seidon are sitting judicial officers. Dkt. No. 8 at 2, 3. Both are sued by plaintiff in their official capacities. *Id.*

"It is well settled that judges are absolutely immune from suit for any actions taken within the scope of their judicial responsibilities." *DuQuin v. Kolbert,* 320 F.Supp.2d 39, 40–41 (W.D.N.Y.2004) (citing *Mireles v. Waco,* 502 U.S. 9, 10 (1991)); *see also Young v. Selsky,* 41 F.3d 47, 51 (2d Cir.1994). This is true however erroneous an act may have been, and however injurious its consequences were to the plaintiff. *Young,* 41 F.3d at 51. It should be noted, however, that "a judge is immune only for actions performed in his judicial capacity." *DuQuin,* 320 F.Supp.2d at 41.

In this instance, defendant Connerton is accused of violating plaintiff's civil rights by revoking his parental rights following a custody trial in August 2015, while defendant Seidon is accused of violating plaintiff's rights when he issued an arrest warrant for the alleged probation violation. Dkt. No. 8 at 3. Because it is clear that plaintiff has sued those defendants based actions they took in their judicial capacity, the claims asserted against them are subject to dismissal on the basis of judicial immunity. [1]

2. *Claims Asserted Against Defendant Mollen*

**\*4** In his third cause of action plaintiff alleges that he is being detained and prosecuted by defendant Broome County District Attorney's Office, under the direction of defendant Mollen in his official capacity, for a violation of probation. Dkt. No. 8 at 3, 4. The claim, however, does not articulate a basis for alleging a constitutional violation. Nonetheless, even assuming that a cognizable constitutional claim is stated, it is subject to dismissal. Like judicial officers, "prosecutors are entitled to absolute immunity for that conduct 'intimately associated with the judicial phase of the criminal process.' " *Hill v. City of New York,* 45 F.3d 653, 660–61 (2d Cir.1995) (quoting *Imbler v. Pachtman,* 424 U.S. 409, 430 (1976)). "In determining whether absolute immunity obtains, we apply a 'functional approach,' looking at the function being performed rather than to the office or identity of the defendant." *Hill,* 45 F.3d at 660 (quoting *Buckley v. Fitzsimmons,* 509 U.S. 259, 269 (1993)); *see also Bernard v. County of Suffolk,* 356 F.3d 495, 504 (2d Cir.2004) ("The appropriate inquiry ... is not whether authorized acts are performed with a good or bad *motive,* but whether the *acts* at issue are beyond the prosecutor's authority."); *Dory v. Ryan,* 25 F.3d 81, 83 (2d Cir.1994) (finding that prosecutorial immunity protects prosecutors from liability under section 1983 "for virtually all acts, regardless of motivation, associated with his function as an advocate"). Prosecuting a criminal for an alleged probation violation is clearly a function of a prosecutor, and, accordingly, plaintiff's claims against defendant Mollen are subject to dismissal on the basis of immunity.

3. *Claims Asserted Against Defendant Kotchak*

Plaintiff commenced this action pursuant to 42 U.S.C. § 1983, which "establishes a cause of action for 'the deprivation of any rights, privileges, or immunities secured by the Constitution and laws' of the United States." *German v. Fed. Home*

*Loan Mortgage Corp.,* 885 F.Supp. 537, 573 (S.D.N.Y.1995) (citing *Wilder v. Virginia Hosp. Ass'n,* 496 U.S. 498, 508 (1990) (quoting 42 U.S.C. § 1983)) (footnote omitted). State action is an essential element of any section 1983 claim. *Gentile v. Republic Tobacco Co.,* No. 95–CV–1500, 1995 WL 743719, at *2 (N.D.N.Y. Dec. 6, 1995) (Pooler, J.) (citing *Velaire v. City of Schenectady,* 862 F.Supp. 774, 776 (N.D.N.Y.1994) (McAvoy, J.)). To survive scrutiny under section 1915(e) where a plaintiff has asserted a section 1983 claim, the complaint must allege facts that plausibly suggest state action on the part of the named defendants. *See DeMatteis v. Eastman Kodak Co.,* 511 F.2d 306, 311 (2d Cir.1975) ("A private party violates [section] 1983 only to the extent its conduct involves state action."); *Wilson v. King,* No. 08–CV–0509, 2008 WL 2096593, at *1 (N.D.N.Y. May 16, 2008) (Sharpe, J.).

Plaintiff's claim against defendant Kotchak, who is alleged to have represented plaintiff in connection with a criminal matter, does set forth a basis for the court to find state action on the part of the defendant. While it is unclear whether defendant Kotchak was retained or assigned by the court to represent plaintiff, even assuming the latter, the assignment of an attorney to represent a plaintiff does not rise to a level of state action sufficient to support a claim under section 1983. *See e.g., Rodriguez v. Welprin,* 116 F.3d 62, 65–66 (2d Cir.1997) ("[I]t is well-established that court-appointed attorneys performing a lawyer's traditional functions as counsel to the defendant do not act 'under color of state law' and therefore not subject to suit under 42 U.S.C. § 1983."). I therefore recommend that plaintiff's claim against defendant Kotchak be dismissed.

### 4. *Claims Asserted Against Defendants Broome County District Attorney's Office, Binghamton City Court, and Broome County Probation Department*

In the event that the recommendations described above are adopted, the remaining defendants in the action are the Broome County District Attorney's Office, Binghamton City Court, and Broome County Probation Department. None of these entities, however, are amenable to suit. To the extent that plaintiff seeks money damages against any of them, those claims are barred by the Eleventh Amendment. *See Gollomp v. Spitzer,* 568 F.3d 355, 366 (2d Cir.2009) ("So far as we can observe, every court to consider the question of whether the New York State Unified Court System is an arm of the State has concluded that it is, and is therefore

protected by Eleventh Amendment sovereign immunity."); *Ceparano v. Suffolk Cnty.,* No. 10–CV–2030, 2010 WL 5437212, at *6 (E.D.N.Y. Dec. 15, 2010) (finding the Suffolk County Probation Department immune from suit under the Eleventh Amendment); *Woodward v. Office of Dist. Atty.,* 689 F.Supp.2d 655, 658 (S.D.N.Y.2010) ("[T]he District Attorney's Office is not a suable entity[.]"); *Quiles v. City of N.Y.,* No. 01–CV–10934, 2002 WL 31886117, at *2 (S.D.N.Y. Dec. 27, 2002) ("[T]he Eleventh Amendment prohibits individuals from suing the District Attorney's Office, an arm of the state, for damages under 42 U.S.C. § 1983 arising from prosecutorial decisions."); *Singleton v. State of N.Y.,* No. 98–CV–0414, 1998 WL 438530, at *2 (S.D.N.Y. July 31, 1998) (finding the New York City Criminal Court immune from suit under the Eleventh Amendment).

**\*5** With respect to plaintiff's claims seeking injunctive relief, there are no allegations in the amended complaint that support a cognizable claim against defendants Broome County District Attorney's Office, Binghamton City Court, and Broome County Probation Department. Plaintiff merely alleges that defendant Broome County District Attorney's Office is pursuing an allegation that plaintiff violated his probation in defendant Binghamton City Court, and that defendant Broome County Probation Department "issued [the] violation." Dkt. No. 8 at 3, 4. Without more, these contentions do not give rise to a cognizable constitutional claim. Accordingly, any cause of action that could be construed as being asserted against defendants Broome County District Attorney's Office, Binghamton City Court, and Broome County Probation Department Binghamton City Court should be dismissed.

### C. *Whether to Permit Amendment*

Ordinarily, a court should not dismiss a complaint filed by a *pro se* litigant without granting leave to amend at least once "when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Branum v. Clark,* 927 F.2d 698, 704–05 (2d Cir.1991); *see also* Fed.R.Civ.P. 15(a) ("The court should freely give leave when justice so requires."); *see also Mathon v. Marine Midland Bank, N.A.,* 875 F.Supp. 986, 1003 (E.D.N.Y.1995) (permitting leave to replead where court could "not determine that the plaintiffs would not, under any circumstances, be able to allege a civil RICO conspiracy"). An opportunity to amend is not required, however, where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000); *see also Cortec Indus. Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48

Bonilla v. Connerton, Not Reported in Fed. Supp. (2016)

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 148 of 449

(2d Cir.1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice."). Stated differently, "[w]here it appears that granting leave to amend is unlikely to be productive, ... it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129, 131 (2d Cir.1993); *accord, Brown v. Peters,* No. 95–CV–1641, 1997 WL 599516, at *1 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.).

In this instance, plaintiff has already been given one opportunity to amend. Despite being granted that opportunity, plaintiff continues to assert claims against defendants who are not subject to suit. Accordingly, I recommend that plaintiff not be granted further leave to amend.

III. *SUMMARY AND RECOMMENDATION*
Having previously found that plaintiff qualifies for IFP status, I have been tasked with reviewing an amended complaint that was filed with the court. In reviewing the amended complaint, I conclude that it fails to state a cognizable claim against any of the seven defendants named. Because plaintiff has already been given one opportunity to replead, and has asserted claims that are facially deficient, including claims against defendants who enjoy immunity from suit, I recommend that plaintiff not be afforded an additional opportunity to amend. It is therefore hereby respectfully.

RECOMMENDED that plaintiff's complaint in this action (Dkt. No. 8) be DISMISSED without leave to replead.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

The clerk of the court is respectfully directed to serve a copy of this report and recommendation on the parties in accordance with the court's local rules.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 2765287

## Footnotes

1    Even if not precluded by judicial immunity, it seems clear that one or both of plaintiff's claims against defendants Connerton and Seidon would be precluded by the *Rooker–Feldman* doctrine, which precludes a federal court from asserting subject matter jurisdiction over a claim that is inextricably intertwined with a state court judgment. *See McKithen v. Brown,* 481 F.3d 89, 96 (2d Cir.2007).

End of Document                                        © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Bonilla v. Connerton, Not Reported in Fed. Supp. (2016)

Case 3:24-cv-00037-DNH-ML  Document 9  Filed 06/11/24  Page 149 of 449

2016 WL 2760373
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Daniel Ray BONILLA, Plaintiff,

v.

Rita CONNERTON, in her official capacity
as Family Court Judge, et al., Defendants.

3:15-cv-1276 (LEK/DEP)
|
Signed 05/12/2016

**Attorneys and Law Firms**

Daniel Ray Bonilla, Binghamton, NY, pro se.

## ORDER

Lawrence E. Kahn, U.S. District Judge

**\*1** This matter comes before the Court following a Report-Recommendation filed on April 14, 2016, by the Honorable David E. Peebles, U.S. Magistrate Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3. Dkt. No. 10 ("Report-Recommendation").

Within fourteen days after a party has been served with a copy of a magistrate judge's report-recommendation, the party "may serve and file specific written objections to the proposed findings and recommendations." FED. R. CIV. P. 72(b); L.R. 72.1(c). If no objections are made, or if an objection is general, conclusory, perfunctory, or a mere reiteration of an argument made to the magistrate judge, a district court must review that aspect of a report-recommendation only for clear error. Barnes v. Prack, No. 11-CV-0857, 2013 WL 1121353, at *1 (N.D.N.Y. Mar. 18, 2013); Farid v. Bouey, 554 F. Supp.

2d 301, 306-07 & n.2 (N.D.N.Y. 2008); see also Machicote v. Ercole, No. 06 Civ. 13320, 2011 WL 3809920, at *2 (S.D.N.Y. Aug. 25, 2011) ("[E]ven a *pro se* party's objections to a Report and Recommendation must be specific and clearly aimed at particular findings in the magistrate's proposal, such that no party be allowed a second bite at the apple by simply relitigating a prior argument."). "A [district] judge ... may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b).

No objections were filed in the allotted time period. See Docket. Accordingly, the Court has reviewed the Report-Recommendation for clear error and has found none. Additionally, the Court agrees with Judge Peebles that since Plaintiff has already been afforded one opportunity to amend his Complaint and continues to make claims against entities and persons that are immune from suit, further leave to amend will not be granted.

Accordingly, it is hereby:

**ORDERED**, that the Report-Recommendation (Dkt. No. 10) is **APPROVED and ADOPTED in its entirety**; and it is further

**ORDERED**, that the Complaint (Dkt. No. 1) is **DISMISSED with prejudice and without leave to amend**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED**.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 2760373

---

Mercado v. Town of Goshen, Not Reported in Fed. Supp. (2020)

Case 3:24-cv-00037-DNH-ML    Document 9    Filed 06/11/24    Page 150 of 449

2020 WL 5210949
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Matthew Louis MERCADO, Plaintiff,

v.

TOWN OF GOSHEN; Orange County
Courts & Correctional Facility; Judge
Freehill; Da Janine Kovacs, Defendants.

20-CV-5399 (LLS)
|
Signed 08/28/2020

**Attorneys and Law Firms**

Matthew Louis Mercado, Goshen, NY, pro se.

ORDER OF DISMISSAL

LOUIS L. STANTON, United States District Judge:

 **\*1** Plaintiff, currently detained at the Orange County Correctional Facility, brings this *pro se* action under 42 U.S.C. § 1983, alleging that Defendants have violated his federal constitutional rights. By order dated August 13, 2020, the Court granted Plaintiff's request to proceed without prepayment of fees, that is, *in forma pauperis.*[1]

**STANDARD OF REVIEW**

The Prison Litigation Reform Act requires that federal courts screen complaints brought by prisoners who seek relief against a governmental entity or an officer or employee of a governmental entity. See 28 U.S.C. § 1915A(a). The Court must dismiss a prisoner's *in forma pauperis* complaint, or any portion of the complaint, that is frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. §§ 1915(e)(2)(B), 1915A(b); *see Abbas v. Dixon,* 480 F.3d 636, 639 (2d Cir. 2007). The Court must also dismiss a complaint if the court lacks subject matter jurisdiction. *See* Fed. R. Civ. P. 12(h)(3).

While the law mandates dismissal on any of these grounds, the Court is obliged to construe *pro se* pleadings liberally, *Harris*

*v. Mills,* 572 F.3d 66, 72 (2d Cir. 2009), and interpret them to raise the "strongest [claims] that they *suggest,*" *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 474 (2d Cir. 2006) (internal quotation marks and citations omitted) (emphasis in original). But the "special solicitude" in *pro se* cases, *id.* at 475 (citation omitted), has its limits – to state a claim, *pro se* pleadings still must comply with Rule 8 of the Federal Rules of Civil Procedure, which requires a complaint to make a short and plain statement showing that the pleader is entitled to relief.

The Supreme Court has held that under Rule 8, a complaint must include enough facts to state a claim for relief "that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007). A claim is facially plausible if the plaintiff pleads enough factual detail to allow the Court to draw the inference that the defendant is liable for the alleged misconduct. In reviewing the complaint, the Court must accept all well-pleaded factual allegations as true. *Ashcroft v. Iqbal,* 556 U.S. 662, 678-79 (2009). But it does not have to accept as true "[t]hreadbare recitals of the elements of a cause of action," which are essentially just legal conclusions. *Twombly,* 550 U.S. at 555. After separating legal conclusions from well-pleaded factual allegations, the Court must determine whether those facts make it plausible – not merely possible – that the pleader is entitled to relief. *Id.*

**BACKGROUND**

The following allegations are taken from the complaint, which is not a model of clarity. Since January 1, 2020, Plaintiff has been "fals[e]ly & illegally detained & unlawfully imprisoned by the Goshen County Court System." (ECF No. 1, at 4.) He was indicted for burglary in the second degree, references being on probation, and maintains that under the "new bail reform law," he should have been released. He writes, "I am not filing suit on State's Bail Reform now I am filing suit for my being illegally detained, false imprisonment unlawfully imprisoned are all violations of my constitutional right which have all been violated." (*Id.*)

 **\*2** Plaintiff further state that he has "grieved the Courts Judges DA's & filed suit & also A Habias [sic] Corpus." (*Id.* at 5.) He seeks monetary compensation and immediate release from custody.

Plaintiff attaches to his complaint a letter addressed "[t]o whom it may concern," which restates many of the facts in the

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 151 of 449

Mercado v. Town of Goshen, Not Reported in Fed. Supp. (2020)

complaint and also states, "I have written a grievance & civil suit & both had informed me to go this way 1st as to file a writ of habeas corpus to gain my relief. So I did no response as of yet." (*Id.* at 7.) Plaintiff also attaches a news clipping about the bail reform law including his handwritten notes; the first page of an affirmation filed in his criminal case in the state court by Orange County Assistant District Attorney Janine Kovacs (named as a defendant here); and a document by the Center for Court Innovation explaining the bail reform law.

Plaintiff's submission also includes a document labeled "Matthew Mercado VS Orange County Courts; D.A. Janine Kovacs & Judge Robert Freehill," which appears to be part of an amended complaint that Plaintiff filed in a previous case, *Mercado v. Orange Cnty. Cts.*, ECF 1:19-CV-11905, 11 (S.D.N.Y. Mar. 23, 2020). (*Id.* at 15-16.) In that action, Plaintiff asserted claims against the "Orange County Courts," two female District Attorneys, Judge Robert Freehill, the "Orange County Legal Aid Society & District Attorney," and the New Windsor Police Department. By order dated January 28, 2020, Chief Judge McMahon dismissed Plaintiff's claims against Judge Freehill and the assistant district attorneys on immunity grounds, and dismissed his claims against the Orange County Courts as barred by the Eleventh Amendment. Chief Judge McMahon granted Plaintiff leave to amend his complaint to detail his Fourth Amendment claims against individual police officers. ECF 1:19-CV-11905, 8. In response to the order, Plaintiff submitted two amended complaints in which he named the same defendants named in his original pleadings. ECF 1:19-CV-11905, 11, 12. By order dated March 23, 2020, Chief Judge McMahon dismissed the action on the same grounds that she dismissed the original complaint. ECF 1:19-CV-11905, 13. It is unclear why Plaintiff included a pleading from his previous action in his submission. In any event, though Plaintiff names some of the same defendants in this action, his claims here appear to be slightly different.

## DISCUSSION

Because Plaintiff invokes the Due Process Clause and asserts claims of false imprisonment, the Court construes those claims as arising under 42 U.S.C. § 1983. To state a claim under 42 U.S.C. § 1983, a plaintiff must allege both that: (1) a right secured by the Constitution or laws of the United States was violated, and (2) the right was violated by a person acting under the color of state law, or a "state actor." *West v. Atkins,* 487 U.S. 42, 48-49 (1988).

### A. Claims against the Town of Goshen

When a plaintiff sues a municipality under § 1983, it is not enough for the plaintiff to allege that one of the municipality's employees or agents engaged in some wrongdoing. The plaintiff must show that the municipality itself caused the violation of the plaintiff's rights. *See Connick v. Thompson,* 131 S. Ct. 1350, 1359 (2011) ("A municipality or other local government may be liable under this section [1983] if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation.") (quoting *Monell v. Dep't of Soc. Servs. of City of New York,* 436 U.S. 658, 692 (1978)); *Cash v. Cnty. of Erie,* 654 F.3d 324, 333 (2d Cir. 2011). In other words, to state a § 1983 claim against a municipality, the plaintiff must allege facts showing (1) the existence of a municipal policy, custom, or practice, and (2) that the policy, custom, or practice caused the violation of the plaintiff's constitutional rights. *See Jones v. Town of East Haven,* 691 F.3d 72, 80 (2d Cir. 2012); *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown,* 520 U.S. 397, 403 (1997) (internal citations omitted).

**\*3** Because Plaintiff fails to allege any facts suggesting that the Town of Goshen has a policy, custom, or practice that caused a violation of his constitutional rights, the Court dismisses Plaintiff's claims against the Town of Goshen. 28 U.S.C. § 1915(e)(2)(B)(ii).

### B. Claims against Orange County Courts and Correctional Facility

The Court must dismiss Plaintiff's claims against the Orange County Courts and Correctional Facility as barred by the Eleventh Amendment. "[A]s a general rule, state governments may not be sued in federal court unless they have waived their Eleventh Amendment immunity, or unless Congress has abrogated the states' Eleventh Amendment immunity...." *Gollomp v. Spitzer,* 568 F.3d 355, 366 (2d Cir. 2009). "The immunity recognized by the Eleventh Amendment extends beyond the states themselves to state agents and state instrumentalities that are, effectively, arms of a state." *Id.*

New York has not waived its Eleventh Amendment immunity to suit in federal court, and Congress did not abrogate the states' immunity in enacting 42 U.S.C. § 1983. *See Trotman v. Palisades Interstate Park Comm'n,* 557 F.2d 35, 40 (2d Cir. 1977). Moreover, "the New York State Unified Court System is unquestionably an 'arm of the State,' and is entitled

Case 3:24-cv-00037-DNH-ML    Document 9    Filed 06/11/24    Page 152 of 449

Mercado v. Town of Goshen, Not Reported in Fed. Supp. (2020)

to Eleventh Amendment sovereign immunity." *Gollomp*, 568 F.3d at 368 (citation omitted); *see Brown v. Astoria Fed. Sav. & Loan Ass'n*, 444 F. App'x 504 n.1 (2d Cir. 2011) (summary order) (claims against New York Supreme Court barred by the Eleventh Amendment) (citing *Gollomp*, 568 F.3d at 368).

Plaintiff sues the "Orange County Court," which is part of the New York State Unified Court System. The Court therefore dismisses Plaintiff's § 1983 claims against this Defendant under the doctrine of Eleventh Amendment immunity and because these claims are frivolous. [2] *See Montero v. Travis*, 171 F.3d 757, 760 (2d Cir. 1999) ("A complaint will be dismissed as 'frivolous' when 'it is clear that the defendants are immune from suit.' " (quoting *Neitzke v. Williams*, 490 U.S. 319, 327 (1989))).

The Court must also dismiss any claims Plaintiff may be asserting against the Orange County Correctional Facility as an entity separate from the Orange County Court. Section 1983 provides that an action may be maintained against a "person" who has deprived another of rights under the "Constitution and Laws." 42 U.S.C. § 1983. The Orange County Correctional Facility is not a "person" within the meaning of § 1983. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58 (1989) (state is not a "person" for the purpose of § 1983 claims); *Whitley v. Westchester Cnty. Corr. Fac. Admin.*, No. 97-CV-420 (SS), 1997 WL 659100, at *7 (S.D.N.Y. Oct. 22, 1997) (correctional facility or jail not a "person" within the meaning of § 1983). The Court therefore dismisses any claims Plaintiff may be asserting against the Orange County Correctional Facility. *See* 28 U.S.C. § 1915(e)(2)(B)(ii).

## C. Claims against Judge Freehill and Assistant District Attorney Kovacs

Judges are absolutely immune from suit for damages for any actions taken within the scope of their judicial responsibilities. *Mireles v. Waco*, 502 U.S. 9, 11 (1991). Generally, "acts arising out of, or related to, individual cases before the judge are considered judicial in nature." *Bliven v. Hunt*, 579 F.3d 204, 210 (2d Cir. 2009). "Even allegations of bad faith or malice cannot overcome judicial immunity." *Id.* (citations omitted). This is because "[w]ithout insulation from liability, judges would be subject to harassment and intimidation...." *Young v. Selsky*, 41 F.3d 47, 51 (2d Cir. 1994). In addition, as amended in 1996, § 1983 provides that "in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall

not be granted unless a declaratory decree was violated or declaratory relief was unavailable." 42 U.S.C. § 1983.

**\*4** Judicial immunity does not apply when the judge takes action "outside" his judicial capacity, or when the judge takes action that, although judicial in nature, is taken "in absence of jurisdiction." *Mireles,* 502 U.S. at 9-10; *see also Bliven,* 579 F.3d at 209-10 (describing actions that are judicial in nature). But "the scope of [a] judge's jurisdiction must be construed broadly where the issue is the immunity of the judge." *Stump v. Sparkman,* 435 U.S. 349, 356 (1978).

Additionally, prosecutors are immune from civil suits for damages for acts committed within the scope of their official duties where the challenged activities are not investigative in nature but, rather, are "intimately associated with the judicial phase of the criminal process." *Simon v. City of New York,* 727 F.3d 167, 171 (2d Cir. 2013) (quoting *Imbler v. Pachtman,* 424 U.S. 409, 430 (1976)); *see also Buckley v. Fitzsimmons,* 509 U.S. 259 (1993) (holding that absolute immunity is analyzed under "functional approach" that "looks to the nature of the function performed, not the identity of the actor who performed it"). In addition, prosecutors are absolutely immune from suit for acts that may be administrative obligations but are "directly connected with the conduct of a trial." *Van de Kamp v. Goldstein,* 555 U.S. 335, 344 (2009).

Here, Plaintiff's claims against Judge Freehill and ADA Kovacs are based on actions taken within the scope of their official duties and associated with the conduct of a trial. The Court therefore dismisses Plaintiff's claims against these defendants because they seek monetary relief against a defendant who is immune from suit and as frivolous. 28 U.S.C. § 1915(e)(2)(b)(i), (iii); *see Collazo v. Pagano,* 656 F. 3d 131, 134 (2d Cir. 2011) (holding that claim against prosecutor is frivolous if it arises from conduct that is "intimately associated with the judicial phase of the criminal process").

## D. Pending state-court proceedings

To the extent that Plaintiff, in seeking injunctive relief, asks this Court to intervene in his pending state-court proceedings, the Court must dismiss those claims. In *Younger v. Harris,* 401 U.S. 37 (1971), the United States Supreme Court held that a federal court may not enjoin a pending state-court criminal proceeding in the absence of special circumstances suggesting bad faith, harassment, or irreparable injury that is both serious and immediate. *See Heicklen v. Morgenthau,*

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 153 of 449

Mercado v. Town of Goshen, Not Reported in Fed. Supp. (2020)

378 F. App'x 1, 2 (2d Cir. 2010) (quoting *Gibson v. Berryhill*, 411 U.S. 564, 573-74 (1973)). *Younger* abstention seeks to avoid federal court interference with ongoing state criminal prosecutions, state-initiated civil enforcement proceedings, and state civil proceedings that involve the ability of state courts to perform their judicial functions. *Jones v. Cnty. of Westchester*, 678 F. App'x 48, 49-50 (2d Cir. 2017) (summary order). Thus, abstention is appropriate in only three categories of state court proceedings: (1) state criminal prosecutions; (2) civil enforcement proceedings that are "akin to criminal prosecutions"; and (3) civil proceedings "that implicate a State's interest in enforcing the orders and judgments of its courts." *Sprint Commc'ns, Inc. v. Jacobs*, 134 S. Ct. 584, 588 (2013).

If a "federal lawsuit implicates the way that New York courts manage their own ... proceedings — a subject in which "the states have an especially strong interest" — a State's interest is most likely implicated, warranting abstention under *Younger*. *Falco v. Justices of the Matrimonial Parts of Supreme Court of Suffolk Cnty.*, 805 F.3d 425, 427 (2d Cir. 2015) (quoting *Phillips, Nizer, Benjamin, Krim & Ballon v. Rosenstiel*, 490 F.2d 509, 516 (2d Cir. 1973)). When any of these types of proceedings are pending in state court, the *Younger* doctrine bars federal courts from ordering injunctive relief that interferes with the state court proceedings. "State proceedings are pending for *Younger* purposes until all appellate court remedies have been exhausted." *People United for Children, Inc. v. City of New York*, 108 F. Supp. 2d 275, 290 n.6 (S.D.N.Y. 2000).

**\*5** Plaintiff's request that this Court intervene in his state-court proceedings implicates how the state court manages its proceedings. *Younger* abstention therefore applies, and this Court will not intervene in those proceedings. *Falco*, 805 F.3d at 428.

**E. *Habeas* relief**

To the extent Plaintiff seeks release from custody, the Court liberally construes his submission as a *habeas corpus* petition filed under 28 U.S.C. § 2241. Under § 2241(c)(3), *habeas corpus* relief is available to a person "in custody in violation of the Constitution or laws or treaties of the United States." A prisoner in state custody generally must challenge his confinement in a *habeas corpus* petition under 28 U.S.C. § 2254, but such relief is available under § 2241 to a state pretrial detainee challenging his custody as unlawful under the Constitution or federal law. *See Robinson v. Sposato*, No. 11-CV-0191, 2012 WL 1965631, at \*2 (E.D.N.Y. May 29,

2012); *see also Hoffler v. Bezio*, 831 F. Supp. 2d 570, 575 (N.D.N.Y. 2011), *aff'd on other grounds*, 726 F.3d 144 (2d Cir. 2013); *Marte v. Berkman*, No. 11-CV-6082 (JFK), 2011 WL 4946708, at \*5 (S.D.N.Y. Oct. 18, 2011), *aff'd on other grounds sub nom.*, *Marte v. Vance*, 480 F. App'x 83 (2d Cir. 2012) (summary order).

Before seeking § 2241 *habeas corpus* relief, however, a state pretrial detainee must first exhaust his available state-court remedies. *See United States ex rel. Scranton v. New York*, 532 F.2d 292, 294 (2d Cir. 1976) ("While [§ 2241] does not by its own terms require the exhaustion of state remedies as a prerequisite to the grant of federal habeas relief, decisional law has superimposed such a requirement in order to accommodate principles of federalism."). In the pretrial context, such exhaustion includes seeking *habeas corpus* relief in the state courts and, if necessary, appealing all the way up to the New York Court of Appeals, the State of New York's highest court. *See* N.Y.C.P.L.R. § 7001, *et seq.*

Plaintiff states that he has filed a petition for *habeas corpus* in the state court, but has not yet received a response. Exhaustion of remedies requires more than merely filing a state-court *habeas* petition. To exhaust his state-court remedies, Plaintiff's state *habeas* petition must be denied by the New York Supreme Court, Orange County, and he must appeal that denial all the way up to the New York Court of Appeals. Because Plaintiff does not show that he exhausted his available state-court remedies before filing his § 2241 petition in this Court, the Court denies without prejudice any application for relief under § 2241.

District courts generally grant a *pro se* plaintiff an opportunity to amend a complaint to cure its defects, but leave to amend is not required where it would be futile. *See Hill v. Curcione*, 657 F.3d 116, 123–24 (2d Cir. 2011); *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988). Because the defects in Plaintiff's complaint cannot be cured with an amendment, the Court declines to grant Plaintiff leave to amend his complaint.

**CONCLUSION**

Plaintiff's complaint, filed *in forma pauperis* under 28 U.S.C. § 1915(a)(1), is dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B)(i)-(iii).

**\*6**  SO ORDERED.

Mercado v. Town of Goshen, Not Reported in Fed. Supp. (2020)

Case 3:24-cv-00037-DNH-ML    Document 9    Filed 06/11/24    Page 154 of 449

**All Citations**

Not Reported in Fed. Supp., 2020 WL 5210949

## Footnotes

1    Prisoners are not exempt from paying the full filing fee even when they have been granted permission to proceed *in forma pauperis. See* 28 U.S.C. § 1915(b)(1).

2    *See also Zuckerman v. Appellate Div., Second Dep't, Supreme Court,* 421 F.2d 625, 626 (2d Cir. 1970) (holding that a state court is not a "person" for the purpose of § 1983 liability).

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 11357852
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

Patricia J. CURTO, Individually and on behalf
of all others similarly situated, Plaintiff,

v.

PALISADES COLLECTION, LLC, Pressler and
Pressler, LLP, Sheldon H. Pressler, Richard A.
Franklin, Jennifer B. Kwak, Phillip Marshall, New
York State Unified Courts System 8th Judicial District
Buffalo City Court, and John/Jane Does, Defendants.

07-CV-529S
|
Signed March 7, 2008
|
Filed 03/10/2008

**Attorneys and Law Firms**

Patricia J. Curto, West Seneca, NY, pro se.

Justin H. Homes, Sessions, Fishman, Nathan & Israel, L.L.P., Metairie, LA, Michael Del Valle, Sessions, Fishman & Nathan of New York, LLC, Amherst, NY, Mitchell L. Williamson, Pressler & Pressler, LLP, Cedar Knolls, NJ, for Defendants.

### ORDER

MICHAEL A. TELESCA, United States District Judge

### INTRODUCTION

**\*1** Plaintiff, Patricia Curto, an experienced pro se litigant,[1] brings this action pursuant to the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1592 et seq., and 42 U.S.C. §§ 1983, 1985 and 1986, seeking monetary damages and declaratory and injunctive relief (Amended Complaint— Docket No. 3), and has also moved for leave to proceed in *forma pauperis.* (Docket No. 2).

Plaintiff alleges that defendants Palisades collection, LLC, Pressler and Pressler, LLP, Sheldon H. Pressler, Richard A. Franklin and Jennifer Kwak (collectively, the "private defendants") violated the FDCPA when they initiated two

actions against plaintiff in Buffalo City Court to obtain a money judgment from her. The amended complaint also asserts claims pursuant to 42 U.S.C. §§ 1983, 1985 and 1986 against defendant Phillip M. Marshall ("Judge Marshall"), stated to be a judge of the "hew York State Unified Court System Judge in the Buffalo City Court," and the New York State Unified Court System. Plaintiff alleges that Judge Marshall violated and conspired with other defendants to violate plaintiff's constitutional and statutory rights in connection with his handling of a lawsuit chat Palisades Collection filed against plaintiff in Buffalo City Court. The complaint also names "John/Jane Does" as defendants, and the claims against them are specified below.

Plaintiff's application to proceed as a poor person is granted, but for the reasons set forth below, her claims against Phillip Marshall, the New York State Unified Court System and "John/Jane Does" are dismissed pursuant to 29 U.S.C. § 1915(e)(2)(B), and her request that this action be certified as a class action is denied.

### DISCUSSION

**Claims Against Palisades Collection, LLC, Pressler and Pressler, LLP, Sheldon H. Pressler, Richard A. Franklin, Jennifer B. Kwak**
Plaintiff has obtained waivers of service pursuant to Fed. R. Civ. Proc. 4(d) from the private defendants. Each of those defendants has answered the complaint (Docket Nos. 10, 11) and plaintiff's action against these five defendants is proceeding.

**Claims Against Phillip Marshall**
In the section of the amended complaint captioned "PARTIES," plaintiff recites that defendant Phillip M. Marshall "is a New York State Unified Court System Judge in the Buffalo City Court; Village of Orchard Park Court judge; a private practice lawyer; resides in Orchard Park NY." (Amended Complaint at ¶ 10). Clarification of Judge Marshall's judicial status is sat forth in the motion to dismiss that has been submitted by defendants Marshall and the New York State Unified Court System, which states that Phillip Marshall is an Acting Buffalo City Court Judge, (Docket No. 26 at 2).[2]

**\*2** In the section of the amended complaint containing plaintiff's factual allegations, she states that after the dismissal

by Buffalo City Court Judge Givens of an action to recover on a debt commenced against plaintiff by defendant Palisades collection ("Palisades"), 3 Palisades filed a second action in Buffalo City Court on May 24, 2007, where it came before defendant Buffalo City Court Judge Marshall on July 20, 2007 upon plaintiff's motion to dismiss. Plaintiff alleges that Judge Marshall adjourned the proceedings upon the request of one of the private defendants until August 20, 2007, even though he "knew he had to dismiss sua sponte the complaint filed in Buffalo City Court...." (Amended Complaint at ¶ 17). Plaintiff further alleges that another judge, not named in the amended complaint, subsequently dismissed the action on the adjourned date of August 20, 2007. (Amended Complaint at ¶ 19), She alleges that Judge Marshall's adjournment of the proceeding, as described above, was "made without authority/jurisdiction," violated her federal constitutional and statutory rights, and was indicative of a conspiracy with the other defendants to violate her due process and equal protection rights. (Amended Complaint at ¶ 18). Judge Marshall's adjournment of plaintiff's motion to dismiss the City Court action, and his failure to dismiss the action *sua sponte an* July 20, 2007 appears to be the only specific non-conclusory allegation in support of her claims against him.

Plaintiff's claims against Judge Marshall are barred by the doctrine of absolute judicial immunity. It is well settled that judges are absolutely immune from suit for any actions taken within the scope of their judicial responsibilities. *See, e.g.*, Mireles v. Waco, 502 U.S. 9, 112 S. Ct. 236, 116 L.Ed.2d 9 (1991).

> Although unfairness and injustice to a litigant may result on occasion, "it is a general principle of the highest importance to the proper administration of justice that a judicial officer, in exercising the authority vested in him, shall be free to act upon his own convictions, without apprehension of personal consequences to himself."

*Id.*, at 10, 297 (quoting Bradley v. Fisher, 80 U.S. (13 Wall.) 335, 347, 20 L.Ed. 646 (1871)). Absolute judicial immunity "protects judges acting in their individual and judicial capacities." Miller v. County of Nassau, 467 F. Supp. 2d 308, 313 (E.D.N.Y. 2006) (emphasis added). The protection of immunity is not pierced by allegations that the judge acted in bad faith or with malice, Pierson v. Ray, 386 U.S. 547, 554, 87 S.Ct. 1213, 1217, 18 L.Ed.2d 288 (1967), even though "unfairness and injustice to a litigant may result on occasion," Mireles, 502 U.S. at 9, 112 S. Ct. at 286.

The Supreme Court has developed a two-part test for determining whether a judge is entitled to absolute immunity. *See* Stump v. Sparkman, 435 U.S. 349, 356-57, 98 S.Ct. 1099, 1106, 55 L.Ed.2d 331 (1978). First, "[a] judge will not be deprived of immunity because the action he took was in error, was done maliciously, or was in excess of his authority; rather, he will be subject to liability only when he has acted in the 'clear absence of all jurisdiction.' " *Id.* at 356-57, 98 S.Ct. at 1105 (quoting Bradley, 80 U.S. (13 Wall.) at 351 (1871)). Second, a judge is immune only for actions performed in his judicial capacity. *Id.* at 360, 98 S.Ct. at 1106; *see also* Maestri v. Jutkofsky, 360 F.2d 50 (2d Cir. 1988) (finding no immunity where town justice issued arrest warrant for conduct which took place within neither his town nor an adjacent town, thereby acting in the absence of all jurisdiction), *cert. denied,* 489 U.S. 1016, 109 S.Ct. 1132, 103 L.Ed.2d 193 (1989); Gregory v. Thompson, 500 F.2d 59, 62 (9th Cir. 1974) (finding no immunity where judge assaulted litigant).

 **3** "Because 'some of the most difficult and embarrassing questions which a judicial officer is called upon to consider [*16] and determine relate to his jurisdiction ...' the scope of the judge's jurisdiction must be construed broadly when the issue is the immunity of the judged." Stump 435 U.S. at 356, (quoting Bradley 80 U.S. (13 Wall.) 335). In Stump, the United States Supreme Court determined that "[a] judge will not be deprived of immunity because the action he took was in error, was done maliciously, or was in excess of his authority; rather, he will be subject to liability only when he has acted in the 'clear absence of all jurisdiction.' " 435 U.S. at 356-57 (quoting Bradley, 80 U.S. at 351) [emphasis supplied]. The critical difference between acts taken in excess of authority, to which immunity attaches, and those taken in the clear absence of all jurisdiction was clearly articulated in Bradley:

> A distinction must be here observed between excess of jurisdiction and the clear absence of all jurisdiction over the subject-matter. Where there is clearly no jurisdiction over the subject-matter any authority exercised is a usurped authority, and for the exercise of such authority, when the want of jurisdiction is known to the judge, no excuse is permissible. But where jurisdiction over the subject-matter is invested by law in the judge, or in the

Case 3:24-cv-00037-DNH-ML    Document 9    Filed 06/11/24    Page 157 of 449

Curto v. Palisades Collection, LLC, Not Reported in Fed. Supp. (2008)

court which he holds, the manner and extent in which the jurisdiction shall be exercised are generally as much questions for his determination as any other questions involved in the case, although upon the correctness of his determination in these particulars the validity of his judgments may depend.

80 U.S. at 351-52. [4]

Here, the amended complaint does not allege that Judge Marshall lacked subject matter jurisdiction over the action filed in Buffalo City Court, [5] and his alleged adjournment of plaintiff's motion to dismiss, a function routinely performed by a judge when acting in a judicial capacity, does not constitute a judicial action taken "in the clear absence of all jurisdiction."

Plaintiff's allegations that Judge Marshall conduct in refusing to immediately grant her motion to dismiss and in adjourning the City Court action was "discriminatory, abusive, hostile," and that he "conspired with" other defendants to violate her rights(Amended Complaint at ¶¶ 18, 19) do not serve to take his actions outside the protection afforded by the doctrine of judicial immunity. As stated by the Supreme Court in Bradley, a judge will not be deprived of immunity even where it is alleged that his actions are alleged to have been done "maliciously or corruptly." Id. at 351. [6]

**\*4** To the extent that the amended complaint may be construed as requesting injunctive relief against Judge Marshall, the absolute immunity afforded the defendant, as described above, extends to claims for injunctive relief. Hubbard v. J.C. Penny Dep't Store, 05-CV-6042CJS(P), 2005 U.S. Dist. LEXIS 40907, at \*5 (W.D.N.Y. 2005) (discussing 1996 amendments to § 1983). Moreover, no injunctive relief can be had where, as here, plaintiff has failed to state a claim for constitutional deprivation. Curto v. Bender, 04-CV-26S, 2005 U.S. Dist. LEXIS 6236, at \*43, n. 15 (W.D.N.Y. 2005).

**Claims Against the New York State Unified Court System 8th Judicial District**

Plaintiff's official capacity claims against the "New York State Unified Court System, 8th Judicial District Buffalo City Court" are barred by the Eleventh Amendment, See Davis v. New York, 106 Fed. Appx. 82, 2004 U.S. App. LEXIS 12389, at \* \*4 (2d Cir. 2004) (unpublished) (the Eleventh Amendment bars claims against the New York State Unified Court System) (citing Pennhurst State Sch. & Hosp. v. Alderman, 465 U.S. 89, 100, 79 L.Ed. 2d 67, 100 S. Ct. 900 (1984)); Singleton v. State of New York, 98 Civ. 0414, 1998 U.S. Dist. LEXIS 11842, at \*6 (S.D.N.Y. 1998) (New York City Criminal Court is immune from suit under the Eleventh Amendment).

Plaintiff also asserts claims for injunctive relief against the Unified Court System, including an order directing a *review* of all consumer credit complaints pending in Buffalo City Court and dismissal of all complaints where the defendant does not reside in Buffalo or a municipality contiguous to the city. (Amended Complaint at p. 13).

Plaintiff's claims for injunctive relief are denied as the amended complaint makes none of the showings necessary to obtain such relief. Plaintiff has not, for instance, established that she will suffer any irreparable harm if she is not granted injunctive relief with respect to collection actions in City Court, given the success she has had obtaining the dismissal of such actions in the past. *See* Reuters Ltd. v. United Press Int'l, Inc., 903 F.2d 904, 907 (2d Cir. 1990) (party seeking injunctive relief must demonstrate irreparable harm "before other requirements for the issuance of an injunction will be considered"), Moreover, plaintiff's request for injunctive relief may be regarded as moot, in light of the dismissal of her claims against the defendant, *see, e.g.,* Kinlaw v. Pataki, 9:07-CV-1314 (GLS) (GJD), 2003 U.S. Dist. LEXIS 3414, at \*5 (N.D.N.Y. 2008), and inasmuch as the two actions brought against her in Buffalo City Court have been dismissed, and the amended complaint does not allege a Likelihood of imminent future injury.

**Claims Against John/Jane Does**

The caption to the amended complaint lists "John/Jane Does" as defendants, and the section of the complaint captioned "PARTIES" states that their identities will be determined during discovery. (Amended Complaint at ¶ 12). The Court has reviewed the plaintiff's references to John or Jane Does in the body of her complaint, and determines that the claims against all "John/Jane Doe" defendants must be dismissed.

Plaintiff identifies one "John Doe" defendant as the court officer who was present at plaintiff's alleged appearance in Buffalo City Court on July 20, 2007, and who is alleged to have instructed her to sit down, and who later "scolded/

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 158 of 449

Curto v. Palisades Collection, LLC, Not Reported in Fed. Supp. (2008)

reminded" her and another person to stop talking, even though lawyers in the courtroom were permitted to talk. On the basis of these allegations, plaintiff alleges that court officer John Doe "conspired [with Judge Marshall] and did violated (sic) ... Curto's rights to equal protection, due process and etc.; their actions or lack of action was discriminatory, abusive, hostile, unlawful, unconstitutional and etc." (Amended Complaint at ¶ 19).

 **5** To the extent that court officer John Doe was assisting the court in the performance of judicial functions, he is immune from suit. Moreover, the claims against court officer John Doe failto state a claim and are frivolous. *See* Bliven v. Hunt, 418 F. Supp. 2d 135, 138 (E.D.N.Y. 2005) (dismissing on the grounds of immunity and as frivolous claims against John Doe judges and court clerks). Subsequent allegations that "Jane Doe/John Doe" is/are conspiring with defendant Marshall and "with all the other defendants" to violate plaintiff's rights (Amended Complaint at ¶¶ 31, 32) are equally frivolous.

Plaintiff makes numerous references to "John/Jane Doe" in those sections of the amended complaint in which she sets forth her claims under the FDCPA against the private defendants. She in essence attempts to "piggyback" the Doe defendants on to each of her claims against the named defendants by adding the language "and John/Jane Doe" to each of her claims against the named defendants. (Amended Complaint at ¶¶ 22, 26). However, the amended complaint is completely devoid of allegations as to who these "John/Jane Doe" defendants might be, and how they facilitated or conspired with the named defendants to facilitate the violation of plaintiff's rights. Plaintiff cannot simply add "and John/Jane Doe" to each of her allegations against the named defendants without providing at least some pertinent information as to these defendants. *See* Bliven, 418 F. Supp. 2d at 138-135 ("Plaintiff's complaint is entirely devoid of allegations as to who these defendants ere or how they were involved is the deprivation of his rights. While Plaintiff is not obligated to provide names, he must at least provide basic information describing these individuals' relevance to this lawsuit.")(citation omitted).

The amended complaint may also be construed as asserting a claim against a "John Doe" process server who is alleged to have failed to effect proper service of the complaint against plaintiff filed by defendant Palisades Collection, and to have falsely sworn in his service affidavit that he had confirmed plaintiff's proper address. (Amended Complaint at

¶¶ 14). Plaintiff also asserts that a "John Doe" process server improperly served a second complaint upon her. (Amended Complaint at ¶ 16). Plaintiff's claims against the John Doe process server(s) must likewise be dismissed for failure to state a claim under 15 U.S.C. § 1692k, or 42 U.S.C. §§ 1983, 1985 and 1986.

Accordingly, plaintiff's claims against all John/Jane Doe defendants must be dismissed.

### Motion to Certify a Class

Plaintiff requests in the amended complaint that the Court issue an order certifying her action as a class action under Rule 23 of the Federal Rules of Civil Procedure (Amended Complaint at p. 12), and one section of the amended complain, captioned "CLASS ALLEGATIONS," contains allegations in support of her request for class certification as to two classes of plaintiffs. (Amended Complaint at ¶¶ 20-34). It is well established, however, that "non-attorneys cannot represent anyone other than themselves and cannot prosecute class actions oft behalf of others. 29 U.S.C. § 1654. " '[B]ecause *pro se* means to appear for one's self, a person may not appear on another person's behalf in the other's cause. A person must be litigating an interest personal to him.' " Daniels v. Niagara Mohawk Power Corp., 04-CV-734S(Sc), 2004 U.S. Dist. LEXIS 28607, at *1-2 (W.D.N.Y. 2004) (citing Iannaccone v. Law, 142 F.3d 553, 558 (2d Cir. 1998)); *see also*, Miller v. Zerillo, CV 07-1719, 2007 U.S. Dist. LEXIS 96353, at *3-4 (E.D.N.Y. 2007). Accordingly, to the extent the complaint is brought as a putative class action or on behalf of anyone other than the individual plaintiffs, it is dismissed.

### State Law Claims

 **6** The amended complaint asserts non-specific state law claims against the defendants. To the extent that any such claims are asserted against defendants Phillip Marshall, the New York State Unified Court System, and John/Jane Does, the Court declines to exercise supplemental jurisdiction over them, inasmuch as all federal claims have been dismissed. 28 U.S.C. § 1367(c)(3).

### Motion to Dismiss

Defendants Phillip Marshall and the New York State Unified Court System have filed a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). (Docket Nos. 25, 26). In view of the Court's dismissal of the claims against Judge Marshall and

Curto v. Palisades Collection, LLC, Not Reported in Fed. Supp. (2008)

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 159 of 449

the Unified Court System, the motion to dismiss is denied as moot.

## CONCLUSION

Because Curto has met the statutory requirements of 28 U.S.C. § 1915(a), her request to proceed *in forma pauperis* (Docket No. 2) is granted. For the reasons set forth above, her claims are dismissed in their entirety, pursuant to 28 U.S.C. § 1915(e)(2)(B), against defendants Phillip Marshall, the New York State Unified Court System 8 th Judicial District Buffalo City Court and all John/Jane Does. Plaintiff's application for class certification is denied. The motion to dismiss filed by defendants Marshall and the New York State Unified Court System is denied as moot.

## ORDER

IT IS HEREBY ORDERED, that plaintiff's motion to proceed in *forma pauperis* (Docket No. 2) is granted;

FURTHER, that any and all claims brought as a class action or on behalf of other similarly situated individuals are dismissed;

FURTHER, that all of plaintiff's federal constitutional and statutory claims against defendants Phillip Marshall, the New York State Unified Court System 8 th Judicial District Buffalo City Court and all John/Jane Does are dismissed with prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B);

FURTHER, that plaintiff's state law claims against defendants Phillip Marshall, the New York State Unified Court System 8 th Judicial District Buffalo City Court and all John/Jane Does are dismissed;

FURTHER, that the Clerk of the Court is directed to terminate defendants Phillip Marshall, the New York State Unified Court System 8 th Judicial District Buffalo City court and John/Jane Does as parties to this action;

FURTHER that the motion to dismiss (Docket No. 25) is dismissed as moot.

**SO ORDERED.**

### All Citations

Not Reported in Fed. Supp., 2008 WL 11357852

## Footnotes

1    In addition to the instant natter, plaintiff has filed seven other actions in the Western and Northern Districts of New York since 2001: Curto v. Town of Orchard Park, et al., 07-CV-255 (W.D.N.Y.); Curto v. Siwek, 06-CV-761 (W.D.N.Y.); Curto v. Bender, et al., 04-CV-26 (W.D.N.Y.); Curto v. Roth, 02-CV-1157 (N.D.N.Y.); Curto v. Edmundson, 01-CV-1824 (N.D.N.Y.); Curto v. Smith, 01-CV-1781 N.D.N.Y.); Curto v. Smith, 01-CV-1570 (N.D.N.Y.)

2    Plaintiff obtained waivers of service from defendants Phillip Marshall and the New York State Unified Court System. (Docket No. 8).

3    Plaintiff indicates that the complaint filed by Palisades alleged that her address was "20 Hazel Court, West Seneca, NY," the mailing address used by plaintiff in filing the instant lawsuit. She states that the action was dismissed by Buffalo City Court Judge Givens pursuant to § 213(a) and related provisions of the Uniform City Court Act, pursuant to which money actions may be filed in Buffalo City Court if plaintiff or defendant resides in Buffalo or, inter alia, a town contiguous to the city. Plaintiff asserts chat Judge Givens dismissed the action after taking judicial notice that the County of Erie's Internet *Mapping Service* indicated that plaintiff's address is in Orchard Park, not West Seneca, and that Orchard Park is not contiguous with Buffalo. (Amended Complaint ¶ 13).

4    Plaintiff is well-familiar with the nature and extent of judicial immunity, having had claims against New York State judges dismissed in several previous actions. *See, e.g.*, Curto v.Siwek, 06-CV-761S, 2007 U.S. Dist. LEXIS 60986, at *5-6 (W.D.N.Y. 2007) (Given plaintiff's knowledge, from the Court's dismissal of her previous action against Justice Burns, that New York State judges cannot be sued for judicial acts, her attempt to commence a very similar if not essentially identical lawsuit against Justice Burns' successor, Justice Siwek, can be properly regarded as frivolous within the meaning of 28 U.S.C. § 1915(e)(2)(B). Plaintiff is accordingly cautioned that the filing of any similarly frivolous actions against state judicial officers in the future may lead the Court to consider the imposition of appropriate sanctions.").

5    Indeed, Section 202 of the Uniform City Court Act provides that City Courts "shall have jurisdiction of actions and proceedings for the recovery of money, actions and proceedings for the recovery of chattels and actions and proceedings for the foreclosure of liens on personal property where the amount sought to be recovered or the value of the property does not exceed fifteen thousand dollars exclusive of interest and costs."

6    The Court notes that plaintiff's claims that Judge Marshall conspired with other defendants would also warrant dismissal because of their entirely conclusory nature, *See, e.g.,* Ciambriello v. County of Nassau, 292 F.3d 307, 325 (2d Cir. 2002) ("[C]omplaints containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed; diffuse and expansive allegations are insufficient, unless amplified by specific instances of misconduct.") (qoting Dwares v. City of N.Y., 985 F.2d 94, 100 (2d Cir. 1993)).

---

**End of Document**                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2000 WL 280328
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Berton SAINT–FLEUR, Plaintiff,

v.

CITY OF NEW YORK, et al., Defendants.

No. 99 Civ.10433 WHP AJP.
|
March 14, 2000.

*REPORT AND RECOMMENDATION*

PECK, Magistrate J.

PAULEY, J.

**\*1**  Pro se plaintiff Berton Saint–Fleur has brought this § 1983 action against the City and State of New York, his wife Betty E. Saint–Fleur, and the Jewish Child Care Association, for false imprisonment, malicious prosecution and defamation, claiming, *inter alia,* that an Assistant District Attorney coerced his wife to falsely accuse plaintiff and convince their child to accuse plaintiff of sexual abuse. [1]

The State of New York has moved to dismiss all claims against it on Eleventh Amendment immunity grounds. For the reasons set forth below, the State's motion should be granted.

*SAINT–FLEUR'S COMPLAINT* [2]

Plaintiff Berton Saint–Fleur ("Saint–Fleur") was arrested on December 22, 1996 and charged with sexual abuse of his six-year old son, Jermaine. (Cplt. ¶ IV at p. 5.) The charges were based on accusations by plaintiff's wife, defendant Betty E. Saint–Fleur, that he had forced her to have sex with Jermaine. (*Id.*) After Saint–Fleur's wife tried to recant her story, Assistant District Attorney ("ADA") Rose Mary Harlem threatened her with "immigration, losing the children and prison" if she continued to maintain her husband's innocence. (*Id.*) "The ADA did not investigate to find out what the truth was" and Saint–Fleur was brought to trial. (*Id.*) Betty Saint–Fleur testified against her husband but has admitted "in letters from jail" that her testimony was false. (Cplt. ¶ IV at p. 6.)

Saint–Fleur was acquitted of criminal charges but "found guilty" in Family Court. (Cplt. ¶ IV at p. 7; *see also* Saint–Fleur Br. at 3.) The Family Court judge stated "on records [sic] while making his decision" that Saint–Fleur was "found guilty" because he "didn't take the stand on [his] behalf." (Cplt. ¶ IV at p. 7; *see also* Saint–Fleur Br. at 1–2.)

Defendant "Jewish Child Care Association had sessions with Jermaine Saint–Fleur once a week making him live a lie and repeating sexual experiences which he never had and which he couldn't remember at time of trial, changing the story drastically. They also conspired with the ADA in their vindictiveness to get a judge to not allow [Saint–Fleur] any visits, phone calls nor mail with any of [his] kids up to date, regardless of [Saint–Fleur's] acquittal by a jury trial who reached a verdict in thirty minutes." (Cplt. ¶ IV at p. 6.)

The complaint appears to allege that Saint–Fleur was "falsely imprisoned, wrongly accused, maliciously prosecuted [and] defamed." (Cplt. ¶ IV at p. 7; *see also* Saint–Fleur Br. at 3.) Saint–Fleur's "sufferings are a direct proximate of the aforementioned corruption of the defendants ADA Rose Mary Harlem for the City of New York, John Doe for Jewish Child Care Association, Betty St. Fleur and the State of New York's appointed judges from family court and from criminal court." (Cplt. ¶ IV at p. 7; *see also* Saint–Fleur Br. at 3–4.) Saint–Fleur seeks damages and injunctive relief to terminate Court-ordered separations from his children, discontinue Betty Saint–Fleur's custody and award custody to the children's grandmother. (Cplt. ¶ V at pp. 5, 8.)

*ANALYSIS*

I. *THE ELEVENTH AMENDMENT BARS SAINT–FLEUR'S CLAIMS FOR DAMAGES AND INJUNCTIVE RELIEF AGAINST THE STATE AND ITS COURT SYSTEM*

**\*2**  Defendant State of New York has moved to dismiss the complaint on Eleventh Amendment immunity grounds insofar as Saint–Fleur attempts to allege claims against the State, the state court system and state judges. (State Br. at 4–6.)

A. *Eleventh Amendment Immunity Generally*

The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the

United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. Amend. XI. As the Second Circuit has explained:

> The Supreme Court has consistently held that the federal courts lack jurisdiction not only over suits against a state brought by citizens of other states, as the literallanguage of the Amendment provides, but also over suits against such states brought by their own citizens. Thus, *it is clear that, with few exceptions, federal courts are barred from entertaining suits by a private party against a state in its own name.*

Dwyer v. Regan, 777 F.2d 825, 835 (2d Cir.1985) (emphasis added); *accord, e.g.,* Dube v. State University of New York, 900 F.2d 587, 594 (2d Cir.1990) (quoting *Dwyer),* cert. denied, 501 U.S. 1211, 111 S.Ct. 2814 (1991). [3]

The result would be no different if the Court were to liberally construe the pro se complaint and find that Saint–Fleur intended to sue the State Courts. (*See, e.g.,* Saint–Fleur Br. at 1–2, 5.) "For Eleventh Amendment purposes, governmental entities of the state that are considered 'arms of the state' receive Eleventh Amendment immunity." Fields v. Walthers, No. 94–CV–1659, 1997 WL 204308 at *2 (N.D.N.Y. April 5, 1997) (Pooler, D.J.); *accord, e.g.,* Posr v. Court Officer Shield No. 207, 180 F.3d 409, 414 (2d Cir.1999) ("An official arm of a state enjoys the same Eleventh Amendment immunity from suit in federal court as is enjoyed by the state itself. The State Office of Court Administration is an arm of the state and therefore immune."). [4]

State courts, as arms of the State, are entitled to Eleventh Amendment immunity from suit in federal court. *See, e.g.,* Gu v. Municipal Gov't of New York, No. 96–2857, 113 F.3d 1229 (table), 1997 WL 280056 at *2 (2d Cir. May 23, 1997) ("the Eleventh Amendment bars the action against the New York criminal court, which is a state agency"); Zuckerman v. Appellate Div., 421 F.2d 625, 626 (2d Cir.1970) (Appellate Division is "part of the judicial arm of the State of New York"); Vishevnik v. Supreme Court, 99 Civ. 3611, 1999 WL 796180 at *1 (S.D.N.Y. Oct. 6, 1999) ("agencies, such as

the state courts, are absolutely immune from suit [in federal court], regardless of the relief sought"); Carp v. Supreme Court, No. 5:98–CV–201, 1998 WL 236187 at *2 (N.D.N.Y. May 5, 1998) (Pooler, D.J.) ("the State Supreme Court and the Appellate Division are ... immune from suit under the Eleventh Amendment"); Casaburro v. Giuliani, 986 F.Supp. 176, 182 (S.D.N.Y.1997) (criminal court of New York City is a state agency entitled to Eleventh Amendment immunity). [5]

**\*3** The State and its agencies are protected by Eleventh Amendment immunity "whether the relief sought is legal or equitable." Papasan v. Allain, 478 U.S. at 276, 106 S.Ct. at 2939; *accord, e.g.,* Pennhurst State School & Hosp. v. Halderman, 465 U.S. at 100, 104 S.Ct. at 908; Missouri v. Fiske, 290 U.S. 18, 27, 54 S.Ct. 18, 21 (1933) ("Expressly applying to suits in equity as well as at law, the [Eleventh A]mendment necessarily embraces demands for the enforcement of equitable rights and the prosecution of equitable remedies when these are asserted and prosecuted by an individual against a state."); Dube v. State University of New York, 900 F.2d at 594; DiNapoli v. DiNapoli, 95 Civ. 7872, 1995 WL 604607 at *1 (S.D.N.Y. Sept. 22, 1995) (Sotomayor, D.J.).

Thus, absent an exception to Eleventh Amendment immunity (and none is applicable here, *see* Point I.B below), the State and the State courts are immune from Saint–Fleur's suit, both for damages and injunctive relief.

Even if Saint–Fleur were to amend to seek damages from a named state official, his claim could not stand. "To the extent that a state official is sued for damages in his official capacity, such a suit is deemed to be a suit against the state, and the official is entitled to invoke the Eleventh Amendment immunity belonging to the state." Ying Jing Gan v. City of New York, 996 F.2d 522, 529 (2d Cir.1993); *accord, e.g.,* Minotti v. Lensink, 798 F.2d 607, 609 (2d Cir.1986), cert. denied, 482 U.S. 906, 107 S.Ct. 2484 (1987); Samuels v. Stone, 98 Civ. 776, 1999 WL 624549 at *4 (S.D.N.Y. Aug. 17, 1999) (Pauley, D.J.); Jackson v. Johnson, 30 F.Supp.2d 613, 618 (S.D.N.Y. Nov. 24, 1998) (Kaplan, D.J. & Peck, M.J.) ("It is black letter law that a suit against a state official in his official capacity seeking damages is barred by the Eleventh Amendment absent the State's waiver or consent ...") (citing cases); Dean v. Abrams, 94 Civ. 3704, 1995 WL 791966 at *4 n.5 (S.D.N.Y. Dec. 26, 1995) (Kaplan, D.J. & Peck, M.J.). [6]

B. *No Exception to Eleventh Amendment Immunity Exists Here*

"The Eleventh Amendment bar to suit is not absolute." *Port Authority Trans–Hudson Corp. v. Feeney,* 495 U.S. 299, 304, 110 S.Ct. 1868, 1872 (1990). As the Supreme Court recently explained:

> While [Eleventh Amendment] immunity from suit is not absolute, we have recognized only two circumstances in which an individual may sue a State. First, Congress may authorize such a suit in the exercise of its power to enforce the Fourteenth Amendment—an Amendment enacted after the Eleventh Amendment and specifically designed to alter the federal-state balance. Second, a State may waive its sovereign immunity by consenting to suit.

*College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.,* 527 U.S. 666, 119 S.Ct. 2219, 2223 (1999) (citations omitted); *see also, e.g., Port Authority Trans–Hudson Corp. v. Feeney,* 495 U.S. at 304, 110 S.Ct. at 1872; *Richardson v. New York State Dep't of Correctional Servs.,* 180 F.3d 426, 448 (2d Cir.1999) ("a state may be divested of immunity and haled into federal court in one of two ways: (1) Congress may abrogate the sovereign immunity through a statutory enactment, ... or (2) a state may waive its immunity and agree to be sued in federal court."); *Close v. State of New York,* 125 F.3d 31, 36 (2d Cir.1997); *Gaynor v. Martin,* 77 F.Supp.2d 272, 281 (D.Conn.1999); *Nash v. New York State Executive Dep't, Div. of Parole,* 96 Civ. 8354, 1999 WL 959366 at *5 (S.D.N.Y. Oct. 20, 1999).

**\*4** Neither exception to Eleventh Amendment immunity applies in this case.

First, it is well-settled that "the civil rights statute 42 U.S.C. § 1983 does not override the eleventh amendment." *Minotti v. Lensink,* 798 F.2d 607, 609 (2d Cir.1986); *see, e.g., Quern v. Jordan,* 440 U.S. 332, 341, 99 S.Ct. 1139, 1145 (1979); *Edelman v. Jordan,* 415 U.S. 651, 675–77, 94 S.Ct. 1347, 1361–62 (1974); *Dube v. State University of New York,* 900 F.2d 587, 594 (2d Cir.1990) ("Although

Congress is empowered under section five of the Fourteenth Amendment to override Eleventh Amendment immunity and 'to enforce "by appropriate legislation" the substantive provisions of the Fourteenth Amendment, which themselves embody significant limitations on state authority,' ... it is well-settled that 42 U.S.C. § 1983 does not constitute an exercise of that authority."). [7]

"Second, the State of New York has not waived its Eleventh Amendment immunity from federal suit." *Estes–El v. New York State Dep't of Motor Vehicles,* 95 Civ. 3454, 1997 WL 342481 at *3 (S.D.N.Y. June 23, 1997); *accord, e.g., Trotman v. Palisades Interstate Park Comm'n,* 557 F.2d 35, 39–40 (2d Cir.1977) (leading case); *DiNapoli v. DiNapoli,* 95 Civ. 7872, 1995 WL 604607 at *1 (S.D.N.Y. Sept. 22, 1995) (Sotomayor, D.J.) ("New York has not consented to be sued in federal court.").

As discussed above, the Eleventh Amendment applies to the State and its agencies, including State courts, regardless of the relief sought. Neither exception to Eleventh Amendment immunity applies in this case. Accordingly, Saint-Fleur's claims for damages and injunctive relief against the State (and its courts) are barred by the Eleventh Amendment. The State's motion to dismiss should be granted.

II. *ADDITIONALLY, TO THE EXTENT SAINT–FLUER'S CLAIMS AGAINST THE STATE ARE INTENDED AS CLAIMS AGAINST PARTICULAR STATE JUDGES OR COLLATERAL ATTACKS ON FAMILY COURT DECISIONS, THE CLAIMS WOULD BE BARRED BY ABSOLUTE JUDICIAL IMMUNITY AND THE ROOKER– FELDMAN DOCTRINE*

A. *Claims Against State Judges Are Barred By Absolute Judicial Immunity*

To the extent that Saint–Fleur's pro se complaint can be construed (or that leave to amend might be sought) to allege claims against particular State judges (*see, e.g.,* Saint–Fleur Br. at 1–2, 5), there is an additional ground to dismiss the complaint and deny leave to amend. [8]

The common law rule of absolute judicial immunity protects judges from civil damage suits under § 1983 relating to the exercise of their judicial functions. *See, e.g., Mireles v. Waco,* 502 U.S. 9, 9–12, 112 S.Ct. 286, 287–88 (1991); *Stump v. Sparkman,* 435 U.S. 349, 355–56, 98 S.Ct. 1099, 1104 (1978); *Pierson v. Ray,* 386 U.S. 547, 553–55, 87 S.Ct.

1213, 1217–18 (1967) ("Few doctrines were far more solidly established at common law than the immunity of judges from liability for damages for acts committed within their judicial jurisdiction," and this doctrine was not abolished by § 1983); *Montero v. Travis,* 171 F.3d 757, 760 (2d Cir.1999) ("It is ... well established that officials acting in a judicial capacity are entitled to absolute immunity against § 1983 actions, and this immunity acts as a complete shield to claims for money damages."); *Tucker v. Outwater,* 118 F.3d 930, 933 (2d Cir.) ("Since the seventeenth century, the common law has immunized judges from damage claims arising out of their judicial acts.... The Supreme Court has specifically applied the doctrine of judicial immunity to actions brought pursuant to 42 U.S.C. § 1983."), *cert. denied,* 522 U.S. 997, 118 S.Ct. 562 (1997); *Fields v. Soloff,* 920 F.2d 1114, 1119 (2d Cir.1990) ("Judicial immunity is by now a well-established doctrine.... A judge defending against a section 1983 suit is entitled to absolute immunity from damages for actions performed in his judicial capacity ."); *Abrams v. Sprizzo,* 98 Civ. 5838, 1998 WL 778001 at [*]1 (S.D.N.Y. Oct. 29, 1998) (Rakoff, D.J. & Peck, M.J.), *aff'd mem.,* 201 F.3d 430 (2d Cir.1999). [9]

**\*5** Absolute judicial immunity exists "however erroneous the act may have been, and however injurious in its consequences it may have proved to the plaintiff." *Bradley v. Fisher,* 80 U.S. 335, 347 (1871); *accord, e.g., Mireles v. Waco,* 502 U.S. at 11, 112 S.Ct. at 288; *Cleavinger v. Saxner,* 474 U.S. 193, 199–200, 106 S.Ct. 496, 499 (1985); *Pierson v. Ray,* 386 U.S. at 554, 87 S.Ct. at 1218 (judicial "immunity applies even when the judge is accused of acting maliciously and corruptly"); *Young v. Selsky,* 41 F.3d 47, 51 (2d Cir.1994), *cert. denied,* 514 U.S. 1102, 118 S.Ct. 1837 (1995); *Carp v. Supreme Court,* No. 5:98–CV–201, 1998 WL 236187 at [*]1 (N.D.N.Y. May 5, 1998) (Pooler, D.J.). [10] Indeed, as the Supreme Court has made clear, judicial "immunity is overcome in only two sets of circumstances. First, a judge is not immune from liability for nonjudicial actions, *i.e.,* actions not taken in the judge's judicial capacity. Second, a judge is not immune for actions, though judicial in nature, taken in the complete absence of all jurisdiction." *Mireles v. Waco,* 502 U.S. at 11–12, 112 S.Ct. at 288 (citations omitted). [11]

Saint-Fleur has not alleged any facts suggesting that either exception to judicial immunity applies. Thus, to the extent that Saint-Fleur's claim against the State is, in reality, an attempt to sue State judges for damages, his claims are barred.

As to Saint-Fleur's claim for injunctive relief, in October 1996, as part of the Federal Courts Improvement Act ("FCIA"), Congress amended § 1983 to provide that "in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable." Federal Courts Improvement Act of 1996, § 309(c), Pub.L. No. 104–317, 110 Stat. 3847, 3853 (1996) (amending 42 U.S.C. § 1983); *see, e.g., Montero v. Travis,* 171 F.3d at 761; *Hili v. Sciarrotta,* 140 F.3d 210, 215 (2d Cir.1998); *Jones v. Newman,* 1999 WL 493429 at [*]6; *Ackerman v. Doyle,* 43 F.Supp.2d 265, 272 (E.D.N.Y.1999); *Kampfer v. Scullin,* 989 F.Supp. 194, 201 (N.D.N.Y.1997).

Saint–Fleur has not alleged that a declaratory decree was violated or that declaratory relief was unavailable, and thus the 1996 amendments to § 1983 would bar Saint–Fleur's claims against state judges for injunctive relief. *See, e.g., Montero v. Travis,* 171 F.3d at 761 (dismissing claim for injunctive relief against judicial officer where plaintiff alleged neither violation of declaratory decree nor unavailability of declaratory relief); *Malizia v. Westchester County Dist. Attorney's Office,* No. 98–7043, 164 F.3d 618 (table), 1998 WL 712424 at [*]1 (2d Cir. Oct. 1, 1998); *Ackerman v. Doyle,* 43 F.Supp.2d at 272.

### B. *Collateral Attacks on Family Court Decisions Are Barred By the Rooker–Feldman Doctrine*

**\*6** Moreover, to the extent Saint–Fleur's complaint appears to be collaterally attacking the judgment of the Family Court, the action additionally is barred by the *Rooker–Feldman* doctrine, which prohibits federal district courts from reviewing final state court decisions arising out of judicial proceedings absent a federal statute (such as 28 U.S.C. § 2254 governing habeas corpus) authorizing such review. *District of Columbia Court of Appeals v. Feldman,* 460 U.S. 462, 486, 103 S.Ct. 1303, 1317 (1983) (federal district courts lack jurisdiction "over challenges to state court decisions ... arising out of judicial proceedings even if those challenges allege that the state court's actions were unconstitutional"); *Rooker v. Fidelity Trust Co.,* 263 U.S. 413, 414–16, 44 S.Ct. 149, 150 (1923); *see, e.g., Pollack v. Nash,* 58 F.Supp.2d at 305 n.3; *Ackerman v. Doyle,* 43 F.Supp.2d at 272–73; *George v. Letren,* 97 Civ. 5991, 1998 WL 684857 at [*]3 & n.5 (S.D.N.Y. Sept. 30, 1998) (district court lacked jurisdiction over action challenging perceived errors in paternity and child support actions); *Pal v. Garvey,* 98 Civ. 4900, 1998 WL 427677 at

*1–2 (S.D.N.Y. July 29, 1998) (no jurisdiction over action alleging constitutional errors in Family Court proceeding resulting in termination of plaintiff's visitation rights with granddaughter); *Sanchez–Preston v. Judge Luria,* 1996 WL 738140 at *3 ("Because plaintiff's § 1983 claim arises out of an allegedly erroneous or unconstitutional judicial proceeding in the New York Family Court, no valid predicate for jurisdiction lies with this Court."); *Brooks–Jones v. Jones,* 916 F.Supp. 280, 281 (S.D.N.Y.1996) ("A plaintiff ... 'may not seek a reversal of a state court judgment simply by casting her complaint in the form of a civil rights action." '); *Fariello v. Campbell,* 860 F.Supp. at 67 (no jurisdiction over § 1983 claim alleging constitutional error committed by Family Court in father's contempt proceeding); *Rogers–Fink v. Cortland County Dep't of Social Servs.,* 855 F.Supp. 45, 47 (N.D.N.Y.1994); *Levine v. County of Westchester,* 828 F.Supp. at 242 ("Plaintiff's claims [regarding child custody and sexual abuse proceedings] ..., to the extent that they arise out of or are based upon allegedly incorrect or erroneous decisions in the state courts, are not properly within the jurisdiction of this Court.").

### CONCLUSION

For the reasons set forth above, Saint Fleur's complaint should be dismissed as to New York State, its courts and its judges, and leave to amend should not be granted. In addition, the claims that Saint–Fleur purports to bring on behalf of his son Jermaine should be dismissed as to all defendants.

### FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report to file written objections. *See also* Fed.R.Civ.P. 6. Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable William H. Pauley, III, 40 Centre Street, Room 234, and to my chambers, 500 Pearl Street, Room 1370. Any requests for an extension of time for filing objections must be directed to Judge Pauley. Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466 (1985); *IUE AFL–CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993), *cert. denied,* 513 U.S. 822, 115 S.Ct. 86 (1994); *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.), *cert. denied,* 506 U.S. 1038, 113 S.Ct. 825 (1992); *Small v. Secretary of Health & Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55, 57–59 (2d Cir.1988); *McCarthy v. Manson,* 714 F.2d 234, 237–38 (2d Cir.1983); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

**All Citations**

Not Reported in F.Supp.2d, 2000 WL 280328

---

### Footnotes

1    Berton Saint–Fleur purports to bring this suit on behalf of both himself and his minor son Jermaine Saint–Fleur. (Cplt.¶ III.) However, as this Court noted in a previous report and recommendation in this case, "it is doubtful that Mr. Saint–Fleur, as the non-custodial parent and whose parental rights appear to have been stripped, has standing to assert claims on behalf of the children." (Dkt. No. 11: 1/24/00 Report & Recommendation at 2.) The Court at this time sua sponte recommends that all claims brought by Berton Saint–Fleur against all parties on behalf of Jermaine Saint–Fleur be dismissed.

2    This section summarizes the relevant allegations in plaintiff Saint–Fleur's complaint, without resort to such phrases as "the complaint alleges."

3    *See also, e.g.,* Port Authority Trans–Hudson Corp. v. Feeney, 495 U.S. 299, 304, 110 S.Ct. 1868, 1872 (1990) ("This Court has drawn upon principles of sovereign immunity to construe the [Eleventh] Amendment to 'establish that "an unconsenting State is immune from suits brought in federal courts by her own citizens as

well as by citizens of another state." " '); *Papasan v. Allain,* 478 U.S. 265, 276, 106 S.Ct. 2932, 2939 (1986); *Pennhurst State School & Hosp. v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 908 (1984); *Edelman v. Jordan,* 415 U.S. 651, 662–63, 94 S.Ct. 1347, 1355 (1974) ("While the [Eleventh] Amendment by its terms does not bar suits against a State by its own citizens, this Court has consistently held that an unconsenting State is immune from suits brought by her own citizens as well as by citizens of another State.") (citing cases).

4 *See also, e.g., United States v. City of Yonkers,* 96 F.3d 600, 619 (2d Cir.1996) (New York State Education Department and State Board of Regents entitled to Eleventh Amendment immunity); *Jackson v. Johnson,* 985 F.Supp. 422, 426 (S.D.N.Y.1997) (Kaplan, D.J. & Peck, M.J.) (New York State Department of Correctional Services entitled to Eleventh Amendment immunity, citing cases).

5 *See also, e.g., Mathis v. Clerk of the First Dep't,* 631 F.Supp. 232, 234 (S.D.N.Y.1986) ("the Appellate Division, a state court, is not amenable to suit under 42 U.S.C. § 1983 ... on the grounds that it is immune from suit by virtue of the Eleventh Amendment"); *Richards v. State of New York,* 597 F.Supp. 692, 693 (E.D.N.Y.1984) (New York Court of Appeals immune under Eleventh Amendment), *aff'd mem.,* 767 F.2d 908 (2d Cir.1985), *cert. denied,* 474 U.S. 1066, 106 S.Ct. 820 (1986).

6 "On the other hand, a suit against a state official in his official capacity based on federal law and seeking prospective injunctive relief is not barred by the Eleventh Amendment." *Jackson v. Johnson,* 30 F.Supp.2d at 618; *accord, e.g., Dube v. State University of New York,* 900 F.2d at 595; *Russell v. Dunston,* 896 F.2d 664, 667–68 (2d Cir.), *cert. denied,* 498 U.S. 813, 111 S.Ct. 50 (1990); *Minotti v. Lensink,* 798 F.2d at 609 ("The amendment does not prevent federal courts from granting prospective injunctive relief against state officials on the basis of federal claims."); *Dwyer v. Regan,* 777 F.2d at 835–36; *Lora v. Greifinger,* 96 Civ. 0628, 1997 WL 102473 at *3 (S.D.N.Y. Feb 27, 1997); *Thomas v. Held,* 941 F.Supp. 444, 447 (S.D.N.Y.1996). For the reasons discussed in Point II below, even if Saint–Fleur were to seek leave to amend to sue a State judge solely for injunctive relief, the claim would have to be dismissed.

7 *See also, e.g., Burgos v. Department of Children & Families,* No. 3:98CV874, 2000 WL 145737 at *2 (D.Conn. Feb. 7, 2000); *Adams v. Bosco,* 98 Civ. 8737, 1999 WL 165691 at *2 (S.D.N.Y. March 25, 1999); *Casaburro v. Giuliani,* 986 F.Supp. 176, 182 (S.D.N.Y.1997); *Fields v. Walthers,* No. 94–CV–1659, 1997 WL 204308 at *2 (N.D.N.Y. April 15, 1997) (Pooler, D. J.); *Daisernia v. State of New York,* 582 F.Supp. 792, 796 (N.D.N.Y.1984) ("The Supreme Court has consistently held ... that § 1983 does not abrogate the eleventh amendment immunity of states.").

8 Saint–Fleur's brief opposing the State's motion states that "[a]lthough the judges' names are unknown, plaintiff ... raised issues regarding '[t]he State of New York's appointed judges' being the guilty parties.... After the involved, unknown names are discovered, plaintiff, with leave from this court, will then amend the complaint to enter the names of the judges." (Saint–Fleur Br. at 5.)

9 *See also, e.g., Sanchez–Preston v. Judge Luria,* No. CV–96–2440, 1996 WL 738140 at *4 (E.D.N.Y. Dec. 17, 1996); *Fariello v. Campbell,* 860 F.Supp. 54, 67–68 (E.D.N.Y.1994); *Levine v. County of Westchester,* 828 F.Supp. 238, 243 (S.D.N.Y.1993), *aff'd mem.,* 22 F.2d 1090 (2d Cir.1994).

10 *See also, e.g., Sanchez–Preston v. Judge Luria,* 1996 WL 738140 at *4; *Fariello v. Campbell,* 860 F.Supp. at 68; *Levine v. County of Westchester,* 828 F.Supp. at 243.

11 *Accord, e.g., Pollack v. Nash,* 58 F.Supp.2d 294, 303 (S.D.N.Y.1999); *Jones v. Newman,* 98 Civ. 7460, 1999 WL 493429 at *6 (S.D.N.Y. June 30, 1999); *Reisner v. Stoller,* 51 F.Supp.2d 430, 442 (S.D.N.Y.1999); *Amaker v. Coombe,* 96 Civ. 1622, 1998 WL 637177 at *3 (S.D.N.Y. Sept. 16, 1998); *Carr v. Village of New*

*York Mills, New York,* No. CivA96CV0042, 1998 WL 187395 at [*]2 (N.D.N.Y. April 15, 1998) (Pooler, D.J.); *Sanchez–Preston v. Judge Luria,* 1996 WL 738140 at [*]4.

---

**End of Document**                                        © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Fields v. Walthers, Not Reported in F.Supp. (1997)

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 168 of 449

1997 WL 204308
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Charles Mason FIELDS, Plaintiff,

v.

Thomas WALTHERS and the New York
State Division of Parole, Defendants.

No. 94–CV–1659 (RSP/GJD).
|
April 15, 1997.

**Attorneys and Law Firms**

Charles Mason Fields, Fishkill, NY, Pro Se.

Dennis C. Vacco, Attorney General of the State of New York, Albany, NY, for Defendants; Anthony B. Quartararo, Assistant Attorney General, of counsel.

*ORDER*

ROSEMARY S. POOLER, District Judge.

 **\*1** The above matter comes to me following a Report–Recommendation by Magistrate Judge Gustave J. DiBianco, duly filed on the 24th day of March, 1997. Following ten days from the service thereof, the Clerk sent me the entire file, including any and all objections filed by the partied herein. Objections have not been filed.

In his civil rights action, plaintiff alleged that defendants violated his constitutional rights with respect to a preliminary parole revocation hearing. The magistrate judge recommended that I grant defendants' motion for summary judgment because (1) the Eleventh Amendment of the United States Constitution prohibits plaintiffs suit against the New York State Division of Parole, and (2) plaintiff failed to demonstrate that defendant Thomas Walthers was personally involved in plaintiffs alleged constitutional violation.

After careful review of all of the papers herein, including the magistrate judge's Report–Recommendation, and no objections have been submitted thereto, it is

ORDERED, that:

 1. The Report–Recommendation is hereby APPROVED.

 2. The defendants' motion for summary judgment is GRANTED and the complaint is dismissed in its entirety for the reasons set forth in the magistrate judge's Report–Recommendation.

 3. The Clerk serve a copy of this Order on the parties by regular mail.

IT IS SO ORDERED.

REPORT–RECOMMENDATION

This matter was referred to the undersigned for report and recommendation by the Honorable Rosemary S. Pooler, United States District Judge, pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rules N.D.N.Y. 72.3(c).

In the instant civil rights complaint plaintiff alleges constitutional violations with respect to his preliminary parole revocation hearing held on October 14, 1994. Plaintiff alleges that he was denied his right to counsel at his preliminary hearing.

Plaintiff seeks substantial monetary relief.

Presently before the court is the defendants' motion for summary judgment pursuant to FED. R. CIV. P. 56 (Docket # 12). For the following reasons, this court agrees with the defendants and will recommend dismissal of the complaint.

DISCUSSION

1. *Summary Judgment:*
Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact. Fed.R.Civ.P. 56; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) (citations omitted). "Ambiguities or inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the summary judgment motion." Id. However, when the moving party has met its burden, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d

202 (1986). At that point, the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial. *Id.*

2. *Eleventh Amendment:*

**\*2** One of the defendants in the instant case is the New York State Division of Parole. It is well settled that absent a waiver by the state, or a valid congressional override, the Eleventh Amendment prohibits federal courts from entertaining suits by private parties against the states. *Farid v. Smith,* 850 F.2d 917, 920–21 (2d Cir.1988) (citing Kentucky v. Graham, 473 U.S. 159, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985)). When Congress enacted sections 1983 and 1985, it did not abrogate the states' Eleventh Amendment immunity. *United States v. City of Yonkers,* 880 F.Supp. 212, 231 (S.D.N.Y.1995)(citing *Quern v. Jordan,* 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979)).

For Eleventh Amendment purposes, governmental entities of the state that are considered "arms of the state" receive Eleventh Amendment immunity. *Will v. Michigan Department of Police,* 491 U.S. 58, 70, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989); *Komlosi v. New York State OMRDD,* 64 F.3d 810 (2d Cir.1995). The New York State Division of Parole is clearly a state entity to which the Eleventh Amendment immunity applies. Thus, the instant case must be dismissed as against the New York State Division of Parole.

3. *Personal Involvement:*

In order to be liable for damages under section 1983, the defendant must have been personally involved in the alleged constitutional violation. *Polk County v. Dodson,* 454 U.S. 312, 325, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981); *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978).

In the instant case, plaintiff sues Thomas Walthers, as the Parole Officer that was responsible for the alleged violation.

However, it is clear from the transcript of the preliminary parole hearing which has been submitted as part of the defendants' motion for summary judgment, that Mr. Walthers was not even present at the plaintiff's preliminary parole revocation hearing. Additionally, it is apparent that the Parole Officer had absolutely nothing to do with the appointment or the lack of appointment of counsel. It was the Administrative Law Judge (ALJ) that did not allow plaintiff the adjournment to obtain counsel. The ALJ's rationale was that plaintiff had no absolute right to counsel at a preliminary parole revocation hearing. Defendants' Exhibit B, Transcript of Preliminary Parole Revocation Hearing at 14. It was the judge's ruling that plaintiff could proceed at that stage without an attorney. *Id.* Plaintiff then decided he would leave the room because he did not wish to proceed. He voluntarily left the hearing room, and the preliminary hearing was held without him. Id. at 15.

In any event, it is clear that defendant Walthers was not personally involved in the alleged constitutional violation. Thus, the complaint may be dismissed as to this defendant.

WHEREFORE, based on the above, it is hereby

RECOMMENDED, that defendants' motion for summary judgment (Docket # 12) be GRANTED, and the complaint be dismissed in its entirety.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

**All Citations**

Not Reported in F.Supp., 1997 WL 204308

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

Morgan v. Semple, Not Reported in Fed. Supp. (2020)

Case 3:24-cv-00037-DNH-ML    Document 9    Filed 06/11/24    Page 170 of 449

2020 WL 2198117
Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.

Lloyd George MORGAN, Jr., Plaintiff,

v.

Scott SEMPLE, et al., Defendants.

No. 3:16-cv-225 (VAB)
|
Signed 05/06/2020

**Attorneys and Law Firms**

Richard M. Dighello, Jr., Updike, Kelly & Spellacy, P.C., Hartford, CT, for Plaintiff.

DeAnn S. Varunes, Attorney General's Office, Jacob McChesney, Connecticut Office of the Attorney General, Hartford, CT, Seth A. Hollander, State of Connecticut Office of the Attorney General, New Britain, CT, for Defendants Scott S. Semple, Monica Rinaldi, Antonio Santiago, Jeffrey Zegarzewski, Conger, James Shabenas, Rivard, Comitos, Senita, Thomas Weglarz, Matthew Morin, Scully.

Terrence M. O'Neill, DeAnn S. Varunes, Jacob McChesney, Connecticut Office of the Attorney General, Hartford, CT, Seth A. Hollander, State of Connecticut Office of the Attorney General, New Britain, CT, for Defendant Elizabeth Coursen.

Eric S. Lankton, Rebar Kelly, New York, NY, DeAnn S. Varunes, Jacob McChesney, Connecticut Office of the Attorney General, Hartford, CT, Seth A. Hollander, State of Connecticut Office of the Attorney General, New Britain, CT, for Defendant Gina Higgins.

Jacob McChesney, Connecticut Office of the Attorney General, Hartford, CT, for Defendant Brett Fulcher.

Brett Fulcher, pro se.

**RULING AND ORDER ON MOTION TO DISMISS SECOND AMENDED COMPLAINT**

Victor A. Bolden, United States District Judge

**\*1** Lloyd George Morgan, Jr. ("Plaintiff") has sued Commissioner Scott Semple, Deputy Commissioner Monica Rinaldi, Warden Antonio Santiago, Deputy Warden Jeffrey Zegarzewski, Captain James Shebanas, and Unit Manager Jeffrey Conger, Corrections Officer Gary Rivard, Corrections Officer Philip Comtois, Corrections Officer Paul Senita, Corrections Officer Thomas Weglarz, Corrections Officer Brett Fulcher, Corrections Officer Matthew Morin, Corrections Officer Scully, Elizabeth Coursen, and APRN Gina Higgins in their individual and official capacities under 42 U.S.C. § 1983 for retaliation, deliberate indifference to safety, violation of the right to privacy, violation of the right to free speech, and violation of the equal protection clause. Second Am. Compl., ECF No. 96 at 1 (June 21, 2019) ("Second Am. Compl.").

Defendants have filed a motion to dismiss Plaintiff's second amended Complaint. Mot. to Dismiss, ECF No. 114 (Oct. 21, 2019) ("Mot.").

For the following reasons, the motion is **GRANTED in part and DENIED in part.**

The Court **DENIES** the motion to dismiss as to Mr. Morgan's claims for First Amendment retaliation against Defendants Morin, Rivard, Comitos, Senita, Weglarz, Scully, Conger, Coursen, and Higgins; the deliberate indifference claim against Defendants Rivard, Comitos, Senita, Scully, Fulcher, Morin, Coursen, Higgins, Semple, Rinaldi, Santiago, Zegarzewski, Shabanas, and Conger; the claim of supervisory liability against Defendants Semple, Rinaldi, Santiago, Zegarzewski, Shebanas, and Conger; and the Fourteenth Amendment equal protection claim.

The Court **GRANTS** the motion to dismiss as to the Fourth Amendment claim; the claim for negligent infliction of emotional distress; and the claim for intentional infliction of emotional distress against Defendants Rivard, Comtois, Senita, Weglarz, Scully, Fulcher, Morin, Coursen, and Higgins.

**I. FACTUAL AND PROCEDURAL BACKGROUND**

**A. Factual Allegations**

From approximately October 2014 to December 2015, Mr. Morgan was incarcerated at the Corrigan-Radgowski Corrections Center ("Corrigan-Radgowski") in Uncasville, Connecticut. Second Am. Compl. ¶¶ 8, 24. He allegedly suffers "from various disabilities and health issues including

Morgan v. Semple, Not Reported in Fed. Supp. (2020)

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 171 of 449

type-two diabetes, mental and emotional disorders and a learning disability." *Id.*

From approximately May to July 2015, Mr. Morgan allegedly "was housed in Unit C Block, Cell 111[.]" *Id.* ¶ 27. He allegedly filed various complaints and grievances against Corrections Officers Barstow and Morin with their supervisors, Lieutenant Gillete, Captain Dougherty, Captain Williams, Deputy Warden Martin, Captain Shebenas, Deputy Warden Zegarzewski, and Warden Santiago "for engaging in unprofessional conduct, including but not limited to, turning the volume on the television in the inmates' day room to levels that made it difficult for Plaintiff to sleep." *Id.*

After learning of the grievances, Corrections Officers Bartsow and Morin allegedly "engaged in a pattern of retaliation and harassment" against Mr. Morgan. *Id.* ¶ 28. The retaliation allegedly included referring to Mr. Morgan "as a 'snitch' in the presence of other inmates with the full knowledge that such a reference would create an unsafe and dangerous environment ... because the other inmates were likely to harm inmates" believed to be informants. *Id.* ¶ 29.

**\*2** Mr. Morgan allegedly once overheard Corrections Officer Morin tell other inmates in Mr. Morgan's cell unit that he was " 'a big fat rat and snitch' and to 'fuck him up and get his ass out of the unit.' " *Id.* ¶ 30. Morgan alleges that Corrections Officers Barstow and Morin knew "that referring to an inmate as a 'snitch' and a 'rat' could cause grave danger[,]" but repeated these phrases in front of other inmates on multiple occasions. *Id.* ¶ 31.

On or around July 2015, Corrections Officer Weglarz allegedly retaliated against Mr. Morgan for filing a complaint and a grievance "for, among other things, playing the television set in the inmates' day room at a volume that made it difficult for Plaintiff to fall asleep." *Id.* ¶ 32. He allegedly threatened to and encouraged "other officers to write false disciplinary reports against" Mr. Morgan. *Id.* ¶ 33. On one occasion, Corrections Officer Weglarz allegedly "issued a false disciplinary report" in retaliation; the report ultimately was dismissed for lack of merit. *Id.* ¶ 34. Mr. Morgan allegedly reported the retaliation and harassment to Deputy Warden Zegarzewski and Warden Santiago, who allegedly failed "to stop Corrections Officer Weglarz from his continued acts of retaliation and harassment[.]" *Id.* ¶ 35.

Mr. Morgan allegedly made several complaints to Lieutenants Gillete and Iozzia, Captain Shebanas, Deputy Warden

Zegarzewski, Warden Santiago, and Commissioner Semple about corrections officers' "continued practice of turning the television in the inmates' day room to loud volumes[,]" thus preventing Mr. Morgan from sleeping. *Id.* ¶ 36. These practices allegedly resulted in Mr. Morgan suffering "from extreme psychological distress and significant sleep deprivation[,]" which affected his physical and mental well-being. *Id.* The complaints allegedly caused further retaliation. *Id.* "[V]arious officers [allegedly] improperly searched [Mr. Morgan's] property with the intent to cause [him] harm or subject him to criminal charges." *Id.*

On or around August 2015, Mr. Morgan "was housed in Unit A[.]" *Id.* ¶ 37. Corrections Officer Morin allegedly was assigned to the same unit. *Id.* With the help of others, Corrections Officers Morin "threatened to plant contraband," like a knife or a "shank," in Mr. Morgan's cell, in order to get him removed from Unit A. *Id.* ¶ 38. Again, Corrections Officer Morin allegedly referred to him as a "snitch" and "pedophile" in front of other inmates. *Id.* ¶ 39. Mr. Morgan believes this was done "as retaliation for the previous complaints and grievances" filed, *id.* ¶ 38, and "with the intention of endangering [his] safety and causing him psychological harm," *id.* ¶ 39.

On or around September 2015, Mr. Morgan allegedly "was assigned to [the] Restrictive Housing [Unit] at Corrigan-Radgowski[,]" allegedly for filing complaints about Corrections Officer Fulcher to Lieutenant Conger. *Id.* ¶ 41. Corrections Officer Fulcher allegedly retaliated against Mr. Morgan. *Id.* ¶ 42. On September 13, 2015, Mr. Morgan filed a complaint with Lieutenant Conger, allegedly "setting forth several instances of abuse of authority and ongoing harassment" by Corrections Officer Fulcher. *Id.* ¶ 43. Lieutenant Conger allegedly acted indifferently and blamed Mr. Morgan for the harassment and retaliation he had endured. *Id.* ¶ 44. Lieutenant Conger allegedly said, "I am not sure why you continue to stir up issues where there is not one. Just because you had your feelings hurt does not mean you can discredit these officers." *Id.* ¶ 45.

**\*3** Lieutenant Conger allegedly "did nothing to prevent" continued harassment and retaliation from Corrections Officer Fulcher. *Id.* ¶ 46. The harassment and retaliation continued, and "Corrections Officer Fulcher [allegedly] went so far as to retrieve Plaintiff's complaint and stomp" on it in front of Mr. Morgan. *Id.*

Corrections Officers Rivard, Comtois, and Senita allegedly harassed and retaliated against Mr. Morgan as well. *Id.* ¶ 47. All three allegedly referred to him as a pedophile to medical staff, other corrections officers, and other inmates on multiple occasion in retaliation for the complaints and grievances Mr. Morgan had filed against them. *Id.* In his opinion, "[t]he sole purpose for continually referring to [Mr. Morgan] as a 'rat,' 'snitch' or pedophile was to create an unsafe environment for [him]" which "would likely subject [him] to a heightened risk of injury and violence...." *Id.* ¶ 48.

Even though Mr. Morgan allegedly had reported all of this to Lieutenant Conger, Deputy Warden Zegarzewski, Warden Santiago, and Captain Shebanas, they allegedly "failed to take any action to" end the harassment and retaliation. *Id.* ¶ 49.

In addition, Corrections Officers Rivard, Comtois, and Senita allegedly "threatened physical violence against [Mr. Morgan] and his family members and friends after learning" of Mr. Morgan's intent to file the instant lawsuit. *Id.* ¶ 50. He alleges they threatened his physical safety and the safety of his friends and family on multiple occasions, unless Mr. Morgan removed them as Defendants from the lawsuit. *Id.* ¶ 51. The threats allegedly were reported to Lieutenant Conger, Captain Shebanas, Deputy Warden Zegarzewski, and Warden Santiago, all of whom allegedly did nothing. *Id.* Mr. Morgan alleges he suffered "extreme emotional distress, anguish and anxiety" as a result. *Id.*

One of the physical threats made by Corrections Officers Rivard, Comtois, and Senita included allegedly telling Mr. Morgan "that they had killed one of [his] sisters and [ ] brutally assaulted another sister." *Id.* ¶ 52. With a limited ability to communicate to his family, Mr. Morgan alleges he believed the corrections officers. *Id.* This allegedly caused him to live "in constant fear, anxiety and anguish about [the] health, safety, and well-being" of his family. *Id.* ¶ 53. Mr. Morgan alleges he "wrote a letter to the Connecticut State Police outlining the threats of physical violence against him and his family[,]" after supervising officers did nothing. *Id.* ¶ 54.

After Mr. Morgan sent the letter to Connecticut State Police, Corrections Officer Senita, with other corrections officers, allegedly "made further threats to the physical safety of [Mr. Morgan] ... including further threats to kill [his] sisters." *Id.* ¶ 55. After the repeated threats, Mr. Morgan allegedly called Corrections Officers Rivard and Comtois "maniacs"

and "mafioso dons[,]" to which they replied "we are maniacs and 'Mafioso dons.' " *Id.* ¶ 56.

Corrections Officers Senita, Comtois, Rivard, and Scully also allegedly "stated on multiple occasions that they placed boric acid in [Mr. Morgan's] food." *Id.* ¶ 57. They allegedly told him this "was because they believed [Mr. Morgan] was a rat for 'snitching' on them." *Id.* Mr. Morgan alleges he thought "that the boric acid was a lethal poison." *Id.* The threats allegedly were made while Mr. Morgan received his food. *Id.* ¶ 58. Mr. Morgan allegedly would request that his food be exchanged, but the corrections officers "refused to grant his requests." *Id.* Mr. Morgan alleges that on more than one occasion he "became very sick after consuming food delivered by Defendants and also experienced burning sensations in [ ] his throat and stomach." *Id.* ¶ 59. The corrections officers allegedly told him on multiple occasions that "they were subjecting [Mr. Morgan] to harassment because they enjoyed preying on weak people." *Id.* ¶ 60.

**\*4** Mr. Morgan eventually applied for and was placed in protective custody. *Id.* ¶ 61. While his application allegedly was pending, Corrections Officer Scully attempted to "undermine approval of [his] application ... [by] falsifying documents that stated [he] was not competent for protective custody and telling other Corrections [Officers] that [Mr. Morgan] liked 'little pee pees' implying that [he] was a pedophile." *Id.* Mr. Morgan alleges he witnessed Corrections Officer Scully ask another corrections officer "to make an entry in a log book stating that [he] was a pedophile." *Id.* Dr. Coursen, the supervising psychologist, and Nurse Higgins allegedly "act[ed] in concert [and] filed falsified reports that claimed [Mr. Morgan] was a pedophile," which resulted in the revocation of Mr. Morgan's previously granted protective custody. *Id.* ¶ 62.

On or around October 5, 2015, Mr. Morgan met with Dr. Coursen and Nurse Higgins to discuss his mental and physical health. *Id.* ¶ 63. He allegedly told them he was not suicidal, but was subjected to continued harassment and retaliation by various corrections officers. *Id.* ¶ 64. Dr. Coursen and Nurse Higgins, with Corrections Officer Rivard and Lieutenant Conger, allegedly placed Mr. Morgan "on level five suicide watch," which meant Mr. Morgan could not use pens or pencils, nor did he have access to his legal mail. *Id.* ¶ 65. "Defendants also threatened to cut off [his] penis and slice his throat if he continued filing complaints and grievances." *Id.* Mr. Morgan believes that his placement on suicide watch was

to prevent the "continued prosecution of his lawsuit" and the "filing [of] further complaints or grievances...." *Id.* ¶ 66.

While at Corrigan-Radgowski, Mr. Morgan allegedly sought help from Inmates' Legal Aid Program attorneys. *Id.* ¶ 67. He was not satisfied with their representation and allegedly wrote complaints against them, claiming he allegedly was "denied adequate and meaningful access to the courts." *Id.* Some of these attorneys allegedly "refused to assist [Mr. Morgan] with his lawsuits because certain Defendants ... falsely told the attorneys that [he] was a pedophile." *Id.* ¶ 68.

From around May 2015 to July 2015, while at the medical ward for diabetes testing, Mr. Morgan alleges Corrections Officer Morin "allowed other inmates ... to enter [Mr. Morgan's] cell and remove and read [his] personal and confidential legal documents." *Id.* ¶ 69. He allegedly reported this to Deputy Warden Zegarzewski, Captain Shebanas, and Warden Santiago." *Id.* ¶ 71.

In July 2015, Mr. Morgan again allegedly "informed Deputy Warden Zegarzewski, Warden Santiago and Commissioner Semple about the continued playing of the day room television at extremely loud volumes." *Id.* ¶ 73. Corrections staff allegedly searched Mr. Morgan's personal property; Corrections Officers Rivard, Comtois, and Senita "even obtained a picture from [Mr. Morgan's] cell of a Mrs. Evelyn Gray and her family." *Id.* Mr. Morgan allegedly "was also in the picture as these were friends of his from Church." *Id.* The three corrections officers allegedly showed the picture to Corrections Officer Williams, the sister of Ms. Gray. *Id.* ¶ 74. They allegedly told Corrections Officer Williams that Mr. Morgan was a pedophile to disparage him and to "plac[e] Plaintiff's life and safety in danger." *Id.*

In September 2015, while assigned to the Restrictive Housing Unit, Mr. Morgan alleges that Corrections Officers Rivard, Comtois, and Senita "placed listening and recording devices and other technology in Plaintiff's cell in order to see and read his confidential legal documents and retrieve other private information." *Id.* ¶ 75. Mr. Morgan again allegedly reported this to "Lieutenant Conger, Captain Shebanas, Deputy Warden Zegarzewski and Warden Santiago, all of whom [allegedly] took no action to protect Plaintiff's privacy." *Id.* ¶ 76.

**\*5** Mr. Morgan alleges harassment and discrimination because of his sexual identity and orientation. *Id.* ¶ 77. On several occasions, Corrections Officer Fulcher allegedly

"made discriminatory remarks about [Mr. Morgan's] sexuality" in the presence of other inmates and corrections officers. *Id.* ¶ 78. During one specific instance, Corrections Officer Fulcher allegedly shouted "you can't get shit from me you fucking homo, you faggot[,]" allegedly "for the express purpose of placing [Mr. Morgan's] safety in jeopardy and to harass and retaliate" against him. *Id.* ¶ 79. He allegedly repeatedly referred to Mr. Morgan as a "fucking homo" and a "faggot," and improperly entered Mr. Morgan's cell to read his confidential legal documents. *Id.* ¶ 80.

Mr. Morgan alleges he reported the discriminatory acts to Lieutenant Conger, "but Lieutenant Conger failed to take any steps to put a stop to the discriminatory treatment [Mr. Morgan] continued to suffer at the hands of Corrections Officer Fulcher." *Id.* ¶ 81. He again allegedly reported Corrections Officer Fulcher's actions to Warden Santiago, "when Warden Santiago toured [Mr. Morgan's] segregation unit." *Id.* ¶ 82. Warden Santiago allegedly "took no steps to put an end to the harassment and discriminatory acts" of Corrections Officer Fulcher. *Id.*

Mr. Morgan also alleges that he intended "to use his allotted legal phone calls or other means of communication" to report the retaliation and harassment to Connecticut State Police, the Department of Justice, and the Federal Bureau of Investigations. *Id.* ¶ 83. "However, his right to use his two legal phone calls or otherwise communicate [allegedly] was not granted." *Id.* He filed several complaints about this to Commissioner Semple, Warden Santiago, and Deputy Commissioner Rinaldi, but they "failed to take any steps to address [his] concerns." *Id.* ¶ 84. Mr. Morgan further alleges that "Commissioner Semple, Warden Santiago, and Deputy Commissioner Rinaldi created rules and regulations, and [policies] and procedures that denied [Mr. Morgan] of his right to "two legal phone calls" per month "or to otherwise communicate with judicial and law enforcement agencies." *Id.* ¶ 85.

### B. Procedural History

The Court assumes familiarity with the case and summarizes only the procedural history relevant to the pending motion.

On June 21, 2019, Plaintiff filed a second amended Complaint against Defendants Comitors, Conger, Coursen, Fulcher, Higgins, Morin, Rinaldi, Rivard, Santiago, Scully, Semple,

Morgan v. Semple, Not Reported in Fed. Supp. (2020)

Senita, Shabanas, Weglarz, and Zegarzewski. Second Am. Compl.

On October 21, 2019, Defendants timely filed a motion to dismiss the second amended complaint. Mot.; Supp. Mem., ECF No. 114-1 (Oct. 21, 2019) ("Defs.' Mem.").

On January 10, 2020, Plaintiff timely filed an objection to the motion to dismiss. Obj., ECF No. 128 (Jan. 10, 2020).

On February 7, 2020, Defendants timely filed a reply. Reply, ECF No. 134 (Feb. 7, 2020).

On April 16, 2020, the Court held a telephonic motion hearing. Minute Entry, ECF No. 144 (Apr. 16, 2020).

## II. STANDARD OF REVIEW

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). Any claim that fails "to state a claim upon which relief can be granted" will be dismissed. Fed. R. Civ. P. 12(b) (6). In reviewing a complaint under Rule 12(b)(6), a court applies a "plausibility standard" guided by "two working principles." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

First, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*; *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations ... a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." (internal citations omitted)). Second, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679. Thus, the complaint must contain "factual amplification ... to render a claim plausible." *Arista Records LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (quoting *Turkmen v. Ashcroft*, 589 F.3d 542, 546 (2d Cir. 2009)).

**\*6** When reviewing a complaint under Federal Rule of Civil Procedure 12(b)(6), the court takes all factual allegations in the complaint as true. *Iqbal*, 556 U.S. at 678. The court also views the allegations in the light most favorable to the plaintiff and draws all inferences in the plaintiff's favor. *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 359 (2d Cir. 2013); *see also York v. Ass'n of the Bar of the City of N.Y.*, 286 F.3d 122, 125 (2d Cir. 2002) ("On a motion to dismiss for failure to state

a claim, we construe the complaint in the light most favorable to the plaintiff, accepting the complaint's allegations as true.").A court considering a motion to dismiss under Rule 12(b)(6) generally limits its review "to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). A court may also consider "matters of which judicial notice may be taken" and "documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993); *Patrowicz v. Transamerica HomeFirst, Inc.*, 359 F. Supp. 2d 140, 144 (D. Conn. 2005).

## III. DISCUSSION

### A. Official Capacity Claims

The Eleventh Amendment divests the district court of subject matter jurisdiction over claims for money damages against state officials acting in their official capacities unless the state has waived this immunity or Congress has abrogated it. *See Kentucky v. Graham*, 473 U.S. 159, 169 (1985) ("The Court has held that, absent waiver by the State or valid congressional override, the Eleventh Amendment bars a damages action against a State in federal court."). The Connecticut Supreme Court has held that the doctrine of sovereign immunity protects the state and state officials in their official capacities from lawsuits seeking monetary damages, unless the plaintiff obtains a waiver from the claims commissioner prior to bringing the action against the state or state officials in their official capacities. *Miller v. Egan*, 265 Conn. 301, 313–18 (2003) (exempting declaratory and injunctive relief from sovereign immunity and explaining the Connecticut legislature has required authorization by the claims commissioner or another statutory provision).

Defendants argue that Mr. Morgan only seeks money damages and that the "Eleventh Amendment bars claims for damages against a state official in his or her official capacity unless the state has waived this immunity or Congress has abrogated it." Defs.' Mem. at 11. Because, in their view, neither Connecticut nor Section 1983abrogate sovereign immunity, all claims against Defendants in their official capacities must be dismissed. *Id.*

Morgan v. Semple, Not Reported in Fed. Supp. (2020)

Case 3:24-cv-00037-DNH-ML    Document 9    Filed 06/11/24    Page 175 of 449

Mr. Morgan argues that because the Court found his First Amendment retaliation, deliberate indifference to safety, denial of equal protection, and right to privacy claims sufficient in its initial review order, the Court should deny the motion to dismiss those claims. Pl.'s Mem. at 3; *see also* Ruling on Plaintiff's Motion to Amend and Initial Review Order, ECF No. 13 (Aug. 23, 2016) ("Ruling and IRO"). [1]

The Court disagrees.

Mr. Morgan has presented no Connecticut statute which abrogates sovereign immunity in this instance. *See Green v. Martin*, 224 F. Supp. 3d 154, 163 (D. Conn. 2016) (dismissing official capacity claims because Section 1983 does not abrogate state sovereign immunity nor did defendant "allege[ ] any facts suggesting that Connecticut has waived this immunity").

**\*7** Accordingly, all claims against Defendants in their official capacities are dismissed.

### B. The Newly Added Claims in the Second Amended Complaint

The Federal Rules of Civil Procedure permit relation back of an amendment to an earlier pleading when "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." Fed. R. Civ. P. 15(c)(1)(B). The amended pleading could relate back to the date of the original pleading in certain circumstances, and allow the addition of a party or claim even after the relevant statute of limitations has run.

Rule 15 permits pleadings to relate back when a defendant "(i) received such notice of the action that it will not be prejudiced in defending on the merits; and (ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the party's identify." Fed. R. Civ. P. 15(c)(1)(C)(i-ii).

"[T]he central inquiry is whether adequate notice of the matters raised in the amended pleading has been given to the opposing party within the statute of limitations by the general fact situation alleged in the original pleading." *Lehman XS Tr., Series 2006-GP2 by U.S. Bank Nat'l Ass'n v. GreenPoint Mortg. Funding, Inc.*, 916 F. 3d 116, 128 (2d Cir. 2019) (internal quotation marks omitted). "Rule 15(c)(1)(C)(ii) asks

what the prospective *defendant* knew or should have known during the Rule 4(m) period, not what the *plaintiff* knew or should have known at the time of filing her original complaint." *Krupski v. Costa Crociere S. p. A.*, 560 U.S. 538, 548 (2010) (emphasis in the original).

Defendants argue that Mr. Morgan presents four new claims that do not "relate back" to the original complaint: (1) "that Defendants Rivard, Comitos, and Senita informed attorneys with the inmate legal assistance program that [he] was a pedophile[;]" (2) "that Defendant Zegarzewski created policies and procedures that prevented him from contacting legal authorities regarding his complaints[;]" (3) that he " 'made several complaints about his inability to use his two legal phone calls or other means of communication to' Defendants Semple, Santiago, and Rinaldi, but they failed to address his concerns[;]" and (4) "that Defendant Scully undermined the plaintiff's approval for protective custody." Defs.' Mem. at 11–12.

The Court will analyze each claim in turn.

### 1. Interference with Inmate Legal Assistance Program Attorneys

In his original Complaint, Mr. Morgan alleged that the Inmate Legal Assistance Program (ILAP) "attorneys denied him legal assistance because they believed the allegedly false statements of correctional staff that Mr. Morgan is a 'snitch' and a 'pedophile.' " Ruling & IRO at 3–4; Am. Compl., ECF No. 11 ¶¶ 29-30 (May 6, 2016). At the time, Mr. Morgan did not name which Defendants allegedly told the ILAP attorneys he was a snitch and pedophile.

Rule 15(c)(1)(C)(ii) is not met "[w]hen the original complaint and the plaintiff's conduct compel the conclusion that the failure to name the prospective defendant in the original complaint was the result of a fully informed decision as opposed to a mistake concerning the proper defendant's identity[.]" *Krupski*, 560 U.S. at 552. The Court's analysis here is complicated by Mr. Morgan's *pro se* status at the filing of the original Complaint.

**\*8** "[A] *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (internal quotation marks omitted); *see also Ceara v. Deacon*, 916 F.3d 208, 213 (2d Cir. 2019) ("It

is of considerable significance that [the plaintiff] was an unrepresented incarcerated litigant and the District Court was required to construe Ceara's *pro se* pleading liberally and with 'special solicitude.' ").

Mr. Morgan, however, did not allege John or Jane Doe Corrections Officers might be held liable. It is in the Second Amended Complaint that Defendants Rivard, Comitos, and Senita were put "on notice as to the conduct and transactions at issue in this action" and that they might be held liable under a related cause of action. *Stevelman v. Alias Research Inc.*, 174 F.3d 79, 87 (2d Cir. 1999) (remanding to the district court after finding the amended complaint related back to the conduct and transactions in the original complaint).

Taking into consideration Mr. Morgan's *pro se* status as well as the Defendants' interest, the Court must consider whether allowing this claim to proceed would unduly prejudice Defendants. "Where a party seeks to add an additional claim, evaluation of prejudice requires consideration of whether the new claim would '(i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; (ii) significantly delay the resolution of the dispute; or (ii) prevent the plaintiff from bringing a timely action in another jurisdiction.' " *Roller Bearing Co. of Am., Inc. v. Am. Software, Inc.*, 570 F. Supp. 2d 376, 385 (D. Conn. 2008) (quoting *Block v. First Blood Assocs.*, 988 F.2d 344, 250 (2d Cir. 1993)). Discovery is set to close on June 26, 2020. Order, ECF No. 133 (Feb. 4, 2020). Given the procedural posture of the case, allowing the claim to proceed would unduly prejudice Defendants. *See AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*, 626 F.3d 699, 725 (2d Cir. 2010) (finding a district court correct in denying "the plaintiffs' 'belated attempt to inject a new legal theory' into the case on grounds of undue delay and prejudice[,]" but ultimately declining to affirm because the district court dismissed the amended complaint as futile without specifying if "the proposed amendment fail[ed] to state a legally cognizable claim or fail[ed] to raise triable issues of fact"); *Ansam Assocs., Inc. v. Cola Petroleum, Ltd.*, 760 F.2d 442, 446 (2d Cir. 1985) (affirming the district court's denial of a motion to amend where new counsel "discovered the information that formed the basis of [plaintiff's] new proposed claim" because it was "an insufficient reason for prejudicing [the defendant] by forcing [the defendant] to proceed to trial, post-discovery, on a new complaint").

Accordingly, the claims related to Defendants Rivard, Comitos, and Senita informing ILAP attorneys that Mr. Morgan was a snitch or pedophile will be dismissed.

### 2. Defendant Zegarzewski

Mr. Morgan also now alleges that Defendant Zegarzewski "created policies and procedures that prevented him from contacting legal authorities regarding complaints." Defs.' Mem. at 11. In his original complaint, Mr. Morgan alleged he filed "several complaints and grievances against correctional officers to Defendant Zegarzewski with no response." Pl.'s Mem. at 6. He now contends that "[t]hese complaints and grievances potentially contained allegations that correctional officers were preventing him from contacting legal authorities about violations of his constitutional rights" and that the claim related to policies and procedures flows from that.

**\*9**  The Court disagrees.

Even if this claim could be construed to relate back to the original Complaint, the factual allegations are entirely conclusory as to Defendant Zegarzewski. *See Adams v. City of New Haven*, No. 3:14-cv-00778 (JAM), 2015 WL 1566177, at *4 (D. Conn. Apr. 8, 2015) (dismissing a failure to train claim where plaintiff did "not provide any facts that would allow the court to infer what city policies, practices, or customs contributed to or caused the deficiency") (quoting *Simms v. City of New York*, No. 10-CV-3420 (NGG)(RML), 2011 WL 4543051, at *3 (E.D.N.Y. Sept. 28, 2011)). Because the claim is insufficiently pled, the Court need not consider whether it would relate back. *See Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." (citing *Twombly*, 550 U.S. at 555)).

Accordingly, the claim will be dismissed.

### 3. Defendants Semple, Santiago, and Rinaldi and Legal Phone Calls

Mr. Morgan alleges that his original Complaint "alleged that Defendants Semple, Santiago, and Rinaldi created policies and procedures that denied him his right to his two legal calls a month." Pl.'s Mem. at 6 (citing Compl. ¶ 40). Paragraph 40 of the original Complaint and the second amended Complaint do not contain references to this claim.

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 177 of 449

Morgan v. Semple, Not Reported in Fed. Supp. (2020)

Accordingly, it will be dismissed.

### 4. Defendant Scully and Protective Custody

Similarly as he did with the claim against Defendants Rivard, Comitos, and Senita, Mr. Morgan argues that this is not a new claim because "[a]lthough Plaintiff did not include Defendant Scully, he was put on notice...." Pl.'s Mem. at 6.

Defendant Scully, however, could not "have known that, *but for a mistake of identity*, the original actions would have been brought against" him. *Cotto v. City of N.Y.*, 17-2845, 2020 WL 1228765, at *2 (2d Cir. 2020) (emphasis in original). Nothing in the initial Complaint suggests that Defendant Scully should have known that the vague reference to corrections officers interfering with Mr. Morgan's approval for protective custody referred to him or that "the lawsuit should have been brought against him" on this claim. *Id.*; *see also Hogan v. Fischer*, 738 F.3d 509, 517 (2d Cir. 2013) ("Generally, John Doe pleadings cannot be used to circumvent statutes of limitations because replacing a John Doe with a named party in effect constitutes a change in the party sued. John Doe substitutions, then, may only be accomplished when all the specifications of Fed. R. Civ. P. 15(c) are met." (internal quotation marks and citations omitted)).

Accordingly, Mr. Morgan's claim of interference with ILAP, his claim that Defendant Zegarzewski prevented him from contacting legal authorities, his claim that Defendants Semple, Santiago, and Rinaldi created policies and procedures which interfered with his legal phone calls, and his claim against Detective Scully will be dismissed.

### C. The First Amendment Claim – Free Speech

"[I]nmates must have a reasonable opportunity to seek and receive the assistance of attorneys." *Procunier v. Martinez*, 416 U.S. 396, 419 (1974), *overruled on other grounds by Thornburgh v. Abbott*, 490 U.S. 401 (1989). "Although prisoners have a right to access counsel from prison, they have no right to unlimited telephone calls...." *Fisher v. Dep't of Corrs.*, 92 Civ. 6027 (LAP), 1995 WL 608379, at *7 (S.D.N.Y. Oct. 16, 1995) (quoting *Bellamy v. McKines*, 692 F. Supp. 205, 214 (S.D.N.Y. 1988)).

**\*10** An inmate's access to counsel by telephone may be limited, as long as other methods of access to counsel are available. *Bellamy*, 692 F. Supp. at 214. "Mere 'delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation.' " *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003) (quoting *Jermosen v. Coughlin*, 877 F. Supp. 864, 871 (S.D.N.Y. 1995)). "[T]o succeed on [a] claim that the right [to seek and receive assistance of attorneys] was violated, [a plaintiff] must show that [a] [d]efendant's conduct deprived him of access to court or to counsel and that his deprivation unfairly prejudiced his case." *Brown v. Brabazon*, 94 CIV. 2600 (RWS), 1998 WL 177612, at *2 (E.D.N.Y. Apr. 13, 1998).

Defendants move to dismiss both alleged violations of Mr. Morgan's First Amendment rights: (1) retaliation for the grievances and complaints allegedly conducted by Defendants Rivard, Comitos, Senita, Weglarz, Scully, Fulcher, Morin, Coursen, Higgens, Congers, Shabanas, and Zegarzewski; and (2) the actions taken by Defendants Semple, Rinaldi, Santiago, Zegarzewski, and Morin to prevent Mr. Morgan from contacting the Connecticut State Police, Department of Justice, and FBI. Defs.' Mem. at 7.

Defendants argue that as there is no "constitutional right to press criminal charges or to a criminal investigation[,]" and Mr. Morgan's First Amendment claim premised on his inability to contact authorities fails as a matter of law. *Id.* at 13 (citing *Johnson v. Ruiz*, No. 3:11-cv-542 (JCH), 2012 WL 90159, at *4–5 (D. Conn. Jan. 10, 2012)). Furthermore, even if the conduct was constitutionally protected, Defendants contend that the allegations are conclusory and fail to state a claim for relief. *Id.* at 14.

As to Mr. Morgan's claim that Defendants interfered with his ability to make two legal phone calls, Defendants argue that the rights of inmates are limited while incarcerated and that prison restrictions on speech may be valid if they support a penological interest. *Id.* (citing *Turner v. Safley*, 482 U.S. 78, 89 (1987)). Because prison administrators have latitude to make these decisions and because Mr. Morgan makes conclusory allegations, Defendants submit that this claim should also be dismissed. *Id.* at 14–15.

With regard to Mr. Morgan's claim that Defendants Semple, Rinaldi, Santiago and Zegarzewski created policies and procedures that interfered with his right to report the harassment endured to the authorities, Defendants argue

Morgan v. Semple, Not Reported in Fed. Supp. (2020)

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 178 of 449

Mr. Morgan "fail[s] to include any factual allegations even describing said policies or customs, how the defendants were involved in creating them, or how they prevented [Mr. Morgan] from exercising a constitutional right in light of existing jurisprudence regarding an inmate's rights to free speech." *Id.* at 16.

Mr. Morgan argues that his attempts to contact the authorities to report the harassment and retaliation he suffered "was a proper exercise of his First Amendment rights." Pl.'s Mem. at 8. In his view, Defendants mischaracterize Mr. Morgan's efforts as a claim for a failure to prosecute, *id.* at 8, when in fact, he has alleged "that Defendants denied his right to petition the government for redress of his grievances[,]" *id.* at 9. Mr. Morgan also notes that the Court's Initial Review Order found he had sufficiently alleged facts to support a First Amendment claim and the fact that Mr. Morgan was able to write one letter to the Connecticut State Police does not defeat his claim. *Id.* at 10; *see generally* Ruling & IRO.

In their reply, Defendants argue that preventing Mr. Morgan from contacting authorities does not constitute a constitutional violation, and, even if it was, Mr. Morgan "failed to adequately set forth a constitutional claim by allegedly being prevented from contacting authorities to report criminal activity." Reply at 2–3. His claim that Defendants created policies which prevented him from contacting authorities is conclusory as it fails "to offer any specificity [ ] beyond a recitation of the elements of his claim[.]" *Id.* at 3. Finally, Defendants refer to Mr. Morgan's letter to the Connecticut State Police to demonstrate his claim that he was prevented from communicating with authorities because of a vague policy is implausible, and demonstrates "that he was able to contact authorities via some method of communication, albeit not in the way he apparently preferred[.]" *Id.* at 4 (emphasis omitted).

**\*11** The Court will consider Mr. Morgan's First Amendment retaliation claim below, and now only addresses the claim that he was prevented from contacting authorities and from using his two legal phone calls.[2]

Mr. Morgan does not allege that Commissioner Semple, Warden Santiago, and Deputy Commissioner Rinaldi were personally involved in depriving him of his two legal phone calls, but instead attempts to hold them accountable by failing to remedy his complaints. Pl.'s Mem. at 8. According to Mr. Morgan, this failure to remedy is "akin to creat[ing] rules and

regulations, and policies and procedures" to deny him of his right to two legal phone calls. *Id.*

Furthermore, Mr. Morgan alleges that he was not allowed to use his legal phone calls to call the authorities, not that he was not permitted to call counsel. Second Am. Compl. at 18 ¶ 86. He has not alleged that he has suffered injury as a result or even that he was deprived of the opportunity to consult or speak with counsel. *See O'dell'bey v. Semple*, No. 3:19-cv-00304 (JAM), 2020 WL 127698 (D. Conn. Jan. 10, 2020) (allowing plaintiff to amend his complaint and his Sixth Amendment right to counsel claim "to state specifically how the restrictions on his legal telephone calls or law library access frustrated his defense").

Accordingly, his First Amendment claim related to his two legal phone calls will be dismissed.

### D. Deliberate Indifference Claim

The Eighth Amendment prohibits "cruel and unusual punishments." U.S. Const. amend. VIII. "[P]rison officials have a duty to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994) (internal quotation marks omitted); *see also Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997) ("The Eighth Amendment ... imposes on prison officials a duty to protect prisoners from violence at the hands of other prisoners." (internal quotation marks omitted)). "[U]nder 41 U.S.C. § 1983, prison officials are liable for harm incurred by an inmate if the officials acted with 'deliberate indifference' to the safety of the inmate." *Hayes v. N.Y.C. Dep't of Corrs.*, 84 F.3d 614, 620 (2d Cir. 1996). Mere negligence is insufficient to demonstrate deliberate indifference. *Id.*

To establish an Eighth Amendment violation for either failure to protect or deliberate indifference to safety, an incarcerated plaintiff must show first, "that [the plaintiff] is incarcerated under conditions posing a substantial risk of serious harm," and second, that the prison official had a "sufficiently culpable state of mind," which in "prisoner-conditions cases" is "one of deliberate indifference to inmate health or safety." *Farmer*, 511 U.S. at 834 (internal quotation marks omitted); *see also Lewis v. Swicki*, 629 F. App'x 77, 79 (2d Cir. 2015) (citing *Hayes*, 84 F.3d at 620). "[A] prison official has sufficient culpable intent if he has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the

Morgan v. Semple, Not Reported in Fed. Supp. (2020)

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 179 of 449

harm." *Hayes*, 84 F.3d at 620 (citing *Farmer*, 511 U.S. at 847). While "individuals in state custody ... have a right to be free from psychological, and emotional harm ... not all bodily harm caused by a government actor is actionable as a constitutional violation." *West v. Whitehead*, No. 04-CV-9283 (KMK), 2008 WL 4201130, at *14 (S.D.N.Y. Sept. 11, 2008) (citations omitted). But " '[p]ain' in its ordinary meaning surely includes a notion of psychological harm." *Hudson v. McMillian*, 503 U.S. 1, 16 (1992) (Blackmun, J., concurring). "Under certain circumstances, the intentional infliction of psychological pain may constitute an Eighth Amendment violation so long as the pain is not *de minimis*." *Aziz Zarif Shabazz v. Pico*, 944 F. Supp. 460, 475 (S.D.N.Y. 1998).

**\*12** "To prove ... deliberate indifference, the plaintiff must show that the need for more or better supervision to protect against constitutional violations was obvious." *Vann v. City of N.Y.*, 72 F.3d 1040, 1049 (2d Cir. 1995) (citation omitted). "An obvious need may be demonstrated through proof of repeated complaints of civil rights violations; deliberate indifference may be inferred if the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents." *Id.* (citing *Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991), and *Fiacco v. City of Rensselaer*, 783 F.2d 319, 328 (2d Cir. 1986)).

The Second Circuit has recognized that "actions that transgress today's broad idealistic concepts of dignity, civilized standards, humanity, and decency" are barred under the Eighth Amendment's protection against the unnecessary and wanton infliction of pain. *Campbell v. Gardiner*, 2014 WL 906160, at *3 (W.D.N.Y. Mar. 7, 2014) (internal quotation marks omitted) (citing *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994), and *Hutto v. Finney*, 437 U.S. 678, 685 (1978)). Labeling an inmate as an informant or a snitch can satisfy the first prong of the deliberate indifference standard. *Id.* at *4 (collecting cases).

"[A] supervisor may be found liable for his deliberate indifference to the rights of others by his failure to act on information indicating unconstitutional acts were occurring or for his gross negligence in failing to supervise his subordinates who commit such wrongful acts, provided that [a] plaintiff can show an affirmative causal link between the supervisor's inaction and her injury." *Poe v. Leonard*, 282 F.3d 123, 140 (2d Cir. 2002). A supervisory defendant's personal involvement may be shown by the following:

(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (citing *Williams v. Smith*, 781 F.2d 319, 323–24 (2d Cir. 1986)).

Defendants argue that both of Mr. Morgan's deliberate indifference claims fail: (1) that Defendants Rivard, Comitos, Senita, Weglarz, Scully, Fulcher, Morin, Coursen, and Higgins "were deliberately indifferent to [Mr. Morgan's] safety ... 'by referring to [him] as a snitch, rat, and pedophile on multiple occasions in the presence of other inmates[;]' " and (2) that Defendants Semple, Rinaldi, Santiago, Zegarzewski, Shabanas, and Conger "were deliberately indifferent to [Mr. Morgan's] safety because they were made aware of the other defendants' conduct ... and failed to protect the plaintiff." Defs.' Mem. at 18.

While labeling an inmate a "snitch" may pose a substantial risk of serious harm, in Defendants' view, Mr. Morgan has failed to allege that he suffered actual physical harm. *Id.* at 19. In their view, Mr. Morgan does not even allege facts that support "an inference that the threat of physical injury was imminent[.]" *Id.* at 20 (citing *Dawes v. Walker*, 239 F.3d 489, 494 (2d Cir. 2001)). With respect to Defendants Coursen, Higgins, Semple, and Rinaldi, the Defendants contend that Mr. Morgan fails to allege that Defendants Coursen or Higgins told other inmates he was a pedophile or that Defendants Semple or Rinaldi ever labeled him a snitch, pedophile, or homosexual. *Id.* at 22.

**\*13**  In Defendants' view, because Mr. Morgan has not alleged physical harm or the imminent threat of physical injury, his deliberate indifference claim should be dismissed. *Id.* at 21.

Mr. Morgan argues that the Court previously found his deliberate indifference claims sufficient, Pl.'s Mem. at 12 (citing Ruling & IRO), and that the Second Circuit has "recognized that labelling an inmate a snitch or rat increases the likelihood that the inmate will suffer violence," *Id.* at 13. He contends that his allegations against Defendants Coursen and Higgins are sufficient because he alleges they identified him as a pedophile "which led to the cancellation of Plaintiff's protective custody...." *Id.* Finally, Mr. Morgan notes that the Court's previous ruling allowed his deliberate indifference claim to proceed against Defendants Semple and Rinaldi and are still adequately alleged. *Id.* at 14; Ruling & IRO at 13.

In their reply, Defendants reiterate that Mr. Morgan's deliberate indifference claim is insufficient "in the absence of allegations demonstrating actual or imminent harm." Reply at 5. Defendants also note that the same actual or imminent harm issues apply to Mr. Morgan's claims against Defendants Higgins and Coursen; specifically, labeling Mr. Morgan a snitch or pedophile does not create a risk of harm "as such reports are not alleged to have been shared with other inmates." *Id.* Nor does Mr. Morgan demonstrate he was exposed to harm when he was removed from protective custody. *Id.* at 6. Finally, Defendants argue that Mr. Morgan does not allege Defendants Semple or Rinaldi ever directly labeled him a "snitch," "rat," or "pedophile," or that he "ever complained[ed] to either [D]efendant about such conduct by others." *Id.*

The Court disagrees.

### 1. Defendants Rivard, Comitos, Senita, Scully, Fulcher, and Morin

Mr. Morgan has adequately alleged that various Defendants referred to him as a snitch or pedophile in front of other inmates. While "[i]ntentionally exposing an inmate to the risk of harm ... with no penological purpose is indicative of deliberate indifference"—which Mr. Morgan argues he has done—deliberate indifference also requires that "the inmate ... allege facts from which the court can infer that he suffered physical injury or that the threat of physical injury was imminent." *Medina v. Whitehead*, 3:13-cv-885 (VLB),

2014 WL 3697886, at \*2 (D. Conn. July 24, 2014) (citations omitted).

Although Mr. Morgan's allegations of psychological harm could be more specific, *see Dawes v. Walker*, 239 F.3d 489 (2d Cir. 2001), *overruled on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002) (plaintiff's complaint was "devoid of factual allegations that [gave] rise to an inference that [plaintiff] actually faced a serious threat" was fatal to plaintiff's Eighth Amendment claim), at this stage of the case, the Court cannot determine whether the psychological pain he experienced was more than *de minimis*. *See Aziz Zarif Shabazz*, 944 F. Supp. at 475 (recognizing that, "[u]nder certain circumstances, the intentional infliction of psychological pain may constitute an Eighth Amendment violation so long as the pain is not *de minimis*."); *see also Hudson*, 503 U.S. at 16 ("I am unaware of any precedent of this Court to the effect that psychological pain is not cognizable for constitutional purposes. If anything, our precedent is to the contrary.") (Blackmun, J., concurring) (citations omitted); *see also Charles v. Orange Cty.*, 925 F.3d 73, (2d Cir. 2019) (detainee plaintiffs would face a serious risk of physical and psychological harm, of which defendants knew or should have known, when defendants failed to provide discharge planning for care and daily medication for mentally ill detainees).[3]

**\*14**  Accordingly, the deliberate indifference claims against these Defendants will not be dismissed.

### 2. Defendants Weglarz, Coursen and Higgins

Mr. Morgan also makes references to instances where Defendants Weglarz, Coursen, and Higgins allegedly called him a rat or snitch in front of other inmates. *See also* Second Am. Compl. at 20–21 ¶¶ 85-89 (including Defendants Coursen and Higgins in the deliberate indifference claim).[4]

For the same reasons as noted above, the Court will permit this claim to proceed beyond this stage and will review it again at the close of discovery and at the summary judgment stage.

Accordingly, Mr. Morgan's deliberate indifference claims against Defendants Weglarz, Coursen, and Higgins will not be dismissed.

Morgan v. Semple, Not Reported in Fed. Supp. (2020)

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 181 of 449

### 3. Defendants Semple, Rinaldi, Santiago, Zegarzewski, Shabanas, and Conger

Mr. Morgan's claim against the supervisory Defendants Semple, Rinaldi, Santiago, Zegarzewsi, Shabanas, and Conger hinges on their alleged liability for constitutional violations conducted by their subordinates. *See Curley v. Village of Suffern*, 268 F.3d 65, 72 (2d Cir. 2001) ("[L]aw enforcement officials have an affirmative duty to intervene to protect against the infringement of constitutional rights from conduct committed by other officers in their presence.") (citing *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994)). Although Mr. Morgan has not alleged that any of these Defendants witnessed the alleged constitutional violations nor has he alleged that he faced actual or imminent harm, *see Chambers v. Johnpierre*, 2015 WL 4751134, at *7 (D. Conn. Aug. 11, 2015) ("To sustain a claim of failure to protect based on comments indicating that an inmate is an informant, the inmate must allege that he faced 'actual or imminent harm.' ") (citing *Hamilton v. Fischer*, No. 6:12-CV-6449 (MAT), 2013 WL 3784153, at *15 (W.D.N.Y. July 18, 2013)), at this stage of the case before the completion of discovery, the Court cannot determine the extent to which Defendants Semple, Rinaldi, Santiago, Zegarzewski, Shabanas, and Conger were aware of the comments made by corrections officers, or if Mr. Morgan's psychological harm was more than *de minimis*. Dismissal at this time therefore would be premature.

Accordingly, Mr. Morgan's claim for deliberate indifference against these Defendants will not be dismissed.

### E. The First Amendment Claim – Retaliation

"The filing of prison grievances is a protected activity." *Brandon v. Kinter*, 938 F.3d 21, 40 (2d Cir. 2019) (citing *Davis v. Goord*, 320 F.3d 346, 352–53 (2d Cir. 2003)). "Prison officials may not retaliate against inmates for exercising their constitutional rights." *Riddick v. Arnone*, 11 Civ. 631 (SRU), 2012 WL 2716355, at *6 (D. Conn. July 9, 2012). When prison officials take adverse action against an inmate, motivated by the inmate's exercise of a protected constitutional right, a section 1983 retaliation claim may be pursued. *See Friedl v. City of N.Y.*, 210 F.3d 79, 85 (2d Cir. 2000) ("In general, a section 1983 claim will lie where the government takes negative action against an individual because of his exercise of rights guaranteed by the Constitution or federal laws."). "To prevail on a First Amendment retaliation claim, [a plaintiff] must establish (1) that the speech or conduct at issue was protected, (2) that the [official] took adverse action against the [prisoner], and (3) that there was a causal connection between the protected [conduct] and the adverse action." *Holland v. Goord*, 758 F.3d 215, 225 (2d Cir. 2014) (internal quotation marks omitted); *Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009).

**\*15** Because the filing of a grievance is a protected activity, the Court "need only consider the latter two elements." *Brandon*, 938 F.3d at 40. "In the prison context, 'adverse action' is objectively defined as conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *O'Diah v. Cully*, 08 Civ. 941, 2013 WL 1914434, at *9 (N.D.N.Y. May 8, 2013) (quoting *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003)); *see also Ramsey v. Goord*, 661 F. Supp. 2d 370, 399 (W.D.N.Y. 2009) (prisoners are required to tolerate more than average citizens before alleged retaliatory action against them is considered adverse). "The test is objective, and the plaintiff is not required to show that he was actually deterred." *Brandon*, 928 F.3d at 40.

In order to allege causation, a plaintiff must state facts "suggesting that the protected conduct was a substantial or motivating factor in the prison official's decision to take action against [him]." *Moore v. Peters*, 92 F. Supp. 3d 109, 121 (W.D.N.Y. 2015) (quoting *Burton v. Lynch*, 664 F. Supp. 2d 349, 367 (S.D.N.Y. 2009)). Some of the factors often used to determine retaliatory motive include: (1) temporal proximity between the protected conduct and the alleged retaliatory act; (2) the prisoner's prior good disciplinary record; (3) a finding of not guilty at the disciplinary hearing; and (4) statements by the official(s) showing motive. *Id.*; *O'Diah*, 2013 WL 1914434 at *10.

Because claims of retaliation are easily fabricated, courts consider such claims with skepticism and require that they be supported by specific facts; thus, conclusory allegations of retaliatory conduct are not sufficient. *See Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983).

Defendants argue that retaliation claims against Defendants Shabanas, Zegarzewski, Fulcher, Conger, and Morin should be dismissed. Defs.' Mem. at 23. [5] With respect to Defendants Shabanas and Zegarzewski, in their view, Mr. Morgan does not allege any facts "suggesting that they ever took any action against the plaintiff[,]" and so the retaliation claim must be dismissed. *Id.* at 24. With respect to Defendant

Morin, Defendants argue that Mr. Morgan's allegations rest entirely on Defendant Morin's alleged name-calling of snitch or pedophile. *Id.* In their view, without allegations that Defendant Morin threatened his physical safety, the allegations do "not demonstrate the necessary 'adverse action' to support the plaintiff's claim." *Id.*

Also, in Defendant's view, with respect to Defendant Fulcher, his alleged conduct—stomping on Mr. Morgan's complaint in his presence, homosexual slurs, reading Mr. Morgan's legal documents—"fail[ ] to qualify as conduct that 'would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights[,]' " requiring dismissal of the claim. *Id.* at 25 (quoting *Dawes,* 239 F.3d at 493).

With respect to Defendants Shabanas and Zegarzewski, Mr. Morgan argues that courts "have held that a person with supervisory authority can be found to be personally involved in constitutional violation [sic] 'based on the fact that the plaintiff wrote to that defendant about the alleged violations.' " Pl.'s Mem. at 15 (quoting *Rivera v. Fischer,* 655 F. Supp. 2d 235, 238 (W.D.N.Y. 2009)). As they have failed to remedy or address his complaints, in Mr. Morgan's view, Defendants Shabanas and Zegarzewski can be held liable. *Id.*

**\*16** With respect to Defendant Morin, Mr. Morgan contends that calling him a snitch or pedophile can be an adverse action and Defendant Morin "exhibited a clear and repeated pattern of conduct" of retaliation. *Id.* at 15–16. With respect to Defendant Fulcher, Mr. Morgan argues that his "actions were direct and specific and a part of a concerted effort to retaliate against Plaintiff for engaging in constitutionally protected activity." *Id.* at 16.

In their reply, Defendants again argue that Mr. Morgan fails to allege facts that suggest Defendants Shabanas or Zegarzewski themselves retaliated against him. Reply at 6. That he informed them of others' actions only supports "liability under a supervisory authority theory[.]" *Id.* Additionally, his claim against Defendant Morin must fail because Mr. Morgan has "not even alleged [that Defendant Morin] made specific threats against the [P]laintiff[.]" *Id.* Nor has Mr. Morgan alleged that Defendant Morin "directly encouraged the [P]laintiff's harassment by other inmates, and the [D]efendant's calling the plaintiff a snitch actually led to [Mr. Morgan's] harm by other inmates." *Id.* at 7.

The Court agrees, in part.

Mr. Morgan has alleged that Defendants' retaliation is evident from the "verbal threats and harassment, including but not limited to labeling [him] a snitch, rat, and pedophile as well as threatening [his] physical safety" and that of his family and friends. Second Am. Compl. ¶ 87. He also alleges that this conduct began after he filed grievances and complaints about the volume of the television in the inmates' day room. *Id.* ¶ 27. Specifically, Mr. Morgan filed grievances against Defendants Barstow, Morin, *id.;* Weglarz, *id.* ¶ 32; Fulcher, *id.* ¶ 43; Rivard, Comtois, and Senita, *id.* ¶ 47.

Mr. Morgan has also alleged that Defendant Morin referred to him as "snitch" around other inmates, Second Am. Compl. ¶ 29; told other inmates to 'fuck him up and get his ass out of the unit' "; *id.* ¶ 30; and threatened to place contraband in his cell, *id.* ¶ 38. These threats of encouraged violence and planting contraband are sufficient to satisfy adverse action. *See Dorsey v. Fisher,* 468 F. App'x 25, 27 (2d Cir. 2012) (affirming district court's dismissal of retaliation claim where claims of "retaliatory verbal abuse ... [did] not include any allegations of physical harm, nor [were] they alleged with any specificity"); *Gill v. Pidlypchak,* 389 F.3d 379, 384 (2d Cir. 2004) (vacating district court's decision because "the filing of false misbehavior reports against [the plaintiff] and his sentence of three weeks in keeplock ... would deter a prisoner of ordinary firmness from vindicating his or her constitutional rights through the grievance process and the courts"); *Tuttle v. Semple,* No. 3:17-cv-02099 (JAM), 2018 WL 11658583, at \*4 (D. Conn. Mar. 6, 2018) (initial review order found retaliation allegations could proceed where plaintiff alleged defendant "[stole plaintiff's] personal items from his cell and interfer[ed] with plaintiff's ability to file grievances"); *Harnage v. Brighthaupt,* 168 F. Supp. 3d 400, 413 (D. Conn. 2016) (filing disciplinary reports after grievances constituted adverse action); *but see Mateo v. Fischer,* 628 F. Supp. 2d 423 (S.D.N.Y. 2010) (alleged threats by a corrections officer did not constitute adverse action). Furthermore, Mr. Morgan adequately alleges a causal connection between his filing of grievances and the adverse action. *Cf. Colon,* 58 F.3d at 873 ("circumstantial evidence" of temporal proximity is insufficient to demonstrate a causal connection on a motion for summary judgment).

**\*17** Mr. Morgan alleges that Defendant Fulcher engaged in a pattern of harassment and retaliation and "went so far as to retrieve Plaintiff's complaint and stomp upon it in Plaintiff's presence[,]" Second Am. Compl. ¶ 46, and made discriminatory remarks about Mr. Morgan's sexuality in front

Morgan v. Semple, Not Reported in Fed. Supp. (2020)

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 183 of 449

of other inmates and corrections officers, including shouting "you can't get shit from me you fucking homo, you faggot[,]" *id.* ¶¶78–79. Mr. Morgan does not allege the threat of harm, injury, or violence. But some, although not all, verbal threats can constitute adverse action. *Mateo*, 682 F. Supp. 2d at 424 (citations omitted). "The less direct and specific a threat, the less likely it will deter an inmate from exercising his First Amendment rights." *Id.* Here, Defendant Fulcher's are vulgar and discriminatory, but not threatening. *See Davis*, 320 F.3d at 353 ("[i]nsulting or disrespectful comments directed at an inmate generally do not rise" to the level of adverse action); *Roseboro v. Gillespie*, 791 F. Supp. 2d 353, 373 (S.D.N.Y. 2011) ("An inmate has no right to redress simply because an officer made a hostile or derogatory comment about him." (internal quotation marks, alteration, and citation omitted)).

Furthermore, even if Mr. Morgan could allege a causal connection, Defendant Fulcher's conduct in stepping on Mr. Morgan's complaint, without allegations that he would prevent Mr. Morgan from filing grievances in the future, does not rise to the level of adverse action. *See Baltas v. Rivera*, No. 3:19-cv-1043 (MPS), 2019 WL 3944435, at *6 (D. Conn. Aug. 21, 2019) (plaintiff allegations "that he was told to stop filing grievances because nothing would be done and that he was threatened for filing grievances" supported a retaliation claim).

Mr. Morgan does not allege that Defendants Shabanas or Zegarzewski retaliated against him, but rather that their failure to act renders them liable. Because Mr. Morgan has not alleged Defendants Shabanas or Zegarzewski retaliated against him, his claim fails. As supervisors, they "are not automatically liable under section 1983 when their subordinates commit a constitutional tort." *Dorlette v. Quiros*, No. 3:10-cv-615 (AWT), 2012 WL 4481455, at *3 (D. Conn. Sept. 26, 2012). In addition, Mr. Morgan "must demonstrate an affirmative causal link between the supervisory official's failure to act and his injury." *Id.* (citing *Poe*, 282 F.3d at 140). Mr. Morgan has not alleged injury and so, lacks a causal connection with Defendants Shabanas and Zegarzewski, which would render them liable for their failure to act.

Accordingly, the retaliation claim against Defendants Shabanas, Zegarzewski, and Fulcher are dismissed. The retaliation claim against Defendant Morin, however, will proceed.

Because Defendants do not move to dismiss the retaliation claims against Defendants Rivard, Comitos, Senita, Weglarz, Scully, Conger, Coursen, and Higgins, the retaliation claim against these Defendants also will proceed.

### F. Harassment Claim

The Court previously denied Mr. Morgan's motion to reconsider his harassment claim. Order, ECF No. 137 (Feb. 24, 2020) ("Order on Mot. to Reconsider"). As his harassment claim is no longer part of this lawsuit, the Court will not now consider Defendants' arguments regarding the harassment claim.

### G. Violations of Right to Privacy

The Supreme Court has held that "the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell." *Hudson*, 468 U.S. at 526. "[A] convicted prisoner's loss of privacy rights can be justified on grounds other than institutional security." *Willis v. Artuz*, 301 F.3d 65, 69 (2d Cir. 2002). "As such, inmates do not have the right to be free from searches of any kind; even searches conducted 'solely for harassment' do not implicate the Fourth Amendment." *West v. City of N.Y.*, No. 13 Civ. 5155(PAE), 2014 WL 4290813, at *6 (S.D.N.Y. Aug. 28, 2014) (citing *Willis*, 301 F.3d at 68). [6]

**\*18** Defendants argue that, as an incarcerated individual, Mr. Morgan does "not have a reasonable expectation of privacy in his prison cell." Defs.' Mem. at 30 (quoting *Hudson v. Palmer*, 468 U.S. 517, 526 (1984)). Because of this, Mr. Morgan's claim that Defendants Morin, Rivard, Comitos, Senita, and Fulcher violated his right to privacy must be dismissed. *Id.* at 29–30.

Mr. Morgan argues that he "has pled facts sufficient to establish that the searches of his cell and subsequent seizures were not for legitimate prison security-related reasons." Pl.'s Mem. at 28. Of the searches that allegedly occurred, some included searching through personal property and reading his confidential legal documents. *Id.* In his view, the "searches were retaliatory in nature and purposefully designed to violate Plaintiff's privacy interest in his grievances and legal documents." *Id.* He also notes that the Court previously found he had adequately alleged facts to establish a privacy claim. *Id.* at 29 (citing Ruling & IRO).

Morgan v. Semple, Not Reported in Fed. Supp. (2020)

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 184 of 449

In their reply, Defendants cite to Supreme Court precedent which rejects both "the concept that an inmate maintains a reasonable expectation of privacy in his cell and, therefore, a right against unreasonable searches" and "the concept that an inmate retains a right against unreasonable seizure[.]" Reply at 8 (citing *Hudson v. Palmer*, 468 U.S. 517, 526, 528 n.8 (1984)). Defendants thus argue that these claims should be dismissed. *Id.*

The Court agrees.

The Court previously dismissed Mr. Morgan's Fourth Amendment claim with respect to the search of his cell, but permitted the Fourth Amendment claim to proceed because he still maintained a privacy interest in his legal documents and grievances. Ruling & IRO at 17. Mr. Morgan relies on *Seattle Times Co. v. Rhinehart* for the proposition that he maintained a privacy interest in his legal documents and grievances. 467 U.S. 20, 35 n. 21 (1984). The issue in *Seattle Times* concerned the dissemination of information gained in the discovery process before trial and the district court's standing protective order in place. *Id.* at 23. The footnote Plaintiff relies on relates to the discovery process and Federal Rule of Civil Procedure 26. *Id.* at 35 n.21 ("Although the Rule contains no specific reference to privacy or other rights or interests that may be implicated, such matters are implicit in the broad purpose and language of the rule.").

Mr. Morgan alleges that legal documents and grievances were searched, read, and distributed. While Mr. Morgan maintains a privacy interest in his legal documents, it is not clear that this privacy right is protected by the Fourth Amendment. Nor is it clear what injury Mr. Morgan suffered and if that injury would implicate the Fourth Amendment. Mr. Morgan refers only to *Seattle Times* and points to no other precedent to support his claimed privacy interest. [7]

Because Mr. Morgan retains no expectation of privacy in his prison cell and has not clearly alleged the privacy interest violated, his Fourth Amendment claim is dismissed with prejudice. *See Griffin v. Komenecky*, 133 F.3d 907 (2d Cir. 1998) (finding the plaintiff's "assertion that his constitutional rights were violated by [the] search does not state a claim under 42 U.S.C. § 1983 because the Fourth Amendment's proscription against unreasonable searches does not apply to searches of a prison cell"); *Lopez v. Lantz*, No. 3:09-cv-22 (CSH), 2010 WL 965747, at *4 (D. Conn. Mar. 12, 2010) (finding that a search that confiscated documents associated

with an incident report or grievance was not a violation of the Fourth Amendment).

### H. The Discrimination Claims

#### 1. The Equal Protection Clause Claim

**\*19** The Fourteenth Amendment's Equal Protection Clause protects individuals from invidious discrimination. This provision does not mandate identical treatment for each individual; rather it requires that similarly situated persons be treated the same. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). To state an equal protection claim, a plaintiff must allege facts showing that the plaintiff was treated differently from similarly situated individuals and that the reason for the different treatment was based on "impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Diesel v. Town of Lewisboro*, 232 F.3d 92, 103 (2d Cir. 2000) (quoting *LeClair v. Saunders*, 627 F.2d 606, 609–10 (2d Cir. 1980)).

To state a valid claim under a "class of one," a prisoner-plaintiff must allege that: (1) he has been intentionally treated differently than other similarly situated inmates; and (2) there is no rational basis for the disparity in treatment. *Holmes v. Haugen*, 356 F. App'x 507, 509 (2d Cir. 2009); *Green v. Martin*, 224 F. Supp. 3d 154, 171 (D. Conn. Dec. 14, 2016). Second, a plaintiff must allege an "extremely high" level of similarity with the person to whom he is comparing himself; their circumstances must be "prima facie identical." *Neilson v. D'Angelis*, 409 F.3d 100, 105 (2d Cir. 2005), *rev'd on other grounds, Appel v. Spiridon*, 531 F.3d 138, 139 (2d Cir. 2008). "The Second Circuit has concluded that homosexuality is a 'quasi-suspect (rather than [a] suspect)' class and discriminatory treatment of the class is subject to 'intermediate judicial review.' " *Trowell v. Theodarakis*, 2018 WL 3233140, at *4 (D. Conn. July 2, 2018) (quoting *Windsor v. U.S.*, 699 F.3d 169, 185 (2d Cir. 2012), *aff'd on other grounds*, 570 U.S. 744 (2013)).

Defendants Fulcher, Conger, and Santiago argue that Mr. Morgan's equal protection claim must fail because Mr. Morgan does not allege facts that support such a claim. Defs.' Mem. at 31. The "use of derogatory slurs does not support an equal protection claim," nor does Mr. Morgan "allege any factual basis to demonstrate disparate treatment of other similarly situated individuals." *Id.* at 32.

Morgan v. Semple, Not Reported in Fed. Supp. (2020)

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 185 of 449

Mr. Morgan argues that he "was singled out among other similarly situated inmates and given selective negative treatment in the form of harassment and abuse because of his sexual orientation." Pl.'s Mem. at 30. Specifically, he argues that Defendant Fulcher's actions "were motivated by discriminatory animus" based on Mr. Morgan's sexual orientation, which led to harassment and retaliation by searching his cell and reading his legal documents. *Id.* Again, Mr. Morgan notes the Court's previous ruling found his allegations establish an equal protection claim. *Id.* at 31 (citing Ruling & IRO).

Mr. Morgan's claim rests on Defendant Fulcher's derogatory use of the words "homo" and "faggot" to refer to him. Second Am. Compl. at 22 ¶ 88. Because Mr. Morgan has alleged that he was treated differently than a similarly situated prisoner, this claim survives for now, barely. *See Adorno v. Semple*, No. 3:16-cv-325 (MPS), 2016 WL 7469709, at *7 (D. Conn. Dec. 28, 2016) (plaintiff's equal protection claim failed in part because "the plaintiff [did] not compare himself to any other similarly situated inmates who were treated differently"); *Vega v. Artus*, 610 F. Supp. 2d 185, 209–10 (N.D.N.Y. 2009) (judgment on the pleadings granted where plaintiff "merely allege[d] that the [ ] [d]efendants made harassing comments against him because they believed that he was homosexual" but did "not allege that any of the [d]efendants ... subjected him to disparate treatment on the basis of his perceived homosexuality"). At the close of discovery and on a motion for summary judgment, if Mr. Morgan lacks sufficient evidence of his being "singled out among other similarly situated inmates and [being] given selective negative treatment in the form of harassment and abuse because of his sexual orientation," Pl.'s Mem. at 30, then this claim will be dismissed.

**\*20** Accordingly, Mr. Morgan's equal protection claim will not be dismissed now.

### 2. Conn. Gen. Stat. § 46a-58

Connecticut General Statute § 46a-58 provides that it is a discriminatory practice "for any person to subject, or cause to be subjected, any person to the deprivation of any rights, privileges or immunities, secured or protected by the Constitution or laws of the United States, on account of ... sexual orientation[.]" Conn. Gen. Stat. § 46a-58(a). "[T]here is no private right of action under" this statute. *Wilson v.*

*City of Norwalk*, 507 F. Supp. 2d 199, 212 (D. Conn. 2007); *see also Garcia v. Saint Mary's Hosp.*, 46 F. Supp. 2d 140, 142 (D. Conn. 1999) ("Connecticut General Statutes Section 46a-58 does not provide for a private cause of action ...Section 46a-58 claims can only be prosecuted through the CHRO's administrative procedures.").

Defendants Fulcher, Conger, and Santiago argue that no private right of action exists under Conn. Gen. Stat. § 46a-58. Defs.' Mem. at 31.

Based on the caselaw noted above, the Court agrees.

Accordingly, Mr. Morgan's § 46a-58 claim will be dismissed, as no private right of action exists under this statute.

### I. Negligent Infliction of Emotional Distress Claims

For a successful negligent infliction of emotional distress claim, a plaintiff must prove: "(1) the defendant's conduct created an unreasonable risk of causing the plaintiff emotional distress; (2) the plaintiff's distress was foreseeable; (3) the emotional distress was severe enough that it might result in illness or bodily harm; and (4) the defendant's conduct was the cause of the plaintiff's distress." *Carrol v. Allstate Ins. Co.*, 262 Conn. 433, 444 (2003). In such cases, the "fear or distress experienced by the plaintiff [must] be reasonable in light of the conduct of defendants." *Id.* at 447 (citing *Barret v. Danbury Hosp.*, 232 Conn. 242, 261–62 (1995)). When that fear is reasonable, "the defendants should have realized that their conduct created an unreasonable risk of causing distress, and they, therefore, properly would be liable." *Id.* At the same time, fear that was "unreasonable in light of defendants' conduct" would not allow defendants to recognize "that their conduct could cause distress, and therefore, they would not be liable." *Id.*

It is well established that negligence claims are not cognizable for damages under § 1983. *See Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006) ("[T]he risk of harm must be substantial and the official's actions more than merely negligent."); *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998) (without more, negligence does not create a constitution claim); *Pabon v. Wright*, No. 99-CIV-2196 (WHP), 2004 WL 628784, at *5 (S.D.N.Y. Mar. 29, 2004), *aff'd*, 459 F.3d 241 (2d Cir. 2006) ("[N]egligent conduct is insufficient to satisfy the standard.").

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 186 of 449

Morgan v. Semple, Not Reported in Fed. Supp. (2020)

Moreover, even if this negligence claim is not premised on § 1983, but is instead based on state law alone, negligence claims against state officials are also barred by section 4-165 of the Connecticut General Statutes. *See* Conn. Gen. Stat. § 4-165(a) ("No state officer or employee shall be personally liable for damage or injury, not wanton, reckless or malicious, caused in the discharge of his or her duties or within the scope of his or her employment."); *see also Miller v. Egan*, 265 Conn. 301, 319 (2003) (state employees are not "personally liable for their negligent actions performed within the scope of their employment").

**\*21** Wanton, reckless, or malicious, as used in § 4-165, has never been definitively determined, however, Connecticut courts have found that "the plaintiff must prove, on the part of the defendants, the existence of a state of consciousness with reference to the consequences of one's acts ... [Such] conduct is more than negligence, more than gross negligence[.]" *Martin v. Brady*, 261 Conn. 372, 379 (2002) (citation omitted); *see also Manifold v. Ragaglia*, 94 Conn. App. 103, 115–16 (2006).

"In order to determine if a state actor's conduct is caused in the discharge of his or her duties or within the granted statutory authority, it is necessary to examine the nature of the alleged conduct and its relationship to the duties incidental to the employment." *Martin*, 261 Conn. at 377. "A state employee [can] be held personally liable acts in the scope of her employment when the employee's actions are 'wanton, reckless, or malicious'—which goes beyond negligence and denotes 'highly unreasonable conduct, involving an extreme departure from ordinary care, in a situation where a high degree of danger is apparent.' " *Matias v. Anderson*, No. 3:18-cv-17 (SRU), 2020 WL 616443, at \*4 (D. Conn. Feb. 10, 2020) (quoting *Martin*, 261 Conn. at 372, 379).

Defendants argue that "[s]tate officials are immune from negligence lawsuits under § 4-165 of the Connecticut General Statutes[.]" Defs.' Mem. at 33. Defendants also contend that Mr. Morgan has not received authorization from the Connecticut State Claims Commissioner to proceed with his suit against state officials. [8] *Id.* Consequently, Defendants assert that Mr. Morgan's negligent infliction of emotional distress claim should be dismissed.

Mr. Morgan argues that "the conduct of all the Defendants constitutes negligent infliction of emotional distress because [they] 'created an unreasonable risk of causing emotional distress....' " to Mr. Morgan and the emotional distress was

likely to result in injury, illness, or harm. Pl.'s Mem. at 31 (quoting Second Am. Compl. ¶¶ 87–88). In his view, Defendants are only protected by statutory immunity to the extent their actions "are performed in the scope of their employment[,]" and Defendants actions here were outside the scope of employment. *Id.* at 31–32. He further argues that "the allegations of harassment and deprivation of [his] constitutional rights by the Defendants under the guise of governmental authority is sufficient to establish that the Defendants misused their governmental authority to justify abhorrent conduct falling outside the scope of their employment." *Id.* at 32–33. The conduct lacked any governmental purpose and so Mr. Morgan's claim should proceed as "statutory immunity does not shield the Defendants from the liability for such alleged conduct." *Id.* at 33.

Mr. Morgan also argues that he "had no obligation to present the negligent infliction of emotional distress claim asserted against the Defendants in their individual capacities to the Claim Commissioner" because that is only required for injury or damage caused during the "discharge of his or her duties or within the scope of his or her employment[.]" *Id.*

**\*22** The Court disagrees.

The Court first notes that it has dismissed Mr. Morgan's harassment claim and, therefore, there cannot be alleged constitutional violations on these grounds. The Court furthermore finds that § 4-165 cannot provide a statutory exception for a negligent infliction of emotional distress claim. As interpreted by Connecticut courts, "wanton, reckless or malicious" conduct requires "a state of consciousness" and "is more than negligence, more than gross negligence." *Martin*, 261 Conn. 379. The statute then cannot act as a statutory exception for a negligence claim. *See also Miller*, 265 Conn. at 319 ("In other words, state employees may not be held personally liable for their negligent actions performed within the scope of their employment.").

Because Mr. Morgan's negligent infliction of emotional distress claim is a negligence claim, one not permitted against state officials under Connecticut law, this claim fails.

Accordingly, the negligent infliction of emotional distress claim will be dismissed.

Morgan v. Semple, Not Reported in Fed. Supp. (2020)

Case 3:24-cv-00037-DNH-ML    Document 9    Filed 06/11/24    Page 187 of 449

**J. Intentional Infliction of Emotional Distress Claims** [9]

To establish a claim of intentional infliction of emotional distress in Connecticut, a plaintiff must allege:

> (1) That the actor intended to inflict emotional distress of that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe.... Whether a defendant's conduct is sufficient to satisfy the requirement that it be extreme and outrageous is initially a question for the court to determine.... Only where reasonable minds disagree does it become an issue for the jury.

*Geiger v. Carey*, 170 Conn. App. 459, 497 (2017) (quoting *Gagnon v. Housatonic Valley Tourism District Comm'n*, 92 Conn. App. 835, 846 (2006)). Extreme and outrageous conduct means conduct that goes "beyond all possible bounds of decency, and [is] regarded as atrocious, and utterly intolerable in a civilized community." *Id.* (quoting *Appleton v. Bd. of Educ.*, 254 Conn. 205, 210–11 (2000)). "In order to state a cognizable cause of action, [p]laintiff must not only allege each of the four elements, but must also allege facts sufficient to support them." *Golnik v. Amato*, 299 F. Supp. 2d 8, 15 (D. Conn. 2003).

Defendants Semple, Rinaldi, Santiago, Zegarzewski, Shabanas, and Conger move to dismiss all claims of intentional infliction of emotional distress against them, the supervisory Defendants. Mot. at 1. In their view, Mr. Morgan fails to allege any direct participation by the supervisory defendants in the alleged conduct against him. Defs.' Mem. at 36. His allegations focus on their failure "to take affirmative action to stop the alleged constitutional violations." *Id.* He does not allege the elements required in an intentional infliction of emotional distress claim nor does he "adequately allege that these supervisory defendants inflicted emotional distress upon him." *Id.*

**\*23** Mr. Morgan argues the "defendants' positions of authority over" him, "their power to significantly impact his qualify of life, and their knowledge of ... [his] mental and emotional disorders," and because of that the Defendants' actions or omissions constitute extreme and outrageous behavior. Pl.'s Mem. at 36.

The Court agrees, in part.

Defendants Semple, Rinaldi, Santiago, Zegarzewski, Shabanas, and Conger are all supervisors and potentially liable under a theory of supervisory liability, and notably, the remaining Defendants have not moved to dismiss this claim. But, Mr. Morgan's intentional infliction of emotional distress against Defendants Semple, Rinaldi, Santiago, Zegarzewski, Shabanas, and Conger cannot proceed because he has not alleged any conduct that was directed at him or intended to infliction emotional distress upon him by these actors. *See Appleton*, 254 Conn. at 210 (the first element of an intentional infliction of emotional distress claim requires the plaintiff to establish "that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct") (quoting *Pyetan v. Elllis*, 200 Conn. 243, 253 (1986)).

Accordingly, the intentional infliction of emotional distress claim will be dismissed only as to Defendants Semple, Rinaldi, Santiago, Zegarzewski, Shabanas, and Conger.

**K. Supervisory Liability Claims**

A plaintiff who sues a supervisory official for monetary damages must allege that the official was "personally involved" in the constitutional deprivation in one of five ways: (1) the official directly participated in the deprivation; (2) the official learned about the deprivation through a report or appeal and failed to remedy the wrong; (3) the official created or perpetuated a policy or custom under which unconstitutional practices occurred; (4) the official was grossly negligent in managing subordinates who caused the unlawful condition or event; or (5) the official failed to take action in response to information regarding the unconstitutional conduct. *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994). A plaintiff must also demonstrate a causal

**Morgan v. Semple, Not Reported in Fed. Supp. (2020)**

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 188 of 449

link between the actions of the supervisory official and his injuries. *Poe v. Leonard*, 282 F.3d 123, 140 (2d Cir. 2002).

"[S]upervisory liability may be imposed where an official demonstrates 'gross negligence' or 'deliberate indifference' to the constitutional rights of inmates by failing to act on information indicating that unconstitutional practices are taking place." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994). A plaintiff "must show that the [d]efendants were aware of, and failed to correct or stop, a constitutional violation." *Myers v. Semple*, 2019 WL 5328692, at *4 (D. Conn. Oct. 21, 2019) (citing *Shaw v. Prindle*, 661 F. App'x 16, 18 (2d Cir. 2016)).

To begin, "supervisory liability cannot lie where there is no underlying constitutional violation by a subordinate." *Green v. Maldonado*, 2018 WL 2725445, at *6 (D. Conn. June 6, 2018). The only remaining claim is Mr. Morgan's retaliation claim.

Defendants argue that Mr. Morgan's allegations are overbroad and conclusory to hold Defendants Semple, Rinaldi, Santiago, Zegarzeski, Shabanas, and Conger liable under a theory of supervisory liability for the retaliation, First Amendment violations, deliberate indifference to safety claim, equal protection claim, right to privacy claim, and negligent infliction of emotional distress claim, as well as the intentional infliction of emotional distress claim. Defs.' Mem. at 34. In their view, Mr. Morgan "presents no factual allegations against these defendants to support their liability for any of the alleged violations based on direct participation, creation of policies or customs that allowed said violations to occur, or grossly negligent management of subordinates." *Id.* at 35.

**\*24** According to Defendants, the supervisory liability claim is based on the "alleged failure to correct violations that they were made aware of" by Mr. Morgan. *Id.* Defendants note that Mr. Morgan never alleges "that he reported the conduct of Defendants Scully, Coursen, Higgins to any supervisory defendant, nor [did he report] ... Defendant Morin's conduct outside of Morin's alleged violation of the right to privacy." *Id.* at n.10. They also contend that he never reported that boric acid was placed in his food. *Id.* Defendants find that Mr. Morgan's failure to adequately set forth any "factual basis to support [the] extension of liability to the supervisory defendants" is fatal to his claim. *Id.* at 36–37.

Mr. Morgan argues that the supervisory Defendants "failed to remedy a violation of his constitutional rights after learning of them through a report or appeal, or that they acted in a grossly negligent or deliberately indifferent manner by failing to respond to the violations once they were known." Pl.'s Mem. at 34. In his view, he sufficiently pled facts demonstrating that the relevant Defendants "failed to remedy the alleged constitutional violation after learning about it" through Mr. Morgan's grievances and complaints, and he submits he also pled facts demonstrating the practices or policies created by Defendants that were unconstitutional. *Id.* at 35. He cites Second Circuit precedent that purportedly supports "that facts alleging that the supervisory Defendants' alleged failure to stop known constitutional violations against" Mr. Morgan survive a motion to dismiss. *Id.* at 38.

In their reply, Defendants argue that Mr. Morgan's "actual factual allegations absolutely do not support such broad liability." Reply at 9.

The Court disagrees.

Mr. Morgan repeatedly alleged that he filed grievances with or otherwise informed the supervisory Defendants. It is unclear to the extent which the supervisory Defendants "were even aware" of his grievances and "[t]he fact that they occupy supervisory positions is insufficient to establish their personal involvement in constitutional deprivation." *Azor v. Semple*, No. 3:19-cv-1068 (SRU), 2019 WL 4167072, at *4 (D. Conn. Sept. 3, 2019) (citing *McKinnon v. Patterson*, 568 F. 2d 930, 934 (2d Cir. 1977)). Nor does Mr. Morgan allege with sufficient specificity any policies or customs that these Defendants directed or maintained. The Court, however, finds that the extent to which the supervisory Defendants knew of Mr. Morgan's grievances and still failed to act cannot be resolved at this time.

Accordingly, Mr. Morgan's claims against the supervisory Defendants will not be dismissed.

### L. Compensatory Damages

Prisoners are required to comply with all procedural rules regarding the grievance process before filing an action in federal court. *Woodford v. Ngo*, 548 U.S. 81, 90–91, 93 (2006) (noting that "proper exhaustion of administrative remedies, which 'means using all steps that the agency holds out and doing so *properly* (so that the agency addresses the issues

Morgan v. Semple, Not Reported in Fed. Supp. (2020)

Case 3:24-cv-00037-DNH-ML    Document 9    Filed 06/11/24    Page 189 of 449

on the merits).' ") (emphasis in the original) (quoting *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002)). Thus, completion of the exhaustion process after a prisoner has filed an action in federal court does not satisfy the exhaustion requirement. *Neal v. Goord*, 267 F.3d 116, 122 (2d Cir. 2001). Special circumstances also will not relieve an inmate of the obligation to satisfy the exhaustion requirement.

An inmate's failure to exhaust all remedies available is only excusable if the remedies are, in fact, unavailable. *Ross v. Blake*, 136 S. Ct. 1850, 1858 (2016). Although failure to exhaust administrative remedies is an affirmative defense, *Jones v. Bock*, 549 U.S. 199, 216 (2007), a court may dismiss a complaint for failure to state a claim when the allegations on the face of the complaint establish that it is subject to dismissal, even on the basis of an affirmative defense. *Williams v. Priatno*, 829 F.3d 118, 122 (2d Cir. 2016) ("[A] district court still may dismiss a complaint for failure to exhaust administrative remedies if it is clear on the face of the complaint that the plaintiff did not satisfy the PLRA exhaustion requirement.").

**\*25** Defendants argue that the Prison Litigation Reform Act (PLRA) bars the award of compensatory damages because he has not alleged physical injury. Defs.' Mem. at 37. In their view, because Mr. Morgan does not sufficiently allege physical injury, his allegations cannot provide a basis for Section 1983. *Id.* at 38.

Mr. Morgan argues he has alleged "significant psychological harm and certain physical manifestations of such harm" and that the PLRA does not bar him "from asserting claims for nominal damages due to the alleged violates [sic] of his constitutional rights." Pl.'s Mem. at 38–39. He also notes that at the time of filing of the Second Amended Complaint, Mr. Morgan was not incarcerated, but on parole, and so no longer a "prisoner" under the PLRA. *Id.* at 39.

In their reply, Defendants argue that Mr. Morgan "remains a 'prisoner' within the meaning of the PLRA because he instituted this action while incarcerated with the [Department of Correction]." Reply at 9.

The Court agrees.

When Mr. Morgan filed his Complaint and initiated this action, he was a prisoner and on parole when he filed his Second Amended Complaint. *See Gibson v. City Municipality of N.Y.*, 692 F.3d 198, 202 (2d Cir. 2012) ("[T]he relevant time at which a person must be 'a prisoner' within the meaning of the PLRA in order for the Act's restrictions to apply is 'the moment the plaintiff files his complaint.' ") (quoting *Harris v. City of N.Y.*, 607 F.3d 18, 21–22 (2d Cir. 2010)). When Mr. Morgan filed his initial complaint, he was incarcerated. *Cf. Liner v. Fischer*, No. 11-CV-6711 (PAC) (JLC), 2014 WL 2880020, at \*4 n.5 (S.D.N.Y. June 25, 2014) ("Although [plaintiff] was released from prison in April 2014, the 'three strikes' provision still applies to this action because the complaint was filed while [plaintiff] was incarcerated."). As a prisoner, he was then required to exhaust administrative remedies.

The exhaustion requirement is intended to "afford [ ] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." *Johnson v. Testman*, 380 F.3d 691, 697 (2d Cir. 2004) (alteration in the original) (quoting *Porter v. Nussle*, 534 U.S. 516, 524–25 (2002)). Mr. Morgan was required to "provide enough information about the conduct of which they complain to allow prison officials to take appropriate responsive measures." *Id.*

Moreover, the Second Circuit has held "that Section 1997e(e) applies to claims in which a plaintiff alleges constitutional violations so that the plaintiff cannot recover damages for mental or emotional injury for a constitutional violation in the absence of a showing of actual physical injury." *Thompson v. Carter*, 284 F.3d 411, 417 (2d Cir. 2002); *see also Vega v. Lantz*, No.3:04-cv-1215 (DRM), 2009 WL 3157586, at \*4 (D. Conn. Sept. 25, 2009) (compensatory damages are unavailable for mental or emotional injuries without a showing of a physical injury (citing *Thompson*, 284 F.3d at 417–18)). While Mr. Morgan has alleged psychological harm and certain physical manifestations, to be eligible to receive compensatory damages Mr. Morgan must show actual physical injury. *See Toliver v. City of N.Y.*, 530 F. App'x 90, 93 n.2 (2d Cir. 2013) (even if plaintiff could not establish his injuries "stemmed from an incident in which he suffered physical injuries" he could still recover damages for injuries to his First Amendment rights and nominal and punitive damages for other constitutional violations).

**\*26** Accordingly, following the close of discovery, Mr. Morgan must be able to show that he has exhausted his administrative remedies as required under Section 1997e(e) or suffered physical injury, otherwise Mr. Morgan may not be able to recover compensatory damages in this case.

Morgan v. Semple, Not Reported in Fed. Supp. (2020)

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 190 of 449

#### IV. CONCLUSION

For the reasons explained above, the Court **DENIES** the motion to dismiss as to Mr. Morgan's claims for First Amendment retaliation against Defendants Morin, Rivard, Comitos, Senita, Weglarz, Scully, Conger, Coursen, and Higgins; deliberate indifference against Defendants Rivard, Comitos, Senita, Scully, Fulcher, Morin, Coursen, Higgins, Semple, Rinaldi, Santiago, Zegarzewski, Shabanas, and Conger; the claim of supervisory liability against Defendants Semple, Rinaldi, Santiago, Zegarzewski, Shebanas, and Conger; and the equal protection claim.

The Court **GRANTS** the motion to dismiss as to the Fourth Amendment claim; the claim for negligent infliction of emotional distress; and the claim for intentional infliction of emotional distress against Defendants Rivard, Comtois, Senita, Weglarz, Scully, Fulcher, Morin, Coursen, and Higgins.

**SO ORDERED** at Bridgeport, Connecticut, this 6th day of May, 2020.

#### All Citations

Not Reported in Fed. Supp., 2020 WL 2198117

---

### Footnotes

1    In their reply, Defendants make a universal argument that the motion to dismiss was not improper simply because of the Court's previous decision in its Ruling & IRO. Reply at 1. In response to an IRO, Defendants "may respond by either filing an answer or a motion to dismiss...." *Id.* In response to the second amended Complaint, Defendants "have properly presented arguments focused on deficiencies in [Plaintiff's] allegations supposedly supporting his various legal claims." *Id.* at 2. In their view, the motion to dismiss is proper. The Court agrees.

2    Mr. Morgan also alleges that Defendant Morin specifically prevented him "from contacting the State Police by letter." Compl. ¶ 86. Without more specific factual allegations, this claim fails.

3    While there appears to be limited precedent in the Second Circuit on whether psychological harm suffices as an "injury" for deliberate indifference requirements, other Circuits, however, have recognized that conduct which creates a substantial risk of psychological harm can violate the Eighth Amendment. *See Colbruno v. Kessler*, 928 F.3d 1155, 1162 (10th Cir. 2019) ("We have held that psychological harm, as well as physical injury, can implicate the Eighth Amendment." (citations omitted)); *Porter v. Clarke*, 923 F.3d 348, 353 (4th Cir. 2019) (affirming district court's determination that long-term detention in conditions akin to solitary confinement "created a 'substantial risk' of psychological and emotional harm and that [ ] [d]efendants were 'deliberately indifferent' to that risk' "); *Gray v. Hardy*, 826 F.3d 1000, 1008 (7th Cir. 2016) ("Evidence that the warden 'must have known' about the risk of physical or psychological harm resulting from the unsanitary conditions is sufficient for a jury to find deliberate indifference."); *Jordan v. Gardner*, 986 F.2d 1521, 1530 (9th Cir. 1993) (plaintiff-inmates established an Eighth Amendment violation as "[t]he record more than adequately supports the district court's finding of psychological harm, and the harm is sufficient to meet the constitutional minimum").

4    The Court has included a page number reference to the Second Amended Complaint because each claim begins at paragraph 85 and thus creates duplicative numbering.

5    Although Defendants move to dismiss claims against Defendant Conger, they fail to make any arguments specific to Defendant Conger's actions.

**Morgan v. Semple, Not Reported in Fed. Supp. (2020)**

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 191 of 449

6      The Court also notes that the cell search cannot be the basis of a First Amendment retaliation claim. *See Davis v. Collado*, 2018 WL 4757966, at *12 (S.D.N.Y. Sept. 30, 2018) (finding retaliatory cell searches do not violate the Constitution or support a federal claim).

7      While "the loss of a prisoner's constitutional right against unreasonable searches 'is occasioned only by the *legitimate* needs of institutional security," that claim is properly brought as a harassment claim. *Willis*, 301 F.3d at 67 (emphasis in the original) (quoting *U.S. v. Cohen*, 796 F.2d 20, 23 (2d Cir. 1986)). The Court has already dismissed Mr. Morgan's harassment claim. Ruling & IRO at 17–18; Order on Mot. to Reconsider.

8      Conn. Gen. Stat. § 4-165b provides: "[a]ny inmate ... who suffers an injury may file a claim against the state." Conn. Gen. Stat.§ 4-165b(a). It requires an inmate to first exhaust administrative remedies before going to the claims commissioner and requires an inmate to present their claim within a year of exhausting all administrative remedies. Conn. Gen. Stat. § 4-165b(b).

9      The parties collapsed their arguments regarding Mr. Morgan's intentional infliction of emotional distress claim within their arguments regarding supervisory liability. The Court chooses to analyze this claim distinctly from the other instances of supervisory liability.

---

**End of Document**                               © 2024 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment

Case Reopened by  Mitchell v. Martin,  D.Conn.,  May 7, 2024

2023 WL 8114344
Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.

James MITCHELL, Plaintiff,
v.
Robert MARTIN et al., Defendants.

No. 3:23-cv-902 (JAM)
|
Signed November 22, 2023

**Attorneys and Law Firms**

James Mitchell, Newtown, CT, Pro Se.

## ORDER DISMISSING COMPLAINT
## PURSUANT TO 28 U.S.C. § 1915A

Jeffrey Alker Meyer, United States District Judge

 *1  Plaintiff James Mitchell is a prisoner in the custody of the Connecticut Department of Correction ("DOC"). He has filed a *pro se* complaint *in forma pauperis* under 42 U.S.C. § 1983 alleging that five prison officials violated his rights under the First, Fifth, Eighth, Eleventh, and Fourteenth Amendments to the U.S. Constitution, as well as the Connecticut Constitution, federal law, and state law. Based on my initial review, pursuant to 28 U.S.C. § 1915A, I will dismiss the complaint as to Mitchell's federal law claims for failure to allege plausible grounds for relief, and I will otherwise decline to exercise supplemental jurisdiction over Mitchell's state law claims.

### BACKGROUND

Mitchell's claims arise from his confinement at Corrigan Correctional Center ("Corrigan") in New London, Connecticut. [1] He has more recently been transferred to a different correctional facility. [2]

Mitchell names five defendants: Corrigan Warden Robert Martin, Mail Clerk Officer Rachel Fontaine, and Corrections Officers Wright, Calderone, and Czikowsky. [3] The following

facts as alleged in the amended complaint are accepted as true for the purposes of this ruling. [4]

In May 2023, Mitchell's previously scheduled call with his attorney was cancelled "due to a facility party for correctional officers." [5] He also claims that inmates do not have access to an adequate law library or legal assistance. [6]

Mitchell highlights several problems regarding his mail. Prior to the events outlined in the complaint, Mitchell filed, but ultimately withdrew, a suit against Fontaine and Martin in 2001 "for misconduct involving [Mitchell's] privileged mail." [7] On May 24, 2023, Mitchell received mail from his attorney that Fontaine had already opened. [8] In June 2023, Fontaine "began holding and delaying [Mitchell's] legal mail" in response to his complaints. [9] The next month, Fontaine gave Mitchell his "regular mail without an envelope and taped together" so that the "contents [could] be viewed by anyone." [10] Later that month, Fontaine refused to mail an envelope from Mitchell, claiming that the "request was improperly filled out." [11] Though Mitchell "notified" Martin's office about these incidents, no action was taken in response. [12]

In May 2023, Mitchell filed with Wright and Calderone multiple Freedom of Information Act ("FOIA") requests, which were unanswered. [13] Mitchell complained to Wright and Calderone but received no response. [14] Mitchell subsequently "wrote grievances to [Martin's] office" but Martin "condoned and ignored the violations, misconduct[,] and retaliation." [15] Mitchell had previously filed suit against Wright for a similar incident, but subsequently withdrew the action due to a global settlement. [16]

 *2  Mitchell was also denied contact and virtual video visitation at Corrigan. [17] Furthermore, Corrigan has an "inadequate phone system" such that the Wi-Fi for "prisoners['] personal tablets [o]n which telephone calls are made continuously drop calls." [18] Mitchell "wrote complaints and grievances" to Martin about this shortcoming but Martin "has not taken any action to fix" the Wi-Fi system. [19]

Mitchell's request for a transfer "to an appropriate facility where he can properly practice his religious freedoms"

was rejected. [20] Moreover, "[M]artin's staff took [Mitchell's] religious items upon arrival" at Corrigan. [21] The confiscated items included Mitchell's "[N]ative [A]merican smudging materials." [22]

On or about September 13, 2023, Mitchell was brought to "a secluded location in the a/p area," and Czikowsky "ordered [him] to do a 'strip search.' " [23] After Mitchell removed his clothing, Czikowsky ordered Mitchell "to 'bend over' and 'spread his butt cheeks' and to let him see [Mitchell's] anus." [24] Mitchell initially refused but Czikowsky ordered him to comply or be placed "in solitary confinement." [25] Mitchell "felt concern for his safety due to the secluded area location" and because he, "a black man, was being aggressively ordered by a white correctional officer to bend over in a sexual position." [26] Mitchell therefore "had no choice but to comply" with the search. [27]

Mitchell was subsequently questioned about "if he had anything in his cell" and given a urine test, which was "negative for all drugs." [28] Mitchell later learned that his cellmate was subjected to a strip search, but not a "cavity search," and ordered "to take a urine test," which was "positive for drugs." [29]

Mitchell ultimately "contacted the PREA investigation unit hotline" and "notified the warden's office" about Czikowsky's actions. [30] Mitchell claims Czikowsky acted "in relation to [Mitchell's] race and because of [Mitchell's] well-known history of filing lawsuits against staff." [31]

Mitchell alleges that Martin's actions "constitute[ ] retaliation, equal protection, access to the court, religious freedoms[,] and cruel and unusual punish[ment]" in violation of the First, Fifth, Eighth, Eleventh, and Fourteenth Amendments to the U.S. Constitution as well as in violation of the Connecticut Constitution. [32] Mitchell further alleges that Martin's "condoning retaliation and abuse of authority by the [Corrigan] staff" violates the First, Eighth, and Fourteenth Amendments to the U.S. Constitution as well as the Connecticut Constitution. [33] Mitchell also alleges that Fontaine's actions "constitute[ ] retaliation, access to the courts[,] and equal protection in violation of the" First, Fifth, and Fourteenth Amendments to the U.S. Constitution as well as in violation of the Connecticut Constitution. [34]

**\*3** Mitchell also alleges that pursuant to FOIA, Wright's actions "constitute[ ] equal protection, retaliation, abuse of authority[,] and due process" violations of the First, Fifth, and Fourteenth Amendments to the U.S. Constitution as well as the Connecticut Constitution. [35] He further alleges that, with respect to his FOIA requests, Calderone's actions "constitute[ ] equal protection and due process violations" of the First, Fifth, and Fourteenth Amendments to the U.S. Constitution as well as the Connecticut Constitution. [36]

In addition, Mitchell alleges that Czikowsky's "abuse of authority, violating [Mitchell's] privacy rights and retaliation constitutes violations of" the First, Eighth, and Fourteenth Amendments to the U.S. Constitution, and that his actions "constitute[ ] cruel and unusual punishment in violation of the" Eighth and Eleventh Amendments to the U.S. Constitution as well as in violation of the Connecticut Constitution. [37] Finally, Mitchell alleges violations of his rights under the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 200bb, *et seq.*, the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 200cc, *et seq.*, and Connecticut Executive Order No. 21-1. [38]

### DISCUSSION

Congress by law requires that a federal court conduct an initial review of a prisoner's civil complaint against a governmental entity or governmental actors and "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint—(1) is frivolous, malicious, or fails to state a claim upon which relief may be granted; or (2) seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b). If the prisoner is proceeding *pro se*, the allegations of the complaint must be read liberally to raise the strongest arguments they suggest. *See Meadows v. United Servs., Inc.*, 963 F.3d 240, 243 (2d Cir. 2020) (*per curiam*). [39] Still, even a *pro se* complaint may not survive dismissal if its factual allegations do not establish plausible grounds for relief. *Ibid.*

### *Injunctive and declaratory relief*

Mitchell was transferred last month to a different state correctional facility. "It is settled law in this circuit that an inmate's transfer or release 'from a prison facility generally moots claims for declaratory and injunctive relief against officials of that facility.' " *Mitchell v. Annucci*, 2023 WL

7648625, at *2 (2d Cir. 2023) (quoting *Salahuddin v. Goord*, 467 F.3d 263, 272 (2d Cir. 2006)). Accordingly, I will dismiss as moot Mitchell's claims for injunctive and declaratory relief.

### Fifth Amendment

The Fifth Amendment protects an individual against actions taken by the federal government. *See Dusenbery v. United States*, 534 U.S. 161, 167 (2002) ("The Due Process Clause of the Fifth Amendment prohibits the United States, as the Due Process Clause of the Fourteenth Amendment prohibits the States, from depriving any person of property without 'due process of law.' "). Although Mitchell claims his Fifth Amendment rights were violated, "the Fifth Amendment Due Process Clause applies to federal, not state, inmates." *Jackson v. Walker*, 2022 WL 16573562, at *3 (D. Conn. 2022). Any claim for violation of rights under the Fifth Amendment is accordingly dismissed pursuant to 28 U.S.C. § 1915A(b)(1) but without prejudice to any cognate claim for violation of due process under the Fourteenth Amendment.

### Eleventh Amendment

**\*4** The Eleventh Amendment bars "federal jurisdiction over suits against nonconsenting States." *Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 73 (2000). Despite Mitchell's allegations to the contrary, the Eleventh Amendment does not confer any individual rights. Any claim for violation of rights under the Eleventh Amendment is accordingly dismissed pursuant to 28 U.S.C. § 1915A(b)(1).

### Access to the courts

Mitchell claims his access to the courts was impeded by lack of access to an adequate law library and legal assistance, as well as by tampering with his legal mail and the cancellation of a previously scheduled call with his attorney. The Supreme Court has long recognized a constitutional right of access to the courts, notwithstanding that the right's precise source in the Constitution remains uncertain. *See Christopher v. Harbury*, 536 U.S. 403, 415 n.12 (2002); *see also Miller v. Semple*, 2019 WL 6307535, at *4 (D. Conn. 2019). A right of access to the courts correlatively means a right to be free from obstruction of this right by the government. *See Whalen v. County of Fulton*, 126 F.3d 400, 406 (2d Cir. 1997). Accordingly, prisoners have a constitutional right of access to the courts that may not be unreasonably obstructed by the actions of prison officials. *See Washington v. James*, 782 F.2d 1134, 1138 (2d Cir. 1986).

To state a claim for denial of access to the courts, a plaintiff must demonstrate that he suffered an actual injury. *See Lewis v. Casey*, 518 U.S. 343, 351–53 (1996). That is, he must allege that "defendant's conduct deprived him of an opportunity to press some nonfrivolous, arguable cause of action in court." *Baker v. Weir*, 2016 WL 7441064, at *2 (D. Conn. 2016) (quoting *Brown v. Choinski*, 2011 WL 1106232, at *5 (D. Conn. 2011)). What this means is "that the underlying cause of action, whether anticipated or lost, is an element that must be described in the complaint, just as much as allegations must describe the official acts frustrating the litigation," and "the underlying cause of action and its lost remedy must be addressed by allegations in the complaint sufficient to give fair notice to a defendant." *Christopher*, 536 U.S. at 415–16. A plaintiff must describe "the predicate claim ... well enough to apply the 'nonfrivolous' test and to show that the 'arguable' nature of the underlying claim is more than hope." *Id.* at 416. In this manner, "the complaint should state the underlying claim in accordance with Federal Rule of Civil Procedure 8(a), just as if it were being independently pursued, and a like plain statement should describe any remedy available under the access claim and presently unique to it." *Id.* at 417–18.

Here, for at least two reasons, Michell's allegations fall well short of plausibly alleging a claim based on denied access to the courts. First, Mitchell does not describe by name or with any precision any past or present legal claim or defense that has been thwarted by any of the defendants' actions. Second, he does not establish that any such actions are or were arguably meritorious and not frivolous. For these reasons, Mitchell does not adequately allege a cognizable claim for violation of his right of access to the courts. *See, e.g.*, *Spates v. Manson*, 644 F.2d 80, 85 (2d Cir. 1981) (the Sixth Amendment "right [to self-representation in a criminal proceeding] does not carry with it a right to state-financed library resources where state-financed legal assistance is available"); *Whitaker v. Evans*, 2019 WL 6700188, at *2–3 (D. Conn. 2019) (dismissing claim "for failure to state an injury resulting from the mail interference"); *Ramos v. Dep't of Corr.*, 2016 WL 740394, at *2 (D. Conn. 2016) (dismissing denial of access to legal telephone call claim based on denial of request, on one occasion, to call attorney); *Abreu v. Travers*, 2016 WL 6127510, at *11 (N.D.N.Y. 2016) (dismissing complaint because the "plaintiff fails to allege any facts to plausibly suggest that a non-frivolous claim was actually hindered or prejudiced because of the alleged denial of access to legal materials"). Accordingly, any claim that Mitchell was denied access to the courts is dismissed pursuant to 28 U.S.C. § 1915A(b)(1).

### First Amendment retaliation

**\*5** Mitchell claims Martin, Fontaine, Wright, and Czikowsky retaliated against him. "[B]ecause prisoner retaliation claims are easily fabricated, and accordingly pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration," courts "are careful to require non-conclusory allegations." *Burns v. Martuscello*, 890 F.3d 77, 83–84 (2d Cir. 2018). A successful retaliation claim consists of three elements: "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Id.* at 84.

The filing of a prison grievance or lawsuit constitutes protected activity under the first element required to state a retaliation cause of action. *See Brandon v. Kinter*, 938 F.3d 21, 40 (2d Cir. 2019); *Lewis v. Stango*, 2023 WL 4684666, at \*5 (D. Conn. 2023). The lawsuits Mitchell filed in 2021 against Martin, Fontaine, and Wright clearly satisfy this element. [40]

An "adverse action," as required by the second element, has been understood as "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights." *Gill v. Pidlypchak*, 389 F.3d 379, 381 (2d Cir. 2004). Courts have found, however, that isolated instances of mail tampering and delay, even with privileged communications, are insufficient to support a retaliation claim. *See Bradshaw v. Annucci*, 2023 WL 4744735, at \*14 (N.D.N.Y. 2023) (collecting cases); *Anderson v. Bender*, 2019 WL 3252914, at \*4 (W.D.N.Y. 2019). Accordingly, Mitchell's retaliation claim against Fontaine is dismissed pursuant to 28 U.S.C. § 1915A(b)(1).

Mitchell's retaliation claim against Martin is similarly unsuccessful. Mitchell claims he wrote to Martin and notified his office about the incidents with Fontaine, Wright, Calderone, and Czikowsky but received no response. "A bare allegation of a correction official's failure to investigate a grievance is inadequate to satisfy the adverse action requirement of a retaliation claim." *Smith v. Annucci*, 2019 WL 11727264, at \*3 (N.D.N.Y. 2019); *see Houston v. Schriro*, 2013 WL 4457375, at \*10 (S.D.N.Y. 2013) ("Ignoring grievances cannot support a First Amendment retaliation claim."). Accordingly, Mitchell's retaliation claim against Martin is dismissed pursuant to 28 U.S.C. § 1915A(b)(1).

Mitchell's retaliation claim against Wright lacks the requisite causal connection between the protected activity and adverse action. To establish a causal connection between Mitchell's previous lawsuit and Wright's adverse action, Mitchell would have to allege facts "suggesting that the protected conduct was a substantial or motivating factor in the prison official's decision to take action against him." *Lewis*, 2023 WL 4684666, at \*6. "Some of the facts often used to determine retaliatory motive include (1) temporal proximity between the protected conduct and the alleged retaliatory act, (2) the prisoner's prior good disciplinary record, (3) a finding of not guilty at the disciplinary hearing, and (4) statements by the officials showing motivation." *Ramos v. Semple*, 2019 WL 2422875, at \*2 (D. Conn. 2019).

Mitchell has not alleged any facts to show that Wright was motivated to take adverse action against him because of his previous lawsuit. *See, e.g.*, *Lewis*, 2023 WL 4684666, at \*5 (finding plaintiff's claim "wholly conclusory" because he "has not alleged any facts to support his claim that any Defendants were motivated to take adverse action against Plaintiff either because he sued the West Haven Police Department or because he filed an action for habeas relief"). Moreover, the timing of events does not support Mitchell's claim; Wright's allegedly retaliatory actions occurred a year and nine months after Mitchell filed suit and seven months after the lawsuit was withdrawn. Accordingly, Mitchell's retaliation claim against Wright is dismissed pursuant to 28 U.S.C. § 1915A(b)(1).

**\*6** The causal connection is similarly absent from Mitchell's retaliation claim against Czikowsky. The complaint provides no indication that Czikowsky was aware of Mitchell's previous lawsuits against Martin, Fontaine, and Wright. Even assuming that Czikowsky was aware of those actions, Mitchell has not provided any basis to believe that Czikowsky would retaliate for lawsuits in which he was not personally named as a defendant. *See Roseboro v. Gillespie*, 791 F. Supp. 2d 353, 369 (S.D.N.Y. 2011) (collecting cases). Accordingly, Mitchell's retaliation claim against Czikowsky is dismissed pursuant to 28 U.S.C. § 1915A(b)(1). [41]

### Religious exercise

Mitchell alleges an infringement of his right under the First Amendment to freely exercise his religion, as well as his statutory rights under the RFRA and RLUIPA. As an initial matter, the Supreme Court has held that the RFRA does not apply to state and local governments. *See City of Boerne*

*v. Flores*, 521 U.S. 507 (1997). Because all of Mitchell's allegations are levied against state employees, his RFRA claim is dismissed pursuant to 28 U.S.C. § 1915A(b)(1).

The First Amendment prohibits prison officials from substantially burdening prisoners in the exercise of their religious beliefs, absent a reason to do so that is reasonably related to legitimate penological interests. *See Brandon*, 938 F.3d at 32 (2d Cir. 2019). Relatedly, RLUIPA states that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ... unless the government demonstrates that imposition of the burden on that person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." *Williams v. Annucci*, 895 F.3d 180, 188 (2d Cir. 2018) (quoting 42 U.S.C. § 2000cc-1(a)); *see also Holland v. Goord*, 758 F.3d 215, 224 (2d Cir. 2014) (noting that RLUIPA allows for injunctive relief but not for money damages claims against state officers in their individual or official capacities).

Mitchell claims his religious freedom was impinged by Martin's refusal to transfer him "to an appropriate facility where he can properly practice his religious freedoms."[42] "Although [Mitchell] has a right to practice his religion, he does not have a right to be incarcerated in the prison of his choice, even if he believes that other institutions would be more accommodating to his religious beliefs." *Greybuffalo v. Frank*, 2003 WL 23211615, at *5 (W.D. Wis. 2003). Indeed, courts across the country have recognized that prison inmates are not entitled to pick or choose their prisons based on access to facilities for religious practices. *See, e.g., Moreno v. Terhune*, 84 F. App'x 818, 820 (9th Cir. 2003) ("We are simply not persuaded that the prison's failure to transfer [plaintiff] interfered with his practice of religion."); *Baltas v. Erve*, 2022 WL 4260672, *12 (D. Conn. 2021) (finding no clearly established right to transfer facilities for sweat lodge access); *Greybuffalo*, 2003 WL 23211615, at *5 (finding that defendant did not violate plaintiff's "right to freely exercise his religion by denying his request to transfer to another prison"). Accordingly, Mitchell's claims under the First Amendment and RLUIPA based on the denial of his transfer request are dismissed pursuant to 28 U.S.C. § 1915A(b)(1).

**\*7** Mitchell's allegations relating to the confiscation of his smudging materials appear, at first glance, to be more sustainable. *See Michalski v. Semple*, 2017 WL 4475994, at *7–8 (D. Conn. 2017) (permitting First Amendment and

RLUIPA claims regarding, in part, the confiscation of a prisoner's smudging materials by prison staff to proceed). Mitchell, however, does not specify who amongst "[M]artin's staff" ultimately "took [his] religious items" that included his "[N]ative [A]merican smudging materials"[43] Thus, it appears that Mitchell is alleging a theory of supervisory liability under which he would hold Martin liable. The Second Circuit has ruled, however, that "there is no special rule for supervisory liability" and "a plaintiff must plead and prove that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020). At the pleading stage, a plaintiff must plausibly allege each defendant's "personal involvement in the alleged constitutional deprivation" to establish his or her liability. *See Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013).

Mitchell has not done so here with respect to Martin. Indeed, he makes no allegations that Martin or any of the other named defendants were personally involved in the confiscation of his "smudging materials." Accordingly, Mitchell's claims under the First Amendment and RLUIPA based on the confiscation of his smudging materials are dismissed pursuant to 28 U.S.C. § 1915A(b)(1).

### Equal protection

Mitchell contends that the defendants violated his Fourteenth Amendment right to equal protection. "The Equal Protection Clause ... commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (quoting *Plyler v. Doe*, 457 U.S. 202, 216 (1982)). In order to state a valid equal protection claim, "a plaintiff must allege facts showing that the plaintiff was treated differently from similarly situated individuals and that the reason for the different treatment was based on 'impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.' " *Morgan v. Semple*, 2020 WL 2198117, at *19 (D. Conn. 2020) (quoting *Diesel v. Town of Lewisboro*, 232 F.3d 92, 103 (2d Cir. 2000)).

To the extent Mitchell claims that performance of the strip search discriminated against him on the basis of his race, that claim fails here.[44] Mitchell appears to allege that his cellmate was treated differently, as he was not subjected to the same

"cavity search" that Mitchell underwent. [45] But the complaint includes no information from which the Court could infer that Mitchell's cellmate was a different race. Moreover, Mitchell has provided nothing more than conclusory claims that Czikowsky's search of him was motivated by his race. *See Gainey v. Pagel*, 2021 WL 2400256, at *3 (D. Conn. 2021). Accordingly, Mitchell's claim under the Fourteenth Amendment based on racial discrimination is dismissed pursuant to 28 U.S.C. § 1915A(b)(1).

Because Mitchell does not successfully advance allegations of class-based discrimination, his equal protection claims must be evaluated as a "class of one" in which he was intentionally and irrationally singled out. *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 601 (2008). To succeed on this claim, Mitchell must "demonstrate the existence of a person who is '*prima facie* identical' to him and who was treated differently." *Conquistador v. Corcella*, 2023 WL 3006806, at*2 (D. Conn. 2023) (quoting *Hu v. City of New York*, 927 F.3d 81, 92 (2d Cir. 2019)). But Mitchell has advanced no such comparator. Rather, he claims in a conclusory fashion that his equal protection rights were violated. Accordingly, Mitchell's equal protection claims are dismissed pursuant to 28 U.S.C. § 1915A(b)(1).

### Strip search

**\*8** Mitchell claims that the strip search carried out by Czikowsky "constitute[d] cruel and unusual punishment in violation of the" Eighth Amendment. [46] "A prisoner's claim that he has been subject to a strip search may implicate both the Fourth Amendment right to be free from an unreasonable search and seizure, and the Eighth Amendment right to be free from cruel and unusual punishment." *Dunbar v. Dep't of Correction*, 2023 WL 143164, at *7 (D. Conn. 2023).

Although prisoners have certain privacy rights, prison officials have a compelling interest in the detection of contraband, and a strip search of a prisoner may be justified by legitimate security and penological objectives. *See, e.g., Florence v. Bd. of Chosen Freeholders*, 566 U.S. 318 (2012); *see also Harris v. Miller*, 818 F.3d 49, 63–65 (2d Cir. 2016) (*per curiam*) (discussing restrictions of the Eighth Amendment on visual body cavity searches); *Crawford v. Cuomo*, 796 F.3d 252, 258 (2d Cir. 2015) (noting that "prison officials looking for contraband may subject inmates to reasonable strip searches and cavity searches").

The complaint makes clear that the search of Mitchell took place in the context of an investigation based on a "suspicion of drug activity" and included a strip search of Mitchell's cellmate and urine tests by both Mitchell and his cellmate. [47] Courts have found that searches similar to the one Mitchell experienced do not implicate Eighth Amendment concerns when performed in an attempt to uncover contraband. *See Shakur v. King*, 2020 WL 4271932, at *4–5 (D. Conn. 2020) (finding no cognizable Eighth Amendment claim for a strip search in which the inmate was ordered "to bend over and spread his buttocks"); *Galarza v. Erfe*, 2019 WL 121784, at *4 (D. Conn. 2019) (dismissing strip search claim where inmate was required to spread buttocks in connection with search for contraband); *see also Vaughn v. Strickland*, 2013 WL 3481413, at *5 (S.D.N.Y. 2013) (noting that "visual cavity searches have been consistently upheld as a legitimate penological restriction").

Nor is Czikowsky's threat of placing Mitchell in solitary confinement if he did not comply with the search sufficient to invoke the Eighth Amendment. "Allegations of threats or verbal harassment, without injury or damage, do not state a claim under 42 U.S.C. § 1983." *Holland v. City of New York*, 197 F. Supp. 3d 529, 546 (S.D.N.Y. 2016) (collecting cases). Accordingly, Mitchell's claims related to the strip search are dismissed pursuant to 28 U.S.C. § 1915A(b)(1).

### Visitation

Mitchell appears to assert that several of his rights under the U.S. Constitution were violated by a lack of contact and video visitation. I will address each claim in turn.

The Supreme Court has observed that "[a]n inmate does not retain rights inconsistent with proper incarceration," and the First Amendment guarantee of "freedom of association is among the rights least compatible with incarceration." *Overton v. Bazzetta*, 539 U.S. 126, 131 (2003). The Court has declined "to explore or define the asserted right of association at any length or determine the extent to which it survives incarceration." *Id.* at 132; *see also Malave v. Weir*, 750 F. App'x 65, 67 (2d Cir. 2019) (noting that "*Overton* did not consider whether there is a First Amendment right to visitation in prison"). Mitchell claims generally that "[M]artin['s] administration has impeded with [his] virtual video visitation" but does not describe the nature or duration of that interference or the role that defendants played. [48] *See Grullon*, 720 F.3d at 138. Because Mitchell fails to state a cognizable claim for the deprivation of his right to visitation

under the First Amendment, any such claim is dismissed pursuant to 28 U.S.C. § 1915A(b)(1).

**\*9**  "In order to establish a violation of his Eighth Amendment rights, an inmate must show (1) a deprivation that is objectively, sufficiently serious that he was denied the minimal civilized measure of life's necessities, and (2) a sufficiently culpable state of mind on the part of the defendant official, such as deliberate indifference to inmate health or safety." *Gaston v. Coughlin*, 249 F.3d 156, 164 (2d Cir. 2001). Though there may be visitation limitations that would implicate Eighth Amendment concerns, limitations more severe than those outlined in the complaint have not been deemed "sufficiently serious." *See Overton* 539 U.S. at 136–37 (ban on all visitation for two years); *Marrero v. Weir*, 2014 WL 4799228, at \*3 (D. Conn. 2014) (inmate denied visitation with his mother); *see also Baltas v. Rizvani*, 2022 WL 17251761, at \*14 (D. Conn. 2022) (noting that "an inmate has no Eighth Amendment right to visitation"). Because Mitchell fails to state a cognizable claim for the deprivation of his right to visitation under the Eighth Amendment, any such claim is dismissed pursuant to 28 U.S.C. § 1915A(b)(1).

In analyzing the Fourteenth Amendment, this Court has not found that inmates have an "independent, fundamental constitutional right to visitation, contact or otherwise." *Green v. Santiago*, 2017 WL 2312355, at \*6 (D. Conn. 2017) (collecting cases); *see, e.g.*, *Mercado v. Dep't of Corr.*, 2017 WL 1095023, at \*3 (D. Conn. 2017) (citing *Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 461 (1989)).

Even without a constitutional right to visitation, however, "state law may create enforceable liberty interests in the prison setting." *Thompson*, 490 U.S. at 461. But the present "Department of Correction Administrative Directive § 10.6 provides in relevant part that 'visitation shall be considered a *privilege* and no inmate shall have entitlement to a [social] visit.' " *Jan G. v. Semple*, 202 Conn. App. 202 (2021) (emphasis added); *see Malavé v. Weir*, 2018 WL 500644, at \*7 (D. Conn. 2018) ("Connecticut prison regulations do not create a liberty interest in prison visitation"), *aff'd sub nom. Malave v. Weir*, 750 F. App'x 65 (2d Cir. 2019); State of Conn. Dep't of Corr., Admin. Directive 10.6 § 4(b) (effective Nov. 6, 2020).

Moreover, there is nothing on the face of Connecticut Executive Order No. 21-1 that purports to mandate contact visitation. *See* Conn. Exec. Order No. 21-1 (effective June 30, 2021) ("By October 1, 2021, the Department of Correction

shall report on steps taken and to be taken to increase access to contact visits for incarcerated persons."). Indeed, this Court has "found no indication that the Order creates a private right of action." *Quint v. Lamont*, 2022 WL 17487978, at \*3 (D. Conn. 2022). Because Mitchell fails to state a cognizable claim for the deprivation of his right to visitation under the Fourteenth Amendment or Connecticut state law, any such claims are dismissed pursuant to 28 U.S.C. § 1915A(b)(1).

### *Telephone access*

Mitchell claims that Corrigan has an "inadequate phone system" such that the Wi-Fi that facilitates telephone calls "continuously drops calls." [49] But "prisoners do not have an absolute right to make phone calls." *Banks v. Argo*, 2012 WL 4471585, at \*5 (S.D.N.Y. 2012); *see Griffin v. Cleaver*, 2005 WL 1200532, at \*6 (D. Conn. 2005) (noting that there is "no constitutional right to telephone use"). Indeed, telephone access may be restricted provided that a prisoner has an alternate method of communication. *See Bradshaw v. Annucci*, 2023 WL 4744735, at \*23 (N.D.N.Y. 2023) (collecting cases). While the complaint includes several allegations regarding the treatment of Mitchell's mail, nowhere does he claim that the mail system was an ineffective method of communication. Mitchell's invocation of Connecticut law is similarly unavailing, as "[v]iolations of state law are not cognizable under Section 1983." [50] *Crowder v. Farinella*, 2017 WL 3392546, at \*6 (D. Conn. 2017) (citing *Pollnow v. Glennon*, 757 F.2d 496, 501 (2d Cir. 1985)).

**\*10**  The complaint appears to allege a theory of supervisory liability based on the lack of "any action to fix" the Wi-Fi, even though Mitchell "wrote complaints and grievances" to Martin. [51] But "a defendant's mere receipt of a letter or grievance, without personally investigating or acting thereon, is insufficient to establish personal involvement." *Evans v. Barone*, 2022 WL 408920, at \*6 (D. Conn. 2022). Mitchell does not allege that Martin was even aware of the problem, such that liability could ensue. *See Tangreti*, 983 F.3d at 616–17. Accordingly, Mitchell's claim for violation of rights based on the deprivation of telephone calls is dismissed pursuant to 28 U.S.C. § 1915A(b)(1).

### *Freedom of Information Act*

Mitchell claims that Wright and Calderone "purposely fail[ed] to respond" to his FOIA requests. [52] Notably, however, a FOIA "violation is not also a violation of the First Amendment." *Book v. Lauretti*, 2022 WL 4944399, at \*7 n.8

(D. Conn. 2022). Indeed, the Supreme Court "has repeatedly made clear that there is no constitutional right to obtain all the information provided by FOIA laws." *McBurney v. Young,* 569 U.S. 221, 232 (2013); *see Concepcion v. Green,* 2021 WL 5988613, at *7 (D. Conn. 2021). Accordingly, Mitchell's claims based on the violation of his rights under FOIA are dismissed pursuant to 28 U.S.C. § 1915A(b)(1).

### Supervisory liability

Finally, Mitchell contends that Martin "condoned and ignored the violations, misconduct[,] and retaliation" by his co-defendants. [53] Specifically, Mitchell "wrote complaints and grievances" to Martin and "[M]artin's office" about the misconduct of his co-defendants but those actions were "overlooked" by Martin. [54]

As discussed above, "mere awareness of an issue is no longer sufficient to state a claim for supervisory liability." *Richard v. Corcella,* 2023 WL 4595695, at *4 (D. Conn. 2023); *see Tangreti,* 983 F.3d at 616–17. Mitchell claims that Martin failed to act based on communications from Mitchell, but it is not clear from the complaint that Martin received these communications; thus, these grounds are insufficient to allege Mitchell's personal involvement such that liability could attach. *See Evans,* 2022 WL 408920, at *6. Accordingly, any claim involving Martin's supervisory liability is dismissed pursuant to 28 U.S.C. § 1915A(b)(1).

### CONCLUSION

For the reasons set forth above, the Court DISMISSES the complaint without prejudice pursuant to § 28 U.S.C. § 1915(b)(1) and DISMISSES Mitchell's subsequent motion (Doc. #12) as moot. Mitchell has not alleged plausible grounds for relief with respect to his federal law claims, and the Court otherwise declines in its discretion to exercise supplemental jurisdiction over his state law claims.

The Clerk of Court shall close this case. If Mitchell has good faith grounds to allege facts that overcome the concerns stated in this ruling, he may file an amended complaint on or before **December 22, 2023**, and the Court will then re-open the case to conduct another initial review of any timely amended complaint.

It is so ordered.

### All Citations

Slip Copy, 2023 WL 8114344

---

### Footnotes

1    Doc. #16 at 2.

2    Doc. #17.

3    Doc. #16 at 2–3.

4    *See Pettaway v. Nat'l Recovery Sols., LLC,* 955 F.3d 299, 303 (2d Cir. 2020) ("an amended pleading ordinarily supersedes the original and renders it of no legal effect") (internal quotation marks and citation omitted); *see also* Doc. #15 (noting that the amended complaint is "the operative complaint in this action").

5    Doc. #16 at 14 (¶¶ 28–29).

6    *Id.* at 9 (¶¶ 1–2).

7    *Id.* at 16 (¶ 41); *see* Doc. #117, *Mitchell v. Martin,* No. KNL-CV21-5022320-S (Conn. Super. Ct. 2022).

8    Doc. #16 at 15 (¶¶ 33, 35).

9    *Id.* at 16 (¶ 44).

10    *Id.* at 16 (¶ 45).

11    *Id.* at 17 (¶ 46).

12    *Id.* at 17 (¶ 47).

13    *Id.* at 17 (¶¶ 49–50).

14    *Id.* at 17 (¶ 51). In September 2023, Calderone told Mitchell "that she brought all of [Mitchell's] request responses to the mail room and does not know what happened after that." *Id.* at 18 (¶ 55).

15    *Id.* at 17 (¶ 52), 18 (54).

16    *Id.* at 17–18 (¶ 53); *see* Doc. #113, *Mitchell v. Spotten*, No. KNL-CV21-5022520-S (Conn. Super. Ct. 2022). Mitchell concedes that Calderone was not a party to that suit. Doc. #16 at 18 (¶ 55).

17    Doc. #16 at 11 (¶ 15), 12 (¶ 20).

18    *Id.* at 12 (¶ 24), 14 (¶ 26).

19    *Ibid.*

20    *Id.* at 11 (¶ 12).

21    *Id.* at 11 (¶ 13).

22    *Ibid.*

23    *Id.* at 18 (¶ 57). The Court understands that the "a/p area" refers to the Admitting and Processing area of Corrigan. *See Granger v. Santiago*, 2021 WL 4133752, at *1 (D. Conn. 2021) (noting that strip searches at Corrigan occur in the Admitting and Processing ("AP") area).

24    Doc. #16 at 19 (¶ 58).

25    *Id.* at 19 (¶ 59).

26    *Id.* at 19 (¶ 61).

27    *Id.* at 19 (¶ 63).

28    *Id.* at 21 (¶¶66, 70)

29    *Id.* at 21 (¶¶ 65, 68, 70).

30    *Id.* at 23 (¶¶ 74–75). The Court understands that "PREA" stands for the Prison Rape Elimination Act, 42 U.S.C. §§ 15601–15609, which was "the first federal law to address the sexual abuse of prisoners." *Crawford v. Cuomo*, 796 F.3d 252, 260 (2d Cir. 2015).

31    Doc. #16 at 23 (¶ 76).

32    *Id.* at 23 (¶ 77). Mitchell does not allege that the state constitution affords him any greater protection than the federal constitution. "Consistent with the Connecticut appellate court's policy regarding unaddressed claims under the Connecticut Constitution, the Court concludes that [Mitchell's] state constitutional rights are co-extensive with his federal constitutional rights in this circumstance." *Cozayatl Sampedro v. Schriro*, 377 F. Supp. 3d 133, 144 n.6 (D. Conn. 2019) (citing *Perez v. Comm'r of Corr.*, 326 Conn. 357, 383 (2017)).

33   Doc. #16 at 25 (¶ 81).

34   *Id.* at 23 (¶ 78).

35   *Id.* at 25 (¶ 79).

36   *Id.* at 25 (¶ 80).

37   *Id.* at 25 (¶ 82).

38   *Id.* at 11 (¶¶ 14, 17).

39   Unless otherwise indicated, this order omits internal quotation marks, alterations, citations, and footnotes in text quoted from court decisions.

40   *Id.* at 16 (¶ 41), 17–18 (¶ 53).

41   Mitchell does not bring an explicit retaliation claim against Calderone. To the extent, however, that Mitchell intended to lodge a retaliation claim against all defendants, such a claim against Calderone would fail for the same reasons as the retaliation claim against Czikowsky.

42   Doc. #16 at 11 (¶ 12).

43   *Id.* at 11 (¶ 13).

44   *See id.* at 23 (¶ 76).

45   *Id.* at 21 (¶ 68).

46   *Id.* at 25 (¶ 82).

47   *Id.* at 21 (¶¶ 65–66, 68, 70). Mitchell alleges that his cellmate tested positive for drugs pursuant to the investigation. *Id.* at 21 (¶ 70).

48   *Id.* at 12 (¶ 20).

49   *Id.* at 12 (¶ 24), 14 (¶ 26).

50   *See id.* at 12 (¶ 25).

51   *Id.* at 12 (¶ 24), 14 (¶ 26).

52   *Id.* at 17 (¶ 50).

53   *See, e.g.*, *id.* at 18 (¶ 54).

54   *See id.* at 16 (¶¶ 39, 42), 17 (¶ 52), 23 (¶ 75).

---

**End of Document**                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.   10

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 202 of 449

Conquistador v. Corcella, Not Reported in Fed. Supp. (2023)

2023 WL 3006806
Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.

Jean Karlo CONQUISTADOR, Plaintiff,

v.

Anthony CORCELLA et al., Defendants.

No. 3:22-cv-00992 (JAM)
|
Signed April 19, 2023

**Attorneys and Law Firms**

Jean K. Conquistador, Meriden, CT, Pro Se.

## INITIAL REVIEW ORDER
## PURSUANT TO 28 U.S.C. § 1915A

Jeffrey Alker Meyer, United States District Judge

**\*1** Plaintiff Jean Karlo Conquistador is a prisoner in the custody of the Connecticut Department of Correction ("DOC"). He has filed a complaint *pro se* and *in forma pauperis* under 42 U.S.C. § 1983 against two DOC employees, alleging that the defendants violated his constitutional rights by restricting his ability to file administrative grievances. Based on my initial review of his complaint, I will dismiss Conquistador's claims against the defendants.

## BACKGROUND

The facts alleged in the complaint are accepted as true for the purposes of initial review only. Conquistador's claims arise from his confinement at Garner Correctional Institution. He names two defendants in their individual and official capacities: DOC Wardens Anthony Corcella and Amonda Hannah.[1] Conquistador alleges that Warden Corcella placed him on an administrative grievance restriction in March 2019, and that Warden Hannah extended the restriction in April 2019.[2] The complaint does not allege any facts to suggest why Conquistador was placed under the restriction.

Conquistador contends that the grievance restriction violated his rights under the First Amendment and the equal protection and due process clauses of the Fourteenth Amendment.[3] He also claims that the defendants have violated the "laws of the State of Connecticut" and that he is "held against his will" by DOC "due to the discrimination and oppression in the United States against people of color."[4] Conquistador seeks declaratory judgment and five million dollars in damages.[5]

## DISCUSSION

Pursuant to 28 U.S.C. § 1915A(b), the Court must review a prisoner's civil complaint against a governmental entity or governmental actors and "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint—(1) is frivolous, malicious, or fails to state a claim upon which relief may be granted; or (2) seeks monetary relief from a defendant who is immune from such relief."

The Supreme Court has set forth a threshold "plausibility" pleading standard for courts to evaluate the adequacy of allegations in federal court complaints. A complaint must allege enough facts—as distinct from legal conclusions—that give rise to plausible grounds for relief. See *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).[6] If the prisoner is proceeding *pro se*, the allegations of the complaint must be read liberally to raise the strongest arguments that they suggest. See *Meadows v. United Servs., Inc.*, 963 F.3d 240, 243 (2d Cir. 2020) (*per curiam*). Notwithstanding the rule of liberal interpretation, a *pro se* complaint may not survive dismissal if its factual allegations do not meet the basic plausibility standard. *See ibid.*

### *Equal protection*

Conquistador contends that the grievance restriction violates the equal protection clause of the Fourteenth Amendment. To establish a class-based equal protection claim, an individual must prove discrimination based on "impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Diesel v. Town of Lewisboro*, 232 F.3d 92, 103 (2d Cir. 2000). In the prison setting, a plaintiff must also show that his treatment was not "reasonably related to any legitimate penological interests." *Phillips v. Girdich*, 408 F.3d 124, 129 (2d Cir. 2005).

Conquistador v. Corcella, Not Reported in Fed. Supp. (2023)

Case 3:24-cv-00037-DNH-ML    Document 9    Filed 06/11/24    Page 203 of 449

**\*2**   Although Conquistador has claimed that his imprisonment is due to discrimination against people of color, he does not explain how the defendants purposefully discriminated against him because of his membership in an identifiable or suspect class. *See Lopez v. McGill*, 2009 WL 179787, at \*6 (D. Conn. 2009) (denying plaintiff's equal protection claims arising from his grievance restriction). Accordingly, Conquistador has failed to state a plausible class-based equal protection claim.

Absent allegations of class-based discrimination, an individual may allege a "class of one" equal protection claim by alleging that he has been intentionally and irrationally singled out as a class of one. *Engquist v. Or. Dep't of Agric.,* 553 U.S. 591, 601 (2008). The plaintiff must demonstrate the existence of a person who is "*prima facie* identical" to him and who was treated differently. *Hu v. City of New York*, 927 F.3d 81, 92 (2d Cir. 2019). Conquistador, however, does not assert that he was treated differently than other inmates. He merely notes the grievance restriction and asserts that his equal protection rights have been violated. Because Conquistador alleges no facts suggesting that he is being treated differently than other inmates, he has not plausibly pled a class of one equal protection claim. *See Baltas v. Erfe,* 2020 WL 1915017, at \*14 (D. Conn. 2020) (dismissing prisoner's equal protection claim because he "does not identify another inmate who was essentially identical to him and who was treated differently").

Because the facts in the complaint do not give rise to a plausible equal protection claim, I will dismiss the equal protection claims against Corcella and Hannah.

### Due process

Conquistador alleges that the grievance restriction violates the due process clause of the Fourteenth Amendment. To evaluate a due process claim, the Court must first consider whether Conquistador "had a constitutionally-recognized liberty interest in making use of ... [the] administrative grievance system." *Rogers v. Long*, 2022 WL 11727852, at \*2 (D. Conn. 2022).

But state statutes and directives "do not create federally protected due process entitlements to specific state-mandated procedures." *Holcomb v. Lykens*, 337 F.3d 217, 224 (2d Cir. 2003). Therefore, inmates have no liberty interest in participating in the DOC's administrative grievance process. *See e.g.*, *Riddick v. Semple*, 731 F. App'x 11, 13 (2d Cir. 2018); *Rogers*, 2022 WL 11727852, at \*3. Because Conquistador's

claim is based on his participation in the DOC administrative grievance system, he has not pled a cognizable due process violation. Accordingly, I will dismiss Conquistador's due process claims against Corcella and Hannah.

### First Amendment

Conquistador contends that the grievance restriction violates the First Amendment. It is well established that "the right of access to the courts is an aspect of the First Amendment right to petition the Government for redress of grievances." *Bill Johnson's Rest. Inc. v. NLRB*, 461 U.S. 731, 741 (1983). But the "denial of access to the grievance process or violation of grievance procedures does not by itself give rise to a constitutional violation." *Lopez*, 2009 WL 179787, at \*6. The Second Circuit has ruled that "we cannot find that the grievance restrictions violated [a prisoner's] right to petition the government in light of the fact that the defendants did not restrict his right to file civil actions and the Prison Litigation Reform Act's ('PLRA') exhaustion requirement would not preclude him from asserting § 1983 claims in federal court that were barred by grievance restrictions." *Riddick*, 731 F. App'x at 13. Accordingly, I will dismiss Conquistador's First Amendment claims against Corcella and Hannah.

### State law

**\*3**   Conquistador asserts that the defendants have violated the "laws of the State of Connecticut." Having dismissed all of Conquistador's federal claims, I decline to exercise jurisdiction over his state law claims. *See* 28 U.S.C. § 1367(c)(3); *Williams v. Katz*, 2022 WL 3646200, at \*6 (D. Conn. 2022). Moreover, the bare assertion that the defendants violated unspecified state laws does not suffice to state a claim upon which relief may be granted. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement."); *Rodriguez v. Connecticut,* 169 F. Supp. 2d 39, 43 n.2 (D. Conn. 2001) (dismissing state law claim where plaintiff did not "specify which statute she is relying on or pursuant to what state law she brings her claim"). Accordingly, I will dismiss Conquistador's state law claims against Corcella and Hannah without prejudice to Conquistador's right to seek any relief that may be available against them in state court.

### CONCLUSION

**Conquistador v. Corcella, Not Reported in Fed. Supp. (2023)**

Case 3:24-cv-00037-DNH-ML    Document 9    Filed 06/11/24    Page 204 of 449

For the reasons set forth above, the Court dismisses all claims against defendants Corcella and Hannah. If the plaintiff believes there are additional facts that the plaintiff can allege that will overcome the deficiencies identified in this ruling, then the plaintiff may file a proposed amended complaint within 30 days of this order.

It is so ordered.

**All Citations**

Not Reported in Fed. Supp., 2023 WL 3006806

## Footnotes

1    Doc. #1 at 1–2.

2    *Id.* at 2.

3    *Ibid.*

4    *Id.* at 1, 3.

5    *Id.* at 3.

6    Unless otherwise indicated, this order omits internal quotation marks, alterations, citations, and footnotes in text quoted from court decisions.

---

**End of Document**                                              © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Mathurin v. Broome County, Not Reported in Fed. Supp. (2020)

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 205 of 449

2020 WL 4194415
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Ravely MATHURIN, Plaintiff,

v.

BROOME COUNTY; and John Doe, Defendants.

3:20-CV-0515 (GLS/ML)
|
Signed 06/25/2020

**Attorneys and Law Firms**

RAVELY MATHURIN, Plaintiff, Pro Se, 416 Oak Hill Avenue, Apt. 1F, Endicott, New York 13760.

### ORDER and REPORT-RECOMMENDATION

MIROSLAV LOVRIC, United States Magistrate Judge

### I. INTRODUCTION

**\*1** The Clerk has sent this *pro se* complaint (Dkt. No. 1) together with an amended application to proceed *in forma pauperis* (Dkt. No. 7) filed by Ravely Mathurin ("Plaintiff") to the Court for review. For the reasons discussed below, I grant Plaintiff's amended *in forma pauperis* application (Dkt. No. 7), and recommend that Plaintiff's Complaint be accepted in part for filing and dismissed in part without prejudice and with leave to amend.

### II. BACKGROUND

Construed as liberally [1] as possible, the Complaint alleges that on or about May 31, 2019, Plaintiff's civil rights were violated by Defendant John Doe, [2] who was an employee of Defendant Broome County (collectively "Defendants"). (*See generally* Dkt. No. 1.) More specifically, Plaintiff alleges that on May 31, 2019, he was arraigned on criminal charges, pleaded not guilty, and was released on his own recognizance. (*Id.*) Plaintiff alleges that he attempted to leave the court but was detained by Defendant Doe, without lawful justification, and was placed in a locked cell. (*Id.*) Plaintiff alleges that "[a]fter several minutes approximately two men in plain clothes ... arrived in front of [his] cell and John Doe opened the cell and released [him] into their hands." (*Id.*) Plaintiff alleges that the two individuals in plain clothes were DHS/ICE officials, who Defendant Doe "must have called ... to

come arrest" Plaintiff. (*Id.*) Plaintiff alleges that he was "detained under the custody of DHS/ICE from [May 31, 2019,] until" the date of his Complaint. (*Id.*)

Based upon the foregoing allegations, the Complaint asserts the following three claims: (1) a claim of false arrest in violation of the Fourteenth Amendment and 42 U.S.C. § 1983; (2) a claim of negligence pursuant to New York common law; and (3) a claim of false arrest pursuant to New York common law. (*See generally* Dkt. No. 1.)

**\*2** For a more complete statement of Plaintiff's claims, refer to the Complaint. (Dkt. No. 1.)

Plaintiff also filed an amended application for leave to proceed *in forma pauperis*. (Dkt. No. 7.)

### III. PLAINTIFF'S APPLICATION TO PROCEED *IN FORMA PAUPERIS*

When a civil action is commenced in a federal district court, the statutory filing fee, currently set at $400, must ordinarily be paid. 28 U.S.C. § 1914(a). A court is authorized, however, to permit a litigant to proceed *in forma pauperis* status if a party "is unable to pay" the standard fee for commencing an action. 28 U.S.C. § 1915(a)(1). [3] After reviewing Plaintiff's *in forma pauperis* application (Dkt. No. 7), the Court finds that Plaintiff meets this standard. [4] Therefore, Plaintiff's amended application to proceed *in forma pauperis* is granted. [5]

### IV. LEGAL STANDARD FOR INITIAL REVIEW OF COMPLAINT

"Notwithstanding any filing fee, or any portion thereof, that may have been paid, the court shall dismiss the case at any time if the court determines that ... the action ... (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2).

In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia*, "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (emphasis added) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

Case 3:24-cv-00037-DNH-ML Document 9 Filed 06/11/24 Page 206 of 449

Mathurin v. Broome County, Not Reported in Fed. Supp. (2020)

(2007)). "Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not shown–that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (internal citation and punctuation omitted).

**\*3** "In reviewing a complaint ... the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994) (citation omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

Courts are "obligated to construe a pro se complaint liberally." *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009); *see also Nance v. Kelly*, 912 F.2d 605, 606 (2d Cir. 1990) (per curiam) (reading the plaintiff's *pro se* complaint "broadly, as we must" and holding that the complaint sufficiently raised a cognizable claim). "[E]xtreme caution should be exercised in ordering sua sponte dismissal of a pro se complaint before the adverse party has been served and [the] parties ... have had an opportunity to respond." *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983).

The Court, however, also has an overarching obligation to determine that a claim is not legally frivolous before permitting a *pro se* plaintiff's complaint to proceed. *See, e.g., Fitzgerald v. First East Seventh St. Tenants Corp.*, 221 F.3d 362, 363 (2d Cir. 2000) (holding that a district court may *sua sponte* dismiss a frivolous complaint, notwithstanding the fact that the plaintiff paid the statutory filing fee). "Legal frivolity ... occurs where 'the claim is based on an indisputably meritless legal theory [such as] when either the claim lacks an arguable basis in law, or a dispositive defense clearly exists on the face of the complaint." *Aguilar v. United States*, 99-MC-0304, 99-MC-0408, 1999 WL 1067841, at \*2 (D. Conn. Nov. 8, 1999) (quoting *Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998)); *see also Neitzke v. Williams*, 490 U.S. 319, 325 (1989) ("[D]ismissal is proper only if the legal theory ... or factual contentions lack an arguable basis."); *Pino v. Ryan*, 49 F.3d 51, 53 (2d Cir. 1995) ("[T]he decision that a complaint is based on an indisputably meritless legal theory for purposes of dismissal under section

1915(d), may be based upon a defense that appears on the face of the complaint.").

## V. ANALYSIS

In addressing the sufficiency of a plaintiff's complaint, the court must construe his pleadings liberally. *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008). The Court notes that Plaintiff's false arrest claims are alleged pursuant to the Fourteenth Amendment and New York State law. (Dkt. No. 1 at 5-6.) However, construing Plaintiff's pleadings liberally, as the Court must, I will consider other legal bases for Plaintiff's claims.

Having reviewed Plaintiff's Complaint, I recommend that (1) Plaintiff's claims of (a) false arrest pursuant to the Fourth Amendment [6] and New York law, and (b) negligence pursuant to New York common law, be accepted for filing, and (2) to the extent that Plaintiff's Complaint is construed as having asserted a claim that his due process rights pursuant to the Fourteenth Amendment were violated, that the Court dismiss those claims without prejudice and with leave to amend.

### A. False Arrest Pursuant to the Fourth Amendment and New York Law

**\*4** "A section 1983 claim for false arrest requires the same elements as a claim for false arrest under New York law." *Lewis v. City of New York*, 18 F. Supp. 3d 229, 235 (E.D.N.Y. 2014) (citing *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996)). "Under New York law, the elements of a false arrest and false imprisonment claim are: '(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged.' " *Hernandez v. United States*, 939 F.3d 191, 199 (2d Cir. 2019) (quoting *McGowan v. United States*, 825 F.3d 118, 126 (2d Cir. 2016) (per curiam). "For purposes of the privilege element of a false arrest and imprisonment claim, an act of confinement is privileged if it stems from a lawful arrest supported by probable cause." *De Lourdes Torres v. Jones*, 26 N.Y.3d 742, 759 (N.Y. 2016); *accord Marshall v. Sullivan*, 105 F.3d 47, 50 (2d Cir. 1996).

Out of an abundance of caution, and mindful of the Second Circuit's instruction that a *pro se* plaintiff's pleadings must be liberally construed, *see, e.g., Sealed Plaintiff v. Sealed Defendant*, 537 F.3d at 191, a response is required to Plaintiff's false arrest claims. *See Alcocer v. Mills*, 800

Mathurin v. Broome County, Not Reported in Fed. Supp. (2020)

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 207 of 449

F. App'x 860, 865 (11th Cir. 2020) (quoting *Arizona v. United States*, 567 U.S. 387, 407 (2012)) (denying summary judgment based on the doctrine of qualified immunity because "Supreme Court precedent ... prohibits keeping a detainee in custody for a new purpose after initial entitlement to release, without new probable cause justifying the new seizure under the Fourth Amendment" and noting that " '[a]s a general rule, it is not a crime for a removable alien to remain present in the United States. If the police stop someone based on nothing more than possible removability, the usual predicate for an arrest is absent.' "); *Reyes-Herrera v. Flaitz*, 19-CV-6257, 2020 WL 871264, at *5-6 (W.D.N.Y. Feb. 20, 2020) (denying a motion to dismiss because Plaintiff's false arrest claim did not require that he plead that his criminal conviction was invalid pursuant to *Heck v. Humphrey*, and holding that the defendants were not entitled to qualified immunity at this stage of the litigation).

### B. Due Process Claim Pursuant to the Fourteenth Amendment

Under the Fourteenth Amendment due process clause, "an inmate has a liberty interest in being released upon the expiration of his maximum term of imprisonment." *Calhoun v. New York State Div. of Parole Officers*, 999 F.2d 647, 653 (2d Cir. 1993). "Due process requires, as a general matter, an opportunity to be heard at a meaningful time and in a meaningful way." *Calhoun*, 999 F.2d at 653. "Federal courts examine procedural due process questions in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." *Francis v. Fiacco*, 942 F.3d 126, 141 (2d Cir. 2019) (citing *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989)).

"When reviewing alleged procedural due process violations, the Supreme Court has distinguished between (a) claims based on established state procedures and (b) claims based on random, unauthorized acts by state employees." *Hellenic Am. Neighborhood Action Comm. v. City of New York*, 101 F.3d 877, 880 (2d Cir. 1996) (citations omitted). "Under the latter scenario, a deprivation effectuated through the random and unauthorized acts of government officials does not violate procedural due process so long as the government provides a meaningful remedy subsequent to deprivation." *Locurto v. Safir*, 264 F.3d 154, 172 (2d Cir. 2001). However, "[w]hen the deprivation occurs in the more structured environment of established state procedures, rather than random acts, the availability of postdeprivation procedures will not, ipso facto,

satisfy due process." *Hellenic Am. Neighborhood Action Comm.*, 101 F.3d at 880 (citing *Hudson v. Palmer*, 468 U.S. 531, 532 (1984); *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 435-36 (1982)).

**\*5** Based on the allegations contained in the Complaint, Plaintiff had a liberty interest in being released at the conclusion of his court appearance where he was released him on his own recognizance. (Dkt. No. 1 at 5, 10-11, 15-16); *see, e.g., Foucha v. Louisiana*, 504 U.S. 71, 80 (1992) ("Freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause...."); *see also Calhoun*, 999 F.2d at 653 ("[A]n inmate has a liberty interest in being released upon the expiration of his ... term of imprisonment.").

Plaintiff's Complaint is devoid of factual allegations plausibly suggesting that the alleged constitutional violation was a result of inadequate procedures. To the extent that Plaintiff's Fourteenth Amendment Due Process claim is based on Defendant Doe's alleged "random, unauthorized" acts, I recommend that claim be dismissed.

It is well established that the availability of Article 78 proceedings or state habeas proceedings provide meaningful post-deprivation remedies sufficient to defeat a due process claim. *See, e.g., Hayes v. Annucci*, 14-CV-8845, 2016 WL 1746109, at *4 (S.D.N.Y. Apr. 29, 2016) ("The Second Circuit has held that the availability of an Article 78 proceeding constitutes a meaningful post-deprivation remedy."); *Schultz v. Egan*, 103 F. App'x 437, 441 (2d Cir. 2004) (noting that when "random and unauthorized" acts led to an inmate being detained beyond his maximum release date, "the availability of an Article 78 proceeding or a habeas proceeding would almost certainly suffice to satisfy the due process clause."); *Peterson v. Tomaselli*, 469 F. Supp. 2d 146, 166 (S.D.N.Y. 2007) ("Plaintiff could have initiated either an Article 78 proceeding or a state habeas proceeding to adjudicate his claim regarding his release date."). As such, Plaintiff has not established that there was no meaningful post-deprivation remedy and his due process claim should be dismissed. *See Hellenic Am. Neighborhood Action Comm.*, 101 F.3d at 882 ("[T]here is no constitutional violation ... when there is an adequate state post-deprivation procedure to remedy a random, arbitrary deprivation of property or liberty.").

### C. Negligence Pursuant to New York Law

"In order to prevail on a negligence claim, 'a plaintiff must demonstrate (1) a duty owed by the defendant to the plaintiff, (2) a breach thereof, and (3) injury proximately resulting

therefrom.' " *Pasternack v. Lab. Corp. of Am. Holdings*, 27 N.Y.3d 817, 825 (N.Y. 2016) (quoting *Solomon v. City of New York*, 66 N.Y.2d 1026, 1027 (N.Y. 1985)).

Out of an abundance of caution, and mindful of the Second Circuit's instruction that a *pro se* plaintiff's pleadings must be liberally construed, *see, e.g., Sealed Plaintiff v. Sealed Defendant*, 537 F.3d at 191, a response is required to Plaintiff's negligence claims.

## VI. OPPORTUNITY TO AMEND

Generally, a court should not dismiss claims contained in a complaint filed by a *pro se* litigant without granting leave to amend at least once "when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Branum v. Clark*, 927 F.2d 698, 704-05 (2d Cir. 1991); *see also* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when justice so requires."). An opportunity to amend is not required, however, where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000); *see also Cortec Indus. Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice."). Stated differently, "[w]here it appears that granting leave to amend is unlikely to be productive, ... it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993); *accord, Brown v. Peters*, 95-CV-1641, 1997 WL 599355, at *1 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.).[7]

**\*6** In this case, I am unable to conclude with complete certainty that if permitted leave to amend his complaint, Plaintiff could not assert a plausible due process claim pursuant to the Fourteenth Amendment and 42 U.S.C. § 1983. Accordingly, I recommend that leave to amend be granted.

If Plaintiff chooses to file an amended complaint, he should note that the law in this circuit clearly provides that " 'complaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning.' " *Hunt v. Budd*, 895 F. Supp. 35, 38 (N.D.N.Y. 1995) (McAvoy, J.) (quoting *Barr v. Abrams*, 810 F.2d 358, 363 (2d Cir. 1987)); *accord Pourzancvakil v. Humphry*, 94-CV-1594, 1995 WL 316935, at *7 (N.D.N.Y. May 22,

1995) (Pooler, J.). Therefore, in any amended complaint, Plaintiff must clearly set forth facts that give rise to the claims, including the dates, times, and places of the alleged underlying acts, and each individual who committed each alleged wrongful act. In addition, the revised pleading should allege facts demonstrating the specific involvement of any of the named defendants in the constitutional deprivations alleged in sufficient detail to establish that they were tangibly connected to those deprivations. *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). Finally, Plaintiff is informed that any such amended complaint will replace the existing Complaint, and must be a wholly integrated and complete pleading that does not rely upon or incorporate by reference any pleading or document previously filed with the Court. *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) ("It is well established that an amended complaint ordinarily supersedes the original and renders it of no legal effect.").

**ACCORDINGLY**, it is

**ORDERED** that Plaintiff's amended IFP application (Dkt. No. 7) **GRANTED**; and it is further respectfully

**RECOMMENDED** that Plaintiff's Complaint (Dkt. No. 1) be accepted for filing with respect to Plaintiff's claims of (1) false arrest pursuant to the Fourth Amendment and New York law, and (2) negligence pursuant to New York law; and it is further

**RECOMMENDED** that the Court **DISMISS WITH LEAVE TO REPLEAD** Plaintiff's Fourteenth Amendment due process claim, pursuant to 28 U.S.C. § 1915(e)(2)(B) for failure to state a claim upon which relief may be granted.

**NOTICE:** Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[8] Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. 28 U.S.C. § 636(b) (1) (Supp. 2013); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)).

**\*7** It is hereby respectfully **ORDERED** that the Clerk of the Court shall file a copy of this order, report, and recommendation on the docket of this case and serve a copy upon the parties in accordance with the local rules.[9]

Case 3:24-cv-00037-DNH-ML    Document 9    Filed 06/11/24    Page 209 of 449

Mathurin v. Broome County, Not Reported in Fed. Supp. (2020)

**All Citations**

Not Reported in Fed. Supp., 2020 WL 4194415

## Footnotes

1    The court must interpret *pro se* complaints to raise the strongest arguments they suggest. *Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)).

2    Plaintiff is advised that service of process cannot be effected on a "John Doe" defendant. In the event Plaintiff wishes to pursue his claims against a "Doe" defendant, Plaintiff shall take reasonable steps to ascertain his identity. Plaintiff may seek to determine the identity of the "Doe" defendant through discovery. When Plaintiff determines the identity of "John Doe" defendant, Plaintiff may seek to amend his pleading to add the properly named Defendant pursuant to Federal Rule of Civil Procedure 15(a). Plaintiff is further advised that if an unnamed individual is not timely served, the action may be dismissed against that individual. *See Cassidy v. Madoff*, 18-CV-0394, 2020 WL 554529, at *4 n.7 (N.D.N.Y. Feb. 4, 2020) (Sannes, J.) (advising the plaintiff that (1) service cannot be effected on a "Doe" defendant, (2) he may determine the identity of "Doe" defendants through discovery, and (3) if the "Doe" defendants are not timely served, the action may be dismissed against them).

3    The language of that section is ambiguous because it suggests an intent to limit availability of IFP status to prison inmates. *See* 28 U.S.C. § 1915(a)(1) (authorizing the commencement of an action without prepayment of fees "by a person who submits an affidavit that includes a statement of all assets such prisoner possesses"). The courts have construed that section, however, as making IFP status available to any litigant who can meet the governing financial criteria. *Hayes v. United States*, 71 Fed. Cl. 366, 367 (Fed. Cl. 2006); *Fridman v. City of N.Y.*, 195 F. Supp. 2d 534, 536 n.1 (S.D.N.Y. 2002).

4    It is unclear to the Court how Plaintiff survives with no income and no monthly expenses. (*Compare* Dkt. No. 7 at ¶¶ 3-5, *with* Dkt. No. 7 at ¶¶ 6-7.) However, based on Plaintiff's sworn declaration, he certainly qualifies for *in forma pauperis* status.

5    Plaintiff is reminded that, although the application to proceed *in forma pauperis* has been granted, he will still be required to pay fees that he may incur in this action, including copying and/or witness fees.

6    An arrestee's § 1983 claims premised on alleged false arrest or false imprisonment are governed by the Fourth Amendment, rather than substantive due process principles under the Fourteenth Amendment. *Jackson ex rel. Jackson v. Suffolk Cnty.*, 87 F. Supp. 3d 386, 399 (E.D.N.Y. 2015). As a result, I considered Plaintiff's false arrest claims pursuant to the Fourth Amendment.

7    *See also Carris v. First Student, Inc.*, 132 F. Supp. 3d 321, 340-41 n.1 (N.D.N.Y. 2015) (Suddaby, C.J.) (explaining that the standard set forth in *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 796 (2d Cir. 1999)— that the Court should grant leave to amend "unless the court can rule out any possibility, however unlikely it might be, that an amended complaint would be successful in stating a claim"—is likely not an accurate recitation of the governing law after *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)), *rev'd on other grounds*, 682 F. App'x 30.

8    If you are proceeding *pro se* and served with this report, recommendation, and order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date that the report, recommendation, and order was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the

**Mathurin v. Broome County, Not Reported in Fed. Supp. (2020)**

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 210 of 449

last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

9       The Clerk shall also provide Plaintiff with copies of all unreported decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

---

**End of Document**                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Mathurin v. Broome County, Not Reported in Fed. Supp. (2020)

Case 3:24-cv-00037-DNH-ML  Document 9  Filed 06/11/24  Page 211 of 449

2020 WL 4192522
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Ravely MATHURIN, Plaintiff,
v.
BROOME COUNTY et al., Defendants.

3:20-cv-515 (GLS/ML)
|
Signed 07/21/2020

**Attorneys and Law Firms**

FOR THE PLAINTIFF: Ravely Mathurin, Pro Se, 416 Oak
Hill Avenue, Apt. 1F, Endicott, NY 13760.

## ORDER

Gary L. Sharpe, Senior District Judge

 **\*1** The above-captioned matter comes to this court
following an Order and Report-Recommendation (R&R) by
Magistrate Judge Miroslav Lovric duly filed on June 25
2020. (Dkt. No. 8.) Following fourteen days from the service
thereof, the Clerk has sent the file, including any and all
objections filed by the parties herein.

No objections having been filed, and the court having
reviewed the R&R for clear error, it is hereby

**ORDERED** that the Order and Report-Recommendation
(Dkt. No. 8) is **ADOPTED** in its entirety; and it is further

**ORDERED** that plaintiff's complaint (Dkt. No. 1) is accepted
for filing with respect to plaintiff's claims of (1) false arrest
pursuant to the Fourth Amendment and New York law, and
(2) negligence pursuant to New York law; and it is further

**ORDERED** that plaintiff's Fourteenth Amendment due
process claim is **DISMISSED** without prejudice and with
leave to amend pursuant to 28 U.S.C. § 1915(e)(2)(B) for
failure to state a claim upon which relief may be granted; and
it is further

**ORDERED** that plaintiff may file an amended complaint
within **THIRTY (30) DAYS** of this Order; and it is further

**ORDERED** that, if plaintiff files an amended complaint
within the time permitted, the amended complaint is referred
to Magistrate Judge Lovric for further review; and it is further

**ORDERED** that the Clerk provide a copy of this Order to
plaintiff in accordance with the Local Rules of Practice.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2020 WL 4192522

---

**End of Document**                 © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Riley v. Cuomo, Not Reported in Fed. Supp. (2018)

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 212 of 449

2018 WL 1832929
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Russell RILEY, Plaintiff,

v.

Andrew CUOMO, in his official capacity
as governor of the State of New York,
New York State Police, Defendant(s).

2:17-cv-01631 (ADS)(AYS)
|
Signed 04/16/2018

**Attorneys and Law Firms**

Christopher Joseph Cassar, 13 East Carver Street,
Huntington, NY 11743, By: Christopher J. Cassar, Esq., Of
Counsel, Attorney for the Plaintiff.

New York State Office of the Attorney General, Nassau
Regional Office, 200 Old Country Road, Suite 240, Mineola,
NY 11501, By: Christina H. Bedell, Assistant Attorney
General, Counsel for the Defendants.

**MEMORANDUM OF DECISION & ORDER**

ARTHUR D. SPATT, United States District Judge

**\*1** The Plaintiff Russel Riley (the "Plaintiff") brought this
federal civil rights action pursuant to 42 U.S.C. § 1983
("Section 1983") against the Defendants Andrew Cuomo, in
his official capacity of the Governor of the State of New
York ("Governor Cuomo," the "Governor," or "Cuomo") and
the New York State Police (the "NYSP") (collectively, the
"Defendants").

Presently before the Court is a motion by the Defendants
to dismiss the complaint pursuant to Federal Rule of Civil
Procedure ("FED. R. CIV. P.") 12(b)(1) and 12(b)(6). For the
following reasons, the Defendants' motion is granted in its
entirety.

**I. BACKGROUND**

**A. The Relevant Facts**

The following facts are drawn from the Plaintiff's complaint,
and for the purposes of the instant motion, are presumed to
be true.

The Plaintiff owned and had a valid license for ten firearms.
On January 9, 2017, members of the NYSP entered the
Plaintiff's home without a warrant and seized ten firearms.

The firearms have not been returned to the Plaintiff, and there
has been no hearing regarding the seizure of the firearms.

The Plaintiff makes broad references to the New York Secure
Ammunition and Firearms Enforcement Act of 2013 (the
"NY SAFE Act"), but does not explicitly state that his
firearms were confiscated as a result of that statute.

**B. The Relevant Procedural History**

On March 23, 2017, the Plaintiff filed his complaint. The
complaint alleges that the NY SAFE Act is unconstitutional
under the Fourth and Fourteenth Amendments to the United
States Constitution in that it fails to provide gun owners who
have had their firearms seized with a hearing. However, the
Plaintiff does not seek a declaratory judgment declaring that
the NY SAFE Act is unconstitutional. Furthermore, as stated
above, he does not explicitly state that his guns were seized
because of that statute; or, if they were, how that statute
caused his firearms to be seized.

The complaint alleges that the Plaintiff's Fourth, Fifth,
and Fourteenth Amendment rights were violated when the
Defendants seized his firearms without a warrant; failed to
provide him with a hearing; and illegally obtained statements
from him. In those ways, the Defendants allegedly violated
Section 1983.

The Plaintiff seeks declaratory relief in the form of an
order stating that the Defendants violated his constitutional
rights. He asks that the Court order that the firearms be
returned to him. Further, he seeks "a judgment ... requiring the
Defendants to conduct a prompt hearing following the seizure
of the property in all cases at which time the Defendants must
demonstrate probable cause for the seizure of the property and
that it was necessary that the property remain in the custody
of the Defendants." (Compl. Wherefore Clause ¶ 3).

The Plaintiff seeks injunctive and declaratory relief; and
a judgment requiring the Defendants to provide notice
and a hearing to any future victims of seizures similar to
the one experienced by the Plaintiff. The complaint does

not explicitly seek damages, but only reasonable attorneys' fees and costs. While the Court notes that the Plaintiff's memorandum in opposition to the motion to dismiss states that "the underlying complaint is not exclusively seeking an award of damages under § 1983," (Pl.'s Mem. in Opp. to Mot. to Dismiss at 4), a plaintiff is not permitted to amend his complaint by virtue of what is said in a memorandum of law, *Uddoh v. United Healthcare*, 254 F. Supp. 3d 424, 429 (E.D.N.Y. 2017) ("A plaintiff, however, is not permitted to interpose new factual allegations or a new legal theory in opposing a motion to dismiss...." (citing *Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998) ) ). The complaint does not explicitly seek damages, and the Court cannot construe it otherwise.

**\*2** On September 25, 2017, the Defendants filed the instant motion to dismiss the complaint for lack of jurisdiction pursuant to Rule 12(b)(1), and for failure to state a claim pursuant to Rule 12(b)(6).

## II. DISCUSSION

### A. As to the Defendants' Motion to Dismiss Based on Sovereign Immunity

The Defendants have moved for dismissal based on sovereign immunity pursuant to Rule 12(b)(1).

As an initial matter, the Court first observes that within the Second Circuit, the question of whether a motion to dismiss made on sovereign immunity grounds should be reviewed under Rule 12(b)(1) or under Rule 12(b)(6) remains unresolved. *See Carver v. Nassau Cty. Interim Fin. Auth.*, 730 F.3d 150, 156 (2d Cir. 2013) ("[W]hether the claim of sovereign immunity constitutes a true issue of subject matter jurisdiction or is more appropriately viewed as an affirmative defense is an open question in the Supreme Court and the Second Circuit." (citing *Wisc. Dep't of Corr. v. Schacht,* 524 U.S. 381, 391, 118 S. Ct. 2047, 141 L.Ed. 2d 364 (1998) ) ); *see also Garcia v. Paylock,* 13-CV-2868 KAM, 2014 WL 298593, at \*2 n.3 (E.D.N.Y. Jan. 28, 2014) ("It is an open question in the Second Circuit whether the claims of sovereign immunity should be viewed as raising a question of subject matter jurisdiction, and thus be evaluated under \*339 Rule 12(b)(1), or as an affirmative defense analyzed under Rule 12(b)(6).").

This "distinction is significant," because "while [a district court] must accept all factual allegations in a complaint as true when adjudicating a motion to dismiss under FED. R. CIV. P. 12(b)(6), ... in adjudicating a motion to dismiss for lack of subject-matter jurisdiction [pursuant to FED. R. CIV. P. 12(b)(1) ], a district court may resolve disputed factual issues by reference to evidence outside the pleadings, including affidavits." *State Employees Bargaining Agent Coal. v. Rowland,* 494 F.3d 71, 77 (2d Cir. 2007) (internal citations omitted). As such, in accordance with the approach taken by other district courts within this Circuit, the Court will apply the stricter standard set under Rule 12(b)(6) while analyzing Defendants' sovereign immunity arguments. *See Tiraco v. New York State Bd. of Elections,* 963 F. Supp. 2d 184, 191 n.6 (E.D.N.Y. 2013) (noting that "[t]his distinction [ ] does not alter the outcome" of the case because "the court [ ] considered only the pleadings and the relevant state and federal law and [drew] all inferences in Plaintiff's favor") (citations omitted); *McMillan v. N.Y. State Bd. of Elections,* No. 10-CV-2502 (JG)(VVP), 2010 WL 4065434, at \*3 (E.D.N.Y. Oct. 15, 2010) (looking "only to the pleadings and to state and federal law" to resolve questions regarding sovereign immunity).

### 1. The Rule 12(b)(6) Standard

In reviewing a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the Plaintiff. *See Walker v. Schult,* 717 F.3d 119, 124 (2d Cir. 2013); *Cleveland v. Caplaw Enters.*, 448 F.3d 518, 521 (2d Cir. 2006); *Bold Electric, Inc. v. City of New York,* 53 F.3d 465, 469 (2d Cir. 1995); *Reed v. Garden City Union Free School Dist.*, 987 F. Supp. 2d 260, 263 (E.D.N.Y. 2013).

**\*3** Under the now well-established *Twombly* standard, a complaint should be dismissed only if it does not contain enough allegations of fact to state a claim for relief that is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974, 167 L.Ed. 2d 929 (2007). The Second Circuit has explained that, after *Twombly,* the Court's inquiry under Rule 12(b)(6) is guided by two principles:

> First, although a court must accept as true all of the allegations contained in a complaint, that tenet is inapplicable to legal conclusions, and [t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. Second,

only a complaint that states a plausible claim for relief survives a motion to dismiss and [d]etermining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.

*Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 664, 129 S. Ct. 1937, 1940, 173 L.Ed. 2d 868 (2009) ).

Thus, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and ... determine whether they plausibly give rise to an entitlement of relief." *Iqbal*, 556 U.S. at 679.

### B. The Eleventh Amendment

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." *Rowland*, 494 F.3d at 95 (quoting U.S. CONST. AMEND. XI). The Eleventh Amendment bars federal courts from exercising subject matter jurisdiction over claims against states absent their consent to such a suit or an express statutory waiver of immunity. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 90-100, 104 S. Ct. 900, 79 L.Ed. 2d 67 (1984); *see also Huminski v. Corsones*, 386 F.3d 116, 133 (2d Cir. 2004). Although the plaintiff generally bears the burden of proving subject matter jurisdiction, the entity claiming Eleventh Amendment immunity bears the burden to prove such. *See Woods v. Rondout Valley Cent. Sch. Dist. Bd. of Educ.*, 466 F.3d 232, 237 (2d Cir. 2006).

Section 1983 imposes liability for "conduct which 'subjects, or causes to be subjected' the complainant to a deprivation of a right secured by the Constitution and laws." *Rizzo v. Goode*, 423 U.S. 362, 370-71, 96 S. Ct. 598, 46 L.Ed. 2d 561 (1976) (quoting 42 U.S.C. § 1983). It is well-settled that states are not "persons" under section 1983 and, therefore, Eleventh Amendment immunity is not abrogated by that statute. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71, 109 S. Ct. 2304, 105 L.Ed. 2d 45 (1989).

### 1. Claims Against State Administrative Agencies

Regardless of the type of relief sought, the Eleventh Amendment bars this Court from assuming jurisdiction over plaintiffs' claims asserted against the State of New York and its agencies. When the state or one of its "arms" is the defendant, sovereign immunity bars federal courts from entertaining lawsuits against them "regardless of the nature of the relief sought." *Pennhurst*, 465 U.S. at 100.

### a. Application to the Plaintiff's
### Claims Against the NYSP

**\*4** As the Eleventh Amendment bars all suits against administrative agencies of a state, the Plaintiff's claims against the NYSP cannot be sustained. Defendant New York State Police is a division in the executive department of New York—*see* section 210 of New York's Executive Law— and is therefore immune from all claims, both federal and state. Congress has not overridden states' sovereign immunity respecting constitutional claims brought under 42 U.S.C. § 1983. *Will*, 491 U.S. at 109. And it is well established that "New York State has not waived its sovereign immunity from Section 1983 claims." *Nolan v. Cuomo*, No. 11 CV 5827 (DRH)(AKT), 2013 WL 168674, at \*7 (E.D.N.Y. Jan. 16, 2013) (citing *Trotman v. Palisades Interstate Park Comm'n*, 557 F.2d 35, 39-40 (2d Cir. 1977) ); *see also Mamot v. Bd. of Regents*, 367 Fed.Appx. 191, 192 (2d Cir. 2010) (summary order); *Dube v. State Univ. of New York*, 900 F.2d 587, 594-95 (2d Cir. 1990) (holding that the Eleventh Amendment precludes an action under Section 1983 against SUNY, an integral part of the State of New York). Therefore, the NYSP is entitled to sovereign immunity on the Plaintiff's claims.

Accordingly, the Defendants' motion to dismiss the Plaintiff's claims against the NYSP is granted.

### 2. Claims Against State Officials in Their Official Capacity

A suit for damages against a state official in his or her official capacity "is deemed to be a suit against the state, and the official is entitled to invoke the Eleventh Amendment immunity belonging to the state." *Ying Jing Gan v. City of New York*, 996 F.2d 522, 529 (2d Cir. 1993); *see also Will*, 491 U.S. at 71; *Ford v. Reynolds*, 316 F.3d 351, 354 (2d Cir. 2003). However, "the applicability of the Eleventh Amendment bar [to suits against individuals in their official capacities] depends on the form of relief sought." *Lee v.*

Riley v. Cuomo, Not Reported in Fed. Supp. (2018)

Case 3:24-cv-00037-DNH-ML    Document 9    Filed 06/11/24    Page 215 of 449

*Dep't of Children & Families,* 939 F.Supp.2d 160, 165-66 (D. Conn. 2013). Money damages cannot be recovered from state officers sued in their official capacities. *See e.g., Will,* 491 U.S. at 71 ("[A] suit against a state official in his or her official capacity is not a suit against an official but rather is a suit against the official's office."); *Edelman v. Jordan,* 415 U.S. 651, 663, 94 S. Ct. 1347, 39 L.Ed. 2d 662 (1974) ("[A] suit by private parties seeking to impose a liability which must be paid from public funds in the state treasury is barred by the Eleventh Amendment."); *Goonewardena v. New York,* 475 F. Supp. 2d 310, 329 (S.D.N.Y 2007) ("[S]overeign immunity also extends to bar claims for monetary damages brought against state officers sued under section 1983 in their official capacities.").

Similarly, "judgments against state officers declaring that they violated federal law in the past" are also not permitted. *Puerto Rico Aqueduct and Sewer Auth. v. Metcalf & Eddy,* 506 U.S. 139, 146, 113 S. Ct. 684, 121 L.Ed. 2d 605 (1993) (citing *Green v. Mansour,* 474 U.S. 64, 73, 106 S. Ct. 423, 88 L.Ed. 2d 371 (1985) ). However, prospective injunctive relief is available against individuals being sued in their official capacities in order to correct an ongoing violation of federal law. *See Edelman,* 415 U.S. at 663; *Ex Parte Young,* 209 U.S. 123, 28 S. Ct. 441, 52 L.Ed. 714 (1908). In this regard, through the doctrine of *Ex Parte Young,* a party may bring "a suit for injunctive [or declaratory] relief challenging the constitutionality of a state official's actions in enforcing state law." *CSX Transp., Inc. v. N.Y. State Office of Real Prop. Servs.,* 306 F.3d 87, 98 (2d Cir. 2002) (internal quotation marks and alteration omitted); *see also Arthur v. Nyquist,* 573 F.2d 134, 138 (2d Cir. 1978).

In order to determine whether the *Ex parte Young* exception allows the Plaintiff to bring suit against state officials, this Court must first determine whether the complaint alleges an ongoing violation of federal law and second, whether the Plaintiff seeks relief properly characterized as prospective. *See Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.,* 535 U.S. 635, 645, 122 S. Ct. 1753, 152 L.Ed. 2d 871 (2002). "[T]o successfully avoid the Eleventh Amendment bar, a plaintiff must prove that a defendant's violation of federal law is of an ongoing nature as opposed to a case 'in which federal law has been violated at one time or another over a period of time in the past.' " *Papasan v. Allain,* 478 U.S. 265, 277-78, 106 S. Ct. 2932, 92 L.Ed. 2d 209 (1986) (quotation omitted). The inquiry for determining whether an "ongoing violation" exists is, "does the enforcement of the law amount to a continuous violation of plaintiffs constitutional rights or a single act that

continues to have negative consequences for plaintiffs." *New Jersey Educ. Ass'n v. New Jersey,* No. 11-5024, 2012 WL 715284, at *4 (D.N.J. Mar. 5, 2012).

**\*5** Furthermore, when a plaintiff seeks prospective relief against a state official in their official capacity where the plaintiff alleges that a particular statute is unconstitutional, "the state officer ... 'must have some connection with the enforcement of the act' " that includes "both a particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty." *Kelly v. New York State Civil Serv. Comm'n,* No. 14 CV 716 VB, 2015 WL 861744, at *3 (S.D.N.Y. Jan. 26, 2015) (quoting *Ex Parte Young,* 209 U.S. at 157), *aff'd sub nom. Kelly v. New York Civil Serv. Comm'n,* 632 Fed.Appx. 17 (2d Cir. 2016); *see also CSX Transp.,* 306 F.3d at 99 (amenability to suit under Eleventh Amendment requires "both the power and the duty" to take challenged action).

### a. Application to the Plaintiff's Claims Against Governor Cuomo in His Official Capacity

As stated above, the complaint does not explicitly seek damages. However, even if it did, the Plaintiff would be unable to seek that relief against Governor Cuomo in his official capacity. *Ying Jing Gan,* 996 F.2d at 529 ("To the extent that a state official is sued for damages in his official capacity, such a suit is deemed to be a suit against the state, and the official is entitled to invoke the Eleventh Amendment immunity belonging to the state." (internal citations omitted) ).

As to his requests for declaratory and injunctive relief, the Court finds that the Plaintiff does not explicitly seek prospective relief. Instead, he seeks a declaration that the Defendants violated federal law in the past, and a return of his firearms. Courts have held that neither of these types of relief are prospective. *See Puerto Rico Aqueduct and Sewer,* 506 U.S. at 146 (stating that "judgments against state officers declaring that they violated federal law in the past" are not permitted under the *Ex Parte Young* doctrine); *Dotson v. Griesa,* 398 F.3d 156, 177 n.16 (2d Cir 2005) (holding that Second Circuit precedent "preclude[s] a federal court from ordering affirmative action by either the state or federal government employees in their official capacities"); *Nat'l R.R. Passenger Corp. v. McDonald,* 978 F. Supp. 2d 215, 233 (S.D.N.Y. 2013) ("[C]ourts in this Circuit have [held] ... that the return of property taken by the state is barred by the

Riley v. Cuomo, Not Reported in Fed. Supp. (2018)

Case 3:24-cv-00037-DNH-ML    Document 9    Filed 06/11/24    Page 216 of 449

Eleventh Amendment because that constitutes 'retrospective' relief." (collecting cases) ), *aff'd*, 779 F.3d 97 (2d Cir. 2015); *Dean v. Abrams*, No. 94 CIV. 3704 (LAK), 1995 WL 791966, at *2 n.5 (S.D.N.Y. Dec. 26, 1995) ("The only exception to the Eleventh Amendment's protection is for 'prospective injunctive relief,' but Dean's demand for ... the return of her property does not qualify for this exception." (collecting cases) ).

While the Plaintiff does ask for an order declaring that the Defendants must afford any future victims of such seizures a prompt and fair hearing, the Plaintiff has not plead sufficient facts to demonstrate that he has standing to request such relief. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 185, 120 S. Ct. 693, 706, 145 L.Ed. 2d 610 (2000) ("[A] plaintiff must demonstrate standing separately for each form of relief sought.")

"In seeking prospective relief like an injunction, a plaintiff must show that he can reasonably expect to encounter the same injury again in the future—otherwise there is no remedial benefit that he can derive from such judicial decree." *MacIssac v. Town of Poughkeepsie*, 770 F. Supp. 2d 587, 593 (S.D.N.Y. 2011) (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 S. Ct. 1660, 75 L.Ed. 2d 675 (1983) ). A plaintiff cannot seek injunctive relief merely for past injury. *O'Shea*, 414 U.S. at 495-96, 94 S. Ct. 669; *Deshawn E. by Charlotte E. v. Safir*, 156 F.3d 340, 344 (2d Cir. 1998). Instead, "the injury alleged must be capable of being redressed through injunctive relief 'at that moment.' " *Robidoux v. Celani*, 987 F.2d 931, 938 (2d Cir. 1993) (quoting *Cty. of Riverside v. McLaughlin*, 500 U.S. 44, 51, 111 S. Ct. 1661, 114 L.Ed. 2d 49 (1991) ).

 *6 Here, the Plaintiff does not allege that his guns will again be seized in the future. Indeed, as stated above, the Plaintiff did not state why his guns were seized. He does not plead sufficient facts to demonstrate standing to seek an order forcing the state to afford any future victims of seizures a prompt and fair hearing because he has not alleged that he will be a victim of such a seizure in the future.

Therefore, the Plaintiff does not seek prospective relief for an ongoing violation of federal law, and cannot avail himself of the *Ex Parte Young* doctrine. Governor Cuomo therefore has sovereign immunity with regard to the Plaintiff's claims.

The Plaintiff contends that he should be permitted to proceed on his theory of supervisory liability until he is able, through discovery, to determine which subordinate officials should

be added to the complaint. This argument is completely unavailing.

First, "[a] defendant's supervisory authority is insufficient in itself to demonstrate liability under § 1983." *LaMagna v. Brown*, 474 Fed.Appx. 788, 789 (2d Cir. 2012) (citing *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003) ); *Richardson*, 347 F.3d at 435 ("[M]ere linkage in the prison chain of command is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim." (citations and internal quotation marks omitted) ). Instead, "to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show, *inter alia*, the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013) (collecting cases). As the Second Circuit has stated, a supervisory defendant's personal involvement can be shown by evidence that:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of [the plaintiff] by failing to act on information indicating that unconstitutional acts were occurring.

*Id.* at 139 (emphasis omitted) (quoting *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) ).

Accordingly, "supervisory liability may be imposed when an official has actual or constructive notice of unconstitutional practices and demonstrates 'gross negligence' or 'deliberate indifference' by failing to act." *Meriwether v. Coughlin*, 879 F.2d 1037, 1048 (2d Cir. 1989) (quoting *McCann v. Coughlin*, 698 F.2d 112, 125 (2d Cir. 1983) ). The Plaintiff does not

allege that any of the above factual circumstances are present here.

Second, the Plaintiff does not even allege that the Governor supervises the NYSP. Indeed, the complaint does not contain any allegations that are specific to Governor Cuomo.

Furthermore, as to the Plaintiff's argument that he should be permitted to maintain suit against Governor Cuomo until he has been afforded an opportunity to identify subordinate officials who have personal liability, the Plaintiff does not meet that "exception" to the supervisory liability rule here. The case cited by the Plaintiff for this very proposition held "[p]ermitting plaintiffs to use discovery as a fishing expedition undermines the principle that only portions of a complaint which satisfy a plausibility standard, *i.e.,* more than possible and less than probable, should unlock the doors of discovery." *Dudek v. Nassau Cty. Sheriff's Dep't,* 991 F. Supp. 2d 402, 414 (E.D.N.Y. 2013) (internal citations and quotation marks omitted).

**\*7** The *Dudek* court relied on the fact that the complaint failed to contain a single factual allegation that any of the supervisory defendant's subordinates were personally involved in the action. Here too, the Plaintiff does not allege that Governor Cuomo supervises members of the NYSP, nor does he allege any specific acts by any individual John Doe officers of the NYSP. Nor would the Plaintiff be permitted to avail himself of the exception allowing discovery to go forward where a litigant raises colorable claims against supervisors because that exception only applies to *pro se* litigants. *See Davis v. Kelly,* 160 F.3d 917, 922 (2d Cir. 1998) ("We therefore hold that when a *pro se* plaintiff brings a colorable claim against supervisory personnel, and those supervisory personnel respond with a dispositive motion grounded in the plaintiff's failure to identify the individuals who were personally involved, under circumstances in which the plaintiff would not be expected to have that knowledge, dismissal should not occur without an opportunity for additional discovery."); *Soto v. Brooklyn Corr. Facility,* 80 F.3d 34, 34 (2d Cir. 1996) (holding that where a pro se litigant mistakenly failed to name the individual corrections officers who might be liable, the pro se plaintiff would be afforded opportunity to amend his complaint after discovery); *Satchell v. Dilworth,* 745 F.2d 781, 785 (2d Cir. 1984) (same).

Finally, the Plaintiff is also unable to bring claims against Governor Cuomo based on his allegation that the NY SAFE Act is unconstitutional. The Court notes again that the Plaintiff does not seek an order stating that the NY SAFE Act is unconstitutional. He instead alleges that it is unconstitutional, and seeks an order requiring the Defendants to afford victims of gun seizures fair hearings.

In any event, the Plaintiff has not alleged that the Governor has any duty to enforce the NY SAFE Act. Nor does N.Y. PENAL LAW § 400, the only specific statute cited by the Plaintiff, afford any duty or power to the Governor. To the extent that the Plaintiff relies on the fact that the NY SAFE Act was signed by Governor Cuomo, which the Court notes that he did not allege, "[t]he well-settled doctrine of absolute legislative immunity ... bars actions against legislators or governors ... on the basis of their roles in enacting or signing legislation." *Warden v. Pataki,* 35 F.Supp.2d 354, 358 (S.D.N.Y. 1999), *aff'd sub nom. Chan v. Pataki,* 201 F.3d 430 (2d Cir. 1999). Furthermore, "the vast majority of courts ... have held ... that a state official's duty to execute the laws is not enough by itself to make that official a proper party in a suit challenging a state statute." *Warden,* 35 F. Supp. 2d at 359.

Therefore, the Plaintiff has failed to allege that Governor Cuomo has the power or duty to take action regarding the NY SAFE Act, and the Governor has sovereign immunity over those claims.

Accordingly, the Defendants' motion to dismiss the Plaintiff's claims against Governor Cuomo is granted.

### III. CONCLUSION

For the reasons stated above, the Defendants' motion to dismiss the complaint based on sovereign immunity is granted in its entirety. The Clerk of the Court is respectfully directed to close the case.

It is **SO ORDERED.**

### All Citations

Not Reported in Fed. Supp., 2018 WL 1832929

---

End of Document                          © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2007 WL 4145456
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Lawrence L. FINKELMAN, Plaintiff,

v.

NEW YORK STATE POLICE, Unknown Governmental
Entities-John Doe's-Jane Doe's 1-100, Defendants.

No. 06 Civ. 8705(JSR).
|
Nov. 15, 2007.

*ORDER*

JED S. RAKOFF, District Judge.

**\*1** On August 20, 2007, the Honorable Kevin Nathaniel Fox, United States Magistrate Judge, issued a Report and Recommendation in the above-captioned matter recommending that plaintiff's claims against defendant New York State Police be dismissed but that in all other respects the defendant's motion to dismiss the complaint be denied. Subsequently, on September 17, 2007, defendant New York State Police submitted objections to certain portions of the Report and Recommendation. Accordingly, the Court has reviewed the motion and the underlying record *de novo*.

Having done so, the Court finds itself in complete agreement with Magistrate Judge Fox's Report and Recommendation and hereby adopts its reasoning by reference. Accordingly, the Court dismisses the claims against the New York State Police, with prejudice, but denies the motion to dismiss in all other respects. The Clerk of the Court is directed to close document number 4 in the Court's docket.

There is, however, an issue as to the remaining defendants that was only raised now before this Court and that needs to be addressed by the Magistrate Judge in the first instance, viz., whether the remaining defendants have been actually served and, if not, whether belated service at this point would be untimely and prejudicial. Accordingly, the Court remands the case to Magistrate Judge Fox to issue a Report and Recommendation on the issue of whether defendants "Unknown Governmental Entities-John Doe's-Jane Doe's 1-100" have been served in this action and whether, if they

have not been, the claims against those defendants should be dismissed pursuant to Federal Rule of Civil Procedure 4(m) or otherwise, and with or without prejudice.

SO ORDERED.

# REPORT & RECOMMENDATION

KEVIN NATHANIEL FOX, United States Magistrate Judge.

TO THE HONORABLE JED S. RAKOFF, UNITED STATES DISTRICT JUDGE

## I. INTRODUCTION

Plaintiff Lawrence L. Finkelman ("Finkelman"), proceeding *pro se,* commenced this action pursuant to 42 U.S.C. §§ 1983, 1985, and 1986, against New York State Police and "Unknown Government Entities-John Doe's-Jane Doe's 1-100" ("defendants"). He contends the defendants conspired to violate his civil rights when, in 2001, without a warrant or probable cause, they forced him from his vehicle by threatening him with physical harm, arrest, and criminal charges, and locked him in their patrol car, thus violating both New York and federal penal laws. Finkelman alleges the conspiracy continued when the defendants twice filed false documents in New York State courts in the years that followed.

Before the Court is the defendants' motion, made pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, to dismiss the claim against defendant New York State Police because the Eleventh Amendment bars suit against a state and its agencies. The defendants also contend Finkelman's claims are barred by a three-year statute of limitations and, as such, permitting him to amend the complaint would be futile. [1] Finkelman opposes the defendants' motion to dismiss and their contention that the applicable statute of limitations has expired.

## II. BACKGROUND

**\*2** Finkelman maintains that some time prior to November 28, 2001, the defendants, acting under the color of law, conspired to kidnap and arrest him unlawfully in violation of the Fourth, Fifth, Eighth and Fourteenth Amendments. He contends the defendants' actions constitute violations of

federal and state criminal statutes: 18 § U .S.C. 1201 and New York Penal Law § 135.20. According to Finkelman, on November 28, 2001, the defendants lay in wait for him on Interstate Highway 87 and ordered him out of his car. Finkelman alleges the defendants acted without a warrant or probable cause to believe he had committed an offense. Finkelman recalls the defendants threatened to use deadly force and to arrest and charge him for acts he never committed. Finkelman also alleges that "[t]he defendants [,] upon learning that the plaintiff had the evidence from the [ ] grand larceny in his possession [,] locked the plaintiff up in the back [of] their patrol vehicle," and continued to threaten him while he was in their custody. Finkelman maintains the defendants destroyed the evidence he possessed and asked him if he was going to accuse them of grand larceny.

Finkelman alleges that, on November 3, 2004, "[d]efendants knowingly filed a fraudulent and perjurious complaint against the plaintiff" to further the goals of their conspiracy and to prosecute a "malicious, fradulent and perjurious lawsuit." According to the plaintiff, the defendants engaged in similar misconduct on October 31, 2005, December 28, 2005, and twice on December 29, 2005, when they filed documents related to him, which they knew to be false and perjurious.

Finkelman alleges the defendants "knowingly failed to disclose to the plaintiff, and actively took steps to conceal material information and criminal acts known only to the Defendants regarding the herein criminal violation of the Constitution and laws of the United States and New York," in order to "prevent the plaintiff from filing criminal complaints and making public the criminal acts [enumerated in the instant complaint] and corruption."

Finkelman contends the defendants violated his Sixth and Seventh Amendment rights by using their official positions to deny him the right to a speedy trial, a jury trial, and "compulsory process for obtaining witnesses." Finkelman also contends that the defendants had the opportunity and authority to stop the civil rights violations he alleges were perpetrated, but they declined to do so. According to Finkelman, all the defendants' acts were committed to shield them from prosecution and to intimidate him because the defendants knew he was "a plaintiff and witness in a felony criminal matter against them. [Therefore, t]he [d]efendants [ ] threatened and intimidated [him] to deter him from attending, testifying and initiating a criminal complaint and/or suit in a State Court of the United States and to interfere with judicial proceedings."

On October 26, 2006, Finkelman commenced the instant action. Thereafter, on November 2, 2006, he amended his complaint by removing, as defendants to the action: "State of New York;" "John Doe 1-20;" and "Jane Doe 1-20" and replacing them with the following defendants: "New York State Police" "Unknown Government Entities-John Doe's-Jane Doe's 1-100." Finkelman has also included, in his amended complaint, a request that the court direct the defendants to disclose to him documents which will enable him to learn the names of the individual defendants and, thereafter, serve them with process. Finkelman has asked, *inter alia,* that the court grant him injunctive relief and direct the defendants to avoid contacting any potential witnesses unless he is present.

### III. DISCUSSION

**\*3** A court may dismiss an action pursuant to Fed.R.Civ.P. 12(b) (1), for lack of subject matter jurisdiction, only if "it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him or her to relief." *Raila v. United States,* 355 F.3d 118, 119 (2d Cir.2004). In considering a motion made pursuant to Fed.R.Civ.P. (12)(b)(1), "[a] court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of the plaintiff." *Id.* Further, "[o]n a motion invoking sovereign immunity to dismiss for lack of subject matter jurisdiction, the plaintiff bears the burden of proving by a preponderance of evidence that jurisdiction exists." *Chayoon v. Chao,* 355 F.3d 141, 143 (2d Cir.2004) (quoting *Garcia v. Akwesasne Hous. Auth.,* 268 F.3d 76, 84 (2d Cir.2001).

"In resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), a district court ... may refer to evidence outside the pleadings." *See Makarova v. United States* 201 F.3d 110, 113 (2d Cir.2000). Additionally, where, as here, the plaintiff is appearing *pro se,* his or her pleadings "are [to be] held 'to less stringent standards than formal pleadings drafted by lawyers,' " *Hughes v. Rowe,* 449 U.S. 5, 9, 101 S.Ct. 173, 176 (1980) (quoting *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 595 [1972] ), and should be interpreted "to raise the strongest arguments that they suggest." *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 [2d Cir.1994] ). This liberal pleading standard is particularly applicable where a *pro se* plaintiff alleges a violation of his

or her civil rights. *See Jacobs v. Ramirez,* 400 F.3d 105, 106 (2d Cir.2005).

In their motion to dismiss, the defendants contend that the Eleventh Amendment bars suit against the state of New York and its agencies and, as a result, defendant New York State Police is immune from suit. Finkelman responds that states "must first be in compliance with the Constitution and the laws of the United States" before the Eleventh Amendment is to be applied.

Under the Eleventh Amendment, a state or an arm of a state may not be sued in a federal court absent the state's consent. *See Puerto Rico Aqueduct and Sewer Authority v. Metcalf & Eddy, Inc.,* 506 U.S. 139, 144, 113 S.Ct. 684, 687-88 (1993) (citations omitted). Defendant New York State Police is an arm of the state, and therefore an action brought against it is a suit against the state. *See, e.g., Morrongiello v. Ashcroft,* No. 01 Civ. 2524, 2004 WL 112944, at *2 (S.D.N.Y. Jan. 22, 2004). Sections 1983 and 1985 of Title 42 were not intended to abrogate the states' immunity. *See Degrafinreid v. Ricks,* No. 03 Civ. 6645, 2004 WL 2793168, at *5 (S .D.N.Y. Dec. 6, 2004). The state of New York has not consented to suit in federal court under: (a) 42 U.S.C. § 1983, *see Le Grand v. Evan,* 702 F.2d 415, 417 (2d Cir.1983); (b) 42 U.S.C. § 1985, *see Quirk v. City of New York,* No. 03 Civ. 0324, 2003 WL 1872714, at *1 (S.D.N.Y. Apr. 10, 2003); or (c) 42 U.S.C. § 1986, *see Gasparik v. Stony Brook University,* No. CV-05-3817, 2007 WL 2026612, at *4 (E.D.N.Y. July 9, 2007).

**\*4** Accordingly, Finkelman's claims against defendant New York State Police should be dismissed. However, the complaint contains claims against "John Does and Jane Does 1-100," which the defendants have not addressed. Therefore, dismissal of the entire complaint is not warranted at this time.

## IV. RECOMMENDATION

For the reasons set forth above, the defendants' motion to dismiss the complaint should be denied. The claims against defendant New York State Police should be dismissed.

## V. FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have ten (10) days from service of the Report to file written objections. *See also* Fed.R.Civ.P. 6. Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Jed S. Rakoff, United States District Judge, 500 Pearl St., Room 1340, New York, New York 10007, and to the chambers of the undersigned, 40 Centre St., Room 540, New York, New York 10007. Any requests for an extension of time for filing objections must be directed to Judge Rakoff. FAILURE TO FILE OBJECTIONS WITHIN TEN (10) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW. *See Thomas v. Arn,* 474 U.S. 140 (1985); *IUE AFL-CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.1992); *Wesolek v. Candair Ltd.,* 838 F .2d 55, 57-59 (2d Cir.1988); *McCarthy v. Manson,* 714 F.2d 234, 237-38 (2d Cir.1983).

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 4145456

## Footnotes

1    The defendants have failed to make a proper motion addressing their statute of limitations defense. Therefore, the Court has determined not to analyze that defense in this writing.

---

KeyCite Yellow Flag - Negative Treatment
Opinion Supplemented by  Garcia v. Hebert,  D.Conn.,  March 28, 2014

2013 WL 1294412
Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.

Fortunato GARCIA, Plaintiff,

v.

Robert HEBERT et al., Defendants.

No. 3:08CV95 (DFM).
|
March 28, 2013.

**Attorneys and Law Firms**

Gabriel North Seymour,  Gabriel North Seymour, Falls
Village, CT, Whitney North Seymour, Jr., New York, NY, for
Plaintiff.

Edward R. Giacci, Shelton, CT, Maite Barainca, Nicole
Demers, Thomas J. Davis, Jr., Attorney General's Office,
Hartford, CT, for Defendants.

*RULING ON MOTIONS FOR SUMMARY JUDGMENT*

DONNA F. MARTINEZ, United States Magistrate Judge.

**\*1** Plaintiff Fortunato Garcia brings this action
against police officers and courthouse employees alleging
misconduct in connection with his arrest and prosecution
on state criminal charges. Pending before the court are
plaintiff's Motion in Limine (doc. # 225), defendants' Motions
for Summary Judgment (docs. # 217, # 218 and # 220)
and plaintiff's Cross–Motions for Summary Judgment (docs.
# 227, # 230 and # 233). For the reasons that follow,
plaintiff's Motion in Limine is denied, the defendants'
Motions for Summary Judgment are granted and plaintiff's
Cross–Motions are denied.

I. *Procedural History*
Plaintiff commenced this action in January 2008. (Doc. #
1.) His Second Amended Complaint alleges deprivations
of his rights under the Fourth, Fifth, Sixth and Fourteenth
Amendments pursuant to 42 U.S.C. § 1983; false arrest,
malicious prosecution, abuse of process under § 1983 and
state law; and defamation and intentional infliction of

emotional distress under state law. (Doc. # 137.) The case
has been partially resolved by way of rulings. In June 2008,
the court granted default judgment against defendant Robert
Hebert. (Doc. # 39.) In March 2009, the court dismissed
defendant Assistant State's Attorneys Magdalena Campos
and Andrew Wittstein and dismissed the official capacity
claims against defendant Lisa Killiany. (Docs.# 94, # 99.) In
April 2009, the court denied plaintiff's motion for summary
judgment against those defendants as moot. (Doc. # 100.) In
December 2009, the Second Circuit affirmed the rulings of
dismissal on interlocutory appeal. (Doc. # 127.) In December
2011, the court declined to vacate its ruling of dismissal as to
the official capacity claims against Killiany, and it dismissed
the official capacity claims against defendant Jane Serafini.
(Docs.# 192, # 193, # 202.) In April and May 2012, the parties
filed the pending cross-motions for summary judgment, with
separate statements of facts from each party pertaining to each
of the six motions. [1]  In September 2012, they consented to
the authority of the undersigned magistrate judge pursuant to
28 U.S.C. § 636(c) and Fed.R.Civ.P. 73. (Doc. # 276.)

II. *Jurisdiction*
Plaintiff brings both federal and state claims. The court has
original jurisdiction over the federal claims under 28 U.S.C.
§ 1331. Because the state-law claims "derive from a common
nucleus of operative fact," *United Mine Workers of Am. v.
Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218
(1966), and "the values of judicial economy, convenience,
fairness, and comity" militate in favor of supplemental
jurisdiction, *Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343,
350, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988), the court exercises
supplemental jurisdiction under 28 U.S.C. § 1367(a). [2]

III. *Undisputed Facts*
The following facts are undisputed. On November 23,
2006, a Thanksgiving holiday, defendant Robert Hebert went
shopping at a Kmart in Torrington with defendant Lisa
Killiany. The two were married at the time, and Hebert
recently had begun working as a police officer in the Town of
Winchester. (Hebert Dep. at 7; Pl.'s 56(a)(1), doc. # 230–1 at ¶
2; Killiany's 56(a)(2), doc. # 259 at ¶ 2.) A store surveillance
video from that day shows that Hebert reached the cash
register at 12:49 p.m. He handed his wallet to Killiany, who
removed cash, handed it back and walked away. Hebert placed
his wallet on a side counter and proceeded to unload the
shopping cart. After the cashier had scanned all his purchases,
Hebert paid with a credit card and walked away without

retrieving his wallet. (Kmart Video, doc. # 223 at 12:49–51.) Plaintiff Fortunato Garcia was the next customer in line. (Garcia Dep., doc. # 222–11 at 105.) Plaintiff placed his wallet on the main counter in front of him. Then he took Hebert's wallet from the side counter, placed it on top of his own wallet and covered it with his hand, concealing it from the cashier. (Kmart Video, doc. # 223 at 12:52.) Plaintiff handed cash to the cashier and, when she turned to the cash register, he put both wallets in his jacket pocket. Simultaneously, Hebert appeared at the end of the checkout line, looking all around. (Kmart Video at 12:52.) Hebert panicked because his wallet contained money, credit cards and his police badge. He said to Killiany: "I don't know what I'm going to do." (Hebert Dep. at 12; Pl.'s 56(a)(1), doc. # 230–1 at ¶ 3; Killiany's 56(a)(2) at ¶ 3.) Plaintiff received change from the cashier and walked away with his receipt and purchases. (Kmart Video, doc. # 223 at 12:53.) As plaintiff walked toward the exit, Hebert and Killiany stopped him and asked in in English, "Did you see a wallet on the counter?" Plaintiff said "No" and walked out of the store. (Hebert Dep. at 12; Killiany Dep. at 10–11; Garcia Dep. at 105–106.)

**\*2** Defendant Hebert had only been employed as a police officer for a short while and was anxious that his employer would "bust his stones" for losing his badge. (Hebert Dep. at 13; Pl.'s 56(a)(1), doc. # 230–1 at ¶ 3; Killiany's 56(a)(2) at ¶ 3.) He could have been written up. (Hebert Dep. at 29–32.) He notified the Winchester Police Department, which logged the incident as "Officer lost wallet." (Hebert Dep. at 13; Activity Log, doc. # 233–11.) Hebert then reported the incident to the Torrington Police Department. The duty officer was defendant Officer John Guerrera, who was in his seventh year as a police officer with the Torrington Police Department. (Guerrera Dep. at 6; Pl. 56(a)(1), doc. # 233–1 at ¶ 1.) Officer Guerrera met Hebert at Kmart, where they viewed a surveillance video of the incident. ((Pl.'s 56(a)(1), doc. # 233–1 at ¶¶ 2–3; Guerrera's 56(a)(2), doc. # 254 at ¶¶ 2–3; Killiany's 56(a)(1), doc. # 219 at ¶¶ 7–8, Pl.'s 56(a)(2), doc. # 229 at ¶¶ 7–8.) Officer Guerrera took the video to the Torrington Police Department, where it was viewed by another police officer. (Pl.'s 56(a)(1), doc. # 230–1 at ¶ 4; Killiany's 56(a)(1) at ¶ 13.) That officer thought he recognized the man who took the wallet as someone named Weston, and he went out in a patrol car to look for him. (Pl.'s 56(a)(1), doc. # 233–1 at ¶¶ 3–4; Guerrera's 56(a)(2), doc. # 254 at ¶¶ 3–4.)

Later that afternoon, plaintiff and a relative brought Hebert's wallet to the Torrington Police Department. Defendants Killiany and Hebert were there. On seeing plaintiff, Killiany said "Remember me, motherf——er?" (Killiany Dep. at 33; Pl.'s 56(a)(1), docs. # 233–1 at ¶ 5, # 230–1 at ¶ 5.) She was angry and frustrated because she and Hebert had missed their Thanksgiving dinner while looking for Hebert's wallet. (Killiany Dep. at 132; Pl.'s 56(a)(1), doc. # 230–1 at ¶ 21.) Defendant Officer Guerrera knew that Killiany worked at the Superior Court in Bantam because he occasionally delivered paperwork to her office. (Pl.'s 56(a)(1), doc. # 233–1 at ¶ 6, Guerrera's 56(a)(2) at ¶ 6.)

Plaintiff was wearing the same brown jacket he had worn at Kmart, with the same maroon cap in his pocket. He stated that he did not speak English. Another policeman spoke with him in Spanish. (Incident Report, doc. # 222–5 at 2; Guerrera Dep. at 20–21, 26, 36.) Officer Guerrera was not aware that plaintiff had made any attempts to return the wallet prior to arriving at the police station. [3] (Pl.'s 56(a)(1), doc. # 233–1 at ¶ 8; Guerrera's 56(a)(2) at ¶ 8.)

Defendant Officer Guerrera arrested plaintiff on a charge of larceny in the 6th degree. (Guerrera's 56(a)(1), doc. # 222 at ¶ 19; Pl.'s 56(a)(1), doc. # 233–1 at ¶ 15.) Other officers processed the arrest (Guida Dep. at 62–65; Pl.'s 56(a)(1), doc. # 233–1 at ¶ 11) and seized a Kmart receipt from plaintiff's wallet. (Seizure Inventory, doc. # 222–3.) Hebert signed a victim statement positively identifying plaintiff as the man that was in line behind them and stating: "I wish to press charges against this male for the theft of my wallet." Killiany signed the statement as a witness. (Doc. # 222–6.) Guerrera worked an extra half-hour after the end of his shift to complete the investigative paperwork. (Guerrera Dep. at 54; Pl.'s 56(a)(1), doc. # 233–1 at ¶ 16.) Police returned the wallet to Hebert, and he found nothing missing. (Pl.'s 56(a)(1), doc. # 230–1 at ¶ 9; Killiany's 56(a)(2) at ¶ 9.)

**\*3** In a letter to the Torrington police chief dated November 30, 2006, defendant Killiany commended the police officers for their efforts. Her letter states: "I heard several times from your officers that they wanted to 'help one of their own.' " (Doc. # 233–4.)

On December 4, 2006, plaintiff went to the Bantam courthouse for his first court date on the larceny charge. Defendant Killiany worked at the Bantam courthouse in the Family Services Unit. (Killiany Dep. at 5–7; Pl.'s 56(a)(1), doc. # 230–1 at ¶ 1; Killiany's 56(a)(2), doc. # 259 at ¶ 1.) When she saw plaintiff, she pointed him out to her friend, Assistant State's Attorney Magdalena Campos. (Pl.'s 56(a)(1), doc. # 230–1 at ¶ 18; Killiany's 56(a)(2) at ¶ 18.)

Attorney Campos conversed with plaintiff in the vestibule of the prosecutor's office. [4] (Campos Dep. at 91–97, 150–53.) After the conversation, plaintiff left the courthouse. (Serafini's 56(a)(1), doc. # 217–1 at ¶ 5; Pl.'s 56(a)(2), doc. # 226 at ¶ 5.) As plaintiff was leaving the courthouse, Killiany told him, "I wish you would say you were sorry. I missed my Thanksgiving." Plaintiff's sister informed Killiany they had tried to return the wallet to defendant Hebert's prior residence. (Killiany Dep. at 69–70, 121; Pl.'s 56(a)(1), doc. # 230–1 at ¶ 17.)

After plaintiff left the building, State's Attorney Campos called his case in court. She requested a continuance date, and Superior Court Judge Richard M. Marano granted it. (Tr. 12/4/06, doc. # 28 at 3–4.) Defendant Jane Serafini, who was acting as courtroom clerk that day, marked the court file "NG" to indicate a plea of not guilty, checked the box for jury election and wrote "1–5" as the continuance date. (Court File, doc. # 150 at 6; Serafini's 56(a)(1) at ¶ 7; Pl.'s 56(a)(2), doc. # 226 at ¶ 7.)

Serafini had been working as an administrative assistant for the Superior Court at Bantam for fourteen years. (Serafini Dep. at 6–8; Pl.'s 56(a)(1), doc. # 227–1 at ¶¶ 3–4.) She has no formal legal education. (Serafini Aff., # 217–4 at ¶ 2; Serafini's 56(a)(1), doc. # 217–1 at ¶ 3; Pl.'s 56(a)(2), doc. # 226 at ¶ 3.) Her work required her to attend court proceedings and make notations in the court file of procedural developments. (Serafini Dep. at 6–8; Pl.'s 56(a)(1), doc. # 227–1 at ¶¶ 3–4.) Serafini did not witness plaintiff's conversation with Assistant State's Attorney Campos. (Serafini's 56(a)(1), doc. # 217–1 at ¶ 5; Pl.'s 56(a)(2), doc. # 226 at ¶ 5.) When she entered notations in plaintiff's case file on December 4, 2006, Serafini assumed that Attorney Campos had informed him of the continuance date. It was common practice at the Bantam courthouse for the state's attorney to meet with a criminal defendant on the first appearance date and give him a continuance date, after which the state's attorney would announce the continuance date in court in the defendant's absence. This practice occurred multiple times per week. (Serafini Dep. at 119–29; Wittstein Dep. at 57; Serafini's 56(a)(1) at ¶¶ 12–13; Pl.'s 56(a)(2), doc. # 226 at ¶¶ 12–13.)

 *4  On January 5, 2007, defendant Serafini again was acting as courtroom clerk when plaintiff's case was called by Superior Court Judge Charles D. Gill. Plaintiff did not appear, and the judge ordered his rearrest on a charge of failure to appear. Supervising State's Attorney Andrew Wittstein recommended a "substantial bond," and the judge set a $5000 cash or surety bond. [5] (Tr. 1/5/07, doc. # 28 at 7–8.) On January 29, 2007, the order of rearrest and bond was noted in the police blotter of a local newspaper, the Torrington Register–Citizen. (Doc. # 231–8.)

On January 10, 2007, defendant Serafini generated an arrest warrant application on the failure to appear charge. The application included a form affidavit stating that "the accused" was "directed to appear" and "failed to appear ... when legally called according to terms of his/her bail bond promise to appear" and that the court "ordered that a warrant be issued for the arrest of the accused for failure to appear and set the following conditions for release." Serafini filled in plaintiff's case data including the charge of larceny in the 6th degree, the date on which he failed to appear (January 5, 2007), the $5000 cash or surety bond and the new charge of Failure to Appear in the 2nd degree. She then dated and signed the affidavit. (Arrest Warrant, doc. # 150 at 9.) In a typical week, Serafini signs ten such affidavits after confirming the data in the case file, after which a state's attorney signs the warrant application and submits it to a judge. (Serafini's 56(a)(1) at ¶ 20; Pl.'s 56(a)(2), doc. # 226 at ¶ 20.) On January 11, 2007, a state's attorney signed the application portion of the document, and Judge Marano signed the warrant. (Doc. # 150 at 9.) Plaintiff was arrested and charged with failure to appear in the 2nd degree. (Serafini's 56(a)(1) at ¶ 22; Pl.'s 56(a)(2), doc. # 226 at ¶ 22.)

On March 1, 2007, at a hearing before Judge Marano at which defendant Serafini was acting as courtroom clerk, plaintiff argued through counsel that he had not been arraigned properly. At the judge's request, Serafini read her notations from the court file. State's Attorney Wittstein then explained that plaintiff had not physically appeared before a judge on December 4, 2006 but instead had spoken to Attorney Campos, who gave plaintiff a continuance date. Judge Marano asked Serafini to read the charges, took plaintiff's not-guilty pleas and jury election and set a continuance date. (Tr. 3/1/07 at 9–10, 13.)

On April 17, 2007, at his next appearance before Judge Marano, plaintiff moved to dismiss the failure to appear charge, arguing that on December 4, 2006 he had neither appeared before a judge nor received notice of the January 5th continuance date. (Tr. 4/17/07, doc. # 88–6 at 43–44.) The State objected that Attorney Campos had orally conveyed the continuance date to plaintiff on December 4th, after which the court "entered a not guilty plea automatically as it

does for statistical purposes." (*Id.* at 45–46.) Judge Marano indicated that he understood the parties' positions. (*Id.* at 48–50.) On May 8, 2007, in a written ruling, Judge Marano found probable cause to sustain the failure to appear charge and denied plaintiff's motion to dismiss. (Doc. # 88–12 at 22–25.) On May 24, 2007, Judge Marano denied plaintiff's motion for reconsideration. (Doc. # 88–12 at 32–33, 41.)

**\*5** On September 25, 2007, the State entered a *nolle prosequi,* explaining that difficulties with witnesses made it unwise to proceed with the prosecution. On plaintiff's motion, the charges were dismissed. (Tr. 9/25/07, doc. 88–6 at 62.)

During the pendency of the criminal case, defendants Killiany and Officer Guerrera had contact with the prosecuting attorneys. Defendant Killiany spoke to Assistant State's Attorney Campos four times about the case. (Killiany Dep. at 61; Pl.'s 56(a)(1), doc. # 230–1 at ¶ 21; Killiany's 56(a)(2) at ¶ 21.) She spoke to Supervisory Assistant State's Attorney Wittstein about the case three times. The first time was during a court recess [6] when she described the Thanksgiving Day incident to him. The second time he informed her that plaintiff had been rearrested, and the third time he informed her that the case would be dismissed. Attorney Wittstein made notes on the prosecutor's file including "Do *Not* Nolle," and "speaks English." He also wrote "Victim Pissed" in reference to Killiany. He assumed that she was speaking both for herself and for Hebert and thought of her as the "combined victim." (Prosecutor's File, doc. # 230–9; Wittstein Dep. at 28–41; Pl.'s 56(a)(1), doc. # 230–1 at ¶ 21; Killiany's 56(a)(2) at ¶ 21 .) The prosecutor's file also contained an undated, typed victim's letter with Hebert's name listed at the bottom. (Doc. # 230–5.) Killiany "contributed" to this letter. Hebert did not write the letter. (Killiany Dep. at 118–20; Hebert Dep. at 47–48, 86–90; Pl.'s 56(a)(1), doc. # 230–1 at ¶ 24; Killiany's 56(a)(2) at ¶ 24.) The letter included the following statement: "Given [plaintiff's] skillful and swift actions, I am certain this is not the first time this man has stolen from someone. What was also concerning was that the arresting police officer stated that Mr. Garcia is employed as a CNA. It is frightening to think that a thief could be working [with] elderly and sick people who are easy targets for being victimized." (Doc. # 230–5.)

At some point while the criminal case was pending, Attorney Wittstein asked defendant Officer Guerrera to contact plaintiff's employer to ask whether plaintiff understood and spoke English. The employer responded that plaintiff needed to understand and speak English for his job. Guerrera verbally

informed Attorney Wittstein, who asked him not to generate a supplemental written report. (Guerrera Letter, doc. # 222–7; Guerrera Dep. at 85–86; Pl.'s 56(a)(1), doc. # 233–1 at ¶ 35.)

During the period in which she took clerical actions in plaintiff's criminal case, defendant Serafini did not speak to anyone about the larceny charge or the underlying incident. (Serafini Dep. at 33–34; Serafini Aff., doc. # 217–4 at 3–4; Serafini's 56(a)(1) at ¶ 24; Pl.'s 56(a)(2), doc. # 226 at ¶ 24.)

## IV. *Standard of Review*

A party is entitled to summary judgment if the record, including pleadings, depositions, answers to interrogatories, admissions and affidavits, establishes that there is no genuine dispute as to any material fact and that the party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56. The moving party has the initial burden of showing an absence of evidence to support an essential element of the opposing party's claim. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). To overcome this showing, the party opposing summary judgment "bears the burden of going beyond the pleadings, and 'designating specific facts showing that there is a genuine issue for trial.' " *Amnesty Am. v. Town of W. Hartford,* 288 F.3d 467, 470 (2d Cir.2002) (quoting *Celotex,* 477 U.S. at 324). The court must view the evidence in the record in the light most favorable to the nonmoving party, drawing all reasonable inferences in that party's favor. *See Weinstock v. Columbia Univ.,* 224 F.3d 33, 41 (2d Cir.2000). On cross motions for summary judgment, the same standard applies. *Morales v. Quintel Entertainment,* Inc., 249 F.3d 115, 121 (2d Cir.2001). Each party's motion is examined on its own merits, and the court need not enter judgment for either party. *Id.; Marcoux v. American Airlines, Inc.,* 645 F.Supp.2d 68 (E.D.N.Y.2008).

**\*6** "On a summary judgment motion, the district court properly considers only evidence that would be admissible at trial." *Nora Beverages v. Perrier Group of Am.,* 164 F.3d 736, 746 (2d Cir.1998).

## V. *Plaintiff's Motion in Limine (doc. # 225)*

As a preliminary matter, plaintiff seeks to exclude from consideration the Kmart surveillance video offered by defendants Officer Guerrera and Killiany. (Docs.# 93, # 223.) He argues that it is inadmissible on two grounds.

Plaintiff's first ground for exclusion is authenticity. He argues that the video cannot be properly authenticated because it is

a duplicate copy. Rule 1002 of the Federal Rules of Evidence provides that "[a]n original writing, recording, or photograph is required in order to prove its content unless these rules or a federal statute provides otherwise." However, Rule 1003 provides that "[a] duplicate is admissible to the same extent as the original unless a genuine question is raised about the original's authenticity or the circumstances make it unfair to admit the duplicate." At his deposition, plaintiff admitted that the video shows him taking defendant Hebert's wallet. (Garcia Dep. at 96–105.) The police evidence custodian affirmed that the exhibit is an authentic copy of that video. (Murphy Aff., doc. # 251–1 at ¶¶ 18–19.) In view of this evidence, there is no genuine question as to authenticity.

Plaintiff's second ground for exclusion of the video is based on a series of suppositions. When defendants showed the video to plaintiff at his deposition, he admitted that it shows him taking defendant Hebert's wallet. He agreed that he saw a video of these events on a prior occasion but thought it had been shot from a different angle. (Garcia Dep., doc. # 222–11 at 96–102.) From that testimony, plaintiff speculates that there must have been two videos, one shot from the other angle (which he labels the "original" video) and the one defendants offer into evidence (which he labels the "substitute" video). Plaintiff next seizes on a notation in the evidence log stating "Destroy per Kmart." (Doc. # 225–6 at 3.) Although other pages in the evidence file clarify that the video was not among the items destroyed (docs.# 225–9, # 251–3), plaintiff advances an argument that defendants destroyed the alleged "original" video because the so-called "substitute" was more favorable to their case. (Pl.'s Mem., doc. # 225–1 at 4–5.)

The court is not persuaded that defendants have concealed, destroyed or substituted video evidence. The affidavit of the police evidence custodian affirms that he destroyed other evidence but not the surveillance video. [7] (Murphy Aff., doc. # 251–1 at ¶¶ 9–12.) The custodian adds: "I made two true and accurate DVD copies of the [original video]tape for Officer Guerrera for use in this case. A second or substitute tape has never existed. The original VHS tape was not destroyed. It remains in my custody." (*Id.* at ¶¶ 18–19.) In light of the foregoing, the exhibit is admitted for purposes of summary judgment.

VI. *Guerrera Cross Motions (docs.# 220, # 233)*

**\*7** As to defendant Officer John (Giovanni) Guerrera, plaintiff claims false arrest, malicious prosecution and other Fourth Amendment violations under 42 U.S.C. § 1983

(Counts Two and Four) and state law (Counts One and Three). He also brings a state-law claim of intentional infliction of emotional distress (Count Twelve).

A. *False Arrest and Malicious Prosecution*
To prevail on a § 1983 claim for either false arrest or malicious prosecution, a plaintiff must show a violation of his rights under the Fourth Amendment by establishing the elements of the parallel claim under state law. [8] *Fulton v. Robinson,* 289 F.3d 188, 195 (2d Cir.2002) (false arrest); *Davis v. Rodriguez,* 364 F.3d 424, 433–34 (2d Cir.2004) (malicious prosecution). Claims of false arrest and malicious prosecution implicate the Fourth Amendment right to be free from unreasonable seizures. *Jocks v. Tavernier,* 316 F.3d 128, 134 (2d Cir.2003). Under Connecticut law, a plaintiff claiming false arrest or malicious prosecution has the burden of proving the absence of probable cause. *Estrada v. Torres,* 646 F.Supp.2d 253, 257 (D.Conn.2009) (citing *Bhatia v. Debek,* 287 Conn. 397, 410–11, 948 A.2d 1009 (2008) (malicious prosecution); *Beinhorn v. Saraceno,* 23 Conn.App. 487, 491, 582 A.2d 208 (1990) (false arrest)). The existence of probable cause is an absolute defense to claims of false arrest and malicious prosecution. *Ruttkamp v. De Los Reyes,* No. 3:10cv392(SRU), 2012 WL 3596064, at \*5 (D.Conn. Aug. 20, 2012) (citing *Caldarola v. Calabrese,* 298 F.3d 156, 161 (2d Cir.2002)).

Officer Guerrera seeks summary judgment on the ground that he had probable cause to arrest and charge plaintiff with larceny in the 6th degree. [9] "Probable cause to arrest exists when the officers have knowledge of, or reasonably trustworthy information as to, facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested." *Zellner v. Summerlin,* 494 F.3d 344, 368 (2d Cir.2007). In other words, the court must assess "whether the facts known by the arresting officer at the time of the arrest objectively provided probable cause to arrest." *Jaegly v. Couch,* 439 F.3d 149, 153 (2d Cir.2006) (citing *Devenpeck v. Alford,* 543 U.S. 146, 153, 125 S.Ct. 588, 160 L.Ed.2d 537 (2004)). Because probable cause "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity," it is a lower standard than preponderance of the evidence. *United States v. Juwa,* 508 F.3d 694, 701 (2d Cir.2007) (quoting *Illinois v. Gates,* 462 U.S. 213, 243 n. 13, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)).

Plaintiff offers several arguments against probable cause. He argues that because one form of larceny, a charge of larceny

of mislaid property, requires "fail[ure] to take reasonable measures to restore the property to a person entitled to it," Conn. Gen.Stat. § 53a–119(4), his alleged attempt to return the wallet to Hebert's home address and his eventual delivery of the wallet to the police station insulated him from liability. [10] He also accuses Officer Guerrera of failing to investigate thoroughly, making the arrest without a positive identification, and basing the probable cause determination on "false material" and "omitted information."

**\*8** None of these arguments is availing. When plaintiff arrived at the police station, he had the wallet in his possession, Officer Guerrera recognized his jacket from the surveillance video, and Killiany verbally identified him as the man he had seen earlier. [11] On the video, Officer Guerrera saw plaintiff concealing the wallet from the cashier, and he was aware that plaintiff, regardless of his English proficiency, had declined an opportunity to interact with Hebert as he exited the store with Hebert's wallet. These facts were sufficient for a person of reasonable caution to believe that plaintiff had committed larceny. Once he had probable cause to arrest, Officer Guerrera was not required to investigate whether plaintiff had attempted to return the wallet, nor was he required to believe to a certainty that the charge would be successfully prosecuted despite plaintiff's delivery of the wallet to the police station. As the Second Circuit has instructed, once a police officer has probable cause, he is not "required to explore and eliminate every theoretically plausible claim of innocence" before arresting a suspect. *Panetta v. Crowley,* 460 F.3d 388, 398 (2d Cir.2006) (quoting *Curley v. Village of Suffern,* 268 F.3d 65, 70 (2d Cir.2001)). In fact, he is "neither required nor allowed" to continue investigating, sifting and weighing information. *Id.* (quoting *Krause v. Bennett,* 887 F.2d 362, 372 (2d Cir.1989)). Nor is the officer required to "believe with certainty that the arrestee will be successfully prosecuted." *Id.* at 396 (quoting *Curley,* 268 F.3d at 70). *See also Southerland v. City of New York,* 681 F.3d 122, 127 (2d Cir.2012) ("[w]hile probable cause requires more than 'mere suspicion,' ... it does not demand 'hard certainties' ") (citations omitted); *cf. Dawkins v. Williams,* 511 F.Supp.2d 248, 276 (N.D.N.Y.2007) (no probable cause to charge where evidence before police investigator included "conspicuous exculpatory statements").

Finally, plaintiff's argument that the probable cause determination was based on "false material" and "omitted information" is inapt. He bases his argument on case law involving issues of false statements or material omitted from arrest warrant affidavits presented to a magistrate. *See, e.g.,*

*Golino v. New Haven,* 950 F.2d 864, 870 (2d Cir.1991) (summary judgment properly denied where arrest warrant affidavit contained false statements and omitted information that was critical to finding of probable cause). Here, Officer Guerrera effected a warrantless arrest, so case law regarding the content of a warrant affidavit does not apply.

Because Officer Guerrera had probable cause to arrest and charge him, plaintiff cannot prevail on his claims of false arrest and malicious prosecution under § 1983.

### B. *Other § 1983 Fourth Amendment Claims* [12]

Plaintiff next maintains that Officer Guerrera violated his Fourth Amendment rights when he searched his wallet and seized the Kmart receipt after plaintiff was arrested. The claim cannot be levied at Officer Guerrera given plaintiff's concession that his wallet was searched by a different police officer. (Doc. # 237 at 12, 29–30.) Regardless, "it is well settled that a search incident to a lawful arrest is a traditional exception to the warrant requirement of the Fourth Amendment." *United States v. Robinson,* 414 U.S. 218, 224 (1973).

**\*9** In addition, plaintiff argues that Officer Guerrera handcuffed him unreasonably. There is no evidence to support the claim that Officer Guerrera handcuffed him. [13] Nonetheless, even assuming that Officer Guerrera did handcuff him and that a jury could find this use of force unreasonable, Officer Guerrera is entitled to qualified immunity. Qualified immunity shields government officials from liability for civil damages unless (1) viewed in the light most favorable to the party asserting the injury, the facts as alleged amount to a violation of a constitutional or statutory right, and (2) the right was "clearly established" at the time of the alleged misconduct. *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). At the time of plaintiff's arrest, " '[n]either the Supreme Court nor the Second Circuit [had] established that a person has a right not to be handcuffed in the course of a particular arrest.' " *Warner v. Gyle,* No. 3:09–CV–199(RNC), 2010 WL 3925211, at \*2 (D.Conn. Sept.30, 2010) (quoting *Soares v. Connecticut,* 8 F.3d 917, 922 (2d Cir.1993)).

### C. *Intentional Infliction of Emotional Distress*

Plaintiff also claims intentional infliction of emotional distress (Count Twelve) in connection with his arrest. To

prevail on a claim of intentional infliction of emotional distress in Connecticut, a plaintiff must prove:

> (1) that the actor intended to inflict emotional distress; or that he knew or should have known that emotional distress was a likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress and (4) that the emotional distress sustained by the plaintiff was severe.

*Petyan v. Ellis,* 200 Conn. 243, 253, 510 A.2d 1337 (1986). "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Appleton v. Board of Educ. of Town of Stonington,* 254 Conn. 205, 210–11, 757 A.2d 1059 (2000) (citing 1 Restatement (Second), Torts § 46, comment (d), p. 73 (1965)). This is initially a question for the court and becomes a factual issue only where reasonable minds disagree. *Id.* at 210, 757 A.2d 1059.

As a matter of law, absent other factors that may constitute "extreme and outrageous" conduct, a routine arrest will not be considered intentional infliction of emotional distress if the arresting officer has probable cause to arrest. *Moreno v. City of New Haven Dept. of Police Service,* 604 F.Supp.2d 364, 376 (D.Conn.2009). Here, Officer Guerrera had probable cause to effect the routine arrest, and he is entitled to summary judgment on the intentional infliction claim.

VII. *Killiany Cross–Motions (docs.# 218, # 230)*
With respect to defendant Lisa Killiany, plaintiff claims false arrest and malicious prosecution in connection with the larceny charge under 42 U.S.C. § 1983 (Counts Two and Four) and state law (Counts One and Three). He brings the same claims under § 1983 (Counts Six and Eight) and state law (Counts Five and Seven) in connection with the failure to appear charge. Finally, he brings state-law claims of defamation (Count Eleven) and intentional infliction of emotional distress (Count Twelve).

A. *False Arrest and Malicious Prosecution*
**\*10** Although defendant Killiany did not directly arrest or charge plaintiff with larceny and failure to appear, plaintiff alleges that she collaborated with defendant Officer Guerrera, defendant Serafini and State's Attorneys Campos and Wittstein to trump up charges against him as revenge for ruining her Thanksgiving dinner and to shield defendant Hebert from discipline for losing his police badge. [14] "Claims for false arrest or malicious prosecution, brought under § 1983 to vindicate the Fourth and Fourteenth Amendment right to be free from unreasonable seizures, are 'substantially the same' as claims for false arrest or malicious prosecution under state law." [15] *Jocks v. Tavernier,* 316 F.3d 128, 134 (2d Cir.2003). Under Connecticut law, a plaintiff claiming false arrest or malicious prosecution has the burden of proving the absence of probable cause. *Estrada v. Torres,* 646 F.Supp.2d 253, 257 (D.Conn.2009) (citing *Bhatia v. Debek,* 287 Conn. 397, 410–11, 948 A.2d 1009 (2008) (malicious prosecution); *Beinhorn v. Saraceno,* 23 Conn.App. 487, 491, 582 A.2d 208 (1990) (false arrest)). The existence of probable cause is an absolute defense to claims of false arrest and malicious prosecution. *Ruttkamp v. De Los Reyes,* No. 3:10cv392(SRU), 2012 WL 3596064, at \*5 (D.Conn. Aug. 20, 2012) (citing *Caldarola v. Calabrese,* 298 F.3d 156, 161 (2d Cir.2002)).

In light of the court's finding *supra* that Officer Guerrera had probable cause to arrest plaintiff, Killiany is entitled to summary judgment on the claims of false arrest and malicious prosecution regarding the larceny charge. As for the failure to appear charge, that was a secondary development in the criminal case for which no reasonable jury would find Killiany responsible. She was not present when Attorney Campos allegedly gave plaintiff a continuance date or at any of the subsequent court proceedings. There is no evidence that she sought rearrest or encouraged prosecution on the failure to appear charge. She did not discuss plaintiff's case with Serafini, the administrative assistant who prepared the rearrest warrant. In fact, Killiany first learned of the failure to appear charge in a passing conversation with Attorney Wittstein after rearrest already had been ordered. Negative inferences from Killiany's thank-you letter to the Torrington Police Department, friendship with Attorney Campos and communication with the prosecution as a purported victim are not sufficient to establish that she instigated plaintiff's rearrest and prosecution on the charge of failure to appear. For these reasons, she is entitled to summary judgment on the claims of false arrest and malicious prosecution. [16]

### B. *Defamation*

Killiany is also entitled to summary judgment on plaintiff's claim that she defamed him by calling him "motherf——er" at the police station in Torrington. [17]  To establish a *prima facie* case of defamation, a plaintiff must demonstrate that (1) the defendant published a defamatory statement; (2) the defamatory statement identified the plaintiff to a third person; (3) the defamatory statement was published to a third person; and (4) the plaintiff's reputation suffered injury as a result of the statement. *Cweklinsky v. Mobil Chemical Co.,* 267 Conn. 210, 217, 837 A.2d 759 (2004). A communication injures a plaintiff's reputation if it "tends to ... lower him in the estimation of the community or to deter third persons from associating or dealing with him." 3 Restatement (Second), Torts § 559, *quoted in QSP, Inc. v. Aetna Cas. and Sur. Co.,* 256 Conn. 343, 356, 773 A.2d 906 (2001). No reasonable jury could find that directing a general expletive at plaintiff in the presence of his relative and several police officers caused an actionable injury to his standing in the community or would deter third persons from associating or dealing with him.

### C. *Intentional Infliction of Emotional Distress*

**\*11**  Plaintiff next claims of intentional infliction of emotional distress (Count Twelve). To prevail on a claim of intentional infliction of emotional distress in Connecticut, a plaintiff must prove:

> (1) that the actor intended to inflict emotional distress; or that he knew or should have known that emotional distress was a likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress and (4) that the emotional distress sustained by the plaintiff was severe.

*Petyan v. Ellis,* 200 Conn. 243, 253, 510 A.2d 1337 (1986). "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Appleton v. Board of Educ. of Town of Stonington,* 254 Conn. 205, 210–11, 757 A.2d 1059 (2000) (citing 1 Restatement (Second), Torts § 46, comment (d), p. 73 (1965)). This is initially a question for the court and becomes a factual issue only where reasonable minds disagree. *Id.* at 210, 757 A.2d 1059.

Plaintiff contends that Killiany exploited her connections as a courthouse employee and wife of a police officer to convince the police, the prosecutors and the courtroom clerk to prosecute him with unusual vigor. He theorizes that she wanted revenge because her Thanksgiving holiday was ruined and her husband was embarrassed in front of his brother officers, citing circumstantial evidence such as Killiany's use of an expletive at the police station, her thank-you note to the Torrington police for treating Hebert as "one of your own," her conversations with prosecutors and her drafting of a letter to the prosecutor over Hebert's name.

Although the circumstances of plaintiff's initial appearance at the Bantam courthouse are disturbing, [18]  Killiany's own conduct was not extreme or outrageous. With respect to the expletive, "[c]onduct on the part of the defendant that is merely insulting or displays bad manners or results in hurt feelings is insufficient to form the basis for an action based upon intentional infliction of emotional distress." *Appleton v. Board of Educ. of Town of Stonington,* 254 Conn. 205, 211, 757 A.2d 1059 (2000). As for her communication with prosecutors, Article 1, § 8 of the Constitution of the State of Connecticut gives a victim of a crime the right to communicate with the prosecution and the right to notification of court proceedings. *See also* Conn. Gen.Stat. § 1–1k ("crime victim" means an individual who suffers direct or threatened physical, emotional or financial harm as a result of a crime). It is apparent by their notations on the case file that Assistant State's Attorneys Campos and Wittstein considered Killiany to be a crime victim. As a result, her communications with the state's attorneys were within the "bounds of decency" as expressed in the state constitution. To the extent that plaintiff might be contending that the state's attorneys gave Killiany a degree of access to which she was not entitled by statute, the responsibility for that decision is theirs. In sum, Killiany is entitled to summary judgment on the claim of intentional infliction of emotional distress.

## VIII.  *Serafini Cross–Motions (docs.# 217, # 227)*

**\*12**  Turning to the allegations against defendant Jane Serafini, plaintiff claims false arrest, malicious prosecution and abuse of process [19]  under 42 U.S.C. § 1983 (Counts Six, Eight and Ten) and state law (Counts Five, Seven and

Nine) in connection with his arrest and prosecution on the failure to appear charge. He also claims intentional infliction of emotional distress (Count Twelve) under state law.

The relevant undisputed facts are as follows. Although plaintiff was not present when his case was called on his initial court date, courtroom clerk Serafini entered a continuance date, not-guilty plea and jury election in the court file on December 4, 2006. After he failed to appear on the continuance date and the judge ordered his rearrest, Serafini generated an arrest warrant affidavit stating that he had been "directed to appear" on the continuance date. Finally, she read the contents of the court file when so ordered by the judge during a subsequent proceeding. Both the notations in the file and the generation of the affidavit were undertaken pursuant to established courthouse practices. Plaintiff urges the court to infer from Serafini's actions that she deliberately misled the court so as to trump up charges against plaintiff at defendant Killiany's behest.

Serafini maintains that she is entitled to absolute quasi-judicial immunity because her actions were part of the judicial process. Judicial immunity does not attach *per se.* It depends on "the nature of the function performed, not the identity of the actor who performed it." *Forrester v. White,* 484 U.S. 219, 229, 108 S.Ct. 538, 98 L.Ed.2d 555 (1988). Under this functional approach,[20] court clerks are immune from suit "for performance of tasks which are judicial in nature and an integral part of the judicial process." *Rodriguez v. Weprin,* 116 F.3d 62, 66 (2d Cir.1997). Specifically, quasi-judicial immunity attaches when a court clerk undertakes "discretionary acts that implement judicial decisions or that are performed at the discretion or under the supervision of a judge." *Bliven v. Hunt,* No. 05–CV–4852 (SJF/LB), 2005 WL 3409620, *2 (E.D.N.Y. Dec.12, 2005) (citations omitted). Additionally, court clerks are absolutely immune from suit for "functions which are administrative in nature if the task was undertaken pursuant to the explicit direction of a judicial officer or pursuant to the established practice of the court."[21] *Humphrey v. Court Clerk for the Second Circuit,* No. 5:08–CV–0363, 2008 WL 1945308, at *2 (N.D.N.Y. May 1, 2008). The Connecticut state courts apply the same "functional approach" to determine whether quasi-judicial immunity attaches to state-law claims. *See Gross v. Rell ("Gross I"),* 585 F.3d 72, 81–82 (2d Cir.2009) (citing *Carrubba v. Moskowitz,* 274 Conn. 533, 542–43, 877 A.2d 773 (2005)), *question certified to Gross v. Rell,* 304 Conn. 234, 273–281 (2012) (applying *Cleavinger* factors).

Defendant Serafini's actions in this case were an integral part of the judicial process. Her notations in the court file, generation and signing of an affidavit and recitation of the file contents were done either at a judge's direction or pursuant to established practices of the state court at Bantam. *See, e.g., McKnight v. Middleton,* 699 F.Supp.2d 507, 525–26 (E.D.N.Y.2010) (court clerk immune from claim that he "failed to process" plaintiff's submissions), *Humphrey v. Court Clerk for the Second Circuit,* No. 5:08–CV–0363, 2008 WL 1945308, at *2 (N.D.N.Y. May 1, 2008) (court clerk immune from claim that she failed to timely inform plaintiff that his appeal was dismissed and neglected to update him on status of appeal); *Pikulin v. Gonzales,* No. 07–CV–412, 2007 U.S. Dist. LEXIS 25551, *6, 2007 WL 1063353 (E.D.N.Y. April 5, 2007) (filing and docketing tasks are integral part of judicial process); *Humphrey v. Court Clerk, NDNY,* No. 5:05–CV–1159 (NAM), 2005 WL 2490155, * (N.D.N.Y. Oct.7, 2005) (court clerks immune from claim that they failed to advise plaintiff that e-mail address was not acceptable under local rule for purposes of service and correspondence). The fact that Serafini's actions were subject to review by the judge—and, moreover, were reviewed—is further indication of their quasi-judicial nature. *See Gross v. Rell ("Gross II"),* 695 F.3d 211, 213–14 (2d Cir.2012) (citing *Cleavinger* factors including "the presence of safeguards that reduce the need for private damages actions as a means of controlling unconstitutional conduct"); *Bimler v. Crouch,* No. 3:04CV1478 (WWE), 2005 WL 1074419, at *3 (D.Conn. May 02, 2005) (support enforcement officer immune from claim that he "misrepresented material facts" when drafting order because family support magistrate reviewed the order).

**\*13** For these reasons, Serafini is entitled to absolute quasi-judicial immunity on all claims.

IX. *Civil Conspiracy*

Finally, plaintiff claims that Officer Guerrera, Killiany and Serafini are civil conspirators and therefore liable for the tortious acts of the other defendants. Civil conspiracy is not an independent cause of action. Under § 1983, a claim of civil conspiracy requires proof of an underlying violation of a federal right. *Singer v. Fulton County Sheriff,* 63 F.3d 110, 119 (2d Cir.1995) ("the [conspiracy] lawsuit will stand only insofar as the plaintiff can prove the *sine qua non* of a § 1983 action: the violation of a federal right"). Similarly, under Connecticut law, "a claim of civil conspiracy must be joined with an allegation of a substantive tort." *Master–Halco, Inc. v. Scillia, Dowling & Natarelli, LLC,* 739 F.Supp.2d 104, 106–107 (D.Conn.2010) (quoting *Macomber v. Travelers*

*Property & Casualty Corp.,* 277 Conn. 617, 636, 894 A.2d 240 (2006)). Because the defendants are entitled to summary judgment on all underlying substantive claims, the civil conspiracy claims fail as a matter of law. *DeStefano v. Duncanson,* No. 08 CIV. 3419(GBD), 2011 WL 651452, at *4 (S.D.N.Y. Feb.10, 2011) (dismissing § 1983 conspiracy claim); *Presley v. Pepperidge Farm, Inc.,* 356 F.Supp.2d 109, 136–37 (D.Conn.2005) (summary judgment on state conspiracy claim).

X. *Conclusion*

For the foregoing reasons, plaintiff's Motion in Limine (doc. # 225) is DENIED; defendants' Motions for Summary Judgment (docs.# 217, # 218, # 220) are GRANTED; and plaintiff's Cross–Motions (docs.# 227, # 230, # 233) are DENIED.

This is not a recommended ruling. The parties have consented to the authority of a magistrate judge in all proceedings in this case including the entry of final judgment pursuant to 28 U.S.C. 636(c) and Fed.R.Civ.P. 73. (Doc. # 276.)

SO ORDERED at Hartford, Connecticut this 27th day of March, 2013.

**APPENDIX of Filings by ECF Number**

| | Serafini | Killiany | Guerrera |
|---|---|---|---|
| **P's Motion in Limine** | | | **# 225** |
| **P's Memo** | | | # 225–1 |
| **Ds' Responses** | | | # 251, 261 |
| **P's Reply** | | | # 267 (268) |
| **D's SJ** | **# 217** | **# 218** | **# 220** |
| **D's 56(a)(1)** | # 217–1 | # 219 | # 222 |
| **D's Memo** | # 217–2 | # 219–8 | # 221 |
| **P's 56(a)(2)** | # 226 | # 229 | # 232–1 |
| **P's Cross–SJ** | **# 227** | **# 230** | **# 233** |
| **P's 56(a)(1)** | # 227–1 | # 230–1 | # 233–1 (232) |
| **P's Memo/Response** | # 236 (239) | # 235 (238) | # 237 (240) |
| **D's Response/Reply** | # 256 | # 258 (260) | # 252 (253) |
| **D's 56(a)(2)** | # 257 | # 259 | # 266 (254) |
| **P's Reply** | # 270 | # 271 | # 269 |

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 1294412

## Footnotes

1   The filings that pertain to the pending motions are voluminous. *See* Appendix of Filings by ECF Number.

2   The court is mindful that "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining pendent state claims." *Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 350 n. 7, 108 S.Ct. 614, 98 L.Ed.2d 720, (1988), *quoted in Valencia ex rel. Franco v. Lee,* 316 F.3d 299, 305 (2d Cir.2003). Here, considerations of economy, convenience and fairness militate in favor of supplemental jurisdiction. Discovery is complete, and all issues are ripe for adjudication. The court has decided a motion for default judgment and two motions to dismiss, one of which was relitigated in an interlocutory appeal and motion to vacate. Plaintiff also filed a prior motion for summary judgment, which the court denied as moot. There are no novel questions of state law. *See, e.g., Raucci v. Town of Rotterdam,* 902 F.2d 1050, 1055 (2d Cir.1990) (exercising supplemental jurisdiction where discovery was complete; the court had decided three dispositive motions; the case was trial-ready; and the state-law claims involved only settled principles).

3   Plaintiff alleges that after he left Kmart, he attempted to return the wallet at a condominium address listed on Hebert's driver's license. No one answered the door, so plaintiff left a note with his sister's phone number. On his way home, his sister informed him that the resident of the condominium had called to say that he had not lost a wallet. Plaintiff's relative then telephoned the Winchester Police Department and reported that plaintiff had found Hebert's wallet. The duty officer told them to take the wallet to the Torrington Police Department. (Second Am. Compl., doc. # 137 at 4–5.)

4   Campos testified that she gave plaintiff a continuance date of January 5, 2007. (Campos Dep. at 150–53.) Plaintiff disputes that testimony.

5   Sometimes when a defendant missed a court appearance, judges at the Bantam courthouse ordered a warning to be mailed (called a bail notice) in lieu of immediate rearrest. (Campos Dep. at 54–56.) Plaintiff alleges that Attorney Wittstein advocated for rearrest and substantial bond in this case at Killiany's behest.

6   Killiany was often in court because it was her duty to make recommendations to the court during arraignment proceedings on domestic violence charges. (Killiany Dep. at 5–7; Pl.'s 56(a)(1), doc. # 230–1 at ¶ 1.)

7   The full inventory of evidence was two Kmart receipts and one surveillance video. The receipts were destroyed pursuant to a state court order because they were not claimed after six months. (Docs.# 225–6, # 225–9, # 251–3.)

8   The Connecticut Supreme Court has articulated the elements of these claims as follows. To prevail on a claim of false arrest, a plaintiff must prove that "his physical liberty has been restrained by the defendant and that the restraint was against his will, that is, that he did not consent to the restraint or acquiesce in it willingly." *Berry v. Loiseau,* 223 Conn. 786, 820, 614 A.2d 414 (1992). With respect to malicious prosecution, a plaintiff must prove that: "(1) the defendant initiated or procured the institution of criminal proceedings against the plaintiff; (2) the criminal proceedings have terminated in favor of the plaintiff; (3) the defendant acted without probable cause; and (4) the defendant acted with malice, primarily for a purpose other than that of bringing an offender to justice." *McHale v. W.B.S. Corp.,* 187 Conn. 444, 447, 446 A.2d 815 (1982).

9   Officer Guerrera urges the court to apply the doctrine of collateral estoppel to bar plaintiff from challenging probable cause, an issue that the state court addressed in the criminal case. Plaintiff responds that collateral estoppel should not apply because he did not receive a full and fair hearing in the Superior Court. (Pl's Mem.,

doc. # 237 at 35–36.) Because the court finds that Officer Guerrera had probable cause, it need not reach collateral estoppel.

10    "A person commits larceny when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner. Larceny includes, but is not limited to: ... (4) Acquiring property lost, mislaid or delivered by mistake. A person who comes into control of property of another that he knows to have been lost, mislaid, or delivered under a mistake as to the nature or amount of the property or the identity of the recipient is guilty of larceny if, with purpose to deprive the owner thereof, he fails to take reasonable measures to restore the property to a person entitled to it." Conn. Gen.Stat. § 53a–119. "A person is guilty of larceny in the sixth degree when he commits larceny as defined in section 53a–119 and the value of the property or service is five hundred dollars or less." Conn. Gen.Stat. § 53a–125b.

11    After Officer Guerrera brought the surveillance video to the police station, another police officer misidentified the man on the video as a transient named "Weston." That officer then went out looking for Weston. (Guida Dep. at 49–60.) Plaintiff appears to argue that he was arrested on the basis of his resemblance to Weston and/or because he is "a dark-skinned Hispanic." (Pl.'s Mem., doc. # 237 at 11–12, 28–29.) The argument is unpersuasive in light of the facts known to Officer Guerrera at the time of plaintiff's arrest.

12    Besides his Fourth Amendment allegations, plaintiff contends that Officer Guerrera violated his "Fifth and Sixth [A]mendment guarantees against self-incrimination and right to counsel." (Pl.'s Mem., doc. # 237 at 18.) Because he supplies no evidence or argument to substantiate the contentions, the court does not address them. Plaintiff also argues that procedural deficiencies in the April 17, 2007 court proceeding deprived him of his right to confront witnesses under the Sixth Amendment. (Id. at 37, 446 A.2d 815.) This is a futile argument. The state court, not Officer Guerrera, decided how the criminal case would proceed.

13    Plaintiff testified that "another policeman came, a younger guy. He cuffed me, and took me to the back." (Garcia Dep. at 80.) Officer Guerrera testified that he could not recall who processed the arrest. (Guerrera Dep. at 38–39.) In deposition testimony, a different police officer inferred from the paperwork that he (not Guerrera) had booked plaintiff but could not recall handcuffing him. (Guida Dep. at 62–64.)

14    Plaintiff alleges without further explanation that Killiany was acting under color of state law. Although Killiany was a state employee, "mere employment by the state does not mean that the employee's every act can properly be characterized as state action." Patterson v. County of Oneida, N.Y., 375 F.3d 206, 230 (2d Cir.2004) (citing West v. Atkins, 487 U.S. 42, 49–50, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988) ("generally, a public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law")). Alternatively, a private individual may be deemed a state actor for § 1983 purposes "if he or she willfully collaborated with an official state actor in the deprivation of the federal right." Dwares v. City of New York, 985 F.2d 94, 98 (2d Cir.1993); see also Khulumani v. Barclay Nat. Bank Ltd., 504 F.3d 254, 316 (2d Cir.2007) (private actor "must jointly participate in the wrongful conduct, pursuant to a common design or plan"); Shattuck v. Town of Stratford, 233 F.Supp.2d 301, 313 (D.Conn.2002) (private actor may be liable for § 1983 false arrest or malicious prosecution if she instigated the arrest or commenced the proceedings). Because the claim fails on other grounds, the court need not linger on this issue.

15    See elements of false arrest and malicious prosecution supra at n. 8.

16    In Counts Four and Eight, plaintiff appears to allege that Killiany is responsible for the fact that he was not informed on December 4, 2006 of an indigent's Sixth Amendment right to appointed counsel. (Second Am. Compl., doc. # 137 at ¶¶ 19B, 36, 54.) Because he supplies no evidence or argument to substantiate the contentions, the court does not address it.

17    In his brief, plaintiff also claims that he was defamed by the mention of his rearrest in the newspaper's police blotter (doc. # 234–8) and by Killiany's statements in the victim letter in his court file (doc. # 230–5). These claims were not alleged in the complaint (doc. # 137) and cannot be raised for the first time on summary judgment. Regardless, Killiany is not liable for the newspaper's statement because she did not make it. Nor for that matter could any party be liable for publishing the fact of plaintiff's rearrest. *Holmes v. Town of East Lyme,* 866 F.Supp.2d 108, 133 (D.Conn.2012) ("truth is a complete defense to a claim of defamation"). As for Killiany's contributions to the victim letter, those statements are privileged from a claim of defamation because they were made for the purpose of marshaling the state's evidence for a judicial proceeding. *See Rioux v. Barry,* 283 Conn. 338, 343, 927 A.2d 304 (2007) (public policy justifies immunity from defamation suit for "those who provide information in connection with judicial and quasi-judicial proceedings"); *Kelley v. Bonney,* 221 Conn. 549, 572–74, 606 A.2d 693 (1992) (communications made to discrete group for purpose of marshaling evidence for quasi-judicial proceeding were privileged from defamation suit).

18    The Second Circuit affirmed this court's dismissal of plaintiff's claims against the state's attorneys on the basis of absolute prosecutorial immunity but noted that it was "disturbed by the allegations of prosecutorial conduct" and described the practices as "if not unconstitutional, likely illegal and certainly improper." *Garcia v. Hebert,* No. 09–1615–CV, 352 Fed. Appx. 602 (unpublished), 2009 WL 3765549 (2d Cir. Nov.12, 2009).

19    *See* elements of false arrest and malicious prosecution *supra* at n. 8. To prevail on a claim of abuse of process, a plaintiff must prove that the defendant used a legal process against another primarily to accomplish a purpose for which it was not designed. *Mozzochi v. Beck,* 204 Conn. 490, 494, 529 A.2d 171 (1987).

20    Whether quasi-judicial immunity attaches under the functional approach may be determined by the so-called *Cleavinger* factors:

(a) the need to assure that the individual can perform his functions without harassment or intimidation; (b) the presence of safeguards that reduce the need for private damages actions as a means of controlling unconstitutional conduct; (c) insulation from political influence; (d) the importance of precedent; (e) the adversary nature of the process; and (f) the correctability of error on appeal.

*Cleavinger v. Saxner,* 474 U.S. 193, 202, 106 S.Ct. 496, 88 L.Ed.2d 507 (1985), *cited in Gross v. Rell ("Gross II"),* 695 F.3d 211 (2d Cir.2012).

21    By contrast, court officers are not entitled to quasi-judicial immunity when they perform "purely ministerial and administrative" tasks that are non-judicial in nature or when they act outside the scope of her official duties. *Quitoriano v. Raff & Becker, LLP,* 675 F.Supp.2d 444, 450 (S.D.N.Y.2009). *See, e.g., Forrester v. White,* 484 U.S. 219, 229, 108 S.Ct. 538, 98 L.Ed.2d 555 (1988) (judge not entitled to absolute immunity for decision to demote and fire probation officer); *Atherton v. D.C. Office of Mayor,* 567 F.3d 672, 683–86 (D.C.Cir.2009) (court officer's dismissal of allegedly disruptive grand juror was administrative, not adjudicative, and not subject to absolute quasi-judicial immunity).

---

**End of Document**                              © 2024 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Blue Flag – Appeal Notification

Appeal Filed by Leftridge v. Judicial Branch, 2nd Cir., July 14, 2023

2023 WL 4304792

Only the Westlaw citation is currently available.

United States District Court, D. Connecticut.

Vernon J. LEFTRIDGE, Jr., Plaintiff,

v.

State of Connecticut JUDICIAL
BRANCH et al., Defendants.

No. 3:22-cv-411 (JAM)
|
Signed June 30, 2023

**Attorneys and Law Firms**

Vernon J. Leftridge, Jr., Hagerstown, MD, Pro Se.

Blake Thomas Sullivan, Timothy J. Holzman, State of CT, Office of the Attorney General, Hartford, CT, for Defendants Judicial Branch, Joan Andrews, Cassandra Williams, Andrea Gaines, Steven Samalot, Richard Julius, Carolyn Anderson, David Gage, Leanne Shaughnessy.

Tanya Feliciano DeMattia, State of CT, Office of Attorney General, Hartford, CT, for Defendant Connecticut Department of Social Services.

Bobbi Lynn Wallace, Office of the Attorney General, Baltimore, MD, Timothy J. Holzman, State of CT, Office of the Attorney General, Hartford, CT, for Defendant Alyson Saunders.

### ORDER GRANTING DEFENDANTS'
### MOTIONS TO DISMISS

Jeffrey Alker Meyer, United States District Judge

**\*1** The plaintiff has filed a complaint *pro se* and *in forma pauperis* against the Connecticut Department of Social Services, the Connecticut Judicial Branch, several state court employees, state prosecutors, and other state employees for actions relating to the plaintiff's various child support and child custody cases. For the reasons set forth below, I will grant the defendants' motions to dismiss.

### BACKGROUND

The complaint spans 97 pages—not including 226 pages of exhibits—and numbers 361 paragraphs. [1] Here I recite only those alleged facts that appear relevant to this ruling and I assume these alleged facts to be true solely for purposes of this ruling.

Plaintiff Vernon J. Leftridge is a disabled African American and Native American male. [2] Leftridge has a minor child, R.L., who resides in Maryland, and an adult child, Juwan James Leftridge ("Juwan"), who resides in Maine. [3] His claims in this case revolve around custody and child support orders entered by the state courts of Connecticut and Maryland.

In 2005, Norwich Superior Court Judge Cynthia Sweinton awarded Leftridge primary custody of Juwan. [4] At some point, David Gage, Chief Clerk of New London and Norwich Judicial Districts, along with Norwich Superior Court Deputy Chief Clerks Corinne McCarthy and Cara Parkinson, modified the court order to remove Leftridge's custody award and insert a $50 weekly child support requirement. [5] Leftridge and his attorney were "victims of severe racial discrimination, harassment, racism and unlawfully kicked out" of the Norwich Superior Courthouse by Gage and a Connecticut Assistant Attorney General. [6] The Appellate Court of Connecticut later vacated and remanded Judge Sweinton's order on the ground that Leftridge had not been served with Connecticut's motion to modify the child support obligation. [7] *See Leftridge v. Wiggins*, 44 A.3d 217, 220–21 (Conn. App. 2012).

Fast forward to 2017, when R.L.'s mother, Niambi Kafi Heyward, filed a paternity and support petition in Maryland. [8] Leftridge was not served with Heyward's petition and was not notified of the subsequent hearing. [9] On the date of the hearing, in which Connecticut Assistant Attorney General Andrea Gaines represented the State of Connecticut, Family Magistrate Judge David A. Dee ordered Heyward to file an amended petition. [10] The Hartford Interstate Support Enforcement Supervisor removed the court order from the website of the State of Connecticut Judicial Branch ("Judicial Branch"). [11]

In April 2018, Judge Dee entered a default order for retroactive child support without notifying Leftridge or Heyward. [12] During the course of these proceedings, Gaines appeared *ex parte* before Judge Dee and made numerous misrepresentations. [13] In August 2018, Uniform Interstate Family Support Act ("UIFSA") Support Enforcement Supervisor Richard Julius falsely certified that Leftridge has been served with process in the Heyward action. [14]

 **\*2**  In January 2019, Leftridge asked Gaines for a copy of documents in the Heyward action, but Gaines refused and "became very hostile towards plaintiff in a racially motivated derogatory t[o]ne of voice." [15] Leftridge then filed a misconduct complaint against Gaines with the Connecticut Statewide Grievance Committee, which he followed up with two additional complaints against Gaines. [16]

On May 9, 2019, Family Magistrate Judge Glady I. Nieves modified Leftridge's child support obligations and arrearage to zero because Leftridge became unable to work due to disability. [17] Nieves ordered Gaines and Connecticut Assistant Attorney General Steven Samalot to produce documents relating to the child support proceedings pertaining to Juwan, but they did not do so. [18] Leftridge subsequently served discovery requests on Heyward, who did not complete them because Gaines told her not to. [19] Leftridge also alleges that Gaines and "unknown defendants she involved" "robbed [him] of his favorable May 9, 2019 court ruling." [20]

In September 2019, Family Court Clerk Cassandra Williams, Family Court Clerk Carolyn Anderson, and Gaines disclosed Leftridge's medical records to Judicial Branch employees. [21] Family Court Clerk Manager Leanne Shaughnessy is Williams's and Anderson's supervisor. [22] Leftridge filed requests for electronic access and for information relating to his court records, but the Judicial Branch and Williams denied them. [23]

At a December 2019 hearing before Family Magistrate Judge Donald Green, Gaines, Anderson, and Williams made numerous misrepresentations, withheld documents, and refused to produce witness statements. [24] Leftridge also alleges that Williams, Anderson, and unknown employees modified court records and that Gaines, Williams, and Anderson attempted to have Leftridge "arrested, prosecuted,

and convicted" for not paying his child support. [25] As a result of the hearing, the Connecticut Department of Social Services ("DSS") reported Leftridge's credit information to credit reporting agencies. [26] The day after the hearing, Judge Green's rulings at the hearing were vacated but Judge Nieves's modification of Leftridge's child support obligation to zero was not restored, which Leftridge alleges was because of "continued lies by [Connecticut Assistant Attorney General] Andrews and Anderson." [27]

In September 2021, Leftridge requested family court records from Child Support Specialist Alyson Saunders, an employee of the Maryland Department of Human Services, who denied his requests. [28] In October 2021, Leftridge attended an appeals hearing before Judge Klau and alleges that Andrews once again made misrepresentations to the court. [29] Later that month, Williams denied Leftridge's request for copies of court documents, and Judicial Branch Deputy Chief Clerk Rene L. Roberston returned his motion for review on the ground that it was premature. [30]

 **\*3**  In April 2022, DSS refused to provide Leftridge with documents that form the basis of DSS's negative reports to credit bureaus. [31] DSS also refused to alter the credit information that it reported to credit bureaus. [32]

I previously entered an order to show cause explaining that Leftridge's original complaint did not comply with Rule 8 of the Federal Rule of Civil Procedure. This rule requires that pleadings contain "a short and plain statement of the claim showing that the pleader is entitled to relief" and that "each allegation must be simple, concise, and direct." *See Leftridge v. Jud. Branch*, 2022 WL 867543, at *2–3 (D. Conn. 2022) (quoting Fed. R. Civ. P. 8(a)(2) and 8(d)(1)). I also noted that it was unclear whether Leftridge's original complaint complied with Rule 20's limits on permissive joinder of claims against multiple defendants. *See id.* at *3.

Now Leftridge has filed an amended complaint *pro se* and *in forma pauperis* alleging 26 claims against the following defendants: Assistant Attorney General for the Connecticut Office of the Attorney General Andrea Gaines, Assistant Attorney General Joan Andrews, Assistant Attorney General Steven Samalot, UIFSA Support Enforcement Supervisor Richard Julius, Family Court Clerk Carolyn Anderson, Family Court Clerk Cassandra Williams, Family Court Clerk Manager Leanne Shaughnessy, Maryland

Department of Human Services Child Support Specialist Alyson Saunders, Chief Clerk of New London and Norwich Judicial Districts David Gage, "unknown employees," the Connecticut Department of Social Services, and the State of Connecticut Judicial Branch. [33] Leftridge names all but the last two defendants in their individual and official capacities. [34]

*Counts One and Seventeen.* Leftridge alleges that the defendants deprived him of his Fourteenth Amendment due process rights as enforceable under 42 U.S.C. § 1983. [35]

*Count Two.* Leftridge alleges that the defendants violated the common law by engaging in the spoliation of evidence. [36]

*Count Three.* Leftridge alleges that the defendants engaged in witness tampering, manipulation of court records, and obstruction of court proceedings in violation of the United States Constitution and the Connecticut Constitution. [37] Leftridge does not cite which provision of the United States Constitution the defendants violated, but I will presume that he alleges a violation of his due process rights under the Fourteenth Amendment as enforceable under 42 U.S.C. § 1983.

*Count Four.* Leftridge alleges that the defendants discriminated against him on the basis of his gender and race in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.,* and the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. § 46a–60 *et seq.* [38]

*Count Five.* Leftridge alleges that the defendants discriminated against him on the basis of disability in violation of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq.* [39]

**\*4** *Count Six.* Leftridge alleges that Shaughnessy engaged in negligent supervision of her employees Williams and Anderson. [40]

*Count Seven.* Leftridge alleges that the Judicial Branch denied Leftridge access to public accommodation by denying him electronic access to the court system. [41] Leftridge does not specify the statute the Judicial Branch violated, but I will presume that he alleges a violation of the ADA.

*Count Eight.* Leftridge alleges that the Judicial Branch denied him equal protection under state law. [42]

*Count Nine.* Leftridge alleges that DSS denied him equal protection under the law, violated the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq.,* and violated Title IV-D of the Social Security Act ("SSA"), 42 U.S.C. § 651 *et seq.* [43]

*Counts Ten and Thirteen.* Leftridge alleges that the defendants violated the FCRA and state tort law, and that they discriminated against him on the basis of his age. [44] Leftridge does not specify which law the defendants violated in discriminating on the basis of age, but I will presume that he alleges a violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*

*Count Eleven.* Leftridge alleges that the defendants violated his First Amendment right to freedom of speech as enforceable under 42 U.S.C. § 1983. [45]

*Count Twelve.* Count Twelve is titled "pendent cause of action" and repeats several causes of action already alleged in prior counts. It also alleges that the defendants committed extortion and violated section 504 of the Rehabilitation Act of 1973 ("RA"), 29 U.S.C. § 794. [46]

*Count Fourteen.* Leftridge alleges that the defendants violated the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq.* [47]

*Count Fifteen.* Leftridge alleges that the defendants violated the "Consumer Fraud Act." [48] There is no federal statute by that name. Accordingly, I will assume he is trying to allege a claim under Connecticut's consumer-fraud statute: the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42–110a *et seq.*

*Count Sixteen.* Leftridge alleges that the defendants violated the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq.* [49]

*Count Eighteen.* Leftridge alleges that the defendants violated the Fourth Amendment as enforceable under 42 U.S.C. § 1983 by prosecuting him without probable cause. [50]

**\*5** *Count Nineteen.* Leftridge alleges that the defendants violated § 1983 by failing to intervene in the deprivation of his constitutional rights.[51]

*Count Twenty.* Leftridge alleges that the defendants violated § 1983 by conspiring to deprive him of his civil rights.[52]

*Count Twenty-One.* Leftridge alleges that the Judicial Branch and DSS promulgated policies that resulted in the violation of Leftridge's constitutional rights.[53]

*Count Twenty-Two.* Leftridge alleges that the defendants maliciously prosecuted him.[54]

*Count Twenty-Three.* Leftridge alleges that the defendants engaged in intentional infliction of emotional distress.[55]

*Count Twenty-Four.* Leftridge alleges that the defendants conspired to deprive him of his rights in violation of state law.[56]

*Count Twenty-Five.* Leftridge alleges that the supervisor defendants are liable for the misconduct of their employees under the principle of *respondeat superior.*[57]

*Count Twenty-Six* (mislabeled as Count Twenty). Leftridge alleges that the government agencies of which the defendants are members are obligated to indemnify their employees and agents for their torts.[58]

Leftridge seeks compensatory and punitive damages, injunctive and declaratory relief, and attorney's fees and costs.[59] The defendants have moved to dismiss all of Leftridge's claims.[60] For the reasons set forth below, I will grant the defendants' motions.

## DISCUSSION

The standard that governs a motion to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) is well established. A complaint may not survive unless it alleges facts that, taken as true, give rise to plausible grounds to sustain the Court's subject-matter jurisdiction as well as the plaintiff's grounds for relief. *See Brownback v. King,* 141 S. Ct. 740, 749 (2021); *Ashcroft v. Iqbal,* 556 U.S. 662,

678 (2009).[61] The Court must "accept as true all factual allegations and draw from them all reasonable inferences," but it is "not required to credit conclusory allegations or legal conclusions couched as factual allegations." *Hernandez v. United States,* 939 F.3d 191, 198 (2d Cir. 2019).

The Court must read the allegations of a *pro se* complaint liberally to raise the strongest arguments that they suggest. *See Meadows v. United Servs., Inc.,* 963 F.3d 240, 243 (2d Cir. 2020) (*per curiam*). Notwithstanding the rule of liberal interpretation of a *pro se* complaint, a complaint may not survive dismissal if its factual allegations do not meet the basic plausibility standard. *See ibid.*

### *Federal claims against DSS, the Judicial Branch, and the individual defendants in their official capacities*

**\*6** DSS and the Judicial Branch are agencies of the State of Connecticut, and the individual defendants are employees of various state agencies. The Eleventh Amendment and related principles of state sovereign immunity generally divest the federal courts of subject matter jurisdiction over lawsuits by private citizens against the States, state government entities, and state government officials in their official capacities. *See generally Lewis v. Clarke,* 137 S. Ct. 1285, 1290–91 (2017); *T.W. v. N.Y. State Bd. of L. Examiners,* 996 F.3d 87, 92 (2d Cir. 2021). "The Eleventh Amendment, however, is not without exception." *We the Patriots USA, Inc. v. Conn. Off. of Early Childhood Dev.,* 579 F. Supp. 3d 290, 300 (D. Conn. 2022). "Congress may abrogate a state's immunity by statute, a state may waive its immunity, or a state official may be sued in his or her official capacity under the *Ex Parte Young* doctrine." *Ibid.* (citing *In re Deposit Ins. Agency,* 482 F.3d 612, 617 (2d Cir. 2007)); *see also Ex parte Young,* 209 U.S. 123 (1908).

I will dismiss Leftridge's claims alleging violations of 42 U.S.C. § 1983, the FCRA, the FDCPA, SSA Title IV-D, the TILA, and the ADEA because they do not fall within any exception to Eleventh Amendment sovereign immunity. First, Congress has not abrogated Eleventh Amendment immunity for claims arising under 42 U.S.C. § 1983, the FCRA, the FDCPA, SSA Title IV-D, and TILA. *See Quern v. Jordan,* 440 U.S. 332, 340–45 (1979) (§ 1983); *Badger v. CUNY Graduate Ctr.,* 2023 WL 35223, at \*5 (S.D.N.Y. 2023) (citing, *inter alia, Seminole Tribe of Fla. v. Florida,* 517 U.S. 44, 59 (1996)) (FCRA); *Banks v. ACS Educ.,* 638 F. App'x 587, 589 (9th Cir. 2016) (citing 15 U.S.C. § 1692a(6)(C)) (FDCPA); *Parent v. New York,* 786 F. Supp. 2d 516, 531 (N.D.N.Y. 2011) (SSA Title IV-D), *aff'd,* 485 F. App'x 500 (2d Cir. 2012); *Patel v.*

*Univ. of Md. Coll. Park*, 2023 WL 2023264, at *4 (D. Md. 2023) (citing, *inter alia*, 15 U.S.C. § 1612(b)) (TILA). The Supreme Court has rejected Congress's attempt to abrogate state sovereign immunity under the ADEA. *See Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 66–67 (2000). Nor has Leftridge alleged that Connecticut has waived its immunity with respect to any of these laws. *Cf. Cohen v. Postal Holdings, LLC*, 873 F.3d 394, 400 (2d Cir. 2017) ("[T]he plaintiff bears the burden of establishing that her claims fall within an applicable waiver.").

Finally, the *Ex parte Young* exception, which permits prospective injunctive and declaratory relief against state officials, does not apply. To invoke *Ex parte Young*, a plaintiff must "(a) allege[ ] an ongoing violation of federal law and (b) seek[ ] relief properly characterized as prospective." *In re Deposit Ins. Agency*, 482 F.3d at 618. Leftridge's claims arise out of alleged actions taken by the defendants in 2005, 2017–2019, and 2021–2022, but Leftridge does not state what, if any, actions of the defendants constitute ongoing violations of his federal rights. Nor does his request for injunctive relief —blanket requests that the Court order the defendants to "fully comply" with various federal laws—shed light on the matter. [62]

As best I can discern, the only ongoing harm Leftridge alleges is DSS's refusal to alter the credit information it reports to credit bureaus. But the *Ex parte Young* exception to state sovereign immunity "has no application in suits against the States and their agencies." *Silva v. Farrish*, 47 F.4th 78, 84 (2d Cir. 2022). And in any event, an injunction must "be 'more specific than a simple command that the defendant obey the law.' " *L.V.M. v. Lloyd*, 318 F. Supp. 3d 601, 620 (S.D.N.Y. 2018) (quoting *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 144 (2d Cir. 2011)).

*7 For example, in *Burns v. Rovella*, 2020 WL 12863774 (D. Conn. 2020), the Court denied a plaintiff's "request[ ] that this court 'prohibit[ ] defendants from denying his rights protected by the [Family and Medical Leave Act],' and 'denying him his rights ... [under] the Fourteenth Amendment Due Process clause of the United [S]tates Constitution." *Id.* at *12. The Court reasoned that "[t]hese are simply requests that the court command the defendant to obey the law, and therefore, are insufficient to seek injunctive relief." *Ibid.* Like the plaintiff in *Burns*, the injunctive relief Leftridge seeks—a court order that defendants obey the law—does not give rise to a valid claim for injunctive relief.

The same goes for Leftridge's request for declaratory relief in the form of a "declar[ation] that the acts of the Defendants alleged in applicable Counts with respect to the acts, policies, practices, and customs deprived Plaintiff of federal rights." [63] "Courts are not obliged to entertain actions for declaratory judgment not seeking prospective relief but merely declaring past wrongs." *Huminski v. Connecticut*, 2015 WL 1650845, at *5 (D. Conn. 2015). Leftridge's request for declaratory relief "asks the Court only to recognize a past wrong, which, in the context of declaratory relief, does not in itself 'amount to that real and immediate threat of injury necessary to make out a case or controversy.' " *Morales v. City of New York*, 59 F. Supp. 3d 573, 581 (S.D.N.Y. 2014) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983)); *see also H.B. v. Byram Hills Cent. Sch. Dist.*, 648 F. App'x 122, 125 (2d Cir. 2016) ("[T]he requested declaratory relief is aimed at past conduct, a target that is impermissible."). In short, Leftridge is not entitled to declaratory relief that would fall within the *Ex parte Young* exception to Eleventh Amendment immunity.

Given that no exception to Eleventh Amendment immunity applies, I will dismiss Leftridge's claims arising under § 1983, the FCRA, the FDCPA, SSA Title IV-D, the TILA, and the ADEA with respect to the agency defendants and the individual defendants in their official capacities.

The defendants further argue that Eleventh Amendment immunity also bars Leftridge's ADA claims. [64] They cite *Hamzik v. Office for People with Developmental Disabilities*, 859 F. Supp. 2d 265, 276 (N.D.N.Y. 2012) and *Board of Trustees of University of Alabama v. Garrett*, 531 U.S. 356, 374 (2001), for the proposition that Title I did not abrogate the states' sovereign immunity. [65] But Title I of the ADA applies to disability discrimination by employers, *see* 42 U.S.C. § 12112(a), and Leftridge does not allege that he was employed by any of the entities involved in the lawsuit. As for Title II, which forbids discrimination by public services, programs, and activities, *see id.* § 12132, the extent to which Congress has abrogated the states' sovereign immunity remains unclear after the Supreme Court's decision in *United States v. Georgia*, 546 U.S. 151 (2006), which held that "insofar as Title II creates a private cause of action for damages against the States for conduct that *actually* violates the Fourteenth Amendment, Title II validly abrogates state sovereign immunity." *Id.* at 159. *See Schmiege v. New York*, 2022 WL 16922123, at *3 n.6 (W.D.N.Y. 2022) ("Since *Georgia*, courts in this Circuit have taken different approaches

when faced with the question of whether Congress has validly abrogated sovereign immunity under Title II.").[66]

**\*8** But "the Court need not wade into these turbulent constitutional waters." *Matagrano v. N.Y. State Dep't of Corr. & Cmty. Supervision*, 2020 WL 7338586, at \*18 (N.D.N.Y. 2020). The state entity bears the burden of demonstrating that Eleventh Amendment immunity applies. *See Woods v. Rondout Valley Cent. Sch. Dist. Bd of Educ.*, 466 F.3d 232, 237 (2d Cir. 2006). Because the defendants make no argument and cite no law regarding Title II of the ADA, they have not carried their burden and I will consider Leftridge's ADA claims on the merits. I will similarly consider the merits of Leftridge's claims arising under the Rehabilitation Act and Title VII because the defendants do not contest that Congress waived the states' sovereign immunity for these two statutes. *See* 42 U.S.C. § 2000d–7 ("A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of section 504 of the Rehabilitation Act of 1973."); *Fin. Oversight & Mgmt. Bd. for Puerto Rico v. Centro de Periodismo Investigativo, Inc.*, 143 S. Ct. 1176, 1178 (2023) ("Title VII of the Civil Rights Act abrogates the immunity of "governments" and "governmental agencies" from all actions it authorizes.") (citing 42 U.S.C. §§ 2000e(a)–(b)).

I will begin with Leftridge's ADA and Rehabilitation Act claims. "[F]or a plaintiff to establish a *prima facie* violation under these Acts, she must demonstrate (1) that she is a qualified individual with a disability; (2) that the defendants are subject to one of the Acts; and (3) that she was denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or was otherwise discriminated against by defendants, by reason of her disability." *Powell v. Nat'l Bd. of Med. Examiners*, 364 F.3d 79, 85 (2d Cir.), *opinion corrected on other grounds*, 511 F.3d 238 (2d Cir. 2004).

Leftridge's complaint fails to state a claim under the ADA or the Rehabilitation Act because it does not allege that he was discriminated against because of his disability. Leftridge's claims center on the defendants' "denying equal access to electronic filing, public accommodations and access to Judicial Branch state government' programs and services that was critical to plaintiff being able to file pleadings electronically for his defense of, and presentation of, his case in the Family Support Court."[67] But "[Leftridge's] complaint contains no plausible allegations that ... the Defendants' actions were taken *by reason* of his [disability], or even that

they were *aware* of his [disability]." *Barone v. Lawyers' Fund for Client Prot.*, 2023 WL 1975783, at \*2 (2d Cir. 2023). Without more, Leftridge fails to state a claim under the ADA, *see ibid.*, or the Rehabilitation Act, *see Harris v. Mills*, 572 F.3d 66, 75 (2d Cir. 2009).

Leftridge's Title VII claim fails as well. Title VII makes it "an unlawful employment practice for an employer ... to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a). "Consequently, the existence of an employer-employee relationship is a primary element of Title VII claims." *Gulino v. N.Y. State Educ. Dep't*, 460 F.3d 361, 370 (2d Cir. 2006). Because Leftridge does not allege that he had an employment relationship with any of the defendants, his Title VII claim fails. *See, e.g.*, *Pandozy v. Tobey*, 335 F. App'x 89, 91 (2d Cir. 2009) ("[Plaintiff's] complaint fails to state a cause of action under Title VII, since he does not allege an employer-employee relationship between himself and any of the Defendants.").

**\*9** Accordingly, I will dismiss Leftridge's claims arising under the ADA, the Rehabilitation Act, and Title VII with respect to the agency defendants and the individual defendants in their official capacities. Having already dismissed Leftridge's claims arising under § 1983, the FCRA, the FDCPA, SSA Title IV-D, the TILA, and the ADEA with respect to the agency defendants and the individual defendants in their official capacities, I will turn to Leftridge's claims against the individual defendants in their individual capacities.

### Federal claims against the individual defendants in their individual capacities

The individual defendants filed motions to dismiss Leftridge's individual-capacity claims on various grounds.[68] For the reasons set forth below, I will grant their motions.

Defendants Anderson, Williams, Shaughnessy, and Gage are state court clerks or supervisors of state court clerks. Defendant Julius is a UIFSA Support Enforcement Supervisor who Leftridge alleges had falsely certified that Leftridge had been served in the 2017 paternity and support action brought by Heyward.

"Courts have extended the absolute judicial immunity afforded judges to individuals, such as prosecutors and witnesses, who perform functions closely associated with the judicial process." *Rodriguez v. Weprin*, 116 F.3d 62, 66 (2d Cir. 1997). "[A]cts arising out of, or related to, individual cases before the judge" are entitled to absolute quasi-judicial immunity because they are considered "judicial in nature." *Bliven v. Hunt*, 579 F.3d 204, 210 (2d Cir. 2009). The relevant inquiry "is the nature and function of the act, not the act itself." *Mireles v. Waco*, 502 U.S. 9, 13 (1991). "A defendant entitled to quasi-judicial immunity loses that privilege only if she acts 'in the clear absence of all jurisdiction.' " *Finn v. Anderson*, 592 F. App'x 16, 19 (2d Cir. 2014) (quoting *Stump v. Sparkman*, 435 U.S. 349, 356–57 (1978)). That a defendant is alleged to have acted erroneously, maliciously, dishonestly, in bad faith, or in excess of her authority does not undermine quasi-judicial immunity. *See ibid.*; *Mireles*, 502 U.S. at 11.

For example, in *Leftridge v. Support Enforcement Services*, 2013 WL 1947174 (D. Conn. 2013), the Court determined that quasi-judicial immunity barred Leftridge's claims against Support Enforcement Officers and court employees for actions related to Leftridge's child custody and child support proceedings "since all of the allegations asserted against these defendants pertain to their performance of official duties integral to the judicial process." *Id.* at *6; *see also Skipp v. Conn. Jud. Branch*, 2015 WL 1401989, at *8 (D. Conn. 2015) ("As all of the challenged actions of court employees were taken in relation to plaintiff's divorce and custody proceedings, the court employees and agents are immune from a claim for money damages.").

Leftridge does not allege that Anderson, Williams, Shaughnessy, Gage, or Julius acted in the clear absence of all jurisdiction. Instead, all of their alleged actions arose out of or related to Leftridge's child support and child custody proceedings before Judge Sweinton, Judge Dee, Judge Nieves, Judge Green, and Judge Klau. Accordingly, quasi-judicial immunity bars Leftridge's claims against these five defendants.

The state prosecutor defendants—Gaines, Andrews, and Samalot—are entitled to absolute immunity as well. "Prosecutors are entitled to absolute immunity with respect to their prosecutorial functions, which include their actions as advocates and when their conduct involves the exercise of discretion." *Bouchard v. Olmsted*, 775 F. App'x 701, 703 (2d Cir. 2019). For example, in *Barrett v. United States*, 798 F.2d 565 (2d Cir. 1986), the Second Circuit held that an

Assistant Attorney General, "representing [the] state as its attorney" in state court, was entitled to absolute immunity. *Id.* at 573. According to the Court, "[t]he fact that [the attorney] may or may not have engaged in questionable or harmful conduct during the course of his representation of the State in that litigation is irrelevant. The immunity attaches to his function, not to the manner in which he performed it." *Ibid.*; *see also Contreras v. Perimenis*, 562 F. App'x 50, 51 (2d Cir. 2014) (affirming district court's finding that Assistant Attorney General for the Connecticut Department of Children and Families "was entitled to absolute immunity because he was sued in his capacity as a government advocate prosecuting child welfare cases").

**\*10** And again, in *Leftridge v. Support Enforcement Services.*, 2013 WL 1947174, the Court determined that absolute immunity barred Leftridge's claims concerning "assistant attorney generals' conduct in carrying out their jobs as assistant attorney generals." *Id.* at *6; *see also Coke v. Samalot*, 2021 WL 4034168, at *7 (D. Conn. 2021) ("As an Assistant Attorney General, Mr. Samalot has immunity while serving in his function as an advocate for the state.").

As with the court-affiliated defendants, Leftridge's allegations regarding Gaines, Andrews, and Samalot pertain exclusively to their roles in Leftridge's child support and child custody proceedings. Absolute prosecutorial immunity thus bars Leftridge's claims against these three defendants.

I turn next to Leftridge's claims against defendant Saunders. Saunders is a Child Support Specialist employed by the Maryland Department of Human Services who Leftridge alleges refused his requests for family court records.

Saunders has moved to dismiss in part for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b) (2). [69] A court lacks personal jurisdiction over an out-of-state defendant if the defendant is not subject under state law to the "long-arm" jurisdiction of the courts of that State, or if exercise of jurisdiction over the defendant would not comport with constitutional principles of fairness and due process. *See U.S. Bank Nat'l Ass'n v. Bank of Am. N.A.*, 916 F.3d 143, 149 (2d Cir. 2019); *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 327 (2d Cir. 2016). "[T]he plaintiff bears the burden of establishing personal jurisdiction over the defendant." *MacDermid, Inc. v. Deiter*, 702 F.3d 725, 727 (2d Cir. 2012). "Prior to trial, however, when a motion to dismiss for lack of jurisdiction is decided on the basis of affidavits and other written materials, the plaintiff need only make a

*prima facie* showing." *Ibid.* "The allegations in the complaint must be taken as true to the extent they are uncontroverted by the defendant's affidavits," *ibid.*, but the Court may dismiss for lack of personal jurisdiction when the plaintiff "failed to controvert the defendants' affidavits showing that the court lacked personal jurisdiction," *Emiabata v. Seton Healthcare Fam.*, 2021 WL 4256846, at *2 (2d Cir. 2021).

Under Connecticut's long-arm statute, "a court may exercise personal jurisdiction over any non-resident individual ... who in person or through an agent ... commits a tortious act outside the state causing injury to a person or property within the state ... if such person or agent (A) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or (B) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce." Conn. Gen. Stat. § 52–59b(a). The statute also extends to any person or agent who "uses a computer ... or a computer network ... located within the state." *Ibid.*

Saunders has attached to her motion an affidavit stating that she has been a Maryland resident since 2003, she has worked as a Maryland state employee for the Montgomery County Office of Child Support for the past 15 years, she has never transacted or solicited business in Connecticut, she does not engage in any persistent course of conduct or derive substantial revenue from goods used or consumed or services rendered in Connecticut, and she does not use a computer or computer network in Connecticut. [70]

 **\*11**  To make out a *prima facie* case, a plaintiff must plead "non-conclusory fact-specific allegations or evidence showing that activity that constitutes the basis of jurisdiction has taken place." *Chirag v. MT Marida Marguerite Schifffarts*, 604 F. App'x 16, 19 (2d Cir. 2015). Leftridge has not done so. Saunders and Leftridge are Maryland residents, and all of Saunders's alleged actions took place in Maryland in her capacity as an employee for the Maryland Department of Human Services. [71] Moreover, Leftridge does not controvert Saunders's affidavit. He does not allege, even in conclusory fashion, that Saunders satisfies prong (A) or (B) of § 52–59b(a), that Saunders uses a computer or computer network in Connecticut, or that Saunders's actions otherwise satisfy Connecticut's long-arm statute. Because there is no statutory long-arm jurisdiction over Saunders, I need not

consider whether exercising jurisdiction over Saunders would be consistent with constitutional due process.

Even if the Court had personal jurisdiction over Saunders, dismissal would nonetheless be proper because Leftridge does not state a plausible claim for relief under Federal Rule of Civil Procedure 12(b)(6) and because the complaint does not comply with Rule 8's pleading requirements. Leftridge's only allegations against Saunders—appearing in 3 of the complaint's 361 paragraphs—are that Saunders refused to provide him with family court records. Leftridge does not explain how Saunders's conduct violated state or federal law. Indeed, none of the 26 counts in his complaint mention Saunders at all. Instead, some counts mention defendants other than Saunders, and the remaining counts refer collectively to the "Defendants," of whom there are at least 11.

Drafting a complaint in this way runs afoul of Rule 8's requirement that each defendant have "fair notice of what the plaintiff's claim is and the ground upon which it rests." *Mohammad v. N.Y. State Higher Educ. Servs. Corp.*, 422 F. App'x 61, 62–63 (2d Cir. 2011); *see also* Fed. R. Civ. P. 8(a) ("A pleading that states a claim for relief must contain ... (2) a short and plain statement of the claim showing that the pleader is entitled to relief."). A complaint does not satisfy Rule 8 "[b]y lumping all the defendants together in each claim and providing no factual basis to distinguish their conduct." *Atuahene v. City of Hartford*, 10 F. App'x 33, 34 (2d Cir. 2001); *see also* *Jackson v. Bank of Am., N.A.*, 898 F.3d 1348, 1356 (11th Cir. 2018) (affirming dismissal of "shotgun pleading" complaint on Rule 8 grounds where it was "nearly impossible for Defendants and the Court to determine with any certainty which factual allegations give rise to which claims for relief"). Because the Court lacks personal jurisdiction over Saunders and Leftridge does not state a plausible or Rule-8-compliant claim for relief against her, I will grant Saunders's motion to dismiss.

In sum, I will grant the individual defendants' motions to dismiss Leftridge's claims against them in their individual capacities. With no federal claims remaining against the defendants in either their individual or official capacities, the Court finds it unnecessary to address the defendants' additional arguments for dismissal on grounds of qualified immunity, litigation privilege, the *Rooker-Feldman* doctrine, or improper service of process.

### Federal claims against unknown employees

Leftridge mentions "unknown employees" at various points in his complaint, whom he identifies as either employees of the Judicial Branch or the Executive Branch of Connecticut. [72] As explained above, Rule 8 requires that the complaint gives each defendant "fair notice of what the plaintiff's claim is and the ground upon which it rests." *Mohammad*, 422 F. App'x at 62–63. Naming "unknown employees" or "unknown defendants" does not comply with Rule 8's fair notice requirement where, as here, the allegations are so vague as to make it impossible to identify them. *See, e.g.*, *Matthews v. NYPD*, 2023 WL 3505634, at *1–2 (S.D.N.Y. 2023)* (dismissing *pro se* complaint against "unknown employees" because "Plaintiff's complaint does not include allegations about 'unknown employees' that are sufficient to put them or the Court on notice of her claims against them. She also does not plead facts that are sufficient to identify such Defendants."); *Ritchie v. N. Leasing Sys., Inc.*, 14 F. Supp. 3d 229, 237 (S.D.N.Y. 2014) ("Although courts sometimes allow plaintiffs to plead causes of action against a 'John Doe' defendant where a plaintiff does not know the defendant's identity, they ultimately require plaintiffs, under Rule 8(a), to allege specific facts that would aid in identifying the defendant and thereby allow defendants to prepare a defense.").

 **\*12**  In any event, there are no freestanding allegations of wrongdoing by the unknown employees. All mentions of unknown employees are tacked on to allegations against other employees of the Judicial Branch and the Office of the Connecticut Attorney General. Having already concluded that all claims against the named employees fail, I will dismiss the claims against the unknown employees on the same grounds. *See, e.g.*, *Gabriel Cap., L.P. v. Natwest Fin., Inc.*, 137 F. Supp. 2d 251, 269–70 (S.D.N.Y. 2000) ("I assume ... that the theory of liability [against the John Doe defendants] is the same as that pled against [named defendants]. As these claims have been dismissed, there is no reason to allow the [complaint] to stand against the Does. Therefore, the claims against John Does 1 through 50 are also dismissed.").

*State law claims*

Having dismissed Leftridge's federal law claims, I turn to his state law claims. Leftridge argues that the Court has diversity jurisdiction over his state law claims because "[t]he plaintiff[ ] and some of the defendants to this case live in the State of Maryland." [73] *See* 28 U.S.C. § 1332 (federal diversity jurisdiction statute). But diversity jurisdiction exists only if there is "complete" diversity among the opposing parties—in other words, only if the plaintiff is a citizen of a different state than all of the defendants. *See Wis. Dep't of Corr. v. Schacht*, 524 U.S. 381, 388 (1998); *Strawbridge v. Curtis*, 3 Cranch 267 (1806) (Marshall, C.J.). And as explained above, both Saunders and Leftridge are Maryland residents. In the absence of federal diversity jurisdiction, and because there are no facially plausible federal claims against the defendants, I conclude that the state courts of Connecticut are best positioned to address Leftridge's state law claims. *See* 28 U.S.C. § 1367(c)(3); *Lundy v. Catholic Health Sys. of Long Island Inc.*, 711 F.3d 106, 117–18 (2d Cir. 2013); *Williams v. Katz*, 2022 WL 3646200, at *6 (D. Conn. 2022). Accordingly, I decline to exercise supplemental jurisdiction over Leftridge's state law claims, which I will dismiss without prejudice to Leftridge's right to seek any relief that may be available in state court.

### CONCLUSION

For the reasons set forth above, the Court GRANTS the defendants' motions to dismiss (Doc. #81, Doc. #123). In light of the granting of the motions to dismiss, the Court DENIES as moot all other pending motions (Docs. #136, #138, #140, and #150).

It is so ordered.

### All Citations

Slip Copy, 2023 WL 4304792

### Footnotes

1       *See* Doc. #18.

2       *Id.* at 3 (¶¶ 6–7).

3   *Id.* at 8 (¶¶ 20, 22).

4   *Ibid.* (¶ 25).

5   *Id.* at 8–11 (¶¶ 25–30, 34).

6   *Id.* at 10 (¶ 33). Leftridge does not specify the name of the Assistant Attorney General.

7   *Id.* at 39 (¶ 153).

8   *Id.* at 11 (¶ 35).

9   *Id.* at 12–13 (¶¶ 41–42).

10  *Id.* at 12 (¶¶ 38–39).

11  *Ibid.* (¶ 40). Leftridge does not specify the name of the Hartford Interstate Support Enforcement Supervisor.

12  *Id.* at 13 (¶ 43).

13  *Id.* at 12–15 (¶¶ 38–50).

14  *Id.* at 16 (¶¶ 55–57).

15  *Id.* at 18 (¶ 64).

16  *Ibid.* (¶ 64).

17  *Id.* at 21–22 (¶¶ 81–85).

18  *Id.* at 22 (¶¶ 87–88).

19  *Id.* at 25–27 (¶¶ 98, 102–03), 36 (¶ 141).

20  *Id.* at 56 (¶ 219).

21  *Id.* at 28–29 (¶¶ 109, 111).

22  *Id.* at 38 (¶ 150).

23  *Id.* at 29–30 (¶¶ 113, 118), 32 (¶ 124).

24  *Id.* at 32–36 (¶¶ 125–31, 137–39), 50–55 (¶¶ 191–204, 210, 212–17).

25  *Id.* at 34 (¶ 133), 40 (¶¶ 156–58), 53–54 (¶¶ 205, 207, 211), 56 (¶ 218).

26  *Id.* at 34 (¶ 132).

27  *Id.* at 34–35 (¶ 134), 37 (¶ 144).

28  *Id.* at 41–42 (¶¶ 162–64).

29  *Id.* at 44–45 (¶¶ 170–72).

30  *Id.* at 45 (¶¶ 173–74).

31    *Id.* at 47–48 (¶ 181).

32    *Id.* at 48 (¶ 182).

33    *Id.* at 1; *see id.* at 3–7 (¶¶ 9–19) (defendants' full names and positions); *id.* at 61–94 (¶¶ 237–361) (causes of action).

34    *Id.* at 1.

35    *Id.* at 61 (¶¶ 237–39), 75–80 (¶¶ 285–304).

36    *Id.* at 61 (¶¶ 240–42).

37    *Id.* at 61–62 (¶¶ 243–45).

38    *Id.* at 62–63 (¶¶ 246–48).

39    *Id.* at 63–64 (¶¶ 249–51).

40    *Id.* at 64–67 (¶¶ 252–54).

41    *Id.* at 67–68 (¶¶ 255–57).

42    *Id.* at 68 (¶¶ 258–60).

43    *Id.* at 68–69 (¶¶ 261–63).

44    *Id.* at 69–70 (¶¶ 264–66), 72–73 (¶¶ 273–75). Count Ten also alleges that the defendants violated the ADA, the Civil Rights Act of 1964, and the Connecticut Fair Employment Practices Act—allegations that are duplicative of the allegations in Counts Four and Five.

45    *Id.* at 70–71 (¶¶ 267–69).

46    *Id.* at 71–72 (¶¶ 270–72).

47    *Id.* at 73 (¶¶ 276–78).

48    *Id.* at 73–74 (¶¶ 279–81).

49    *Id.* at 74–75 (¶¶ 282–84).

50    *Id.* at 79–80 (¶¶ 297–304). Count Eighteen also alleges that the defendants deprived him of his Fourteenth Amendment due process rights as enforceable under 42 U.S.C. § 1983—an allegation that is duplicative of the allegations in Counts One, Three, and Seventeen.

51    *Id.* at 80–82 (¶¶ 305–12).

52    *Id.* at 82–83 (¶¶ 313–19).

53    *Id.* at 83–89 (¶¶ 320–40). Count Twenty-One also mentions policies of three additional agencies—the Maryland Department of Human Services, Montgomery Count Office; the Office of the Connecticut Attorney General; and the Connecticut Interstate Government UIFSA Department—but the complaint does not name these agencies as defendants. *See ibid.*

54    *Id.* at 89–91 (¶¶ 341–46).

55    *Id.* at 91 (¶¶ 347–49).

56    *Id.* at 91–92 (¶¶ 350–54).

57    *Id.* at 92–93 (¶¶ 355–57).

58    *Id.* at 93–94 (¶¶ 358–61).

59    *Id.* at 94–96.

60    Doc. #81; Doc. #123.

61    Unless otherwise indicated, this order omits internal quotation marks, alterations, citations, and footnotes in text quoted from court decisions.

62    Doc. #18 at 95–96.

63    *Id.* at 95 (¶ 8).

64    Doc. #81-1 at 8–9; Doc. #123-1 at 15–16.

65    Doc. #81-1 at 8–9.

66    To the extent Leftridge alleges that the defendants violated Title *III* of the ADA, Leftridge fails to state a claim because "Title III is not applicable to public entities." *Morales v. New York*, 22 F. Supp. 3d 256, 266–67 (S.D.N.Y. 2014) (citing cases).

67    Doc. #18 at 63–64 (¶ 250). Leftridge does not explain what acts the defendants took that violate the RA, but the Court takes them to be the same as those acts that Leftridge alleges violated the ADA. *Cf. Paystrup v. Benson*, 2015 WL 506682, at *11 (D. Utah 2015) (assuming plaintiff's RA claim to be "based on the same actions as the ADA claims" where it was unclear which of defendants' actions were alleged to violate the RA).

68    Doc. #81 at 10–22, Doc. #123 at 9–15, 17–22.

69    Doc. #123 at 11–14.

70    Doc. #123-3 at 1–2 (¶¶ 1–2, 5).

71    *See* Doc. #18-1 at 1, 7; Doc. #137 at 9 (Leftridge's opposition to defendants' motion to dismiss stating that "[t]he plaintiff[ ] ... live[s] in the State of Maryland").

72    Doc. #18 at 58 (¶¶ 225–26).

73    Doc. #137 at 9.

---

**End of Document**                                     © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 4207907
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Keston BRAITHWAITE, Plaintiff,

v.

Frank TROPEA, Clerk of Court, County
Court, Suffolk County; Honorable John B.
Collins, Justice Supreme Court; and Susan
Conner, Senior Court Reporter, Defendants.

23-CV-1431(JS)(AYS)
|
Signed June 27, 2023

**Attorneys and Law Firms**

For Plaintiff: Keston Braithwaite, pro se, 22B4593, Sing Sing
Correctional Facility, 354 Hunter Street, Ossinig, New York
10562.

For Defendants: No appearance.

MEMORANDUM AND ORDER

SEYBERT, District Judge:

 **\*1** By Order dated March 2, 2023 (the "Order"), the
Court granted the Application to Proceed in District Court
Without Paying Fees or Costs (Application, ECF No. 2)
filed by incarcerated Plaintiff Keston Braithwaite ("Plaintiff")
together with his pro se Complaint (Compl., ECF No. 1). [1]
(See Order, ECF No. 9.) The Complaint is brought pursuant to
42 U.S.C. § 1983 ("Section 1983") against Frank Tropea, the
Clerk of the Court, County Court Suffolk County ("Tropea"),
Honorable John B. Collins ("Judge Collins"), and Susan
Conner, [2] Senior Court Reporter ("Conner"; collectively, the
"Defendants").

Upon review of Plaintiff's Complaint (ECF No. 1) in
accordance with 28 U.S.C. § 1915A(a), the Court finds
that Plaintiff has not alleged a plausible claim for relief.
Accordingly, for the reasons that follow, the Complaint is
DISMISSED WITH PREJUDICE pursuant to 28 U.S.C. §
1915A(b). Given the dismissal of the Complaint, Plaintiff's
motion seeking a preliminary injunction (ECF No. 4) is
DENIED.

RELEVANT BACKGROUND AND
SUMMARY OF THE COMPLAINT

Plaintiff is a prolific filer in this Court; excluding the instant
action, since January 2022, he has filed eight unsuccessful pro
se in forma pauperis complaints relating to his arrest and state
court criminal prosecution. See Braithwaite v. Gaitman, No.
22-CV-0974, 2022 WL 14059127, at \*1 n.2 (E.D.N.Y. Oct.
24, 2022) (identifying those eight other actions). In his present
Section 1983 Complaint, which relates to his arrest and state
court criminal prosecution, [3] Plaintiff asserts that: (1) (a) even
though Plaintiff requested specific documents and his entire
state-court file from May 5, 2022 from the County Court, (b)
the County Court responded to Plaintiff's request indicating
those documents were available, consisted of 220 pages, and
would cost $143 to copy, and (c) Plaintiff submitted the $143
copying fee (as a money order), Tropea failed to turn over the
requested copies of Plaintiff's state-court file (see Compl. at
ECF pp. 5-7, 11-12); (2) thereafter, "Tropea chose to forward
Plaintiff's $143 money order to Judge John B. Collins" (id.
at ECF p. 16); (3) in turn, Judge Collins returned Plaintiff's
$143 money order to Plaintiff's defense attorney in open court
"to block Plaintiff from inspecting his Court file" (id. at ECF
pp. 9, 12); and (4) on July 5, 2022, Plaintiff's defense attorney
handed Plaintiff a partial copy of his state-court file, which
did not include filings made prior to June 2022 (see id.; see
also id. at ECF p. 16), and which Plaintiff believes was done
under Tropea's and Judge Collin's directives (see id. at ECF
p. 15).

 **\*2** As to Conner, Plaintiff alleges: "Conner[ ] deliberately
[sic] falsified documents for the District Attorney of Suffolk
County and Judge Collins to hinder Plaintiff's appeal," (id. at
ECF p. 16), to wit, "Conner[ ]chose not to record Plaintiff's
Statement 'Ping Data' in favor for her colleagues [sic] Jacob
Kubetz [the Assistant District Attorney] and Judge Collins."
(Id. at ECF p. 18.) Moreover, despite Plaintiff's requests
that Conner correct the sentencing transcript during which
Plaintiff referred to "Ping Data", she has not done so. (See id.)

Based upon these allegations, Plaintiff claims his First, Fifth,
Sixth, and Fourteenth Amendment Constitutional rights have
been violated. (See Compl. at ECF p. 4.) He further asserts
the following ten purported causes of action:

1. denial of judicial records;

2. fraud on the court;

3. concealment of records;

4. falsify evidence/documents;

5. altered transcripts;

6. procedural due process;

7. substantive due process;

8. Fourteenth Amendment violation;

9. Conspiracy to interfere with civil rights; and

10. Deprivation of civil rights.

(Compl. at ECF p. 19.) By way of relief, Plaintiff requests:

> [d]eclaratory relief, injunctive relief in that my court file that consist of 220 pages that was filed before May 5th, 2022, that the Clerk of the Court including Frank Tropea refrain from falsifying documents for the District Attorney Suffolk County, and Judge Collins such as back dating and filing Search and Arrest warrants after they admitted that there was no Search and Arrest warrants filed in their office, and Susan O'Conner [sic] fix errors in my sentencing transcripts so I can bring up those issues in my appeal. I am seek [sic] compensatory damages in that I would like my entire Court file with no pages missing (Certified, true and accurate filing dates), a True and accurate copy of my sentencing transcript, and the costs and fees I spent to prosecute this action, Past and future damages, Punitive damages. I would like all money damages in the sum of $30,000,000.00.

(<u>Id.</u> at ECF pp. 20-21.)

DISCUSSION

I. <u>Legal Standards</u>

A. <u>Consideration of the Complaint Under</u> 28 U.S.C. § 1915A

Section 1915A of Title 28 requires federal district courts to screen complaints brought by prisoners who seek relief against a governmental entity or an officer or employee of a governmental entity. <u>See</u> Prison Litigation Reform Act ("PLRA"), 28 U.S.C. § 1915A(a). The Court must dismiss a prisoner's civil rights complaint, or any portion of that complaint, that is frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief. <u>See</u> 28 U.S.C. § 1915A(b); <u>see also</u> Abbas v. Dixon, 480 F.3d 636, 639 (2d Cir. 2007). The Court is required to dismiss the action as soon as it makes such a determination. <u>See</u> 28 U.S.C. § 1915A; Avant v. Miranda, No. 21-CV-0974, 2021 WL 1979077, at *2 (E.D.N.Y. May 18, 2021).

Courts are obliged to construe the pleadings of a <u>pro se</u> plaintiff liberally. <u>See</u> Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191 (2d Cir. 2008); McEachin v. McGuinnis, 357 F.3d 197, 200 (2d Cir. 2004). However, a complaint must plead sufficient facts to "state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citation omitted). The plausibility standard requires "more than a sheer possibility that a defendant has acted unlawfully." Id.; accord Wilson v. Merrill Lynch & Co., 671 F.3d 120, 128 (2d Cir. 2011). While "detailed factual allegations" are not required, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' " Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 555).

B. Section 1983

**\*3** Section 1983 provides:

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities

secured by the Constitution and laws, shall be liable to the party injured....

42 U.S.C. § 1983; accord Rehberg v. Paulk, 566 U.S. 356 (2012). To state a claim under Section 1983, a plaintiff must " 'allege that (1) the challenged conduct was attributable at least in part to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed under the Constitution of the United States.' " Rae v. County of Suffolk, 693 F. Supp. 2d 217, 223 (E.D.N.Y. 2010) (quoting Snider v. Dylag, 188 F.3d 51, 53 (2d Cir. 1999)).

Plaintiff alleges a deprivation of his First, Fifth, Sixth, and Fourteenth Amendment rights (Compl., ECF No. 1, at 4 (Section II.B)) and, as liberally construed, the Complaint purports to allege denial of a fair trial, as well as procedural and substantive due process claims.

### C. Application

Before addressing the merits of Plaintiff's Section 1983 claims, the Court first considers several threshold barriers to the adjudication of his claims.

#### 1. Immunity

##### a. Absolute Judicial Immunity

Plaintiff's Section 1983 claims against Judge Collins are subject to dismissal because, as a judge employed by the state of New York, he is absolutely immune from suit. It is well-established that judges "generally have absolute immunity" from suit for judicial acts performed in their judicial capacities. Bliven v. Hunt, 579 F.3d 204, 209 (2d Cir. 2009) (citing Mireles v. Waco, 502 U.S. 9, 11 (1991)); Hardy-Graham v. Southampton Just. Ct., No. 20-CV-0981, 2021 WL 260102, at *5 (E.D.N.Y. Jan. 25, 2021) (Seybert, J.). This absolute "judicial immunity is not overcome by allegations of bad faith or malice," nor can a judge "be deprived of immunity because the action he took was in error ... or was in excess of his authority." Mireles, 502 U.S. at 11, 13 (internal quotation marks and citation omitted; ellipsis in original). Rather, judicial immunity is overcome in only two instances. The first instance is "liability for nonjudicial actions, i.e., actions not taken in the judge's judicial capacity." Bliven, 579 F.3d at 209 (quoting Mireles, 502 U.S. at 11). The second instance is liability arising from actions taken " 'in the

complete absence' of all jurisdiction.' " Basile v. Connolly, 538 F. App'x 5, 7 (2d Cir. 2013) (quoting Mireles, 502 U.S. at 11-12; emphasis in original).

Here, even upon a liberal construction, Plaintiff's allegations do not suggest that either exception applies to overcome absolute judicial immunity. Clearly Judge Collins acted within his jurisdiction given that the alleged conducted occurred in open court during the criminal prosecution that lead to Plaintiff's state court conviction. There can be no doubt that state court prosecution for violations of state laws relating to drug possession and weapon possession is the very kind of case over which state courts have jurisdiction. Accordingly, Judge Collins is shielded from suit by absolute immunity. [4]

**\*4** The absolute immunity afforded to judges is not limited to judges alone, but also extends to "certain others who perform functions closely associated with the judicial process." Oliva v. Heller, 839 F.2d 37, 39 (2d Cir. 1988) (citation omitted); see also McKeown v. N.Y. State Comm'n on Judicial Conduct, 377 F. App'x 121, 124 (2d Cir. 2016). Here, Tropea is entitled to absolute immunity given that Plaintiff's allegations against him concern conduct that is "closely related to the judicial process." Jackson v. Pfau, 523 F. App'x 736, 737-38 (2d Cir. 2013) (affirming dismissal pursuant to Section 1915(e)(2)(B) of pro se plaintiff's Section 1983 claims against judicial law clerk, the N.Y.S. Chief Administrative Judge, court attorneys, and the Chief Clerks of several state courts, finding "defendants were entitled to judicial immunity, because [ ][the] allegations against each of them concerned actions that were judicial in nature or closely related to the judicial process") (citing Rodriguez v. Weprin, 116 F.3d 62, 66 (2d Cir. 1997) (noting that "[c]ourts have extended the absolute judicial immunity afforded judges to individuals ... who perform functions closely associated with the judicial process," and holding that judges and their supporting staff are absolutely immune in matters regarding "[a] court's inherent power to control its docket")).

As a result, Plaintiff's Section 1983 claims against Judge Collins and Tropea are not plausible as a matter of law and are, therefore, DISMISSED WITH PREJUDICE pursuant to 28 U.S.C. § 1915A(b). See Mills v. Fischer, 645 F.3d 176, 177 (2d Cir. 2011) ("Any claim dismissed on the ground of absolute judicial immunity is 'frivolous' for purposes of [the IFP statute].").

#### b. Eleventh Amendment Immunity

" '[A]s a general rule, state governments may not be sued in federal court unless they have waived their Eleventh Amendment immunity or unless Congress has abrogate[d] the states' Eleventh Amendment immunity....' " Griggs v. Crim. Ct. of City of N.Y., No. 21-CV-1899, 2021 WL 1535056, at *2 (S.D.N.Y. Apr. 19, 2021), appeal dismissed (Oct. 28, 2021) (quoting Gollomp v. Spitzer, 568 F.3d 355, 366 (2d Cir. 2009) (internal quotation marks and citation omitted, alteration in original)). "This immunity shields States from claims for money damages, injunctive relief, and retrospective declaratory relief." Griggs, 2021 WL 1535056, at *2 (citing Green v. Mansour, 474 U.S. 64, 72-74 (1985); Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 101-02 (1984)).

Plaintiff claims that Tropea failed to perform his duties; yet, there are no allegations that Tropea acted outside of his official capacity. (See Compl., in toto.) Indeed, Tropea is a state officer because he is the Chief Clerk of the Suffolk County Court, and the Suffolk County Court is an arm of the New York state court system.[5] See Gollomp, 568 F.3d at 366–67 ("[E]very court to consider the question of whether the New York State Unified Court System is an arm of the State has concluded that it is, and is therefore protected by Eleventh Amendment sovereign immunity."); Fishman v. Off. of Ct. Admin. N.Y.S. Cts., No. 18-CV-0282, 2020 WL 1082560, at *7 (S.D.N.Y. Mar. 5, 2020), aff'd, No. 20-1300, 2021 WL 4434698 (2d Cir. Sept. 28, 2021) ("[T]he Second Circuit has specifically held that the New York State Unified Court System is unquestionably an arm of the State, and is entitled to Eleventh Amendment sovereign immunity." (internal quotation marks and citation omitted)). Accordingly, Tropea is shielded from suit by the Eleventh Amendment, and Plaintiff's Section 1983 claims are therefore implausible. See Watanmaker v. Clark, No. 09-CV-3877, 2010 WL 3516344, at *7 (E.D.N.Y. Aug. 31, 2010) (dismissing Section 1983 claims alleged against the Chief Clerk of the Suffolk County District Court as barred by the Eleventh Amendment (citing Casaburro v. Guiliani, 986 F. Supp. 176, 182 (S.D.N.Y. 1997) (granting state court clerk's motion to dismiss official capacity suit on Eleventh Amendment grounds)); Davis v. State of N.Y., No. 90-CV-6170, 1991 WL 156351, at *2 (S.D.N.Y. Aug. 6, 1991) (dismissing claim against state-court officials on Eleventh Amendment grounds), aff'd 106 F. App'x 82 (2d Cir. 2004); see also Manko v. Steinhardt, No. 11-CV-5430, 2012 WL

213715, at *3 (E.D.N.Y. Jan. 24, 2012) (finding clerk of court immune from claims arising from alleged failure to perform duties where there were no allegations that clerk of court acted in individual capacity); Peterkin v. Carr, No. 20-CV-0524, 2020 WL 7186796, *3 (E.D.N.Y. Dec. 7, 2020) (finding court staff member named in his official capacity entitled to judicial immunity (citing Treistman v. McGinty, 804 F. App'x 98 (2d Cir. 2020)) (affirming district court's determination that family court employees were immune from suit))). Thus, Plaintiff's Section 1983 claims against Tropea are also barred by the Eleventh Amendment and are DISMISSED WITH PREJUDICE as pursuant to 28 U.S.C. § 1915A(b).[6]

#### c. Qualified Immunity

**\*5** Plaintiff's Section 1983 claims against Conner are not plausible because she is entitled to qualified immunity. Qualified immunity shields government officials from civil liability resulting from the performance of their discretionary functions only where their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Wallace v. Suffolk County Police Dep't, 396 F. Supp. 2d 251, 265 (E.D.N.Y. 2005) (Seybert, J.) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). To determine whether qualified immunity applies, courts consider "whether the facts shown make out a violation of a constitutional right and whether the right at issue was clearly established at the time of the defendant's alleged misconduct." Tankleff v. County of Suffolk, No. 09-CV-1207, 2017 WL 2729084, at *17 (E.D.N.Y. June 23, 2017) (Seybert, J.) (quoting Estate of Devine v. Fusaro, 676 F. App'x 61, at *1 (2d Cir. 2017) (cleaned up)). Whether a right was clearly established should be analyzed from the perspective of a reasonable official, and the relevant inquiry is whether "it would be clear to a reasonable offic[ial] that his conduct was unlawful in the situation he confronted." Id.

The United State Supreme Court has long extended qualified immunity to court reporters, such as Conner, where their conduct does not violate clearly established statutory or constitutional rights. See Antoine v. Byers & Anderson Inc., 508 U.S. 429 (1993) (holding that court reporters are qualifiedly, not absolutely, immune from suit); Harlow, 457 U.S. at 818 (discussing standard for establishing qualified immunity); see also Green v. v. Maraio, 722 F. 2d 1013, 1019 (2d Cir. 1983) (finding Rule 12(b)(6) dismissal of claim against court reporter on grounds of qualified immunity was appropriate where the complaint alleged court reporter acted

pursuant to judge's explicit instructions). Indeed, "there is no constitutional or federal statutory right to an absolutely accurate trial transcript." Burrell v. Swartz, 558 F. Supp. 91, 92 (S.D.N.Y. 1983). Thus, insofar as Plaintiff complains that Conner excluded the words "ping data" at pages 86 and 87 from the 121-page sentencing transcript, in the absence of any constitutional or federal statutory right to an "absolutely accurate" transcript, Conner is protected by qualified immunity.[7] McCaw v. McPartland, No. 17-CV-6431, 2018 WL 10701609, at *1 (S.D.N.Y. Apr. 2, 2018).

**\*6** Accordingly, Plaintiff's Section 1983 claims against Conner are not plausible and are thus DISMISSED WITH PREJUDICE pursuant to 28 U.S.C. § 1915(b). See Green, 722 F. 2d at 1019 (affirming dismissal of claims against court reporter on basis of qualified immunity and stating: "allowing ... dismissal whenever the basis for finding qualified immunity applicable is established by the complaint itself 'permit[s] "[i]nsubstantial lawsuits [to] be quickly terminated" ' ") (quoting Harlow, 457 U.S. at 814; further citation omitted); Griggs v. Crim. Ct. of City of N.Y., No. 21-CV-1899, 2021 WL 1535056, at *3 (S.D.N.Y. Apr. 19, 2021), appeal dismissed (Oct. 28, 2021) (sua sponte dismissing Section 1983 claims pursuant to 28 U.S.C. § 1915(e)(2)(B) against two court reports in the absence of "any facts that suggest that the court reporters' conduct violated any of [p]laintiff's clearly established statutory or constitutional rights").

Given the dismissal of Plaintiff's federal claims against the Defendants on immunity grounds, the Court need not reach the merits. However, in light of his pro se status, the Court explains, to the extent that Plaintiff complains that the allegedly inaccurate sentencing transcript "deprived him of due process, such a claim would fail, because New York has adequate procedures for correcting alleged inaccuracies in transcripts." See id., (citing Curro, 884 F. Supp. at 720-23); Collins v. N.Y. City, No. 19-CV-7156, 2019 WL 4805692, at *3 (S.D.N.Y., 2019) (sua sponte dismissing Section 1983 claims upon initial screening, explaining "[t]o the extent [p]laintiff attempts to assert that inaccurate transcriptions deprived him of due process, such a claim would fail, because New York has adequate procedures for correcting alleged inaccuracies in transcripts") (citing Curro, 884 F. Supp. at 720-23) (discussing New York's transcript settlement procedures and finding they provide all the process due plaintiff). Notwithstanding having filed a complaint with the Tenth District Administrative Office, Suffolk County ("Tenth District AO") (see Compl. at ECF p. 18), Plaintiff has not

alleged to have availed himself of other available transcript settlement procedures and Plaintiff has other means to seek the correction of his sentencing transcript. See Curro, 884 F. Supp. at 718 ("In addition [to available N.Y.S. post-deprivation remedies], any significant unresolved questions concerning the transcript's accuracy could be raised on appeal, and if found to be substantial, would permit a remand of the proceedings back to the original trial judge to resettle the transcript.") (citations omitted).[8]

Moreover, "[a] claim that deficiencies in the trial transcripts were so great that the plaintiff's constitutional rights on appeal were violated is 'a direct challenge to the validity of the conviction and the legality of plaintiff's confinement.' " Stokes v. Kreidler, No. 18-CV-0113, 2018 WL 1226027, at *3 (N.D.N.Y. Jan. 30, 2018), report and recommendation adopted, 2018 WL 1229699 (N.D.N.Y. Mar. 8, 2018) (citing Davison v. Reyes, No. 11-CV-0167, 2012 WL 948591, at *3 (E.D.N.Y. Mar. 20, 2012)). The sole remedy for a challenge to Plaintiff's conviction is under 28 U.S.C. § 2254, after exhausting his state court remedies. See, e.g., Bridgeforth v. County of Rensselaer, No. 08-CV-0779, 2008 WL 5156936, at *4 (N.D.N.Y. Dec. 8, 2008), adhered to on denial of reconsideration, 2009 WL 102959 (N.D.N.Y. Jan. 13, 2009) (dismissing Section 1983 claims alleging, inter alia, that the prosecutor, judge, and court reporter conspired to alter official court records because "any attack on the sentence for which Plaintiff is currently serving cannot be attacked in a § 1983 action without an indication that such sentence has been reversed") (citing Heck v. Humphrey, 512 U.S. 477, 486-87 (1994)).

**\*7** Accordingly, as is readily apparent, Plaintiff's Section 1983 claims are not plausible even if the Court were to consider the merits.

## II. Leave to Amend

Given the Second Circuit's guidance that a pro se complaint should not be dismissed without leave to amend unless amendment would be futile, see Cuoco v. Moritsugu, 222 F.3d 99, 112 (2d Cir. 2000), the Court has carefully considered whether leave to amend is warranted. Here, because Plaintiff could not cure the substantive deficiencies set forth above with better pleading, amendment would be futile. Accordingly leave to amend the Complaint is DENIED.

CONCLUSION

Accordingly, **IT IS HEREBY ORDERED** that, upon this Court's Section 1915A(a) screening of the Complaint, Plaintiff fails to allege a plausible claim for relief for the reasons set forth above; and

**IT IS FURTHER ORDERED** that the Complaint is DISMISSED pursuant to 28 U.S.C. § 1915A(b) given that it fails to state a claim and seeks monetary relief from Defendants who are immune from such relief and it is frivolous; and

**IT IS FURTHER ORDERED** that Plaintiff's motion seeking a preliminary injunction (ECF No. 4) is DENIED; and

**IT IS FURTHER ORDERED** that, pursuant to 28 U.S.C. § 1915(a)(3), the Court certifies any appeal from this Order would not be taken in good faith. Therefore, in forma pauperis status is DENIED for the purpose of any appeal. See Coppedge v. United States, 369 U.S. 438, 444-45 (1962); and

**IT IS FURTHER ORDERED** that the Clerk of Court mail a copy of this Order to the pro se Plaintiff at his address of record, including the notation "LEGAL MAIL" on the mailing envelope.

**All Citations**

Slip Copy, 2023 WL 4207907

## Footnotes

1    The Order also denied Plaintiff's Motion for Order to Show Cause seeking an order: (1) directing Defendants to show cause "why a preliminary injunction should not issue" enjoining "them from denying the Plaintiff access to the Records in his Case, County Court Ind. No. 308C-2020 and falsifying documents in the past and in the future," and (2) requesting Defendants temporarily be ordered to "restrain[ ] from commiting [sic] crimes including concealment of Records and falsifying documents." (Order at 1-2 (citing OSC Motion, ECF. No. 4, and Pl.'s Support Aff., ECF No. 4-1).) The Court ruled on Plaintiff's OSC Motion to the extent it sought a temporary restraining order ("TRO") and held in abeyance any determination regarding Plaintiff's request for a preliminary injunction pending its initial screening of Plaintiff's Complaint pursuant to 28 U.S.C. § 1915A. (See Order at 2 n.1.)

2    Notably, the Sentencing Transcript filed by Plaintiff as Exhibit 18 to his Complaint (see ECF No. 7-4 at 2) reflects that the Court Reporter's sur-name is "Connors" rather than "Conner". For consistency with Plaintiff's Complaint, the Court will use "Conner" in this Memorandum and Order.

3    The Court presumes familiarity with Plaintiff's underlying state court criminal action, but notes that according to the information maintained by the New York State Office of Court Administration on its public website, in Suffolk County Court, Criminal Term, Case No. 00308C-2020, on July 18, 2022, Plaintiff was convicted by a jury on a multi-count indictment including Operating as a Major Trafficker, a class A-1 felony, and Conspiracy in the Second Degree, a class B felony. See https://iapps.courts.state.ny.us/webcrim (last visited on Sept. 16, 2022). In sum, Plaintiff challenges his arrest and conviction, asserting that he was illegally apprehended, and then convicted, based upon cellphone "ping data" collected without a warrant; he also maintains that evidence used against him at trial was illegally obtained via a warrantless search of his apartment. (See Sept. 23, 2022 Sent'g Hr'g Tr., ECF No. 7-4, at ECF pp. 81-87; see also Compl. at ECF pp. 16-17, 19.)

4    Although "[t]he doctrine of judicial immunity does not shield judges from claims for prospective declaratory relief," Krupp v. Todd, No. 14-CV-0525, 2014 WL 4165634, at *4 (N.D.N.Y. Aug. 19, 2014), "[a]bsolute judicial immunity bars declaratory judgment claims that are retrospective in nature in that they seek a declaration that a judge's past behavior has violated the Constitution." Leathersich v. Cohen, No. 18-CV-6363, 2018 WL 3537073, at *4 (W.D.N.Y. July 23, 2018) (internal quotation omitted) (citing cases); see also Moore v. City

of N.Y., No. 12-CV-4206, 2012 WL 3704679, at *2 (E.D.N.Y. Aug. 27, 2012) ("Judicial immunity also bars ... claims for retrospective declaratory relief."). A review of the Complaint makes clear that it is targeted at Judge Collins's conduct in Plaintiff's concluded state court action. (See Compl., ECF No. 1, in toto.) Indeed, Plaintiff seeks not to vindicate some prospective right, but a declaration that Judge Collins's prior judicial actions were erroneous. Given that Plaintiff seeks retrospective relief, such claims are barred. Montesano v. New York, Nos. 05-CV-9574, 05-CV-10624, 2006 WL 944285, at *4 (S.D.N.Y. Apr. 12, 2006) (neither "injunctive nor declaratory relief is available to be used as a vehicle for disgruntled litigants to reverse adverse judgments") (citing Huminski v. Corsones, 396 F.3d 53 (2d Cir. 2005)).

5      Although Plaintiff alleges Tropea is the Clerk of the Court, County Court of Suffolk County (see ECF No. 1 at 2), the information maintained by the New York State Office of Court Administration on its public website reflects that Tropea is the Chief Clerk of that court. See https://ww2.nycourts.gov/courts/10jd/suffolk/county.shtml (last visited on June 16, 2023).

6      Similarly, given that Judge Collins is also a New York state employee, he too is shielded from liability in his official capacity by the Eleventh Amendment. See Silvels v. New York, 81 F. App'x 361, 362 (2d Cir. 2003) (affirming dismissal of Section 1983 claims sua sponte pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) on the grounds of judicial and Eleventh Amendment immunity). Moreover, given Conner's apparent employment by the New York State Office of Court Administration as an Official Senior Court Reporter, she too would be shielded from liability in her official capacity by the Eleventh Amendment. However, the Court need not reach that question for the reasons that follow.

7      Insofar as Plaintiff complains that the alleged transcript errors prejudice an appeal of his conviction, such facts may form the basis of a proper Section 1983 claim at the appropriate time. A criminal defendant possesses a due process right to a "substantially accurate" transcript in a criminal proceeding. Argentieri v. Majerowicz, 158 F. App'x 306, 307 (2d Cir. 2005) (summary order). However, "[m]ore than an inaccurate transcript is necessary to state a claim, [ ] [and] a [p]laintiff must also show that the alleged inaccuracies adversely affected the outcome of her proceedings." Wilson v. Richards, No. 14-CV-2459, 2014 WL 6682579, at *2 (S.D.N.Y. Nov. 25, 2014) (citing Tedford v. Hepting, 990 F.2d 745, 748 (3d Cir. 1993) (internal quotation marks omitted); also citing Argentieri, 158 F. App'x at 308 (affirming summary judgment for defendant because plaintiff was not "deprived in any way of his access to courts or right to an effective appeal")). Any such claim is premature at this juncture given that the appeal filed by Plaintiff is not yet perfected. See People v. Braithwaite, No. 2022-09001, May 5, 2023 Decision and Order (N.Y. App. Div., 2d Dep't 2023) (granting Braithwaite leave to prosecute the appeal as a poor person, assigning appellate counsel, and granting extension to perfect appeal). In turn, any related claim of prejudice is currently speculative, making it implausible. See Burrell, 558 F. Supp. at 92 ("[I]f a state official intentionally alters a transcript in a way that prejudices a defendant's appeal, the due process clause of the fourteenth amendment might be violated.... To prove such a violation plaintiff would have to show ... the existence of intentional tampering; then, he would have to prove the alleged errors and omissions in the trial transcript prejudice his statutory right to appeal." (citations omitted)); Godfrey v. Irvin, 871 F. Supp. 577, 584 (W.D.N.Y. 1994) ("In order to demonstrate denial of a fair appeal, [plaintiff] must show prejudice resulting from the missing or incomplete transcript."). Thus, any substantive due process claim is not plausible given the absence of any allegation that Plaintiff suffered "some tangible harm." Curro v. Watson, 884 F. Supp. 708, 720 (E.D.N.Y. 1995), aff'd, 100 F.3d 942 (2d Cir. 1996); see also Collins, 438 F. Supp. 2d 399, 415–16 (2d Cir. 2006) (plaintiff alleging violation of right to access to the courts must allege an "actual injury"). Upon careful review of the Complaint, Plaintiff has not alleged any tangible harm. (See Compl., in toto.) Plaintiff does not allege that he was not successful in his Article 78 proceedings. Even if he was unsuccessful in those proceedings, he does not allege that any such failure stemmed from the transcriptions. Compare Collins, 438 F. Supp. 2d at 417 (prisoner adequately alleged tangible harm where he

alleged that his Article 78 proceeding was dismissed when prison officials failed to provide him with necessary copies of documents).

8     Plaintiff's allegation that the transcript was <u>deliberately</u> tampered with does not save his procedural due process claim because the state provides adequate post-deprivation remedies. <u>See</u> Curro, 884 F. Supp. at 717–19 (prisoner who alleged that court reporters deliberately altered the transcript of his criminal trial did not state procedural due process claim because New York provides a procedure for challenging inaccuracies in trial transcripts).

---

**End of Document**                                           © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 3587600
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Hiram Noel MENDEZ, Plaintiff,

v.

Reginald J. JOHNSON; Stephen A. Ronco;
Spencer Guerrero; Tina Cardinale; Belle Bowen;
Officer Dycktra; Officer Santos, Defendants.

22-CV-6811 (LTS)
|
Signed August 22, 2022

**Attorneys and Law Firms**

Hiram Noel Mendez, Cortland Manor, NY, Pro Se.

ORDER TO AMEND

LAURA TAYLOR SWAIN, Chief United States District
Judge:

 **\*1** Plaintiff, who is appearing *pro se*, invokes the
Court's federal question jurisdiction, alleging that Defendants
violated his civil rights. The Court construes the complaint
as asserting claims under 42 U.S.C. § 1983. Named as
Defendants are City of Peekskill Judge Reginald J. Johnson;
Assistant District Attorney (ADA) Stephen A. Ronco; City of
Peekskill Clerk of Court Spenser Guerrero; City of Peekskill
Chief Clerk Belle Bowen; [1] Tina Cardinale; and Officers
Dycktra and Santos. By order dated August 10, 2022, the
Court granted Plaintiff's request to proceed *in forma pauperis*
(IFP), that is, without prepayment of fees.

For the reasons set forth below, the Court dismisses Plaintiff's
claims against Judge Johnson, Clerk of Court Guerrero, and
Chief Clerk Bowen, and grants Plaintiff leave to file an
amended complaint with respect to the remaining defendants
within 60 days of the date of this order.

STANDARD OF REVIEW

The Court must dismiss an IFP complaint, or any portion of
the complaint, that is frivolous or malicious, fails to state a
claim on which relief may be granted, or seeks monetary relief

from a defendant who is immune from such relief. 28 U.S.C.
§ 1915(e)(2)(B); *see Livingston v. Adirondack Beverage Co.*,
141 F.3d 434, 437 (2d Cir. 1998). The Court must also dismiss
a complaint when the Court lacks subject matter jurisdiction
of the claims raised. *See* Fed. R. Civ. P. 12(h)(3).

While the law mandates dismissal on any of these grounds, the
Court is obliged to construe *pro se* pleadings liberally, *Harris
v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009), and interpret them
to raise the "strongest [claims] that they *suggest*," *Triestman
v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006)
(internal quotation marks and citations omitted) (emphasis in
original). But the "special solicitude" in *pro se* cases, *id.* at
475 (citation omitted), has its limits – to state a claim, *pro se*
pleadings still must comply with Rule 8 of the Federal Rules
of Civil Procedure, which requires a complaint to make a short
and plain statement showing that the pleader is entitled to
relief.

BACKGROUND

The complaint alleges that Plaintiff's claims arose on January
12, 2020, in Peekskill, New York. The "facts" section of the
complaint states in its entirety: [2]

> I bealieve and do believe that I have
> concerning fiduciary relationships
> in the matter of HIRAM NOEL
> MENDEZ Estate Peekskill City Court
> claimed to be fiduciary's trustees over
> one's estate and they're also claiming
> to be beneficiaries so they're collecting
> on the estate I'm standing in there
> courts venue being auctioned off
> without my knowledge or concent or
> authorization and at the same time
> they're collecting. They want me to pay
> whether it's in my physical being or
> FRN what have you [F]ederal Reserve
> Notes. I do not wish to bring liability
> issues upon that court however my life
> has been place in jeopardy. I am being
> targeted and I require an advocate and
> the underline subject here is I don't

want to be a party of any tax fraud.
Nunc pro tunc.

**\*2**  (ECF 2, at 5.)

Plaintiff describes his injuries as the following: "I had to go to the hospital because my handcuff I mean there had cuffs hurt me so bad I was bleading I needed to get professional help." (*Id.* at 6.)

In the section of the complaint form to state the relief he is seeking, Plaintiff writes,

> I demand compensation from the state in the amount of $240,000.00 for the commercial injuries I have sustained from the loss of my property, loss of time from work and cost certify mailings and affidavit notice of man's and parties involved the cost of filing and according as well the expensive and curve traveling as resolved to being deprived of use my private property automobile.

(*Id.*)

## DISCUSSION

Because Plaintiff states that Defendants violated his civil rights, the Court construes the complaint as asserting claims under 42 U.S.C. § 1983. To state a claim under Section, a plaintiff must allege both that: (1) a right secured by the Constitution or laws of the United States was violated, and (2) the right was violated by a person acting under the color of state law, or a "state actor." *West v. Atkins,* 487 U.S. 42, 48-49 (1988).

### A. Judicial and Quasi-Judicial Immunity

The Court dismisses Plaintiff's claims against Judge Johnson, Clerk of Court Guerrero, and Chief Clerk Bowen. Judges are absolutely immune from suit for damages for any actions taken within the scope of their judicial responsibilities. *Mireles v. Waco,* 502 U.S. 9, 11 (1991). Generally, "acts

arising out of, or related to, individual cases before the judge are considered judicial in nature." *Bliven v. Hunt,* 579 F.3d 204, 210 (2d Cir. 2009). "Even allegations of bad faith or malice cannot overcome judicial immunity." *Id.* (citations omitted). This is because, "[w]ithout insulation from liability, judges would be subject to harassment and intimidation ...." *Young v. Selsky,* 41 F.3d 47, 51 (2d Cir. 1994). In addition, Section 1983, as amended in 1996, provides that "in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable." 42 U.S.C. § 1983.

Judicial immunity does not apply when the judge takes action "outside" his judicial capacity, or when the judge takes action that, although judicial in nature, is taken "in absence of jurisdiction." *Mireles,* 502 U.S. at 9-10; *see also Bliven,* 579 F.3d at 209-10 (describing actions that are judicial in nature). But "the scope of [a] judge's jurisdiction must be construed broadly where the issue is the immunity of the judge." *Stump v. Sparkman,* 435 U.S. 349, 356 (1978).

This immunity also applies to government officials, including clerks of court and other court employees, for their acts that assist a judge in the performance of his or her judicial duties. *See Cleavinger v. Saxner,* 474 U.S. 193, 200 (1985); *Montero v. Travis,* 171 F.3d 757, 760 (2d Cir. 1999); *see also Ali v. Pollak,* 182 F.3d 898 (2d Cir. 1999) (unpublished opinion) (extending judicial immunity to a pro se law clerk); *Oliva v. Heller,* 839 F.2d 37, 39-40 (2d Cir. 1988) (extending judicial immunity to a judge's law clerk); *Chmura v. Norton, Hammersley, Lopez & Skokos Inverso PA,* No. 3:17-CV-2164, 2018 WL 2138631, at \*2 (D. Conn. May 9, 2018) (extending judicial immunity to a clerk of court); *Manko v. Ruchelsman,* No. 12-CV-4100, 2012 WL 4034038, \*2 (E.D.N.Y. Sept. 10, 2012) (same), *appeal dismissed,* 12-4080 (2d Cir. Jan. 31, 2013); *Gibson v. Brown,* No. 12-CV-0622, 2012 WL 1744845, at \*4-5 (E.D.N.Y. May 16, 2012) (extending judicial immunity to a pro se writ clerk), *appeal dismissed,* No. 12-2748 (2d Cir. Dec. 20, 2012).

**\*3**  Although the factual basis is not entirely clear, it appears that Plaintiff's claims against Johnson, Guerrero, and Bowen arise from actions taken with respect to a case before Judge Johnson in the Peekskill City Court. Plaintiff fails to allege any facts showing that these defendants acted beyond the scope of their judicial responsibilities or outside their jurisdiction. *See Mireles,* 509 U.S. at 11-12. Because Plaintiff sues Johnson, Guerrero, and Bowen for "acts arising out of,

Case 3:24-cv-00037-DNH-ML    Document 9    Filed 06/11/24    Page 256 of 449

Mendez v. Johnson, Not Reported in Fed. Supp. (2022)

or related to, individual cases before" Judge Johnson, these defendants are immune from suit for such claims. *Bliven*, 579 F.3d at 210. The Court therefore dismisses Plaintiff's claims against Johnson, Guerrero, and Bowen because they seek monetary relief against a defendant who is immune from such relief, 28 U.S.C. § 1915(e)(2)(B)(iii), and, consequently, as frivolous, 28 U.S.C. § 1915(e)(2)(B)(i). *See Mills v. Fischer*, 645 F.3d 176, 177 (2d Cir. 2011) ("Any claim dismissed on the ground of absolute judicial immunity is 'frivolous' for purposes of [the *in forma pauperis* statute].").

**B. Claims against ADA Ronco**

Plaintiff also asserts claims against ADA Ronco. However, prosecutors are immune from civil suits for damages for acts committed within the scope of their official duties where the challenged activities are not investigative in nature but, rather, are " 'intimately associated with the judicial phase of the criminal process.' " *Giraldo v. Kessler*, 694 F.3d 161, 165 (2d Cir. 2012) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976)); *see also Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993) (absolute immunity is analyzed under a "functional approach" that "looks to the nature of the function performed, not the identity of the actor who performed it" (internal quotation marks and citations omitted)). In addition, prosecutors are absolutely immune from suit for acts that may be administrative obligations but are "directly connected with the conduct of a trial." *Van de Kamp v. Goldstein*, 555 U.S. 335, 344 (2009); *see also Ogunkoya v. Monaghan*, 913 F.3d 64, 70-72 (2d Cir. 2019) (holding that ADAs' direction as to where criminal defendant would be arraigned was in preparation for a court proceeding in which the prosecutors were acting as advocates, and ADAs were therefore shielded by absolute immunity (citing, *inter alia*, *Van de Kamp*)).

Because the complaint does not allege any facts explaining how ADA Ronco allegedly violated Plaintiff's rights, the Court is unable to determine whether prosecutorial immunity applies. If Plaintiff believes that Ronco has committed acts outside of the scope of his official duties as a prosecutor that have violated Plaintiff's rights, Plaintiff may reassert his claims against Ronco in the amended complaint, and Plaintiff must allege facts suggesting that prosecutorial immunity does not apply.

**C. Claims against Dycktra, Santos, and Cardinale**

Rule 8 of the Federal Rules of Civil Procedure requires a complaint to include enough facts to state a claim for relief

"that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible if the plaintiff pleads enough factual detail to allow the Court to draw the inference that the defendant is liable for the alleged misconduct. In reviewing the complaint, the Court must accept all well-pleaded factual allegations as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). But it does not have to accept as true "[t]hreadbare recitals of the elements of a cause of action," which are essentially just legal conclusions. *Twombly*, 550 U.S. at 555. After separating legal conclusions from well-pleaded factual allegations, the Court must determine whether those facts make it plausible – not merely possible – that the pleader is entitled to relief. *Id.*

Here, Plaintiff does not allege facts suggesting a plausible Section 1983 claim against Officer Dycktra, Officer Santos, or Tina Cardinale. Plaintiff names the two police officers as defendants and states that he was bleeding due to handcuffs, but he does not allege any facts explaining how these two defendants were personally involved in causing such injuries. Furthermore, Plaintiff names Tina Cardinale as a defendant in the caption, but the complaint does not allege any facts regarding Cardinale, including who she is or how she was personally involved in violating Plaintiff's rights. The Court therefore grants Plaintiff leave to file an amended complaint that alleges facts suggesting that Officer Dycktra, Officer Santos, and Tine Cardinale violated his rights.

**LEAVE TO AMEND**

**\*4** Plaintiff proceeds in this matter without the benefit of an attorney. District courts generally should grant a self-represented plaintiff an opportunity to amend a complaint to cure its defects, unless amendment would be futile. *See Hill v. Curcione*, 657 F.3d 116, 123-24 (2d Cir. 2011); *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988). Indeed, the Second Circuit has cautioned that district courts "should not dismiss [a *pro se* complaint] without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (quoting *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 795 (2d Cir. 1999)). Because it is not clear at this point that amendment would be futile, the Court grants Plaintiff 60 days' leave to amend his complaint to detail his Section 1983 claims against ADA Ronco, Tina Cardinale, and Officers Dycktra and Santos. If Plaintiff chooses to reassert his claims against Ronco, he must allege facts suggesting that Ronco has committed acts outside

Mendez v. Johnson, Not Reported in Fed. Supp. (2022)

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 257 of 449

of the scope of his official duties as a prosecutor that have violated Plaintiff's rights.

In the "Statement of Claim" section of the amended complaint form, Plaintiff must provide a short and plain statement of the relevant facts supporting each claim against each defendant. If Plaintiff has an address for any named defendant, Plaintiff must provide it. Plaintiff should include all of the information in the amended complaint that Plaintiff wants the Court to consider in deciding whether the amended complaint states a claim for relief. That information should include:

    a) the names and titles of all relevant people;

    b) a description of all relevant events, including what each defendant did or failed to do, the approximate date and time of each event, and the general location where each event occurred;

    c) a description of the injuries Plaintiff suffered; and

    d) the relief Plaintiff seeks, such as money damages, injunctive relief, or declaratory relief.

Essentially, Plaintiff's amended complaint should tell the Court: who violated his federally protected rights and how; when and where such violations occurred; and why Plaintiff is entitled to relief.

Because Plaintiff's amended complaint will completely replace, not supplement, the original complaint, any facts or claims that Plaintiff wants to include from the original complaint must be repeated in the amended complaint.

## CONCLUSION

The Court dismisses Plaintiff's claims against Johnson, Guerrero, and Bowen because they seek monetary relief against a defendant who is immune from such relief, 28 U.S.C. § 1915(e)(2)(B)(iii), and, consequently, as frivolous, 28 U.S.C. § 1915(e)(2)(B)(i). *See Mills,* 645 F.3d at 177 ("Any claim dismissed on the ground of absolute judicial immunity is 'frivolous' for purposes of [the *in forma pauperis* statute].").

Plaintiff is granted leave to file an amended complaint that complies with the standards set forth above. Plaintiff must submit the amended complaint to this Court's Pro Se Intake Unit within sixty days of the date of this order,

caption the document as an "Amended Complaint," and label the document with docket number 22-CV-6811 (LTS). An Amended Civil Rights Complaint form is attached to this order. No summons will issue at this time. If Plaintiff fails to comply within the time allowed, and he cannot show good cause to excuse such failure, the complaint will be dismissed for failure to state a claim upon which relief may be granted.

The Court certifies under 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith, and therefore IFP status is denied for the purpose of an appeal. *Cf. Coppedge v. United States,* 369 U.S. 438, 444-45 (1962) (holding that an appellant demonstrates good faith when he seeks review of a nonfrivolous issue).

SO ORDERED.

### Attachment

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

*(In the space above enter the full name(s) of the plaintiff(s).)*

    -against-

    **AMENDED COMPLAINT**
    under the Civil Rights Act,
    42 U.S.C. § 1983

    Jury Trial: ☐ Yes ☐ No
    (check one)

    ___ Civ. _____ (  )

*(In the space above enter the full name(s) of the defendant(s). If you cannot fit the names of all of the defendants in the space provided, please write "see attached" in the space above and attach an additional sheet of paper with the full list of names. The names listed in the above caption must be identical to those contained in Part I. Addresses should not be included here.)*

**I. Parties in this complaint:**

A.    List your name, identification number, and the name and address of your current place of confinement. Do the same for any additional plaintiffs named. Attach additional sheets of paper as necessary.

Plaintiff's   Name _____
        ID# _____
        Current Institution _____
        Address _____

B.    List all defendants' names, positions, places of employment, and the address where each defendant may be served. Make sure that the defendant(s) listed below are identical to those contained in the above caption. Attach additional sheets of paper as necessary.

Defendant No. 1   Name _____ Shield # _____
        Where Currently Employed _____
        Address _____

*Rev. 01/2010*        1

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 258 of 449

Mendez v. Johnson, Not Reported in Fed. Supp. (2022)

Defendant No. 2    Name _____ Shield # _____
                   Where Currently Employed _____
                   Address _____

Defendant No. 3    Name _____ Shield # _____
                   Where Currently Employed _____
                   Address _____

Who did
what?

Defendant No. 4    Name _____ Shield # _____
                   Where Currently Employed _____
                   Address _____

Defendant No. 5    Name _____ Shield # _____
                   Where Currently Employed _____
                   Address _____

**II.    Statement of Claim:**

State as briefly as possible the *facts* of your case.  Describe how each of the defendants named in the caption of this complaint is involved in this action, along with the dates and locations of all relevant events. You may wish to include further details such as the names of other persons involved in the events giving rise to your claims.  Do not cite any cases or statutes.  If you intend to allege a number of related claims, number and set forth each claim in a separate paragraph.  Attach additional sheets of paper as necessary.

A.     In what institution did the events giving rise to your claim(s) occur?
       _____
       _____

B.     Where in the institution did the events giving rise to your claim(s) occur?
       _____
       _____

C.     What date and approximate time did the events giving rise to your claim(s) occur?
       _____
       _____
       _____

What
happened
to you?

D.     Facts:_____
       _____
       _____

*Rev. 01/2010*                    2

_____
_____
_____
_____
_____
_____
_____
_____

Was
anyone
else
involved?

_____
_____

Who else
saw what
happened?

**III.    Injuries:**

If you sustained injuries related to the events alleged above, describe them and state what medical treatment, if any, you required and received.
_____
_____
_____
_____
_____
_____

**IV.    Exhaustion of Administrative Remedies:**

The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  Administrative remedies are also known as grievance procedures.

A.     Did your claim(s) arise while you were confined in a jail, prison, or other correctional facility?
       Yes _____ No _____

*Rev. 01/2010*                    3

If YES, name the jail, prison, or other correctional facility where you were confined at the time of the events giving rise to your claim(s).
_____
_____
_____

B.     Does the jail, prison or other correctional facility where your claim(s) arose have a grievance procedure?
       Yes _____ No _____ Do Not Know _____

C.     Does the grievance procedure at the jail, prison or other correctional facility where your claim(s) arose cover some or all of your claim(s)?
       Yes _____ No _____ Do Not Know _____
       If YES, which claim(s)?
       _____

D.     Did you file a grievance in the jail, prison, or other correctional facility where your claim(s) arose?
       Yes _____ No _____
       If NO, did you file a grievance about the events described in this complaint at any other jail, prison, or other correctional facility?
       Yes _____ No _____

E.     If you did file a grievance, about the events described in this complaint, where did you file the grievance?
       _____

       1.    Which claim(s) in this complaint did you grieve?
             _____

       2.    What was the result, if any?
             _____

       3.    What steps, if any, did you take to appeal that decision?  Describe all efforts to appeal to the highest level of the grievance process.
             _____
             _____
             _____

F.     If you did not file a grievance:
       1.    If there are any reasons why you did not file a grievance, state them here:
             _____
             _____

*Rev. 01/2010*                    4

             _____
             _____
             _____

       2.    If you did not file a grievance but informed any officials of your claim, state who you informed, when and how, and their response, if any:
             _____
             _____
             _____
             _____

G.     Please set forth any additional information that is relevant to the exhaustion of your administrative remedies.
       _____
       _____
       _____
       _____

Note:  You may attach as exhibits to this complaint any documents related to the exhaustion of your administrative remedies.

**V.    Relief:**

State what you want the Court to do for you (including the amount of monetary compensation, if any, that you are seeking and the basis for such amount). _____
_____
_____
_____
_____
_____

*Rev. 01/2010*                    5

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 259 of 449

**Mendez v. Johnson, Not Reported in Fed. Supp. (2022)**

**All Citations**

Not Reported in Fed. Supp., 2022 WL 3587600

# Footnotes

1    Plaintiff sometimes lists this defendant's last name as "Bowmen."

2    Plaintiff writes using irregular capitalization. For readability, the Court uses standard capitalization when quoting from the complaint. The Court otherwise quotes from the complaint verbatim and all grammar, spelling and punctuation are as in the original.

---

**End of Document**                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 260 of 449

Chmura v. Norton, Hammersley, Lopez & Skokos Inverso PA, Not Reported in Fed....

2018 WL 2138631
Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.

Linda Lan CHMURA, Plaintiff,

v.

NORTON, HAMMERSLEY, LOPEZ & SKOKOS
INVERSO PA, Acme Investment Group LLC,
John W. Deidre Jago, Sanctuary Pelican Pointe
Hoa, Progressive Community MGT Inc., Judd,
Ulrich, Scarlett, Wickman, Simmonti & Dean, PA,
Stephen H. Kurvin, Judges LoGalbo Jr., Haworth,
Bennett Jr., Dakin, Roberts, Rushing, Sheriff
Thomas Knight, The Florida Bar, Defendants.

No. 3:17-cv-2164 (MPS)
|
Signed 05/09/2018

**Attorneys and Law Firms**

Linda Lan Chmura, Stamford, CT, pro se.

**INITIAL REVIEW ORDER**

Michael P. Shea, U.S.D.J.

### I. Background

 **\*1**  Plaintiff Linda Lan Chmura, appearing *pro se*, brings this action under 42 U.S.C. §§ 1983, 1985, the Racketeer Influences and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1965(a), *et seq.*, and other statutory provisions. She seeks declaratory and injunctive relief, as well as punitive damages, in connection with a foreclosure action filed against her in Sarasota County, Florida.

Ms. Chmura's complaint arises out of a foreclosure of a property she owned in Sarasota County, Florida ("the Property"). Ms. Chmura alleges that she retained a law firm, Norton, Hammersley, Lopez & Skokos PA ("Norton Hammersley"), to represent her in the foreclosure action. Eventually, as a result of disagreements between Ms. Chmura and her counsel, Norton Hammersley terminated its representation. Ms. Chmura filed a legal malpractice action against the firm in Florida state court (Case No. 09 CC 001986 NC) and retained attorney Stephen Kurvin to represent her. Norton Hammersley asserted counterclaims, including that

Ms. Chmura owed the firm unpaid fees. Ms. Chmura fired Kurvin in May 2010 and ultimately lost the suit against Norton Hammersley. On September 13, 2010, Judge LoGalbo of the Florida Circuit Court for Sarasota County entered final judgment against Ms. Chmura and in favor of Norton Hammersley. (ECF No. 1-2 at 36-38.)

On May 26, 2011, Sheriff Thomas Knight executed the judgment by foreclosing upon and selling the Property to Acme Investment Group, LLC ("Acme"). (ECF No. 1-2 at 50.) Ms. Chmura then filed another lawsuit (Case No. 11 CA 004853 NC) against Norton Hammersley and Acme, seeking a declaratory judgment that the foreclosure sale was void. (ECF No. 1-2 at 91-94.) On October 28, 2011, Judge Roberts of the Florida Circuit Court for Sarasota County entered final judgment against Ms. Chmura and in favor of Norton Hammersley and Acme, stating that Acme owned the Property. (ECF No. 1-2 at 34.)

Ms. Chmura brings this action against Norton Hammersley, Acme Investment Group, her former attorney Stephen Kurvin, the Florida state court judges who rendered rulings against her, Clerk of Court Karen Rushing, Sheriff Thomas Knight, the Florida Bar, and various other individuals and entities. She seeks a declaration that the Sheriff's foreclosure sale was void, an injunction granting her the right to repossess the Florida property, and punitive damages.

### II. Legal Standard

Because Ms. Chmura seeks to proceed *in forma pauperis*, the Court must evaluate her complaint and determine whether it should advance. 28 U.S.C. § 1915(e)(2) ("[T]he court shall dismiss [a] case at any time if the court determines that [the action] is frivolous or malicious; fails to state a claim on which relief may be granted; or seeks monetary relief against a defendant who is immune from such relief.") The Court must construe *pro se* pleadings liberally, *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009), and interpret them to raise the "strongest arguments that they suggest." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 472 (2d Cir. 2006). A *pro se* plaintiff, however, still must meet the standard of facial plausibility. *See Hogan v. Fischer*, 738 F.3d 509, 515 (2d Cir. 2013) ("[A] *pro se* complaint must state a plausible claim for relief.") (citing *Harris v. Mills*, 572 F.3d 66, 73 (2d Cir. 2009) ). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### III. Discussion

#### A. Absolute Judicial Immunity

**\*2** Ms. Chmura's claims against Florida state court judges fail under the doctrine of absolute judicial immunity, which renders judges immune from suit for damages for judicial acts. *Mireles v. Waco*, 502 U.S. 9, 11 (1991). "[A]cts arising out of, or related to, individual cases before the judge are considered judicial in nature." *Bliven v. Hunt*, 579 F.3d 204, 210 (2d Cir. 2009). Absolute judicial immunity protects judges from liability for their judicial acts, even when the plaintiff alleges that the judge acted "maliciously or corruptly." *Stump v. Sparkman*, 435 U.S. 349, 356 (1978). Absolute immunity shields judges from all civil suits for damages, including suits under Section 1983, Section 1985, or civil RICO. *See, e.g., Peia v. U.S. Bankruptcy Court*, 62 Fed.Appx. 394, 396 (2d Cir. 2003) (summary order affirming dismissal of RICO claim as barred by judicial immunity); *Turner v. Boyle*, 116 F. Supp. 3d 58, 81-82 (D. Conn. 2015) (dismissing Section 1983 and 1985 claims as barred by judicial immunity).

Absolute immunity also bars Ms. Chmura's Section 1983 claim for injunctive relief. The 1996 amendments to Section 1983 make injunctive relief unavailable for claims against judges for actions taken in their judicial capacity "unless a declaratory decree was violated or declaratory relief was unavailable." *Montero v. Travis*, 171 F.3d 757, 761 (2d Cir. 1999).

Ms. Chmura's claims against Defendants LoGalbo, Haworth, Bennett, Dakin, and Roberts arise from acts the judges took in their judicial capacities while presiding over Ms. Chmura's Florida lawsuits. Ms. Chmura does not allege that any of the actions violated a declaratory decree or that declaratory relief was unavailable. Therefore, the claims against Florida state court Judges LoGalbo, Haworth, Bennett, Dakin, and Roberts are dismissed under the doctrine of judicial immunity and because they are frivolous. *See* 28 U.S.C. § 1915(e)(2)(B)(i), (iii); *Mills v. Fischer*, 645 F.3d 176, 177 (2d Cir. 2011) ("Any claim dismissed on the ground of absolute judicial immunity is 'frivolous' for purposes of [the *in forma pauperis*] statute.").

#### B. Absolute Quasi-Judicial Immunity

Clerk of Court Karen Rushing and Sheriff Thomas Knight are also immune from suit based on Ms. Chmura's allegations that Rushing entered writs of execution and Knight completed a Sheriff's sale as part of the foreclosure proceedings. Absolute immunity extends to nonjudicial officers who perform acts that "are integrally related to an ongoing judicial proceeding." *Mitchell v. Fishbein*, 377 F.3d 157, 172-73 (2d Cir. 2004). Quasi-judicial immunity protects court clerks and sheriffs from suit "for performance of tasks which are judicial in nature and an integral part of the judicial process." *Garcia v. Hebert*, No. 3:08CV95 (DFM), 2013 WL 1294412, at \*12 (D. Conn. Mar. 28, 2013) (quoting *Rodriguez v. Weprin*, 116 F.3d 62, 66 (2d Cir. 1997) ), *aff'd*, 594 Fed.Appx. 26 (2d Cir. 2015) (summary order), *cert. denied*, No. 14-9720 (Oct. 5, 2015). *See also Tornheim v. Eason*, 363 F. Supp. 2d 674, 677 (S.D.N.Y. 2005) (sheriff had absolute quasi-judicial immunity for effectuating a judgment's mandate). Ms. Chmura's claims against Rushing and Knight arise out of acts that were integrally related to the Florida foreclosure proceedings. Therefore, the Court dismisses Ms. Chmura's claims against Rushing and Knight as frivolous.

#### C. *Rooker-Feldman* Doctrine

The Court must also dismiss this action because it lacks jurisdiction over Ms. Chmura's claims under the *Rooker-Feldman* doctrine. *See Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 415-16 (1923); *Dist. of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 482-86 (1983). That doctrine precludes federal district courts from reviewing final judgments of state courts. *See Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005) (holding that federal district courts are barred from deciding cases "brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments"). The *Rooker-Feldman* doctrine applies where the plaintiff (1) lost in state court, (2) complains of injuries caused by the state-court judgment, (3) invites the district court to review and reject the state court judgment, and (4) commenced the district court proceedings after the state-court judgment was rendered. *Vossbrinck v. Accredited Home Lenders, Inc.*, 773 F.3d 423, 426 (2d Cir. 2014). The *Rooker-Feldman* doctrine "concerns a district court's subject-matter jurisdiction." *Lance v. Coffman*, 549 U.S. 437, 439 n.\* (2007).

**\*3** Ms. Chmura lost her cases in the Florida state courts before she filed this suit. She complains of injuries that she suffered as a result of those losses and requests that this Court declare that the foreclosure sale was void and order that she may take possession of the Property. Thus, Ms. Chmura's federal claims are "inextricably intertwined" with the Florida

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 262 of 449

Chmura v. Norton, Hammersley, Lopez & Skokos Inverso PA, Not Reported in Fed....

state court judgments, and this Court lacks jurisdiction to hear those claims. *See, e.g., Andrews v. Citimortgage, Inc.,* No. 14-CV-1534 (JS)(AKT), 2015 WL 1509511, at *4 (E.D.N.Y. Mar. 31, 2015) (holding that *Rooker-Feldman* doctrine precluded federal court jurisdiction over claims alleging injuries that occurred as a result of a state court foreclosure judgment); *Done v. Option One Mortg.,* No. 09-CV-4770, 2011 WL 1260820, at *7 (E.D.N.Y. Mar. 30, 2011) ("Although plaintiff has made a cursory reference to seeking monetary damages, it is abundantly clear that the whole purpose of this action is to undo the foreclosure judgment. Therefore, *Rooker-Feldman* clearly applies."). Therefore, the Court dismisses Ms. Chmura's claims for lack of subject matter jurisdiction. *See* Fed. R. Civ. P. 12(h)(3). [1]

### D. Statute of Limitations

Ms. Chmura's claims also fail because they are barred by the statute of limitations. The statute of limitations for a section 1983 claim is "that which the State provides for personal-injury torts." *Wallace v. Kato,* 549 U.S. 384, 387 (2007). The Connecticut statute of limitations for personal injury actions is three years. "When a § 1983 action is filed in the District of Connecticut, it is subject to a three-year statute of limitations." *Walker v. Jastremski,* 159 F.3d 117, 119 (2d Cir. 1998). "RICO claims are subject to a four-year statute of limitations." *Koch v. Christie's Intern. PLC,* 699 F.3d 141, 148 (2d Cir. 2012). "A cause of action to recover damages based on [a] RICO injury accrues to plaintiff at the time [she] discovered or should have discovered the injury." *Eno Farms Co-op. Ass'n., Inc. v. Corp.*

*for Indep. Living,* 2007 WL 3308016, at *4 (D. Conn. Nov. 5, 2007) (quoting *Bankers Trust Co. v. Rhodes,* 859 F.2d 1096, 1102 (2d Cir. 1988) ) (alterations omitted).

Here, all of the conduct underlying Ms. Chmura's claims occurred more than four years ago, with the most recent conduct occurring on October 28, 2011, when Judge Roberts entered final judgment against Ms. Chmura and in favor of Norton Hammersley and Acme. Ms. Chmura does not allege that she discovered her injuries at a later point in time. Therefore, Ms. Chmura's claims are barred by the statutes of limitations applicable to both Section 1983 and RICO claims and must be dismissed. [2]

### IV. Conclusion

**\*4** For the reasons stated above, Plaintiff's claims are DISMISSED. The Court certifies under 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith, and therefore *in forma pauperis* status is denied for the purpose of an appeal. The motion for leave to proceed *in forma pauperis* (ECF No. 2), emergency petitions (ECF Nos. 3 and 7), and motion to appoint counsel (ECF No. 6) are DENIED as moot.

IT IS SO ORDERED.

### All Citations

Not Reported in Fed. Supp., 2018 WL 2138631

---

### Footnotes

1    Further, the complaint fails to plead facts showing why the Court would have personal jurisdiction over any of the defendants. *See* Fed. R. Civ. P. 8(a)(1) (requiring allegations showing that the court has jurisdiction); *Sinoying Logistics Pte Ltd. v. Yi Da Xin Trading Corp.,* 619 F.3d 207, 213 (2d Cir. 2010) (where defendants have not appeared in a case, the court may dismiss a case *sua sponte* for lack of personal jurisdiction).

2    While the statute of limitations is an affirmative defense, the Court may consider it upon the filing of the complaint if "it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law." *Staehr v. Hartford Fin. Servs. Grp.,* 547 F.3d 406, 425 (2d Cir. 2008). Further, while the statute of limitations may be avoided where equitable tolling or other tolling doctrines apply, in this case the inapplicability of such doctrines is apparent because Ms. Chmura pleads no facts demonstrating that she was reasonably diligent in pursuing her claims and that extraordinary circumstances prevented her from filing her complaint within the limitations period. *See Walker v. Jastremski,* 430 F.3d 560, 564 (2d Cir. 2005). The facts alleged indicate not only that she knew of the cause of action but that she was actively litigating related claims in another forum at a time that is well beyond the statute of

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

limitations. Ms. Chmura asserts a "fraud upon the court" but pleads no facts alleging "fraudulent concealment of the existence of a cause of action," as required for equitable tolling on the basis of "fraud." *See Pearl v. City of Long Beach*, 296 F.3d 76, 84 (2d Cir. 2002).

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 4034038

Only the Westlaw citation is currently available.

United States District Court,

E.D. New York.

Nella MANKO, Plaintiff,

v.

Leon RUCHELSMAN, individually and in his official capacity as Justice of the N.Y.S. Supreme Court of Kings County; Kagan, individually and in his official capacity as Law Clerk of Part 16 of the Supreme Court of Kings County; Leslie Torres, individually and in her official capacity as Deputy Commissioner of the N.Y.S. Division of Housing and Community Renewal Office of Rent Administration; Jerry M. Scher, individually and in his official capacity as Rent Administrator of the N.Y.S. Division of Housing and Community Renewal Office of Rent Administration; Mary Elizabeth Lacerenza, Esq., individually and in her official capacity as Attorney of the N.Y.S. Division of Housing and Community Renewal Office of Rent Administration; Susan E. Kearns, Esq., individually and in her official capacity as Attorney of the N.Y.S. Division of Housing and Community Renewal Office of Rent Administration; New York State Division Of Housing And Community Renewal Office Of Rent Administration; Shorefront Apartment Co., in its individual and professional capacities; Shorefront Apartments, LLC, in its individual and professional capacities; Alan Polen, in his individual and professional capacities; Robert Polen, in his individual and professional capacities HOward M. File, P.C., in his individual and professional capacities; Sylvia O. Hinds–Radix, individually and in her official capacity as Administrative Judge of the Supreme Court of Kings County; Kings County Supreme Court of the State of New York; Supreme Court of the State of New York, Kings County; Chief Clerk Nancy T. Sunshine, individually and in her official capacity as County Clerk of the Kings County Clerk's Office; Kings County Clerk's Office; William F. Mastro, Presiding Justice, Appellate Division of the N.Y.S. Supreme Court (Second Department); Appellate Division of the N.Y. Supreme Court (Second Department); A. Gail Prudenti, Former Presiding Justice, Appellate Division of the N.Y.S. Supreme Court (Second

Department); CHief Judge Jonathan Lippman; New York Court of Appeals; John Doe 1, individually and in official capacity; John Doe 2, individually and in official capacity; JOHN DOE 3, individually and in official capacity; John Doe 4, individually and in official capacity; John Doe 5, individually and in official capacity; State of New York, Defendants.

No. 12–CV–4100 (KAM)(LB).

|

Sept. 10, 2012.

## Attorneys and Law Firms

Nella Manko, Brooklyn, NY, pro se.

### *MEMORANDUM AND ORDER*

MATSUMOTO, District Judge.

**\*1** On August 13, 2012, *pro se* plaintiff Nella Manko filed this action pursuant to 42 U.S.C. §§ 1983 and 1985, alleging that defendants violated and conspired to violate her constitutional rights during her 2008 and 2010 state court housing actions, Kings County Supreme Court Index Numbers 26610/2008 and 21055/2010. Plaintiff also alleges various pendent state law claims. Plaintiff seeks damages in the amount of $12 million. (*See* ECF No. 1, Complaint ("Compl.") at 37–38.) Plaintiff's request to proceed *in forma pauperis* is granted solely for the purpose of this Memorandum and Order, but the action is hereby dismissed under 28 U.S.C. § 1915(e)(2)(B).

### 1. Litigation History

Plaintiff has filed five prior actions in this court, all of which challenge decisions made in state court actions and allege constitutional violations by judges, attorneys, court officers, court reporters, and the courts involved in those state court actions. *See Manko v. Finkelstein,* No. 11–CV–5054 (KAM) (E.D.N.Y. filed Oct. 14, 2011, dismissed Feb. 7, 2012); *Manko v. Steinhardt,* No. 11–CV–5103 (KAM) (E.D.N.Y. filed Oct. 17, 2011, dismissed Jan. 27, 2012); *Manko v. Steinhardt,* No. 11–CV–5430 (KAM) (E.D.N.Y. filed Oct. 31, 2011, dismissed Jan. 27, 2012); *Manko v. Steinhardt,* No. 12–CV–1472 (KAM) (E.D.N.Y. filed March 21, 2012, dismissed April 20, 2012); *Manko v. Steinhardt,* No. 12–CV–2964 (KAM) (E.D.N.Y. filed June 12, 2012, dismissed June 20, 2012).

Although each of the five actions plaintiff previously filed in this court names slightly different parties, each seeks to challenge the proceedings and outcomes of state court actions and alleges that the defendants violated her constitutional rights during the course of the proceedings. In every instance, plaintiff's case has been dismissed on the bases of the *Rooker–Feldman,* [1] res judicata, or judicial and sovereign immunity doctrines.

By Order dated February 7, 2012, under docket number 1 1–CV–5054, the court requested that the plaintiff "abstain from filing further duplicative or frivolous litigation in this court." *Manko v. Finkelstein,* 2012 WL 407092, at *1 (E.D.N.Y. Feb.7, 2012). In addition, under docket number 12–CV–1472, the court "notifie[d] plaintiff that similar future filings will subject her to a filing injunction." *Manko v. Steinhardt,* 12–CV–1472 (KAM), Order dated April 17, 2012, at 3, 6–7 (setting forth plaintiff's litigation history and giving notice that similar future filings will likely subject her to a filing injunction). Then, in its Order dated May 15, 2012, denying plaintiff's motion for reconsideration in *Manko v. Steinhardt,* No. 11–CV–5103 (KAM), the court reiterated its warning but did not yet enjoin plaintiff because she "filed this motion to reconsider on the same day that the court entered the Memorandum and Order in the subsequent action, *Manko v. Steinhardt,* 12–CV–1472." *Manko v. Steinhardt,* 2012 WL 1744836, at *2 (E.D.N.Y. May 15, 2012).

 **\*2** Finally, by Order dated June 20, 2012, the court dismissed plaintiff's fifth duplicative action and ordered plaintiff to show cause within thirty days why she should not be barred from filing any new actions under the *in forma pauperis* statute without first obtaining the court's permission to do so. *Manko v. Steinhardt,* No. 12–CV–2964, slip op. at 7–8 (E.D.N.Y. June 20, 2012). On July 20, 2012, plaintiff requested an extension of time until August 20, 2012, to respond to the order to show cause. Although the court granted plaintiff's request, plaintiff's response failed to address the court's order to show cause. On August 30, 2012, the court entered an Order barring plaintiff from filing any new actions under the *in forma pauperis* statute without first obtaining the court's permission. Plaintiff filed this action on August 13, 2012, without seeking or obtaining prior court permission.

**2. Standard of Review**

Under 28 U.S.C. § 1915(e)(2)(B), a district court shall dismiss an *in forma pauperis* action where it is satisfied that the action is "(i) frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." A court must construe a *pro se* litigant's pleadings liberally, however, *see Chavis v. Chappius,* 618 F.3d 162, 171 (2d Cir.2010), especially when those pleadings allege civil rights violations. *See Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007); *Sealed Plaintiff v. Sealed Defendant # 1,* 537 F.3d 185, 191–93 (2d Cir.2008).

**3. Deficiencies in the Complaint**

Plaintiff is advised that, as currently stated, the complaint is barred by the doctrines of *Rooker–Feldman* and judicial, quasi-judicial and sovereign immunity. In *Hoblock v. Albany Cnty. Bd. of Elections,* the Second Circuit set forth four factors to determine whether the Rooker–Feldman doctrine applies: (1) plaintiff lost in state court; (2) plaintiff complains of the injury caused by the state court order; (3) plaintiff wants this court to review and reject the state court's determinations, and (4) the state court determinations in question were rendered before this action was commenced. 422 F.3d 77, 85 (2d Cir.2005). Each of the *Hoblock* requirements are met in the instant case which, in essence, asks for relief from a state court order against the plaintiff. Therefore, because the district court lacks subject-matter jurisdiction over this action, the court dismisses the complaint pursuant to Federal Rule of Civil Procedure 12(h)(3). *See id.* at 86.

In addition, each of the named state court employee defendants are protected from suit by absolute immunity. Because the claims against the judges are based solely on judicial acts performed in their judicial capacity, such claims against the judicial defendants are barred by the doctrine of judicial immunity. *Bliven v. Hunt,* 579 F.3d 204, 209 (2d Cir.2009). Moreover, a clerk of court, like defendant Sunshine named herein, and law clerks, like defendant Kagan, are absolutely immune from claims arising from their failure to properly manage the court calendar. *See Rodriguez v. Weprin,* 116 F.3d 62, 66 (2d Cir.1997) (finding that the court's "inherent power to control its docket is part of its function of resolving disputes between parties" and is therefore "a function for which judges and their supporting staff are afforded absolute immunity"); *Oliva v. Heller,* 839 F.2d 37, 39–40 (2d Cir.1988).

 **\*3** Plaintiff has also named as defendants a host of private parties, including her apartment building and its operators.

These private parties are not subject to suit under 42 U.S.C. § 1983. *Rendell–Baker v. Kohn,* 457 U.S. 830, 838–42, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982) (affirming dismissal of § 1983 claim because defendants not state actors); *Flagg Bros. Inc. v. Brooks,* 436 U.S. 149, 155–57, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978) (stating § 1983 reaches only deprivations of rights by persons acting under color of law); *Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 173, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972) (distinguishing private conduct from state action).

Finally, plaintiff has named as defendants the State of New York, the New York State Division of Housing and Community Renewal Office of Rent Administration ("HCR"), and several New York state courts. All of these parties are absolutely immune from suit. The Eleventh Amendment bars § 1983 claims against states, absent their consent. *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100–01, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984); *Gollomp v. Spitzer,* 568 F.3d 355, 366 (2d Cir.2009) (the New York State Unified Court System is an arm of the State, and therefore protected by Eleventh Amendment immunity); *Morris v. Katz,* No. 11–CV–3556, 2011 WL 3918965, at *5 (E.D.N.Y. Sept.4, 2011) (HCR is immune from suit under the Eleventh Amendment); *Mullin v. P & R Educ. Servs., Inc.,* 942 F.Supp. 110, 112–13 (E.D.N.Y.1996) (holding that § 1983 claims against former DMV Commissioners are barred by the Eleventh Amendment).

Finally, the court finds that the filing of this action is frivolous and malicious. 28 U.S.C. § 1915(e)(2)(B)(i).

### CONCLUSION

For the reasons set forth above, the complaint is dismissed. 28 U.S.C. § 1915(e)(2)(B). The court's Order enjoining plaintiff from filing any new *in forma pauperis* action without first obtaining permission from the court remains in effect. The court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal would not be taken in good faith and therefore *in forma pauperis* status is denied for the purpose of an appeal. *See Coppedge v. United States,* 369 U.S. 438, 444–45, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962).

The Clerk of the Court is respectfully requested to serve a copy of this Memorandum and Order on plaintiff and note service on the docket.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 4034038

---

### Footnotes

1    Under the *Rooker–Feldman* doctrine, cases "brought by [a] state-court loser[ ] complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments" are barred in federal courts, which lack subject-matter jurisdiction over such actions. *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.,* 544 U.S. 280, 284, 125 S.Ct. 1517, 161 L.Ed.2d 454 (2005).

---

**End of Document**                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2024 WL 1344697

Only the Westlaw citation is currently available.

United States District Court, D. Connecticut.

Maurice D. HARRIS, Plaintiff,

v.

John DOE, Badge #469, Defendant.

CASE NO. 3:24-cv-151 (MPS)

|

Signed March 29, 2024

**Attorneys and Law Firms**

Maurice D. Harris, New Haven, CT, Pro Se.

**INITIAL REVIEW ORDER**

Michael P. Shea, United States District Judge

**\*1** Plaintiff Maurice D. Harris, a pretrial detainee incarcerated at New Haven Correctional Center, filed this case under 42 U.S.C. § 1983 naming one defendant, New Haven Police Officer John Doe, Badge #469. The plaintiff alleges that the defendant falsely arrested and detained him. The plaintiff seeks damages from the defendant in his individual capacity.

The Court must review prisoner civil complaints and dismiss any portion of the complaint that is frivolous or malicious, that fails to state a claim upon which relief may be granted, or that seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915A. This requirement applies to all prisoner filings regardless whether the prisoner pays the filing fee. Nicholson v. Lenczewski, 356 F. Supp. 2d 157, 159 (D. Conn. 2005) (citing Carr v. Dvorin, 171 F.3d 115 (2d Cir. 1999) (per curiam)). Here, the plaintiff is proceeding *in forma pauperis*.

The Court has thoroughly reviewed all factual allegations in the complaint and conducted an initial review of the allegations therein pursuant to 28 U.S.C. § 1915A. Based on this initial review, the Court orders as follows.

**I. Allegations**

While the Court does not set forth all of the facts alleged in the plaintiff's Complaint (ECF No. 1) and Addendum [1] (ECF No. 12), it summarizes his basic factual allegations here to give context to this ruling.

On September 25, 2023, the plaintiff got into a disagreement with library worker Jane Doe at the New Haven Library. ECF No. 12 ¶ 1. Jane Doe assaulted the plaintiff with "her walkie talkie." *Id.* ¶ 2. The plaintiff did not defend himself, instead calling 9-1-1 for assistance. *Id.*

The defendant and his partner responded to the call and the plaintiff told them what had happened. *Id.* ¶ 3. The defendant viewed the library video and showed the plaintiff a copy of the footage on his phone. *Id.* ¶ 4. The footage clearly showed Jane Doe hitting the plaintiff. *Id.* Regardless, the defendant arrested and detained the plaintiff, charging him with breach of peace and assault in the third degree. *Id.* ¶ 5. Jane Doe was not arrested or charged. *Id.* ¶ 9.

The plaintiff told the defendant that he had violated the plaintiff's constitutional rights, but the defendant only responded, "well, that's more money in your pocket." *Id.* ¶ 7. As a result of the arrest, the plaintiff was charged with violation of probation. *Id.* ¶ 10.

The plaintiff filed a complaint with the New Haven Police Department Office of Internal Affairs which remains under investigation. ECF No. 1 at 7.

**II. Discussion**

The plaintiff asserts two claims. First, he contends that the defendant violated his rights under the Fourth, Fifth, and Fourteenth Amendments to the United State Constitution, Article first, sections 7, 8, and 9 of the Connecticut Constitution, and committed the tort of false arrest by detaining and arresting him without probable cause after viewing the video footage. Second, the plaintiff asserts state torts for intentional infliction of emotional distress, defamation, and slander based on the defendant's "arrogant" response to the plaintiff.

**\*2** The plaintiff's federal claims are for violations of the Fourth, Fifth, and Fourteenth Amendments. The primary claim is the Fourth Amendment claim for false arrest. The Fifth Amendment claim is based on the plaintiff's allegation that he was not advised of his rights when he was arrested. The plaintiff does not specify any Fourteenth Amendment claim.

### A. Fourth Amendment

"To state a valid claim for false arrest ... under § 1983, a plaintiff must plead an unreasonable deprivation of liberty in violation of the Fourth Amendment and satisfy the state law elements of the underlying claims." *Walker v. Sankhi*, 494 F. App'x 140, 142 (2d Cir. 2012) (summary order); *see also Henderson v. Williams*, 2013 WL 2149698, at *3 (D. Conn. May 16, 2013). The addition of the requirement that the plaintiff show an unreasonable deprivation of liberty is necessary to bring the claim under section 1983 as "the basic purpose of § 1983 damages is to compensate persons for injuries that are caused by the deprivation of constitutional rights." *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 307 (1986) (internal quotation marks, citation, and emphasis omitted).

Under Connecticut law, a plaintiff seeking to bring a false arrest claim must allege that "(1) the defendant arrested plaintiff or had plaintiff arrested; (2) the plaintiff was aware of the arrest; (3) there was no consent for the arrest; and (4) the arrest was not supported by probable cause." *Chase v. Nodine's Smokehouse, Inc.*, 360 F. Supp. 3d 98, 112 (D. Conn. 2019) (citations omitted). In addition, the Second Circuit has held that a plaintiff bringing a false arrest claim under Connecticut law must have had the underlying charges terminated in his or her favor. *See Miles v. City of Hartford*, 445 F. App'x 379, 383 (2d Cir. 2011) (summary order) (noting that in *Roesch v. Otarola*, 980 F.2d 850, 853-54 (2d Cir. 1992), "this Court expressly held, invoking Connecticut law, that favorable termination is an element of a section 1983 claim sounding in false imprisonment or false arrest.").

Recent state superior court decisions question the inclusion of favorable termination as an element of a false arrest claim. *See, e.g., Burton v. Mason*, No. 06-UWY-CV-21-5028294-S, 2022 WL 433695, at *7 (Conn. Super. Ct. Jan. 21, 2022) ("[F]avorable termination of a criminal action on the plaintiff's behalf has not been established as a required element for a claim of false arrest in Connecticut courts." (citation and internal quotation marks omitted)). However, in the absence of Connecticut appellate precedent addressing this issue, the Court is required to follow Second Circuit precedent and conclude, for purposes of a constitutional claim for false arrest arising in Connecticut, that favorable termination of a prosecution is a required element of a claim for false arrest.

The plaintiff does not allege that the charges for which Officer Doe arrested him terminated in his favor. The plaintiff alleges that he was arrested on September 25, 2023. The Connecticut Judicial Branch website list a case, *State v. Harris*, No. N23N-CR23-0249858-S, where the plaintiff was arrested on September 25, 2023 and charged with assault in the third degree and breach of peace. This appears to be the criminal case underlying this action. The website indicates that the plaintiff pled guilty to assault in the third degree. *See* www.jud2.ct.gov/crdockets/CaseDetail.aspx?source=Pending&Key=10a051fa-d38d-4c40-a887-8e40c00b8de (last visited Mar. 28, 2024). As the criminal case has not terminated in the plaintiff's favor, he cannot state a plausible false arrest claim.

### B. Fifth Amendment

**\*3** The Fifth Amendment protects against compulsory self-incrimination by forbidding the introduction of coerced statements into evidence at trial. *Miranda*[2] warnings, however, are not constitutionally required. They were developed as a means to protect the Fifth Amendment right against compulsory self-incrimination. The failure to read the plaintiff his rights before questioning did not violate the plaintiff's constitutional rights and does not support a section 1983 claim. *See Chavez v. Martinez*, 538 U.S. 760, 772 (2003) (explaining that the Fifth Amendment only forbids introduction of coerced statements at trial, so failure to provide *Miranda* warning does not violate suspect's constitutional rights and "cannot be grounds for a § 1983 action"). Thus, the plaintiff fails to allege facts stating a plausible Fifth Amendment claim.

### C. Fourteenth Amendment

The plaintiff states that he brings this case for violation of his rights under the Fourteenth Amendment but alleges no facts supporting a Fourteenth Amendment claim. The mere mention of a constitutional provision is not sufficient to state a claim for relief under that provision. *See Calhoun v. Quiros*, No. 3:23-CV-00715(SVN), 2023 WL 8618745, at *4 (D. Conn. Dec. 13, 2023) (citing *Monger v. Conn. Dep't of Transp.*, No. 3:17-CV0205(JCH), 2017 WL 3996393, at *5 (D. Conn. Sept. 11, 2017)). The Court does not construe the complaint as stating claims under the Fourteenth Amendment.

### D. Jane Doe

In his prayer for relief, the plaintiff seeks damages from library worker Jane Doe. He has not, however, named her as a defendant in the case caption or in the body of the complaint. Federal Rule of Civil Procedure 10(a) requires that the names of all parties be included in the case caption. As the plaintiff did not comply with this requirement, Jane Doe is not a defendant in this case.

Further, the plaintiff does not name Jane Doe in his legal claims and fails to allege facts suggesting that Jane Doe violated his constitutional rights. He alleges only that they had a disagreement and she hit him with her walkie-talkie. This allegation constitutes, at most, a state law claim for assault and battery which is considered in the following section.

### E. State Law Claims

The plaintiff's remaining claims are state law constitutional and tort claims. However, all federal claims have been dismissed. The district court may decline to exercise supplemental jurisdiction over a state law claim if "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c); *see also Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.,* 373 F.3d 296, 308 (2d Cir. 2004) (noting that "[t]he fact that the district court has the power to hear these supplemental claims does not mean, of course, that it must do so. Instead, it may decline to exercise its power based on the factors laid out in 28 U.S.C. § 1367(c).."). Accordingly, the Court declines to exercise supplemental jurisdiction over the plaintiff's state constitutional and tort claims. The plaintiff may pursue these claims in state court.

### III. Conclusion

All federal law claims are **DISMISSED** pursuant to 28 U.S.C. § 1915A(b)(1) and the Court declines to exercise supplemental jurisdiction over the plaintiff's state law claims.

**SO ORDERED** this 29th day of March 2024 at Hartford, Connecticut.

**All Citations**

Slip Copy, 2024 WL 1344697

## Footnotes

1   Plaintiff filed an Addendum to his Complaint which is a copy of the handwritten pages appended to the Complaint. The only change is a correction to the date the incident occurred.

2   *Miranda v. Arizona,* 384 U.S. 436 (1966).

2024 WL 1344697
Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.

Maurice D. HARRIS, Plaintiff,

v.

John DOE, Badge #469, Defendant.

CASE NO. 3:24-cv-151 (MPS)
|
Signed March 29, 2024

**Attorneys and Law Firms**

Maurice D. Harris, New Haven, CT, Pro Se.

### INITIAL REVIEW ORDER

Michael P. Shea, United States District Judge

 **\*1** Plaintiff Maurice D. Harris, a pretrial detainee incarcerated at New Haven Correctional Center, filed this case under 42 U.S.C. § 1983 naming one defendant, New Haven Police Officer John Doe, Badge #469. The plaintiff alleges that the defendant falsely arrested and detained him. The plaintiff seeks damages from the defendant in his individual capacity.

The Court must review prisoner civil complaints and dismiss any portion of the complaint that is frivolous or malicious, that fails to state a claim upon which relief may be granted, or that seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915A. This requirement applies to all prisoner filings regardless whether the prisoner pays the filing fee. Nicholson v. Lenczewski, 356 F. Supp. 2d 157, 159 (D. Conn. 2005) (citing Carr v. Dvorin, 171 F.3d 115 (2d Cir. 1999) (per curiam)). Here, the plaintiff is proceeding *in forma pauperis.*

The Court has thoroughly reviewed all factual allegations in the complaint and conducted an initial review of the allegations therein pursuant to 28 U.S.C. § 1915A. Based on this initial review, the Court orders as follows.

#### I. Allegations

While the Court does not set forth all of the facts alleged in the plaintiff's Complaint (ECF No. 1) and Addendum [1] (ECF

No. 12), it summarizes his basic factual allegations here to give context to this ruling.

On September 25, 2023, the plaintiff got into a disagreement with library worker Jane Doe at the New Haven Library. ECF No. 12 ¶ 1. Jane Doe assaulted the plaintiff with "her walkie talkie." *Id.* ¶ 2. The plaintiff did not defend himself, instead calling 9-1-1 for assistance. *Id.*

The defendant and his partner responded to the call and the plaintiff told them what had happened. *Id.* ¶ 3. The defendant viewed the library video and showed the plaintiff a copy of the footage on his phone. *Id.* ¶ 4. The footage clearly showed Jane Doe hitting the plaintiff. *Id.* Regardless, the defendant arrested and detained the plaintiff, charging him with breach of peace and assault in the third degree. *Id.* ¶ 5. Jane Doe was not arrested or charged. *Id.* ¶ 9.

The plaintiff told the defendant that he had violated the plaintiff's constitutional rights, but the defendant only responded, "well, that's more money in your pocket." *Id.* ¶ 7. As a result of the arrest, the plaintiff was charged with violation of probation. *Id.* ¶ 10.

The plaintiff filed a complaint with the New Haven Police Department Office of Internal Affairs which remains under investigation. ECF No. 1 at 7.

#### II. Discussion

The plaintiff asserts two claims. First, he contends that the defendant violated his rights under the Fourth, Fifth, and Fourteenth Amendments to the United State Constitution, Article first, sections 7, 8, and 9 of the Connecticut Constitution, and committed the tort of false arrest by detaining and arresting him without probable cause after viewing the video footage. Second, the plaintiff asserts state torts for intentional infliction of emotional distress, defamation, and slander based on the defendant's "arrogant" response to the plaintiff.

 **\*2** The plaintiff's federal claims are for violations of the Fourth, Fifth, and Fourteenth Amendments. The primary claim is the Fourth Amendment claim for false arrest. The Fifth Amendment claim is based on the plaintiff's allegation that he was not advised of his rights when he was arrested. The plaintiff does not specify any Fourteenth Amendment claim.

## A. Fourth Amendment

"To state a valid claim for false arrest ... under § 1983, a plaintiff must plead an unreasonable deprivation of liberty in violation of the Fourth Amendment and satisfy the state law elements of the underlying claims." *Walker v. Sankhi*, 494 F. App'x 140, 142 (2d Cir. 2012) (summary order); *see also Henderson v. Williams*, 2013 WL 2149698, at *3 (D. Conn. May 16, 2013). The addition of the requirement that the plaintiff show an unreasonable deprivation of liberty is necessary to bring the claim under section 1983 as "the basic purpose of § 1983 damages is to compensate persons for injuries that are caused by the deprivation of constitutional rights." *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 307 (1986) (internal quotation marks, citation, and emphasis omitted).

Under Connecticut law, a plaintiff seeking to bring a false arrest claim must allege that "(1) the defendant arrested plaintiff or had plaintiff arrested; (2) the plaintiff was aware of the arrest; (3) there was no consent for the arrest; and (4) the arrest was not supported by probable cause." *Chase v. Nodine's Smokehouse, Inc.*, 360 F. Supp. 3d 98, 112 (D. Conn. 2019) (citations omitted). In addition, the Second Circuit has held that a plaintiff bringing a false arrest claim under Connecticut law must have had the underlying charges terminated in his or her favor. *See Miles v. City of Hartford*, 445 F. App'x 379, 383 (2d Cir. 2011) (summary order) (noting that in *Roesch v. Otarola*, 980 F.2d 850, 853-54 (2d Cir. 1992), "this Court expressly held, invoking Connecticut law, that favorable termination is an element of a section 1983 claim sounding in false imprisonment or false arrest.").

Recent state superior court decisions question the inclusion of favorable termination as an element of a false arrest claim. *See, e.g., Burton v. Mason*, No. 06-UWY-CV-21-5028294-S, 2022 WL 433695, at *7 (Conn. Super. Ct. Jan. 21, 2022) ("[F]avorable termination of a criminal action on the plaintiff's behalf has not been established as a required element for a claim of false arrest in Connecticut courts." (citation and internal quotation marks omitted)). However, in the absence of Connecticut appellate precedent addressing this issue, the Court is required to follow Second Circuit precedent and conclude, for purposes of a constitutional claim for false arrest arising in Connecticut, that favorable termination of a prosecution is a required element of a claim for false arrest.

The plaintiff does not allege that the charges for which Officer Doe arrested him terminated in his favor. The plaintiff alleges that he was arrested on September 25, 2023. The Connecticut Judicial Branch website list a case, *State v. Harris*, No. N23N-CR23-0249858-S, where the plaintiff was arrested on September 25, 2023 and charged with assault in the third degree and breach of peace. This appears to be the criminal case underlying this action. The website indicates that the plaintiff pled guilty to assault in the third degree. *See* www.jud2.ct.gov/crdockets/CaseDetail.aspx?source=Pending&Key=10a051fa-d38d-4c40-a887-8e40c00b8de (last visited Mar. 28, 2024). As the criminal case has not terminated in the plaintiff's favor, he cannot state a plausible false arrest claim.

## B. Fifth Amendment

*3 The Fifth Amendment protects against compulsory self-incrimination by forbidding the introduction of coerced statements into evidence at trial. *Miranda*[2] warnings, however, are not constitutionally required. They were developed as a means to protect the Fifth Amendment right against compulsory self-incrimination. The failure to read the plaintiff his rights before questioning did not violate the plaintiff's constitutional rights and does not support a section 1983 claim. *See Chavez v. Martinez*, 538 U.S. 760, 772 (2003) (explaining that the Fifth Amendment only forbids introduction of coerced statements at trial, so failure to provide *Miranda* warning does not violate suspect's constitutional rights and "cannot be grounds for a § 1983 action"). Thus, the plaintiff fails to allege facts stating a plausible Fifth Amendment claim.

## C. Fourteenth Amendment

The plaintiff states that he brings this case for violation of his rights under the Fourteenth Amendment but alleges no facts supporting a Fourteenth Amendment claim. The mere mention of a constitutional provision is not sufficient to state a claim for relief under that provision. *See Calhoun v. Quiros*, No. 3:23-CV-00715(SVN), 2023 WL 8618745, at *4 (D. Conn. Dec. 13, 2023) (citing *Monger v. Conn. Dep't of Transp.*, No. 3:17-CV0205(JCH), 2017 WL 3996393, at *5 (D. Conn. Sept. 11, 2017)). The Court does not construe the complaint as stating claims under the Fourteenth Amendment.

### D. Jane Doe

In his prayer for relief, the plaintiff seeks damages from library worker Jane Doe. He has not, however, named her as a defendant in the case caption or in the body of the complaint. Federal Rule of Civil Procedure 10(a) requires that the names of all parties be included in the case caption. As the plaintiff did not comply with this requirement, Jane Doe is not a defendant in this case.

Further, the plaintiff does not name Jane Doe in his legal claims and fails to allege facts suggesting that Jane Doe violated his constitutional rights. He alleges only that they had a disagreement and she hit him with her walkie-talkie. This allegation constitutes, at most, a state law claim for assault and battery which is considered in the following section.

### E. State Law Claims

The plaintiff's remaining claims are state law constitutional and tort claims. However, all federal claims have been dismissed. The district court may decline to exercise supplemental jurisdiction over a state law claim if "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c); *see also Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 308 (2d Cir. 2004) (noting that "[t]he fact that the district court has the power to hear these supplemental claims does not mean, of course, that it must do so. Instead, it may decline to exercise its power based on the factors laid out in 28 U.S.C. § 1367(c)."). Accordingly, the Court declines to exercise supplemental jurisdiction over the plaintiff's state constitutional and tort claims. The plaintiff may pursue these claims in state court.

### III. Conclusion

All federal law claims are **DISMISSED** pursuant to 28 U.S.C. § 1915A(b)(1) and the Court declines to exercise supplemental jurisdiction over the plaintiff's state law claims.

**SO ORDERED** this 29th day of March 2024 at Hartford, Connecticut.

### All Citations

Slip Copy, 2024 WL 1344697

## Footnotes

1    Plaintiff filed an Addendum to his Complaint which is a copy of the handwritten pages appended to the Complaint. The only change is a correction to the date the incident occurred.

2    *Miranda v. Arizona*, 384 U.S. 436 (1966).

End of Document                                                © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Kampfer v. Argotsinger, Not Reported in Fed. Supp. (2020)

Case 3:24-cv-00037-DNH-ML    Document 9    Filed 06/11/24    Page 273 of 449

2020 WL 906274
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Douglas E. KAMPFER, Plaintiff,

v.

Richard ARGOTSINGER, et al., Defendants.

1:18-CV-0007 (LEK/ATB)
|
Signed 02/25/2020

**Attorneys and Law Firms**

Douglas E. Kampfer, Mayfield, NY, pro se.

April J. Laws, Gregg T. Johnson, Corey A. Ruggiero, Loraine Clare Jelinek, Johnson & Laws, LLC, Clifton Park, NY, for Defendants.

<u>**MEMORANDUM-DECISION AND ORDER**</u>

Lawrence E. Kahn, Senior U.S. District Judge

**I. INTRODUCTION**

 **\*1**  Plaintiff Douglas Kampfer lives in Mayfield, New York ("Mayfield" or the "Town"), where defendant Richard Argotsinger serves as Town Supervisor and sits on the Mayfield Town Board (the "Town Board" or the "Board") along with defendants Vincent Coletti, Jack Putman, Thomas Ruliffson, and Steven Van Allen (collectively, "Defendants"). Dkt. No. 39 ("Amended Complaint"). Plaintiff sues under 42 U.S.C. § 1983, alleging that Defendants violated his constitutional rights during a series of events surrounding his appointment and tenure as Mayfield's Dog Control Officer. Id. He seeks declaratory relief and damages. Id. at 1, 2, 12.

Defendants have moved for summary judgment under Federal Rule of Civil Procedure ("FRCP") 56. Dkt. Nos. 86 ("Defendants' SJ Motion"); 86-19 ("Defendants' Memorandum"); 86-20 ("Defendants' Statement of Material Facts" or "Defendants' SMF"). Plaintiff has opposed Defendants' motion and cross-moves for summary judgment in his own right. Dkt. Nos. 87 ("Plaintiff's SJ Motion"); 87-2 ("Plaintiff's Statement of Material Facts" or "Plaintiff's SMF"); 87-3 ("Plaintiff's Memorandum"); 87-4 ("Response to Defendants' SMF"). Defendants have filed a reply in further support of their summary judgment motion and

opposing Plaintiff's summary judgment motion. Dkt. No. 88 ("Defendants' Reply"). For the following Dog reasons, the Court grants Defendants' summary judgment motion and denies Plaintiff's.

**II. BACKGROUND**

  **A. Factual Background**
The following facts are taken primarily from Defendants' Statement of Material Facts, as Plaintiff admitted most of the facts in Defendants' SMF, see Resp. to Defs.' SMF, and Plaintiff's purported SMF offered in support of his own summary judgment motion is two pages and consists largely of legal conclusions, see Pl's. SMF. The facts are undisputed unless otherwise noted.

Until his retirement in 2015, Plaintiff worked as Town of Mayfield cemetery caretaker, a position to which he was appointed annually by the Town Board. Defs' SMF ¶¶ 1, 2. In Mayfield, several town positions are filled each year upon appointment of the board at an annual "organizational meeting" in early January. Id. ¶¶ 9, 24–27, 30–31. Though Plaintiff denies that he attended any "organizational meetings," he admits that, in connection with the cemetery caretaker role, he attended seven January Board meetings in which the Board would authorize his position as cemetery caretaker. Id. ¶ 9.

In June of 2017, Plaintiff applied for a position as Mayfield's Dog Control Officer. Id. ¶ 3. For at least several years prior to 2017, Mayfield's Dog Control Officer had been appointed to one-year terms by the Town Board at the annual organizational meeting. [1] Id. ¶¶ 24–27. For example, a woman named Jane Potts served as Dog Control Officer in 2014, and after her appointment expired at the end of the year, the Town Board appointed a woman named Nancy Parker in her stead. Id. ¶¶ 24–25. Parker was reappointed several times. Id. ¶¶ 26–27.

 **\*2**  On January 5, 2017, at that year's organizational meeting, the Board appointed Parker to the Dog Control Officer position for a one-year term expiring on December 31, 2017. Id. ¶ 27. Then, in February 2017, Parker was appointed to the position of Mayfield town clerk. Dkt. No. 86-18 ("Parker Declaration") ¶ 4. In order to focus full-time on her new duties, Parker resigned as Dog Control Officer, effective August 11, 2017. Id. ¶ 8; Defs.' SMF ¶¶ 28, 29. Prior to the effective date of Parker's resignation, the Town Board began looking for a replacement dog control officer. After the Board

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 274 of 449

Kampfer v. Argotsinger, Not Reported in Fed. Supp. (2020)

received Plaintiff's application for the position in June, they appointed him dog control officer at the July 11, 2017 Board meeting. Id. ¶¶ 15, 29.

And here lies the crux of this dispute: the duration of Plaintiff's appointment. Defendants insist that Plaintiff was appointed merely to serve out the remainder of Parker's term, i.e., from August 11, 2017 to December 31, 2017, id. ¶ 29, whereas Plaintiff understood his appointment to be permanent. Id. ¶ 59. Plaintiff understood this to be so because he never received a letter of appointment clarifying the duration of his term in office, id. ¶ 60. [2] In support of his position, Plaintiff points out that the minutes from the July 11, 2017 board meeting say only that the "Board approve[d] the appointment of Douglas Kampfer as Dog Control Officer" and say nothing about a duration of employment. Pl.'s Resp. to Defs.' SMF ¶ 29. However, in their sworn declarations, Defendants state that they intended and understood Plaintiff's appointment to last only to the end of Parker's term. Dkt. Nos. 86-13 ("Argotsinger Declaration") ¶¶ 16–17; 86-14 ("Putnam Declaration") ¶¶ 15–16; 86-15 ("Van Allen Declaration") ¶¶ 15–16; 86-16 ("Ruliffson Declaration") ¶¶ 15–16; 86-17 ("Coletti Declaration") ¶¶ 15–16.

Further, Defendants point out that, after receiving his appointment as Dog Control Officer, Plaintiff signed an "Oath of Office" form that, as submitted to the Court, lists the dates of Plaintiff's appointment "from 8/11/17 to 12/31/17." Defs.' SMF ¶¶ 16–18; Dkt. No. 86-6 ("Minutes of July 11, 2017 Board Meeting") at 6. But Plaintiff insists that the dates were not written on the oath form when he signed it. Dkt. No. 86-10 ("Kampfer Deposition") at 160. Regardless, it is undisputed that no town official told Plaintiff "that there was going to be any change regarding the Dog Control Officer position," Defs.' SMF ¶¶ 19, and that, when Plaintiff left the Board meeting on July 11, 2017, he understood that he had replaced Parker as Dog Control Officer, id. ¶ 22. Plaintiff then began working as Dog Control Officer. See Am. Compl. at 5.

On August 18, 2017, Parker gave Plaintiff a proposed independent contractor agreement ("Agreement") related to his work as Dog Control Officer. Id. ¶ 39. The agreement stated that Plaintiff would serve as Dog Control Officer from July 11, 2017 to December 31, 2017. Id. ¶ 40; Dkt. No. 86-11 ("Independent Contractor Agreement"). However, Plaintiff refused to sign the Agreement. Defs.' SMF ¶ 43.

Also sometime in August, Plaintiff attended an executive session of the Town Board in which the Board asked him

to "slow down the work he was doing" because he was requesting more travel reimbursements than the town had budgeted for. Id. ¶ 34; Kampfer Depo. at 65. At this same meeting, the Board also told Plaintiff that a letter he had written in his capacity as Dog Control Officer to certain town citizens was "inappropriate." Defs.' SMF ¶¶ 35–36. Plaintiff responded that he thought the letter was appropriate. Id. ¶ 36.

**\*3** Plaintiff apparently continued to discharge his duties as dog control officer for the remainder of the year, without incident, and was paid accordingly. Id. ¶¶ 43–44. Near the end of the year, in December 2017, Plaintiff received a letter from the Town Board informing him that his appointment as Dog Control Officer would end on December 31, 2017 and that he would not be reappointed. Id. ¶ 45. The Board had made this decision at an executive session held on December 12, 2017. Id. The letter further asked Plaintiff to return any town equipment he had in relation to his Dog Control Officer role, which he subsequently did on January 1 or 2, 2018. Id. ¶ 54. Plaintiff was paid in full for the work he did as Dog Control Officer from August 11, 2017 to December 31, 2017. Id. ¶ 44.

Following the expiration of Plaintiff's term as Dog Control Officer, at the January 1, 2018 organizational meeting the Board appointed Karen Wilson as Dog Control Officer for a one-year term expiring on December 31, 2018. Id. ¶ 30.

Those are essentially the facts, though one other point bears mentioning here. Plaintiff alleges in his Amended Complaint that asking him to sign the independent contractor agreement "was a violation of ... New York['s] Agriculture and Markets Law," and that, on August 18, 2017, he filed a "formal complaint" about this alleged violation with the office of the New York State Attorney General (the "AG Complaint"). Am. Compl. at 6. However, because Plaintiff has apparently taken no discovery in this case, [3] and has submitted minimal evidence in support of his motion for summary judgment, see generally Pl.'s SMF, the Court has no evidence about the AG Complaint other than the allegations in the Amended Complaint. Plaintiff himself does not know if the Attorney General's office ever followed up on this complaint or contacted any town official about it. Defs.' SMF ¶ 65.

### B. Relevant Procedural History

On January 2, 2018, two days after his term as Dog Control Officer expired, Plaintiff filed this suit. Dkt. No. 1 ("Complaint"). Then, on July 12, 2018, he filed the Amended

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 275 of 449

Kampfer v. Argotsinger, Not Reported in Fed. Supp. (2020)

Complaint, which the Court declared to be the operative pleading on August 31, 2018. Dkt. Nos. 48, 53.

For the sake of judicial economy, the Court notes that the remainder of this case's procedural history leading up to the instant summary judgment motions consists primarily of Plaintiff filing frivolous motions, see, e.g., Dkt. Nos. 58, 64 (attempting to add the Honorable Andrew T. Baxter, the presiding United States Magistrate Judge in this case, to Plaintiff's witness list), and attempting avoid sitting for his deposition, see, e.g., Dkt. Nos. 53, 68, 79. The Court takes this opportunity to commend Judge Baxter for his speedy, fair, and patient resolution of many of these motions.

Finally, after eventually deposing Plaintiff on December 19, 2018, Defendants moved for summary judgment on March 1, 2019. See Defs.' SJ Mot. Plaintiff filed his cross-motion on March 11, 2019. See Pl.'s SJ Mot. The Court notes here that Plaintiff's summary judgment motion is supported by only one page of legal argument and a few sparse evidentiary exhibits. See Pl.'s Mem., Exs. A–B; Pl.'s SMF. For this reason, the following discussion focuses primarily on Defendants' summary judgment motion and arguments.

### C. Plaintiff's Claims

The Amended Complaint contains four causes of action: (1) Defendants violated Plaintiff's Fifth and Fourteenth Amendment procedural and substantive due process rights by failing to provide him with notice and a hearing related to the cessation of his position as Dog Control Officer; (2) Defendants retaliated against Plaintiff in violation of the First Amendment because he complained to the New York Attorney General about the "illegal" independent contractor agreement; (3) Defendants' actions "so shock[ ] the conscience of a person[ ] that the Defendant(s) ... are liable to the plaintiff under the Seventh Amendment ..."; and (4) Defendants' actions constitute "cruel and unusual punishment" in violation of the Eighth Amendment. Am. Compl. at 9–11.

**\*4** Plaintiff seeks declaratory relief clarifying "what Procedural Due Process rights ... must be applied ... before [Plaintiff] ... can be deprived of" "any appointments or wages." Id. at 2. Specifically, he asks the Court to clarify whether procedural due process guarantees him notice and a hearing regarding the Board's decision not to reappoint him, whether the Board violated his rights by failing to give him a "written [a]ppointment," and whether he was illegally deprived of wages after December 31, 2017. Id.

Further, the Amended Complaint initially contained a request that the Court declare whether a public official who commits a civil rights violation can be assessed punitive damages or even be held liable criminally. Id. at 3. However, with approval of the Court, Plaintiff subsequently withdrew these requests for declaratory relief. Dkt. Nos. 53, 54.

Finally, Plaintiff asks for costs and a hearing on damages subsequent to any trial on the merits. Id. at 12.

### III. LEGAL STANDARD

FRCP 56 instructs courts to grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute is " 'genuine' ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Thus, while "[f]actual disputes that are irrelevant or unnecessary" will not preclude summary judgment, "summary judgment will not lie if ... the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.; see also Taggart v. Time, Inc., 924 F.2d 43, 46 (2d Cir. 1991) ("Only when no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted.").

The party seeking summary judgment bears the burden of informing the court of the basis for the motion and identifying those portions of the record that the moving party claims will demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Similarly, a party is entitled to summary judgment when the nonmoving party has failed "to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

In attempting to repel a motion for summary judgment after the moving party has met its initial burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). At the same time, a court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). Thus, a court's duty in reviewing a motion for summary judgment is "carefully limited" to finding genuine disputes of fact, "not to deciding them." Gallo v.

Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).

## IV. DISCUSSION

The Court addresses in turn: (A) two preliminary matters; (B) the merits of Defendants' summary judgment motion as to each of Plaintiff's claims; and (C) a few final loose ends.

### A. Preliminary Matters

#### 1. Waiver of Arguments

In their Reply, Defendants urge the Court to find that Plaintiff has "consented" to the arguments Defendants made in their summary judgment briefing. Defs.' Reply at 2. This is because "Plaintiff ... failed to offer any arguments whatsoever in opposition to Defendants' Motion and, instead, merely asserts a cross-motion" that consists of a "one and a half page 'argument' ... 'supported' solely by conclusory statements and two factually distinguishable and legally inapplicable cases...." Id. at 1–2; see also Pl.'s Mem. at 4 (citing Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532 (1985) and Kampfer v. Jacob DaCorsi, 6 N.Y.S.3d 680 (3rd Dept. 2015)) (containing the sum total of Plaintiff's argument on summary judgment). Defendants point out that, in similar circumstances, courts in this district generally deem the litigant who has failed to respond as "consenting" to the opposing party's arguments. Defs.' Reply at 2 (citing Robert H. Law, Inc. v. Woodbine Bus. Park, Inc., No. 13-CV-1393, 2018 WL 851382, at *10 (N.D.N.Y. Feb. 12, 2018) ("[W]here a non-movant has failed to respond to a movant's properly filed and facially meritorious memorandum of law, the non-movant is deemed to have "consented" to the legal arguments contained in that memorandum of law....") (other citations omitted)). Moreover, pointing to Plaintiff's extensive history of filing lawsuits,[4] Defendants argue that the Court should disregard Plaintiff's pro se status in this case, because Plaintiff is an "experienced" litigant who "do[es] not enjoy the same 'special solicitude' afforded to other pro se litigants." Defs.' Reply at 3 (citing Shaheen v. McIntyre, No. 05-CV-173, 2007 WL 3274835, at *7 (N.D.N.Y. Nov. 5, 2007) ("revok[ing]" pro se plaintiff's "special status" because he had filed "at least twenty other federal court actions ... and at least four state court actions" over the previous twenty years)).

**\*5** Defendants' points are well-taken, however the Court is chary of granting so drastic a remedy as deeming Plaintiff

to have consented to Defendants' Motion. In any event, as described below, the Court finds that Plaintiff's claims fail on the merits. As for whether to strip Plaintiff of the special status he enjoys as a pro se litigant, since Plaintiff's claims fail on the merits, the Court declines to wade through the twenty-eight prior cases Defendants have identified to determine if they really were filed by Plaintiff, if Plaintiff proceeded pro se, and whether Plaintiff was victorious. See id. (listing factors courts consider when deciding whether to grant a pro se litigant "special solicitude"). Plaintiff has occupied enough of the Court's time as it is.

#### 2. Individual vs. Official Capacity

There appears to be some uncertainty as to whether Plaintiff sues Defendants in their individual or official capacities. For example, in the caption of the Amended Complaint, after the name of each defendant, Plaintiff has written "[i]ndividual capacity," Am. Compl. at 1, but later under each cause of action he lists each defendant "in their individual and in their official capacity," id. at 9–11. Also, in his deposition, Plaintiff agreed that he was suing the five members of the Town Board listed above and confirmed that he was not suing the Town of Mayfield itself. Kampfer Depo. at 109–10. This testimony, along with Plaintiff's earlier filings with the Court, see Dkt. No. 64 (letter to the Court stating that "Plaintiff is not suing the Municipality the Town of Mayfield ... [but] is suing the Defendants in their individual capacities"), formed the basis of Defendants' observation in their statement of material facts that "Plaintiff ... is suing ... Defendants in their individual capacities[ ] only ... [and] is not maintaining and claims against the Town as a municipal entity," Defs.' SMF ¶¶ 66–67. However, in his Response to Defendants' SMF, Plaintiff states the contradictory propositions that he is suing Defendants in their "[i]ndividual capacities and [o]fficial capacities" but not suing the Town itself. Resp. to Defs.' SMF ¶¶ 66–67.

The Court attributes this confusion to Plaintiff failing to understand that suing a municipal official—such as a member of the Town Board—in her or his official capacity is tantamount to suing the municipality itself. See, e.g., Macera v. Vill. Bd. of Ilion, No. 16-CV-668, 2019 WL 4805354, at *10 n.5 (N.D.N.Y. Sept. 30, 2019) (Kahn, J.). However, regardless of whether Plaintiff actually intended to sue the Town and, thus, regardless of whether Plaintiff knew the import of suing Defendants in their official capacities, the Town cannot be liable through any "official capacity" claim because, as the Court explains below, Plaintiff's individual

Kampfer v. Argotsinger, Not Reported in Fed. Supp. (2020)

Case 3:24-cv-00037-DNH-ML    Document 9    Filed 06/11/24    Page 277 of 449

capacity claims against each Defendant fail on their own accord. Id. at *22. ("[T]he Village cannot be liable for conduct that the Court ... determine[s] was not a constitutional violation.").

**B. Merits**

Turning to the merits of Plaintiff's claims, the Court first lays out the general requirements for bringing a claim under § 1983. In order to maintain a claim under § 1983, a plaintiff must establish "(1) that some person has deprived him of a federal right, and (2) that the person who has deprived him of that right acted under color of state ... law." Velez v. Levy, 401 F.3d 75, 84 (2d Cir. 2005) (quoting Gomez v. Toledo, 446 U.S. 635, 640 (1980) (internal quotations omitted)); United States v. Int'l Bhd. of Teamsters, 941 F.2d 1292, 1295–96 (2d Cir. 1991) ("Because the United States Constitution regulates only the Government, not private parties, a litigant claiming that his constitutional rights have been violated must first establish that the challenged conduct constitutes 'state action.' "). "Section 1983 is not itself a source of substantive rights[,] but merely provides a method for vindicating federal rights elsewhere conferred[.]" Patterson v. County of Oneida, 375 F.3d 206, 225 (2d Cir. 2004) (quoting Baker v. McCollan, 443 U.S. 137, 144 n.3 (1979)).

**\*6** Bearing these rules in mind, the Court now addresses each of Plaintiff's claims.

*1. Fourteenth Amendment Procedural Due Process*[5]

Defendants argue that "Plaintiff had no property interest in continued employment after December 31, 2017, and thus was not entitled to any procedural due process." Defs.' Mem. at 9. The Court agrees.

The Due Process Clause of the Fourteenth Amendment contains both a procedural and substantive component. Zinermon v. Burch, 494 U.S. 113, 125 (1990). The procedural component bars "the deprivation by state action of a constitutionally protected interest in 'life, liberty, or property' ... without due process of law." Rotundo v. Vill. of Yorkville, No. 09-CV-1262, 2011 WL 838892, at *7 (N.D.N.Y. Mar. 4, 2011) (citing Zinermon, 494 U.S. at 125). "To establish a procedural due process violation, a plaintiff 'must: (1) identify a property right; (2) establish that governmental action with respect to that property right amounted to a deprivation; and (3) demonstrate that the

deprivation occurred without due process.' " Macera, 2019 WL 4805354, at *12 (quoting Rosa R. v. Connelly, 889 F.2d 435, 438 (2d Cir. 1989), cert. denied, 496 U.S. 941 (1990)). "Property interests are not created by the Constitution, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." Facci-Brahler v. Montgomery Cty., No. 18-CV-941, 2020 WL 360873, at *8 (N.D.N.Y. Jan. 22, 2020) (Kahn, J.) (citing Coles v. Erie Cty., 629 F. App'x 41, 42 (2d Cir. 2015)). "In the [public] employment context, a property interest arises only where the state is barred, whether by statute or contract, from terminating (or not renewing) the employment relationship without cause." S & D Maint. Co. v. Goldin, 844 F.2d 962, 967 (2d Cir. 1988). "The party asserting due process rights has the burden of establishing a legitimate property interest in continued employment." Jones v. Town of Whitehall, No. 13-CV-806, 2015 WL 4603511, at *5 (N.D.N.Y. July 30, 2015) (Kahn, J.).

Here, Plaintiff has failed to meet his burden of raising a genuinely disputed issue of material fact as to whether he had a property interest in continued employment. First, Plaintiff was not a "covered employee" under New York Civil Service Law § 75, which provides civil service protections to certain categories of public employees. See id. at *6 (citing N.Y. Civ. Serv. Law § 75). New York Civil Service Law § 75 does not apply to the Dog Control Officer position because there is no evidence in the record that: "(a) the [Dog Control Officer] was ... a competitive class position; (b) Plaintiff was ... honorably discharged from the armed forces of the United States; (c) Plaintiff [held] [his] position for five years continuously; (d) Plaintiff was ... a Homemaker or Home Aide in New York City with at least three years of continuous service; [or] (e) Plaintiff [was] a police officer."[6] Defs.' Mem. at 11. Indeed, Plaintiff does not allege or argue that any of these categories laid out in the statute cover the Dog Control Officer position. See generally Am. Compl.; Pl.'s Mem.[7] Further, New York State Agriculture and Markets Law § 113, which governs the appointment of local dog control officers and which Plaintiff does cite to in his briefing, id. at 3, says nothing about the duration of appointments made under that section or civil service protections for those appointed. See N.Y. Agric. & Mkts. Law § 113. Nothing in these relevant statutory provisions gives Plaintiff "a legitimate property interest in [his] continued employment." See Jones, 2015 WL 4603511, at *6.

**\*7** Without a statutory basis for his alleged property interest in continued employment, Plaintiff must raise a triable issue

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 278 of 449

Kampfer v. Argotsinger, Not Reported in Fed. Supp. (2020)

of fact that he had a contractual basis for his interest. See S & D Maint. Co., 844 F.2d at 967. Yet here too, Plaintiff has failed to do so. Plaintiff admits that he refused to sign the employment Agreement presented to him by the Board, Kampfer Depo. at 95, and in, fact, admits that he had no written contract with Defendants at all. See Pl.'s Mem. at 4 ("Defendants did not have a valid written ... contract [with Plaintiff]"); Kampfer Depo. at 52. [8] Nor is there evidence in the record that any Defendant made an oral representation to Plaintiff that he was being appointed for anything more than the remainder of Parker's term as Dog Control Officer. See Defs.' SMF ¶¶ 19, 22, 55–56; see generally Pl.'s SMF. This undisputed evidence dooms Plaintiff's claim.

Plaintiff may have personally believed that his appointment was "permanent," id. at 140, and the oath of office form may not have listed the dates of Plaintiff's appointment when he signed it, but "an employee must have more than a unilateral expectation of continued employment" to establish a property interest sufficient to maintain a procedural due process claim. Jones, 2015 WL 4603511, at *6. Here, it appears to be undisputed that no Defendant—or any other town official— represented to Plaintiff that his appointment was for anything more than the remainder of Parker's 2017 term as Dog Control Officer, Defs.' SMF ¶¶ 19, 22, 42, that the practice in Mayfield had always been to appoint the Dog Control Officer for year-long terms, id. ¶ 64, that Plaintiff had been appointed annually to his cemetery caretaker position in the past, id. ¶ 2, and that Defendants intended to appoint Plaintiff only for the remainder of Parker's term, see Argotsinger Decl.; Putnam Decl.; Van Allen Decl.; Ruliffson Decl.; Coletti Decl. Therefore, there is no evidence that Plaintiff had anything other than a "unilateral expectation" that his appointment was permanent, and Plaintiff has not raised a triable issue of fact as to whether he had constitutionally protected property interest. See Jones, 2015 WL 4603511, at *7 (no constitutionally protected property interest where plaintiff "assert[ed] that she believed that she could only be fired for misconduct ... and that it was customary for other appointed employees to be reappointed each year"). Without such a property interest, his procedural due process claim fails. See Bd. of Regents of State Colleges v. Roth, 408 U.S. 564, 578 (1972) (where a public employee's appointment terminated on a certain date and there was no specific provision for renewal after that date, the employee "did not have a property interest sufficient to require ... a hearing when [officials] declined to renew his contract of employment").

Further, to the extent Plaintiff's procedural due process claim is based on the Board's alleged failure to give him a "written appointment," see Am. Compl. at 2, the claim also fails. Plaintiff's evidence, such as it is, does not raise a triable issue of fact as to whether he had a "legitimate claim of entitlement" to receive a document memorializing his appointment as Dog Control Officer. See Kapps v. Wing, 404 F.3d 105, 113 (2d Cir. 2005) ("[A] property interest arises only where one has a legitimate claim of entitlement to the benefit....") (internal quotation marks omitted). Plaintiff points to two state statutes that purportedly support his claim: New York Agriculture and Markets Law § 113 and New York Town Law § 25. Pl.'s Mem. at 4. But neither of these statutes require the Town Board to provide an appointed Dog Control Officer with any such writing. See generally N.Y. Agric. & Mkts. Law § 113; N.Y. Town Law § 25. Nor is the Court aware of any other statutory provision that would require the Board to provide Plaintiff with the kind of "written appointment" he demands.

*8 In support of Plaintiff's summary judgment motion he submitted excerpts from the New York Department of Agriculture and Markets' "Dog Control Officer & Municipal Shelter Guide," which says that "[a]ll appointments and/or contracts must be in writing." Pl.'s SMF, Ex. A. Yet this document specifically states that it is a "summar[y] of laws and regulations" and "not meant to replace" them. Id. And when the Board presented Plaintiff with a contract memorializing the terms of his appointment— as contemplated by this Guide—Plaintiff refused to sign it. Plaintiff's claim, then, appears to be based on nothing more than a "unilateral expectation" of receiving a different, undefined sort of "written appointment," and no reasonable jury could find that he had a legitimate claim of entitlement to receiving that writing. The Court therefore grants summary judgment to Defendants. [9]

### 2. Fourteenth Amendment Substantive Due Process [10]

Defendant argues that Plaintiff's substantive due process claim fails because, once again, Plaintiff "has not, and cannot, demonstrate any property interest in continued employment ... and he is unable to offer evidence of any consci[ence]-shocking state action by any Defendant." Defs.' Mem. at 16. The Court agrees.

"The substantive component [of the due process clause] bars certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them."

Case 3:24-cv-00037-DNH-ML  Document 9  Filed 06/11/24  Page 279 of 449

Kampfer v. Argotsinger, Not Reported in Fed. Supp. (2020)

Rotundo, 2011 WL 838892, at *7. "To establish that defendants violated plaintiff's substantive due process rights, the Court must first inquire 'whether a constitutionally cognizable property interest is at stake.' " Scaccia v. Stamp, 700 F. Supp. 2d 219, 235 (N.D.N.Y. 2010) (quoting Villager Pond, Inc. v. Town of Darien, 56 F.3d 375, 378 (2d Cir. 1995)), aff'd, 447 F. App'x 267 (2d Cir. 2012). "Second, the Court must determine whether Defendants acted in an arbitrary or irrational manner in depriving [Plaintiff] of that property interest." Facci-Brahler, 2020 WL 360873, at *9 (internal quotation marks omitted). "With regard to the second element, 'a plaintiff must demonstrate that the state action was so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.' " Doe v. Patrick, No. 17-CV-846, 2020 WL 529840, at *8 (N.D.N.Y. Feb. 3, 2020) (Kahn, J.) (quoting Okin v. Village of Cornwall-On-Hudson Police Dep't, 577 F.3d 415, 431 (2d Cir. 2009) (other quotation marks omitted)).

As described above, Plaintiff has failed to establish a triable issue of fact as to whether he had a constitutionally protected property interest in his position as Dog Control Officer. But even if he had, his substantive due process claim would fail because "[t]he Second Circuit has never articulated a fundamental interest in public employment giving rise to substantive due process protection." Mathirampuzha v. Potter, No. 08-CV-682, 2010 WL 55061, at *9 (D. Conn. Jan. 4, 2010), aff'd sub nom. Mathirampuzha v. Donahoe, 423 F. App'x 108 (2d Cir. 2011). Further, "other courts have explicitly declared that there is no such interest." See Nichik v. New York City Transit Auth., No. 10-CV-5260, 2013 WL 142372, at *12 (E.D.N.Y. Jan. 11, 2013) (citing Nicholas v. Pa. State Univ., 227 F.3d 133, 142 (3d Cir. 2000) (joining the "great majority of courts of appeals" in holding that "tenured public employment" is not a "fundamental property interest entitled to substantive due process protection"); McKinney v. Pate, 20 F.3d 1550, 1553, 1560 (11th Cir. 1994) (en banc) (state-created property interest in employment does not give rise to substantive due process claim)). Additionally, where the undisputed evidence is that the Board declined to reappoint Plaintiff because he had acted inappropriately with certain town residents, see Argotsinger Decl. ¶ 17, there is no evidence that Defendants' decision was so arbitrary or outrageous that it would constitute a substantive due process violation. See Mathirampuzha, 2010 WL 55061, at *9 ("Given the legitimate reason advanced for Ms. Mathirampuzha's termination ... terminating her ... hardly shocks the conscience."). For all these reasons, the Court

grants Defendants' summary judgment motion as to Plaintiff's substantive due process claims.

### 3. First Amendment Retaliation

**\*9** Defendants argue that Plaintiff's First Amendment retaliation claim fails because, as a public employee, his speech about his role as Dog Control Officer is not protected. Defs.' Mem. at 18–22. The Court agrees that Plaintiff's claim fails, but grants Defendants' motion primarily on the basis that Plaintiff has not raised a triable issue of fact as to causation.

To survive a motion for summary judgment on a First Amendment retaliation claim, a plaintiff must present evidence: "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." Myers v. Municipality of Greene Cty., No. 19-CV-325, 2020 WL 204296, at *5 (N.D.N.Y. Jan. 14, 2020) (Kahn, J.). A public employee's work-related speech is protected "when he or she is speaking 'as a citizen upon matters of public concern.' " Raymond v. City of New York, 317 F. Supp. 3d 746, 772 (S.D.N.Y. 2018) (quoting Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968)). If a plaintiff establishes a triable issue of fact as to all three elements of the retaliation claim, including that her or his speech was delivered as a citizen on a matter of public concern, "the defendant [then] has the opportunity to show by a preponderance of the evidence that it would have taken the same adverse employment action even in the absence of the protected conduct." Nagle v. Marron, 663 F.3d 100, 105 (2d Cir. 2011).

Here, the alleged basis for Plaintiff's retaliation claim appears to be his AG Complaint about the Board's request that he sign an "illegal" independent contractor agreement. See Am. Compl. at 9–10. Plaintiff's retaliation claim on this basis fails, however, because there is no evidence of causation. The record contains no evidence that any member of the Town Board knew about Plaintiff's complaint when they decided not to reappoint Plaintiff in December 2017. Indeed, Plaintiff acknowledges that he has no evidence that the Attorney General's office ever contacted any town official about his complaint. See Resp. to Defs.' SMF. Without any admissible evidence that Defendants knew about his complaint, Plaintiff has not met his burden to raise a triable issue of fact as to whether his AG Complaint *caused* Defendants' decision

not to reappoint him. Cf. Kim v. Columbia Univ., 460 F. App'x 23, 25 (2d Cir. 2012) (describing how a plaintiff can show retaliation through adverse actions taken soon after an "employer[ ] [had] knowledge of [the] protected activity").

Admittedly, "a plaintiff can indirectly establish a causal connection to support a ... retaliation claim by showing that the protected activity was closely followed in time by the adverse [employment] action." Gorman–Bakos v. Cornell Coop. Extension of Schenectady Cnty., 252 F.3d 545, 554 (2d Cir. 2001) (internal quotation marks and citation omitted). However, without any direct evidence of retaliatory animus, the four-month time period between Plaintiff's complaint on August 18, 2017 and the Board's decision not to reappoint him on December 12, 2017 is too long to establish an inference of causation. See Dillon v. Suffolk Cty. Dep't of Health Servs., 917 F. Supp. 2d 196, 214 (E.D.N.Y. 2013) ("[C]ourts in this Circuit have consistently held that a passage of more than two months between the protected activity and the adverse employment action does not allow for an inference of causation."). [11]

 **\*10**  Nor does it appear that Plaintiff has raised a triable issue of fact as to whether his AG Complaint was on a matter of a public concern. Speech "on a matter of public concern" "relat[es] to any matter of political, social, or other concern to the community." Nagle, 663 F.3d at 106 (quoting Connick v. Myers, 461 U.S. 138, 146 (1983)). Assuming for the sake of argument that Plaintiff's AG Complaint reported an actual crime, "[n]o authority supports [the] argument that [merely] reporting an alleged crime [necessarily] implicates matters of public concern." Id. at 107. Here, where there is "no[ ] claim that the [allegedly illegal act] revealed an ongoing pattern of conduct or even a particularly important instance of bad judgment on [the Defendant's] part," Plaintiff has failed to show that the Board's allegedly illegal attempt to get him to sign an independent contract agreements was "a matter of public concern." Id. at 108 (where a public school teacher alleged that she was not granted tenure in retaliation for reporting an assistant principal who had forged her signature, stating that "even if [the act of forgery] were criminal, [it] had no practical significance to the general public").

For all these reasons, the Court grants Defendants' motion for summary judgment on this claim.

### *4. Seventh Amendment*

Plaintiff's third cause of action purports to bring claims under the Seventh Amendment. See Am. Compl. at 10–11. Specifically, Plaintiff alleges that "[t]he actions of Defendant(s) ... using the[ ] power of their respective offices ... to deprive the Plaintiff of his First, Fifth and Fourteenth Amendment Rights ... so shocks the conscience of a person[ ] that the Defendant(s) ... are liable to the plaintiff under the Seventh Amendment...." Id. But Plaintiff misunderstands the law. The Seventh Amendment "preserve[s]" "the right of trial by jury" for certain cases brought in a federal court. See Messa v. Goord, 652 F.3d 305, 308 (2d Cir. 2011) (citing U.S. Const. amend. VII). It does not, however, "provide[ ] a basis for an additional cause of action" cognizable under § 1983. See White v. City of New York, No. 13-CV-7156, 2014 WL 4357466, at *8 n.13 (S.D.N.Y. Sept. 3, 2014). Therefore, "[t]he Court construes Plaintiff's citation to the Seventh Amendment as support for h[is] request for a civil jury trial," rather than as an independent basis for relief. Id.

Additionally, because Plaintiff has made no allegations—other than the statement quoted in the previous paragraph—and submitted no evidence that his Seventh Amendment rights were violated, the Court dismisses any claims purportedly brought under the Seventh Amendment. See Guttila v. City of New York, No. 14-CV-156, 2015 WL 437405, at *10 (S.D.N.Y. Feb. 3, 2015) (dismissing purported Seventh Amendment claim brought under Section 1983 where plaintiff "allege[d] nothing to support a Seventh Amendment claim; she merely list[ed] that amendment in the complaint as a source of law purportedly violated by Defendants").

### *5. Eighth Amendment*

Plaintiff's Eighth Amendment claim also fails as a matter of law. "The Eighth Amendment's prohibition of 'cruel and unusual punishment' applies only to those who have been convicted of a crime and sentenced, and are thus suffering the 'punishment' contemplated by the Cruel and Unusual Punishment Clause." Balkum v. Sawyer, No. 06-CV-1467, 2011 WL 5041206, at *9 (N.D.N.Y. Oct. 21, 2011); see also Jackson v. Johnson, 118 F. Supp. 2d 278, 286 (N.D.N.Y. 2000), aff'd in part, dismissed in part, 13 F. App'x 51 (2d Cir. 2001) ("The Eighth Amendment 'was designed to protect those convicted of crimes....' ") (quoting Whitley v. Albers, 475 U.S. 312, 318 (1986)). Plaintiff has neither alleged nor submitted evidence demonstrating that he was convicted of,

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 281 of 449

Kampfer v. Argotsinger, Not Reported in Fed. Supp. (2020)

or sentenced for, any crime. Therefore, he cannot bring a claim under the Eighth Amendment.

### C. Loose Ends

Because the Court dismisses Plaintiff's claims on the above grounds, there is no need to address Defendants' alternative arguments as to legislative immunity, qualified immunity, or personal involvement. See generally Defs.' Mem. Additionally, before closing, the Court notes here that there are some allegations in Plaintiff's summary judgment briefing that it disregards. Specifically, Plaintiff makes several statements that appear to accuse defense counsel of violating Plaintiff's rights. See Pl.'s Mem. at 4 ("[T]he Defendants and their attorney Gregg T. Johnson on May 14, 2018 engaged in a State Action to deprive myself of the Procedural Due Process I was due on July 11, 2017, by refusing to entertain my request to settle this matter...."); Pl.'s SMF ¶ 6. These allegations are not found in the Amended Complaint and therefore are inappropriate to include in summary judgment briefing. See Southwick Clothing LLC v. GFT (USA) Corp., No. 99-CV-10452, 2004 WL 2914093, at *6 (S.D.N.Y. Dec. 15, 2004) ("A complaint cannot be amended merely by raising new facts and theories in plaintiffs' opposition papers, and hence such new allegations and claims should not be considered in resolving the [summary judgment] motion.").

## V. CONCLUSION

**\*11**   Accordingly, it is hereby:

**ORDERED**, that Defendants' motion for summary judgment (Dkt. No. 86) is **GRANTED**; and it is further

**ORDERED**, that Plaintiff's motion for summary judgment (Dkt. No. 87) is **DENIED**; and it is further

**ORDERED**, that the Amended Complaint (Dkt. No 39) is **DISMISSED in its entirety**; and it is further

**ORDERED**, that the Clerk shall close this action; and it is further

**ORDERED**, that the Clerk shall serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

### All Citations

Not Reported in Fed. Supp., 2020 WL 906274

---

## Footnotes

1    Defendants also point out that there is no evidence in the record that anyone has ever been appointed Mayfield Dog Control Officer for more than a one-year term. Id. ¶ 64.

2    For their part, Defendants point out that Plaintiff never requested a letter of appointment. Id. ¶ 56.

3    See Defs.' Mem. at 2 ("[D]uring this action Plaintiff failed to conduct a single deposition or demand a single document ... from any named defendant – despite his knowledge and the Court's reminders to him that he had the right to do so.").

4    Defendants have identified twenty-eight cases apparently filed by Plaintiff in both state and federal court since 2005. Defs.' Reply at 4 n.1.

5    Plaintiff also purports to bring his due process claims under the Fifth Amendment. However, "because his due process claims are against state, not federal, actors, ... the Fourteenth Amendment, rather than the Fifth Amendment, applies to these claims." Wolff v. State Univ. of New York Coll. at Cortland, No. 13-CV-1397, 2016 WL 9022503, at *16 (N.D.N.Y. Feb. 5, 2016) (citing Bussey v. Phillips, 419 F. Supp. 2d 569, 586 (S.D.N.Y. 2006)), aff'd sub nom. Wolff v. State Univ. of New York, 678 F. App'x 4 (2d Cir. 2017).

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 282 of 449

Kampfer v. Argotsinger, Not Reported in Fed. Supp. (2020)

6    As Defendants make clear in their statement of material facts, Plaintiff admitted in his deposition that he had never served in the military, never taken a civil service exam, and never seen a civil service application or job description for the Dog Control Officer position. Defs.' SMF ¶¶ 5, 6, 10, 11.

7    Without much explanation, Plaintiff instead cites to Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532 (1985), a case that discussed the procedural due process rights of a public employee who enjoyed "classified civil servant" protections under Ohio law. Id. at 535. However, because New York Civil Service Law § 75 does not apply to Plaintiff's position, and therefore the Dog Control Officer position does not enjoy civil service protections, Cleveland Board is inapposite.

8    "Q: You never signed any contract with the Town of Mayfield that related to the dog control officer position, correct?

     A: No, I did not."

9    Plaintiff also lacks any claim to "unpaid" or "back" wages, as it is undisputed that he was paid in full for the work did as Dog Control Officer from August 11, 2018 to December 31, 2017, Defs.' SMF ¶ 44, and the Court finds that none of his cognizable federal rights were violated when the Board declined to reappoint him.

10   For the same reasons as those stated above in Footnote 5, Plaintiff's substantive due process claim purportedly brought under the Fifth Amendment fails.

11   To the extent Plaintiff's retaliation claim is based on his refusal to sign the independent contractor agreement, assuming for the sake of argument that such a refusal constitutes protected conduct, the claim fails for the same reason. The time period between August—when Plaintiff refused to sign the Agreement—and December—when the Board declined to reappoint him—is too long, without other evidence of retaliatory animus, to establish an inference of causation. Id.

---

**End of Document**                                 © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 4357466
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Tricia WHITE, Plaintiff,

v.

The CITY OF NEW YORK; New York City Department
of Education; Dennis Walcott, Chancellor; Elisa Brown,
Principal of P.S. 249; Ana Dejesus, Siolen Kelly
Ho, Assistant Principals, P.S. 249; Buffie Simmons,
Community District Superintendent District 17; All Sued
in Their Official and Individual Capacity, Defendants.

No. 13 Civ. 7156(ER).
|
Signed Sept. 3, 2014.

### *OPINION AND ORDER*

RAMOS, District Judge.

**\*1** Plaintiff Tricia White (the "Plaintiff" or "Mrs. White"), appearing *pro se,* brings this action against her former employers, supervisors and co-workers: the City of New York (the "City"), the New York City Department of Education (the "BOE"), [1] Dennis Walcott, Elisa Brown, Ana DeJesus and Buffie Simmons (collectively, the "Individual Defendants," and together with the City and BOE, the "Defendants") in their official and individual capacities. Plaintiff claims that Defendants unlawfully terminated her from her position as a special education teacher in retaliation for speaking out against the school's administration and exposing "special education fraud" there. She further alleges that Defendants discriminated against her due to her pregnancy, harassed her, caused the premature birth of her child, and lodged false accusations of corporal punishment against her, then deprived her of the ability to defend herself against them. Plaintiff asserts that Defendants' false accusations not only contributed to her termination, but also prevented her from obtaining new employment.

Liberally construed, the Complaint asserts claims pursuant to 42 U.S.C. §§ 1983 and 1985 for violations of Plaintiff's rights, and conspiracy to violate Plaintiff's rights, under the First and Fourteenth Amendments; an employment discrimination claim under Title VII of the Civil Rights Act of 1964; New York state law claims for wrongful termination, intentional and negligent infliction of emotional distress, fraud, "verbal harassment, with unjustified threats of future harm," and defamation; and claims under New York Civil Service Law § 75–b. Compl., Doc. 1. Plaintiff seeks more than two million dollars in damages, punitive damages and costs, a declaratory judgment stating that Defendants violated her rights, and injunctive relief. *Id.*

Before the Court is Defendants' motion to dismiss all of Plaintiff's claims, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Doc. 11. Defendants seek dismissal on the grounds that Plaintiff has failed to: (1) timely file notice for her New York state law claims, which are also time-barred; (2) state a claim pursuant to 42 U.S.C. §§ 1983 or 1985; (3) exhaust her administrative remedies for her Title VII claim; (4) allege municipal liability for her claims against the BOE or its officers in their official capacities; and (5) assert liability against the City, as it is an improper party. *See* Defs.' Mem. L. Supp. Mot. Dismiss ("Defs.' Mem.") 2, Doc. 12.

For the reasons discussed below, Defendants' motion is GRANTED and Plaintiff's complaint is dismissed.

### I. BACKGROUND

The Court accepts the following allegations as true for purposes of this motion. [2]

#### A. The Parties

##### 1. Plaintiff

On September 7, 2010, Plaintiff began employment as an untenured special education teacher for Defendant BOE. [3] Compl. ¶¶ 27, 31. She was assigned to work at the Caton School, also known as "P. S. 249," in Brooklyn, New York. *Id.* Mrs. White has a license for "Special Education Day" [4] and several certifications within the State of New York that allow her to teach general students and students with disabilities in all grade levels, from pre-kindergarten through twelfth grade. *Id.* ¶ 18. Throughout the 2010–2011 academic year, Plaintiff received a rating of "satisfactory" for her lesson observations and performance evaluations. *Id.* ¶¶ 19, 28. This case arises from allegations of harassment, discrimination and retaliation that Mrs. White claims she suffered during the 2011–2012 school year.

##### 2. Defendants

**\*2** Defendant Dennis Walcott ("Chancellor Walcott") is the Chancellor of Defendant BOE. *Id.* ¶ 21. Plaintiff alleges that Chancellor Walcott worked with the other co-Defendants to "assist in the[ir] misconduct and [lodge] false claims" against her. *Id.* Defendant Buffie Simmons ("Superintendent Simmons") was, and is, the "Community District Superintendent" for District 17, which includes the Caton School. *Id.* ¶ 22. Defendant Elisa Brown ("Principal Brown") served as the principal of the Caton School, and Defendants Ana DeJesus ("Assistant Principal DeJesus") and Siolen Kelly Ho ("Assistant Principal Ho") were both assistant principals there. *Id.* ¶¶ 23–25. Plaintiff alleges that each of the Individual Defendants had responsibility for creating and implementing policies that comply with city, state and federal law. *Id.* ¶¶ 21–25.

**B. Factual Allegations**
At the start of the 2011–2012 academic year, Plaintiff was three months pregnant. *Id.* ¶ 31. Assistant Principal DeJesus told Plaintiff that she should not have a baby while working as an untenured teacher. *Id.*

In addition to "harassing" her due to her pregnancy, Plaintiff claims that Defendants targeted her for disciplinary action because they wanted to suppress information about their failure to provide appropriate educational services for special needs students at the Caton School. *Id.* ¶ 37. As a supplement to the lessons provided by special education teachers in public schools, "related service providers" implement Individual Education Programs ("IEPs")—personalized plans for student growth—for special education students. Plaintiff appears to allege that, at the Caton School, such special education service providers—who are employed by outside agencies, not the school itself—are supposed to work with students in person, on an individual basis, and during school hours, as set forth in each student's IEP. At one point, [5] Assistant Principal DeJesus asked Plaintiff to write IEP goals for students who were not receiving services from related service providers. *Id.* ¶ 29. Specifically, Ms. DeJesus instructed Plaintiff to write "speech codes," meaning, speech—related education plans, for students who did not receive speech services. *Id.* "Supervisors" threatened Plaintiff that they would give her an unsatisfactory ("U") rating on her evaluation if she did not comply with this directive, even though Plaintiff believed that it was out of compliance with special education protocol. *Id.* ¶ 30.

Documents attached to the Complaint [6] indicate that, on Thursday, September 22, 2011, Assistant Principal DeJesus observed an occupational therapist working with a student in Plaintiff's classroom. Assistant Principal DeJesus and Mrs. White discussed the possibility that the therapist would work with that particular student in the classroom at certain times, and Mrs. White apparently agreed to permit such services in the classroom. Assistant Principal DeJesus emphasized to Mrs. White the importance of allowing related service providers to work with students in the classroom, noting "that the child must be able to function in her classroom and can only do so when the services needed for her academic growth are provided where she spends most of her day, in the classroom." Compl. Ex. 2 (Oct. 28, 2011 Ltr.).

**\*3** On Saturday, September 24, 2011, Mrs. White sent several e-mails (the "September 24, 2011 Emails") to certain related service providers that she believed were not appropriately providing services to her students. Plaintiff claims that these service providers had not been communicating feedback to her, and parents had expressed reservations about their children's progress. Compl. ¶ 32, Ex. 1. Mrs. White copied Assistant Principal DeJesus on the September 24, 2011 Emails, the first of which stated as follows:

> [8:23 a.m.]
>
> All service providers MUST FOLLOW each individual student's IEP. If a student [sic] IEP states, "2 twice a week, 30 minutes, SEPARATE LOCATION," please provide theses [sic] services as is. Students [sic] IEP should not be amended based on personal opinions or judgments. If you have any questions about any student receiving related services and you want to make any changes, please follow the correct protocols to do so.
>
> Mrs. White

Compl. Ex. 1 at 1–3 (emphasis in original). At 8:36 a.m., Assistant Principal DeJesus emailed Mrs. White to ask who the email was for, and instructed Plaintiff to meet with her on Monday, September 26, 2011 "as soon as you get in." *Id.;* Compl. ¶¶ 33–34. At 2:02 p.m., Mrs. White responded: "I am just doing my job while providing and advocating for my students, based on their needs and what is written on a state legal document. I will definitely speak to you [as soon as possible] on Monday about the matter." *Id.* at Ex. 1. Minutes later, Mrs. White sent another email to related service

providers, again copying Assistant Principal DeJesus, which stated:

> [2:13 p.m.]
>
> If you have not provided me with your schedule, please try and do so [as soon as possible] so that I could informed [sic] students [sic] parents. If schedules overlap with other related service providers, please make an extra effort to work out a time that will work for everyone. If a prescription is needed in order to provide services, please put it in writing, so that I could [sic] inform the parents. Also, reader's workshop is a very important instruction time. It is usually during 2nd period, so if possible, please could related services be schedule [sic] around that time:) [sic]. However, based on each student, exceptions could be made.
>
> Mrs. White

*Id.*

At the meeting on September 26, 2011, Assistant Principal DeJesus directed Mrs. White not to "put 'stuff'" like that in e-mails"—referring to the content of the September 24, 2011 Emails—"because the school could get in trouble." *Id.* ¶ 34. According to documents attached to the Complaint, on September 26, 2011, Assistant Principal DeJesus also saw Mrs. White rubbing Principal Brown's hair while telling her that Ms. DeJesus displayed favoritism. *Id.* at Ex. 2 (Oct. 28, 2011 Ltr.). When Ms. DeJesus asked Mrs. White to name the favorites, she responded by laughing and did not answer. *Id.*

On September 28, 2011, Plaintiff attended a meeting with her union representative, Assistant Principal DeJesus and Principal Brown. At this meeting, Ms. DeJesus asked Plaintiff if she read the page of the teachers' handbook for P.S. 249 which provides, in relevant part, that all e-mails must be preapproved by the principal. *Id.* Plaintiff stated, "I am not sure." *Id.* Plaintiff also indicated that she had forwarded the September 24, 2011 Emails to three principals and two CEC [7] representatives, and they did not believe that the content was insubordinate. *Id.* When asked by Principal Brown if Plaintiff addressed her concerns about the related service providers with Assistant Principal DeJesus before sending the September 24, 2011 Emails, Plaintiff replied that she "[did not] want to bother Ms. DeJesus." *Id.*

**1. The October 28, 2011 Disciplinary Letter**

**\*4** Plaintiff asserts that, in retaliation for sending the September 24, 2011 Emails, Assistant Principal DeJesus placed a letter in her personnel file on October 28, 2011 (the "October 28, 2011 Letter") that described several acts of "insubordination" committed by Plaintiff. *Id.* ¶ 35; Ex. 2. First, the October 28, 2011 Letter states:

> On Thursday, September 22, 2011, I [Assistant Principal DeJesus] entered your classroom at approximately 9:15 [a.m.] and Mrs. Williams, [a student's] occupational therapist[,] was servicing [the student] in your classroom. We briefly discussed the possibility of servicing [that student] in the classroom at certain times. I stated that this was acceptable and directed the [occupational therapy] provider to provide services within the classroom. We further discussed that related service providers can provide services within the classroom. In addition, I stated that the child must be able to function in her classroom and can only do so when the services needed for her academic growth are provided where she spends most of her day, in the classroom. On Saturday, September 24, 2011 at 8:23 [a.m.], I received an email from you directing all related service providers to conduct all services in a separate location. In addition, you directed all related service providers to follow the student's IEP without my approval.

*Id.* at Ex. 2. The October 28, 2011 Letter also cites the portion of the P.S. 249 teacher's handbook requiring that all emails be pre-approved by Principal Brown and describes the encounter on September 26, 2011 during which Plaintiff allegedly rubbed Principal Brown's hair. *Id.* The letter concludes as follows:

> [T]he conduct you [Mrs. White] exhibited, namely failing to take my directive of allowing the related

service providers to provide the services within the classroom at certain times, writing an email without approval to all related service providers, your inappropriate touching of the principal and your remarks to me constitutes insubordination, dereliction of duty and conduct unbecoming a professional educator ... You are reminded of your obligation to follow my supervisory directions and address me in a professional manner. Please be advised this incident may lead to further disciplinary action including an unsatisfactory rating and your termination.

*Id.* at 2.

Plaintiff claims that "the staff at P.S. 249 routinely sent emails without first obtaining approval of the principal," a fact which Plaintiff pointed out at the time of her disciplinary letter. *Id.* ¶ 36. Plaintiff believes that she was "singled out" because of her attempt to expose the "lack of proper servicing of special needs children" at the Caton School. *Id.* ¶¶ 36–37. After this incident, Assistant Principal DeJesus "verbally harassed" and threatened to terminate Mrs. White because of her non-tenured status. *Id.* ¶ 38.

### 2. Denial of External Professional Development Opportunities

**\*5** Acting in further retaliation for her speech, and to punish her status as a pregnant person, Defendants allegedly denied Mrs. White opportunities to engage in professional development ("PD") workshops outside of the school, in violation of her "tenure process rights." *Id.* ¶ 39. Principal Brown explained to Plaintiff that the school did not want to be held responsible if she was harmed on the way in or out of the building. *Id.* Assistant Principal DeJesus "repeatedly told Plaintiff that she should never have become pregnant during her probationary period." *Id.* Defendants did not offer Plaintiff any external PD opportunities until after she gave birth. *Id.*

### 3. Plaintiff's December 11, 2011 Union Grievance
Plaintiff filed a "Special Ed Complaint Form" with the United Federation of Teachers ("UFT") on December 11,

2011. *See* Compl. Ex. 6 (the "Special Ed Complaint"). Plaintiff informed UFT that she received satisfactory ratings for her evaluation during the 2010–2011 academic year, but complained that her students were not receiving related services and that nothing changed with respect to provision of services after she brought the issue to Principal Brown's attention. *Id.* Plaintiff explained to UFT that Assistant Principal DeJesus placed a letter in her file after she sent the September 24, 2011 Emails. Plaintiff also complained that Ms. DeJesus told her (1) to "rewrite 12 IEPs this week for the 12 ... students [she had]," and (2) that because Plaintiff had planned on taking maternity leave for six weeks at the end of February, she should " 'go ahead and write the IEP[s] even though most of them are due in April, May, [and] June ... because I don't know your situation,' implying that [Plaintiff] might not be coming back." *Id.* Plaintiff told Assistant Principal DeJesus that "it is illegal to re-write IEPs before giving the students the opportunity and time length to meet their goals—which is equivalent to one year." *Id.* Assistant Principal DeJesus responded by issuing another disciplinary letter to Plaintiff requesting a meeting with Principal Brown. *Id.*[8]

In response to Plaintiff's Special Ed Complaint, Emma Mendez of UFT advised Plaintiff to consult the UFT Chapter Leader and District Representative regarding "guidance ... on how to document and proceed with" the issue of "the harassment that you seem to be experiencing." *Id.*

### 4. The January 11, 2012 Incident and April 4, 2012 Disciplinary Letter
Plaintiff alleges that Defendants continued to retaliate against her by falsely accusing her of corporal punishment. On January 11, 2012, during Plaintiff's seventh month of pregnancy, a student threw a book at her when she requested that the students hand in their books (the "January 11, 2012 Incident"). *Id.* ¶ 40. Plaintiff claims that she gently slid the book back to the student and asked the student to hand the book to her. *Id.*

**\*6** Several days later, Plaintiff received a letter requesting that she meet with Assistant Principal DeJesus and a union representative on January 23, 2012. *Id.* ¶¶ 40–41. During that meeting, Plaintiff stated that she threw the book at the student but felt she did nothing wrong "because she did not hit [the student]." *Id.* at Ex. 2. Plaintiff claims that, as a result of Defendants' harassment, she prematurely went into labor on

January 27, 2012.[9] *Id.* ¶¶ 39, 41. Her due date had been in March 2012. *Id.* ¶ 41.

Plaintiff returned from maternity leave in April 2012. *Id.* ¶ 42. Thereafter, Assistant Principal DeJesus informed Plaintiff that an investigation regarding the January 11, 2012 Incident had been conducted, and another letter was placed in her personnel file for corporal punishment dated April 4, 2012 (the "April 4, 2012 Letter"). *Id.* at Ex. 2 at 3–4. Specifically, the April 4, 2012 Letter describes the investigation as follows:

> Chancellor['s [R]egulation A–420 defines corporal punishment as "any act of force upon a pupil for the purpose of punishment[.]"
>
> On January 11, 2012 at approximately 9:15 AM in Room 103, you, out of anger, threw the book at [the student] rather than following a more appropriate manner of punishing the student for his mis-behavior [sic].
>
> ...
>
> On January 11, 2012, at approximately 9:15 AM in Room 103, you behaved in a manner unbecoming of a professional when you threw a book at [the student] because he threw it at you first.
>
> On January 11, 2012, at approximately 9:15 AM, in Room 103, you were in violation of Chancellor's Regulation A–420 when you threw a book at a student. This allegation of corporal punishment is substantiated against you.

According to the April 4, 2012 Letter, Plaintiff declined to submit a written statement to the administration regarding the January 11, 2012 Incident. *Id.* The April 4, 2011 Letter directed Plaintiff to "in the future be in compliance with all Chancellors' regulations" and school policies, and informed her that she may be rated "unsatisfactory" for the current school year, which could lead to termination. *Id.*[10]

Plaintiff contends that the allegation of corporal punishment lodged against her was false, and that Defendants denied her due process to defend herself. Plaintiff claims the BOE did not question her or inform her of any investigation before she received the April 4, 2011 Letter, and that the BOE did not inform her, the students' parents or her union that they filed an incident report with the Office of Special Investigation. *Id.* ¶ 40.

Plaintiff claims that, in addition to satisfactory ratings that she received for four observations during the school year, she had an excellent attendance record, even in spite of her maternity leave. *Id.* ¶ 42. However, on June 7, 2012, the administration at the Caton School told Plaintiff that she would be receiving an unsatisfactory ("U") rating for the 2011–2012 school year. *Id.* On June 29, 2012, Superintendent Simmons "affirmed Plaintiff's discontinuance" due to the "U" rating. *See* Compl. Ex. 5 (Letter from B. Simmons). On August 13, 2012, Plaintiff discussed the discontinuance with Simmons, who informed Plaintiff that she received a placement at a new school, P.S. 375. *Id.* ¶ 42. However, Plaintiff was never hired at P.S. 375 because her fingerprints were "flagged" as ineligible by the Department of Education Office of Personnel Investigations ("OPI") as a result of the January 11, 2012 Incident. *Id.* Plaintiff claims that, since the discontinuance, she has not been able to obtain employment due to the "false 'U' rating." *Id.*

**\*7** Plaintiff appeared at a Discontinuance Hearing[11] on October 26, 2012. Her allegations do not state what transpired at that hearing. However, Plaintiff believes that she remained on an "HR Connect blacklist"[12] until August 8, 2013, when she "cleared her file" by bringing Betsy Combier, a teacher advocate, and Steven Perez, a paraprofessional who witnessed the Incident, to OPI and explaining her innocence. Compl. ¶ 42. Mr. Perez also drafted an undated written statement corroborating Plaintiff's version of the events, indicating that he did not observe any abuse by Mrs. White. *Id.* at Ex. 4 at 2. Plaintiff claims that Mr. Perez would have testified on her behalf at an earlier juncture, but did not want to initially support her because Assistant Principal DeJesus threatened him by saying "remember who gave you a job." *Id.* ¶ 40.

On October 9, 2013, Plaintiff filed the instant action.

## II. LEGAL STANDARD

When ruling on a motion to dismiss pursuant to Rule 12(b)(6), district courts are required to accept as true all factual allegations in the complaint and to draw all reasonable inferences in the plaintiff's favor. *Walker v. Schult,* 717 F.3d 119, 124 (2d Cir.2013); *see also Famous Horse Inc. v. 5th Ave. Photo Inc.,* 624 F.3d 106, 108 (2d Cir.2010). However, this requirement does not apply to legal conclusions, bare assertions or conclusory allegations. *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 681 (2009) (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007)). In order to satisfy the pleading

standard set forth in Rule 8 of the Federal Rules of Civil Procedure, a complaint must contain sufficient factual matter to state a claim to relief that is plausible on its face. *Id.* at 678 (citing *Twombly,* 550 U.S. at 570). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Accordingly, a plaintiff is required to support its claims with sufficient factual allegations to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (internal quotation marks omitted) (quoting *Twombly,* 550 U.S. at 557).

In the case of a *pro se* plaintiff, the Court is obligated to construe the complaint liberally, *Hill v. Curcione,* 657 F.3d 116, 122 (2d Cir.2011), and to interpret the claims as raising the strongest arguments that they suggest. *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 474 (2d Cir.2006); *Chavis v. Chappius,* 618 F.3d 162, 170 (2d Cir.2010) (citing *Harris v. City of New York,* 607 F.3d 18, 24 (2d Cir.2010)). The obligation to read a *pro se* litigant's pleadings leniently "applies with particular force when the plaintiff's civil rights are at issue." *Jackson v. NYS Dep't of Labor,* 709 F.Supp.2d 218, 224 (S.D.N.Y.2010) (citing *McEachin v. McGuinnis,* 357 F.3d 197, 200 (2d Cir.2004)). "However, even *pro se* plaintiffs asserting civil right claims cannot withstand a motion to dismiss unless their pleadings contain factual allegations sufficient to raise a 'right to relief above the speculative level.' " *Id.* (quoting *Twombly,* 550 U.S. at 555).

## III. DISCUSSION

### A. Plaintiff's Section 1983 Claims Are Dismissed

**\*8** In order to state a claim under 42 U.S.C. § 1983, a plaintiff must allege that: (1) defendants were state actors or were acting under color of state law at the time of the alleged wrongful action; and (2) the action deprived plaintiff of a right secured by the Constitution or federal law. *Am. Mfrs. Mut. Ins. Co. v. Sullivan,* 526 U.S. 40, 49–50 (1999). "Section 1983 is only a grant of a right of action; the substantive right giving rise to the action must come from another source." *Singer v. Fulton Cnty. Sheriff,* 63 F.3d 110, 119 (2d Cir.1995) (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 150 (1970)). Thus, a civil rights action brought under § 1983 will stand only insofar as the plaintiff can prove an actual violation of his rights under the Constitution or federal law. *Id.*

Liberally construed, the Complaint asserts claims under 42 U.S.C. § 1983 for First Amendment retaliation and violations of her rights guaranteed by the Due Process and Equal Protection clauses of the Fourteenth Amendment. [13]

### 1. First Amendment Retaliation Claim

Plaintiff claims that Defendants retaliated against her for speaking out regarding "special education fraud" at the Caton School.

"Government employers, like private employers, need a significant degree of control over their employees' words and actions" to ensure that employees do not "contravene governmental policies or impair the proper performance of governmental functions." *Garcetti v. Ceballos,* 547 U.S. 410, 418–19 (2006). A government entity in the form of an "employer charged with providing such essential services as public safety and education," rather than a sovereign governing its citizens, has "greater leeway" under the Constitution "to control employees' speech that threatens to undermine its ability to perform its legitimate functions." *Jackler v. Byrne,* 658 F.3d 225, 234 (2d Cir.2011) (citation omitted).

While government employees have diminished speech rights as compared with private citizens, government employment "does not ... eviscerat[e] ... an employee's First Amendment rights." *Johnson v. Ganim,* 342 F.3d 105, 112 (2d Cir.2003) (quoting *Hale v. Mann,* 219 F.3d 61, 70 (2d Cir.2000) (quoting *Connick v. Myers,* 461 U.S. 138, 140 (1983)). "It is by now well established that public employees do not check all of their First Amendment rights at the door upon accepting public employment." *Lewis v. Cowen,* 165 F.3d 154, 158 (2d Cir.1999). Regarding certain topics, it "is essential that public employees be able to speak out freely without fear of retaliatory dismissal." *Connick,* 461 U.S. at 149. Accordingly, in First Amendment, public employee freedom of speech cases, courts must achieve a balance between the interest of the public employee "as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Bd. of Educ.,* 391 U.S. 563, 568 (1968).

**\*9** Following *Garcetti,* courts employ a two-step approach to evaluate whether the First Amendment protects employee speech from retaliation. First, the court inquires "whether the employee spoke as a citizen on a matter of public

concern." *Ruotolo v. City of New York,* 514 F.3d 184, 188 (2d Cir.2008) (internal quotation marks and citation omitted). If the answer to this question is no, then "the employee has no First Amendment cause of action based on ... her employer's reaction to the speech." *Garcetti,* 547 U .S. at 418. If the answer is yes, the court must then decide "whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." *Ruotolo v. City of New York,* 514 F.3d 184, 188 (2d Cir.2008) (internal quotation marks and citation omitted); *see also Garcetti,* 547 U.S. at 418.

The first factor, "whether the employee spoke as a citizen on a matter of public concern," consists of two subcomponents: "(1) whether the subject of the employee's speech was a matter of public concern and (2) whether the employee spoke 'as a citizen' rather than solely as an employee." *Matthews v. City of New York,* 957 F.Supp.2d 442, 451 (S.D.N.Y.2013) (quoting *Jackler,* 658 F.3d at 235). Speech is of public concern if it relates to political, social or other community concerns, rather than an employee's personal concerns. *Johnson,* 342 F.3d at 112 (citing *Connick,* 461 U.S. at 146); *Hoyt v. Andreucci,* 433 F.3d 320, 330 (2d Cir.2006) (same). Generally, "discussion regarding current government policies and activities is perhaps the paradigmatic matter of public concern"; if the government entity cannot show that such speech would impact or disrupt the government employer's functions, then it may receive First Amendment protection. *See Harman v. City of New York,* 140 F.3d 111, 118 (2d Cir.1998) (citation and internal punctuation omitted). Matters of public concern also include "speech aimed at uncovering wrongdoing or breaches of the public trust." *Wrobel v. Cnty. of Erie,* 692 F.3d 22, 31 (2d Cir.2012) (quoting *Glass v. Dachel,* 2 F.3d 733, 741 (7th Cir.1993)).

Importantly, however, "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti,* 547 U.S. at 421, 423; *Connick,* 461 U.S. at 146; *Healy v. City of New York Dep't of Sanitation,* 286 F. App'x 744, 746 (2d Cir.2008) (summary order) (holding that speech is not protected where it "ar[i]se[s] in the course of official job duties ."). Thus, the First Amendment does not shield work environment correspondence. *Frisenda v. Incorporated Village of Malverne,* 775 F.Supp.2d 486, 507 (E.D.N.Y.2011) (holding that correspondence between police officer employees pertained to the "core function"

of the officers' employment thus fell beyond the First Amendment's purview). Although context determination for public employees' speech may be fact-intensive, it is a matter of law left to the court. *Johnson,* 342 F.3d at 112; *accord Ruotolo,* 514 F.3d at 189. While "there is no categorical approach," courts evaluate the "content, form, and context of a given statement." *Norton v. Breslin,* No. 13 Civ.1962, 2014 WL 1851888, at *1–*2 (2d Cir. May 9, 2014) (summary order) (quoting *Hoyt,* 433 F.3d at 330).

**\*10** Here, Plaintiff claims that Defendants terminated her in retaliation for sending the September 24, 2011 Emails and complaining to parents about the policies for servicing special needs students at the Caton School. Compl. ¶ 11. Plaintiff contends that her speech regarding the servicing of special needs students is protected by the First Amendment because she spoke as a private citizen on a matter of public concern. Pl.'s Opp. 17–21, Doc. 18. While possible violations of special education laws may be of public concern, Plaintiff was clearly acting within the scope of her official duties when she made specific, work-related demands of the service providers that she emailed. After Assistant Principal DeJesus asked to speak with her concerning the September 24, 2011 Emails, Plaintiff responded by acknowledging that "[she was] just doing [her] job while providing and advocating for [her] students, based on their needs and what is written on a state legal document." Compl. Ex. 1 at 2. Indeed, Plaintiff alleges that she sent the emails "with the *sole* purpose of improving the education and performance of her students." Compl. ¶ 33 (emphasis added). The Court thus finds Plaintiff's argument that she "was not speaking generally as an advocate for her students, nor as an employee as part of her duties" (Pl.'s Opp. 20) unavailing.

The Court also rejects Plaintiff's argument that her speech was protected because it was not a required part of her job description or "core function." *Frisenda,* 775 F.Supp.2d at 507 (holding that communication stimulated by employee's concern about abilities to perform job-related functions is not speech as a public citizen); Pl.'s Opp. ¶ 34. Arguments that job responsibilities do not expressly encompass the speech in question are particularly unpersuasive. *See Ross v. New York City of Dep't of Educ.,* 935 F.Supp.2d 508, 521 (E.D.N.Y.2013) (referring to such arguments as "red herring [s]"); *see also Massaro v. The Dep't of Educ. of the City of New York,* No. 08 Civ. 10678(LTS)(FM), 2011 WL 2207556, at *4 (S.D.N.Y. June 3, 2011), *aff'd sub nom. Massaro v. New York City Dep't of Educ.,* 481 F. App'x 653, 656 (2d Cir.2012) (summary order) ("Regardless of whether Plaintiff was formally tasked with alerting the school to the

unsanitary condition in her classroom, ensuring that the room provided a safe learning environment was part of her duties as an educator."). "[F]ormal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient" to establish that it falls "within the scope of the employee's professional duties for First Amendment purposes." *Garcetti,* 547 U.S. at 424–25. Speech that is not expressly required can still be "pursuant to official duties," as long as the speech is in furtherance of those duties expressed. *Id.* at 421, 444.

**\*11** Plaintiff's speech pertaining to the location and scheduling of the services for her special education students clearly falls within the scope of her professional duties. Compl. Ex. 1. The language that she used in the September 24, 2011 Emails does not "[bear] similarities to letters [or e-mails] submitted by numerous citizens every day"—it is that of a concerned teacher, not a concerned citizen. *Garcetti,* 547 U.S. at 422 (citing *Pickering,* 391 U .S. 563). Although Plaintiff argues that a teacher's job description might not explicitly require reporting on "special education irregularities," duties of "ensuring that a classroom is well supplied, safe, and conducive to learning and that the curriculum is substantively appropriate—are quintessentially those of a teacher." *Felton v. Katonah Lewisboro Sch. Dist.,* No. 08 Civ. 9340(SCR), 2009 WL 2223853, at \*5 (S.D.N.Y. July 27, 2009) (granting motion to dismiss First Amendment claim due to plaintiffs' failure to adequately plead that they spoke as citizens, "rather than pursuant to their official duties").

Accordingly, Defendants' motion to dismiss Plaintiff's First Amendment retaliation claim is GRANTED. [14]

### 2. Fourteenth Amendment Claims

#### i. Due Process

Plaintiff asserts that Defendants violated her rights by discontinuing her employment and giving her an unsatisfactory rating for the 2011–2012 school year without affording her due process of law.

Courts "examine procedural due process questions in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." *Ky. Dep't of Corr. v. Thompson,* 490 U.S. 454, 460 (1989). When analyzing procedural due process violations, the threshold

issue is always whether the plaintiff possessed a valid property or liberty interest. *See Oneida Indian Nation of N.Y. v. Madison Cnty.,* 665 F.3d 408, 427–28 (2d Cir.2011); *see also Zahra v. Town of Southold,* 48 F.3d 674, 680 (2d Cir.1995) (citing *Brady v. Town of Colchester,* 863 F.2d 205, 211–12 (2d Cir.1988)) ("a party must *first* establish that he had a valid 'property interest' in a benefit that was entitled to constitutional protection at the time he was deprived of that benefit." (emphasis in original)).

#### 1. Property Interest

The Constitution protects, but does not create, property rights. "Rather, 'they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.' " *Donato v. Plainview–Old Bethpage Cent. Sch. Dist.,* 96 F.3d 623, 629 (2d Cir.1996) (citation omitted). Thus, here, Plaintiff must show that, under New York law, she "had a constitutionally-protected 'legitimate claim of entitlement' " to employment. *Id.* (citation omitted).

**\*12** Plaintiff started working for the BOE on September 7, 2010. Compl. ¶ 18. Throughout her employment at the Caton School, Plaintiff was an untenured or "probationary" employee, as she had not completed the three years of probationary employment required to be eligible for tenure. Compl. ¶ 39; N.Y. Educ. Law § 2573(1)(a) (McKinney). It is well-settled under New York law that a teacher lacks a property interest in probationary employment because "services of a probationary teacher may be discontinued at any time during the probationary period." *Federico v. Bd. of Educ. of Pub. Sch. of Tarrytowns,* 955 F.Supp. 194, 202 n. 1 (S.D.N.Y.1997) (citing *Donato,* 96 F.3d at 629; *accord Blasi v. New York City Bd. of Educ.,* No. 00 Civ. 5320(RRM) (MDG), 2012 WL 3307227, at \*9 (E.D.N.Y. Mar. 12, 2012), *report and recommendation adopted,* No. 00 Civ. 5320, 2012 WL 3307346 (E.D.N.Y. Aug. 12, 2012), *aff'd,* 544 F. App'x 10 (2d Cir.2013). "An interest that can be terminated 'at the whim of another person' is not protected by the Due Process clause." *McPherson v. New York City Dep't of Educ.,* 457 F.3d 211, 216 (2d Cir.2006) (citation omitted). Thus, as a probationary employee, Plaintiff lacked a property interest in her continued employment. *Rivera v. Cmty. Sch. Dist. Nine,* 145 F.Supp.2d 302, 306–07 (S.D.N.Y.2001) ("Where there is no property interest in the employment, there can be no property interest in the procedures that follow from the employment.").

### 2. Liberty Interest

Nonetheless, Plaintiff's allegations may also be construed to assert that Defendants violated her due process rights by lodging false accusations against her that precluded her from obtaining a new job. "A person's interest in his or her good reputation alone, apart from a more tangible interest, is not a liberty or property interest sufficient to invoke the procedural protections of the Due Process Clause or create a cause of action under § 1983." *Patterson v. City of Utica,* 370 F.3d 322, 329–30 (2d Cir.2004). However, the Second Circuit has "recognized that a probationary employee can 'invoke the protections of the Due Process Clause' where that employee has suffered a loss of reputation 'coupled with the deprivation of a more tangible interest, such as government employment.' " *Segal v. City of N.Y.,* 459 F.3d 207, 212 (2d Cir.2006) (quoting *Patterson,* 370 F.3d at 330). "A liberty interest is implicated where defamatory statements, made in connection with a probationary employee's termination, denigrate the employee's competence as a professional and impugn the employee's professional reputation in such a fashion as to effectively put a significant roadblock in that employee's continued ability to practice ... her profession." *Rivera,* 145 F.Supp.2d at 307; *see also Donato,* 96 F.3d 623, 630 (citing *Bd. of Regents v. Roth,* 408 U.S. 564, 573 (1972)) (a previous employer's stigmatizing statements can constitute a deprivation of liberty if, for example, the employer's actions deny the employee "freedom to take advantage of other employment opportunities.").

**\*13** The test for statements impacting an employee's reputation is commonly known as "stigma plus." *Velez v. Levy,* 401 F.3d 75, 87 (2d Cir.2005). To state a "stigma plus" claim, "[t]he defamatory statement must be sufficiently public to create or threaten a stigma; hence, a statement made only to the plaintiff, and only in private, ordinarily does not implicate a liberty interest." *Id.* (quoting *Donato,* 96 F.3d at 631–32). An employee plaintiff must also allege that her former employer made statements of "professional incompetence" and denied her of a chance to clear or redeem her reputation. *Roth,* 408 U.S. at 573; *Donato,* 96 F.3d at 630 ("When a state fires an employee and publicly charges that she acted dishonestly or immorally, due process guarantees the employee an opportunity to defend her good name."). The statements and allegations must discuss the employee's inability to do a particular job and not simply state that an employee performed poorly. *O'Neill v. City of Auburn,* 23 F.3d 685, 692 (2d Cir.1994). Remarks that an unsatisfactory rating was based on "substantiated corporal punishment" can cause

constitutional concerns "since the comment likely would limit employment or reassignment opportunities in a profession that places its members in positions of trust and authority over children's physical safety and emotional well-being." *Storman v. Klein,* No. 09 Civ. 0338(SHS)(AJP), 2009 WL 1035964, at \*14 (S.D.N.Y. Apr. 20, 2009) (citations omitted). A plaintiff must allege that the defendant employers publicly attacked the professional competency of the plaintiff and that the defendant employers publicized unfavorable reasons for plaintiff's dismissal.

Here, Plaintiff fails to establish that Defendants made stigmatizing remarks about her professional competency. Although Plaintiff refers to Defendants flagging her fingerprints for the "ineligible/inquiry list," Plaintiff cites her discontinuance due to the "false 'U' rating" as the reason she has been unable to obtain new employ. Compl. ¶ 42. Nor does she explain what the "HR Connect blacklist" is. The existence of a discontinuance on Plaintiff's record "might make [her] somewhat less attractive to some other employers" but "would hardly establish the kind of foreclosure of opportunities amounting to a deprivation of liberty." *Russell v. Hodges,* 470 F.2d 212, 216 (2d Cir.1972) (quoting *Roth,* 408 U.S. at 574 n. 13). Even if Plaintiff had alleged that her "chances for equivalent future employment anywhere else [were] thin to none," such allegations, standing alone, are "insufficient to show that [a plaintiff] has been foreclosed from a range of other employment opportunities." *Koehler v. New York City,* 04 Civ. 6929(RMB), 2005 WL 3502042, at \*3 (S.D.N.Y. Dec. 20, 2005). Finally, because Plaintiff fails to allege facts indicating that the "ineligible/inquiry" or "HR Connect" lists were public to future employers, she fails to state a "stigma plus" claim. *Id.* (holding that probationary employee's placement on the "ineligible list" for future employment after being charged with corporal punishment did not constitute stigmatization because the plaintiff did not allege that the ineligible list publicly disclosed grounds for dismissal and therefore could not have attacked professional competency); *Longarzo v. Anker,* 578 F.2d 469, 472 (2d Cir.1978) (dismissing claim by public school teacher where he failed to allege that the BOE publicized the unfavorable ratings that he received). Consequently, Plaintiff has failed to allege a deprivation of liberty under the Due Process Clause.

### 3. Procedural Rights

**\*14** Even if Plaintiff had adequately alleged a protected property or liberty interest, her Due Process claim would nonetheless fail because she does not plead the deprivation of any process to which she was entitled.

"The second step of the [procedural due process] analysis ... asks what process was due to the plaintiff, and inquires whether that constitutional minimum was provided." *Rivera,* 145 F.Supp.2d at 306; *see also Hellenic Am. Neighborhood Action Comm. v. City of New York,* 101 F.3d 877, 881–82 (2d Cir.1996). "Due process requires, as a general matter, an opportunity to be heard at a meaningful time and in a meaningful manner." *Adams v. New York State Educ. Dep't,* 752 F.Supp.2d 420, 455 (S.D.N.Y.2010) (citations and internal quotation marks omitted), *aff'd sub nom. Ebewo v. Fairman,* 460 F. App'x 67 (2d Cir.2012) (summary order). A "stigma plus" due-process claim cannot survive merely because a government employer said something allegedly stigmatizing or false about the plaintiff; the claim must be based on a denial of adequate processes to contest the allegedly damaging statement. *Segal,* 459 F.3d at 214 ("the availability of an adequate, reasonably prompt, post-termination name-clearing hearing [is] sufficient to defeat a stigma-plus claim" by an at-will government employee plaintiff). As the Second Circuit explained in *Segal:*

> Because stigma plus is a species within the phylum of procedural due process claims, however, it is not enough that the plaintiff has demonstrated the deprivation of her liberty interest; in order to bring a successful stigma-plus claim, the plaintiff also must demonstrate that her liberty was deprived without due process of law. Stated differently, the availability of adequate process defeats a stigma-plus claim.

*Id.*

Plaintiff contends that she was discontinued due to a "false 'U' rating" and that BOE Office of Personnel Investigations ("OPI") "flagged" her fingerprints for the " 'ineligible/ inquiry' list." Compl. ¶ 42. However, New York state law provides for special proceedings pursuant to Article 78, at which individuals—such as Plaintiff—may challenge actions by governmental bodies such as the BOE. N.Y. C.P.L.R. §§ 7801–06. "In cases where the state actor engaged in random and unauthorized acts, an Article 78 proceeding 'constitutes a wholly adequate post-deprivation hearing for due process

purposes.' " *Sindone v. Kelly,* 254 F. App'x 58, 59 (2d Cir.2008) (summary order) (quoting *Locurto v. Safir,* 264 F.3d 154, 175 (2d Cir.2001)); *see also Koehler,* 2005 WL 3502042, at *2 ("[A] non-tenured employee is not entitled to a pre-deprivation hearing because such an employee does not have a property interest in her position." (citation omitted)). Because Article 78 provides a "meaningful opportunity" for Plaintiff to challenge her discontinuance, due process is not lacking simply because she "fail[ed] to avail [her]self of the opportunity." *Giglio v. Dunn,* 732 F.2d 1133, 1134–35 (2d Cir.1984); *accord Anemone v. Metro. Transp. Auth.,* 629 F.3d 97, 121 (2d Cir.2011) ("An Article 78 proceeding provides the requisite post-deprivation process—even if [plaintiff] failed to pursue it.").

**\*15** Moreover, Plaintiff's allegations reveal that she received a post-termination discontinuance hearing on October 26, 2012, and that she ultimately "cleared her file" on August 8, 2013, when she presented witnesses and argument OPI to demonstrate her innocence while represented by a "teacher advocate" (Compl.¶ 42). *See Moore v. New York City Dep't of Educ.,* No. 03 Civ.2034(LAP), 2004 WL 691523, at *4 (S.D.N.Y. Mar. 31, 2004). Though she concedes that her name has been cleared, "[t]o the extent plaintiff believes that the hearing officer reached an erroneous conclusion, plaintiff could have challenged the results at an Article 78 proceeding." *Id.* As such, Plaintiff cannot establish a violation of her due process rights.

Thus, the Court GRANTS Defendants' motion to dismiss Plaintiff's Due Process claim.

### ii. Equal Protection

Plaintiff alleges that she was wrongfully terminated because Defendants discriminated against her based on her pregnancy, in violation of the Equal Protection Clause of the Fourteenth Amendment.

Courts evaluate Section 1983 employment discrimination claims asserted as equal protection violations under the same standards as Title VII claims. *See Patterson v. Cnty. of Oneida, N.Y.,* 375 F.3d 206, 225 (2d Cir.2004). Generally, to state a claim for discriminatory discharge under the Equal Protection clause: "the plaintiff must show (1) that [s]he belongs to a protected class; (2) that [s]he was performing h[er] duties satisfactorily; (3) that [s]he was discharged; and (4) that h[er] discharge occurred under circumstances giving rise to an inference of discrimination on the basis of h [er] membership in that class." *Chick v. Cnty. of Suffolk,* 546

F. App'x 58, 59 (2d Cir.2013) (summary order) (quoting *Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 37 (2d Cir.1994)).

Sex-based classifications, like race, national origin, and alienage, are considered protected classes. *Frontiero v. Richardson,* 411 U.S. 677, 682 (1973) (citing *Reed v. Reed,* 404 U.S. 71 (1971)). Here, while Plaintiff does not allege that she belongs to a protected class, the Court can assume that she is a woman based upon the allegations concerning her pregnancy. Compl. ¶ 31. Although discrimination against pregnant women is not, per se, a sex-based form of discrimination, *see Bray v. Alexandria Women's Health Clinic,* 506 U.S. 263, 271 (1993), in 1978, Congress passed the Pregnancy Discrimination Act ("PDA"), which amended Title VII "to prohibit sex discrimination on the basis of pregnancy ." *Codrington v. Carco Grp.,* No. 13 Civ. 2780(SJF), 2014 WL 2945987, at *3 (E.D.N.Y. June 27, 2014). To bring a claim under the PDA, a plaintiff must show that she suffered an adverse employment action "while she was 'affected by pregnancy, childbirth, or related medical conditions.' " *Briggs v. Women in Need, Inc.,* 819 F.Supp.2d 119, 126 (E.D.N.Y.2011) (quoting 42 U.S.C. § 2000e(k)); *see also Helmes v. South Colonie Cent. Sch. Dist.,* 564 F.Supp.2d 137, 147 (N.D.N.Y.2008) ("Certainly, women who are pregnant at or very near the time of the adverse employment action are members of the protected class, as are women who are on maternity leave or recently have returned to work from maternity leave when the employment action occurs."). Courts determine when a plaintiff stops being "affected by pregnancy, childbirth, or related medical conditions" based on the particular facts and circumstances of the case; however, "leaves-of-absence for childrearing purposes are not conditions protected under the PDA." *Briggs,* 819 F.Supp.2d at 127. Additionally, while the determination of when a pregnant woman loses her status as a member of a protected class varies based upon the facts of each case, "a pattern has developed in this Circuit establishing a loose line at approximately four months from the date of birth." *Albin v. LVMH Moet Louis Vuitton, Inc.,* No. 13 Civ. 4356(JPO), 2014 WL 3585492, at *4 (S.D.N.Y. July 8, 2014) (collecting cases); *see also Pellegrino v. Cnty. of Orange,* 313 F.Supp.2d 303, 317 (S.D.N.Y.2004).

**\*16** "A plaintiff can establish a *prima facie* case of pregnancy discrimination under Title VII by showing that (1) she is a member of a protected class; (2) she satisfactorily performed the duties required by the position; (3) she was discharged; and (4) her position remained open and was ultimately filled by a non-pregnant employee." *Codrington,* 2014 WL 2945987, at *3 (quoting *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 401 (2d Cir.1998) (internal quotation marks omitted)). Alternatively, a plaintiff may establish the fourth element "by alleging that the discharge occurred under circumstances giving rise to an inference of discrimination." *Hill v. Dale Electronics Corp.,* No. 03 Civ. 5907(MBM), 2004 WL 2937832, at *2 (S.D.N.Y. Dec. 19, 2004).

Here, even assuming *arguendo* that Plaintiff adequately alleged that she was a member of a protected class, she fails to state a claim for discrimination based on her status as a pregnant person. Plaintiff alleges that she gave birth on January 27, 2012 and that Superintendent Simmons affirmed her discontinuance on June 29, 2012, five months later. Compl. ¶¶ 41–42. The timeframe alleged "is considered quite weak temporal correlation in this Circuit." *Pellegrino,* 313 F.Supp.2d at 317 (deeming a "four month temporal gap between knowledge of pregnancy and adverse employment action ... [a] quite weak" proximity).

Moreover, Plaintiff does not claim that a non-pregnant —or any—employee filled her position, nor does she plead any facts describing treatment of similarly-situated pregnant persons. While she alleges that Defendant DeJesus criticized her for becoming pregnant, she never alleges that her pregnancy was the reason for her termination; such allegations of "stray remarks," standing alone, cannot support a discrimination suit. *Cf. Danzer v. Norden Sys.,* 151 F.3d 50, 56 (2d Cir.1998) (internal quotations omitted) (holding that the employee had been fired due to discriminatory practices because he demonstrated more than just stray remarks). Plaintiff's failure to allege facts that give rise to an inference of pregnancy-based discrimination is fatal to her claim. *Cf. Albin,* 2014 WL 3585492, at *5 (finding that plaintiff stated a claim for discriminatory discharge based on pregnancy where she alleged that she was not promoted, she was recently pregnant and on maternity leave, a non-pregnant candidate was hired instead, the non-pregnant candidate was hired before she received her second interview, and that candidate was less qualified than plaintiff). Accordingly, Defendants' motion to dismiss Plaintiff's Equal Protection claim is GRANTED. [15]

### 3. Plaintiff's Title VII Claims Are Dismissed

Defendants also argue that, to the extent that Plaintiff seeks to assert a violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), the Court must dismiss it because she has

failed to exhaust her administrative remedies relative to such claims. Defs.' Mem. ¶ 20.

**\*17** Claimants under Title VII must file a complaint with the Equal Employment Opportunity Commission ("EEOC") "within 180 days after the alleged discriminatory act occurred," or "if [s]he has already filed the charge with a state or local agency that monitors fair employment practices, [she] must file [her] EEOC charge within 300 days of the alleged discriminatory act." *Falso v. Gates Chili Cent. Sch. Dist.,* 408 F. App'x 494, 495 (2d Cir.2011) (summary order); *see also Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 109–10 (2002); *EEOC v. Bloomberg L.P.,* 967 F.Supp.2d 816, 831 (S.D.N.Y.2013) (citing 42 U.S.C. § 2000e–5(e)(1)). "The filling deadlines for a charge of discrimination act as a 'statute of limitations' and a failure to timely file a charge acts as a bar to a plaintiff's action." *Butts v. New York City Dep't Of Hous. Pres. And Dev.,* No. 00 Civ. 6307(KMK), 2007 WL 259937, at \*6 (S.D.N.Y. Jan. 29, 2007), *aff'd sub nom. Butts v. NYC Dep't of Hous. Pres. & Dev.,* 307 F. App'x 596 (2d Cir.2009) (summary order); *see also Francis v. City of N.Y.,* 235 F.3d 763, 767 (2d Cir.2000) (quoting *Zipes v. Trans World Airlines, Inc.,* 455 U.S. 385 (1982)).

Plaintiff does not claim to have filed a complaint with the EEOC prior to initiating the instant action, or ever. Plaintiff was required to file a claim with the EEOC within 300 days of the last discriminatory incident or within 180 days of filing a complaint with a State or local agency that monitors discriminatory behavior by employers. *Nat'l R.R. Passenger Corp.,* 536 U.S. at 109–10. She has failed to do so. The Court construes the last alleged discriminatory act by the Defendants as occurring on June 29, 2012, the date of the letter affirming Plaintiff's termination. Compl. Ex. 5. at 1. Plaintiff filed the instant action on October 9, 2013, more than 300 days after June 29, 2012. Doc. 1. Moreover, Plaintiff submitted the Special Ed Complaint to UFT—a local agency —on December 8, 2011. Compl. Ex. 6 at 1–4. More than 180 days have passed since she filed that complaint.

Accordingly, to the extent that Plaintiff seeks to assert a Title VII claim, the Court GRANTS Defendants' motion to dismiss it due to her failure to comply with the applicable exhaustion requirements.

### 4. Plaintiff's § 1985 Claims Are Dismissed
Plaintiff also brings claims under 42 U.S.C. § 1985(2)-(3) alleging that the Defendants conspired to deprive her of her constitutional rights. In order to state of claim under § 1985,

a plaintiff must allege (1) a conspiracy (2) for the purpose of depriving a person or class of persons of the equal protection of the laws, or the equal privileges and immunities under the laws; (3) an overt act in furtherance of the conspiracy; and (4) an injury to the plaintiff's person or property, or a deprivation of a right or privilege of a citizen of the United States. *Traggis v. St. Barbara's Greek Orthodox Church,* 851 F.2d 584, 586–87 (2d Cir.1988) (quoting *Griffin v. Breckenridge,* 403 U.S. 88, 102–03 (1970)).

**\*18** Because she only alleges that BOE employees conspired with one another, Plaintiff's claim fails due to the "legal impossibility of pleading conspiracy by exclusive reference to actions of employees of a single corporation." *Farbstein v. Hicksville Pub. Library,* 254 F. App'x 50, 51 (2d Cir.2007) (citing *Herrmann v. Moore,* 576 F.2d 453, 459 (2d Cir.1978)); *see also Hartline v. Gallo,* 546 F.3d 95, 99 n. 3 (2d Cir.2008) (affirming the dismissal where defendants were all Southampton Police Department employees). While an exception to the intracorporate conspiracy doctrine exists where coconspirators purportedly act based on personal motives wholly distinct from the interests of their organization, the exception does not apply where, as here, the alleged co-conspirators acted within the scope of their employment. *Chillemi v. Town of Southampton,* No. 12 Civ. 3370(ADS)(ETB), 2013 WL 1876443, at \*12 (E.D.N.Y. May 4, 2013) ("For the exception to apply, '[t]he [P]laintiff must ... allege that [the Defendants] acted other than in the normal course of their corporate duties.' " (citation omitted)). Even if Plaintiff alleged that Assistant Principal DeJesus harbored personal biases against her, or wanted to "get rid of" her, such biases "do[ ] not constitute personal interest[s] and [are] not sufficient to defeat the intracorporate conspiracy doctrine." *Bond v. Board. of Educ. of City of New York,* No. 97 Civ. 1337(NG), 1999 WL 151702, at \*2 (E.D.N.Y. Mar. 17, 1999).

Accordingly, Defendants' motion is GRANTED with respect to Plaintiff's § 1985 claims.

### 5. Plaintiff's Claims against the City Are Dismissed
Defendants argue that the City is a distinct legal entity from the BOE, and cannot be held liable for alleged wrongdoing committed by the BOE in the absence of any allegation directly implicating it. Defs.' Mem. 24; *Linder v. City of New York,* 263 F.Supp.2d 585, 590–91 (E.D.N.Y.2003) (citing *Campbell v. City of New York,* 203 A.D.2d 504 (2d Dep't 1994)).

The Mayor of the City of New York appoints the Chancellor of the New York City Department of Education. N.Y. Educ. Law § 2690–h. Notwithstanding the Mayor's appointment powers, however, the City and the BOE remain distinct legal entities. *Gonzalez v. Esparza,* No. 02 Civ. 4175(SWK), 2003 WL 21834970, at *2 (S.D.N.Y. Aug. 6, 2003) (describing recent "changes in the statutory scheme regarding the interplay between the Board and the City" as purely " 'political,' with the [BOE] continuing to exist as a separate and distinct legal entity from the City."). Thus, neither can be held liable for the torts of the other. *Id.; accord Perez v. City of New York,* 41 A.D.3d 378, 379 (1st Dep't 2007) (noting that City and BOE remain separate).

Here, Plaintiff names the City as a party, but fails to allege anything more. In *Linder v. City of New York,* the court dismissed the plaintiff's claims against the City brought by a teacher because it was not implicated in the sexual harassment and sexual assault claims that she asserted against a fellow male teacher. 263 F.Supp.2d at 590–91. So too here, the City is an improper party because Plaintiff has not alleged any facts implicating it in the alleged wrongdoing. *Wade v. New York City Dep't of Educ,* No. 11 Civ. 05278(LGS), 2014 WL 941754, at *5 (S.D .N.Y. Mar. 10, 2014) (citing *Linder,* 263 F.Supp.2d at 590) (dismissing claims because plaintiff failed to "include allegations against agents of the City of New York," as distinct from the BOE).

**\*19** Accordingly, the Court GRANTS Defendants' motion to dismiss all of Plaintiff's claims against the City.

### 6. State Law Claims

Defendants argue that Plaintiffs' state law claims are barred because she failed to timely file a notice of claim, nor has she complied with the applicable statute of limitations. Defs.' Mem. 7–9. Because the Court dismisses all claims over which it has original jurisdiction, it declines to exercise pendent jurisdiction over Plaintiff's remaining state law claims. 28 U.S.C. § 1367(b)(3).

### IV. Conclusion

For the reasons set forth above, Defendants' motion is GRANTED. [16] The Clerk of the Court is respectfully directed to terminate the motion, Doc. 11, mail a copy of the instant Opinion and Order to Plaintiff, and close the case.

It is so ORDERED.

### All Citations

Not Reported in F.Supp.3d, 2014 WL 4357466

---

### Footnotes

1    Defendants refer to the New York City Department of Education as the "BOE," designating the Board of Education of the City School District of the City of New York. *See, e.g.,* Defs.' Reply Br. 1 n. 1, Doc. 19.

2    Some of the allegations appear in documents attached to the complaint and incorporated by reference, as well as in Plaintiff's opposition to the motion to dismiss. "[I]n cases where a *pro se* plaintiff is faced with a motion to dismiss, it is appropriate for the court to consider materials outside of the complaint to the extent they are consistent with the allegations in the complaint." *Donhauser v. Goord,* 314 F.Supp.2d 119, 121 (N.D.N.Y.2004) (quotation marks omitted) (collecting district court cases), *vacated in part on other grounds,* 317 F.Supp.2d 160 (N.D.N.Y.2004); *see also Gill v. Mooney,* 824 F.2d 192, 195 (2d Cir.1987) (considering allegations in *pro se* plaintiff's opposition to motion to dismiss).

3    The BOE is considered a "public employer" as defined by the New York State Civil Service Law. N.Y. Civ. Serv. Law § 75–b (1)(a)(iii) (McKinney).

4    Presumably, to teach special education students during the daytime.

5   Although the Complaint specifies the 2010–2011 academic year for this allegation, the Court assumes that Plaintiff meant to state 2011–2012 in light of her contention that the "critical period" for her retaliation claim started in September 2011. *See* Compl. ¶¶ 31–32.

6   As discussed *infra*, Plaintiff attaches several letters to the Complaint, including a disciplinary letter dated October 28, 2011 written by Assistant Principal DeJesus. To the extent that they are consistent with Plaintiff's allegations, the Court deems such letters incorporated into the Complaint by reference. *Donhauser,* 314 F.Supp.2d at 121.

7   The meaning of this acronym is not apparent to the Court, as Plaintiff's allegations do not define the term.

8   Other than the limited reference to it in the Special Ed Complaint, the record is silent regarding the content of this disciplinary letter.

9   While Exhibit 2 to the Complaint indicates that she attended a meeting on January 23, 2012, prior to going into labor, Plaintiff appears to allege that she went into labor *before* the meeting (Compl.¶ 41).

10  The letter bears Plaintiff's signature, an apparent acknowledgement of receipt.

11  Section 4.3.2 of the BOE's bylaws, entitled "Appeals re Discontinuance of Probationary Service," provides that:

> Any person in the employ of the City School District who appears before the Chancellor, or a committee designated by the Chancellor, concerning the discontinuance of service during the probationary term, or at the expiration thereof, shall have a review of the matter before a committee which shall be designated in accordance with contractual agreements covering employees or by regulations of the Chancellor, as appropriate.

> After the review, the committee shall forward its advisory recommendation to the community superintendent or to the Chancellor in accordance with contractual agreements.

*Kahn v. N.Y.C. Dep't of Educ.,* 18 N.Y.3d 457, 463 (N.Y.2012). Pursuant to section 4.3.3, "the employee is entitled to appear in person at the hearing, accompanied by an advisor; to be confronted by and call witnesses; and to examine exhibits and introduce relevant evidence. The CBA calls for the section 4.3.2 review to be conducted by a tripartite committee of professional educators, with one selected by the teacher, one by BOE and the third by the other two from an agreed-upon list." *Id.*

12  The Court interprets the "HR Connect blacklist" to be internal to the City of New York Department of Education based on facts alleged by the Plaintiff.

13  While Plaintiff also cites the Fifth and Seventh Amendments, *see* Compl. ¶ 1, neither amendment provides a basis for an additional cause of action. The Court construes Plaintiff's citation to the Seventh Amendment as support for her request for a civil jury trial, U.S. Const. Amend. VII, and the Fifth Amendment has no applicability here, as Defendants are state, not federal, actors.

14  To the extent that the Complaint can be construed to allege First Amendment retaliation for Plaintiff's decision to file the Special Ed Complaint, the Court likewise dismisses such claim. Plaintiff's Special Ed Complaint expressed concern about the Defendants' response to the September 24, 2011 Emails and complained of "special education fraud" at P.S. 249. Compl. Ex. 6. Yet, because filing a grievance with a union is "not a form or channel of discourse available to non-employee citizens," it is not speech made as a public citizen, and thus falls outside of the umbrella of First Amendment protection. *Weintraub v. Bd. Of Educ.,* 593 F.3d 196, 204 (2d Cir.2010). "[T]he First Amendment invests public employees with certain rights, [but] it does not empower them to 'constitutionalize the employee grievance.' " *Garcetti,* 547 U.S. at 420 (quoting *Connick,*

461 U.S. at 154). Thus, Plaintiff's grievance lacks First Amendment protection and cannot form the basis of a retaliation claim.

15    Claims under the Fourteenth Amendment are not restricted to multi-person classes; an individual, as a "class of one," can seek Equal Protection under the Fourteenth Amendment. *See, e.g., Engquist v. Or. Dep't of Agric.,* 553 U.S. 591 (2008). However, the Supreme Court has held that equal protection "class of one" claims do not apply in the public employer context. *Id.* at 605–607. Accordingly, Plaintiff cannot seek relief as a "class of one" here. *See id.* at 602.

16    To the extent that the Complaint can be construed as an attempt to allege violations of the witness tampering statute, 18 U.S.C. § 1512, the Court also dismisses such claims. Compl. ¶ 11. None of Plaintiff's allegations involve a witness threatened with physical force or death at an "official proceeding"—but most significantly, the witness tampering statute does not provide for a private right of action.

---

**End of Document**                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2024 WL 1466880
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Ralph RODRIGUEZ, Plaintiff,
v.
Edward R. BURNETT et al., Defendants.

22-CV-10056 (PMH)
|
Signed April 4, 2024

**Attorneys and Law Firms**

Ralph Rodriguez, Wallkill, NY, Pro Se.

Neil Shevlin, Andrew Blancato, New York State Office of the
Attorney General, New York, NY, for Defendants Edward R.
Burnett, Stephen Urbanski, Akinola Akinyombo, Block (first
name unknown), Sally A. Reams, Mohammad A. Bhuiyan,
Davachi M. Sullivan, Oujas Gifty, Sangeethe L. Mukkatt,
Mitchell, Flanagan, Franco, Santiago, Oge, Crofoot, Garrett,
Ciacco, Cherry, Okusko, Aleisha Rose.

Andrew Blancato, New York State Office of the Attorney
General, New York, NY, for Defendants C.E.R.T. Members
John Does 2-8, Number 18-42, 13-38, 13-24, Matos, Hanley.

C.E.R.T. Members John Does 2-8, Number 18-42, 13-38,
13-24, Pro Se.

Matos, Pro Se.

Hanley, Pro Se.

**OPINION & ORDER**

PHILIP M. HALPERN, United States District Judge:

 **\*1** Ralph Rodriguez ("Plaintiff") brings this action *pro se*
and *in forma pauperis* under 42 U.S.C. § 1983, predicated
upon violations of the First, Fourth, Eighth, Ninth, and
Fourteenth Amendments to the United States Constitution,
Title II of the Americans with Disabilities Act ("ADA"), 42
U.S.C. § 12101 *et seq.*, Section 504 of the Rehabilitation
Act ("Rehab Act"), 29 U.S.C. § 794, and the Religious Land
Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C.
§ 2000cc *et seq.*, which occurred during his confinement
at Fishkill Correctional Facility ("Fishkill"). The matter

proceeded initially against eleven named employees and
several other John and Jane Doe employees of the New York
State Department of Corrections and Community Supervision
("DOCCS") in their individual and official capacities, the
County of Dutchess, and the State of New York. (Doc. 2,
"Compl." at pp. 3-4).

The Court, in a February 1, 2023 Order, dismissed all
claims against the State of New York, Commissioner
Annucci, and Governor Hochul. (Doc. 6). The remaining
Defendants are Edward Burnett, Stephen Urbanski, Akinola
Akinyombo, Michael Blot a/k/a Sgt. Block ("Blot"), Sally A.
Reams, Mohammad A. Bhuiyan, Mahnaz Sullivan-Davachi
("Sullivan"), Oujas Gifty, Sangeethe L. Mukkatt, Robert
Mitchell, Richard Flanagan, Jonathan Franco, Angel Matos,
Vincent Santiago, Jean Marc Oge, Jason Crofoot, Carlton
Garrett, Christopher Ciaccio, Shawn Hanley, Alexis Cherry,
Jan Okusko, and Aleshia Rose (collectively, "Defendants").

Defendants filed a motion to dismiss under Federal Rule of
Civil Procedure 12(b)(6) on September 12, 2023. (Doc. 43;
Doc. 44, "Def. Br."). Plaintiff filed opposition on October 13,
2023 (Doc. 46; Doc. 47, "Pl. Br."), and Defendants' motion
to dismiss was fully briefed with the filing of their reply
memorandum of law on October 26, 2023. (Doc. 48). [1]

For the reasons set forth below, the motion to dismiss is
GRANTED in part and DENIED in part.

**BACKGROUND**

Plaintiff alleges that he was assaulted by several officers
of DOCCS Correctional Emergency Response Team
("C.E.R.T.")—namely Flanagan, Franco, Matos, Santiago,
Oge, Crofoot, and Garrett (together with Blot, the "C.E.R.T.
Defendants")—conducting a raid on his housing unit at
Fishkill on the morning of December 30, 2021 (the "C.E.R.T.
Raid"). (Compl. ¶¶ 13-15). He alleges that he was lifted out
of his bed, "slammed ... head first into the floor" and beaten
with closed fists all over his body. (*Id.* ¶ 15). Six other Black
or Spanish inmates were attacked at the same time. (*Id.* ¶
18). Plaintiff alleges that Blot led the C.E.R.T. Raid and
made disparaging and racist remarks to Plaintiff during the
assault. (*Id.* ¶¶ 16-17, 19-21). Plaintiff further alleges that
five Office of Special Investigation ("OSI") officers—Ciaccio,
Hanley, Cherry, Okusko, and Rose ("OSI Defendants")—
were present outside the dorm during the assault and did
nothing to stop it. (*Id.* ¶ 21). Plaintiff similarly alleges that

his housing unit officer, Bhuiyan, was present but did not intervene. (*Id.* ¶ 23).

 **\*2** Plaintiff alleges that the C.E.R.T. Defendants ripped off his clothes during the raid, left him naked on the floor with only his boxers on, and then searched him. (*Id.* at p. 51). Plaintiff also alleges that his personal property was destroyed during the C.E.R.T. Raid—namely, his legal documents, letters, artwork, electronics, art supplies, a diary, two books written by Plaintiff, and his shrine which contained numerous religious items. (*Id.* ¶¶ 27, 68).

Plaintiff allegedly suffered injuries to the left ankle, back, neck and head. (*Id.* ¶ 26). At around 12:00 pm., Plaintiff asked Bhuiyan for medical attention and was told to wait. (*Id.* ¶ 28). Plaintiff was escorted to medical at about 6:00 p.m. and was examined by Nurses Mukkatt and Sullivan. (*Id.* ¶¶ 28, 31, 37). Plaintiff alleges that Nurse Sullivan gave him two bandages and an Aspirin and completed an injury report. (*Id.* ¶¶ 37, 39). On January 4, 2022, he was given a crutch to help him walk and an X-ray was performed. (*Id.* ¶¶ 46-47).

## STANDARD OF REVIEW

On a Rule 12(b)(6) motion, a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible on its face "when the ple[d] factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant acted unlawfully." *Id.* The factual allegations pled "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

"When there are well-ple[d] factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679. Thus, the court must "take all well-ple[d] factual allegations as true, and all reasonable inferences are drawn and viewed in a light most favorable to the plaintiff[ ]." *Leeds v. Meltz*, 85 F.3d 51, 53 (2d Cir. 1996). The presumption of truth, however, " 'is inapplicable to legal conclusions,' and

'[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.' " *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678 (alteration in original)). Therefore, a plaintiff must provide "more than labels and conclusions" to show entitlement to relief. *Twombly*, 550 U.S. at 555.

A complaint submitted by a *pro se* plaintiff, "however inartfully ple[d], must be held to less stringent standards than formal pleadings drafted by lawyers." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976) (quoting *Haines v. Kerner*, 404 U.S. 519, 520-21 (1972) (internal quotation marks omitted)). Because *pro se* plaintiffs " 'are often unfamiliar with the formalities of pleading requirements,' courts must apply a more flexible standard in determining the sufficiency of a *pro se* [complaint] than they would in reviewing a pleading submitted by counsel.' " *Smith v. U.S. Dep't of Just.*, 218 F. Supp. 2d 357 (W.D.N.Y. 2002) (quoting *Platsky v. Cent. Intelligence Agency*, 953 F.2d 26, 28 (2d Cir. 1991)). While "[p]ro se complaints are held to less stringent standards than those drafted by lawyers, even following *Twombly* and *Iqbal* ... dismissal of a *pro se* complaint is nevertheless appropriate where a plaintiff has clearly failed to meet minimum pleading requirements." *Thomas v. Westchester Cty.*, No. 12-CV-6718, 2013 WL 3357171, at \*2 (S.D.N.Y. July 3, 2013) (internal citations omitted); *see also Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010) ("Even in a *pro se* case ... although a court must accept as true all of the allegations ... in a complaint, that tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." (internal quotation marks omitted)).

 **\*3** Therefore, while the Court must "draw the most favorable inferences that [a plaintiff's] complaint supports, [it] cannot invent factual allegations that [a plaintiff] has not pled." *Chappius*, 618 F.3d at 170. The Court also has a duty to interpret "the pleadings of a *pro se* plaintiff liberally and interpret them 'to raise the strongest arguments that they suggest.' " *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)).

## ANALYSIS

Plaintiff proceeds under 42 U.S.C. § 1983. That law provides, in pertinent part, that "[e]very person who, under color of any statute ... subjects, or causes to be subjected, any citizen

of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured ....” 42 U.S.C. § 1983. “[T]his language does not create substantive rights; rather, it creates a mechanism by which individuals can vindicate the violation of rights secured elsewhere.” *Linares v. Annucci*, No. 19-CV-11120, 2021 WL 2689736, at *6 (S.D.N.Y. June 30, 2021) (quoting *Santucci v. Levine*, No. 17-CV-10204, 2021 WL 76337, at *3 (S.D.N.Y. Jan. 8, 2021) (alteration in original)). The Court construes Plaintiff's Complaint as asserting the following claims for relief: (1) retaliation and denial of access to courts in violation of the First Amendment; (2) unreasonable search in violation of the Fourth Amendment; (3) excessive force, failure to intervene, and deliberate indifference in violation of the Eighth Amendment; (4) violation of the Ninth Amendment; (5) denial of equal protection rights in violation of the Fourteenth Amendment; (6) religious freedom violations under the First Amendment and RLUIPA; (7) disability discrimination and failure to accommodate pursuant to the ADA and Rehab Act; and (8) supervisory liability. [2]

### I. Group Pleading

As a threshold matter, Defendants argue that each of Plaintiff's claims (except for the unreasonable search claim) is impermissibly based on group pleading. (Def. Br. at 10). Plaintiff responds that he clearly identified by badge number the C.E.R.T. team members who entered his housing unit, assaulted him, and destroyed his property (Compl. at ¶¶ 22, 24), and argues that he could not possibly have identified which of the C.E.R.T. Defendants took what specific action because each wore “riot gear that completely covered their entire body and [a] black mask that covered their face” during the raid. (Pl. Br. at 10). Under these circumstances, the Court agrees with Plaintiff that reference to the C.E.R.T. Defendants collectively is sufficient to withstand a motion to dismiss on personal involvement grounds. *See Gomez-Kadawid v. Lee*, No. 20-CV-001786, 2022 WL 676096, at *7 (S.D.N.Y. Feb. 3, 2022) (“a motion to dismiss for group pleading may fail when, ‘even though the plaintiff refers to defendants generally rather than a particular defendant individually, it is sufficiently clear that in the particular factual context of [the] case ... the complaint furnishes adequate notice for initial pleading purposes of plaintiff's claim of wrongdoing.’ ”) (citing *Arias v. E. Hartford*, No. 3:20-CV-00895, 2021 WL 3268846, at *4 (D. Conn. July 30, 2021)); *see also Messina v. Mazzeo*, 854 F.Supp. 116, 125-26 (E.D.N.Y. 1994).

### II. Personal Involvement

**\*4** Defendants argue that Plaintiff fails to plead the personal involvement of Reams, Mitchell, or Akinyombo in any of the claims for relief. (Def. Br. at 3). Plaintiff responds that he sufficiently alleged personal involvement in that he informed Akinyombo of complaints made against the Fishkill medical staff and that Akinyombo was responsible for overseeing them. (Pl. Br. at 12). Plaintiff also alleged that Mitchell, the Director of C.E.R.T., “was directly responsible for overseeing his subordinates’ actions ....” (*Id.* at 12). Finally, Plaintiff alleged that Reams “conspired with officials” to deprive Plaintiff of his constitutional rights. (*Id.* at 12-13). These allegations are insufficient to sustain a § 1983 claim against these Defendants. *See Boley v. Durets*, 687 F. App'x 40, 41 (2d Cir. 2017); *Shomo v. City of New York*, 579 F.3d 176, 184 (2d Cir. 2009); *see also Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020). Therefore, all claims are dismissed to the extent they are asserted against Reams, Mitchell, or Akinyombo.

### III. First Claim for Relief: Retaliation in violation of the First Amendment

Plaintiff's First Claim for Relief alleges retaliation and denial of access to courts in violation of the First Amendment. (Compl. at pp. 47-49). Defendants move only to dismiss Plaintiff's retaliation claim. Specifically, Plaintiff alleges that the C.E.R.T. Defendants assaulted him and destroyed his personal property—including legal documents, letters, artwork, electronics, art supplies, a diary, and two books written by Plaintiff—in retaliation for his prior lawsuits and grievances. (*Id.* at ¶ 27).

“[T]o sustain a First Amendment retaliation claim, a prisoner must demonstrate the following: (1) that the speech or conduct at issue was protected; (2) that the defendant took adverse action against the plaintiff; and (3) that there was a causal connection between the protected speech and the adverse action.” *Handle v. Alexander*, No. 10-CV-09235, 2011 WL 1226228, at *2 (S.D.N.Y. Mar. 22, 2011) (quoting *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004)). Defendants argue that Plaintiff's retaliation claim fails because he did not establish a causal connection. (Def. Br. at 16). The Court agrees.

Plaintiff states that at the time of the C.E.R.T. Raid, he was “known for exercising his constitutional [r]ight to petition the court for the wrong doing of correctional officials and grieving them ...,” and that this was the “main reason for

the assault by the [C.E.R.T.] Defendants." (Compl. at p. 48). Plaintiff does not specifically identify any grievances or civil lawsuits he instituted against correctional officers. Nor does Plaintiff allege that the C.E.R.T. Defendants were aware of or involved in any prior grievances or lawsuits he had filed. These vague and conclusory allegations do not constitute a plausible retaliation claim against the C.E.R.T. Defendants. *See Thomas v. DeCastro*, No. 14-CV-06409, 2018 WL 1322207, at *10 (S.D.N.Y. Mar. 13, 2018) (dismissing retaliation claim which was based on "entirely conclusory" allegations and plaintiff's belief that defendants colluded to punish him). Plaintiff's First Claim for Relief is dismissed to the extent it is based on a claim for retaliation.

IV. <u>Second Claim for Relief: Unreasonable Search in violation of the Fourth Amendment</u>

The Court construes Plaintiff's Second Claim for Relief as a claim for unreasonable search in violation of the Fourth Amendment based on the C.E.R.T. Defendants' strip search of Plaintiff in his cell during the C.E.R.T. Raid. (Compl. at pp. 50-52).

"While 'the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell,' 'inmates retain a limited right of bodily privacy under the Fourth Amendment.' " *Baltas v. Jones*, No. 21-CV-00469, 2023 WL 8827880, at *17 (D. Conn. Dec. 21, 2023) (citing *Harris v. Miller*, 818 F.3d 49, 57 (2d Cir. 2016)). When evaluating an inmate's claim that an officer infringed his right to bodily privacy: "(1) [f]irst, the court must determine whether the [prisoner] has exhibit[ed] an actual, subjective expectation of bodily privacy; and (2) second, the court must determine whether the prison officials had sufficient justification to intrude on [the inmate's] [F]ourth [A]mendment rights." *Singleton v. City of New York*, No. 20-CV-08570, 2022 WL 4620174, at *9 (S.D.N.Y. Sept. 30, 2022) (citing *Harris*, 818 F.3d at 57). "A strip search violates the Fourth Amendment 'if it is unrelated to any legitimate penological goal or if it is designed to intimidate, harass, or punish.' " *Id.* (citing *Jean-Laurent v. Wilkerson*, 438 F. Supp. 2d 318, 323 (S.D.N.Y. 2006)).

**\*5** Plaintiff alleges that his clothes were ripped off during the assault, he was left naked on the floor with his boxers barely on, and the C.E.R.T. Defendants searched him "without any [l]egitimate penological purpose for the strip search ...." (Compl. at p. 51). These allegations, accompanied by the physical abuse and racial slurs Plaintiff allegedly endured during the C.E.R.T. Raid, are sufficient at this stage to plead that the search was not reasonably related to any legitimate penological interest. *See i.e. Jean-Laurent*, 438 F. Supp. 2d at 323. Accordingly, Plaintiff has stated a plausible claim for unreasonable search against the C.E.R.T. Defendants in violation of the Fourth Amendment.

V. <u>Third Claim for Relief: Deliberate Indifference in violation of the Eighth Amendment</u>

Plaintiff's Third Claim for Relief advances three separate violations of the Eighth Amendment: (i) excessive force; (ii) failure to intervene; and (iii) deliberate indifference to serious medical needs.[3] (Compl. at pp. 53-57). Defendants move only to dismiss the deliberate indifference claim.

"The Cruel and Unusual Punishments Clause of the Eighth Amendment imposes a duty upon prison officials to ensure that inmates receive adequate medical care." *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006) (citing *Farmer v. Brennan*, 511 U.S. 825, 832, 844 (1994)). "In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove 'deliberate indifference to [his] serious medical needs.' " *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (quoting *Estelle*, 429 U.S. at 104 (alteration in original)). "A plaintiff can prevail on a deliberate indifference to medical needs claim under the Eighth Amendment by satisfying a two-prong test." *Sutton v. Rodriguez*, No. 18-CV-01042, 2020 WL 5504312, at *4 (S.D.N.Y. Sept. 8, 2020). Generally, as explained by this Court previously:

[t]he first prong is objective and requires that the alleged deprivation in medical care be sufficiently serious. A deprivation in medical care is sufficiently serious if (1) the prisoner was actually deprived of adequate medical care and (2) the inadequacy in medical care is sufficiently serious. The latter inquiry contemplates a condition of urgency that may result in degeneration or extreme pain.

....

The second prong of the deliberate indifference test under the Eighth Amendment is subjective and requires that the plaintiff demonstrate that the defendant had a sufficiently culpable state of mind. A defendant had a sufficiently culpable state of mind if he acted or failed to act while actually aware of a substantial risk that serious inmate harm will result.

*Id.* at *4-5 (internal citations and quotation marks omitted).

Defendants advance three arguments with respect to Plaintiff's claim for deliberate indifference: (i) the claims are duplicative of Plaintiff's claims in a prior suit; (ii) Plaintiff fails to plead an objectively serious medical risk; and (iii) Plaintiff fails to plead deliberate indifference by any Defendant. (Def. Br. at 12-16; Reply at 3-4).

**\*6** With respect to Defendant's argument that Plaintiff fails to demonstrate an objectively serious medical risk resulting from the C.E.R.T. Raid (Def. Br. at 14-16), Plaintiff responds that his medical needs were sufficiently serious and that the exhibits attached to the Complaint support his position. (Pl. Br. at 16). The Complaint alleges that following the C.E.R.T. Raid Plaintiff was in "extreme pain especially to the left ankle, back, neck and head" and "was almost unable to walk ... without assistance." (Compl. ¶¶ 26-27). A medical record attached to the Complaint shows that Plaintiff was treated for bruising on the day of the C.E.R.T. Raid. (*Id.*, Ex. D). [4] While Plaintiff's alleged injuries are described in vague terms, the Court, construing the facts in Plaintiff's favor and considering the brutality of the alleged assault (Compl. ¶¶ 15-16), finds these injuries sufficient to meet the first prong.

Defendants also argue that Plaintiff fails to demonstrate that they acted with a sufficiently culpable state of mind. (Def. Br. at 15). Plaintiff responds that the prison officials involved knew about and ignored an excessive risk to his health and safety. (Pl. Br. at 16). The Court agrees with Defendants.

Plaintiff alleges that he should have received medical assistance after the C.E.R.T. Raid beyond the bandages and Aspirin provided by Nurse Sullivan, such as stronger pain medication or an immediate X-Ray or M.R.I. (Compl. ¶¶ 28, 31, 37, 58-59; *id.* at pp. 55-56). Medical records attached to the Complaint confirm that Plaintiff was treated with ice and bandages (*id.*, Ex. D) and that Nurse Sullivan ordered Plaintiff an X-ray which was performed on January 4, 2022 (*id.*, Ex. J). Defendants argue that Plaintiff's dissatisfaction with Sullivan's treatment does not demonstrate deliberate indifference. (Def. Br. at 15). The test for deliberate indifference to a serious medical need under the Eighth Amendment, laid out *supra*, exists with a caveat: "a prisoner is not entitled to the best healthcare possible or even to a choice among available treatment modalities." *Robinson v. Wolf-Friedman*, No. 18-CV-02409, 2019 WL 4640236, at \*6 (S.D.N.Y. Sept. 24, 2019) (internal quotation marks omitted). "Indeed, prison officials and medical officers have wide discretion in treating prisoners, and Section 1983 is

not designed to permit federal courts to interfere in the ordinary medical practices of state prisons." *Sonds v. St. Barnabas Hosp. Corr. Health Servs.*, 151 F. Supp. 2d 303, 311 (S.D.N.Y. 2001). Here, Plaintiff's allegations that Nurse Sullivan should have done more to treat his injuries than provide bandages and Aspirin is not sufficient to establish a culpable state of mind. *See Chance*, 143 F.3d at 703 ("It is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation."). Accordingly, Plaintiff fails to satisfy the second prong. [5]

**\*7** Defendants further argue that there are no facts to suggest that either Blot or Bhuiyan was subjectively reckless in their denial of medical care. (Def. Br. at 44). Plaintiff responds that both were aware of his medical needs prior to entering the housing unit. (Pl. Br. at 16). With respect to Bhuiyan, Plaintiff alleges that he requested medical attention from Bhuiyan after the C.E.R.T. Raid and that Bhuiyan told him to wait. (*Id.* ¶ 28). Plaintiff does not otherwise allege that Bhuiyan knew of a serious medical risk or disregarded such a risk. Moreover, Plaintiff does not allege that he requested medical care from Blot, let alone that he was denied medical care. Therefore, Plaintiff has not met the subjective prong as to either Blot or Bhuiyan.

Accordingly, Plaintiff's Third Claim for Relief for deliberate indifference is dismissed. [6]

## VI. Fourth Claim for Relief: Violation of the Ninth Amendment

Plaintiff's Fourth Claim for Relief alleges violation of the Ninth Amendment. (Compl. at pp. 58-59). The Ninth Amendment cannot serve as the basis for a § 1983 claim. *See Lloyd v. Lee*, 570 F. Supp. 2d 556, 566 (S.D.N.Y. 2008). Accordingly, Defendants' motion to dismiss is granted as to the Fourth Claim for Relief.

## VII. Fifth Claim for Relief: Denial of Equal Protection in Violation of the Fourteenth Amendment

Plaintiff's Fifth Claim for Relief alleges violation of his equal protection rights pursuant to the Fourteenth Amendment on the basis that the C.E.R.T. Defendants targeted him in the assault because he is Hispanic. (Compl. at pp. 60-61; Pl. Br. at 21-22). Plaintiff alleges that the C.E.R.T. Defendants

attacked only Black or Hispanic inmates, not White inmates, and used racial slurs against him during the assault. (Compl. ¶¶ 16, 70). These allegations which involve physical abuse are sufficient to sustain an equal protection claim at this stage. *See Nova v. Smith*, No. 19-CV-00072, 2019 WL 13417142, at *4 (N.D.N.Y. Feb. 27, 2019); *see also Baskerville v. Goord*, No. 97-CV-06413, 2000 WL 897153, at *3 (S.D.N.Y. July 6, 2000) ("Mere verbal abuse or the use of racial slurs or epithets reflecting racial prejudice, although reprehensible, does not form the basis of a claim pursuant to § 1983 ... Where, however, such statements are shown to be connected with physical injury, a § 1983 claim may indeed lie."). Accordingly, Defendants' motion to dismiss the Fifth Claim for Relief is denied.

## VIII. Sixth Claim for Relief: Violation of the First Amendment and RLUIPA

Plaintiff asserts in his Sixth Claim for Relief that the C.E.R.T. Defendants' destruction of religious items on a shrine in his prison cell constituted a violation of his free exercise rights under the First Amendment and RLUIPA. (Compl. at pp. 62-63).

"The religion clauses of the First Amendment, applicable to the states through the Fourteenth Amendment, provide that 'Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof.' " *Kravitz v. Purcell*, ─── F.4th ───, 2023 WL 8177114, at *4 (2d Cir. Nov. 27, 2023). Alleged violations of the right to free exercise, in the prison context, are "judged under a 'reasonableness' test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights." *Id.* (quoting *O'Lone v. Est. of Shabazz*, 482 U.S. 342, 349 (1987)). Accordingly, a prisoner's First Amendment right to the free exercise of his religious beliefs may only be infringed to the extent that such infringement is reasonably related to legitimate penological interests. *Id.*; *see also Turner v. Safley*, 482 U.S. 78, 89 (1987); *Young v. Coughlin*, 866 F.2d 567, 570 (2d Cir. 1989). "In short, to assess a free exercise claim, a court must determine (1) whether the practice asserted is religious in the person's scheme of beliefs, and whether the belief is sincerely held; (2) whether the challenged practice of the prison officials infringes upon the religious belief; and (3) whether the challenged practice of the prison officials furthers legitimate penological objectives." *Kravitz*, 2023 WL 8177114, at *11.

**\*8** A RLUIPA violation, on the other hand, requires a showing that "the challenged conduct substantially burdened

his sincerely held religious beliefs." *Lloyd v. City of New York*, 43 F. Supp. 3d 254, 263 (S.D.N.Y. Aug. 4, 2014); *see also Kravitz*, 87 F.4th at 125-126 ("an inmate does not need to establish a substantial burden in order to prevail on a free exercise claim under § 1983" but "[RLUIPA] requires a substantial burden inquiry.").

Here, Plaintiff alleges the C.E.R.T. Defendants destroyed the shrine—including "a painting of Jesus Christ holding his heart, and a Crucifix, and Cup of Holy Water, Fruits and Rosary ... and Religious books and Written Scriptures, Passages and Prayers from the Bible." (Compl. ¶¶ 68, 98-99). Defendants do not challenge that Plaintiff's religious beliefs are sincerely held, so the Court assumes sincerity for the purposes of this Motion. *See Porter v. Bunch*, No. 16-CV-05935, 2019 WL 1428431, at *15 (S.D.N.Y. Mar. 29, 2019). Defendants argue, however, that Plaintiff has failed to allege *how* the C.E.R.T. Defendants' actions burdened his religious practice as a Protestant. (Def. Br. at 21) (emphasis in original). Plaintiff alleges that he "[p]rayed [d]aily in front of [his] Shrine," that the shrine was destroyed, and that he was afraid to re-create the shrine for fear that it would be destroyed again. (Compl. ¶¶ 68, 98-99). Plaintiff further alleges that the destruction of these items "all together Stopped Plaintiff from Practicing in [ ]his Belief, being Protestant." (*Id.*). The Court understands Plaintiff as alleging that the loss of his shrine infringed on his daily prayer practice. Moreover, Defendants do not assert any legitimate penological interest in destroying Plaintiff's shrine. At this stage of the litigation, Plaintiff has plausibly stated a claim under the First Amendment and RLUIPA.

Accordingly, Defendants' motion is denied as to the Sixth Claim for Relief.

## IX. Seventh Claim for Relief: Failure to Accommodate under ADA and Rehab Act

Plaintiff's Seventh Claim for Relief asserts claims for failure to make a reasonable accommodation for Plaintiff's disability in violation of the ADA and Rehab Act. (Compl. at pp. 64-66). Defendants argue that this claim for relief is duplicative of claims asserted in Plaintiff's earlier filed action—namely, the alleged denial of an extra mattress or egg crate mattress as a reasonable accommodation. *See Rodriguez v. Burnett*, No. 22-CV-02198, 2023 WL 3902705, at *5 (S.D.N.Y. June 7, 2023). (Def. Br. at 13). Plaintiff indicates in Opposition that the only reason he included allegations about the need for an egg crate mattress in this action to show that Defendants "knew about their subordinates actions and failed to respond." (Pl.

Br. at 14). Defendants construe this as an admission that Plaintiff is not seeking redress for disability violations. (Reply at 3). The Court is not convinced that Plaintiff intends such an admission. Plaintiff goes on to argue that the pending claim is not duplicative of his earlier action because the "date, time and incident involved were different from any previous claim." (Pl. Br. at 15). But Plaintiff has not identified in the Complaint or his briefing any factual basis for the reasonable accommodation claim other than the denial of an egg create mattress. (Compl. ¶ 55). Accordingly, the Seventh Claim for Relief is dismissed as duplicative Plaintiff's claim in the earlier filed action which dealt with nearly identical allegations. *See Rodriguez*, 2023 WL 3902705, at *5-6.

### X. Eighth Claim for Relief: Supervisory Liability

**\*9** Plaintiff's Eighth Claim for Relief advances a theory of supervisory liability without identifying specific Defendants. (Compl. at pp. 68-69). In any event, allegations that individuals failed to supervise employees does not establish liability. *See Russell v. Stanford*, No. 21-CV-00296, 2021 WL 1565147, at *5 (N.D.N.Y. Apr. 21, 2021) ("there is no special rule for supervisory liability ... a plaintiff must plead and prove that each Government-official defendant, through the official's own individual actions, had violated the Constitution."). Accordingly, Defendants' motion is granted as to the Eighth Claim for Relief.

### XI. Qualified Immunity

Finally, Defendants argue that the claims against Burnett and Urbanski should be dismissed by operation of qualified immunity. (Def. Br. at 18-19). "Qualified immunity protects public officials from liability for civil damages when one of two conditions is satisfied: (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Garcia v. Does*, 779 F.3d 84, 92 (2d Cir. 2015) (quoting *Russo v. City of Bridgeport*, 479 F.3d 196, 211 (2d Cir. 2007)). "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Almighty Supreme Born Allah v. Milling*, 876 F.3d 48, 59 (2d Cir. 2017) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). If an official's belief that his action does not violate clearly established law is "objectively reasonable," he is shielded from liability by qualified immunity. *Cooper v. City of New Rochelle*, 925 F. Supp. 2d 588, 608 (S.D.N.Y. 2013); *see also al-Kidd*,

563 U.S. at 743 ("Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments .... [I]t protects all but the plainly incompetent or those who knowingly violate the law." (internal quotation marks omitted)). However, on a motion to dismiss, Plaintiff's entitlement to qualified immunity must "appear on the face of the complaint." *Hyman v. Abrams*, 630 F. App'x 40, 42 (2d Cir. 2015) (internal quotation marks omitted). That is not the case here.

Defendants argue that the Plaintiff's allegations that Burnett and Urbanski "authoriz[ed] the deployment of C.E.R.T. without just cause" (Compl. ¶ 9) does not rise to the level of violating clearly established statutory or constitutional rights because "[d]eploying specialized security personnel does not alone violate the law." (Def. Br. at 18). This conclusory argument merely parrots the qualified immunity standard without meaningfully applying applicable case law to the facts of this case. Moreover, Defendants' argument ignores Plaintiffs' allegations that the C.E.R.T. Defendants were deployed for the improper purpose of assaulting prisoners, specifically Black and Hispanic prisoners. (Compl. ¶¶ 62-64). The Court cannot conclude from the four-corners of the Complaint and on the motion papers before it that Burnett and Urbanski are entitled to qualified immunity at this early pleading stage. *See Dipinto v. Westchester Cty.*, No. 18-CV-00793, 2019 WL 4142493, at *4 n.4 (S.D.N.Y. Aug. 30, 2019). Although Burnett and Urbanski are "not entitled to qualified immunity on the face of the complaint ... a factual basis for qualified immunity may arise as the proceedings develop." *Terranova v. New York*, 144 F. App'x 143, 146-47 (2d Cir. 2005) (internal quotation marks omitted). Defendants may revisit this argument after developing the record.

### CONCLUSION

**\*10** For the foregoing reasons, the motion to dismiss is GRANTED in part and DENIED in part.

Defendants' motion is GRANTED as to: (i) First Claim for Relief (retaliation); (ii) Third Claim for Relief (deliberate indifference); (ii) Fourth Claim for Relief (Ninth Amendment); (iii) Seventh Claim for Relief (disability discrimination and reasonable accommodation); (iv) Eighth Claim for Relief (supervisory liability); and (v) any claims asserted against Reams, Mitchell, or Akinyombo.

Defendants' motion is DENIED as to: (i) First Claim for Relief (access to courts); (ii) Second Claim for Relief (unreasonable search); (iii) Third Claim for Relief (excessive force and failure to intervene); (iv) Fifth Claim for Relief (equal protection); (v) Sixth Claim for Relief (religious freedom); and (vi) the affirmative defense of qualified immunity. [7]

Defendants are directed to file an answer to the complaint within 14 days of the date of this Order. The Court will thereafter docket a Notice of Initial Conference.

**All Citations**

Slip Copy, 2024 WL 1466880

## Footnotes

[1]    With respect to Defendants Matos and Hanley, service was accepted on behalf of both Defendants and was deemed complete for Hanley as of July 26, 2023 (Doc. 29) and Matos as of August 16, 2023. (Doc. 42). Defense counsel did not appear or move on behalf of Matos or Hanley. (Doc. 43; Doc. 53). Accordingly, Matos and Hanley are currently in default and not a part of this motion practice.

[2]    On February 1, 2023, the Court dismissed Plaintiff's Ninth Claim for Relief for municipal liability against Dutchess County. (Doc. 6).

[3]    While Defendants acknowledge in briefing that the Complaint alleges the use of excessive force (Def. Br. at 7), Defendants do not address excessive force or failure to intervene as independent claims for relief. The Complaint states that Plaintiff "has raised multiple violations under the Eighth Amendment of the Constitution that include, Deliberate Indifference to Serious Medical need, Excessive Force By Prison Officials, and Failure to Protect From Prison Officials." (Compl. at p. 54). Indeed, the gravamen of the Complaint is the alleged physical assault on Plaintiff during the C.E.R.T. Raid. Therefore, the Court construes the Third Claim for Relief as alleging claims for excessive force and failure to intervene, as well as deliberate indifference to serious medical needs, under the Eighth Amendment.

[4]    On a Rule 12(b)(6) motion, "the Court is entitled to consider facts alleged in the complaint and documents attached to it or incorporated in it by reference, [as well as] documents 'integral' to the complaint and relied upon in it, and facts of which judicial notice may properly be taken ...." *Heckman v. Town of Hempstead*, 568 F. App'x 41, 43 (2d Cir. 2014); *Manley v. Utzinger*, No. 10-CV-02210, 2011 WL 2947008, at *1 n.1 (S.D.N.Y. July 21, 2011) (explaining that a court may consider "statements or documents incorporated into the complaint by reference, and documents possessed by or known to the plaintiff and upon which the plaintiff relied in bringing the suit"). The Court may therefore consider the medical records attached to the Complaint.

[5]    Though Plaintiff identifies Nurses Mukkatt and Gifty as having failed to provide prompt medical care (Compl. ¶ 58), Plaintiff does not allege in sufficient detail that Mukkatt or Gifty saw him after the C.E.R.T. Raid, became aware of a serious medical risk, and deliberately disregarded that risk. The Third Claim for Relief against them is dismissed.

[6]    Given the conclusions reached herein, the Court need not address Defendants' argument that Plaintiff's deliberate indifference allegations against Sullivan are duplicative of those asserted in Plaintiff's prior litigation. (Def. Br. at 13).

[7]    These claims proceed against the Defendants in their individual capacities only, since the Eleventh Amendment bars § 1983 claims against individual Defendants in their official capacities as DOCCS employees. *Phillips v. New York*, No. 13-CV-00927, 2013 WL 5703629, at *3 (N.D.N.Y. Oct. 17, 2013) (citing

*Vincent v. Yelich*, 718 F.3d 157, 177 (2d Cir. 2013)); *see also Keitt v. New York City*, 882 F. Supp. 2d 412, 424 (S.D.N.Y. 2011).

**End of Document**                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 137775
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Gwendolyn SHERMAN, Plaintiff,

v.

YONKERS PUBLIC SCHOOLS, Yonkers Public
Schools Board of Education, Edwin M. Quezada,
Superintendent, Cesar E. Chaves Elementary School, f/
k/a Cedar Place School, Magdaline M. Delany, Principal,
John Doe, #1-50, and Mary Roe, #1-50, Defendants.

No. 21-CV-7317 (CS)
|
Signed January 9, 2023

**Attorneys and Law Firms**

Adrian J. Johnson, Johnson & Associates, PC, Iselin, New
Jersey, Counsel for Plaintiff.

Joanna M. Topping, Abrams Fensterman, LLP, White Plains,
New York, Counsel for Defendants.

**OPINION & ORDER**

Seibel, United States District Judge

 *1  Before the Court is the motion to dismiss of Defendants
Yonkers Public Schools and Yonkers Public Schools Board
of Education (together, "YPS"), Dr. Edwin M. Quezada, and
Magdaline M. Delany (collectively, "Defendants"). (ECF No.
25.) [1] For the following reasons, the motion is GRANTED.

## I. BACKGROUND

I accept as true the facts, but not the conclusions, set forth in
Plaintiff's AC.

### A. Factual Background

Plaintiff Gwendolyn Sherman is Black woman employed by
YPS as a special education teacher at the Cesar E. Chavez
School ("Chavez"). (AC ¶¶ 14-15.) Defendant Magdaline M.
Delany is the principal at Chavez. (Id. ¶¶ 16-17.) Plaintiff
alleges that Defendants created a hostile work environment;
discriminated against her on the basis of her race, (AC ¶¶ 36,
78, 79), color, (id. ¶ 79), religion, (id.), gender, (id. ¶ 78), and

veteran status, (id.); and retaliated against her for speaking out
about student placement, (id. ¶ 46), student misconduct, (id.
¶32), and child abuse (id. ¶¶ 64-67).

Plaintiff alleges that from 2009 to 2019, Defendants
"collectively and individually" publicly belittled and
humiliated her and reprimanded her without basis. (Id. ¶¶
18-20.) She alleges she faced "verbal, mental and emotional
abuse" daily during this period. (Id. ¶ 71.) She does not
provide examples or any specifics regarding these alleged
belittlings, reprimands or abuses.

Plaintiff states that Defendants have reassigned Plaintiff's
classroom aides to allegedly "increase the difficulty"
for Plaintiff. (Id. ¶ 87.) As early as 2012, Defendant
Delany allegedly started punishing Plaintiff for protesting
the reassignment by transferring back to Plaintiff's class
"difficult" students who had earlier been transferred to
non-white co-workers by the Special Education Placement
Department. (Id. ¶¶ 24, 46.) These transfers from non-white
teachers are also alleged to constitute "favoritism towards
Caucasian teachers." (Id. ¶ 83.)

She alleges that starting in 2013, Defendant Delany
purposefully tampered with her evaluations, "in an attempt to
cause fear," (id. ¶ 21), and "force her to resign or retire," (id.
¶¶ 31, 55). She provides no facts regarding what was changed
in her evaluations or what effect this alleged conduct had.
She alleges that Defendants defamed her by portraying her
negatively to others outside of the school, preventing her
from transferring, being promoted, or being hired in other
districts. (Id. ¶¶ 97-99.) No specifics are provided regarding
any allegedly false statements made by Defendants, to whom
they were made, when they were made, how they were
communicated, or what connection they had to positions
for which Plaintiff applied. Plaintiff further alleges that
from 2014 through 2019, Delany allegedly "blackballed"
Plaintiff from applying for or obtaining higher-level positions
for which Plaintiff believes she was qualified, (id. ¶ 73),
and Plaintiff had to train staff members newly appointed
to those positions, (id. ¶ 74). No information is provided
about these positions, what Delany said or did, how Delany
communicated with the decision makers, or how Plaintiff's
qualifications compared to those of other applicants.

 *2  Pursuant to New York state law, Plaintiff was required
to report suspected child abuse. (Id. ¶¶ 61-63); see N.Y.
Soc. Serv. Law § 413(1)(a) (teachers, among others, "are
required to report ... when they have reasonable cause to

suspect that a child coming before them in their professional or official capacity is an abused or maltreated child."). During the 2016-2017 school year, Plaintiff reported to her building principal (presumably Delany) that she believed another teacher at the school was abusing a student, and was told that she should not report it, as the school would conduct an internal investigation. (AC ¶¶ 64-66.) She alleges that she was then "targeted" for opposing orders to not report such incidents, (*id.* ¶ 33; *see id.* ¶ 32), in that "harassing activities," (*id.* ¶ 67), directed against her intensified, (*id.* ¶¶ 67, 71). She does not describe what she said or did to protest the alleged orders. The only specific she provides about the retaliation is that "Defendants, collectively and individually, kept [her] from leaving her classroom at any time for any reason," (*id.* ¶ 68), but she also alleges that "Defendant Delany instructed [her] not to leave her classroom outside of her lunch or planning period," (*id.* ¶ 69). Plaintiff believes that the retaliatory harassment was intended to hamper her ability to teach and advocate on behalf of her special education and African-American students. (*Id.* ¶ 34.) Plaintiff also believes that because she expressed concerns about "the sexual misconduct of emotionally disturbed students, both disabled and non-disabled," Defendants retaliated against her by writing negative and false evaluations, verbally abusing and threatening her, humiliating her in front of her peers, and more. (*Id.* ¶ 32.) She does not say when or how she expressed these concerns, nor are there any facts regarding the evaluations or the other abuse.

Plaintiff also alleges she was assaulted by Defendant Delany. In November 2017, after meeting with Plaintiff in her office, Delany allegedly "had an angry attitude and rushed [Plaintiff] out of the door." (*Id.* ¶¶ 89-90.) Plaintiff turned around to ask Delany a question but she "slammed her door in [Plaintiff]'s face." (*Id.* ¶ 91.) Although the door did not touch her, Plaintiff believed she was in "imminent danger of being hit by the door." (*Id.* ¶ 92.)

Beginning in 2018 and through 2019, according to Plaintiff, Delany "embarrassed, humiliated and belittled Plaintiff in the presence of other staff members." (*Id.* ¶ 45.) At unstated times, "Defendants, collectively and individually," would allegedly reprimand Plaintiff "openly and publicly throughout the building," (*id.* ¶ 26), and publicly humiliate her during staff meetings, (*id.* ¶ 29), but again no facts about the alleged conduct are provided. Plaintiff alleges that she is "treated ... differently" in the presence of non-white team members, (*id.* ¶ 23), but does not say from whom she is treated differently, how she is treated, or how that treatment is different if white

staff members are present. Defendants allegedly stated that they had received complaints about Plaintiff from other staff members, but would not identify who lodged these complaints and did not put any complaints in her employee file. (*Id.* ¶¶ 26-27.)

Plaintiff is allegedly the only special education teacher who is denied access to information related to students' assessments and performance. (*Id.* ¶¶ 28, 52; *see id.* ¶ 85.) Plaintiff was "forced ... to come out of her classroom to address behavioral needs of students in other classrooms," which was not required of other teachers. (*Id.* ¶ 84.)

Allegedly at the instruction of Defendant Delany, (*id.* ¶ 54), support staff, "collectively and individually," would not schedule meetings for Plaintiff with the District superintendent or other administrators, (*id.* ¶ 30). Further, she claims she was denied funding for class trips, even though her white counterparts regularly received funding approval. (*Id.* ¶¶ 80-81.) She also believes she was intentionally excluded from administrative emails that were sent to other staff members. (*Id.* ¶ 82.)

Plaintiff alleges that as a result of Defendants' actions, she has suffered from many panic attacks, (*id.* ¶ 56), and in September 2019 applied to retire "to escape this nightmare," (*id.* ¶ 57), but due to the alleged stress her co-workers were facing, she withdrew her application and returned to work in November 2019, (*id.* ¶ 58). She also claims that she would have earned more had she gotten one of the positions she believes she was denied as a result of Defendants' "slanderous statements." (*Id.* ¶ 99; *see id.* ¶ 100.) These false statements have also resulted in her taking a medical leave of absence. (*Id.* ¶ 101.)

### B. Procedural History

Plaintiff filed her IC in this Court on August 31, 2021, bringing federal and state employment discrimination claims against Defendants YPS, Quezada, Cesar E. Chaves Elementary School, Delany, John Does #1-50, and Mary Roes #1-50. (ECF No. 1.) The case was initially assigned to Judge Paul A. Crotty. No summons was issued, yet Plaintiff purported to have served Defendants. (*See* ECF Nos. 6, 8.) On December 7, 2021, Defendants requested an extension of time to respond to the IC, which Judge Crotty granted. (ECF Nos. 4-5.) Defendants then requested a conference in advance of their anticipated motion to dismiss. (ECF No. 6.) On January 26, 2022, the matter was reassigned to the undersigned in White Plains. The Court then set a date for a pre-motion conference and ordered Plaintiff to respond to Defendants'

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 309 of 449

Sherman v. Yonkers Public Schools, Not Reported in Fed. Supp. (2023)

earlier letter. (ECF No. 7.) Plaintiff responded, (ECF No. 8), and on February 23, 2022, the Court held a pre-motion conference, granted Plaintiff leave to amend her complaint, and set a briefing schedule for this motion, (Minute Entry dated Feb. 23, 2022). [2] Plaintiff filed her AC on April 8, 2022, summonses were issued, and the instant motion followed. (AC; ECF Nos. 13-22; ECF Nos. 25-28.)

## II. LEGAL STANDARDS

### A. Federal Rule of Civil Procedure 12(b)(6)

**\*3** "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). [3] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. While Federal Rule of Civil Procedure 8 "marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, ... it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678-79.

In considering whether a complaint states a claim upon which relief can be granted, the court "begin[s] by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth," and then determines whether the remaining well-pleaded factual allegations, accepted as true, "plausibly give rise to an entitlement to relief." *Id.* at 679. Deciding whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'shown' – 'that the pleader is entitled to relief.' " *Id.* (quoting Fed. R. Civ. P. 8(a)(2)). [4]

## III. DISCUSSION

Plaintiff brings seven claims: (1) race-based discrimination and retaliation under 42 U.S.C. § 1981, (AC at 8-9); (2) conspiracy under 42 U.S.C. § 1985(3), (*id.* at 9-10); (3) hostile work environment, untethered to any provision of law, (*id.* at 10-13); (4) retaliation, untethered to any provision of federal law, (*id.* at 13-15); (5) discrimination under Title VI of the Civil Rights Act of 1964, (*id.* at 15-17); [5] (6) assault, (*id.* at 17-18); and (7) defamation, (*id.* at 18-19). All of these claims are dismissed.

### A. Federal Claims

#### 1. Statute of Limitations

**\*4** Defendants argue that the statute of limitations limits Plaintiff's discrimination and retaliation claims under § 1981 and Title VI. (Ds' Mem. at 14.)

"[E]mployment discrimination claims arising under ... § 1981 are subject to the four-year federal 'catch-all' statute of limitations...." *Bedden-Hurley v. N.Y.C. Bd. of Educ.*, 385 F. Supp. 2d 274, 278 (S.D.N.Y. 2005); *see James v. Countrywide Fin. Corp.*, 849 F. Supp. 2d 296, 317-18 (E.D.N.Y. 2012). A three-year statute of limitations governs Title VI claims. *Singh v. Wells*, 445 F. App'x 373, 376 (2d Cir. 2011) (summary order). Recovery for discrete acts of discrimination that occur outside the applicable limitations period are barred, but a hostile work environment claim is timely, even if some of the conduct at issue occurred before the limitations period, so long as an act contributing to that environment occurred within that period. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 (2002).

Plaintiff filed her IC in this Court on August 31, 2021. Accordingly, any discrete acts of discrimination or retaliation under § 1981 that are alleged to have occurred prior to August 31, 2017, and any such acts under Title VI that are alleged to have occurred prior to August 31, 2018, are time barred.

#### 2. Claims as to YPS

Defendants argue that Plaintiff's § 1981 and Title VI claims against YPS fail because Plaintiff does not allege that any civil rights violations occurred because of a municipal policy or custom. (Ds' Mem. at 3-4.) Plaintiff did not address this argument in her opposition, and thus has abandoned those claims as to YPS. *Horsting v. St. John's Riverside Hosp.,*

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 310 of 449

Sherman v. Yonkers Public Schools, Not Reported in Fed. Supp. (2023)

No. 17-CV-3230, 2018 WL 1918617, at *6 (S.D.N.Y. Apr. 18, 2018) ("At the motion to dismiss stage, where review is limited to the pleadings, a plaintiff abandons a claim by failing to address the defendant's arguments in support of dismissing that claim."); *Johnson v. City of N.Y.*, No. 15-CV-8195, 2017 WL 2312924, at *17 (S.D.N.Y. May 26, 2017) ("By failing to address Defendants' arguments in support of dismissing this claim, it is deemed withdrawn or dismissed as abandoned."); *Brandon v. City of N.Y.*, 705 F. Supp. 2d 261, 268 (S.D.N.Y. 2010) (claims abandoned where Plaintiff "did not raise any arguments opposing Defendants' motion") (collecting cases); *Bonilla v. Smithfield Assocs. LLC*, No. 09-CV-1549, 2009 WL 4457304, at *4 (S.D.N.Y. Dec. 4, 2009) (claims deemed abandoned and dismissed as a matter of law where defendants raised three arguments for dismissal of those claims and plaintiff responded to only one).

But while Defendants are correct that when a municipality (or an individual in his official capacity, *see Hafer v. Melo*, 502 U.S. 21, 25 (1991)), is sued for discrimination under § 1981, the plaintiff must show that the challenged acts were performed pursuant to a municipal custom or policy, *see, e.g.*, *Jett v. Dall. Indep. Sch. Dist.*, 491 U.S. 701, 733-36 (1989), it has not provided authority for the proposition that the same is true under Title VI. Thus, despite Plaintiff's failure to oppose, I will dismiss only the § 1981 claims against Defendant YPS for failure to allege a policy or custom. As will be seen, the Title VI claim fails for different reasons.

### 3. Personal Involvement

**\*5** Defendants argue that Plaintiff has failed to plead facts showing the personal involvement of Defendant Quezada. (Ds' Mem. at 5-6.) As for claims under 42 U.S.C. § 1983, a showing of personal involvement by the defendant is required for liability under § 1981. *Patterson v. County of Oneida*, 375 F.3d 206, 229 (2d Cir. 2004); *Baker v. Connecticut*, No. 03-CV-1994, 2006 WL 581205, at *10 (D. Conn. Mar. 8, 2006); *see Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 75 (2d Cir. 2000) ("[P]ersonal liability under section 1981 must be predicated on the actor's personal involvement."). While *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995), laid out a special test for supervisory liability, outlining five ways a plaintiff could show personal involvement of a supervisor, the Second Circuit has clarified that under the Supreme Court's ruling in *Iqbal*, the *Colon* test is invalid and "a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has

violated the Constitution.' " *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (quoting *Iqbal*, 556 U.S. at 676). "Simply put, there's no special rule of liability for supervisors." *Id.* While " '[t]he factors necessary to establish a [§ 1981] violation will vary with the constitutional provision at issue' because the elements of different constitutional violations vary," *id.* (quoting *Iqbal*, 556 U.S. at 676), "[t]he violation must be established against the supervisory official directly," *id.*

Plaintiff has not pleaded enough facts to render it plausible that Defendant Quezada – the Superintendent of YPS, (AC ¶ 8) – was personally involved in the alleged violations. While Plaintiff alleges that "Defendants, collectively and individually" retaliated against Plaintiff, created a hostile work environment, belittled and humiliated her, and reprimanded her for no reason, (*id.* ¶¶ 18-20, 35-38), these allegations are insufficient because they "lump[ ] all the defendants together in each claim and provide[ ] no factual basis to distinguish their conduct." *Tracey v. City of Geneva*, No. 17-CV-6567, 2018 WL 1509355, at *3 (W.D.N.Y. Mar. 26, 2018); *see Ruiz v. Westchester County*, No. 18-CV-7007, 2020 WL 4340788, at *4 (S.D.N.Y. July 28, 2020) (collecting cases); *see also Gonzalez v. Yepes*, No. 19-CV-267, 2019 WL 2603533, at *7 (D. Conn. June 25, 2019) ("As a corollary of the personal involvement requirement, complaints that rely on 'group pleading' and fail to differentiate as to which defendant was involved in the alleged unlawful conduct are insufficient to state a claim.") (collecting cases); *5465 Route 212, LLC v. N.Y. State Dep't of Transp.*, No. 19-CV-1510, 2020 WL 6888052, at *9 (N.D.N.Y. Nov. 24, 2020) ("Because the personal involvement of a defendant is a prerequisite to an award of damages under § 1983, a plaintiff cannot rely on a group pleading against all defendants without making specific individual factual allegations"). Plaintiff provides no specifics as to anything Quezada did or did not do, or how he was involved in the alleged mistreatment of Plaintiff.

It is apparent that Quezada is being sued merely based on his supervisory position, which even before *Tangreti* would not have sufficed to show personal involvement. *See, e.g.*, *Banks v. Annucci*, 48 F. Supp. 3d 394, 416 (N.D.N.Y. 2004) ("Where a defendant is a supervisory official, a mere linkage to the unlawful conduct through the chain of command (*i.e.*, under the doctrine of *respondeat superior*) is insufficient to show his or her personal involvement in that unlawful conduct."). Further, Plaintiff in her opposition does not address how Quezada may have been personally involved, so her § 1981 claims against him have been abandoned.

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 311 of 449

Sherman v. Yonkers Public Schools, Not Reported in Fed. Supp. (2023)

The § 1981 claims against Quezada are dismissed.

### 4. Discrimination Claims

#### a. Section 1981 Claim

As established above, Plaintiff's § 1981 claim remains only as to Defendant Delany. To state a claim under that statute, a plaintiff "must allege facts supporting the following elements: (1) plaintiff [is a] member[ ] of a racial minority; (2) defendants' intent to discriminate on the basis of race; and (3) discrimination concerning one of the statute's enumerated activities." *Brown v. City of Oneonta*, 221 F.3d 329, 339 (2d Cir. 2000).

 **\*6** In her AC, Plaintiff summarily states, "Defendants' conduct ..., motivated in substantial respect by race-based animus, violated Plaintiff's rights as guaranteed [under] 42 U.S.C. § 1981." (AC ¶ 36.) But despite this allegation, the vast majority of the facts she provides are wholly unconnected to race. Plaintiff states that she was singled out – for example, she alleges she is the only special education teacher who was denied information on students' assessments and performance, (*id.* ¶¶ 28, 86); she was excluded from administrative emails that had been sent to other staff members, (*id.* ¶ 83); and, unlike other teachers, she had to leave her classroom to address other students' behavioral issues, (*id.* ¶ 84) – but nowhere does she provide facts suggesting that she was subjected to such treatment because of her race, as opposed to, say, Delany not liking her. She does not describe any racially discriminatory remarks by Delany or any mistreatment of other Black teachers. Indeed, that Plaintiff attributes her mistreatment variously to her race, color, gender, veteran status, and religion, (*id.* ¶¶ 78-79), illustrates that Plaintiff lacks facts supporting the notion that her treatment was attributable to any particular protected characteristic.

The only allegations Plaintiff connects to race are that Defendants never approved her requests to fund class trips, even though her white colleagues regularly received approval, (*id.* ¶ 81), and that Delany reassigning difficult students back to Plaintiff was favoritism toward Caucasian teachers, (*id.* ¶ 83). Elsewhere Plaintiff alleges that the difficult students came back to her from non-white teachers, (*id.* ¶ 24), so it is hard to see how that conduct could reflect favoritism toward white teachers. And Plaintiff provides no facts about

her trip requests or those of other teachers that would show the requests to be sufficiently similar to give rise to an inference of discrimination. *See Wegmann v. Young Adult Inst., Inc., Trustees of Supplemental Pension Plan for Certain Mgmt. Emps. of Young Adult Inst.*, No. 20-1147, 2021 WL 3573753, at \*4 (2d Cir. Aug. 13, 2021) (where plaintiff seeks to make out *prima facie* case by reference to disparate treatment of other employees, situation of those employees must be sufficiently similar to support minimal inference that difference in treatment may be attributable to discrimination).

But even if she had, and even assuming that she meant to say that the difficult students came back to her from white teachers, Plaintiff's claim fails as to the third element of her *prima facie* case, because the treatment she describes does not amount to an adverse employment action. For purposes of a discrimination claim, "[a]n adverse employment action is a materially adverse change in the terms and conditions of employment," *Mathirampuzha v. Potter*, 548 F.3d 70, 78 (2d Cir. 2008), "one which is more disruptive than a mere inconvenience or an alteration of job responsibilities," *Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012). "Examples of materially adverse employment actions include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." *Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004).

As a general matter, "assignments that are part of an employee's normal responsibilities are not adverse employment actions where, as here, the rate of pay and benefits remains the same." *Rodriguez v. Coca Cola Refreshments USA, Inc.*, No. 12-CV-234, 2013 WL 5230037, at \*3 (E.D.N.Y. Sept. 16, 2013) (collecting cases); *see Potash v. Fla. Union Free Sch. Dist.*, 972 F. Supp. 2d 557, 584 (S.D.N.Y. 2013) ("Changes in assignments or responsibilities that do not radically change the nature of work are not typically adverse employment actions.") But "[a] change in duties or job reassignment may be an adverse employment action, if it results in a change in responsibilities so significant as to constitute a setback to the plaintiff's career." *Edwards v. Huntington Union Free Sch. Dist.*, 957 F. Supp. 2d 203, 211 (E.D.N.Y. 2013). "A plaintiff can make such a showing by demonstrating that the new assignment was materially less prestigious, materially less suited to his skills and expertise, or materially less conducive to career advancement." *Id.* But unfair work assignments or undesirable duties, absent

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 312 of 449

Sherman v. Yonkers Public Schools, Not Reported in Fed. Supp. (2023)

negative ramifications for employment status, do not rise to the required level. *Grant v. N.Y. State Off. for People with Developmental Disabilities*, No. 12-CV-4729, 2013 WL 3973168, at *7 (E.D.N.Y. July 30, 2013). Nor does being berated or embarrassed by a supervisor. *Voss v. McDonough*, No. 17-CV-9015, 2021 WL 4199941, at *10, *17 (S.D.N.Y. Sept. 15, 2021); *see Stewart v. City of N.Y.*, No. 18-CV-7140, 2022 WL 4485048, at *5 (E.D.N.Y. Sept. 27, 2022) (reprimands, admonishments, and other actions causing embarrassment and anxiety are not adverse actions where they result in no tangible employment consequences).

**\*7** Disapproval of trip requests and assignment of "difficult" students do not involve a guaranteed employment benefit or a term or condition of employment, such that the denial amounted to a material adverse action. *See Smalls v. Allstate Ins. Co.*, 396 F. Supp. 2d 364, 371 (S.D.N.Y. 2005) (unfair criticism, unfavorable schedules, or undesirable work assignments do not rise to level of adverse employment actions because they do not have material impact on terms and conditions of employment). Nor does Plaintiff allege that teaching "difficult" students was outside her job responsibilities, *see Rodriguez*, 2013 WL 5230037, at *3 ("[I]t is well established that assignments that are part of an employee's normal responsibilities are not "adverse employment actions" where, as here, the rate of pay and benefits remains the same."), or "so significant as to constitute a setback to the plaintiff's career," *Galabya v. N.Y.C. Bd. of Educ.*, 202 F.3d 636, 641 (2d Cir. 2000). At most, what Plaintiff describes can be characterized as "mere inconvenience," which is not enough to constitute an adverse employment action. *Brown*, 673 F.3d at 150. [6]

Therefore, Plaintiff's § 1981 discrimination claim is dismissed.

### b. Title VI Claim

Section 601 of Title VI of the Civil Rights Act of 1964 provides: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. For the same reasons described above, Plaintiff has not made out a plausible discrimination claim. She has provided only conclusions, not facts, to support the notion that her race

resulted in any discrimination. But her Title VI claim must also be dismissed for independent reasons.

To begin, Title VI does not provide for individual liability, *see Bayon v. State Univ. of N.Y. at Buffalo*, No. 98-CV-578, 2001 WL 135817, at *2 (W.D.N.Y. Feb. 15, 2001), so any Title VI claim against Defendants Quezada and Delany in their individual capacities would have to be dismissed. Further, "covered entities can only be sued for employment discrimination [under Title VI] 'where a primary objective of the Federal financial assistance ... is to provide employment.' " *Reynolds v. Sch. Dist. No. 1*, 69 F.3d 1523, 1531 (10th Cir. 1995) (quoting 42 U.S.C. § 2000d-3). Thus, "for a claimant to recover under Title VI against an employer for discriminatory employment practices, a threshold requirement is that the employer be the recipient of federal funds aimed primarily at providing employment." *Ass'n Against Discrimination in Emp., Inc. ("AADE") v. City of Bridgeport*, 647 F.2d 256, 276 (2d Cir. 1981); *see Sulehria v. New York*, No. 13-CV-6990, 2014 WL 4716084, at *5 (S.D.N.Y. Sept. 19, 2014) ("To state a claim under Title VI, a plaintiff must plausibly allege ... that the federal funds have been made available primarily for providing employment."). "This section essentially requires a logical nexus between the use of federal funds and the practice toward which the action is directed." *Johnson v. County of Nassau*, 411 F. Supp. 2d 171, 175 (E.D.N.Y. 2006).

Plaintiff has not alleged, even in conclusory fashion (which in any event would not suffice), that the federal funds received by YPS were primarily intended to provide employment. *See Gilmore v. Univ. of Rochester*, 410 F. Supp. 2d 127, 132 (W.D.N.Y. 2006) (Title VI claim dismissed where complaint alleged only that defendant received federal funds, not that the funds were primarily intended to provide employment). The AC alleges that "[a]ll Defendants in this matter, in some form or another, receive financial benefits that can be traced back to Federal spending," (AC ¶ 76), but that is not enough to show that any federal funds were primarily intended to provide employment. *See Verdi v. City of N.Y.*, 306 F. Supp. 3d 532, 546 (S.D.N.Y. 2018) (Title VI claim dismissed because the "allegations regarding federal funding are bare and conclusory and do not describe the federal funding the DOE received, let alone link that funding to the students whose discrimination was the subject of Plaintiff's complaints"). Plaintiff thus has not plausibly alleged any "logical nexus between the use of federal funds and the practice toward which agency action is directed." *AADE*, 647 F.2d at 276; *see Dobroff v. Hempstead Union Free Sch. Dist.*,

Case 3:24-cv-00037-DNH-ML Document 9 Filed 06/11/24 Page 313 of 449

Sherman v. Yonkers Public Schools, Not Reported in Fed. Supp. (2023)

No. 21-CV-1567, 2022 WL 4641128, at *5 (E.D.N.Y. Sept. 30, 2022). [7]

**\*8** Plaintiff's Title VI claim is therefore dismissed.

### 5. Conspiracy Claim Under Section 42 U.S.C. § 1985(3)

To state a claim under § 1985(3), a plaintiff must show "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." *Dolan v. Connolly*, 794 F.3d 290, 296 (2d Cir. 2015); *see* 42 U.S.C. § 1985(c). "[T]o maintain an action under Section 1985, a plaintiff must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Webb v. Goord*, 340 F.3d 105, 110 (2d Cir. 2003). Here, Plaintiff has provided no more than a conclusory allegation of conspiracy, stating, "Under the premises Defendants' conduct violated Plaintiff's rights .... [W]e have such conspiracies by Defendants to violate Plaintiff's constitutional rights." (AC ¶¶ 40, 42.) On this basis alone, Plaintiff's conspiracy must be dismissed for failure to state a claim. *See Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir. 1997) (dismissal of "conclusory, vague or general allegations of conspiracy to deprive a person of constitutional rights" is proper). That Plaintiff's conclusory allegations are aimed at Defendants "collectively" does not, as Plaintiff argues in her opposition, render it plausible that Defendants acted as a collective and "with one objective in mind." (*See* P's Opp. at 8.)

Defendants also argue that Plaintiff's conspiracy claim fails because she does not show that racial animus motivated Defendants' claimed conspiracy. (Ds' Mem. at 10-11.) To plead a § 1985(3) claim, "[t]he conspiracy must also be 'motivated by some racial or perhaps otherwise class-based, invidious discriminatory animus.' " *Dolan*, 794 F.3d at 296 (quoting *Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 791 (2d Cir. 2007)). The AC does not explicitly allege any race-based motivation for her conspiracy claim, and – as discussed above – barely mentions facts related to race. Even in her opposition, Plaintiff simply states that she has adequately shown that Defendants acted in concert toward

her, (P's Opp. at 8), with no effort to describe any such actions or connect them to race.

Moreover, even if a sufficient connection to race were pleaded, the AC (as discussed) provides facts only against Delany, and she cannot conspire with herself. *See Jianjun Li v. Vill. of Saddle Rock*, No. 22-CV-2289, 2021 WL 1193618, at *10 (E.D.N.Y. Mar. 30, 2021); *Heinfling v. Colapinto*, 946 F. Supp. 260, 266-67 (S.D.N.Y. 1996). Finally, even if Plaintiff had pleaded facts as to Quezada, her claim would be barred by the intracorporate conspiracy doctrine. Under this doctrine, "officers, agents and employees of a single corporate entity are legally incapable of conspiring together." *Quinn v. Nassau Cnty. Police Dep't*, 53 F. Supp. 2d 347, 359 (E.D.N.Y. 1999) (applying doctrine in § 1985(3) context). [8]

**\*9** For all these reasons, the § 1985(3) conspiracy claim is dismissed.

### 6. Retaliation

Plaintiff brings a "workplace retaliation" claim, alleging Defendants retaliated against her after she reported a potential instance of child abuse in 2016-2017. (AC ¶¶ 64-66.) She claims that after she reported the incident, Defendants harassed her by keeping her from leaving her classroom; verbally, mentally, and emotionally abused her; and obstructed her ability to apply for and get a higher-level administrative position. (*Id.* ¶¶ 67-74.)

As an initial matter, Plaintiff's retaliation claim is pleaded without specifying the statute under which it is brought. Defendants analyze it as a claim under § 1983 for retaliation for opposition to a discriminatory employment practice, and note that such a claim is analyzed under the same standards as a retaliation claim under Title VII. (Ds' Mem. at 12-14); *see Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010). In her opposition, Plaintiff seems to concur, citing Title VII standards. (P's Opp. at 5). Accordingly, Plaintiff's retaliation claim can only be brought against Defendant Delany, for the reasons stated above. "[F]or a retaliation claim under § 1983 to survive a ... motion to dismiss, the plaintiff must plausibly allege that: (1) defendants acted under the color of state law, (2) defendants took adverse employment action against h[er], (3) because [s]he complained of or otherwise opposed discrimination." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 91 (2d Cir. 2015). "That is, [Plaintiff] must plead (1) engagement in opposition to an unlawful

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 314 of 449

Sherman v. Yonkers Public Schools, Not Reported in Fed. Supp. (2023)

employment practice; (2) an adverse employment action; and (3) factual matter rendering plausible an inference of causation between her protected activity and the adverse employment action." *Ray v. N.Y. State Ins. Fund*, 2018 WL 3475467, at *9 (S.D.N.Y. July 18, 2018). "[T]o establish participation in a protected activity, a plaintiff is required to show not an actual violation of the act, but only that he was acting under a good faith, reasonable belief that such a violation existed." *Grant v. Hazelett Strip-Casting Corp.*, 880 F.2d 1564, 1569 (2d Cir. 1989). "Moreover, the employer must be able to reasonably understand that the complaint was directed at conduct prohibited by Title VII." *Bamba v. Fenton*, 758 F. App'x 8, 12-13 (2d Cir. 2018) (summary order).

Plaintiff's claim fails. First, Plaintiff alleges she reported a suspected incident of child abuse in 2016-2017, which is outside of three-year statute of limitations period. *Milan v. Wertheimer*, 808 F.3d 961, 963 (2d Cir. 2015) ("Section 1983 actions in New York are subject to a three-year statute of limitations."). Thus any alleged retaliatory activity that occurred prior to August 31, 2018 is time-barred. Even assuming that at least some of the retaliatory activity occurred after this date [9] – and if it did, it is hard to see how it could be connected to the protected activity, *see Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (To establish causation based on temporal proximity, period between protected activity and adverse action must be "very close.") – Plaintiff's claim fails because she does not plead a sufficient protected activity. Protected activity is complaining about or otherwise opposing discrimination. *Vega*, 801 F.3d at 91; *see Littlejohn v. City of N.Y.*, 795 F.3d 297, 316-17 (2d Cir. 2015). Here, Plaintiff does not allege that she complained about unlawful discrimination; rather, she reported a potential incident of child abuse. [10] Plaintiff does not even allege, let alone plausibly show, that she had a good faith reasonable belief that she was opposing an employment practice that is outlawed by federal law, or that there was any way her employer could have understood her report as such.

**\*10** Therefore, Plaintiff's retaliation claim must also be dismissed.

### 7. Hostile Work Environment

Plaintiff also alleges a hostile work environment claim, and as with her retaliation claim, does not state under which statutory scheme she intends this claim to fall, but I will assume she

meant to invoke a race-based or gender-based § 1981 or § 1983 claim.

"To establish a hostile work environment under Title VII, § 1981, or § 1983, a plaintiff must show that the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Littlejohn*, 795 F.3d at 320-21. Courts consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 321. Plaintiff must come forward with "evidence not only that [she] subjectively perceived the environment to be hostile or abusive," but also that an objectively reasonable employee would perceive it to be so. *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 745 (2d Cir. 2003); *see Dawson v. County of Westchester*, 351 F. Supp. 2d 176, 186 (S.D.N.Y. 2004). Furthermore, "[a] plaintiff must also demonstrate that she was subjected to the hostility because of her membership in a protected class." *Brennan v. Metro. Opera Ass'n, Inc.*, 192 F.3d 310, 318 (2d Cir. 1999).

Plaintiff alleges that from 2009 to 2019, Defendants, "collectively and individually," created a hostile work environment by publicly belittling and humiliating her, (AC ¶¶ 18-19; *see id.* ¶ 45), but because no details about this alleged abuse are provided, it is impossible to conclude that an objectively reasonable employee would plausibly view it as severe or pervasive. She also specifies that: (1) from 2012 to 2019, Delany reassigned difficult students back to Plaintiff's classroom as punishment for Plaintiff speaking out, at an unspecified time, about removal of aides, (*id.* ¶¶ 46-47) [11]; (2) from 2010 through 2019, Delany reprimanded Plaintiff without cause, (*id.* ¶ 48); (3) from 2013 to 2019, Delany tampered with Plaintiff's evaluations in an unspecified way, (*id.* ¶¶ 49, 55); (4) from 2009 through 2019, Delany ordered Plaintiff to take on students "outside her teaching grade group," train staff members for positions she did not hold, and work with staff members against whom Plaintiff had filed complaints, (*id.* ¶ 50); (5) at an unspecified time, Delany did not provide Plaintiff with information about students' assessments and performances, (*id.* ¶ 52); (6) throughout Plaintiff's entire tenure, Delany divulged unspecified sensitive information about Plaintiff, (*id.* ¶ 53); and (7) at an unspecified time, Delany directed support staff to not schedule Plaintiff for meetings with administrators, (*id.* ¶ 54).

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 315 of 449

Sherman v. Yonkers Public Schools, Not Reported in Fed. Supp. (2023)

**\*11** Without more detail, it is dubious whether these alleged events, over a ten-year period, are plausibly objectively severe or pervasive enough to constitute a hostile work environment. But regardless, Plaintiff plainly fails to show how any of these allegations, singularly or in the aggregate, occurred because of her membership in a protected class. Even in her opposition, Plaintiff addresses only whether the environment was sufficiently hostile, and makes no effort to suggest, let alone point to facts that support, that the hostility arose because she is Black and/or female. Allegations of unfair treatment directed at a member of a protected class do not establish a claim absent a basis to conclude that unfair treatment arose because of the victim's membership in that class. *See Grillo v. N.Y.C. Transit Auth.*, 291 F.3d 231, 235 (2d Cir. 2002) ("Even if [plaintiff's] highly dubious claim that he was unfairly singled out for punishment by the instructors is credited, [plaintiff] has done little more than cite to his alleged mistreatment and ask the court to conclude that it must have been related to his race."); *Varughese v. Mount Sinai Med. Ctr.*, No. 12-CV-8812, 2015 WL 1499618, at \*42 (S.D.N.Y. Mar. 27, 2015) ("fallacy" for plaintiff to say: "I belong to a protected class; something bad happened to me at work; therefore, it must have occurred because I belong to a protected class"); *Rissman v. Chertoff*, No. 08-CV-7352, 2008 WL 5191394, at \*4 (S.D.N.Y. Dec. 12, 2008) ("In essence, plaintiff alleges that because he was yelled at [by his supervisors], this must have been because [of his protected status]. Such conclusory and speculative statements are insufficient.").

> Unfortunately, the term "hostile work environment" has been interpreted by some in the general public to refer to workplaces with abusive bosses, bullying, cutthroat competition, nastiness, or unfairness. While those workplaces may be hostile in the colloquial sense, they do not violate the law unless they are that way because of an employee's protected characteristic.

*Estevez v. Berkeley Coll.*, No. 18-CV-10350, 2021 WL 3115452, at \*19 n.21 (S.D.N.Y. July 19, 2021), *aff'd*, No. 21-1988, 2022 WL 16843460 (2d Cir. Nov. 10, 2022).

Accordingly, Plaintiff's hostile work environment claim is also dismissed.

**B. State Law Claims**

Defendants argue that Plaintiff's state law claims for assault and defamation must be dismissed because Plaintiff did not file a notice of claim, as required by N.Y. Educ. Law § 3813, and they are time-barred, given that state law claims brought against a school district or its employees are subject to a one-year statute of limitation. (Ds' Mem. at 15-17.) Plaintiff did not address her state law claims in her opposition, and as a result, those claims are deemed abandoned and dismissed.

**C. Leave to Amend**

Leave to amend a complaint should be freely given "when justice so requires." Fed. R. Civ. P. 15(a)(2). "[I]t is within the sound discretion of the district court to grant or deny leave to amend." *Kim v. Kimm*, 884 F.3d 98, 105 (2d Cir. 2018). "Leave to amend, though liberally granted, may properly be denied" for " 'repeated failure to cure deficiencies by amendments previously allowed' " or " 'futility of amendment,' " among other reasons. *Ruotolo v. City of N.Y.*, 514 F.3d 184, 191 (2d Cir. 2008) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

Plaintiff has already amended, after having the benefit of a pre-motion letter from Defendants outlining the proposed grounds for dismissal, (ECF No. 8), and the discussion at the February 23, 2022 pre-motion conference, (*see* Minute Entry dated Feb. 23, 2022). In general, a plaintiff's failure to fix deficiencies in the previous pleading, after being provided notice of them, is alone sufficient ground to deny leave to amend. *See Nat'l Credit Union Admin. Bd. v. U.S. Bank Nat'l Ass'n*, 898 F.3d 243, 257-58 (2d Cir. 2018) ("When a plaintiff was aware of the deficiencies in his complaint when he first amended, he clearly has no right to a second amendment even if the proposed second amended complaint in fact cures the defects of the first. Simply put, a busy district court need not allow itself to be imposed upon by the presentation of theories seriatim."); *In re Eaton Vance Mut. Funds Fee Litig.*, 380 F. Supp. 2d 222, 242 (S.D.N.Y. 2005) (denying leave to amend because "the plaintiffs have had two opportunities to cure the defects in their complaints, including a procedure through which the plaintiffs were provided notice of defects in the Consolidated Amended Complaint by the defendants and given a chance to amend their Consolidated Amended Complaint," and "plaintiffs have not submitted a proposed amended complaint that would cure these pleading defects"),

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 316 of 449

Sherman v. Yonkers Public Schools, Not Reported in Fed. Supp. (2023)

aff'd sub nom. *Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110, 118 (2d Cir. 2007) (*per curiam*) ("[P]laintiffs were not entitled to an advisory opinion from the Court informing them of the deficiencies in the complaint and then an opportunity to cure those deficiencies.").

 **\*12** Moreover, Plaintiff has not asked to amend or otherwise suggested that she is in possession of facts that would cure the deficiencies identified in this opinion. *See TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) (plaintiff need not be given leave to amend if plaintiff fails to specify how amendment would cure the pleading deficiencies in the complaint); *Gallop v. Cheney*, 642 F.3d 364, 369 (2d Cir. 2011) (district court did not err in dismissing claim with prejudice in absence of any indication plaintiff could or would provide additional allegations leading to different result); *Horoshko v. Citibank, N.A.*, 373 F.3d 248, 249-50 (2d Cir. 2004) (*per curiam*) (district court did not abuse its discretion

by not granting leave to amend where there was no indication as to what might have been added to make complaint viable and plaintiffs did not request leave to amend).

Accordingly, the Court declines to grant leave to amend *sua sponte*.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion is GRANTED. The Clerk of Court is respectfully directed to terminate the pending motion, (ECF No. 25), and close the case.

**SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2023 WL 137775

---

## Footnotes

1    Defendants state, and Plaintiff does not dispute, that Cesar E. Chavez School – erroneously named as "Cesar E. Chaves Elementary School" in the initial Complaint, (ECF No. 1 ("IC")), and Amended Complaint, (ECF No. 11 ("AC")) – is within YPS and therefore not a separate legal entity. (ECF No. 26 ("Ds' Mem.") at 1 n.1.)

2    At the pre-motion conference, Plaintiff's counsel had no explanation for why he had served Defendants with an unsigned, unsealed "summons" that had not been issued by the Court, but in the interest of resolving the claims on the merits, I extended Plaintiff's time to serve to 21 days after the filing of the AC.

3    Unless otherwise indicated, case quotations omit all internal citations, quotation marks, footnotes, and alterations.

4    Plaintiff's counsel acknowledges that *Twombly* and *Iqbal* are more recent than *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), yet seems to rely on *Conley*'s statement that dismissal is not warranted unless it is apparent that Plaintiff can prove no set of facts that would entitle it to relief. (ECF No. 27 ("P's Opp.") at 9.) *Conley*'s "no set of facts" standard, however, was "retire[d]" by the Supreme Court in *Twombly*, 550 U.S. at 562-63, and the applicable standard is now one of plausibility, *see Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 570. No attorney should be citing to or relying on the "no set of facts" standard over a decade after it has been overruled.

5    The fifth claim in the AC is captioned "Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq." (AC at 15.) This caption is puzzling, because § 2000d is Title VI of the Civil Rights Act, whereas Title VII is § 2000e. It is even more puzzling because I specifically told Plaintiff's counsel at the pre-motion conference to make clear under which Title Plaintiff was bringing her claim. "Title VI prohibits a recipient of federal funds from discriminating on the basis of race, color, or national origin." *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 664 (2d Cir. 2012). Because Plaintiff in her fifth claim alleges that Defendants receive federal funds, (AC ¶ 76), and because at the pre-motion conference Defendants represented that no administrative

Case 3:24-cv-00037-DNH-ML Document 9 Filed 06/11/24 Page 317 of 449

Sherman v. Yonkers Public Schools, Not Reported in Fed. Supp. (2023)

complaint had been filed, as would be required for a Title VII claim, I conclude that Plaintiff means to assert a Title VI claim.

6    To the extent Plaintiff wishes to bring discrimination claims based on gender, those claims also fail. Gender is not a protected class under § 1981. *Anderson v. Conboy*, 156 F.3d 167, 170 (2d Cir. 1998) ("Section 1981 does not prohibit discrimination on the basis of gender or religion, national origin, or age.") More fundamentally, the AC is devoid of any facts even faintly suggesting that Defendants discriminated on the basis of her gender. The same is true as to Plaintiff's religion (which she does not describe) and veteran status.

7    In addition, as Defendants point out, (ECF No. 28 ("Ds' Reply") at 4-5), Plaintiff does not address this argument in her opposition, and thus has abandoned her Title VI claim.

8    "There is a 'personal interest' or 'personal stake' exception to the intracorporate conspiracy doctrine, however, which permits a § 1985 claim where there are individuals who are 'motivated by an independent personal stake in achieving the corporation's objective.' " *Salgado v. City of N.Y.*, No. 00-CV-3667, 2001 WL 290051, at *8 (S.D.N.Y. Mar. 26, 2001) (quoting *Girard v. 94th St. & Fifth Ave. Corp.*, 530 F.2d 66, 71-72 (2d Cir. 1976)). Plaintiff does not allege that any such exception applies, and courts in this district have held that personal bias, by itself, is insufficient to defeat the intracorporate conspiracy doctrine. *See Salgado*, 2001 WL 290051, at *9 (officer defendants' derogatory remarks about plaintiff's sexual orientation were insufficient to properly allege "personal interest" exception to intracorporate conspiracy doctrine); *Johnson v. Nyack Hosp.*, 954 F. Supp. 717, 723 (S.D.N.Y. 1997) ("[P]ersonal bias is not the sort of individual interest that takes a defendant out of the intraenterprise conspiracy doctrine," or else the exception would swallow the rule.).

9    The AC states that the directive to remain in her classroom (if indeed that is what Plaintiff was told, as opposed to being required to stay in her room except for her free periods) followed "[s]oon after" the report, (AC ¶¶ 67-69), and that the verbal abuse "intensified" after the report, (*id.* ¶¶ 67, 72). But it also says that Delany "increased" her abuse "[s]tarting in 2009 and running through 2019," (*id.* ¶ 71), and that Delany blackballed Plaintiff "[s]tarting in 2014 and running through 2019," (*id.* ¶ 73). It is hard to see how mistreatment after August 31, 2018 – which by Plaintiff's account was the continuation of years of increasing abuse – could be attributable to the protected activity. *See Cayemittes v. City of N.Y. Dep't of Hous. Pres. & Dev.*, 974 F. Supp. 2d 240, 262 (S.D.N.Y. 2013) ("It is well-settled that an adverse employment action cannot serve as the basis for a retaliation claim if the action was set in motion before a plaintiff engaged in protected activity."), *aff'd*, 641 F. App'x 60 (2d Cir. 2016) (summary order).

10   To the extent Plaintiff meant to advance a claim of retaliation under New York Social Services Law § 413(c) and New York Labor Law § 740 – and she makes no such suggestion in her opposition – it would be even further outside the statute of limitations, *see Lomonoco v. Anne*, No. 15-CV-1163, 2016 WL 4402029, at *6 (N.D.N.Y. Aug. 18, 2016) (no private right of action under N.Y. Social Services Law so Plaintiff must bring action under N.Y. Labor Law § 740) (collecting cases); *Geldzahler v. N.Y. Med. Coll.*, 746 F. Supp. 2d 618, 630 (S.D.N.Y. 2010) ("The statute of limitations for bringing an action under Section 740 is one year after the alleged retaliatory action was taken"), and would fail for the same reasons as her other state-law claims, as discussed below. Plaintiff plainly did not intend to advance a claim of First Amendment retaliation, as her IC contained such claims, (IC at 8, 11-12), and they were removed in the AC.

11   To the extent this allegation could be interpreted as advancing a claim that the hostile work environment was retaliation for this protest, it would fail for two reasons. First, as set forth in note 11 above, Plaintiff withdrew her First Amendment claims. Second, when teachers complain internally about their work conditions, they are speaking as employees, not citizens, and their speech does not constitute protected activity that can support a retaliation claim. *See, e.g., Brooke v. County of Rockland*, No. 21-598-CV, 2022 WL 6585350, at

Case 3:24-cv-00037-DNH-ML    Document 9    Filed 06/11/24    Page 318 of 449

Sherman v. Yonkers Public Schools, Not Reported in Fed. Supp. (2023)

*3-4 (2d Cir. Oct. 11, 2022); *Weintraub v. Bd. of Educ.*, 593 F.3d 196, 203 (2d Cir. 2010); *Geer v. Gates Chili Cent. Sch. Dist.*, 577 F. Supp. 3d 147, 177 (W.D.N.Y. 2021).

---

**End of Document**                                          © 2024 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment

Disagreement Recognized by   TC v. Valley Cent. School Dist.,   S.D.N.Y., March 30, 2011

2001 WL 135817

Only the Westlaw citation is currently available.

United States District Court, W.D. New York.

Carlos BAYON, Plaintiff,

v.

THE STATE UNIVERSITY OF NEW YORK AT BUFFALO; Dr. Robert Dentan, Associate Professor of Anthropology, State University of New York at Buffalo, in his Individual Capacity; Dr. Christine Duggelbey, Director Graduate Studies, State University of New York at Buffalo, in her Official and Individual Capacity; Dr. Ann McElroy, Buffalo Associate, Professor of Anthropology, State University of New York at Buffalo, in her Individual Capacity; Dr. Sarunas Milisauskas, Chair, Department of Anthropology, in his Official and Individual Capacity; Dr. Pauketat, Associate Professor, State University of New York at Buffalo, in his Individual Capacity; Dr. Donald Pollack, Director of Graduate Studies, State University of New York at Buffalo, in his Official and Individual Capacity; Dr. Steegmann, Jr., Associate Professor of Department of Anthropology, State University of New York at Buffalo, in his Individual Capacity; and Joanne Plunkett, Director of Finance and Records, State University of New York at Buffalo, in her Official and Individual Capacity; Defendants.

No. 98–CV–0578E(SR).

|

Feb. 15, 2001.

**Attorneys and Law Firms**

Doris A. Corbonelli–Medina, Esq., Buffalo, for the Plaintiff.

Ann C. Williams, Esq., Asst. Attorney General for NYS, Buffalo, for the Defendant.

MEMORANDUM and ORDER

ELFVIN, S.D.J.

**\*1**  Plaintiff filed an Amended Complaint in this action January 5, 2000, claiming that the above-captioned defendants had acted to deprive him of civil rights guaranteed to him by Title VI of the Civil Rights Act of 1964 ("Title VI"), 42 U.S.C. § 2000d et seq., Title II of the American with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12131–12165 and 42 U.S.C. § 1983, as well as those rights secured to him "by the statutes[,] codes [,] rules, regulations, [and] common law of the State of New York." Am. Compl. ¶ 1. Jurisdiction is premised on 28 U.S.C. §§ 1331, 1343 and 1367. Presently before this Court is defendants' motion to dismiss the Amended Complaint except insofar as plaintiff has asserted an ADA claim. For the reasons that follow, defendants' motion will be granted.

Preliminarily, the undersigned notes that, since the filing of the Amended Complaint, plaintiff has apparently acted without the benefit of counsel, despite Doris A. Carbonell–Medina, Esq., having signed the Amended Complaint. By Order dated November 13, 2000, such counsel's motion to withdraw as attorney for plaintiff was denied without prejudice on the basis that "good cause" therefor had not been shown. Nevertheless, plaintiff has continued to act as a *pro se* litigant, as is evidenced by the facts that the response to the instant motion was signed by the plaintiff and not his counsel and that he has requested that this Court appoint counsel for him. While such lack of representation might normally preclude consideration of a motion to dismiss, in light of the fact that the instant motion to dismiss challenges only the legal efficacy of plaintiff's Amended Complaint and such having been submitted by counsel, consideration of such motion is not prejudicial and will proceed.

The following facts are drawn from the Amended Complaint in accordance with the standards governing motions to dismiss under or pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure ("FRCvP"). *See Cooper v. Parksky,* 140 F.3d 433, 440 (2d Cir.1998) (noting that, in ruling on a FRCvP 12(b)(6) motion, federal district courts are "required to accept as true all factual allegations in the complaint" and must "consider documents attached to or incorporated by reference in the complaint"). Plaintiff is of Puerto Rican descent and suffers from, *inter alia,* a disabling back condition. Am. Compl. ¶¶ 14, 15, Ex. J. During the 1996/1997 academic year, plaintiff was admitted to pursue a course of graduate study in the Department of Anthropology at the State University of New York at Buffalo ("SUNYAB"). Am. Compl. ¶ 11. By letter dated October 30, 1996, plaintiff wrote New York State Governor George E.

Pataki "concerning [the] unprofessional conduct" of certain Department of Anthropology faculty and complained of disparate treatment. Am. Compl. ¶ 16. Such allegations were allegedly investigated. Am. Compl. ¶ 17. During the next academic semester and as a result of health-related issues that arose in the Spring of 1997, plaintiff made inquiries of a number of SUNYAB faculty members as to whether he could postpone the completion of certain tests and assignments. Am. Compl. ¶¶ 21, 23. As to none of such requests, however, did plaintiff obtain satisfactory relief. Plaintiff alleges, *inter alia,* that defendants would not grant him grades of "Incomplete" in two Department of Anthropology courses, that defendants refused his request to delay taking the "Physical Anthropology Qualifying Examination," that defendants prevented him from commencing "field work" in the Summer of 1997, that defendants refused to grant him a leave of absence in 1998 and that defendants wanted plaintiff to "resign" from SUNYAB. Am. Compl. ¶¶ 21–82. Sometime in late May 1997, moreover, plaintiff wrote the United States Department of Education Office of Civil Rights complaining about what he believed was the discriminatory basis for many of the aforementioned acts, for which complaint he was allegedly threatened by defendants. Am. Compl. ¶¶ 45, 101. Plaintiff alleges that these threats, as well as the discriminatory treatment, were motivated by impermissible considerations such as race, color, national origin and disability. Since the 1997/1998 academic year, plaintiff has not been registered as a student. Am. Compl. ¶¶ 84–85.

**\*2** A motion to dismiss pursuant to FRCvP 12(b)(6) may not be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46 (1957). This Court must not consider whether the claim will ultimately be successful, but merely "assess the legal feasibility of the complaint." *Cooper,* at 440. As stated previously, this Court must accept as true all factual allegations in the Amended Complaint, consider documents attached to or incorporated by reference in the Amended Complaint, and draw therefrom all reasonable inferences in favor of the plaintiff. *Ibid.* However, conclusory statements are not proper substitutes for minimally-sufficient factual allegations. *ECC v. Toshiba America Consumer Products, Inc.,* 129 F.3d 240, 243 (2d Cir.1997). Further, this Court must not presume that plaintiff will be able to prove facts that are not alleged in the Amended Complaint or that are not consistent with facts alleged therein. *Ibid.*

Insofar as plaintiff has alleged ADA claims against the individual defendants in their individual capacities, such claims fail because the ADA does not provide for individual liability. Title II thereof states, in relevant part, that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. As this Court has previously held, because "[n]othing in the legislative history of Title II of the ADA indicates that individual liability was intended" and because "Title II applies only to 'public entit[ies]' and that term was not defined to include individuals," imposition of "liability upon individuals for violations of Title II was not intended by the drafters of the ADA." *Smith v. University of State of New York,* No. 95–CV–0477E(H), 1997 WL 800882, at \*8 (W.D.N.Y. Dec. 31, 1997); *see also Montez v. Romer,* 32 F.Supp.2d 1235, 1241 (D.Colo.1999) (ruling that "individual defendants in their individual capacities are not properly subject to suit under the \* \* \* Disability Act"). Accordingly, all ADA claims alleged against the defendants in their individual capacities must be dismissed.

Similarly, plaintiff's Title VI claims against the individual defendants in their individual capacities fail because this act does not provide for individual liability. Title VI states, in relevant part, that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance ." 42 U.S.C. § 2000d. As a plain reading of the text of Title VI indicates and as other federal courts have found, "Title VI was designed to prohibit discrimination by organizations receiving assistance." *Farmer v. Ramsay,* 41 F.Supp.2d 587, 592 (D.Md.1999). The undersigned agrees that "the proper defendant in a Title VI case is an entity rather than an individual \* \* \*." *Jackson v. Katy Indep. School Dist.,* 951 F.Supp. 1293, 1298 (S.D.Tex.1996). Accordingly, all Title VI claims alleged against the defendants in their individual capacities must be dismissed.

**\*3** Plaintiff's section 1983 claims fail as against SUNYAB and the individual defendants in their official capacities. As was stated by this Court in this action by Memorandum and Order dated May 11, 2000, "state defendants are protected by the Eleventh Amendment from damages claims brought by private parties for alleged constitutional violations" and neither " 'a State nor its officials acting in their official

capacities are 'persons' under § 1983." ' Memorandum and Order, at 3 (May 11, 2000) (quoting *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71 (1989)). Accordingly, plaintiff's section 1983 claims against SUNYAB and the individual defendants in their official capacities must be dismissed.

Plaintiff's remaining section 1983 claims against the individual defendants in their individual capacities also fail because he has only implicated those rights protected by Title VI and the ADA in his Amended Complaint and plaintiff cannot use section 1983 to assert rights based solely on violations of the ADA or Title VI. *See Saulpaugh v. Monroe Comm. Hosp.,* 4 F.3d 134, 142–143 (2d Cir.1993). In other words, plaintiff's section 1983 claims, as pled, are not separate and distinct from his Title VI and ADA claims. Where Congress has established enforcement mechanisms containing remedial devices that are sufficiently comprehensive, as it has done with Title VI and the ADA, those enforcement mechanisms may not be bypassed by bringing suit under section 1983. *See Middlesex Cty. Sewerage Auth. v. Sea Clammers,* 453 U.S. 1, 20 (1981). Accordingly, plaintiff's remaining section 1983 claims against the individual defendants in their individual capacities must be dismissed.

Plaintiff's claims as they relate to a $2,729.70 loan that defendants "failed" to apply to his student account must be dismissed on the ground of claim preclusion. Federal courts must grant a prior state court decision the same preclusive effect—whether by claim preclusion or its subset, issue preclusion—that the courts of that state would give to it. Under the doctrine of claim preclusion, "a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Rivet v. Regions Bank of La.,* 522 U.S. 470 (1998).[1] "Simply put, the doctrine states that once a final judgment has been entered on the merits of a case, that judgment will bar any subsequent litigation by the same parties or those in privity with them concerning 'the transaction, or series of connected transactions, out of which the [first] action arose." ' *Maharaj v. BankAmerica Corp.,* 128 F.3d 94, 97 (2d Cir.1997) (quoting Restatement (Second) of Judgments § 24(1) (1982)). By Decision and Order dated August 12, 1999, Justice E. Michael Kavanaugh of the New York State Supreme Court, Albany County, dismissed with prejudice, *inter alia,* claims by plaintiff that SUNYAB had attempted "to collect an illegal debt" based on plaintiff's assertion that a "summer loan left in [SUNYAB's] account a credit of $2,729.70." *See* Reply Brief Exhibits entitled

"Motion to Vacate" & "Complaint." In that order, Justice Kavanaugh ruled that plaintiff's allegations had already been deemed to be "without merit [in a previous state court action] to establish a defense to * * * [the] action to collect the debt" and that "plaintiff's claims fail to state a cause of action." *Bayon v. Greiner,* Index No. 1581–99, at 3 (N.Y. Sup.Ct., Albany County, Aug, 12, 1999). Inasmuch as plaintiff seeks to relitigate in the instant action his allegation that "SUNYAB has failed to account for the $2,729.70 credit," it is plain that a different judgment in this action regarding such allegation would act to "destroy or impair interests established by the first [state court action]." *Schuykill Fuel Corp. v. B. & C. Nieberg Realty Corp.,* 250 N.Y. 304, 307 (1929). Accordingly, plaintiff's claims as they relate to such loan are barred by the doctrine of claim preclusion.

**\*4** Insofar as plaintiff seeks to assert causes of action based on unnamed "statutes, codes, regulations and common law of the State of New York," such fails for two reasons. Firstly and as defendants indicate, "a federal suit against state officials on the basis of state law contravenes the Eleventh Amendment when—as here—the relief sought and ordered has an impact directly on the State itself ." *Pennhurst State School & Hosp. v. Halderman,* 465 U.S. 89, 117 (1984); *see also Dube v. State University of New York,* 900 F.2d 587, 594 (2d Cir.1990) (noting that, for Eleventh Amendment purposes, when "SUNYAB is sued the State of New York is the real party). Secondly and insofar as such claims are meant to be asserted against the individual defendants in their individual capacities, in light of the fact that such Amended Complaint was signed by an attorney and the fact that plaintiff has had two previous opportunities in which to amend his pleading in a way which specifies the basis for such claims, such unidentified claims must be dismissed for failure to comply with the FRCvP. " ' The function of pleadings under the Federal Rules is to give fair notice of the claim asserted. Fair notice is that which will enable the adverse party to answer and prepare for trial, allow the application of *res judicata,* and identify the nature of the case so it may be assigned the proper form of trial." ' *Simmons v. Abruzzo,* 49 F.3d 83, 86–87 (2d Cir.1995) (quoting 2A Moore's Federal Practice ¶¶ 8.13). Under no set of circumstances can the undersigned imagine such "claims" as being anything other than "confused, ambiguous, vague, or otherwise unintelligible" such that their "true substance, if any, is well disguised." *Salahuddin v. Cuomo,* 861 F.2d 40, 42 (2d Cir.1988). In short, such claims must be dismissed because they do not comport with FRCvP 8 and further leave to amend will not be granted. *See id.* (stating that "where

leave to amend has previously been given and the successive pleadings remain prolix and unintelligible," a court may dismiss such claims without further leave to amend).

Finally, insofar as plaintiff seeks punitive damages for the claims that remain—*viz.,* the ADA and Title VI claims against SUNYAB and the individual defendants acting in their official capacities—, such damage claims must be dismissed because punitive damages may not be assessed against the remaining state defendants under either act. Given the fact that both provisions are silent as to whether a plaintiff may be entitled to punitive damages thereunder, the general rule that government entities are not subject to punitive damages applies. *See, e.g., City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247 (1981). Moreover, the fact that the 1991 Civil Rights Act explicitly amended Title I of the ADA (which guarantees equal employment opportunities), 42 U.S.C. §§ 12111–12117, by providing for the award of punitive damages counsels against any inference that punitive damages are available under Title II of the ADA without such statutory authorization. Such an inference would be "inappropriate" within the meaning of *Franklin v. Gwinnett County Public Schools,* 503 U.S. 60 (1992), wherein was reiterated the longstanding rule that courts "presume the availability of all *appropriate* remedies unless Congress has expressly indicated otherwise." *Id.* at 66 (emphasis added); *see also* 42 U.S.C. § 1981a(a)(2) (allowing a complaining party under Title I of the ADA to recover punitive damages).

**\*5** Accordingly, it is hereby *ORDERED* that plaintiff's section 1983 claims are dismissed in their entirety, that plaintiff's ADA and Title VI claims are dismissed as against all defendants except SUNYAB and the individual defendants acting in their official capacities, that plaintiff's claims as they relates to a "$2,729.70 loan" are dismissed, that plaintiff's claims are dismissed insofar as they assert causes of action based on unspecified New York law, that plaintiff's claim for punitive damages is dismissed, that—in the interest of eliminating undue complication without affecting the substantial rights of the parties—this Court substitutes SUNYAB as the defendant in this action in place and stead of all defendants named in their official capacities—FRCvP 21 ("[p]arties may be dropped or added by order of the court on motion of any party or on its own initiative at any stage of the action and on such terms as are just")—and that the caption of this case shall be changed to read

"CARLOS BAYON, Plaintiff,

-vs-

THE STATE UNIVERSITY OF NEW YORK AT BUFFALO, Defendant."

**All Citations**

Not Reported in F.Supp.2d, 2001 WL 135817

---

## Footnotes

1      Internal quotation marks omitted.

---

End of Document                              © 2024 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Distinguished by Vaughn v. Empire City Casino at Yonkers Raceway, S.D.N.Y., July 14, 2017

2015 WL 1499618
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Leena VARUGHESE, M.D., Plaintiff,
v.
MOUNT SINAI MEDICAL CENTER, Patrick
Lento, M.D., Carlos Cordon–Cardo, M.D., Adolfo
Firpo, M.D., and Ira J. Bleiweiss, M.D., Defendants.

No. Civ. 8812(CM)(JCF).
|
Signed March 27, 2015.

## MEMORANDUM DECISION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

McMAHON, District Judge.

**\*1** Plaintiff Dr. Leena Varughese ("Varughese") has sued Mount Sinai Medical Center ("Mount Sinai") and several of its individual physicians and administrators (collectively "Defendants") in connection with her September 21, 2011 termination from Mount Sinai's residency program. Now before the Court is Defendants' motion for a summary judgment of dismissal.

For the following reasons, the motion is GRANTED and all of plaintiff's claims are dismissed with prejudice.

## BACKGROUND

Mount Sinai is a large medical center located on the upper east side of Manhattan. From July 1, 2008 until September 21, 2011, Varughese was a resident in its Department of Pathology. Each of the individually named defendants served as an attending physician or supervisor in that department during Varughese's residency.

Varughese, a woman of Indian descent, alleges that Mount Sinai subjected her to discrimination and a hostile work environment on the basis of her gender and national origin (Indian); retaliated against her when she complained about discrimination and alleged unsafe practices within the hospital; punished her for failing to confess to nonexistent misconduct; and ruined her job prospects with other employers. Her complaint pleads eleven counts under federal, state, and local anti-discrimination laws; one count of interference with business relations; one count of defamation; one count of breach of her employment contract; one count of breach of the covenant of good faith and fair dealing; one count of whistleblower retaliation under a state health law; one count alleging a violation of 42 U.S.C. § 1981; one count of interference with her rights under the Family and Medical Leave Act; and one count of individual liability.[1] (Docket # 66.) She seeks several million dollars in damages, as well as injunctive relief that would both restrain Defendants from disseminating an allegedly defamatory evaluation and require them to provide her with various certifications that would allow her continue her medical training. (*Id.*)

In Defendants' view, Varughese was an insubordinate employee who was disciplined, counseled, and then fired after an escalating series of unprofessional errors and omissions she refused either to acknowledge or to correct. Defendants accuse her of repeated absenteeism, failure to complete assigned tasks, failure to communicate with supervisors and colleagues, ignoring supervisors' directions, using inappropriate language, and behaving rudely and in a manner that called her mental health into question. Ultimately, Mount Sinai terminated Varughese because of what it deemed repeated, egregiously unprofessional behavior that culminated with her being caught while surreptitiously rifling through files in someone else's office.

Varughese admits to much of the behavior assigned her, although she denies that some of the events underlying these accusations occurred in the manner Defendants describe. She also alleges that similarly situated residents who were not members of her protected class were not disciplined in the same way for the same conduct.

**\*2** Varughese was originally represented by counsel-for example, her original complaint was drafted by counsel-but she has been *pro se* for some time. She is, of course, required to abide by all the rules of the Court, notwithstanding her *pro se* status. However, she has made errors in her response to Defendants' motion for summary judgment that are common

among non-lawyer litigants. Her response to Defendants' Local Civil Rule 56.1 statement is conclusory and repetitive. To the extent that it relies on evidence at all, it relies in large measure on hearsay and other evidence rendered inadmissible by Federal Rules of Evidence 401, 403, 404, 802, and/or 805—even though a motion for summary judgment must be controverted by admissible evidence.

At times, her response veers into territory that has nothing to do with this lawsuit. For example, Varughese insinuates that the suicide of a colleague's relative was actually a murder for which yet another colleague is somehow responsible, and that Defendants' attorneys are involved in a criminal conspiracy. *See, e.g.,* Varughese 56.1 at ¶¶ 30.7–30.8 ("Residents ... were involved in what appeared to be the questionable suicide at best (by overdose of propofol of [one resident's] 'best friend' under the most suspicious circumstances ... The Caucasian leadership did not target ... [the resident's] rampant suspect conduct including ... not performing her duties or for suicide or homicide [sic] of her family member etc"); *id.* at ¶ 119.4 (complaining that the wife of one member of an internal appeal board "has the same surname as ... Rory McEvoy, the lawyers representing the Institution"), ¶ 123.2 ("McEvoy kept insisting ... that I had alleged a conspiracy against me by the Defendants to commit criminal acts, and to conduct an ongoing discrimination campaign, which, by the way, was obviously exactly what was happening.").

In order to give Varughese the benefit of any and every doubt, the Court has conducted a searching review of the several thousand pages of transcripts and other documents that she submitted in opposition to summary judgment. *DeRienzo v. Metro. Transp. Auth., Metro N. Commuter R.R.,* 237 F. App'x 642, 646 (2d Cir.2007) ("a district court has 'broad discretion ... to overlook a party's failure to comply with local court rules' and may 'opt to conduct an assiduous review of the record' even when one of the parties has failed to file a Rule 56.1 statement") (quoting *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 73 (2d Cir.2001)).

That record consists of: (1) deposition transcripts and several affidavits; (2) documentary evidence including e-mails, performance evaluations, letters and their attachments; (3) transcripts of sworn testimony given in the course of Dr. Varughese's use of Mount Sinai's internal appellate process, which was subject to cross-examination; and (4) audiotaped conversations between Varughese and various individual defendants and other administrators at Mount Sinai, and transcripts of these tapes prepared by certified court reporters.[2] As part of its exhaustive review of the record, the Court has both listened to the tapes and reviewed the transcripts.

**\*3** The content of the lengthy Statement of Facts is drawn from any portion of a party's 56.1 Statement that relies on competent evidence, as well as the accompanying exhibits. As is customary, the facts are viewed most favorably to the non-moving party (Varughese). Unless otherwise noted, these facts are undisputed, purely conclusory assertions (there are many such) are identified and are not relied on to raise genuine issues of material fact.

## DISCUSSION

### I. Standard

A party is entitled to summary judgment when there is "no genuine issue as to any material fact" and the undisputed facts warrant judgment for the moving party as a matter of law. *Anderson v. Liberty Lobby, Inc., All* U.S. 242, 247–48 (1986); *see* Fed.R.Civ.P. 56(a), (c). On a motion for summary judgment, the court must view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact. *Celotex Corp. v. Catrett, All* U.S. 317, 323 (1986). Once such a showing has been made, the nonmoving party must present "specific facts showing that there is a genuine issue for trial." *Beard v. Banks,* 548 U.S. 521, 529, 126 S.Ct. 2572, 165 L.Ed.2d 697 (2006). The party opposing summary judgment "may not rely on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998). Moreover, not every disputed factual issue is material in light of the substantive law that governs the case. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude summary judgment." *Anderson,* 477 U.S. at 248.

To withstand a motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586. Instead, sufficient evidence must exist upon which a reasonable jury could return a verdict for the nonmoving party. "Summary judgment is designed ... to flush

out those cases that are predestined to result in directed verdict." *Lightfoot v. Union Carbide Corp.,* 110 F.3d 898, 907 (2d Cir.1997).

In cases involving allegations of employment discrimination, the court must exercise "an extra measure of caution" in determining whether to grant summary judgment "because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence." *Schiano v. Quality Payroll Sys., Inc.,* 445 F.3d 597, 603 (2d Cir.2006) (internal citations omitted); *see also Holcomb v. Iona Coll.,* 521 F.3d 130, 137 (2d Cir.2008). Even in an employment discrimination case, however, "a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment." *Holcomb,* 521 F.3d at 137. The ultimate test for summary judgment in discrimination cases, as in other cases, "is whether the evidence can reasonably support a verdict in plaintiff's favor." *James v. N.Y. Racing Ass'n,* 233 F.3d 149, 157 (2d Cir.2000).

**\*4** In considering the defendants' summary judgment motion, the court liberally construes all submissions by a *pro se* plaintiff and "interpret[s] [them] to raise the strongest arguments that they suggest." *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 474 (2d Cir.2006) (per curiam) (citation and emphasis omitted). "This precept is especially important in the summary judgment context, where claims are subject to final adjudication." *S.E.C. v. Mattera,* No. 11 Civ. 8323,2013 WL 6485949, at \*6 (S.D.N.Y. Dec. 9, 2013). Indeed, the duty is "particularly strong when a *pro se* plaintiff alleges violation of h[er] civil rights." *Germany v. N.Y.S. D.O.C.S.,* No. 03 CIV. 148, 2003 WL 22203724, at \*3 (S.D.N.Y. Sept. 22, 2003) (citing *Weinstein v. Albright,* 261 F.3d 127, 132 (2d Cir.2001)).

The application of this forgiving standard for *pro* se litigants, however, "does not relieve plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Jorgensen v. Epic/Sony Records,* 351 F.3d 46, 50 (2d Cir.2003) (citation omitted); *Nolley v. Swiss Reinsurance Am. Corp.,* 857 F.Supp.2d 441,454 (S.D.N.Y.2012) *aff'd,* 523 F. App'x 53 (2d Cir.2013). "[A]t some point in a lawsuit even *pro se* litigants must make clear to the court their claims and the facts that they believed entitle them to specific relief. The summary judgment stage is an appropriate juncture to identify the real issues in a case, even where a party proceeds *pro se.*" *Mattera,* 2013 WL 6485949, at \*6 (quoting *Salahuddin v. Coughlin,* 781 F.2d 24, 29 (2d Cir.1986)).

Thus, even a *pro se* party "may not rely simply on conclusory allegations or speculation to avoid summary judgment, but instead must offer evidence to show that its version of the events is not wholly fanciful." *Shah v. Kuwait Airways Corp.,* 653 F.Supp.2d 499, 502 (S.D.N.Y.2009) (quoting *Auguste v. N.Y. Presbyterian Med. Ctr.,* 593 F.Supp.2d 659, 663 (S.D.N.Y.2009)). That evidence must be admissible under the Federal Rules of Evidence, which apply equally to *pro se* litigants. *See Holtz v. Rockefeller & Co.,* 258 F.3d 62, 73 (2d Cir.2001) (evidence submitted in summary judgment proceedings must be admissible, as required by Fed.R.Civ.P. 56(e)).

## II. Facts

Varughese was a resident physician in Mount Sinai's Department of Pathology ("the Department") from July 1, 2008 until September 21, 2011. (Defendants' 56.1 at ¶ 1).

During that period, there were two female residents of Indian descent (including Varughese) and three female fellows of Indian descent enrolled in the residency or fellowship program in the Department. (Johnson Decl. at ¶ 2, Defs.' Ex. 1.) All of the female residents and fellows of Indian descent in the Department graduated from the residency or fellowship program, except for Varughese. (Defendants' 56.1 at ¶ 132.)

*Job Duties and Employment Contract*

As a resident in the Pathology department, Varughese was expected to perform clinical, educational, and administrative tasks in one-month rotations focused on different sub-disciplines of pathology. Some of these rotations occurred at Mount Sinai. Others took place under Mount Sinai's purview but at different hospitals, such as the Bronx Veterans' Affairs Hospital and the Elmhurst Hospital Center.

**\*5** A series of one-year contracts with Mount Sinai governed Varughese's employment. Each incorporated the provisions of Mount Sinai's House Staff Manual, which provided, in pertinent part, that, "The Program Director [or] the Department Chair ... may take disciplinary action, including termination for cause, against any [resident] who ... fails to demonstrate an acceptable level of ... professionalism." (Defendants' 56.1 at ¶ 148)

The Department was in a state of turmoil during Varughese's employment. (Figur Dep. at 38.) In early 2011, a period of intense activity relevant to this case, the American College of Graduate Medical Education ("ACGME"), which

accredits residency programs throughout the United States, cited the Department for various problems with its residency program. The Department's head changed several times during Varughese's tenure, as did its middle management. Its laboratories appear to have struggled to achieve adequate staffing levels. By the fall of 2011, Mount Sinai's director of medical education actually called the Department of Pathology a "zoo." A new director, Defendant Carlos Cordon–Cardo, who was charged with putting it in order, arrived just as long-standing issues involving Varughese came to a head.

*The First and Second Years of Varughese's Residency*

Varughese's allegations of discrimination, hostile work environment and retaliation concern the way that she was treated beginning with her third year of residency (July 2010–June 2011). However, as background, especially to her hostile work environment claim, she cites to several comments that she testified were made during her first and second years of residency, July 1, 2008–June 30, 2009.

Varughese testified that Dr. Allan Schiller, who chaired the Department from Varughese's arrival until December 2010, (when he remained as an employee but apparently gave over his Chair duties to a female Interim Chair) would say something to the effect of "you don't know the type of things you'll find in India or the crazy things you'll find in India" every time he saw her at a conference or supervised her for an autopsy. (Varughese Dep. at 765–68.) He allegedly used that "line ... at least four, maybe more times over" for as long as he interacted with her-from the beginning of her residency until Dr. Melissa Pessin–Minsley took over as Interim Chair of the Department in December 2010. (Defendants' 56.1 at ¶¶ 2–3.) There is no evidence that Schiller directly supervised Varughese thereafter except during individual, occasional autopsies. He is not named as a party defendant and has not been deposed.

Varughese appeared out of sorts towards the end of her first year of residency, in a way that other first-year residents were not. A "couple of months" into that first year, Dr. Patrick Lento, the director of the Department's residency program, observed a change in Varughese's demeanor: "she never seemed to smile anymore," and "seemed distracted. When [Lento] would address her to say 'Hello, Leena,' she would not respond, which [Lento] thought was odd." (Lento Dep. at 51–52,60–61.)

**\*6** Varughese got mixed reviews during her first two years. Some supervisors rated her as superior; others found her work "inconsistent." Interim Chair Dr. Melissa Pessin–Minsley recalled that, when she sat on the residency committee during Varughese's first year, there was a "perception" on the committee "that in the end of [Varughese's] first year ... she was weak ... she wasn't performing at the strongest level of a pathology resident who had finished a first year of a pathology residency." (Pessin–Minsley Dep. at 52.)

In October 2009, three months into her second year, Schiller (who was still Chair of the Department) "wanted to see me ... about my unhappiness. He said that I didn't look happy ... if you're unhappy that's part of who you are and it's sort of your DNA and so on." (Varughese Dep. at 42.) According to Varughese, Schiller went on to say, "that [when] people were unhappy like that, it's trouble ... we don't want you to be in trouble." (*Id.* at 10, 43.) He "wanted to know if [Varughese] was speaking to someone, you know, getting help. [She] said no ... [She] didn't think [she] needed help." (*Id.*) Schiller, who obviously did think she needed therapy, told Varughese to seek professional help and bring back a note attesting that she was under someone's professional care. (*Id.*)

Varughese testified at her deposition that she understood the statement about unhappiness being in her DNA to be a reference to her race/national origin, rather than to any genetic basis of depression, which is a scientific/medical issue. (*Id.*) Varughese did not testify that Schiller made any remark about India or her Indian ancestry during this conversation.

The record contains no suggestion that Varughese told Schiller that any of his comments made her uncomfortable. Nor is there any evidence that she complained about Schiller's comments to anyone else until at least December 2010, by which time he was no longer acting as Chair and Varughese had received the first of several warnings that she was having performance problems.

From October 2009 through the summer of 2010 (the beginning of her second through the beginning of her third years of residency), the record reveals little about Varughese's on-the-job performance or her experiences. So we turn to her third year of residency. That is when the problems that gave rise to this lawsuit began.

*The July 2010 Promotions of a Filipino Male and a Woman of Indian Descent*

In July 2010, the Department promoted two of Varughese's colleagues to Chief Resident: Drs. Kruti Maniar and Samuel McCash. (*See* Lento Dep. at 13.) Like Varughese, Maniar is a woman of Indian descent. Varughese consistently describes McCash as Caucasian (*see, e.g.,* Varughese 56.1 at ¶ 16.1), but he identifies himself as a Pacific Islander of Filipino descent. (Docket # 165, McCash Decl. at ¶ 2.), and there is no evidence that others in the Department (other than Varughese) perceived him as anything other than what he himself claims to be. I view his self-identification as undisputed; there is no evidence in the record that Dr. McCash is not a Pacific Islander of Filipino descent. I will not refer to him as Caucasian.

**\*7** Chief Residents had the authority to assign tasks to other residents, to instruct them how to perform those tasks, to admonish them if the Chief's expectations were not met, and to control some portions of residents' scheduling. (Pessin–Minsley Dep. at 32–33.)

*Performance Issues*
Varughese began to be criticized for performance issues about this time.

Dr. Ira Bleiweiss, a named defendant and an attending pathologist at Mount Sinai, recalled having issues with her when she was assigned to him on frozen section duty, which is to say, on the shift that analyzes patient tissue samples sent down during surgery: "When you're on frozen section duty, there is an attending [physician] always and a resident who is assigned to be with you. I recall more than one occasion being on frozen section with Leena being the resident assigned to me and she [was] not anywhere to be found." (Bleiweiss Dep. at 54–55.)

In August 2010, a less senior resident, a Caucasian woman named Adrienne Jordan, e-mailed the two Chief Residents to complain about Varughese's work ethic: "How does she function!!!!!!! I just wonder how she gets out of bed in the morning and not hurt herself she is so lazy ..." (Aug. 13, 2010 e-mail from Jordan to McCash and Maniar, Docket # 205–5 at 2.) Later that same day, Jordan complained that her team was missing a slide from one of Varughese's cases, which Lento needed, "but of course [Varughese] called out 'sick' today." (Aug. 13, 2010 e-mail from Jordan to McCash and Maniar, Docket # 205–5 at 5.)

*The September 14, 2010 Altercation with McCash*

On September 14, 2010, Varughese had the first of two notable run-ins with McCash.

There is some evidence that Varughese's relationship with McCash was strained from the beginning; Varughese alleges, for example, that McCash gave her menial tasks and overburdened her with work. (Varughese 56.1 at ¶¶ 11.4, 11.13.) But on the day in question, Varughese refused to cover for another resident who was on leave. This prompted an argument between her and McCash. Varughese alleges that McCash became irrationally angry about her refusal, and that he "screamed ... shut up, shut up, shut your mouth Leena" at her while "lurching" towards her (Docket # 205–4 at 85). He also allegedly "cursed and ranted about" her in public, insulted her professional qualifications, told her that no one liked her, and told her she was lucky to have a job. (Varughese 56.1 at ¶¶ 11.4, 11.13.)

Kruti Maniar-the woman of Indian descent who was promoted to Chief Resident at the same time as McCash-was present during McCash's alleged tirade. Interestingly, Maniar contacted Program Director Lento that same day to express her concern that *Varughese* had acted unprofessionally during this encounter. (Lento Dep. at 68, 69, 71.) Varughese contacted Lento after Maniar did, complaining that McCash had been "hostile" to her. (*Id.*) The next morning, Lento met with both women residents. (*Id.*)

**\*8** Varughese repeated her version of events and said "something to the effect that she was perhaps singled out for coverage," meaning the duty to cover for an absent resident. (*Id.* at 82–84.) Lento asked whether Maniar agreed with Varughese's account; Maniar "pointedly" said no. (Lento Dep. at 75, 77, 90, 91.)

Lento later followed up with attending physician Dr. Melissa Pessin–Minsley, whose office was near where Varughese and McCash had argued. Pessin–Minsley told Lento that she did not hear McCash yelling at Varughese. (*Id.*) In fact, no one who was present in the area of the hospital where the encounter took place corroborated Varughese's story that McCash was yelling at her. (*Id.* at 85–90.)

Varughese claims that Maniar would support her version of the facts. (Varughese 56.1 at ¶¶ 11.5, 136.2.) Her opinion about what Maniar would say is, of course, not admissible evidence. Maniar was not deposed, but Mr. Sinai has submitted a declaration from her, in which she avers that McCash "treated all residents equally and always tried to be

fair. I never had any reason to believe that McCash harbored any discriminatory animus towards me or any other female resident because of our gender or, in my case, because I am a woman of Indian descent." (Docket # 163 at ¶ 7.) Maniar also attests that "throughout my tenure at Mount Sinai, both as a medical student and as a resident, I felt encouraged and supported ... I never felt discriminated against by anyone at Mount Sinai for any reason." (*Id.* at ¶ 4.)

However, the Hospital responded as though Lento had been able to corroborate Varughese's story. Lento told Varughese that he would speak with McCash, and later did speak to McCash about how to handle similar situations in the future. (Lento Dep. at 82.) Varughese was not satisfied; she asked Pessin–Minsley to obtain an apology from McCash. Pessin–Minsley did not believe Varughese was entitled to an apology. Indeed, her view was that Varughese's unspecified "behavior over the weekend was irresponsible and could have jeopardized patient care." (Docket # 205–4 at 2, e-mail of Sept. 15, 2010 from Pessin–Minsley to Lento).

By September 17, 2010, three days after the encounter, Varughese complained to her supervisors that she was being made into a "scapegoat," and that the "hostile environment" McCash was creating caused her "far too much unhealthy mental stress." (Docket # 205–5 at 62, e-mail of Sep. 17, 2010 Varughese to Drs. Schiller and Pessin–Minsley.) Varughese did not want to deal with McCash, and on September 23, 2010, she tried to switch rotations with another resident, Jaclyn Hechtman, so she could avoid working with him. (Docket # 205–5 at 72, e-mail of Sept. 23, 2010 from Maniar to Hechtman, McCash and Varughese). She was prevented from doing so. (Varughese 56.1 at ¶ 11.6.)

But Varughese did not allege at that time that that "hostile" environment had anything to do with her membership in any protected class, or compare McCash's treatment of her to his treatment of anyone outside her protected groups (female and of Indian descent.) Indeed, she did not assign either her gender or her national origin as the reason for McCash's loss of temper. The people to whom she complained about McCash (specifically Lento, Pessin–Minsley, and, at some point, attending physician and Defendant Ira J. Bleiweiss) did not interpret her complaints as complaints about discrimination or hostile work environment based on her gender, her national origin or any protected category-although none of these individuals could recall seeing or being trained in Mount Sinai's anti-discrimination policy, or its anti-harassment policy, or its anti-retaliation policy. (Lento

Dep. at 24–25; Pessin–Minsley Dep. at 38–39; Bleiweiss Dep. at 15–16.) After she complained about the September 14, 2010 incident, Varughese claims that her work materials, including slides of patient tissue, started to go missing. (Varughese Dep. at 824–27.) Varughese allows that she and other residents had always had some problems with misplaced slides-whether the fault of general organizational lapses or specific failures of other departments. (Varughese Dep. at 819.) However, "in terms of it being sort of a problem for me that was in excess of other people's issues, that didn't happen until after like September 2010." (*Id.* at 823.)

*The December 8, 2010 Altercation with McCash*

**\*9** A second and more serious altercation between McCash and Varughese occurred on December 8, 2010.

In and before December 2010, pathology residents could make extra money by "moonlighting," i.e., taking extra shifts within their own department. According to the Defendants, on December 8, 2010, McCash told Varughese to examine certain specimens (the complexity of which are in dispute), but Varughese instead gave that work to Paul Azar, a white male resident who was moonlighting. (Defendants' 56.1 at ¶¶ 9–10).

Varughese admits that she gave the work to Azar. (*See* Self–Reflection Essay 1, Docket # 205–4 at 86). She contends that she was never clearly told that she had to do the work herself. (*Id* ). She also argues that any instruction would have been discriminatory, since two fellow residents-one a non-Indian female and the other a white male-"routinely assigned very complicated patient cases to moonlighters" and were never prohibited from doing so or disciplined for it. (Varughese 56.1 at ¶ 10.2.)

Whether the work she delegated was complicated or not, the particular work that Varughese delegated to Azar should not have been delegated to a moonlighter-and McCash should not have had to explain that to plaintiff. The samples came from patients of a Dr. Goldfarb. His standing order was that the resident on duty had to examine the particular kind of sample at issue (the margins of an incision into the breast). Dr. Goldfarb did not want the moonlighters doing this work, presumably because they were working extra hours and might not be as alert as the resident on duty. (Figur Dep. at 44–45.) The record is replete with references to "Goldfarb cases" and the particular steps that were to be followed when handling "Goldfarb cases."

There was another reason why Varughese delegating her work to Azar was not appropriate. The Department was trying to cut back on moonlighters in order to achieve budgetary reductions. When Varughese assigned the work to Azar, he was about to leave; Jordan, another resident moonlighting that night, recalled that when she left, "Dr. Azar was supposed to be shortly behind [her] ... When he wasn't, [she] went back to see what was taking him so long because we were going to walk out together." (Jordan Dep. at 110.) By giving Azar extra work, Varughese increased the amount the Department would have to pay him; McCash testified that this was inappropriate "because it would have been very easy for her [Varughese] to have done that herself and not expend unnecessary resources." (McCash Dep. at 62–63.)

When McCash became aware of what had happened, he confronted Varughese. These followed a loud, profanity-laced altercation between Varughese and McCash about Varughese's having failed to follow McCash's instruction. Jordan testified that McCash raised his voice and followed Varughese around the room. (Jordan Dep. at 118–119.) Varughese characterizes McCash's behavior as a "rampage" that was physically intimidating and verbally threatening. (Varughese Dep. at 705–06.)

 **\*10**  However, witnesses to the altercation also described Varughese's behavior as out of line, especially after she left the room to try to fetch Dr. Bleiweiss. Bleiweiss, who was on the phone in his office, could see that Varughese was "rather upset ... she was practically in tears," but when he did not immediately end the call to speak to her (Bleiweiss Dep. at 59, 61.), Varughese returned to the lab and began yelling. (Lento Dep. at 114; *see also* Defendants' 56.1 at ¶ 11.) Some of Varughese's ire was directed at Jordan, the white female resident who had previously complained about Varughese's work ethic (*see supra* at 11); Varughese engaged Jordan in a "one-sided yelling argument where [Varughese] was yelling at [Jordan]." (Jordan Dep. at 116.) Azar advised Jordan to leave, "something to the effect of 'You can't engage with [her]. She's not being rational.' " (Jordan Dep. at 116.)

In interviews conducted after this incident, numerous witnesses to the event-Jordan. Azar, Jaffer, Bleiweiss, a medical student, a technician, and a fellow-told administrators that, while McCash may have lost his composure with Varughese, it was "not to the degree of what the other witnesses described [about] Varughese's behavior." (Figur Dep. at 48.) "They could understand what he [McCash] said. It was logical. It was coherent. Dr. Varughese was described as

infantile, incoherent, unintelligible, and the wording was not making any sense to anybody else." (*Id.*) One medical student who was present became so upset that she had to leave the room.

Varughese does not dispute that she raised her voice and swore.

Late that evening, McCash e-mailed several supervisors to complain about Varughese's behavior, especially her assignment of the case to her Azar, which "ma[de him] question her work *ethnic.*") (McCash e-mail of Dec. 8, 2010 at 8:16 p.m., Docket # 205–6 at 2 (emphasis added).) The e-mail was several paragraphs long and includes no other reference to race, ethnicity, or any other protected category. (*Id.*) Shabnam Jaffer, an attending physician of Indian descent who was present, was carbon copied on the e-mail; Varughese was not. (*Id.*) There is no evidence that anyone noticed or commented on the "n" inserted into what, in the context of the email's entire text, appears to have been intended as "work ethic." At her deposition, Varughese testified that McCash never commented on her Indian background to her or to anyone else, to her knowledge. (Varughese Dep. at 175–176.) Either Varughese did not see this e-mail until after her deposition, or she did not interpret it as McCash denigrating her national origin until well into this lawsuit.

*The Department's Investigation of the December 8 Incident*
There were several administrative investigations into the December 8 altercation. Varughese alleges that hospital authorities were consistently and unfairly skeptical of her, and consistently and unfairly trusting of white and/or male employees (including McCash, who does not self-identify as white), during those investigations. Varughese asserts that these attitudes were the proximate cause of several disciplinary actions that were to follow, up to and including her eventual termination.

 **\*11**  The Department of Pathology was the first to investigate. During the investigation, Varughese was told to report to Chief Resident Maniar (an Indian woman) rather than McCash. (Varughese Dep. at 179–80.)

As part of the investigation of the December 8, 2010 incident, Lento interviewed Drs. Bleiweiss, Jaffer, and Azar (the moonlighter), as well as a fellow who had been present. (Lento Dep. at 105, 113.) He also reviewed several e-mailed accounts from witnesses. (*Id.* at 105, 113.)

At least some of the people being interviewed had had doubts about Varughese before the December 8 incident. The reader will recall that Bleiweiss had found Varughese to be a no-show for several shifts, and that Jordan had previously complained that Varughese was lazy. They were not the only ones who criticized Varughese's professionalism. A departmental administrator named Eileen Hauptman assessed the December 8 incident as follows: "One person has [a work ethic] (SAM [McCash] ), the other (LEENA [Varughese] ) doesn't. Since Leena has been here, she has shown great antipathy to any work and least of all to patient care." (Docket # 205–6 at 5, e-mail of Dec. 9, 2010 from Hauptman to Pessin–Minsley *et al.* (emphasis in original).)

Prior to the December 8 incident, Varughese's formal evaluations reflected that she was "inconsistent" but were not negative. However, Bleiweiss' evaluation of Varughese for the period including December 8, 2010 (which he submitted on December 18, 2010) ranked her "below expectations" for professionalism. (Bleiweiss Evaluation, Docket # 205–7 at 14–15.) Others reviewing her for the same period marked her as satisfactory or slightly above average. (Evaluations, Docket # 204–8 at 4–23.)

During the investigation, Varughese refused to acknowledge that she had done anything wrong, that she could have handled her disagreement with McCash and Jordan differently, or that she might benefit from a different approach to conflict resolution. (Pessin–Minsley Dep. at 122.) As Dr. Pessin–Minsley testified, Varughese:

> was very angry. She was not hearing what [administrators] were saying to her and not responding to what we had asked her to do ... most situations are the fault of more than one side ... and there was no comprehension or any feeling that she might have had any responsibility or any part of it could have been her fault or she could have mitigated the situation.

(*Id.* at 123–24.) Varughese's attitude, as described by Pessin–Minsley, would surface again and again during the next nine months, as her career imploded. It is undisputed that whenever Varughese was questioned about an incident, she denied any wrongdoing and cast all blame on others, viewing

her defensiveness as fully justified because of the unfairness of any and all complaints about her behavior. (*See* Varughese 56.1, *passim.*)

During the Department's investigation, Varughese went to Lento over and over again to complain about McCash's behavior on December 8. She alleges that Lento was unsympathetic to her complaints. However, Varughese did not think this was because of her gender, her national origin, or her membership in any other protected class. Instead, Varughese believed that Lento was hostile to her because she had given him a negative review in a student-to-teacher review of a rotation months earlier. Varughese testified that, during one December 2010 meeting, Lento "indicated to me that in so many words that my rights won't be protected as long as he believed that I wrote a negative evaluation" about the rotation. (Transcript of Internal Appeal at 281–82, Docket # 205–31 at 77.)

 **\*12**  The negative evaluation is not part of the record, but there is no evidence that it involved any complaint of discrimination, or that it otherwise constituted protected activity.

### The December 10, 2010 Altercation with Jordan
Two days after the December 8, 2010 incident, Varughese was in trouble again, this time for ignoring an instruction to let the Department's investigation proceed without interference.

On December 10, 2010, Varughese allegedly confronted Jordan about her role in the December 8 incident. (*See* Docket # 205–5 at 10, e-mail of December 10, 2010 from Jordan to Pessin–Minsley, McCash and Lento.) The parties disagree about who started the confrontation, but Varughese agrees that it occurred at Jordan's desk.

Varughese received a written warning for interfering with the investigation; Jordan did not. Both Jordan and McCash sent e-mails to others in the department publicizing their version of what had happened on December 8. Neither was disciplined for interfering with the investigation.

At her deposition, Interim Chair Pessin–Minsley explained that Varughese alone was disciplined "because there was physical confrontation, as opposed to something put in an e-mail to senior people of a department ... [e]ven though, I would not have put all of those people in the e-mail." (Pessin–Minsley Dep. at 131–32.)

*December 21, 2010 Notice of Academic Advisement*

On December 21, 2010, the Department concluded its investigation and placed Varughese on a form of probation known as an Academic Advisement. The Department cited Varughese's behavior on both December 8, 2010 (the McCash incident) and December 10, 2010 (the confrontation at Jordan's desk) to justify the imposition of probation. (Dec. 21, 2010 Notice of Academic Advisement, Docket # 205–7 at 29.)

Academic Advisement warns a resident that she must improve her performance in accordance with certain guidelines or she will face discipline. (Defendants' 56.1 at ¶ 16.) Associate Director of Graduate Medical Education Scott Barnett testified that academic advisement

> was ... a very clever invention. Before academic advisement was available, all discipline was formal with, uhm, due process rights. And it didn't give the programs the flexibility to create remediation plans that fell short of formal discipline. So this category was created ... so as to avoid the first step being a formal discipline which could potentially be reported to regulatory bodies [such as] licensing authorities, boards [ ... or] the Office of Professional Medical Conduct of New York State.

(Barnett Dep. at 34–35.)

The Notice given to Varughese reads as follows:

> This letter is to inform you that you are being placed on Academic Advisement. This decision is based on the investigation of your altercation(s) with other residents while on the Surgical Pathology rotation on Dec 8 th and Dec 10th, 2010.

*Brief summary of events*

> One of the chief residents had specifically discussed with you the need for you to gross specific specimen(s). Instead, you had one of the moonlighters handle the specimen(s).

When confronted with this by the chief, you became loud and verbally abusive to his authority and advisement as chief. This altercation was upsetting to those present (including other residents in the gross room [i.e., the area where residents "grossed" (analyzed) patient tissue samples and slides], an attending (Dr. Jaffer) and a medical student, who felt she needed to leave the area as a direct result of the altercation) and disruptive to the Department's operations. You are also noted to have gotten into an argument with one of the moonlighting residents (Dr. Jordan) that evening and continued to harass her about it on another day. In addition, it was noted that you had failed to appropriately gross in cases that should have been taken care of that day.

*Problematic areas identified*

> **\*13** ○ Failure to demonstrate an appropriate level of professionalism
>
> > ○ Patient care related lapse (grossing-related responsibilities)
>
> These are critical areas fundamental to successful completion of your training.

*Plan of action*

After discussions with you, Dr. Pessin[-Minsley] and [nonparty] Dr. Stimmel, we hope the following plan with help you overcome these deficits:

○ Meeting with the Program Director or, as needed, interim chair/chair or others in authority within the Department of Pathology, every 3–4 weeks for continued assessment and advisement

○ Continued performance of assigned resident duties under the guidance of Pathology Chief resident(s), Pathology faculty and/or Program Director

○ Self–Reflection exercise (to be handed in to me within 4 weeks)-You are expected to write down your account of the situation and describe how you could have approached things in a better fashion, including commentary on physician professionalism and its role in this circumstance.

○ Reading exercise-You are expected to read the book entitled *Practicing excellence: A physician's manual to exceptional healthcare* [sic] by Stephen Beeson during the 3 month period of academic advisement (we can obtain a copy for you if necessary).

*Follow up*

We will meet again in 3 months to review your progress. Your performance will be closely monitored for improvement in the areas of professionalism and patient care as outlined above. We expect that you will perform your duties in a manner that is professional, appropriate and non-threatening to others. We are hopeful that this plan of action will allow you to overcome the difficulties outlined and succeed in our training program.

We must make it clear, however, that if you are unable to improve your performance or if any future incidents involving poor professionalism recur, you may be subject to discipline up to and including termination from the Program.

(Docket # 205–7 at 29–30.)

McCash was not placed on Academic Advisement. (Varughese 56.1 at ¶ 7.1.) He was, however, disciplined. Lento testified that, as was his "standard," he applied an "individualized" and informal approach to disciplining McCash for his role in the December 8 incident. (Lento Dep. at 28–31.) McCash's informal discipline required him to accept "training" from supervisors "about how to handle situations like [this one] better in the future." (Varughese 56.1 at ¶ 14.3; Defendants' 56.1 at ¶ 144.) Further, in the months that followed, HR "actively follow[ed] up with McCash regarding his wrongdoing, and he apologized" to several supervisors. (Varughese 56.1 at ¶ 23.1.) Lento believed, however, that he needed to use a more "formal" approach to discipline with Varughese, because her behavior had been so extreme, and because less formal reprimands had not been effective thus far at convincing her that her behavior had been inappropriate. (Lento Dep. at 28–31.)

**\*14** When Lento informed Varughese that she was being placed on Academic Advisement on December 21, it seemed to him that she "lack[ed] insight into what happens and still blames others for what occurred." (*See* Lento Notes, dated December 21, 2010, Docket # 205–7 at 30.)

And indeed, on December 23, 2010, Varughese sent a written response to the Notice of Academic Advisement contesting its version of events and identifying several "Problem areas ...:(1) Public humiliation by Dr. McCash[;] (2) Potential immediate danger[;] (3) Possible retaliatory action to this complaint ... (4) Negative consequences of

this event on my health." (Docket # 205–9 at 11, e-mail and attachment of Dec. 23, 2010.) Among the recipients of this communication was Associate Director of Graduate Medical Education Scott Barnett. After reading it, he wrote to Pessin–Minsley, expressing concern that, if Varughese's "allegations regarding Sam [McCash] are true, he may need to be counseled and placed on" Academic Advisement himself. (Docket # 205–9 at 17, e-mail of Dec. 23, 2011 at 3:50 p.m.). Pessin–Minsley responded to Barnett based on her belief that none of Varughese's allegations were true:

I have witness documentation that there was no physician intimidation or abuse by Sam [McCash] ... All accounts indicate that his response to Leena not following his direction was appropriate. He was firm, but not loud or physical. Leena's account seems to be a figment of her imagination or at the very least, a significant exaggeration.

(Docket # 205–9 at 9, e-mail of Dec. 23, 2010 at 3:56 p.m.,) Pessin–Minsley's information came from Azar (the moonlighter) and Jordan. (Pessin–Minsley Dep. at 151–53.)

*Varughese Complains to HR*

In addition to protesting her Academic Advisement within the Department, Varughese submitted substantially the same grievance to Human Resources. This caused Caryn Tiger–Paillex of HR to begin a second, independent investigation.

Tiger–Paillex first met with Varughese. At that meeting, Varughese expressed concern that McCash was, "going out of his way to micromanage [her]" and questioned whether it was "because he is a guy?" (Tiger–Paillex Dep. at 30–32, 38, 41.) This was the first and only indication that Varughese might have perceived McCash's behavior as motivated by her gender; even this was backhanded, though, since the statement literally indicates that Varughese correlated a negative behavior (micro-managing) with being a man.

During the meeting Varughese did not (1) allege that McCash treated other women or other people of Indian descent similarly, (2) allege that he treated men better or differently

than he treated women, or (3) allege anything at all about her national origin.

Varughese testified that Lento began treating her coldly after she complained to HR. She alleges that, on January 10, 2011, Dr. Lento admonished Varughese for taking matters "outside the Department." (Varughese 56.1 at ¶ 35.1.) Varughese claims that this comment was part of a pattern of Lento's becoming progressively more "aggressive" toward her in person, but she does not identify any other acts that demonstrated this. (Varughese 56.1 at ¶ 37.2.)

*Varughese Fails to Fulfill the Requirements of the Academic Advisement*
**\*15** Varughese did not fulfill the terms of her Academic Advisement. Her self-reflection essay was due on January 18, 2011. She did not ask for an extension; she simply did not submit it. (Defendants' 56.1 at ¶ 35.)

While Varughese met with supervisors "three, four times" in the period of her Advisement (Varughese Dep. at 270–71), she did not meet with them each time she was required to do so. (Defendants' 56.1 at ¶ 37.)

At her deposition, Varughese testified that she was excused from complying with the Advisement by virtue of complaining to the Department and to HR. (Varughese Dep. at 274.) No one ever told her that complaining excused compliance, and she never bothered to ask anyone whether the effect of her complaints was to lift the Advisement. (*Id.*) In fact, her complaint had no effect on her Advisement, which was part of the training component of her residency.

On January 19, 2011, the day after she was supposed to have submitted the self-reflection, Varughese told administrators that Lento was being hostile to her. Again, she ascribed that hostility to her negative review of Lento's rotation, not to retaliation for any protected activity. (*See* Notes entitled "LV–1/19/11–w/SB," Docket # 205–9 at 32.)

On January 21, 2011, Varughese reported that someone had broken into her locked desk at work; she found a drawer that was normally locked was open; the lock was broken. (Docket # 205–21 at 11, Jan. 21, 2011 e-mail from Varughese to Maniar.)

*Varughese Accuses McCash and Jordan of Drinking on the Job*

In a January 24, 2011 meeting with Caryn Tiger–Paillex, Varughese injected a new issue into her complaints about McCash and Jordan: she accused them of drinking alcohol at work. (*See* Tiger–Paillex Notes of Jan. 24, 2011, Docket # 205–7 at 5; *see also* Docket # 205–10 at 2, e-mail of Apr. 25, 2011 (referencing Jan. 24 meeting as her first complaint on the subject).) Specifically, she accused McCash and Jordan of drinking Captain Morgan rum at work, "right before AP [anatomic pathology] call." (Tiger–Paillex Notes of Jan. 24, 2011, Docket # 205–7 at 5.) Varughese also accused other residents of conducting happy hours on work premises in the evenings. (*Id.*)

There is some evidence that residents, including McCash, engaged in a social drinking activity called "dementia rounds," on hospital premises. (*See* Docket # 205–3 at 8–18: e-mail of Sept. 9, 2009 from McCash to Michael Mikulasovich; e-mail of Oct. 7, 2010 from McCash to fellow residents; e-mail of Nov. 4, 2010 from McCash to fellow residents; e-mail of Dec. 1, 2010 from McCash to fellow residents). In organizing what appear to be weekly or monthly "dementia rounds"-normally on a weeknight in a hospital conference room-various residents either offered to bring alcohol or asked others to do so, in the form of beer, wine, or simply "booze." (*See* Docket # 205–3 at 19, e-mail from Jessica French to other residents; *id.* at 20, e-mail of March 4, 2009; *id.* at 21, e-mail of August 3, 2010.) There is also some evidence that dementia rounds occurred during, and not merely after, residents' shifts. For example, McCash promised to come to one evening of dementia rounds as a way to "tak[e] a *break* from grossing," meaning analyzing patients' tissue samples. (Docket # 205–3 at 16, e-mail of June 3, 2010 from McCash to other residents (emphasis added).) At his deposition, McCash denied ever having returned to work after drinking, and if McCash dropped in on a dementia round in mid-shift, that does not mean that he imbibed. Varughese testified that he did, but she did not explain how she knew this-whether she observed it personally, heard it from third parties, or simply inferred it from McCash's presence at an event. Whatever, simply having alcohol on hospital premises was at a minimum unwise and more than likely a violation of hospital protocol; it was not behavior that could or should be ignored.

*The Physician Wellness Committee*
**\*16** After Varughese had been placed on Academic Advisement, and while the HR investigation into the December 8, 2010 incident was open, Interim Chair Pessin–

Minsley referred her to the Physician Wellness Committee ("PWC").

The PWC is a hospital-wide resource that assists physicians suspected of being impaired for behavioral, psychiatric or physical reasons. (Defendants' 56.1 at ¶ 30.) Significantly for our purposes, if the PWC makes a request of any physician at Mount Sinai, immediate compliance is mandatory, on pain of termination.

Pessin–Minsley told Dr. Arthur Figur, the chair of the PWC's investigative arm, that she was making the referral because Varughese was "insubordinate, loses control, and shouts and screams when confronted with issues that she needs to address." (Figur Dep. at 24–25.)

Varughese alleges that the act of referring her to the PWC was a Kafka-esque attempt to humiliate and discredit her, even as she was managing thousands of cases for the hospital, caring for patients, and covering for other residents. (Varughese 56.1 at ¶¶ 30.2–30.3, 34.1.)

When the referral was made, Figur did something he has never done before or since-he investigated whether the referral to the PWC was itself appropriate. He did this, "Because the department was in turmoil." (Figur Dep. at 38.) He wanted to be sure that Varughese's behavior was appropriate for referral to the PWC, and that Varughese was not being made a casualty of departmental dysfunction. (*Id.*)

Figur conducted his own investigation of the events of December 8, interviewing more or less the same witnesses that the Department had interviewed and that HR was interviewing. He eventually concluded that McCash was "loud" with Varughese and "pressed the issue that she should be responsible and perform her duties," but that Varughese had lost control entirely. (Figur Dep. at 43, 48.)

Figur did not investigate the earlier September incident "because having interviewed other people, they have had similar experiences with Dr. Varughese. And there were issues of lateness coming in, not calling in when she would not-was sick, at the appropriate times, not listening to other chief residents." (Figur Dep. at 48–50.) Such reports-of Varughese's lateness or absenteeism, and her failure to tell people where she was-pepper the record.

After conducting his own inquiry, Figur concluded that the referral was in fact appropriate. "We felt she had difficulties;

we are here to help. And that it was not an administrative disciplinary type of issue, but something that could possibly be corrected." (Figur Dep. at 38.)

It took a long time to convince Varughese that she had no choice but to meet with the PWC; she failed to respond to messages and at first refused to cooperate with the referral. When she finally agreed, on pain of termination, she immediately gave the PWC cause for concern.

Because the PWC had reports that Varughese's behavior was erratic, Figur asked her to submit to a toxicology screen, which:

> **\*17** was negative, but she wanted to drink an excessive amount of water. When [Figur] told her no, [he] took her over and the nurse at employees health would also refuse to give her more water and she admitted that she is on [certain] medications [including a sleep aid and possibly a stimulant] ... I would then be very concerned and would mandate that she give us a prescription from her current treating [physician] who gave her these medications because I'm always concerned about self-medicating by physicians.

(Transcript of Internal Appeal at 242–244, Docket # 205–31 at 68.) In other words, Varughese admitted that she was taking medications (which might well have been as unwise or inappropriate as participating in dementia rounds). Her desire for excessive amounts of water prior to screening is consistent with flushing any residue out of her system before the toxicology screen; the Court is familiar with this gambit from criminal cases, where drug users use water to dilute evidence of drugs in their urine. Varughese's insistence on drinking lots of water while being screened for drugs was itself of concern to the PWC, and justifiably so.

It was standard for the PWC to refer physicians to the staff psychiatrist, and Figur thought it was particularly appropriate that Varughese see someone, because her "behavior at various times during the past was inappropriate. She lost control of herself. Not being a psychiatrist," Figur "put down the pattern

of behavior ... that she may have anger management issues, that she certainly does not deal [well] with authority." (Figur Dep. at 47.)

On April 11, 2011, Figur referred Varughese to a staff psychiatrist, Dr. Madeleine Fersh.

In the referral, Figur explained to Fersh that:

> most [of Varughese's] workplace behavioral issues can be summarized as inappropriate outbursts ... instead of collegial discussions ... by not accepting the hierarchy of delegated authority. The presenting behavior: shouting, screaming, incoherent rants in the hallway in response to an admonishment by a chief resident ... She did not admit to us that she was out of control although numerous unbiased witnesses agreed that she behaved in that manner ... The outbursts are 'unpredictable' and over 70% of the time she is collegial.

(Docket # 205–24 at 55.)

Varughese did eventually see Dr. Fersh, although she cancelled her first appointment, came to the second at the last second and [Redacted]

  [Redacted]

[Redacted] [3] (This paragraph will be redacted from the published decision.)

### Jordan is Promoted to Chief Resident

By mid-February 2011, Lento had promoted Jordan to be the third acting Chief Resident. Varughese's summary judgment opposition papers allege-again, for the first time in this litigation-that Jordan's promotion over her was discriminatory, presumably because of her national origin, since Jordan, like Varughese, is a woman. (The reader will recall that one of the Chief Residents, Dr. Maniar, was a woman of Indian descent).

**\*18** Jordan's promotion *was* unusual in one sense; she was only in her second year of residency. (*See* Docket # 205–9 at 57, e-mail of Feb. 17, 2011 from attending physician Dr. Tamara Kalir to colleagues; Jordan Tr. at 14.) One professor found "the matter of bypassing seniors to be very troubling. It has hurt resident morale-significantly ... Bypassing senior housestaff [i.e., residents] gives them the message that we don't believe in them. I feel very uncomfortable, not to mention a little embarrassed about this." (*Id.*)

However, Varughese does not explain why she was as or better qualified for the position than Jordan, and the undisputed evidence. The very fact that Varughese had difficulty dealing with colleagues, which is not in any genuine dispute, would appear to disqualify her from serious consideration. So would the fact that Varughese was on Academic Advisement, as well as the fact that she was resistant to being assessed by the PWC. Jordan suffered under none of these impediments. While Varughese points to difficulties Jordan had managing certain administrative responsibilities once she became a Chief Resident, she presents no evidence that Jordan had performance issues before the promotion.

There is no evidence that either Schiller (who allegedly referred to Varughese's national background in the early years of her residency) or McCash (whose e-mail referred to Varughese's "work ethnic") was involved in the decision-making process.

### Varughese Persists in Refusing to Fulfill the Terms of the Academic Advisement

On March 30, 2011, Varughese finally submitted the self-reflection essay that her Academic Advisement required. It was two and a half months late.

The reflection was hardly reflective. It is in fact highly defensive. It goes on for several pages about McCash's alleged wrongs. A representative sampling, beginning with the first words that appear in the reflection:

> I was verbally intimidated by Samuel McCash in a very aggressive and confrontational manner on September 12 th 2010 ... [after meeting with Lento about the September 12 incident], I believed that the evaluations which, were to be completely anonymous

were not in fact anonymous, and realized or suspected that they may pose a threat to residents if anyone were to negatively evaluate a rotation ... on December 8, 2010, there was a second incident with Samuel McCash, very much to my dismay ... Samuel McCash became verbally abusive towards me ... The next day, I sensed that there was much whispering and talking amongst the attendings and others regarding this event, and I felt humiliated and thoroughly distressed that I was in the midst of this situation ... I feel that I have attempted to remedy these situations to the best of my ability by utilizing the appropriate authoritative channels and giving Drs. Pessin and Lento the benefit of the doubt but these have only led to what seems to be additional complaints and accusations (i.e. insubordination on 12/21/2010) to be launched against me, even after several months after these incidents ... Samuel McCash has exhibited volatile, aggressive and dangerous behavior towards me twice already ... However I now find that I have to defend myself from not only avoiding and preventing abusive behavior from Samuel McCash but also to defend myself from complaints of unprofessionalism at how I handled a difficult situation to blatantly false aaccusations of insubordination when presented with the Notice of Academic Advisement ... Despite these incidents, I have completed my assigned rotations without taking time off to deal with the traumatic and abusive nature of these incidents."

**\*19** Toward the end of the essay, Varughese wrote that, "finally," she was "apologetic that I did not find a better way to navigate [the September and December] incidents." (Self–Reflection Essay 1,

Docket # 205–4 at 88.), but she did not admit to having done anything wrong, explain what she could have done differently, or express how she could have better handled the confrontations. (Defendants' 56.1 at ¶¶ 35–36.)

Significantly for this lawsuit, Varughese's document mentions nothing about discrimination and does not suggest that her race or gender figured into the incidents she was describing.

When Pessin–Minsley read the reflection, she was not pleased. She wrote to HR that the essay "was supposed to be [Varughese's] reflection on how SHE would have handled herself differently ... Clearly she is incapable of any self-reflection." (Docket # 205–9 at 25, e-mail of Mar. 30, 2011 at 3:42 p.m.) She also wrote that Varughese had "twisted all the events and much is blatantly not true," and complained that "both Dr. McCash and Dr. Lento (as well as [her]self) [were] being harassed and slandered." (Docket # 205–9 at 25, e-mail of Mar. 30, 2011 at 2:58 p.m.)

During this time, Varughese alleges that the workplace environment was becoming unbearable for her. She alleges that Dr. Lento "was erratic and threatening" towards her (Varughese 56.1 at ¶ 18.3), and that McCash and Jordan "continued to harass" her and disrupt her work (*id.* at ¶ 18.1). She offers no evidence about specific instances or behaviors to support those conclusory assertions. And indeed, Varughese had no contact with McCash at all from and after December 8, 2010–a fact that she admitted to Tiger–Paillex. (Varughese Dep. at 142.) So he could not possibly have been making life difficult for her during this period.

### *HR Concludes its Investigation and Permanently Removes Varughese from McCash's Supervision*
On April 5, 2011, Tiger–Paillex told Varughese that the investigation had concluded and that she would continue to report to Maniar, rather than to McCash. (Varughese Dep. at 131, 133.) Either at that meeting or on the phone shortly thereafter, Varughese told Tiger–Paillex that she had had no direct interaction with McCash since December 2010. (*Id.* at 142.)

On April 7, 2011, Varughese asked for a copy of Tiger–Paillex's written summary of her investigation. (Docket # 205–9 at 13, e-mail of Apr. 7, 2011.) She also asked to "move on in my life. These continued investigations and interrogations have taken a toll on my physical and mental well-being. I find that I am relieving [sic] this event [sic] over and over again with each new interview, now nearly 4 months

after the incident ... Under NYC law, workplace harassment and retaliation are crimes." (*Id.*)

That same day, Varughese forwarded an e-mail regarding a proposed "dementia round" to an attending physician, Mary Fowkes, to "voice my concern" that people should not "drink and 'drive'," i.e., drink and return to work. (*See* Docket # 205–3 at 13, e-mail of Apr. 7, 2011 from Varughese to Fowkes).

 **\*20** On April 11, 2011, HR sent Varughese a letter saying that it had been unable to substantiate her claim that McCash had engaged in inappropriate behavior on December 8, 2010. (Defendants' 56.1 at ¶ 23.) Nevertheless, HR confirmed that Varughese was to continue to report to Maniar, rather than McCash. (Defendants' 56.1 at ¶ 24.)

Of course, Maniar had been plaintiff's direct supervisor since December 8, and this had not solved any of Varughese's problems. As a supervisor, Maniar-an Indian woman, just like Varughese-was no more pleased with Varughese's professionalism than McCash had been. In her declaration, Maniar described Varughese as a problem employee who "would call out unexpectedly and for multiple days and it would be difficult for me to find coverage." (Docket # 163, Maniar Decl. at ¶ 8.) Maniar recalled one specific occasion on which Varughese said she would not be available to cover for another resident even before she knew what date the other resident would be absent. (*Id.*)

*Varughese Explicitly Complains About Gender Discrimination*
On April 25, 2011, Varughese e-mailed the HR department, and, for the first time, explicitly asserted that McCash had discriminated against her because of her gender. (Defendants' 56.1 at ¶ 26). Her

> perception was and is that I am being threatened and berated by a male resident because I am a woman. I doubt that he would yell or attempt to physically intimidate a male resident ... My complaint is that of being discriminated against by the male chief resident based on the fact that I am a woman ...

(Docket # 205–10 at 2, e-mail of Apr. 25, 2011 from Varughese to Tiger–Paillex.) By the time she made this complaint, Varughese had long since ceased reporting to McCash; by her admission, she had had no dealings with McCash since December 8, 2010. [4]

Varughese's April 25, 2011 complaint also mentioned that Schiller had "said that there is something wrong with my DNA and asked me to see a therapist." (*id.*) This appears to refer to Varughese's discussion with Schiller in the fall of 2009, discussed above. (*See supra* at 9–10). Varughese did not suggest that this comment had anything to do with her race or gender. [5]

Finally, Varughese reported that she "had witnessed ... McCash and ... Jordan drinking ... liquor at work at 5 pm ... while still involved in patient care related duties, this situation was relayed to Dr. Figur and [departmental administrator] Paul Johnson at the second [PWC] interview." (Docket # 205–10 at 2, e-mail of Apr. 25, 2011 from Varughese to Tiger–Paillex.)

In response to Varughese's explicit complaint of discrimination on the basis of her sex, Tiger–Paillex of HR asked to meet with Varughese to discuss the matter further. Varughese refused; she thought that it would be a "waste of time." (Varughese Dep. at 177–79.)

*Varughese is Given a Fresh Start*
On April 1, 2011, Dr. Carlos Cordon–Cardo joined Mount Sinai as Chair of the Department of Pathology, taking over from Interim Chair Pessin–Minsley. (Final Warning Letter, Docket # 205–7 at 33.) He had never before interacted with Varughese; he had no involvement in her Advisement.

 **\*21**  Cordon–Cardo turned his attention to Varughese one month into his tenure. He met with her on May 3, 2011 to follow up on her original Academic Advisement. He told her that he wanted to give her a fresh start with him-a chance to rewrite the self-reflection and otherwise complete the terms of the Advisement, which she had thus far failed to complete. (Defendants' 56.1 at ¶ 40.)

Varughese surreptitiously taped that meeting; she has submitted both a copy of the audiorecording and a transcript. (*See* Docket # 205–24, beginning at 13.) The conversation began with Lento asking Varughese whether she had read the

book on professionalism she was required to read as part of her Academic Advisement. (*Id.* at 14–15.) She claimed to have read the book, but could not recall the name of its author or any of its content beyond its title. (Docket # 205–24 at 5.) It was obvious to Lento-and to anyone who has listened to the tape-that she was not truthful when she said she had read the book, and indeed, at her depositition, she admitted to having lost, not one, but two copies of it. (Varughese Dep. at 281–82.)

The tape reveals that Varughese evaded questions with further questions. (Docket 205–24, Transcript at 6, 8). When Lento admonished her for rolling her eyes after Lento commented that she had "some anger issues regarding what happened," she neither apologized nor denied what she had done, but said, "Let's just ignore that." (*Id.* at 6, 8.) Even as her supervisors tried to focus her on how she would handle conflict in the future, Varughese kept rehashing the December 8, 2010 incident. (*See, e.g.,* id. at 19.) She repeatedly interrupted her supervisors. (*See, e.g., id.* at 3, 14, 22, 23, 31.) To a listener, she does not come across well.

And still the hospital tried to work with her. An administrator who was present asked Varughese to rewrite her self-reflection, actually read the book and come back in two weeks. (*Id.* at 29.)

> If you can complete these processes and actually do them in the right way not just, okay, I'll read the book, you know, go through the motions. Actually do it the right way and come back to us in two weeks and say yes, I reflected, this is how I could have handled it differently. Really try and look at it from a different perspective. Not just go through the motions. I understand it's an exercise that probably nobody would want to go through, but this is where we are right now and how we're going to address it ... Give us an essay that ... to put aside all of these things and to be creative ... forward thinking.

(*Id.* at 29, 32.)

Varughese was supposed to submit the revised reflection prior to the May 24 follow-up meeting and no later than May 23, 2011. (Final Warning Letter, Docket # 205–7 at 33.)

*Varughese Again Complains about Drinking in the Hospital*
On May 5, 2011, two days after their first meeting, Varughese e-mailed Cordon–Cardo with a host of complaints. (*See* Docket # 205–24 at 47–48, e-mail of May 5, 2011 from Varughese to Cordon–Cardo.) She reiterated her complaint that McCash had discriminated against her because of her sex, and also complained for the first time about retaliation: "It has become apparent to me that the [disciplinary] actions taken thus far have been in retaliation to my complaints of harassment ..." (*Id.* at 48.) Varughese also characterized Lento's treatment of her as "unfair," but in contrast to her accusation that McCash's behavior was "based on gender bias," she did not ascribe that unfair treatment to discrimination or to retaliation. (*Id.*)

**\*22** Varughese also revisited the topic of McCash and Jordan's drinking. This time, she said " 'dementia rounds' ... had never been an issue" (Docket # 205–24 at 44, e-mail of May 5, 2011 from Varughese to Cordon–Cardo.)–an odd thing for her to say, since dementia rounds was exactly what she had been complaining about. Instead, she complained that McCash and Jordan had been drinking while "involved with patient care duties on several evenings including November 23 [2010]." (*Id.*)

This allegation led to yet another internal investigation-conducted in part by Figur of the PWC. The investigation turned up a bottle of Captain Morgan rum on hospital premises. Without finally concluding who brought it, administrators immediately sent a hospital-wide e-mail forbidding anyone from bringing alcohol to work or drinking on hospital grounds. (*See* Johnson Dep. at 133–35.)

*The Second Essay*
Rather than submit her second self-reflection essay by the May 23 deadline, as instructed, Varughese submitted her second essay at the May 24 follow-up meeting. (Defendants' 56.1 at ¶¶ 44–45.)

The second essay was, if possible, less "reflective" than the first. Varughese complained that Defendants' request that she re-write the essay was itself retaliatory. She asserted that, even though she had "apologized for anything that I had done that was not perceived as positive or professional by

Dr. Lento ... I had not done anything except defend myself in a difficult situation." (Self–Reflection Essay # 2, Docket # 205–10 at 8.) She continued to dispute Defendants' version of events on December 8, 2010, accused others of being "unprofessional," unreasonable and "retaliatory," and "stand by my decision[s]" thus far. (*Id.*) There is no suggestion in the essay that Varughese ever did anything inappropriate or that she could have done anything differently. (*See id.*) Rather, reflecting her refusal or inability to understand why she was on Academic Advisement, Varughese stated, "I have been professional throughout." (*Id.* at 9.)

Varughese alleges that, at the May 24, 2011 meeting, Cordon–Cordo instructed her to stop complaining about doctors drinking on the job. (Varughese 56.1 at ¶ 42.1). A verbatim transcript of that meeting and the tape show Dr. Cordon–Cardo telling her that "the best way ... to move on is not with this attitude. You can come here with another attitude and to say ... I'm going to drop all of this nonsense of people drinking ..." (Docket # 205–24 at 40.) Varughese interrupts him to say that those are important matters "that need to be addressed," and Cordon–Cardo responds

> We are addressing these people ... we are taking these matters very seriously today. We ... have a lot of work to do to do ... but at the end of the day it's a program to teach and train people that are excited and passionate about pathology, not that are upset or that have problems ... You can't keep going back and forth ... coming back with new allegations now this person is drinking and now the other person is drinking then no one knows what it's about if you're talking and to be honest with you ...

**\*23**  (*id.* at 40–41.) At that point Varughese interrupted her supervisor with a long rambling speech about matters far afield from her conduct in issue. (*Id.*) [6]

The tape of the May 24, 2011 follow-up meeting is otherwise at variance with Varughese's account that she never engaged in unprofessional behavior. (*See* Docket # 205–24, beginning at 32.) The conversation begins with Varughese alternately speaking indiscernibly and swearing. (*See id.* at 33.) In

response to the question "How are you?" Varughese launches into the following:

> this is rather silly given that I've already written a reflection ... and I apologized for whatever I had done [no apology is reflected in the transcripts of the May 3, 2011 or the May 24, 2011 meetings] ... I even changed my mind as to how I feel regarding everything, but ... You're retaliating against me for making a complaint ... Yeah. I already said I apologized ... Every single time there's a meeting there's something. And I'm supposed to go back and reflect ... What's happened has happened and that's that.

(*Id.* at 32–33.)

Varughese characterized her first essay as describing what she could have done differently in that it describes what she *did.* She appeared not to comprehend that she was supposed to identify things she should not have done or things did *not* do that she could and perhaps should have done. (*Id.* at 35–36.)

The essay ends with an apology, "if I ... offended anyone else in any way, shape or form." (*Id.* at 40.)

*Varughese's Job Performance Continues to be Problematic*
During May and June 2011, Varughese alleges that she was still actively working on various rotations, analyzing patients' slides for diagnosis, teaching medical students, and otherwise doing her job. (Varughese 56.1 at ¶ 43.2.)

Her supervisors did not see it that way. In the hours following the morning meeting of May 24, 2011, Chief Resident Elizabeth Morency (an African American woman) wrote to Cordon–Cardo regarding "the ongoing problems we have been having with Leena Varughese." (Docket # 205–24 at 71–72, e-mail of May 24, 2011 from Elizabeth Morency to Cordon–Cardo.) She described Varughese's getting into arguments with Physicians' Assistants ("P.A.s"), in which she demanded that those P.A.s do more of her work in the grossing room. (*Id.*) "These disagreements have been escalating in the past couple of days and I had to stop grossing

myself to help diffuse a disagreement between [a P.A.] and Leena this afternoon ... that was witnessed by several other residents and was completely unfounded." (*Id.*) After the argument, Morency related that Varughese left early, leaving work undone. (*Id.*) At her deposition, Morency testified that Varughese, "raised her voice and w[as] disproportionally angry to the situation at hand and ... [was] not calm and it was over grossing a specimen. It just seemed over the top." (Morency Dep. at 54.)

 **\*24**  While Cordon–Cardo explained that Varughese had had a stressful morning (i.e. meeting with him), Morency went on that this was "just one example of an issue that has come up in the past couple of weeks." (*Id.* at 72.) She asked for a meeting "to discuss Leena's increasingly erratic behavior and her future in our program. I am becoming increasingly concerned, not only for [Varughese's] well-being, but for the well-being and morale of the other residents and PAs that are also affected by her behavior." (*Id.*)

After her outbursts, Lento asked several people to help Varughese with her work so that she could get "back on track." (*See* Docket # 205–24 at 82–83, e-mail chain of May 26, 2011.) It seemed to work; with assistance, one supervisor found Varughese to have shown "SIGNIFICANT improvement." (Docket # 205–24 at 93, e-mail of Jun. 2, 2011 from Kalir to Lento.)

Nevertheless, Varughese continued to have difficulties through June 2011. To be fair, she was not the only one; several people in Varughese's program were behind in their work. A white female resident had "about 15 cases from the middle to end of May that ha[d] yet to be signed out. Last week [a male resident of Asian descent] had 6 placentas that were 3 weeks late." (Docket # 205–11 at 17, e-mail of Jun. 10, 2011 from Jordan to Lento, Bleiweiss and Morency.) Jordan was having trouble completing her responsibilities-a supervisor had to "ask[ ] her to let [the supervisor] know when she is required elsewhere, so we can try and make provisions in her absence." (Docket # 205–11 at 18, e-mail of Jun. 13, 2011 from Kalir to Lento.)

Varughese's issues, however, were more intractable than others'. (*See* Tiger–Paillex Dep. at 105–106.) At some point in June, Cordon–Cardo asked whether they could hold Varughese accountable for failing to make certain data entries. (*Id.*) Tiger–Paillex asked whether others had the same issue and were going to be held accountable as well. (*Id.*) In the end, Tiger–Paillex concluded that Varughese was in a different situation from the othr residents, because she submitted her data entries later than everyone else. (*Id.* at 109.)

*Varughese Retains Counsel*
On June 10, 2011, Varughese's newly-retained counsel wrote a letter to Tiger–Paillex, advising her "that this firm has been retained ... to prosecute claims of sex/ gender discrimination, perceived disability discrimination, and retaliation in violation of the [sic] Title VII ... the [NYSHRL] and the [NYCHRL] ... during [Varughese's] employment ... her supervisor Samuel McCash verbally and physically intimidated her ..." and referencing Varughese's April complaint as the first time she had complained about gender discrimination. (*See* Docket # 205–10 at 12.)

It is worth noting that counsel did not advance any race discrimination claim.

Counsel demanded a response by July 6, 2011, failing which it would take legal action. (*Id.*) The record does not contain any evidence of a response directed to counsel.

*Final Warning and the Supervision of Defendant Firpo*
 **\*25**  The Department issued Varughese a Final Warning letter on July 15, 2011. (Docket # 205–7 at 32 (it is dated July 1, 2011, but Varughese actually received it on July 15).) The Warning was:

> To inform you of the Department's decision to issue this final warning to you. This decision stems from your failure to fulfill the requirements of your December 21, 2010 Academic Advisement and your behavior at the follow up meeting on May 24, 2011.

The Academic Advisement required you:

(1) To prepare a written self-reflection by January 18, 2011

(2) To meet with [Lento] periodically to assess your progress

(3) To read [the book]

Throughout the period of Academic Advisement you showed a pattern of lack of professionalism. First, you submitted your self-reflection ... long after it was due, and, once submitted, the essay did not meet the Advisement's requirements. When I asked you on March 22, 2011 when you would be submitting the essay, you responded that you were 'really swamped' that week, did not know when you would have time to write the reflection, and asked to submit it the following week. You did not hand in the essay until March 30, 2011.

Although the Academic Advisement required a self-reflection on 'how you could have approached things in a better fashion, including commentary on physician professionalism and its role in this circumstance,' your essay contains nothing resembling self-reflection. Instead, it is a lengthy recitation of the events that led to the Academic Advisement and various ways in which you feel that you were wronged. Remarkably, it ends with a wish for mediation and an apology regarding these long-past events. There is no discussion of physician professionalism or its relevance to the situation. Your essay reflects a lack of insight into your own behavior, a failure to understand the role of physician professionalism-regardless of how others behave-or the impact of your behavior on those around you. You have utterly failed this exercise.

Second, you failed to meet with me as required by the Advisement. On February 17, 2011, I emailed you that we 'need' to meet on the following day and asked that you propose potential times. Your email response to me indicated you could meet at 5:30 p.m. on February 18, 2011. On the day in question, you did not show up to the meeting or contact me to let me know that you would not be coming. When I questioned this, you said that I did not confirm the time. Despite this purported 'miscommunication,' you made no effort to contact me-your supervisor-to clarify any misunderstanding regarding whether we were meeting.

Dr. Carlos Cordon–Cardo ... was new to the Department and had not been involved in the earlier discussions with you. After reviewing the self-reflection you submitted and also determining that it did not meet expectations, Dr. Cordon–Cardo decided to give you a second chance to fulfill the requirements of the Academic Advisement. On Tuesday, May 24, 2011, you attended a scheduled follow-up meeting ... When the meeting was confirmed by email on May 9, 2011, you were instructed to submit a revised reflection prior to the meeting and no later than May 23, 2011. The purpose of this meeting was, in part, to give you the opportunity to meet your new Department Chair and to establish that you were able to meet the Department's professionalism expectations. Despite being given this fresh opportunity, you did not provide a revised reflection before the meeting as requested. Rather, you submitted it a day late, at the start of the meeting. When Dr. Cordon–Cardo asked if you read the book assigned to you, you cavalierly tossed the book on the table at him [Varughese disputes this fact], and continued to be flippant and disrespectful throughout this meeting.

**\*26** During the Academic Advisement period and again at the follow up meeting, your behavior reflected a lack of insight and a failure to appreciate the need to function within a hierarchy. We are, therefore, compelled to issue this formal notice of disciplinary warning that any recurrence of unprofessional behavior may result in further disciplinary action, up to and including your dismissal from the Program. You are expected to act at all times in a manner appropriate to your position as a house staff officer. If you have issues of concern, you may utilize any of the many mechanisms available to house staff to bring complaints, but you must behave in a professional manner.

You will be required to meet biweekly for three months with Dr. Adolfo Firpo, Director for Educational Activities, to review your performance. The purpose of this review is to provide guidance and to assess your improvement. These meetings will include discussion of feedback received from faculty, residents, and staff.

You have a right to appeal this disciplinary action by requesting, in writing, a hearing before the House Staff Affairs Committee of the Medical Board within ten days of receiving this notice. [It provides an address to which to send the request.] If you do not appeal this action, it will become final at the end of the appeal period.

(Docket # 205–7 at 32–34.)

Varughese did not appeal the Final Warning.

Firpo, the doctor with whom she would now be required to meet, was new to the institution. Once again, Varughese had a chance to make a fresh start.

*Varughese's Performance Problems in August 2011*

When Varughese began a two-week rotation in the Cytogenetics lab in August 2011, she allegedly caused "the

worst teaching experience" in the thirty-year career of her supervisor, Dr. Vesna Najfeld. (Najfeld Decl., Docket # 164 at ¶ 19). Najfeld is a woman; the record does not reveal her race or national origin.

Some of the underlying facts are contested, but Varughese does not dispute that she could not be reached when she was supposed to be available, and that she refused to provide coverage for her colleagues even when she was available to do so. (Najfeld Deck, Docket # 164 at ¶ 17; Varughese Dep. at 465.) Varughese used her blackberry while Najfeld was teaching (Varughese says she was taking notes), but when Najfeld asked that Varughese stop using the blackberry, Varughese admits that she disobeyed. (Varughese Dep. at 417.)

Varughese failed to complete some assignments in that rotation (Najfeld Deck, Docket # 164 at ¶ 16), and performed poorly on others. The straw that broke the camel's back for Najfeld was one particular assignment: Varughese was told to make a presentation to her colleagues and other physicians on a particular form of leukemia. Najfeld told plaintiff to provide her with the slides for the presentation in advance, so she could review them. Varughese waited until 4 p.m. on the day before the scheduled presentation to e-mail the slides to Najfeld. (*Id.* at ¶¶ 4–12). Najfeld e-mailed her back five minutes later that there were "major problems" with the presentation, asking that Varughese call her "a.s.a.p." (*Id.*) But Varughese did not check her e-mail before leaving campus, so she did not see Najfeld's response, until she got home (an hour away from the hospital), where she could do nothing to fix her presentation. (Varughese Dep. at 380–84.)

 **\*27**  When she finally called Najfeld, Varughese was directed to "Please send an e-mail that the conference will not be held." (*Id.*) Varughese took that to mean that she should e-mail Najfeld to confirm that she would not be presenting. But that was silly; Najfeld already knew the conference would not be held, because she had decided to cancel it. Najfeld obviously wanted Varughese to e-mail the attendees of the conference to ensure that no one would show up for a presentation that had been cancelled. (*Id.* at 392.) Needless to say, Varughese did not notify other conference attendees of the cancellation; as a result, people showed up for the canceled conference early the next morning when they need not have shown up at all. (Defendants' 56.1 at ¶ 62.)

At her deposition, Varughese blamed everything on Najfeld. She complained that Najfeld should have called or paged Varughese in addition to e-mailing her. (*Id.* at 384.) Varughese also claimed to be "shock[ed]" that Najfeld did not "explain herself in the first email by giving reasons as to why the presentation was inadequate, rather than asking Varughese to call her. (*Id.*)

During the same period, Varughese was insubordinate towards now-Chief Resident Jordan. On August 4, 2011, Varughese refused a coverage assignment. She claimed to be injured, but refused to provide a doctor's note. (Termination Letter of Sept. 21, 2011, Docket # 205–7 at 37.) On August 12, 2011, Varughese ignored page after page from Jordan and Lento. (Termination Letter of Sept. 21, 2011, Docket # 205–7 at 38.) Ultimately, Lento was able to reach her only by calling Najfeld and asking Najfeld to bring Varughese to the phone so that he could speak with her. (*Id.*) Although Lento instructed Varughese to contact Jordan, she did not do so. (*Id.*)

At her deposition, Varughese admitted that, when Jordan asked her to confirm that she would provide coverage on that day, she did not respond, saying it was because she "did not have time." (Varughese Dep. at 465–66.) She also complained that asking her to confirm coverage was "outrageous," "a travesty" and "harassment." (*Id.*)

At her deposition, Varughese maintained that her behavior during the rotation with Najfeld was completely professional, and that she had done nothing untoward. (Varughese Dep. at 625–26.)

*Transfer Request*

Scheduling residents' various rotations was no small feat, requiring complex coordination among multiple departments. The schedule depended in part on residents' requests. Residents were responsible for ensuring that they had sufficiently broad and deep experience to graduate in a timely fashion.

For her October 2011 rotation, Varughese initially requested a rotation in GI Pathology. She apparently submitted this request before a July cut-off date. (The reader will recall that July was the beginning of Mount Sinai's academic year.)

The overall schedule was then finalized.

 **\*28**  After the schedule was finalized, Varughese changed her mind. She asked instead to be allowed to do a

Dermatophatology rotation. She spoke to Firpo about her request, and he said he would see what he could do.

Firpo did follow up for Varughese, but the request required Firpo to go through several steps, including assessing its "possible impact on the existing schedule." (Jul. 13, 2011 e-mail from Firpo to Morency, Jordan et al., Docket # 205–17 at 19–20.) Even in July, Firpo described the request as "very late and [thus] ... in violation of the established policy." (*Id.* at 20.) Then again, Firpo described Varughese's request as having a "minor impact on the overall program" to a supervisor in the rotation that Varughese wanted to switch into, and that supervisor in return wrote to Firpo that Varughese would be welcome in the rotation. (E-mail Chain of Aug. 4, 2011 and Aug. 9, 2011, Docket # 205–28 at 3.)

Apparently, there were more problems with scheduling than Firpo anticipated in August. Varughese's scheduled roration "coincided with necessary coverage ... and alternative coverage could not be identified." (Termination Letter of Sept. 21, 2011, Docket # 205–7 at 38.) While Firpo apparently went to bat for Varughese and tried to get her a scheduling change, it was too late to get another resident to cover Varughese's scheduled rotation, and a first-year resident's illness and associated absence made scheduling even tighter. (*See* e-mail chain of Aug. 24, 2011, Docket # 205–27 at 171.) Moreover, while Varughese apparently told Firpo that another resident, Mabel Ko, had agreed to switch rotations with her, Ko denied that that she had agreed to the switch-she had already completed the rotation that Varughese wanted her to cover. (*See* Ko e-mail to Firpo of Sept. 7, 2011, Docket # 167–1 at 3.)

According to Firpo, when he told Varughese on September 7, 2011, that her transfer request had been denied, she became irate and accusatory, and continued to complain and seek a rotation change through late September. (Termination Letter of Sept. 21, 2011, Docket # 205–7 at 38–39.) No matter what Firpo told her, Varughese went to others to renew her transfer request, fired off several e-mails, and complained to Associate Director of Graduate Medical Education Scott Barnett at a September 12, 2011 meeting. (*See* Transcript of Sept. 12, 2011 Conversation, Docket # 205–28 at 35.)

*Varughese's Poor Record of Attendance and Failures at Remediation*

In August 2011, Varughese was notified that she was failing to meet the hospital's attendance requirement for educational conferences. (Defendants' 56.1 at ¶¶ 91–92.) The hospital

required residents to be present at 80% of weekly conferences on different subjects relevant to their chosen discipline. Firpo had told Varughese that she should attend conferences that interested her. Varughese claims to have understood this to mean that she only need attend 80% of the conferences that interested her, rather than attending 80% of all conferences, with her choices of what to eliminate being guided by her interests. (Varughese Dep. at 495.)

**\*29** In keeping with the Pathology Department's policy for residents who fell behind in conference attendance, Morency told Varughese on August 29, 2011, that plaintiff would have to present a lecture at the conference scheduled for September 14, 2011. (Defendants' 56.1 at ¶ 93.)

From then on, it appeared to Morency that Varughese "just seemed increasingly agitated, and, to some degree, unstable and unpredictable." (Morency Dep. at 51.) These impressions came from Morency's observations of Varughese getting into "altercations" "in the residents' room, in the gross room[; Varughese] just didn't seem to get along with people in general." (*Id.* at 65.) By September 2011, Morency wrote to her supervisors that simply having Varughese around was "emotionally taxing." (*Id.* at 167.) At her deposition, she explained that, "having to deal with a resident who continually is unprofessional, unreliable, erratic at best, can be emotionally taxing when nothing is being done about it." (*Id.*)

On September 12, 2011, Varughese met with Scott Barnett, the Associate Director of Graduate Medical Education to complain about her treatment and ask for the same transfer that Firpo had already told her would not be granted. Varughese told Barnett, in essence, that everyone who had ever criticized her had been wrong and unfair. (*See generally* Transcript of Sept. 12, 2011 conversation, Docket # 205–28 at 35–112.) She ascribed the unfairness to petty politicking rather than to discrimination. And she continued with her fixation on the December 8 incident, which she would not view as closed until the Hospital came around to her point of view about what had occurred. For example, she complained that her relationship with Lento had deteriorated after she gave Lento a negative evaluation. Lento "wouldn't discuss the whole incident [the December 8 incident] with Sam. And [Lento]'s like, oh, I'll speak to [McCash]. And then [Lento] said, oh, well, you know, that's too bad because why would you write a diatribe of an evaluation against surgical pathology rotation here?" (*Id.* at 82.)

While they were discussing her two inadequate self-reflective essays, Varughese alleges that Barnett asked "how dare you write that shit?" (Varughese 56.1 at ¶ 34.1.) The tape of that conversation-and its transcript-reveals that her memory is not accurate. (*See* Docket # 205–28 at 35–112.) In fact, Barnett said this about Varughese's self-reflections:

> If one of my kids were to read that, I would have screamed at them, how dare you write that? How dare you write that? It was one-sided. It was not an attempt in any way to address the program's concern[ ] ... It was a rehashing of issues that they were trying to put behind you. And it was not-my mind that was not a good faith attempt to do what they were asking you to do. And, basically, you got pissed off and you just threw some shit against the wall and hoped it would stick. That's what it was.

**\*30**  (Transcribed Conversation of Sept. 12, 2011 at 58, Docket # 205–28 at 64.)

On September 13, the day before her scheduled presentation, Varughese called in sick. That afternoon, she had a conversation with Jordan about the next day's scheduled presentation. When told that she really did have to present at a make-up conference, Varughese responded that she did not "feel well, won't be able to present tomorrow." Jordan, hoping to avoid a repeat of the cancelled Najfeld conference, notified others who were supposed to be in attendance that Varughese would "be out sick tomorrow." Varughese took great offense at this, emailing Jordan, "Why are you stating that I will be calling out tomorrow?" (*See* Docket # 205–29 at 30–32, e-mail chain of Sept. 13, 2011.) Jordan was unnerved by Varughese's response, especially as plaintiff did in fact call in sick on September 14, 2011. (Docket # 205–29 at 80, e-mail of Sept. 14, 2011.) (Defendants' 56.1 at ¶¶ 95–96.) Jordan e-mailed Firpo to say that she was "terrified to be at work right now" and was "afraid that at any moment [Varughese] will lash out at me or worse, hurt me or the residents around me." (Docket # 205–29 at 51, e-mail of Sept. 14, 2011.)

The cancelled conference was rescheduled for September 15. The program instructed Varughese to provide proof that she had in fact been sick on September 13 and 14, the days when she had called in sick. She failed to provide any proof. (Termination Letter of Sept. 21, 2011, Docket # 205–7 at 39.) Varughese does not contend otherwise, but alleges that unidentified "others" were not required to bring doctors' notes for absences. (*See* Varughese 56.1 at ¶¶ 74.1–74.3.) There appears to be some disagreement among Mount Sinai's witnesses about the hospital's policy on providing doctor's notes to confirm illness,[7] but whatever the policy in the ordinary course, it is undisputed that Varughese failed to comply with a direct order from a supervisor. Furthermore, the fact that she was still on Academic Advisement, and that she called out sick on a day when she was required to make a presentation-itself a make-up for a presentation for her previous failures to attend educational conferences-place her is a different category than a resident who had no special professional obligations on a day when she called in sick.

### *Varughese Fails to Make Her Presentation and Inquires About Taking FMLA Leave*

Varughese did come to work on September 15, but she arrived late to the conference and she did not make her presentation. She stayed for fifteen minutes, left without giving her lecture, and did not return until everyone else had gone. (Defendants' 56.1 at ¶ 97.)

Bleiweiss, who was at the conference that morning, could not "recall ever having a[nother] situation where someone who was scheduled to present just simply walked out without saying a word, without any explanation or apology." (Bleiweiss Dep. at 90.)

Varughese has offered two excuses for her absence at various times. At her administrative appeal following her termination from the residency program, she said that she "never agreed" to give the lecture. (Transcript of Internal Appeal at 160–61, Docket # 205–31 at 47.) At her deposition, she claimed that she had had a stomach virus. (Varughese Dep. at 540.)

**\*31**  On the afternoon of September 15, Firpo and Patel met with Varughese to discuss her latest vanishing act. Varughese raised the issue of taking FMLA leave. According to Firpo, Varughese told Firpo she felt overwhelmed and unable to concentrate or do any work. (Defendants' 56.1 at ¶¶ 99–101.) Patel thought Varughese "didn't seem like herself ... depressed, kind of ... out of it." (Patel Dep. at 68.) Varughese told Patel that "she didn't feel like herself, and she didn't feel like she could perform the tasks at hand." (Patel Dep. at 70.)

Varughese actually contends that this meeting did not occur, and now claims that she had no such concerns about her health or ability to work. (Varughese 56.1 at 100.4–100.5.) She admits, however, that she asked about the possibility of taking FMLA leave and that Patel discussed the issue with her. (Defendants' 56.1 at ¶¶ 102–104.)

At the end of the day on September 15, Varughese told Firpo that she wanted to continue working until she could be assessed by a doctor. (Termination Letter of Sept. 21, 2011, Docket # 205–7 at 39.) She said that she had a doctor's appointment the next day. (*Id.*)

In view of her behavior over the preceding few days, Varughese's suggestion was not acceptable to the Hospital. On September 16, Firpo e-mailed Varughese and directed her not return to work until the issue of FMLA leave was resolved. (Termination Letter of Sept. 21, 2011, Docket # 205–7 at 39.)

Over the next few days, administrators repeatedly tried to contact Varughese to ask about her health and also to inquire whether she would be making a formal request to take FMLA leave. Varughese did not respond to any of these inquiries.

Varughese disregarded Firpo's written directive not to come to work; she came to work on September 16 and 19. (Defendants' 56.1 at ¶ 106.) She felt free to ignore a direct order not to come in because she was dissatisfied with the Hospital's reason for telling her to stay home:

> because it was completely opposite of the day before and I did not know what the-what the issue was here. It was not really explained to me ... It seems very irregular.
>
> Q. Whether it was irregular, whether you understood why, I take it you understood that he told you not to come back to work.
>
> A: Well, I'm a contracted employee. He has to provide me with a logical explanation as to why.

(Varughese Dep. at 563–64.)

*Varughese Rifles Through an Administrator's Files*
On September 20, 2011, Varughese-in defiance of two direct orders from her supervisors (one to provide a doctor's note and one to remain at home until the leave issue, which she had raised, was resolved)-decided to report for work. She stopped into a Starbucks on her way to work. (*See* Termination Letter

of Sept. 21, 2011, Docket # 205–7 at 40.) Administrator Shema Patel (a woman of Indian descent, like Varughese) and her husband happened to be there. Varughese alleges that Patel was stalking her on behalf of the Hospital: her Rule 56.1 Statement says, "The Defendant Institution utilized Patel to confront me and stalk me because she was a woman of Indian descent, and I cannot ascribe Patel's presence at Starbucks on 96 th and Lexington as an innocent coincidence with her husband in tow." (Varughese 56.1 at ¶ 107.1). Varughese offers no evidence to suggest that Patel had any way of knowing that Varughese would be in the Starbucks at 96 th and Lexington at that precise moment, or otherwise to support this wholly conclusory allegation; Patel was deposed when Varughese still had counsel. Not surprisingly, counsel did not raise or otherwise explore Varughese's current stalking theory, but Patel simply testified that she was at the Starbucks with her husband when Varughese approached her. (Patel Dep. at 96.)

**\*32** Patel knew that Varughese was not supposed to be at work until she provided a doctor's note. When Varughese said she was on her way to the hospital, Patel told Varughese to come to her office. (Defendants' 56.1 at ¶¶ 107–109.)

Shortly after they arrived, Patel was called away. She left Varughese alone in her office. (Defendants' 56.1 at ¶¶ 113.) When Patel returned, she saw Varughese looking through a file on her desk labeled "Pathology." (Defendants' 56.1 at ¶ 114). When the supervisor told Varughese the files were confidential and asked her to explain herself, Varughese asked, "What's the big deal?" and told her to "chill out." (Defendants' 56.1 at ¶¶ 115–116.)

At her deposition, Varughese admitted (reluctantly, and only after repeated questioning) that she had in fact looked at a file on Patel's desk while Patel was absent from the room:

> Q. Were there files on Ms. Patel's desk?
>
> A. No, there were no files.
>
> Q. Was there anything on Ms. Patel's desk?
>
> A. There was one folder, I believe.
>
> Q. And while Ms. Patel was out of the office did you look through that folder?
>
> A. I picked it up, but I didn't really look through it.
>
> Q. Did you open it?

A. Yes.

Q. Did you look through the pages?

A. Yes.

(Varughese Dep. at 581–82.) While admitting what she did, Varughese tried to minimize her conduct at deposition and currently characterizes what she did as a "mistake." She claims to have believed that the folder was her own. (Varughese 56.1 at ¶ 113–115.)

Varughese was then shepherded into Tiger–Paillex' office. She recorded the ensuing conversation and the Court has heard the tape. After talking through the still unresolved leave issue and making sure Varughese knew she would have to see the PWC again, Tiger–Paillex asked Varughese what had happened in Patel's office. Plaintiff refused to respond, saying, "I don't have anything to say about that." Varughese then accused Patel of simply "assuming" that Varughese had snooped into her files; when Tiger–Paillex told Varughese that there was no assumption, that Patel personally observed Varughese looking through the file-"there is a witness and [Patel] is the witness-Varughese told Tiger–Paillex that Patel should not have left someone alone in her office if confidential files were in the office. (Termination Letter of Sept. 21, 2011, Docket # 205–7 at 40–41.) Once again, the problem was of someone else's making, not hers.

No other resident has been caught rifling through an administrator's confidential files. (Cordon–Cardo Dep. at 220.)

*Varughese's Termination from the Residency Program*
Varughese was summarily terminated the next day.

Varughese was handed a termination letter (Docket # 205–7, beginning at 36). It explained that the Hospital was terminating her: "because your performance and conduct have been unacceptable and your continued presence in the Program is a risk to the Hospital and its patients." (*Id.*) The letter referred to the behavior recounted in the July 1 Final Warning and then went on to say, "[S]ince the final warning was issued, you have continued to demonstrate unprofessional behavior." (*Id.*) The next four pages recount the various performance and professionalism issues that had arisen in just the previous six weeks. (*Id.* at 37–40.)

*33 The letter concluded by noting that Varughese had "exercised extremely poor judgment in accessing Ms. Patel's file [and] lied several times when questioned about it." (*Id.* at 40.)

*Internal Appeal to the House Staff Affairs Committee*
As was her right, Varughese appealed her termination to the Mount Sinai School of Medicine House Staff Affairs Committee (the "Staff Affairs Committee") within ten days of receiving the termination letter.

Under Hospital rules, Varughese was permitted to review which Committee members would hear her appeal and to ask that members be removed from her panel. She challenged several members and they were removed from the panel at her request. (Varughese Dep. at 639–40.)

The Staff Affairs Committee held an appeal hearing regarding Varughese's termination on November 14, 2011. (*See generally,* Transcript of Internal Appeal at 284, Docket # 205–31 at 7–94.) It heard sworn testimony from seven physicians and three administrators, including Varughese. Varughese had the opportunity to cross-examine all witnesses, to present her own witnesses, to submit exhibits, and to make opening and closing statements. She was permitted to bring a friend with her, a practicing pathologist at a different hospital. While a lawyer for the hospital was present, Dr. Firpo, not counsel, presented the Department's case.

At the hearing, Varughese steadfastly maintained that she had done nothing wrong. Regarding her self-reflection essays, she testified that, "the reflection does accurately reflect what happened" on December 8, and also said it "accurately reflected with appropriate amount of insight [sic]." (*Id.* at 78.) She argued that her "defensive tone" was "necessitated" by "the actions taken against me instead of some acknowledgment and mediation." (*Id.*)

This defensiveness continued at the hearing. For example, Varughese cross-examined Jordan about why Jordan had forwarded Varughese's e-mail that Varughese would be out on the morning of September 13, 2011, asking: "Why did you state I was not presenting? I mean why did you state that I would not come into work?" (*Id.* at 43.) Then, in a comment addressed to the panel hearing her appeal, Varughese complained that Jordan "calls out sick for me on my behalf, how rude and obnoxious is that?" (*Id.* at 144), and, addressing Jordan, "Do you think you're warranted to call out

for me? ... To make a statement for me on my behalf, as the Chief Resident?" (*Id.* at 145.)

Regarding her decision to defy instructions to stay home until a doctor declared her fit for duty, she acknowledged that several supervisors and HR representatives "all sent me e-mails, left voice mails and so on stating that their sentiment regarding my right to be at work is that I do not have the right to be at work." (*Id.* at 84.) Nevertheless, "In this particular circumstance [she] felt the best course of action for me was to follow hospital policy and be present at work." (*Id.*)

**\*34** On the question of opening Ms. Patel's files, she alleged neither that it was a mistake (as she does in her sworn submissions to the Court, *see* Varughese 56.1 at ¶ 111.2), nor that she thought the file was her own (as she did at her deposition, *see supra*), but rather that "as I waited there, there was a folder on her desk next to where I placed my coffee which I leafed through with no ulterior motive." (Docket # 205–31 at 85.) Given the opportunity to cross-examine Patel at the hearing, Varughese asked her whether it was "appropriate" to leave people alone in her office "when you have confidential documentation or documents in your office." (*Id.* at 60.) She went on to state that, when Patel came back into the office and admonished her for looking through the file, "I was once again bewildered by the incongruency of the situation," (*Id.* at 85)—"incongruency" that she obviously did not believe was her fault.

When Varughese said that she wanted to conclude the hearing, she was asked if she had "any objection to the proceedings that took place today, anything that the conduct of this hearing that you want to put on the record?" (*Id.* at 91.) She responded "no." (*Id.*) [8]

The Staff Affairs Committee issued its post-hearing decision on December 2, 2011. (Defendants' 56.1 at ¶¶ 118–121; Letter of Dec. 2, 2011, Docket # 205–7 at 43). It found "that there is ample evidence to demonstrate that the [termination] ... was not arbitrary and capricious." (Findings and Conclusions of the Staff Affairs Committee, Docket # 205–7 at 46.)

It found that the "underlying facts" set forth in the September 21, 2011 Termination letter

> were clearly established by the Department with testimony and documentary evidence. For example, Dr. Vesna Najfeld ... testified ... and confirmed ... facts ... including Dr. Varughese's inadequate responses concerning her

case conference presentation, her absenteeism, and her unprofessional interactions with faculty and staff ... Dr. Jordan ... and Dr. Lento ... testified to the facts set forth in the September 21, 2011 letter concerning coverage ... Lento, in particular, described a pattern of non-responsiveness to emails and pages that he sent to Dr. Varughese ... ("One of the difficulties that I have had with Leena is she virtually never responded to my pages and infrequently responded to my e-mails.") ...

The Committee finds Dr. Varughese's presentation unpersuasive. She took issue with virtually every witness who testified and in some instances questioned their authority to make the decisions they did. Yet the testimony and evidence clearly demonstrate a continuing pattern of unprofessional conduct in the face of a final warning that put her on notice that further incidents of unprofessional conduct could lead to her dismissal. It is clear to the Committee that Dr. Varughese lacks insight into her behavior and her role as a resident in the Department as evidenced by the extensive testimony and documents presented to the Committee. Indeed, at the conclusion of the hearing, *Dr. Rocco, one of the two residents on the Committee, asked Dr. Varughese: 'Do you take responsibility or do you feel remorse involving any of the things that you 've talked about ... ? Dr. Varughese's response was argumentative and she never acknowledged responsibility for any of the events as to which there was ample testimony and evidence.*

**\*35** It is also clear from the testimony and other evidence that the Department gave Dr. Varughese multiple opportunities to correct her behavior and to become a constructive part of the Department's residency program ... Unfortunately ... Dr. Varughese's lack of insight into her behavior was such that she was unable to make the constructive changes to her behavior needed to fulfill her responsibilities ...

In sum ... based on the testimony and evidence presented, the Committee unanimously finds and concludes that the Department's actions to suspend and terminate Dr. Varughese from the Pathology Residency Program were clearly supported by the testimony and other evidence.

(*Id.* at 48–50 (emphasis added).)

### Internal Appeal to Mount Sinai's Appeal Committee

Varughese took another appeal, to Mount Sinai's Appeal Committee. (*See* Defendants' 56.1 at 122–124.) The Appeal

Committee was made up of three senior faculty members, including the Chief Medical Officer and Senior Vice President for Medical Affairs. (*Id.*)

On March 7, 2012, the Appeal Committee upheld the Staff Affairs Committee's determination. (*See* Letter and Decision of Mar. 7, 2012, Docket # 205–8.)

The Committee emphasized that *any* impairment of a Pathology resident can present a significant danger to patients. In its final determination upholding Varughese's termination, Mount Sinai's Appeal Committee wrote that:

> The Pathology Department at Mount Sinai is the largest in any single comparable academic institution in New York City. Pathology residents are given a great deal of responsibility. Though attending physicians supervise residents, the need for skilled performances by residents cannot be overemphasized ... A physician who ... displays physical signs of impairment to a degree that others fear for the physician's wellness ... clearly should not be charged with such critical responsibilities.

(Final Appeal Decision, Docket # 205–8 at 11.)

The Appeal Committee reviewed the transcript of Varughese's initial hearing and all of the exhibits submitted. On the basis of that review, it found fault with Varughese's behavior outright. For example, it found that Varughese "was argumentative with Dr. Jordan ... [and] unwilling[ ] to accept instructions from those in positions of authority;" and that she "intentionally ignored ... instructions." (Docket # 205–8 at 7.) It explained why Varughese's radio silence in response to coverage requests was so problematic, and why her refusal to acknowledge wrongdoing regarding that issue was so baffling:

> Dr. Varughese's claim that her lack of response [to a request for coverage] signified that she affirmatively agreed

to cover and that she did not have to respond to emails that simply stated facts is incomprehensible. Dr. Jordan could, under no circumstances, make an assumption that Dr. Varughese would cover surgical service and patient safety and care would be preserved. Patient care could not be left to supposition. The chaos that resulted from Dr. Varughese's inaction is clear from the numerous emails.

**\*36** (*Id.* at 8.) The Appeal Committee further found that Varughese tried to "subvert[ ] Dr.s Lento and Firpo" by repeatedly going to others to try to get a rotation change (*id.* at 8), and that these actions were "insubordinate." (*Id.*) It found Varughese's communications to Jordan and Morency regarding the remedial presentation to be "argumentative" and to have "challeng[ed] the authority of her Chief Residents." (*Id.* at 9.) Varughese's "continued insistence that Dr. Firpo exempted her from the 80% conference attendance policy, her refusal to adhere to departmental attendance policy, her failure to respond to and recognize the authority of her chief Residents, her refusal to present on a[ ] topic from a list selected by her Chief Residents, and her departure from the September 15 conference without presenting or saying a word to anyone ... among other actions, clearly indigate that Dr. Varughese has an issue with authority and an inability to abide by the rules." (*Id.* at 9–10.) Regarding Varughese's behavior on September 15, "Varughese herself admitted at the time that she was unable to work and indicated that she may need to take a leave. The fact that she lacked and continues to lack insight that her impairment could have posed a risk to others in the work environment, including patients, is extremely problematic." (*Id.* at 11.) It found that Varughese's blaming Patel for leaving her alone with confidential files "showed that [Varughese] continued to fail to grasp the inherent wrongness of her actions." (*Id.* at 12.)

In sum, the Appeal Committee, which reviews Staff Affairs Committee findings to ensure that they have a "reasonable basis," found that there was indeed a reasonable basis for the Staff Affairs Committee's finding that firing Varughese was neither arbitrary nor capricious. (*Id.* at 13–14.)

Mount Sinai subsequently gave Varughese a final "summative evaluation," a standard document within the world of graduate medical education, which marked her as

"unsatisfactory" in three of six categories (professionalism, interpersonal and communication skills, and patient care). She was assessed as not ready to practice without supervision. The document stated that Varughese had been promising in her first two years but that, in her third, her supervisors had found her performance to be "substandard" "unprofessional" and "unsatisfactory." (Docket # 162–6 at 39–40.)

There is no evidence whatever that the final summative evaluation was ever provided to anyone except Varughese herself. There is absolutely no evidence that Mount Sinai ever provided it to any potential employer. It was shown to a witness, Dr. Fyfe of Robert Wood Johnson Hospital, at a deposition in this case.

*Varughese's Job Search*

Meanwhile, Varughese-armed with support from Mount Sinai attending Tamara Kalir—had been looking for other employment. She actually secured an offer from Robert Wood Johnson Hospital ("RWJ") in New Jersey on January 31, 2012. (Varughese 56.1 at ¶ 1.4.) That offer was contingent on Mount Sinai's verification of certain records. A Dr. Fyfe of RWJ contacted Lento to request them. The administrative appeals were still pending, so Lento explained that he was unable to provide RWJ with any documentation at that time, because Varughese had "legal proceedings" ongoing with the hospital.

**\*37** By the time Varughese's appeal concluded in March 2012, RWJ had hired another candidate. Dr. Fyfe considered the person hired to be less academically qualified than Varughese

At her deposition, Dr. Fyfe testified that she still might have offered Varughese the job, even if she received a bad report from Mount Sinai. In light of Dr. Kalir's recommendation, Dr. Fyfe thought further investigation would have been required. "In looking at [the summative evaluation for the first time at her deposition], I know that my first response would have been to try to get a little bit more information ... any specifics. These are general ... I would like ... to try to find out more of what was actually going on." (Fyfe Dep. at 48–49.)

The interim chair of RWJ's Department of Pathology and Laboratory Medicine, a Dr. Cadoff, only recalls that, "there were some kind of discussions because there was a reason that Dr. Varughese was leaving Mount Sinai that had to do with something at Mount Sinai. That's as much as I knew at the time." (Cadoff Dep. at 22.)

Varughese filed this lawsuit on December 4, 2012.

### III. The Complaint

Varughese's Second Amended Complaint (Docket # 66) includes 21 counts.

Varughese alleges that Defendants discriminated against her on account of her sex and her race and/or national origin in Counts 1, 2, 5, 6, 9, 10 and 18. These counts invoke the New York City Human Rights Law, New York State Human Rights Law, Title VII, and § 1981.

Varughese alleges that she suffered a hostile work environment on account of her race and gender in counts 3, 7, 11 and 18. They invoke Title VII, the NYSHRL, the NYCHRL, and § 1981, respectively.

Varughese alleges that Defendants subjected her to retaliation for protected complaints about discrimination in counts 4, 8, 12 and 18. Those counts invoke Title VII, the NYSHRL, the NYCHRL, and § 1981, respectively.

In count 17, Varughese alleges a violation of the New York State healthcare whistleblower law.

Counts 15 and 16 accuse the Defendants of breaching their employment contract with Varughese and also violating the implied covenant of good faith and fair dealing.

Counts 13 and 14 allege that Defendants tortiously interfered with Varughese's offer of employment from RWJ Hospital, and that the summative evaluation Defendants issued is defamatory.

Count 19 alleges violations of the Family and Medical Leave Act ("F.M.L.A.").

Count 21 pursues individual liability for all of the foregoing against individual defendants Lento, Cordon–Cardo, Firpo and Bleiweiss.

Varughese voluntarily dismissed Count 20, a claim for intentional infliction of emotional distress, after Judge Francis told her she would have to submit to a psychiatric evaluation in order to pursue it.

**IV. The Motion for a Summary Judgment is GRANTED as to Counts 1, 2, 5, 6, 9, 10, 16, and 18 (Gender and Race/National Origin Discrimination under Title VII, the NYCHRL, the NYHRL, and 42 U.S.C. § 1981).**

**\*38** Varughese argues that Mount Sinai and the individual defendants-Lento, Cordon–Cardo, Firpo and Bleiweiss-subjected her to disparate treatment on the basis of her gender and Indian ancestry during the nine-month period from December 2010 to her termination on September 21, 2011.

Discrimination claims brought under Title VII, § 1981, the New York State Human Rights Law ("NYSHRL") and New York City Human Rights Law ("NYCHRL") all are analyzed under the burden-shifting framework that the Supreme Court established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Ruiz v. Cnty. of Rockland,* 609 F.3d 486, 491 (2d Cir.2010); *Holcomb v. Iona Coll.,* 521 F.3d 130, 138 (2d Cir.2008); *Dawson v. Bumble & Bumble,* 398 F.3d 211, 216–17 (2d Cir.2005) (applying *McDonnell Douglass* to NYSHRL and NYCHRL discrimination claims).

That framework requires a plaintiff to establish a *prima facie* case of discrimination. *Holcomb,* 521 F.3d at 138. To do so, the plaintiff must submit evidence that (1) she is a member of a protected class; (2) her job performance was satisfactory; (3) she suffered an adverse employment action; and (4) the action occurred under conditions giving rise to an inference of discrimination. *Demoret v. Zegarelli,* 451 F.3d 140, 151 (2d Cir.2006) (citing *McDonnell Douglas,* 411 U.S. at 802). "The burden of establishing a *prima facie* case is not onerous, and has frequently been described as minimal." *Scoria v. Rubin,* 117 F.3d 652, 654 (2d Cir.1997).

After a *prima facie* case is established, a presumption of discrimination arises and the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Holcomb,* 521 F.3d at 138.

Once the defendant provides such a reason, "the burden shifts back to the plaintiff to demonstrate by competent evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination," *Leibowitz v. Cornell Univ.,* 584 F.3d 487, 499 (2d Cir.2009) (internal quotation marks and citations omitted), *superseded on other grounds by* N.Y.C. Local L. No. 85.

A plaintiff who establishes both a *prima facie* discrimination case and pretext must still, in order to survive summary judgment, demonstrate that she can meet her "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against her." *Schnabel v. Abramson,* 232 F.3d 83, 90–91 (2d Cir.2000) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)).

While the *McDonnell Douglass* burden-shifting framework applies to all of Varughese's claims, her discrimination claims under the NYCHRL, *i.e.* counts 9 and 10, "must be reviewed independently from and more liberally than their federal and state counterparts" in light of the local statute's "uniquely broad and remedial' purposes." *Loeffler v. Staten Island Univ. Hosp.,* 582 F.3d 268, 278 (2d Cir.2009) (quoting *Williams v. N.Y. City Hous. Auth.,* 61 A.D.3d 62, 66–69, 872 N.Y.S.2d 27 (1 st Dep't 2009)). There is thus a "one way ratchet" at work, under which "interpretations of New York state or federal statutes with similar wording may be used to aid in interpretation of New York City Human Rights Law, viewing similarly worded provisions of federal and state civil rights laws as a *floor* below which the City's Human Rights law cannot fall." *Id.*

**\*39** The NYCHRL's uniquely broad and remedial purpose requires courts to construe the statute "broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible." *Albunio v. City of New York,* 16 N.Y.3d 472, 477–478, 922 N.Y.S.2d 244, 947 N.E.2d 135 (N.Y.2011); *see also* Administrative Code § 8–130. In doing so, courts have noted two differences between the NYCHRL and its state and federal counterparts that bear mentioning at the outset.

First, to make out a *prima facie* case under state or federal law, the plaintiff must submit proof that she "endure[d] a 'materially adverse change' in the terms and conditions of her employment." *Galabya v. NYC Bd. of Educ.,* 202 F.3d 636, 640 (2d Cir.2000) (quoting *Richardson v. New York State Dep't of Correctional Servs.,* 180 F.3d 426, 446 (2d Cir.1999)).

To be "materially adverse" a change in working conditions must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Crady,* 993 F.2d at 136. A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material

responsibilities, or other indices ... unique to a particular situation.

*Id.* (internal quotations and citations omitted).

By contrast, the NYCHRL does not require that the offending employment action be "materially adverse." *See, e.g., Williams,* 872 N.Y.S.2d at 34 (holding there is no material adversity requirement for a retaliation claim under the NYCHRL); *Margherita v. FedEx Exp.,* No. 07 CV 4826, 2011 WL 5024577, at *8 (E.D.N.Y. Oct. 20, 2011) (no material adversity requirement for a discrimination claim under the NYCHRL). Rather, "In order to make out the [adverse action] prong of a *prima facie* case of discrimination under the NYCHRL, a plaintiff must simply show that she was treated differently from others in a way that was more than trivial, insubstantial, or petty." *Williams v. Regus Mgmt. Group, LLC,* 836 F.Supp.2d 159, 173 (S.D.N.Y.2011) (describing development of NYCHRL case law since legislation removed the materiality requirement from the NYCHRL's adverse action prong in 2005).

Second, the NYCHRL places a burden with the defendant that rests with the plaintiff under state and federal law. Under state and federal law, a plaintiff may pursue a "mixed-motive" theory that discriminatory animus was "a motivating factor" in the adverse action, rather than its but-for cause. *See Univ. of Texas Sw. Med. Ctr. V. Nassar,* ––– U.S. ––––, ––––, 133 S.Ct. 2517, 2526, 186 L.Ed.2d 503 (2013) (recounting the evolving jurisprudence of Title VII's causation requirement). Under a mixed-motive theory, a plaintiff may

> obtain declaratory relief, attorney's fees and costs, and some forms of injunctive relief based solely on proof that race, color, religion, sex, or nationality was a motivating factor in the employment action; but the employer's proof that it would still have taken the same employment action [in the absence of the impermissible motivating factor] would save [the employer] from monetary damages and a reinstatement order.

**\*40** *Id.*

Under federal and state law, plaintiffs pursuing this "mixed-motive" theory must have particularly strong evidence of discriminatory animus. "[T]o warrant a mixed-motive burden shift, the plaintiff must be able to produce a 'smoking gun' or at least a 'thick cloud of smoke' to support his allegations of discriminatory treatment." *Sista v. CDC Ixis N. Am., Inc.,* 445 F.3d 161, 173–74 (2d Cir.2006) (internal citation omitted).

Under the NYCHRL, however, it is not plaintiffs who must show their proof deserves a mixed-motive analysis, but defendants who must show that the proof precludes mixed motive liability. Claims under the NYCHRL should be dismissed at the summary judgment stage "only if the *defendant* demonstrates that it is entitled to summary judgment under both" the *McDonnell Douglas* analysis and also the "mixed motive" analysis. *Melman v. Montefiore Med. Ctr.,* 98 A.D.3d 107, 113, 946 N.Y.S.2d 27 (N.Y.App. Div. 1 st Dep't 2012) (citing *Albunio,* 16 N.Y.3d at 477–78, 922 N.Y.S.2d 244, 947 N.E.2d 135) (emphasis added).

Notwithstanding these important analytical differences, the state courts have cautioned that "the NYCHRL does not alter the kind, quality or nature of evidence that is necessary to support or defeat a motion for summary judgment under Rule 56." *Lytle v. JPMorgan Chase,* No. 08 Civ. 9503, 2012 WL 393008, at *19 (S.D.N.Y. Feb.8, 2012) *report and recommendation adopted sub nom. Lytle v. JP Morgan Chase,* No. 08 CIV. 9503 DAB, 2012 WL 1079964 (S.D.N.Y. Mar.30, 2012) *aff'd,* 518 F. App'x 49 (2d Cir.2013) (quoting *Williams,* 2011 WL 6073560, at *6 (quotation marks and citations omitted)). Thus, "The mere fact that [plaintiff] may disagree with her employer's actions or think that her behavior was justified does not raise an inference of pretext." *Melman v. Montefiore Med. Ctr.,* 98 A.D.3d 107, 121, 946 N.Y.S.2d 27 (1st Dep't 2012). So too, for a plaintiff to raise an inference of discrimination through comparative analysis, the NYCHRL requires the plaintiff to show that she is "similarly situated in all material respects" to the coworker to whom she compares herself. *Shah v. Wilco Systems, Inc.,* 27 A.D.3d 169, 169, 806 N.Y.S.2d 553 (N.Y.App. Div. 1st Dep't 2005)

Moreover, "a plaintiff must still link the adverse employment action to a discriminatory motivation" to withstand summary judgment on her NYCHRL claim. *Sotomayor v. City of New York,* 862 F.Supp.2d 226, 258 (E.D.N.Y.2012) *aff'd,* 713 F.3d 163 (2d Cir.2013) (citing *Williams,* 872 N.Y.S.2d at 34–35). "Where a plaintiff cannot do so, her claims fail." *Id.*

That is, local law mirrors state and federal law in that "the burden of persuasion of the ultimate issue of discrimination always remains with the plaintiff," *Step hens on v. Hotel Empls. & Rest. Empls. Union Local 100 of AFL–CIO,* 6 N.Y.3d 265, 271, 811 N.Y.S.2d 633, 844 N.E.2d 1155 (N.Y.2006).

Construed liberally, Varughese's papers suggest eight separate instances of discrimination in violation of the NYCHRL, the NYSHRL, Title VII and § 1981:

**\*41** (1) The July 2010 failure to promote Varughese to Chief Resident, rather than McCash;

(2) The December 2010 altercation with McCash;

(3) The December 21, 2010 Academic Advisement;

(4) The January 2011 failure to promote Varughese to Chief Resident, rather than Jordan;

(5) The Winter 2011 Referral to the PWC

(6) The July 15, 2011 Final Warning

(7) The August–September 2011 Denial of Transfer

(8) The September 21, 2011 Termination

Varughese argues that each of these actions was individually discriminatory, and that all of them collectively contributed to a hostile work environment, which is itself a form of discrimination.

Again, Title VII, the NYSHRL and § 1981 (which I shall refer to collectively as "state and federal anti-discrimination laws") are all subject to the same *McDonnell Douglas* analysis. *Ruiz,* 609 F.3d at 491.

Varughese's NYCHRL claims, however, must be analyzed under the more lenient modification of the *McDonnell Douglas* burden shifting analysis set forth above.

*Failure to Promote Varughese to Chief Resident*
Varughese argues that she has a claim for discriminatory failure to promote her to the position of Chief Resident, both when McCash took the position in July 2010 and again when Jordan was promoted in January 2011. The former implicates both sex and national origin discrimination, the latter only national origin discrimination.

This specific allegation is not asserted in the complaint-in fact, the first time it has come up during this lawsuit, at least in the court's memory, is in Varughese's response to the Defendants' motion for summary judgment. No one has provided Varughese's administrative charge to the Court, so I have no idea whether the charge was administratively exhausted. No one has analyzed this issue, so I assume that it was; otherwise, any challenge to administrative exhaustion appears to have been waived.

In any event, the hospital is entitled to summary judgment on the merits.

To make out *a prima facie* case of discriminatory failure to promote, a plaintiff

> ordinarily must demonstrate that: (1) she is a member of a protected class; (2) she applied and was qualified for a job for which the employer was seeking applicants; (3) she was rejected for the position; and (4) the position remained open and the employer continued to seek applicants having the plaintiff's qualifications.

*Yu v. New York City Hous. Dev. Corp.,* 494 F. App'x 122, 124–25 (2d Cir.2012) (citing *Estate of Hamilton v. City of New York,* 627 F.3d 50, 55 (2d Cir.2010) (applying NYCHRL) (internal citation and quotations omitted). "Of course, the fourth element is also established if the employer fills the position with 'a person outside the protected class who was similarly or less qualified than' the plaintiff." *Id.* at n. 4 (citing *Stockwell v. City of Harvey,* 597 F.3d 895, 901 (7th Cir.2010).

Varughese fails to make out a *prima facie* case, because she offers no evidence that Defendants filled the position with "a person outside the protected class *who was similarly or less qualified* than" Varughese was. She alleges in conclusory fashion that McCash was less qualified than she was, but she provides the Court with no actual evidence to support that assertion. I have been provided no evidence whatever of McCash's evaluations, nor his performance before his July 2010 promotion to Chief Resident. It is impossible to draw an inference of discrimination in a failure to promote claim where the available evidence provides no foundation for comparison between the plaintiff and

the person promoted. *See Sareen v. Port Auth. of N.Y. & N.J.,* No. 12 Civ. 2823(PAE), 2013 WL 6588435, at *9 (S.D.N.Y. Dec.16, 2013) (granting summary judgment where plaintiff "[did] not offer any evidence on which to assess [the allegedly similarly situated employee's] qualifications"). Varughese's personal opinion about McCash's qualifications is irrelevant. [9]

**\*42** Moreover, it is not clear that Varughese can make the requisite showing under the second prong of a *prima facie* case of failure to promote. Normally, a specific application is required to satisfy the second element of such a claim. *See Petrosino v. Bell Atlantic,* 385 F.3d 210, 227 (2d Cir.2004). A narrow exception to this requirement, exists, however, where a plaintiff can

> demonstrate that (1) the vacancy at issue was not posted, and (2) the employee either had (a) no knowledge of the vacancy before it was filled or (b) attempted to apply for it through informal procedures endorsed by the employer.

*E.E.O.C. v. Bloomberg L.P.,* 967 F.Supp.2d 816, 846 (S.D.N.Y.2013) (analyzing claim brought under Title VII, the NYSHRL, and the NYCHRL) (internal quotation and citation omitted).

Varughese has made no such showing with respect to the Chief Resident position. It does not appear to have been posted; rather, it appears to have been offered at regular intervals. But

Varughese has not even alleged-let alone offered evidence-that she lacked knowledge of the position; nor has she testified that she ever expressed any interest in it. Indeed, the record suggests that one of Varughese's colleagues turned down the Chief Resident position before it was offered to Jordan. I cannot simply assume that anyone offered the job would have taken it.

Even under the NYCHRL, failure to express interest in a promotion or otherwise invoke an exception like the ones above is fatal to a failure to promote claim. *Hen ry v. Metro. Transp. Auth.,* No. 07 CIV. 3561 DAB, 2014 WL 4783014, at *15 (S.D.N.Y. Sept.25, 2014) (failure to submit proof of interest in the position or proof that others were promoted without expressing interest fatal to the *prima facie* case under the NYCHRL).

Finally, assuming arguendo that Varughese had made out a *prima facie* case on this point, Defendants would still prevail on their motion, because no evidence in the record suggest that the failure to promote her was occasioned by her gender or her race/national origin. Indeed, her assertion is particularly weak because McCash was not the only person promoted to Chief Resident in July 2010. Kruti Maniar, a woman of Indian descent, was also promoted; they were named co-chief residents. When a woman of Indian descent got the job instead of plaintiff, no reasonable trier of fact could possibly conclude, that Varughese lost out because of her gender or her national origin.

At the third *McDonnell Douglas* stage, it is not enough for the plaintiff to say: "I belong to a protected class; something bad happened to me at work; therefore, it must have occurred because I belong to a protected class." *Peters v. Mount Sinai Hosp.,* No. 08 Civ. 7250, 2010 WL 1372686, at *8 (S.D.N.Y. Mar.30, 2010) (citing *Grillo v. N.Y. City Transit Auth.,* 291 F.3d 231, 235 (2d Cir.2002) ("Even if [plaintiff's] highly dubious claim that he was unfairly singled out for punishment by the instructors is credited, [plaintiff] has done little more than cite to [his alleged] mistreatment and ask the court to conclude that it must have been related to [his] race. This is not sufficient." (internal quotations omitted)); *Lizardo v. Denny's, Inc.,* 270 F.3d 94, 104 (2d Cir.2001)). That logical fallacy is also insufficient to sustain plaintiff's claim under § 1981 for national origin discrimination. *See Kantrowitz v. Uniondale Union Free Sch. Dist.,* 822 F.Supp.2d 196, 215 (E.D.N.Y.2011) ("employment discrimination claims brought pursuant to Sections 1981 and 1983 are analyzed under the three-step, burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp.*" (internal citations omitted)). The NYCHRL must of course be interpreted as liberally as is "reasonably possible," but even under that statute, acceding to the logical fallacy *of post hoc ergo propter hoc* is not reasonable.

**\*43** Varughese's summary judgment papers also argue that Defendants' failure to promote her to Chief Resident in January 2011 was a discriminatory adverse act. Again, this claim is raised for the first time in her opposition to the motion for summary judgment.

This claim is slightly different from Varughese's other failure-to-promote claim, because we know at least one way in which Jordan's and Varughese's qualifications differed in a manner favorable to plaintiff: Jordan was only in her second year of residency, while Varughese was in her third. At least one member of Mount Sinai's Pathology staff, attending physician Tamara Kalir, questioned the propriety of promoting Jordan over more senior residents, of whom Varughese was one.

However, Varughese has again failed to make out the second prong of a *prima facie* case even under the NYCHRL. That is, she submits no testimony that she was interested in the position or would have accepted it had it been offered.

Assuming arguendo that she did make out a *prima facie* case, she also fails at the third step in the *McDonnell Douglas* analysis: there is no evidence that Jordan was promoted over Varughese in circumstances giving rise to an inference that national origin was any part of the motivation. As noted above, one of the (now) three Chief Residents was an Indian woman, so Mount Sinai had plainly established a willingness to promote someone who belonged to both of plaintiff's protected classes. There is no evidence that any person involved in the decision to promote Jordan had ever expressed any bias toward Varughese or anyone else on the basis of national origin. Gender, of course, is irrelevant where Jordan's promotion is concerned. [10] Finally, at the time Jordan was promoted, Varughese was on an Academic Advisement (with which she was not cooperating), was the subject of numerous complaints and had been referred to the PWC. There is no evidence that Jordan labored under similar constraints. [11] Under those circumstances, no reasonable trier of fact could find that the promotion of Jordan ahead of Varughese was the product of discrimination, in whole or in part.

Defendants' motion for summary judgment dismissing Counts 1, 2, 5, 6 and 18 is GRANTED insofar as addressed to plaintiff's assertion that the failure to promote her was discriminatory.

*December 8.2010 Incident with McCash*

Varughese's first claim of gender discrimination was her statement to HR in April 2011 that McCash would not have acted the way he did on December 8, 2010—yelling at her and moving toward her in a way she found threatening (though she makes no claim that McCash touched her)-but for her gender. She has added a claim that the December 8 incident was motivated by racism in the course of this lawsuit.

Under federal and New York State antidiscrimination laws, "yelling at an employee ... does not amount to an adverse action." *E.E.O.C. v. Bloomberg, L.P.,* 967 F.Supp.2d 816, 873 (S.D.N.Y.2013) (citing *Sekyere v. City of N.Y.,* No. 05 Civ. 7192, 2009 WL 773311, at *3 (S.D.N.Y. Mar. 18, 2009)). Therefore, Defendants are entitled to summary judgment dismissing Counts 1, 2, 5, 6, and 18 insofar as those counts relate to the December 8, 2010 incident.

**\*44** As I have explained, the NYCHRL has a more lenient definition of what constitutes an "adverse action" for purposes of establishing *a prima facie* case of discrimination than federal law has. Judge Gleeson has explained that, "A plaintiff who is treated worse, in a nontrivial way, because of [her race or gender] is subject to an adverse employment action for purposes of the CHRL." *Forgione v. City of New York,* No. 11–CV–5248, 2012 WL 4049832, at *6 (E.D.N.Y. Sept.13, 2012). In *Williams v. New York City Rous. Auth.,* 61 A.D.3d 62, 78–79, 872 N.Y.S.2d 27 (N.Y.App. Div. 1 st Dep't 2009), the New York Appellate Division, First Department, held that "a focus on unequal treatment based on gender regardless of whether the conduct is 'tangible' (like hiring or firing) or not-is in fact the approach that is most faithful to the uniquely broad and remedial purposes of the local statute." Thus, many acts that would not constitute "adverse actions" under federal law have been held to suffice under the NYCHRL. See *Kellman v. Metro. Transp. Auth.,* No. 07 Civ. 3561, 2014 WL 1243698 (S.D.N.Y. Mar. 26, 2014) (denial of training constituted an adverse action under the NYCHRL even though it did not affect plaintiff's wages or chances of promotion); *Williams,* 836 F.Supp.2d at 175–76 (holding that ignoring plaintiff's opinion and communicating with him differently than Caucasian employees was adverse under NYCHRL even though it was probably not adverse under Title VII); *see also Forgione v. City of New York,* No. 11 Civ. 5248, 2012 WL 4049832, at *5–6 (E.D.N.Y. Sept.13, 2012) (holding that defendants' referral of plaintiff for psychological evaluation, while not materially adverse under NYSHRL, was not "merely trivial" under NYCHRL); *Sotomayor v. City of New York,* 862 F.Supp.2d 226, 255, 257–58 (E.D.N.Y.2012) (holding that negative observations, evaluations, and letters to file that did not trigger negative consequences for plaintiff's employment were not adverse under Title VII or NYSHRL but were adverse under NYCHRL).

However, the NYCHRL, like Title VII, is not a "general civility code." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.,* 715 F.3d 102, 113 (2d Cir.2013). Thus, one state court

found that the NYCHRL's "adverse action" requirement was not met even where an employer "(i) told [plaintiff] that his "medicine was wrong"; [and] (ii) made fun of his accent." *Hanna v. New York Hotel Trades Council,* 18 Misc.3d 436, 440–41, 851 N.Y.S.2d 818 (Sup.Ct.2007). The state trial court found that, "Although making fun of an employee's accent is offensive and inappropriate, it does not constitute an adverse employment action [under the NYCHRL]." *Id.*

Varughese has not managed to make out a *prima facie* case, even under the extremely lenient standard of the City Human Rights Law. A single instance of being addressed publicly in an inappropriate fashion (assuming that yelling at a subordinate is always inappropriate) does not rise to the level of being "treated worse in a non-trivial way"-especially in light of the hospital's immediate corrective action of removing Varughese from McCash's supervision.[12]

**\*45** However, even if Varughese were able to make out a *prima facie* case under city law, her claim still would fail.

Defendants articulate a legitimate and non-discriminatory reason for McCash's behavior: Varughese earned his ire by disobeying a direct instruction from a supervisor. The burden thus shifts back to Varughese to prove both (1) pretext; and (2) that the real reason McCash yelled at her was her membership in a protected class.

To prove pretext, Varughese (1) claims that no clear instruction was given as to the need for her to do the work; and (2) points to some direct evidence of McCash having a discriminatory bias against her: his December 8, 2010 complaint regarding her "work ethnic."

There is no genuine issue of fact as to the first of these issues. The slides in question came from a Dr. Goldfarb, and that doctor had a standing instruction that the resident on duty, not a moonlighter, was to examine all of his breast slides. Varughese was the duty resident; Azar was a moonlighter. Varughese, like all residents, was charged with knowing about standing orders from doctors and obeying them. She offers no evidence to the contrary. Therefore, the issue is not whether McCash was sufficiently specific; he did not need to be, because no resident, not even the Chief Resident, could countermand Dr. Goldfarb.

As to the second: rather than discussing this issue in the context of a *prima facie* case, where the plaintiff's burden is light, I will skip to the third *McDonnell Douglas* step-where I

conclude that there is simply no genuine issue of fact as to the question whether discriminatory animus motivated McCash on December 8, 2010. Drawing all inferences in Varughese's favor, no reasonable trier of fact could possibly conclude that McCash yelled at Varughese because she was a woman or because she was of Indian descent.

This is not a close question.

The only evidence offered by Varughese to show that there was any discriminatory animus behind McCash's behavior on December 8, 2010 is the "n" in "work ethnic" in McCash's e-mail. I must draw all *reasonable* inferences in Varughese's favor, but the only *reasonable* inference here is that McCash made a very unfortunate typo. His lengthy e-mail is rendered offensive by the insertion of a single letter. The Court has reviewed *many* e-mails from McCash, to Varughese and to others, and this is the only one with any language that is even arguably discriminatory. There is no reference at all to Varughese's gender in the e-mail, and when she complained of McCash's behavior, she believed it to be motivated by her sex. There is no evidence in the record that McCash ever said or did anything derisivie about persons of Indian ancestry; indeed, the record reveals no instance in which he so much as commented about anyone's ancestry.

Furthermore, McCash sent this particular e-mail to numerous recipients, including Shabnam Jaffer, a woman of Indian descent who was an attending physician *and his supervisor.* Without some other evidence, there is no reason to believe that McCash decided to do something that might amount to professional suicide by uttering a slur that would have tended to be offensive to someone who shared membership in Varughese's protected classes. (Incredibly, McCash was not asked about this e-mail at his deposition by either side, and Defendants did not submit any declaration from him except one explaining that he is Filipino, so we have no way of knowing what he would say about it).

**\*46** Moreover, McCash's conduct on December 8 is colored by the history he shared with Varughese: they had a difficult relationship. There had been a confrontation between them in September, and she was repeatedly insubordinate to him. "Mere personality conflicts must not be mistaken for unlawful discrimination." *Taylor v. New York Univ. Med. Ctr.,* 21 Misc.3d 23, 871 N.Y.S.2d 568, 571–72 (N.Y.App. Term 1st Dep't 2008).

There is no evidence that McCash had any problems working with other women, other people of Indian descent, or with women who were also of Indian descent. There certainly is no evidence that he had any problems with his co-Chief Resident, a woman of Indian descent; she has averred that he was never discriminatory toward anyone. The only fair inference is that McCash had a problem with Varughese-the same problem lots of other people had.

In short, no reasonable jury could find by a preponderance of the evidence that discriminatory animus, whether based on race or gender, was behind McCash's loss of temper. So even under city law, the claim that this outburst was an instance of either gender-based or national origin-based discrimination must be dismissed.

*The December 21, 2010 Academic Advisement*

Varughese alleges that Defendants placed her on Academic Advisement on account of her sex and her race.

I assume without deciding that an Academic Advisement could constitute an adverse employment action under city, state and federal law. This is not immediately apparent under federal and state law. See *Phillips v. Bowen,* 278 F.3d 103, 109 (2d Cir.2002) ("courts in this circuit have found that reprimands, threats of disciplinary action and excessive scrutiny do not constitute adverse employment actions in the absence of other negative results such as a decrease in pay or being placed on probation."); *Uddin v. City of N.Y.,* 427 F.Supp.2d 414, 429 (S.D.N.Y.2006) (quotation omitted); *see also Weeks v. New York State,* 273 F.3d 76, 86 (2d Cir.2001) ("It hardly needs saying that a criticism of an employee (which is part of training and necessary to allow employees to develop, improve and avoid discipline) is not an adverse employment action."), *abrogated on other grounds, National R.R. Passenger Co. v. Morgan,* 536 U.S. 101, 122, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002).

On the question whether Defendants have offered a legitimate, non-discriminatory reason for that Advisement, Judge Cote's analysis in *Nolley v. Swiss Reinsurance Am. Corp.,* 857 F.Supp.2d 441 (S.D.N.Y.2012), *aff'd sub nom. Nolley v. Swiss Reinsurance Am. Holding Corp.,* 523 F. App'x 53 (2d Cir.2013), a case brought under the same suite of city, state and federal antidiscrimination laws at issue here, is instructive. The employer placed Nolley on a "Performance Improvement Plan" ("PIP") after customers complained that Nolley was aggressive and confrontational. The PIP required Nolley to improve his professionalism, or else. When he did

not improve, but rather, reacted to the PIP with yet more hostility and aggressively confronted his superior, he was terminated. Once in court, Mr. Nolley contested the truth of the customer complaints but could not dispute that they had in fact been made-that customers had deemed his conduct offensive and unprofessional. The fact of the complaints alone was enough to constitute a legitimate, non-discriminatory justification that satisfied the employer's burden at the second stage of the *McDonnell Douglas* analysis-even if, as Nolley insisted, the complaints were entirely unwarranted.

**\*47** So too here. Defendants received multiple reports that Varughese was erratic and disruptive. Administrators received reports that Varughese lost the faculty of cogent speech on December 8, 2010, that she accosted Jordan on December 10, 2010, and that she refused to address her own role in the December 8 fracas. They also heard that she had been insubordinate to McCash, ignoring a clear instruction to do certain work herself, which instruction was grounded in a general need to cut costs and also the instructions of a particular surgeon. Varughese disagrees that her conduct was worthy of complaint, but she does not raise any genuine issue about whether complaints were in fact made.

The receipt of these complaints that Varughese was disruptive and insubordinate-from her fellow residents, her two Chief Residents, two attending physicians, a lab technician and a medical student-are enough to satisfy Defendant's burden at the second stage of the *McDonell Douglas* analysis, even if they are unfounded, and without considering in any way Varughese's admission that she raised her voice and swore on December 8, 2010.

In sum, Defendants offer what the Second Circuit has found to be a legitimate and nondiscriminatory reason for adverse employment actions against an employee: "gross insubordination." *Owens v. New York City Hous. Auth.,* 934 F.2d 405, 409 (2d Cir.1991); *see also Zambrano–Lamhaouhi v. New York City Bd. of Educ.,* 866 F.Supp.2d 147, 172 (E.D.N.Y.2011) (recognizing insubordination as a legitimate non-discriminatory reason in the NYCHRL context).

Because defendants have produced a legitimate, nondiscriminatory reason for the Advisement, the presumption of discrimination raised by her *prima facie* case simply "drops out of the picture." *Cifra v. General Electric,* 252 F.3d 205, 215 (2d Cir.2001) (quoting *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d

407 (1993)); *see also See Kaytor v. Elec. Boat Corp.,* 609 F.3d 537, 553 (2d Cir.2010).

The question now is whether Varughese has provided sufficient evidence for a factfinder to conclude that Defendants' purported rationale for the Advisement was actually a pretext for discrimination on the basis of either her gender or her national origin. *Pearson v. Unification Theological Seminary,* 785 F.Supp.2d 141, 158–59 (S.D.N.Y.2011). The plaintiff must not simply produce "some" evidence, but "sufficient evidence to support a rational finding that the legitimate, nondiscriminatory reasons proffered by the defendant[s] were false, and that more likely than not [discriminatory animus] was the real reason for the employment action." *Weinstock v. Columbia Univ.,* 224 F.3d 33, 42 (2d Cir.2000) (quoting *Woroski v. Nashua Corp.,* 31 F.3d 105, 110 (2d Cir.1994)). Alternatively, the plaintiff may show that the defendants' non-discriminatory justifications for the adverse action "were not the only reasons and that the prohibited factor was at least one of the motivating factors." *Holcomb,* 521 F.3d at 138 (internal quotation and citation omitted).

**\*48** In order to show pretext, a plaintiff must "establish a genuine issue of material fact either through direct, statistical, or circumstantial evidence as to whether the employer's reason for [the relevant adverse action] is false and as to whether it is more likely that a discriminatory reason motivated the employer" to undertake it. *Dhar v. NYC Dep't of Transp.,* No. 10–CV–5681, 2014 WL 4773965, at \*10 (E.D.N.Y. Sept. 24, 2014) (internal citations omitted).

Varughese again fails to raise any genuine issue of material fact as to whether it is more likely that a discriminatory reason motivated Defendants to place her on Academic Advisement. After the December 8 incident with McCash, witness after witness came forward to complain, not only that Varughese had completely lost control of herself, but also to voice apparently longstanding complaints about her reliability and work ethic. Varughese may and obviously does disagree with those assessments, but she cannot deny that hospital administrators had to weigh her word alone against the word of at least five witnesses (not including McCash or Jordan), all of whom attested that she was out of control. Whether those witnesses were right is not the point. The point is that the hospital had every non-discriminatory reason in the world to be concerned about Varughese's behavior, and so to place her on an Academic Advisement.

Varughese complains that Defendants took everyone else's word over her own because Lento and others "wanted to believe" that McCash, a white male (only according to Varughese—recall that he self-identifies as an Asian Pacific Islander of Filipino descent, and that this Court does not find any genuine dispute that he is correct), had done nothing wrong. But she offers no *evidence* to support that wholly conclusory assertion. None whatever.

Disparate treatment-which may serve to both raise an inference of discrimination in the first step of the *McDonnell Douglass* burden-shifting analysis and establish pretext at the third [13]—occurs where an employer "treat[s] [the plaintiff] ... less favorably than a similarly situated employee outside h[er] protected group." *Graham v. Long Island R.R.,* 230 F.3d 34, 39 (2d Cir.2000) (*citing Int'l Bhd. of Teamsters v. U.S.,* 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977)).

To benefit from a disparate treatment analysis, however, the plaintiff needs someone to whom she can reasonably compare herself. She need not show that the person to whom she compares herself is identical to her, but she must show that she and her proposed comparator are similarly situated in "all material respects." *Id.* at 39–40; *see also Shumway v. United Parcel Serv., Inc.,* 118 F.3d 60, 64 (2d Cir.1997); *Shah v. Wilco Systems, Inc.,* 27 A.D.3d 169, 169, 806 N.Y.S.2d 553 (N.Y.App. Div. 1st Dep't 2005) (applying same standard to NYCHRL claims). Where there is too much dissonance between a plaintiff's circumstances and her proposed comparator's, the employer's "treatment of th[at] [other] employee[ ] ha[s] no logical relevance to the plaintiff's claims" and thus cannot give rise to an inference of discrimination. *McGuinness v. Lincoln Hall,* 263 F.3d 49, 54 (2d Cir.2001); *see also LeBlanc v. United Parcel Service,* No. 11 Civ. 6983, 2014 WL 1407706, at \*15 (S.D.N.Y. Apr. 11, 2014) (applying same standard to analysis whether plaintiff has raised triable issue regarding a "similarly situated" coworker under the NYCHRL).

**\*49** In the particular context of this motion, a court examining a discrimination claim only compares two employees' treatment when those employees are "similarly situated in all material respects." *Graham v. Long Island R.R.,* 230 F.3d 34, 39 (2d Cir.2000) (*citing Int'l Bhd. of Teamsters v. U.S.,* 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977)). The Circuit has recognized that "[w]hat constitutes 'all material respects' [ ] varies somewhat from case to case and ... must be judged based on (1) whether the plaintiff and those [she] maintains were similarly situated were subject to

the same workplace standards and (2) whether the conduct for which the employer imposed discipline was of comparable seriousness." *Id.* at 40.

Varughese argues that Defendants showed their discriminatory hand by placing her on Academic Advisement while failing to place McCash on Academic Advisement. But McCash ws not similarly situated to Varughese in all material respects. McCash was Varughese's *supervisor* at that time. Leaving aside the disputed factual question of who yelled more loudly or struck more fear into coworkers' hearts on December 8, 2010, a supervisor yelling at his subordinate is something quite different from a subordinate yelling at her supervisor. Varughese admits that she yelled at McCash. She also admits to yelling at coworker Jordan-while McCash is not alleged to have yelled at anyone other than his subordinate (Varughese). Any workplace's standard regarding insubordination will inherently be more onerous toward a subordinate's behavior, because the supervisor cannot be "insubordinate" to the subordinate.

Moreover, there is no dispute that the evidence before the Hospital decision-makers did not indicate that Varughese's and McCash's conduct was of comparable seriousness. The unbiased third party witnesses all told administrators that Varughese's behavior was more seriously out of line than McCash's. Again, the issue is not whether or not that is true; it is whether the evidence to that effect was given to the Hospital.

Finally, in the fortnight between the December 8, 2010 incident and the December 21 advisement, McCash acknowledged wrongdoing and submitted to counseling. Varughese, by contrast, categorically refused to do so. During those same 12 days, Varughese interfered with the investigation by getting into a confrontation with Jordan; McCash did no such thing.

So McCash and Varughese are simply not "similarly situated in all material respects." For that reason the decision to discipline McCash more leniently (and remember, he was disciplined), while placing Varughese on Academic Advisement, does not lend itself to an inference of either gender or national origin discrimination.

There is evidence in the record of an instance when the hospital put a male resident on Academic Advisement when the male resident behaved in a manner similar to Varughese. In the summer of 2011, a male resident of Asian descent

threw a temper tantrum and yelled at a technician who was trying to help him with a dictation machine. That resident was placed on Academic Advisement. He did not react to being on Advisement in the same way as Varughese, however; he apologized profusely, revised his written apology twice to make it more personal and self-reflective, and met with supervisors for months to talk about professionalism.

**\*50** Varughese also seeks to raise an inference that discrimination motivated the Academic Advisement by pointing to Schiller's comments from 2008–2009 and McCash's December 2010 "work ethnic" e-mail. Assuming arguendo that Schiller's comments can be deemed evidence of ethnic bias (I have already address why McCash's email with its obvious typo cannot), this argument gets plaintiff nowhere, because Schiller played no role in the December 8 incident and there is no evidence that he was involved in the decision to put Varughese on Academic Advisement. Melissa Pessin–Minsley had taken over as Interim Chair of the Department by that time. There is no evidence in the record that Schiller was even consulted about the Advisement. Nor is there any evidence that anyone involved in the decision to place Varughese on Advisement knew about Schiller's comments; Varughese herself had not yet complained about them.

As for McCash, the Chief Resident, he too played no role in making the decision about Academic Advisement, and Varughese was removed from his supervision.

Schiller's stray remarks and McCash's email, assuming any of them to be offensive, thus have no bearing on attitudes displayed by anyone who actually made the decision to place Varughese on Academic Advisement. That means they are not evidence of pretext on the part of those decisionmakers and Mount Sinai. "Statements by nondecisionmakers or statements by decisionmakers unrelated to the decision process itself are insufficient to establish discriminatory intent, even under city law, and certainly under federal and state law. *Taylor v. New York Univ. Med. Ctr.,* 21 Misc.3d 23, 871 N.Y.S.2d 568, 572 (N.Y.App. Term 1st Dep't 2008) (quoting *Forrest v. Jewish Guild,* 3 N.Y.3d at 308, 786 N.Y.S.2d 382, 819 N.E.2d 998); *Bir v. Pfizer, Inc.,* 510 F. App'x 29, 31–32 (2d Cir.2013) (citing *James v. N.Y. Racing Ass'n,* 233 F.3d 149, 154 (2d Cir.2000)).

Ultimately, Varughese's attempt to prove pretext through a disparate treatment analysis fails with respect to the Academic Advisement because she relies on only on her own conclusory

accusations of bias and a disparate treatment analysis that fails for lack of a real comparator. She offers nothing else, and the Court's exhaustive review of the record reveals nothing else.

By contrast, Defendants have presented voluminous evidence from multiple sources to show that Varughese was placed on Advisement for perfectly legitimate reasons having nothing whatever to do with her membership in any protected class.

No reasonable jury could find that the Advisement was imposed as a pretext for discrimination. Plaintiff fails to carry her burden at Step 3. Counts 1, 2, 5, 6, 9, 10, 16 and 18 are dismissed insofar as they are predicated on Varughese's allegation that the Academic Advisement was imposed as an act of discrimination.

*Referral to the PWC*

Varughese also suggests that she views her referral to the PWC as a distinct discriminatory act.

The referral is not cognizable under state or federal antidiscrimination law because it is not "materially" adverse. She was required to meet with Dr. Figur and Dr. Fersh, and to submit to a toxicology screen. The referral did not cause her to lose any benefits, to lose any responsibilities, to have a lesser title, to disclose the fact of her referral to coworkers, or indeed do anything beyond meet with a few doctors whose job it was to help her. Forcing someone to seek medical or psychological help is not itself an adverse employment action where it is not accompanied by any diminution of the benefits or responsibilities of employment or some actual adverse consequence to the terms or conditions of employment. To the extent that Varughese claims that the referral itself constituted discrimination in violation of state or federal statutes, that claim is dismissed because it was not an adverse employment action.

**\*51** However, Judge Gleeson has specifically found that referring a plaintiff for psychological evaluation, while not materially adverse under federal or state law, is not "merely trivial" under the NYCHRL. *Forgione v. City of New York,* No. 11 Civ. 5248, 2012 WL 4049832, at \*5–6 (E.D.N.Y. Sept.13, 2012). I must agree.

Nevertheless, I cannot agree that Varughese's claim should proceed to trial because, in support of her claim that the referral was *discriminatory,* Varughese has presented only her own conclusory allegations. *See, e.g.,* Varughese 56.1 at ¶ 32.3 ("The PWC is paranoid about their illegal fraudulent

conduct against minority women ..."). She has not presented any evidence.

In particular, on this claim Varughese has presented no testimony that anyone was similarly situated to her-i.e. any other resident or doctor who behaved in the erratic and disruptive way that multiple witnesses described to Hospital administrators-was not referred to the PWC. The hospital has submitted evidence that it referred a black female resident to the PWC when she persisted in making inappropriate advances towards another employee.

Varughese's unconvincing "comparator" analysis asks the Court to conclude that her referral to the PWC was discriminatory insofar as Dr. Najfeld was not also referred to the PWC. Varughese claims that the PWC should have been called to investigate Najfeld after Najfeld criticized Varughese for her failure to prepare an adequate presentation. It should go without saying that a supervisor reprimanding Varughese for her deficient performance does not constitute "erratic" behavior but rather, a natural consequence of Varughese's own performance problems.

Further, Varughese has not presented any direct evidence that the person who made the referral (Pessin–Minsley) or the person who did his own research to confirm the propriety of the referral (Figur) harbored any discriminatory animus against her, based on either her gender or her national origin. Notwithstanding Varughese's unsupported assertions in her Rule 56.1 statement that Figur has been the subject of some unspecified other litigation, there is no evidence in the record of gender or ethnicity-based comments or prior actions by either of them.

No reasonable jury could find fault with the decision to refer a physician who had exhibited obvious signs of distress, and whose behavior was causing severe disruptions in her department, to an administrative body designed to assist troubled physicians,.

Varughese's claim that her referral to the PWC constituted gender or national origin discrimination is dismissed under the City Human Rights Law as well.

*The July 15, 2011 Final Warning*

Next, Varughese alleges that Defendants discriminated against her on the basis of her sex and her national origin by issuing her a Final Warning on July 1, 2011.

Defendants' reasons for issuing the Final Warning-detailed in the warning itself (*see supra* at 43–45)–are on their face perfectly legitimate and completely nondiscriminatory. They are also entirely true. The Department accused her of failing to comply with the terms of her Academic Advisement; Varughese admits that she failed to comply with the terms of her Academic Advisement. The Department accused her of missing required appointments; she admits that she missed appointments required under her advisement. The Department accused her of failing to submit her self-reflective essay; she admits that she submitted her essay on professionalism two and a half months late, and that she also submitted the revised essay after its due date. The Department accuses her of failing to respond to pages, refusing to cover for other residents, being late with assignments, and being late to work; she admits to it all. The list goes on and on.

 **\*52** That she has excuses and what seem to her explanations matters not. Defendants' burden of production at this second stage of the *McDonnell Douglass* analysis is satisfied.

At Stage Three, Varughese offers no evidence that those stated reasons are pretextual. She submits a sampling of e-mails showing that other residents were sometimes late, or could not cover a shift. The most notable thing about those e-mails, however, is that they are proof that other residents actually communicated to others about when they would be absent, when Varughese routinely failed to do so. Varughese also submits the admissions of Morency, Jordan, and others that they were not always in perfect health and sometimes took time off and were unable to cover for other residents. This is unsurprising, to say the least.

Varughese presents *no* evidence that any other resident had an extensive history of stubborn insubordination and absenteeism without notice, i.e. a history comparable to her.

Varughese also fails to come to grips with the difference between her behavior when counseled by administrators and the behavior of others. After the December 8, 2010 incident, McCash accepted counseling and apologized; Varughese did not. The male resident was placed on Academic Advisement, apologized profusely and met with supervisors for months to talk about professionalism; Varughese refused to acknowledge that she had ever exhibited unprofessional behavior.

Varughese is similar to the plaintiff in *Shekhem' El–Bey v. City of New York, et al.,* 419 F.Supp.2d 546 (S.D.N.Y.2006). In that case, Mr. Shekhem' El–Bay complained that his termination must have been the product of discrimination discriminatory because, even though he filed fraudulent tax returns, others who did so were not fired. The Court found him to be without comparators, because:

> not one of the DOC employees cited in plaintiff's complaint was even remotely similarly situated to plaintiff with respect to the disciplinary action taken by the DOC. Mr. El–Bey, in addition to having filed fraudulent tax documents, was found guilty of numerous other disciplinary violations while employed with the DOC, *e.g.,* countless sick leave violations and excessive absenteeism. Nowhere does the complaint allege that even one of the purportedly similarly situated corrections officers was guilty of committing a single act of misconduct other than filing fraudulent tax documents.

419 F.Supp.2d at 551 (internal citations omitted). Varughese has too many strikes against her to compare her to those with just a one or even a few.

It also bears noting that, according to the record, the only other resident who was persistently absent without an adequate excuse-a white male-was also put on final warning. He improved his punctuality and attendance, and successfully graduated from the residency program.

Varughese's claim that Defendants subjected her to illegal discrimination by issuing the Final Warning is dismissed.

### Fall 2011 Refusal to Transfer
 **\*53** Varughese also alleges that Defendants discriminated against her by refusing her request to allow her to switch rotations in October 2011. This incident would not seem to be of any moment; since Varughese was kicked out of the residency program nine days prior to October 2011, so she could not have assumed a different rotation even if the switch had been authorized.

The However, the Department's refusal was communicated to her multiple times—including on September 7, 2011, and certainly before she was sent a Termination Letter, so I will analyze whether she has raised a genuine issue of fact about the reason why her rotation was not changed. She has not.

I will accept, for purposes of this analysis, that not being allowed to change rotations could be an adverse employment action-although I can think of many reasons why that might not be so. However, the Hospital has advanced a legitimate and non-discriminatory reason why it did not authorize the change in her schedule: Varughese missed the July 1, 2011 deadline to request a scheduling change (a fact that is not in dispute) and granting her request would have had a ripple effect on the schedules of others that would have been too difficult to manage, since no one could be found to cover the rotation to which Varughese was assigned-which, by the by, was the rotation she had requested during the period when requests were being accepted.

The question then becomes, at Step Three, whether Varughese has raised a genuine issue of fact going to either pretext or to the real reason for the decision's being discrimination. She has not. Varughese submits no evidence that the decision to deny her change of schedule request was a mere pretext for anything, let alone for discrimination. Defendants note, as they did when they denied the request in September 2011, that 8 out of 10 residents' requests for schedule changes" that came after that July 1, 2011 deadline were denied. (Termination Letter of Sept. 21, 2011, Docket # 205–7 at 38.) Varughese has not submitted any evidence that Defendants granted any transfer requests that were as untimely as hers. Her own conclusory assertion that her request must have been denied because of her gender and/or national origin is woefully insufficient.

Varughese's claim that Defendants violated federal, state, and local antidiscrimination law by refusing her belated schedule change request is dismissed.

*The September 21, 2011 Termination*

I come now to the heart of Varughese's claim: that Defendants should not have kicked her out of Mount Sinai's residency program on September 21, 2011.

I will assume that she makes out a *prima facie* case and ignore the obvious argument that her performance issues rendered her unqualified for her position.

The letter notifying her of her summary suspension reveals multiple, independent, legitimate and nondiscriminatory reasons to have terminated Varughese.

I begin with the most obvious: she rifled through an administrator's files when left alone in that administrator's office. Varughese admits (reluctantly) that she did so. There can be little dispute that this conduct would provide a legitimate, nondiscriminatory reason for termination in any workplace.

 **\*54**  There is no evidence that Varughese's secret examination into the file on Patel's desk was simply seized on as pretextual cover for an action Defendants were prepared to take for reasons related to Varughese's gender or her national origin. No one else who was guilty of similar misconduct has even been identified; Cordon–Cardo has testified, without contradiction, that there is no such person. It thus stands to reason that no one has ever been allowed to get away with such serious misconduct.

Varughese offers no evidence, direct or even circumstantial, that anyone involved in the decision to fire her (a group that does not include either Schiller or McCash) had ever exhibited any sort of discriminatory attitude, toward her or anyone else. The fact that she was in Patel's office only by accident (because Patel encountered her at Starbucks that morning) negates any notion that she might have been "set up;" the fact that she was caught in the act eliminates any possible suggestion that she was singled out. Where, as here, a plaintiff fails

> to rebut specific, credible evidence offered in support of an employer's articulated reason for their firing, [she] cannot maintain claims that [her] firing[s] w[as] discriminatory.

*Griffin v. Ambika Corp.,* 103 F.Supp.2d 297, 310 (S.D.N.Y.2000) (internal citations omitted) (analyzing case brought under Title VII, the NYSHRL, and the NYCHRL).

Varughese's argument that she should have kept her job despite her snooping relies on her own conclusory and unsubstantiated assertions that Defendants were engaged in a discriminatory "conspiracy" of some kind. But her unsubstantiated and conclusory allegations that there was

discrimination "in the air," and that Defendants engage in "plantation politics," do not meet her third stage burden of producing evidence to raise any genuine issue of fact that would require a trial. "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff,* 196 F.3d at 451–52 (restating principle that to defeat summary judgment, plaintiffs', "affidavits must be based upon concrete particulars, not conclusory allegations") (citing, *inter alia, BellSouth Telecomms., Inc. v. W.R. Grace & Co.,* 77 F.3d 603, 615 (2d Cir.1996)). *See also Ricks,* 92 F.Supp.2d at 346–47 (basing grant of summary judgment for defendant in Title VII case, in part, on plaintiff's reliance on conclusory allegations to rebut defendants' specific evidence); *Lytle,* 2012 WL 393008, at *19 ("the NYCHRL does not alter the kind, quality or nature of evidence that is necessary to support or defeat a motion for summary judgment under Rule 56.").

The analysis might stop there. But inquiring into the hospital's other justifications for terminating Varughese-and her rejoinders-only strengthens Defendants' case.

The termination letter cited six additional reasons why she was being fired. First, there was her disastrous performance on Najfeld's rotation. Varughese admits that, during that rotation, she disobeyed instructions to stop fiddling with her phone, failed to follow Najfeld's instructions on how to prepare a presentation, provided Najfeld with an incomplete presentation only an hour before the close of business the day before the presentation was to be made, and failed to notify others that the presentation conference was being canceled. Varughese submits no evidence that anyone else engaged in similar conduct. Nor does she submit any evidence that Najfeld, a woman, complained about Varughese because of plaintiff's gender or her national origin, rather than because of her admitted bad conduct.

 **\*55** Next is Varughese's insubordinate behavior towards Jordan on August 5, 2011 and August 12, 2011. Varughese admits that, on those dates, she failed to respond to Jordan's e-mails and pages. Indeed, she admits that she failed to respond to Jordan even after Lento explicitly told her to do so. Varughese submits no evidence that anyone else was allowed to engage in a similar pattern of disobeying instructions and failing to communicate with supervisors regarding coverage. Nor does she submit any direct evidence that Jordan, Lento or Najfeld-the three persons who testified about these incidents-

had any bias against her because of her gender or national origin.

Third is Varughese's "Unprofessional Response to Request for Change of Elective Rotation," referring to Varughese's refusal to accept the Department's decision not to consent to her untimely request to switch rotations. Varughese does not dispute that, when one administrator denied her request, she went to supervisor after supervisor to renew her request, failing in each instance to tell anyone that it had already been denied by others. Varughese points to no one else who engaged in similar conduct. Nor does she submit any direct evidence of discriminatory animus by any of the administrators involved, i.e. Firpo, a Dr. Harpaz, Scott Barnett, and Paul Johnson.

Fourth, the Department cited her for her poor conference attendance. When a male resident was told that he was below the 80% conference attendance requirement, he gave a make-up presentation without complaint. (*Id.* at 72–73). When Varughese was told the same thing, she procrastinated, objected, and then walked out of her scheduled presentation with neither explanation nor apology. She never made the presentation.

Fifth is Varughese's "poor communication regarding leave of absence." Varughese does not dispute that she herself asked about taking F.M.L.A. leave on September 15, 2011. Nor she does dispute that Defendants encouraged her to take a leave and gave her materials so she could make such a request. In the days that followed, several hospital administrators tried to reach Varughese to inquire about whether she would in fact be making a leave request, as well as to ask about her health. She did not respond to any of these queries, although she admits that she read them. She showed up at work despite having been being told-by Lento, in writing-*not* to come to work. Varughese submits no evidence that anyone else engaged in similar behavior. Nor does she submit evidence that Lento or anyone else demonstrated animus toward women or anyone because of national origin.

Sixth, all of this behavior occurred in the brief six week period following Varughese's receipt of a Final Warning telling her that she had to start acting more professionally or she would be fired. None of this behavior is particularly professional. All of it is either petulant or insubordinate.

Varughese may take issue with what it meant to behave "professionally" at Mount Sinai, but she cannot get around the

fact that, "an employer is permitted to set its own performance standards" including standards ... so long as they are not discriminatory." *Nolley,* 857 F.Supp.2d at 441 (analyzing case under federal law, state law, and the NYCHRL). As neither the Final Warning nor the Advisement was discriminatory, Defendants cannot be faulted for firing Varughese when she failed to abide by their terms.

**\*56** Whether summary judgment is appropriate always depends on ' "the strength of the plaintiff[s'] *prima facie* case, the probative value of the proof that the [defendants'] explanation is false, and any other evidence' that supports the defendants' case." *Lizardo v. Denny's, Inc.,* 270 F.3d at 103 (2d Cir.2001) (quoting *Reeves,* 530 U.S. at 148–49). Having reviewed the entire record as submitted by Varughese, I conclude that Varughese has failed to mount an evidentiary carry her burden of production at the third stage of the analysis and her ultimate burden of persuasion. On the evidence in the record, no reasonable juror could find Varughese to have overcome the overwhelming evidence that Defendants disciplined and terminated her, not because of her sex or her ethnicity, but because of her own admitted behavior-behavior that her employer found unprofessional and inappropriate.

In *Pearson v. Unification Theological Seminary,* 785 F.Supp.2d 141 (S.D.N.Y.2011), the Court dismissed a Title VII plaintiff's claims because it was not disputed that she

> engaged in a loud argument with her boss and called her a "racist" and a "liar." Whatever occurred, it required the presence of building security, the NYPD, and EMS. This is not acceptable office behavior, and a complaint of racial discrimination does not shield an employee from termination when she acts inappropriately.

*Id.* at 161 (analyzing claims brought under, *inter alia,* the NYCHRL). Throughout the final year of her residency, Varughese engaged in unacceptable workplace behavior. By her own admission, she yelled, she swore, she interrupted, she rolled her eyes, she was late, absent, and-in conversations she recorded and submitted to the Court-by turns confrontational and evasive. The very tape recordings she made-and the pacing and aggressive tone of voice they reveal-confirm the

testimony of others about her attitude and her behavior. This court can hardly ignore what is on the tapes for anyone to hear. *See Scott v. Harris,* 550 U.S. 372, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) (appropriate for a court to take judicial notice of facts regarding intangible circumstances of encounter preserved in audiovisual recordings if court reviews said recordings).

Yet despite her protracted confrontational conduct, Defendants appear to have bent over backwards to assist Varughese. She received counseling from the Department, from the hospital's overarching Office of Graduate Medical Education, from Human Resources, and from the PWC. Several administrators came in from outside Mount Sinai and were prepared to offer her a clean slate, which she promptly sullied. Even if the Department was, at times, in disarray, antidiscrimination law "does not make [defendants] liable for doing stupid or even wicked things; it makes them liable for *discriminating." Norton v. Sam's Club,* 145 F.3d 114, 120 (2d Cir.1998) (analyzing ADEA claim) (emphasis in original). There is no evidence on which a reasonable jury could conclude that Defendants *discriminated* against Varughese on the basis of her race or her gender.

**\*57** *Nolley* again proves instructive. When Mr. Nolley was given a PIP and told to improve his professionalism, he broke the standards set forth in that PIP by aggressively confronting his superior about what he thought were lies in the customers' complaints that had prompted the PIP in the first instance. He ultimately was fired because he could not handle professionally the complaints about professionalism. It did not matter whether the initial complaints were truthful, it mattered that he was unable to resolve his differences with his employer peacefully and professionally.

Varughese's case suffers from the same defect. As in *Nolley,* "Any deceitful conduct by [Jordan or McCash] or deficiencies in [her supervisors'] performance *do not create an issue of fact regarding [Varughese's] own performance* during [the months-long disciplinary process] or [Defendants'] motives in firing [her] for [her] failure to perform as [her] employer expected and as outlined in the [Academic Advisement]."(emphasis added). She has therefore failed to raise a genuine issue of material fact that her termination or any of the supposedly adverse actions preceding it were pretextual or that they were motivated, in whole or in part, by any desire to discriminate against her, on any ground. She *Nolley,* 857 F.Supp.2d at 460.

Varughese has also been unable to point to any circumstantial evidence of discriminatory animus because she has identified *no one* who was similarly situated to her in all material respects-material respects including being on Academic Advisement, having been referred to the PWC, and being on Final Warning. No one else whose existence is disclosed in the record had a similarly pockmarked record of chronic lateness, absenteeism, refusal to follow instructions, and explosive anger. No one else simply refused to comply with the terms of an Academic Advisement or made up silly excuses for not doing so, like "I complained to HR so I don't have to comply." Any mistakes made by other residents to which Varughese points are either less severe, less frequent, or more willingly remedied by their perpetrators-and in most instances, all three.

Rather than point to others outside her protected class who engaged in similar conduct and received preferential treatment, Varughese blames others for her own conduct. She failed to plan an acceptable presentation? That was Najfeld's fault, for not telling her soon enough that it was unacceptable-never mind that Varughese did not send it to her supervisor until an hour before the close of business on the day before she was scheduled to present. (Varughese Dep. at 384.) Varughese was caught going through the files on someone else's desk? That was Patel's fault, for leaving her in an office with files on the desk. (Internal Appeal Hearing, Docket # 205–31 at 60.) Varughese failed to confirm that she could not cover for a sick resident? That was Jordan's fault, for asking her to provide coverage in the first place-the very request constituted "outrageous harassment." (Varughese Dep. at 465–66.)

**\*58**  There is no evidence in the record that any other resident acted out in such a way. Moreover, even under the NYCHRL, a plaintiff cannot "establish pretext "by rationalizing her errors or by blaming others." *Melman,* 98 A.D.3d at 121, 946 N.Y.S.2d 27 (N.Y.App. Div. 1st Dep't 2012) (internal citations omitted).

There are a few instances when Varughese is able to point to other residents who engaged in single bad acts, or who had bad weeks. But the record contains no evidence that anyone else had her lengthy record of persistently bad behavior. While other residents were cited for inappropriate attitudes or isolated angry outbursts, Varughese's lapses in professionalism were chronic and cumulative. (Firpo Dep. at 43, 170–74.) Varughese submits no evidence of anything different.

As the New York Court of Appeals has found, "it matters not whether the [employer's] stated reason for [the challenged action] was a good reason, a bad reason, or a petty one. What matters is that the [employer's] stated reason for [the action] was nondiscriminatory." *Forrest v. Jewish Guild for the Blind,* 3 N.Y.3d 295, 308 n. 5, 786 N.Y.S.2d 382, 819 N.E.2d 998 (N.Y.2004). Varughese has submitted no evidence that discrimination played any part-even a small part-in the decisions to discipline or terminate her. *Kerman–Mastour v. Fin. Indus. Regulatory Auth.,* 814 F.Supp.2d 355, 367 (S.D.N.Y.2011) ("[E]ven under the more liberal NYCHRL, summary judgment will still be appropriate where a plaintiff does not adduce sufficient evidence of a link between her termination and a discriminatory motive ..."); *see also Jeune v. City of New York,* No. 11 Civ. 7424, 2014 WL 83851, at \*4 (S.D.N.Y. Jan. 9, 2014) (collecting cases). She has done little more than recount that she was subjected to adverse actions and that she was a member of two protected classes. More is required. *Dhar,* 2014 WL 4773965, at \*7.

The motion for a summary judgment of dismissal is GRANTED as to Counts 1, 2, 5, 6, 9, 10, 16, and 18.

## V. The Motion for Summary Judgment is GRANTED as to Counts 3, 7, 8, and 11 (Hostile Work Environment under Title VII, NYHRL and NYCHRL).

Varughese claims-in counts 3, 7, 8 and 11–that Defendants subjected her to a hostile work environment on the basis of her race and gender, in violation of state, local and federal law.

### A. *Varughese's State and Federal Claims*

To defeat a motion for summary judgment on a claim of racially or sexually hostile work environment under federal and state law, a plaintiff must produce evidence that "the work environment both objectively was, and subjectively was perceived by the plaintiff to be," *Schiano v. Quality Payroll Sys., Inc.,* 445 F.3d 597, 604 (2d Cir.2006), "permeated with discriminatory intimidation, ridicule, and insult, that [wa]s sufficiently severe or pervasive to alter the conditions of the victim's employment." *Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 570 (2d Cir.2000) (citation and quotation marks omitted). The Supreme Court has "made it clear that that conduct must be extreme to amount to a change in the terms and conditions of employment" and that courts must filter out complaints attacking "the ordinary tribulations of the workplace." *Faragher v. City of Boca Raton,* 524 U.S.

775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). Isolated incidents ordinarily will not rise to the level of a hostile work environment, but may if sufficiently severe. *See id.; Kemp v. A & J Produce Corp.,* 164 Fed. Appx. 12, 14 (2d Cir.2005); *Howley v. Town of Stratford,* 217 F.3d 141, 153 (2d Cir.2000).

**\*59** In determining whether the alleged conduct was so severe or pervasive as to create an objectively hostile or abusive work environment, courts should consider the totality of the circumstances, including such factors as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).

Varughese's hostile work environment claims are based on an accumulation of discrete indignities. In addition to the matters she assigned as discrimination-all of which make up part of her hostile work environment claims-these include (1) Schiller's few sporadic comments during the first two years of her residency, (2) her desk was broken into (although she does not know by whom), (3) the lab slowed processing of her patient slides, (4) other people whispered about her, (5) McCash yelled at her before she was removed from his supervision, and "stomped around" afterward. For purposes of this motion, I will presume that all of these things happened.

> *Varughese Has Failed to Present Any Evidence Connecting These Any of These Events to Her Membership in a Protected Class.*

The principal reason why the Hospital is entitled to summary judgment dismissing Varughese's hostile work environment claim under federal and state law. Varughese has not presented any evidence from which a reasonable jury could infer that any of those events-let alone all of them collectively-occurred under circumstances giving rise to an inference of discrimination.

While "the incidents comprising a hostile work environment claim need not make reference to any trait or condition on the basis of which the discrimination has occurred" they must occur under circumstances in which "the incidents can reasonably be interpreted as having taken place on the basis of that trait or condition." *Svenningsen v. Coll. of Staten Island,* No. 01–CV–7550, 2003 WL 21143076, at \*2 (E.D.N.Y.Mar.23, 2003) (citing *Gregory v. Daly,* 243 F.3d 687, 694–95 (2d Cir.2001)). "Everyone can be characterized

by ... race ... and many bosses are harsh, unjust, and rude. It is therefore important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage or correlation to the claimed ground of discrimination." *Alfano v. Costello,* 294 F.3d 365, 377 (2d Cir.2002). Facially neutral incidents may be sufficient to establish a hostile work environment claim "so long as a reasonable fact finder could conclude that they were, in fact, based on [race]. But this requires some circumstantial or other basis for inferring that incidents [race]-neutral on their face were in fact discriminatory." *Id.* at 378.

Varughese points to no evidence that would allow a jury to conclude that she was subjected to any purported indignity because of either her race or her sex. As discussed above, when analyzing Varughese's discrimination claims, there is no evidence in the record to connect any of the eight adverse actions she identified as discriminatory to Varughese's being a woman or being of Indian descent. That lack of evidence does not change when those activites are viewed through the prism of hostile work environment analysis.

**\*60** Varughese also submits no evidence connecting the other incidents described-such as the broken lock on her desk, or the lab's pace in processing her slides-to her membership in any protected class. None whatever.

So her hostile work environment claim under state and federal law rises and falls on whether Schiller and McCash's comments created a hostile work environment for her. They do not. They were the quintessence of "stray remarks"-neither so many nor so frequent as to alter her workplace in any material way. This is without regard to the fact that at least two of the comments-Schiller's DNA remark and McCash's "work ethnic" e-mail-could not be understood by any reasonable trier of fact as the ethnic slurs Varughese makes them out to be.

It is not clear that these allegedly scurrilous remarks were made more than 300 days before plaintiff filed her charge with the EEOC: Schiller's remarks were made during the first two years of her residency. Nevertheless, "consideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, is permissible for the purposes of assessing liability, so long as an act contributing to that hostile environment takes place within the statutory time period." *McGullam v. Cedar Graphics, Inc.,* 609 F.3d 70, 75 (2d Cir.2010) (quoting *Nat'l*

*R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 105, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002)).

Schiller's alleged comments about the "crazy things you'll find in India" were perhaps impolitic but they are hardly "severe" or "pervasive" enough to create a hostile work environment, since they are alleged to have occurred four times over the course of her employment. That is by definition not "pervasive."

Schiller's DNA remark was made early in Varughese's second year of residency, in the fall of 2009. It was a one-off remark. It contained no reference to her ethnicity or national origin. In context, it was a remark about the genetic basis of depression, which was the subject under discussion-Varughese's mental health, her perceived depression. Schiller directed Varughese to obtain mental health counseling, not because of her gender or her ethnicity, but because she presented as depressed in the workplace. Many people, including doctors, believe that there is a genetic (i.e., DNA-based) component to depression. *See, e.g.,* Eileen P. Ryan, D.O., "What Psychiatry, Developmental Psychology, and Neuroscience Can Teach Us About at-Risk Students," 17 Wash. & Lee J. Civil Rts. & Soc. Just. 59, 64–65 (2010). Schiller's comment cannot reasonably be understood in any manner other than this.

As for McCash's e-mail, it was discussed extensively above. It does not refer to Varughese's status as a person of Indian descent. The insertion of the letter "n" into the phrase "work ethic" is an obvious typographical error. For that reason it does not evidence a hostile work environment on any forbidden basis.

But there is another reason why this email is not evidence of a hostile work environment. Varughese did not become aware of it until long after she stopped working for Defendants. Varughese was not carbon copied on the "work ethnic" e-mail. At her deposition (which occurred after her termination), she denied knowing about any discriminatory comments ever uttered by McCash. Only now does she allege that this, email contributed to the purportedly hostile environment she faced.

**\*61** A plaintiff need not herself be the target of discriminatory comments in order for those comments to contribute to a hostile work environment; nor does the plaintiff need to hear such comments first-hand. *Whidbee v. Garzarelli Food Specialties, Inc.,* 223 F.3d 62, 69–70 (2d Cir.2000); *see also Perry v. Ethan Allen, Inc.,* 115 F.3d 143, 150 (2d Cir.1997) ("Since one of the critical inquiries

with respect to a hostile environment claim is the nature of the environment itself, evidence of the general work atmosphere is relevant."); *Cruz,* 202 F.3d at 571 (finding that, even if plaintiff were not present when some comments were made, "a jury plausibly could find that [defendant's] persistently discriminatory conduct created an overall hostile or abusive environment" which "exacerbated the effect of the harassment [plaintiff] experienced individually" (internal quotation marks and citations omitted))..

But, to rely on discriminatory comments in pursuit of a hostile work environment claim, a plaintiff must at least have been generally *aware* that such comments were uttered. The *Whidbee* court examined the totality of the circumstances and found that "the plaintiffs were subjected to, *or at the very least aware of,* a stream of racially offensive comments." 223 F.3d at 70 (emphasis added). The *Whidbee* court relied on *Schwapp v. Town of Avon,* 118 F.3d 106 (2d Cir.1997). In *Schwapp,* the court explained that, "The mere fact that [the plaintiff] was not present when a racially derogatory comment was made will not render that comment irrelevant to his hostile work environment claim" *because* "the fact that a plaintiff learns second-hand of a racially derogatory comment or joke by a fellow employee or supervisor also can impact the work environment." 118 F.3d at 111.

Here, Varughese did not learn of the "work ethnic" comment even second-hand. She was not aware of the email at all during the period while she was a resident at Mount Sinai. It would be difficult indeed for a comment to alter the conditions of Varughese's employment if she was unaware of it until well after she stopped being employed. "A plaintiff need not be the recipient of [racially] offensive material for it to contribute to a hostile work environment. Nevertheless, if the material is not publicly displayed or disseminated, and is not something [she was] ... generally aware of, its contribution to a hostile work environment may be negligible. *Ortiz–Moss v. New York City Dep't of Transp.,* 623 F.Supp.2d 379, 401 n. 19 (S.D.N.Y.2008); *cf. Patane v. Clark,* 508 F.3d 106, 114 (2d Cir.2007) (plaintiffs regular observation of male employee watching pornographic videos, and her being required to handle pornographic material herself in opening supervisor's mail, were relevant to assessing whether her work environment was objectively hostile to women). Here, where there is literally no other evidence of ethnic slurs (as there was in *Whidbee),* and no other evidence of compromised behavior on McCash's part, the probative value of the email is not just negligible; it is nil.

**\*62** The "work ethnic" e-mail is the *only* comment with any nexus whatsoever to the treatment she describes as hostile that occurred within the statutory period, in that it has a connection to the December 8, 2010 incident. There is no other evidence of discriminatory comments or other direct evidence of animus that relates to the treatment of which she complains. I therefore cannot consider the comment as but one instance of a general atmosphere of discriminatory hostility, particularly in view of the circumstances under which the comment was made-i.e. that it would be reasonable to consider it a scrivener's error.

Moreover, when Varughese complained about McCash's behavior in December (i.e., at the time he composed the e-mail), Defendants removed her from his supervision and ensured that they did not have to work together, even as colleagues, thus shielding her from whatever hostility she alleges. She now claims that McCash "stomped around" her desk on a subsequent rotation, but admits that she did not have to work with him and that she never notified anyone that she was still having problems with him.

Under federal and state laws, to prevail on a hostile work environment claim, plaintiffs must show not only severe or pervasive harassment but also "a specific basis ... for imputing the conduct that created the hostile environment to the employer." *Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 715 (2d Cir.1996). Because the "stomping" was by a co-worker (as she no longer reported to him) and not a supervisor, Varughese must demonstrate that Defendants "either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it." *Id.* (internal quotation marks omitted). "[A]n employer will be liable in negligence for a racially ... hostile work environment created by a victim's co-workers if the employer knows about (or reasonably should know about) that harassment but fails to take appropriately remedial action." *Richardson,* 180 F.3d at 446 (citing *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 759, 118 S.Ct. 2257, 141 L.Ed.2d 633, (1998)); *see Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 766 (2d Cir.1998).

In the end, "Determining whether workplace harassment was severe or pervasive enough to be actionable depends on the totality of the circumstances." *Cruz,* 202 F.3d at 570. Here, the totality of the circumstances do not even remotely suggest that Varughese was the victim of a hostile work environment, either because she was a woman or because she was of Indian descent. If there is any suggestion of hostility at all-a proposition very much in dispute-the entirety of the evidence

points to Varughese's uncooperative, insubordinate attitude as its root cause. The statutes she invokes do not protect Varughese from the consequences of her own behavior. Varughese has failed to provide evidence from which a reasonable jury could conclude that any dislike was based on her race or her sex.

**\*63** Consideration of the totality of Varughese's employment does not yield any evidence of an environment severely or pervasively infected with discriminatory hostility on the basis of her gender and/or her race. It merely reveals that, when she acted out, there were consequences, and that she happened to be a woman of Indian descent. But again, "I am a member of a protected class; my workplace was hostile; it must have been because of my protected class," is a logical fallacy that does not insulate a plaintiff from summary judgment where the undisputed facts warrant dismissal of her claims as a matter of law.

While "the appalling conduct alleged in prior cases should not be taken to mark the boundary of what is actionable," *Richardson v. New York State Dep't of Correctional Serv.,* 180 F.3d 426, 439 (2d Cir.1999), Varughese's evidence of McCash's e-mail, Schiller's interest in India, and Schiller's concern that her depression might be DNA-based are neither "severe" nor "continuous" nor "concerted," *Cruz,* 202 F.3d at 570 (internal quotation marks omitted)-and so will not sustain a hostile work environment claim under federal or state law. There is *no* evidence in this record that Varughese was subjected to repeated indignities (or even to one particularly egregious indignity) *because of either her race or her gender.*

Not a single piece of evidence even *alludes* unfavorably to Varughese's gender. Plaintiff did not complain that she was experiencing a hostile work environment based on her gender until April 2011. But when she did so, she accused McCash of creating the hostile work environment. But the record contains evidence of only two run-ins between McCash and Varughese-in September 2010 and again in December 2010-which is too sporadic to create a hostile work environment. After that, the hospital removed Varughese from McCash's supervision-five months before she uttered her first complaint. In short, there is not a scintilla of support for her claim of a gender-based hostile work environment.

And so we turn to national origin. Schiller's comments about things one might find in India were, *at worst,* subject to interpretation-and both few in number and sporadic. They were also made well before Varughese's workplace problems

began. Even if these were racially insensitive remarks, his comments cannot be attributed to others, and he ceased being chairman of the Pathology Department before the December 8 incident, the Academic Advisement or the PWC referral.

Schiller's comment about depression's being associated with DNA cannot logically be construed as a comment on Varughese's national origin except under some sort of utterly unreasonable, Oliver Stone-like "conspiracy theory" And McCash's "work ethnic" e-mail almost certainly contains a typographical error, given the complete lack of any other evidence suggesting that McCash was insensitive or worse toward anyone on the basis of their race or national origin. At worst, it is at worse a single stray remark-which, under federal and state law, is insufficient to prove hostile work environment. And of course, Varughese *never* complained that she was being subjected to a hostile work environment on the basis of her race during her tenure at Mount Sinai. Even when she retained counsel in June 2011, her lawyers claimed that the hospital was discriminating against her because of her *gender*.

 **\*64** What remains are only Varughese's conclusory allegations that everyone in the hospital was a racist, a sexist, or both. That is not enough.

Defendants' motion for a summary judgment of dismissal is GRANTED as to counts 3, 5, and 18, i.e. Varughese's state and federal hostile work environment claims.

### B. *Varughese's Hostile Work Environment Claim under the NYCHRL*

Having dismissed Varughese's hostile work environment claim under state and federal law, I now consider whether Varughese's city law claim of hostile work environment can survive Defendants' motion for summary judgment.

The NYCHRL has a more forgiving standard for hostile work environment claims than federal or state laws do. There is no "severe or pervasive" requirement under city law, and "while courts may still dismiss 'truly insubstantial cases,' even a single comment may be actionable in the proper context." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.,* 715 F.3d 102, 113 (2d Cir.2013) (citing *Williams,* 872 N.Y.S.2d at 41 & n. 30).

Nevertheless, the NYCHRL "is not a general civility code," and "summary judgment is still appropriate in NYCHRL cases ... if the record establishes as a matter of law that a

reasonable jury could not find the employer liable under any theory." *Id.* (internal citations omitted). In this case, the record establishes precisely that. Varughese offers no evidence connecting the incidents she now perceives as hostile to bias related either to her race or to her gender. Her wide-ranging, conclusory assertions that there was discrimination in the air do not withstand any level of scrutiny.

Count 11 is dismissed.

### VI. The Motion for Summary Judgment is GRANTED as to Counts 4, 8 and 12 (Retaliation under Title VII, NYHRL and NYCHRL).

Varughese alleges-in counts 4, 8 and 12 of her Second Amended Complaint-that she was disciplined and terminated in retaliation for engaging in the protected activity of complaining about discrimination.

Title VII provides, "It shall be an unlawful employment practice for an employer to discriminate against any ... employee [ ] ... because [the employee] has opposed any practice made an unlawful employment practice by" Title VII. 42 U.S.C. § 2000e–3(a). Retaliation claims are cognizable under § 1981. *See Choudhury v. Polytechnic Inst. of N.Y.,* 735 F.2d 38, 43–44 (2d Cir.1984).

To survive summary judgment with respect to her claim of retaliation, Varughese must raise a genuine issue of fact whether "(1) she participated in a protected activity known to the defendant; (2) the defendant took an employment action disadvantaging her; and (3) there existed a causal connection between the protected activity and the adverse action." *Patane,* 508 F.3d at 115 (citing *Feingold*v. *New York,* 366 F.3d 138, 156 (2d Cir.2004)). The NYCHRL against has no "materiality" requirement; it forbids any form of retaliatory action.

It is well-established that a "plaintiff may prevail on a claim for retaliation even when the underlying conduct complained of was not in fact unlawful so long as he can establish that he possessed a good faith, reasonable belief that the underlying challenged actions of the employer violated [the] law." *Treglia v. Town of Manlius,* 313 F.3d 713, 719 (2d Cir.2002) (internal quotation marks omitted). The law protects employees in the filing of formal charges of discrimination as well as in the making of informal protests of discrimination, including complaints to management. *See Sumner v. U.S. Postal Serv.,* 899 F.2d 203, 209 (2d Cir.1990). Moreover, as the Supreme Court has explained, any action

that "could well dissuade a reasonable worker from making or supporting a charge of discrimination" may constitute retaliation. *Burlington N. and Santa Fe Ry. Co. v. White,* 548 U.S. 53, 57, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006).

**\*65** In this Circuit, the analysis of a retaliation claim follows the same *McDonnell–Douglas* framework discussed in Part III, *supra. Kemp v. A & J Produce Corp.,* 164 F. App'x 12, 15–16 (2d Cir.2005). Thus, "once the plaintiff has made out a *prima facie* case of retaliation, the defendant then has the burden of pointing to evidence that there was a legitimate, non-retaliatory reason for the challenged action. If the defendant meets that burden, the plaintiff must then demonstrate that there is sufficient evidence upon which a reasonable jury could find the proffered legitimate reason merely a pretext for impermissible retaliation." *Id.* (citing *Gallagher v. Delaney,* 139 F.3d 338, 349 (2d Cir.1998)).

With respect to retaliation, Varughese does not get past the first step of the inquiry.

Varughese's 56.1 Statement repeatedly claims that she complained about "discrimination" earlier than April 2011, but *nothing* in the record supports that assertion. Certainly she complained about a "hostile environment" at work as early as September 2010, and described others' behavior as "offensive," but she never gave anyone any reason to suspect that the hostile or offensive environment she was complaining about had anything to do with either her race or gender. She did not mention her sex or her ethnicity in her complaints. She did not complain about any allegedly racist or sexist comments. She did not ascribe what she perceived as mistreatment to her membership in any protected class. She did not compare the way she was being treated to the way Caucasians or males were treated. The people explicitly contradicting her versions of events were often members of one or both of the same protected categories as she-including Drs. Jaffer and Maniar, women of Indian descent, both of whom outranked her and one of whom outranked McCash. Maniar, who Varughese believes would support her version of events, denied that Varughese had ever complained to her about discrimination or retaliation. (Docket # 163 at ¶ 10.)

When Varughese complained about "retaliation" before April 2011, she explicitly linked the alleged retaliation to non-protected activities-principally to having given Lento's rotation a negative internal review or making general allegations about unfair treatment and workplace bullying.

Her first reflection explicitly declined to ascribe McCash's behavior to any motive at all: "*I will not claim to know why Samuel McCash treats me the way he does,* nor will I need to understand why ... But I feel that he is resentful of any success or well-being I may exhibit." (Self–Reflection Essay # 1, Docket # 205–10 at 19.) (emphasis added) Not until April 25, 2011 did Varughese explicitly assert that McCash's behavior toward her was based on her gender. (E-mail from Varughese to Tiger–Paillex of Apr. 25, 2011, Docket # 205–10 at 2.) The letter written by her attorney to Mt Sinai in June 2011 (*See* Docket # 205–10 at 12) identifies a December 23, 2010 email as containing an earlier complaint that she was being discriminated against on the basis of her gender and/ or some perceived disability (which is not a claim asserted in this lawsuit). However, that December 23 email asserts nothing about discrimination: she complained about what she characterizes as abusive behavior and public humiliation. Neither her gender nor her national origin is mentioned; there is nothing in the email to alert the recipient (Tiger–Paillex) that these were the basis of her complaint.

**\*66** Thus, notwithstanding Varughese's conclusory assertions in her 56.1 Statement, there is no *evidence* that she engaged in any protected activity prior to being placed on Academic Advisement.

Instead, all of her statutorily protected activity began in April 2011–well after her December 21, 2010 Academic Advisement, well after McCash's and Jordan's promotions to Chief Resident, and well after Pessin–Minsley's referral of Varughese to the PWC. None of those issues can be chalked up to retaliation for any complaint about discrimination based on gender or national origin.

Of course, her Final Warning and ultimate termination occurred after Varughese engaged in protected activity. But those adverse actions cannot be chalked up to retaliation, either, because they were part and parcel of a course of conduct that began well before any protected activity took place. Under federal and state law, where "gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." *Slattery,* 248 F.3d at 95. The same is true under the NYCHRL. *Melman v. Montefiore Med. Ctr.,* 98 A.D.3d 107, 129, 946 N.Y.S.2d 27, 42 (2012) ("an employer's continuation of a course of conduct that had begun before the employee complained does not constitute retaliation because, in that situation, there is no causal connection between the

employee's protected activity and the employer's challenged conduct ...") (internal citations omitted).

Varughese thus "cannot establish a *prima facie* case of retaliation based on the temporal proximity between the adverse employment actions and her protected activity, even though some of the things about which [she] complains occurred after she engaged in protected activity" in April 2011. *Williams v. Woodhull Med. & Mental Health Ctr.,* 891 F.Supp.2d 301, 315 (E.D.N.Y.2012).

Bending over backward to try to find some way to keep Varughese's claim of retaliation alive, the Court has considered whether her off-hand question to Tiger–Paillex in late December 2010 or January 2011 whether McCash wanted to micromanage her "because he is a guy?" qualifies as protected activity. First, let us assume that this actually qualifies as a complaint of gender-based treatment, rather than evidence of Varughese's own gender bias. However, even assuming that it qualifies as protected, Varughese only raised the concern *after she had already been placed on Academic Advisement.* It does not get her out from under the rule announced above.

The totality of the evidence simply does not admit of an inference that Defendants retaliated against Varughese for engaging in any protected activity.

Defendants' motion for a summary judgment of dismissal is GRANTED as to counts 4, 8 and 12.

### VII. The Motion for Summary Judgment is GRANTED as to Count 17 (Whistleblower Retaliation).

Varughese claims that Defendants violated New York Labor Law § 740, New York's whistleblower statute, by penalizing her for reporting McCash and Jordan for drinking on the job. Presumably, Varughese invokes § 740 because it provides the only private right of action for enforcing § 741, New York's Health Care Whistleblower statute.

**\*67** Section 741 specifically protects healthcare providers who "disclose [ ] or threaten[ ] to disclose to a supervisor, or to a public body an activity, policy or practice of the employer ... that the employee, in good faith, reasonably believes constitutes improper quality of patient care; or objects to, or refuses to participate in" any such activity, policy or practice. N.Y. Labor Law § 741(a)-(b). An employer may not take any adverse personnel action against an

employee "because" she engages in protected activity. N.Y. Labor Law § 740.

Relying on a 2010 Appellate Division decision, Defendants argue that Varughese's whistleblower retaliation claim should be dismissed because she has "failed to identify a specific law, rule or regulation" that the alleged drinking purportedly violated. *See* Defs. Mem., Docket # 172 at 24–25, *citing Deshpande v. Medisys Health Network, Inc.,* 70 A.D.3d 760, 762, 896 N.Y.S.2d 103 (2d Dep't 2010).

The case on which Defendants rely is no longer good law. The New York Court of Appeals expressly directed that it not be followed two months before Defendants filed their brief. *Webb–Weber v. Cmty. Action for Human Servs., Inc.,* 23 N.Y.3d 448, 451, 992 N.Y.S.2d 163 (2014) ("there is no such [identification] requirement ... [and] Appellate Division authority ... should no longer be followed for that proposition.").

The Court of Appeals cautioned that *"recover [y]* under a Labor Law § 740 theory" requires an actual violation of law, 23 N.Y.3d at 452–53, 992 N.Y.S.2d 163, but, were Varughese's accusations true, there would have been a violation of actual law. Undertaking the liberal review that I must for a *pro se* plaintiff, it is not difficult to find a regulation that would be violated if Defendants' physicians—the need for whose "skilled performances ... cannot be overemphasized" (Docket # 205–8 at 11)— were becoming intoxicated before assessing whether, say, someone had cancer. Specifically, New York Public Health Law § 230 *et seq.* is clear that a physician "practicing the profession while impaired by alcohol" has committed "professional misconduct" that can lead to the revocation of his or her medical license. N.Y. Pub. Health Law § 230(1) (incorporating by reference the definition of professional misconduct in N.Y. Educ. Law § 6530); *see also* N.Y. Educ. Law § 6530(7).

Defendants' better objection is that there is no evidence that Plaintiff was terminated in retaliation for engaging in conduct protected by the statute.

New York "enacted Section 741 of the Labor Law to encourage employees to report hazards to their supervisors and to protect them from retaliatory personnel actions when they make such reports." *Pal v. New York Univ.,* No. 06 CIV.5892, 2007 WL 4358463, at *7 (S.D.N.Y. Dec. 10, 2007) (citing Sponsor's Mem. (Oct. 23, 2001), N.Y. Bill Jacket,

L.2002, ch. 24); *see also Collate v. St. Luke's Roosevelt Hosp.,* 132 F.Supp.2d 256, 263 (S.D.N.Y.2001) (citing *Rodgers v. Lenox Hill Hosp.,* 211 A.D.2d 248, 250–51, 626 N.Y.S.2d 137 (1st Dep't 1995)).

 **\*68**  However, to fall afoul of the statute, the adverse action must be taken "because" the employee engaged in protected activity. § 740. In other words, the whistleblower statute, like the anti-discrimination laws, requires some causal connection between an adverse personnel action and a report of dangerous activity.

No reasonable jury could conclude that Defendants took any adverse action to retaliate against Varughese for reporting residents' drinking. Indeed, Varughese herself has specifically disclaimed any idea that there is any causal link between her reports of drinking and any adverse action she experienced: "I don't see it as retaliation for a complaint about people drinking on the job." (Varughese Dep. at 748.)

Even if Varughese had not waived reliance on this theory, however, the record does not support it.

Every time Varughese reported Dementia rounds or other alcoholic activity, she had just been taken to task for her own behavior-not the other way around. She made the first allegation about drinking after she was placed on Academic Advisement and around the time she was referred to the PWC. Varughese brought the issue up again in April, two days after Tiger–Paillex told her that HR could not substantiate her claims regarding the December 8 incident. Her third allegation-specifically claiming that McCash and Jordan had been drinking while involved with patient-care duties-came two days after her contentious May 3, 2011 meeting with Cordon–Cardo, in which she was told to rewrite her self-reflection.

At the follow-up meeting on May 24, when Varughese submitted her self-reflection late, rolled her eyes and allegedly threw a book on the table, Cordon–Cardo said: "the best way ... to move on is not with this attitude. You can come here with another attitude and to say ... I'm going to drop all of this nonsense of people drinking ..."

> We are addressing these people ... we are taking these matters very seriously today. We ... have a lot of work to do ... but at the end of the day it's a program to teach and train people that are excited and passionate about pathology, not that are upset or that have problems ... You can't keep going back and forth ... coming back with new allegations now this person is drinking and now the other person is drinking then no one knows what it's about if you're talking ..."

(Docket # 205–24 at 40–41). When he said that they were indeed taking these matters seriously, he was not kidding. He was obviously referring to Figur's involvement, which led to finding a bottle of Captain Morgan on hospital premises. This in turn led to a hospital-wide e-mail admonishing people to stop bringing alcohol to work. Varughese was not punished for her "whistleblowing" activity; to the contrary, it was followed up on, and things improved. But as with her claims of retaliation under Title VII and the state and city human rights laws, we must look at the totality of the circumstances, as demonstrated by the admissible evidence, rather than conclusion or conjecture.

 **\*69**  The totality of the circumstances of this case would not permit any reasonable juror to conclude that the hospital was reacting to Varughese's complaints about alcohol with adverse actions, rather than the other way around. Before she uttered a word about alcohol, Varughese had been put on Academic Advisement, so that very serious disciplinary action cannot be attributed to her whistleblowing. The evidence is undisputed that she failed to comply with the conditions of her Advisement; that was misconduct on her part, which was in no way excused by her whistleblowing. Ample evidence of her behavior at work justifies her being referred to the PWC. And her termination was occasioned by admitted instances of misconduct, the last straw being her admitted rifling through a file on the desk of an HR employee. Engaging in whistleblowing does not insulate an employee from being disciplined or fired for misconduct, and here, there is no genuine issue of fact that misconduct warranting discipline occurred.

The motion for summary judgment is GRANTED as to Varughese's §§ 740–741 claim (Count 17).

**VIII. The Motion for Summary Judgment Dismissing Count XIX (Family and Medical Leave Act) is GRANTED.**

Varughese's FMLA claim is an unusual one.

In September 2011, Varughese herself suggested she might take a leave of absence from work. Defendants encouraged her to do so, provided her with the materials necessary to apply for

FMLA leave, and followed up to see how Varughese was doing when she failed to submit an application. Several days after her initial inquiry and (according to her Rule 56.1 Statement) before she had even made a formal request to take leave, she said she wanted to take some leave at a later date and and come back to work. Her FMLA claim is based on the hospital's refusal to allow her to come back to work until she obtained a doctor's assessment that she was fit to return, essentially forcing her to take involuntary leave. *See* Docket # 66 at ¶ 56. The undisputed facts also establish that she disobeyed her employer's orders and came to work without permission for several days.

This is not a violation of the FMLA. The claim is dismissed.

FMLA was enacted because Congress believed "there is inadequate job security for employees who have serious health conditions that prevent them from working for temporary periods ..." 29 U.S.C. § 2601(a)(4). FMLA therefore provides employees with certain substantive rights, with which employers cannot interfere. *Sarno v. Douglas–Elliman,* 183 F.3d 155 (2d Cir.1999). The Act provides eligible employees the right to take unpaid leave for up to twelve weeks for a serious medical condition as defined by the Act. 29 U.S.C. § 2612(a)(1). It further provides that at the end of that leave the employee is entitled to reinstatement to the former position or an equivalent position. 29 U.S.C. § 2614(a). To ensure the availability of these rights, section 2615(a)(1) makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." Therefore, employers may not "use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions." 29 C.F.R. § 825.220(c).

**\*70** Forced leave, however, "by itself, does not violate any right provided by the FMLA." *Sista v. CDC Ixis N. Am., Inc.,* 445 F.3d 161, 175 (2d Cir.2006). The FMLA establishes certain rights, including, inter alia, "to take leave, to restoration of position, and to maintain a civil action," but it "does not create a right to be free from suspension with

or without pay, nor does the FMLA create a right against infliction of emotional distress." *Id.*

The Second Circuit has allowed that a cause of action "might" lie under the FMLA if such a forced leave "interfered with, restrained, or denied the exercise or attempted exercise of a right provided under the FMLA." But Varughese does not allege that the requirement that she not come back without a doctor's note interfered with her ability to take leave under the FMLA, or with her ability to communicate with Defendants' HR department and submit her FMLA forms. It didn't even interfere with her ability to work; she ignored orders and reported to work anyway.

There can be no question that the Defendants wanted Varughese to exercise her rights under FMLA; they believed she was unstable and needed to take some leave. They did nothing to prevent her from taking FMLA leave; they encouraged her to take a leave.

There is no evidence in the record that would permit a reasonable juror to conclude that Defendants interfered with any right guaranteed by FMLA by requiring Varughese-who, by her own admission, had been ill frequently to the point of absence, and was extremely anxious-to provide a doctor's certification that she was fit for duty before she returned to making assessments that could affect patients' health. *See Robertson v. Amtrak/Nat'l R.R. Passenger Corp.,* 400 F.Supp.2d 612, 614 (S.D.N.Y.2005) (Chin, J.)

Further, even if Varughese had exercised her right to take leave under FMLA, "an employer is entitled to a certification of fitness to return to duty for such absences up to once every 30 days if reasonable safety concerns exist regarding the employee's ability to perform his or her duties, based on the serious health condition for which the employee took" a leave. 29 C.F.R. § 825.312. For a hospital to require a doctor's note certifying the fitness of a physician who has taken, or indicated a desire to take FMLA leave, is a prudent measure for the protection of the public.

To the extent that Varughese claims that Defendants did not require doctors' certifications of fitness from persons not in her protected class, her claim does not lie under the FMLA.

The motion for a summary judgment is GRANTED as to count 19.

## IX. The Motion for Summary Judgment Dismissing Count XV and XVI (Breach of Contract and Breach of Covenant of Good Faith and Fair Dealing) is GRANTED.

Varughese claims that her termination breached her employment contract. The Second Amended Complaint does not specify the alleged breach, but the gravamen of Varughese's contractual claim at her deposition and in her *pro se* papers has been that she was terminated without cause.

**\*71** Varughese's employment contract provided that: "The Program Director [or] the Department Chair ... may take disciplinary action, including termination for cause, against any [resident] who ... fails to demonstrate an acceptable level of ... professionalism."

Varughese has *admitted* to, *inter alia,* screaming, swearing, rolling her eyes, being absent, being late, ignoring pages, ignoring e-mails, ignoring calls, ignoring instructions, going through the files on someone else's desk, canceling a presentation without notice, and submitting an essay on professionalism two months late. The hospital concluded that the admitted behavior did not demonstrate an acceptable level of professionalism. Two appeals boards upheld that determination.

The hospital, not Dr. Varughese and not a jury, has the right to decide which behavior in a resident physician is sufficiently unprofessional to constitute cause for termination. She was terminated for cause. Her contract was not breached.

Her breach of the covenant of good faith and fair dealing fares no better.

Under New York law, there is a covenant of good faith and fair dealing implied in all contracts. *See 511 West 232nd Owners Corp. v. Jennifer Realty Co.,* 98 N.Y.2d 144, 153, 746 N.Y.S.2d 131, 773 N.E.2d 496 (N.Y.2002); *Carvel Corp. v. Diversified Mgmt. Grp.,* 930 F.2d 228, 230 (2d Cir.1991). "This covenant embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Harris v. Provident Life & Accident Ins. Co.,* 310 F.3d 73, 80 (2d Cir.2002). While the implied covenant of good faith and fair dealing does not "imply obligations inconsistent with other terms of the contractual relationship," it does encompass "any promises which a reasonable person in the position of the promisee would be justified in understanding were included." *Manhattan Motorcars, Inc. v. Automobili Lamborghini,* 244

F.R.D. 204 (S.D.N.Y.2007) (quoting *Murphy v. Am. Home Prods. Corp.,* 58 N.Y.2d 293, 304, 461 N.Y.S.2d 232, 448 N.E.2d 86 (N.Y.1983); *Rowe v. Great Atl. & Pac. Tea Co.,* 46 N.Y.2d 62, 69, 412 N.Y.S.2d 827, 385 N.E.2d 566 (N.Y.1978)).

To avoid redundancy, "Claims of breach of the implied covenant ... must be premised on a different set of facts from those underlying a claim for breach of contract." *Deutsche Bank Sec. Inc. v. Rhodes,* 578 F.Supp.2d 652, 664 (S.D.N.Y.2008). "A party may maintain a claim for breach of the implied covenant only if the claim is based on allegations different from the allegations underlying the accompanying breach of contract claim." *Id.* Accordingly, "A claim for breach of the implied covenant will be dismissed as redundant where the conduct allegedly violating the implied covenant is also the predicate for breach of covenant of an express provision of the underlying contract." *ICD Holdings S.A. v. Frankel,* 976 F.Supp. 234, 2434 (S.D.N.Y.1997); *Murphy,* 58 N.Y.2d 293, 461 N.Y.S.2d 232, 448 N.E.2d 86 (holding that the implied obligation is simply "in aid and furtherance of other terms of the agreement of the parties."); *Madison Capital Co., LLC v. Alasia, LLC,* 615 F.Supp.2d 233, 239 (S.D.N.Y.2009).

**\*72** Here, Varughese has not provided any separate set of facts to support her breach of covenant claim, and the Court's own review of the record suggests none.

The motion to dismiss counts 15 and 16 is GRANTED.

## X. The Motion for Summary Judgment is GRANTED as to Count 13 (Tortious Interference with Business Relations).

Varughese alleges that, by failing to provide a summative evaluation to prospective employer RWJ hospital in January of 2011, Defendants engaged in the New York common law tort of interference with business relations, also known as tortious interference with prospective economic advantage.

"To state a claim for tortious interference with prospective economic advantage, a Plaintiff must show that '(1) the Plaintiff had business relations with a third party; (2) the defendant interfered with those business relations; (3) the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) the defendant's acts injured the relationship.' " *Doe v. White Plains Hosp. Med. Ctr. (WPHMC),* No. 10 CIV. 5405 GBD, 2011 WL 2899174, at \*4 (S.D.N.Y. July 8, 2011) *aff'd sub nom. Doe v. French,* 458 F.

App'x 21 (2d Cir.2012) (quoting *Catskill Dev., LLC v. Park Place Entm't,* 547 F.3d 115, 132 (2d Cir.2008)).

Varughese's claim founders on the third element. She has provided nothing other than her own conclusory assertions to prove that Mount Sinai "acted for a wrongful purpose or used dishonest, unfair, or improper means" when it refused to provide RWJ Hospital with a summative evaluation while her appeals were pending.

The Second Circuit has explained that, under New York law, the phrase "wrongful means"

> represent[s] 'physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure; they do not, however, include persuasion alone although it is knowingly directed at interference with the [prospective] contract.' " *NBT Bancorp,* 664 N.E.2d at 497, 641 N.Y.S.2d at 586 (quoting *Guard–Life Corp. v. S. Parker Hardware Mfg. Corp.,* 50 N.Y.2d 183, 428 N.Y.S.2d 628, 632, 406 N.E.2d 445, 449 (N.Y.1980)).

*Scutti Enterprises, LLC v. Park Place Entm't Corp.,* 322 F.3d 211, 216 (2d Cir.2003)

There is neither an allegation nor any evidence that Mount Sinai used the means described in *Scutti Enterprises.* Defendants did not wish to release any summative evaluation of Varughese's employment until her internal appeals of her termination had concluded. This decision actually was to Varughese's benefit; when the request was made her status was "terminated for cause," so if her appeal had been successful in overturning that determination, the information Mount Sinai would have provided would have been incorrect. The hospital was prudent to abide the final resolution of the appeals; prudence does not amount to fraud or any of the other improper means listed above.

The motion to dismiss Count 13 is GRANTED.

### XI. The Motion for Summary Judgment is GRANTED as to Count 14 (Defamation and Defamation Per Se).

**\*73** Varughese alleges that Defendants' act of forwarding the "summative evaluation" to a potential employer would constitute defamation and defamation *per se.* She seeks an injunction preventing Defendants from sending the "summative evaluation" to anyone.

To recover for defamation in New York, Varughese must prove that the Defendants made:

> (1) a false statement about the plaintiff, (2) published to a third party without authorization or privilege; (3) through fault amounting to at least negligence on [the] part of the publisher, (4) that either constitutes defamation *per se* or caused 'special damages.'

*Thorsen v. Sons of Norway,* 996 F.Supp.2d 143, 173 (E.D.N.Y.2014), *reconsideration denied* (May 14, 2014) (quoting *Thai v. Cayre Grp., Ltd.,* 726 F.Supp.2d 323, 329 (S.D.N.Y.2010) (internal citations omitted).

The claim must be dismissed because there is no evidence in the record that Defendants have actually published the summative evaluation to anyone except plaintiff. Unless there is publication to a third party, there is no defamation. [14]

Varughese's real goal is to obtain an injunction prohibiting Mount Sinai from publishing the evaluation to anyone in the future on the ground that it is defamatory. That claim fails because the statements in the summative evaluation she protests are not statements of fact. They are thus not actionable as defamation.

The "threshold issue which must be determined, as a matter of law, [in a defamation case] is whether the complained of statements constitute fact or opinion." *Steinhilber v. Alphonse,* 68 N.Y.2d 283, 290, 508 N.Y.S.2d 901, 501 N.E.2d 550 (1986); *Cohen v. Google, Inc.,* 25 Misc.3d 945, 887 N.Y.S.2d 424 (N.Y.Sup.2009). In determining whether a statement constitutes fact or opinion, a court should consider: "(1) whether the specific language at issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proven true or false; and (3) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to signal ... readers or listeners that what is being read or heard is likely to be opinion, not fact." *Gross v. New York Times Co.,* 82 N.Y.2d 146, 153, 603 N.Y.S.2d 813, 623 N.E.2d 1163 (N.Y.1993) (quoting *Steinhilber,* 68N.Y.2d at 290, 68 N.Y.2d 283, 508 N.Y.S.2d 901, 501 N.E.2d 550). A court is to consider the

context of the statement as a whole. *Sandals Resorts Intern. Ltd. v. Google, Inc.,* 86 A.D.3d 32, 925 N.Y.S.2d 407, 2011 WL 1885939, at *5 (N.Y.2011).

If the statements are "pure opinion," then they are not defamatory as a matter of law even if they are false and libelous. *Steinhilber,* 68 N.Y.2d at 289, 508 N.Y.S.2d 901, 501 N.E.2d 550; *Rinaldi v. Holt, Rinehart & Winston, Inc.* 42 N.Y.2d 369, 380–81, 397 N.Y.S.2d 943, 366 N.E.2d 1299 (*Ct.App.1977* ). "A 'pure opinion' is a statement of opinion which is accompanied by a recitation of the facts upon which it is based." *Steinhilber,* 68 N.Y.2d at 289, 508 N.Y.S.2d 901, 501 N.E.2d 550.; *see also Sandals Resorts Intern. Ltd.,* 86 A.D.3d 32, 925 N.Y.S.2d 407, 2011 WL 1885939, at *5. Such statements are not actionable because "a proffered hypothesis that is offered after a full recitation of the facts on which it is based is readily understood by the audience as conjecture." *Gross,* 80 N.Y.2d at 154, 589 N.Y.S.2d 833, 603 N.E.2d 938.

**\*74** The Summative Evaluation is a two-page document consisting of checked boxes marking Varughese as "satisfactory" or "unsatisfactory" in six categories, plus two explanatory paragraphs:

> Dr. Varughese's evaluations over the initial portion of her Pathology residency training at Mount Sinai demonstrated satisfactory development in the six Core Competency domains. In some rotations her performance was considered superior by individual attendings, particularly in the areas of patient care (gynecological pathology) and medical knowledge (VA hospital rotations).

> However, Dr. Varughese began to exhibit unprofessional behavior and was placed on academic advisement in December 2010, in the middle of her third year of training. While the program advanced Dr. Varughese to her fourth year of training, her substandard performance led the Department Chair to issue her a final warning notice on July 1, 2011. Dr. Varughese's level of professionalism continued to be unsatisfactory and she was summarily suspended pending termination from the program on September 21, 2011. Following Mount Sinai's grievance procedures, Dr. Varughese appealed the termination, but the decision was upheld.

(Docket # 162–6 at 39–40.) The evaluation then checks "no" in response to the prompt "The resident/fellow has demonstrated sufficient competence to enter practice without direct supervision." (*Id.* at 40, 589 N.Y.S.2d 833, 603 N.E.2d 938.)

The only factual assertions in that document are ones with which Varughese does not take issue. They recount what other people thought, the dates of various actions that unquestionably took place, and the results of Varughese's appeals.

What Varughese objects to are the characterizations of her work as "unsatisfactory" "unprofessional" and "substandard." But these are matters of *opinion,* not actionable assertions of fact. *See Tasso v. Platinum Guild Int'l,* No. 94 Civ. 8288, 1998 WL 841489, at *5 (S.D.N.Y. Dec.3, 1998) (finding statements that plaintiff was "unethical, untrustworthy, unprofessional" and "incompetent" to be non-actionable opinion) (citing *Gavenda v. Orleans County,* No. 95–CV–0215E, 1997 WL 65870, at *8, (W.D.N.Y. Feb.10, 1997) (statements that plaintiff was "incompetent," and "there had been problems with her before and she wasn't doing her job right" were non-actionable statements of opinion); *Miller v. Richman,* 184 A.D.2d 191, 592 N.Y.S.2d 201, 203 (App.Div.1992) (statements criticizing plaintiff's performance and comparing her unfavorably to other employees as "one of the wors[t]" nonactionable as a matter of law); *Amodei v. N.Y. State Chiropractic Ass'n,* 160 A.D.2d 279, 553 N.Y.S.2d 713, 715–16 (App.Div.1990), *aff'd, 11* N.Y.2d 891, 77 N.Y.2d 891, 568 N.Y.S.2d 900, 571 N.E.2d 70 (1991) (statement accusing chiropractor of "unprofessional conduct" fails to state an action in defamation); *Hollander v. Cayton,* 145 A.D.2d 605, 606, 536 N.Y.S.2d 790, 792 (App.Div.1988) (statements allegedly made by president of professional staff that plaintiff-physician was "immoral," "unethical," and had "mismanaged cases" were non-actionable)).

**\*75** Moreover, as Judge Daniels has explained, "New York courts have consistently held that subjective job evaluations, including those in connection with an employee's termination, are non-actionable opinion." *Doe v. White Plains Hosp. Med. Ctr. (WPHMC),* No. 10 Civ. 5405, 2011 WL 2899174, at *3 (S.D.N.Y. July 8, 2011) *aff'd sub nom. Doe v. French,* 458 F. App'x 21 (2d Cir.2012) (citing *Williams v. Varig Brazilian Airlines,* 169 A.D.2d 434, 564 N.Y.S.2d 328, 331 (1st Dep't 1991) (memorandum of one supervisor to another and a termination letter from supervisor to Plaintiff are non-actionable opinion); *Ott v. Automatic Connector, Inc.,* 193 A.D.2d 657, 598 N.Y.S.2d 10 (2d Dep't 1993) (unfavorable assessment of work performance in termination letter amounted to a non-actionable expression of opinion). Such statements are non-actionable because "[a]n employer

has the right to assess an employee's performance on the job without judicial interference." *Ott,* 193 A.D.2d at 658, 598 N.Y.S.2d 10 (citing *Miller v. Richman,* 184 A.D.2d 191, 592 N.Y.S.2d 201 (4th Dep't 1992); *Williams,* 169 A.D.2d 434, 564 N.Y.S.2d 328; *Goldberg v. Coldwell Banker,* 159 A.D.2d 684, 553 N.Y.S.2d 432 (2d Dep't 1990)). While not a per se rule, courts are reluctant to sustain a claim for defamation for statements made in the context of an employee evaluation or termination because "no workplace ... can operate effectively unless the employers and employee who work there have the ability to speak freely in evaluating the actions of their employees and co-employees." *Albert v. Locksen,* 239 F.3d 256, 268 (2d Cir.2001)).

There is no reason to depart from that rule here. Indeed, Varughese presented testimony from her prospective employer essentially discounting the importance of the Summative Evaluation as a mere opinion. Had RWJ Hospital received it earlier, it would have investigated the underlying *facts.* That testimony merely confirms the wisdom of the rule in New York: end-of-job evaluations are generally not actionable in defamation suits.

Defendants' motion for a summary judgment of dismissal is GRANTED as to Count 14.

## XII. The Motion for Summary Judgment is GRANTED as to Count 21 (Individual Liability against Defendants Cordon–Cardo, Firpo, and Lento).

As I have found that Varughese cannot withstand summary judgment on any of her claims, no individual liability can attach as to those claims.

The motion for summary judgment is GRANTED as to count 21's claim for individual liability as against defendants Cordon–Cardo, Firpo, Lento and Bleiweiss.

## CONCLUSION

For the foregoing reasons, Defendants' motion for a summary judgment of dismissal as to all counts is GRANTED and the case is dismissed.

The Clerk of the Court is directed to remove Docket No. 161 from the Court's list of pending motions and to close the file.

## All Citations

Not Reported in F.Supp.3d, 2015 WL 1499618

## Footnotes

1    Varughese voluntarily dismissed another count for intentional infliction of emotional distress after Magistrate Judge Francis ordered her to submit to a psychiatric evaluation as a condition of maintaining it. *See* Docket # 45.

2    Only the transcripts were submitted with the motion. By order dated March 13, 2015 (Docket # 215), the Court ordered Varughese to produce the tapes so that I could listen to them myself, rather than merely reading the transcripts or relying on the parties' characterizations of what was said and how. *See Scott v. Harris,* 550 U.S. 372, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) (appropriate for a court to take judicial notice of facts regarding intangible circumstances of an encounter preserved in audio-visual recordings if court reviews said recordings).

3    Varughese herself provided this document to the Court in a public filing. *See* Docket # 205–24.

4    In May 2011, after she made this complaint, Varughese was on rotation at the VA Hospital in the Bronx. (Varughese Dep. at 127–128.) McCash was also there. (*Id.*) There is no evidence that he had any supervisory authority over Varughese, and it is undisputed that he and Varughese were kept apart. (*Id.*) While Varughese reports that McCash "glared" at her or "stomped" around her workplace, she did not report this to anyone. (*Id.*)

5    There is no evidence in the record that Schiller had any role in guiding the course of the Department's investigation of the December 8 incident. The record is also devoid of evidence that Schiller had any role in placing Varughese on Academic Advisement.

6    It begins, "Well, we need some honesty and transparency then because, you know, you can't just have one person, you know, saying whatever they want and doing whatever they want, such as on the moonlighting nights-I'm the primary moonlighter, really, then why does the schedule say somebody else is the primary moonlighter? You know, these are issues like, you need to address, like if you are going to have integrity you're going to have integrity across the board, if not, you're not." (*Id.*) It goes on for another paragraph in the transcript.

7    Jordan testified that a doctor's note was required whenever an absence prevented a resident from fulfilling a departmental requirement *or* whenever the resident is out for three or more days (Jordan Dep. at 162); Morency testified that a note was not required unless the absence was longer than three days. (*See* Transcript of Internal Appeal at 158, Docket # 205–31 at 47.) Specifically, Morency was asked whether she ever asked Varughese "for proof of illness since her absences precluded her from fulfilling a task?" She answers "No, because the policy is you have to miss three consecutive days and she only missed two, so I didn't ask her." (*Id.*)

8    Varughese's claim that the Staff Affairs Committee was a kangaroo court (*see* Varughese 56.1, *passim*), must be assessed in light of her contemporaneous refusal to put any objection to the conduct of the proceedings when those objections could have been addressed.

9    I cannot fault the Hospital for failing to make records available if it did not do so, since this claim has arisen at the last possible moment, long after the close of discovery.

10   Lento appears to have been responsible for Jordan's selection as Chief Resident. Varughese submits only her own conclusory assertions of bias as against him. There is no evidence that McCash had anything to do with the decision, and Schiller was no longer acting as Chair.

11   These facts could also demonstrate that Varughese failed to meet her burden, at McDonnell–Douglas Stage One, of proving, as part of her prima facie case, that she was qualified for the position. It really does not matter, however, whether one analyzes this as a Stage One or a Stage Three issue: there were significant differences between Jordan and Varughese that easily overcame her lesser experience.

12   One might ask whether the hospital's immediate corrective action is enough to save it from liability under the NYCHRL. After all, it immediately removed Varughese from McCash's supervision and separated them moving forward. The answer is no, at least in the context of sexual harassment. *See Zakrzewska v. New Sch.,* 14 N.Y.3d 469, 477, 902 N.Y.S.2d 838, 928 N.E.2d 1035, 1037–38 (2010). In *Zakrzewska,* the state high court returned to the language of the city statute to find that "the affirmative defense to employer liability articulated in *Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) and *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) [does not] apply to sexual harassment and retaliation claims under section 8–107 of the New York City Administrative Code." *Id.* (answering certified question from the Second Circuit in the negative). Of course, there is no Faragher–Ellerth defense under federal law to claims of discrimination, as opposed to harassment/retaliation CHECK; the pertinence of the Hospital's action is that the employer did not discriminat

13   *McDonnell Douglas,* 411 U.S. at 804; *see also Ellis v. Long Island Rail Road Co.,* No. 05–CV–3847, 2008 WL 838766, at *4 (E.D.N.Y. Mar. 31, 2008) (*citing Collins v. New York City Transit Auth.,* 305 F.3d 113, 119 n. 1 (2d Cir.2002)).

14     The evaluation was shown to persons who were deposed, including Dr. Fyfe of Robert Wood Johnson Hospital, but that is a privileged act, taking place in the context of a lawsuit, where the witness (who was identified by Varughese) was being questioned about whether RWJ would have been willing to employ Varughese if the evaluation had been sent (it had not even been written yet when Varughese was discussing possible employment at RWJ). It is not actionable.

---

**End of Document** © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 5191394
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Garry RISSMAN, Plaintiff,

v.

Michael CHERTOFF et al., Defendants.

No. 08 Civ. 7352(DC).
|
Dec. 12, 2008.

West KeySummary

**1** **Civil Rights** 🔑 **Particular Cases**

An airport luggage screener could not maintain an employment discrimination claim since discrimination based on an individual's sexual orientation or perceived sexual orientation was not actionable under federal law. Though individuals may maintain a claim under Title VII for adverse employment actions caused by their lack of conformity to gender stereotypes, the screener did not allege any facts that would support a gender discrimination claim. 42 U.S.C.A. § 2000e et. seq.

22 Cases that cite this headnote

**Attorneys and Law Firms**

Garry Rissman, New York, NY, pro se.

***MEMORANDUM DECISION***

CHIN, District Judge.

**\*1** *Pro se* plaintiff Garry Rissman filed a complaint on August 19, 2008, against defendant Michael Chertoff under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et. seq., and for alleged violations of his Fifth Amendment rights under *Bivens v. Six Unknown Agents of the Fed. Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). Upon review of the complaint, I ordered plaintiff to show cause why his Title VII claim for discrimination based on sexual orientation or perceived sexual orientation and his *Bivens* claim should not be dismissed. Plaintiff submitted a response on November 5, 2008. He also filed an amended complaint on November 3, 2008, naming nine additional defendants, and adding a defamation claim against defendant John Allen. As defendants have not answered, plaintiff has the right to file an amended complaint. His amended complaint is accepted, and I consider the merits of the amended complaint.

Plaintiff has now had two opportunities to articulate a claim. Upon review of plaintiff's amended complaint, as well as his November 5, 2008 response to my order to show cause, I am dismissing the amended complaint *sua sponte* for failure to state a claim upon which relief may be granted. My reasons are as follows: first, plaintiff may not maintain a claim for employment discrimination (including any hostile work environment claim) based on his sexual orientation or perceived sexual orientation; second, plaintiff fails to allege sufficient facts to assert a plausible claim for employment discrimination (including hostile work environment) based on race, religion, or age; third, plaintiff's *Bivens* claim is time-barred by the applicable statute of limitations; and fourth, plaintiff's defamation claim is also time-barred by the applicable statute of limitations.

***BACKGROUND***

Plaintiff was employed from September 1, 2002, to July 27, 2004, by the Transportation Security Agency ("TSA") as a passenger and luggage screener at LaGuardia International Airport in Queens, New York. (Am.Compl.¶ 19). He is a white, Jewish, gay male who was 48 years old when he commenced working at TSA. (*Id.* ¶ 21). He contends that during his employment with TSA, he was discriminated against on the basis of his race, religion, age, sexual orientation, and perceived sexual orientation, and he was denied equal protection of the laws. He also contends defendant Allen lied about him during TSA's investigation into his discrimination claims. (*Id.* ¶¶ 34-35).

***DISCUSSION***

**A. Pleading Standard**

At the pleadings stage, plaintiff's amended complaint must only satisfy Fed.R.Civ.P. 8(a), which calls for "a short and plain statement of the claim," and allege " 'enough facts to

state a claim for relief that is plausible on its face.' " *Patane v. Clark,* 508 F.3d 106, 111-12 (2d Cir.2007) (quoting *Atl. Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1975, 167 L.Ed.2d 929 (2007)). A *prima facie* case is not required. *Amron v. Morgan Stanley Inv. Advisors Inc.,* 464 F.3d 338, 343 (2d Cir.2006).

**\*2** Here, neither plaintiff's complaint nor his response to my order to show cause asserts facts sufficient to state a plausible claim for relief. Even according *pro se* plaintiff's amended complaint the leniency it is due and interpreting it "to raise the strongest arguments that [it] suggest[s]," plaintiff's amended complaint fails to state a claim upon which relief can be granted. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (quotations omitted).

### B. *Employment Discrimination*

#### 1. *Sexual Orientation Discrimination*
As discussed in my September 22, 2008 order to show cause, employment discrimination and workplace harassment based on an individual's sexual orientation or perceived sexual orientation are not actionable under federal law. *See Dawson v. Bumble & Bumble,* 398 F.3d 211, 217-18 (2d Cir.2005). Though individuals may maintain a claim under Title VII for adverse employment actions caused by their lack of conformity to gender stereotypes, *id.* at 218, plaintiff does not allege any facts that would make out a case for gender discrimination under Title VII. Therefore, plaintiff's claims alleging discrimination and hostile work environment because of his sexual orientation or perceived sexual orientation are dismissed.

#### 2. *Race, Religion, Age Discrimination*
Plaintiff's claims of employment discrimination and hostile work environment on the basis of his race, religion, and age are also dismissed for failure to allege facts sufficient to state a plausible claim. Plaintiff alleges a litany of facts regarding his mistreatment by co-workers and supervisors at TSA in LaGuardia Airport. He states that although his work was above average in quality (Am.Compl.¶¶ 36-38), he was frequently reprimanded without justification by his supervisors and co-workers in the presence of others, including passengers (*id.* ¶¶ 27, 44-45, 47, 56, 59). Plaintiff describes specific instances where he was reprimanded without justification, but he does not allege any facts establishing that this mistreatment was prompted by animus towards him because of his race, religion,

or age. Disrespectful, harsh, and unfair treatment in the workplace alone does not state a claim for violation of federal employment law. *See Fridia v. Henderson,* No. 99 Civ. 10749(BSJ), 2000 WL 1772779, at \*6 (S.D.N.Y. Nov.30, 2000) ("not every unpleasant matter creates a cause of action"). To be actionable under Title VII or the Age Discrimination in Employment Act (the "ADEA"), abusive conduct in the workplace must have occurred at least in part because of plaintiff's membership in a protected class. *See Holtz v. Rockefeller & Co.,* 258 F.3d 62, 76 (2d Cir.2001); *Brennan v. Metro. Opera Ass'n,* 192 F.3d 310, 318 (2d Cir.1999); *Ford v. New York City Dep't of Mental Health & Hygiene,* 545 F.Supp.2d 377, 393 (S.D.N.Y.2008). The statutes prohibit discrimination; they do not constitute civility codes. *See Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998).

**\*3** The few facts alleged by plaintiff relating to his race or religion do not amount to more than stray remarks made by co-workers and cannot support a plausible claim of hostile work environment. *See Petrosino v. Bell Atl.,* 385 F.3d 210, 223 (2d Cir.2004) ("Simple teasing, offhand comments, or isolated incidents of offensive conduct (unless extremely serious) will not support a claim of discriminatory harassment."). For instance, plaintiff alleges that when he remarked that the Mel Gibson-directed movie *Passion of the Christ* was "the most anti-semitic [sic] movie ever made, one female screener ... said: 'Your Rabbi told you to say this!' " (Am.Compl.¶ 76). Plaintiff also states he heard "many comments to make him feel left out as one of the few non-Hispanic white persons." (*Id.* ¶ 80). Even interpreting these factual allegations "to raise the strongest arguments they suggest," *Graham v. Henderson,* 89 F.3d at 79, they do not state a plausible claim for a hostile work environment "permeated with discriminatory intimidation, ridicule, and insult ... that was sufficiently severe or pervasive to alter the conditions of ... employment" and create an abusive working environment. *Petrosino,* 385 F.3d at 223 (internal quotation marks and citations omitted).

Nor does plaintiff allege a plausible claim that he suffered adverse employment action because of his race, religion, or age. Instead of pleading facts regarding defendants' discriminatory animus, plaintiff merely makes conclusory statements attributing discriminatory intent to defendants' actions. For instance, plaintiff alleges:

[T]he very fact that Plaintiff was constantly screamed at by TSA employees for being too "thorough" must be the ultimate red flag that he was being discriminated

against. Is there any sphere of federal activity where quality work is penalized? If a staff physician at a Veterans' Administration hospital were too "thorough" during surgery and thereby had a zero mortality rate, would he then be penalized or rewarded? Would such a physician receive a recommendation letter? Plaintiff knows from his life experience that such good work would be rewarded. Such a physician would also have been given a very strong recommendation letter without even having to ask.

Therefore, Plaintiff was discouraged repeatedly from applying for the position for Lead Screener because of his race, religion, and sexual orientation....

(Am.Compl.¶¶ 38-39).

He also alleges:

No one cared to even listen to Plaintiff's point of view, which is the "reason d'etre" of this suit. The powers that be, [defendants] John Allen and John Ellison already made up their made [sic] before they even spoke to Plaintiff. Not once did they let him speak at length. They badgered and scolded Plaintiff for hours as if he were a terrorist in a poorly written "B" movie script.

This was the most extreme example of a constant and one-sided harassment of Plaintiff and intentional infliction of a hostile work environment, which was perpetrated by Defendants because of Plaintiff's race, religion and sexual orientation in violation of Title VII and the Fifth Amendment....

**\*4**  (*Id.* ¶¶ 69-70).

Without support, plaintiff concludes that defendants:

> [I]nflicted this hostile work environment upon Plaintiff in a deliberate attempt to induce him to resign his employment because they did not want an effeminate, gay, Jewish older white male working together with them in the same team.

(*Id.* ¶ 50). He also speculates he "is certain [defendant Annette Torres] would not have yelled at Plaintiff had he been either heterosexual or an African American as she was." (*Id.* ¶ 58).

In essence, plaintiff alleges that because he was yelled at, this must have been because he was "an effeminate, gay, Jewish older white male." Such conclusory and speculative statements are insufficient. While the court must accept the factual allegations of the complaint as true and draw all reasonable inferences in favor of the plaintiff, *Bernheim v. Litt,* 79 F.3d 318, 321 (2d Cir.1996), "bald contentions, unsupported characterizations, and legal conclusions are not well-pleaded allegations" and are insufficient to state a claim for which relief may be granted. *Gavish v. Revlon, Inc.,* No. 00 Civ. 7291(SHS), 2004 WL 2210269, at \*10 (S.D.N.Y. Sept.30, 2004) (quoting *Citibank, N.A., v. Itochu Int'l Inc.,* No. 01 Civ. 6007(GBD), 2003 WL 1797847, at \*1 (S.D.N.Y. Apr.4, 2003)).

Accordingly, plaintiff's claims alleging violation of his rights under federal employment law are dismissed.

**B. *Bivens* Claim**

Plaintiff's *Bivens* claim for violations of his right to equal protection is dismissed because it is time-barred by the applicable statute of limitations. A three-year statute of limitations under New York C.P.L.R. § 214(5) applies to *Bivens* actions brought in federal district court in New York. *Chin v. Bowen,* 833 F.2d 21, 24 (2d Cir.1987). Plaintiff worked as a screener for TSA at LaGuardia International Airport until July 27, 2004. (Am.Compl.¶ 19). The entirety of his *Bivens* claim arises from events that occurred while he was working at the airport.

Accordingly, to the extent that plaintiff's *Bivens* claim is distinct from his statutory employment discrimination claims, it is time-barred. [1] Even assuming any alleged constitutional violations were of a continuing nature that lasted until the date of his departure, plaintiff's *Bivens* claim is time-barred because he filed this action on August 19, 2008, more than four years after he stopped working at the airport.

**C. *Defamation***

Plaintiff's defamation claim against Allen is also dismissed as time-barred. Under New York law, an action to recover damages for defamation must be commenced within one year of the publication of the allegedly defamatory material. *See* N.Y. C.P.L.R. § 215(3); *Shamley v. ITT Corp.,* 869 F.2d 167, 172 (2d Cir.1989). When the plaintiff actually discovers the publication is not relevant. *See Memory's Garden, Inc. v. D'Amico,* 84 A.D.2d 892, 892, 445 N.Y.S.2d 45 (3d Dep't

1981); *Rand v. New York Times Co.,* 75 A.D.2d 417, 424, 430 N.Y.S.2d 271 (1st Dep't 1980). The cause of action accrues on the date of the utterance.

**\*5** Plaintiff alleges Allen lied in a written statement he made to a TSA investigator who was investigating plaintiff's employment discrimination claims. (Am.Compl.¶¶ 34-35). The statement was signed by Allen on November 2, 2005, and the report of investigation was submitted December 22, 2005. (*Id.* Ex. B at F-4). Accordingly, any claim plaintiff may have against Allen for making false factual statements is barred by the one-year statute of limitations.

### *CONCLUSION*

For the reasons set forth above, plaintiff's amended complaint is dismissed, with prejudice and without costs. The Clerk of the Court shall enter judgment accordingly and close the case.

SO ORDERED.

### **All Citations**

Not Reported in F.Supp.2d, 2008 WL 5191394

---

## Footnotes

1    To the extent plaintiff's *Bivens* claim concerns employment discrimination (including hostile work environment) at TSA, Title VII and the ADEA are his exclusive remedies and no *Bivens* cause of action may lie. *See Brown v. Gen. Servs. Admin.,* 425 U.S. 820, 835, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976) (holding Title VII to be the "exclusive judicial remedy for claims of discrimination in federal employment"); *Briones v. Runyon,* 101 F.3d 287, 289 (2d Cir.1996) ("Title VII is the exclusive remedy for discrimination by the federal government on the basis of race, religion, sex, or national origin."); *Bumpus v. Runyon,* No. 94 Civ. 2570(DC), 1997 WL 154053, at \*4 (S.D.N.Y. April 2, 1997) ("ADEA provides the exclusive remedy for federal employees who allege age discrimination.").

---

**End of Document** © 2024 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**  © 2024 Thomson Reuters. No claim to original U.S. Government Works.   4

Johnson El v. Bird, Not Reported in Fed. Supp. (2020)

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 383 of 449

KeyCite Yellow Flag - Negative Treatment

Distinguished by   Richards v. City of New York,   S.D.N.Y.,   May 30, 2023

2020 WL 5124920
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Jeremiah Siddique JOHNSON EL,
a/k/a Jerry L. Johnson, Plaintiff,

v.

Robert J. BIRD d/b/a Robert J. Bird/Town of Chester
Police, Bruce R. Chambers, Anthony Miranda, Daniel
Doellinger, and Town of Chester Police, Defendants.

No. 19-CV-5102 (CS)
|
Signed 08/31/2020

**Attorneys and Law Firms**

Jeremiah S. Johnson El, Warwick, New York, Pro se Plaintiff.

Michael A. Czolacz, Morris Duffy Alonso & Faley, New York, New York, Counsel for Defendants.

**OPINION & ORDER**

Seibel, U.S.D.J.

**\*1** Before the Court is the motion to dismiss of Defendants Robert J. Bird, Bruce R. Chambers, Daniel J. Doellinger, and the Town of Chester Police Department (collectively, "Defendants"). (Doc. 38.) For the following reasons, Defendants' motion is GRANTED.

# I. BACKGROUND

## A. Facts

I accept as true the facts, but not the conclusions, set forth in Plaintiff's Second Amended Complaint, (Doc. 27 ("SAC")), and Plaintiff's Opposition to Defendants' Motion to Dismiss (Doc. 42 ("P's Opp.")).[1] As I explained in the memo endorsement issued December 3, 2019, (Doc. 32), I treat the documents at ECF Nos. 28-30[2] as if they are part of the Second Amended Complaint.[3]

On or about March 22, 2019, around 4:00 a.m., Town of Chester Police Officer Bruce R. Chambers followed Plaintiff's car for about one mile and then pulled him over for a traffic stop. (SAC at 1-2.) Plaintiff did not initially understand why Chambers pulled him over. (*Id.* at 4-5.) Chambers asked, "[W]ho is this car registered to[?]," and Plaintiff stated that the car was registered to "a religious organization and trust" called "MOSI-EL." (P's Opp. at 4.)[4] When Chambers requested Plaintiff's driver's license, Plaintiff stated that he is an "indigenous man of Moorish American de[s]cent" and did not need to have a driver's license while traveling, and instead he provided a "nationality card" and a "picture identification card." (*Id.*)

**\*2** Chambers threatened to arrest Plaintiff or impound his vehicle, and grabbed the handle of his gun. (*Id.*) After forty-five minutes, Plaintiff requested a sergeant. (*Id.*) Thereafter, Officer Robert J. Bird arrived and made unspecified threats, and Plaintiff again requested a sergeant. (*Id.*) Bird said he was a "supervising officer sergeant" but "had no sergeant shield displayed." (*Id.* at 2.) Bird ordered Plaintiff out of the car and opened his passenger door. (*Id.* at 4.) Chambers stood at the driver's side door. Bird said that if Plaintiff did not get out of the car, he would " 'physically snatch' " Plaintiff out of the car, and said, "[G]et your black ass out of the car before I physically remove your ass out of the car.' " (*Id.* at 2, 4.) Plaintiff exited the car, and the officers "surrounded" him while "grabbing their guns," refused to return his identification, and said they would tow his car if he did not produce a driver's license. (*Id.* at 4.)

Plaintiff gave Chambers his "bank card," and Chambers conducted "an unlawful search of [his] information." (*Id.*) Plaintiff was told to sit back in his car. (*Id.*) One of the officers told him he was pulled over for "a wrong left turn" and "having no inspection sticker." (SAC at 4-5.) Chambers gave him a ticket for "no inspection" and then partially tore the inspection sticker on Plaintiff's window. (P's Opp. at 4; *see* Doc. 30 at 3.) Bird said, " '[W]here did you get this inspection, New Burgh New York I bet, yea, Yall, All dirty and illegal in New Burgh,' " and " 'I don't trust [none] of you people, you all are illegal.' " (P's Opp. at 4.) Plaintiff was also ticketed for failing signal when making a turn under New York Vehicle and Traffic Law ("VTL") § 1163(b). (SAC at 21; *see* Doc. 40-2.)[5] The officers told Plaintiff that they did not recognize Plaintiff's "status as an indigenous man" and that he did not have any rights under the Treaty of Peace and Friendship of 1786/87, which Plaintiff claims governs his rights as a "flesh and blood man Moor/Muur American National." (P's Opp. at

Case 3:24-cv-00037-DNH-ML    Document 9    Filed 06/11/24    Page 384 of 449

Johnson El v. Bird, Not Reported in Fed. Supp. (2020)

4.) On July 17, 2019, Plaintiff disposed of his case with a $150 fine for failing to yield to a pedestrian in a crosswalk under VTL § 1152(a), and that disposition covered the no-inspection ticket. (Doc. 40-2.)

At some point after the traffic stop, Plaintiff made a complaint to the Town of Chester Police Department about Bird and Chambers. (P's Opp. at 4.) "[S]hortly afterwards," a poster with Plaintiff's photograph under the word "CAUTION" was displayed at gas stations in Chester. (*Id.*; *see* SAC at 20.) The text of the poster reads as follows:

> The above listed male is Jeremiah Siddique Johnson El (AKA Jerry Lateek Johnson, Jerry Poindexter, Jerome Johnson). During a recent interaction with TCPD Officers, Jeremiah stated that he is a Moorish National and that the laws of the United States, as well as the State of New York do not apply to him. Jeremiah claims to be a former law enforcement officer and has a current unrestricted (full carry) pistol permit. Jeremiah has also mailed several suspicious packages to Town Offices. At this time Jeremiah is considered a safety risk. Persons coming into contact with Jeremiah are to contact Town Police at (845) 469-9311 for non-emergencies and 911 for emergencies.

(SAC at 20.) The poster "[s]lander[ed]" Plaintiff and "cause[d] injury," (P's Opp. at 4), by affecting "the family and [neighbors]" and making his neighbors uncomfortable, afraid, and antisocial, (SAC at 5).

Some weeks after the traffic stop, Bird wrote a letter to Orange County Court Judge William J. DeProspo describing what he called "concern[ing]" behavior by Plaintiff, stating that Plaintiff had a county-issued Unrestricted Carry Pistol Permit, and requesting that Judge DeProspo "immediately revoke" the pistol permit "in the interest of public safety." (SAC at 13.) Bird wrote that he learned that Plaintiff claimed to be a former police officer with the Administration for Children's Services ("ACS") in New York City, checked with Chief

Miranda of the ACS Police, and was told that Plaintiff was never employed as a police officer by that organization and that Plaintiff "resigned while facing charges for a false arrest as well as an Article 78 for being mentally unfit for the job." (*Id.*) Bird also wrote that in 1991 Plaintiff was convicted for criminal possession of a loaded firearm in the third degree, a felony. (*Id.*) Plaintiff alleges that the letter is a "false report." (*Id.*)

**\*3** On May 16, 2019, Plaintiff's pistol permit was revoked. (*Id.* at 15.) Plaintiff requested reconsideration and Judge DeProspo scheduled a hearing, for which Plaintiff failed to appear. (*Id.*; *see id.* at 10-11.) Plaintiff was not aware of the hearing. (*Id.* at 4.) On October 9, 2019, after receiving and reviewing several written submissions from Plaintiff, (*id.* at 11), Judge DeProspo issued a second order revoking Plaintiff's pistol permit, (*id.* at 15). As a result of losing his permit, Plaintiff lost contracts to work as an armed security guard. (*Id.* at 5.) Officers from the Orange County Sheriff's Department, the Bureau of Alcohol, Tobacco, Firearms, and Explosives, and the Federal Bureau of Investigation came to Plaintiff's home and removed his weapons. (P's Opp. at 5.)

**B. Procedural History**

On May 30, 2019, Plaintiff filed a complaint against Bird, Chambers, and Western Surety Company alleging various constitutional violations resulting from the traffic stop. (Doc. 2 at 5-6.) Plaintiff also alleged a violation of the Treaty of Peace and Friendship between the United States and Morocco ("Treaty"). (*Id.* at 5.) By Order dated July 3, 2019, the Court granted Plaintiff's request to proceed without prepayment of fees – that is, *in forma pauperis*. (Doc. 5.) By Order dated July 12, 2019, the Court dismissed the claims against Western Surety and ordered service on Defendants Bird and Chambers. (Doc. 7.) Defendants answered, (Doc. 15), and at a case management conference on September 5, I granted Plaintiff leave to amend. (Minute Entry dated Sept. 5, 2019.) On October 1, Plaintiff filed an amended complaint, adding Miranda and Town of Chester Police Chief Doellinger as defendants. (Doc. 19 at 1.) [6] The Town of Chester Defendants – Bird, Chambers, and Doellinger – filed a pre-motion letter on October 3, (Doc. 20), and the Court held a pre-motion conference on October 28 at which I granted Plaintiff leave to amend a second time, (Minute Entry dated Oct. 28, 2019).

On November 26, Plaintiff filed the Second Amended Complaint naming Bird and "Et al" as Defendants and listing four causes of action: fraud, violation of due process,

Johnson Er v. Bird, Not Reported in Fed. Supp. (2020)

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 385 of 449

perjury, and emotional distress. (SAC at 4-6.) On January 13, 2020, Defendants filed a motion to dismiss, (Doc. 38), a memorandum of law in support of that motion, (Doc. 39), and an affidavit of counsel, (Doc. 40). On February 19, 2020, Plaintiff filed an opposition to the motion, (P's Opp.), and Defendants replied on March 2, 2020, (Doc. 43), after which Plaintiff submitted unauthorized sur-replies, (Docs. 45-47).

## II. LEGAL STANDARDS

### A. Motion to Dismiss

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (alteration, citations, and internal quotation marks omitted). While *Federal Rule of Civil Procedure 8* "marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, ... it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678-79.

**\*4** In considering whether a complaint states a claim upon which relief can be granted, the court "begin[s] by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth," and then determines whether the remaining well-pleaded factual allegations, accepted as true, "plausibly give rise to an entitlement to relief." *Id.* at 679. Deciding whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'shown' – 'that the pleader is entitled to relief.' " *Id.* (alteration omitted) (quoting *Fed. R. Civ. P. 8(a)(2)*).

As described above, complaints by *pro se* plaintiffs shall be examined with "special solicitude," interpreted "to raise the strongest arguments that they suggest," *Shibeshi*, 475 F. App'x at 808 (internal quotation marks and emphasis omitted), and "held to less stringent standards than formal pleadings drafted by lawyers," *Hughes v. Rowe*, 449 U.S. 5, 9 (1980) (*per curiam*) (internal quotation marks omitted). Nevertheless, "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," and district courts "cannot invent factual allegations that [the plaintiff] has not pled." *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010).

### B. Documents Properly Considered

When deciding a motion to dismiss, a court is entitled to consider:

> (1) facts alleged in the complaint and documents attached to it or incorporated in it by reference, (2) documents integral to the complaint and relied upon in it, even if not attached or incorporated by reference, (3) documents or information contained in defendant's motion papers if plaintiff has knowledge or possession of the material and relied on it in framing the complaint ..., and (5) facts of which judicial notice may properly be taken under *Rule 201 of the Federal Rules of Evidence*.

*Weiss v. Incorporated Village of Sag Harbor*, 762 F. Supp. 2d 560, 567 (E.D.N.Y. 2011) (internal quotation marks omitted). Plaintiff has attached the following relevant documents to the Second Amended Complaint and his opposition: the letter from Bird to DeProspo, (SAC at 13), the poster, (*id.* at 20), the revised order of revocation and accompanying letter from DeProspo to Plaintiff, (*id.* at 10-12, 14-15), and a receipt dated July 17, 2019, showing the disposition of two traffic violations, (*id.* at 21). I consider the facts alleged in these documents for purposes of this motion. Plaintiff also attached a document entitled "Treaty with Morocco. 1787." (SAC 22-29.) As I informed Plaintiff on the record at conferences on September 5, 2019, and October 28, 2019, and in writing, (*see* Doc. 12), this document cannot affect the outcome of this motion as any claims asserted under it are frivolous. *See Murakush Caliphate of Amexem*

Johnson Et v. Bird, Not Reported in Fed. Supp. (2020)

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 386 of 449

*Inc. v. New Jersey*, 790 F. Supp. 2d 241, 272 (D.N.J. 2011) (emphasis in original) (internal quotations omitted) ("[C]laims challenging any events associated with arrests, searches, detention, incarceration, prosecution, conviction, etc. that occur within the United States' actual geographical territory (and, especially, if these events involved individuals who reside within that territory) cannot possibly implicate *any* provision of the Treaty with Morocco. Therefore, all such ... claims invoking the Barbary Treaties ... are necessarily frivolous...."). Accordingly, I do not consider it. And as previously mentioned, I take judicial notice of the Chester Town Court Certificate of Disposition dated August 20, 2019. (Doc. 40-2.) *See Jones*, 2015 WL 8362766, at *3.

## III. DISCUSSION

### A. Claims Arising Out of the Traffic Stop

**\*5** Plaintiff styles his first cause of action as "fraud" related to the March 22, 2019 traffic stop, (*see* SAC at 4-5; P's Opp. at 5), but he does not allege any facts that would support such a claim. Interpreting Plaintiff's papers to raise the strongest arguments they suggest, I construe Plaintiff's allegations to be seeking to assert claims based on a traffic stop without reasonable suspicion and/or malicious prosecution under 42 U.S.C. § 1983.

### 1. Illegal Stop

"[T]raffic stops must satisfy the Fourth Amendment's reasonableness limitation, which requires that an officer making a traffic stop have probable cause or reasonable suspicion that the person stopped has committed a traffic violation or is otherwise engaged in or about to be engaged in criminal activity." *United States v. Gomez*, 877 F.3d 76, 86 (2d Cir. 2017) (internal quotation marks omitted).

> An investigatory stop is permissible under the Fourth Amendment if supported by reasonable suspicion. The principal components of a determination of reasonable suspicion will be the events which occurred leading up to the stop and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer,

amount to reasonable suspicion. Reasonable suspicion exists where the officer has a particularized and objective basis for suspecting the person stopped of criminal activity.

*Chepilko v. Bushuyev*, No. 14-CV-6732, 2016 WL 6407479, at *4 (S.D.N.Y. Oct. 28, 2016) (internal quotation marks, citations, and alterations omitted), *report & recommendation adopted*, 2016 WL 7106235 (S.D.N.Y. Dec. 5, 2016). "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren v. United States*, 517 U.S. 806, 810 (1996).

Plaintiff alleges in conclusory fashion that Chambers had no probable cause to stop him, but his papers contain no facts that plausibly allege an illegal traffic stop. Plaintiff alleges that Chambers told him that the stop was for a "wrong left turn." (SAC at 5.) VTL § 1163(b) requires turn signals to be used "during not less than the last one hundred feet" before turning. Plaintiff does not allege that he was using his turn signal, that he did not make a "wrong" turn, or that Chambers did not see him or could not have seen him making such a turn. Plaintiff alleges that Chambers did not pull over a speeding driver who dangerously passed Plaintiff, but that fact has no bearing on Chambers's reasonable suspicion as to whether Plaintiff was not using proper turning movements and required signals. Plaintiff alleges no facts from which I can infer that Chambers lacked reasonable suspicion to stop him. Accordingly, his claim based on an illegal stop is dismissed. *See Marshall v. City of N.Y.*, No. 12-CV-7128, 2014 WL 1468890, at *4 (S.D.N.Y. Apr. 15, 2014). [7] Indeed, Plaintiff later admitted that he had failed to yield, (*see* Doc. 40-2), which shows that he committed a traffic violation supporting the stop. *Sandstrom v. New York*, No. 18-CV-1514, 2020 WL 3949344, at *15 (W.D.N.Y. Feb. 20, 2020), *report & recommendation adopted sub nom. Sandstrom v. Chautauqua County*, 2020 WL 1861710 (W.D.N.Y. Apr. 13, 2020). In other words, Plaintiff's admission to the violation "conclusively establishes probable cause for [the] traffic stop." *Evans v. Solomon*, 681 F. Supp. 2d 233, 245 (E.D.N.Y. 2010). [8] Plaintiff has thus not stated a plausible Fourth Amendment violation arising from the stop.

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 387 of 449

Johnson El v. Bird, Not Reported in Fed. Supp. (2020)

### 2. Malicious Prosecution

**\*6**  Plaintiff alleges that Chambers "gave [him] a ticket for no inspection and then ripped [his] inspection sticker out of [his] window." (P's Opp. at 4.) To assert a malicious prosecution claim, Plaintiff must plausibly allege that "(1) the defendant either commenced or continued a criminal proceeding against him; (2) that the proceeding terminated in his favor; (3) that there was no probable cause for the criminal proceeding; and (4) that the criminal proceeding was instituted in actual malice." *Creese v. City of N.Y.*, No. 19-2502, 2020 WL 2755698, at \*3 (2d Cir. May 27, 2020) (summary order) (internal quotation marks omitted). "[T]o make out a claim for malicious prosecution, a plaintiff must 'show some deprivation of liberty consistent with the concept of "seizure." ' " *Corcoran v. Higgins*, No. 08-CV-10734, 2010 WL 1957231, at \*4 (S.D.N.Y. May 13, 2010) (quoting *Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 116 (2d Cir. 1995)). "[T]he issuance of a pre-arraignment, non-felony summons requiring a later court appearance, without further restrictions, does not constitute a Fourth Amendment seizure." *Burg v. Gosselin*, 591 F.3d 95, 98 (2d Cir. 2010). "[A] plaintiff asserting a malicious prosecution claim under § 1983 must [also] show that the underlying criminal proceeding ended in a manner that affirmatively indicates his innocence." *Lanning v. City of Glens Falls*, 908 F.3d 19, 22 (2d Cir. 2018).

Here, Plaintiff suffered no deprivation of liberty because he received two pre-arraignment, non-felony summonses for violation of VTL §§ 1163 (failure to use a turn signal before changing lanes) and 306 (uninspected motor vehicle) with no further restrictions. (See P's Opp. at 4-5; Doc. 40-2.) Plaintiff does not allege any further encumbrances on his liberty. Accordingly, he has not plausibly alleged a malicious prosecution claim. *See Corcoran*, 2010 WL 1957231, at \*4 (granting summary judgment on malicious prosecution claim because two traffic tickets did not constitute a Fourth Amendment seizure); *Mangino v. Incorporated Village of Patchogue*, 739 F. Supp. 2d 205, 227-29 (E.D.N.Y. 2010) (collecting cases), *on reconsideration in part*, 814 F. Supp. 2d 242 (E.D.N.Y. 2011).

Even if Plaintiff had plausibly alleged deprivation of liberty, he has not alleged that the proceeding terminated in his favor. "[I]f the outcome [of a proceeding] was the result of a compromise to which the accused agreed, ... it is not a termination in favor of the accused for purposes of a malicious prosecution claim." *Posr v. Ct. Officer Shield No.*

*207*, 180 F.3d 409, 418 (2d Cir. 1999). "When a charge is dismissed as part of a plea bargain, the dropped charge is not a favorable termination sufficient to support a malicious prosecution claim." *Wims v. N.Y.C. Police Dep't*, No. 10-CV-6128, 2011 WL 2946369, at \*3 (S.D.N.Y. July 20, 2011). Here, Plaintiff received tickets for violation of VTL §§ 1163 and 306. (See Doc. 40-2.) The Chester Town Court disposed of the § 1163(b) ticket upon Plaintiff's payment of a fine for violation of VTL § 1152(a) (failure to yield to a pedestrian in a crosswalk), and it disposed of the § 306(b) ticket because it was covered by that payment. (See id.) Accordingly, Plaintiff did not allege a favorable termination, and his malicious prosecution claim would also be dismissed on that basis. [9] See *Black v. Petitinato*, 761 F. App'x 18, 23 (2d Cir. 2019) (summary order) ("The dismissal of charges as part of a plea bargain ... does not constitute a favorable termination.").

### B. Claims Arising Out of the Revocation of Plaintiff's Firearm Permit

Plaintiff styles his second cause of action as a "violation of due process" involving "[f]raud regarding Violation of 2nd Amendment Rights." (See SAC at 5; P's Opp. at 5-6.) Plaintiff may be asserting claims that Bird, Chambers, Doellinger, and Miranda violated his right to procedural due process by causing his pistol permit to be revoked. But in a previous ruling in a different case brought by Plaintiff, Chief Judge McMahon dismissed for failure to state a claim on which relief may be granted Plaintiff's procedural due process claim based on the same facts, because "Plaintiff allege[d] no facts suggesting that the state-court remedy to challenge Judge DeProspo's decision – an Article 78 proceeding in the Appellate Division – is inadequate." *Johnson El ex rel. Johnson v. DeProspo*, No. 19-CV-8426, 2019 WL 6311882, at \*4 (S.D.N.Y. Nov. 22, 2019) (citation omitted). This claim is barred here under the doctrine of claim preclusion, which provides that "a final judgment on the merits of an action precludes the parties ... from relitigating issues that were or could have been raised in that action." *Allen v. McCurry*, 449 U.S. 90, 94 (1980). "To prove the affirmative defense a party must show that (1) the previous action involved an adjudication on the merits; (2) the previous action involved the plaintiffs or those in privity with them; (3) the claims asserted in the subsequent action were, or could have been, raised in the prior action." *Twersky v. Yeshiva Univ.*, 112 F. Supp. 3d 173, 179 (S.D.N.Y. 2015) (internal quotation marks omitted), *aff'd sub nom. Gutman v. Yeshiva Univ.*, 637 F. App'x 48 (2d Cir. 2016) (summary order). [10] A court is entitled to raise the defense of claim preclusion *sua sponte. Scherer v.*

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 388 of 449

Johnson Et v. Bird, Not Reported in Fed. Supp. (2020)

*Equitable Life Assurance Soc'y of U.S.*, 347 F.3d 394, 398 n.4 (2d Cir. 2003).

**\*7**  The previous granting of a motion to dismiss for failure to state a claim is a final adjudication on the merits, it involved Plaintiff, and the claim that Defendants violated Plaintiff's procedural due process right by causing his pistol permit to be revoked was raised in the prior action as to Bird and Chambers and could have been raised as to Doellinger and Miranda because the claims arise out of the same incident. Moreover, I agree with Chief Judge McMahon on the merits. And, in any event, even if Plaintiff was not notified of the in-person hearing, Judge DeProspo provided Plaintiff with an ample opportunity to be heard by considering multiple written submissions from Plaintiff before entering his final order. Plaintiff's due process claims arising out of the pistol permit revocation are therefore dismissed. [11]

The next claim Plaintiff advances under the heading of due process seems to be distinct from what Plaintiff alleged in his case before Chief Judge McMahon. Plaintiff alleges here that Bird, Chambers, and Doellinger conducted an investigation into Plaintiff's background and sent to Judge DeProspo false information provided by Miranda, which caused DeProspo to revoke Plaintiff's gun permit, which caused the authorities to go to Plaintiff's home and confiscate his arms. Plaintiff claims that this violated his Second Amendment right to bear arms. (P's Opp. at 5-6.)

Judge DeProspo revoked Plaintiff's pistol permit under N.Y. Penal Law § 400, (*see* SAC at 14-15), which provides that no firearm license shall be issued to a person who has been convicted of a felony. Judge DeProspo's order indicates that Plaintiff had been convicted of a felony, and Plaintiff does not deny it. [12]  Therefore, the permit revocation appears to be squarely within § 400. And it is well established that denying felons firearm permits does not violate the Second Amendment. *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (reaffirming that prohibitions on firearm possession by felons are permissible); *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008) ("[N]othing in our opinion should be taken to cast doubt on the longstanding prohibitions on the possession of firearms by felons...."); *United States v. Bogle*, 717 F.3d 281, 281-82 (2d Cir. 2013) (upholding as constitutional restriction on Second Amendment rights of convicted felons) (*per curiam*).

Plaintiff claims as his third cause of action that Miranda, the Chief of ACS, committed perjury. (SAC at 5.) This

allegation seems to arise out of Bird's investigation, during which Miranda told him that Plaintiff was never employed as a police officer by ACS and that Plaintiff "resigned while facing charges for a false arrest as well as an Article 78 for being mentally unfit for the job." (*Id.* at 13.) There is no indication that Bird was aware that any information he received from Miranda was false, but in any event, perjury is a crime and does not give rise to a civil cause of action. *Luckett v. Bure*, 290 F.3d 493, 497 (2d Cir. 2002). [13]  Plaintiff therefore has not stated a cognizable claim in connection with this activity. [14]

### C. Claims Arising Out of the Town of Chester Police Department's Poster

**\*8**  Plaintiff claims that the Town of Chester created a "[s]landerous, defamatory notice" that caused him emotional distress. (SAC at 5-6.) I construe this to be an attempt to state a claim that Defendant Town of Chester violated Plaintiff's right to due process by defaming him, which is known as a "stigma plus" claim. *See Sadallah v. City of Utica*, 383 F.3d 34, 38 (2d Cir. 2004).

Even palpably false statements by a governmental actor will not support a federal claim if the only injury is to the plaintiff's reputation. *See Paul v. Davis*, 424 U.S. 693, 712 (1976) ("[A]ny harm or injury to [a reputational] interest, even where ... inflicted on an officer of the State, does not result in a deprivation of any 'liberty' or 'property' recognized by state or federal law...."). To prevail on a "stigma plus" claim, a plaintiff must show "(1) the utterance of a statement 'sufficiently derogatory to injure his or her reputation, that is capable of being proved false, and that he or she claims is false,' and (2) a material state-imposed burden or state-imposed alteration of the plaintiff's status or rights" in addition to the stigmatizing statement. *Sadallah*, 383 F.3d at 38 (quoting *Doe v. Dep't of Pub. Safety ex rel. Lee*, 271 F.3d 38, 47 (2d Cir. 2001), *rev'd on other grounds sub nom. Conn. Dep't of Pub. Safety v. Doe*, 538 U.S. 1, 6-7 (2003); *see Paul*, 424 U.S. at 701-02, 710-11). "Thus, even where a plaintiff's allegations would be sufficient to demonstrate a government-imposed stigma, such defamation is not, absent more, a deprivation of a liberty or property interest protected by due process." *Sadallah*, 383 F.3d at 38 (citing *Siegert v. Gilley*, 500 U.S. 226, 233 (1991)).

Assuming that Plaintiff had plausibly alleges that the poster is sufficiently false and derogatory, he has failed to plausibly allege any state-imposed burden. Plaintiff does not describe

Johnson El v. Bird, Not Reported in Fed. Supp. (2020)

Case 3:24-cv-00037-DNH-ML    Document 9    Filed 06/11/24    Page 389 of 449

any injury resulting from the poster beyond damage to his reputation, (*see* SAC at 5 (Defendants' actions made Plaintiff's neighbors uncomfortable, afraid, and antisocial)), and " 'deleterious effects [flowing] directly from a sullied reputation,' standing alone, do not constitute a 'plus' under the 'stigma plus' doctrine," *Sadallah*, 383 F.3d at 38 (alteration in original) (quoting *Valmonte v. Bane*, 18 F.3d 992, 1001 (2d Cir. 1994)). Absent any allegation of an additional "deprivation of a legal right or status," *Abramson v. Pataki*, 278 F.3d 93, 101, 103 (2d Cir. 2002), Plaintiff has not alleged a "plus" sufficient to sustain a "stigma plus" claim. Accordingly, his due process claim arising out of the Town of Chester Police Department's poster is dismissed.

Plaintiff also alleges that he made a complaint to the Town of Chester Police Department against Bird and Chambers and "shortly afterwards" the poster "was circulated throughout the town." (P's Opp. at 4.) Plaintiff may be trying to state a claim for First Amendment retaliation. (*See* SAC at 5 ("Respondent(s) acted in careless manner with regards to the personal attacks/retaliation....").) To state such a claim, a plaintiff "must plausibly allege that (1) his or her speech or conduct was protected by the First Amendment; (2) the defendant took an adverse action against him or her; and (3) there was a causal connection between this adverse action and the protected speech." *Montero v. City of Yonkers*, 890 F.3d 386, 394 (2d Cir. 2018) (internal quotation marks and alterations omitted). "[P]rivate citizens claiming retaliation for their criticism of public officials have been required to show that they suffered an actual chill in their speech" or other forms of "tangible harm" as a result. *Zherka v. Amicone*, 634 F.3d 642, 645-46 (2d Cir. 2011) (internal quotation marks omitted) (collecting cases).

**\*9** Here, Plaintiff has not alleged that the poster chilled his speech or caused other tangible harm sufficient to state a retaliation claim under § 1983. He alleges in conclusory fashion that his family and neighbors were affected and his neighbors made to feel uncomfortable, afraid, and anti-social. (SAC at 5.) But he does not allege any concrete harm such as the revocation of a building permit, the failure to enforce zoning laws, or an arrest without probable cause. See *Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 91 (2d Cir. 2002); *Gagliardi v. Village of Pawling*, 18 F.3d 188, 195 (2d Cir. 1994); *Goonewardena v. Spinelli*, No. 15-CV-5239, 2017 WL 4280549, at \*14 (E.D.N.Y. Sept. 26, 2017). Because "[h]urt feelings or a bruised ego are not by themselves the stuff of constitutional tort," the poster "fail[s] to cross the threshold of measurable

harm required to move government response to public complaint from the forum of free speech into federal court." *Zherka*, 634 F.3d at 645-46. Plaintiff's First Amendment claim is therefore dismissed.

### D. Remaining Claims

To the extent Plaintiff attempted to allege that Doellinger should be liable for the actions of his employees under a theory of supervisory liability because he is the Chief of the Town of Chester Police Department, those claims must be dismissed because all of the underlying claims are dismissed, *see Jones v. Harris*, 665 F. Supp. 2d 384, 403 (S.D.N.Y. 2009), and because even if Plaintiff had pleaded a constitutional tort, a supervisor cannot be held liable for constitutional torts of subordinates on a theory of *respondeat superior, see Ying Li v. City of N.Y.*, 246 F. Supp. 3d 578, 638 (E.D.N.Y. 2017).

To the extent that Plaintiff alleges discrimination based on his status as "a [descendant] of the aboriginal indigenous, Native American, Moorish American National," (*see* P's Opp. at 4), those claims are dismissed for failure to state a claim upon which relief can be granted. *See El Ameen Bey v. Stumpf*, 825 F. Supp. 2d 537, 546 (D.N.J. 2011) ("Any claims or arguments raised by Plaintiff which are based on his membership in the Moorish American Nation are by definition frivolous.") (internal quotation marks and alterations omitted).

To the extent Plaintiff attempts to state any claims against Judge DeProspo, those claims are dismissed because he is protected by the doctrine of judicial immunity, *see Libertarian Party of Erie Cnty. v. Cuomo*, No. 18-386, 2020 WL 4590250, at \*12 (2d Cir. Aug. 11, 2020), and because Chief Judge McMahon already dismissed Plaintiff's claims against him, *Johnson El ex rel. Johnson*, 2019 WL 6311882, at \*3.

Plaintiff's request for a "nun[c]-pro-tunc order Ex parte in this matter of that has caused injury" is denied. (*See* P's Opp. at 3.) That application is nonsensical.

To the extent any of Plaintiff's allegations can be construed as attempting to state claims under state law, those claims are dismissed. The "traditional 'values of judicial economy, convenience, fairness, and comity' " weigh in favor of declining to exercise supplemental jurisdiction where all federal law claims are eliminated before trial. *Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir 2006) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)). Having determined that all of the claims over which this Court

has original jurisdiction should be dismissed, and having considered the factors set forth in *Cohill*, I decline to exercise supplemental jurisdiction over any of Plaintiff's potential remaining state law causes of action. *See id.* (citing 28 U.S.C. § 1367(c)(3)). Accordingly, Plaintiff's state law claims are dismissed without prejudice.

## IV. LEAVE TO AMEND

Leave to amend a complaint should be freely given "when justice so requires." Fed. R. Civ. P. 15(a)(2). "[I]t is within the sound discretion of the district court to grant or deny leave to amend." *Kim v. Kimm*, 884 F.3d 98, 105 (2d Cir. 2018) (internal quotation marks omitted).

 **\*10** Leave to amend, though liberally granted, may properly be denied for: "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc."

*Ruotolo v. City of N.Y.*, 514 F.3d 184, 191 (2d Cir. 2008) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

Plaintiff has already amended twice, after having the opportunity to review two pre-motion letters from Defendants stating the grounds on which they would move to dismiss, (Docs. 20, 35), as well as having the benefit of the Court's observations during the pre-motion conference, (Minute Entry dated Oct. 28, 2019). In general, a plaintiff's failure to fix deficiencies in the previous pleading, after being provided notice of them, is alone sufficient ground to deny leave to amend. *See Nat'l Credit Union Admin. Bd. v. U.S. Bank Nat'l Ass'n*, 898 F.3d 243, 257-58 (2d Cir. 2018) ("When a plaintiff was aware of the deficiencies in his complaint when he first amended, he clearly has no right to a second amendment even if the proposed second amended complaint in fact cures the defects of the first. Simply put, a busy district court need not allow itself to be imposed upon by the presentation of theories *seriatim.*") (internal quotation marks, alteration, and footnote omitted); *In re Eaton Vance Mut. Funds Fee Litig.*, 380 F. Supp. 2d 222, 242 (S.D.N.Y. 2005) (denying leave to amend because "the plaintiffs have had two opportunities to cure the defects in their complaints, including a procedure through which the plaintiffs were provided notice of defects in the Consolidated Amended Complaint by the defendants and given a chance to amend their Consolidated Amended Complaint," and "plaintiffs have not submitted a proposed amended complaint that would cure these pleading defects"),

aff'd sub nom. *Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110, 118 (2d Cir. 2007) (*per curiam*) ("[P]laintiffs were not entitled to an advisory opinion from the Court informing them of the deficiencies in the complaint and then an opportunity to cure those deficiencies.") (internal quotation marks omitted).

After the motion to dismiss was fully briefed, Plaintiff attempted, without leave of court, to file a Third Amended Complaint, which I struck as unauthorized and untimely. (*See* Doc. 49.) Having reviewed the proposed Third Amended Complaint, I find that allowing Plaintiff to amend a third time would be futile. The proposed Third Amended Complaint is largely identical to pages one through six of the Second Amended Complaint and pages four through five of Plaintiff's memorandum of law in opposition to Defendants' motion to dismiss. The only new fact that would have any effect on the plausibility of Plaintiff's claims is that while Plaintiff was being followed by Chambers, Plaintiff turned on his left turn signal before making a left turn. But as described above, Plaintiff's admission of his failure to yield separately supports the traffic stop and extinguishes Plaintiff's claims arising from an allegedly illegal stop. *See Sandstrom*, 2020 WL 3949344, at \*15; *Evans*, 681 F. Supp. 2d at 245. Accordingly, accepting the proposed Third Amended Complaint – even if there were some excuse for attempting to file it after the motion to dismiss was fully briefed – would not change the outcome here.

 **\*11** "The problem with [Plaintiff's] causes of action is substantive; better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000); *see TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) (plaintiff need not be given leave to amend if he fails to specify how amendment would cure the pleading deficiencies in his complaint); *Gallop v. Cheney*, 642 F.3d 364, 369 (2d Cir. 2011) (district court did not err in dismissing claim with prejudice in absence of any indication plaintiff could or would provide additional allegations leading to different result), *reh'g denied*, 645 F.3d 519 (2d Cir. 2011) (*per curiam*). Accordingly, there being no indication that Plaintiff is in possession of facts that could cure the problems identified in this Opinion, I decline to grant Plaintiff leave to amend.

## V. CONCLUSION

For the above reasons, the Defendants' motion to dismiss is GRANTED. The Clerk of Court is respectfully requested to terminate the pending motion, (Doc. 38), and close the case.

Johnson El v. Bird, Not Reported in Fed. Supp. (2020)

Case 3:24-cv-00037-DNH-ML    Document 9    Filed 06/11/24    Page 391 of 449

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2020 WL 5124920

## Footnotes

1   "[A]llegations made in a *pro se* plaintiff's memorandum of law, where they are consistent with those in the complaint, may also be considered on a motion to dismiss." *Braxton v. Nichols*, No. 08-CV-8568, 2010 WL 1010001, at *1 (S.D.N.Y. Mar. 18, 2010). The Court will send Plaintiff copies of all unreported cases cited in this Opinion and Order. Plaintiff submitted several unauthorized sur-replies, (Docs. 45-47), which I nevertheless have considered and which do not change the outcome.

2   In my December 3, 2019 Order, I erroneously referred to Docs. 28-31, but Doc. 31 is a letter from defense counsel; I meant to refer to Docs. 28-30.

3   Plaintiff's papers include entirely frivolous material, such as irrelevant legal citations and incoherent arguments regarding ancient treaties and the like. I informed Plaintiff several times, through memo endorsement and at conferences, that "[t]his case is about an allegedly unlawful stop and allegedly unlawful tickets" and that he "would do well to set aside the gobbledygook and focus on those claims." (*See* Doc. 12.) He did not heed my suggestion. Nevertheless, because Plaintiff *pro se* he is entitled to "special solicitude," *Shibeshi v. City of N.Y.*, 475 F. App'x 807, 808 (2d Cir. 2012) (summary order) (internal quotation marks omitted), and I construe his papers liberally to raise the strongest arguments that they suggest, *see Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (*per curiam*).

4   Citations to the Second Amended Complaint and Plaintiff's Opposition use the page numbers generated by the Court's Electronic Filing System.

5   I can take judicial notice of the Chester Town Court Certificate of Disposition dated August 20, 2019, attached to Defendants' counsel's declaration in support of the motion to dismiss. (Doc. 40-2.) *See Jones v. Rivera*, No. 13-CV-1042, 2015 WL 8362766, at *3 (S.D.N.Y. Dec. 7, 2015) (taking judicial notice of certificate of disposition submitted by defendant on motion to dismiss).

6   It does not appear that Miranda was served, but for the reasons discussed herein, Plaintiff's claims against him are dismissed *sua sponte* for failure to state a claim, pursuant to 28 U.S.C. § 1915(e)(2)(B).

7   Plaintiff alleges that Chambers detained him "for over 45 minutes." (P's Opp. at 4.) To the extent Plaintiff is seeking to allege an unreasonable seizure based on the length of his detention, he fails to do so. Even though "a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures," *Rodriguez v. United States*, 575 U.S. 348, 350 (2015), Plaintiff alleges no facts suggesting that the stop was overly long. To the contrary, Plaintiff admits that he prolonged the stop by refusing to produce a driver's license, providing only unofficial identification that required the officers to track down whether Plaintiff was in fact licensed, and insisting that the laws of New York State and the United States do not apply to him as a Moorish national. (P's Opp. at 4.)

8   To the extent Plaintiff means to argue that traffic enforcement violates his right to travel, that claim is dismissed as frivolous. *See Annan v. State of N.Y. Dep't of Motor Vehicles*, No. 15-CV-1058, 2016 WL 8189269, at *5 (E.D.N.Y. Mar. 2, 2016), *aff'd*, 662 F. App'x 85 (2d Cir. 2016) (summary order).

**Johnson Er v. Bird, Not Reported in Fed. Supp. (2020)**

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 392 of 449

9   If Plaintiff intended to assert a false arrest claim, it would likewise fail, both because Plaintiff was not subjected to deprivation of liberty tantamount to an arrest, *see LoSardo v. Ribaudo*, No. 14-CV-6710, 2015 WL 502077, at *5 (E.D.N.Y. Feb. 5, 2015) (collecting cases), and because his conviction shows that by definition there was probable cause, *see, e.g., Horvath v. City of N.Y.*, No. 12-CV-6005, 2015 WL 1757759, at *3 (E.D.N.Y. Apr. 17, 2015).

10   Because the previous suit arose in federal court, federal common law governs. *See Taylor v. Sturgell*, 553 U.S. 880, 891 (2008); *Wyly v. Weiss*, 697 F.3d 131, 140 (2d Cir. 2012).

11   Chief Judge McMahon's order of dismissal is dated November 22, 2019. Plaintiff's Second Amended Complaint is dated November 26, 2019. It therefore seems like Plaintiff was trying to get a second bite at the apple as to his pistol permit revocation claim. He is advised that further attempts to bring this same claim may be dismissed as frivolous because he has now been told twice that it is not meritorious, and any further attempts will waste the Court's and opposing counsel's time.

12   Evidently, Plaintiff lied to the licensing judge in 2015 and said he was not guilty of the felony of which he had previously been convicted. (SAC at 12.) But he has not denied in his many submissions to this Court that he was convicted of Criminal Possession of a Loaded Firearm in the Third Degree in 1991. (*See id.* at 14.)

13   Further, the crime of perjury involves knowingly false statements under oath, and there is no indication that any of the challenged statements were made under oath.

14   The Court dismisses this claim *sua sponte* as to Miranda under 28 U.S.C. § 1915(e)(2)(B) (authorizing dismissal of claims filed *in forma pauperis* if they are frivolous or fail to state a claim upon which relief can be granted).

---

**End of Document**                                  © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Annan v. State of New York Department of Motor Vehicles, Not Reported in Fed. Supp....

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 393 of 449

2016 WL 8189269
Only the Westlaw citation is currently available.
<u>NOT FOR PUBLICATION</u>
United States District Court, E.D. New York.

Ibrahim ANNAN, Sui Juris In-Propia Persona, Plaintiff,
v.
STATE OF NEW YORK DEPARTMENT OF
MOTOR VEHICLES; Department of Motor
Vehicles Traffic Violations Division; Judge
Hamsho; Judge Levine; Deborah V. Dugan;
NYPD #944071, 120th Precinct, Defendants.

15-CV-1058 (CBA) (CLP)
|
Filed 03/02/2016

**Attorneys and Law Firms**

Ibrahim Annan, Staten Island, NY, pro se.

Rebecca Durie Katherine Culley, NYS Attorney General,
Brachah Goykadosh, Kathryn M. Sprovieri, New York City
Law Department, New York, NY, for Defendants.

**MEMORANDUM & ORDER**

AMON, Chief United States District Judge:

 **\*1**    Plaintiff Ibrahim Annan brings this <u>pro se</u> action
against the New York State Department of Motor Vehicles
("DMV"), the Department of Motor Vehicles Traffic
Violations Division ("Traffic Violations Division"), Deborah
V. Dugan, Chairwoman of the DMV Appeals Board, and
DMV Administrative Law Judges ("ALJs") Hamsho and
Levine (collectively, the "State Defendants"), as well as the
120th Precinct of the New York City Police Department
("NYPD") and an unnamed NYPD officer identified as
"#944071." (D.E. # 1, Compl.) Corporation Counsel for the
City of New York ("Corporation Counsel") has represented
that this number matches NYPD Officer Blase Gorcsos, who
has been served with process. (D.E. # 11 at 1 n.l.) Annan
appears to allege that defendants violated his right to travel
in connection with the issuance and adjudication of several
traffic tickets and the suspension of his driver's license. Annan
seeks $753,750,000 in damages.

The State Defendants now move to dismiss the complaint
pursuant to Federal Rules of Civil Procedure 12(b)(1), (2),
(5), and (6). (D.E. # 20.) Specifically, the State Defendants
argue that: (1) the Eleventh Amendment of the United States
Constitution bars all claims for money damages against a
state agency and its employees when acting in their official
capacities; (2) the Court lacks personal jurisdiction over the
State Defendants because Annan has not served them with the
summons and complaint; (3) the complaint fails to provide
a short plain statement explaining why Annan is entitled to
relief; and (4) the complaint fails to state a viable claim
for relief based on the constitutional right to travel. (D.E.
# 20-1, Defs.' Mem. in Support of Mot. to Dismiss ("State
Defs.' Mem."), at 1.) Officer Gorcsos moves for a more
definite statement pursuant to Federal Rule of Civil Procedure
12(e) and requests that the majority of Annan's complaint be
stricken pursuant to Federal Rule of Civil Procedure 12(f) as
vague, ambiguous, repetitive, and immaterial. (D.E. #11.)

For the reasons stated below, the Court grants the State
Defendants' motion to dismiss, dismisses Annan's remaining
claims <u>sua sponte.</u> and denies Officer Gorcsos's motions as
moot.

**BACKGROUND**

 **I. Factual Background**
Although Annan's 95-page complaint is difficult to decipher,
his claims appear to stem from the issuance and adjudication
of several traffic tickets, as well as the suspension of his
driver's license. (<u>See, e.g.,</u> Compl. at 62-65, 69, 74, 83. [1] )
Annan's submissions indicate that he was charged with the
following traffic violations: failing to observe a red light on
November 5, 2014, (<u>id.</u> at 64, 74); failing to yield to an
emergency vehicle on December 1, 2012, (<u>id.</u> at 62-63); and
disobeying a traffic device, (<u>id.</u> at 84-85). The DMV Appeals
Board appears to have affirmed his conviction as to at least
one of these violations, (<u>Id.</u>) The DMV apparently imposed a
$300 fine and suspended Annan's license effective August 26,
2014, for failure to pay a driver responsibility assessment. (<u>Id.</u>
at 69.) Annan's license appears to have been suspended again
effective February 11, 2015, for failure to appear to answer a
traffic ticket received for running a red light. (<u>Id.</u> at 83.)

 **\*2**    Even construed liberally, the complaint makes no specific
allegations against the individual State Defendants. Indeed,
the only factual allegations even related to the individual
defendants are that: (1) Annan appeared before ALJ Hamsho

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 394 of 449

Annan v. State of New York Department of Motor Vehicles, Not Reported in Fed. Supp....

on January 18, 2013, February 14, 2013, and January 12, 2015, (id. at 3, 37-38); (2) Annan received letters dated February 3, 7, and 25, 2014, bearing Dugan's name on the letterhead, (id. at 9, 84-85); (3) ALJ Levine issued an order suspending Annan's license on June 30, 2014, (id. at 25); and (4) ALJ Hamsho "ordered" Annan "to check the not guilty box on the instrument/ticket" after he told her that he was pleading not guilty, (id. at 48-49).

The only mention of Officer Gorcsos, a.k.a. NYPD officer #944071, in the entire complaint appears on page 2, where Annan identifies the parties and their addresses. (Id. at 2.) In opposing the instant motions, Annan suggests that Officer Gorcsos was present at a ticket-related court proceeding, but does not specify when that proceeding took place or what Officer Gorcsos did at that proceeding. (See D.E. # 28 at 3.) Annan also claims that Officer Gorcsos ignored a document Annan calls a " 'Notice' of Special Appearance & Violation of Liberty Fees." (Id. at 7; see also D.E. # 18 at 11.) The Court is familiar with this document from Annan's other pending case before this Court, Annan v. City of New York, et al., No. 12-CV-2702 (CBA) (CLP). Based on Annan's submissions and representations at status conferences before this Court in that action, the Court understands that Annan attempts to charge judicial or law-enforcement officers $500,000 for each "special appearance" before them, plus "$250,000 for every fifteen minutes or any part thereof" for the duration of that appearance. (See, e.g., 12-CV-2702, D.E. # 1, Compl. at 15-16, 22, 67.)

Annan's submissions also refer to two other NYPD officers not formally named in the complaint: Officers "Anker 'AKA' Robert A. Amaty" and Detective Patrick Cherry (together with Officer Gorcsos, the "NYPD Defendants"). Annan claims Officer Amaty issued him a ticket and when presented with Annan's "Right to Travel" affidavit, discussed further below, "threw it in [Annan's] face yelling that's not what I asked you for." (D.E. # 18 at 5.) Annan appears to allege that Detective Cherry recorded this exchange in writing. (Id.) Annan also contends that Officer Amaty owes him $1,500,000 for "special appearance" fees, the amount to which Annan apparently believes he is entitled for appearing in court in connection with the ticket. (See Compl. at 30-31.)

**II. Annan's Claims**

The gravamen of Annan's complaint is that these traffic-enforcement actions violated his constitutional right to travel. To support this contention, Annan cites what he calls a "right to travel affidavit," which is attached to the complaint and

states that because Annan is not a legal "person," "driver," or "operator" and his "self-propelled contrivance/carriage" is not a motor vehicle, his right to travel cannot be circumscribed by law or the DMV. (See id. at 22-24.) As such, Annan contends that the issuance and adjudication of various traffic tickets by the DMV has deprived him of his right to travel under the "organic constitution." (Id. at 4, 7, 22.) The Court liberally construes these assertions as seeking relief for alleged deprivations of Annan's federal constitutional rights under 42 U.S.C. § 1983 against the State and NYPD Defendants.

Annan's complaint also refers to, inter alia, more than 60 sections of Titles 18 and 28 of the United States Code, dozens of UCC provisions, provisions of the Bankruptcy Code, the Freedom of Information Act ("FOIA"), and various unspecified fraud claims. Even construing these assertions liberally, the Court is unable to identify a coherent claim under any of these provisions of law, most of which are patently irrelevant.[2]

**\*3** Annan requests $753,750,000 in "Booty & Prize" from all defendants. (Id. at 3, 9, 27-28, 30, 38, 83-84.) Annan does not explain why he is entitled to that amount. Annan's submissions also include 49 pages labeled "Notice of Motion," purporting to seek relief under Federal Rules of Civil Procedure 8, 11, 13, 26, 37, 55, 56, 57, 64, 65, and 70, as well as various provisions of the UCC and U.S. Code. (D.E. # 18 at 21-39; D.E. # 19 at 16-44; D.E. # 27 at 12.) Even construed liberally, these notices do not provide any explanation as to why Annan believes he is entitled to relief under the cited rules or provisions, many of which are inapplicable at this stage of litigation. The Court is thus unable to determine the basis for any applications Annan is attempting to make.

**III. Procedural History**

Annan filed this action on March 2, 2015. (D.E. # 1.) Both the State Defendants and Corporation Counsel, acting on behalf of then-unidentified NYPD #944071, sought and received extensions of time to answer. (D.E, # 5, 6, 8, 9.) The State Defendants then sought leave to file a motion to dismiss, while Officer Gorcsos sought to file a motion for a more definite statement. (D.E. # 11, 13, 14.) Those motions are now pending before the Court.

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 395 of 449

Annan v. State of New York Department of Motor Vehicles, Not Reported in Fed. Supp....

### STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) provides for dismissal of a complaint that "fail[s] to state a claim upon which relief can be granted." To avoid dismissal, a plaintiff must state a claim that is "plausible on its face" by alleging sufficient facts to enable "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). In determining whether a claim has "facial plausibility," a court accepts all factual allegations in the complaint as true, but does not credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." Id. at 678.

Moreover, federal district courts "may dismiss a frivolous complaint sua sponte even when plaintiff has paid the required filing fee." Fitzgerald v. First East Seventh Street Tenants Corp., 221 F.3d 362, 364 (2d Cir. 2000); see also Greathouse v. JHS Sec. Inc., 784 F.3d 105, 119 (2d Cir. 2015) ("Courts have both statutory and inherent authority to sua sponte dismiss frivolous suits."). A claim is frivolous "where it lacks an arguable basis in either law or in fact," or when "it is clear that the defendants are immune from suit.' " Neitzke v. Williams, 490 U.S. 319, 325, 327 (1989).

In applying these standards, the Court is mindful that pro se pleadings are held to less stringent standards than pleadings drafted by lawyers, Erickson v. Pardus, 551 U.S. 89, 94 (2007), and that "the submissions of a pro se litigant must be construed liberally and interpreted to raise the strongest arguments that they suggest," Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 474 (2d Cir. 2006) (internal quotation marks and citations omitted).

### DISCUSSION

### I. The State Defendants' Motion to Dismiss

Annan alleges that the State Defendants violated his constitutional right to travel by issuing traffic tickets to him, adjudicating those tickets, and suspending his driver's license. The Court liberally construes these assertions as seeking relief for alleged constitutional deprivations under 42 U.S.C. § 1983. The State Defendants argue that Annan's claims are barred by the Eleventh Amendment [3] and that, in any event, he has failed to state a claim on which relief may be granted under Federal Rule of Civil Procedure 12(b)(6).

Annan does not respond to these arguments, other than by expressing his opinion that "[d]efendants' defense strategy is the employment of compounded fraud in the form of a motion, for 'immunity' under the 11th amendment," (D.E. # 17 at 7), and by reiterating allegations levied in his complaint. For the reasons stated below, the Court grants the State Defendants' motion to dismiss in its entirety.

### A. Eleventh Amendment Immunity

**\*4** "Stated as simply as possible, the Eleventh Amendment means that, as a general rule, state governments may not be sued in federal court unless they have waived their Eleventh Amendment immunity, or unless Congress has abrogate[d] the states' Eleventh Amendment immunity." Gollomp v. Spitzer, 568 F.3d 355, 366 (2d Cir 2009) (internal quotation marks and citation omitted). This immunity extends to agencies and departments of the states, including New York's DMV and its subdivisions. Feingold v. State of New York, 366 F.3d 138, 149 (2d Cir. 2004) (affirming dismissal of § 1983 claim against DMV as barred by Eleventh Amendment); Rubin v. N.Y. State Dep't of Motor Vehicles, No. 10-CV-4119, 2010 WL 3842011, at *1 (E.D.N.Y. Sept. 28, 2010) (dismissing claims against DMV as barred by Eleventh Amendment). Congress has not abrogated sovereign immunity from claims brought under 42 U.S.C. § 1983, Dube v. State Univ. of N.Y., 900 F.2d 587, 594 (2d Cir. 1990), nor has New York waived immunity with respect to such claims, Trotman v. Palisades Interstate Park Comm'n, 557 F.2d 35, 39–40 (2d Cir. 1977); Harrison v. New York, 95 F. Supp. 3d 293, 314 (E.D.N.Y. 2015). Accordingly, Annan's claims against the State of New York, the DMV, and the Traffic Violations Division are barred by the Eleventh Amendment and dismissed. See Feineold, 366 F.3d at 149; Burroughs v. Dorn, No. 13-CV-3609 (ARR) (LB), 2013 WL 3820673, at *4 (E.D.N.Y. July 22, 2013) (dismissing claims against DMV and DMV Appeals Board as barred by Eleventh Amendment).

The Eleventh Amendment likewise bars suits for monetary damages against a state official acting in her official capacity, as "the state is the real, substantial party in interest" in such cases. Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 101-03 (1984) (internal quotation marks and citation omitted). As discussed above, the complaint alleges only that ALJs Hamsho and Levine presided over proceedings related to Annan's traffic tickets and contains no allegations whatsoever regarding Dugan's personal involvement in any purported constitutional deprivations. It is thus unclear

Case 3:24-cv-00037-DNH-ML Document 9 Filed 06/11/24 Page 396 of 449

Annan v. State of New York Department of Motor Vehicles, Not Reported in Fed. Supp....

what, if any, claims Annan is asserting against any of these individual defendants. But to the extent Annan seeks monetary damages against Dugan or ALJs Hamsho and Levine in their official capacities, those claims are also barred by the Eleventh Amendment and are dismissed. See Phillips v. N.Y. State Dep't of Labor Unemployment Ins. Appeal Bd., No. 11-CV-1633 (JS) (ARL), 2011 WL 2837499, at *2 (E.D.N.Y. July 12, 2011) (dismissing claims against administrative law judge for New York State agency as barred by the Eleventh Amendment).

Eleventh Amendment immunity does not shield state officers from suits seeking prospective injunctive or declaratory relief or damages from the officers in their individual capacities, however. Edelman v. Jordan, 415 U.S. 651,677 (1974); Ex parte Young, 209 U.S. 123, 159-60 (1908); In re Deposit Ins. Agency, 482 F.3d 612, 617 (2d Cir. 2007); Posr v. Court Officer Shield No. 207,180 F.3d 409, 414 (2d Cir. 1999). Accordingly, to the extent Annan's complaint could be construed as seeking nonmonetary relief [4] or asserting any individual-capacity claims against the individual State Defendants, the Court must determine whether Annan has stated a plausible claim that those defendants violated his constitutional right to travel.

### B. Right to Travel

The thrust of Annan's complaint is that the State Defendants have infringed on his right to travel by enforcing New York traffic laws against him and, specifically, by suspending his driver's license. (See Compl. at 4, 7, 22-24.) "The Constitution protects a fundamental right to travel within the United States," which the Second Circuit has also called "the right to free movement," Selevan v. N.Y. Thruway Auth., 584 F.3d 82, 99 (2d Cir. 2009). A state law implicates this right only "when it actually deters such travel, when impeding travel is its primary objective, or when it uses any classification which serves to penalize the exercise of that right.' " Id. (quoting Att'y Gen. of N.Y. v. Soto-Lopez, 476 U.S. 898, 903 (1986) (internal quotation marks and citations omitted)). Annan has not alleged that any of New York's traffic laws deter travel, were enacted with the primary objective of impeding travel, or utilize a classification that penalizes exercise of the right to travel.

*5 What is at issue here is simply Annan's ability to travel by motor vehicle on New York's roads—a privilege not protected by the Constitution. See Haselton v. Amestoy,

No. 03-CV-223, 2003 WL 23273581, at *2 (D. Vt. Nov. 4, 2003) (denying injunctive relief where plaintiff claimed that suspension of his driver's license violated the right to travel and concluding that there is no "fundamental right to drive a vehicle on public roads"). It is well established that "travelers do not have a constitutional right to the most convenient form of travel, and minor restrictions on that travel simply do not amount to the denial of a fundamental right," Town of Southold v. Town of E. Hampton, 477 F.3d 38, 54 (2d Cir. 2007) (internal quotation marks and citation omitted) (citing Miller v. Reed, 176 F.3d 1202, 1205 (9th Cir. 1999) (stating that "burdens on a single mode of transportation do not implicate the right to interstate travel"); City of Houston v. F.A.A., 679 F.2d 1184, 1198 (5th Cir. 1983) (noting that there is no "constitutional right to the most convenient form of travel")). To the contrary, the Supreme Court has repeatedly affirmed that the states have a paramount interest in highway safety and may summarily suspend or revoke a driver's license with due process. [5] See Mackey v. Montrym, 443 U.S. 1, 19 (1979) (holding that Massachusetts statute allowing for summary suspension of a driver's license with availability of prompt postsuspension hearing was constitutional); Dixon v. Love, 431 U.S. 105, 115 (1977) (holding that Illinois statute providing for summary suspension of a driver's license with availability of a postdeprivation hearing was constitutional). Annan has therefore failed to state a plausible claim that the State Defendants violated his right to travel. Accordingly, to the extent Annan asserts any claims against Dugan or ALJs Hamsho and Levine that are not barred by the Eleventh Amendment, those claims are dismissed for failure to state a claim on which relief may be granted. [6]

\*\*\*

For the reasons above, the State Defendants' motion to dismiss is granted in its entirety. Because Annan's claims against the State Defendants are either barred by the Eleventh Amendment or fail to state a claim on which relief may be granted, the Court need not reach the alternative grounds for dismissal advanced by the State Defendants under Federal Rules of Civil Procedure 12(b)(2) and 12(b)(5).

### II. Claims Against the NYPD Defendants and the 120th Precinct

Having dismissed Annan's claims against the State Defendants, the Court now addresses claims against the NYPD Defendants and the 120th Precinct. At the outset, the

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 397 of 449

Annan v. State of New York Department of Motor Vehicles, Not Reported in Fed. Supp....

Court notes that the 120th Precinct is not amenable to suit. The New York City Charter requires that suit "be brought in the name of the City of New York and not in that of any agency." N.Y.C. Charter § 396; see also Ximines v. George Wingate High Sch., 516 F.3d 156, 159-60 (2d Cir. 2008) (per curiam) (noting that § 396 "has been construed to mean that New York City departments [and agencies], as distinct from the City itself, lack the capacity to be sued"). The NYPD and specific NYPD precincts thus may not be sued directly—instead, suit must be brought against the City of New York. Richardson v. N.Y.C. Police Dep't, No. 12-CV-5753 (ARR), 2013 WL 101403, at *2 (E.D.N.Y. Jan. 7, 2013). Accordingly, the Court interprets the complaint as stating a claim against the City of New York.

 **6** As explained above, the Court liberally construes Annan's submissions as alleging that defendants violated his constitutional right to travel under 42 U.S.C. § 1983. To state a claim for relief under § 1983, Annan must allege that (1) "the conduct complained of ... [was] committed by a person acting under color of state law;" and (2) "the conduct complained of must have deprived ... [him] of rights, privileges or immunities secured by the Constitution or laws of the United States." Pitchell v. Callan, 13 F.3d 545, 547 (2d Cir. 1994). With respect to the NYPD Defendants, Annan must also allege facts showing that each was personally involved in the alleged deprivations. Farid v. Ellen, 593 F.3d 233, 240 (2d Cir. 2010). With respect to the City of New York, Annan must plead, and ultimately prove, three elements: "(1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." Torraco v. Port Auth. of N.Y. & N.J., 615 F.3d 129, 140 (2d Cir. 2010) (internal quotation marks omitted). Where no underlying constitutional violation has occurred, there is no basis for municipal liability under § 1983. See Segal v. City of New York, 459 F.3d 207, 219 (2d Cir. 2006).

Annan has not pleaded facts showing that any of the NYPD Defendants were personally involved in a deprivation of Annan's constitutional or federal rights. Annan alleges only that the NYPD Defendants issued him traffic tickets, appeared at court proceedings where those tickets were adjudicated, and ignored Annan's "right to travel affidavit" and his notices of "Special Appearance & Violation of Liberty" fees. As discussed above, notwithstanding his "right to travel affidavit," Annan is subject to the traffic laws of the State of New York and the enforcement of those laws against him does not implicate the constitutional right to travel. Moreover, there is plainly no basis in law for Annan's claim that he is

entitled to $500,000 plus $250,000 for every 15 minutes of the encounter each time he interacts with a judicial or law-enforcement officer. Accordingly, the NYPD Defendants did not violate any of Annan's rights by ignoring that document or refusing to pay those fees. Annan has thus failed to allege that any of the NYPD Defendants personally participated in a deprivation of his constitutional or federal rights. Because Annan has not pleaded facts plausibly alleging that he suffered any violation of his rights, his claim against the City of New York fails as a matter of law. See Segal, 459 F.3d at 219. For these reasons, Annan's claims against the NYPD Defendants and the City of New York are dismissed sua sponte as frivolous. See Neitzke, 490 U.S. at 325.

***

The Court is mindful that "a pro se complaint should not be dismissed without the Court granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." Dolan v. Connolly, 794 F.3d 290, 295 (2d Cir. 2015) (internal quotation marks and citation omitted). However, "leave to amend a complaint may be denied when amendment would be futile." Tocker v. Philip Morris Cos., 470 F.3d 481, 491 (2d Cir. 2006). Here, Annan's claims are barred by the Eleventh Amendment or otherwise fail to state a claim on which relief may be granted because the enforcement of New York's traffic laws against Annan does not implicate the constitutional right to travel. These deficiencies stem from "substantive" problems with Annan's claims rather than inartful pleading. Cuoco v. Moritsugu, 222 F. 3d 99, 112 (2d Cir. 2000) (affirming district court's denial of leave to amend where plaintiff sought relief from defendants shielded by absolute and qualified immunity after concluding that "[t]he problem with [plaintiff's] causes of action is substantive[ and therefore, that] better pleading will not cure it"). Leave to amend would therefore be futile. See Weisshaus v. Port Auth. of N.Y. & N.J., 497 Fed.Appx. 102, 104 (2d Cir. 2012) (affirming district court's sua sponte dismissal of right to travel claims arising from toll increases, noting that "travelers do not have a constitutional right to the most convenient form of travel, and minor restrictions," such as the toll increases at issue, "do not amount to the denial of a fundamental right" (quoting Torraco, 615 F.3d at 140)); Harrison v. New York, 95 F. Supp. 3d 293, 305-06 (E.D.N.Y. 2015) (denying leave to amend claims dismissed on sovereign immunity grounds as futile). Annan's complaint is therefore dismissed without leave to amend.

Annan v. State of New York Department of Motor Vehicles, Not Reported in Fed. Supp....

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 398 of 449

## CONCLUSION

**\*7**  For the reasons stated above, the State Defendants' motion to dismiss is granted and Annan's remaining claims are dismissed. This action is therefore dismissed in its entirety without leave to amend. The Clerk of Court is directed to enter judgment accordingly and close the case. If Annan requests in forma pauperis status for any appeal of this order, the Court

certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal would not be taken in good faith. Coppedge v. United States, 369 U.S. 438, 444-5 (1962).

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 8189269

## Footnotes

1    Because the complaint is not consistently, the Court refers to the ECF page numbers.

2    For example, Annan does not have standing to assert claims under the host of criminal statutes he cites (some of which have been repealed, such as 18 U.S.C. § 835, or are non-existent, such as 18 U.S.C. § 8872). Linda R.S. v. Richard D., 410 U.S. 614, 619 (1973) ("[A] private citizen lacks a judicially cognizable interest in the prosecution or non-prosecution of another."). As another example, Annan refers to FOIA, but FOIA applies only to federal agencies and would thus provide no relief against any of the defendants in this action. See, e.g., Grand Cent. P'ship, Inc. v. Cuomo, 166 F.3d 473, 484 (2d Cir. 1999) (FOIA applies only to federal agencies).

3    The State Defendants style their sovereign immunity defense as a motion to dismiss for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1). It is an open question of law in the Second Circuit whether an assertion of Eleventh Amendment sovereign immunity should be treated as a defect in subject matter jurisdiction or as an affirmative defense. Carver v. Nassau Cnty. Interim Fin. Auth., 730 F.3d 150, 156 (2d Cir. 2013) ("[W]hether the claim of sovereign immunity constitutes a true issue of subject matter jurisdiction or is more appropriately viewed as an affirmative defense is an open question in the Supreme Court and the Second Circuit." (citing Wisc. Dep't of Corr. v. Schacht, 524 U.S. 381, 391 (1998) (stating that the Court has "not decided" whether "Eleventh Amendment immunity is a matter of subject-matter jurisdiction"))). Although this distinction may be significant in certain circumstances, because it impacts what materials the Court may consider and what inferences it may draw from the record, it does not affect the outcome in this case. In considering the State Defendants' sovereign immunity defense, the Court has considered "only the pleadings and the relevant state and federal law and has drawn all inferences in [the p]laintiff's favor" and therefore need not resolve whether a sovereign immunity defense is more appropriately raised under a Rule 12(b)(1) or Rule 12(b)(6) motion. Tiraco v. N.Y. State Bd. of Elections, 963 F. Supp. 2d 184, 191 n.6 (E.D.N. Y, 2013); see also McMillan v. N.Y. Bd. of Elections, No. 10-CV-2502 (JG) (VVP), 2010 WL 4065434, at *3 (E.D.N.Y. Oct. 15, 2010) aff'd. 449 Fed.Appx. 79 (2d Cir. 2011) ("This distinction does not affect the outcome here; in evaluating the State Board's assertion of sovereign immunity, I look only to the pleadings and to state and federal law.").

4    To the extent Annan refers to a "writ of mandamus" in his submissions, the Court lacks jurisdiction to grant mandamus relief against state officials. Davis v. Lansing, 851 F.2d 72, 74 (2d Cir. 1988) ("[F]ederal courts have no general power to compel action by state officials."); see also Main v. Altieri, No. 09-CV-108, 2009 WL 1109878, at *1 (D. Vt. Apr. 22, 2009) (dismissing request for writ of mandamus to compel action by state officials sua sponte for lack of jurisdiction).

5   Nothing in the complaint suggests Annan is attempting to claim his license was suspended without due process. However, any such claim would be meritless. As discussed above, the Supreme Court has repeatedly affirmed state statutes allowing for summary suspension of a driver's license with a postdeprivation opportunity to challenge the suspension. See Mackey, 443 U.S. 1, 19 (1979); Dixon. 431 U.S. 105, 115 (1977). Under New York law, tickets for traffic infractions are adjudicated at hearings, see N.Y. Veh. & Traff. § 227, the determinations at such hearings may be appealed to an administrative appeal board, see id. § 261, and judicial review is available for any appeal determination through an Article 78 proceeding. Annan does not challenge the constitutional adequacy of those procedures or allege that he was deprived of those opportunities to challenge the suspension of his license. To the contrary, the complaint confirms that Annan availed himself of the opportunity to appeal at least one of his traffic convictions. (See Compl. at 84-85 (letter from DMV Appeals Board).) Moreover, the complaint reveals that at least one of the suspensions stemmed from his failure to appear to answer a traffic ticket receive for running a red light. (Id. at 83). He was thus afforded a predeprivation opportunity to challenge the underlying traffic conviction that he chose not to pursue. See Davis v. Nassau Cnty., No. 06-CV-4762 (ADS) (WDW), 2011 WL 5401663, at *5–6 (E.D.N.Y. Nov. 5, 2011) ("The Plaintiff was given the opportunity of a trial on the merits [of his traffic infraction] and did not attend, even though he knew the consequences of not doing so. Therefore, the Court finds that the Plaintiff received all the process he was due under the law.").

6   Although not raised by the State Defendants, any claims against ALJs Hamsho and Levine are also barred by absolute judicial immunity. See Burroughs, 2013 WL 3820673, at *4 (dismissing claims against ALJs for DMV as barred by judicial immunity); see also Bliven v. Hunt, 418 F. Supp. 2d 135, 137-38 (E.D.N.Y. 2005) (dismissing claims barred by judicial immunity sua sponte in fee-paid pro se action).

---

**End of Document**                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

---

2023 WL 8809732
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

Shannon J. BONES, a/k/a Shannon Joy,
individually and as a parent and natural
guardian of M.B., an infant, Plaintiff,
v.
COUNTY OF MONROE, et al., Defendants.

Case # 23-CV-06201-FPG
|
Signed December 20, 2023

**Attorneys and Law Firms**

Edward P. Yankelunas, Tiveron Law PLLC, Amherst, NY, for
Plaintiff.

Robert John Shoemaker, Monroe County Law Department,
Rochester, NY, for Defendants County of Monroe, Dr.
Michael Mendoza.

DECISION AND ORDER

FRANK P. GERACI, JR., United States District Judge

**INTRODUCTION**

\*1 On April 11, 2023, Plaintiff Shannon J. Bones, a/k/
a Shannon Joy, individually and as a parent and natural
guardian of M.B., an infant, ("Plaintiff") brought this
action against Defendants County of Monroe, County
of Monroe Department of Public Health, Fairport Police
Department, and Dr. Michael Mendoza, in his capacity
as Commissioner for the Monroe County Department of
Public Health (collectively, "Defendants"), asserting claims
for constitutional violations pursuant to 42 U.S.C. § 1983.
ECF No. 1 at 7-9. This action arises out of Defendants'
enforcement of a COVID-19 health quarantine order against
M.B. in April 2021. *Id.* at 4.

On July 10, 2023, Defendants County of Monroe, County
of Monroe Department of Public Health, and Dr. Michael
Mendoza filed a motion to dismiss Plaintiff's complaint under
Federal Rule of Civil Procedure 12(b)(6). ECF No. 6. On
August 28, 2023, Defendant Fairport Police Department filed
a separate motion to dismiss under Rule 12(b)(6). ECF No. 13.

On October 13, 2023, Plaintiff filed responses to both motions
and attached a proposed amended complaint to each response.
ECF Nos. 19-20. On October 27, 2023, Defendants replied.
ECF Nos. 21-22. For the reasons below, Defendants' motions
are granted.

**A. Proposed Amended Complaint**
As a preliminary matter, the Court must address the filing
of Plaintiff's proposed amended complaint. ECF Nos. 19-1,
20-1. Plaintiff has included a proposed amended complaint
within her memoranda in opposition to Defendants' motions
to dismiss, rather than filing a motion for leave to amend
under Local Rule of Civil Procedure 15(a). Defendants argue
that Plaintiff should not be permitted to request leave to
amend absent a proper motion and, in the alternative, that
Plaintiff's request for leave to amend should be denied as
futile should the Court be inclined to waive noncompliance
with Local Rule 15(a). ECF Nos. 21-22. The Court, in its
discretion, will consider Plaintiff's request for leave to amend
and determine whether the proposed amendment would be
futile.

Under Federal Rule of Civil Procedure 15(a)(1), a party may
amend its pleading as a matter of course within 21 days after
service of a defendant's motion to dismiss under Rule 12(b)
(6). Plaintiff did not do so. Under Rule 15(a)(2), in all other
cases, a party may amend its pleading only with the opposing
party's written consent or the Court's leave. In her opposition
memoranda, Plaintiff requests leave under Rule 15(a)(2). [1]
ECF Nos. 19 at 2, 20 at 2. Such leave shall be freely given
"when justice so requires." Fed. R. Civ. P. 15(a)(2). "[T]he
decision to grant leave to amend is wholly within a district
court's discretion." *Henneberry v. Sumitomo Corporation of
America,* 532 F. Supp. 2d 523, 531 (S.D.N.Y. 2007). Leave
to amend should be given "absent evidence of undue delay,
bad faith or dilatory motive on the part of the movant, undue
prejudice to the opposing party, or futility." *Monahan v. New
York City Dep't of Corrs.,* 214 F.3d 275, 283 (2d Cir. 2000).
Defendants argue that leave to amend should be denied on the
basis of futility. ECF Nos. 21-22.

\*2 Local Rule of Civil Procedure 15(a) provides that a "[a]
movant seeking to amend or supplement a pleading must
attach an unsigned copy of the proposed amended pleading as
an exhibit to the *motion.*" (emphasis added). Local Rule 15(b)
provides that "the amendment(s) or supplement(s) to the
original pleading shall be identified in the proposed pleading
through the use of a word processing 'red-line' function or

other similar markings that are visible in both electronic and paper format."

As discussed, Plaintiff requests leave to amend within her responses to Defendants' motions to dismiss, not a motion for leave to amend under Local Rule 15(a), which is not procedurally proper. Plaintiff has, however, presented a proposed amended complaint that complies with Local Rule 15(b). *See* ECF Nos. 19-1, 20-1.

Despite Plaintiff's failure to comply with Local Rule 15(a), the Court will consider Plaintiff's request for leave to amend. Courts have broad discretion under Fed. R. Civ. P. 15(a)(2) to give leave to amend "when justice so requires[,]" and an "inherent power" to manage their own dockets "so as to achieve the orderly and expeditious disposition of cases," *In re World Trade Ctr. Disaster Site Litig.*, 722 F.3d 483, 487 (2d Cir. 2013), so long as this inherent authority is exercised in a manner that is consistent with the Federal Rules of Civil Procedure. *Landau & Cleary, Ltd. v. Hribar Trucking, Inc.*, 867 F.2d 996 (7th Cir. 1989). Plaintiff's request for leave to amend, though improperly presented, is within the ambit of Rule 15(a)(2) and consideration of it at this juncture will facilitate a more "expeditious" disposition of Defendants' motions to dismiss, for the reasons explained below. *Henneberry*, 532 F. Supp. 2d at 531.

Plaintiff's proposed amended complaint, *see* ECF Nos. 19-1 and 20-1, includes additional factual allegations arising from the same course of conduct alleged in Plaintiff's original complaint, and identifies with greater particularity the contours of the claims Plaintiff had asserted in the original complaint. *See* ECF No. 1 (asserting a single cause of action for several distinct constitutional violations). Contrary to Defendants' contention, Plaintiff does not appear to assert "new causes of action" in the proposed amended complaint, ECF No. 21 at 2; rather, Plaintiff's proposed amended complaint appears to assert the same claims that her original complaint alluded to, but did not expressly state in an organized or immediately discernible manner. Many of the arguments Defendants make in their motions to dismiss apply with equal force to the proposed amended complaint, except one, due to Plaintiff's request for the addition of a new party.

In her proposed amended complaint, Plaintiff requests the addition of the Village of Fairport as a Defendant, following her concession that the claims she had asserted against Defendants Fairport Police Department and Monroe County Department of Health must be dismissed because each

defendant is not a proper party to this action, as Defendants had argued in their motions to dismiss. *See Bones v. Cnty. of Monroe*, No. 22-CV-6072-FPG, 2022 WL 4921985, at *7 (W.D.N.Y. Oct. 4, 2022) (dismissing claims against police department because it is "not an entity capable of being sued[,]" separate from the municipality); *see also Busch v. Howard*, No. 1:20-CV-01515, 2021 WL 2946532, at *5 (W.D.N.Y. July 14, 2021) (county departments are merely "administrative arms of a municipality" and "do not have a legal identity separate and apart from the municipality and cannot sue or be sued") (collecting cases); ECF Nos. 6, 13. Because Plaintiff's proposed amended complaint appears to rectify a discrete question as to the proper party to be subjected to the claims originally asserted against Defendant Fairport Police Department, irrespective of the proposed additional Defendant's liability, the Court is inclined to consider Plaintiff's request for leave to amend and determine whether Plaintiff's proposed amendment would be futile with respect to the proposed additional Defendant.

**\*3** Still, the Court is mindful that, when it is presented with a proposed amended pleading, "the opposing part[ies] must be put on notice of the nature of the proposed amendment so that [they are] given ample opportunity to present specific objections" to it. *Koller v. Riley Riper Hollin & Colagreco*, 850 F. Supp. 2d 502, 515 (E.D. Pa. 2012). Here, the Court finds that Defendants have received ample opportunity to respond. Defendants discuss at length in their reply briefs the claims asserted in the proposed amended complaint and present varied arguments as to why Plaintiff's proposed amendment would be futile. *See* ECF Nos. 21-22. Accordingly, the Court will consider Plaintiff's proposed amendment and determine whether the proposed amendment would be futile.

## BACKGROUND

On a Rule 12(b)(6) motion, courts must accept as true all well-pleaded facts in a proposed amended complaint and draw all reasonable inferences in favor of the party seeking leave to amend. *See Dougherty v. Town of North Hempstead Board of Zoning Appeals*, 282 F.3d 83, 88 (2d Cir. 2002). Accordingly, the following facts are taken from Plaintiff's proposed amended complaint.

On April 3, 2021, Plaintiff and M.B. were at their home in the Village of Fairport when, at around 10:00 a.m., members of the Fairport Police Department, at the direction

of Monroe County, visited the home to serve M.B. with a "Health Order of Quarantine for COVID-19," signed by Defendant Mendoza. ECF No. 19-1 at 14-15. Monroe County also "unnecessarily dispatched" the Monroe County Sheriff to serve the order. *Id.* at 15. When the order was served, M.B. was subjected to "intimidating tactics" by a Fairport police officer. *Id.* The police officers "caused a disturbance by banging aggressively" on Plaintiff's door, "which caused neighbors to gather in the street." *Id.* at 17. This incident "caused and continues to cause" Plaintiff "great distress" and "embarrassment." *Id.*

Plaintiff alleges that the motivation for Defendants' conduct was not a dispassionate desire to enforce a public health measure, but Plaintiff's political commentary. Plaintiff is a "broadcaster and political commentator by trade, and the host of a radio program based in the Rochester, New York area." ECF No. 19-1 at 13. Prior to the incident that gave rise to the present action, Plaintiff "appeared on local, regional and national news and entertainment shows," and had "expressed her critical views on controversial topics, including, but not limited to, [ ] Defendants' policies, procedures and decisions." *Id.* Specifically, Plaintiff had been a "vocal and public critic of [Monroe County] and [its] polices in response to the COVID-19 virus." *Id.* at 15. Plaintiff alleges that "Defendants were well aware of [Plaintiff's] publicly voiced criticism" and that Defendants Monroe County, Dr. Michael Mendoza, and the Village of Fairport "communicated with one another" to serve the quarantine order in response to Plaintiff's criticism. *Id.* at 15-17.

In further support of these allegations, Plaintiff alleges that "on April 2, 2021," the day before the order was served, she spoke on the phone with a pediatric nurse practitioner at the Monroe County Department of Health who was "in charge of isolation follow up and contract [sic] tracing during the COVID-19 pandemic." *Id.* at 13. Plaintiff alleges that the nurse practitioner indicated that Defendants may serve M.B. with a quarantine order because Defendants believed "M.B. had come into contact" with a separate individual that had contracted COVID-19. ECF No. 19-1 at 14. During the call, Plaintiff alleges that she contested whether M.B. was exposed to the individual who had contracted COVID-19 because M.B. "was not in contact with the individual." ECF No. 19-1 at 14. The nurse practitioner indicated that the quarantine order may be served by police at Plaintiff's home. *Id.* After the phone call, Plaintiff alleges that she received a call from the Monroe County Sheriff, but does not describe the content of this call. *Id.*

**\*4** In April 2023, Plaintiff brought the present action. ECF No. 1. In October 2023, Plaintiff filed her proposed amended complaint, asserting five constitutional claims against Defendants County of Monroe, Dr. Michael Mendoza, and Village of Fairport.[2] ECF Nos. 19-1, 20-1. Plaintiff asserts claims for (i) First Amendment retaliation pursuant to 42 U.S.C. § 1983, (ii) "class of one" Equal Protection pursuant to 42 U.S.C. § 1983, (iii) "selective enforcement" Equal Protection pursuant to 42 U.S.C. § 1983, (iv) conspiracy to interfere with civil rights pursuant to 42 U.S.C. § 1985 and § 1986, and (v) a violation of M.B.'s "right to travel" pursuant to 42 U.S.C. § 1983. ECF Nos. 19-1 at 18-24, 20-1 at 18-24.[3]

## LEGAL STANDARD

"The standards for determining whether a proposed amendment would be futile are the same as for considering a motion to dismiss under Rule 12(b)(6)." *Argentieri v. Clerk of Ct. for Judge Kmiotek*, 420 F. Supp. 2d 162, 165 (W.D.N.Y. 2006) (quoting *Lucente v. International Business Machines Corp.*, 310 F.3d 243, 248 (2d Cir. 2002)); *see also AEP Energy Services Gas Holding Co. v. Bank of America, N.A.*, 626 F.3d 699, 726 (2d Cir. 2010) ("Leave to amend may be denied on grounds of futility if the proposed amendment fails to state a legally cognizable claim[.]"). To survive a Rule 12(b)(6) challenge, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). The "plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (internal quotation marks omitted). A district court must accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the nonmoving party. *Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co.*, 517 F.3d 104, 115 (2d Cir. 2008).

The "touchstone for a well-pleaded complaint under Federal Rules of Civil Procedure 8(a) and 12(b)(6) is plausibility." *In re AOL Time Warner, Inc. Sec. Litig.*, 503 F. Supp. 2d 666, 670 (S.D.N.Y. 2007) (citing *Twombly*, 550 U.S. at 560-61, 127 S.Ct. 1955). To meet this plausibility standard, the factual allegations must permit the Court "to infer more than the mere possibility of misconduct." *Iqbal*, 556 U.S. 679.

## DISCUSSION

### I. First Amendment Retaliation Under Section 1983

Plaintiff asserts under 42 U.S.C. § 1983 that Defendants retaliated against her for her "past speech and press" in violation of the First Amendment by serving the quarantine order at her home with police assistance. ECF No. 19-1 at 18-19. Defendants contend that Plaintiff fails to allege the existence of a municipal custom or policy that caused the alleged constitutional violation. ECF No. 6-2 at 2; ECF No. 13-3 at 3-5. Defendants also argue that Plaintiff fails to allege that Defendant Mendoza had any final policy making authority with respect to the service of the quarantine order, and that he is entitled to qualified immunity. ECF No. 6-2 at 3-4. For the reasons below, the Court concludes that Plaintiff's claim would not survive a motion to dismiss, and accordingly, Plaintiff's proposed amendment would be futile.

### A. *Monell* Liability

**\*5**   "To prevail on a 42 U.S.C. § 1983 claim against a municipality, a plaintiff must show that a municipal policy or custom caused the deprivation of his constitutional rights." *Plair v. City of New York*, 789 F. Supp. 2d 459, 468 (S.D.N.Y. 2011) (citing *Monell v. Dep't Soc. Servs.*, 436 U.S. 658, 693, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). "A plaintiff can establish an official policy or custom by showing any one of the following: (1) a formal policy officially endorsed by the municipality; (2) actions or decisions made by municipal officials with decision-making authority; (3) a practice so persistent and widespread that it constitutes a custom of which policymakers must have been aware; or (4) a failure by policymakers to properly train or supervise their subordinates, such that the policymakers exercised 'deliberate indifference' to the rights of the plaintiff and others encountering those subordinates." *McLennon v. City of New York*, 171 F. Supp. 3d 69, 94 (E.D.N.Y. 2016).

"Although there is no heightened pleading requirement for complaints alleging municipal liability under § 1983, ... a complaint does not suffice if it tenders naked assertions devoid of further factual enhancement." *Green v. City of Mount Vernon*, 96 F. Supp. 3d 263, 301-02 (S.D.N.Y. 2015). "To survive a motion to dismiss a municipal liability claim, a plaintiff must allege facts tending to support, at least circumstantially, an inference that a municipal policy or custom exists." *McLennon v. City of New York*, 171 F. Supp.

3d 69, 95 (E.D.N.Y. 2016) (internal quotation marks and ellipsis omitted); *see also Cruz v. Vill. of Spring Valley*, No. 21-CV-2073, 2022 WL 428247, at \*6 (S.D.N.Y. Feb. 11, 2022) (collecting cases). Put simply, to allege "there is a policy does not make it so." *Vassallo v. City of New York*, No. 15-CV-7125, 2016 WL 6902478, at \*14 (S.D.N.Y. Nov. 22, 2016) (internal quotation marks omitted); *see also Cruz*, 2022 WL 428247, at \*6 ("Plaintiff cannot, through conclusory allegations, merely assert the existence of a municipal policy or custom, but must allege facts tending to support, at least circumstantially, an inference that such a municipal policy or custom exists." (internal quotation marks omitted)).

Plaintiff's proposed amended complaint does not plausibly allege a municipal policy or custom sufficient to establish municipal liability against Defendants. Throughout Plaintiff's proposed pleading, Plaintiff does not allege a custom or policy that may have plausibly caused the alleged misconduct in a non-conclusory or speculative manner. Plaintiff claims that she had been a public critic of Defendants' "policies in response to the COVID-19 virus[,]" but does not state a particular policy, nor any policy or custom that may have caused the alleged unconstitutional conduct at issue in this case; specifically, Defendants' service of the quarantine order at her home with police assistance, in response to her speech. [4] ECF No. 19-1 at 6. Plaintiff alleges only that she spoke with a nurse practitioner that indicated that Defendants may serve M.B. with a quarantine order, and that the quarantine order may be served by police. *See* ECF No. 19-1 at 14. While such a conversation may have occurred, this allegation, alone, is insufficient to support an inference that a municipal policy existed with respect to the challenged conduct. *See Cruz*, 2022 WL 428247, at \*6. Plaintiff repeatedly alleges that "Defendants' conduct was "retaliatory" due to her "disagreements with [ ] Defendants' policy enforcement of COVID-19 protocols[,]" but fails to allege any specific policy or protocol that may have plausibly led to the alleged constitutional deprivation, as is required under Section 1983. Without facts tending to support, at least circumstantially, an inference that a municipal policy or custom existed with respect to the challenged conduct, Plaintiff's proposed amended complaint fails to plausibly allege municipal liability.

**\*6**   Moreover, even assuming for the purposes of this analysis that Defendants' enforcement of the quarantine order was executed in a constitutionally impermissible manner, "in the absence of other evidence, it is well-settled that a 'single incident of errant behavior is an insufficient basis for finding

that a municipal policy caused [a] plaintiff's injury.' " *JF v. Carmel Cent. Sch. Dist.*, 168 F. Supp. 3d 609, 617 (S.D.N.Y. 2016) (quoting *Sarus v. Rotundo*, 831 F.2d 397, 402 (2d Cir. 1987)); *see DeCarlo v. Fry*, 141 F.3d 56, 61 (2d Cir. 1998) (concluding that "a single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal liability").

With respect to Defendant Mendoza, specifically, Plaintiff contends that he may still be subject to *Monell* liability because it has been applied to public officials "who can be considered a final decision maker over significant matters under certain circumstances." *Saunders v. N.Y.C. Dept. of Educ.*, No. 07-CV-2725 (SJF) (LB), 2010 WL 2985031, at *3 (E.D.N.Y. July 20, 2010)). Plaintiff, however, provides no factual allegations to demonstrate that Defendant Mendoza was, indeed, the final decision maker with respect to the alleged misconduct, despite her allegation that the quarantine order was "signed" by Defendant Mendoza. ECF No. 19-1 at 4, 6. Accepting as true that Defendant Mendoza may have authorized the issuance of quarantine orders as Commissioner of the County of Monroe Department of Public Health, in general, Plaintiff proffers no allegations that he decided or directed that the order in question would be enforced in the particular manner Plaintiff alleges.

More to the point, the Supreme Court has stated that "whether a particular official has final policy making authority is a question of state law." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988) (internal quotations omitted). To adequately plead such a claim on the basis that Defendant Mendoza was a final decision maker, then, Plaintiff must allege that, with respect to the challenged conduct, he was responsible under a particular state law for making a policy that enabled it. *See Hurdle v. Bd. of Educ.*, 113 F. App'x 423, 425-26 (2d Cir. 2004); *see also Searle v. Red Creek Cent. Sch. Dist.*, No. 21-CV-6086-FPG, 2021 WL 5086405, at *6 (W.D.N.Y. Nov. 2, 2021). Plaintiff includes no such allegations except for her conclusory allegation that Defendant Mendoza acted "under his final policy making authority." ECF No. 19-1 at 4. Still, Plaintiff's claim suffers from a more fundamental deficiency. Even if Plaintiff had plausibly alleged a custom or policy sufficient to establish municipal liability, which she does not, Plaintiff would still fail to plausibly allege the underlying constitutional violation asserted.

## B. First Amendment Retaliation

To state a claim for First Amendment retaliation, Plaintiff must allege that "(1) [s]he has an interest protected by the First Amendment; (2) defendants' actions were motivated or substantially caused by his exercise of that right; and (3) defendants' actions effectively chilled the exercise of [her] First Amendment right" or caused "some other concrete harm." *Searle v. Red Creek Cent. Sch. Dist.*, No. 22-2049-CV, 2023 WL 3398137, at *2 (2d Cir. May 12, 2023); *see Dorsett v. Cnty. of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013) (plaintiff has standing to assert a First Amendment retaliation claim where "he can show either that his speech has been adversely affected by the government retaliation or that he has suffered some other concrete harm. Various non-speech related harms are sufficient to give a plaintiff standing."); *see also Zherka v. Amicone*, 634 F.3d 642, 645 (2d Cir. 2011) (summarizing cases recognizing other forms of harm).

**\*7** Assuming *arguendo* that Plaintiff has alleged sufficient facts to satisfy the first two elements, Plaintiff's pleading lacks allegations that plausibly establish the third. Plaintiff's proposed amended complaint does not establish that her exercise of her First Amendment right was "chilled," nor that she suffered any other cognizable "concrete harm" as a result of Defendants' conduct.

To satisfy the "chilling" requirement, a plaintiff typically must show that the retaliatory conduct deprived her of her First Amendment right by either (1) silencing her or (2) having some "actual, non-speculative chilling effect on [her] speech." *See Williams v. Town of Greenburgh*, 535 F.3d 71, 78 (2d Cir. 2008). Here, Plaintiff does not allege that she was silenced or inhibited from exercising her right to free speech as a result of Defendants' conduct. In her proposed amended complaint, Plaintiff does not allege any facts plausibly suggesting that she was prevented from continuing to voice criticism of Defendants, in public or private, nor that she was coerced or intimidated into ceasing her speech. That is, Plaintiff alleges no plausible "change in [ ] behavior" for the purposes of this requirement. *Curley v. Village of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001).

Likewise, Plaintiff fails to allege that she suffered "concrete harm" in a manner sufficient to establish facial plausibility in this Circuit. Plaintiff alleges only that the incident in question caused "distress" and "embarrassment[,]" which, alone, is insufficient to establish such harm. ECF No. 19-1 at 7, 10. The Second Circuit "demands more" than such "cursory" allegations in the First Amendment retaliation context. *Zherka v. Amicone*, 634 F.3d 642, 647, fn. 9 (2d

Cir. 2011). While certain limited forms of harm, beyond "chilling," can be sufficient to establish "concrete harm" for the purposes of a First Amendment retaliation claim, no such harms are alleged by Plaintiff in this action. *See, e.g., Zherka,* 634 F.3d at 646 (lost government contract); *Tabbaa v. Chertoff,* 509 F.3d 89, 102 (2d Cir. 2007) (additional scrutiny at border crossing); *Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals,* 282 F.3d 83, 91 (2d Cir. 2002) (alleging retaliatory revocation of building permit); *Gagliardi v. Vill. of Pawling,* 18 F.3d 188, 195 (2d Cir. 1994) (alleging retaliatory failure to enforce zoning laws).

Accordingly, even accepting as true Plaintiff's allegations that Defendants intended to "stifle" and "silence" Plaintiff, Plaintiff does not allege that her speech was "effectively" or "actually chilled" as a result of Defendants' conduct, nor that she suffered any other "concrete harm" sufficient to establish facial plausibility for this claim. ECF No. 19-1 at 10; *Avgerinos,* 690 F. Supp. 2d at 132.

Even so, Plaintiff asserts that Defendant Mendoza may yet be held liable for First Amendment retaliation in his individual capacity. ECF No. 20 at 3. Defendants maintain that Defendant Mendoza is shielded from individual liability by qualified immunity. *See* ECF Nos. 6, 22. Qualified immunity protects public officials when they make reasonable, even if mistaken, decisions. "To decide whether to grant a public official's motion [to dismiss] based on qualified immunity, courts ask: (1) whether the facts, viewed in the plaintiff's favor, show that the official's conduct violated a constitutional right; and (2) if so, whether the right at issue was clearly established at the time of the alleged violation." *See Hansen v. Watkins Glen Cent. Sch. Dist.,* No. 17-CV-6143-FPG-JWF, 2019 WL 3113309, at *4 (W.D.N.Y. July 15, 2019) (citing *Doninger v. Niehoff,* 642 F.3d 334, 345 (2d Cir. 2011)). Because the Court has determined that Plaintiff does not plausibly allege a constitutional violation, the Court need not determine whether the right at issue was clearly established at the time of the alleged violation for qualified immunity purposes.

**\*8** Thus, the Court concludes that this claim would not survive Rule 12(b)(6) dismissal, and Plaintiff's proposed amendment would be futile.

## II. Equal Protection: Class of One, Selective Enforcement

Next, Plaintiff asserts that Defendants' service of the quarantine order violated her and M.B.'s right to Equal Protection under the Fourteenth Amendment. The Equal Protection Clause is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). An individual who does not allege discrimination "based upon membership in a protected class[,]" such as Plaintiff, may assert either a "class of one" or a "selective enforcement" equal protection claim. *Progressive Credit Union v. City of New York,* 889 F.3d 40, 49 (2d Cir. 2018); *Artec Constr. & Dev. Corp. v. N.Y.C. Dep't of Hous. Pres. & Dev.,* No. 15 Civ. 9494 (KPF), 2017 WL 782911, at *2 (S.D.N.Y. Feb. 27, 2017). Plaintiff asserts both.

### A. Class of One

Plaintiff asserts under 42 U.S.C. § 1983 a "class of one" Equal Protection claim in connection with Defendants' service of the quarantine order; specifically, that "others exposed to the individual who had contracted COVID-19 were not intimidated by service of the Health Order by Police or intimidated into complying with the Health Order" and M.B. was "treated differently from others served with the Health Order of Quarantine." ECF No. 19-1 at 11-12. Defendants argue that Plaintiff fails to sufficiently allege the existence of similarly situated comparators. The Court agrees with Defendants.

To prevail on a "class of one" claim, a plaintiff must establish that "[i] no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and [ii] the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendant acted on the basis of a mistake." *Hu v. City of New York,* 927 F.3d 81, 92 (2d Cir. 2019) (quoting *Neilson v. D'Angelis,* 409 F.3d 100, 105 (2d Cir. 2005)). "Class of one" claims require "an 'extremely high' degree of similarity between a plaintiff and comparator." *Id.* at 93.

Here, Plaintiff fails to plausibly allege a similarly situated comparator, beyond her generalized assertions that she was "treated differently than others" and her conclusory allegation that "no other minor who was served an Order of Quarantine had the police arrive at their door to serve the notice." ECF No. 19-1 at 7. The Court may not reasonably infer the existence of a similarly situated comparator, as required, from these conclusory allegations, alone. Additionally, Plaintiff fails to allege an "extremely high degree of similarity" between the circumstances of M.B. and other children that

may have been subjected to a health quarantine order, beyond her own conclusory statements. *Hu*, 927, F.3d at 93. Accordingly, the Court concludes this claim would not survive dismissal, and amendment would be futile.

### B. Selective Enforcement

Plaintiff asserts in her "selective enforcement" claim the same allegations proffered in support of her "class of one" claim; specifically, that "others exposed to the individual who had contracted COVID-19 were not intimidated by service of the Health Order by Police or intimidated into complying with the Health Order" and M.B. was "treated differently from others served with the Health Order of Quarantine." ECF No. 19-1 at 12-13. Defendants argue, and the Court agrees, that Plaintiff again does not sufficiently allege a comparator.

**\*9** To plead a selective enforcement claim, Plaintiff must allege that (1) she was treated differently than other "similarly situated" individuals; and (2) "such differential treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Jones v. Bayshore Union Free Sch. Dist.*, 666 F. App'x 92, 94 (2d Cir. 2016) (summary order) ("*Jones II*") (quoting *Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 790 (2d Cir. 2007) (internal quotations omitted)); *Searle*, 2021 WL 5086405, at \*6. While "class of one" claims require "an 'extremely high' degree of similarity between a plaintiff and comparator," selective enforcement claims "merely require[ ] a 'reasonably close resemblance' between a plaintiff's and comparator's circumstances." *Hu*, 927 F.3d at 93.

Assuming Plaintiff has properly alleged that service of the quarantine order was impermissibly motivated by retaliation for her speech, she fails to allege the existence of similarly situated individuals who were treated differently. Plaintiff's allegation that Defendants treated her "differently from others served with the Health Order of Quarantine" is insufficient, without more, to survive Rule 12(b)(6) dismissal. *See Jones II*, 666 F. App'x at 94 (dismissing plaintiff's equal protection claim where complaint contained only bare allegations that others were similarly situated to him); *Kamholtz v. Yates Cnty.*, 350 F. App'x 589, 591 (2d Cir. 2009) (summary order). Accordingly, this claim is legally insufficient, and Plaintiff's proposed amendment would be futile.

### III. Conspiracy to Interfere with Civil Rights Pursuant to 42 U.S.C. § 1985 and § 1986

Plaintiff next asserts a conspiracy to interfere with civil rights claim pursuant to 42 U.S.C. § 1985 and § 1986, alleging that Defendants conspired and "communicated" with one another "for the purpose of arranging to have police intimidate an[d] scare" Plaintiff and M.B. into complying with the quarantine order. ECF No. 19-1 at 14-15. As Defendants argue, however, Plaintiff's Section 1985 claim fails because Plaintiff fails to allege "some racial or [ ] otherwise class-based, invidious discriminatory animus behind the conspirators' action." *Palmieri v. Lynch*, 392 F.3d 73, 86 (2d Cir. 2004). Plaintiff makes no such showing in her pleadings. *See* ECF Nos. 1 at 7-8, 19-1 at 13-14; *see also Levine v. New York State Police*, No. 21-CV-1181, 2022 WL 1987845, at \*14 (N.D.N.Y. June 6, 2022). As a result, Plaintiff's Section 1986 claim must also be dismissed. *Steadman v. Mayo*, No. 09-CV-5154, 2012 WL 1948804, at \*5 (S.D.N.Y. Mar. 27, 2012) (Section 1986 claim must fail as a matter of pleading because it is contingent on the pleading of an adequate 1985 claim).[5] Accordingly, this claim would not survive a motion to dismiss, and Plaintiff's proposed amendment with respect to this claim would be futile.

### IV. Right to Travel

Plaintiff asserts under 42 U.S.C. § 1983 that the order of quarantine that restricted M.B.'s movement to her home violated M.B.'s "constitutional right to travel."[6] ECF No. 19-1 at 15. Plaintiff alleges that the quarantine order "stated that [M.B.] could not leave her house for ten days following her exposure[,]" and that the order "prevented her from exercising her right to travel." ECF No. 19-1 at 15-16. Defendants, and the Court, construe this claim to challenge the constitutionality of the quarantine order, itself, rather than its enforcement as alleged in Plaintiff's prior claims.[7] ECF No. 6-2 at 6. Defendants argue that the order is constitutional under *Jacobson v. Commonwealth of Massachusetts* and its progeny. *Id.* Applying the *Jacobson* framework, the Court confirms its constitutionality.[8]

**\*10** The right to travel is not explicitly mentioned in the text of the Constitution, *Saenz v. Roe*, 526 U.S. 489, 498, 119 S.Ct. 1518, 143 L.Ed.2d 689 (1999), but it is undoubtedly fundamental. *See, e.g.*, *United States v. Guest*, 383 U.S. 745, 758, 86 S.Ct. 1170, 16 L.Ed.2d 239, (1966); *see also Page v. Cuomo*, 478 F. Supp. 3d 355, 362 (N.D.N.Y. 2020). As the Second Circuit has acknowledged, this right to travel includes a "constitutional right to travel within a state." *King v. New Rochelle Mun. Hous. Auth.*, 442 F.2d 646, 649 (2d Cir. 1971).

In *Jacobson*, the Supreme Court articulated a broadly deferential standard for assessing the constitutionality of emergency public health measures, pursuant to which states and local authorities are granted substantial deference in enacting measures "to prevent the spread of contagious diseases" during public health crises. *197 U.S. at 35, 25 S.Ct. 358 (1908)*; *see Jones v. Cuomo, 542 F. Supp. 3d 207, 217 (S.D.N.Y. 2021)*. Under *Jacobson*, a state or local regulation "enacted to protect the public health" will survive judicial scrutiny unless it bears "no real or substantial relation to [the public health], or is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law[.]" *197 U.S. at 31, 25 S.Ct. 358*. While *Jacobson* "predated the modern constitutional jurisprudence of tiers of scrutiny," *Agudath Israel of Am. v. Cuomo, 983 F.3d 620, 635 (2d Cir. 2020)*, it has been likened to rational basis review, *see Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. —— (2020) (Gorsuch, J., concurring); *Jones, 542 F. Supp. 3d at 217*.

"Courts across the country have nearly uniformly relied on *Jacobson*'s framework to analyze emergency public health measures put in place to curb the spread of coronavirus." *Page, 478 F. Supp. 3d at 366*; *see, e.g., In re Abbott, 954 F.3d 772, 785 (5th Cir. 2020)* (faulting district court for "ignor[ing] the framework governing emergency public health measures" set forth in *Jacobson*); *In re Rutledge, 956 F.3d 1018, 1028 (8th Cir. 2020)* ("[T]he district court's failure to apply the *Jacobson* framework produced a patently erroneous result."); *Carmichael v. Ige*, No. 20-00273, 470 F.Supp.3d 1133, 2020 WL 3630738, at *5 n.6 (D. Haw. July 2, 2020)* (rejecting assertion that *Jacobson* is inapplicable to plaintiffs' challenge to quarantine requirement); *Ass'n of Jewish Camp Operators v. Cuomo, 470 F. Supp. 3d 197, 214 (N.D.N.Y. July 6, 2020)* (Suddaby, J.) ("[T]he Court joins the many courts throughout the country that rely on *Jacobson* when determining if a governor's executive order has improperly curtailed an individual's constitutional right during the COVID–19 pandemic."); *McCarthy v. Cuomo*, No. 20-CV-2124 (ARR), 2020 WL 3286530, at *3 (E.D.N.Y. June 18, 2020)* (applying *Jacobson* to reject challenge to several State Executive Orders related to the pandemic).

Under *Jacobson*, "[t]he bottom line is this: when faced with a society-threatening epidemic, a state may implement emergency measures that curtail constitutional rights so long as the measures have at least some 'real or substantial relation' to the public health crisis and are not 'beyond all question, a plain, palpable invasion of rights secured by the fundamental

law.' " *In re Abbott, 954 F.3d at 784* (quoting *Jacobson, 197 U.S. at 31, 25 S.Ct. 358*); *Page, 478 F. Supp. 3d at 366*.

Here, Plaintiff presents sparse factual allegations from which the Court may examine the substance of the public health measure in question, but even liberally construing Plaintiff's allegations in her favor, the Court concludes that the measure passes muster under *Jacobson*'s deferential standard. Plaintiff's uncontested allegations include that a "Health Order of Quarantine [ ] directed [M.B] to remain at her residence for ten (10) days[,]" and that the order was "issued by Defendant Mendoza." ECF No. 19-1 at 10-11. Plaintiff further alleges that M.B. "could not leave her house for ten days following her exposure, which was determined by the Monroe County Department of Health to have occurred on March 27, [2021]." [9] *Id. at 15, 25 S.Ct. 358*. This is the extent of the relevant allegations. Applying the *Jacobson* framework, the Court cannot conclude that the ten-day quarantine policy, as alleged, did not bear some " 'real or substantial relation' to the public health crisis[,]" nor that it was " 'beyond all question, a plain, palpable invasion of rights secured by the fundamental law.' " *In re Abbott, 954 F.3d at 784*. Courts have routinely found even more restrictive public health measures constitutional, and this Court discerns no reason why the challenged measure here should be treated differently. *See Page, 478 F. Supp. 3d at 367* (finding New York's "fourteen day" quarantine period constitutional under *Jacobson* because, *inter alia*, COVID-19 "has an incubation period of up to fourteen days"); *see also Jones, 542 F. Supp. 3d at 219* (same); *McCarthy*, 2020 WL 328650, at *3 (collecting cases upholding restrictions on social gatherings). Accordingly, the Court concludes that the challenged measure is constitutionally permissible under the *Jacobson* framework. Therefore, the Court concludes that this claim would not survive a *Rule 12(b)(6)* motion, and Plaintiff's proposed amendment would be futile.

### CONCLUSION

**\*11** For the foregoing reasons, Defendants' motions to dismiss are granted. The Clerk of Court is directed to (i) terminate Defendants County of Monroe Department of Public Health and Fairport Police Department from this action; (ii) update the case caption accordingly; and then (iii) enter judgment for Defendants and close this case.

IT IS SO ORDERED.

**All Citations**

Slip Copy, 2023 WL 8809732

## Footnotes

1      Defendant Fairport Police Department's argument that Federal Rule of Civil Procedure 15(c) precludes leave to amend is inapposite because Plaintiff invokes Rule 15(a) as a basis for the request for leave to amend. *See* ECF No. 13 at 4-5.

2      Because the parties do not dispute that Defendants County of Monroe Department of Health and Fairport Police Department are not proper parties to this action, *see* Section B, *supra*, the Court does not address any claim asserted against these Defendants.

3      Plaintiff also references several other bases for her claims throughout both her original complaint and proposed amended complaint, including her "right to liberty." ECF No. 1; ECF No. 19-1, 20-1. This is not a cognizable claim, and the Court accordingly does not address it. *See Nguyen v. Ridgewood Sav. Bank*, 66 F. Supp. 3d 299, 307 (E.D.N.Y. 2014) (rejecting Section 1983 claim premised on the "vague invocation of the right to life, liberty and the pursuit of happiness" (internal quotation marks omitted)); *Transitional Servs. of N.Y. for Long Island, Inc. v. N.Y.S. Office of Mental Health*, 91 F. Supp. 3d 438, 442 (E.D.N.Y. 2015) ("Section 1983 is enforceable only for violations of federal rights." (internal quotation marks omitted)).

4      The Court does not construe this claim to allege that the health order of quarantine enacted in connection with COVID-19 was, itself, unconstitutional. Rather, Plaintiff alleges that Defendants' *enforcement* of the health order of quarantine, as applied to M.B. via police assistance, was the alleged unconstitutional act. For a discussion of the former, *see* Section V. *infra.*

5      Under 42 U.S.C. § 1986, a defendant can be held liable for neglecting or refusing to stop a conspiracy when he was aware of the conspiracy and in a position to prevent it. *See* 42 U.S.C. § 1986. However, "a claim under section 1986 ... lies only if there is a viable conspiracy claim under section 1985." *Gagliardi v. Vill. of Pawling*, 18 F.3d 188, 194 (2d Cir. 1994).

6      Though Plaintiff asserts this claim against all Defendants, the Court can discern no factual basis for alleging this claim against proposed Defendant Village of Fairport. Plaintiff does not allege that that Defendant contributed to the creation or issuance of the challenged public health measure. Accordingly, the Court analyzes the sufficiency of this claim only with respect to Defendants County of Monroe and Mendoza.

7      Defendants do not appear to dispute that the issuance of public health measures during COVID-19, like the quarantine order, amounted to a "custom or policy" sufficient to establish *Monell* liability, nor that the practice may have caused the alleged constitutional violation of M.B.'s "right to travel." *Monell v. Dep't Soc. Servs.*, 436 U.S. 658, 693, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). The Court accordingly confines its analysis whether a "constitutional deprivation" occurred. *Plair v. City of New York*, 789 F. Supp. 2d 459, 468 (S.D.N.Y. 2011).

8      Though the parties do not raise it, the Court is mindful that this claim may be subject to dismissal for "mootness." A claim is moot, and therefore no longer a case or controversy for the purposes of Article III, "when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91, 133 S.Ct. 721, 184 L.Ed.2d 553 (2013). Still, a defendant's "voluntary cessation of challenged conduct does not [necessarily] render a [claim] moot." *Knox v. Serv. Emp. Int'l Union, Local 1000*, 567 U.S. 298, 307, 132 S.Ct. 2277, 183 L.Ed.2d 281 (2012). Because

Defendants' cessation of the challenged conduct under *Knox* is not alleged or raised, the Court cannot engage meaningfully with the mootness doctrine and applies the *Jacobson* framework. In addition, the Court assumes, without deciding, for the purposes of this Decision and Order that Plaintiff has Article III standing to pursue this claim on M.B.'s behalf.

9   To the extent Plaintiff argues that M.B "was not able to exercise her right to travel [...] for additional time" because the quarantine order "should have been based on the exposure date which [Plaintiff alleges] occurred earlier in the week on Thursday or Friday, prior to [Saturday,] March 27, 2021," ECF No. 19-1 at 15-16, the Court finds that, even accepting as true this contention that the exposure date was one or two days before March, 27, 2021, this "additional time" of approximately one or two days would not materially change the Court's analysis of the order under *Jacobson*. In addition, Plaintiff presents no plausible allegations that the exposure date the quarantine order was based on was estimated or imposed in an "arbitrary [or] unreasonable manner." *Luke's Catering Serv., LLC v. Cuomo*, 485 F. Supp. 3d 369, 379 (W.D.N.Y. 2020) (citing *In re Abbott*, 954 F.3d at 783).

---

**End of Document**                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2024 WL 243436
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Genevieve ZIETEK, Plaintiff,

v.

PINNACLE NURSING AND
REHAB CENTER, Defendant.

21-CV-5488 (AT) (JLC)
|
Signed January 23, 2024

**Attorneys and Law Firms**

Genevieve Zietek, Bronx, NY, Pro Se.

James P. Connors, Lewis Johs Avallone Aviles, LLP, Islandia, NY, for Defendant.

## REPORT & RECOMMENDATION

JAMES L. COTT, United States Magistrate Judge,

**\*1 To the Honorable Analisa Torres, United States District Judge:**

Before the Court is a renewed motion to dismiss the complaint under Rule 12(b)(1), 12(b)(2), and 12(b)(6) of the Federal Rules of Civil Procedure brought by Pinnacle Nursing and Rehab Center ("Pinnacle"). Plaintiff *pro se* Genevieve Zietek, a former Pinnacle resident, did not file a formal opposition to the motion. For the reasons set forth below, I recommend that the motion be granted and Zietek's case be dismissed.

## I. BACKGROUND

Zietek, an 82-year-old woman at the time of the filing of the complaint, brought this action on June 17, 2021, alleging physical abuse and theft by Pinnacle and its staff members, harassment by co-residents, and malfeasance by a New York state court judge who appointed a guardian for her in 2020. Complaint ("Compl."), Dkt. No. 1. The action was brought via a 12-page, hand-written letter addressed to the Court that was construed as a complaint. *Id.* [1]

On July 28, 2021, the Court exercised its authority under 28 U.S.C. § 1915(e)(2)(B) to screen complaints filed *in forma*

*pauperis.* Order of Service ("July 28 Order"), Dkt. No. 7. In doing so, it construed the complaint as sounding under the Federal Nursing Home Reform Act ("FNHRA"), 42 U.S.C. § 1396(r). *Id.* at 1. The Court ruled that Zietek's claims against New York State Supreme Court Justice Robert Johnson were frivolous under the doctrine of judicial immunity and accordingly dismissed them. *Id.* at 2 (citing *Mireles v. Waco,* 502 U.S. 9, 11–12 (1991)). The Court went on to analyze Zietek's claims against the individual defendants, and determined that the primary concern of her complaint was the alleged financial abuse she experienced at Pinnacle. *Id.* at 5. [2] The Court held that joinder of the individual defendants was inappropriate because Zietek did not allege that they were personally involved in that financial abuse and, in addition, her claims against the individual defendants "do not allege common questions of law and facts and do not arise out of the same series of transactions or occurrences" as her financial abuse claims. *Id.* The Court therefore severed Zietek's claims against the five individual defendants and dismissed them without prejudice. *Id.* Thus, only the claims against Pinnacle remained.

On August 18, 2021, Pinnacle moved to dismiss the complaint under Rule 12(b)(1) for lack of subject matter jurisdiction, Rule 12(b)(2) for lack of personal jurisdiction, and Rule 12(b)(6) for failure to state a claim upon which relief may be granted. Dkt. No. 15.

On August 23, 2021, Zietek moved for reconsideration of the July 28 Order. Dkt. No. 19.

On January 4, 2022, Zietek submitted a letter to the Court, seeking to add Matthew Varghese, an administrator of Pinnacle's operating company Bay Park Center for Nursing, as a named defendant to the case and raising allegations under the Violence Against Women Act (42 U.S.C. § 13981). Dkt. No. 33. [3] Also on January 4, Zietek filed her opposition to the motion to dismiss. Plaintiff's Opposition to Motion to Dismiss ("Pl. Opp."), Dkt. No. 34. In her opposition, Zietek identified four statutes that allegedly provided bases on which to support her claims: the Elder Justice Act (42 U.S.C. § 1397), the Older Americans Act (42 U.S.C. §§ 3001 *et seq.*), the Violence Against Women Act, and the Notification and Federal Employee Antidiscrimination and Retaliation Act ("No Fear Act") (5 U.S.C. § 2301 *et seq.*). [4] *Id.* at 7. Zietek also sought $2,000,000 in damages. *Id.*

**\*2** On March 2, 2022, the Court denied Zietek's motion for reconsideration of the July 28 Order. Dkt. No. 41. On that

same day, the Court denied, without prejudice to renewal, Pinnacle's dismissal motion. Dkt. No. 42. Pinnacle, in its motion papers, had provided the Court with information indicating that Zietek was an "incapacitated person" requiring appointment of a guardian. Dkt. No. 16-3. Given this information, and Rule 17(c)(2) of the Federal Rules of Civil Procedure's requirement that the Court "appoint a guardian *ad litem* ... to protect a[n] incompetent person who is unrepresented in an action," the Court determined that it was obliged to evaluate Zietek's competency before it could reach the merits of her claims. *Id.* at 3 The issue of Zietek's competency was subsequently referred to me for a hearing. *Id.*

On August 8, 2022, Zietek requested a change of venue to the White Plains Courthouse, alleging unfair treatment by the Court. Dkt. No. 57. This request was denied. Dkt. Nos. 61, 67.

On December 13, 2022, following a hearing that featured testimony from physicians and social workers who had treated Zietek but which she herself refused to attend, I issued a Report and Recommendation recommending that Zietek be found competent to proceed with her lawsuit and that Pinnacle be given leave to renew its motion to dismiss. Dkt. No. 80.

On January 4, 2023, Zietek filed an interlocutory appeal of the Court's order denying Pinnacle's motion to dismiss. Dkt. No. 83. She also filed an objection to the Report and Recommendation, arguing that the recommendation to allow Pinnacle to resubmit its motion to dismiss was improper. Dkt. No. 84.

On February 2, 2023, the Report and Recommendation was adopted and Pinnacle was directed to renew its motion to dismiss by February 13, 2023. Dkt. No. 86.

On February 13, 2023, Pinnacle renewed its motion to dismiss. Dkt. No. 87. In support, it filed a memorandum of law ("Def. Mem."). Dkt. No. 87-9. Zietek was directed to submit her opposition by March 7, 2023. Dkt. No. 88. In response, Zietek submitted a letter to the Court (1) insisting that the Court's adoption of the Report and Recommendation was invalid; (2) claiming that the case was stayed pending her interlocutory appeal; (3) demanding that an additional Pinnacle representative be added as a named defendant; (4) increasing her damages demand to $14,000,000; and (5) alleging a conspiracy between her current nursing home and Pinnacle. Dkt. No. 89. Then, by letter dated February 28, she objected to Pinnacle's motion ("Pl. Obj."). Dkt. No. 92. While the letter primarily discussed her objections to the New

York state court guardianship proceeding, she also claimed that Pinnacle did not renew its motion by the Court's deadline. *Id.* at 1. In lieu of a reply brief, Pinnacle submitted a letter to the Court addressing only the timeliness of its motion. Dkt. No. 93. [5]

Subsequent to her objections, Zietek submitted additional letters to the Court, reiterating her generalized grievances, seeking more time to reply to the motion to dismiss, and insisting that the case was stayed pending appeal. Dkt. No 94. By order dated November 2, 2023, the Court responded by restating that the case was not stayed, and that Zietek should submit her formal opposition to the motion by December 7, 2023. Dkt. No. 95. No further opposition was submitted.

On December 13, 2023, Pinnacle's motion was referred to me for a report and recommendation. Dkt. No 96. Zietek objected to this referral. Dkt. No. 98.

## II. DISCUSSION

**\*3** Pinnacle has moved to dismiss Zietek's claims pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction or, in the alternative, pursuant to Rule 12(b)(6) for failure to state a claim on which relief can be granted. [6]

### A. Applicable Law

### 1. Dismissal for Lack of Subject Matter Jurisdiction Under Rule 12(b)(1)

"Dismissal of a case for lack of subject matter jurisdiction under Rule 12(b)(1) is proper when the district court lacks the statutory or constitutional power to adjudicate it." *Gelmart Indus., Inc. v. Everready Battery Co., Inc.*, No. 13-CV-6310 (PKC), 2014 WL 1512036, at \*2 (S.D.N.Y. Apr. 15, 2014) (quoting *Ford v. D.C. 37 Union Local 1549*, 579 F.3d 187, 188 (2d Cir. 2009)). In deciding such a motion, the Court construes the complaint in the plaintiff's favor and accepts all factual allegations as true. *Id.* However, "[j]urisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." *Ryan v. United States*, No. 15-CV-2248 (GHW), 2015 WL 7871041, at \*3 (S.D.N.Y. Dec. 3, 2015) (quoting *APWU v. Potter*, 343 F.3d 619, 623 (2d Cir. 2003)).

In evaluating a Rule 12(b)(1) motion, "the Court may consider evidence outside the pleadings." *Id.* "[P]laintiffs [may] come forward with evidence of their own to controvert that presented by the defendant if the affidavits submitted on a 12(b)(1) motion ... reveal the existence of factual problems in the assertion of jurisdiction." *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 57 (2d Cir. 2016) (quotation marks omitted). "However, the plaintiffs are entitled to rely on the allegations in the Pleading if the evidence proffered by the defendant is immaterial because it does not contradict plausible allegations that are themselves sufficient to show standing." *Id.*

Dismissals for lack of subject matter jurisdiction are without prejudice. *See, e.g., Green v. Dep't of Educ. of City of New York*, 16 F.4th 1070, 1074 (2d Cir. 2021).

### 2. Dismissal for Failure to State a Claim Under Rule 12(b)(6)

To survive a Rule 12(b)(6) motion, a plaintiff must plead sufficient facts "to state a claim to relief that is plausible on its face" and that satisfy Federal Rule of Civil Procedure 8(a)(2). *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although the Court "construe[s] the pleadings and affidavits in the light most favorable to plaintiffs ... the Court will not draw argumentative inferences in the plaintiff's favor and need not accept as true a legal conclusion couched as a factual allegation." *Gilbert v. Indeed, Inc.* 513 F. Supp. 3d 374, 391 (S.D.N.Y. 2021) (cleaned up). Rule 8(a)(2) of the Federal Rules of Civil Procedure requires "a short and plain statement of the claim showing that the pleader is entitled to relief," and Rule 8(d)(1) requires that each allegation be "simple, concise, and direct." Fed. R. Civ. P. 8.

In considering a motion to dismiss, a district court "accept[s] all factual claims in the complaint as true, and draw[s] all reasonable inferences in the plaintiff's favor." *Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 403 (2d Cir. 2014) (citation and internal quotation marks omitted). However, this tenet is "inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. 662, 678. Instead, the pleading's "factual allegations must be enough to raise a right to relief above the speculative level, ... *i.e.*, enough to make the claim plausible."

*Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (internal quotation marks and brackets omitted).

**\*4** Dismissals for failure to state a claim are considered to be "with prejudice." *See, e.g., Lynch v. Hanley*, No. 21-CV-25 (GTS), 2021 WL 2309688, at \*2 n.4 (N.D.N.Y. June 7, 2021) (collecting cases and holding dismissal for failure to state a claim viewed as adjudication "on the merits" of the action, and thus dismissal "with prejudice" appropriate).

### 3. Standards for *Pro Se* Plaintiffs

"*Pro se* plaintiff filings are liberally construed, and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Franklin v. X Gear 101, LLC*, No. 17-CV-6452 (GBD) (GWG), 2018 WL 3528731, at \*4 (S.D.N.Y. July 23, 2018) (cleaned up), *adopted by* 2018 WL 4103492 (Aug. 28, 2018); *see also Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011) (review of *pro se* complaint for sufficiency requires "special solicitude, interpreting complaint to raise strongest claims that it suggests" (cleaned up)). "However, even the pleadings of *pro se* plaintiffs 'must contain factual allegations sufficient to raise a right to relief above the speculative level.' " *Franklin*, 2018 WL 3528731, at \*4 (quoting *Dawkins v. Gonyea*, 646 F. Supp. 2d 594, 603 (S.D.N.Y. 2009)); *see also Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010) ("Even in a *pro se* case ... threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." (citation omitted)).

### B. Analysis

### 1. Zietek's Claims Should Be Dismissed for Lack of Subject Matter Jurisdiction

As noted above, Zietek's case-initiating document was not structured as a formal legal complaint. Instead, it consisted of a number of grievances, which can be divided into several categories: first, an alleged conspiracy by Pinnacle, aided by her court-appointed guardian, to keep her at Pinnacle and steal her savings (Compl. at 4–6); second, alleged physical abuse by individual health aides at Pinnacle (*id.* at 6–8); and third, harassment by other residents at Pinnacle (*id.* at 10–11). In its July 28 Order, the Court determined that it is this first claim that forms the core of Zietek's complaint, and severed and dismissed the other claims and their related individual

defendants. Dkt. No. 7. Accordingly, the analysis that follows only concerns whether Zietek's allegations of a conspiracy to steal her money by keeping her at Pinnacle are sufficient to survive a motion to dismiss.

There is no dispute that both Zietek and Pinnacle are residents of New York State. Compl. at 2; Dkt. No. 37-1. Therefore, the diversity of parties under 28 U.S.C. § 1332 cannot be a source of jurisdiction in this case. Any jurisdiction must consequently stem from 28 U.S.C. § 1331, which provides that "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States," also known as federal question jurisdiction.

Zietek did not submit a substantive opposition to the pending motion. As a result, the Court will rely on her opposition to the previous motion to dismiss, in which she argued that the Court has federal question jurisdiction. Dkt. No. 34, at 6. Zietek lists four statutes that she alleges provide a basis for her all claims: the Elder Justice Act, the Older Americans Act, the Violence Against Women Act, and the No Fear Act. *Id.* Additionally, Zietek referred to, and the Court previously construed Zietek as making a claim under, the FNHRA. *Id.*; July 28 Order at 1. The Court will briefly analyze each in turn.

 **\*5** Courts have consistently held that the Elder Justice Act does not confer a private right of action. *See, e.g., Kampfer v. Nathan Littauer Hosp.*, No. 1-22-CV-1235 (TJM/ML), 2023 WL 4847279, at *4 (N.D. N.Y. July 28, 2023); *Cook v. Doe*, No. 21-CV-01720-JSC, 2021 WL 2444959, at *6 (N.D. Cal. May 17, 2021); *Wister v. White*, No. 19-CV-05882-WHO, 2019 WL 6841370, at *3 (N.D. Cal. Dec. 16, 2019) (Elder Justice Act does not "[confer] a private right of action"). It therefore cannot serve as a basis for this Court's jurisdiction.

The Violence Against Women Act also confers no private right of action. *See, e.g., United States v. Morrison,* 529 U.S. 598, 627 (2000) (invalidating Act's private remedy provision); *Clesi v. Zinc Corp.*, No. 01-CV-374, 2001 WL 1223456, at *2 (N.D.N.Y. Oct. 11, 2001). Like the Elder Justice Act, it cannot provide jurisdiction in this case.

The Older Americans Act establishes federal programs and grants to states to provide for the welfare of the elderly. It too does not confer any private right of action. *See, e.g., Eldereiny v. TD Ameritrade, Inc.*, No. 8:21-CV-451, 2022 WL 801118, at *3 (D. Neb. Mar. 16, 2022); *Abdul-Hamid v. Fed. Savings Bank*, No. 19-CV-03013-CMA-NYW, 2020 WL 1685573,

at *3 (D. Colo. Apr. 7, 2020); *Roa v. City of Denison*, No. 4:16-CV-115, 2017 WL 9287012, at *17 (E.D. Tex. Aug. 29, 2017), *adopted by,* 2017 WL 4675062 (Oct. 18, 2017).

The No Fear Act, a law to protect federal employees from workplace discrimination, is not applicable to Zietek's case. Moreover, "[o]f the few courts that have considered claims made under the No Fear Act, none have found that the Act provides a private cause of action[.]" *Baney v. Mukasey*, No. 3:06-CV-2064-L, 2008 WL 706917, at *6 (N.D. Tex. Mar. 14, 2008); *see also Lee v. Saul,* No. 19-CV-6553 (PGG) (SN), 2022 WL 1051216, at *12 (S.D.N.Y. Feb. 10, 2022), *adopted by* Order dated March 23, 2022 (Dkt. No. 51); *Glaude v. United States,* 2007 WL 2682957, at *2 (Fed. Cir. Sept. 7, 2007); *Pedicini v. U.S.,* 480 F. Supp.2d 438, 459 (D. Mass. 2007); *Mills v. Barreto,* 2004 WL 3335448, at *3 (E.D. Va. Mar. 8, 2004).

The Supreme Court recently ruled that the FNHRA can, in certain circumstances, convey a private right of action enforceable against state actors under 42 U.S.C. § 1983. *See Health & Hosp. Corp. of Marion Cnty. v. Talevski,* 599 U.S. 166, 184 (2023). However, Zietek does not allege that Pinnacle is a state actor, or that it operates under color of law. *See Tancredi v. Metro. Life Ins. Co.,* 316 F.3d 308, 312 (2d Cir. 2003) ("A plaintiff pressing a claim of violation of his constitutional rights under § 1983 is ... required to show state action."). The Second Circuit has held that the FNHRA does not convey a private right of action against private parties. *Prince v. Dicker,* 29 F. App'x 52, 54 (2d Cir. 2002) ("[T]he Nursing Home Reform Act's provisions do not confer a right of action on [the plaintiff] that can be enforced against a private nursing home[.]"); *see also Baum v. N. Dutchess Hospital,* 764 F. Supp. 2d 410, 425 (N.D.N.Y. 2011) ("FNHRA does not clearly and unambiguously authorize a private federal cause of action for nursing home residents against private nursing homes."); *cf. Pantalone ex rel. Pantalone v. County of Fulton,* No. 6:10-CV-913, 2011 WL 1457935, at *8 (N.D.N.Y. Apr. 15, 2011) (finding FNHRA confers rights enforceable under § 1983 against state actors). Because Pinnacle, as a private nursing home, is not a state actor, the FNHRA does not provide Zietek with a cause of action against it and cannot provide a basis for jurisdiction.

 **\*6** Therefore, none of the statutes cited by plaintiff provides for a right of action against a private defendant such as Pinnacle. The Court accordingly lacks jurisdiction to hear Zietek's claims under any of the cited authorities, and the case

against Pinnacle should be dismissed without prejudice for lack of subject matter jurisdiction.

### 2. Zietek Fails to State a Claim on Which Relief Can Be Granted

If the Court declines to dismiss Zietek's claims under Rule 12(b)(1), it should nevertheless dismiss them under Rule 12(b)(6) for failure to state a claim on which relief can be granted.

In her initial complaint, Zietek asked the Court to impose a variety of civil and criminal penalties on the individual defendants: termination of employment, criminal prosecution, restraining orders, and psychiatric counselling. Compl. at 11–12. She also sought "all my money back" and "compensation for illegally holding me against my will." *Id.* at 6. In later correspondence to the Court, she specified that she wanted two million dollars (Def. Mem. at 7) or fourteen million dollars (Dkt. No. 92, at 1) in compensation for Pinnacle's alleged wrongs.

Even considering the latitude provided to *pro se* plaintiffs, Zietek fails to make "a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Her allegations that Pinnacle ascertained her savings, coordinated a fraudulent scheme to have her declared incompetent, successfully deceived a New York state court, and then, with the assistance of the court-appointed guardian, transferred her money to Pinnacle, are entirely unsubstantiated and not plausible on their face.

Zietek does not offer anything in her pleadings to support the allegation that her guardian and/or his employer, the Bronx Community Guardianship Network, conspired with Pinnacle. She does provide annotated copies of some of her bank statements, but insofar as they contain allegations of misappropriation, they are directed at the guardian, not Pinnacle. She complains that the guardian paid money to Pinnacle without her consent, paid himself $500 per month, and did not disburse her social security and stimulus checks to her. Dkt. No. 56, at 41–42. Her evidence consists of records of disbursements provided to her per the Guardianship Order, but these disbursements were explicitly permitted by the Guardianship Order. *See* Dkt. No. 87-7, at 8–10 ("[T]he Guardian shall have the following powers: ... (a) Marshal the Incapacitated Person's assets ... and to apply so much of the income and principal as necessary for the Incapacitated Person's comfort, support, maintenance and well-being; ...

Endorse, collect, negotiate, deposit and withdraw Social Security and other pension, annuity, or benefit checks"); *id.* at 13 ("[T]he Guardian shall be compensated in the amount of $500 per month, which sum shall be deducted from the Incapacitated Person's income on a monthly basis."). Throughout her communications with the Court, Zietek has repeatedly attacked the Guardianship Order. *See, e.g.*, Dkt. No. 92, at 1 (demanding the entire guardianship case be voided). Her claims of financial abuse are predicated on the initial guardianship proceeding being improper. But this Court is not the proper forum to challenge the Guardianship Order.

Zietek's allegations, even distilled from her numerous filings, fail to meet the plausibility standard established by *Iqbal*. Because the Court cannot draw a reasonable inference that Pinnacle is responsible for the alleged misconduct, the claims against it should be dismissed. *See, e.g., Jones v. Trump*, Nos. 96-CV-2995 (SAS), 96-CV-6927 (SAS), 1997 WL 277375, at *7 (S.D.N.Y. May 27, 1997) ("[C]omplaints which ramble, which needlessly speculate, accuse and condemn, and which contain circuitous diatribes far removed from the heat of the claim do not comport with the requirements of Rule 8." (quotation omitted)).

### 3. Zietek Should Not Be Granted Leave to Further Amend

**\*7** In the Second Circuit, "a *pro se* complaint should not be dismissed without the Court granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Dolan v. Connolly*, 794 F.3d 290, 295 (2d Cir. 2015). Nonetheless, "leave to amend is not necessary when it would be futile." *Petway v. New York City Transit Auth.*, 2011 WL 6157000, at *1 (2d Cir. Dec. 13, 2011); *see also Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (finding leave to replead would be futile where complaint, even when read liberally, did not "suggest[ ] that the plaintiff has a claim that [ ]he has inadequately or inartfully pleaded and that [ ]he should therefore be given a chance to reframe").

In this case, granting Zietek leave to further amend her complaint would be futile. She has repeatedly ignored Court directives to file her substantive opposition papers and, indeed, directly defied a Court order to appear at her own competency hearing. Dkt. No 63, at 4 (refusing to attend the competency hearing as it would be "torture and humiliation");

Dkt. No 89, at 2 (describing the mental competency hearing as "corrupt" and "criminal"). Instead, she has repeatedly submitted a growing list of grievances directed not only at Pinnacle, but at non-parties and the Court itself. *See, e.g., id.* at 1 (accusing her current nursing home of conspiring with Pinnacle to steal her litigation materials); Dkt. No. 98 (letter objecting to the amended referral order consisting primarily of *ad hominem* attacks on the Court). Furthermore, there is no indication that granting Zietek leave to further amend would enable her to cure the underlying jurisdictional defects in her case. Insofar as she is seeking monetary compensation for an alleged scheme to defraud her of her assets by Pinnacle, there is no basis for federal court jurisdiction.

### III. CONCLUSION

For the above reasons, Zietek's case should be dismissed in its entirety. Dismissal should be without prejudice if it is for lack of jurisdiction, or with prejudice if it is for failure to state a claim on which relief can be granted.

### PROCEDURE FOR FILING OBJECTIONS

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. *See also* Fed. R. Civ. P. 6. Such objections, and any responses to such objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Analisa Torres, United States Courthouse, 500 Pearl Street, New York, NY 10007. Any requests for an extension of time for filing objections must be directed to Judge Torres.

**FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.** 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.*, 596 F.3d 84, 92 (2d Cir. 2010). If Zietek does not have access to cases cited herein that are reported on Westlaw, she should request copies from counsel for Pinnacle. *See Lebron v. Sanders*, 557 F.3d 76, 79 (2d Cir. 2009); Local Civil Rule 7.2, Local Rules of the United States District Courts for the Southern and Eastern Districts of New York.

### All Citations

Slip Copy, 2024 WL 243436

---

### Footnotes

1   Zietek no longer resides at Pinnacle, but is instead a resident at the Schervier Rehabilitation and Nursing Center. Dkt. No. 34 at 7.

2   This is consistent with Zietek's own description of her lawsuit. *See* Notice of Appeal at 1, Dkt. No. 85 (describing her case as one for "financial assault").

3   This request was part of a 37-page letter to the Court. No motion to amend was ever made, and Varghese was accordingly never added as a defendant.

4   In its papers, Pinnacle also identifies a potential mail interference claim under 18 U.S.C. § 1701. As Zietek's allegations of mail interference concern one of the individual defendants who had been previously dismissed by the Court (Compl. at 9), this Report will not address this claim in detail. But in any event, 18 U.S.C. § 1701 does not provide a private right of action. *See, e.g., Sciolino v. Marine Midland Bank–Western,* 463 F. Supp. 128, 130–31 (W.D.N.Y. 1979) (holding "[a] civil claim arising out of an alleged violation of penal statutes relating to the mails—i.e., 18 U.S.C. §§ 1701, 1702, 1703, 1708 and 1709 is not" cognizable (citations omitted)).

5      Zietek argued that the motion was untimely, as she had received it on February 16. Pl. Obj. at 1. However, the motion was timely filed via the Court's Electronic Case Filing system on February 13. Dkt. No. 87.

6      In its Notice of Motion, Pinnacle also cited to Rule 12(b)(2) and argued that the Court lacked personal jurisdiction, but it did not pursue this argument in its renewed motion papers.

---

**End of Document**         © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Lee v. Saul, Not Reported in Fed. Supp. (2022)

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 417 of 449

2022 WL 1051216
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Danny LEE, Plaintiff,
v.
Andrew SAUL, Commissioner, Social
Security Administration, Defendant.

19-CV-06553 (PGG)(SN), 20-CV-02956 (PGG)(SN)
|
Signed 02/10/2022

**Attorneys and Law Firms**

Danny D. Lee, Poway, CA, Pro Se.

Zachary Bannon, DOJ-USAO, New York, NY, for Defendant.

#### REPORT AND RECOMMENDATION

SARAH NETBURN, United States Magistrate Judge.

**\*1  TO THE HONORABLE PAUL G. GARDEPHE:**

Plaintiff Danny Lee ("Plaintiff" or "Lee") brings this employment discrimination action against Andrew Saul ("Defendant"), the former Commissioner of the Social Security Administration ("SSA"). Plaintiff, proceeding *pro se*, asserts claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, the Rehabilitation Act of 1973, 29 U.S.C. § 701, *et seq.*, the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, *et seq.*, ("ADA"), and the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601, *et seq.*, ("FMLA"). Additionally, Lee alleges that Defendant violated the Notification and Federal Employee Antidiscrimination and Retaliation Act of 2002 ("No FEAR Act"), 5 U.S.C. § 2301 *et seq.*, and his right to union representation at investigatory interviews pursuant to National Labor Relations Board v. J. Weingarten, Inc., 420 U.S. 251 (1975), and obstructed justice by deleting emails and destroying evidence. Defendant moves to dismiss the complaint under Rule 12(b)(6) for failure to state a claim. I recommend that the Court grant Defendant's motion to dismiss.

#### BACKGROUND

Between 2009 and 2016, Lee was employed by the Social Security Administration as a Legal Assistant and Case Intake Specialist. ECF No. 29, Second Amended Complaint ("Sec. Am. Compl.") at 16–24. He has filed three cases alleging that the SSA discriminated against him, failed to accommodate his disabilities, and retaliated against him when he sought legal recourse. In the first suit, Lee v. Colvin, No. 15-cv-1472 (KPF), 2017 WL 486549 (S.D.N.Y. Feb. 6, 2017) (Lee I), only Lee's retaliation claim under the Rehabilitation Act survived Defendant's motion to dismiss. Id. at 16. Judge Failla subsequently granted Defendant's motion for summary judgment on the remaining claim, which related to events that occurred in June 2011 (Lee's assignment to process paper cases), 2019 WL 367834, at *1, *4 (S.D.N.Y. Jan. 30, 2019), and the Court of Appeals affirmed (802 F. App'x 663, 664 (2d Cir. 2020)). While the appeal was pending, Lee filed a second action. Lee v. Saul, No. 19-cv-6553 (PGG)(SN), 2020 WL 5836513, at *1 (S.D.N.Y. Sept. 30, 2020) (Lee II). Defendant moved to dismiss, and the Court granted the motion in its entirety. Id. at *1. Although the Court expressed doubt that the Complaint's defects could be cured, Plaintiff was granted leave to amend his claims under the Rehabilitation Act. Id. at *9.

On April 10, 2020, Lee filed his third case. ECF No. 2, Complaint. The Court subsequently consolidated the 2019 and 2020 cases. ECF No. 27. Lee filed his Second Amended Complaint on April 12, 2021. ECF No. 29. Lee alleges generally that the SSA discriminated against him on the basis of his disabilities – hip pain and depression – and also engaged in unlawful disparate treatment, retaliation, and harassment in violation of the Rehabilitation Act, the ADA, and the FMLA. Sec. Am. Compl. at 3–5. He also claims that the SSA did not promote him, did not accommodate his disabilities, denied him leave, and suspended him. Id. at 5. In attached documents, Lee describes allegations against the SSA and provides a detailed timeline of his employment beginning in 2009 and ending in 2016. Id. at 13–24.

**\*2**  In addition to the underlying complaints, two right-to-sue letters, the first dated May 31, 2019, and the second dated January 14, 2020, are attached to the Second Amended Complaint. Id. at 29–36. The first letter denied Lee's request for reconsideration of a prior decision concluding that the SSA neither discriminated against him on the basis of disability by failing "to provide him with appropriate reasonable accommodations for his disability beginning on May 20, 2015" nor "subjected him to harassment based on disability and reprisal beginning May 20, 2015 and

Lee v. Saul, Not Reported in Fed. Supp. (2022)

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 418 of 449

ongoing, in terms of job duties including time and attendance, training, and reasonable accommodation." Id. at 29–30. The second letter concerned three complaints Lee filed in April and September 2016 relating to a three-day suspension in February 2016, alleged harassment between February 1 and August 30, 2016, the denial of his request for Leave Without Pay and charge of Absent Without Leave on multiple occasions in 2016, the failure to provide a timely response to his request for a hardship transfer, and his suspension on August 15, 2016. Id. at 33–34. The EEOC affirmed the denial of administrative relief and informed Lee of his right to file a civil action. Id. at 35–36.

The Defendant moved to dismiss the Complaint pursuant to Rule 12(b)(6). ECF No. 34. Plaintiff submitted an objection, attaching documents relevant to the events in question and a portion of a transcript of a court hearing. See ECF No. 38.

## DISCUSSION

### I. Legal Standard

A complaint must be dismissed if it fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To state a legally sufficient claim, a complaint must plead "enough facts to state a claim for relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). In evaluating a complaint under this standard, a court must accept as true the well-pleaded factual allegations set forth in the complaint and draw all reasonable inferences in favor of the plaintiff. Bernheim v. Litt, 79 F.3d 318, 321 (2d Cir. 1996). While the plausibility standard "does not require detailed factual allegations," it "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); see also Cantor Fitzgerald Inc. v. Lutnick, 313 F.3d 704, 709 (2d Cir. 2002) (stating that a court need not give "credence to [a] plaintiff's conclusory allegations"). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 555). "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action" is insufficient to survive a motion to dismiss under Rule 12(b)(6). Iqbal, 556 U.S. at 678 (internal quotation marks omitted).

Where, as here, a plaintiff proceeds *pro se,* his complaint "must be held to less stringent standards than formal pleadings drafted by lawyers." Erickson v. Pardus, 551 U.S. 89, 94 (2007) (quotation marks omitted) (quoting Estelle

v. Gamble, 429 U.S. 97, 106 (1976)). When considering a motion to dismiss a *pro se* complaint, "courts must construe [the complaint] broadly, and interpret [it] to raise the strongest arguments that [it] suggest[s]." Weixel v. Bd. of Educ. of City of New York, 287 F.3d 138, 145–46 (2d Cir. 2002).

A complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference. See, e.g., Hart v. FCI Lender Servs., Inc., 797 F.3d 219, 221 (2d Cir. 2015) (citing Fed. R. Civ. P. 10(c) ("A statement in a pleading may be adopted by reference elsewhere in the same pleading or in any other pleading or motion. A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.")). A complaint does not include allegations raised for the first time in opposition to a motion to dismiss and such allegations do not automatically amend the complaint. See O'Brien v. Nat'l Prop. Analysts Partners, 719 F. Supp. 222, 229 (S.D.N.Y. 1989) ("[I]t is axiomatic that the Complaint cannot be amended by the briefs in opposition to a motion to dismiss."); Capers v. Kirby Forensic Psychiatric Ctr., 13-cv-6953 (AJN), 2016 WL 817452, at *2 (S.D.N.Y. Feb. 25, 2016) (applying rule against amending complaint by the briefs to *pro se* plaintiff). A court may, however, consider new allegations in an opposition brief "in determining whether to grant [the plaintiff] leave to file a[n] ... Amended Complaint." Capers, 2016 WL 817452, at *2; see also Jordan v. Chase Manhattan Bank, 91 F. Supp. 3d 491, 500 (S.D.N.Y. 2015).

### II. Rehabilitation Act Claims

**\*3** Under the Rehabilitation Act, Plaintiff checked boxes indicating allegations of failure to hire, unlawful termination, failure to promote, failure to provide reasonable accommodations, disparate treatment, retaliation, and a hostile work environment. Sec. Am. Compl. at 5. He further specifies that the SSA denied him leave and suspended him and caused permanent damage to his hip by failing to provide reasonable accommodations. Id. I first consider Defendant's argument that Plaintiff failed to exhaust most of his claims, and then address the potential claims in turn.

#### A. Exhaustion

"The Rehabilitation Act requires that an employee exhaust certain administrative requirements prior to filing a suit in district court." Hodges v. Att'y Gen. of U.S., 976 F. Supp. 2d 480, 490 (S.D.N.Y. 2013). Under EEOC regulations, the "employee must first seek EEO counseling within forty-five days of the allegedly discriminatory act." Boos v. Runyon,

Lee v. Saul, Not Reported in Fed. Supp. (2022)

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 419 of 449

201 F.3d 178, 181 (2d Cir. 2000); see also 29 C.F.R. § 1614.105(a)(1). The regulations require that that counselor conduct a final interview with the aggrieved employee within 30 days of the initial contact, unless he or she agrees in writing to postpone the final interview and extend the counseling period for an additional period of no more than 60 days. 29 C.F.R. §§ 1614.105(d)–(e). If the complaint is not resolved, then the employee may file a complaint with "the agency that allegedly discriminated against" them "within 15 days of receipt of notice." 29 C.F.R. §§ 1614.106(a)–(b). "In order for the court to consider a particular claim of alleged discrimination, it must have been either explicitly raised during the EEO process or be reasonably related to claims that were." Hodges, 976 F. Supp. 2d at 490 (internal quotation omitted). Retaliation claims and claims where a plaintiff "alleges further incidents of discrimination carried out in precisely the same manner alleged in the EEOC charge" are also considered to be reasonably related to claims asserted in an EEO complaint. Deravin v. Kerik, 335 F.3d 195, 201 n.3 (2d Cir. 2003) (citation omitted). Unless the employee has exhausted his administrative remedies, his employment discrimination claims under the Rehabilitation Act are barred. Hodges, 976 F. Supp. 2d at 490. Although plaintiffs are also required to exhaust administrative remedies for hostile work environment claims, "an instance of harassment need not have occurred within the forty-five days preceding the employee's request for counseling so long as it is 'part of hostile work environment that allegedly occurred at least partly within the statutory period.' " Id. at 492 (quoting Costanzo v. U.S. Postal Serv., No. 00-cv-5044 (NRB), 2003 WL 1701998, at *6 (S.D.N.Y. Mar. 31, 2003)).

Although Lee does not allege the dates when he first sought EEO counseling, the time period covered by his complaint can be calculated by working backwards from the date of filing. Lee's first EEO complaint was filed on October 3, 2015. Sec. Am. Compl. at 38. If the EEO counseling was extended pursuant to § 1604.105(e), then the latest date Lee could have sought counseling was June 20, 2016, and so claims related to conduct that occurred on or after May 6, 2015, would be considered exhausted. See Lucenti v. Potter, 432 F. Supp. 2d. 347, 357 (S.D.N.Y. 2006) (determining whether allegations in complaint were timely by identifying date that plaintiff first contacted EEO counselor and calculating first day of the 45-day time period accordingly). As such, to the extent that Plaintiff raises claims related to Defendant's conduct before May 6, 2015, those claims are barred. [1]

**\*4** Lee has, however, exhausted his claims of harassment and retaliation from 2015, which may also be construed as a hostile work environment charge and denial of reasonable accommodations. Lee cites to multiple incidents where he was instructed to work as a receptionist in May and June 2015, which he alleges constitutes harassment, and notes that he requested and was denied the accommodations of disabled parking status and toner for his printer in June and July of the same year. Sec. Am. Compl. at 21–22. The first right-to-sue letter indicates that the SSA considered, and rejected, his claim that he was subjected to harassment, retaliation, and denial of reasonable accommodations beginning May 20, 2015. Id. at 29.

Lee's claim that he was unlawfully suspended is also exhausted. In his Second Amended Complaint, Lee alleges that he was suspended on February 1, 2016, and again on August 15, 2016. Lee filed an EEO complaint on April 27, 2016, specifically raising the February suspension. Id. at 43–44. Although Lee did not provide specific dates when he sought EEO counseling, the February suspension occurred 86 days before the filing of the complaint, and so it likely occurred within the 45-day statutory period. Furthermore, the August suspension was explicitly mentioned in his third, undated, EEO complaint, likely filed in September 2016. Id. at 50–51. Both incidents were investigated by the SSA during the EEO process. Id. at 34.

In addition, Lee's claims that he was unlawfully denied leave and charged as absent without leave, and that the SSA failed to provide a timely response to his request for a hardship transfer, are exhausted. Lee identifies multiple occasions between January and April 2016 when he requested, and was denied, leave. Id. at 22–23. Similarly, in his April 27, 2016 complaint, Lee reported that he requested leave on February 5, February 8, April 18, and on other occasions between February 8 and March 14. Id. at 44–45. He also notes that he was charged as absent without leave on two occasions in April and that his request for a transfer was not granted until April 25. Id. Again, although the date when Lee sought EEO counseling is unclear, it can reasonably be presumed that at least one of these incidents occurred within the 45-day statutory period, and any subsequent denials of requests for leave would be reasonably related. See Almendral v. New York State Off. of Mental Health, 743 F.2d 963, 967 (2d Cir. 1984) ("[D]efendants' alleged subsequent acts are essentially the same as the earlier allegedly wrongful conduct contained in the EEOC complaint."). Furthermore, all three claims were explicitly considered by the SSA. S.A.C. at 34.

Lee v. Saul, Not Reported in Fed. Supp. (2022)

Case 3:24-cv-00037-DNH-ML    Document 9    Filed 06/11/24    Page 420 of 449

Despite Defendant's argument to the contrary, Lee's claims of repeated harassment regarding suspensions, telework, leave, and workloads between February and August 2016 are also exhausted. Defendant urges that to the extent that these claims related to events that occurred in San Diego after Lee's transfer in May 2016, "they were allegedly perpetrated by different individuals, at a different location from the conduct challenged by the EEOC" and hence were not "reasonably related" to the other claims. ECF No. 35, Memorandum of Law ("Def. Br.") at 11. However, it is clear from Lee's EEO complaints that he alleged a pattern of harassment, not isolated, discrete acts of discrimination. S.A.C. at 43–45, 47–48, 50. In contrast, in the cases cited by Defendant, the EEO complaints filed by the plaintiffs did not allege a pattern of discrimination, and hence did not put the SSA on notice to investigate subsequent events. See, e.g., Samimy v. Cornell Univ., 961 F. Supp. 489, 493 (W.D.N.Y. 1997) (reasoning that because of the "narrow scope" of the EEO charge, which was "limited to a discrete incident, the 1992 performance evaluation" the additional claims raised in the federal complaint were not reasonably related). Moreover, Lee's allegations could reasonably be construed as a hostile work environment claim: in his May 2016 complaint, he states that his supervisors made his job "impossible" by "restricting contacting offices per training and job function, change job to receptionist which is physically demanding and had no experience nor knowledge of what to do up there, illegally suspended, denied union rep, harassed, given [absent without leave]." S.A.C. at 48. To the extent that some of the incidents alleged by Lee did not fall within the 45-day statutory period, the hostile work environment exception applies. Hodges, 976 F. Supp. 2d at 492; cf. Bazile v. City of New York, 215 F. Supp. 2d 354, 361 (S.D.N.Y. 2002) (rejecting argument that hostile work environment claim was reasonably related to charges in EEOC complaint where plaintiff "failed to suggest the existence of a hostile work environment anywhere in his EEOC charge").

**\*5** Finally, to the extent that Lee argues that Defendant discriminated against him in failing to promote him and eventually terminating his employment, neither of these claims are explicitly mentioned in his EEO complaints, nor does he provide facts or dates that indicate that "the conduct complained of would fall within the 'scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination.' Butts v. City of New York Dep't of Hous. Pres. & Dev., 990 F.2d 1397, 1402 (2d Cir. 1993), superseded by statute on other grounds as stated in Legnani

v. Alitalia Linne Aeree Italiane, S.P.A., 274 F.3d 683, 686 (2d Cir. 2001) (quoting Smith v. American President Lines, Ltd., 571 F.2d 102, 107 n.10 (2d Cir. 1978)). As such, I conclude that these claims are unexhausted.

In conclusion, Lee's claims of the denial of reasonable accommodations and harassment (construed as a hostile work environment claim) and retaliation are exhausted, as are his claims that he was unlawfully suspended, denied leave, and charged as absent without leave. His claim that the SSA failed to timely consider his hardship transfer request is similarly exhausted. But any claims arising out of conduct from before May 2015 and his allegation that the SSA failed to promote him and ultimately terminated him for discriminatory reasons are unexhausted, and I recommend that the Court dismiss them on this ground.

### B. Denial of Reasonable Accommodations

Under the Rehabilitation Act, it is unlawful for "a covered entity not to make reasonable accommodation to the known physical or mental limitations of an otherwise qualified applicant or employee with a disability, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of its business." 29 C.F.R. § 1630.9. In order to establish a prima facie case for failure to accommodate under the Rehabilitation Act, a plaintiff must show "(1) that he is an individual who has a disability within the meaning of the [Rehabilitation Act], (2) that an employer covered by the statute had notice of his disability, (3) that with reasonable accommodation, he could perform the essential functions of the position sought, and (4) that the employer has refused to make such accommodations." Stone v. City of Mount Vernon, 118 F.3d 92, 96–97 (2d Cir. 1997). "While a plaintiff need not allege specific facts establishing a prima facie case of discrimination in order to withstand a motion to dismiss, the elements of a prima facie case often provide an outline of what is necessary to render a plaintiff's claims for relief plausible." See Carter v. Verizon, 13-cv-7579 (KPF), 2015 WL 247344, at \*5 (S.D.N.Y. Jan. 20, 2015). "[T]he determination of whether a particular modification is 'reasonable' involves a fact specific, case-by-case inquiry that considers, among other factors, the effectiveness of the modification in light of the disability in question and the cost to the organization that would implement it." Staron v. McDonald's Corp., 51 F.3d 353, 356 (2d Cir. 1995).

In his Second Amended Complaint, Lee alleges that on June 24, 2015, he requested via email disabled parking status and toner for a printer he kept at his desk as an accommodation,

Lee v. Saul, Not Reported in Fed. Supp. (2022)

Case 3:24-cv-00037-DNH-ML    Document 9    Filed 06/11/24    Page 421 of 449

referencing a doctor's note stating that he has a "chronic condition in his left hip" and that "[e]xtended standing and walking and repetitive movements like sitting to standing/ standing to sitting may be difficult for him, due to pain." Sec. Am. Compl. at 21; Ex. 43 at 2; Ex. 44 at 1 ("What about the disabled parking? What about the printer toner?"). This request was made in response to an email from the SSA's Hearing Office Director, explaining that Lee's request for a "printer, scanner, [and] electronic case assignment" made on May 12, 2015, had been denied. Ex. 44 at 4. The Director notes that when he met with Lee, he explained that he had a printer at his desk, which Lee acknowledged was working well, and that management was investigating providing a printer at the receptionist desk as well. Id. at 4–5. He added that a scanner was not necessary to Lee's current job duties, and if he required one while working at reception, he should notify management. Id. at 5. As to Lee's request for electronic case load, the supervisor explained that working with paper cases was an essential function of Lee's job, and prior adjudication had determined that he could perform this function as long as he was limited to carrying documents that weigh less than five pounds. Id. In the alternative, he could contact management for assistance. Id. Although Lee attaches an August 2015 letter from the SSA's Office of Human Resources stating that his request for a standalone printer to be installed at the reception desk was approved, he alleges that it never arrived. Sec. Am. Compl. at 25; Ex. 45 at 1.

**\*6** On February 1, 2016, he requested telework as a "reasonable accommodation." Sec. Am. Compl. at 26; Ex. 52 at 1. Lee claims that his request for reasonable accommodations were denied on April 27, 2016, pointing to an email from his supervisor that explained that his request to work only with electronic cases was previously denied as processing paper applications was an essential job function but noting that he could reach out to management if he needed help lifting a particular case. Sec. Am. Compl. at 26, Ex. 61. He alleges that when he transferred to San Diego, he was provided with a broken printer instead of a new one. Sec. Am. Compl. at 26. In support of this claim, he references email correspondence with technical support staff at Dell informing him that a new printer had been ordered and was expected to arrive within five to ten business days and explaining that his old printer had been shipped to the SSA on December 3, 2014, one and a half years prior. Id. at 26; Ex. 64 at 1–2.

Even though the Second Amended Complaint adequately alleges that Lee is a person with a disability and the SSA

was aware of that disability, Lee cannot satisfy the third and fourth elements necessary to establish a *prima facie* claim of failure to accommodate. Although Lee relies on his requests for toner for his printer, disability parking rights, and telework as proof that the SSA had failed to accommodate him, he does not allege any facts that indicate that these accommodations would allow him to perform the essential functions of his job. [2] See Borkowski v. Valley Cent. School Dist., 63 F.3d 131, 138 (2d Cir. 1995) ("Under our approach, the plaintiff bears the burden of production and persuasion on the issue of whether she is otherwise qualified for the job in question.... It follows that the plaintiff bears the burden of proving ... that an accommodation exists that permits her to perform the job's essential functions.").

Moreover, Lee's claim that the SSA failed to provide him with reasonable accommodations is plainly contradicted by the exhibits attached to his complaint. "The Court is not required to accept as true the allegations in the Complaint, in the face of documents that state otherwise." Sosa v. New York City Dep't of Educ., 368 F. Supp. 3d 489, 524 (E.D.N.Y. 2019); see also Matusovsky v. Merrill Lynch, 186 F. Supp. 2d 397, 399–400 (S.D.N.Y. 2002) ("[A] court may consider documents attached to the complaints as exhibits, or incorporated by reference, as well as any documents that are integral to, or explicitly referenced in, the pleading. If a plaintiff's allegations are contradicted by such a document, those allegations are insufficient to defeat a motion to dismiss."). The SSA provided Lee with a printer both at his desk and the receptionist desk, and when he moved to San Diego the SSA ordered a new printer. Id. at 524 (reasoning that plaintiff failed to state a claim of failure to accommodate where the documents attached to the complaint indicated that despite delays, her requests were eventually granted). Although the SSA did not grant his request for an electronic caseload on the grounds that processing paper applications was an essential function of his position, it provided that he could seek help lifting files that weighed more than five pounds from management. Goonewardena v. N. Shore Long Island Jewish Health Sys., No. 11-cv-2456 (MKB), 2014 WL 1271197, at *10 (E.D.N.Y. Mar. 26, 2014) (holding that plaintiff failed to state a plausible failure accommodate claim under the Rehabilitation Act where defendants attempted to accommodate him); see also McElwee v. Cty. of Orange, 700 F.3d 635, 642 (2d Cir. 2012) ("Although a public entity must make 'reasonable accommodations,' it does not have to provide a disabled individual with every accommodation he requests or the accommodation of his choice.") Overall, the documents submitted with Lee's complaint indicate

Lee v. Saul, Not Reported in Fed. Supp. (2022)

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 422 of 449

that the SSA made "good faith and reasonable efforts" to accommodate him. Quadir v. New York State Dep't of Lab., 39 F. Supp. 3d 528, 540 (S.D.N.Y. 2014).

**\*7** I conclude that Lee has failed to state a claim for failure to accommodate and recommend that it be dismissed.

### C. Disparate Treatment

To state a disparate treatment claim under the Rehabilitation Act, an individual must show: "(1) plaintiff's employer is subject to the [Rehabilitation Act]; (2) plaintiff was disabled within the meaning of the [Rehabilitation Act]; (3) plaintiff was otherwise qualified to perform the essential functions of her job, with or without reasonable accommodation; and (4) plaintiff suffered [an] adverse employment action because of her disability." Jacques v. DiMarzio, Inc., 386 F.3d 192, 198 (2d Cir. 2004). "A plaintiff sustains an adverse employment action if he or she endures a materially adverse change in the terms and conditions of employment." Galabya v. New York City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000) (internal quotation marks omitted). This action "must be more disruptive than a mere inconvenience or an alteration of job responsibilities." Id. For example, "[a] materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation." Id. (internal quotation marks omitted). "Actions that are 'trivial harms'—*i.e.*, 'those petty slights or minor annoyances that often take place at work and that all employees experience'—are not materially adverse." Tepperwien v. Entergy Nuclear Operations, Inc., 663 F.3d 556, 568 (2d Cir. 2011) (emphasis omitted) (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006)).

Lee's disparate treatment claim is difficult to differentiate from his retaliation claim. In the Second Amended Complaint, he provides the following explanation:

> Plaintiff reprisal complaint is due to Social Security Administration Brooklyn management instructions contrary to national desk guide and training, disparate treatment, 4x more work than co-worker in 2015, changing job to receptionist in 2015, 3 day suspension, 14 day suspension falsifying time records, mailing notices to wrong address, deleting emails and evidence, assigning physical duties denying reasonable accommodations, denying union representation, providing false information such as temporary transfer and leave.

Sec. Am. Compl. at 10. A few pages later, he adds that "harassing officials were not removed and time records were not corrected and reasonable accommodations requests and medical were ignored which lead [sic] to the suspensions in 2016." Id. at 14. He claims that he was assigned "over 10 supervisors" during 2015 "against job description and training and national procedure." Id. "This is disparate treatment and retaliation," he concludes. Id. Lastly, in his objections to the Defendant's motion to dismiss, Lee writes:

> Social Security Administration retaliated and discriminated based on disability and appealing reasonable accommodation denials and non responses and delays. The assignment of work and change of position to receptionist backup and suspensions are related to the retaliation for being disabled.

**\*8** ECF No. 39, Ex. 1 at 3. Reading these contentions to raise the strongest arguments they suggest, Lee alleges that he suffered the following adverse employment actions because of his disability: the assignment of four times more work; his assignment to work as the receptionist; one fourteen-day and one three-day suspension; the denial of reasonable accommodations; and the assignment of additional supervisors.

These allegations are similar to those raised in his previous complaint, and, with the exception of the suspensions, do not constitute adverse employment actions. The receipt of additional work within an individual's job description is not adverse so long as it is not paired with a loss in pay or benefits. See, e.g., Rodriguez v. Coca Cola Refreshments USA, Inc., No. 12-cv-234 (BMC), 2013 WL 5230037, at \*3 (E.D.N.Y.

Lee v. Saul, Not Reported in Fed. Supp. (2022)

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 423 of 449

Sept. 16, 2013) ("[I]t is well established that assignments that are part of an employee's normal responsibilities are not 'adverse employment actions' where ... the rate of pay and benefits remains the same."). Similarly, Lee does not allege that his assignment to cover receptionist duties was a demotion that resulted in the loss of pay or benefits. Indeed, the exhibits to the complaint indicate that Lee was only assigned for brief periods to cover for the receptionist during her breaks and do not support his claim that he was demoted. ECF No. 29, Ex. 42 at 1, Ex. 47 at 1; see also Fletcher v. ABM Building Value, 775 F. App'x 8, 13 (2d Cir. 2019) (reasoning that plaintiff's transfer to work as receptionist was not an adverse employment action because it was not accompanied by a cut in pay, a change in title, a diminution in authority, or a measurable loss of status). Furthermore, "a failure to provide a reasonable accommodation in and of itself does not equate to an adverse employment action." Berger v. New York City Police Dep't, 304 F. Supp. 3d 360, 368 (S.D.N.Y. 2018). Although Lee claims that he had 10 supervisors, the email he cites does not support his claim that he was supervised by multiple parties, see ECF No. 29, Ex. 49. Juggling relationships with superiors is precisely one of the "petty slights or minor annoyances that often take place at work and that all employees experience." Tepperwien, 663 F.3d at 568.

Although suspension without pay may be considered an adverse employment action, Lee has not established the necessary nexus with his disability. Edrisse v. Marriott Intern., Inc., 757 F. Supp. 2d 381, 389 n.52 (S.D.N.Y. 2010). Lee includes a few emails along with his complaint claiming that he was absent for medical reasons, but the exhibits he submits along with his objections further undermine his claims. See Lee II, 2020 WL 5836513, at *7 ("Although courts typically ignore factual material raised for the first time in objections to the R&R, this Court may consider Plaintiff's own assertions that contradict a plausibly alleged claim."). The Hearing Officer's decision on the February 1, 2016 suspension indicates that Lee was suspended because he made disrespectful comments to his supervisors, refused to cover for the receptionist, made inappropriate comments to a mail carrier, a building maintenance worker, and co-workers, sent an email about covering receptionist duties in defiance of explicit instructions to only discuss the topic with management, and allowed an unauthorized party to access a hearing itinerary with names and social security numbers. ECF No. 38, Ex 2. at 1–3. The Hearing Officer's decision from the August 15, 2016 suspension shows that Lee was charged with failing to comply with leave procedures

39 times in February-March 2016, and that he was absent without leave forty times in the same period. Id. at 9–15. The decision explicitly addresses Lee's claim that he required medical leave, explaining that he did timely request medical leave and the medical documentation he submitted – a brief note from his doctor stating that he required a leave of absence – was not sufficient to demonstrate that he was incapacitated and incapable of working. Id. at 19. Because the decisions fully articulate non-discriminatory explanations for Lee's dismissal, I conclude that Lee does not "specifically allege ... circumstances giving rise to a plausible inference of discriminatory intent." Brodt v. City of N.Y., 4 F. Supp. 3d 562, 568 (S.D.N.Y. 2014).

**\*9** I conclude that Lee has failed to state a claim for disparate treatment and recommend that the Court dismiss the cause of action.

### D. Retaliation

The Rehabilitation Act prohibits an employer from "discriminat[ing] against any individual because such individual ... made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [the Act]" 42 U.S.C. § 12203(a); see also 29 U.S.C. § 794(d). Claims for retaliation under the Rehabilitation Act are "analyzed under the same burden-shifting framework established for Title VII cases." Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002). "To establish a prima facie case of retaliation, an employee must show that (1) [he] was engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered a materially adverse action; and (4) there was a causal connection between the protected activity and that adverse action." Lore v. City of Syracuse, 670 F.3d 127, 157 (2d Cir. 2012). "An employer's action is 'materially adverse' within the context of a retaliation claim where it is 'harmful to the point that it could well dissuade a reasonable worker from making or supporting a charge of discrimination.' " Atencio v. U.S. Postal Serv., 14-cv-7929 (GHW), 2015 WL 7308664, at *8 (S.D.N.Y. Nov. 19, 2015) (quoting White, 548 U.S. at 57). "The standard for an adverse employment action in a retaliation claim, however, is not as demanding as it is in a discrimination claim." Quadir, 39 F. Supp. 3d at 542. While a discrimination claim must demonstrate adverse actions affecting the terms and conditions of employment, a retaliation claim may be based on "employer actions that are likely to deter victims of discrimination from complaining to the EEOC, the courts, and employers." White, 548 U.S. at 68. However, "normally petty

Lee v. Saul, Not Reported in Fed. Supp. (2022)

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 424 of 449

slights, minor annoyances, and simple lack of good manners will not create such deterrence." Id.

In his Second Amended Complaint, Lee identifies a range of alleged adverse employment actions and asserts that the SSA retaliated against him for filing multiple EEO complaints and lawsuits, and for testifying on behalf of co-workers in disciplinary actions. Sec. Am. Compl at 12–13, 15. The alleged adverse employment actions include: the assignment of additional work, Id. at 10, the assignment to work as receptionist, Id., one three-day and one fourteen-day suspension without pay, Id., the denial of reasonable accommodations, Id. at 10, 15, the assignment of additional supervisors, id. at 10, 14, the denial of Lee's requests for leave, Id. at 11–13, and delayed processing of his transfer request. Id. at 13. Lee claims that union representative Cindy Berger told him he would be demoted to receptionist if he filed another lawsuit. Id. at 14, 16.

Plaintiff's participation in the SSA's internal EEO process is participation in a legally protected activity. See Lee I, 2017 WL 486944, at *12 (citing Treglia, 313 F.3d at 719). As with Lee's prior Complaint, the Defendant does not dispute this point, but argues that Lee has failed to allege conduct that is actionably adverse and has not established a causal nexus between the protected activity and the adverse action.

**\*10** Contrary to Defendant's argument, for the purpose of a retaliation claim, Lee is not required to allege adverse employment actions that resulted in a materially adverse change in the terms and conditions of his employment. Courts have held that reassignment to a different position, suspension without pay, denial of reasonable accommodation, denial of requests for time off, and delay in processing a request for benefits or reassignment constitute adverse employment actions for the purpose of a retaliation claim. See White, 548 U.S. at 70 (holding that reassignment from forklift duty to standard track laborer tasks and 37-day suspension without pay sufficient to support retaliation claim); Jones v. City of New York, No. 17-cv-4894 (AT), 2020 WL 91532, at *8 (S.D.N.Y. Jan. 8, 2020) (holding that denial of a reasonable accommodation is an adverse employment action for purposes of retaliation claim); Wharton v. Cty. of Nassau, No. 10-cv-0265 (JS)(AKT), 2013 WL 4851713, at *12 (E.D.N.Y. Sept. 10, 2013) ("Defendants' denial of Plaintiff's requests for reassignment, self-swaps, and time off are adverse actions as they would dissuade a reasonable employee from making or supporting a charge of discrimination."); Dechberry v. New York City Fire Dep't, 124 F. Supp. 3d 131, 148

(E.D.N.Y. 2015) (holding that a delay in receipt of benefits was insufficient to establish an adverse employment action for the purpose of a discrimination claim, but "could dissuade a reasonable worker from making or supporting a charge of discrimination"). Notwithstanding these examples, however, a "bare, conclusory allegation that [plaintiff] is assigned extra work is insufficient to show that [he] suffered an adverse action." Kelly v. New York State Off. of Mental Health, 200 F. Supp. 3d 378, 406 (E.D.N.Y. 2016). Similarly, "[t]he receipt of undesirable assignments, without more, amounts to nothing more than a 'mere inconvenience.' " Lee v. Starwood Hotels & Resorts Worldwide, Inc., 2016 WL 3542454, at *14 (S.D.N.Y. June 22, 2016) (quoting Henry v. NYC Health & Hosp. Corp., 18 F. Supp. 3d 396, 406 (S.D.N.Y. 2014)). As a result, for the purposes of his retaliation claim, Lee has adequately alleged adverse employment actions to the extent that he alleges he was threatened with demotion, suspended without pay, denied reasonable accommodations, denied requests for leave without pay, and did not promptly receive his requested hardship transfer.

Lee has not, however, adequately alleged that "a retaliatory motive played a part" in his assignment to cover for the receptionist, suspension without pay, the denial of reasonable accommodations, the denial of his requests for leave without pay, and the delay in the receipt of his hardship transfer. Jones, 2020 WL 91532, at *8. "A causal connection may be established 'either: (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." Id. (quoting Gordon v. New York City Bd. of Educ., 232 F.3d 111, 117 (2d Cir. 2000)). But the fact that an adverse employment action occurs after the plaintiff has engaged in protected activity is insufficient, standing alone, to establish causation. Mandavia v. Columbia Univ., 912 F. Supp. 2d 119, 133 (S.D.N.Y. 2012).

Lee generally asserts that Defendant's conduct was retaliatory, but he does not articulate any connection, either temporal or otherwise, between the alleged retaliation and his protected activities. "[V]ague and non-specific" allegations asserting a nexus between the protected activities and adverse actions cannot survive a motion to dismiss. Carter, 2015 WL 247344, at *15. Moreover, Lee filed multiple complaints and lawsuits over the course of his seven-year employment with the SSA, including three EEO complaints during the period at issue. As

a result, "there was a rarely a time that [the SSA] could have taken action against [Lee] that would *not* have been recently preceded by some complaint that [he] believes is subject to ... protection." Manon v. Pons, 131 F. Supp. 3d 219, 235 (S.D.N.Y. 2015). Therefore, the Court cannot infer retaliation based solely on the proximity between his protected activity and adverse actions.

Although Lee argues that the union representative's comment that he would be demoted to receptionist if he filed another EEO complaint is evidence of retaliatory animus, the Court considered and rejected this argument in reviewing the prior motion to dismiss, concluding that "the statements of a union representative are not imputed to an employer for purposes of discrimination claims." Lee II, 2020 WL 5836513, at *7.

I conclude that Lee has failed to state a claim for retaliation under the Rehabilitation Act and recommend that it be dismissed.

### E. Hostile Work Environment

**\*11** The Court of Appeals "has not yet decided whether a hostile work environment claim may be made under the ADA" and by extension, the Rehabilitation Act. See Wesley-Dickson v. Warwick Valley Cent. Sch. Dist., 586 F. App'x 739, 745 n.2 (2d Cir. 2014). For the purposes of this Report and Recommendation, I assume a hostile work environment claim is actionable under the Rehabilitation Act. See Kelly, 200 F. Supp. 3d at 399 (assuming hostile work environment claim is actionable under the Rehabilitation Act and applying standards used in Title VII context); see also Monachino v. Bair, 769 F. Supp. 2d 431, 442 (S.D.N.Y. 2011).

In order to state a claim for hostile work environment, a plaintiff "must first show that his workplace 'was permeated with discriminatory intimidation, ridicule, and insult,' that was 'sufficiently severe or pervasive to alter the conditions' of the victim's employment and create an abusive working environment." Martinez v. City of N.Y., 338 F. App'x 71, 73 (2d Cir. 2009) (quoting Hayut v. State Univ. of N.Y., 352 F.3d 733, 745 (2d Cir. 2003)). This requires a plaintiff to "plead facts that would tend to show that the complained of conduct: (1) is objectively severe or pervasive—that is, ... creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment because of the plaintiff's [membership in a protected class]." Patane v. Clark, 508 F.3d 106, 113 (2d

Cir. 2007) (alteration in original) (internal quotation marks omitted).

Lee points to the following conduct by Defendant as evidence of harassment: directing him to cover for the receptionist during her breaks, Sec. Am. Compl. at 22, 26, telling him "not to send or develop cause for late filing ... [a]gainst training and policy," id. at 23, requiring him to mail paper cases, id., sending correspondence to his personal email, id., denying him reasonable accommodations, id. at 24, and assigning him additional work and supervisors, id. at 24, 26. It can reasonably be inferred from the Complaint (as well as Lee's EEO complaints) that Lee also views the denial of leave and his suspensions as further evidence of a hostile work environment. Id. at 13. Although Lee alleges that this environment caused him to suffer from depression, Id. 11, 13, 14, the conduct he describes does not rise to the level of objectively severe and persistent harassment. Nothing indicates that a reasonable person would have found the actions of Lee's supervisors "physically threatening or humiliating," or that it "unreasonably [interfered] with [his] work performance." Hodges, 976 F. Supp. 2d 489, 497–98 (S.D.N.Y. 2013) (dismissing plaintiff's hostile work environment claim based on incidents that were, ultimately, personnel decisions "untethered to the claimed ground of discrimination). Indeed, with the exception of the denial of leave and the suspensions without pay, Lee's allegations are not substantively different from those raised in his prior complaint. The Court concluded there that Lee had "not plausibly alleged a hostile work environment" and dismissed the claim. Lee II, 2020 WL 5836513, at *6.

I therefore conclude that Lee has failed to state a hostile work environment claim under the Rehabilitation Act and recommend that the claim be dismissed.

### III. Title VII Claims

Lee indicates in the Court's form complaint that he is pleading a claim under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* SAC at 3. Title VII prohibits employment discrimination on the basis of race, color, religion, sex, or national origin. Lee did not indicate any basis for such discrimination (that is, he did not check any box in the form complaint). Because Lee does not allege any discrimination claims based on the covered traits, his claim under Title VII should be dismissed.

### IV. ADA Claims

Lee v. Saul, Not Reported in Fed. Supp. (2022)

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 426 of 449

**\*12** The ADA provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability." 42 U.S.C. § 12112. A "covered entity" means "an employer, employment agency, labor organization, or joint labor-management committee." 42 U.S.C. § 12111(2). The term "employer," however, does not include "the United States." 42 U.S.C. § 12111(5)(B)(i). Accordingly, courts have concluded that, while the ADA prohibits discrimination and retaliation by certain private sector employers as well as state and local government employers, it does not provide a cause of action against the federal government for employment discrimination. Hodges v. Att'y General of the U.S., 976 F. Supp. 2d 480, 490 (S.D.N.Y. 2013) (holding that the Rehabilitation Act, not the ADA, provides "the exclusive route by which federal employees may raise claims of employment discrimination on the basis of disability"); see also Rivera v. Heyman, 157 F.3d 101, 103 (2d Cir. 1998) ("As a federal employee, [Plaintiff] has no remedy for employment discrimination under the ADA."). The Court previously determined that amendment of Lee's ADA claim would be "futile" and denied leave to amend. Lee II, 2020 WL 5836513, at \*9. I conclude that Plaintiff's ADA claim should be dismissed accordingly.

**V. FMLA Claims**

Although the FMLA grants a private right of action to an employee in the private sector who alleges violation of his FMLA rights, see 29 U.S.C. § 2617(a)(2) (1994), the FMLA does not afford a private right of action to an employee of the federal government, see 5 U.S.C. §§ 6381–6387; see also Beauchat v. Mineta, No. 03-cv-03196 (DRH)(ETB), 2006 WL 2711608, at \*9 (E.D.N.Y. Sept. 21, 2006) ("The courts have recognized the distinction between private sector employees and federal government employees with regard to enforcement rights and have held that no independent right of action is available to federal government employees to enforce their FMLA rights."). Notably, the Court previously did not grant Lee leave to amend his FMLA claim. Lee II, 2020 WL 5836513, at \*9. Because Plaintiff is a federal employee, he does not have a private right of action under the FMLA and his claim should be dismissed.

**VI. No FEAR Act Claim**

Lee also brings a cause of action under the No FEAR Act. The law "includes provisions requiring federal agencies to provide additional reimbursement for discrimination cases, to notify and train employees about their rights, and to report on employee complaints about the agency." Mallard v. Brennan,

No. 14-cv-00342 (JAW), 2015 WL 2092545, at \*9 (D. Maine May 5, 2015). Although the issue has been sparsely litigated, the courts that have considered the issue have concluded that it "does not create any private cause of action or substantive rights." Id.; see also Alexidor v. U.S. Off. of Pers. Mgmt., No. 13-cv-4027 (DLI)(SMG), 2013 WL 4647528, at \*2 (E.D.N.Y. Aug. 29, 2013). I therefore conclude that Lee does not have a private right of action under the No FEAR Act and recommend that his claim be dismissed.

**VII. Weingarten Violation**

"Weingarten rights refers to the right to union representation during an 'investigatory interview' under the National Labor Relations Act." Figueroa v. Nielsen, 423 F. Supp. 3d 21, 26 n.5 (S.D.N.Y. 2019). The National Labor Relations Board "has 'exclusive jurisdiction' ... when there is an arguable violation of the NLRA." Rest. Law. Ctr. v. City of New York, 360 F. Supp. 3d 192 223 (S.D.N.Y. 2019). As such, "the proper forum to hear [Lee's] complaint is the National Labor Relations Board, not this Court." Bowman v. New York State Hous. & Cmty. Renewal, No. 18-cv-11596 (ER), 2020 WL 1233701, at \*9 (S.D.N.Y. Mar. 13, 2020). I recommend that the Court dismiss this claim.

**VIII. Obstruction of Justice**

Lee alleges that the SSA is "guilty of obstruction of justice by deleting emails and splitting complaints and not taking complaint and destroying medical evidence." Compl. at 11. There is not, however, a private right of action for violations of the criminal statutes regarding obstruction of justice. Pierre v. Lieberman, No. 16-cv-5473 (GBD)(HBP), 2017 WL 9565660, at \*9 n.6 (S.D.N.Y. June 14, 2017); see also Sheehy v. Brown, 335 F. App'x 102, 104 (2d Cir. 2009) (upholding dismissal of claims based on violation of federal criminal statutes because "federal criminal statutes do not provide private causes of action"); Langella v. United States, No. 1-cv-11583 (AKH), 2002 WL 1218525 at \*4 (S.D.N.Y. June 5, 2002) ("These [obstruction of justice] provisions ... do not create a private right of action for money damages, but may be enforced only by the Department of Justice."). As such, Lee's obstruction of justice claim should be dismissed.

**IX. Leave to Amend**

**\*13** Courts "should not dismiss [a *pro se* complaint] without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." Cuoco v. Moritsugu, 222 F.3d 99, 112 (2d Cir. 2000).

Lee v. Saul, Not Reported in Fed. Supp. (2022)

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 427 of 449

"Where it appears that granting leave to amend is unlikely to be productive, however, it is not an abuse of discretion to deny leave to amend." Lucente v. Int'l Bus. Machines Corp., 310 F.3d 243, 258 (2d Cir. 2002) (internal quotation marks omitted). "One appropriate basis for denying leave to amend is that the proposed amendment is futile ... An amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6)." Id. (internal citations omitted). Leave to amend may also be denied "when a party has been given ample prior opportunity to allege a claim." De Jesus v. Sears, Roebuck & Co., Inc., 87 F.3d 65, 72 (2d Cir. 1996).

I recommend that the Court deny with prejudice Plaintiff's claim under Title VII because he has not alleged discrimination on any covered ground. The Court should deny with prejudice Plaintiff's claims under the ADA and FMLA because, as a federal employee, he does not have a right of action under either law. Similarly, I recommend that the Court deny with prejudice Plaintiff's No FEAR Act claim and his allegations of a Weingarten violation and obstruction of justice, because there is no private right of action to enforce the No FEAR Act or federal criminal statutes, and this Court does not have jurisdiction over violations of the NLRA.

Furthermore, I recommend that the Court deny Plaintiff's Rehabilitation Act claims with prejudice. Plaintiff was previously granted the opportunity to amend his complaint, and despite his extensive allegations and voluminous submissions in support of his claims, he has failed to "give any indication that a valid claim might be stated." Cuoco, 222 F.3d at 112. "Leave to amend ... may properly be denied for ... 'repeated failure to cure deficiencies by amendments previously allowed ... [or] futility of amendment.' " Ruotolo v. City of New York, 514 F.3d 184, 191 (2d Cir. 2008) (quoting Foman v. Davis, 371 U.S. 178, 182 (1962)). I conclude that granting Lee an additional opportunity to amend his complaint would be futile and recommend that the Court deny him leave to amend.

## CONCLUSION

Even construing Plaintiff's allegations under the liberal standard afforded to *pro se* litigants, I find that the Complaint does not plausibly allege claims under Title VII, the ADA, the FMLA, the Rehabilitation Act, or the No FEAR Act. Furthermore, this Court does not have jurisdiction over the Plaintiff's allegation of a Weingarten violation, nor is there a private right of action that would allow him to bring an obstruction of justice claim against Defendant. Accordingly, I recommend the Court grant Defendant's motion to dismiss in its entirety.

## NOTICE OF PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION

The parties shall have fourteen days from the service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. A party may respond to another party's objections within fourteen days after being served with a copy. Fed. R. Civ. P. 72(b)(2). Such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Paul G. Gardephe at the United States Courthouse, 40 Foley Square, New York, New York 10007, and to any opposing parties. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must be addressed to Judge Gardephe. The failure to file these timely objections will result in a waiver of those objections for purposes of appeal. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); Thomas v. Arn, 474 U.S. 140 (1985).

**All Citations**

Not Reported in Fed. Supp., 2022 WL 1051216

## Footnotes

1    To the extent that Lee's statement of facts in his complaint raises issues relevant to the period at issue in his first suit, Lee I, 2017 WL 486944, those claims are also barred by res judicata. Allen v. McCurry, 449 U.S. 90, 94 (1980) ("Under res judicata, a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action."); see also Cho v.

Blackberry Limited, 991 F.3d 155, 168–69 (2d Cir. 2021) (holding that plaintiffs' claims arose out of the same transaction or occurrence as a prior suit and so were precluded by res judicata).

2    In Lee's first lawsuit, he also alleged that toner was not provided, but admitted that "the lack of toner was due to funding, and was an issue office-wide." Lee I, 2017 WL 486944, at *11 n.10. As such, Judge Failla declined to "make the logical leap to conclude that these episodes amounted to the SSA's failure to make a reasonable accommodation." Id.

---

**End of Document**        © 2024 Thomson Reuters. No claim to original U.S. Government Works.

248 Fed.Appx. 175
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1 generally
governing citation of judicial decisions issued on or after
Jan. 1, 2007. See also U.S.Ct. of App. Fed. Cir. Rule 32.1.
United States Court of Appeals,
Federal Circuit.

Royal Edward GLAUDE, Plaintiff–Appellant,

v.

UNITED STATES, Defendant–Appellee.

No. 2007–5125.
|
Sept. 7, 2007.
|
Rehearing and Rehearing En Banc Denied Nov. 19, 2007.

**Synopsis**
**Background:** Following failed attempt to bring action against
Merit Systems Protections Board in federal district court,
former postal service employee brought action in the United
States Court of Federal Claims challenging his discharge from
the postal service 27 years prior. The Court of Federal Claims,
Eric Bruggink, Senior Judge, dismissed complaint. Employee
appealed.

**Holdings:** The Court of Appeals held that:

[1] Notification and Federal Employee Antidiscrimination
and Retaliation Act (No FEAR Act) did not provide Court of
Federal Claims with jurisdiction over employee's claims;

[2] conspiracy-based claims did not allege breach of contract
or violation of a money-laundering constitutional provision,
statute, or regulation, as required to confer Court of Federal
Claims with jurisdiction over claims; and

[3] cause of action accrued on date of employee's discharge
from postal service.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion to Dismiss.

**West Headnotes (3)**

[1]   **United States**   Employment claims

The Notification and Federal Employee
Antidiscrimination and Retaliation Act (No
FEAR Act), requiring that federal agencies repay
any discrimination or whistleblower damage
awards out of agency funds rather than the
General Fund of the Treasury, did not create
substantive right for which the government must
pay damages, and thus Act did not provide
Court of Federal Claims with jurisdiction over
wrongful termination claims of former postal
service employee seeking reinstatement of his
job and back pay. Notification and Federal
Employee Antidiscrimination and Retaliation
Act of 2002, § 1 et seq., 5 U.S.C.A. § 2301 note.

33 Cases that cite this headnote

[2]   **United States**   Employment claims

Conspiracy-based claims asserted by former
postal worker challenging his termination from
the postal service did not allege breach of
contract or violation of a money-mandating
constitutional provision, statute, or regulation, as
required to confer Court of Federal Claims with
jurisdiction over claims. 28 U.S.C.A. § 1491(a).

2 Cases that cite this headnote

[3]   **United States**   Computation;
Commencement and Accrual

Former postal service employee's cause of action
challenging his discharge from postal service
over 27 years prior accrued on date of his
discharge. 28 U.S.C.A. § 2501.

**\*175**  Appealed from: United States Court of Federal Claims,
Eric Bruggink, Senior Judge.

**Attorneys and Law Firms**

**\*176**  Royal Edward Glaude, of Newark, CA, pro se.

Robert C. Bigler, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, for defendant-appellee. With him on the brief were Peter D. Keisler, Assistant Attorney General, Jeanne E. Davidson, Director, and Todd M. Hughes, Deputy Director.

Before MICHEL, Chief Judge, MOORE, Circuit Judge, and COTE, District Judge. *

**Opinion**

PER CURIAM.

**\*\*1** Royal E. Glaude appeals the judgment of the Court of Federal Claims, *Glaude v. United States,* No. 07–282 (Fed.Cl. May 11, 2007), dismissing Glaude's complaint for lack of jurisdiction. We *affirm.*

BACKGROUND

This case stems from Glaude's employment with the United States Postal Service, which ended on January 15, 1979 when he was discharged from service. On June 26, 2006, Glaude filed an appeal with the Merit Systems Protection Board (the Board), challenging his discharge. The Board dismissed Glaude's appeal for lack of jurisdiction. *Glaude v. U.S. Postal Serv.,* No. SF–0752–06–0720–I–1, 2006 WL 3078088 (M.S.P.B. Oct.2, 2006). Glaude thereafter filed a petition for review, which the Board denied, making the dismissal of his appeal final. *See Glaude v. U.S. Postal Serv.,* No. SF–0752–06–0720–I–1, 105 M.S.P.R. 98 (M.S.P.B. Jan.31, 2007).

Following a failed attempt to bring an action against the Board in federal district court, Glaude filed the present suit in the Court of Federal Claims on May 4, 2007. The Court of Federal Claims raised the issue of lack of jurisdiction sua sponte. The court characterized Glaude's claims as alleging conspiracy by the United States Postal Service and the Board. *Glaude,* slip. op. at 4. The court also noted that Glaude sought reinstatement of his job and back pay in the amount of three million dollars. *Id.* at 3. The court held that it did not have jurisdiction over the conspiracy claims, as they sound in tort, nor over the civilian discharge claims. *Id.* at 4–5. The court further reasoned that even if it could find an issue raised by Glaude that arguably fell within the court's jurisdiction, the claim would be time barred as beyond the six-year statute of limitations for seeking

damages against the United States. *Id.* at 5 (citing 28 U.S.C. § 2501). Thus, the court dismissed Glaude's complaint.

Glaude argues on appeal that the Court of Federal Claims erred in holding that it did not have jurisdiction over his claims. In particular, Glaude argues that the court failed to consider whether the court has jurisdiction over his claim in light of the Notification and Federal Employee Antidiscrimination and Retaliation Act of 2002, Public Law 107–174, 116 Stat. 556 (2002) (the No FEAR Act).

ANALYSIS

We review de novo a dismissal by the Court of Federal Claims for lack of subject matter jurisdiction. *Wilson v. United States,* 405 F.3d 1002, 1008 (Fed.Cir.2005). Jurisdiction in the Court of Federal Claims is primarily based on the Tucker Act, which provides the court with jurisdiction to hear cases "against the United States founded either upon the Constitution, or any Act of Congress or any regulation of **\*177** an executive department ... in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). The Tucker Act itself, however, "does not create any substantive right enforceable against the United States for money damages." *United States v. Testan,* 424 U.S. 392, 398, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976). Thus, in order to establish jurisdiction, Glaude must rely on some other money-mandating right created by statute, regulation, or Constitutional provision.

**\*\*2** **[1]** Glaude's reliance on the No FEAR Act is unavailing. That Act does not create a substantive right for which the government must pay damages, but rather, it requires that federal agencies repay any discrimination or whistleblower damage awards out of agency funds rather than the General Fund of the Treasury. *See* Pub. Law 107–174, Sec. 201. Thus, the No FEAR Act is not a money mandating statute, and it does not provide the Court of Federal Claims with jurisdiction over Glaude's claims.

**[2]** **[3]** We also conclude that the Court of Federal Claims correctly determined that it lacked jurisdiction with respect to the other issues raised by Glaude's complaint. Most of Glaude's allegations are directed to the Board and its relevant members acting in a "manner to accomplish a common and unlawful plan in aiding [the U.S. Post Master General] in clear disregard of their obligations." *Glaude,* slip. op. at 4 (citing Glaude's complaint). These claims appear to allege a conspiracy to defraud and discriminate against Glaude.

However characterized, these conspiracy-based claims do not allege breach of a contract or violation of a money-mandating constitutional provision, statute, or regulation, and therefore, they do not fall within the jurisdiction of the Court of Federal Claims. *See* 28 U.S.C. § 1491(a). To the extent that Glaude was seeking relief, including back pay, from a discharge that occurred over twenty-seven years ago, the court also properly dismissed these claims as being time-barred. *See Martinez v. United States,* 333 F.3d 1295, 1310 (Fed.Cir.2003) (holding the six-year statute of limitations under 28 U.S.C. § 2501 begins to run on claims arising from discharge as of the date of discharge).

For the foregoing reasons, the judgment of the Court of Federal Claims is affirmed.

COSTS

Each party shall bear its own costs.

**All Citations**

248 Fed.Appx. 175, 2007 WL 2682957

## Footnotes

\*       Honorable Denise Cote, United Stated District Judge for the Southern District of New York, sitting by designation.

---

**End of Document**                                   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2004 WL 3335448
Only the Westlaw citation is currently available.
United States District Court,
E.D. Virginia.

Josette Michele MILLS, Plaintiff,

v.

Hector BARRETO, Administrator, et al., Defendants.

No. Civ.A. 3:03CV735.
|
March 8, 2004.

**Attorneys and Law Firms**

Josette Michele Mills, Richmond, VA, pro se.

Robert P. Mcintosh, United States Attorney's Office, Richmond, VA, for Defendants.

*MEMORANDUM OPINION*

WILLIAMS, Senior J.

**\*1** This matter is before the Court on the defendants' motion to dismiss individually named defendants and defendants' motion for summary judgment. Also pending are several motions filed by the plaintiff, who is proceeding *pro se*. The motions are fully briefed, and the Court has reviewed the pleadings. Accordingly, this matter is ripe for adjudication. Finding that the decisional process would not be aided by oral argument, the Court rules without a hearing.

*I. FACTS*

On September 9, 2003, the plaintiff, Josette M. Mills ("Mills" or "plaintiff"), filed a complaint against the Administrator of the Small Business Administration ("SBA"), the SBA, and four other individually named defendants who were SBA employees. Mills alleges that she has a cause of action under (1) the Rehabilitation Act; (2) the Family and Medical Leave Act; (3) the Americans with Disabilities Act; (4) the Notification and Federal Employee Anti-discrimination and Retaliation Act of 2002; (5) a provision in the Code of Federal Regulations; and (6) the "Master Agreement between SBA and AFGE." On December 29, 2000, Mills filed an Administrative Complaint. The Administrative Complaint

went through the EEO process. By order dated April 28, 2003, summary judgment was granted to the SBA by the Administrative Judge without a hearing. The Final Agency Decision adopting the Administrative Judge's order was dated June 3, 2003. It appears that Mills received a copy of the Final Agency Decision on June 13, 2003. Mills filed her complaint in this action on September 9, 2003, within 90 days of receiving the Final Agency Decision.

In the complaint in this action, the plaintiff alleges that she has "suffered harassment, reprisal, retaliation and intentional and wreck less [sic] discrimination due to my disability." In the Administrative Complaint, the plaintiff had alleged that she suffered from "acute asthma, migraines, MVP [mitral valve prolapse], & chronic pain." She had also claimed that "[b]eing a disabled veteran with health problems," she was entitled to a "reasonable accommodation." Her Administrative Complaint had also alleged race, sex, age, and disability discrimination, as well as retaliation. The issue accepted for investigation at the administrative level was: "whether complainant has been subjected to severe or pervasive conduct based on Race, Sex, Disability or Retaliation, constituting a hostile work environment, subsequent to July 20, 2000." However, Mills' complaint in this action does not suggest any race, sex or age discrimination nor are there any factual allegations that would support a claim for relief under Title VII.

Mills was first employed by the SBA in October 1998 as an administrative clerk trainee for a three-year trial and training period under the Welfare to Work Program. Her title was changed to Information Receptionist in November 2000. Her status was converted to career appointment effective December 2, 2001. The SBA was aware that Mills was rated as a ten percent disabled veteran under the Department of Veterans Affairs' rules, but the SBA knew nothing about the nature and extent of Mills' alleged disability. Mills' supervisors never saw any medical records describing a disability nor did they observe anything regarding Mills that would suggest that she was less than fully capable of performing normal day-to-day activities.

**\*2** In September 1999, Mills had thoracic surgery. She also told her supervisor that she suffered from asthma. It appeared to her supervisors that Mills had recovered from the surgery and that she did not have any lingering disabling effects from the surgery or asthma. According to the discharge summary, after her 1999 surgery, the only restriction imposed by her doctors was that she stop smoking. Medical records indicate that plaintiff's primary care physician saw her on November

9, 1999, December 27, 1999, and April 27, 2000. On July 3, 2000, her primary care physician certified that she was seen on these dates and that she "was told to follow up if needed," but stated that "we have not seen her since."

On August 4, 2000, Mills sent an email to her first line supervisor, Betty Verser, requesting "reasonable accommodations" to allow her "to attend all scheduled appointments" in connection with her "be[ing] under continual physicians['] care" starting on August 14, 2000. The email stated that "I will however be in the office, but need to be able to attend all scheduled appointments." She does not state what her disability is but asserts that she is a "disabled veteran" covered by the Rehabilitation Act and that she is therefore entitled to a reasonable accommodation in the form of being "allowed to work flexi-tour or an alternate work schedule." On August 9, Verser responded to the request by email stating that she would consult with her supervisor, Jimmie Anderson, and respond later. By email dated September 1, 2000, Mills inquired as to the decision, adding "I am a single parent with two young school age children, therefore my hours would have to be conducive to their needs." On September 7, the SBA proposed an alternative work schedule. That same day, Mills made her initial contact with an EEO counselor. She complained of the alleged failure to accommodate and several other issues. The EEO counselor never reviewed the September 7, 2000 email offering an alternative work schedule. Mills never finalized the alternative work schedule by agreeing to the proposed alternative work schedule and submitting the necessary form. By email dated October 11, 2000, she informed her supervisor that she would have the form to her by October 20, 2000, and indicated that she would offer a counter-proposal.

Mills alleges that she was subjected to retaliation when her performance rating was lowered. She was given a rating of "exceeds fully successful," which qualified her for a bonus amounting to two percent of her basic pay. This rating was based on the appraisal of both Verser and Anderson and the narrative justification supporting the evaluation. The justification supported the rating given but did not support a rating of "outstanding." There are other allegations, related to incidents alleged to have occurred before the filing of the plaintiff's Administrative Complaint, which were beyond the scope of the administrative investigation. There are other allegations, related to various confrontations between plaintiff and her supervisors and to leave issues.

## II. MOTION TO DISMISS

**\*3** Citing 42 U.S.C. § 2000e–16(c), 29 U.S.C. § 794(a)(1), and *Johnston v. Home,* 875 F.2d 1415 (9 th Cir.1989), the defendants argue that with regard to claims of disability discrimination in federal employment, the Rehabilitation Act is the exclusive remedy, and the head of the employing agency is the proper defendant. Further, when "the acts complained of consist of actions taken by defendants in their official capacity as agents of the United States, the action is in fact one against the United States." *Atkinson v. O'Neill,* 867 F.2d 589, 590 (10 th Cir.1989). The defendants are correct, and the Court will grant the motion to dismiss the individually named defendants and dismiss the claims against the individual defendants—Charles Gaston, Betty Verser, Jimmie Anderson, and Thomas Tolan.

## III. MOTION FOR SUMMARY JUDGMENT

Summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has met its burden, the nonmoving party must come forward with evidence that shows that, upon the record taken as a whole, a rational trier of fact could find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A mere scintilla of evidence presented by the nonmoving party is insufficient to circumvent summary judgment. *Id.* at 252. In addition, summary judgment may be granted based upon facts developed during the administrative proceedings, the pleadings, and supplemental affidavits. *Volpone v. Caldera,* 190 F.R.D. 177, 180 (E.D.Va.1999).

### A. Sovereign Immunity

It is well settled that the United States, as sovereign, is immune from suit except to the extent that it has consented to be sued by statute. *United States v. Dalm,* 494 U.S. 596, 609, 110 S.Ct. 1361, 108 L.Ed.2d 548 (1990). Statutory waivers of sovereign immunity "cannot be implied but must be unequivocally expressed." *United States v. King,* 395 U.S. 1,4, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969). Further, they must be construed strictly in favor of the sovereign and may not

be enlarged beyond what the statutory language requires. *Ruckelshaus v. Sierra Club,* 463 U.S. 680, 685–86, 103 S.Ct. 3274, 77 L.Ed.2d 938 (1983). General jurisdictional statutes do not waive the government's sovereign immunity. *Holloman v. Watt,* 708 F.2d 1399, 1401 (9 th Cir.1983).

There is no waiver of sovereign immunity under the provisions of the Code of Federal Regulations or the Master Agreement cited by Mills. Also, sovereign immunity has not been waived, jurisdiction does not exist, and the plaintiff has no cause of action against the federal government under the Americans with Disabilities Act. *See* 42 U.S.C. § 12131(1) (A)-(B) (defining public entities covered by the ADA as any state or local government). Nor has sovereign immunity been waived, jurisdiction been granted, or a cause of action against the federal government been created under the No FEAR Act or the FMLA. *See* Pub.L. 107–174, 116 Stat. 566; *Mann v. Haigh,* 120 F.3d 34, 37 (4 th Cir.1997) (federal employees covered by Title II of the FMLA do not have a right to judicial review of their claims; no express or implied right of action is created). Therefore, the plaintiff's exclusive remedy is under the Rehabilitation Act.

### B. The Rehabilitation Act

#### 1. Disability Discrimination

**\*4** For federal employees, the Rehabilitation Act, 29 U.S.C. §§ 791, 794(a) ("the Act"), is the exclusive remedy for discrimination based on disability. *Lassiter v. Reno,* 885 F.Supp. 869 (E.D.Va.1995), *aff'd* 86 F.3d 1151 (4 th Cir.1996), *cert. denied,* 519 U.S. 1091, 117 S.Ct. 766, 136 L.Ed.2d 712 (1997). In this case, the plaintiff alleges that the SBA violated her rights under the Rehabilitation Act by failing to accommodate her alleged disability. In order to establish a *prima facie* case for failure to accommodate, the plaintiff must demonstrate that (1) she is an individual who has a disability within the meaning of the statute; (2) the employer had notice of the disability; (3) with reasonable accommodation she could perform the essential functions of the position; and (4) the employer refused to make such accommodations. *Rhoads v. F.D.I.C.,* 257 F.3d 373, 387 (4 th Cir.2001). The threshold requirement for coverage is that a plaintiff is disabled under the Act. 29 U.S.C. § 794(a); *Gupton v. Virginia,* 14 F.3d 203, 205 (4 th Cir.1994). The Act defines an "individual with a disability" as any person who:

(i) has a physical or mental impairment which substantially limits one or more of such person's major life activities;

(ii) has a record of such an impairment; or

(iii) is regarded as having such an impairment.

29 U.S.C. § 706(8)(B). In order to establish that she is "substantially limit[ed]" in one or more of the "major life activities," the plaintiff must show that she has "an impairment that prevents or severely restricts [her] from doing activities that are of central importance to most people's daily lives." *Toyota Motor Manufacturing v. Williams,* 534 U.S. 184, 198, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002). The impairment must be "permanent or long term." *Id.* The Supreme Court examined the effects of the medical conditions of the plaintiff in *Toyota* to construe what activities are of "central importance to daily life." Mills claims entitlement to accommodation because she is "a disabled veteran with health problems." She had thoracic surgery in 1999 and states that she has experienced "acute asthma" and mitral valve prolapse ("MVP"). Her claim that she is disabled is based solely on these few conclusory allegations.

Despite her allegations, it is clear that the plaintiff is not "substantially limit[ed]" in any of her "major life activities." She can perform her work responsibilities without any difficulty. She walks several city blocks without difficulty and has no difficulty standing and waiting at the bus stop, commuting to and from work. *See* Verser Dec., ¶ 4. There is nothing to suggest to those observing Mills that she is limited in any of her life activities. While she has taken many hours of annual and sick leave, the number of appointments certified by her doctors is not significant. After she was discharged following her surgery, the only restriction imposed by her doctors was that she quit smoking. The medical records substantiate that follow-up visits with her doctors were minimal. Although she has claimed an inability to carry office mail, she carries a heavy personal brief case. Verser Dec., ¶ 3. Even if she were not capable of carrying a heavy brief case, the Fourth Circuit has held as a matter of law that such lifting limitations do not constitute an impairment that substantially limits any major life activity. *See* Pollard v. High's of Baltimore, Inc., 281 F.3d 462, 470–71 (4 th Cir.2002); *Williams v. Channel Master Satellite Systems, Inc.,* 101 F.3d 346, 349 (4 th Cir.1996) (holding that a twenty-five pound lifting limitation ... does not constitute a significant restriction on a major life activity). Lastly, there was never any indication from any of the medical personnel who examined,

diagnosed, or treated Mills that her condition at the time of her discharge from surgery was anything other than temporary. Accordingly, the Court finds that the plaintiff was not an "individual with a disability."

**\*5** The Court also finds that the plaintiff did not have a record of impairment and that she was not regarded as having an impairment. To be deemed disabled due to a record of impairment under subsection (ii), a plaintiff must have a history of, or been misclassified as, having an impairment that substantially limited a major life activity. 29 CFR § 1613.2(k). To be deemed "regarded as" disabled under subsection (iii), an individual must show that "(1) her employer 'mistakenly believe[d] that [she] has a physical impairment that substantially limits one or more major life activities' or (2) her employer 'mistakenly believe[d] that an actual, nonlimiting impairment substantially limits one or more major life activities.'" *Rhoads v. F.D.I.C.,* 257 F.3d 373, 390 (4 th Cir.2001) (quoting *Haulbrook v. Michelin North America,* 252 F.3d 696, 703 (4 th Cir.2001)). "[T]he mere fact that an employer is aware of an employee's impairment is insufficient to demonstrate that the employer regarded the employee as disabled." *Kelly v. Drexel University,* 94 F.3d 102, 109 (3 rd Cir.1996). Based on this standard, the plaintiff fails to establish that she was "regarded as" disabled. Her employer was aware that she had surgery, that she allegedly suffered from asthma, and that she had stated that she experienced headaches. However, there was nothing in her behavior, her medical records, or any other indications known or observed by her employer that would indicate that her ability to perform any major life activities was substantially impaired. No conditions prevented Mills from performing her work for the SBA. Therefore, she did not have a record of impairment nor was she regarded as having an impairment.

For the same reasons, the SBA did not have notice of any disability. She appeared to have completely recovered from her surgery in 1999. While Mills told a supervisor she suffered from asthma, the asthma did not appear to have any lasting disabling effect on her. While she made a statement regarding her headaches to Anderson, he never observed any behavior that would suggest that Mills had any impairment that would limit any of her major life activities. Anderson Dec., ¶¶ 3 & 4. From everything her employer could observe, Mills "appear[ed] to be ablebodied." Verser Dec., ¶ 3. Accordingly, the SBA did not have notice of any disability.

With regard to the issue of reasonable accommodation, Mills never identified the accommodation she required beyond stating that she wanted an alternative work schedule or a flexitour schedule. This request ostensibly was to allow the plaintiff to perform her job and still attend scheduled doctor appointments, but the evidence suggests that the real reason for the request was to facilitate child care responsibilities. Despite Mills' failure to identify a specific accommodation, the SBA proposed an accommodation. The plaintiff did not accept the accommodation, but stated that she would propose an alternative accommodation. She never did so. Accordingly, the SBA did not fail to reasonably accommodate a disability in Mills' case.

## 2. Retaliation

**\*6** Mills also alleges that the SBA retaliated against her for protected activity under the Act. To establish a *prima facie* claim of retaliation under the Act, an employee must demonstrate that: (1) she engaged in protected activity; (2) the employer took adverse employment action against the employee; and (3) a causal connection existed between the protected activity and the adverse action. *Hooven–Lewis v. Caldera,* 249 F.3d 259 (4 th Cir.2001). Mills alleges that the SBA retaliated against her for filing a complaint under the Act when her reviewing official gave her a rating of "exceeds fully successful" instead of the highest possible rating of "outstanding." As to this allegation, the defendants argue that the plaintiff has not exhausted her administrative remedies with respect to this claim. The issue accepted for investigation at the administrative level was:

> Whether complainant has been subjected to severe or pervasive conduct based on Race, Sex, Disability or Retaliation, constituting a hostile work environment, subsequent to July 20, 2000.

While Mills' job performance evaluation was an exhibit in the record contained in the Report of Investigation, the issue did not relate to any severe or pervasive conduct that would arise to the level of a hostile work environment. Thus, the Court finds that Mills has not exhausted her administrative remedies with respect to the job performance evaluation. Further, even if Mills had exhausted her administrative remedies with respect to this claim, she cannot establish a *prima facie* case of

retaliation based on the job performance evaluation. "There is little support for the argument that negative performance evaluations alone can constitute an adverse employment action." *Smart v. Ball State University,* 89 F.3d 437, 442 (7th Cir.1996) (noting that the court could not find one case where adverse performance ratings alone were found to constitute adverse employment action). In this case, Mills' evaluation was not negative. It was positive. Further, it did not adversely affect any term or condition of the plaintiff's employment. In fact, she received a bonus.

She also alleges that the rating criteria were changed and that this constituted retaliation. However, the case law is clear that an employer is free to set its own performance standards and that such action does not constitute adverse employment action. *See Beall v. Abbott Laboratories,* 130 F.3d 614, 620 (4th Cir.1997); *DeJarnett v. Corning Inc.,* 133 F.3d 293, 298–99 (4th Cir.1998).

Many of Mills' claims are perceived grievances, which she alleges constitute harassment. None of the allegations of "harassment" relate to Mills' alleged status as a disabled person. Further, the allegations do not describe "severe" or "pervasive" harassment that could "alter the conditions of employment and create an abusive employment atmosphere."

Plaintiff also includes allegations contained in a section of her complaint called "amendments." She has also filed several motions to amend her complaint, and in her opposition to the defendants' motion for summary judgment, plaintiff argues that she may raise claims of retaliation "based on the proposed amendments." The Court finds that all of plaintiff's amendments either (1) are barred by her election to pursue grievance procedures under the Master Agreement between the SBA and the AFGE or (2) fail to state a claim because the defendants have legitimate, non-discriminatory/non-retaliatory reasons for the actions taken, and the plaintiff cannot show that such reasons are a pretext for retaliation.

**\*7** The matters complained of in the "amendments" section of the complaint relating to improper charges of absence without leave are barred by Mills having elected the union grievance procedure. Before filing this action, Mills had filed at least three union grievances relating to "absence without leave" issues. The grievances were dated May 9, 2003, May 20, 2003, and August 19, 2003. Federal law provides that an "aggrieved employee affected by a prohibited personnel practice under section 2302(b)(1) of [Title 5, U.S.C.] which also falls under the coverage of the negotiated grievance procedure may raise the matter under a statutory procedure or the negotiated procedure, but not both." 5 U.S.C. § 7121(d). Since Mills raised these leave matters in the negotiated grievance procedure, her attempt to challenges these matters in this action are barred. *See Guerra v. Cuomo,* 176 F.3d 547, 548–49 (D.C.Cir.1999).

With regard to the "amendments" not barred, the Court finds that there are legitimate, non-discriminatory and non-retaliatory reasons to support the actions taken by the defendants. While there is no doubt that the plaintiff can show that she engaged in protected activity, Mills did not suffer adverse employment action by reason of the LWOP or AWOL charges. Further, the employer had legitimate non-discriminatory and non-retaliatory reasons for its actions. The Anderson Declaration demonstrates that Mills did not provide the required documentation and did not otherwise justify her absences. The Court also finds that there are legitimate, non-discriminatory and non-retaliatory reasons to support the other actions taken by the defendants with regard to Mills, including her two suspensions and ultimately her termination from employment. The repeated instances of leaving the workplace without approval, repeated failure to follow supervisory orders to perform work, repeated insolence and abusive language, and other actions of Mills constitute ample reasons for each of the suspensions and termination. *See* Declarations of Anderson, Verser, and Dailey and Exhibits 24, 28, and 29. Mills fails to establish that the proffered reasons are false or that they are merely a pretext for retaliation. The charges of insolence and insubordination were charges that formed the basis of both suspensions, and insubordination continued to be an additional reason supporting the plaintiff's termination. *See Chaney v. New Orleans Public Facility Management, Inc.,* 179 F.3d 164, 167–68 (5th Cir.1999); *N.L.R.B. v. Consolidated Diesel Elec. Co.,* 469 F.2d 1016 (4th Cir.1972) ("Insubordination and refusal to obey instructions constitute reasonable grounds for disciplining an employee, and discharge for insubordination or refusal to obey instructions is lawful."); *E.E.O.C. v. Reynolds Metals Company,* 212 F.Supp.2d 530 (E.D.Va.2002).

For these reasons, the defendants' motion for summary judgment will be granted, and judgment will be entered on behalf of the defendants.

**\*8** An appropriate Order shall issue.

*FINAL ORDER*

This matter is before the Court on the defendants' motion to dismiss individually named defendants and defendants' motion for summary judgment. Also pending are several motions filed by the plaintiff, who is proceeding *pro se*. For the reasons stated in the accompanying Memorandum Opinion, the Court GRANTS the defendants' motion to dismiss individually named defendants—Gaston, Anderson, Verser, and Tolan—and GRANTS the defendants' motion for summary judgment. The Clerk is DIRECTED to ENTER JUDGMENT for the defendants.

Given the Court's granting the defendants' motion to dismiss and motion for summary judgment, the remaining pending motions are MOOT, and the Clerk is DIRECTED to TERMINATE them as MOOT.

Plaintiff is advised that she has the right to appeal the decision of the Court. Should she wish to do so, written notice of appeal must be filed with the Clerk of the Court within sixty (60) days of the date of entry hereof. Failure to file a timely notice of appeal may result in the loss of the right to appeal.

It is so ORDERED.

Let the Clerk send a copy of this Order to all counsel of record and the plaintiff.

**All Citations**

Not Reported in F.Supp.2d, 2004 WL 3335448

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**   © 2024 Thomson Reuters. No claim to original U.S. Government Works.   6

Brown v. Peters, Not Reported in F.Supp. (1997)

Case 3:24-cv-00037-DNH-ML    Document 9    Filed 06/11/24    Page 438 of 449

1997 WL 599355
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Kenneth BROWN, Plaintiff,

v.

Andrew PETERS, Warden, Watertown Correctional
Facility; Joseph Williams, Warden, Lincoln Work–
Release Center; Francis J. Herman, Senior Parole
Officer Interstate Bureau; T. Stanford, Senior Parole
Officer; Deborah Stewart, Parole Officer; John Doe #
1, Parole Agent, Watertown Correctional Facility; John
Doe # 2, Parole Agent, Lincoln Work Release Center;
Susan Bishop, Director of Interstate Compact, South
Carolina; Cecil Magee, Parole Officer, South Carolina;
Frank Barton, Parole Officer, South Carolina; John
McMahan, Parole Officer, South Carolina, Defendants.

No. Civ.A. 95CV1641RSPDS.
|
Sept. 22, 1997.

**Attorneys and Law Firms**

Kenneth Brown, State Court Institute–Greene, Waynesburg,
PA, plaintiff, pro se.

Dennis C. Vacco, New York State Attorney General, The
Capitol Albany, NY, for defendants Peters, Herman Stewart,
Doe # 1, Doe # 2, and Williams, Jeffrey M. Dvorin, Assistant
Attorney General, Carl N. Lundberg, Chief Legal Counsel,
South Carolina Department of Probation, Columbia, SC, for
defendants Bishop, Magee, Barton, McMahan, and Stanford,
Carl N. Lundberg, of Counsel.

DECISION AND ORDER

POOLER, J.

**\*1**  The above matter comes to me following a Report–
Recommendation by Magistrate Judge Daniel Scanlon, Jr.,
duly filed on April 17, 1997. Following ten days from the
service thereof, the Clerk has sent me the entire file, including
any and all objections filed by the parties herein.

Plaintiff Kenneth Brown commenced this Section 1983 civil
rights action on November 17, 1995. On February 12,

1996, Magistrate Judge Scanlon ordered Brown to submit an
amended complaint alleging the specific acts committed by
the individuals named as defendants which Brown claimed
violated his constitutional rights. Brown filed an amended
complaint on March 21, 1996. In his amended complaint,
Brown alleged that defendants violated his rights under the
Eighth and Fourteenth Amendments by failing to process
properly his interstate compact paperwork, resulting in Brown
being imprisoned pursuant to a parole hold when in fact
he had never violated the conditions of his parole. For a
more complete statement of Brown's claims, see his amended
complaint. Dkt. No. 5.

On August 5, 1996, defendants Peters and Williams made
a motion to dismiss for failure to state a claim pursuant to
Fed.R.Civ.P. 12(b)(6). Dkt. No. 13; Dkt. No. 14, at 2. On
August 19, 1996, defendants Bishop, Magee, Barton, and
McMahan made a motion to dismiss the complaint against
them or, in the alternative, for summary judgment. Dkt. No.
20. On October 17, 1996, defendants Herman, Stewart, and
Stanford made a motion to dismiss for failure to state a
claim. Dkt. No 34. On April 17, 1996, Magistrate Judge
Scanlon recommended that all defendants' motions to dismiss
be granted and that the complaint be dismissed. Dkt. No. 50.

On June 9, 1997, Brown filed objections to the
magistrate judge's report-recommendation, having been
granted additional time in which to do so. Dkt. No. 52. In
addition, Brown filed on June 9, 1997, a motion for leave to
file a second amended complaint and a copy of his proposed
amended complaint. Dkt. No. 53. I turn first to the last motion
filed, Brown's motion for leave to amend his complaint a
second time.

Brown seeks to file a second amended complaint "setting
forth in detail the personal involvement of each defendant
and how their acts of commission and omission served to
deprive plaintiff of Constitutionally secured rights." Dkt. No.
53. The district court has discretion whether to grant leave
to amend. *Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129,
131 (2d Cir.1993). In exercising that discretion, the court
should freely grant leave to amend when justice so requires.
Fed.R.Civ.P. 15(a). However, the court need not grant leave
to amend where it appears that amendment would prove to be
unproductive or futile. *Ruffolo,* 987 F.2d at 131.

Here, Brown moved to amend his complaint to add additional
allegations against the named defendants. However, the
additional allegations fail to cure the deficiency which

Brown v. Peters, Not Reported in F.Supp. (1997)

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 439 of 449

forms the basis of defendants' motion to dismiss—the absence of defendants' personal involvement in a constitutional deprivation. Section 1983 imposes liability upon an individual only when personal involvement of that individual subjects a person to deprivation of a federal right. *See Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). A complaint is fatally defective if it fails to allege personal involvement sufficient to establish that a supervisor was "directly and personally responsible for the purported unlawful conduct." *Alfaro Motors, Inc. v. Ward,* 814 F.2d 883, 886 (2d Cir.1987).

**\*2** Brown's proposed amended complaint alleges in conclusory fashion that defendants acted "in a grossly negligent and concerted manner which breached their duties owed to Plaintiff and is the proximate cause of [the violation of plaintiff's constitutional rights]." Proposed Am. Compl., at 3. Brown continues in the same vein, stating that defendants owed duties to plaintiff to carry out their jobs in a professional manner and they failed to carry out those duties appropriately. The complaint states that defendants held specific responsibilities, such as checking for outstanding warrants, which if performed properly should have alerted them to a problem. However, nowhere does the complaint set forth allegations that these defendants either participated directly in any constitutional infraction or that they were even aware of such an infraction. The proposed amended complaint merely alleges that these defendants failed in performing their supervisory and ministerial functions. "These bare assertions do not state a claim under 42 U.S.C. § 1983." *Smiley v. Davis,* 1988 WL 78306, \*2 (S.D.N.Y.).

This plaintiff previously has had the opportunity to amend his complaint for the same reason asserted here, to allege personal involvement on the part of defendants. Brown's first amended complaint failed to accomplish that task, and it appears that even if allowed to amend again Brown would be unable to make the requisite allegations with sufficient specificity to sustain his complaint. Consequently, I find that amendment would be futile, and I deny Brown's motion for leave to amend his complaint.

I turn now to the magistrate judge's report-recommendation and defendants' motions. The magistrate judge recommends that I grant defendants' motions and dismiss the complaint as to all defendants. The report-recommendation clearly describes the grounds on which the magistrate judge recommends dismissal as to each defendant. Fed.R.Civ.P. 72(b) requires the district judge to make a *de novo* determination on "any portion of the magistrate's disposition to which specific, written objection has been made." Brown's objections fail to address directly any of the analysis. Brown's objections state (1) that he has been deprived of his constitutional rights; (2) that he has stated a cause of action; (3) that the court wrongly refused to appoint an attorney for him and wrongly stayed discovery pending the outcome of these motions; (4) that he seeks to file an amended complaint; (5) the standard of review for a Fed.R.Civ.P. 12(b)(6) motion; (6) that he disagrees with the magistrate judge's recommendation to grant defendants' motions because the allegations in his complaint, which he repeats, show that his rights were violated; and (7) the text of the Fourteenth and Eighth Amendments.

Even affording the objections the liberal reading required for *pro se* pleadings, I find that these objections fail to state any basis whatsoever, much less a specific one, for the court not to adopt the magistrate judge's rulings. They simply re-state the relief sought and the facts on which Brown grounds his complaint and conclude that the magistrate judge's conclusions are wrong. When the parties make only frivolous, conclusive, or general objections, the court reviews the report-recommendation for clear error. *See Camardo v. General Motors Hourly–Rate Employees Pension Plan,* 806 F.Supp. 380, 382 (W.D.N.Y.1992) (court need not consider objections which are frivolous, conclusive, or general and constitute a rehashing of the same arguments and positions taken in original pleadings); *Chambrier v. Leonardo,* 1991 WL 44838, \*1 (S.D.N.Y.) (restatement of allegations already before the court and assertion that valid constitutional claim exists insufficient to form specific objections); *Schoolfield v. Dep't of Correction,* 1994 WL 119740, \*2 (S.D.N.Y.) (objections stating that magistrate judge's decisions are wrong and unjust, and restating relief sought and facts upon which complaint grounded, are conclusory and do not form specific basis for not adopting report-recommendation); *Vargas v. Keane,* 1994 WL 693885, \*1 (S.D.N.Y.) (general objection that report does not address violation of petitioner's constitutional rights is a general plea that report not be adopted and cannot be treated as objection within the meaning of 28 U.S.C. § 636), *aff'd,* 86 F.3d 1273 (2d Cir.), *cert. denied,* 519 U.S. 895, 117 S.Ct. 240, 136 L.Ed.2d 169 (U.S.1996). *See also Scipio v. Keane,* 1997 WL 375601, \*1 (1997) (when objections fail to address analysis directly, court reviews report-recommendation for clear error); Fed.R.Civ.P. 72(b), Advisory Comm. Note (when no specific, written objections filed, "court need only satisfy itself that there is

no clear error on the face of the record in order to accept the recommendation").

**\*3** Because Brown fails to make specific objections or provide any basis for his general objections, I review the report-recommendation for clear error. After careful review, I conclude that the magistrate judge's report-recommendation is well-reasoned and is not clearly erroneous.[1] The magistrate judge employed the proper standard, accurately recited the facts, and reasonably applied the law to those facts. Consequently, I adopt the report-recommendation.

CONCLUSION

Because plaintiff's proposed amendment demonstrates that amendment would be futile, I deny plaintiff's motion for leave to amend his complaint. I approve the magistrate judge's recommendation and grant defendants' motions to dismiss. Plaintiff's complaint is dismissed in its entirety.

IT IS SO ORDERED.

**ORDER and REPORT–RECOMMENDATION**

This matter was referred to the undersigned for report and recommendation by the Hon. Rosemary S. Pooler, United States District Judge, by Standing Order dated November 12, 1986. Currently before this Court are a number of motions. Defendants Peters and Williams have filed a motion to dismiss (dkt.13); defendants Bishop, Magee, Barton and McMahan have filed a motion for summary judgment, or in the alternative to dismiss (dkt.20); and defendants Herman, Stewart and Stanford also have filed a motion to dismiss (dkt.34). Plaintiff opposes these three motions (dkts.27, 29, 33, 38). Defendants Bishop, Magee and McMahan have filed a motion to stay discovery (dkt.41) and plaintiff has filed a motion to extend time (dkt.44) in which to file opposition to the latter motion for a stay of discovery.

The Court addresses these issues *seriatim*.

**BACKGROUND**

Plaintiff's amended complaint, which he has brought pursuant to 42 U.S.C. § 1983, alleges the following facts. In October, 1991, plaintiff was incarcerated in the Watertown Correctional Facility in Watertown, New York. He applied for an interstate compact because he wanted to return to South Carolina to live with his common law wife, Pamela Reid. During the application process, he was interviewed by the facility's parole officer, identified only as defendant John Doe # 1. After signing the necessary papers, his application was forwarded to defendant Andrew Peters, the facility's superintendent, who reviewed, signed and forwarded the papers to the Interstate Bureau. Amend. Compl. at ¶¶ 1–2; Exs. A, B.

On or about January 15, 1992, while his compact was waiting for review at the Interstate Bureau, plaintiff was approved for work release and sent to the Lincoln Work Release Center in New York City. While at the center, plaintiff spoke to a parole officer, defendant John Doe # 2, and told him that he was seeking a compact that would return him to South Carolina upon his conditional release. Plaintiff claims the parole officer told him that he would handle the necessary paperwork, although the officer had had no experience with an interstate compact. Amend. Compl. at ¶¶ 3, 4.

**\*4** Plaintiff, meanwhile, asked Reid whether any officials had contacted her in South Carolina regarding his prospective residence in that state. Upon discovering no one had contacted her, plaintiff asked a lawyer he knew, Navron Ponds, to inquire as to his compact status. In March, 1992, the lawyer spoke with defendant Susan Bishop, who is the director of the interstate compact program in South Carolina. Bishop allegedly told Ponds that plaintiff "was disapproved because there was a discrepancy about approving plaintiff['s] compact." The "discrepancy" was the fact that plaintiff owed the state of South Carolina eighty-six days of confinement from a previous sentence. Plaintiff claims Bishop told Ponds to contact defendants Cecil Magee and Frank Barton, who worked for the South Carolina Parole Department. Sometime in March, 1992, Ponds made some calls to Barton and Magee. A verbal agreement was reached, and plaintiff, upon speaking with Barton and Magee was told that his compact had been approved. He also was told that he should report to the South Carolina Department of Parole upon being released. Amend. Compl. at ¶¶ 5–7.

Prior to leaving the Lincoln Work Release Center, plaintiff processed paperwork related to his interstate compact. His paperwork was sent by Doe # 2 to defendant Joseph Williams, the superintendent of the center. Williams reviewed, signed and returned the paperwork to plaintiff. On May 1, 1992,

upon his release from the center, plaintiff traveled to South Carolina. Three days later, he entered a South Carolina parole office and promptly was arrested because of the eighty-six days of confinement that he owed the state. Plaintiff's paperwork was given to defendant John McMahan, a parole officer. Plaintiff claims that McMahan never returned this paperwork to him. On May 20, 1992, the state of South Carolina revoked plaintiff's parole and plaintiff was returned to prison to serve the eighty-six days that he owed. When he asked McMahan what would happen to his one year of parole from New York, the officer allegedly told him that his New York parole would run concurrently with his South Carolina parole, and that when he finished his South Carolina parole, he would not owe any parole whatsoever. Plaintiff served the eighty-six days he owed and was released on July 31, 1992. Amend. Compl. at ¶¶ 8–10.

In February, 1993, plaintiff was arrested on robbery charges in South Carolina. The charges ultimately were dropped, but he apparently encountered some difficulties regarding this arrest as a result of a parole hold that New York state had placed upon him. Bishop's office told him that it had nothing to do with his parole hold and that any problem that he had was between him and the state of New York. He talked to authorities in Albany, New York regarding the parole hold, but was not successful in his efforts to have the hold removed. On September 30, 1993, after had been extradited to New York as a fugitive from justice, plaintiff was given a preliminary hearing at Riker's Island, New York. The hearing officer found no probable cause that plaintiff had violated any condition of parole. He was released. Amend. Compl. at ¶¶ 11–14; Exs. C–J.

**\*5** Plaintiff claims that he would not have suffered hardships if his interstate compact had been handled correctly. He alleges that defendant Deborah Stewart failed to follow up and see whether plaintiff had arrived in South Carolina. If she had, he argues, she would have discovered that he had been arrested upon his arrival. He alleges that defendant Francis Herman, a parole officer at the Interstate Bureau failed to do his job by not investigating plaintiff's violation reports. Amend. Compl. at ¶¶ 15–17; Exs. F–I.

Plaintiff asserts that the foregoing amounts violations of his Eighth and Fourteenth Amendment rights, wherefore he both compensatory and declaratory relief.

## DISCUSSION

A. Motion to Dismiss by Williams and Peters.

Williams and Peters have filed a motion to dismiss plaintiff's complaint pursuant to FED.R.CIV.P. 12(b)(6) on the grounds that it fails to state a claim upon which relief may be granted. In a Rule 12(b)(6) motion, all factual allegations in the complaint must be taken and construed in plaintiff's favor. *See LaBounty v. Adler,* 933 F.2d 121, 122 (2d Cir.1991) (citing *Ortiz v. Cornette,* 867 F.2d 146, 149 (1989)). The Court's role is not to assess whether plaintiffs have raised questions of fact or demonstrated an entitlement to a judgment as a matter of law, as in a motion made pursuant to FED.R.CIV.P. 56 for summary judgment, but rather to determine whether plaintiff's complaint sufficiently alleges all of the necessary legal elements to state a claim under the law. *See Christopher v. Laidlaw Transit, Inc.* 899 F.Supp. 1224, 1226 (S.D.N.Y.1995), (citing *Ricciuti v. New York City Transit Authority,* 941 F.2d 119, 124 (2d Cir.1991)). Factual allegations in brief or memoranda may not be considered. *Fonte v. Board of Managers of Continental Towers Condominium,* 848 F.2d 24, 25 (2d Cir.1988). The Court now turns to the issues presented.

Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994). As superintendents at New York State Correctional facilities, Williams and Peter may be found personally involved in the alleged deprivation of plaintiff's constitutionally protected rights by a showing that they: (1) directly participated in the infraction; (2) knew of the infraction, but failed to remedy the wrong; (3) created or continued a policy or custom under which unconstitutional practices occurred; or (4) were grossly negligent in managing subordinates who caused unlawful conditions or events. *Id.,* (quoting *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)). Supervisory liability also may be imposed against Williams or Peters with a showing of gross negligence or deliberate indifference to plaintiff's constitutional rights. *Id.* Absent some personal involvement by Williams or Peters in the allegedly constitutionally infirm conduct of their subordinates, neither can be held liable under § 1983. *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987).

**\*6** Plaintiff has not provided any evidence linking either Williams or Peters to his alleged constitutional deprivations. All that plaintiff has alleged is that Williams and Peters, as superintendents, have reviewed and signed paperwork

**Brown v. Peters, Not Reported in F.Supp. (1997)**

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 442 of 449

relating to plaintiff's compact. Though it has long been held that *pro se* complaints are held to "less stringent standards than formal pleadings drafted by lawyers" for the purpose of a motion to dismiss under Rule 12(b)(6), *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 595–96, 30 L.Ed.2d 652 (1972), plaintiff has not explained how the ministerial conduct of these two defendants was violative of the Constitution. Their motion to dismiss should be granted.

**B. Motion for Summary Judgment or to Dismiss by Bishop, Magee, Barton and McMahan.**

Bishop, Magee, Barton and McMahan have filed a motion for summary judgment, or in the alternative a motion to dismiss. The Court will treat their motion as a motion to dismiss. "[C]omplaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning." *Barr v. Adams,* 810 F.2d 358, 363 (2d Cir.1987). Plaintiff has not alleged specifically how the conduct of these four defendants infringed upon his constitutional rights. In his amended complaint, he contends that defendants violated the Constitution by "continuously breaching [[[their] duty" to him. This language underscores the defect with the complaint: if it alleges anything at all, it alleges that defendants were negligent in handling plaintiff's interstate compact and parole. To state a cognizable § 1983 claim, the prisoner must allege actions or omissions sufficient to demonstrate deliberate indifference; mere negligence will not suffice. *Hayes v. New York City Dept. of Corrections,* 84 F.3d 614, 620 (2d Cir.1996); *Morales v. New York State Dep't of Corrections,* 842 F.2d 27, 30 (2d Cir.1988) (section 1983 does not encompass a cause of action sounding in negligence).

The Court finds that the claims against Bishop, Magee, Barton and McMahan should be dismissed.

**C. Motion to Dismiss by Herman, Stewart and Stanford.**

Plaintiff's claim against Stewart is that she failed to follow up and see whether plaintiff had arrived in South Carolina. Herman, he likewise asserts, failed to do his job because he did not investigate plaintiff's violation reports. Plaintiff has not alleged how these actions run afoul of the Constitution; and again, these claims seem to be grounded in negligence, which is not actionable under § 1983. *Hayes,* 84 F.3d at 620.

Plaintiff's claim against Stanford must fail because his complaint literally fails to state a claim against that

defendant. Aside from naming Stanford as a defendant, and alleging that he was the appointed Senior Parole Officer at plaintiff's September 30, 1993 revocation hearing at Riker's Island, plaintiff does not detail how Stanford violated his constitutional rights. Absent some personal involvement by Stanford in the allegedly constitutionally infirm conduct of his subordinates, he cannot be held liable under § 1983. *Gill,* 824 F.2d at 196.

**\*7** Accordingly, the Court finds that Stanford, Stewart and Herman's motion to dismiss should be granted.

**D. Plaintiff's "John Doe" Claims.**

In so far as neither John Doe # 1 nor John Doe # 2 have been identified and served in this matter, the Court does not have jurisdiction over these parties and does not reach the merits of plaintiff's claims against them.

**E. Discovery Motions.**

Defendants Bishop, Magee and McMahan have filed a motion to stay discovery until the Court has made a ruling on their motion to dismiss. Plaintiff has filed a motion to extend the time in which he may file opposition to defendants' motion. Plaintiff, however, has filed his opposing response (dkt.47), therefore his instant discovery motion is denied as moot. In that the Court recommends granting defendants' motion to dismiss, discovery in this matter would be fruitless. Accordingly, defendants' motion for a stay of discovery pending the resolution of their motion to dismiss is granted.

## CONCLUSION

WHEREFORE, based upon the foregoing analysis, it is hereby

ORDERED, that plaintiff's motion to extend the time to file an opposing reply (dkt.44) is denied as moot; and it is further

ORDERED, that defendants Bishop, Magee and McMahan's motion to stay discovery until their motion to dismiss is decided (dkt.41) is granted; and it is further

RECOMMENDED, that defendants Peters and Williams' motion to dismiss (dkt.13) be granted; and it is further

**Brown v. Peters, Not Reported in F.Supp. (1997)**

Case 3:24-cv-00037-DNH-ML    Document 9    Filed 06/11/24    Page 443 of 449

RECOMMENDED, that defendants Bishop, Magee, Barton and McMahan's motion to dismiss (dkt.20) be granted; and it is further

RECOMMENDED, that defendants Herman, Stewart and Stanford's motion to dismiss (dkt.34) be granted.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); FED.R.CIV.P. 6(a), 6(e) and 72.

**All Citations**

Not Reported in F.Supp., 1997 WL 599355

---

### Footnotes

1    I note, however, that the report-recommendation would survive even *de novo* review.

---

    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 444 of 449

Genco v. Sargent & Collins LLP, Not Reported in Fed. Supp. (2018)

2018 WL 3827742
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

Benedict R. GENCO, Plaintiff,

v.

SARGENT & COLLINS LLP, Defendant.

18-CV-0107-LJV-MJR
|
Signed 06/01/2018
|
Filed 06/04/2018

**Attorneys and Law Firms**

Benedict R. Genco, N. Tonwanda, NY, pro se.

Richard G. Collins, Sargent & Collins, LLP, Williamsville, NY, for Defendant.

REPORT AND RECOMMENDATION

HONORABLE MICHAEL J. ROEMER, United States Magistrate Judge

## INTRODUCTION

**\*1** This case has been referred to the undersigned pursuant to Section 636(b)(1) of Title 28 of the United States Code, by the Honorable Lawrence J. Vilardo, for hearing and reporting on dispositive motions for consideration by the District Court. Before the Court is defendant's motion to dismiss plaintiff's complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Dkt. No. 3). For the following reasons, it is recommended that defendant's motion to dismiss be granted and the complaint dismissed with prejudice.

## RELEVANT FACTS AND BACKGROUND

Plaintiff Benedict Genco ("plaintiff" or "Genco"), who is proceeding *pro se*, filed the instant complaint against the law firm of Sargent & Collins, LLP ("Sargent & Collins" or "defendant") on January 22, 2018. (Dkt. No. 1). The allegations in plaintiff's complaint are, in large part, difficult to follow or fully understand. In light of plaintiff's *pro se* status, the Court has attempted to discern

the causes of action asserted. Plaintiff's claims appear to be premised upon Sargent & Collins' legal representation of his employer, Starpoint Central School District ("Starpoint"), in or around January of 2017. (*Id.*). Plaintiff contends that, on account of his various disabilities, Starpoint placed him on administrative leave pursuant to Section 72 of the New York State Civil Service Law and forced him to undergo a fitness for duty medical examination. (*Id.*). He claims that by serving as legal counsel to Starpoint during this time, Sargent & Collins also discriminated and retaliated against him on the basis of his disabilities. [1] (*Id.*). Plaintiff alleges that Sargent & Collins contacted the doctor who performed the examination, that they engaged in the "unauthorized disclosure" of his medical records, and that they "assisted" Starpoint in placing him on unpaid leave. (*Id.*). Plaintiff indicates that the nature of his suit against Sargent & Collins is "disability discrimination, retaliation, providing unauthorized medical records and failure to accommodate." Genco's complaint further alleges that: (1) Starpoint failed to accommodate his disability with respect to boiler training; (2) his fitness for duty examination was improper because the doctor who performed the examination was not a physician; [2] and (3) the fitness for duty examination as well as his placement on administrative leave violated the New York State Civil Service Law and the New York State Education Law. (*Id.*).

**\*2** On February 20, 2018, Sargent & Collins filed the instant motion to dismiss the complaint on the basis that plaintiff fails to assert any viable claims for relief. (Dkt. Nos. 3-5). Plaintiff filed responses in opposition to the motion to dismiss. [3] (Dkt. Nos. 8, 10). The responses allege, for the first time, that Sargent & Collins committed the criminal offense of "offering a false instrument for filing" and that their motion to dismiss his complaint was untimely. Defendant filed a reply in further support of the motion to dismiss on March 29, 2017. (Dkt. No. 9). On April 16, 2018, this Court heard oral argument as to defendant's motion to dismiss. [4]

## DISCUSSION

A defendant may move to dismiss a complaint on the ground that the complaint fails to state a claim on which relief can be granted. *See* Fed. R. Civ. P. 12(b)(6). In order to state a claim on which relief can be granted, a complaint must contain, *inter alia*, "a short and plain statement of the claim showing that the pleader is entitled to relief." *See* Fed. R. Civ. P. 8(a)

Genco v. Sargent & Collins LLP, Not Reported in Fed. Supp. (2018)

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 445 of 449

(2). In reviewing a complaint in the context of a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the court must accept as true all factual allegations and draw all reasonable inferences from those allegations in favor of the plaintiff. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). Specifically, a complaint must plead "enough facts to state a claim to relief that is plausible on its face", *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), and must "allow[ ]the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The Supreme Court has further instructed that "[d]etermining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense ... [w]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Bell Atl. Corp.*, 550 U.S. at 679.

**\*3** Additionally, the court must be mindful when an individual is proceeding *pro se*. "[A] *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *see also Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) ("[T]he submissions of a *pro se* litigant must be construed liberally and interpreted to raise the strongest arguments that they suggest."). However, even a *pro se* complaint will be dismissed if it does not contain "sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face'." *Ashcroft*, 556 U.S. at 678; *quoting Bell Atl. Corp.*, 550 U.S. at 570.

In reviewing Genco's complaint and response to the motion to dismiss, the Court has accepted as true all factual allegations, drawn all inferences in plaintiff's favor, and held plaintiff's *pro se* pleadings to a less stringent standard than those drafted by an attorney. Moreover, the Court has attempted to interpret Genco's lengthy, disjointed and confusing allegations and arguments in a manner consistent with a claim or claims upon which relief may be granted. However, the Court concludes that plaintiff has not stated a claim for relief that is plausible on its face.

Genco alleges that his placement on administrative leave and the requirement that he undergo a fitness for duty examination amounted to disability discrimination by Starpoint, his employer. He contends that Sargent & Collins also discriminated and retaliated against him based upon his disabilities by providing legal representation to Starpoint at the time these actions were taken. Indeed, plaintiff cannot maintain a cause of action against Sargent & Collins pursuant to the Americans with Disabilities Act ("ADA"). Title I of the ADA prohibits employers from discriminating against a qualified individual with a disability in regard to any aspect of employment. 42 U.S.C. § 12112(a) ("no covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to ... the hiring, advancement, or discharge of employees ... and other terms, conditions, and privileges of employment."). Genco admits in his complaint that he is not a current or former employee of Sargent & Collins. Therefore, he cannot sue defendant for disability discrimination pursuant to Title I of the ADA.[5] *See Curry v. Town of Islip*, 13-CV-3597, 2017 U.S. Dist. LEXIS 203382, *10 (EDNY Dec. 8, 2017) (*sua sponte* recommendation that plaintiff's ADA claim be dismissed because she was not an employee or a former employee of defendant); *Lauria v. Donahue*, 438 F. Supp. 2d 131, 140 (EDNY 2006) (because plaintiff "was neither an employee, nor former employee of [the company], her claim under the ADA was dismissed."); *Morgenthal v. AT&T*, 97-CIV-6443, 1999 U.S. Dist. LEXIS 4294, at *4 (S.D.N.Y. 1999) (holding that because the plaintiff was not an employee of the defendant he could not be considered a "qualified individual" under the ADA).

Plaintiff also seems to claim that in providing legal representation to Starpoint and communicating with the doctor who performed the fitness for duty examination, Sargent & Collins "assisted" Starpoint in placing plaintiff on unpaid leave. His complaint further alleges, albeit in a vague and confusing manner, that Starpoint failed to accommodate his disability with respect to a boiler training. However, it is unclear exactly how Sargent & Collins was involved in the alleged failure to accommodate. For the reasons just stated, to the extent that plaintiff is claiming that he suffered adverse employment actions on account of his disabilities during his tenure at Starpoint, his cause of action rests with his employer and not his employer's legal counsel.[6]

**\*4** Further, even if plaintiff were able to bring a claim against Sargent & Collins under the ADA, Genco's conclusory allegations of discrimination fail to explain how benign actions taken by the law firm in course of representing a client, such as writing letters on behalf of their client or facilitating an independent medical examination and communicating the

results, are in any way discriminatory or otherwise connected to plaintiff's disabilities. *See Iqbal*, 556 U.S. at 678 (Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully harmed-me accusation ... [n]or does a complaint suffice if it tenders naked assertions devoid of further factual enhancement.") (internal citations and quotations omitted); *Reyes v. Fairfield Props.,* 661 F. Supp.2d 249, 268-269 (EDNY 2009) (conclusory statements that defendants retaliated and discriminated against plaintiff based upon race "do not establish plausibility on [their] face and are insufficient to satisfy even the liberal pleading standards under *Rule 8(a)* and *Iqbal*.").

Genco's allegations that Sargent & Collins was involved in the "unauthorized disclosure" of his medical information also fail to state a claim under federal law. Even if the Court were to construe these vague allegations as a claim under the Health Insurance Portability and Accountability Act ("HIPAA"), no such cause of action exists here. Sargent & Collins is not a health care provider and HIPAA does not provide private rights of action to individuals. *See Mathie v. Lawrence Womack,* 14-CV-6577, 2015 U.S. Dist. LEXIS 11266 (EDNY Jan. 29, 2015) (there is no private right of action under HIPAA and HIPAA enforcement actions are "in the exclusive purview of the Department of Health and Human Services"); *Hunt v. Conry, Simberg, Gannon, Drevans, Abel, Lurvey, Morrow & Schefer, P.A.*, 13-CV-1493, 2013 U.S. Dist. LEXIS 187052 (NDNY Dec. 11, 2013) (dismissing plaintiff's claim that law firm defendant disclosed medical information about plaintiff during the law suit because "the law firm is certainly not a health care provider, and plaintiff has no private right of action under HIPAA.").

Finally, to the extent plaintiff is attempting to assert causes of action based upon allegations that Sargent & Collins filed an untimely motion to dismiss or offered "a false instrument for filing", his claims lack even an arguable basis in law or fact. Offering a false instrument for filing is a violation of Section 175.35 of the New York State Penal Law, for which there is no private right of action. Furthermore, the record is bereft of evidence that defendant filed any document containing false or fraudulent information. Likewise, no cause of action exists for the untimely filing of a motion to dismiss a complaint nor is the instant motion to dismiss untimely. Genco served the summons and complaint on defendant on January 30, 2018. (Dkt. No. 2). Rule 12 of the Federal Rules of Civil Procedure indicates that a party has twenty-one days to answer or move to dismiss a complaint. *See* Fed. R. Civ. P 12(a). Rule 5 of the Federal Rules of Civil Procedure provides that service

is "complete upon mailing." *See* Fed. R. Civ. P. 5(b)(2)(C). Defendant filed the motion and mailed a copy to plaintiff on February 20, 2018, which is twenty-one days after the motion to dismiss was served.

For these reasons, the Court finds that plaintiff has not alleged a claim for relief that is plausible on its face and recommends that the complaint be dismissed. The Court now turns to whether the complaint should be dismissed with or without prejudice. The Second Circuit has advised that "[a] *pro se* complaint should not be dismissed without the Court's granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013) (internal citations omitted). However, leave to replead may be denied where it is apparent that no amendments would cure the deficiencies of the pleading and an attempt to replead would be futile. *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) ("The problem with [plaintiff's] cause[ ] of action is substantive; better pleading will not cure it. Repleading would thus be futile. Such a futile request to replead should be denied."). *See also Hayden v. Cnty. of Nassau*, 180 F.3d 42, 53 (2d Cir. 1999) ("[W]here the plaintiff is unable to demonstrate that he would be able to amend his complaint in a manner which would survive dismissal, opportunity to replead is rightfully denied."). Here, the Court cannot identify any allegations in plaintiff's complaint that, even if properly pled, would constitute a viable claim under the law. The deficiencies are substantive in nature and cannot be remedied by amendment or repleading. Therefore, it is recommended that plaintiff's complaint against Sargent & Collins be dismissed with prejudice.

## CONCLUSION

**\*5** For the foregoing reasons, it is recommended that Sargent & Collins, LLP's motion to dismiss the complaint be granted and the complaint dismissed with prejudice. (Dkt. No. 3).

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby **ORDERED** that this Report, Recommendation and Order be filed with the Clerk of Court.

Unless otherwise ordered by Judge Vilardo, any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a), and 6(d) of the Federal Rules of Civil Procedure,

and W.D.N.Y. L. R. Civ. P. 72. Any requests for an extension of this deadline must be made to Judge Vilardo.

***Failure to file objections, or to request an extension of time to file objections, within fourteen days of service of this Report and Recommendation WAIVES THE RIGHT TO APPEAL THE DISTRICT COURT'S ORDER.*** *See* *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989).

The District Court will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the Magistrate Judge in the first instance. *See* Paterson–Leitch Co. v. Mass. Mun. Wholesale Elec. Co., 840 F.2d 985, 990-91 (1st Cir. 1988).

*Finally, the parties are reminded that, pursuant to W.D.N.Y. L.R.Civ.P. 72(b), written objections "shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection, and shall be supported by legal authority." Failure to comply with these provisions may result in the District Court's refusal to consider the objection.*

**SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2018 WL 3827742

## Footnotes

1    Genco has filed a separate suit in this Court against Starpoint alleging employment discrimination, retaliation and failure to accommodate in violation of the Americans with Disabilities Act. (*See* *Genco v. Starpoint Central School District*, Case No. 1:17-CV-01168). Starpoint moved to dismiss plaintiff's *pro se* complaint. Today, the Court issued a Report recommending that Starpoint's motion to dismiss plaintiff's complaint be denied. (Case No. 1:17-CV-01168, Dkt. No. 26). Plaintiff further filed suit, also on a *pro se* basis, against the law firm of Webster Szanyi LLP. (*See* *Genco v. Webster Szanyi, LLP*, Case No. 1:18-CV-00093). Webster Szanyi, who is representing Starpoint in the course of plaintiff's employment discrimination lawsuit, moved to dismiss the complaint. Today, this Court issued a Report recommending that the complaint against Webster Szanyi be dismissed with prejudice. (*Id.* at Dkt. No. 18). It is also noted that plaintiff filed a previous employment discrimination lawsuit against Starpoint, in this Court, in March of 2013. In February of 2015, the Honorable William M. Skretny granted summary judgment in favor of Starpoint. *See Genco v. Starpoint Central School District*, 1:13-CV-301, 2015 WL 540217 (WDNY Feb. 10, 2015).

2    The complaint states that Michael P. Santa Maria, Ph.D. performed plaintiff's medical examination. (Dkt. No. 1). Defendant's response papers indicate that Dr. Santa Maria is a board-certified neuropsychologist and that he performed a neuropsychological evaluation and independent medical examination of plaintiff. (Dkt. No. 5).

3    The allegations and arguments in plaintiff's responses, like those in his complaint, lack clarity or coherence. His disjointed narrative sets forth a litany of grievances against Starpoint, Sargent & Collins, and Dr. Santa Maria. He attaches various documents including letters from Sargent & Collins and Starpoint relative to his leave and fitness for duty examination, Dr. Santa Maria's report from his neuropsychological evaluation and independent medical examination, a "transcript" of the medical examination that plaintiff transcribed himself, HIPAA releases provided to Dr. Santa Maria, plaintiff's individualized education plan from when he was enrolled in the Starpoint School District, internet research regarding Dr. Santa Maria's practice and areas of specialty, a decision in a prior federal lawsuit filed by plaintiff against Starpoint, and information regarding the elements of the crime of filing a false instrument. As best the Court can ascertain, plaintiff's chief complaint against defendant is that by providing legal representation to Starpoint when plaintiff was placed on administrative leave, Sargent & Collins discriminated against him.

Case 3:24-cv-00037-DNH-ML   Document 9   Filed 06/11/24   Page 448 of 449

**Genco v. Sargent & Collins LLP, Not Reported in Fed. Supp. (2018)**

4    Also at that time, this Court heard oral argument as to the motion to dismiss and a request for a filing injunction on behalf of Starpoint in *Genco v. Starpoint Central School District*, and oral argument as to the motion to dismiss in *Genco v. Webster Szanyi LLP.*

5    Likewise, the facts of this lawsuit have nothing to do with the other four titles of the ADA, which prohibit disability discrimination in: (1) access to public services, programs and activities provided by public entities (Title II); (2) access to public accommodations, such as hotels and theaters, provided by private entities (Title III); and (3) telecommunications (Title IV). *See* 42 U.S.C. §§ 12101-12213.

6    Similarly, plaintiff has failed to establish any viable claim for relief against Sargent & Collins based upon his allegations that the doctor who performed the fitness for duty examination was not a physician and that the examination was not performed in accordance with the New York State Civil Service Law or New York State Education Law. Plaintiff acknowledges in his complaint that Starpoint, his employer, placed him on administrative leave and sent him for a medical examination. No cause of action exists against Sargent & Collins for their role in facilitating the medical examination or communicating Starpoint's position to plaintiff or others. *See Hills v. Praxair, Inc.*, 11-CV-678, 2012 U.S. Dist. LEXIS 74125 (WDNY May 29, 2012) (dismissing plaintiff's complaint against the attorneys who represented his employer in defense of plaintiff's EEOC charge because, *inter alia*, statements made in quasi-judicial proceedings, such as arguments submitted in response in an EEOC charge or while representing a client at a hearing, are protected by absolute privilege).

---

**End of Document**    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 2673753
Only the Westlaw citation is currently available.
United States District Court,
N.D. Texas,
Dallas Division.

John-Pierre BANEY, Plaintiff,
v.
Michael MUKASEY, Defendant.

Civil Action No. 3:06-CV-2064-L.
|
June 30, 2008.

*** Start Section

... 2007, the District Court accepted a recommendation
to dismiss Plaintiff's USERRA claims pursuant to Rule
12(b)(1) and to dismiss Plaintiff's Title VII claims against
all defendants except Attorney General Alberto Gonzalez
pursuant to *Rule 12(b)(6) of the Federal Rules of Civil
Procedure. Baney v. Gonzales,* 2007 WL 1944462, at *8
(N.D.Tex. June 27, 2007). On March 14, 2008, the District
Court accepted a recommendation to dismiss Plaintiff's No
FEAR Act claim pursuant to Rule 12(b)(6) and to grant
summary judgment in favor of Defendant Michael Mukasey
("Defendant") on Plaintiff's Title VII claims related to the
falsification of government documents, AWOL status, annual
and sick leave, and seniority in work schedule (claims 1, 2, 4,
and 5). *Baney v. Mukasey,* 2008 WL **706917**, at *13 (N.D.Tex.
Mar.14, 2008).

Remaining for determination are Plaintiff's Whistleblower
Protection Act ("WPA") claim and his Title VII claim
regarding the suspension of his medical, dental, and life
insurance benefits (claim 3). Defendant filed the instant
motion for summary judgment on May 2, 2008; Plaintiff
did not file a response.[2] The motion is now ripe for
determination.

## II. STANDARD OF REVIEW

Summary judgment is appropriate when the pleadings and
evidence on file show that no genuine issue exists as to any
material fact and that the moving party is entitled to judgment
as a matter of law. Fed.R.Civ.P. 56(c). "[T]he substantive law
will identify which facts are material." *Anderson v. Liberty*

*Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d
202...